**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| DEARREA KING, | Case No. 2:18-cv-1060 |
| Plaintiff, | |
| | Judge Edmund A. Sargus |
| v. | |
| | Chief Magistrate Judge |
| | Elizabeth A. Preston Deavers |
| CITY OF COLUMBUS, OHIO, et al., | |
| | **MOTION FOR SUMMARY** |
| Defendants. | **JUDGMENT OF DEFENDANT** |
| | **BRYAN MASON** |

Pursuant to Rule 56(a) of the Federal Rules of Civil Procedure, Defendant Bryan Mason moves this Court for summary judgment on all claims asserted against him in this action by Plaintiff Dearrea King, Administrator of the Estate of Tyre King. A memorandum in support of this motion is attached, and supporting exhibits have been filed together and separately.

Respectfully submitted,

/s/ Westley M. Phillips
Westley M. Phillips (0077728)
Assistant City Attorney
City of Columbus, Department of Law
77 North Front Street, Columbus, Ohio 43215
(614) 645-7385 / (614) 645-6949 (fax)
wmphillips@columbus.gov
Attorney for Defendants

## TABLE OF CONTENTS

TABLE OF CONTENTS ........................................................................................................ i

I.    INTRODUCTION ................................................................................................. 1

II.   SUMMARY OF THE ARGUMENT ..................................................................... 1

III.  STATEMENT OF FACTS ..................................................................................... 2

      A.    THE ARMED ROBBERY ............................................................................... 2

      B.    OFFICER MASON .......................................................................................... 8

      C.    THE SHOOTING ........................................................................................... 10

      D.    OTHER WITNESSES .................................................................................... 14

            1.    CPD Officer Robert Reffitt ........................................................... 14

            2.    Demetrius Braxton ......................................................................... 15

            3.    William Scott .................................................................................. 16

            4.    Anna Skora ..................................................................................... 17

      E.    KING'S GUN ................................................................................................. 20

      F.    ACTION V. REACTION .................................................................................. 20

      G.    MELVIN TUCKER ........................................................................................ 22

      H.    THE AFTERMATH ....................................................................................... 23

IV.   LEGAL STANDARD ........................................................................................... 23

V.    LAW & ARGUMENT .......................................................................................... 24

      A.    PLAINTIFF'S FEDERAL CLAIMS .............................................................. 24

            1.    Plaintiff's Fourth Amendment Claim Fails ................................ 25

            2.    Plaintiff's Equal Protection Claim Fails .................................... 30

            3.    Plaintiff's Denial of Medical Care Claim Fails ......................... 32

      B.    PLAINTIFF'S STATE LAW WRONGFUL DEATH CLAIM ........................ 33

            1.    Plaintiff's State-law Claim Is Barred by O.R.C. § 2307.60(B)(2) ....... 33

            2.    Officer Mason is Entitled to Statutory Immunity ..................... 37

VI.   CONCLUSION ..................................................................................................... 38

## MEMORANDUM IN SUPPORT

### I.    INTRODUCTION

This civil action arises out of the September 14, 2016 police-involved shooting death of 13-year-old Tyre King. *See* COMPLAINT ¶1 (R.1 #2). On September 14, 2018, the administrator of King's estate, Plaintiff Dearrea King, filed a complaint against Defendant Bryan Mason. *See id*. Plaintiff alleges that Mason violated King's Fourth and Fourteenth Amendment rights. Plaintiff also asserts a state-law claim against Mason for wrongful death under O.R.C. § 2125.01.

This was an unquestionably tragic loss of life, but as demonstrated below, Officer Mason's conduct was objectively reasonable under the circumstances that he faced.

### II.    SUMMARY OF THE ARGUMENT

Officer Mason is entitled to summary judgment on Plaintiff's excessive force claim because his use of force was reasonable under the Fourth Amendment. He is also entitled to qualified immunity because he did not violate any clearly established constitutional right. Mason was pursuing two suspects from an armed robbery and was giving verbal commands for them to stop and get down. King resisted Mason's commands started to draw what appeared to be a deadly weapon from his waistband. A reasonable officer would have probable cause to believe that King posed a threat of death or serious physical injury to Mason and others when Mason used deadly force. **(Pages 24 to 30).** Primary Sources: *Tennessee v. Garner*, 471 U.S. 1 (1985); *Graham v. Connor*, 490 U.S. 386 (1989).

Officer Mason is entitled to summary judgment and qualified immunity on Plaintiff's Equal Protection claim. King's race played no role in Mason's actions. Mason attempted to take King into custody because of the armed robbery. Mason used deadly force to stop the deadly threat

posed by King. **(Pages 30 to 32).** Primary Sources: *Whren v. United States*, 517 U.S. 806 (1996); *Bennett v. City of Eastpointe*, 410 F.3d 810 (6th Cir. 2005).

Officer Mason is entitled to summary judgment and qualified immunity on Plaintiff's denial of medical care claim. Officer Robert Reffitt aired for a medic immediately after the shooting, which Mason would have heard being aired. Officer Mason could see that nothing would delay the paramedics from reaching King. **(Pages 32 to 33).** Primary Source: *Stevens-Rucker v. City of Columbus*, 739 Fed. Appx. 834 (6th Cir. 2018).

Officer Mason is entitled to summary judgment on Plaintiff's state-law wrongful death claim. Officer Mason acted lawfully and reasonably during the incident. The claim is barred by O.R.C. § 2307.60(B)(2) because King's death was a proximate result of King's commission of a felony. Furthermore, statutory immunity shields Officer Mason from the wrongful death claim for the same reasons qualified immunity shields him from the undue-force claim. **(Pages 33 to 38).** Primary Sources: O.R.C. § 2307.60(B)(2); O.R.C. § 2744.03(A)(6).

## III.    STATEMENT OF FACTS

### A.  THE ARMED ROBBERY

On September 14, 2016, King, 19-year-old Demetrius Braxton, 16-year-old Jaronn Collins, 14-year-old AB and 12-year-old PR were driving around in a car that PR had stolen from her mother. BRAXTON DEP. 29, 40, 43-44, 51 (R.127-1 #1545, 1556, 1559-60, 1567); A.B. DEP. 12-13, 18-20 (R.125-1 #1375-79).  The entire group, including King, knew the car was stolen but merely laughed at PR's family's numerous attempts to locate her and the car. BRAXTON DEP. 56-60 (R.127-1 #1572-76).  According to Braxton, "In the type of environment we live in, it's natural for people to steal people's cars or steal their family's car and drive around in it...To me, killing

somebody is not a big deal. So stealing a car is…not even on my radar."[1] BRAXTON DEP. 173 (R.127-1 #1689).

With the 12-year-old driving the group in the stolen car, King, Braxton, and Collins started talking about guns. BRAXTON DEP. 181-182 (R.127-1 #1697-98). During this conversation, they handled an air-pistol that was in King's possession and agreed the pistol looked like an actual firearm, with Collins specifically stating that "nobody else will know" that King's gun was a BB gun. BRAXTON DEP. 69-70, 76-77, 181-184 (R.127-1 #1585-86; 1592-93; 1697-1700); BRAXTON DEP. EX. H (R.127-9 #1858).

When the group realized the car was running low on gas, they hatched a plan to use King's gun to commit an armed robbery to get gas money. BRAXTON DEP. 185-188 (R.127-1 #1701-04). Braxton describes King's participation in the planning of the robbery as follows:

Q. What did Tyre say about the robbery?

A. Tyre was always agreeing with him.

Q. Who is "him"?

A. Jaronn.

Q. Okay.

A. So he was all for it. That was his right-hand man, his best friend. So when Jaronn said it, he was like, "All right. Let's do it."

Q. So when Jaronn said, "Let's rob somebody," Tyre said, "All right. Let's do it." Right?

A. Yes. Basically, in so many words.

---

[1] Minors' names have been redacted in Braxton's deposition transcript. Furthermore, due to the highly sensitive and deeply disturbing nature of Braxton's testimony regarding his acts leading up to the incident and the days that followed, additional portions of his deposition transcript have been redacted to protect others. For the same reason, BRAXTON DEP. EXS. K, S1, S2 were not filed. Defendants can provide the Court with unredacted copies upon request.

Q. And then, specifically, when you're talking about the robbery, everybody decided that Jaronn was going to use Tyre's gun to commit the robbery to get gas for this car; correct?

A. Yeah. Yes.

BRAXTON DEP. 188 (R.127-1 #1704).

The group parked the car in the area of South 18th Street and East Capital Street. BRAXTON DEP. 192, 271, 294-295 (R.127-1 # 1708, 1787, 1810-11); PIS TMK Video 25 (OCIC PIS TMK Video 12 Clip) (0:00:01 to 0:01:22).[2] After they exited the car, King took the gun from his waistband and gave it to Collins for the robbery. BRAXTON DEP. 192 295 (R.127-1 #1708, 1811); PIS TMK Video 25 (OCIC PIS TMK Video 12 Clip) (0:00:40 to 0:00:50). They then walked in a group towards South 18th Street to commit the robbery. BRAXTON DEP. 110, 295, 298-99 (R.127-1 # 1626, 1811, 1814-15); BRAXTON DEP. EX. BB (R.127-27 #1884); PIS TMK Video 25 (OCIC PIS TMK Video 12 Clip) (0:00:51 to 0:01:19); PIS TMK Video 24 (OCIC PIS TMK Video 01 Clip) (0:00:01 to 0:01:05). Braxton describes the robbery as follows:

A. We walked down the street. We probably didn't even get that far away from the car. First they asked a white female, and she kept pushing—

Q. When you say "they," who is that?

A. Jaronn asked a white female, and she kept it pushing, moving fast. She knew what was going on, so she started speed walking and got away. That's when we was closer to Broad Street still.

