IN THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| DEARREA KING, | Case No. 2:18-cv-1060 |
| Plaintiff, | Judge Edmund A. Sargus, Jr. |
| v. | Chief Magistrate Judge Elizabeth A. Preston Deavers |
| CITY OF COLUMBUS, OHIO, et al., | **AFFIDAVIT OF BRYAN MASON** |
| Defendants. | |

STATE OF OHIO

COUNTY OF FRANKLIN, SS:

1. I, Bryan Mason, having been first duly cautioned and sworn, do hereby state and affirm that I have personal knowledge of the facts stated in this affidavit below and that I am competent to testify to those facts.

2. I am employed by the Columbus Division of Police ("CPD") as a police officer. My hire date with the CPD was December 17, 2006.

3. On September 14, 2016, I was involved in a police-involved shooting incident involving Tyre King ("the incident").

4. I have reviewed audio files of CPD radio transmissions that I heard during the incident. These CPD radio transmissions are respectively labeled:

    a.    AUDIO 02 2016-09-14_19.43.06_Ch63

    b.    AUDIO 03 2016-09-14_19.43.15_Ch63

    c.    AUDIO 04 2016-09-14_19.44.23_Ch63

    d.    AUDIO 05 2016-09-14_19.45.05_Ch63

  e.  AUDIO 06 2016-09-14_19.45.19_Ch63

  f.  AUDIO 07 2016-09-14_19.45.34_Ch63

  g.  AUDIO 08 2016-09-14_19.45.53_Ch63

  h.  AUDIO 09 2016-09-14_19.46.03_Ch63

  i.  AUDIO 10 2016-09-14_19.46.10_Ch63

  j.  AUDIO 11 2016-09-14_19.46.18_Ch63

  k.  AUDIO 12 2016-09-14_19.46.25_Ch63

  l.  AUDIO 13 2016-09-14_19.46.32_Ch63

  m.  AUDIO 14 2016-09-14_19.46.35_Ch63

Each audio file is accurately date and time stamped. CPD radio transmissions are marked with a 24 hour clock, so 19.43.06 means 7:43:06 p.m. CPD "Official Ten Code" numeric radio references are used during the radio transmissions. Exhibit 1 to this affidavit is a copy of the CPD's Ten Code.

  5.  I was working with a partner, Officer Robert Reffitt, in Car 7514, a clearly identifiable marked Columbus police cruiser. Officer Reffitt was driving the cruiser and I was the passenger.

  6.  Officer Reffitt and I were wearing uniforms that clearly identified us as Columbus Police officers. A picture of me that was taken shortly after the shooting occurred is attached to this affidavit as Exhibit 2.

  7.  I was carrying my Division issued Smith & Wesson, Model M&P, .40 caliber pistol, loaded with Division issued ammunition.

  8.  Shortly after 7:43 p.m., Officer Reffitt and I responded to a dispatched call of an armed robbery occurring in the area of 18th Street and East Broad Street. I heard the following information aired over the police radio at the following times:

  a. 7:43:06 p.m. "Radio to 9070 and 9111 if I could get your help on 12 Precinct. Are there any cars on 12 that can clear up? S12 if you could copy. I'm getting a 41 at 18th and East Broad." (AUDIO 02 2016-09-14_19.43.06_Ch63). A "41" is a call of a robbery that had just occurred.

  b. 7:43:15 p.m. "Have 33 point. Still waiting on additional. Saying that they are eastbound. Direction of travel is eastbound on foot. Suspect is a male black. Dark hoodie. Baggy pants." (AUDIO 03 2016-09-14_19.43.15_Ch63). A "33 point" is a CPD reference to someone pointing a gun.

  c. 7:44:23 p.m. "Cars on the 41, they are saying the suspect is going to be part of a group of 7 to 8 people." (AUDIO 04 2016-09-14_19.44.23_Ch63).

  d. 7:45:05 p.m. "Cars on the 41, looks like he ran eastbound through the Red Cross lot toward Bryden and Oak." (AUDIO 05 2016-09-14_19.45.05_Ch63).

  e. 7:45:19 p.m. "Nelson special. They're saying there are four kids all together. They're headed in a southeast direction." (AUDIO 06 2016-09-14_19.45.19_Ch63).

  f. 7:45:34 p.m. "Hey chopper, we have a 41 at 18th and East Broad Street. 33 point. Suspect is going to be a male black. Dark hoodie. Baggy pants. And went eastbound on foot. And he's in a group of four kids." (AUDIO 07 2016-09-14_19.45.34_Ch63).

  g. 7:45:53 p.m. "Understand. 18th and East Broad. We're coming from 8 Precinct. What was the description again?" (AUDIO 08 2016-09-14_19.45.53_Ch63).

  h. 7:46:03 p.m. "Male black. Dark hoodie. Baggy pants." (AUDIO 09 2016-09-14_19.46.03_Ch63).

  i. 7:46:10 p.m. "Male black. Dark hoodie. Black pants. And did we get a direction of travel?" (AUDIO 10 2016-09-14_19.46.10_Ch63).

  j. 7:46:18 p.m. "Eastbound on foot." (AUDIO 11 2016-09-14_19.46.18_Ch63).

