IN THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| DEARREA KING, | Case No. 2:18-cv-1060 |
| Plaintiff, | |
| v. | Judge Edmund A. Sargus, Jr. |
| | Chief Magistrate Judge Elizabeth A. Preston Deavers |
| CITY OF COLUMBUS, OHIO, et al., | |
| Defendants. | **AFFIDAVIT OF THOMAS B. PAIGE** |

STATE OF OHIO

COUNTY OF FRANKLIN, SS:

1. I, Thomas B. Paige, having been first duly cautioned and sworn, do hereby state and affirm that I have personal knowledge of the facts stated in this affidavit below and that I am competent to testify to those facts.

2. I am employed by the Columbus Division of Police (also known as the "Division," the "Columbus Police Department," or the "CPD"). I have been employed as a police officer with the CPD since 1991.

3. The CPD owns, maintains, and operates the Chief James G. Jackson Columbus Police Academy at 1000 North Hague Avenue, Columbus, Ohio 43204.

4. My resume is attached to this affidavit as Exhibit 1.

5. I have been a Defensive Tactics Instructor for the CPD since 1995. I have been a Recruit Basic Instructor for the CPD since 1996. I have been a Trainer of Trainers for the CPD since 2011.

6. In 1993, I received a Master's Degree in Education Studies from Ohio State. In 1986, I received a Bachelor's Degree in Education from Ohio University.

7. I have been a member of the International Law Enforcement Trainers Association. I have been a member of the American Society for Law Enforcement Trainers.

8. The CPD Training Academy is both a police academy for the CPD and a regional training center for certified law enforcement officers who are presently employed by a law enforcement agency other than the CPD.

9. The CPD operates its Training Academy for basic recruit training and the ongoing training of veteran law enforcement officers.

10. Before becoming a police officer with the CPD, an individual must successfully complete the CPD's basic recruit training program.

11. The CPD's basic recruit training program is full-time, Monday through Friday, for approximately six months.

12. The CPD's basic recruit training program consists of more than 1,000 hours of comprehensive instruction.

13. During the CPD's basic recruit training program, recruits are provided training, instruction, and education in a vast array of law-enforcement topics.

14. Among other things, recruits in the CPD's basic recruit training program are provided training, instruction, and education in: (a) the safe, proper, and effective use of non-lethal force; (b) the safe, proper, and effective use of lethal force; (c) the safe, proper, and effective use of firearms; and (d) the law and legal limits applicable to the use of non-lethal force, lethal force, and firearms.

15. The CPD's basic recruit training meets, and often exceeds, the State of Ohio's requirements for basic law enforcement training.

16. During the CPD's basic recruit training program, recruits are also provided with training, instruction, and education on the CPD's written directives regarding the use of non-lethal force, lethal force, and firearms.

17. During the CPD's basic recruit training program, recruits are further provided with training, instruction, and education in: (a) basic first aid; (b) community diversity; (c) the inappropriateness of biased-based (i.e., racial) profiling; (d) crisis intervention; and (e) de-escalation techniques).

18. Following graduation from the CPD's Training Academy, all CPD officers continue their training through the CPD's Field Training Officer (FTO) program, which usually lasts about 15 weeks and consists of four phases of one-on-one training. During each of those phases, veteran CPD officers will evaluate and record the new CPD officers' performance in the field. The veteran officers will offer additional advice, training, and instruction to the new officers when and where necessary.

19. All sworn CPD law enforcement officers must successfully pass the FTO portion of their training to remain on the force.

20. Each year, sworn CPD officers are also required to participate in CPD-mandated annual and periodic in-service training, which also includes any additional training mandated by the State of Ohio.

21. All sworn personnel are also required to view numerous roll-call training presentations on a variety of law-enforcement subjects as deemed necessary or appropriate by changes in the law, technology, law-enforcement theory or application.

