Paige Aff. Ex. 7

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | |
|---|---|
| DEARREA KING,<br><br>            Plaintiff,<br><br>   v.<br><br>CITY OF COLUMBUS, OHIO, et al.,<br><br>            Defendants. | Case No. 2:18-cv-1060<br><br>Judge Edmund A. Sargus<br><br>Chief Magistrate Elizabeth P. Deavers<br><br>**EXPERT REPORT OF<br>THOMAS B. PAIGE** |

I submit this expert report to Plaintiff Dearrea King on behalf of Defendants City of Columbus and Bryan Mason. My name is Thomas B. Paige, and I am an employee of the City of Columbus. I am also an Officer with the Columbus Division of Police, which is also known as the Columbus Police Department, Division, Department, or simply CPD. I am a Recruit Training Instructor and a Defensive Tactics Instructor with the Division's Training Bureau.

I was asked by the Columbus City Attorney's Office to review an incident that occurred on September 14, 2016, at approximately 7:45 p.m. in the City of Columbus, County of Franklin County, and State of Ohio. The incident involved Decedent Tyre M. King and CPD Officer Bryan Mason. The opinions expressed in this report are based on my twenty-eight years of experience as a Law Enforcement Officer, Ohio Peace Officer Basic Training Instructor, Subject Control Instructor, upon my education, training, and experience, and upon my review of the materials submitted to me by the City of Columbus City Attorney's Office. I also hold those opinions to a reasonable degree of professional certainty.

I have testified in federal court cases. I have testified at least 52 times before the Franklin County Grand jury and in several law enforcement criminal cases throughout my twenty-eight years of service. I am a certified Subject Matter Expert in Subject Control through the Ohio Peace Officers Training Commission, and my experience includes instruction to officers throughout the country and throughout the State of Ohio on all concepts, issues, and procedures related to threat assessment and to approaching, controlling, and restraining resistive subjects. Attached to this report is my personal resume.

## I. OVERVIEW OF EVENTS

Mason began his employment with the Columbus Division of Police on December 16, 2006. He graduated from the Columbus Police Academy on June 22, 2007, and he became a certified law enforcement officer with the City of Columbus, Ohio. Mason swore an oath to uphold the laws of the City of Columbus, the State of Ohio, and the United States of America.

On September 14, 2016, Mason was working his regular CRT-5 assignment, and his duty hours were 2:00–10:00 pm. CRT assignments place emphasis on community interaction, bike patrol, and proactive policing efforts. Mason was partnered with CPD Officer Robert Reffitt who was driving the cruiser during their shift.

Mason's and Reffitt's duties the afternoon of September 14, 2016, included looking for a car that was stolen from the Franklin Park Area, conducting a traffic stop, and speaking to a group of teenagers who were loitering behind a vacant house near Mt. Vernon Plaza. Mason and Reffitt had just returned to their cruiser after eating dinner—and were leaving the substation lot at approximately 7:40 pm—when CPD communications aired a call involving an armed robbery in the area of 18th Street and East Broad Street. As Reffitt was driving east on East Broad Street from High street, Mason informed Reffitt of additional information that was being posted on Patrol View (or, the cruiser's computer), to include that an individual had been robbed at gunpoint by a group of at least three or four male black suspects. At least one of the suspects was described as wearing a black hoodie, and the suspects had fled the scene southeast on foot.

CPD Officers Ryan McKee and Kevin Yankovich were both working a special duty assignment at the time. McKee's and Yankovich's special duty assignment was Nelson Park Apartments Special, which is located at Maryland Avenue and Nelson Road. Their special duty hours were 5:30–9:30 pm, and they were assigned marked Cruiser # R-72. That cruiser was not equipped with a video system.

McKee and Yankovich were driving southbound on Ohio Avenue, approaching Long Street, when CPD communications aired a robbery at gunpoint at East Broad Street and South 18th Street. Yankovich was driving, and the two proceeded to that location. Upon their arrival, McKee and Yankovich were met by four individuals, one of whom had been robbed. The officers were told that the suspects ran in a southeastern direction. The suspect with the firearm was one of the four who fled on foot.

