IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| **DEARREA KING**, <br> Administrator of the Estate of **Tyre King**, | CASE NO. 2:18-cv-1060 |
| Plaintiff, | |
| -vs- | JUDGE EDMUND A. SARGUS, JR. |
| **CITY OF COLUMBUS, et al.**, | CHIEF MAG. JUDGE ELIZABETH P. DEAVERS |
| Defendants. | |

**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT**

Jacqueline Greene (0092733)
Sarah Gelsomino (0084340)
M. Caroline Hyatt (0093323)
FRIEDMAN, GILBERT + GERHARDSTEIN
50 Public Square, Suite 1900
Cleveland, OH 44113
T: (216) 241-1430
F: (216) 621-0427
jacqueline@FGGfirm.com
sarah@FGGfirm.com
caroline@FGGfirm.com

*Counsel for Plaintiff*

Sean L. Walton (0088401)
Chanda L. Brown (0081076)
Walton + Brown, LLP
395 E. Broad St. Suite 200
Columbus, Ohio 43215
T: (614) 636-3476
F: (614) 636-3453
sean@waltonandbrownlaw.com
chanda@waltonbrownlaw.com

*Counsel for Plaintiff*

Dated: March 24, 2021

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................. 1

STATEMENT OF FACTS ................................................................................................... 1

LAW AND ARGUMENT .................................................................................................. 19

I.   Summary Judgment Standard ................................................................................. 19

II.  Plaintiff's Constitutional Claims Against Defendant Mason Must Proceed to Trial........ 20

    A.   Defendant Mason Violated Tyre King's Constitutional Rights When He Used Deadly Force ........................................................................................................ 20

    B.   Defendant Mason is Not Entitled to Qualified Immunity Because Tyre's Right Not to be Shot was Clearly Established in 2016 ............................................................ 26

    C.   Defendant Mason Violated Tyre King's Right to Equal Protection When He Used Deadly Force and Denied him Medical Treatment on the Basis of his Race ............ 28

III. Plaintiff's Wrongful Death Claim Must Proceed to Trial ................................................. 29

    A.   Defendant Mason is Liable for his Reckless Conduct and is Not Entitled to Statutory Immunity ................................................................................................................ 30

    B.   Plaintiff's Claim is Not Barred by R.C. § 2307.60(B)(2) .......................................... 30

IV.  Defendant City of Columbus is Liable for the Violation of Tyre King's Constitutional Rights ......................................................................................................................... 33

    A.   The Policies and Practices of the Columbus Police Department Caused the Constitutional Violations......................................................................................... 33

    B.   A Final Decision Maker Approved Every Use of Deadly Force by Defendant Mason and Caused Defendant Mason to Continue to Use Excessive Force........................ 35

    C.   The Columbus Police Department Tolerated and Acquiesced in the Use of Excessive Force by Conducting Inadequate Investigations, Approving All Uses of Force, and Never Discipling Defendant Mason for the Excessive Use of Force ........................ 38

    D.   The Inadequate Training and Supervision of Defendant Mason Caused Defendant Mason to Use Excessive Deadly Force ................................................................... 43

CONCLUSION................................................................................................................... 46

# TABLE OF AUTHORITIES

**Cases**

*Adickes v. S.H. Kress & Co.*,
      398 U.S. 144 (1970)……………………………………………………………..34

*Anderson v. Liberty Lobby Inc.*,
      477 U.S. 242 (1986) …………………….…………………………..…………… 19

*Anderson v. Massillon*,
      134 Ohio St.3d. 380, 983 N.E. 2nd 266 (2012) ………………………..……………… 30

*Arendale v. City of Memphis*,
      519 F.3d 587 (6th Cir. 2008)……………………………………………………..39

*Bletz v. Gribble*,
      641 F.3d 743, 752 (2011)……………………………………………………...22

*Botto v. Fischesser*,
      174 Ohio St. 322 (1963) …………………….…………………………….....… 30

*Bouggess v. Mattingly*,
      482 F.3d 886 (6th Cir. 2007) ………………………….………………..………21, 27

*Brandenburg v. Cureton*,
      882 F.2d 211 (6th Cir. 1989)……………………………………………………27, 28

*Burgess v. Fischer*,
      735 F.3d 462 (6th Cir. 2013) …………………………………………....………30, 33

*Brown v. Chapman*,
      814 F.3d 447 (6th Cir. 2016)…………………………………………………...45

*Brown v. Shaner*,
      172 F.3d 927 (6th Cir. 1999)…………………………………………………..44

*Celotex Corp. v. Catrett*,
      477 U.S. 317 (1986) …………………….…………………………………… 19

*Chappell v. City of Cleveland*,
      585 F.3d 901 (6th Cir. 2009) …………………………………………...……………… 20

*City of Canton v. Harris*,
      489 U.S. 378 (1989)……………………………………………………33, 44, 45

*City of Cleburne v. Cleburne Living Ctr.*,
    473 U.S. 432 (1985)……………………………………………………………..28

*City of St. Louis v. Praprotnik*,
    485 U.S. 112 (1988)……………………………………………………………36

*Craighead v. Lee*,
    399 F.3d 954 (8th Cir. 2005)………………………………………………………27

*Daniel v. Cook Cnty.*,
    833 F.3d 728 (7th Cir. 2016)………………………………………………………..34

*Dickerson v. McClellan*,
    101 F.3d 1151 (6th Cir. 1996)……………………………………………….......27

*Ellis ex rel. Pendergrass v. Cleveland Mun. School Dist.*,
    455 F.3d 690, 700 (6th Cir. 2006)………………………………………………..44

*Estate of Jones by Estate of Jones v. City of Martinsburg*
    961 F.3d 661, 673 (4th Cir. 2020)……………………………….……………… 19

*Garner v. Memphis Police Dep't*,
    8 F.3d 358 (6th Cir. 1993)………………………………………………………..33

*Gonzalez v. City of Anaheim*,
    747 F.3d 789 (9th Cir. 2014)………………………………………………………28

*Goodwin v. Richland Cty.*,
    832 F.App'x 354 (6th Cir. 2020)……………………………………………….....25

*Graham v. Connor*,
    490 U.S. 386, 109 S. Ct. 1865, 104 L. Ed. 2d 443 (1989) ……………....…....21, 24

*Harris v. City of Circleville*,
    583 F.3d 356 (6th Cir. 2009)………………………………………………....29

*Jefferson v. Lewis*,
    594 F.3d 454 (6th Cir. 2010)…………………………………………………21, 28

*Jensen v. City of Oxnard*,
    145 F.3d 1078 (9th Cir.1998)………………………………………………………23

*Jackson v. City of Cleveland*,
    925 F.3d 793 (6th Cir. 2019)……………………………………………33, 34, 44

*Jones v. City of Chicago*,

787 F.2d 200 (7th Cir. 1986)………………………………………………………34

*King v. Taylor*,
944 F. Supp. 2d 548 (E.D. KY May 8, 2013) …………………………..…..………22, 27

*Knowlton v. Richland Cty.*,
No. 1:15-cv-00210, 2017 WL 5649597 (N.D. Ohio April 5, 2017); 726 F.App'x 324(6th Cir. 2018)……………………………………………………………………………...25

*Lemmon v. City of Akron*,
768 F.App'x 410 (6th Cir. 2019)……………………………………………………25

*Livermore ex rel Rohm v. Lubelan*,
476 F.3d 397 (6th Cir. 2007)……………………………………………………...25

*Matulin v. Village of Lodi*,
862 F.2d 609, 613 (6th Cir. 1988)……………………………………………………46

*Monell v. Dept. of Social Serv.*,
436 U.S. 658 (1978)………………………………………………………………33, 34

*Mullenix v. Luna*,
136 S.Ct. 305 (2015) ……………………………………………………..……… 27

*North v. Cuyahoga County*,
754 F.App'x 380 (6th Cir. 2018)……………………………………………………33

*Oklahoma v. Tuttle*,
471 U.S. 808 (1985)………………………………………………………………...46

*Otero v. Wood*,
316 F. Supp. 2d 612 (S.D. Ohio 2004)………………………………………………23

*Paige v. Coyner*,
614 F.3d 273 (6th Cir. 2010)………………………………………………………34

*Pearson v. Callahan*,
555 U.S. 223 (2009) …………………………………….……………………… 26

*People v. Hickman*,
59 Ill.2d 89, 94 (1974)………………………………………………………………32

*People v. Hudson*,
222 Ill.2d 392 (2006)………………………………………………………………32

*Pollard v. City of Columbus*,

    780 F.3d 395 (6th Cir. 2015)………………………………………………………………25

*Powers v. Hamilton Cnty. Public Defender*,
    501 F.3d 592 (6th Cir. 2007)………………………………………………………...46

*Reynolds v. Oakwood*,
    38 Ohio App.3d 125 (Ohio Ct. App. 1987) ……………………………….……………..……… 30

*Ryburn v. Huff*,
    565 U.S. 469 (2012)………………………………………………………………...24

*Sample v. Bailey*,
    409 F.3d 689 (6th Cir. 2005) ……………………….……………………………...… 27

*Saucier v. Katz*,
    533 U.S. 194 (2001) ……………………………………………………...……..20, 26

*Scarbrough v. Morgan Cnty. Bd. of Educ.*,
    470 F.3d 250 (6th Cir. 2006)………………………………………………………28

*Sherrod v. Williams*,
    No. 3:14-cv-454, 2019 WL 267175 (S.D. Ohio Jan. 15, 2019)………………..21, 22, 27

*Sova v. City of Mt. Pleasant*,
    142 F.3d 898 (6th Cir. 1998) ……………………….…………………………...20, 27, 28

*State v. McGuire*,
    Case No.1-13-47, 2015-Ohio-1887 (Ohio App. 3rd Dist. Allen May 18, 2015)…………31

*State v. Ford*, Case No.07-AP-803, 2008-Ohio-4373
    (Ohio App. 10th Dist. Franklin Aug. 28, 2008)…………………………………………...31

*State v. Dixon*,
    Case No. 18582, 2002-Ohio-541 (2nd Dist. Montgomery Feb. 8, 2002)…………………31

*Stemler v. City of Florence*,
    126 F.3d 856 (6th Cir. 1997)………………………………………………………...29

*Tennessee v. Garner*,
    471 U.S. 1, 105 S. Ct. 1694, 85 L. Ed. 2d 1 (1985) ………………….20, 21, 23, 45,

*Thomas v. City of Chattanooga*,
    398 F.3d 426 (6th Cir. 2005)……………………………………………………39

*Thomas v. City of Columbus*,
    854 F.3d 361 (6th Cir. 2017)……………………………………………………23, 24

*Thornton v. City of Columbus*,
    727 F.App'x 829 (6th Cir. 2018)…………...……………………………………………24

*Whren v. United States*,
    517 U.S. 806 (1996)………………………………………………………………...29

*White v. Pauly*,
    137 S.Ct. 548, 196 L. Ed. 2d 463 (2017)…………………………………………...27

*Wright v. Euclid*,
    962 F.3d 852 (6th Cir. 2020)…………………………………………………...34, 42

**Statutes and Rules**

United States Constitution………………………………………………………………..*passim*

42 U.S.C. § 1983 ……………………………………………….………………20, 33, 34, 38

Fed. R. Civ. P. 56(c)…………………………………………………………...……… 19

Ohio Rev. Code §2744 …………………………………………….……………………… 30

Ohio Rev. Code § 2744.03…………………………………….…………………………30

Ohio Rev. Code § 2307.60………...……………….……………...…………….………29, 30, 31

## INTRODUCTION

When 13-year-old Tyre King was approached by Defendant Mason on September 14, 2016, he was scared, confused, panicking, and he tried to flee. Although Tyre never made himself a threat to Defendant Mason or any other person, Mason used deadly force against Tyre, shooting him three times as he fled, killing him. This use of deadly force was excessive, unnecessary, and violated young Tyre's Fourth Amendment Rights. Defendants Mason and City of Columbus are both responsible for this egregious use of deadly force because while Defendant Mason acted in violation of clearly established law, he was actually acting consistently with CPD policies and training, which directed officers to shoot an armed suspect, even where there was no immediate threat of harm. Defendant City of Columbus repeatedly ratified and approved of the use of such force, including by Defendant Mason himself on a prior occasion. It was as a result of these policies and practices that Defendant Mason used deadly force against young Tyre. Defendants must be held accountable for this dangerous and unconstitutional policy. There are critical facts in dispute that must be resolved by a jury. Summary judgment must be denied on all claims[1].