Q. So if she would have stopped, she would have been the robbery victim?

A. More than likely, yes, she would have been the robbery victim.

BRAXTON DEP. 104 (R.127-1 #1620).

Q. So Jaronn had Tyre's gun when he was asking people what time it was; correct?

---

[2] The audio/visual files cited in this memorandum can be found on a flash drive that Defendants manually filed with the Court.

A. Yes.

Q. And how was Jaronn carrying the gun?

A. Concealed to his side.

Q. In his pants or out of his pants?

A. Out of his pants.

Q. Outside of his pants?

A. Yes.

Q. So he's holding it in his hand, down to his side?

A. Yeah.

Q. Kind of like straight arming the gun?

A. Something like that.

Q. All right. But it was out in the open; correct?

A. Yes. It was in the open.

Q. All right.

A. I think that's why the other girl got going, though, the other woman. She probably saw it.

Q. So the first girl Jaronn asked what time it was, you think she probably saw the gun and figured, "This is not a good idea. I'm about to get robbed"?

A. Yeah.

Q. And that was before Mr. Ames came down the street; correct?

A. Yeah.

BRAXTON DEP. 220-221 (R.127-1 #1736-37).

A. [W]e are probably walking right past 19th Street now. That's when we saw Michael Ames. He asked him, again, "What time is it?" He shrugged his shoulders, like, I don't know. He said, "Aww, Man, what time is it? Come on, Bro, you got a watch on." He said, "I don't know," and kept it moving.

BRAXTON DEP. 105 (R.127-1 #1621).

5

Q. So when Jaronn Collins asked Michael Ames, "What time is it," he was trying to lure him close to rob him at gunpoint; correct?

A. He was trying to make him stop so he could get closer to him.

Q. And then to rob him at gunpoint; correct?

A. Yes.

Q. All right. And then when you say that Jaronn chickened out, Jaronn then did not pull out the gun and point it at Michael Ames; correct?

A. Correct.

Q. And that—

A. He said he didn't want to do it, so I took the gun and did it.

BRAXTON DEP. 27-28 (R.127-1 #1543-44).

A. I'm like, "Man, give me the gun." I snatched the gun and I ran up on the dude and robbed him.

Q. And when you robbed him, specifically what did you say?

A. "Don't move or I'm going to blow your fucking head off," was my words. "Give me everything." He was going to give me his phone and his wallet and shit. I just took the money and said, "Keep everything else."

BRAXTON DEP. 105 (R.127-1 #1621).

Q. And you did that while pointing the gun at his head; correct?

A. Yes.

BRAXTON DEP. 28, 299-300 (R.127-1 #1544, 1815-16); BRAXTON DEP. EX. CC (R.127-28 #1885);

BRAXTON DEP. EX. EE (R.127-30 #1887); PIS TMK Video 24 (OCIC PIS TMK Video 01 Clip)

(0:03:20 to 0:03:30).

Braxton then ordered Ames to turn around and walk away and threatened, "Don't turn

around at all or I'll blow your head off." BRAXTON DEP. 193-195, 299 (R.127-1 #1709-11, 1815);

BRAXTON DEP. EX. DD (R.127-29 #1886); PIS TMK Video 24 (OCIC PIS TMK Video 01 Clip)

(0:03:31 to End). Braxton committed the robbery wearing jeans and a black hoodie, which was

6

covering his face, in an attempt to prevent his victim from identifying him. BRAXTON DEP. 26, 62 (R.127-1 #1542, 1578). Bystanders witnessed the robbery, called 911, and along with the robbery victim, provided a real-time narration of the rest of the incident. AUDIO 01 2016-09-14 911 CALL; MORRIS AFF. ¶¶ 6-7 (attached as MASON MSJ EX. A).

Immediately after robbing Ames, Braxton handed the stolen money to PR and the gun to King. BRAXTON DEP. 13, 201-202 (R.127-1 #1529, 1717-18). "I gave him back his gun. He tucked it back into the front of his pants." BRAXTON DEP. 103 (R.127-1 #1619). Braxton then hid his hoodie and jeans under a nearby Red Cross van, remaining in a black t-shirt and shorts, so as to confuse any responding police officers as to who committed the robbery. BRAXTON DEP. 21, 198-199, 296-97 (R.127-1 #1537, 1714-15, 1812-13); BRAXTON DEP. EX. E (R.127-6 #1855); BRAXTON DEP. EX. U (R.127-20 #1877); BRAXTON DEP. EX. V (R.127-21 #1878); BRAXTON DEP. EX. W (R.127-22 #1879). As this was occurring, Collins, King, and PR retrieved the stolen car and drove to pick up Braxton and AB in the alley that is South 19th Street. BRAXTON DEP. 21-23, 196-200 (R.127-1 #1537-39, 1712-16); BRAXTON DEP. EX. D (R.127-5 #1854); BRAXTON DEP. EX. E (R.127-6 #1855); BRAXTON DEP. EX. F (R.127-7 #1856); BRAXTON DEP. EX. G (R.127-8 #1857); PIS TMK Video 25 (OCIC PIS TMK Video 12 Clip) (0:08:31 to End).

On South 19th Street, Braxton, Collins, and King stood outside of the car and joked about how easy the robbery was to commit until "Tyre said, 'Man, that's the boys. Run.' So we all took off…The boys are the police officers. So me, Jaronn, and Tyre took off. Tyre followed me and Jaronn split the other way." BRAXTON DEP. 201, 203 (R.127-1 #1717, 1719). PR drove AB away

from the scene in the stolen car.[3] AB DEP. 82 (R.125-1 #1380). Braxton and King were chased on foot by responding police officers. BRAXTON DEP. 206-211 (R.127-1 #1722-27). King's gun was pulling his pants down as he ran so he held the front of his pants with his elbow "bent out" "as [if] he was holding onto something." BRAXTON DEP. 274-276 (R.127-1 #1790-92); PIS TMK Video 07 Braxton #4 Pt.1 (161025) (2:28:27 to 02:28:45). "[The gun] was pulling his pants down. He had to hold his pants to run." BRAXTON DEP. 275 (R.127-1 #1791). Braxton and King hopped over two wooden privacy fences and were confronted by Officer Mason. BRAXTON DEP. 47, 297-98 (R.127-1 #1563, 1813-14); BRAXTON DEP. EX. X (R.127-23 #1880); BRAXTON DEP. EX. Y (R.127-24 #1881); BRAXTON DEP. EX. Z (R.127-25 #1882); BRAXTON DEP. EX. AA (R.127-26 #1883).

### B. OFFICER MASON

Officer Mason was working with a partner, Officer Robert Reffitt, in Car 7514, a clearly identifiable marked Columbus police cruiser. MASON AFF. ¶ 5 (attached as MASON MSJ EX. B); MASON DEP. 44 (R.132-1 #2635). Reffitt was driving the cruiser with Mason as the passenger. MASON AFF. ¶ 5; MASON DEP. 53 (R.132-1 #2644). The officers were wearing uniforms that clearly identified them as Columbus Police officers. MASON AFF. ¶ 6; MASON AFF. EX. 2 (Photo). Mason was carrying his Division issued Smith & Wesson, Model M&P, .40 caliber pistol, loaded with Division issued ammunition. MASON AFF. ¶ 7.

Shortly after 7:43 p.m., Reffitt and Mason responded to a dispatched call of an armed robbery occurring in the area of 18th Street and East Broad Street. MASON AFF. ¶ 8; MASON DEP.

---

[3] After driving away from the scene, PR used the money from the robbery to buy gas for the stolen car. AB DEP. 82-83 (R.125-1 #1380-81). The car was recovered the next day after PR led police officers on a dangerous high-speed chase through the streets of Columbus. AB DEP. 91-95 (R.125-1 #1382-86); AB DEP. EX. I [Video 3, CVS Unit 73A (Start to 9:41:120; Video 2 (9:42:00 to 9:42:35)] (The folder labeled "Viewer Files" contains an AVViewer player. The player needs to be opened first, then the two video files can be opened and played on the player).

52 (R.132-1 #2643). Mason heard the following information aired over the police radio at the following times:

a.  7:43:06 p.m. "Radio to 9070 and 9111 if I could get your help on 12 Precinct. Are there any cars on 12 that can clear up? S12 if you could copy. I'm getting a 41 at 18th and East Broad."[4]

b.  7:43:15 p.m. "Have 33 point. Still waiting on additional. Saying that they are eastbound. Direction of travel is eastbound on foot. Suspect is a male black. Dark hoodie. Baggy pants."[5]

c.  7:44:23 p.m. "Cars on the 41, they are saying the suspect is going to be part of a group of 7 to 8 people."[6]

d.  7:45:05 p.m. "Cars on the 41, looks like he ran eastbound through the Red Cross lot toward Bryden and Oak."[7]

e.  7:45:19 p.m. "Nelson special. They're saying there are four kids all together. They're headed in a southeast direction."[8]

f.  7:45:34 p.m. "Hey chopper, we have a 41 at 18th and East Broad Street. 33 point. Suspect is going to be a male black. Dark hoodie. Baggy pants. And went eastbound on foot. And he's in a group of four kids."[9]

g.  7:45:53 p.m. "Understand. 18th and East Broad. We're coming from 8 Precinct. What was the description again?"[10]

h.  7:46:03 p.m. "Male black. Dark hoodie. Baggy pants."[11]

i.  7:46:10 p.m. "Male black. Dark hoodie. Black pants. And did we get a direction of travel?"[12]

j.  7:46:18 p.m. "Eastbound on foot."[13]

---

[4] AUDIO 02 2016-09-14_19.43.06_Ch63. A "41" is a call of a robbery that had just occurred. MASON AFF. ¶ 8; MASON AFF. EX. 1 (CPD's Ten Code).
[5] AUDIO 03 2016-09-14_19.43.15_Ch63. A "33 point" is a CPD reference to someone pointing a gun. MASON AFF. ¶ 8; MASON AFF. EX. 1 (CPD's Ten Code).
[6] AUDIO 04 2016-09-14_19.44.23_Ch63.
[7] AUDIO 05 2016-09-14_19.45.05_Ch63.
[8] AUDIO 06 2016-09-14_19.45.19_Ch63.
[9] AUDIO 07 2016-09-14_19.45.34_Ch63.
[10] AUDIO 08 2016-09-14_19.45.53_Ch63.
[11] AUDIO 09 2016-09-14_19.46.03_Ch63.
[12] AUDIO 10 2016-09-14_19.46.10_Ch63.
[13] AUDIO 11 2016-09-14_19.46.18_Ch63.