9. As we drove eastbound on Broad Street to the location of the robbery, I informed Officer Reffitt of additional information that was being posted on our cruiser's computer. A true and accurate copy of that information is attached to this affidavit as Exhibit 3.

10. As Officer Reffitt and I approached the vicinity of the robbery, Officer Reffitt turned southbound on Hoffman Avenue, which is one block east of South 18th Street. Exhibit 4 to this affidavit is a map of the area of the incident. The direction of our southbound travel on Hoffman Avenue is fairly and accurately depicted by the yellow arrow shown on Exhibit 5 to this affidavit.

11. Almost immediately after making the turn onto Hoffman Avenue, I saw a northbound Columbus Police cruiser approximately one block south, quickly coming to a stop. Both of the cruiser doors opened, and two officers exited and ran directly westbound between houses on the west side of the street. Officer Reffitt stopped our cruiser just south of East Capital Street, which is an alley that runs parallel to and is directly south of East Broad Street. Exhibits 4 and 6 to this affidavit show the location of East Capital Street.

12. I believed that the officers from the other cruiser were pursuing the robbery suspects, and I quickly exited the cruiser and told Officer Reffitt that they were running westbound. I then ran westbound on East Capital Street thinking that I might be able to stop the suspects if they turned north and away from the other officers. The direction of my westbound path on East Capital Street is fairly and accurately depicted by the yellow arrow shown on Exhibit 7 to this affidavit. Having knowledge that the suspects were wanted for an armed robbery committed at gunpoint, I drew my duty weapon as I ran westbound in the alley.

13. I approached South 19th Street, which is another alley that runs south from East Capital Street behind the houses on the west side of Hoffman Avenue. I saw a wooden privacy fence along the west side of South 19th Street.

14. I looked south on South 19th Street and immediately saw who I now know to be Demetrius Braxton and Tyre King running northbound, at a full sprint, directly toward me. Mr. Braxton was running about 5 feet ahead and to the left (northwest) of Mr. King.

15. I moved a few steps south near the center of South 19th Street, raised my gun, and began shouting "Get down!" or "Get on the ground!" Almost immediately after I shouted these commands, Mr. Braxton dropped down onto his chest near the middle of South 19th Street, with his hands open and his arms spread out to the sides of his head.

16. Mr. King was running to the right and slightly behind (southeast of) Mr. Braxton. Mr. King was wearing a light colored shirt, and when I started to shift my focus to Mr. King, I could immediately see the grip of a handgun that was tucked into Mr. King's front waistband.

17. As I repeatedly shouted "Get down!" Mr. King continued running, veering northeast toward a car that was parked, facing south, in a small parking area located on the southeast corner of East Capital Street and South 19th Street. The area into which Mr. King ran is marked with the yellow box shown on Exhibit 8 to this affidavit. Photographs of the parked car taken the night of the incident are attached to this affidavit as Exhibits 9 and 10.

18. I thought Mr. King was going to run past the driver's side of the parked car, but Mr. King came to a stop with a quick stutter step—facing north—approximately 3 feet in front of the car on the driver's side. Mr. King looked directly at me before he grabbed the grip of the handgun in his waistband and tugged on it.

19. I was intently focused on Mr. King's hands and the threat of the gun in his waistband. While still shouting, "Get down!" and with my gun pointed at Mr. King, I quickly took one or two steps closer to the passenger side of the parked car, hoping it would provide me with some cover.

20. Mr. King forcefully tugged on the grip of his gun at least one or two more times as if it were snagged on something. In that instant, Mr. King's refusal to comply with my commands, and his continuing attempts to pull the gun out, caused me to believe that Mr. King was going to engage me in a gun fight.

21. Mr. King then pulled the gun out of his waistband and, as he raised it up in front of his torso, I could see it had a laser sight or light attached to the bottom of the barrel. Believing that Mr. King was going to shoot me, I fired three shots at Mr. King in rapid succession, with all three shots occurring in less than two seconds.

22. I had very little cover from the parked car when I fired my gun, only from my thighs down to my feet, and I did not believe that I had any other reasonable means to protect myself from death or serious injury.

23. My training and knowledge provided my understanding of the "reactionary gap" concept. I recognized that a resistive felony suspect holding a gun in his waistband poses an imminent deadly threat as the gun can be pointed and fired in fractions of a second. I recognized that when that suspect pulls that gun from his waistband he poses even more of an imminent deadly threat.

24. Immediately after the first shot, King began to spin clockwise to his right, and, immediately following the last shot, he dropped to the ground in front of the parked car.