22. This ongoing and continued training, instruction, and education reaches almost every law-enforcement subject, but certainly includes: (a) the safe, proper, and effective use of non-lethal force; (b) the safe, proper, and effective use of lethal force; (c) the safe, proper, and effective use of firearms; (d) the law and legal limits applicable to the use of non-lethal force, lethal force, and firearms; and (e) the CPD's written directives regarding the use of non-lethal force, lethal force, and firearms.

23. Firearms qualification and training for all sworn CPD law enforcement officers is also provided annually in at least four phases. Included within this training is on-going and updated training, instruction, and education on (a) the safe, proper, and effective use of firearms; (b) the law and legal limits applicable to the use of non-lethal force, lethal force, and firearms; and (c) the CPD's written directives regarding the use of non-lethal force, lethal force, and firearms.

24. The CPD's firearms qualifications and training requirements meet or exceed the State of Ohio's requirements for such qualifications and training.

25. Exhibit 2 to this affidavit is a true and accurate copy of the CPD's Core Values Statement. Among the CPD's core values is "respect," which the CPD describes as "[d]emonstrating appreciation for human dignity, diversity, and individual rights while holding reverence for human life above all else." In addition to providing recruits with extensive training, instruction, and education in the safe, proper, effective, and legal use of force (either lethal or non-lethal), the CPD's basic recruit training program also impresses upon recruits that such use of force decisions are serious and that the sanctity of human life (their lives, as well as the lives of their fellow officers, the community, and suspects) is to be at the forefront of their use-of-force decision making.

26. Exhibit 3 to this affidavit is a true and accurate copy of the CPD's Rule of Conduct. CPD Rule of Conduct 1.01 states, "Division personnel shall obey the Constitutions of the United States and the State of Ohio and all federal, state, and local laws." CPD Rule of Conduct 1.19 states, "Division personnel shall use force only in accordance with law and Division policy and procedures."

27. Exhibit 4 to this affidavit is a true and accurate copy of the CPD's use-of-force directive that was in effect on September 14, 2016 (CPD Directive 2.01).

28. Exhibit 5 to this affidavit is a true and accurate copy of the directive that was in effect on September 14, 2016 that establishes the procedures for all sworn CPD personnel involved in incidents of discharged firearms, on or off duty. (CPD Directive 2.02).

29. Exhibit 6 to this affidavit is a true and accurate copy of the CPD's directive regarding Bias-Based Profiling that was in effect on September 14, 2016. (CPD Directive 3.07).

30. I was asked by the Columbus City Attorney's Office to review an incident that occurred on September 14, 2016, at approximately 7:45 p.m. in the City of Columbus, County of Franklin County, and State of Ohio. The incident involved Decedent Tyre M. King and CPD Officer Bryan Mason. The opinions expressed in this affidavit are based on my twenty-eight years of experience as a Law Enforcement Officer, Ohio Peace Officer Basic Training Instructor, Subject Control Instructor, upon my education, training, and experience, and upon my review of the materials submitted to me by the City of Columbus City Attorney's Office. I also hold those opinions to a reasonable degree of professional certainty.

31. I have testified in federal court cases. I have testified at least 52 times before the Franklin County Grand jury and in several law enforcement criminal cases throughout my twenty-eight years of service. I am a certified Subject Matter Expert in Subject Control through the Ohio

Peace Officers Training Commission, and my experience includes instruction to officers throughout the country and throughout the State of Ohio on all concepts, issues, and procedures related to threat assessment and to approaching, controlling, and restraining resistive subjects.

32. My opinions in this case are also based on an intensive review of the documents and materials listed in the report that is attached as Exhibit 7 to this affidavit.

33. Most deadly confrontations begin and end within three seconds. Time is a life-threatening factor—time to think, to act, to react, and to do it all within the parameters of the law and departmental policy. Research has shown that a deadly threat can unfold at a speed of one quarter of a second or less.

34. The physiological realities of deadly force confrontations include the factors of action-versus-reaction. Force Science Institute, Ltd. ("Force Science"), an independent human dynamics research institute, defines reaction time as a measure of the time from the arrival of a suddenly presented and unanticipated signal to the beginning of the response to it.