Yankovich drove southbound on South 18th Street and turned eastbound on Oak Street. He then drove northbound on Hoffman Avenue, and as Yankovich and McKee approached Broad Street, they observed a group of males in the roadway on Hoffman Avenue, south of Broad Street. One of the individuals was wearing a white t-shirt and the other was wearing a dark colored t-shirt.

At about that same time, Reffitt had been driving east on Broad Street. He had passed a British Petroleum gas station on the south side of the street and had just turned right (south) onto Hoffman Avenue.

As Yankovich and McKee were approaching the individuals in the roadway on Hoffman from the south and as Reffitt and Mason were approaching the group from the north, two of the individuals took off running. Mason observed one male black in a white tee shirt standing on the sidewalk near the cruiser. The third individual just remained stationary. Yankovich and McKee exited their cruiser and began to chase the two fleeing suspects on foot, and they both had drawn their duty weapons. Yankovich and McKee pursued the two fleeing individuals into a back yard of one of the residences on the west side of Hoffman, and these two individuals jumped over a fence. At one point, Yankovich was able to get the gate open.

From the north, Reffitt stopped his cruiser south of East Capital Street, and Mason quickly exited the cruiser. He told Reffitt that the individuals were running westbound. Mason also ran west on East Capital Street attempting to cut off the path of the individuals if they decided to run northbound.

Having prior knowledge that the individual were suspected of being involved in armed robbery by firearm, Mason had drawn his duty weapon as he gave chase. As Mason approached South 19th Street, he looked south and immediately saw two male blacks running northbound at a full sprint directly toward him. The males were approximately fifteen-twenty yards south of him.

The first male suspect (Demetrius Braxton) was running about five feet ahead and to the left of the second male (King). The two suspects were being chased by two CPD officers. Mason moved to the center of South 19th Street, raised his weapon, and began shouting verbal commands to the suspects to "get down" or "get on the ground." Almost immediately, the first male in dark clothing (Braxton) dropped down onto his chest near the middle of the alley with his hands open and his arms spread out to the sides of his head. Braxton was fifteen to twenty feet southwest of Mason.

The second male suspect (King) was running to the right and slightly behind (southeast) of Braxton. Mason shifted his sight to focus on King, who was not listening to his commands. Mason took two steps closer to the passenger side of a car that was parked just to his east on a small blacktop area behind 27 and 29 Hoffman Avenue. Mason immediately saw what he believed to be the grip of a handgun tucked in King's front waistband. King tugged on the handgun a couple of times before the firearm cleared his waistline, and a laser sight on the firearm was visible as King was pulling it form his waistband. Mason fired his weapon three times in rapid succession. Once King fell to the ground, Mason asked Reffitt to cover him, and Mason went over and handcuffed King. Mason then asked Reffitt to request a medic. Mason then observed the gun on the ground slightly under the front bumper of the parked car.

Reffitt observed King pulling the handgun from the area of his waistband, but Reffitt did not fire because he would be shooting through the window of the vehicle and thus did not believe he had a clear shot. Yankovich and McKee took Braxton into custody.

## II. GENERAL OPINIONS

**Opinion 1: Mason was acting in his official capacity as a CPD Officer on September 14th, 2016.**

Mason began his employment with the Columbus Division of Police on December 16, 2006. He graduated from the Columbus Police Academy on June 22, 2007, and he became a certified law enforcement officer with the City of Columbus, Ohio. Mason swore an oath to uphold the laws of the City of Columbus, the State of Ohio, and the United States of America.

On September 14, 2016, Mason was working his regular CRT-5 assignment, and his duty hours were 2:00–10:00 pm. CRT assignments place emphasis on community interaction, bike patrol, and proactive policing efforts.

On the afternoon of September 14, 2016, King, Braxton, Jaronn Collins, and two minors (PR and AB) were all occupants in a stolen vehicle (CPD report number 160822092). They developed a plan to rob someone to buy gas for the vehicle. (Informational Summary #43 Interview of Akilah Bulger). Collins approached Michael Ames and asked him what time it was. Unsure of the time, Ames kept walking. Ames was then approached by Braxton, who drew a firearm from the right side of his waistband and pointed it at Ames. Braxton threatened to shoot Aimes if Aimes did not empty his pockets. Ames set his wallet, keys, phone, e-cigarette, and ten dollars cash on the ground. Braxton told Ames to turn around and walk away. Ames took all of his items except for the ten dollars. Braxton took the money and told Ames that, if he turned around and looked back, Braxton would shoot him.