## STATEMENT OF FACTS

### I.     CPD policy and training regarding the use of deadly force

Columbus Police Division Direction 2.01, which purports to be the use of force policy of Defendant City of Columbus, prohibits using "more force than is reasonable," and prohibits deadly force by a police officer except when "the response is objectively reasonable to protect themselves or others from the imminent threat of death or serious physical harm." (Doc. 136-27, CPD Use of Force Directive, PageID#2963-2964). When used to prevent escape, the directive is clear that there

---

[1] Plaintiff agrees to voluntarily dismiss Count Four: Deliberate Indifference to a Serious Medical Need.

must be "probable cause to believe that the suspect poses an *immediate* threat." (*Id.*, PageID#2964). (emphasis in original). However, the actual policies and practices of the City of Columbus, and the training City of Columbus police officers receive, is directly contrary to the Columbus Police Division Directives: a threat does not actually need to be "imminent" or "immediate" to justify the use of deadly force by City of Columbus police officers but can be merely "speculative." (Pl. Ex. 1, Deposition of Sergeant Eric Pilya, p. 147). And while the directive indicates that the use of force must be objectively reasonable, the City of Columbus will allow the use of deadly force, so long as they can "articulate" the threat they "believed" to exist. (*Id.*, pp. 168-169). This subjective standard does not account for whether the use of force was objectively reasonable. The City of Columbus also did not consider pointing a weapon at someone as a use of force at all prior to December 2020. (Pl. Ex. 2, Deposition of Traci Shaw, p. 55).

City of Columbus police policies also unnecessarily escalate non-threatening situations by requiring guns to be drawn in non-threatening situations. For example, Columbus police officers are trained to draw their weapons for any foot chase, regardless of whether they have seen a weapon. (Pl. Ex. 2, p. 114). Officers are trained to respond to the future "threat" not the "actual action," purportedly because of the risk that an officer would respond too slowly if they waited for the threat to materialize. (*Id.*, p. 107). This includes shooting before a suspect even pulls a gun out of their waistband. (*Id.*). A suspect having their hand on a gun (even though Ohio is an open-carry state) is enough to justify using deadly force. (*Id.*). This, in conjunction with the policy of treating uses of force as justified any time the officer articulates a threat he subjectively perceived, regardless of the reasonableness of that perception, trains officers to respond with deadly force to future, speculative threats.

Finally, City of Columbus police officers are trained to handcuff all persons who have been shot by police officers. (Pl. Ex. 2, pp. 121-122). This remains true even if it would cause greater injury to the wounded individual. (*Id*.). Requiring this in every case, not merely where justified by an actual, objective threat, is a denial of medical care to persons wounded by City of Columbus police officers.

## II.   Biased Columbus Division of Police Investigations are Not Meaningful Reviews of Deadly Force

The City of Columbus police department has procedures for administrative and criminal investigations when an officer discharges his weapon. The Critical Incident Response Team ("CIRT") is tasked with undertaking the criminal investigation of the shooting. CIRT is activated following most intentional and unintentional weapon discharges, including any discharge of a firearm resulting in injury (except for non-lethal self-inflicted injury), intentional discharge directed at a person or reasonably construed as directed at a person, and the unintentional discharge of a firearm that could be reasonably construed as being directed at someone. (Doc. 136-28, CPD Discharged Firearms Directive, PageID#2973). However, CIRT does not treat the investigation of shootings by police officers like other criminal investigations. In fact, CIRT has never treated the investigation of a police shooting as a criminal investigation. (Pl. Ex. 1, p. 39). Rather, it is presumed to be a "police action" until "proven" otherwise, and it is only "proven otherwise" when a grand jury decides that charges should be brought. (*Id*., pp. 65-66). CIRT regularly develops a "gist" about the anticipated outcome, in favor of the officer, at the scene of the shooting, well before the complete investigation is completed. (*Id.,* pp. 65-66).

Following a police shooting, the officer is supposed to notify his immediate supervisor, and the supervisor responds to the scene, separating witnesses, putting up crime scene tape, and calling for an "officer support member" to "support" the police shooter. (Pl. Ex. 1, p. 41). The

officer support member takes the police shooter to the nearest police facility. (*Id*.). CIRT is called to the scene. (*Id*.). The CIRT team is comprised of six detectives and two sergeants. (*Id*.). One of the detectives is primary investigator. (*Id.,* p. 43). Once everyone is present, the CIRT team determines which officers were involved, whether there are officer witnesses, and whether there are civilian witnesses. (*Id.,* p. 47). The CIRT detectives interview officer and civilian witnesses. (*Id*.). at 48. The civilian witnesses are detained in the back of police cruisers until they can be interviewed. (*Id.,* p. 49). Police witnesses do not leave the scene until they have been interviewed. (*Id.,* p. 62). The CIRT detectives may also canvas the area for witnesses. (*Id*., p. 82). The CIRT detectives report the contents of their interviews to Sergeant Pilya, the CIRT team leader. (*Id*., p. 61).

The police officer suspect is allowed to leave the scene with their support person. (Pl. Ex. 1, p. 63). This is for the officer's "mental wellbeing." (*Id.,* p. 64). According to long-standing but unwritten policy, the police shooter can only be asked three questions at the scene: are you injured in any way, is there any evidence out here the investigator would not know about (e.g., officer saw suspect throw drugs in a dumpster), and where were you standing and what direction did you fire? (*Id*., pp. 85, 91). After this, the police shooter is photographed by the crime scene unit and his weapon is taken. (*Id.,* p. 92). He is then immediately given a replacement weapon. (*Id.,* p. 92).

After the scene is cleared, it varies in how the investigation proceeds. (Pl. Ex. 1, p. 84). There may be follow up with witnesses, follow up on the canvas, and there may be crime lab testing and an autopsy. (*Id*., p. 84). The police shooter is typically given at least seven to fourteen days to make their formal statement, though no formal statement is requried. (*Id*., p. 88).

After a use of deadly force, police shooters are given three paid days off, and can receive more if considered necessary. (Pl. Ex. 1, p. 118). This time is used to meet with their attorney and

to see a psychologist. (*Id*.). Officers return to active duty before the CIRT investigation is complete. (*Id*., p. 119).

A shooting that results in death is sent to a grand jury to decide if charges will be filed. (Pl. Ex. 1, p. 69). If the shooting was not fatal, CIRT makes the ultimate decision of whether it was a police action or criminal. (*Id*., p. 70). Strikingly, CIRT has never concluded that a police officer committed a criminal act when using deadly force. (*Id*., p. 77). Only one use of deadly force had ever resulted in charges prior to the events relevant here; in that case, CIRT believed that the use of force was justified, but it went to the grand jury automatically because it resulted in a death, and charges were filed. (*Id*., pp. 70-73, 78). Columbus Police Sergeant Eric Pilya, team leader for CIRT and designated 30b6 witness, testified that he has never reviewed an officer use of deadly force and found it to be excessive or unjustified. (*Id*., p. 236). At all times relevant to this matter, CDP had never terminated a single police officer for using deadly force. (*Id*., p. 232).

After the CIRT investigation, the Firearms Review Board ("FRB") completes an administrative review to determine if any policies were violated. (Pl. Ex. 3, Deposition of Deputy Chief Kenneth Kuebler, pp. 54-55). Each review determines whether the shooting was intentional or unintentional, and whether it was in violation of policy. (*Id*., p. 69). The FRB bases their review on the CIRT investigation that already occurred. (*Id*., pp. 63, 66-68). While it is possible for the FRB to request further investigation, this rarely occurs. (*Id*., p. 63).

The unintentional discharge of a weapon is a violation of policy because department policy requires that every discharge be intentional, and those are consistently found to be in violation of policy. (Pl. Ex. 3, p. 129). However, the intentional discharge of a weapon is almost always found to be justified. Of the shootings reviewed by FRB in 2005, every shooting found to violate policy was an accidental shooting except for one. (*Id*., p. 110). In 2006 and 2007, the only shootings

found to violate policy were accidental shootings. (*Id.*, pp. 113, 115). In 2008, every shooting found to violate policy was an accidental shooting except for one; the FRB found that this shooting was reasonable from a force perspective, but outside of policy because it was too long of a shot. (*Id.*, pp. 117-118). In 2009, 2010, and 2011, the only shootings found to violate policy were accidental shootings. (*Id.*, pp. 120, 122). In 2012, there were two intentional shootings found to violate policy, but neither were based on the level of force used. Rather the violations of policy concerned the risk posed in the "backdrop," that is, the risk to persons near or behind the target of the shooting. (*Id.*, pp. 125-130). In 2013 and 2014, every shooting found to violate policy was an accidental shooting. (*Id.*, pp. 131, 135). In 2015, there was one intentional shooting found to violate policy, and like those found previously, it was a "backdrop" issue. (*Id.*, pp. 136, 138). In 2016, only one intentional shooting out of 100 was found to violate policy, and it did not result in discipline. (*Id.*, p. 140). While the FRB regularly finds that accidental discharges violate policy, it almost never finds a violation when force is used intentionally. Intentional uses of force are almost exclusively found to be justified.

### III.    Hiring and Training of Defendant Bryan Mason by the City of Columbus

Defendant Bryan Mason was originally hired by Defendant City of Columbus in 2006. (Doc. 132-1, Mason Dep., PageID#2603). When Defendant Mason first applied, a polygraph test found he was "less than forthcoming" about masturbating in his car and at work. (Pl. Ex. 4, Exhibit 11 to Deposition of Deputy Chief Richard Bash – Mason Hiring Polygraph, p. 1). While this was identified in the polygraph summary as a concern regarding his honesty, it did not disqualify him. The polygraph also uncovered "criminal activity," including pirating software and music, and receiving stolen goods. (Pl. Ex. 5, Deposition of Deputy Chief Richard Bash, p. 137; Pl. Ex. 6, Exhibit 12 to Deposition of Deputy Chief Richard Bash – Memorandum Regarding Background

Removal of Mason). For this, he was disqualified and removed from the list of applicants. (*Id*.). However, after he appealed the decision, his application was reinstated. (Pl. Ex. 7, Exhibit 14 to Deposition of Deputy Chief Richard Bash – Notice of Removal to Mason). Despite Defendant Mason's unabashed dishonesty in the application process, CDP did not devise a plan to ensure that his dishonesty did not continue during his tenure as a City of Columbus police officer. (Pl. Ex. 5, p. 144).

Defendant Mason received his basic training through the Columbus Division of Police. (Pl. Ex. 2, p. 44). Defendant City of Columbus trained its new officers, including Mason, to categorize people into three groups: sheep, sheepdogs (the police), and wolves (the "Bad Guys"). (Pl. Ex. 8, Exhibit 14 to Deposition of Traci Shaw – Defensive Tactics Unit 2007 Proficiency Skills & Taser Phase Training, pp. 21-29). The sheep live "in denial" and "[d]o not want to believe that evil exists." (*Id*., p. 23). They experience "fear, helplessness, and horror when the wolf shows up." (*Id*., p. 28). Wolves "[f]eed on the sheep without mercy," have "a capacity for violence," "[p]ray on the weak and defenseless," and have "[n]o empathy for their fellow citizens." (*Id*., pp. 22, 24). Thus, the sheepdogs must protect the sheep from the wolf. (*Id*., p. 22). However, a police officer being a "sheepdog" and not a "sheep" himself is dependent on being armed with his firearm. If he "step[s] outside without that weapon, then [he] becom[es] a sheep." (*Id*., p. 29). Officers are encouraged to carry their weapon at all times. "[I]f you are authorized to carry a weapon, and you walk outside without it," you are a sheep. (*Id*.). Defendant Mason received this training, and it is the policy of Defendant City of Columbus. (Pl. Ex. 2, p. 129). This concept was referenced again in training in 2016. (Pl. Ex. 9, Exhibit 16 to Deposition of Traci Shaw – 2016 Deadly Force Encounters Training, p.  82).