MASON AFF. ¶ 8; MASON DEP. 52 (R.132-1 #2643). As they drove to the location of the robbery, Officer Mason informed Officer Reffitt of the additional information that was being posted on their cruiser's computer and that is contained in MASON AFF. EX. 3. MASON AFF. ¶ 9; MASON DEP. 53 (R.132-1 #2644).

As Mason and Reffitt approached the vicinity of the robbery, Reffitt turned southbound on Hoffman Avenue, which is one block east of South 18th Street. MASON AFF. ¶ 10; MASON AFF. EXS. 4 & 5; MASON DEP. 53 (R.132-1 #2644). Almost immediately after making the turn onto Hoffman Avenue, Mason saw a northbound Columbus Police cruiser approximately one block south, quickly coming to a stop. MASON AFF. ¶ 11; MASON DEP. 53 (R.132-1 #2644). Both of the cruiser doors opened, and two officers exited and ran directly westbound between houses on the west side of the street. MASON AFF. ¶ 11; MASON DEP. 53 (R.132-1 #2644). Officer Reffitt stopped their own cruiser just south of East Capital Street, which is an alley that runs parallel to and is directly south of East Broad Street. MASON AFF. ¶ 11; MASON AFF. EXS. 4 & 6; MASON DEP. 54 (R.132-1 #2645). Mason believed that the officers from the other cruiser were pursuing the robbery suspects, and he quickly exited the cruiser and told Reffitt that they were running westbound. MASON AFF. ¶ 12; MASON DEP. 54 (R.132-1 #2645). Mason ran westbound on East Capital Street thinking that he might be able to stop the suspects if they turned north and away from the other officers. MASON AFF. ¶ 12; MASON AFF. EX. 7; MASON DEP. 54 (R.132-1 #2645). Having knowledge that the suspects were wanted for an armed robbery committed with a gun, he drew his duty weapon as he ran westbound in the alley. MASON AFF. ¶ 12.

### C. THE SHOOTING

Mason approached South 19th Street, which is another alley that runs south from East Capital Street behind the houses on the west side of Hoffman Avenue. MASON AFF. ¶ 13; MASON DEP. 55 (R.132-1 #2646). Mason saw a wooden privacy fence along the west side of South 19th

Street. MASON AFF. ¶ 13. He looked south on South 19th Street and immediately saw Braxton and King running northbound, at a full sprint, directly toward him. MASON AFF. ¶ 14; MASON DEP. 55 (R.132-1 #2646). Braxton was running about 5 feet ahead and to the left (northwest) of King. MASON AFF. ¶ 14; MASON DEP. 55 (R.132-1 #2646). Mason moved a few steps south near the center of South 19th Street, raised his gun, and began shouting "Get down!" or "Get on the ground!" MASON AFF. ¶ 15; MASON DEP. 56 (R.132-1 #2647). Almost immediately after he shouted these commands, Braxton dropped down onto his chest near the middle of South 19th Street, with his hands open and his arms spread out to the sides of his head. MASON AFF. ¶ 15; MASON DEP. 55 (R.132-1 #2646).

King was running to the right and slightly behind (southeast of) Braxton. MASON AFF. ¶ 16. King was wearing a light colored shirt,[14] and when Mason started to shift his focus to King, Mason could immediately see the grip of a handgun that was tucked into King's front waistband. MASON AFF. ¶ 16; MASON DEP. 56 (R.132-1 #2647). As Mason repeatedly shouted "Get down!" King continued running, veering northeast toward a car that was parked, facing south, in a small parking area located on the southeast corner of East Capital Street and South 19th Street. MASON AFF. ¶ 17; MASON AFF. EXS. 8, 9, 10; MASON DEP. 56 (R.132-1 #2647). Mason thought King was going to run past the driver's side of the parked car, but King came to a stop with a quick stutter step—facing north—approximately 3 feet in front of the car on the driver's side. MASON AFF. ¶ 18; MASON DEP. 56-57 (R.132-1 #2647-48). King looked directly at Mason before he grabbed the grip of the handgun in his waistband and tugged on it. MASON AFF. ¶ 18; MASON DEP. 57 (R.132-1 #2648).

---

[14] BRAXTON DEP. 265-66 (R.127-1 #1781-82); BRAXTON DEP. EX. P-001, 003 (R.127-16 #1868, 1870).

Mason kept yelling "Get down! Get down! Get down!" MASON DEP. 57 (R.132-1 #2648). But King forcefully tugged on the grip of his gun at least one or two more times as if it were snagged on something. MASON AFF. ¶ 20; MASON DEP. 57, 60 (R.132-1 #2648, 2651). In that instant, King's refusal to comply with Mason's commands, and his continuing attempts to pull the gun out, caused Mason to believe that King was going to engage him in a gun fight. MASON AFF. ¶ 20; MASON DEP. 112 (R.132-1 #2703). King then pulled the gun out of his waistband and, as he raised it up in front of his torso, Mason could see it had a laser sight or light attached to the bottom of the barrel. MASON AFF. ¶ 21; MASON DEP. 57 (R.132-1 #2648). Mason, believing King was going to shoot him, fired three shots at King in rapid succession, with all three shots occurring in less than two seconds. MASON AFF. ¶ 21; MASON DEP. 57, 106 (R.132-1 #2648, 2697).

Mason had very little cover and he did not believe that he had any other reasonable means to protect himself from death or serious injury. MASON AFF. ¶ 22; MASON DEP. 66 (R.132-1 #2657). Mason's training and knowledge provided his understanding of the "reactionary gap" concept. He recognized that a resistive felony suspect holding a gun in his waistband poses an imminent deadly threat as the gun can be pointed and fired in fractions of a second. MASON AFF. ¶ 23. He recognized that when that suspect pulls that gun from his waistband he poses even more of an imminent deadly threat. MASON AFF. ¶ 23. Immediately after the first shot, King began to spin clockwise to his right, and, immediately following the last shot, he dropped to the ground in front of the parked car. MASON AFF. ¶ 24. This was a rapidly occurring incident. There were 5-8 seconds separating the moment Mason first saw Braxton and King running toward him in the alley from the instant he fired his gun. MASON AFF. ¶ 25.

Mason moved a few steps forward and saw Officer Reffitt approaching from the north, with his gun drawn, along the driver's side of the parked car. MASON AFF. ¶ 26. At 7:46:25 p.m.,

Mason heard Officer Reffitt air over the police radio, "Madison and 18th. We have shots fired. Start a medic. Suspect down." MASON AFF. ¶ 26; AUDIO 12 2016-09-14_19.46.25_Ch63. King was lying on his chest, and Mason could see his left arm and hand to the left side of his body, but could not see his right hand. MASON AFF. ¶ 27. He was not moving, and Mason positioned himself between the front of the parked car and King. MASON AFF. ¶ 27. Mason asked Reffitt to cover him, and he stepped forward to place handcuffs on King, believing that his gun might be under him in his right hand. MASON AFF. ¶ 27; MASON DEP. 84 (R.132-1 #2675). He was able to secure the handcuffs after pulling King's right hand out. MASON AFF. ¶ 28. He then quickly scanned the area, and saw King's gun on the ground slightly under the front bumper of the parked car. MASON AFF. ¶ 28; MASON AFF. EXS. 11, 12. At 7:46:32 p.m., Mason heard the radio dispatcher air, "I copy. 10-3.[15] Where are you at?" MASON AFF. ¶ 29; AUDIO 13 2016-09-14_19.46.32_Ch63. At 7:46:35 p.m., Mason heard Officer Reffitt respond, "Rear of 957 East Broad Street. 33 recovered."[16] MASON AFF. ¶ 29; AUDIO 14 2016-09-14_19.46.35_Ch63.

Mason saw that King had suffered a gunshot wound to his head and didn't know if he was dead or alive. MASON AFF. ¶ 30. While he had training in basic first aid, he knew that King's wounds were far outside of his level of competence and that attempting treatment would be futile or may inadvertently cause additional serious injury or death. MASON AFF. ¶ 30. As stated above, Reffitt had aired for a medic immediately after the shooting, which Mason would have heard being aired. MASON AFF. ¶ 31. Mason could see that nothing would delay the paramedics from reaching King. MASON AFF. ¶ 31. Other officers began to arrive at the scene. MASON AFF. ¶ 31. Mason believes that the medics were arriving on the scene at the same time that he was leaving the area

---

[15] "10-3" means "Officer in Trouble." MASON AFF. EX. 1 (CPD's Ten Code).
[16] "33 recovered" means "gun recovered." MASON AFF. EX. 1 (CPD's Ten Code).

with the Officer Support Team. MASON AFF. ¶ 31. This concluded Mason's involvement in the incident. MASON AFF. ¶ 31.

### D. OTHER WITNESSES

Other witnesses describe the incident as follows.