25. This was a rapidly occurring incident. There were 5-8 seconds separating the moment I first saw Braxton and King running toward me in the alley from the instant I fired my gun.

26. I moved a few steps forward and saw Officer Reffitt approaching from the north, with his gun drawn, along the driver's side of the parked car. At 7:46:25 p.m., I heard Officer

Reffitt air over the police radio, "Madison and 18th. We have shots fired. Start a medic. Suspect down." (AUDIO 12 2016-09-14_19.46.25_Ch63). I would have heard that call being aired.

27. Mr. King was lying on his chest, and I could see his left arm and hand to the left side of his body, but I could not see his right hand. Mr. King was not moving, and I positioned myself between the front of the parked car and Mr. King. I asked Officer Reffitt to cover me, and I stepped forward to place handcuffs on Mr. King, believing that his gun might be under him in his right hand.

28. I was able to secure the handcuffs after pulling Mr. King's right hand out. I then quickly scanned the area and saw Mr. King's gun on the ground slightly under the front bumper of the parked car. Photographs of Mr. King's gun and where it was located are attached to this affidavit as Exhibits 11 and 12.

29. At 7:46:32 p.m., I heard the radio dispatcher air, "I copy. 10-3. Where are you at?" (AUDIO 13 2016-09-14_19.46.32_Ch63). At 7:46:35 p.m., I heard Officer Reffitt respond, "Rear of 957 East Broad Street. 33 recovered." (AUDIO 14 2016-09-14_19.46.35_Ch63).

30. I saw that Mr. King had suffered a gunshot wound to his head and didn't know if he was dead or alive. While I had training in basic first aid, I knew that Mr. King's wounds were far outside of his level of competence and that attempting treatment would be futile or may inadvertently cause additional serious injury or death.

31. Officer Reffitt had aired for a medic immediately after the shooting, which I would have heard being aired. I could see that nothing would delay the paramedics from reaching Mr. King. Other officers began to arrive at the scene. I believe that the medics were arriving on the scene at the same time that I was leaving the area with the Officer Support Team. This concluded my involvement in the incident.

32. I am aware that Demetrius Braxton now alleges that after the shooting of Mr. King, I stated, "Ya'll dumb. Ya'll should have stopped. You should have got down. Ya'll so stupid. Just a bunch of dumb n*****s." This allegation is blatantly false. I did not direct a racial slur towards Mr. King or Mr. Braxton. Mr. King's race played no role whatsoever in my actions. I attempted to take Mr. King into custody because of the armed robbery. I used deadly force to stop the deadly threat posed by Mr. King.

33. I am aware that Plaintiff's expert witness Melvin Tucker has noted that I was involved in three other uses of deadly force. These incidents occurred on September 7, 2009, December 17, 2012, and February 2, 2013.

34. The facts and circumstances surrounding the September 7, 2009 incident are accurately described in the document that has been marked as Exhibit 13 to this affidavit. I was awarded CPD's Silver Cross for my actions that day.

35. The facts and circumstances surrounding the December 17, 2012 incident are accurately described in the documents that have been marked as Exhibits 14 and 15 to this affidavit.

36. The facts and circumstances surrounding the February 2, 2013 incident are accurately described in the document that has been marked as Exhibit 16 to this affidavit.

37. My uses of deadly force during each of those incidents was justified. I was not charged with a crime by any prosecuting authority for my conduct during any one of the incidents. Each of the incidents was thoroughly investigated, and my conduct was not found to be in violation of any version of the City of Columbus' use-of-force directives. No civil claims were successfully prosecuted against me for any of the incidents.

38. My basic training for the CPD was full-time, Monday through Friday, for about six months. During basic training, I was provided training, instruction, and education in a wide range of law-enforcement topics, including, but not limited to: (a) the proper and effective use of force by law enforcement officers; (b) the law and legal limits related to the use of force by law enforcement officers; (c) the safe, proper, and effective use of firearms by law enforcement officers; (d) the law and legal limits related to the use of firearms by law enforcement officers; (e) the CPD's directives regarding the use of force; (f) basic first aid; (g) community diversity and the inappropriateness of racial/bias profiling; (h) crisis intervention and de-escalation.

39. After graduating from the Training Academy, I participated in the CPD's Field Training Officer (FTO) program, which is a type of on-the-job training through which I worked one-on-one with veteran officers. Those veteran officers observed and evaluated my performance in the field and offered advice, instruction, and (when necessary) correction.

40. Since finishing the FTO program, I have also attended annual and periodic Division-mandated in-service and roll-call training on many of the topics already discussed above.

**FURTHER AFFIANT SAYETH NAUGHT.**

_____
BRYAN MASON

Sworn to before me and subscribed in my presence on February 15th, 2021.

_____
NOTARY PUBLIC - STATE OF OHIO
My commission expires: 06/16/2021

KATHLEEN AUKERMAN
Notary Public, State of Ohio
My Commission Expires 06-16-2021