35. Action and reaction sequences take quantifiable amounts of time to complete. There have been many studies completed on action versus reaction. In a series of experiments with officers from Tempe, Arizona, researchers discovered that the average reaction time for officers to shoot when cued with a light was .31 seconds. Three-quarters of that time (.23 seconds) was taken up with processing and one fourth (.08 seconds) with the actual physical motion of moving the finger from the resting position and firing (Lewinsky and Hudson, 2003a). In a more complex scenario where officers had to process information from a number of lights in different rows in the decision to shoot, the reaction almost doubled to .56 seconds (Lewinsky and Hudson, 2003b).

36. Since the invention of a shot timer, research has been completed on the length of time to fire a shot. Force Science completed a study with the primary purpose being to measure

the times it takes to do certain motions. All the motions in the study were self-initiated, and therefore were "action" motions to which an officer would presumably be reacting. In this study it gave an average time for a person sitting in an automobile to draw a gun from across his body and fire it the opposite direction. The average time to grab a firearm from one side of the body and point and shoot in the opposite direction was 26/100ths of a second.

37. The findings of the study show that most officers cannot fire faster than a suspect with a weapon in hand, even if it was not aimed at the officer. The officer has to perceive and absorb the threat that a suspect is going to fire, process the information within the current context, decide on an appropriate action, and then signal the muscles to respond. In the meantime, the suspect has already assessed the situation, decided on a course of action, and must only complete the act of firing. That is why it is commonly stated that action is always faster than reaction.

38. Force Science completed a study of the average time it takes to remove a gun from the waistband (Combat Tuck) and fire in a very quick, close combat tuck maneuver. The study found that the average time to remove a firearm from one's waistband and fire was 0.23 seconds. The fastest time recorded was 0.09 seconds. This of course is less than the average reaction time of 0.31 seconds.

39. The video files labeled PAIGE AFFIDAVIT VIDEOS 1-4 illustrate the remarkable speed of gun attacks from a suspect's waistband.

40. A 13 year old with a handgun is more than capable of killing someone, as evident in the May 22, 2019 shooting in Columbus, A 13 year old shot two 14 year olds, wounding one and killing the other (Associated Press, May 30, 2019).

41. When Officer Mason observed the handgun in Mr. King's waistband, he was already mathematically at risk of being shot. Mason was pursuing two suspects from an armed

robbery and was giving verbal commands for them to stop and get down. Braxton complied. King did not. Instead, King continued to resist commands, began to change his course of flight, and started to draw what appeared to be a deadly weapon from his waistband. This was the dramatic change in circumstances that led Mason to fire his weapon at King. Mason complied with national law enforcement guidelines, training, and best practices when he fired his weapon at King.

42. When Mason suddenly encountered King, King was armed with the 40 XP air pistol that looked and functioned like an actual firearm and that had been modified with a laser sight to further appear to be a real firearm. Mason was confronted with what appeared to be a fully functioning firearm carried by the suspect of an aggravated robbery that had just occurred.

43. Given the facts of this case, it is my opinion that Mr. King appeared to pose a significant threat of death or serious physical injury to both Officer Mason and others at the moment that Officer Mason used deadly force. This remains my opinion in either of the following scenarios: (1) if Mr. King was holding the gun in his waistband; or (2) if Mr. King pulled his gun from his waistband.

FURTHER AFFIANT SAYETH NAUGHT.

_____
THOMAS B. PAIGE

Sworn to before me and subscribed in my presence on February ____, 2021.

_____
NOTARY PUBLIC - STATE OF OHIO

My commission expires: 06/16/2021

KATHLEEN AUKERMAN
Notary Public, State of Ohio
My Commission Expires 06-16-2021

*Dearrea King v. City of Columbus, Ohio, et al.* S.D. Ohio No. 2:18-cv-1060
Affidavit of Thomas B. Paige
Page 9 of 9