Sarah Yantis and Felicia Johnson were both standing at the corner of South 18th Street and East Broad Street. Yantis observed Braxton pointing the firearm at Ames for what she believes was three minutes, even as Ames walked away. Yantis and Johnson called 911 and told personnel in real time what was going on. They also provided a clothing description and a direction of travel of those involved in the robbery. After the robbery was over, Ames went over to Yantis and Johnson, and he remained with them until officers arrived on scene.

Mason and Reffitt had just returned to their cruiser after eating dinner. They were leaving the substation lot at approximately 7:40 pm when dispatch aired a call involving an armed robbery in the area of 18th Street and East Broad Street. Sworn CPD personnel have a duty to take prompt, effective action regarding anything that comes to their attention requiring a police response within the City of Columbus (CPD Rule of Conduct 1.08(A), 6/30/15). It is thus my opinion that Mason was acting in his official capacity as a CPD

Officer in responding to the armed robbery call on September 14, 2016, and it was during Mason's response to this call that he encountered King.

**Opinion 2: Mason was acting in his official capacity as a CPD Officer when he responded to the area of South 18th Street and Hoffman Avenue on September 14, 2016.**

As noted above, Mason was acting in his official capacity as a CPD Officer in responding to the armed robbery call on September 14, 2016, and it was during Mason's response to this call that he encountered King

Aggravated Robbery is defined by Ohio Revised Code 2911.01

(A)     No person, in attempting or committing a theft offense, as defined in section 2913.01 of the revised Code, or in fleeing immediately after the attempt or offense, shall do any of the following:

(1)     Have a deadly weapon on or about the offender's person or under the offender's control and either display the weapon, brandish it, indicate that the offender possesses it, or use it;

(2)     Have a dangerous ordnance on or about the offender's person or under the offender's control;

(3)     Inflict, or attempt, serious physical harm on another.

Mason had a duty to respond to the area where a citizen had just reported being the victim of an aggravated robbery. "Sworn personnel of the Columbus Division of Police, shall take prompt, effective action regarding anything that comes to their attention requiring a police response within the City of Columbus. Specifically, no exceptions apply in life-threatening situations." (CPD Rule of Conduct 1.08(A), 6/30/15).

As Mason and Reffitt turned southbound onto Hoffman Avenue, they observed another CPD cruiser heading northbound, only one block from their location. That cruiser quickly come to a stop, the doors came open, and Yankovich and McKee began to chase two male suspects believed to be involved in the aggravated robbery. Mason began to parallel the foot chase from the north. Its best practice that setting up a perimeter is an effective way to contain a foot chase. It is also common practice that Mason should have his weapon drawn due to the nature of the offense at issue (Aggravated Robbery).

CPD Standard Operating Procedures for a Robbery Just Occurred (10-41):

1.     Two officer run.

2.	Both officers shall respond to the scene and any additional units shall circulate the area in search of the suspect(s).

3.	The nearest available supervisor and police helicopter, if available, shall be contacted and respond if necessary.

4.	Communicate and coordinate the response. When possible, establish a perimeter in situations where the incident appears likely.

* * *

7.	Locate the victim(s) to determine if an actual robbery has occurred.

	a.	Immediately broadcast a detailed physical description, vehicle, direction of travel, and time lapse since the offense occurred.

	b.	Verify if a weapon was seen or implied and advise Communications Bureau and other responding sworn personnel.

	c.	Request response from EMS if needed

(CPD Patrol SOP 2.02, 4/30/15).

**Opinion 3: Mason's actions and responses on September 14, 2016, were consistent with generally accepted national law enforcement guidelines, training, and best practices when he attempted to deescalate the immediate threat posed by King.**

Mason, Yankovich, and McKee were shouting verbal commands directing Braxton and King to comply with their lawful orders. Initially, Braxton and King continued to run from McKee and Yankovich. Mason was able to effectively set up a perimeter and give commands. Braxton instantly complied with Mason's commands. At a distance of fifteen-twenty yards, Braxton dropped down onto his chest in the middle of the alley. King, however, continued to actively resist and to flee, thus ignoring Masons' commands.