Defendant City of Columbus also trains its officers to shoot before a suspect begins to pull a gun out of their waistband. (Pl. Ex. 2, p. 107; Pl. Ex. 10, Exhibit 5 to Deposition of Traci Shaw – Defensive Tactics Unit 2009 Proficiency Skills & Taser Phase Training, p. 2). They are trained to react to the "threat," not the "action." (Pl. Ex. 2, p. 107). Despite Ohio's status as an open-carry state, a suspect having their hand on a gun is enough to justify CDP officers' use of deadly force, according to the policy of the City of Columbus police department. (*Id*.). This problematic practice is taught in the training for recruits and for officers, including Defendant Mason. (*Id*., p. 108, 129).

## IV. Defendant Mason's Clear Pattern of Excessive Deadly Force Left Unchecked by the Columbus Division of Police

In the seven years prior to Defendant Mason shooting Tyre King, Mason was the subject of dozens of separate use of force reports, including three shootings. (Doc. 132-3, PageID#2752-2757; Pl. Ex. 11, Summary of Masson Citizen Complaints and Internal Investigations). Many of those uses of force required medical attention and one was fatal. (*Id*.). It is "unusual" for a police officer to use deadly force this many times in their entire career, and Mason had done so in only seven years. (Pl. Ex. 12, Deposition of Kim Jacobs, p. 140). In fact, "it's unusual to have one." (*Id*.).

The first time Defendant Mason used deadly force was on September 18, 2009. A CIRT investigation was conducted, no criminal acts were found, and the FRB found Defendant Mason's use of force to be within policy. (Pl. Ex. 13, Mason Farnsworth Shooting Routing Sheet; Pl. Ex. 11, p. 43). His second use of deadly force was on December 17, 2012. (Pl. Ex. 14, Mason IAB File Excerpts, p. 4). There was a CIRT investigation, and then on October 3, 2013, the investigation went to the FRB. (Pl. Ex. 14, p. 1). On October 11, 2013, the FRB concluded that Defendant Mason's use of force was reasonable and within policy. (*Id*.).

8

On February 2, 2013, long before the conclusion of the investigation of Defendant Mason's December 17, 2012 use of deadly force, Defendant Mason once again used deadly force, this time against a man named Gary Williams. This time, Mason shot and injured the victim, but the bullet wound was not fatal.

While on patrol with another officer, Defendant Mason initiated a traffic stop for a lane violation. (Pl. Ex. 14, p. 26). When the vehicle pulled over, the person in the passenger side got out and began running down the sidewalk. (*Id*.). Mason yelled for him to stop, but he did not. (*Id*.). Defendant Mason did not see a weapon, or have probable cause for any criminal act by the passenger of the car, but he "believed" that the man's hand was in his pocket because he was holding a gun there. (*Id*., pp. 26-27). Mason ran after him, yelling for him to stop, but the man continued running. (*Id*., p. 27). Eventually, the man began to slow down, and Mason was slowing down too, as they both became winded. (*Id*.). Then, according to Defendant Mason's statement, the man raised his arm to the side, holding a gun. (*Id*., p. 28). Defendant Mason shot at him once. (*Id*.). The man fell and dropped the gun. (*Id*.). He began to crawl towards the gun, and Mason shot again, hitting him this time. (*Id*.).

Unlike Defendant Mason's prior uses of force, Defendant Mason did not witness any evidence that Williams had committed any crime, but rather he happened to merely be a passenger in a vehicle during a traffic stop. The only thing Williams did was flee when the vehicle was pulled over. Williams never fired his weapon, never threatened to fire it, and never aimed it any person.

Following the shooting, Defendant Mason gave an initial interview again, and declined to give a formal statement without counsel. (Pl. Ex. 14, pp. 22-24). On February 8, 2013, Defendant Mason provided a written formal statement. (*Id*., p. 31). In his statement, Mason explained that when he shot the first time, Williams "had just pulled a handgun out of his coat pocket or

waistband, and I believed that he was going to shoot me." (*Id.*, p. 29). The second time Mason fired his weapon, Williams "was crawling on his hands and knees directly toward his gun," and "I believed [he] was trying to regain control of his weapon so he could shoot at me, and I fired my gun at him again." (*Id.*). At no time did he allege that Williams made any threat or ever pointed the weapon at Mason, or another person, or that Williams engaged in any conduct that suggested he would imminently pull the trigger. On February 11, 2013, Mason was interviewed by Sgt. Pilya. (*Id.*, p. 31). Pilya asked the usual routine questions and had Mason mark where he and Williams had been standing on the crime scene sketch. (*Id.*, pp. 31-39). Pilya asked a leading question to get Defendant Mason to answer that he shot in a direction he did to avoid any "backdrop" concerns. (*Id.*, p. 39). The only substantive question was about the action Williams took when he pulled out the gun. Defendant Mason explained that Williams had his arm straight out to the side (not pointed in the direction of Defendant Mason). (*Id.*). Pilya then asked leading questions to substantiate the use of force, asking if Williams was rotating towards Mason in one "fluid movement," to which Mason agreed. (*Id.*).

Williams was interviewed at the hospital. He told the investigator that he was holding a gun that belonged to someone else and that when he slipped on snow, Defendant Mason shot at him. (Pl. Ex. 14, p. 21). When he tried to stand back up, Mason shot him. (*Id.*). He told the investigator that he never pointed the weapon at Mason. (*Id.*). The gun was not loaded. (*Id.*). Defendant Mason was never questioned on the differences between Williams' statement and his own.

Following the investigation, it was the position of CIRT that Defendant Mason's use of force was not criminal and the grand jury did not indict. (Pl. Ex. 1, p. 215-217). On November 8, 2014, the FRB received the investigation into the shooting of Williams. (Pl. Ex. 13, p. 20). The

Board met on November 13, 2014 to discuss the investigation and concluded that Defendant Mason acted in self-defense and that his use of force was within policy. (*Id*.). Defendant Mason's multiple uses of deadly force did not factor into this decision. (Pl. Ex. 1, p. 217).

Defendant City of Columbus does not have any effective mechanism to identify and track dangerous officers like Mason. The Employee Action Review System ("EARS") is intended to identify negative employee behavior, including identifying "risk indicators in an employee's performance before damaging behavior occurs." (Pl. Ex. 17, Excerpts, EARS Standard Operating Procedures, p. 1). Ostensibly, the system is used to develop and improve training, policies, and procedures, and to intervene into an officer's behavior. (*Id*.). However, Plaintiff's police practices expert opines that EARS is "ineffective in intervening or correcting the problematic behavior of officers." (Pl. Ex. 16, Tucker Report, p. 7). In conducting this review, EARS considers complaints against the officer, uses of force, and criminal and internal investigations. (Pl. Ex. 17, Excerpts, EARS Standard Operating Procedures, p. 2). If an officer reaches a certain threshold, a review should be triggered by EARS. If that review uncovers a pattern or other problem, the officer is referred for an action plan from their chain of command. (Pl. Ex. 5, p. 160). Defendant Mason was reviewed by EARS once for his use of mace and his use of force, but in both cases the EARS Committee determined that no further action was needed. (Pl. Ex. 18, Excerpts, EARS Semi-Annual Reviews 2011-2012 and 2012-2013).

Out of a department of more than 1500 police officers, only two officers have been involved in more shootings than Defendant Mason. However, although the Columbus Police Department ostensibly has a program for flagging dangerous officers—EARS—Columbus does not consider the number of times an officer uses deadly force to raise a red flag. (Pl. Ex. 5, p. 157). The EARS system only captures the top five percent of officers who use force on an annual basis.

(Pl. Ex. 17, p. 3). There is no objective, baseline assessment for when EARS should be triggered by officer conduct—instead, it is only relative, year-to-year, based on how many force incidents occur and who happens to be in the top five percent of those officers engaging in use of force. (*Id*.). The EARS system is not designed to identify officers who repeatedly use a certain type of force or who engage in problematic use of force over a period of years. The EARS system does not effectively capture problematic use of force patterns nor does it allow for meaningful review and retraining of officer use of force beyond the small group reviewed on an annual basis in the "top five percent." (*Id*.).

**V.     The Use of Deadly Force Against Tyre King**

On September 14, 2016, 19-year-old Demetrius Braxton and 16-year-old Jaronn Collins robbed Michael Ames using 13-year-old Tyre King's inoperable BB gun. (Doc. 127-1, Deposition of Demetrius Braxton, PageID#1578-1586, 1592-1593, 1709-1711). Jaronn came up with the idea to rob someone for gas money using the BB gun that Tyre had in his possession that day. (*Id*., PageID#1620, 1703, 1740-1741). After Jaronn initially intended to commit the robbery but got cold feet, Demetrius took the gun from Jaronn and committed the robbery himself. (*Id*., PageID#1580, 1735). During this time, Tyre, A.B., and P.R. stood across the street near a fence and were not active participants in the robbery nor did they provide any assistance during the robbery. (*Id*., PageID#1580, 1733-1734; Doc. 130-1, Deposition of Robert Reffitt, PageID#2108-2109). Aside from possessing the toy gun that was used in the robbery and being with the older teens who committed the robbery, Tyre was not involved with the planning or execution of the robbery. (Doc. 127-1, PageID#1580, 1626-1627, 1732-1734, 1751, 1771-1772).

Defendant Officer Bryan Mason learned of a robbery near Broad and 18th while he and his partner, Officer Robert Reffitt, were at the police substation. (Doc. 132-1, PageID#2643). They

were informed that a group of "kids," perhaps three to four, were running south and east from 18th and Broad. (*Id*., PageID#2643-2644).

After the robbery, Tyre King, Jaronn, Demetrius, P.R., and A.B., walked together towards their car, which was parked behind a building situated across the street from the BP gas station on East Broad Street. (Doc. 127-1, PageID#1582-1583). Tyre was thirteen and was 5'2" and only 120 pounds. (Pl. Ex. 15, Autopsy Report, p 7). They saw police officers approaching and began to run. (Doc. 127-1, PageID#1719; Doc. 130-1, PageID#2106). As they ran through the neighborhood, they eventually separated, and Tyre and Demetrius ended up running together. (Doc. 127-1, PageID#1720; Doc. 130-1, PageID#2106, 2202-2203, 2219, 2226). Two officers followed them. They hopped a privacy fence into an alley. As they turned to run north up the alley, they were confronted by Defendant Officer Bryan Mason, who was by himself at the time. (Doc. 127-1, PageID#1599-1600, 1723-1724; Doc. 130-1, PageID#2131, 2185, 2201, 2214, 2231-2232, 2273; Doc. 126-1, Deposition of Anna Skora, PageID#1423, 1460-1462, 1465, 1468-1470).

Defendant Mason had his gun already drawn. (Doc. 130-1, PageID#2186-2187, 2213-2215, 2218, 2131; Pl. Ex. 2, p. 114). Mason, facing both teens, ordered them to get on the ground. (Doc. 127-1, PageID#1609, 1729; Doc. 130-1, PageID#2131-2132, 2213, 2231, 2264). Demetrius went to the ground, however Tyre, appearing panicky, fearful, and surprised, did not get on the ground. (Doc. 127-1, PageID#1599; Doc. 130-1, PageID#2133, 2231-2232, 2264-2265; Doc. 126-1, PageID#1410, 1470-1471, 1430). Tyre hesitated and looked left and right, before attempting to run around a parked car. (Doc. 131-1, PageID#2502-2503, 2514; Doc. 126-1, PageID#1432, 1446). Contrary to Mason's story, Tyre's hands never went down into his pants and were in fact outside of his pants as he attempted to run around the car. (Doc. 127-1, PageID#1750, 1792). His arms were at his sides in a running motion. *Id.*

13

As Tyre began to run, Defendant Mason shot him in the left side of the head, then shot twice more. (Doc. 130-1, PageID#2140-2141, 2213-2214, 2232). Tyre was in motion when he was shot, in his attempt to flee. Tyre had turned to his right and was heading toward the parked car positioned to his right. (Doc. 127-1, PageID#1599-1600; Doc. 130-1, PageID#2141-2142, 2213-2214, 2224, 2232, 2266, 2319-2321, 2323-2325, 2328, 2332-2333; Doc. 126-1, PageID#1432). At the time that Defendant Mason shot Tyre King, he was not presenting any immediate threat of harm and was merely fleeing. Witnesses were surprised when Mason began shooting. (Doc. 130-1, PageID#2243-2244; Doc. 126-1, PageID#1400, 1409-1410). They did not perceive a threat that justified such force. (Doc. 130-1, PageID#2250; Doc. 126-1, PageID#1445-1446, 1472). They saw Tyre was a child and did not believe that he was attempting to reach into his pants for a weapon. (Doc. 127-1, PageID#1603, 1606, 1721, 1770, 1789; Doc. 130-1, PageID#2134-2135, 2137, 2242-2244, 2246, 2265; Doc. 126-1, PageID#1445, 1483). They only movements they saw where Tyre's attempt to run *away* from the officer. (Doc. 127-1, PageID#1599, 1603, 1606-1607; Doc. 130-1, PageID#2133, 2140-2141, 2232, 2243-2244, 2246, 2266, 2320; Doc. 126-1, PageID#1432, 1445-1446, 1484). Defendant Mason's partner, Officer Reffitt agreed that Tyre did not look menacing at all, aside from the failure to comply. (Doc. 131-1, PageID#2514-2515). Simply failing to comply, even if Mason's disputed claim that Tyre was holding a gun is to be believed, would not justify the use of deadly force. (Ex. 1, p 217).