#### 1. CPD Officer Robert Reffitt

Officer Reffitt confirms that he and Mason responded to the armed robbery with Reffitt driving their cruiser. REFFITT AFF. ¶ 3 (attached as MASON MSJ EX. C). As they turned southbound onto Hoffman Avenue from East Broad Street, Reffitt saw Braxton, King, and another male on the sidewalk on the west side of the street, just south of East Capital Street. REFFITT AFF. ¶ 4; REFFITT DEP. 58 (R.131-1 #2469). At the same time, he saw CPD Officers Kevin Yankovich and Ryan McKee in CPD Cruiser #R-72 turn northbound onto Hoffman Avenue from Madison Avenue. REFFITT AFF. ¶ 5; REFFITT DEP. 58 (R.131-1 #2469). When this happened, King and Braxton fled westbound between the houses. REFFITT AFF. ¶ 5; REFFITT DEP. 58 (R.131-1 #2469). Officer Mason exited the cruiser and ran westbound on East Capital Street. REFFITT AFF. ¶ 5; REFFITT DEP. 59 (R.131-1 #2470). Reffitt pulled the cruiser in behind Officer Mason and followed him for a short distance. REFFITT AFF. ¶ 5; REFFITT DEP. 59 (R.131-1 #2470).

Officer Mason ran past the first house, turned southbound into a small parking area, and began yelling commands at King to "Get on the ground! Get on the ground!" REFFITT AFF. ¶ 6; REFFITT DEP. 59 (R.131-1 #2470). Reffitt stopped and exited the cruiser and went to the driver's (east) side of the southbound facing parked car so as to cut King off from going that direction away from Officer Mason. REFFITT AFF. ¶ 7; REFFITT DEP. 59 (R.131-1 #2470). King then stopped in front of the parked car. REFFITT AFF. ¶ 7; REFFITT DEP. 59 (R.131-1 #2470). It appeared that King wanted to go one way or the other but could not. REFFITT AFF. ¶ 7. King then pulled a gun out of his waistband. REFFITT AFF. ¶ 8; REFFITT DEP. 60, 65, 89-91 (R.131-1 #2471, 2476, 2500-02);

REFFITT DEP. Ex. G1 (providing a visual of where this was occurring). Reffitt immediately felt that King posed a deadly threat and Reffitt heard Mason yell, "Don't do it!" REFFITT AFF. ¶ 8; REFFITT DEP. 104-05 (R.131-1 #2515-16). Reffitt was preparing to shoot his gun at King, but didn't have a clear shot, when he heard Mason fire three shots. REFFITT AFF. ¶ 8; REFFITT DEP. 74 (R.131-1 #2485). King fell and dropped his gun. REFFITT AFF. ¶ 8; REFFITT DEP. 65 (R.131-1 #2476). King's gun hit a parking block and slid in front of the parked car's driver's side front tire. REFFITT AFF. ¶ 8; REFFITT DEP. 60 (R.131-1 #2471). Everything had happened very quickly with all three shots occurring within two or three seconds of Reffitt exiting his cruiser. REFFITT AFF. ¶ 8; REFFITT DEP. 85-86 (R.131-1 #2496-97).

Reffitt then provided cover for Mason while King was handcuffed and the scene was secured. REFFITT AFF. ¶ 9; REFFITT DEP. 80 (R.131-1 #2491). Reffitt immediately aired for a medic for Mr. King. REFFITT AFF. ¶ 9; AUDIO 12 2016-09-14_19.46.25_Ch63 ("Madison and 18th. We have shots fired. Start a medic. Suspect down."); REFFITT DEP. 60 (R.131-1 #2471).

### 2.    Demetrius Braxton

Braxton testified that while he witnessed portions of the incident, he was high on cocaine and marijuana, his vision is terrible, and he wasn't wearing either his prescribed glasses or contacts. BRAXTON DEP. 107, 261 (R.127-1 #1623, 1777); MASON MSJ Ex. D (Transcript of Collins Case p. 20). Braxton testified that King did not obey Officer Mason's order to get down on the ground but instead headed towards the parked car while holding the front of his pants with his elbow out as he demonstrated at 2:28:34 of PIS TMK Video #4 Pt.1 (161025). BRAXTON DEP. 83, 85, 274-75 (R.127-1 #1599, 1601, 1790-91); BRAXTON DEP. Ex. I (R.127-10 #1859), BRAXTON DEP. Ex. J (R.127-11 #1860); MASON MSJ Ex. E (Screenshot of 2:28:34 of PIS TMK Video 07 Braxton #4 Pt.1 (161025). Braxton told A.B. that King then pulled the gun out. A.B. DEP. 113-14 (R.125-1 #1387-88). However, Braxton now states "I know that he did not pull that gun out" [BRAXTON

DEP. 90 (R.127-1 #1606)] but equivocates by stating, "If it was like a regular gun, it could be on the borderline. Like, yeah, he might have pulled it to try to kill the cop and get away" BRAXTON DEP. 283 (R.127-1 #1799). He continues,

> A. I wasn't certain. That's the reason why I failed [a polygraph examination], saying did I see him pull the gun out or not.
>
> Q. After you failed the polygraph, you told the polygraph examiner—
>
> A. I failed because my eyesight didn't make my words certain. It's not that I was telling a lie. It's that I wasn't certain. So when you state that, just state that you failed because you wasn't certain if you seen it or not.

BRAXTON DEP. 89 (R.127-1 #1605). Tellingly, Braxton admits,

> I honestly wish that I would have kept the gun so they couldn't have said nothing like that. Because me being on the ground with that gun on my hip, they would have just pulled it and cuffed me up and been like, "Oh, yeah, you robbed him." That would have been the end of it. And little Tyre King would still be alive today.

BRAXTON DEP. 202-203 (R.127-1 #1718-19).

### 3. William Scott

William Scott testified that he was walking in an alley approaching 18th Street when he saw Braxton rob Ames at gunpoint. SCOTT DEP. 35-36, 47, 63 (R.130-1 #2081-82, 2093, 2109). Scott then saw Braxton give the gun used in the robbery to King. SCOTT DEP. 62-63 (R.130-1 #2108-09). Scott ran after Braxton and King, intending to help the police catch the robbery suspect.[17] SCOTT DEP. 157, 223 (R.130-1 #2203, 2269). Scott saw Mason get out of the police cruiser and order Braxton and King to get on the ground at gunpoint. SCOTT DEP. 85 (R.130-1 #2131). Braxton immediately got on the ground. SCOTT DEP. 88 (R.130-1 #2134). King did not get on the ground. SCOTT DEP. 87, 167 (R.130-1 #2133, 2213). Rather, King "was getting ready to run" with his hands in his waistband or crotch area "as if he was holding a gun in his pants." SCOTT

---

[17] *See also* MASON MSJ EX. F (Stipulations Re Scott).

DEP. 87, 91 (R.130-1 #2133, 2137). According to Scott, "the way he was holding his pants, whatever was in his pants was heavy enough to weigh him down." SCOTT DEP. 90 (R.130-1 #2136). Scott realized that King "probably had something in his pants" but he "couldn't say whether or not it was a gun." SCOTT DEP. 93-94 (R.130-1 #2139-40). According to Scott, King turned, and Mason shot him, with all of the shots happening within seconds of each other. SCOTT DEP. 94, 168 (R.130-1 #2140, 2214).

### 4.    Anna Skora

Anna Skora[18] witnessed the incident while waiting to get into a car that was parked in a nearby parking lot. SKORA DEP. 17 (R.126-1 #1408). Skora saw King and Braxton jump the wooden privacy fence and come into contact with Officer Mason. SKORA DEP. 17-18, 78-79 (R.126-1 #1408-09, 1469-70). According to Skora, King was "surprised because when he jumped over, he was surprised that [the] police [officer was] already [there]." SKORA DEP. 78-79 (R.126-1 #1469-70). King "didn't listen to the directions that [Mason] gave to him. It was so many directions and always the same. Like, I don't know, like, 'lay down' or something like this. He didn't listen, and he tried to run away from the police officer." SKORA DEP. 38 (R.126-1 #1429). Braxton "listened when the police said, like, 'lay down' or something, he listened and he lay down...But [King] didn't lay down on the ground." SKORA DEP. 39 (R.126-1 #1430). "[T]his is how I explain. Like, why this one is not laying down or why this one is still not listening. This is only what I was thinking seeing this." SKORA DEP. 82 (R.126-1 #1473).

According to Skora, King "tried to run, like, he tried to go left and right, left and right because he was not sure which side to run away from the police officer. So he was not thinking to run toward, like, run back. He thought to run toward the police officer, but he was not sure right

---

[18] Skora is a Catholic nun from Poland. SKORA DEP. 6, 15 (R.126-1 #1397, 1406). English is her second language. *Id.* at 10 (R.126-1 #1401).

side or left side." SKORA DEP. 41 (R.126-1 #1432). "It was so fast. He didn't listen, and then I only

heard the police officer was shooting him." SKORA DEP. 19 (R.126-1 #1410).

Plaintiff's counsel asked Skora,

Q And he was running away when he was shot by the police officer?

A No. When—when first time he called him and he gave him directions, he
wants to run away because, you know, like, didn't think that police officer
was, like, serious, so he tried to just run away.

Q Right. So at that time he was moving his body trying—

A Back and—yes, left and right to try—this way he can avoid him or this
way he can avoid him.

Q And was he still doing that, running left and right like that, at the time
that the police officer shot him?

A No, he was straight. He stood up. He stood up straight.

SKORA DEP. 54-55 (R.126-1 #1445-46).

Q But you also saw Tyre running around, right?

A Not, like, running around. He was trying to go back like—like, go left,
right because he doesn't know how he can run away.

SKORA DEP. 93 (R.126-1 #1484). Skora confirms that King did not turn his back to Mason (Q. Did

the first boy ever turn his back to the officer that shot him? A. No, he didn't.). SKORA DEP. 41

(R.126-1 #1432).

Skora could only see Mason's right side and King's left side when the shooting occurred.