The National Consensus Policy on Use of Force defines de-escalation as taking action or communicating verbally during a potential force encounter in an attempt to stabilize the situation and reduce the immediacy of the threat so that more time, options, and resources can be called upon to resolve the situation without a use of force or with a reduction in the force necessary. De-escalation may include the use of such techniques as command presence, advisements, warnings, verbal persuasion, and tactical repositioning (National Consensus Policy on Use of Force, October 2017)

Mason had a split second to decide what action to take as he observed King and Braxton running towards him at a full sprint and at a distance of only 15-20 yards. Mason began shouting "Get down!" or "Get on the ground!" In this short time frame, Mason had to

perceive, evaluate, decide, and act. Mason was able to observe Braxton's compliance and King's noncompliance. Mason was able to observe what he recognized as the grip of a firearm tucked into King's waistband. Mason also had reason to believe that at least one of the two individuals he was observing possessed a firearm and had just used in during an armed robbery. Still, Mason did not use lethal force to stop King at this instant. He did not use lethal force even at the moment King put his hand on the hand grip of the firearm and tugged on the it to remove it. Mason was clearly trying to deescalate the encounter with King, knowing that he was dealing with a person suspected to be involved in an armed aggravated robbery and seeing a firearm in that person's waistband.

Ohio Revised Code defines force as "any violence, compulsion, or constraint physically exerted by any means upon or against a person or thing." (R.C. § 2901.01 (A)(1), 2016). Further, a "use of force is used to control resistive or aggressive behavior toward the involved personnel, other parties, or property and results in the following Levels of Control." (CPD Directive 2.01(I)(A), 6/30/14). The controls listed in the CPD Directive 2.01 (B) are a progression of techniques used to control a suspect's actions. The use of force Levels of Control used by the CPD are as follows:

Level 0:    Officer presence, verbal and non-verbal commands, searching, handcuffing, sparking a taser for compliance, use of flashbangs and multiple baton rounds as diversions

Level 1:    Empty hand control, pressure points, grounding techniques and joint manipulations

Level 2:    Use of chemical spray

Level 3:    Use of electronic device (electronic custody belt or taser)

Level 4:    Hard empty hand control (strike/punch/kick)

Level 5:    Use of impact weapon (baton/flashlight)

Level 6:    Police K-9 bite

Level 7:    Less lethal weapons (beanbag/multiple baton rounds/stinger cartridges)

Level 8:    Deadly Force

(CPD Directive 2.01(B), 6/30/14).

These Levels of Control guide CPD Officers in a progression of techniques to control a suspect's actions. However, there is no mandate in policy or within the law to sequencing through a list of various force options. The standard that all law enforcement officers must

follow in the use of any type of force against a citizen is derived from the U.S. Supreme Court case of *Graham v. Connor*, 490 U.S. 386 (1989). As the Supreme Court stated:

> *[A]ll* claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other "seizure" of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' approach.
>
> The "reasonableness" of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight…. The calculus of reasonableness must embody an allowance for the fact that police officers are often forced to make split-second judgements, in circumstances that are tense, uncertain and rapidly evolving about the amount of force that is necessary in a particular situation.

*Id* at 395, 396–97

The Court has also provided some general guidance as to what should be viewed as relevant when law enforcement officers are decided whether to use force and what force to use during an arrest/seizure. The totality of the facts and circumstances confronting the officer at the moment are important, particularly:

a)    The severity of the crime suspected

b)    Whether the suspect poses an immediate threat to the safety of officers or others

c)    Whether the suspect is actively resisting

d)    Whether the suspect is attempting to evade arrest by flight

**Opinion 4: Mason complied with national law enforcement guidelines, training and best practices when he drew his firearm and pointed it at Braxton and King, who were aggravated robbery suspects.**

As Mason headed towards the area of South 18th Street and East Broad Street, he became aware of additional information about the run that was being posted on Patrol View (cruiser computer), as well as on the main radio channel. Importantly, he learned the victim of the robbery had been robbed at gunpoint. Information was also received on the clothing descriptions as well as the number participants in the robbery. As Mason exited his cruiser to assist in the foot pursuit of Braxton and King, he drew his weapon.

Drawing his weapon was an appropriate response based on the totality of the circumstances and the high probability that either Braxton or King (or both) were armed.