Officer Reffitt was not with Mason at the time when Mason initially confronted Tyre and Demetrius. (Doc. 127-1, PageID#1723-1724; Doc. 130-1, PageID#2222-2223). Reffitt had pulled their cruiser past Capital Street and Mason knew that it would take Reffitt some time to back up and go down Capital Street. Instead of waiting on Reffitt, Mason decided to exit the passenger side of the cruiser and ran westbound down Capital Street in order to cut off Tyre and Demetrius. (Doc.

132-1, PageID#2645-2646). Mason believes the entire incident from the moment he confronted Tyre and he "broke away" to the moment he fired his last shots last two to three seconds. (Doc. 132-1, PageID#2650, 2697, 2700.) Reffitt believes three to five seconds elapsed from the moment he turned onto Capital Street to the point when he stopped and exited the vehicle, and then at least seven or eight seconds passed from the time that Mason exited the vehicle to the time he heard gunshots. (Doc. 131-1, PageID#2510-2511). Reffitt also believes two to three seconds from the time he finally parked the vehicle to the moment he heard gunshots. (*Id.* at 2496-2497). Witnesses did not see Reffitt at the scene of the shooting at the moment shots were fired. (Doc. 127-1, PageID#1723-1724; Doc. 130-1, PageID#2222-2224).

One of the witnesses, a nun, Sister Anna Skora, testified that she never saw Tyre with a gun and only saw him running away. (Doc. 126-1, PageID#1445). Sister Skora explained that had Tyre moved his hand in front of his body, she was in a position to have been able to see it. (*Id*., PageID#1485-1486). However, she never saw Tyre reach into his pants, pull on his pants or make any movements that indicated to her that Tyre was doing anything other than attempting to run. (*Id*., PageID#1432, 1483-1484). At the time of the shooting, she observed Tyre moving in an attempt to figure out which direction to run. (*Id*., PageID#1470-1471). She saw only a playful situation and it did not appear to be a scary confrontation to her. (*Id*., PageID#1472-1473).

Additionally, the physical evidence supports that Tyre was turning away from Mason to flee, rather than facing him head on, as alleged by Mason. There is no physical evidence corroborating Mason's claim that Tyre was holding a gun when shot. (Pl. Ex. 19, Bauer Report, p. 16). Plaintiff's reconstruction expert Jeremy Bauer was retained to provide analysis and opinions regarding ballistics, shooting incident reconstruction, visibility analysis, and injury biomechanics in this case. (Pl. Ex. 19, Bauer Report, p. 1; see also Pl. Ex. 20, Diaz report). Bauer determined

that Tyre was looking away from Mason when Mason shot Tyre in the head.  (Pl. Ex. 19, Bauer Report, p. 16). This is inconsistent with Mason's account of the shooting. (*Id*.). The location of the gun after Mason shot Tyre further disputes Mason's account. The gun was found near the wheel of the parked car, some distance away from Tyre's body, however Mason claims he never saw Tyree throw the gun. Tyre could have tossed the gun before he was shot, thereby disputing Mason's story that Tyre was holding a gun when shots were fired. Or he tossed the gun as he was shot, in which case Mason would have seen his arm swing. Either way, the physical evidence, the kinematics of being shot, and Mason's versions of events are not consistent. (*Id.* pp. 15-16).

However, even under Defendant Mason's version of the facts, which is hotly contested, the most Tyre did was pull unsuccessfully on the grip of the gun as it snagged on his pants. (Doc. 132-1, PageID#2648, 2651, 2702-2703). When Tyre finally got it free, Mason testified that it was angled downward, not pointed at any person, when Mason fired. (*Id*., PageID#2648, 2654). Mason did not provide any warning that he was going to use deadly force and never made any command regarding the weapon or any command other than "Get down." (*Id*., PageID#2651). Mason testified that he was unaware if Tyre said anything to him and did not look at his face to see if he said anything or made any attempts to communicate with Mason before shooting. (*Id*., PageID#2738, 2744). The only actions Defendant Mason relies upon to justify the use of deadly force were that Tyre was not following commands and was able to pull the gun from his waistband, which is disputed. Neither of these justify the use of deadly force (*Id*., PageID#2656-2657; Ex. 1, p 217). He also testified that even if Tyre had been seven years old, he still would have felt justified in using deadly force. (*Id*., PageID#2662).

After the shooting, Officer Reffitt held Tyre at gunpoint while Mason walked over, handcuffed Tyre and rolled him over to check for any other weapons. (Doc. 131-1, PageID#2491).

After handcuffing him, Mason began yelling "Fuck. Fuck. Fuck." (Doc. 132-1, PageID#2676-2677). As Tyre lie on the ground dying, Officer Mason then directed racial slurs towards him, calling him a "dumb nigger" and said, "why would you fucking run?" (Doc. 127-1, PageID#1615-1616, 1769-1770).

After the shooting, Defendant Mason and his partner Reffitt left Tyre handcuffed on the ground and made no attempts to save his life or provide any medical attention. (Doc. 132-1, PageID#2729-2730; Doc 131-1, PageID#2491). Defendant Mason noticed Tyre unconscious and bleeding from his head, but he did not check for a pulse. (Doc. 132-1, PageID#2730). He was unaware whether Tyre had any other wounds and did not check for them, despite the fact that Mason knew he had fired three times. (Doc. 132-1, PageID#2730-2731). At no point prior to leaving the scene did Mason call for a medic or inquire as to whether a medic was called. Mason did not take any steps to provide Tyre medical attention or to ask anyone else to provide Tyre with medical attention. (*Id.*, PageID#2732). Although he was in possession of "QuickClot," used by officers to stop bleeding, he did not make any attempt to use it to stop Tyre's bleeding. (*Id.*, PageID#2642, 2731).

Following the shooting of Tyre King, CIRT conducted an investigation and the grand jury declined to indict Defendant Mason for the shooting. (Doc. 137-2, PageID#3065 ¶ 18; Doc.137-3, PageID#3070-3077; Doc. 137-2, PageID#3065 ¶ 19; Doc. 137-4, PageID#3078-3079). CIRT agreed with the determination of the grand jury because, according to Defendant Mason, Mason saw a gun and saw Tyre attempt to pull it out of his waistband. (Pl. Ex. 1, p. 216). CIRT did not credit witness statements contradicting Mason's version of events. (Pl. Ex. 1, p. 216, 220). On review, the FRB found that Mason's use of force was intentional and was not in violation of policy. (Pl. Ex. 3, p. 150). Deputy Chief Richard Bash was final decision maker. (*Id.*). Because the use of

deadly force was found to be consistent with City of Columbus policy, Mason was not disciplined for this excessive use of force. (Pl. Ex. 5, p. 146). However, afterwards he was removed from patrol to a different position, "for his protection and also the protection of the community." (*Id*., p. 153). The move to narcotics was widely regarded as a desirable position, and not a punishment. (*Id*., p.159; Pl. Ex. 12, p. 151. The use of racial slurs towards Tyre was never investigated. (Pl. Ex. 12, p. 157).

While Mason suffered no discipline and was actually rewarded with a coveted position, Police Chief Jacobs admitted that his pattern of using deadly force was "concerning." (*Id*., p. 149. She "had at least some concern that he shouldn't be out there on patrol." (*Id*.).

### VI. Police Practices Expert Melvin Tucker Opined that the Force Used by Defendant Mason was Unnecessary and Greater than Other Officers Would Have Used in 2016 and that Defendant City of Columbus Policies Caused Mason's Use of Excessive Force

Plaintiff's police practices expert Melvin Tucker opined that, accepting Defendant Mason's version of the facts as true for purposes of his review, Mason's use of deadly force was unnecessary and was a greater level of force that other officers would have used in 2016. (Pl. Ex. 16, Report of Expert Melvin Tucker, p. 4). He opined that Mason had cover readily available to him but ignored that option and chose to shoot Tyre King instead. (*Id*.). In fact, while Defendant Mason claims that he had "very little cover," he actually agrees that he did have cover "from my thighs down to my feet," which supports that cover was available had he chosen to use it. (Doc. 136-2, Mason Affidavit, PageID#2895.) Tucker explained that in doing so, Mason ignored recommended tactics and demonstrates that Mason uses deadly force as a first option and not as a last resort. (Pl. Ex. 16, pp. 5-6). Tucker also opined that the use of force was unjustified and greater than other officers would have used because Tyre had not put Mason or anyone else in immediate jeopardy of serious bodily harm or death. (*Id*., p. 6).

Tucker also opined that Defendant City of Columbus failed to put into place an effective early warning and intervention system, and if it had, it is likely that Mason's propensity to use force would have been identified and intervention would have prevented further incidents. (Pl. Ex. 16, p. 7). While Tucker reviewed the City's EARS system, he found that it was not effective because it failed to trigger any response to Mason's repeated uses of force. (*Id.*). Tucker also found that the ratification of the City in the investigation of the shooting "sent a message" to all officers that they "will not be held accountable when they use more force than is necessary and when they violate Department policy." (*Id.*). He opined that the ratification and the failure to supervise constitutes an unwritten but affirmative policy that reflects that police-involved shootings will almost always be found within policy, even if they are unjustified or excessive and that this policy caused Defendant Mason's unnecessary use of deadly force and the death of Tyre King. (*Id.*, p. 8).

Tucker noted that police officers often resort to deadly force unnecessarily against young black males, such as Tyre, and that courts have started to recognize this as well. "Although we recognize that our police officers are often asked to make split-second decisions, we expect them to do so with respect for the dignity and worth of black lives." (Pl. Ex. 16, p. 4, citing *Estate of Jones by Estate of Jones v. City of Martinsburg,* 961 F.3d 661, 673 (4th Cir. 2020)).

## LAW AND ARGUMENT

### I.      Summary Judgment Standard

Summary judgment is appropriate only when the evidence shows no genuine issue as to any material fact and the moving party is entitled to summary judgment as a matter of law. Fed. R. Civ. P. 56(c). The movant bears the initial burden. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The Court must view evidence in a light most favorable to Plaintiff and draw all reasonable inferences in her favor. *Anderson v. Liberty Lobby Inc*., 477 U.S. 242, 251 (1986). "Credibility

determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Id*. at 255.

## II. Plaintiff's Constitutional Claims Against Defendant Mason Must Proceed to Trial

Defendant Mason violated Tyre King's constitutional rights and this case must proceed to trial. Defendant Mason argues that his actions were reasonable and that he is entitled to qualified immunity. However, Defendant Mason's use of deadly force was unreasonable because it was based on a future, hypothetical threat, not an immediate one as required by clearly established caselaw. Disputed material facts preclude summary judgment on Plaintiff's constitutional claims. A jury must hear and decide this case.

### A. Defendant Mason Violated Tyre King's Constitutional Rights When He Used Deadly Force

To hold police officers liable in a Section 1983 suit, a plaintiff must allege or show that he suffered a violation of a constitutional right. *Saucier v. Katz*, 533 U.S. 194, 200 (2001). When a police officer shoots an individual, that person is seized within the meaning of the Fourth Amendment. *Tennessee v. Garner*, 471 U.S. 1, 7 (1985). The Supreme Court clarified that "there can be no question that apprehension by the use of deadly force is a seizure[.]" *Id.* When Defendant Mason shot Tyre King, he implicated Tyre's Fourth Amendment rights.