SKORA DEP. 93 (R.126-1 #1484). She testified,

Q From where you were standing, what side of the first boy's body did you
see?

A Oh, I saw his left side of his body.

Q Could you see his right side?

A No, I couldn't.

18

Q Could you see his right hand?

A No, I didn't. I didn't see his right hand.

Q Did you see his right hip?

A No, no right side at all. I saw only left side.

Q Did you see what, if anything, he was doing with his right hand?

A No, I didn't.

SKORA DEP. 41-42 (R.126-1 #1432-33).

Q When you say you could see the left side of Tyre at the time of the shooting, could you see Tyre's right side?

A No, I didn't see his right side at all, even his hand or anything.

*****

Q If Tyre had put his right hand at or near his right waistband, would you have been able to see that?

A I will not see this.

Q If Tyre had started to pull something from his right waistband with his right hand, would you have been able to see that?

A No, I will not.

SKORA DEP. 111 (R.126-1 #1502).

Skora confirms that King was provided medical care after the shooting. "[W]hen this boy got shot, they put him and gave him—like, they take care of him. Like, they put his hands back and wait—they were waiting for ambulance because few minutes later the ambulance came and they took care of this boy." SKORA DEP. 20 (R.126-1 #1411). "So he check on him. I notice that they were calling for [an] ambulance. Somebody was calling right away." SKORA DEP. 91 (R.126-1 #1482). "[T]hey were waiting for [an] ambulance. So this is what I mean 'took care.' That he didn't—he didn't shoot him and walk away, you know. It's not like that." SKORA DEP. 95 (R.126-1 #1486).

### E. KING'S GUN

King's Umarex 40XP "is not a toy gun." TURNER DEP. 17-19, 22, 25-26 (R.129-1 #1948-50, 1953, 1956-57); TURNER DEP. EX. D at p. 1 (R.129-5 #2000); TURNER DEP. EX. E (R.129-6 #2040); TURNER DEP. EX. H (R.129-9 #2043); TURNER DEP. EX. I (R.129-10 #2044). Rather, it "is an air pistol that has characteristics of a real firearm..." TURNER DEP. 29 (R.129-1 #1960). "[It has] a lot of the similar features you would find on traditional handguns." TURNER DEP. 16 (R.129-1 #1947). "It is [made of] a combination of metals and polymers. And in this instance you will see a polymer frame, but you have got a metal die cast slide in this product." TURNER DEP. 17 (R.129-1 #1948). The gun's packaging and instruction manual specifically state: "Warning: Do not brandish or display airgun in public—it may confuse people and may be a crime. Police and others may think it is a firearm." TURNER DEP. 20, 22-23 (R.129-1 #1951, 1953-54); TURNER DEP. EX. D at p. 2 (R.129-5 #2001), TURNER DEP. EX. F (R.129-7 #2041).

### F. ACTION V. REACTION

Most deadly confrontations begin and end within three seconds. PAIGE AFF. ¶ 33 (attached as MASON MSJ EX. G). Time is a life-threatening factor—time to think, to act, to react, and to do it all within the parameters of the law and departmental policy. *Id*. Research has shown that a deadly threat can unfold at a speed of one quarter of a second or less. *Id*. The physiological realities of deadly force confrontations include the factors of action-versus-reaction. *Id*. at ¶ 34. Force Science Institute, Ltd. ("Force Science"), an independent human dynamics research institute, defines reaction time as a measure of the time from the arrival of a suddenly presented and unanticipated signal to the beginning of the response to it. *Id*.

Action and reaction sequences take quantifiable amounts of time to complete. *Id*. at ¶ 35. There have been many studies completed on action versus reaction. *Id*. In a series of experiments with officers from Tempe, Arizona, researchers discovered that the average reaction time for

officers to shoot when cued with a light was .31 seconds. *Id*. Three-quarters of that time (.23 seconds) was taken up with processing and one fourth (.08 seconds) with the actual physical motion of moving the finger from the resting position and firing.[19] *Id*. In a more complex scenario where officers had to process information from a number of lights in different rows in the decision to shoot, the reaction almost doubled to .56 seconds.[20] *Id*.

Since the invention of a shot timer, research has been completed on the length of time to fire a shot. *Id*. at ¶ 36. Force Science completed a study with the primary purpose being to measure the times it takes to do certain motions. *Id*. All the motions in the study were self-initiated, and therefore were "action" motions to which an officer would presumably be reacting. *Id*. In this study it gave an average time for a person sitting in an automobile to draw a gun from across his body and fire it the opposite direction. *Id*. The average time to grab a firearm from one side of the body and point and shoot in the opposite direction was 26/100ths of a second. *Id*. The findings of the study show that most officers cannot fire faster than a suspect with a weapon in hand, even if it was not aimed at the officer. *Id*. at ¶ 37. The officer has to perceive and absorb the threat that a suspect is going to fire, process the information within the current context, decide on an appropriate action, and then signal the muscles to respond. *Id*. In the meantime, the suspect has already assessed the situation, decided on a course of action, and must only complete the act of firing. *Id*. That is why it is commonly stated that action is always faster than reaction. *Id*.

Force Science completed a study of the average time it takes to remove a gun from the waistband (Combat Tuck) and fire in a very quick, close combat tuck maneuver. *Id*. at ¶ 38. The study found that the average time to remove a firearm from one's waistband and fire was 0.23

---

[19] Lewinsky, W. and Hudson, B. (2003a). Time to start shooting? Time to stop shooting?: The Tempe study. *The Police Marksmen*, (September/October), 26-29.
[20] Lewinsky, W. and Hudson, B. (2003b). The impact of visual complexity, decision making and anticipation. *The Police Marksmen*, (November/December), 24-27.

seconds. *Id*. The fastest time recorded was 0.09 seconds. *Id*. This of course is less than the average reaction time of 0.31 seconds. *Id*. The video files labeled PAIGE AFFIDAVIT VIDEOS 1-4 illustrate the remarkable speed of gun attacks from a suspect's waistband. *Id*. at ¶ 39.

### G. MELVIN TUCKER

Melvin Tucker is presented by Plaintiff as a "police procedures" expert. Regarding King's age, Tucker states, "Well, I think that—that it doesn't make a lot of difference. A 13 year old can kill you just like a 36 year old can. It's just really unfortunate that we're talking about a 13-year-old, black male." TUCKER DEP. 107 (R.128-1 #1916). Regarding Mason's belief that King's gun was an actual firearm, Tucker states, "I'm not going to fault an officer for that. If it looks like a gun—if it walks like a duck, quacks like a duck, it's a duck. So you can make that decision. That's all right." TUCKER DEP. 106-07 (R.128-1 #1916). Regarding Mason's belief that King was armed, Tucker states,

> A. Are you asking me whether it was reasonable for Mason to assume that he had a gun in his waistband?
>
> Q. If his hand was going to his waistband?
>
> A. Yes. Given the fact that this was a call in response to what was a robbery with a gun—armed robbery.

TUCKER DEP. 108 (R.128-1 #1916).

Despite the foregoing, Tucker opines that the shooting was unreasonable because "[i]t wasn't necessary for him to shoot King because he was so close to the car right there he could have taken concealment and cover and then communicated with King. If King came out and pointed a toy gun at him or any kind of gun or whatever, he could have communicated with him and said, drop it, you know, avoided the shooting…" TUCKER DEP. 109 (R.128-1 #1917). According to Tucker,

A. Last resort. Deadly force should be a last resort, not a first resort; not the first option chosen. Now, that doesn't mean that sometimes there's not a choice. And I supported that and testified on behalf of officers who have used deadly force when it was justified.

Q. So in this particular case, deadly force was not the only resort—or the only available option to Officer Mason because he had the option of cover and concealment, correct?

A. Right.

Q. And that cover and concealment was behind the car?

A. Right.

TUCKER DEP. 109-10 (R.128-1 #1917).

## H.  THE AFTERMATH

On September 17, 2016, three days after the incident, Braxton was arrested for the robbery. BRAXTON DEP. 117, 149-50 (R.127-1 #1633, 1665-66); BRAXTON DEP. EX. L (R.127-12 #1861). Braxton ultimately pled guilty to a third-degree-felony charge of robbery in violation of O.R.C. § 2911.02. BRAXTON DEP. 10, 12-13 (R.127-1 #1526, 1528-29); BRAXTON DEP. EX. C (R.127-4 #1825-53). Collins was found to be a delinquent minor by the Franklin County Court of Common Pleas and to have committed the September 14, 2016 robbery. MASON MSJ EX. H (Collins Admissions).

## IV.  LEGAL STANDARD

Summary judgment is appropriate "if [Defendant shows] that there is no genuine dispute as to any material fact and [he is] entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Even though the Court must view all of the evidence and draw all reasonable inferences in Plaintiff's favor, Plaintiff must still identify specific facts within the record showing there is a genuine issue of material fact. *See Muncie Power Prods. v. United Techs. Auto.*, 328 F.3d 870, 873 (6th Cir. 2003). Not just any dispute of fact will do. The "dispute must present a *genuine* dispute

of *material* fact." *Rogers v. O'Donnell*, 737 F.3d 1026, 1030 (6th Cir. 2013) (emphasis in original).

A fact is "material" only if its resolution "might affect the outcome of the suit under the governing

law," and a dispute is "genuine" only if the "evidence presents a sufficient disagreement to require

submission to a jury." *Anderson v. Liberty Lobby*, 477 U.S. 242, 248, 251-52 (1986). The evidence

with respect to a particular factual dispute cannot be "so one-sided that [Defendants] must prevail

as a matter of law," and [Plaintiff] cannot rely upon a "mere existence of a scintilla of evidence in

support of [her] position." *Id.* at 251-52.