Law enforcement officers are not trained to withhold an action in order to protect themselves and others. To the contrary, they are trained to recognize the duty they have to protect themselves and others. The Ohio Revised Code defines "deadly force" as any force that carries a substantial risk that it will proximately result in the death of any person (O.R.C.§ 2901.01(A)(2), 2016). In *Tennessee v Garner*,471 U.S. 1 (1985), the U.S. Supreme Court has provided that deadly force is appropriate if an officer has "probable cause to believe that the suspect poses a threat of serious physical harm." Thus, CPD law enforcement officers may use deadly force to achieve seizures in two general contexts:

1.  To protect themselves or others from immediate threats of serious physical injury; and /or

2.  To prevent escape of a fleeing "dangerous" person

"Imminent" means that the danger could happen at any moment—it does not have to have happened, or be happening yet, but could happen at any moment. Patrick, Hall (2010).

Mason was correct in drawing his firearm based on the information known to him at the time. At the time, he had probable cause to believe that Braxton and King posed an imminent threat of serious physical harm to himself and/or others. He had probable cause to believe that they had just participated in an armed robbery, and thus he had reason to believe that either or both of them was still armed. Thus, it is my opinion that Mason complied with national law enforcement guidelines, training, and best practices when he drew his firearm and pointed it at Braxton and King, who were fleeing aggravated robbery suspects at the time.

**Opinion 5: Mason complied with national law enforcement guidelines, training and best practices when he fired his weapon at King.**

Upon perceiving the imminent threat of serious physical harm that King posed to himself and others, Mason shouted commands for King to get down and to comply, just as Braxton had done. It is impossible for an officer to know what a particular subject is going to do. An officer can only react to what the subject does and what the officer reasonably infers the subjects' intentions to be. This illustrates the unavoidable necessity that officers must train to respond to the threat and not the action. Mason showed great restraint when he first observed the grip of a firearm in the waistband of King. He did not fire at that moment, and instead moved from the center of the alley towards the parked vehicle in hopes of providing himself with some cover. He continued shouting commands.

King came to stop with a quick stutter step. He then reached and put his hand on the hand grip of the firearm. Mason did not fire his weapon until the firearm that King was holding was clearly visible in front of his torso and he could see the laser sight on the bottom of the barrel. Mason fired three shots in rapid succession until he perceived the threat had stopped. Mason had a duty to protect himself and others. The U.S. Supreme Court in *Graham v. Connor* (1989) stated that "[o]fficers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." Id at 396–397.

Time is a critical factor in determining the amount of force that can be applied in various situations. Most deadly confrontations begin and end within three seconds. The Force Science Institute has performed several studies on action versus reaction, and one of their key findings is that a deadly threat can unfold at a speed of one quarter of a second or less. (Force Science Institute Ltd., Gun in Waistband, 2016). In a series of experiments with officers from Tempe, Arizona, researchers discovered that the average time for officers to shoot when cued with a light was 0.31 seconds. Three-quarters of that time (0.23 seconds) was taken up with processing and one fourth (0.08 seconds) with the actual physical motion of moving the finger from the resting position and firing (Lewinsky and Hudson, 2003a).

When Mason observed the handgrip in King's waistband, he was already mathematically at risk of being shot. Given the above listed information from the Tempe study, it taking 0.31 seconds to perceive and react to a threat. It only takes an average of .23 seconds for a person to draw a gun tucked in a waistband/combat tuck and discharge a round. The fastest time in the study was 0.09 seconds (Lewinski 2000). This research supports what is commonly stated as "action is always faster than reaction" (Honig and Lewinsky, 2008, p.141).

Mason was pursuing two suspects from an armed robbery and was giving verbal commands for them to stop and get down. Braxton complied. King did not. Instead, King continued to resist commands, began to change his course of flight, and started to draw what appeared to be a deadly weapon from his waistband. This was the dramatic change in circumstances that led Mason to fire his weapon at King. Mason complied with national law enforcement guidelines, training, and best practices when he fired his weapon at King.

**Opinion 6: Handcuffing King and rendering aid complied with national law enforcement guidelines, training, and best practices.**

When Mason saw that King had fallen to the ground, he was still unaware of where the weapon was. Mason began making an assessment of Kings' condition, and he asked Reffitt to cover him as he approached King. King's intentions and physiological state were not known at the time. Human beings are remarkably resilient when it comes to surviving gunshot wounds. Once King was secured, Reffitt immediately requested medical assistance.