An officer's use of deadly force is reasonable—and constitutional—only if he "has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or others." *Chappell v. City of Cleveland,* 585 F.3d 901, 908 (6th Cir. 2009), citing *Garner*, 471 U.S. at 7, 11. This is an objective test, "'judged from the perspective of a reasonable officer on the scene…'" *Sova v. City of Mt. Pleasant*, 142 F.3d 898, 902-903 (6th Cir. 1998). The existence of an immediate threat of danger or serious physical harm must amount to more than mere guesswork. *Garner*, 471 U.S. at 11.

Defendant Mason lacked the requisite probable cause to use deadly force against Tyre. "In applying *Garner*'s 'probable cause' standard, the Sixth Circuit has focused on the following non-exhaustive list of factors: (1) the severity of the crime at issue; (2) whether the suspect poses an immediate threat to the safety of the officers or others; and (3) whether the suspect is actively resisting arrest or attempting to evade arrest by flight." *Bouggess v. Mattingly*, 482 F.3d 886, 889 (6th Cir. 2007); *see also Graham*, 490 U.S. at 396. However, deadly force is only justified when there is an immediate threat of harm to the officer or others. *Garner*, 471 U.S. at 11. The use of deadly force is not justified against a fleeing felon, nor is it justified merely because the suspect has a gun. *Id.*; *Bouggess v. Mattingly*, 482 F.3d 886, 896 (6th Cir. 2007). The Court must "not simply accept what may be a self-serving account by the police officer, and must instead look at circumstantial evidence that, if believed, would tend to discredit the police story." *Jefferson v. Lewis*, 594 F.3d 454 (6th Cir. 2010). This is especially true here, where Tyre died as a result of Mason's actions and therefore is unable to tell his own version of events. When a police-involved shooting victim "is no longer alive to give his account," "[i]n resolving the inconsistencies between the officers' statements, the Court may consider competent expert and physical evidence." *Sherrod v. Williams*, No. 3:14-cv-454, 2019 WL 267175, *11 (S.D. Ohio Jan. 15, 2019), citing *George v. Morris*, 736 F.3d 829, 834 (9th Cir. 2013).

Taking the facts in the light most favorable to Plaintiff, Tyre was fleeing, did not pull his BB gun out of his pants, and was not posing any immediate threat. See Statement of Facts, Section V. Additionally, a reasonable officer would have known that he was a child, because Mason was told the suspects were "kids" and his small stature would have confirmed that information. (Doc. 132-1, PageID#2643-2644; Pl. Ex. 15, Autopsy Report, p 7). He was not acting in a menacing manner. (Doc. 131-1, PageID#2514-2515). Finally, expert and physical evidence disputes

Defendant Mason's account. The trajectory of the bullets indicate that Tyre was not facing Mason when he was shot, which supports that he was actually fleeing when Defendant Mason chose to use deadly force. (Pl. Ex. 19, Bauer Report, p. 16). Defendant Mason argues that he acted reasonably because Tyre "*could have* pulled, pointed, and shot a gun at Mason or Reffitt." (Doc. 136, Mason MSJ, PageID#2875). (emphasis added). This is patently inadequate to justify a use of deadly force.

It is not reasonable to conclude that every person carrying a gun poses a serious threat of harm. See *Bletz v. Gribble*, 641 F.3d 743, 752 (2011) (denying qualified immunity to officers who shot armed man). Rather, even where officers believe that the suspect is "brandishing a loaded gun" there must be "some other kind of movement, gesture or verbal statement giving rise to a reasonable belief that the officers or others were in imminent danger of serious bodily harm." *Sherrod*, 2019 WL 267175, *16. There is no such movement or statement here that could justify a reasonable belief of imminent danger. Even in Defendant Mason's version of the facts, Tyre never threatened anyone with the BB gun and never aimed it at any person. (Pl. Ex. 21, King CIRT Investigation Excerpts, pp. 21-30). Any threat Mason claims to have subjectively perceived was entirely hypothetical, not immediate, and never actualized. For that reason, the use of deadly force was not justified.

That Defendant Mason's conduct was in violation of legal and professional police standards is also relevant to the totality of the circumstances. *King v. Taylor*, 944 F. Supp. 2d 548, 555 (E.D. KY May 8, 2013). Plaintiff's police practices expert, Melvin Tucker, opines that Defendant Mason's use of force was in violation of decades of law enforcement training and standards and that he used a greater level of force than other officers would have used if confronted with the same, or similar, circumstances in 2016. (Pl. Ex. 16, Tucker Report).

22

The actions Defendant Mason relies upon to justify his use of deadly force were that Tyre was not following commands and was able to pull the gun from his waistband – an assertion that is hotly contested. (Doc. 123-1, PageID#2656-2657). As explained below, even holding the gun is not enough to justify the use of deadly force, without something more. However, whether or not Defendant Mason is able to identify "something more" to justify his use of deadly force, the fact of whether Tyre ever even had the weapon in his hand or was even attempting to pull the weapon from his waistband is hotly contested. (See Statement of Facts, Section V). Because this key fact is in dispute, summary judgment is clearly improper and a jury must have the opportunity to resolve this factual issue.

Also weighing against the reasonableness of Defendant Mason's use of force are his failure to use cover before resorting to deadly force and his failure to give a warning. "Sometimes, the time or space available to an officer may mean that the reasonable thing to do is to monitor the suspect, issue a warning, or take cover." *Thomas v. City of Columbus*, 854 F.3d 361, 366-67 (6th Cir. 2017). The Supreme Court has held that a warning is necessary where feasible. *Tennessee v. Garner*, 471 U.S. 1, 11-12 (1985) ("if the suspect threatens the officer with a weapon ... deadly force may be used if necessary to prevent escape, and if, where feasible, some warning has been given."). "A suspect has the right to a warning—absent exceptional circumstances that would render a warning impracticable—before police use deadly force." *Otero v. Wood*, 316 F. Supp. 2d 612, 624 (S.D. Ohio 2004), citing *Jensen v. City of Oxnard*, 145 F.3d 1078, 1086 (9th Cir.1998); *Garner*, 471 U.S. 1 at 11-12. Despite having cover available to him, Defendant Mason did not attempt to use it before resorting to deadly force. (Pl. Ex. 16, Report of Expert Melvin Tucker, p. 4). The availability of cover suggests that it was feasible to give a warning in this case. Plaintiff's police practices expert opined that the use of deadly force when cover was available was

unnecessary and a greater level of force than other officers would have used. (Pl. Ex. 16, Tucker Report, p. 4). The failure to take advantage of cover and give a warning prior to the use of deadly force was unreasonable.

Mason then argues that his assessment cannot be second-guessed. (Doc. 136, Mason MSJ, PageID#2875-2876). This is false. Even the case cited by Defendant Mason merely says that courts should be "cautious about second-guessing a police officer's assessment," not that the assessment cannot be questioned. *Ryburn v. Huff*, 565 U.S. 469, 477 (2012). While the law gives police officers the room to make reasonable mistakes when they are confronted with split-second decisions, they must act reasonably, and that reasonableness is judged by an objective standard. *Graham v. Connor*, 490 U.S. 386, 396 (1989). The fact that an officer subjectively felt threatened will not justify a use of force unless objectively reasonable.

The facts here are easily distinguishable from every case identified by Defendant Mason as allegedly justifying his use of force. Defendant Mason claims that he did not have to wait for Tyre to raise the gun at anyone, because the use of force in *Thornton v. City of Columbus*, 727 F.App'x 829, 838 (6th Cir. 2018), was found to be justified. However, the officers in *Thornton* reasonably believed that the person with the gun threatened another person with it only moments earlier and had repeatedly failed to comply with orders to drop the gun. Here, there is no evidence that Mason ever ordered Tyre to drop his weapon, and whether he ever even had the weapon in his hand is contested. Thus, summary judgment is not appropriate. *Thomas v. City of Columbus*, 854 F.3d 361, 366 (6th Cir. 2017), is similarly distinguishable. There, the use of force was justified because while the individual had not yet pointed the weapon at the officer, he was running at the officer with a gun drawn. Tyre was not running at Defendant Mason, but was running away when he was shot. (Doc. 127-1, PageID#1599-1600; Doc. 130-1, PageID#2141-2142, 2213-2214, 2224,

2232, 2266, 2319-2321, 2323-2325, 2328, 2332-2333; Doc. 126-1, PageID#1432; Pl. Ex. 19, Bauer Report, p. 16). As a result, there was no reasonable basis to believe that Tyre presented a deadly threat to Defendant Mason.

Finally, Defendant Mason pointed to caselaw where a use of deadly force was found justified even where it turned out there was no weapon. These are not on point. In one, while it turned out that the victim was not actually armed, he was moving in a deliberate manner to make the officer believe he was armed. *Lemmon v. City of Akron,* 768 F.App'x 410, 417 (6th Cir. 2019). Additionally, the court specifically notes that the use of force was *not* justified merely because the plaintiff had his hand in his waistband and was being defiant. *Id.* Rather, the totality of the circumstances also showed that the plaintiff was daring the officers to shoot him, and then dropped his bike and moved suddenly in the direction of the officer. *Id.* The court in *Lemmon* also discussed other cases, where again, the mere "reaching movement" towards a weapon was *not* enough to justify force. *Id.*, at 418, citing *Pollard v. City of Columbus*, 780 F.3d 395 (6th Cir. 2015); *Livermore ex rel Rohm v. Lubelan*, 476 F.3d 397 (6th Cir. 2007). Mason also relies upon *Goodwin v. Richland Cty.*, 832 F.App'x 354 (6th Cir. 2020).[2] Summary judgment was actually denied in that case, because whether the officers fired based on a "pop" sound they believed to be a gunshot, and whether they actually heard such a sound, hinged entirely on the credibility of the officers. For that reason, summary judgment was denied. *Knowlton v. Richland Cty.*, No. 1:15-cv-00210, 2017 WL 5649597, *10 (N.D. Ohio April 5, 2017), affirmed on appeal *Knowlton v. Richland Cty.*, 726 F.App'x 324, 331-332 (6th Cir. 2018).

Here too, Mason's attempt to justify his force hinges on his credibility. Only a jury should

---

[2] Defendant Mason cites only to the post-trial appellate decision wherein the court found only that the verdict in favor of the officer was not against the manifest weight of the evidence. *Id.* at 357-358.

weigh his credibility and determine whether to believe the story of this officer with a documented history of an unusually high number of uses of deadly forces, which is disputed by other witnesses and evidence. It was not reasonable to believe that deadly force was justified when Defendant Mason responded to a call for suspects that were "kids," and confronted Tyre, a young, panicked, not menacing small child, who was trying to get away. Whether Tyre was reaching for or had grabbed a gun inside his pants is disputed. And even then, without something more to support that he would have used it, mere possession of the weapon is not enough to justify the use of deadly force. Summary judgment should be denied.

### B. Defendant Mason is Not Entitled to Qualified Immunity Because Tyre's Right Not to be Shot was Clearly Established in 2016

Defendant Mason attempts to avoid trial by invoking qualified immunity. In fact, Tyre King's rights were clearly established on the date Mason shot and killed him. As a result, Defendant Mason is not entitled to this defense.

To assess qualified immunity, courts ask two questions: (1) "whether the facts that a plaintiff has … shown make out a violation of a constitutional right," and (2) "whether the right at issue was clearly established at the time of [the] defendant's alleged misconduct." *Pearson v. Callahan*, 555 U.S. 223, 232 (2009). In this analysis, the Court must take the facts "in the light most favorable to the party asserting the injury." *Saucier v. Katz*, 533 U.S. 194, 201 (2001). For all the reasons given in Section II(A), Plaintiff has shown that, taking the facts in the light most favorable to Plaintiff, that Defendant Mason violated Tyre's constitutional right to be free from unjustified deadly force. Because that right was clearly established, Defendant Mason is not entitled to qualified immunity.