## V.    LAW & ARGUMENT

### A.  PLAINTIFF'S FEDERAL CLAIMS

Plaintiff has asserted Fourth and Fourteenth Amendment claims against Officer Mason

under 42 U.S.C. § 1983. For the following reasons, Mason is entitled to qualified immunity and

summary judgment for these claims. Qualified immunity shields government officials from

liability for civil damages under § 1983 insofar as their actions do not violate any clearly

established statutory or constitutional rights of which a reasonable person would have known at

the time of the incident. *See Pearson v. Callahan*, 555 U.S. 223, 231 (2009). Qualified immunity

"ordinarily applies unless it is obvious that [a] reasonably competent official would have

concluded that the actions taken were unlawful," *Chappell v. Cleveland*, 585 F.3d 901, 907 (6th

Cir. 2009), and it affords "'ample room for mistaken judgments' by protecting 'all but the plainly

incompetent or those who knowingly violate the law.'" *Hunter v. Bryant*, 502 U.S. 224, 229 (1991)

(quoting *Malley v. Briggs*, 475 U.S. 335, 343, 341, (1986)). "In a civil suit arising from the use of

deadly force, immunity should be recognized 'if officers of reasonable competence could disagree

on the issue.'" *Mullins v. Cyranek*, 805 F.3d 760, 765 (6th Cir. 2015) (quoting *Malley*, 475 U.S. at

341).

Plaintiff must demonstrate that Officer Mason is not entitled to qualified immunity. *See Chappell*, 585 F.3d at 907. Consequently, Plaintiff bears the burden of showing that, when the evidence is viewed in her favor: (1) a constitutional right was violated; and (2) that right was clearly established at the time of the violation. *See id.* Because Plaintiff fails to demonstrate either prong of this test, she fails to carry her burden. *See id.* Courts have discretion to decide which of the "two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson*, 555 U.S. at 236.

### 1. Plaintiff's Fourth Amendment Claim Fails

Plaintiff argues that Officer Mason used excessive force against King in violation of the Fourth Amendment.[21] However, Officer Mason is entitled to summary judgment because his use of force was reasonable under the Fourth Amendment and is also entitled to qualified immunity because he did not violate any clearly established constitutional right.

The Fourth Amendment guarantees the right to be free from unreasonable seizures, and includes the right to be free from excessive force. *See Graham v. Connor*, 490 U.S. 386, 388 (1989). An "objective reasonableness" standard governs whether an officer's particular use of force was excessive, *see id.*, and deadly force is objectively reasonable when an officer "has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or others..." *Tennessee v. Garner*, 471 U.S. 1, 11 (1985). The objective reasonableness test "requires careful attention to the facts and circumstances of each particular case, including … whether the suspect poses an immediate threat to the safety of the officers or others." *Graham,* 490

---

[21] See COMPLAINT ¶¶ 87-93 (DOC.1, PAGE ID #: 14-16). Plaintiff also references the Fourteenth Amendment in her excessive force claim. The Fourteenth Amendment protects pretrial detainees from the use of excessive force, but it does not apply to claims arising from an arrest. *Aldini v. Johnson*, 609 F.3d 858, 865 (6th Cir. 2010). Rather, the Fourth Amendment governs claims of excessive force occurring "in the course of an arrest or other seizure of the plaintiff," as well as claims arising from a stop. *Id.*

U.S. at 396. The officer's conduct is to be "judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* Because "police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation," *id.* at 396–97, courts "must avoid substituting [their] personal notions of proper police procedure for the instantaneous decision of the officer at the scene." *Smith v. Freland*, 954 F.2d 343, 347 (6th Cir. 1992). That is, courts "must never allow the theoretical, sanitized world of [their] imagination to replace the dangerous and complex world that policemen face every day." *Id.* "After all, 'what constitutes reasonable action may seem quite different to someone facing a possible assailant than to someone analyzing the question at leisure.'" *Mullins*, 805 F.3d at 766 (quoting *Dickerson v. McClellan*, 101 F.3d 1151, 1163 (6th Cir. 1996)).

To determine whether a suspect presents an imminent danger to officers or the public at the time the officers use deadly force requires an analysis of both the moments before the shots were fired and the prior interactions between the suspect and the Officers. See *Latits v. Phillips*, 878 F.3d 541, 548 (6th Cir. 2017). The Court may consider only the facts that were knowable to the Officers at the time of the incident. *White v. Pauly*, 137 S. Ct. 548, 550 (2017) (per curiam).

Given the facts of this case, a reasonable officer would have probable cause to believe that King posed a threat of death or serious physical injury to Officer Mason and others. Mason was pursuing two suspects from an armed robbery and was giving verbal commands for them to stop and get down. Braxton complied. King did not. Instead, King continued to resist commands, began to change his course of flight, and started to draw what appeared to be a deadly weapon from his waistband. King could have pulled, pointed, and shot a gun at Mason or Reffitt in fractions of a second.

While the ultimate determination of reasonableness must be based on the totality of the circumstances, the Sixth Circuit has repeatedly found three factors to be helpful in excessive force cases: "(1) the severity of the crime at issue; (2) whether the suspect poses an immediate threat to the safety of the officers or others; and (3) whether the suspect is actively resisting arrest or attempting to evade arrest by flight." *Mitchell v. Schlabach*, 864 F.3d 416, 421 (6th Cir. 2017).

Regarding the first factor, the severity-of-the-crime inquiry weighs in favor of Officer Mason. An armed robbery involving a suspect who points a gun at the victim's head while threatening "Don't move or I'm going to blow your fucking head off" is a severe crime.

Regarding the second factor, as stated above, it was reasonable to believe that King posed an immediate threat to the safety of Officer Mason or others at the moment deadly force was used. *Bouggess v. Mattingly*, 482 F.3d 886, 889 (6th Cir. 2007). This was the epitome of a split-second decision. The Court must not second-guess Officer Mason's assessment, made on the scene, of the danger presented by King. *Ryburn v. Huff*, 565 U.S. 469, 477, 132 S. Ct. 987, 181 L. Ed. 2d 966 (2012) (*per curiam*).

Regarding the third factor, King was resisting arrest and attempting to evade arrest when he was shot. *See Ewolski v. City of Brunswick*, 287 F.3d 492, 506 (6th Cir. 2002) ("A Fourth Amendment seizure occurs when a police officer restrains the liberty of a citizen in such a way that a reasonable citizen would reasonably believe under the circumstances that he or she was not free to leave.").

Each of the above factors support a finding of reasonableness. And to be clear, Officer Mason did not have to wait for King to raise his gun before employing deadly force. *See Thornton v. City of Columbus*, 727 Fed. App'x. 829, 838 (6th Cir. 2018) citing *Anderson v. Russell*, 247 F.3d 125, 131 (4th Cir. 2001) ("[A]n officer does not have to wait until a gun is pointed at the

officer before the officer is entitled to take action."); *Thomas v. City of Columbus*, 854 F.3d 361, 366 (6th Cir. 2017). The Sixth Circuit has recently found uses of deadly force to be objectively reasonable where it was later determined the suspects did not have weapons at all. *See Lemmon v. City of Akron*, 768 Fed. Appx. 410, 413 (6th Cir. 2019); *Goodwin v. Richland Cty.*, 2020 U.S. App. LEXIS 32727, 2020 FED App. 0588N (6th Cir. 2020).

Based on the facts of this case, Officer Mason had probable cause to believe that King posed a threat of serious harm and his use of deadly force was objectively reasonable under the circumstances. The opinion of Plaintiff's expert Melvin Tucker does not change this result. As stated above, Tucker testified that (1) it was reasonable for Mason to believe that King was armed with an actual firearm; and (2) King's age bore no relevance to the threat that was posed. Yet Tucker criticizes Mason's tactics and opines that the shooting was unreasonable because "[i]t wasn't necessary for him to shoot King because he was so close to the car right there he could have taken concealment and cover and then communicated with King. If King came out and pointed a toy gun at him or any kind of gun or whatever, he could have communicated with him and said, drop it, you know, avoided the shooting…" TUCKER DEP. 109 (R.128-1 #1917).

The substance of Tucker's opinion regarding Mason's tactical decisions, and thus Plaintiff's argument, has been specifically rejected by both the United States Supreme Court and the Sixth Circuit.[22] Plaintiff "cannot establish a Fourth Amendment violation based merely on bad tactics that result in a deadly confrontation that could have been avoided." *Rucinski v. Cnty. of Oakland*, 655 Fed. Appx. 338, 343 6th Cir. 2016) (quoting *San Francisco v. Sheehan*, 135 S. Ct. 1765, 1777 (2015)). Rather, courts must consider the officer's reasonableness under the

---

[22] Tucker's avoidable-equals-unreasonable standard has no support from any legal authority and directly contradicts the long-held standard against judging an officer's conduct with safe and leisurely hindsight. *See Graham*, 490 U.S. at 396; *Mullins*, 805 F.3d at 766; *Dickerson*, 101 F.3d 1151, 1163; *Smith*, 954 F.2d at 347.

circumstances he faced at the time he decided to use force. *See Livermore ex rel. Rohm, v. Lubelan*, 476 F.3d 397, 406 (6th Cir. 2007) (describing the so-called "segmented analysis" this circuit uses to analyze use-of-force claims). Courts may not scrutinize whether it was reasonable for an officer "to create the circumstances." *Id.* Even a reckless approach to the scene will not necessarily render a later use-of-force decision unreasonable. *See Chappell*, 585 F.3d at 915–16; *Thomas*, 854 F.3d 365. According to the Sixth Circuit:

> …we cannot, as [the plaintiff] urges, find a constitutional violation based on how [the officer] approached the crime scene. Arguably, [the officer's] decisions to rush toward the apartment without backup violated Columbus Police Department procedures. Arguably, his violations increased the likelihood that [the officer] might have to use force. But those decisions were not seizures. Their reasonableness is not at issue.