On April 11, 1986, in Dade County, Florida eight FBI agents engaged robbery suspects Michael Lee Platt and William Russell Matix. (Forensic Analysis of the April 11, 1986, FBI Firefight (2006)). In the gunfight that ensued, there were a total of 145 rounds exchanged, two agents were killed, and another five agents were wounded before both suspects were killed. During the incident, Platt was shot six times, and Matix was shot twelve times. Later toxicology test established that both subjects' were able to fight, fire, and try to escape through multiple traumatic gunshot wounds and without the assistance of any chemical means. Both Platt and Matix were found to have been drug free. It has since been found that 64% of gunshot victims with wounds to the chest and abdomen and 36% of those with wounds to the head and neck can survive more than five minutes. Some are even able to perform strenuous activity and to continue to physically resist. Thus, for the safety of officers and others, a subject is not totally controlled until he is controlled in handcuffs, patted down, and searched for additional weapons. It is not until any possibility of a threat is mitigated that medical personnel can begin to safely attend to an injured subject. Thus, it is my opinion that handcuffing King before rendering aid complied with national law enforcement guidelines, training, and best practices.

## III.     FACTS, DATA & ADDITIONAL OPINIONS

It only takes an average of 0.23 seconds for a person to draw a gun tucked in a waistband/combat tuck and discharge a round (Force Science Institute Ltd, 2019). An arm can move so fast that it is virtually impossible to intentionally hit it with a firearm. This makes shooting to wound or shooting a weapon out of someone's hand virtually impossible.

If a person is falling forward where his head is parallel to the ground, essentially face forward toward the ground and pointed towards the officer, that motion can be accomplished in 0.5 seconds or less. It takes an officer at an absolute minimum 0.25 seconds to recognize such an action and react to it. While officers are responding to a threat and shooting as the suspect falls through the plane of center mass, it is very likely that the subject may be struck in the neck or head area. (Force Science Review Study 2013).

If someone is stepping towards or away from an officer, he has made that movement in the less time it would take the officer to even make the decision to shoot, let alone the time required to implement that decision. Thus, there can be dynamic motion on the part of the subject occurring within an almost instantaneous amount of time. (Force Science Review Study 2013).

The cadence of fire for the average police officer is 0.25 seconds to fire a round. A cadence of four rounds per second is quite common. It also takes an officer time to stop shooting. The officer must perceive a change in circumstances, process that change, and then react to that change. If an officer were to take 0.56 seconds to react to a stop-shooting signal, approximately three (extra) rounds could be fired by the officer as an automatic sequence after the signal to stop had already occurred. The slower the officer's

reaction time, the greater number of shots that can be fired before a conscious stopping can occur (Force Science Review Study 2013).

It also takes time to detect the change based on what the officer is focused on. The officer may or may not immediately detect a significant change on the part of the subject. The average human reaction time is 1/3 of a second. This time includes the time an officer needs to perceive the threat and react to it by pulling the trigger one time. Reaction time with complex visual stimulus can be as slow as 0.56 or 0.5 seconds. (Hudson B., Lewinski B. 2003).

The average person can over 21 feet in 1.7 seconds and cover 7 feet in 2/3 of a second. Mason observed King running full speed towards him at a distance of 15–20 yards. When Mason fired his weapon King was standing at the front driver's side bumper area of the parked Honda as Mason was standing by the passenger side B-pillar area. Current training teaches officers to fire until the threat ceases or is definitively neutralized. Mason stated he stopped firing once King fell. Mason, in this case, fired his weapon within a distance of (8–15 feet) from the subject, which was at or within the reactionary gap. The reactionary gap is the distance an officer must keep between him/herself and the suspect in order to respond to any sudden threat. According to the Ohio Peace Officers Training subject control manual, the reactionary gap depends on the height/reach of the subject, if they have a weapon, and the effective range of that weapon (e.g., knife versus a long stick). In general, most feel that 6–8 feet is an appropriate distance. The reactionary gap must eventually be closed in order to place a subject in handcuffs.

A 13 year old with a handgun is more than capable of killing someone, as evident in the May 22, 2019 shooting in Columbus, A 13 year old shot two 14 year olds, wounding one and killing the other (Associated Press, May 30, 2019).