Qualified immunity will not be granted to an officer who shoots a suspect because of their "mere possession of a weapon." *Bouggess v. Mattingly*, 482 F.3d 886, 896 (6th Cir. 2007). An

officer is only justified in using deadly force "when a police officer both knows a defendant has a weapon and has a reasonable belief that the weapon will be used against him or others." *Id*. "When a suspect has a weapon, but the officer has no reasonable belief that the suspect poses a danger of serious physical harm to him or others, deadly force is not justified." *Id*. See also *Dickerson*, 101 F.3d at 1160–62; *Brandenburg*, 882 F.2d at 213–14; *Craighead v Lee*, 399 F.3d 954, 962 (8th Cir. 2005); *Sova v. City of Mt. Pleasant*, 142 F.3d 898, 901, 903–05 (6th Cir.1998) (denying qualified immunity to officers who shot deranged suspect armed with butcher knives, because there were disputed facts as to whether suspect posed a threat to the officers rather than merely to himself). Indeed, "only in rare instances may an officer seize a suspect by use of deadly force." *Sample v. Bailey*, 409 F.3d 689, 697 (6th Cir. 2005).

*Sherrod v. Williams* resolves any doubt about whether Tyre's rights were clearly established in 2016. No. 3:14-cv-454, 2019 WL 267175, *16 (S.D. Ohio Jan. 15, 2019). In a lengthy analysis of the 2014 shooting of John Crawford and deadly force cases decided at that time, *Sherrod* explains that even under the specificity requirements of *Mullenix v. Luna*, 136 S.Ct. 305 (2015) and *White v. Pauly*, 137 S. Ct. 548, 196 L. Ed. 2d 463 (2017) et seq., "the law is clearly established that, even when officers respond to a report that a suspect is brandishing a loaded gun, the use of deadly force is not justified unless the suspect either points the gun at the officers or makes some other kind of movement, gesture or verbal statement giving rise to a reasonable belief that the officers or others were in imminent danger of serious bodily harm." *Sherrod* at *16. See also, e.g., *King v. Taylor*, 694 F.3d 650 (6th Cir. 2012); *Bouggess v. Mattingly*, 482 F.3d 886, 895 (6th Cir. 2007), citing *Dickerson v. McClellan*, 101 F.3d 1151, 1162 (6th Cir. 1996). Here, the record is replete with disputes about whether Tyre ever even held the gun or even attempted to pull it from his waistband.

"When 'the legal question . . . is completely dependent upon which view of the facts is accepted by the jury,' the District Court cannot grant a defendant police officer immunity from a deadly force claim." *Sova v. City of Mt. Pleasant*, 142 F.3d 898, 903 (6th Cir. 1998) citing *Brandenburg v. Cureton*, 882 F.2d 211, 215-16 (6th Cir. 1989). Courts must examine "'all the evidence in the record . . . to determine whether the officer's story is internally consistent and consistent with other known facts,'" *Gonzalez v. City of Anaheim*, 747 F.3d 789, 795 (9th Cir. 2014), and must "not simply accept what may be a self-serving account by the police officer, and must instead look at circumstantial evidence that, if believed, would tend to discredit the police story." *Jefferson v. Lewis*, 594 F.3d 454 (6th Cir. 2010). The jury must weigh "competing inferences one might draw" from the facts "and their effect on the question of whether [the officer's] actions were objectively unreasonable." *Id*. Here, the jury must determine which view of the facts—and which inferences to draw—regarding circumstances facing Defendant Mason at the moment he shot Tyre. Defendant Mason is not entitled to qualified immunity.

### C. Defendant Mason Violated Tyre King's Right to Equal Protection When He Used Deadly Force and Denied him Medical Treatment on the Basis of his Race

The Equal Protection Clause requires that the State may not "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1, cl. 4. The general principle requires that similarly situated persons should be treated alike. *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). More specifically as relevant here, the Equal Protection Clause "protects against invidious discrimination among similarly-situated individuals or implicating fundamental rights." *Scarbrough v. Morgan Cnty. Bd. of Educ.*, 470 F.3d 250, 260 (6th Cir. 2006). When challenging how police officers effectuate an arrest, "the constitutional basis for objecting to intentionally discriminatory application of laws is the Equal Protection Clause."

*Whren v. United States*, 517 U.S. 806, 813 (1996), quoted in *Stemler v. City of Florence*, 126 F.3d 856, 873 (6th Cir. 1997).

In *Harris v. City of Circleville*, 583 F.3d 356, 369-370 (6th Cir. 2009), the plaintiff argued that the use of force and delay in medical treatment he experienced was based on his race and violated his rights to equal protection. There, the court found sufficient evidence that the conduct was based on race where one of the officers, after kicking him in the ribs, stated "Looks like we got us a broke nigger here." *Id*. at 370. Here, the facts are very similar. After shooting Tyre King, Defendant Mason called him a "dumb nigger." (Doc. 127-1, PageID#1615-1616, 1769-1770). This supports that Defendant Mason acted based on race.

Defendant Mason argues that this claim fails because he did not use a slur. However, all he does is dispute the fact. Defendant Mason claims he did not use a slur in regards to Tyre. (Doc. 136, Mason MSJ, PageID#2880). However, Plaintiff has presented evidence that he did. (Doc. 127-1, PageID#1615-1616, 1769-1770). This is a classic dispute of fact and summary judgment must be denied so that the trier of fact can resolve the dispute.

Defendant Mason also argues that there is no statistical evidence or comparator evidence that Tyre was treated differently. However, like in *Harris*, the use of the slur is sufficient evidence that his conduct was based impermissibly on race. Because there is a material dispute of fact, summary judgment must be denied.

### III.  Plaintiff's Wrongful Death Claim Must Proceed to Trial

Defendant Mason is responsible for Tyre King's wrongful death and this case must proceed to trial. Defendant Mason argues that he is entitled to Ohio statutory immunity and that the claim is barred by R.C. § 2307.60(B)(2). However, because his actions were reckless, he is not entitled to immunity and R.C. § 2307.60(B)(2) does not bar claims of this type. Material facts regarding

29

Defendant Mason's recklessness preclude summary judgment on Plaintiff's state law claims. A jury must hear and decide this case.

### A. Defendant Mason is Liable for his Reckless Conduct and is Not Entitled to Statutory Immunity

Political subdivision employees who engage in "acts or omissions with malicious purpose, in bad faith, or in a wanton or reckless manner" are not immune from suit in Ohio. Ohio Rev. Code § 2744.03(6); *Anderson v. Massillon*, 134 Ohio St.3d. 380, 983 N.E. 2nd 266 (2012) at ¶ 23. Defendant Mason's actions were reckless, thus he is not entitled to § 2744 immunity. The same acts depriving him of qualified immunity deprive him of §2744 immunity because these acts could be interpreted by a reasonable jury as willful, wanton, or reckless conduct. *See*, e.g., *Burgess v. Fischer*, 735 F.3d 462, 479 (6th Cir. 2013)("[B]ecause we find that there is a question as to whether [the officers'] conduct was reasonable under the Fourth Amendment, we also find that upon viewing the facts in a light most favorable to Plaintiffs there is a question as to whether the conduct was reckless under § 2744.03(A)(6)(b)."); *Reynolds v. Oakwood*, 38 Ohio App.3d 125, 127 (Ohio Ct. App. 1987), citing *Botto v. Fischesser*, 174 Ohio St. 322, 325-26, (1963).

### B. Plaintiff's Claim is Not Barred by R.C. § 2307.60(B)(2)

Defendant Mason also argues that Plaintiff's wrongful death claim is barred by R.C. § 2307.60(B)(2), however it is clear that this statute was never meant to bar a claim such as Plaintiff's and has never been used in such a way. R.C. § 2307.60(B)(4) explains that it does not apply to "intentionally tortious conduct" or "alleged violations of the United States Constitution." It is plain then, that the statute does not bar recovery for Defendant Mason's violations of Tyre's constitutional rights. And because the wrongful death claim is based on Defendant Mason's intentional act of shooting Tyre, it likewise does not bar the wrongful death claim. This statute has never been used to deny recovery to the victim of a police officer's use of force, whether in the

form of a constitutional claim or a tort claim and Defendant Mason does not cite to any case that has done so.

Even if the statute does apply to Plaintiff's state tort claims, it is only a bar to recovery where the alleged criminal conduct "was a proximate cause of the injury or loss for which relief is claimed." R.C. § 2307.60(B)(2). Because it is not foreseeable that an officer will use excessive force, or will recklessly harm a suspect, any act of Tyre's was not a proximate cause of his injuries at the hands of Defendant Mason. For this reason, R.C. § 2307.60(B)(2) cannot bar Plaintiff's tort claims. Defendant Mason's attempt to distract the court with felonies that Tyre might have committed is completely irrelevant for this reason.

Additionally, Defendant Mason's citation to caselaw regarding the foreseeability of encountering deadly resistance is not on point. Defendant Mason argues that "[e]ncountering deadly resistance during the commission of a felony is a foreseeable consequence of committing that felony." (Doc. 136, Mason MSJ, PageID#2885). It is not entirely clear what "deadly resistance" means here, but it appears Defendant Mason is attempting to argue that deadly force is an inherently foreseeable consequence of the commission of any felony. However, none of the cases cited to by Defendant Mason support that dangerous proposition. Rather, every case cited merely recounts the elements of the crime of felony murder. *State v. McGuire*, Case No.1-13-47, 2015-Ohio-1887, ¶¶ 63-64 (Ohio App. 3rd Dist. Allen May 18, 2015); *State v. Ford*, Case No.07-AP-803, 2008-Ohio-4373, ¶¶ 31-33 (Ohio App. 10th Dist. Franklin Aug. 28, 2008); *State v. Dixon*, Case No. 18582, 2002-Ohio-541 (2nd Dist. Montgomery Feb. 8, 2002). Felony murder is a crime whereby one can be held criminally responsible for a death only where the death *is* the foreseeable result of the commission of a felony. *McGuire*, at ¶¶ 63-64. However, if anything, requiring that foreseeability be proven supports that the commission of the felony itself is insufficient to establish

31

foreseeability. None of these cases support that a death is always foreseeable, nor that deadly force by police officers in response to a felony is foreseeable.

The closest Defendant Mason comes to supporting his claim that an officer's use of deadly force is the foreseeable result of the commission of a felony is his citation to a concurrence in an Illinois state court case. See *People v. Hudson*, 222 Ill.2d 392, 409 (2006) (Freeman, concurring), quoting *People v. Hickman*, 59 Ill.2d 89, 94 (1974) ("Those who commit forcible felonies know they may encounter resistance, both to their affirmative actions and to any subsequent escape"). Beyond the fact that state court cases from other jurisdictions have no binding effect on this Court, there are three additional problems here. Firstly, that resistance by police officer is foreseeable in response to the commission of a felony does not necessarily mean that "deadly resistance" is foreseeable. What could be foreseeable is that an officer would use a reasonable amount of force, and not an excessive, unconstitutional, or reckless amount of force, in response to the commission of a felony. But excessive force would not be foreseeable, and this case does not indicate otherwise. In fact, the second problem with Defendant Mason's citation to *Hudson* is that this case agrees that not all deaths are the foreseeable result of the commission of a felony. *Id*. at 412-413. Third, in *Hudson*, the death occurred after the decedent ignored warnings to drop his gun and pointed the gun at a police officer. *Id*. at 409. That the officer shooting back was foreseeable in *Hudson* is very distinguishable from the facts here, where Tyre never aimed his pellet gun at Defendant Mason. Because Defendant Mason's use of deadly force was not foreseeable, there is no proximate cause between any act of Tyre's and Defendant Mason's use of deadly force, and the statute does not bar any claim for recovery for that injury.

For all of these reasons, Plaintiff's state tort claim is not barred and summary judgment must be denied.

**IV.     Defendant City of Columbus is Liable for the Violation of Tyre King's Constitutional Rights**

To establish municipal liability under 42 U.S.C. § 1983 and *Monell v. Dept. of Social Serv.*, 436 U.S. 658 (1978), Plaintiff must show that Defendant City of Columbus' policy, custom, or procedure was the moving force behind the constitutional violation. *City of Canton v. Harris*, 489 U.S. 378 (1989). Plaintiff can prevail on his *Monell* claim independent of whether Defendants are granted qualified immunity. *Garner v. Memphis Police Dep't*, 8 F.3d 358, 365 (6th Cir. 1993).