*Thomas*, 854 F.3d at 365.

In fact, the Sixth Circuit has recently considered and rejected Tucker's "cover and communication" theory in *Goodwin*, 2020 U.S. App. LEXIS 32727, 2020 FED App. 0588N (6th Cir. 2020). In *Goodwin*, a police officer entered the home of a suicidal man who was holding what appeared to be a gun under his shirt while refusing commands to show his hands or drop his "weapon." The officer shot the man who was found to be unarmed. The district court excluded Tucker's testimony criticizing the officers' decision to confront the decedent in his bedroom rather than communicate with him from a position of cover. In affirming the district court's decision, the Sixth Circuit ruled that Tucker's proffered testimony was inadmissible because it was irrelevant to the sole issue before the jury: whether, at the moment that the officer shot the decedent, his use of deadly force was objectively reasonable. According to the Sixth Circuit, even assuming that Tucker's theory was true, it may not be used to determine whether the later use of force was reasonable. *Goodwin*, 2020 U.S. App. LEXIS 32727, *8-9 citing *Cnty. of Los Angeles v. Mendez*, 137 S. Ct. 1539, 1547, 198 L. Ed. 2d 52 (2017); *Livermore ex rel. Rohm*, 476 F.3d at 406.

To be clear, Officer Mason denies making any tactical errors. He had very little cover when he fired his gun and he did not believe that he had any other reasonable means to protect himself from death or serious injury. But even if Tucker's opinion is admitted and taken as true, there is still no dispute that Officer Mason acted reasonably under the circumstances at the moment he fired his weapon. Because the undisputed record shows that Officer Mason had probable cause to believe that King posed a threat of serious harm to Mason and others, his use of deadly force was objectively reasonable under the circumstances and thus constitutionally permissible. *See Lemmon*, 768 Fed. Appx at 420.  Officer Mason is entitled to qualified immunity and summary judgment on Plaintiff's excessive force claims.

### 2.    Plaintiff's Equal Protection Claim Fails

Plaintiff also alleges that Officer Mason racially discriminated against King in violation of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.[23] "It is axiomatic that the Equal Protection Clause of the Fourteenth Amendment protects citizens from police action that is based on race." *Bennett v. City of Eastpointe*, 410 F.3d 810, 818 (6th Cir. 2005). An officer's discriminatory motivations for pursuing a course of action can give rise to an Equal Protection claim, even where there are sufficient objective indicia of suspicion to justify the officer's actions under the Fourth Amendment. *Whren v. United States*, 517 U.S. 806, 813 (1996). To prevail on a claim of selective enforcement, plaintiff must establish that the challenged police action "had a discriminatory effect and that it was motivated by a discriminatory purpose." *Bennett*, 410 F.3d at 818, quoting *Wayte v. United States*, 470 U.S. 598, 608, 105 S. Ct. 1524, 84 L. Ed. 2d 547 (1985). "To show discriminatory effect, a plaintiff can proffer evidence showing similarly

---

[23] *See* COMPLAINT ¶¶ 94-102 (DOC.1, PAGE ID #: 16-17).

situated individuals of another race were treated differently through statistical evidence or identifying a person of another race who [Mason] treated differently." *Id*.

On that the night of the incident, Braxton told CPD Detective William Gillette that after the shooting, Officer Mason "was just calling us stupid, like ya'll stupid, ya'll dumb. Dumb."[24] BRAXTON DEP. 93-94 (R.127-1 #1609-10). Braxton now alleges that after the shooting Mason stated, "Ya'll dumb. Ya'll should have stopped. You should have got down. Ya'll so stupid. Just a bunch of dumb n*****s."[25] BRAXTON DEP. 100 (R.127-1 #1616).

Simply put, Braxton's allegation is false. MASON AFF. ¶ 32; REFFITT AFF. ¶ 10. Mason did not direct a racial slur towards King or Braxton. MASON AFF. ¶ 32; MASON DEP. 127-28 (R.132-1 #2718-19); REFFITT AFF. ¶ 10; REFFITT DEP. 107 (R.131-1 #2518). According to Scott, after the shooting, "[Mason's] face looked like he was sad, maybe, but that's about it. I didn't hear him say anything [to either Braxton of King]." SCOTT DEP. 98-99 (R.130-1 #2144-45). King's race played no role whatsoever in Officer Mason's actions. MASON AFF. ¶ 32. Officer Mason attempted to take King into custody because of the armed robbery. *Id*. He used deadly force to stop the deadly threat posed by King. *Id*. Plaintiff cannot produce any evidence showing similarly situated individuals

---

[24] Notably, Braxton volunteered that statement without even being asked what Officer Mason said after the shooting. BRAXTON DEP. 93-95 (R.127-1 #1609-11). According to Braxton, "I didn't have to say anything. I said just a select few things that was going through my mind while I was tired at that moment, still coming down off a high. So my mind wasn't clear." BRAXTON DEP. 96-97 (R.127-1 #1612-13). As stated above, Braxton was admittedly high on cocaine and marijuana on the night of the incident.

[25] Braxton changed his story after he realized that he mistakenly left his identification in the clothing he wore during the robbery and hid under the van. BRAXTON DEP. 239, 296-97 (R.127-1 #1755, 1812-13); BRAXTON DEP. EX. U (R.127-20 #1877); BRAXTON DEP. EX. V (R.127-21#1878). Only after returning to the scene of the crime the day after the incident, and realizing that his clothes and identification had been discovered, did Braxton's story change. BRAXTON DEP. 247-48, 250, 253 (R.127-1 #1763-64, 1766, 1769). During this same time, Braxton tried to convince 14-year old A.B. to give a false story to the police in an attempt to get himself out of trouble for the robbery. BRAXTON DEP. 121 (R.127-1 #1637). Braxton then threatened to kill A.B. and also threatened his aunt, who knew he committed the robbery, "to make her shut up." BRAXTON DEP. 146, 244-45 (R.127-1 #1662, 1760-61). When asked why he gave a different story to Detective Gillette on September 14th, 2016, Braxton states, "[b]ecause it didn't—I was really trying to get out of there. I didn't really care what happened at the moment. I was trying to go home....I didn't care what happened. I was just giving a false story so I could go home." BRAXTON DEP. 100 (R.127-1 #1616).

of another race were treated differently by Mason. Officer Mason is entitled to qualified immunity and summary judgment for Plaintiff's Equal Protection claim.

### 3. Plaintiff's Denial of Medical Care Claim Fails

Plaintiff next alleges that Officer Mason showed deliberate indifference to a serious medical need.[26] The Due Process Clause of the Fourteenth Amendment requires governments and their agents to secure medical care for individuals injured in police custody. *Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244 (1983). A plaintiff must show that the defendant acted with "deliberate indifference to serious medical needs" to establish a violation of the right to adequate medical care under 42 U.S.C. § 1983. *Watkins v. City of Battle Creek*, 273 F.3d 682, 685 (6th Cir. 2001). A deliberate indifference claim "requires that the defendant[] knew of and disregarded a substantial risk of serious harm to [the plaintiff's] health and safety." *Watkins*, 273 F.3d at 686; *Linden v. Piotrowski*, 619 F. App'x 495, 500 (6th Cir. 2015). The subjective component of this claim requires that Officer Mason perceived facts from which to infer a substantial risk to King, that Mason did in fact draw that inference, and that Mason then disregarded that risk. *See id.*

In this case, as stated above, Officer Reffitt aired for a medic immediately after the shooting, which Mason would have heard being aired. Officer Mason could see that nothing would delay the paramedics from reaching King. Officer Mason saw that King had suffered a gunshot wound to his head and didn't know if he was dead or alive. While he had training in basic first aid, he knew that King's wounds were far outside of his level of competence and that attempting treatment would be futile or may inadvertently cause additional serious injury or death. Other officers began to arrive at the scene. Officer Mason believes that the medics were arriving on the scene at the same time that he was leaving the area with the Officer Support Team.

---

[26] *See* COMPLAINT ¶¶ 103-09 (DOC.1, PAGE ID #: 17-18).

Anna Skora confirms that King was provided medical care after the shooting. Based on the foregoing, Officer Mason's actions did not constitute a deliberate indifference to King's medical needs and they did not violate any clearly established constitutional right. Officer Mason is entitled to qualified immunity and summary judgment for Plaintiff's denial of medical care claim. *See Thomas*, 854 F.3d at 367; *Stevens-Rucker v. City of Columbus*, 739 Fed. Appx. 834, 846 (6th Cir. 2018).

## B.  PLAINTIFF'S STATE LAW WRONGFUL DEATH CLAIM

Plaintiff has also asserted an Ohio state-law claim against Officer Mason for wrongful death.[27] O.R.C. 2125.02(A)(1) permits the recovery by a personal representative for the wrongful death of a decedent when the death of a person is caused by wrongful act, neglect, or default which would have entitled the party injured to maintain an action and recover damages under O.R.C. 2125.01. *Jacobson v. Kaforey*, 149 Ohio St. 3d 398, 417 (2016). Plaintiff's wrongful death claim fails because Officer Mason acted lawfully and reasonably during the incident. Furthermore, as discussed below, Plaintiff's wrongful death claim is barred by O.R.C. § 2307.60(B)(2) and statutory immunity shields Officer Mason from liability.

### 1.    Plaintiff's State-law Claim Is Barred by O.R.C. § 2307.60(B)(2)

Under O.R.C. § 2307.60(B)(2), recovery on a claim for relief in a tort action is barred to any person or the person's legal representative if any of the following apply:

\*\*\*

(b)The person engaged in conduct that, if prosecuted, would constitute a felony, a misdemeanor that is an offense of violence, an attempt to commit a felony, or an attempt to commit a misdemeanor that is an offense of violence and that conduct was a proximate cause of the injury or loss for which relief is claimed in the tort action, regardless of whether the person has been convicted of or pleaded guilty to or has been charged with

---

[27] *See* COMPLAINT ¶¶79-86 (R.1 #13-14).

committing the felony, the misdemeanor, or the attempt to commit the felony or misdemeanor.