In the book *Code of the Street*, Elijah Anderson (Charles and William L. Day Professor of the Social Sciences and Professor of Sociology at the University of Pennsylvania, and Director of the Philadelphia Ethnography Project) wrote, "A drawn gun is a blunt display of power….The films, along with rap music as well as their everyday experiences, help youths become inured to violence and perhaps, death itself." (Pages 125,135).

The instances of subjects with toy guns and police confronting them is not a new issue. The publicity associated with toy gun incidents and concomitant public concern prompted federal legislation requiring that toy guns have a "blaze orange" marking. Congress mandated in Public Law 100-615, June 1990, that a study be conducted to examine the relationship between toy or imitation guns and crime.

Between January 1, 1985, and September 1, 1989, a total of 15,162 imitation gun incidents were identified. During this same time period, there were 31,650 reported imitation gun seizures by the police where there was some type of crime or encounter. (Toy Guns: Involvement In Crime and Encounters With The Police, June 1990, Page 10).

The first type of incident was the commission of a crime with an imitation gun being intentionally used as an instrumentality of the crime. Generally, the suspect would brandish the gun as if it were a real weapon. The most common crime was robbery (Toy Guns: Involvement In Crime and Encounters With The Police, June 1990, Page 18).

The second type of incident found could be classified a mistaken encounters. These occurred when a citizen and/or officer encountered a person with a toy gun, but as a result of the gun's appearance and the circumstances of the incident, the people reacted as if the gun were real (Toy Guns: Involvement In Crime and Encounters With The Police, June 1990, Page 9).

A third category of occurrences were the officer-involved shooting in a non-criminal situations. In these incidents, the circumstances facing the officer reasonably appeared threatening and /or criminal. As a result of multiple factors, the officer used deadly force against a person and a crime was not being committed, but the erratic behavior of the person caused the shooting (Toy Guns: Involvement In Crime and Encounters With The Police, June 1990, Page 10).

The final incident type is the commission of a crime and/or the brandishment of a toy gun as a real weapon resulting in an officer involved shooting. In these cases, the suspect was involved in a crime (or a criminal attempt) and attempted to dissuade officer intervention by acting as if the imitation weapon were real. These incidents typically involved some form of overt behavior prompting the officer's decision to shoot (Toy Guns: Involvement In Crime and Encounters With The Police, June 1990, Page 20).

Richard Turner III, the President of Umarex USA, which is the manufacturer of the 40XP pistol that King had in his possession, was deposed in this matter on March 29, 2019. During the deposition, Turner agreed that the Umarex air pistol is not an exact replica of a real firearm but has features similar to a real semi- automatic handgun and functions like a real handgun. The 40XP has a functioning slide, a frame, a trigger assembly, and a drop out magazine. The 40XP is made from a combination of metals and polymers. Turner also read from the warning label, "Warning: not a toy. Adult supervision is required, misuse or careless use may cause serious injury or death. May be dangerous up to 325 yards."

Turner also read the warning label of the second page of the owner's manual that reads: "Warning: do not brandish or display air gun in public, it may confuse people and may be a crime. Police and others may think it is a firearm. Do not change the coloration and markings to make it look more like a firearm. That is dangerous and may be a crime."

The 40XP pistol that King had when he was shot by Mason also had a laser sight mounted on the front rail underneath that does not come standard on the air pistol. Turner was asked what would be the purpose of adding a laser sight to the 40XP or any other air pistol. He replied, "It is for helping to sight in or to, you know, it is target acquisition."

When Mason suddenly encountered King, King was armed with the 40 XP air pistol that looked and functioned like an actual firearm and that had been modified with a laser sight to further appear to be a real firearm. Mason's split second response was clearly reasonable when confronted with what appeared to be a fully functioning firearm carried by the suspect of an aggravated robbery that had just occurred.

It is my opinion based upon the Police Executive Research Forum (PERF) study that the common theme in the police involved shootings stem from the noncompliance or erratic behavior of the subject when confronted by officers. (Toy Guns: Involvement In Crime and Encounters With The Police, June 1990, Page 10). These finding mirror the actions of King on September 14, 2016. Braxton complied with Mason's commands and got down on the ground. King, on the other hand, continued to run and tried to brandish what looked like a gun.