There are four general methods of proving a municipality's illegal policy or custom: the plaintiff may prove "(1) the existence of an illegal official policy or legislative enactment; (2) that an official with final decision making authority ratified illegal actions; (3) the existence of a policy of inadequate training or supervision; or (4) the existence of a custom of tolerance or acquiescence of federal rights violations." *Jackson v. City of Cleveland*, 925 F.3d 793, 828 (6th Cir. 2019) (citing *Burgess*, 735 F.3d at 478). The first two methods of demonstrating municipal liability are based on city policy itself being unconstitutional. The latter two are based on a failure to act that is deliberately indifferent to the rights of persons who come into contact with City of Columbus police officers. See *North v. Cuyahoga County*, 754 F.App'x 380, 384 fn. 2 (6th Cir. 2018), citing *Garner v. Memphis Police Dep't*, 8 F.3d 358, 365–66 (6th Cir. 1993) (noting that the deliberate indifference test is used to analyze failure-to-train claims but not affirmative policy or custom claims). Here, all four methods of imposing municipal liability apply. Defendant City of Columbus' motion for summary judgment must be denied.

**A. The Policies and Practices of the Columbus Police Department Caused the Constitutional Violations**

"[T]o satisfy the *Monell* requirements a plaintiff must identify the policy, connect the policy to the city itself, and show that the particular injury was incurred because of the execution of that policy." *Jackson*, 925 F.3d at 829 (internal quotation omitted). However, "a city may be

liable under *Monell* for a policy of permitting constitutional violations regardless of whether the policy is written." *Id*. at 830. An unconstitutional policy can also include implicit policy or gaps in policies. *Daniel v. Cook Cnty*., 833 F.3d 728, 734 (7th Cir. 2016); *Jones v. City of Chicago*, 787 F.2d 200, 204 (7th Cir. 1986). "[C]ustoms, in contrast to official policies, do not receive 'formal approval,'" and instead are "'persistent and widespread . . . practices of . . . officials.'" *Monell*, 436 U.S. at 690-691; *Paige v. Coyner*, 614 F.3d 273, 284 (6th Cir. 2010). "[P]olicy or custom does not have to be written law; it can be created 'by those whose edicts or acts may fairly be said to represent official policy.'" *Id*. "Congress included customs and usages" in 1983 because "[a]lthough not authorized by written law, such practices ... could well be so permanent and well settled as to constitute a 'custom or usage' with the force of law." *Monell*, 436 U.S. at 691, quoting *Adickes v. S.H. Kress & Co*., 398 U.S. 144, 167–68 (1970))).

Defendant City of Columbus argues that this basis of imposing municipal liability claim fails because the City's written policies are not unconstitutional, however, City policies also include unwritten customs and usages. *Wright v. Euclid*, 962 F.3d 852, 880-881 (6th Cir. 2020). The facts presented by Plaintiff demonstrate that while Defendant City of Columbus had written policies that appear to be consistent with the requirements of the Constitution, the actual customs and usages of the City of Columbus police department are inconsistent with the requirements of the Constitution and cause its police officers to use excessive force.

It is the policy of Defendant City of Columbus that police officers are allowed to use deadly force if they experience subjective fear. (Pl. Ex. 1, p. 148). This is contrary to the Constitution and results in police officers, including Defendant Mason, using deadly force when there is no objectively reasonable basis that an immediate threat of harm to the officer or to another person exists.

More specifically, it is also the policy of Defendant City of Columbus for police officers to shoot when a suspect has their hand on a weapon or when they merely reach in the direction of a weapon. (Pl. Ex. 2, pp. 107, 114). This is also contrary to the Constitution, because, on its own, it does not support that there is an immediate threat of harm. This results in City of Columbus police officers, including Defendant Mason, using deadly force when a suspect has a weapon in hand or is reaching towards a weapon or towards a waistband, but has demonstrated no reasonable basis that they present a threat of immediate harm.

Because Defendant Mason acted in accordance with, and as a result of, Defendant City of Columbus' use of force policy when he used excessive force against Tyre, Defendant City of Columbus is liable for that unconstitutional use of force, and the municipal claim against Defendant City must be denied.

Finally, it is also the policy of Defendant City of Columbus to handcuff all persons shot by police, regardless of whether they continue to pose a threat. (Pl. Ex. 2, pp. 121-122). This results in City of Columbus police officers, including Defendant Mason, spending critical time that could mean the difference between life and death, handcuffing unarmed, wounded suspects, instead of obtaining medical treatment. Because Defendant Mason acted in accordance with, and as a result of, Defendant City of Columbus' policy of unnecessarily handcuffing wounded persons who pose no threat, rather than providing medical treatment, Defendant City of Columbus is liable for that failure to provide adequate medical treatment, and that municipal claim against Defendant City must be denied as well.

### B. A Final Decision Maker Approved Every Use of Deadly Force by Defendant Mason and Caused Defendant Mason to Continue to Use Excessive Force

In *City of St. Louis v. Praprotnik*, 485 U.S. 112 (1988), the court explained how a decision by the final policy maker reviewing a single incident of alleged misconduct can bind a

municipality: When an official's discretionary decisions are constrained by policies not of that official's making, those policies, rather than the subordinate's departures from them, are the act of the municipality. Similarly, when a subordinate's decision is subject to review by the municipality's authorized policymakers, they have retained the authority to measure the official's conduct for conformance with their policies. If the authorized policymakers approve a subordinate's decision and the basis for it, their ratification would be chargeable to the municipality because their decision is final. *Id*. at 127 (emphasis added).

In other words, when the final municipal policymaker reviews the employee's discretionary actions, he measures those actions against the municipality's official policies. If he approves the employee's actions and does not discipline or reprimand the employee, his approval is final and demonstrates that the employee followed official policy. In a ratification case, therefore, the municipality's liability is not based on the policymaker's ex post facto approval of the employee's actions. Rather, it is based on the municipality's own policy, which the employee followed in carrying out his actions. The official's ratification merely confirms that the employee was acting according to official policy.

As described in Section IV(A), Defendant City of Columbus' use of force policy is constitutionally deficient and caused the constitutional violation at issue here. The ratification of Defendant Mason's use of force further supports that he was acting because of, and in compliance with, City of Columbus policy. In addition, there is evidence that supports that the ratification of Defendant Mason's *prior* uses of force, including an unjustified and unreasonable use of force, which conveyed to Defendant Mason that the City of Columbus use of force policy allowed deadly force even where there was no immediate threat. Mason's use of deadly force against Tyre King is the direct result of that ratification.

Defendant City of Columbus has many problems with their process for investigating uses of force, which is addressed further in Section IV(C). However, aside from the problems with the investigations themselves, every use of force by Defendant Mason was found to be justified and in policy. (Pl. Ex. 11). Prior to shooting Tyre King—a child who was fleeing and had a pellet gun in his pants, but who never threatened to use the gun, and never pointed the gun at anyone— Defendant Mason shot Gary Williams, who similarly had a weapon, but demonstrated no intent to use it, did not threaten anyone with it, and never pointed it at anyone. (Pl. Ex. 14, p. 29). Despite the lack of an immediate threat of harm to Mason or another person, Mason shot Williams. (*Id.*). And most importantly, his use of force was investigated by Defendant City, that investigation revealed that Williams never aimed his weapon at anyone, and Defendant City of Columbus told Defendant Mason that his actions were justified and consistent with City policy. (Pl. Ex. 13, p. 20).

The obvious and foreseeable result of that prior ratification is that Defendant Mason would continue to use the level of force that Defendant City approved, in circumstances like those approved of by Defendant City. And that is exactly what he did when he shot Tyre as he fled, without ever threatening to use his weapon or presenting any immediate threat of harm. (See Statement of Facts, Section V. When the use of deadly force against Tyre was investigated, it was also found to be consistent with Defendant City of Columbus' policies. (Pl. Ex. 3, p. 150). That is because Mason's decision to shoot and kill Tyre King *was* in compliance with CDP's unconstitutional policies. The CIRT investigation and the FRB investigations approved Defendant Mason's use of deadly force against Tyre: they measured Defendant Mason's acts against the City's policies, and found his actions in compliance with City policy. That approval demonstrated Defendant City's policy of using deadly force where there is no immediate threat of harm, and

37

demonstrated Defendant Mason's compliance with that policy. Defendant City of Columbus is liable for having such a policy, which Defendant Mason acted in accordance with, and as a result of.

Defendant City of Columbus argues that an after-the-fact investigation is not capable of causing the constitutional violation, and so there is no basis for imposing liability on the City under the ratification theory. However, because the ratification is evidence of the policy in existence at the time that Defendant Mason shot Tyre, it supports imposing liability. Additionally, the ratification of the use of force against Mr. Williams was prior to Defendant Mason's use of force against Tyre and is perfectly capable of causing his use of force here. Because that prior investigation approved Defendant Mason's use of deadly force, despite the lack of any immediate threat, and he continued to use excessive deadly force in the absence of an immediate threat, that prior investigation and ratification caused the use of force at issue here. Defendant City of Columbus' motion for summary judgment must be denied.

### C. The Columbus Police Department Tolerated and Acquiesced in the Use of Excessive Force by Conducting Inadequate Investigations, Approving All Uses of Force, and Never Discipling Defendant Mason for the Excessive Use of Force

Defendant City of Columbus also tolerated a pattern of excessive force by its officers, which caused Defendant Mason's use of deadly force against Tyre King. When a municipality has a custom of inaction to constitutional violations, it is shown by "(1) the existence of a clear and persistent pattern of [violations under §1983] by municipal employees, (2) notice or constructive notice on the part of the City; (3) the City's tacit approval of the unconstitutional conduct, such that its deliberate indifference in its failure to act can be said to amount to an official policy of inaction; and (4) that the City's custom was the "moving force" or direct causal link in the constitutional deprivation." *Arendale v. City of Memphis*, 519 F.3d 587, 599-600 (6th Cir. 2008).

This same standard is used to evaluate the adequacy of investigations. See *Thomas v. City of Chattanooga*, 398 F.3d 426, 433 (6th Cir. 2005) (The plaintiffs "must show not only that the investigation was inadequate, but that the flaws in this particular investigation were representative of (1) a clear and persistent pattern of illegal activity, (2) which the [police d]epartment knew or should have known about, (3) yet remained deliberately indifferent about, and (4) that the [d]epartment's custom was the cause of the [unconstitutional activity].").

Defendant City of Columbus argues that Plaintiff has not found any deficiency in the investigation, and that the fact that Plaintiff disagrees with the outcome of the investigation is insufficient. This is untrue. Instead, City of Columbus use of force investigations are plainly deeply deficient and the investigations of Defendant Mason's uses of force demonstrate those deficiencies.

Investigations by Defendant City of Columbus are fundamentally inadequate to respond to and discover excessive uses of force. They are designed not to discover if the officer's actions were criminal, but to find a justification for the officer's use of force. (Pl. Ex. 1, p. 39). This is apparent in the interviews and statements of the officers subject to investigation. One egregious example is from the investigation of Office Keith Abel's shooting of James England, where Pilya testified about just how "painful" the interview was, describing it as "one of the most confusing statements [he] had taken." (Pl. Ex. 1, p. 194). Pilya described how he "kept going back to him and trying to get him to articulate his actions better." *Id*. This clearly demonstrates the real goal of the investigation—to justify the use of force, not to determine whether the use of force was criminal.

In addition, while Pilya indicated that an officer's statement would be subject to the usual methods of investigation, such as comparing the statement to the evidence to see if the facts

support or dispute it, this does not occur. For example, in the investigation of Defendant Mason's shooting of Mr. Williams, prior to his shooting of Tyre King, Pilya did not attempt to reconcile the differing statements from Defendant Mason and Mr. Williams and did not use those contrary facts to challenge Mason's statement. (Pl. Ex. 14, pp. 31-41). After the CIRT investigation, the administrative review begins. This FRB administrative review is not an investigation, but a review of the completed CIRT criminal investigation file. Therefore, the administrative review, which is intended to determine if policies were violated and is thus much broader than the criminal investigation, not only imports all the problems with the criminal investigation but also lacks the necessary evidence to uncover policy violations.

The statement of the officer and his interview are assumed to be true and not questioned. So as long as he stated that he feared for his life, the use of force is deemed justified and there is no evaluation of whether that belief was reasonable. (Pl. Ex. 1, p. 169-170 (officer can use deadly force in absence of immediate threat of death or bodily harm so long as he can "articulate" what he "believed")). Additionally, because no further investigation takes place, the investigation has likely not uncovered relevant facts that would be required to evaluate adequate compliance with policies. While Deputy Chief Kuebler testified that it was possible for the FRB to request further investigation, he admitted that it rarely occurs. (Pl. Ex. 3, p. 63). Ultimately, this inevitably results in a lengthy but meaningless investigation process that inevitably finds the officer's use of force justified on all levels.