(c)The person suffered the injury or loss for which relief is claimed in the tort action as a proximate result of the victim of conduct that, if prosecuted, would constitute a felony, a misdemeanor that is an offense of violence, an attempt to commit a felony, or an attempt to commit a misdemeanor that is an offense of violence acting against the person in self-defense, defense of another, or defense of the victim's residence, regardless of whether the person has been convicted of or pleaded guilty to or has been charged with committing the felony, the misdemeanor, or the attempt to commit the felony or misdemeanor...

For purposes of this statute, a "tort action" means any "civil action for damages for injury, death, or loss to person or property," and also specifically includes "an action for wrongful death under Chapter 2125 of the Revised Code." O.R.C. § 2307.60(B)(1)(a).

King's death was a proximate result of the commission of a felony. King was shot and killed during the group's attempted flight from the armed robbery they planned and executed together. As stated above, Braxton ultimately pled guilty to a third-degree-felony charge of robbery in violation of O.R.C. § 2911.02 (*see also* O.R.C. § 2911.02(A)(3), (B)). Collins was found to be a delinquent minor by the Franklin County Court of Common Pleas and to have committed the September 14, 2016 robbery.

Ohio's robbery statute states, in part, "No person, in … committing a theft offense or in fleeing immediately after the…offense, shall…threaten the immediate use of force against another." O.R.C. § 2911.02(A)(3).[28] By pointing King's gun at the robbery victim, threatening to shoot him, and robbing him of $10 in cash, Braxton not only committed a "theft offense" for purposes of the robbery statute, he also threatened an immediate use of force against the victim while committing the offense itself. *See* O.R.C. §§ 2911.02(A)(3), 2913.01(K)(1), (3),

---

[28] There are also colorable arguments that the conduct constituted either an aggravated robbery in violation of O.R.C. § 2911.01(A)(1), or a second-degree felony charge of robbery in violation of O.R.C. § 2911.02(A)(2), (B). *See also* O.R.C. § 2323.01(A)(1)–(2) (conspiracy); O.R.C. § 2923.03(A)(1)–(3) (complicity).

2913.02(A)(4)–(5). Braxton committed a felony robbery per O.R.C. § 2911.02(A)(3). *See also In re DRS*, Case No.103584, 2016-Ohio-3262, ¶¶ 1–12, 30 (Ohio App. 8th Dist. June 2, 2016) (affirming a delinquency adjudication for aggravated robbery and robbery that involved the use of a "black revolver-style pellet gun with a six-inch barrel" that was "described as 'very, very realistic looking'"); *State v. Jones*, Case No.11-AP-204, 2011-Ohio-6824, ¶¶1–5, 15–20 (Ohio App. 10th Dist. Dec. 30, 2011) (affirming a robbery conviction where the defendant used "what looked to be an authentic pistol").

King was at least complicit in Braxton's robbery. *See* O.R.C. §§ 2923.03(A)(1)–(3); *see also* O.R.C. § 2923.01(A)(1)–(2). King helped plan the robbery. He provided the gun used in the robbery. He walked to the location of the robbery with his other coconspirators. He then took back the gun immediately after it was used in the robbery. He then went with others to get the getaway car for the group's (unsuccessful) escape from the scene. "To sustain a conviction on the basis of complicity, the evidence must show that the defendant 'supported, assisted, encouraged, cooperated with, advised, or incited the principal in the commission of the crime, and that the defendant shared the criminal intent of the principal.'" *State v. Ayers*, Case No.13–AP-18, 2013-Ohio-5601, ¶19 (Ohio App. 10th Dist. Franklin Dec. 19, 2013) (quoting *State v. Johnson*, 93 Ohio St.3d 240, 245–46 (2001)). Anyone who is guilty of complicity, "shall be prosecuted and punished as if he were a principal offender." O.R.C. § 2923.03(F). "There is no significant distinction between a defendant convicted as a complicitor and one convicted as the principal offender." *State v. Beshara*, Case No.07-MA-37, 2009-Ohio-6529, ¶76 (Ohio App. 7th Dist. Mahoning Dec. 2, 2009). That is, "complicity in the underlying felony also constitutes complicity in the involuntary manslaughter where the death is the proximate result of the underlying felony." *State v. Gravely*, Case No.92–AP-1027, 1993 Ohio App. LEXIS 501, *9 (10th Dist. Franklin Jan. 26, 1993).

A direct and foreseeable consequence of the group's criminal conduct was someone's death. That someone could have been the robbery victim, a bystander, a responding officer, King, or one of the other robbery participants. The fact that King was fleeing from the scene of the armed robbery or was attempting to evade arrest by Officer Mason at the time of shooting is irrelevant. "Those who commit forcible felonies know they may encounter resistance, both to their affirmative actions and to any subsequent escape." *People v. Hudson*, 222 Ill.2d 392, 409 (2006) (quoting *People v. Hickman*, 59 Ill.2d 89, 94 (1974)). Moreover, the "period of time and activities involved in escaping to a place of safety are part of the crime itself." *Hickman*, 59 Ill.2d at 94 (citing *People v. Golson*, 32 Ill.2d 398, 408 (1965)). In short, escape is considered part of the crime. *See United States v. Scaggs*, 377 Fed. App'x 653, 658 (9th Cir. 2010). The crime continues until after its perpetrators have actually reached a place of apparent security. *See State v. Habig*, 106 Ohio St. 151, 160 (1922).

"Under 'proximate cause theory' when a felon sets in motion a chain of events which were or should have been within his contemplation when motion was initiated, the felon and those acting in concert with him, should be held responsible for any death which by direct and almost inevitable consequences results from the initial criminal act." *State v. Kennedy*, Case No. 288, 1979 Ohio App. LEXIS 8967, *9 n.3 (1st Dist. Warren May 23, 1979) (quoting *State v. Canola*, 135 N.J. Super. 224, 235 (1975)); *see also People v. Lowery*, 178 Ill.2d 462, 465–66 (1997). Encountering deadly resistance during the commission of a felony is a foreseeable consequence of committing that felony. *See State v. Dixon*, Case No. 18582, 2002 Ohio App. LEXIS 472, *15 (2nd Dist. Montgomery Feb. 8, 2002); *State v. McGuire*, Case No.1-13-47, 2015-Ohio-1887, ¶¶63–64 (Ohio App. 3rd Dist. Allen May 18, 2015); *State v. Ford*, Case No.07-AP-803, 2008-Ohio-4373, ¶¶31–33 (Ohio App. 10th Dist. Franklin Aug. 28, 2008).

In this case, the injury or loss for which relief is claimed occurred as a proximate result of the group's felonious conduct. Accordingly, Plaintiff's state law claim for wrongful death is barred under O.R.C. § 2307.60(B)(2) and must be dismissed.

### 2. Officer Mason is Entitled to Statutory Immunity

Statutory immunity shields Officer Mason from Plaintiff's state-law wrongful death claim for the same reasons qualified immunity shields him from the undue-force claim. *See Wilkerson v. City of Akron,* 2018 U.S. App. LEXIS 28934, *15, 2018 FED App. 0232p (6th Cir.), 9; *Chappell*, 585 F.3d at 916 n.3. Pursuant to O.R.C. § 2744.03(A)(6), City employees are statutorily immune from tort liability unless: (a) their acts or omissions were manifestly outside the scope of their employment or official responsibilities; (b) their acts or omissions were with malicious purpose, in bad faith, or in a wanton or reckless manner; or (c) civil liability is expressly imposed upon them by some other section of the Ohio Revised Code. The statute creates a presumption of immunity, and Plaintiff must provide sufficient evidence to rebut it with one of those three statutory immunity exceptions. *See Cook v. Cincinnati*, 103 Ohio App. 3d 80, 90 (Ohio App. 1st Dist., 1995).

Because Officer Mason was acting within the course and scope of his employment and official responsibilities at all relevant times, O.R.C. § 2744.03(A)(6)(a) does not apply. O.R.C. § 2744.03(A)(6)(c) does not apply because there is no provision of the Ohio Revised Code that would otherwise impose liability upon Mason for the conduct about which Plaintiff complains. Finally, the same facts that support the reasonableness of Mason's conduct also support the absence of malice, bad faith, wantonness, or recklessness under O.R.C. § 2744.03(A)(6)(b). *See Pollard v. City of Columbus*, 780 F.3d 395, 404 (6th Cir. 2015). Because none of these three immunity exceptions applies to Plaintiff's state-law claim, Officer Mason is statutorily immune

from tort liability. For all of the foregoing reasons, Officer Mason is entitled to summary judgment on Plaintiff's state-law claims.

## VI.  CONCLUSION

For the reasons stated above, Defendant Bryan Mason respectfully moves this Court for summary judgment on all remaining claims asserted against him in this action and for a final judgment entry in his favor.

Respectfully submitted,

/s/ Westley M. Phillips
Westley M. Phillips (0077728)
Assistant City Attorney
City of Columbus, Department of Law
77 N. Front St., Columbus, OH 43215
(614) 645-7385 / (614) 645-6949 (fax)
wmphillips@columbus.gov
Attorney for Defendants

## CERTIFICATE OF SERVICE

I hereby certify that, on **February 17, 2021**, I electronically filed the foregoing with the Clerk of this Court by using the Court's CM/ECF System. Copies will be served upon counsel of record by, and may be obtained through, the Court's CM/ECF System:

/s/ Westley M. Phillips
Westley M. Phillips (0077728)