## IV.   CONCLUSION

This was an unquestionably tragic loss of life, but Mason's conduct was objectively reasonable under the circumstances that he faced. Consideration of all available evidence indicates that Mason's actions were those of an objectively reasonable officer following the state law, the training provided by the State of Ohio, the training provided by the CPD, and the recognized and accepted National Police Best Practices. Any outcome contrary to this would be to judge Mason by an impossible 20/20 hindsight standard.

## V.   MATERIALS REVIEWED

I understand that electronic documents, videos, and images have produced with this report. The files contained within the following folders were provided to me by the Columbus City Attorney's Office, and they are the materials that I reviewed to form my opinions and to write this report.

1. Crime Lab
2. Crime Scene Search Unit
3. Criminal Cases - Braxton
4. Criminal Cases - Collins
5. Drawings & Google Maps
6. Franklin County Coroner
7. Informational Summaries
8. Mason Statements
9. Photos - Cooper
10. Photos - Jackson

11. Photos - Shoaf
12. Photos – Standley #1
13. Photos – Standley #2
14. Photos – Standley #3
15. Photos – Standley #4
16. Photos – Taliaferro
17. Property Slips, etc.
18. Radio
19. Video – Crime Cams
20. Video – East Broad 899
21. Video – East Broad 929
22. Video – East Broad 995
23. Video – Oak 899
24. Video – Oak 892

I was also provided with, reviewed, and relied upon the following files within the folder named "Miscellaneous":

25. Dispatch Article 12.03.2019
26. PIS TMK 000008–000012 – CPD Report #173013027-001
27. PIS TMK 000033–000038 – Criminal Investigation Summary
28. PIS TMK 000066–000073 – CPD Report #160822092-005
29. PIS TMK 000082–000088 – CPD Report #160822744-001
30. PIS TMK 000117–000123 – CPD Report #160822744-002
31. PIS TMK 000145–000151 – CPD Report #160822744-003
32. PIS TMK 000152–000153 – Use of Force Report
33. PIS TMK 000162–000163 – Data Processing Worksheet
34. PIS TMK 00097–000202 – Autopsy Report
35. PIS TMK 000238–000245 – Preliminary Progress Report
36. PIS TMK 000255 – Second Progress Report
37. PIS TMK 000257 – Third Progress Report
38. PIS TMK 000262–000263 – Forensic Progress Report
39. PIS TMK 000264–000265 – Final Progress Report

40. PIS TMK 001806–001807 – Recovered Firearm Report
41. PIS TMK 004056–004059 – CFP Report #16133509

I also reviewed and relied upon the following:

42. Paige Video 42 (Casuccio)
43. Paige Video 43 (Combat Tuck)
44. Paige Video 44 (Quincy)
45. Paige Video 45 (Foot-Chase Bicycle)
46. Paige Video 46 (Passenger)
47. Paige Video 47 (Turn-Run)
48. Paige Video 48 (Act vs. React)
49. Paige Video 49 (Officer Shot)
50. Paige Video 50 (Lavonia)
51. Paige Video 51 (Fullerton)
52. Paige Video 52 (Officer Shot)
53. Paige Video 53 (Press Conference)
54. Paige Image 54 (BB Gun vs Police Gun)

## VI. QUALIFICATIONS

For a statement of my qualifications, see the attached resume.

## VII. COMPENSATION

I am an employee of the City of Columbus. I have not been specially retained by any party in this case. To the extent I have provided or will provide expert analysis, consultation, or testimony on behalf of any party to this case, I have done so or will do so as part of the regular duties of my employment with the City. I will not be paid any compensation above my normal salary for any expert analysis, consultation, or testimony that I have provided or will provide in this matter. Moreover, I have no financial interest or employment interest in the outcome of this case.

## VIII. PRIOR TESTIMONY

I have not testified as an expert witness, either at trial or by deposition, in any other case during the previous 4 years. The last time I testified as an expert witness at a deposition was January 6, 2016, in *Stevens-Rucker v. City of Columbus, et al.* S.D. Ohio Case No. 2:14-cv-2319.

Respectfully Submitted,

*(signature)*

**THOMAS B. PAIGE**
**POLICE OFFICER**
**COLUMBUS DIVISION OF POLICE**

DATED: 9/25/20