The investigation here into Defendant Mason's use of force against Tyre was plagued with the same problems, and was likewise designed not to determine if Mason's actions were criminal or violated policy, but to justify his actions. The interviews of Braxton by CIRT actually uncovered that directly contradicted Mason's statement. He insisted that Tyre never pulled out the gun out

40

and described the gun as "deep" in his pants. (Pl. Ex. 21, p. 8). The response to this conflict between the witness and Defendant Mason however, was not to reinterview Mason and subject his statement to any scrutiny. Instead, they gave Braxton a polygraph test in an obvious attempt to discredit evidence they didn't like. This was an unheard of step; CIRT had never before given a civilian witness a polygraph. (Pl. Ex. 1, p. 220). Tellingly, Mason's statement was never subjected to the same scrutiny. (*Id.*). And even after other witnesses produced testimony that called into question Mason's insistence that Tyre pulled out a weapon and had it in his hand, including Sister Skora, While Sister Skora was interviewed by CIRT, it was not adequately comprehensive, and did not uncover that her account differed from Mason's. (Pl. Ex. 21, pp. 1-3). In fact, Pilya actually treated Sister Skora's account as corroborating Mason's because she saw officers chasing two people and the placement of the officer and of Tyre was consistent with Mason's statement. (Pl. Ex. 1, p. 225). However, Skora's deposition demonstrated that she never saw a weapon in Tyre's hands and she indicated that she was in a position to have been able to see it. (Doc. 126-1, PageID#1445, 1485-1486). Despite this, she never saw Tyre reach into his pants, pull on his pants or make any movements that indicated to her that Tyre was doing anything other than attempting to run. (*Id.*, PageID#1432, 1483-1484). Additionally, Mason said that he observed two officers chasing Tyre and Braxton down the alley, about 15-20 yards behind them. (Doc. 132-1, PageID#2649). However, the only two officers who could have been present at the time, provided statements indicating that they were still behind the fence at the time of the shooting and had not made it over yet. (*Id.*, PageID#2744-2745). Despite multiple witness accounts, including that of other officers, that differed from Mason's in key ways, Defendant City of Columbus never questioned Defendant Mason's story and continues to accept it as the only truthful account of what occurred that night, despite the inconsistencies.

It is also clear that these inadequate investigations are allowing a pattern of unconstitutional violations to occur and continue. While one of the deficiencies of the use of force investigations is that they do not collect sufficient evidence to uncover all possible policy violations, they do collect sufficient evidence of constitutional violations for the City of Columbus to be on notice of a pattern of officers using deadly force when there is no immediate threat. Defendant Mason has used deadly force multiple times, and the investigations of those uses of force demonstrate that he used force at least twice where there was no basis for a reasonable belief that there was an immediate threat of harm that justified deadly force. (Pl. Ex. 14, p. 29; Pl. Ex. 21, pp. 14-20). As a result, Defendant City was on notice of a pattern of City of Columbus police officers using force when there is no immediate threat of harm.

Despite notice of this pattern, Defendant City of Columbus failed to act. No one has ever been terminated for using excessive force. (Pl. Ex. 1, p. 232). CIRT has never found a use of force to be criminal. (Pl. Ex. 1, p. 78). Even finding a policy violation, based on the amount of force used, is almost unheard of. The only violations ever uncovered are for purely accidental discharges and occasionally for non-level of force related violations. (Pl. Ex. 3, pp. 110-140). Defendant Mason has never been found to have acted outside of City of Columbus policy when using force, and has never been disciplined, much less terminated. (Pl. Ex. 11). This is despite two separate investigations of deadly force that indicate that he shot without evidence of an immediate threat of harm. The failure to discipline Defendant Mason was deliberately indifferent. As a result, Defendant Mason predictably continued to use excessive force. In *Wright*, the Sixth Circuit found that the failure to ever meaningfully investigate excessive force complaints supported municipal liability. 962 F.3d at 882. The court specifically noted that evidence that a department *never* found

a use of force inappropriate supported that a dispute existed over whether the city's policy allowed excessive force to be used by its officers. *Id*.

The approval of these uses of force in the investigations by Defendant City "send[s] a message to all department officers that officers will not be held accountable when they use more force than necessary and when they violate Department policy." (Pl. Ex. 16, Tucker Report, p. 7). Plaintiff expert Tucker opines that Defendant City has a custom and practice of not holding officers accountable when they use more force than necessary and the policy of the City is to "ignore the law." *Id*., p. 8. This pattern is evident in the "failure by CPD to meaningfully investigate and punish unjustified deadly force events." *Id*.

Defendant City of Columbus argues that there is no liability because the approval of the investigation cannot be the cause of the constitutional violation. However, the deficiencies with Defendant City of Columbus' investigations did not begin with the investigation that following Tyre King's death. Rather, the policy of Defendant City prior to Tyre King's death was deficient and acquiesced in the repeated use of excessive force, including by Defendant Mason specifically. This policy existed prior to Tyre's death and was the cause of the constitutional violation that caused his death.

Defendant City of Columbus' motion for summary judgment must be denied.

### D. The Inadequate Training and Supervision of Defendant Mason Caused Defendant Mason to Use Excessive Deadly Force

The training provided by Defendant City of Columbus to Defendant Mason caused his use of excessive force. "To succeed on a failure to train or supervise claim, the plaintiff must prove the following: (1) the training or supervision was inadequate for the tasks performed; (2) the inadequacy was the result of the municipality's deliberate indifference; and (3) the inadequacy was closely related to or actually caused the injury." *Ellis ex rel. Pendergrass v. Cleveland Mun. School*

*Dist.*, 455 F.3d 690, 700 (6th Cir. 2006). "When determining whether a municipality has adequately trained its employees, 'the focus must be on adequacy of the training program in relation to the tasks the particular officers must perform." *Jackson*, 925 F.3d at 834 (quoting *City of Canton v. Harris*, 489 U.S. 378, 390 (1989)). The deliberate indifference prong can be met by showing that the municipality failed "to provide adequate training in light of foreseeable consequences that could result from a lack of instruction." *Ellis*, at 700-701. The deliberate indifference prong will also be met "where the city fails to act in response to repeated complaints of constitutional violations by its officers." *Brown v. Shaner*, 172 F.3d 927, 931 (6th Cir. 1999).

The training provided by Defendant City of Columbus is inadequate in light of the foreseeable consequences that would result from the instruction provided. Defendant City of Columbus' training puts its citizens in danger and in fact trains its officers to violate the Constitution. The training provided by Defendant City of Columbus and received by Defendant Mason dangerously characterizes persons who break the law as "wolves" who "[f]eed on the sheep without mercy," have "a capacity for violence," "[p]ray on the weak and defenseless," and have "[n]o empathy for their fellow citizens." (Pl. Ex. 8, pp. 22, 24). It also makes the characterization of police officers as sheepdogs, rather than sheep themselves, dependent on their use of a firearm. If an officer "step[s] outside without that weapon, then [he] becom[es] a sheep." (*Id.*, p. 29). This training encourages City of Columbus police to dehumanize suspects, to assume that they are violent, and to use force against them.

However, most importantly for purposes of imposing liability against Defendant City, the City of Columbus also explicitly trains its officers to react to the "threat," not the "action." (Pl. Ex. 2, p. 107). The "threat" here is not a threat in the sense of a verbal statement of an intention to inflict harm, but in the sense of a *potential* risk of future harm—which is constitutionally

inadequate to justify deadly force. Defendant City of Columbus explicitly trains its officers to shoot before a suspect begins to pull a gun out of their waistband and to shoot when a suspect merely has their hand on a gun. (Pl. Ex. 2, p. 107; Pl. Ex. 10, p. 2). Defendant Mason received this training. (Pl. Ex. 2, pp. 108, 129).

This training is inadequate to the tasks to be performed by police officers. It has long been established that "city policymakers know to a moral certainty that their police officers will be required to arrest fleeing felons" and where "[t]he city has armed its officers with firearms, in part to allow them to accomplish this task… the need to train officers in the constitutional limitations on the use of deadly force ... can be said to be 'so obvious,' that failure to do so could properly be characterized as 'deliberate indifference' to constitutional rights." *City of Canton v. Harris*, 489 U.S. 378, 390, fn. 10 (1989), citing *Tennessee v. Garner*, 471 U.S. 1 (1985).

Defendant City of Columbus has *not* trained its officers in the constitutional limitations on the use of deadly force, but on a different set of standards of its own making, and the entirely foreseeable result is that City of Columbus police officers will follow their training and use deadly force when there is no immediate threat of harm. *Brown v. Chapman*, 814 F.3d 447, 464 (6th Cir. 2016) (denying summary judgment on municipal training claim because foreseeable consequence of training officers to discharge taser at suspect's chest was that officers would discharge taser at suspects' chests). This is deliberately indifferent.

Defendant City of Columbus argues that their training is adequate and Plaintiff has not identified any deficiencies. This is plainly not true, as Plaintiff has described the flaws with Defendant City's training in detail. Defendant City of Columbus also argues that there is no evidence of deliberate indifference, because there is no pattern of unconstitutional acts. This is only one way to satisfy the deliberate indifference prong. Here, because future police misconduct

was the foreseeable consequence of Defendant City of Columbus' training, deliberate indifference is established. But it is also incorrect that there is no pattern of unconstitutional actions that reasonably put Defendant City of Columbus on notice that its officers were using excessive deadly force. *See* Section IV(C).

Defendant City of Columbus appears to argue that a pattern only exists where a court has found the actions unconstitutional. (Doc. 137, City MSJ, PageID#3023). This has never been the standard and this Court should not create such a standard now.

Finally, the training provided by Defendant City of Columbus to Defendant Mason was the moving force behind his violation of Tyre's constitutional rights. It is clear here that the inadequacy was closely related to or actually caused the injury. The CDP's constitutionally-deficient training instructed Defendant Mason to shoot if a suspect has a hand on a weapon or reaches towards it and that is what he did. Defendant Mason acted according to that training here, and for that reason, Defendant City of Columbus is liable. Moving force causation is a question of fact for the jury. *Matulin v. Village of Lodi*, 862 F.2d 609, 613 (6th Cir. 1988); *Oklahoma v. Tuttle*, 471 U.S. 808, 833 n.9 (1985) (Brennan, J., concurring); *Powers v. Hamilton Cnty. Public Defender*, 501 F.3d 592, 608 (6th Cir. 2007). Defendant City's motion for summary judgment must be denied and Plaintiff's municipal claims must proceed to trial to be heard by a jury.

## CONCLUSION

For the reasons stated above, Plaintiff asks the Court to deny Defendants' Motions for Summary Judgment and to permit this case to proceed to trial.

Respectfully Submitted,

*/s/ M. Caroline Hyatt*
M. Caroline Hyatt (0093323)
Jacqueline Greene (0092733)

FRIEDMAN, GILBERT + GERHARDSTEIN
441 Vine Street, Suite 3400
Cincinnati, Ohio 45202
T: 513-572-4200
F: 216-621-0427
caroline@FGGfirm.com
jacqueline@FGGfirm.com

Sarah Gelsomino (0084340)
Marcus Sidoti (0077476)
FRIEDMAN, GILBERT + GERHARDSTEIN
50 Public Square, Suite 1900
Cleveland, OH 44113-2205
T: 216-241-1430
F: 216-621-0427
sarah@FGGfirm.com
marcus@FGGfirm.com

Sean L. Walton (0088401)
Chanda L. Brown (0081076)
Walton + Brown, LLP
395 E. Broad Street, Suite 200
Columbus, Ohio 43215
T: (614) 636-3476
F: (614) 636-3453
swalton@waltonbrownlaw.com
cbrown@waltonbrownlaw.com

*Counsel for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that on March 24, 2021, a copy of the foregoing was filed electronically. Notice of this filing will be sent to all registered parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

*/s/ M. Caroline Hyatt*
M. Caroline Hyatt (0093323)
*One of the Attorneys for Plaintiff*