```
 1              IN THE UNITED STATES DISTRICT COURT
                  SOUTHERN DISTRICT OF OHIO
 2                     EASTERN DIVISION

 3
                        - - - -
 4
     DEARREA KING, Adm., of the   )
 5
     ESTATE OF TYREE KING,        )CASE NO. 2:18CV1060
 6
              Plaintiff,          )JUDGE EDMUND A. SARGUS, JR
 7
     -V-                          )CHIEF MAG. JUDGE ELIZABETH
 8
     THE CITY OF COLUMBUS, et al,)P. DEAVERS
 9
              Defendant.          )
10
11                  - - - oOo - - -
12
     CHRISTOPHER M. COOPER, Adm.,)
13
     Of the ESTATE OF DEAUNTE     )CASE NO. 2:19CV3105
14
     BELL-McGREW,                 )
15
              Plaintiff,          )JUDGE GEORGE C. SMITH
16
     -V-                          )CHIEF MAG. JUDGE ELIZABETH
17
     THE CITY OF COLUMBUS, et al,)P. DEAVERS
18
              Defendant.          )
19                  - - - oOo - - -
20
     JAMES J. ENGLAND,            )CASE NO. 2:19CV1049
21
              Plaintiff,          )JUDGE SARAH D. MORRIS
22
     -V-                          )MAGISTRATE JUDGE KIMBERLY
23
     THE CITY OF COLUMBUS, et al,)A. JOLSON
24
              Defendant.          )
25
```

EXHIBIT
Pl. Ex. 1

Deposition of Sergeant Eric Pilya Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

```
 1                  - - - o0o - - -

 2         The video teleconference deposition of SERGEANT

 3    ERIC PILYA, a witness herein, being called by the

 4    Plaintiffs as if upon cross-examination under the

 5    statute, and taken before Megan A. Medved, a Notary

 6    Public within and for the State of Ohio, pursuant to the

 7    agreement of counsel, on Monday, November 24th, 2020, at

 8    10:00 a.m., at the Offices of Tackla Court Reporting,

 9    LLC, 1020 Ohio Savings Plaza, 1801 East 9th Street, City

10    of Cleveland, County of Cuyahoga, and the State of Ohio.

11                    - - - -

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1    APPEARANCES:

 2   On behalf of the Plaintiffs:

 3        By:  Sarah Gelsomino, Esq.

 4             Jacqueline Greene, Esq.

 5             Friedman & Gilbert

 6             55 Public Square, Ste. 1900

 7             Cleveland, Ohio 44113

 8             Jgreene@f-glaw.com

 9             Sgelsomino@f-glaw.com

10             (216)241-1430

11

12   On behalf of the Defendants:

13        By:  Michael Halloran, Esq.

14             City of Columbus Deputy Chief of Litigation

15             77 North Front Street

16             Columbus, Ohio 43215

17             Wmphillips@columbus.gov

18             (614)645-6959

19

20

21

22

23

24

25
```

Deposition of Sergeant Eric Pilya                    Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

```
1                              INDEX

2    APPEARANCES ...................................... 3

3    SERGEANT ERIC PILYA

4    CROSS-EXAMINATION BY MS. GELSOMINO ................ 5

5    REPORTER CERTIFICATE ............................. 239

6    PLAINTIFF'S:

7    1. Critical Incident Response Team Standard Operating

8    Procedure ....................................... 117

9    2. Power Point .................................. 122

10   3. 2011 Police Involved Situations ............. 135

11   4. 2012 Police Involved Situations ............. 138

12   5. 2013 Police Involved Situations ............. 160

13   6. 2015 Police Involved Situations ............. 182

14   7. 2016 Police Involved Situations ............. 213

15   8. 2017 Police Involved Situations ............. 229

16   9. 2018 Police Involved Situations ............. 229

17

18

19

20

21

22

23

24

25
```

Deposition of Sergeant Eric Pilya      Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

```
 1                   P-R-O-C-E-E-D-I-N-G-S

 2                        - - - -

 3          SERGEANT ERIC PILYA  of lawful age, a witness

 4      herein, having been first duly sworn, as hereinafter

 5            certified, deposes and says as follows:

 6                        - - - -

 7          CROSS-EXAMINATION OF SERGEANT ERIC PILYA

 8   BY MS. GELSOMINO:

 9   Q.      Good morning.  Will you please state your full

10   name for the record?

11   A.      Eric Ian Pilya.

12   Q.      What is your position with the Columbus Division

13   of Police?

14   A.      I'm the first shift Homicide Sergeant, and the

15   team leader for the Critical Incident Response Team.

16   Q.      Do you have an employee number or badge number?

17   A.      My badge number is 5115.

18   Q.      Has that ever changed?

19   A.      Only when I got promoted.

20   Q.      When was that?

21   A.      June of 1994.

22   Q.      Okay.  My name is Sarah Gelsomino.  I'm one of

23   the Plaintiff's attorneys in these cases, along with two

24   of my co-counsel who are here, Sean Walton and

25   Jacqueline Greene who you saw earlier.  You understand
```

Deposition of Sergeant Eric Pilya          Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

 1    you have been designated by the City of Columbus to give

 2    binding testimony on behalf of the city in three

 3    different cases?

 4    A.      Yes.

 5    Q.      Okay.  So one is the case called Cooper, which

 6    is related to the shooting of Deaunte Bell-McGrew.  One

 7    is the case related to the shooting of Tyree King, and

 8    the third is the shooting related to James England.  Do

 9    you understand that?

10    A.      Yes.

11    Q.      What does it mean to you to be designated by the

12    city to give binding testimony?

13    A.      I guess as leader of the Critical Incident

14    Response Team I'm in the position to give information on

15    the investigation of those cases.

16    Q.      And all of the other cases that have been

17    investigated since 2005, right?

18    A.      No.  I took over as team leader of the Critical

19    Incident Response Team in February of 2011.

20    Q.      This may be a question for your lawyer.

21                    MS. GELSOMINO:  Michael, I would like

22    to put on the record what he's been designated to

23    testify to in the notice.  I have found that it's easier

24    for the lawyer to do this rather than to ask the actual

25    deponent to do this in the last couple of depositions.

Deposition of Sergeant Eric Pilya        Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

| | |
|---|---|
| 1 | MR. HALLORAN:  We can stipulate to |
| 2 | that, if you would like me to just read off what the |
| 3 | destinations is for today. |
| 4 | MS. GELSOMINO:  That would be great. |
| 5 | MR. HALLORAN:  In the King case |
| 6 | numbers 1.)B and 1.)C, number 2.)B, number 6, number |
| 7 | 7.)B.  In the England case number 1.)B, 1.)C, number |
| 8 | 2.)B number 6, number 7.)B.  In the Cooper case, number |
| 9 | 1.)B, 1.)C, 2.)B, 6, and 7.)B. |
| 10 | MS. GELSOMINO:  Thank you.  I |
| 11 | appreciate that. |
| 12 | BY MS. GELSOMINO: |
| 13 | Q.    I'm going the read for you what these |
| 14 | destinations are, and I'd like you to tell me if you're |
| 15 | prepared to testify on these today.  The first is all |
| 16 | division of police procedures, policies and practices |
| 17 | from 2010 to present concerning the use of deadly force |
| 18 | investigations and the investigations into the shooting |
| 19 | of these three victims.  Are you prepared to testify to |
| 20 | that today? |
| 21 | A.    Yes. |
| 22 | Q.    Are you prepared to testify to all the division |
| 23 | of police's training of police officers and the |
| 24 | materials used for those training from 2010 to the |
| 25 | present regarding use deadly force investigations? |

Deposition of Sergeant Eric Pilya                    Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

1    A.       I have a question concerning this one.  I don't

2    actually do that training.  I can speak towards it, but

3    I don't conduct that training.

4    Q.       **Well, you've been designated by the city to give**

5    **binding testimony regarding that today.**

6    A.       Okay.

7    Q.       **Are you prepared to testify to all the deadly**

8    **force by members of the division of police from 2005 to**

9    **present?**

10   A.       No.  I would only know about the cases from

11   February of 2011.

12   Q.       **Have you made any effort to gather information**

13   **regarding any of the cases prior to 2011?**

14   A.       No.

15   Q.       **Why not?**

16   A.       I wasn't on the CIRT team at that time.

17   Q.       **You have access to all of the information**

18   **regarding uses of deadly force by members of the**

19   **division of police before 2011, right?**

20   A.       There are records, yes.

21   Q.       **If you made an effort you could have gathered**

22   **those and reviewed them in order to testify on that**

23   **topic today, correct?**

24   A.       Yes.

25                    MR. HALLORAN:  Objection.  Go ahead.

1    BY MS. GELSOMINO:

2    **Q.       You've also been designated to testify on behalf**

3    **of the City of Columbus regarding all investigations,**

4    **reviews, findings and outcomes from 2005 to the present**

5    **for all deadly force events concerning the chain of**

6    **command policy and disciplinary review.  Are you**

7    **prepared to do that today?**

8    A.       Yes.

9    **Q.       Great.  What have you done to prepare for your**

10   **deposition on behalf of the City of Columbus today?**

11   A.       I reviewed the three cases that are mentioned,

12   Deaunte Bell, James England and Tyree King.  And I also

13   reviewed the use of force division directives.

14   **Q.       When you say that you reviewed the investigation**

15   **for these three cases, what does that include?**

16   A.       Reading over the case package information.

17   **Q.       Is that the CIRT investigation?**

18   A.       Correct.

19   **Q.       Did you review anything else related to any of**

20   **those cases?**

21   A.       No.

22   **Q.       Did you review anything else in preparation for**

23   **the deposition today?**

24   A.       No.

25   **Q.       How much notice did you have before you came**

```
 1   here to testify?

 2   A.      I don't recall when the first notice went out

 3   that we were going to be deposed and to give some dates

 4   that we would be available.  That was, I don't know --

 5   Mike would probably be a better person to ask that

 6   question to.

 7   Q.      Have you had over a month since you received

 8   notice of this deposition?

 9   A.      I would say approximately around there.

10   Q.      So you had approximately a month to prepare.

11   And during that month, did you do anything to get ready

12   other than review the division directives and the case

13   investigations for each of these three cases?

14   A.      No.

15   Q.      When did you review those?

16   A.      Over the last couple of days.

17   Q.      Okay.  In the course of that month that you had

18   to prepare for these depositions, did you make any

19   effort to gather these documents or information

20   reasonably available to the City of Columbus related to

21   each of these designated topics that we just went over?

22                   MR. HALLORAN:  Objection.  You can

23   answer.

24   A.      Like I said, I reviewed the division directives

25   and policies in regard to use of deadly force.
```

1  BY MS. GELSOMINO:

2  **Q.      Okay.  You agree with me that that is not all of**

3  **the information that's reasonably available to the City**

4  **of Columbus related to these designated topics, right?**

5  A.      Yes.

6  **Q.      You could have done far more information**

7  **gathering in order to prepare to testify today?**

8                    MR. HALLORAN:  Objection.

9  A.      I'm not sure I knew exactly the topics that I

10  would be testifying to.

11  BY MS. GELSOMINO:

12  **Q.      Sure.  I understand you've been put in this**

13  **position.  Do you understand that as a designated 30(b)6**

14  **witness for the City of Columbus you had a**

15  **responsibility to gather all information known or**

16  **reasonably available to the entire City of Columbus**

17  **regarding these designated topics?**

18                    MR. HALLORAN:  Objection.

19  A.      Not really, no.

20  BY MS. GELSOMINO:

21  **Q.      Did you make any effort to gather documents that**

22  **are responsive or related to these areas and produce**

23  **them to me via your lawyer?**

24                    MR. HALLORAN:  Objection.

25  A.      No.

```
 1   BY MS. GELSOMINO:

 2   Q.      Why not?

 3                   MR. HALLORAN:  Objection.

 4   A.      I wasn't told to do so.

 5   BY MS. GELSOMINO:

 6   Q.      Would you have done so had you been told?

 7   A.      Absolutely.

 8   Q.      Do you have any documents with you today in your

 9   box room?

10   A.      No, I do not.

11   Q.      I know you've been through depositions before,

12   but just as a reminder we have Megan transcribing

13   everything that we're both saying, so we want to do our

14   best to facilitate her making a nice clean record for

15   us.  Let's try not to talk over each other.  Answer

16   everything out loud so she can write it down.  She can't

17   write down uh-huh or anything like that.

18           Sometimes it's a little extra complicated over

19   Zoom, but let's bear with each other and do our best.

20   If you don't understand something that I said, either

21   because I asked a less than perfect question or because

22   some kind of a technology glitch, just tell me.  If you

23   do answer a question I'll assume you understood it, is

24   that fair?

25   A.      Yes.
```

1 **Q.  You understand that Michael Halloran is**

2 **representing you in this deposition, right?**

3 A.  Yes.

4 **Q.  As you've already experienced, he may object**

5 **throughout the deposition.  You can give him time to**

6 **make his objection, but then unless he instructs you not**

7 **to answer, you're still expected to answer the question**

8 **that I asked.  Okay?**

9 A.  Yes.

10 **Q.  Did you talk with anyone about this deposition**

11 **before you came here today?**

12 A.  Mike Halloran.

13 **Q.  Okay.  Anyone other than your lawyer?**

14 A.  No.

15 **Q.  Okay.  You've been with the department for a**

16 **while.  Can you just give me a quick overview of your**

17 **assignments with -- should I call it the division or**

18 **department, does it matter?**

19 A.  Division.

20 **Q.  Okay.  Just give me a quick overview of your**

21 **employment history with them.**

22 A.  I was hired on December 13th of 1987.  After the

23 academy I went through several different patrol

24 assignments.  I then went to homicide.  I was promoted

25 June of 1994.  From there I went to the Communications

1    Bureau as a sergeant. I then went out to several patrol

2    assignments as a sergeant. I then went to the Strategic

3    Response Bureau Enforcement Teams, and then I've been in

4    homicide since 2001.

5    **Q.     All right. Have you ever applied for an**

6    **additional promotion?**

7    A.     No.

8    **Q.     Why not?**

9    A.     I really wanted to be in homicide, and once I

10   got there, there was no going anywhere else. I didn't

11   want to get promoted out of there.

12   **Q.     Why did you always want to be in homicide?**

13   A.     I just found it to be extremely interesting.

14   **Q.     What about it is interesting to you?**

15   A.     Just the whole process of the investigation, and

16   the importance of the investigation.

17   **Q.     Why is a homicide investigation so important?**

18   A.     I believe that homicide investigation is

19   important to seek justice for the families of the

20   victims.

21   **Q.     Have you ever received any discipline from the**

22   **division?**

23   A.     Yes.

24   **Q.     Tell me about it.**

25   A.     It's been a long time. I'm sure I've received

1  discipline out of accidents.  I believe I received

2  discipline out of my detective not getting his walkie

3  programmed on time, and other than that -- oh, I did get

4  disciplined for improperly performing performance

5  evaluations once.

6  Q.      Why?

7  A.      At that time I had thought it was better to

8  utilize the halo effect with some detectives because it

9  really didn't go anywhere.  But then, I had a detective

10  that did not do a good job on a case and I wanted that

11  detective disciplined, and they brought up that that

12  detective had all excellent on their performance

13  evaluation.  So I said that I had utilized the halo

14  effect at that time, and they deemed that to be an

15  improper reason for completing performance evaluations.

16  Q.      What's the halo effect?

17  A.      Basically the performance evaluation can't

18  really be used for anything.  It's not used for

19  promotion or pay increases or anything of that nature,

20  so I felt it was better across the board to give high

21  marks on the performance evaluation even if a person was

22  a little deficient in an area.

23  Q.      Why?

24  A.      Because it didn't go anywhere.  Every time that

25  you used something negative it just decreases the moral

1    of that individual employee, so I felt it was better not

2    to do that since they didn't go anywhere.

3    **Q.      So in order to keep moral up you would give high**

4    **marks even if an employee was deficient in a particular**

5    **area?**

6    A.      On the performance evaluations.  Now, if they

7    were deficient I wold handle those deficiencies with

8    that individual detective.  It was just on the

9    performance evaluation.  Since it didn't go anywhere I

10   felt that was the better way to handle that.

11   **Q.      What's the point of a performance evaluation?**

12   A.      It's a document that's completed once a year on

13   each of your subordinates where you evaluate their

14   performance to the division.

15   **Q.      What's the purpose of it if it doesn't go**

16   **anywhere?**

17   A.      I don't know.

18   **Q.      Is there a purpose?**

19   A.      I don't know.

20   **Q.      In your capacity as a supervisor within the**

21   **department here to testify about disciplinary reviews,**

22   **do you believe there to be a purpose to the performance**

23   **evaluation and the way that they're handled in the**

24   **division of police?**

25                    MR. HALLORAN:  Objection.  Go ahead.

Deposition of Sergeant Eric Pilya  Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

1 A.  I think the performance evaluations are a time

2 where you can set aside time each year and sit down with

3 your employees and discuss how they're doing.

4 BY MS. GELSOMINO:

5 **Q.  But there's no actual impact because those**

6 **aren't used in any other proceedings?**

7 A.  Correct.

8 **Q.  Are employee evaluations considered in**

9 **disciplinary reviews?**

10 A.  Sometimes.

11 **Q.  When?**

12 A.  I think to refute information such as this.  I

13 was saying that this detective was deficient, and yet

14 the performance evaluation was contrary to that.  That's

15 the only time that I really feel that the performance

16 evaluation plays a role in that process.

17 **Q.  So performance evaluations are just used to**

18 **rebut any kind of allegation of deficiency or**

19 **wrongdoing?**

20 A.  I think that's when they come into play the

21 most.  Yes.

22 **Q.  Has a performance evaluation ever been used to**

23 **show any kind of history of deficiency or use of**

24 **misconduct?**

25 A.  Not that I've been involved in, no.

1    Q.      Has a performance evaluation been used by the

2    division in order to identify a trend in police officer

3    conduct which could lead to deficiencies?

4    A.      I'm sure they have, yes.

5    Q.      But you don't know of any examples?

6    A.      I have not had the occasion to have that be the

7    case.

8    Q.      Are performance evaluations used to note

9    misconduct or note potential warning signs in any kind

10   of early warning system within the division?

11                   MR. HALLORAN:  Objection.

12   A.      I think it's fair to say that.  If there was an

13   employee that was having deficiencies the supervisor

14   could document that through a performance evaluation,

15   yes.

16   BY MS. GELSOMINO:

17   Q.      But then, would that performance evaluation be

18   used or analyzed, audited in any way to track potential

19   warning signs?

20   A.      I think it's on a case-by-case basis with

21   individual officers.  A supervisor could put together a

22   program to help them do better in the areas that are

23   deficient.

24   Q.      Do you know of any examples of that happening?

25   A.      Not with me personally, no.

Deposition of Sergeant Eric Pilya　　　　　Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

1  Q.　　As a supervisor in the division of police have

2  you ever received any training to that end?

3  A.　　Yes.

4  Q.　　What?

5  A.　　Just in-service training on performance

6  evaluations and completing them.

7  Q.　　What were you trained on in those in-service

8  trainings?

9  A.　　They would just go over the form and discuss how

10  to complete the form.

11  Q.　　Other than being taught how to fill in the form,

12  have you ever received any training from the division of

13  police for how to look for warning signs and potential

14  problematic behavior in your subordinates through the

15  use of performance evaluations?

16  A.　　I believe that was part of the training program

17  that if you check the boxes -- I can't recall what the

18  boxes are right off hands.  Development needed.  Then

19  there's a process that you have to go through with that.

20  If they need development in certain areas, then you have

21  to put a plan together to help them do better in that

22  area.

23  Q.　　Have you ever checked the develop needed box for

24  any of your subordinates?

25  A.　　I don't believe so, no.

Deposition of Sergeant Eric Pilya  Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

```
 1   Q.      How many performance evaluations have you
 2   completed for people within the division of police?
 3   A.      Well, I don't know when the performance
 4   evaluations went into effect.  When I first got promoted
 5   we did not have those for sworn personnel.  Over the
 6   years -- we did have it, I would say, at least back in
 7   2002 maybe I recall that I had them.  You do one a year
 8   for each of your employees.
 9   Q.      Approximately how many is that for you?
10   A.      A bunch.
11   Q.      Over 100?
12   A.      I'm sure.
13   Q.      Over 200?
14   A.      Possibly.
15   Q.      Could it be over 500?
16   A.      Okay.  Well, I have approximately ten detectives
17   that I do every year and I've done that for
18   approximately 20 years.  So close to 200, I would say.
19   Q.      You've never identified any development needed
20   for any of them?
21   A.      No.
22   Q.      When did you first become associated with the
23   CIRT team?
24   A.      I took over as the team lead in February of
25   2011, but probably mid-2009 I started shadowing Sergeant
```

Deposition of Sergeant Eric Pilya                    Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

1    Jeffery Sagstetter, who was the team leader at that

2    time.

3    **Q.      Were you a member of the team at that point in**

4    **mid 2009?**

5    A.      I was, but I didn't actively do investigations.

6    I was just following Sergeant Sagstetter around, and he

7    was instructing me on how to be the team lead, because I

8    was going to be the team lead when he retired.

9    **Q.      Who selected you for that?**

10   A.      I believe it was Deputy Chief Flanotta at the

11   time.

12   **Q.      What were your qualifications to become the team**

13   **lead?**

14   A.      I believe it was based on seniority.  I was the

15   senior homicide sergeant at the time.

16   **Q.      What kind of training did you receive to be the**

17   **team lead for CIRT?**

18   A.      Shadowing Sergeant Sagstetter for approximately

19   a year to two years.

20   **Q.      Anything else?**

21   A.      No.  That was pretty much on-the-job training

22   part of it.

23   **Q.      Are CIRT investigations the same as other**

24   **homicide investigations?**

25   A.      I would say yes, but there are differences.

1  Q.      What are the differences?

2  A.      Being that it's a police action there's other

3  steps taken at the scene.  There's formal statements

4  that you do with the officers and things of that nature

5  that you do do those in a homicide investigation, it's

6  just a little bit different.

7  Q.      Are there any differences other than steps taken

8  at the scene, and formal statements with officers?

9  A.      Not on CIRT's behalf.

10  Q.      Are there on any other part of the division's

11  behalf?

12  A.      Well, these cases, after the criminal

13  investigation is finished, then they move on to an

14  administrative review.

15  Q.      When you say, "these cases," what do you mean?

16  A.      CIRT cases.  Cases involving critical incidents

17  involving police officers.

18  Q.      And who conducts the administrative review?

19  A.      We have a Firearms and Death Review Board that

20  these cases go to.  It's made up of three police

21  commanders, and they make their recommendations as to

22  whether it's in-policy or not.

23  Q.      All right.  So explain to me all of the

24  differences then between -- I mean, a CIRT investigation

25  for like a police use of force, which is lethal, is a

Deposition of Sergeant Eric Pilya      Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

```
 1   homicide investigation, right?

 2   A.      Yes.

 3   Q.      How is it different than other homicide

 4   investigations?

 5                   MR. HALLORAN:  Objection.

 6   A.      Answer?

 7                   MR. HALLORAN:  Yes.

 8   A.      I think it's different because you have more

 9   cooperation from the quote, unquote, suspect.  They will

10   come back and give you some information about the scene

11   so that the crime scene knows where to search for

12   evidence.  They'll come in with their attorney and

13   provide a written statement, which we don't usually get

14   from civilian homicide suspects.  I would say those are

15   the primary differences.

16   BY MS. GELSOMINO:

17   Q.      What do you mean by quote, unquote, suspect?

18   A.      Well, it is a homicide investigation, and the

19   police officer is technically a suspect in the homicide

20   investigation.  But if it's found to be a justifiable

21   homicide, because law enforcement officers are allowed

22   by law to protect their lives or the lives of someone

23   else, you know, it's a police action rather than a

24   criminal murder.

25   Q.      Correct.  That is determined after a conclusion
```

Deposition of Sergeant Eric Pilya    Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

1 is made regarding whether or not the use of force is

2 justified or unjustified, right?

3 A.  Well, technically no.  That determination is

4 made by a Grand Jury.  If they decide that it wasn't

5 criminal, then it becomes a justifiable homicide.

6 Q.  So up until the Grand Jury makes a decision

7 then, the police officer is a suspect, right?

8 A.  Correct.

9 Q.  Why aren't they treated as a suspect?

10 A.  They are treated as a suspect.

11 Q.  Is there a -- do you believe that any of the

12 CIRT members in the division treat an officer suspect

13 differently because of the potential that their actions

14 will be deemed a police action and not a homicide?

15 A.  Yes.

16 Q.  How so?

17 A.  Well, little things.  For instance, we don't put

18 a police officer in the back seat of a cruiser --

19 Q.  Okay.

20 A.  -- because they're with an officer support team

21 member, and if it is just a police action, they're not

22 treated like a suspect by being placed in the back of a

23 cruiser.  That's one of the ways that occurs.

24 Q.  What are the other ways?

25 A.  I would say having them be cooperative and

```
 1   coming back to the scene and giving us information about
 2   where to look for evidence and things like that.  That
 3   would not happen with a civilian suspect.
 4   Q.      Why not?
 5   A.      Mostly because the civilian suspects are
 6   un-cooperative.
 7   Q.      Have you ever asked a civilian suspect to give
 8   you information about a scene?
 9   A.      Yes.
10   Q.      Have you ever had a civilian suspect agree to
11   give you information about a scene?
12   A.      Yes.  But it's rare that they agree to that is
13   what I'm saying.
14   Q.      Have you ever at any point allowed a civilian
15   suspect to stay with support people after a shooting?
16   A.      No.
17   Q.      Have you ever after a shooting had a civilian
18   suspect you did not put in the back seat of a cruiser?
19   A.      I wouldn't think so, no.
20   Q.      Have you ever had a civilian suspect accused of
21   a potential homicide who you didn't put in handcuffs?
22   A.      Probably not.
23   Q.      Have you ever had a civilian suspect accused of
24   a homicide who you allowed days before you attempted to
25   interrogate regarding the incident?
```

Deposition of Sergeant Eric Pilya   Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

1 A.  No.

2 **Q.  Have you ever attempted to interrogate a police**

3 **officer suspect immediately after a fatal shooting?**

4 A.  Every time.

5 **Q.  You attempt to interrogate them immediately?**

6 A.  Yes.

7 **Q.  How so?**

8 A.  So when the officer comes back to the scene we

9 ask them to tell us where they were standing when they

10 fired and in which direction they fired, so that we can

11 look for evidence, and also look for where their

12 projectile may have gone to make sure it didn't strike

13 anybody else or anything like that.  It gives us a gist

14 on a crime scene to know where to collect evidence.

15 After that they're taken on our command bus, they're

16 photographed by crime scene, and then we take their

17 weapon, count their rounds so crime scene knows how many

18 shell casings and projectiles to look for.  We replace

19 their duty weapon with another duty weapon and we

20 attempt to get a statement from them.  In most cases, I

21 would say 99.9 percent of the cases, they have their FOP

22 attorney, and the FOP attorney refuses to allow them to

23 make a statement at the time.

24 **Q.  Do you consider the questions that you ask an**

25 **officer suspect on the scene regarding the location of**

1    bullets and stuff to be an interrogation?

2    A.      No.

3    Q.      Do you believe that an officer refusing to give

4    a statement on the night of is somehow indicative of

5    guilt?

6    A.      No.

7    Q.      Do you believe that a civilian suspect refusing

8    to give a statement in an attempt interrogation is

9    somehow indicative of guilt?

10   A.      No.

11   Q.      Why not?

12   A.      Because I believe they're exercising their

13   rights to remain silent and to speak with an attorney

14   before giving a statement.

15   Q.      You said that the officers would come back to

16   the scene to give information regarding the location of

17   bullets and stuff?

18   A.      Correct.

19   Q.      Come back from where?

20   A.      At the immediate conclusion of a critical

21   incident the officer's removed from the scene by an

22   officer support team officer and taken to the nearest

23   police facility, a substation or headquarters, a police

24   facility.  There they await their FOP attorney, and they

25   converse with the FOP attorney there at that location.

Deposition of Sergeant Eric Pilya      Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

1   And then when we are ready at the scene for them to come

2   back, they're transported back from the scene by the

3   officer support team member and met there by the FOP

4   attorney, and that's when we speak to them.

5   **Q.     So you never make any attempt to speak to an**

6   **officer suspect before they've had a opportunity to**

7   **speak to their attorney?**

8   A.     Usually by the time the CIRT arrives at scene

9   they're already at the substation.

10  **Q.     So do you make any attempt ever to interrogate**

11  **or have any conversation with an officer suspect before**

12  **you have given them the opportunity to talk to their**

13  **lawyer?**

14  A.     No.  I would say it does not work out that way.

15  **Q.     And is that -- do you believe -- would you**

16  **consider an officer refusing to give a statement on the**

17  **day of the shooting to be cooperative?**

18  A.     No.

19  **Q.     Why not?**

20  A.     Because just on the surface they're not agreeing

21  to give a statement at that time.  In that particular

22  instance, I would say that's not being cooperative.

23  **Q.     So if they're not being cooperative, why are**

24  **they treated any differently than any other civilian**

25  **homicide suspect?**

1  A.      Well, they are cooperative for the most part.

2  In that particular sense, that's not being cooperative.

3  They're exercising their rights of remaining silent

4  because their attorney is there with them and advising

5  them to do so.

6  **Q.      Do you have an assumption that civilian homicide**

7  **suspects will be uncooperative?**

8  A.      No.  I think with civilian suspects you can say

9  that a lot of the time, not most of the time even, a lot

10  of the time they're not cooperative or don't wish to

11  give a statement, but many times they do.  Each case is

12  taken on a case-by-case basis.

13  **Q.      That's fair.  Why is it that police suspects are**

14  **automatically treated differently than a civilian**

15  **suspect?**

16              MR. HALLORAN:  Objection.

17  A.      Well, I would say that because by and large the

18  vast majority of these incidents are found to be

19  noncriminal and they're police actions.  We understand

20  that, and I think that's why there are some allowances

21  taken by maybe removing the officer from the scene

22  before we've had the chance to talk to them.

23  BY MS. GELSOMINO:

24  **Q.      Does the fact that the vast majority of these**

25  **investigations find that the use of deadly force was not**

1  **criminal and instead a police action, and that fact**

2  **impacts the CIRT investigation right from the start,**

3  **then?**

4  A.       I would say only in the way that the division

5  has developed procedures in which to allow officer

6  support to remove them from the scene and take them to

7  the nearest substation.  For the most part other than

8  that I think that, no, we treat every incident the same.

9  **Q.       Officer suspects are granted these allowance as**

10  **a result of the fact that most of the investigations**

11  **into the use of deadly force find that use of force was**

12  **not criminal, right?**

13  A.       I would say that the division has taken a stance

14  to not treat them as a criminal suspect until it's

15  warranted.

16  **Q.       At what point does it become warranted to treat**

17  **an officer suspect as a criminal suspect?**

18  A.       I believe in most aspects they are.  We do the

19  same with civilian suspects as we do with officer

20  suspects in that we attempt to interview them.  We

21  afford them the opportunity to exercise their rights.

22  We go through the motions with them the same at that

23  point.  I think the only difference is that you have an

24  officer being cooperative and coming back to the scene

25  giving us that public safety information and cooperating

1    with an investigation differently than a civilian

2    suspect would.

3    **Q.      Or maybe wouldn't, right?**

4    A.      We have had occasions where they have.

5    **Q.      You've had occasions where a civilian suspect**

6    **came back and gave you information on the scene, right?**

7    A.      Yes.  It's the same thing.  If we go in and try

8    to do the initial interview with the civilian suspect

9    and they agree to speak to us and, for instance, on a

10   homicide investigation, they killed someone and disposed

11   of the body in an unknown location.  If we go in there

12   and they agree to give us an initial statement and they

13   agreed to take us to the location of the body, then

14   we'll do that, and we'll have them return to the scene

15   with us so we could recover that evidence, which is the

16   body, and important to the case.  There are times that

17   that happens.

18   **Q.      So in that case would you take that civilian**

19   **suspect who is being cooperative back to the scene in**

20   **handcuffs?**

21   A.      Yes.

22   **Q.      Would you take them back to the scene in the**

23   **back seat of a police car?**

24   A.      Yes.

25   **Q.      Would you book them into custody that night**

Deposition of Sergeant Eric Pilya      Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

1   rather than let them go home?

2   A.     If they have admitted to a murder and we have

3   probable cause, yes.

4   Q.     How is that any different than a police officer

5   who has admitted to using deadly force that killed

6   someone?

7   A.     I think the difference comes into play where a

8   law enforcement officer has the right by law to use

9   deadly force to protect the life of himself or another.

10   Q.     In certain circumstances, right?

11   A.     Correct.

12   Q.     But not all the time?

13   A.     Not all the time, no.

14   Q.     So is there a presumption that officers who use

15   deadly force and actually kill people are acting within

16   their rights as a police officer even at the beginning

17   of the CIRT investigation before that case has been

18   taken to the Grand Jury?

19   A.     I would not say there's a presumption. I would

20   say it's a possibility, and until we know otherwise we

21   follow the same procedures that we always do.

22   Q.     Which procedures that you always do?

23   A.     As in the officer being afforded an officer

24   support team member, being taken to the nearest police

25   facility, things of that nature.

Deposition of Sergeant Eric Pilya            Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

1  Q.      You'd agree with me though, that you're treating

2  the civilian homicide suspect very differently than a

3  police officer homicide suspect, right?

4  A.      I would say, yes.  There are differences.

5  Q.      And the only reason that you're treating the

6  police homicide suspect any differently is because the

7  majority of these uses of force are deemed to be

8  noncriminal, right?

9  A.      I would say that's why these policies were put

10  in place over the years, yes.

11  Q.      And the only reason that the CIRT investigation

12  is any different than a typical homicide investigation

13  is because officers who are suspects of homicide are

14  typically found to be justified?

15                  MR. HALLORAN:  Objection.

16  A.      I'm not sure I understand the question there.

17  BY MS. GELSOMINO:

18  Q.      What don't you understand?

19  A.      Could you rephrase it, please?

20  Q.      You're treating civilian suspects -- strike

21  that.  You're treating officer homicide suspects

22  differently throughout the investigation, from the

23  moment of the shooting through the end of the

24  investigation, you're treating them differently because

25  the majority of these uses of force are deemed to be

1    noncriminal and within policy, right?

2    A.      I would say that the officers are treated

3    differently because there's a difference between a

4    police action and a murder.

5    Q.      But the difference between a police action and a

6    murder -- there is no difference until after the

7    investigation is completed and a determination has been

8    made about whether criminal activity occurred, correct?

9    A.      Technically, yes.

10   Q.      What do you mean by technically?

11   A.      Let me give you an example.  If we had a police

12   officer that was involved in a domestic situation and

13   killed their spouse.  On the surface of that we would

14   treat that case much differently than one that we got to

15   the scene and it was apparent that it was a police

16   action.  All the CIRT investigators are trained

17   investigators that have handled a lot of different

18   criminal cases, so we have a pretty good idea when we

19   get there what the facts of the case are.  So in the

20   case of the example that I gave you, that officer would

21   be placed in handcuffs and placed in the back of a

22   cruiser.  Does that make sense?

23   Q.      An officer who uses deadly force within the line

24   of duty can still be found to have committed criminal

25   activity, right?

1   A.      Yes.

2   **Q.      Can a police shooting ever be murder?**

3   A.      Yes.

4   **Q.      When?**

5   A.      When the officer was acting outside the scope of

6   his responsibilities as a police officer.

7   **Q.      And the only way to determine if an officer**

8   **acted outside of the scope of a police officer is to**

9   **conduct a thorough investigation, correct?**

10  A.      Correct.

11  **Q.      And then determine whether or not that action**

12  **was criminal, correct?**

13  A.      Correct.

14  **Q.      And so, up until the point that that**

15  **determination has been made an officer suspect is no**

16  **different than a civilian suspect, right?**

17                  MR. HALLORAN:  Objection.

18  A.      No.  I think there are subtle differences.  As I

19  said, these investigators are well-versed in what's

20  within the scope of an officer's duties, and within that

21  preliminary investigation that night we have a pretty

22  good idea which direction this investigation is going to

23  go.  We're not the final determining factor.  All we do

24  is collect the facts, but there are facts available to

25  us that allows us to come up with an idea of which way

1   this investigation is going.

2   BY MS. GELSOMINO:

3   **Q.   And you believe that the division's CIRT**

4   **investigators can develop an idea of which direction the**

5   **investigation is going on the night of the shooting**

6   **itself?**

7   A.   Yes.

8   **Q.   Before conducting any witness interviews?**

9   A.   No. Usually those are going on simultaneous.

10   When we first get there assignments are made, and these

11   things are going on a lot of the times prior to the

12   officer even getting back to the scene. We have a lot

13   of information of what transpired there before the

14   officer even comes back.

15   **Q.   The division's CIRT investigation develop an**

16   **idea of where the investigation might be going before**

17   **talking to the officer?**

18   A.   Yes. I think we can come up with the ideas of

19   what happened during the incident prior to the officer

20   coming back.

21   **Q.   Is that typically what happens in these**

22   **investigations?**

23   A.   I would say yes.

24   **Q.   Are any other allowances made for police**

25   **officers suspects that you haven't told me about?**

```
 1   A.      No.  I think that's it.
 2   Q.      If a shooting is within the scope of duty, can
 3   it be a crime?
 4   A.      No.
 5   Q.      What does it mean to be within the scope of
 6   duty?
 7   A.      It means taking action that you're required to
 8   do by division policy, by law, and taking enforcement
 9   action that you're required to take.  I think when an
10   officer would get outside the scope of their employment
11   would be when they would be not following the law, not
12   following the policies set forth by the division, having
13   some malicious intent and things of that nature.
14   Q.      Officers --
15   A.      Let me put it to you this way:  An officer can
16   be attempting to do their job and make tactical errors
17   or even administrative errors that don't rise to the
18   level of criminality.
19   Q.      Like what?
20   A.      So, maybe, for instance, an officer gets to a
21   scene first and doesn't wait for back up and they go in
22   and get into an altercation with a suspect and pulls a
23   weapon on them and they have to fire to protect their
24   own life.  They didn't commit a crime there, but I'm
25   sure a supervisor would have said, you should have
```

 1   waited for back up.  Maybe if there were two of you this

 2   situation wouldn't have escalated.  They didn't commit a

 3   crime there, but they may have made a tactical error.

 4   They were still within the scope of their duties, but

 5   there may be a retraining or discussion about the

 6   tactics that they used.

 7   **Q.      Can an officer be on duty trying to effect their**

 8   **duties as a police officer and still be acting outside**

 9   **of the scope of their duties?**

10   A.      I don't understand.  You're saying they're

11   acting within the scope but outside the scope?  I dont

12   understand that.

13   **Q.      I'm still trying to wrap my head around what you**

14   **mean by acting within the scope.  Can an officer be on**

15   **duty and do his best to take care of his duties as a**

16   **police officer and still take actions that are outside**

17   **the scope?**

18   A.      I don't think you can be one or the other.  I

19   think it's either within the scope or outside the scope

20   of their duties.

21                    MS. GELSOMINO:  I need like a six

22   minute break.

23                    MR. HALLORAN:  Thank you.

24                            - - - -

25      (Thereupon, an off-the-record discussion was held.)

Deposition of Sergeant Eric Pilya    Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

```
 1                              - - - -
 2    BY MS. GELSOMINO:
 3    Q.      Have you ever -- is it the policy of the
 4    division of police to view all police involved shootings
 5    as noncriminal until the time of the Grand Jury saying
 6    otherwise?
 7    A.      No.
 8    Q.      How is that incorrect?
 9    A.      Well, like I described before, I think each case
10    is different on its own merits.
11    Q.      Do you know of a time when the CIRT team
12    investigated a police involved shooting and considered
13    it criminal from the time of the shooting?
14    A.      I can only speak to CIRT as long as I've been
15    involved, and I have not had an occasion, no.
16    Q.      Are you aware of any time that CIRT has treated
17    a police officer and a police involved shooting the same
18    as a civilian suspect?
19                    MR. HALLORAN:  Objection.
20    A.      I believe that other than the procedures that
21    have been adopted by the division as far as the criminal
22    investigation is concerned, we attempt to treat the
23    police suspect the same as a civilian suspect in most
24    regards.
25    BY MS. GELSOMINO:
```

1  Q.      But you're not aware of any cases in which a

2  civilian suspect -- a police officer suspect has been

3  treated the same as a civilian suspect would be treated,

4  right?

5                      MR. HALLORAN:  Objection.

6  A.      I think I'm going to stand with my previous

7  answer.

8  BY MS. GELSOMINO:

9  Q.      Can a police officer commit a crime while acting

10  within the scope of duty?

11                     MR. HALLORAN:  Objection.

12  A.      No.

13  BY MS. GELSOMINO:

14  Q.      How is the CIRT team comprised?

15  A.      The CIRT team is made up of 12 homicide

16  detectives.  All of the homicide section sergeants are

17  involved in the CIRT team, with one being the team

18  leader, and then we're in the chain of command of the

19  Major Crimes Bureau, so the lieutenant and commander for

20  the Major Crimes Bureau.

21  Q.      Did you say that all the homicide detectives are

22  involved in CIRT?

23  A.      No.  All the homicide sergeants are involved in

24  CIRT.

25  Q.      Okay.  So who determines which homicide

1   detectives are assigned to CIRT?

2   A.      The team leader will make a recommendation of

3   someone from those interested in applying for a CIRT

4   vacancy, and then the commander will make the final

5   determination.

6   Q.      Who's the commander?

7   A.      Currently Robert Strausbaugh.

8   Q.      Who was it in 2015 and 2016?

9   A.      I'm not really sure.  I think in 2015 it was

10  Commander Kelly Whiner, and Commander Mike Gray

11  succeeded her.  I'm not really sure what year.

12  Q.      Okay.  So from the moment of a police involved

13  shooting walk me through the steps.  What happens?

14  A.      So an officer involved in a police involved

15  shooting on the street, they notify their immediate

16  supervisor, the immediate supervisor responds to the

17  scene, separates witnesses, puts up the crime scene

18  tape, they air for an officer support member.  An

19  officer support member will arrive, take the involved

20  officer or officers away from the scene to the nearest

21  police facility.  They would air for a CIRT call-out,

22  usually that means radio room will call the

23  investigative duty desk and the investigative duty desk

24  personnel will start to call in CIRT team.  They have a

25  list of -- there's a do not call list so they know who

 1   not to call in for this.  There are two teams of six.

 2   They rotate each month.  In addition to that they rotate

 3   who's going to be the primary investigator, the

 4   investigative duty desk knows who that is, calls them

 5   first.  They call myself, and based on the incident I

 6   may call in additional detectives, but for the most part

 7   each CIRT team requires six detective to be called in

 8   and two sergeants.  One to act as team leader, one as

 9   assistant CIRT sergeant.  They also call the chain of

10   command lieutenant commander.  If it's an injury they

11   call the public information officer and we respond to

12   the scene.  In route to the scene we make sure that the

13   command bus is in route.  Hopefully it's there by the

14   time that we get there.  When we get to the scene we

15   wait for everyone on the CIRT team to arrive, then we

16   ask for patrol to brief us.

17   **Q.      Okay.  Let's stop there for a quick second.**

18   A.      Sure.

19   **Q.      We'll start back up with patrol briefing later,**

20   **but let me do some follow-up on that.  Do you get a**

21   **phone call every time there's a police involved**

22   **shooting?**

23   A.      Unless I'm on the do not call list because I'm

24   on a vacation, out of town, sick, something like that.

25   **Q.      Did you get a phone call in the shooting of**

1    Deaunte Bell-McGrew?

2    A.      Yes.

3    Q.      Did you go to the scene?

4    A.      Yes.

5    Q.      Did you get a phone call in the shooting of

6    Tyree King?

7    A.      Yes.

8    Q.      Did you go to the scene?

9    A.      Yes.

10   Q.      Did you get a phone call in the shooting of

11   James England?

12   A.      Yes.

13   Q.      Did you go to the scene?

14   A.      Yes.

15   Q.      The two teams of six that rotate, is that six

16   plus a primary investigator?

17   A.      No.  It's including the primary investigator.

18   Q.      How is a primary investigator designated for

19   each shooting?

20   A.      The one that had the oldest investigation gets

21   the newest investigation.  It's a rotations.

22   Q.      You said that you may call in additional

23   detectives.  Why would you do that?

24   A.      For instance, if SWAT or intact is involved and

25   there's a lot of witnesses to be interviewed.  For

1    instance, we had a police involved shooting one time

2    that involved a mega-bus full of passengers.  In that

3    particular case I had to call in detectives that weren't

4    even CIRT detectives to help with witness interviews.

5    **Q.      Just because of the number of interviews?**

6    A.      Yes.  Because of the number of witnesses.

7    **Q.      Do you have the discretion to designate a**

8    **different lead detective outside of this rotation that**

9    **you discussed?**

10    A.      I'm sorry.  Do I have the discretion?

11    **Q.      To assign a different person?**

12    A.      Can I, yes.  Do I, no.

13    **Q.      Did you do that in any of these three specific**

14    **cases?**

15    A.      No.

16    **Q.      Do you call anyone else between the time that**

17    **you -- like when you actually get that first phone call**

18    **alerting you, what do you do?**

19    A.      I start to get ready and respond.  The detective

20    bureau desk calls me and I will say, "give me six

21    detectives."  They'll call off that list and call me

22    back and let me know which six detectives are

23    responding.

24    **Q.      Okay.  Do you do anything else before you get to**

25    **the scene?**

1    A.       I'll usually go, either call the COM channel or

2    use the radio in my car to see if the command bus is in

3    route.

4    **Q.       Right.   What's the command bus?**

5    A.       The command buss is a large RV that's outfitted

6    with a table and an area for us to do interviews to meet

7    and brief, to get out of the weather elements, things of

8    that nature.

9    **Q.       Do you use that in each CIRT investigation?**

10   A.       When it's available, yes.

11   **Q.       Do you call in any additional resources?**

12   A.       How do you mean?

13   **Q.       Any other equipment or personnel that you call**

14   **in?**

15   A.       If we have knowledge ahead of time that it's an

16   outdoor scene, I may call the crime scene sergeant and

17   say, "you guys can start this way."  If a search warrant

18   is needed I don't do that because it's going to be a lot

19   of downtime before they can get started.  That's pretty

20   much the only person that I would call in addition on

21   the way to the scene.

22   **Q.       Okay.   And what is the role of the CIRT team?**

23   A.       CIRT is responsible for doing investigations

24   involving critical incidents involving law enforcement

25   officers, division personnel.

1    Q.     And this is the criminal investigation, right?

2    A.     Correct.

3    Q.     Is there any other -- are you investigating

4    anything else aside from the violation of laws?

5    A.     No.

6    Q.     Do you as the leader of CIRT communicate with

7    any other leadership or chain of command when you are

8    advised of a police involved shooting?

9    A.     The only contact really is at the scene we'll be

10   briefed by the supervisor in charge of the scene when we

11   get there so they can give us a brief rundown of what

12   occurred in the incident.  In addition to that there

13   will be a Firearms Review Board commander that will

14   respond to the scene and we'll kind of walk them through

15   what happened as well.

16   Q.     Do you talk to any of your chain of command?

17   A.     Yes.  Usually the lieutenant and the commander

18   are at scene.

19   Q.     Okay.

20   A.     Sometimes the deputy chief.

21   Q.     How do you communicate with them on scene?

22   A.     Just verbally.

23   Q.     Do you make any effort before you get to the

24   scene to determine what happened there, an initial

25   report of what occurred?

1    A.        No, because usually the reports that come in

2    aren't accurate.

3    **Q.        What do you mean?**

4    A.        Well, a lot of times they don't even know who

5    the officers are that are involved, how many officers

6    are involved, information like that.  So I don't really

7    rely on any information until I get to the scene.

8    **Q.        Okay.  So what happens when you get to the**

9    **scene?**

10   A.        We make sure that the scene is large enough.  If

11   it doesn't contain everything that we would desire,

12   we'll have patrol push it back.  And then we wait for

13   everyone to get there.  We brief with the scene

14   supervisor so they know.  Give us a gist of what

15   occurred and who the players are.  Usually I will

16   request to know who the involved officers are, who the

17   police witnesses are, if there's any civilian witnesses

18   that they have detained, and information on the suspect,

19   the civilian suspect.  If there was an injury, like what

20   hospital they went to and things of that nature.  After

21   we've gotten that information, then I start making

22   assignments of the detectives that responded on what

23   they're required to do.  For instance, we already know

24   who the primary is going to be because of the rotations.

25   I assign a scene detective.  I'll assign a detective to

1  go to the hospital, if that's necessary.  Interview

2  officers.  I'll assign detectives to be in charge of the

3  officer witnesses.  I'll assign detectives to be in

4  charge of the civilian witnesses.  And then as they're

5  doing that, then they'll come back and report to me what

6  information they got from these witnesses.

7  **Q.     Do you remain on the scene the entire time?**

8  A.     For the most part.  I'm there until -- sometimes

9  I leave and the scene isn't completely finished yet.

10  They're still doing scans or things of that nature, but

11  for the most part I'm there for the majority of the

12  investigation.

13  **Q.     You said you request to know who are the police**

14  **witnesses and who are the civilian witnesses, right?**

15  A.     Correct.

16  **Q.     And you mentioned that civilian witnesses would**

17  **be detained?**

18  A.     Correct.

19  **Q.     Are all civilian witnesses always detained**

20  **before they're interviewed?**

21  A.     Usually, yes.  Because they're a witness to the

22  criminal incident, so we're allowed to detain them until

23  the detective gets the chance to talk to them and

24  usually the CIRT members are called in, so it takes a

25  while for them to get there.  Patrol officers hold on to

Deposition of Sergeant Eric Pilya        Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

1   these witnesses until we've had a chance to talk to

2   them. Occasionally we'll have a witness that has to get

3   to work or something of that nature. The patrol officer

4   is then required to get a good identification, like a

5   driver's license or something of that nature, and we'll

6   follow up with that witness at a later time.

7   **Q.**      **Where are these civilian witnesses detained?**

8   A.      Usually in the back of a police cruiser.

9   Sometimes they don't want to get in the back of a police

10   cruiser, so they'll just be standing next to it.

11   **Q.**      **Are they separated into individual police**

12   **cruisers?**

13   A.      Yes.

14   **Q.**      **Why?**

15   A.      You want to separate witnesses so they can't

16   communicate and influence each other's idea of what

17   happened.

18   **Q.**      **Do these civilian witnesses who are detained can**

19   **be detained for a number of hours before they're**

20   **interrogated?**

21   A.      Yes.

22   **Q.**      **Are the civilian witnesses who are detained**

23   **suspected of committing any crimes?**

24   A.      Are they suspected of committing any crimes?

25   Not that I'm aware of. Usually they're just witnesses

Deposition of Sergeant Eric Pilya                Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

1    of the incident.

2    Q.        So there's no reasonable suspicious or probable

3    cause for any of these civilian witnesses, right?

4    A.        Usually not, no.

5    Q.        So why are you authorized to detain a civilian

6    witness who is not accused of any crime for any period

7    of time?

8    A.        Because they have critical information in a

9    critical investigation.  By law we're allowed to detain

10   them for a reasonable amount of time until a detective

11   can speak with them.

12   Q.        Do you ask these individuals whether or not they

13   consent to being detained?

14   A.        I personally do not.

15   Q.        Do you instruct any of your CIRT officers to do

16   so?

17   A.        No.  Usually this is patrol that has the first

18   contact with these witnesses.

19   Q.        Okay.  Do you take any steps to ensure that the

20   civilian witnesses are given the option to remain in

21   detention or not?

22   A.        I personally do not.

23   Q.        Is it the policy of the division of police to

24   detain all civilian witnesses in a police car until they

25   can give statements?

Deposition of Sergeant Eric Pilya                    Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

1              MR. HALLORAN:  Objection.

2     A.      It is the policy of the division to detain

3     witnesses, yes.  Not necessarily in the back of a police

4     car.

5     BY MS. GELSOMINO:

6     Q.      **Is this something that's different in police**

7     **involved shootings than in other investigations?**

8     A.      No.

9     Q.      **So across the division witnesses to potential**

10    **criminal activity are detained until the time that their**

11    **statement is taken?**

12    A.      Yes.

13    Q.      **Why?**

14              MR. HALLORAN:  Objection.

15    A.      Pretty much what I said before.  They have

16    critical information on a criminal investigation, so

17    we're permitted by law to detain them until a detective

18    can get that information from them.

19    BY MS. GELSOMINO:

20    Q.      **Where in the law does it give you the permission**

21    **to do this?**

22    A.      Right offhand I couldn't quote you the section,

23    but we have received this training from our legal

24    bureau.

25    Q.      **What is a reasonable amount of time?**

Deposition of Sergeant Eric Pilya          Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

```
 1              MR. HALLORAN:  Objection.
 2   A.       Well, I would say a reasonable amount of time is
 3   the length of time it takes for the detectives to get
 4   there, be briefed and speak with them.
 5   BY MS. GELSOMINO:
 6   Q.       Is this the same procedure that's utilized
 7   regardless of the crime, the severity of the potential
 8   crime?
 9   A.       I can only speak to homicide and felonious
10   assault and police involved situations because that's
11   what I've been doing.  I don't know if they do this for
12   misdemeanors investigations.  I believe they're allowed
13   to, but I don't know if they do.  I can't speak to that.
14   Q.       Are police officer witnesses separated from each
15   other?
16   A.       Yes.
17   Q.       How?
18   A.       Usually they stand by their cruiser and wait to
19   be interviewed.
20   Q.       Are you aware of any time which police officer
21   witnesses have gone back to a station together before
22   interviews were conducted?
23   A.       Not really right off the top of my head, no.
24   Q.       During the time the civilian witnesses are
25   detained are they free to leave?
```

1  A.      Yes.  Well, let me rephrase that.  We can detain

2  them, even against their will, until a detective talks

3  to them.  However, we don't usually do that because we

4  want the witnesses to talk to us.  We want them to be

5  happy.  We want them to talk to us.  If we keep them

6  against their will, then, obviously, that's going to

7  anger them and they're not going to be a cooperative

8  witness and talk to us and give us information that they

9  saw.

10       Usually if they wish to leave the patrol

11  officers are to get a good contact or identity on them

12  and get a good contact number.  Then when the detectives

13  get to the scene they'll give us that information and

14  then we'll follow-up by trying to set up an interview

15  with that witness.

16  **Q.      In the shooting of Deaunte Bell-McGrew were any**

17  **of the civilian witnesses given the option of leaving**

18  **before giving a statement to the police?**

19  A.      I don't know.

20  **Q.      Were they held in police custody from the time**

21  **of the shooting until the time they gave a statement?**

22  A.      I'm not certain.

23  **Q.      Did you ever give them any opportunity to**

24  **consult with a lawyer before they gave a statement?**

25  A.      I don't believe so, no.

1   **Q.     In the case of the shooting of Tyree King were**

2   **any of the civilian witnesses given the option of**

3   **leaving or not remaining in police custody until the**

4   **time that they gave a statement?**

5   A.     I believe that the majority of the witnesses in

6   that case were not even in custody. I believe the other

7   individual that was with Mr. King was taken into

8   custody, but he was also believed to be a suspect out of

9   the earlier armed robbery. The other witnesses, I don't

10   believe any of them were detained.

11   **Q.     Why not?**

12   A.     I don't know.

13   **Q.     What did you do to figure that out?**

14   A.     Well, what we did was there was information that

15   there was a victim out of a robbery and we had his

16   information, so we followed that up and contacted him.

17   And there were some witnesses to that robbery, female

18   witnesses. They remained at scene and they were

19   interviewed. There were several people that live in the

20   residences right there that backed up to that alley that

21   were interviewed. There were some nuns that worked out

22   of the building there on the north side of the scene

23   that were interviewed as well. They just remained where

24   they were, and when we were made aware of them being

25   potential witnesses we went and interviewed them.

1    Q.       No officer ever put any of those witnesses in

2    the back of a police cruiser?

3    A.       I don't specifically remember any of those

4    witnesses with being in the back of a police cruiser,

5    but that's possible.

6    Q.       Why were the witnesses in Deaunte Bell-McGrew's

7    shooting taken into police custody before their

8    statement?

9    A.       I don't have an answer for you there.  I don't

10   know why they were.  Maybe there's a possibility that

11   the officers thought they could be suspects.

12   Q.       Which officers thought they could be suspects?

13   A.       I don't know.  I'm just throwing that out there

14   as a potential.

15   Q.       Well, you were the CIRT lead investigator at the

16   time, correct?

17   A.       Correct.  What I can tell you is that when we

18   got there that the two other individuals that had been

19   in the vehicle were being detained in cruisers at that

20   time.

21   Q.       What did you do in response to learning the

22   information that two civilian witnesses were being

23   detained in cruisers?

24   A.       I assigned detectives to go interview them.

25   Q.       How long were they detained in police custody

1   **before they were interviewed?**

2   A.      I don't know.

3   **Q.      Did you take any steps to ensure that they were**

4   **held in police custody for a reasonable amount of time**

5   **only?**

6   A.      I would say yes, in the fact that I always try

7   and assign detectives to interview the civilian

8   witnesses first so that they can be released in a

9   reasonable amount of time.

10  **Q.      But you didn't take any actions to ensure that**

11  **they were actually interviewed and released in a**

12  **reasonable amount of time, right?**

13                  MR. HALLORAN:  Objection.

14  A.      I don't specifically recall, but I'm sure that

15  them being the best witnesses that we had that night

16  that they were interviewed first.

17  BY MS. GELSOMINO:

18  **Q.      Do you know whether any of them were taken to**

19  **the station?**

20  A.      Being critical interviews I believe that they

21  were taken to headquarters to be interviewed on video.

22  **Q.      So they were taken into police custody, put in**

23  **the back of a police car and taken to police**

24  **headquarters?**

25  A.      Correct.

Deposition of Sergeant Eric Pilya      Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

1    **Q.**    **When they got to police headquarters were they**

2    **free to leave?**

3    A.    Yes.

4    **Q.**    **Were they ever told that they were free to**

5    **leave?**

6    A.    I'm not sure.

7    **Q.**    **Were they in handcuffs?**

8    A.    I'm not sure.

9    **Q.**    **Should they have been?**

10    A.    In handcuffs, I think for officer safety reasons

11    they may have been placed in handcuffs initially, but

12    then once they were determined they were not suspects of

13    a crime, then they should have been released from

14    handcuffs.

15    **Q.**    **Who made the determination that they were not**

16    **suspects of a crime in the Deaunte Bell-McGrew case?**

17    A.    I don't specifically recall.

18    **Q.**    **Who should have made that decision?**

19    A.    Well, there's two different options with that.

20    Based on once they found out what was going on a patrol

21    officer might make the decision that they're a witness

22    and not a suspect and remove the handcuffs, or when the

23    detectives interviewed them and determined that they

24    probably would have had their handcuffs removed before

25    even speaking with the detectives in the interview room,

1   but I don't know for certain if that was the case.

2   Q.      When you get to the scene who takes command of

3   the scene?

4   A.      I do.

5   Q.      So you are the top of the chain at the scene

6   after a police involved shooting?

7   A.      Yep.

8   Q.      So any detention of witnesses would be your

9   responsibility, right?

10  A.      Sure.

11  Q.      And ensuring whether or not civilian witnesses

12  are unlawfully detained is your responsibility, right?

13                  MR. HALLORAN:  Objection.

14  A.      I would say that I make sure that when I am

15  advised at the scene by patrol that there are civilian

16  witnesses that have been detained, I immediately assign

17  a detective, one of the CIRT detectives, to go interview

18  them, and they are trained to make a decision on whether

19  this person has information pertinent to the criminal

20  case.

21  BY MS. GELSOMINO:

22  Q.      What does it matter if the person has

23  information pertinent to the criminal case?

24  A.      Because we're allowed to detain them until we

25  speak with them.

```
 1   Q.      My previous question related to your
 2   responsibilities, but the chain of command -- you're at
 3   the top of the chain of command on a scene.  You're
 4   ultimately responsible for the conduct of your
 5   subordinates and the officers on the scene, right?
 6                   MR. HALLORAN:  Objection.
 7   A.      I would say that I'm aware of.
 8   BY MS. GELSOMINO:
 9   Q.      Who's responsible if not you?
10   A.      I believe the officers are responsible for their
11   own actions.  If I'm not aware of it, there's not much I
12   can do about it.
13   Q.      You understand that supervisors can be
14   responsible for the actions of their subordinates,
15   right?
16                   MR. HALLORAN:  Objection.
17   A.      Sure.
18   BY MS. GELSOMINO:
19   Q.      Do you agree with me that it's your duty as a
20   supervisor to properly supervise and monitor the
21   behavior of your subordinates?
22   A.      Yes.
23   Q.      So if one of your subordinates on a scene is
24   unlawfully detaining a civilian witness for hours, it's
25   your responsibility to do something, right?
```

Deposition of Sergeant Eric Pilya                    Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

```
 1   A.        Well, when would that be unlawful?
 2   Q.        Can you answer my question, first?
 3   A.        I'm just trying to understand your question.  So
 4   if a civilian witness has information that's critical to
 5   our investigation we're by law allowed to detain them
 6   until a detective speaks with them.  And the key to that
 7   is we can detain them for a reasonable amount of time,
 8   and I believe the courts have decided that that
 9   reasonable amount of time is how long it takes the
10   detectives to respond to be able to speak with them, and
11   that occurs in every one of our CIRT investigations that
12   their detained until we get there.  We're advised of
13   their presence and a detective goes and speaks with
14   them.  I would say that the civilian witnesses in each
15   of our cases are detained lawfully for a reasonable
16   amount of time.
17   Q.        If an individual was detained unlawfully on a
18   scene, which is under your command, it would be your
19   responsibility, right?
20                   MR. HALLORAN:  Objection.
21   A.        If I was aware of it, yes.
22   BY MS. GELSOMINO:
23   Q.        Have you ever done anything to ensure that the
24   detectives who you assigned to talk to witnesses do so
25   in a reasonable amount of time?
```

1  A.      Yes.  As I said, when we get there and we're

2  briefed and we're told what witnesses are there, both

3  police and civilian, I always attempt to get the

4  civilian witnesses interviewed first so they can be

5  released.  They're there.  They probably don't want to

6  be there.  They're being inconvenienced by this, so I

7  want to get them interviewed as quickly as possible.

8  Q.      And how do you do that?

9  A.      I assign a detective to go interview them.

10  Q.      Have you ever taken any steps after that point,

11  after you assign a detective to ensure that that

12  detective actually takes the statements and releases

13  that civilian within a reasonable amount of time?

14                      MR. HALLORAN:  Objection.

15  A.      Yes, because that detective after that interview

16  comes back and shares the content of that interview with

17  me.

18  BY MS. GELSOMINO:

19  Q.      Immediately?

20  A.      Yes.

21  Q.      What if that detective determines that they want

22  to conduct the interview back at the station?

23  A.      Well, then, that witness is transported to

24  headquarters and interviewed there.

25  Q.      And how are you informed, if at all, of the

1   content of that investigation?

2   A.     The detective will call me and let me know what

3   the individual said.

4   **Q.     Who makes the decision whether or not to**

5   **transport a civilian witness to the station to give a**

6   **statement?**

7   A.     Usually it will be a joint decision between the

8   detective assigned to interview that individual, the

9   primary investigator and myself.

10   **Q.     In the case of the shooting of Deaunte**

11   **Bell-McGrew, was there ever any reasonable suspicion or**

12   **probable cause of the other two individuals that were**

13   **inside the car with Deaunte Bell-McGrew made at any**

14   **time?**

15   A.     I'm trying to remember. I do believe there was

16   some drugs taken off of one of them, but I could be

17   mistaken about that. Other than that I would say, no.

18   **Q.     Was anyone charged with any amount of drugs?**

19   A.     I don't recall.

20   **Q.     Are any of the police officer witnesses**

21   **detained?**

22   A.     They are not allowed to leave the scene.

23   **Q.     Are they put into police cars?**

24   A.     They're usually in their police car.

25   **Q.     In the front of their own police car?**

 1    A.       Correct.

 2    **Q.       You say they're usually there.**

 3    A.       They may be standing next to their cruiser.

 4    They may be assigned to block off a roadway, but they're

 5    not allowed to leave the scene until a detective speaks

 6    with them.

 7    **Q.       At what point do they go to their cruisers?**

 8    A.       Once the scene is secured and they're not given

 9    a task at the scene.  Usually the first responding

10    officers are given a task of securing the scene.  They

11    may block a roadway or may be placed to stand over top

12    of a weapon, something of that nature.

13    **Q.       Even though they're police officer witnesses,**

14    **right?**

15    A.       Correct.

16    **Q.       In many cases then, police officer witnesses are**

17    **not sitting in their cars up until the point that they**

18    **give a statement, right?**

19    A.       Sometimes they are, yes.  Sometimes they're not.

20    **Q.       Why are the suspect officers permitted to leave**

21    **the scene?**

22    A.       The suspect officers are permitted to leave the

23    scene with an officer support team member.  This has

24    been a long standing policy of the division of police,

25    that this is the way that the involved officer is

1   handled in these cases.  There's an officer support team

2   member that's assigned to that officer, that is with

3   that officer one hundred percent of the time when

4   they're not with their attorney.

5   **Q.**      **Why?**

6   A.      I did not put that policy in place.  I couldn't

7   tell you why that was in place, but I think it was best

8   to take them to a police facility.  I think way back

9   before I had anything to do with even homicide, I

10   believe that the policy was more to take them to

11   headquarters or do a Tim Horton's down the street.  I

12   think it's for the officer's mental wellbeing.  The

13   officer support team is made up of members that have

14   been in critical incidents like this and can walk them

15   through the process of what's expected of them, what's

16   going to happen, and things of that nature.

17   **Q.**      **Do you take any steps in a non-police involved**

18   **shooting homicide investigation to consider the mental**

19   **wellbeing of a civilian suspect?**

20   A.      I would say that the civilian suspect is having

21   issues, a mental breakdown or something of that nature,

22   we do take them to a hospital and get them cleared

23   before proceeding.  So I would say in certain occasions,

24   yes.

25   **Q.**      **In the event of a mental breakdown which**

1  requires hospitalization, do you take any steps to

2  consider the mental wellbeing of a civilian suspect like

3  you do for a police officer homicide suspect?

4  A.    We do not take the same steps, no.

5  Q.    Why do you think that it is good to consider the

6  mental wellbeing of a police officer after he was

7  involved in a police involved shooting and before he

8  gives a statement?

9  A.    Because it is a traumatic event and it is a

10  police action as well.  We as the division have adopted

11  policies, long-standing policies, to look at the officer

12  as being involved in a police action until it's

13  determined that they're not for the most part.  I think

14  that's why a lot of these policies are in place.

15  Q.    So it is the policy of the department to look at

16  the officer homicide suspect as having been involved in

17  a police action rather than a crime up until the time

18  that the Grand Jury makes a determination?

19              MR. HALLORAN:  Objection.

20  A.    I would say that there are procedures in place

21  that treat the officer as if they were involved in a

22  police action until it's proven that they're not.

23  BY MS. GELSOMINO:

24  Q.    And when is it proven that they're not?  At the

25  Grand Jury?

1    A.     Well, as I gave you an example before, if we had

2    an officer that was on duty and ended up killing their

3    spouse, went home during their tour, went home and

4    killed their spouse and we caught them there, and from

5    the preliminary investigative information that we have,

6    that officer would be treated as a criminal suspect

7    rather than someone who is involved in a police action.

8    There are determinations that can be made based on the

9    initial facts of the case as we see them.

10   **Q.     Let's put that domestic violence incident aside.**

11   **Let's talk about all the other kinds of police involved**

12   **shootings that you're in charge of and are designated to**

13   **talk about today.   Okay?**

14   A.     Okay.

15   **Q.     You keep referring to the time that it's a**

16   **police action until it's decided otherwise.   When is it**

17   **decided otherwise?**

18                MR. HALLORAN:   Objection.

19   A.     Officially it's the Grand Jury.   When the Grand

20   Jury decides to no bill the case, it's decided that it's

21   not a criminal action.   However, based on preliminary

22   information at the scene we can get a gist as to whether

23   this is going to be a crime or not.

24   BY MS. GELSOMINO:

25   **Q.     Right.   So you guys make a determination early**

```
 1    at the scene as to whether or not you, the

 2    investigators, believe that this is a police action or a

 3    crime, right?

 4                    MR. HALLORAN:  Objection.

 5    A.      We can.   It doesn't effect the way that we

 6    conduct the investigation, but we can.

 7    BY MS. GELSOMINO:

 8    Q.      Do you make that determination on the scene as

 9    to whether or not you believe it to be a criminal action

10    or a police action?

11                    MR. HALLORAN:   Objection.

12    A.      No.  I do not make that determination.

13    BY MS. GELSOMINO:

14    Q.      Do your investigators?

15    A.      No.

16    Q.      Do you or your investigators develop a gist at

17    the scene as to whether or not you believe the police

18    involved shooting to be a criminal action or a police

19    action?

20    A.      Of course.

21    Q.      And you make that determination well before the

22    time that the investigation is complete, correct?

23                    MR. HALLORAN:   Objection.

24    A.      It's not a determination.  It's, as you said, a

25    gist.
```

Deposition of Sergeant Eric Pilya       Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

```
 1   BY MS. GELSOMINO:

 2   Q.       Okay.  So you guys, you as the lead investigator

 3   and the CIRT team, at the scene develop a gist about

 4   your conclusions regarding the shooting well before the

 5   end of the investigation, right?

 6                     MR. HALLORAN:  Objection.

 7   A.       Yes.  We have an idea in mind about what

 8   happened based on the preliminary investigation.

 9   BY MS. GELSOMINO:

10   Q.       And you have that idea in your mind about what

11   happened well before the time that the Grand Jury is

12   presented with any information regarding the shooting,

13   right?

14                     MR. HALLORAN:  Objection.

15   A.       Yes.

16   BY MS. GELSOMINO:

17   Q.       Now, I just want to be clear.  When you say that

18   you look at the officer as being involved in a police

19   action, not a crime, until decided otherwise, is there

20   any other --

21   A.       I didn't say that.  You said that.

22   Q.       I wrote down a quote from you.  Is there any

23   other mechanism that can determine otherwise other than

24   the Grand Jury?

25                     MR. HALLORAN:  Objection.
```

1  A.       Is there any other mechanism?  And we're talking

2  about an officer involved situation that's a fatality?

3  BY MS. GELSOMINO:

4  **Q.       Yes.**

5  A.       So, yes.

6  **Q.       Tell me about it.**

7  A.       Well, in Franklin County they have a policy that

8  they take every one of these to the Grand Jury.

9  **Q.       Right.**

10 A.       If we have something that happens in another

11 county, such as Fairfield County, they have the option.

12 It's our responsibility to present the case to the

13 prosecutor in the county in which it occurred.  They

14 have the option to present it to the Grand Jury or just

15 go ahead and file charges or determine that charges

16 aren't warranted.  That's up to the prosecutor's office.

17 In Franklin County under Ron O'Brien they have a

18 standing policy that each one of those would be

19 presented to the Grand Jury.

20 **Q.       Okay.  So in the case where it's not presented**

21 **to the Grand Jury it's the prosecutor's office who**

22 **determines whether or not an action will be charged as a**

23 **crime, right?**

24 A.       Correct.

25 **Q.       And that's at the end of the CIRT investigation?**

1  A.       Correct.

2  Q.       In the case of a non-fatality tell me how it's

3  determined whether the action is deemed to be a police

4  action or a criminal action?

5  A.       The CIRT team would make that decision.

6  Q.       Okay.  So in that case is it ever presented to a

7  prosecutor's office?

8  A.       We do have that option to present to the

9  prosecutor's office, but we also have the option to file

10  charges ourself.

11  Q.       Okay.  So in the case of a non-fatality officer

12  involved shooting the CIRT team itself can determine, or

13  does determine, whether or not to deem the action

14  criminal, right?

15  A.       Yes.

16  Q.       And in that case are you, as the head of the

17  CIRT team, the final decision-maker?

18  A.       Not necessarily, no.  If we were to file

19  criminal charges on an officer the entire chain of

20  command would be involved in that.

21  Q.       Has the CIRT team ever determined to bring

22  criminal charges against an officer in a non-fatality

23  officer involved shooting?

24  A.       Since I've been involved as the team leader of

25  the CIRT team the only incident where an officer was

1    charged criminally was Andrew Mitchell.

2    **Q.       Tell me about Andrew Mitchell.**

3    A.       Andrew Mitchell was an officer involved

4    shooting.   He was a vice officer and he picked up a lady

5    who he believed to be a prostitute and he was effecting

6    an arrest.   He was stabbed and he fired shots at this

7    individual killing her.   And it was presented to the

8    prosecutor's office, taken to a Grand Jury and that

9    officer was indicted.

10   **Q.       What were the conclusions of the CIRT**

11   **investigation?**

12   A.       The CIRT team did not believe that it was a

13   criminal action.

14   **Q.       Okay.   But it was a fatality?**

15   A.       It was.

16   **Q.       So where did it go after it left the CIRT team?**

17   A.       In fatal cases we are required to present it to

18   the prosecutor in the county in which it occurred.

19   **Q.       Which county that was?**

20   A.       Franklin.

21   **Q.       Okay.   So in this case it was a fatality, you**

22   **presented it to Franklin County and Franklin County**

23   **presented it to the Grand Jury?**

24   A.       Correct.

25   **Q.       What charges was Mitchell indicted for?**

Deposition of Sergeant Eric Pilya        Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

```
 1    A.      Murder.

 2    Q.      Anything else?

 3    A.      Not in Franklin County, no.

 4    Q.      Does the division of police disagree with the

 5    conclusions of the prosecutor's office in this case?

 6    A.      I can't speak for the division.

 7    Q.      You're here to speak for the division.  You've

 8    been designated by the City of Columbus to speak for the

 9    City of Columbus regarding this.  Is it the position of

10    the City of Columbus that Andrew Mitchell did not commit

11    a crime?

12    A.      I'm sorry.  Was this one of the cases that I was

13    called here to testify to?

14    Q.      Yeah.  You've been called here to testify on

15    every case since 2005.

16    A.      I will tell you my personal opinion is it was a

17    justifiable police shooting.

18    Q.      Based on what?

19    A.      Based on the facts of the case.

20    Q.      Well, what facts of the case leads you to

21    testify today on behalf of the City of Columbus that

22    Andrew Mitchell was involved in a justified police

23    shooting?

24                    MR. HALLORAN:  Objection.

25    A.      So, Detective Mitchell was acting within the
```

Deposition of Sergeant Eric Pilya        Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

```
1   scope of his duties.  He'd been critically injured by a
2   suspect and was in fear of his life at the time that he
3   fired his weapon to stop that action from occurring.
4   For those reasons I believe that he was acting within
5   the scope of his duties, so therefore, was not a
6   criminal case.
7   BY MS. GELSOMINO:
8   Q.      Do you believe that he violated any policies?
9   A.      Administrative policies, yes, I do believe he
10  violated some administrative policies.
11  Q.      Which policies did he violate administratively?
12  A.      There were certain policies that they have.  He
13  should have waited for his back up to have gotten there
14  before starting to effect the arrest.  And, you know, I
15  think that's pretty much -- administrative policy wise,
16  I think that's pretty much the only thing that he did
17  wrong.
18  Q.      So when the CIRT investigation -- well, you said
19  that the CIRT investigation concluded that Mitchell did
20  not commit any crime, right?
21  A.      Correct.
22  Q.      Does the CIRT team make conclusions or
23  recommendations?
24  A.      As to whether someone committed a crime or not
25  in nonfatal cases, we do.  In fatal cases we do not.  We
```

Deposition of Sergeant Eric Pilya      Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

1   send it to the prosecutor's office.

2   **Q.**     **Right. So this being a fatal case, why did the**

3   **CIRT team come to a conclusion that he had not committed**

4   **a crime?**

5   A.     We didn't write a conclusion in the

6   investigative packet. We send it to the prosecutor's

7   office. You were asking me for my opinion.

8   **Q.**     **No. I'm asking you for your testimony as a**

9   **30(b)6 deponent?**

10   A.     The CIRT's opinion.

11   **Q.**     **Pardon?**

12   A.     You're asking me whether I believed it to be a

13   crime, and I said I did not.

14   **Q.**     **That was the opinion of the CIRT team at the**

15   **conclusion of the investigation into the death of Donna**

16   **Castleberry?**

17   A.     We did not render an opinion in that CIRT

18   package. It was given to the prosecutor's office to

19   present to the Grand Jury.

20   **Q.**     **I understand that. But was that the position of**

21   **the CIRT team at the conclusion of the investigation?**

22                  MR. HALLORAN: Objection.

23   A.     It was the position of -- if you asked us what

24   our position was, I would say yes. Was it written into

25   the investigative package, no.

Deposition of Sergeant Eric Pilya      Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

```
 1   BY MS. GELSOMINO:

 2   Q.      Okay.  Was the position of the division of

 3   police at the conclusion of the CIRT investigation that

 4   Mitchell did not commit any criminal activity when he

 5   fatally shot Mrs. Castleberry?

 6                   MR. HALLORAN:  Objection.

 7   A.      I can't really speak as to the position of the

 8   division of police unless you're considering my position

 9   to be that, if that makes sense.

10   BY MS. GELSOMINO:

11   Q.      You understand that your testimony today is the

12   testimony of the City of Columbus in this case?

13                   MR. HALLORAN:  Objection.

14   A.      I understand.

15   BY MS. GELSOMINO:

16   Q.      Okay.  What was your involvement in the

17   investigation into the homicide of Ms. Castleberry?

18                   MR. HALLORAN:  Objection.  It's beyond

19   the scope.  Irrelevant.

20   A.      I was the CIRT team leader and responded to the

21   scene of that investigation.

22   BY MS. GELSOMINO:

23   Q.      Okay.  At the conclusion of the investigation

24   before it's handed over to the prosecutor's office, in

25   this case with Andrew Mitchell, did anyone else in the
```

Deposition of Sergeant Eric Pilya    Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

1   **division of police review the investigation?**

2   A.    I'm not sure.  I know that the chief reviewed

3   the investigation.  I don't recall whether it was before

4   or after it was given to the prosecutor.

5   **Q.    Okay.  How is this investigation handed over to**

6   **the prosecutor's office, or how was it handed over?**

7   A.    We make a copy of the completed case package and

8   then we take it over to the prosecutor's office.

9   **Q.    Like hand-deliver a physical copy?**

10  A.    Yes.

11  **Q.    Who did that?**

12  A.    I did.

13  **Q.    Who who did you drop it off to?**

14  A.    Ron O'Brien and Jimmy Lowe.

15  **Q.    What was the conversation between you, Ron**

16  **O'Brien and Jimmy Lowe when you dropped off this packet?**

17  A.    Basically we told them what we thought occurred

18  during the investigation based on the facts of the case

19  and left it in their hands.

20  **Q.    Who is we?**

21  A.    Myself and I think Detective Greg Shepherd was

22  involved in that investigation, I believe.

23  **Q.    Was he the lead?**

24  A.    Yes.

25  **Q.    How long was your meeting with O'Brien and Lowe?**

Deposition of Sergeant Eric Pilya                    Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

```
 1    A.      I don't recall.
 2    Q.      Did you tell O'Brien and Lowe the informal
 3    position of the CIRT team in the division of police at
 4    the time?
 5    A.      I believe when they asked my opinion I did so,
 6    yes.
 7    Q.      What did you tell them?
 8    A.      That we believe that it was a -- that Detective
 9    Mitchell was acting within the scope of his duties.
10    Q.      What did they say in response?
11    A.      I don't believe they took a position at the
12    time.
13    Q.      So has the CIRT team ever concluded formally or
14    informally that an officer committed a criminal act when
15    they used deadly force?
16    A.      Has the CIRT team ever concluded formally or
17    informally that an officer committed a criminal act?  I
18    would say no, for the length of time that I've been
19    here.
20    Q.      And that is since 2009?
21    A.      Well, yeah.  I was shadowing.  I don't believe
22    any occurred then either.
23    Q.      Okay.  So at least since 2009 CIRT has never
24    taken the position that any officer has committed a
25    criminal act when using deadly force, right?
```

Deposition of Sergeant Eric Pilya       Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

1                MR. HALLORAN:  Objection.

2  A.    I believe so.

3  BY MS. GELSOMINO:

4  **Q.    Okay.  Other than this one example with**

5  **Mitchell, have criminal charges ever been lodged against**

6  **any division of police officer for using deadly force?**

7                MR. HALLORAN:  Objection.

8  A.    I don't know the answer to that.  I don't

9  believe so.  Certainly not since 2009.  Before then,

10  maybe.  I don't know.

11  BY MS. GELSOMINO:

12  **Q.    Okay.  So since 2009 no division of police**

13  **officer has ever been charged with a crime for using**

14  **deadly force?**

15  A.    I believe so, no.

16  **Q.    Did you -- what was your relationship with**

17  **Andrew Mitchell?**

18                MR. HALLORAN:  Objection.

19  A.    My relationship with Andrew Mitchell?  I knew

20  Andrew Mitchell.  We were in the same class together in

21  the academy and we never worked together.  He did work

22  homicide, but he worked third shift for a brief period

23  of time, but I had very little contact with him after

24  the academy.

25  BY MS. GELSOMINO:

1   Q.     Okay.   In every case of a fatal shooting do you

2   hand-deliver the documents to the prosecutor's office

3   and have a conversation with the prosecutor regarding

4   the position of the CIRT team?

5   A.     No.   Usually the primary investigator has that

6   responsibility, takes the package over to the

7   prosecutor's office.

8   Q.     Why don't you do it with the primary

9   investigator?

10   A.     It's just not the way that we do it.

11   Q.     So why did you do it in the Mitchell case?

12   A.     Well, in the Mitchell case I actually was

13   designated the primary in that case and Detective

14   Shepherd was secondary in that case.

15   Q.     Why were you primary?

16   A.     I think because they wanted to make sure that

17   there was no conflicts with anybody that had worked

18   around Andy in homicide.   They didn't want to have any

19   conflict of interest there.   Since I had very little

20   contact with Detective Mitchell they had me take over

21   the investigation.

22   Q.     Who's they?

23   A.     Our chain of command.

24   Q.     Who ordered you to do that?

25   A.     The Chief of Police, Thomas Quinlin.

1  Q.       Have you ever been designated primary on any

2  other CIRT investigation?

3  A.       No.

4  Q.       In the case of the shooting death of Deaunte

5  Bell-McGrew, did you participate at any point in any

6  conversations with the prosecutors?

7  A.       I don't recall.  That was a long time ago.

8  Q.       Did you testify at the Grand Jury?

9  A.       No.

10  Q.       In the shooting death of Tyree King, did you

11  participate at any point in any conversations with

12  prosecutors?

13  A.       I don't recall.  I don't believe so.

14  Q.       Did you testify in the Grand Jury?

15  A.       I did not.

16  Q.       In the shooting of James England, did you at any

17  point participate in any conversations with prosecutors?

18  A.       I don't believe so.

19  Q.       There was a Grand Jury?

20  A.       No.  I don't believe so on that because it was a

21  nonfatal incident.

22  Q.       And the CIRT team concluded that there was no

23  criminal activity, right?

24  A.       Correct.

25  Q.       In that case even though it was nonfatal, CIRT

1  knew, as the leader of CIRT, the department could have

2  taken it to a prosecutor to discuss potential criminal

3  activity, right?

4  A.      Yes.

5  Q.      And you choose not to?

6  A.      I don't believe so.

7  Q.      Why?

8  A.      Because it was our determination that he was

9  acting within the scope of his duties and it didn't

10  constitute a criminal act.

11  Q.      All right.  I want to go back to the scene after

12  a police shooting.  We got to the point where you were

13  on scene, the CIRT members are on scene and all the

14  civilian witnesses have been detained.  What happens

15  after that point?

16  A.      So, once we've been briefed and we're aware of

17  who all the witnesses are and where they're located, as

18  I said before, I divvy out the assignments.  Detectives

19  respond out there to interview the civilian witnesses,

20  the police witnesses.  One detective is in charge of the

21  crime scene and we just begin our investigation from

22  that point.

23  Q.      Tell me about the investigation.

24  A.      Well, it depends.  Each investigation is

25  different.  For example, if it occurred inside a

1    residence and we believe that the civilian suspect has

2    the right to privacy, then we get a search warrant.  If

3    it's an outside scene we can call crime scene and have

4    them head that way to begin processing the scene.

5    There's different decisions there based on the facts of

6    each individual case that determines how we proceed.

7    **Q.       Okay.  When do you know that it's time to wrap**

8    **up the scene part of an investigation?**

9    A.       So the scene is considered cleared after all of

10   the witnesses have been interviewed.  All the witnesses

11   that we know of have been interviewed.  All of the

12   canvas has taken place.  You know what a canvas is?

13   **Q.       I do, but why don't you explain it to me.**

14   A.       A canvas is basically we assign detectives to

15   knock on doors of the residents that are in close

16   proximity of the scene, anybody that could have had a

17   view of the scene and see if there's any witnesses.

18   Once all of that is concluded and the crime scene is

19   finished, the crime scene search unit is completed with

20   their processing of the scene, then the scene is

21   cleared.

22   **Q.       Is there ever any follow-up on the canvas?**

23   A.       Yes.  Occasionally you'll get somebody that will

24   answer the door and say that somebody was there during

25   the incident but they had to leave, so we'll have to

1   follow-up and talk to that person at a later date, or

2   you'll get no answer. Sometimes we'll recanvas and go

3   back out at approximately the time the incident occurred

4   and knock on the doors that initially we had no answer

5   at to see if anybody is home at the time. So we do go

6   back out and recanvas from time to time.

7   **Q.    Who makes that decision to go back and recanvas?**

8   A.    The primary investigator.

9   **Q.    Do you oversee the actions of the primary**

10   **investigator?**

11   A.    I do.

12   **Q.    How so?**

13   A.    Well, I have the primary investigator keep me

14   informed on what's going on in the case and make

15   decisions on how we could do additional follow-up, et

16   cetera.

17   **Q.    How do you do that?**

18   A.    Just by talking to the detective, going over the

19   facts, what they're doing.

20   **Q.    Do you ever get any summary memos or anything,**

21   **e-mail updates, text message updates regarding the**

22   **status?**

23   A.    Not really. Usually it's face-to-face because

24   we work there in the office together. We will get

25   informational summaries on everything that the

1   detectives do.  We will get an informational summary

2   that will be placed in the investigative package.

3   Q.      Okay.  So then, the scene is clear.  Then what

4   happens in the investigation next?

5   A.      In the investigation after that then it really

6   determines on a case-by-case basis as to what needs to

7   occur.  You know, we could do follow-up with other

8   witnesses.  We can do recanvas.  The primary detective

9   will complete all the labs for the case, send those to

10  the crime lab for testing the evidence collected and

11  things of that nature.

12  Q.      How long does a CIRT investigation take?

13  A.      It depends.  Sometimes it takes a long time and

14  sometimes it doesn't take very long at all.  Most of

15  them lean towards a long time.  I mean, we don't get

16  autopsy reports for about 12 weeks.  Sometimes it's four

17  to eight weeks for lab results to come in, so it's a

18  process.

19  Q.      Is there any other part of the investigation

20  that you haven't told me about yet?

21  A.      I'm sure there's a lot.  There's a lot of facets

22  on these investigations.

23  Q.      What else haven't you told me about it?

24  A.      When crime scene gets there we walk through and

25  determine what they're going to do.  Often times they'll

Deposition of Sergeant Eric Pilya      Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

```
1    have Leica scanners and we'll determine whether Leica is
2    necessary or discuss how many scans they're going to
3    take and things of that nature.  There's a processing of
4    the officer.  I told you a little bit about that.
5         When crime scene gets to the scene that's when
6    we call for the officer to come back and usually we'll
7    just have a patrol officer that's on the scene call the
8    substation and tell them we're ready for them to come
9    back.  An officer support team member will transport
10   back to the scene and we'll do public safety questions
11   that we have agreed with FOP attorneys to ask them.
12   Usually it's three questions.  Are you injured in any
13   way?  Is there any evidence out here we wouldn't know
14   about it, unless you told us?  For example, if it's just
15   an officer and suspect in an alley and a suspect throws
16   drugs into a dumpster, if the only witness to this
17   incident is the involved officer, we need to know about
18   that so crime scene can recover evidence.  So we ask
19   that.  And then the final question is kind of two parts.
20   Where were you standing and what direction did you fire?
21   As I explained earlier, that's so crime scene can look
22   for shell casings and follow the path of projectiles.
23   Q.     Is that conversation with the officer suspect
24   and his lawyer recorded in any way?
25   A.     No.
```

1    **Q.    Do you ask about any further details about what**

2    **happened?**

3    A.    It depends on the case.  If there is still a

4    suspect at large, then we'll ask for a description of

5    the suspect, or maybe there was a suspect vehicle that

6    got away.  We'll ask for that information so we can air

7    that on the radio so the officers can be looking for the

8    suspect or their vehicle in the area.  Sometimes I will

9    ask the attorney instead of the officer if the suspect,

10    civilian suspect, fired at them so we could look for

11    that kind of evidence, but I leave answering that

12    question up to the attorneys.

13    **Q.    Why?**

14    A.    Because it's not one of the three questions that

15    we've informally agreed to in the public safety

16    questions.

17    **Q.    Tell me about this agreement with the FOP to**

18    **only ask officer suspects three questions on the scene.**

19    A.    So way before my time on CIRT it was agreed with

20    the FOP that they would answer these public safety

21    statements as long as they were not recorded and not

22    documented and remained informal.

23    **Q.    Is that a formalized agreement with the FOP?**

24    A.    No.

25    **Q.    The division of police has just decided to**

1    function this way, not to ask the officer any

2    substantive questions regarding the justification of the

3    shooting on the scene?

4    A.       No.   The statement comes later.   We ask them to

5    make a statement as soon as they get on the command bus.

6    The walk-through occurs before that.   And these public

7    safety statements are necessary for us to look for

8    evidence at the crime scene.   So, we've agreed not to

9    document those in order to get that information to

10   further our criminal investigation.

11   Q.       Wouldn't it also be essential for information to

12   further your investigation to ask the officer questions

13   regarding the details of the shooting?

14   A.       Absolutely.   I would love to do that, but they

15   have their attorney with them and their attorney

16   wouldn't permit it.

17   Q.       Have you ever asked the questions to try to ask

18   them?   Maybe the attorney would permit it.

19   A.       Yeah.   Every time.   We have a standardized

20   protocol that we go through.   And we go through their

21   name, badge number, assignment, what duty hours they

22   were working that day, if they were working with a

23   partner or anything like that.   We ask if they wish to

24   give a statement with regard to the incident --

25   Q.       So basically --

Deposition of Sergeant Eric Pilya      Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

1   A.     -- that night.

2   **Q.     -- you talk to the officer with their attorney**

3   **regarding where things happened, right? You ask them**

4   **three questions?**

5   A.     Correct.

6   **Q.     And then you give them the opportunity to make a**

7   **statement, which they refuse to do, correct?**

8   A.     Correct.

9   **Q.     And it isn't until days later or some time**

10   **thereafter that the officer gives a statement along with**

11   **their lawyer, right?**

12   A.     Correct.

13   **Q.     What period of time after the shooting can the**

14   **officer wait before deciding to give a statement?**

15   A.     We try to get them in as soon as possible. I

16   believe the time for a long time it was seven to 14

17   days.

18   **Q.     What's the policy or practice within the**

19   **division of police, within what period of time does the**

20   **division require the officer to give a statement?**

21   A.     Seven to 14 days.

22   **Q.     So an officer can wait a full seven to 14 days**

23   **to consult with their lawyers before they give any kind**

24   **of statement regarding the details of the shooting?**

25                MR. HALLORAN: Objection.

Deposition of Sergeant Eric Pilya         Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

1  A.       That was the policy.  It has recently changed.

2  I believe it's seven days now.  We want to get them in

3  within seven days.

4  BY MS. GELSOMINO:

5  Q.       Is it the policy now that they must give a

6  statement within seven days?

7  A.       Yes.

8  Q.       Does it ever take longer?

9  A.       Yes.  It can take longer.  We've had incidents

10  where the attorney was unavailable, or I was

11  unavailable.  We had one occasion with the involved

12  officer was called out to military service.  There are

13  different occasions where it may take longer.

14  Q.       What's the longest period of time that it's

15  taken for an officer to give a statement after using

16  deadly force?

17  A.       I couldn't say.  I don't recall.

18  Q.       Could it be more than a month sometimes?

19  A.       I think the longest was the officer that was

20  activated in the military, but I couldn't tell you how

21  long that was.

22  Q.       Was there any effort if that case to have him

23  give a statement before he shipped off to military?

24  A.       I believe so, yes.

25  Q.       Why didn't that happen?

 1   A.       We're kind of at whim of the attorney.  They

 2   have a right not to talk to us at all.  If they're going

 3   to come in and give me a written statement, I'm

 4   obviously going to accept that.

 5   **Q.       Now, if an officer elects not to talk to you in**

 6   **the course of a criminal investigation are there any**

 7   **administrative and employment consequences of that?**

 8   A.       Not where CIRT is concerned.

 9   **Q.       How about where the division is concerned?**

10   A.       So the way that works is CIRT conducts the

11   criminal investigation, so we're cognizant of their

12   Miranda warnings and their right not to give a

13   statement, a right to have counsel, and if they choose

14   to exercise those like in a civilian suspect that

15   lawyers up, we don't get that statement.  Now, at the

16   conclusion of the criminal investigation, then there's

17   going to be an administrative investigation and they can

18   utilize Garrity and compel them to talk based on their

19   employment.

20   **Q.       Has CIRT ever asked that a police officer**

21   **suspect make a more detailed statement at the scene?**

22                     MR. HALLORAN:  Objection.

23   A.       I'm not really sure what you mean.  As I stated

24   earlier, there may be -- based on the facts of the case,

25   there may be an outstanding suspect or suspect vehicle

1   or something like that, and then I'll ask the attorney

2   if they're comfortable giving me that information to

3   further the case.  Like I said, that takes place before

4   we request the statement of the incident.

5   BY MS. GELSOMINO:

6   Q.      Right.  At the scene walk-through -- do you call

7   **it a walk-through?**

8   A.      Yes.

9   Q.      **During a walk-through has CIRT ever requested an**

10  **officer explain the reasons why he or she shot?**

11  A.      No.

12  Q.      **Why not?**

13  A.      Because that's not within the parameters of the

14  agreement of the FOP attorneys.

15  Q.      **Has the agreement with the FOP attorneys been**

16  **memorialized anywhere?**

17  A.      I don't believe so, no.

18  Q.      **How do you know about it?**

19  A.      Just the way that I was trained by Sergeant

20  Sagstetter.  This policy was in place long before I took

21  over the team, and dealing with the FOP attorneys

22  they're versed with it as well.  That's the way we do

23  things.

24  Q.      **And you've never made any effort to change the**

25  **way you do things?**

```
 1              MR. HALLORAN:  Objection.
 2   A.      Not specifically with the walk-through.
 3   Basically because I believe there wouldn't be any point
 4   to it.  The FOP attorneys aren't going to agree to the
 5   change in that.
 6   BY MS. GELSOMINO:
 7   Q.      So it would just be futile because the FOP
 8   attorneys wouldn't cooperate in giving the information
 9   earlier?
10                  MR. HALLORAN:  Objection.
11   A.      No.  I don't think so.
12   BY MS. GELSOMINO:
13   Q.      Okay.  So at this point have you told me
14   everything that happens on the scene before it's
15   cleared?
16   A.      Well, there's more with the processing of the
17   officer.  Once we do that walk-through they're taken to
18   the command bus and then crime scene will photograph
19   them basically in what they were wearing at the time of
20   the incident, and then we will do a determination of
21   rounds.  We'll take the weapon that they used and count
22   the rounds so we know how many are missing so we can
23   tell crime scene what to look for.  And then they're
24   given a replacement weapon, and at that time we do the
25   initial statement with them and try to get a statement
```

1   of what happened from them.

2          At that point if the attorneys say no, they are

3   free to go.  They can leave with their officer support

4   team member and they leave the scene.  After that the

5   assistant sergeant will interview the officer support

6   team member.  We want to ensure that they didn't discuss

7   the case at all, that the involved officer didn't give

8   them any facts of the case because they're not supposed

9   to talk about that.  They're trained that way.  Then we

10  keep doing what we're doing.

11          I'll meet up with the detectives, they'll come

12  back, regroup and discuss what all the witnesses had to

13  say and then go from there.  Maybe one witness will say

14  that somebody else saw something and they're not there

15  anymore and we have to follow-up with that witness, so

16  we'll try and find that other person.  I'll send a

17  detective out to do that.  At this point I might send

18  detectives to the addresses of the people who called in

19  on the initial 911 call and things of that nature.  I'll

20  meet with crime scene and see if they've got everything

21  that they need.

22          We will communicate with crime scene and the

23  scene detective and crime scene will determine the best

24  time to call the coroner's office if it's a fatality,

25  and then the coroner's office will come out and do their

1   thing. And once the body is transported to the morgue,

2   I'll again confer with crime scene, see what else they

3   have left to do, and usually at that point the scene is

4   cleared.

5   **Q.    And then, anything that you haven't told me**

6   **about in terms of the remainder of the investigation?**

7   A.    The remainder of the investigation just based on

8   the preliminary information that we've received,

9   follow-up and deal with information from witnesses, and

10   then further follow-up will occur when we get some of

11   our lab results back. If it's a fatal, the primary

12   investigator, or someone that he designates, will attend

13   the autopsy and call the coroner's office and set that

14   up. It's usually the next day or a couple days.

15   Sometimes they're backed up, but they attend autopsy.

16   Within 24-hours the lead detective has to put out a

17   summary index. That's usually just numbering the

18   summaries that everyone has told them of what witnesses

19   they interviewed so when they do their informational

20   summary they can attach a number to it. They start

21   typing their informational summaries from their

22   interviews and we go from there.

23   **Q.    Has there been discussion between the CIRT team**

24   **and the coroner's office regarding how police involved**

25   **shootings are handled?**

1 A. Not really.  They're supposed to make a police

2 involved shooting autopsy a priority.  Other than that I

3 think they pretty much just handle it the same as any

4 other death.

5 **Q. Has the division of police every communicated to**

6 **the coroner's office in any way that only limited**

7 **information should be shared regarding police involved**

8 **shootings?**

9 A. We don't have any control over that.

10 **Q. My question is whether the division of police or**

11 **anyone within it has ever communicated anything like**

12 **that to the coroner's office?**

13 A. Not officially.  I mean, I believe I've had

14 discussions with Jan Gorniak over the years about that,

15 and they are pretty much tied to whatever their policy

16 is on releasing information to the public, to the media,

17 so we don't have any control over what they release.

18 **Q. Who's Jan Gorniak?**

19 A. She was the coroner.  She's no longer the

20 coroner.  She was the coroner before Dr. Ortiz.

21 **Q. Have you or anyone else within the division have**

22 **any other communication with anyone in the coroner's**

23 **office regarding information release?**

24 A. Not that I can recall.

25 **Q. Or regarding the procedure in handling police**

1  involved shootings in any way?

2  A.        Not that I recall.

3  Q.        Tell me about your conversations with Jan

4  Gorniak.

5  A.        Over the years, and not necessarily specifically

6  related to PIS, but even like homicides, there was a

7  couple of occasions where information was released to

8  the media that only the murderer would know, and those

9  are the kind of things that we want to keep back because

10  that's how we'll determine if we have the right suspect

11  based on knowledge that only they should have of the

12  crime scene.  If that information gets out ahead of time

13  in an ongoing investigation, that would be detrimental

14  to the case.  We had discussions about, I don't know

15  what your policies are, but you have to be careful about

16  what you release.  If it's something that could be

17  detrimental to the case, it's not good for anybody.

18  It's not good for the community, it's not good for the

19  victim's family, the coroner's office reputation.  We

20  did have discussions on those lines.  I don't know if it

21  influenced them at all.

22  Q.        Were your conversations at any point related

23  specifically to police involved shootings?

24  A.        I can't really specifically recall them being

25  about police involved shootings, no.

1   **Q.      How could the release of information related to**

2   **a police involved shooting from the coroner's office**

3   **negatively impact the investigation of CIRT?**

4   A.      I would say just basic investigatory practices.

5   When a criminal investigation is ongoing you don't want

6   to release specific details of an investigation.  For

7   instance, we don't release where somebody is shot, what

8   body parts or what calibers of weapons were used or

9   things of that nature.  Those are all specific details

10  to the investigation that shouldn't be public knowledge.

11  **Q.      Why?**

12  A.      Well, because then you have people -- for

13  instance, if it gets out that a 9mm was used, then the

14  family members are like, well, the person always carried

15  a 40.  It just muddies the waters of the investigation,

16  so we try and keep specific details from being released

17  to the public.

18  **Q.      Let's talk about specifically how any**

19  **information released from the coroner's office would**

20  **negatively impact the investigation of a police involved**

21  **shooting.**

22  A.      That's what I'm saying.  We would prefer they

23  not release where a person was shot or how many times

24  they were shot, or what caliber rounds were used,

25  specific details such as that.

Deposition of Sergeant Eric Pilya      Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

1   **Q.      But why?**

2               MR. HALLORAN:  Objection.

3   A.     Because it may be pertinent to the investigation

4   down the road.  We don't know how all the time.  It's

5   just basic investigative practice that in an ongoing

6   criminal investigation you keep specific details of the

7   case not a matter of public knowledge.

8   BY MS. GELSOMINO:

9   **Q.      In a police involved shooting you already know**

10  **how many times a person was shot, right?**

11  A.     We do, yes.

12  **Q.      How could it potentially impact an investigation**

13  **if the public knows how many times a person was shot by**

14  **the police officer?**

15  A.     I'm not saying that I know specifically how this

16  would impact.  It's just a basic investigation practice

17  that we don't want to release specific details of a

18  case.

19  **Q.      Is there any fear within the division that**

20  **releasing that type of information before the conclusion**

21  **of the investigation would inflame public sentiment?**

22  A.     No.  I don't think that plays a role into it.

23  It's really just basic investigation one-o-one.  You

24  don't release specific details while it's an ongoing

25  case.

1    Q.     Is there any other information that the division

2    of police has requested the coroner's office not to

3    release in a police involved shooting?

4    A.     Not that I'm aware of, no.

5    Q.     So other than the location of the gunshots and

6    the caliber of the weapon, is there anything else the

7    division of police asked the coroner's office to

8    maintain confidential from the public?

9    A.     We don't ask them really.  We could discuss the

10    merits of keeping this confidential, but we don't have

11    any control over what they actually release.

12    Q.     I understand that.  But what else have you

13    requested or discussed the merits of keeping

14    confidential?

15    A.     I don't believe anything else.  I don't want to

16    disturb your roll, but at some point I'd like to take a

17    restroom break.

18    Q.     I'm ready for one too, actually.  Let me just

19    ask you this:  Who else was present in those

20    conversations with Jan?

21    A.     I don't recall.  It was probably just the two of

22    us.

23    Q.     In-person or over the phone?

24    A.     In-person.

25    Q.     Have you ever talked to anyone else from the

 1 | office?

 2 | A.       I don't believe so, no.

 3 |                   MS. GELSOMINO:  Okay.  Let's take a

 4 | break.

 5 |                        - - - -

 6 |     (Thereupon, an off-the-record discussion was held.)

 7 |                        - - - -

 8 | BY MS. GELSOMINO:

 9 | Q.       So you left off at like the completion of the

10 | CIRT investigation.  Is there anything else about the

11 | way that these cases are investigated that you haven't

12 | told me about?

13 | A.       Maybe the formal statement.

14 | Q.       Okay.  At some point the officer gives a formal

15 | statement.  I think you referenced that.  Anything else?

16 | A.       I think that's about it.  There's multifaceted

17 | things that come up in unique cases, but that's pretty

18 | much the way that things go.

19 | Q.       At the conclusion then of the investigation,

20 | what happens?

21 | A.       Well, at the conclusion of the criminal

22 | investigation into either the officer suspect or the

23 | civilian suspect when the criminal is all adjudicated

24 | and we send that package for our involved officers for

25 | CPD, the package would then go to the Firearms and Death

1  Review Board.  If, say, we do a package for another

2  agency, we would send it to that agency for their review

3  for their administrative policies.

4  **Q.      Okay.  Let's focus on Columbus shootings.**

5  A.      Okay.

6  **Q.      Does it go to the Firearms Review Board just**

7  **like after the determination about criminal charges is**

8  **made?**

9  A.      No.  When it's adjudicated.

10 **Q.      What does that mean?**

11 A.      When it's gone through the court system and is

12 completely over criminally.

13 **Q.      Okay.  So like if a Grand Jury no bills it, then**

14 **it can go to the FRB?**

15 A.      That's if we didn't charge a civilian suspect.

16 On a fatal as soon as it's done with the Grand Jury then

17 it goes to the Firearms Death Review Board.  In the case

18 that it's a nonfatal it will also have to wait for the

19 civilian suspect's case to be adjudicated.

20 **Q.      Before it's passed on to the prosecutor, is**

21 **there any kind of like wrap up that you do or any of the**

22 **officers do?  Do you like do a case summary or have a**

23 **meeting of some kind before you pass it along?**

24 A.      No.  It is reviewed by the chain of command.

25 When the package is totally completed it will come to me

1  and I will start from the very beginning and go through

2  the package and review it.  Then I'll give it to my

3  lieutenant who will also review it.  If the commander

4  wants to review it he can, and so can the deputy chief

5  and the chief.

6  **Q.    And that's all before the FRB looks at it?**

7  A.    That's before the Firearms Review Board looks at

8  the case.

9  **Q.    What's the purpose of this initial chain of**

10  **command review?**

11  A.    Pretty much just to make sure that literally the

12  I's are dotted the T's are crossed.  We correct grammar,

13  misspellings, punctuation.  If anything was forgotten to

14  be done in the investigation we get that wrapped up.  I

15  usually will give the detective back a to-do list of

16  things I think should still be done and they give it

17  back to me when it's done, and then I'll give it back

18  and pass it on to the lieutenant.

19  **Q.    Does the lieutenant have to sign off on it**

20  **somehow?**

21  A.    No.  Nobody signs off on the review process.

22  **Q.    Okay.  Have you ever had anyone in the chain of**

23  **command disagree with any of the parts of the**

24  **investigation or the position of the CIRT team?**

25  A.    Not in our CIRT chain of command, no.

1  Q.      After it goes through the CIRT chain of command

2  then where does it go?

3  A.      The Firearms and Death Review Board.

4  Q.      Does it go through the CIRT chain of command

5  before or after the conclusion of the criminal

6  adjudication?

7  A.      After.

8  Q.      Okay.  So it never goes up the chain until all

9  the criminal proceedings are finished?

10  A.      Well, once the package is done, I've already

11  reviewed it pretty much once, and then after it's

12  adjudicated we add what's called a final progress that

13  says what happened in the criminal case, what courtroom,

14  they plead, sentenced, whatever, once that final

15  progress is in there then it will go to the lieutenant.

16  Q.      The CIRT lieutenant chain of command?

17  A.      Yes.

18  Q.      And then after that it goes to FRB?

19  A.      Yes.

20  Q.      Do you have any communication with FRB at the

21  time of this transition?

22  A.      Usually not.  Well, no.  Never at the time of

23  the transition.  What I do is I make three copies of the

24  criminal investigation, one for each of the Firearms

25  Review Board commanders, take those copies up to Nancy

1    Cameron, who is the deputy chief secretary, and she

2    gives it to the Firearms Review Board commanders that

3    were assigned.  She also makes those assignments and

4    gives it out to the Firearms Review Board commanders, so

5    I don't have contact with them right then.

6    Q.      When do you have contact with them?

7    A.      Most of the time never.  On a very rare occasion

8    they'll have a question about something and they'll call

9    back down and ask a question, and then I'll answer the

10   question.  That's pretty much the extent of it.

11   Q.      In the investigation to the shooting death of

12   Deaunte Bell-McGrew, did anyone from the FRB have any

13   questions for you?

14   A.      Not that I recall.

15   Q.      How about in the Tyree King investigation?

16   A.      Not that I recall.

17   Q.      In the James England investigation?

18   A.      Not that I recall.

19   Q.      Okay.  What happens to it, then?

20   A.      Well, there's three commanders that are assigned

21   to the Firearms and Death Review Board, and they will

22   make a determination.  If there's descent amongst the

23   Firearms Review Board, then the descenting commander has

24   to write a letter detailing why they descent.  That's

25   why there's three.  The majority kind of rules in that

1  case.  And then they'll rule it.  There's four ways they

2  can go with it, unintentional in-policy, unintentional

3  outside of policy, intention in-policy, and intentional

4  outside of policy.

5  Q.        Okay.

6  A.        Once they've ruled on that they'll send it to

7  the chain of command of the involved officer and that

8  chain of command gets to review the package as well.  If

9  they agree with the Firearms Review Board, then it's

10  done.  The case is over and it gets filed at Internal

11  Affairs.  Internal affairs has that option of also doing

12  a concurrent administrative investigation.  If they

13  descent and don't agree with the Firearms Review Board's

14  conclusion, then it will go to the discipline grievance

15  office for review, and then it will go to the chief and

16  the chief makes the final decision as the tie-breaker.

17  Q.        Okay.  The concurrent investigation with IA, how

18  did that work?

19  A.        Basically what they'll do is if the chain of

20  command's or the Firearms Review Board raised any

21  administrative issues that maybe didn't pertain to the

22  case, were outside of the case but were still an

23  administrative issue, or even pertaining to the case,

24  Internal Affairs can open up an investigation and go

25  from there and look at the administrative issues.

1  Q.      Do you mean like if there was some kind of a

2  policy violation other than violating the use of force

3  policy?

4  A.      Yes.

5  Q.      Whose job is it to investigate violations of

6  other policies other than the use of force policy in the

7  context of a police involved shooting?

8  A.      Those would be left up to that officer's chain

9  of command.  In the occasions like I described earlier

10  like there might be a tactical error, but wasn't

11  out-of-policy, that's up to their chain of command to

12  then decide, well, they didn't do the greatest job with

13  their tactics in this, so I'd like to have them go back

14  to DTU or whatever and get retrained.  So it's really up

15  to the chain of command of the officers to decide on

16  administrative issues.

17  Q.      How is an IA investigation triggered?

18  A.      They're supposed to -- basically when a police

19  involved situation occurs Internal Affairs essentially

20  opens up a concurrent investigation.  And then when they

21  get the CIRT package, they review the CIRT package and

22  if there's anything they want to address they can

23  address it at that point.

24  Q.      They don't get the CIRT package until it's

25  already gone through FRB and the officer's chain of

1    **command and potentially the chief?**

2    A.        Yes.

3    **Q.        Okay.  Do they have the discretion or authority**

4    **to investigate any violations of policy before that**

5    **point, before they get it after the chief review?**

6    A.        Like I said, they do a concurrent investigation.

7    Usually they don't do anything until they get the

8    package from us, but I don't see why they couldn't.  Now

9    we do try and keep criminal and administrative

10   investigations separate.  We don't want any

11   administrative investigations taking place before the

12   criminal investigation is over because we don't want any

13   of those investigations to influence the criminal case.

14   That's more the prosecutor's thing.

15   **Q.        Why?**

16   A.        Well, we don't -- you don't know what's going to

17   happen with the administrative investigation.  They

18   don't want that to have any influence whatsoever on the

19   criminal investigation.  Additionally administrative

20   investigations are public record right away, whereas if

21   it's still an ongoing criminal investigation that hasn't

22   gone to court yet, they wouldn't want that information

23   out there.

24   **Q.        Wouldn't it be in the interest of public safety**

25   **to address any policy violations of an officer in a**

1  timely manner?

2  A.       Yes.

3  Q.       And yet the division routinely waits until the

4  conclusion of not only the criminal investigation, but

5  the entire FRB and chain of command review before

6  looking at any corrections of any policy violations?

7  A.       I think if there's something glaringly obvious

8  the chain of command is going to take action from the

9  night of.  If it's not a matter of public safety or

10 something like that, if it's just tactics or something

11 they'll address that at a later time.

12 Q.       Has the chain of command in the division of

13 police in Columbus ever taken any action to correct

14 policy violations immediately following a police

15 shooting?

16 A.       I'm not really sure.  That's outside my scope of

17 control, so I'm not really sure.

18 Q.       Have you ever heard of that happening?

19 A.       I can't really think of one right now.

20 Q.       And you've been on the scene of nearly every

21 police shooting since 2009, right?

22 A.       For the most part, yes.

23 Q.       And you can't think of any time where the chain

24 of command or anyone on scene determined that some

25 immediate action needed to be taken in terms of a policy

Deposition of Sergeant Eric Pilya                    Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

```
 1   violation?
 2                   MR. HALLORAN:  Objection.
 3   A.     I can't really remember.  One was tickling my
 4   memory there.  I was thinking there's one-time where an
 5   officer got into multiple shootings in a short period of
 6   time, and I think they pretty much pulled him off the
 7   street for a little while to assess whether those were
 8   good shootings or if this was a problem officer, but I
 9   don't really recall which one that was.
10   BY MS. GELSOMINO:
11   Q.     Was that at all related to the shooting of Tyree
12   King?
13   A.     No.
14   Q.     In the CIRT investigation do you consider
15   officer background and the officer's other uses of force
16   in the context of the investigation?
17   A.     Yes.
18   Q.     How?
19   A.     Well, we evaluate those and see how many
20   shootings they've been in, and then we'll ask them
21   during formal statement if those previous incidents
22   affected their actions in this case at all as well.
23   Q.     In many cases in CIRT investigations you have to
24   weigh the credibility of various witnesses, right?
25   A.     Yes.
```

1  Q.          How do you do that in an un-bias manner?

2                     MR. HALLORAN:  Objection.

3  A.       I think that, again, is on a case-by-case basis.

4  With each individual that you interview you attempt to

5  use the various techniques that we use in an interview

6  to determine whether you believe them to be truthful or

7  not.  In addition to that, you match that up with the

8  evidence that you find at the scene.

9  BY MS. GELSOMINO:

10  Q.       What are some of those techniques that are used

11  in interrogations to determine whether someone is being

12  truthful?

13  A.       There's different techniques that you use, such

14  as kinetic techniques where you're looking at the

15  nonverbal cues of the person you're interviewing.  Some

16  of those indicate deception.  You're looking at how

17  nervous the individual is.  You evaluate the answers to

18  the question and their confidence is those answers, or,

19  you know, pregnant pauses that they have.  Things of

20  that nature.  Many of those things go into whether you

21  believe the person to be credible or not.

22  Q.       Do you also try to identify pieces of evidence

23  that contradict parts of the witness statement?

24  A.       Yes.

25  Q.       Do you do that with officer suspect statements?

1    A.      Yes.

2    **Q.      How?**

3    A.      The exact same way.  If they say something that

4    doesn't match up with our evidence, that's something

5    that we're going to want to delve into deeper and ask

6    additional questions on.

7    **Q.      You agree with me that CIRT does not conduct an**

8    **independent investigation?**

9    A.      No, I don't.

10   **Q.      Well, you're a bunch of homicide detectives**

11   **within the department, right?**

12   A.      Right.

13   **Q.      Investigating your own officers?**

14   A.      Correct.

15   **Q.      Has there ever been any discussion within the**

16   **division of police about engaging some agency outside of**

17   **the division of police to conduct these investigations?**

18   A.      Yes.

19   **Q.      Tell me about those.**

20   A.      Currently, according to a decree by the Mayor

21   and a change of the charter by city council, now

22   investigations involving Columbus Police Officers are to

23   be conducted by the Bureau of Criminal Investigation

24   identification, the State BCI agents.

25   **Q.      How do you feel about that?**

1   A.      To be honest, I understand the public perception

2   that exists about investigating your own detectives, but

3   I believe that the CIRT team has operated for the last

4   25 years with the most integrity, and I don't think they

5   can show me any one of those cases that we weren't

6   unbiased in.

7   **Q.      So why do you think that the city and the**

8   **division are doing this then?**

9   A.      Public perception.

10   **Q.      What does that mean?**

11   A.      I think the public by and large is untrustful of

12   an agency investigating their own people.  You know,

13   there's any number of television shows that portray the

14   police as corrupt and not being trustworthy enough to do

15   those investigations.  That's not been my experience,

16   but I do understand where the public perceives that

17   might exist.

18   **Q.      Is there a burden -- like do you evidence by a**

19   **preponderance or anything like that in terms of trying**

20   **to weigh the competing evidence?**

21   A.      I'm not really sure what you're asking.

22   **Q.      Sure.  That's fair.  Has CIRT ever credited a**

23   **civilian statement regarding the justification to use**

24   **force over a police officer's statement?**

25   A.      So if I understand the question correctly, are

1   you asking me have we ever believed a civilian witness

2   that pretty much nullified the credibility of the

3   officer witness, is that what you're saying?

4   **Q.**     **Yes.**

5   A.     I do recall one case in particular where the

6   officer was not -- it wasn't that the officer had not

7   been credible, but it was an omission of a fact that we

8   believed the civilian witness over the officer that led

9   to us investigating the officer in an area more

10   specifically.

11   **Q.**     **Tell me more about that.**

12   A.     There was an officer that was chasing a person

13   that had warrants. This person ran into a body of

14   water, and swam out into the body of water, and

15   eventually drown. So it was a death in custody.

16   Basically it was a death in custody investigation, and

17   several of the civilian witnesses reported that the

18   officer had been throwing rocks from the shore and the

19   officer had failed to disclose that to us. Once we had

20   that information and an area that we had to delve into

21   in a formal statement and specifically ask the officer

22   what the situation was with that, and it ended up

23   resolving itself. But that was one where we did

24   question the credibility of the officer at first because

25   they omitted that information.

1  Q.      Did you still credit the remainder of the

2  officer's statement?

3  A.      We did, because the facts of the matter were

4  that the water was so cold that the person drown.  They

5  jumped into the water on their own volition and the

6  reason of the death had nothing to do with the officers.

7  There wasn't much we could do with that one other than

8  document the facts.

9  Q.      Has there ever been a time where a civilian

10 witness statement contradicted a police officer suspect

11 statement regarding the reason he used deadly force?

12 A.      I can't specifically recall at this time.

13 Q.      Okay.  So you can't think of any times where you

14 or the CIRT team credited the statement of a civilian

15 witness regarding the justification for the use of force

16 over the statement of the police officer suspect, right?

17                MR. HALLORAN:  Objection.

18 A.      I don't necessarily believe that that's been the

19 case.  It's more that the civilian witnesses have

20 corroborated the officer's testimony.  I can't recall

21 one that made us change our opinion of the officer's

22 credibility.

23 BY MS. GELSOMINO:

24 Q.      Okay.  Was there an IA investigation into the

25 shooting of James England?

1    A.        I'm not sure.

2    **Q.        How would I find that out?**

3    A.        Contact Internal Affairs.  I don't believe there

4    was because I reviewed that package, as I said, before I

5    came here, and there was nothing in the package.

6    Usually we'll get a notification of some Internal

7    Affairs complaint or something along those lines, and

8    there was nothing in that investigative package, so I

9    don't believe there was.

10   **Q.        How about for the shooting of Deaunte**

11   **Bell-McGrew?**

12   A.        I don't believe so.

13   **Q.        And the shooting of Tyree King, was there an IA**

14   **investigation?**

15   A.        Tyree King, I don't specifically recall an

16   Internal Affairs investigation with Tyree King.

17   **Q.        Okay.  So after the use of deadly force there's**

18   **no group within the division that is automatically**

19   **tasked with investigating the use of deadly force for**

20   **violations other than a violation of the force policy,**

21   **right?**

22   A.        No.  Like I said earlier, that would be up to

23   the chain of command, the officer's immediate chain of

24   command when they get the package from the Firearms and

25   Death Review Board?

1   **Q.     They look at all of the policy violations?**

2   A.     Yes.

3   **Q.     And they can do that without consulting IA?**

4   A.     Yes.  The chain of command can take their own

5   action and find that they violated a policy and take

6   discipline action without IA involvement.

7   **Q.     After an investigation goes through the chain of**

8   **command to the chief, then it goes back to CIRT?**

9   A.     No.  After it goes through -- say it goes

10  through the chief of police for the tie breaker

11  decision, then if discipline is recommended, a copy of

12  the package will go to human resources and then another

13  copy of the package will go to internal affairs.

14  **Q.     Do you have any further involvement with any**

15  **deadly force investigation after the conclusion of the**

16  **CIRT investigation?**

17  A.     You mean other than civil depositions?

18  **Q.     Yes.**

19  A.     That was a little joke.  I'm sorry.  Not really.

20  I don't have further involvement unless there's a

21  lawsuit filed or something of that nature.

22  **Q.     Which policies and practices or SOPs govern the**

23  **CIRT investigation and the CIRT team?**

24  A.     Policies and practices, that would be our use of

25  force directive.  I think there's something in the

```
 1    serious crime scenes directive, the discharge firearms
 2    directive.  We have a CIRT SOP, and that might be it.
 3    Q.      Okay.  There is a CIRT manual, right?
 4    A.      Yes.  That's our SOP.
 5    Q.      That was going to be my next question.
 6    A.      Yes.
 7    Q.      I'm going to show this to you and we'll mark
 8    this as Exhibit 1.
 9                           - - - -
10        (Thereupon, Plaintiffs Exhibit 1 was marked for
11                       identification.)
12                           - - - -
13    BY MS. GELSOMINO:
14    Q.      What do you see?
15    A.      That's the table of contents for the Critical
16    Incident Response Team SOP.
17    Q.      Okay.  Perfect.  I'm just going to scroll
18    through this quickly.  It's a 31 page document.  Let me
19    know if you think this is the complete SOP that you
20    referred to.
21    A.      You can go a little faster.  I believe this is
22    the completed version.
23    Q.      This is like the primary SOP that --
24    A.      That CIRT follows, yes.
25    Q.      Other than some mention of CIRT in those other
```

1   **policies that you mentioned, is there any other written**

2   **policy or practice that governs the CIRT team?**

3   A.     I don't think so, no. Maybe the general

4   investigative procedure for the Major Crimes Bureau SOP.

5   **Q.     Okay. So we'll mark that as ==Exhibit 1==. So all**

6   **of the practices and procedures and customs that you've**

7   **described up to this point in the deposition, did all of**

8   **those apply in 2015 and 2016 at the times of the**

9   **shooting of James England, Deaunte Bell-McGrew, and**

10   **Tyree King?**

11   A.     I'm not sure, because that SOP was revised in

12   December 19th of -- what does it say at the bottom

13   there?

14   **Q.     December 19th, 2013.**

15   A.     Okay. Then, yes. They would have been.

16   **Q.     Okay. Is the shooting officer ever taken off**

17   **work, like taken off the streets after the deadly force**

18   **event?**

19   A.     Yes. It's division policy that they'll get a

20   mandatory three days off. Their chain of command

21   commander can give them more days off if they feel it's

22   necessary. Most of that is to give them time to meet

23   with their attorney and also they have to meet with the

24   police psychologist before they're allowed to come back

25   to work.

1  Q.      Has CIRT ever completed their investigation as

2  to potential criminal charges before an officer comes

3  back to work?

4  A.      I don't believe so, no.

5  Q.      So you have officers in the division who are

6  functioning with full police powers on the streets even

7  while they're being investigated for a potential

8  homicide?

9  A.      Correct.

10 Q.      And also you have officers within the division

11 of police who are functioning with full police powers on

12 the streets before their actions in taking deadly force

13 have been evaluated for any policy violations, right?

14 A.      Correct.

15 Q.      Now, do you conduct any training for CIRT teams?

16 A.      I do.

17 Q.      Tell me about that.

18 A.      I teach two cases for the division on CIRT.  One

19 I do for the new supervisors.  Those that have just been

20 promoted to supervisor, or those that are on the list to

21 be promoted for supervisor, I'll do a new supervisor

22 training class.  And then I also once a year do a CIRT

23 class for the officer support team.

24 Q.      What is that CIRT class for the officer support

25 team called?

Deposition of Sergeant Eric Pilya  Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

1 A.  It's just CIRT procedures.

2 **Q.  Is this part of like an inservice training?**

3 A.  Pretty much.

4 **Q.  What materials do you use when you do the**

5 **supervisor training?**

6 A.  It is pretty ad-lib.  With those supervisors,

7 they're newly promoted supervisors, so my focus with

8 them is pretty much making sure that the scene is

9 secure, making sure that witnesses are separated, and

10 that kind of thing.

11 **Q.  Do you use any notes or outline or agenda or**

12 **anything for those classes?**

13 A.  Not for that one, no.

14 **Q.  Do you use any Power Points or any other**

15 **presentation materials?**

16 A.  For the officer support team, I think I do, and

17 just in the last year I've done it twice, taught the new

18 recruits just before they got on the street, and I do

19 have a Power Point for that.

20 **Q.  So for the sergeant no Power Point, presentation**

21 **materials or handouts?**

22 A.  I don't think so, no.

23 **Q.  So then, for the CIRT team officer do you have a**

24 **Power Point?**

25 A.  For the officer support teams.

1  Q.      Okay.  So the sergeants, the officer support

2  team and the recruits?

3  A.      Yes.

4  Q.      So for the officer support team, what materials

5  do you use?

6  A.      For officer support team I believe I have a

7  Power Point.

8  Q.      Anything else?

9  A.      No.

10  Q.      Have you ever changed the Power Point?

11  A.      No.  It's actually I don't -- it's been used for

12  a long time.  I don't think anything has changed on it.

13  Q.      Okay.  Did you create it?

14  A.      No.  Detective Jim McCosky did years and years

15  ago.

16  Q.      Okay.  For the recruits, tell me about that

17  training.

18  A.      For the recruits I just go over -- it's pretty

19  much the same class as the officer support class, but

20  it's in a lot more detail.  I kind of tell them what to

21  expect if they get into a police involved shooting on

22  the first day of their coaching period.  I run through,

23  just like I did with you, what the CIRT investigation is

24  going to look like.  That they'll be assigned an officer

25  support team member.  We'll walk them through what the

1  procedures are going to be, and everything like that.  I

2  go through the procedures with them more or less.

3  Q.      Okay.  All right.  I'm showing you what I'm

4  going to mark as **Exhibit 2**.

5                        - - - -

6      (Thereupon, Plaintiff's **Exhibit 2** was marked for

7                    identification.)

8                        - - - -

9  BY MS. GELSOMINO:

10 Q.      Do you see this document that's says, "Best

11 practices for officer involved shootings"?

12 A.      Yes.

13 Q.      What is this?

14 A.      This is a class I teach for OPOTA.  We put

15 together that class some years ago because a lot of your

16 smaller agencies have never ever had a police involved

17 shooting.  So I put that together for them, and I've

18 taught that two to three times for OPOTA.

19 Q.      Have you ever used any other teaching materials

20 for OPOTA?

21 A.      For OPOTA, no.

22 Q.      Have you ever made any changes or edits to this

23 Power Point?

24 A.      I'm not sure.  Part of this Power Point heavily

25 involves on the SOP.  If there was a change to the SOP I

1  may have made the exact same change to where it speaks

2  to the SOP in this, but I don't specifically recall.

3  Q.      Okay.  When did you first create this Power

4  Point?

5  A.      It's been a while ago.  Steve Eppert was on it

6  with me and he's been retired for several years now.

7  Maybe four or five years ago.

8  Q.      Okay.  Do you use any other agendas, notes,

9  outlines, anything for your OPOTA presentation?

10  A.      No.  I do give them a copy of our SOP, our CIRT

11  manual, and also a copy of our use of force and

12  discharge firearms directive.

13  Q.      Okay.  Anything else?

14  A.      Huh-uh.

15  Q.      Is that a no?

16  A.      I'm sorry.  I do not believe so, no.

17  Q.      Okay.  Does this Power Point, which I've marked

18  as Exhibit 2, accurately explain the customs and

19  practices and policies of the division of police?

20  A.      I believe so, yes.

21  Q.      Related to deadly force incidents?

22  A.      Yes.

23  Q.      Okay.  Is there anything that you believe is

24  inaccurate or should be changed from this Power Point

25  that you created?

Deposition of Sergeant Eric Pilya      Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

1   A.    I don't believe so.

2   Q.    **Okay.  Now the other Power Point that you said**

3  **you used for the officer support team, have you ever**

4  **given that to any of the lawyers in any of these cases?**

5   A.    I don't believe so, no.

6              MS. GELSOMINO:  Mike, do you know if

7  that was produced to us?

8              MR. HALLORAN:  I don't know, but we

9  can check.  I presume if it was created after 2016, I

10  could speak for Cooper, but not necessarily the other

11  two cases if it's been produced.  We probably objected

12  to it, but we can look.

13              MS. GELSOMINO:  Okay.  Thank you.

14  BY MS. GELSOMINO:

15   Q.    **When did you create the Power Point materials**

16  **that you used for your officer support trainings?**

17   A.    That also has been a long time ago.  I don't

18  recall specifically, but it's been a long time ago.

19   Q.    **More than four years ago probably?**

20   A.    Oh, yeah.

21   Q.    **Okay.  Thank you.  Other than the trainings that**

22  **we just talked about that you conduct within the**

23  **department and this OPOTA one, do you do any other**

24  **training on CIRT or anything else?**

25   A.    No.

1    **Q.      Have you ever presented anywhere else?**

2    A.      No.  I did a use of force class for the new

3    supervisor school, but that was probably more than ten

4    years ago.

5    **Q.      Okay.  Have you ever published anything, thought**

6    **pieces, articles, posted to LinkedIn, anything like that**

7    **relating to your police duties?**

8    A.      No.

9    **Q.      How about social media, do you use it?**

10   A.      I do use social media.  But I'm very weary about

11   social media.  I don't even hit like on stuff.  I'm a

12   classic troll.  I wouldn't know what my daughters were

13   doing if I didn't have social media, but that's pretty

14   much all I use it for.

15   **Q.      Okay.  Have you ever posted at all on social**

16   **media?**

17   A.      I'm sure I have, but most of it is either happy

18   birthday or about woodworking.  I steer clear of police

19   related topics.

20   **Q.      Do you like or follow any pages that are related**

21   **at all to policing?**

22   A.      Yes.  I think Police One, maybe.  I'm not sure

23   if I follow that on Facebook or not.  Maybe the FOP.  I

24   can't really think of anything else.

25   **Q.      What's your Facebook name?**

1    A.      E. Pilya.

2    Q.      **Very creative.  Do you use any other social**

3    **media platforms other than Facebook?**

4    A.      I do have Instagram.  I do have Snapchat.  I

5    never use it.

6    Q.      **For your daughters?**

7    A.      Exactly.

8    Q.      **What's your Instagram handle?**

9    A.      I don't even know.  It's probably E. Pilya.

10   Q.      **Okay.  What about like Twitter or LinkedIn or**

11   **anything like that?**

12   A.      I do have a Twitter, and it's probably E. Pilya

13   too.

14   Q.      **Okay.  Any other social media?**

15   A.      I don't think so.

16   Q.      **So in your capacity as the head of the CIRT team**

17   **what documentation do you create?  Obviously, you**

18   **approve the CIRT investigations themselves, but in terms**

19   **of reports, summaries, data collection, any other CIRT**

20   **duties that you have, what do you do?**

21   A.      I do a CIRT spreadsheet that is just an overview

22   of what officers were involved, what date it happened,

23   what PIS number it is.  You guys should have all of

24   that.  I also do a CIRT summary that just is pretty much

25   a rolling document throughout the year as well.  You

1   guys should probably have that as well.

2   Q.      I'm going to ask you some questions about that.

3   Anything besides those two?

4   A.      Let's see.  I have a spreadsheet internally that

5   I keep to document which CIRT members are showing up.  I

6   want to make sure that they show up for the CIRT

7   callouts.  I have another one that documents the

8   rotation.  It's just something that changes.  I put the

9   date of the latest one and filter it, and they go to the

10  bottom and the next person is up for the next one.  I

11  also make changes to the call-in sheet.  Basically it's

12  like changing phone numbers and adding new members when

13  somebody leaves or somebody is added.  Things of that

14  nature.  I think that's pretty much it.

15  Q.      What's the purpose of the CIRT spreadsheets that

16  you make?

17  A.      Just for me to manage so that I know what's

18  going on and just have an overview.  If anybody calls --

19  we handle so many cases.  If somebody calls and they

20  have somebody's name I have ready reference to look it

21  up and know what case number it is so I can go look at

22  it.

23  Q.      It's not something that you pass on to anyone

24  else in the department?

25  A.      No.  The spreadsheets and the summary go to my

1    chain of command and Chief Quinlin.  They also go to our

2    secretaries so they know when we have a new one, and our

3    crime analysis are also copied on that.

4    **Q.      Okay.  How often do you send the spreadsheet and**

5    **summaries to those people?**

6    A.      Every time there's a PIS.

7    **Q.      So you just send like an updated summary?**

8    A.      Yes.  I update it.

9    **Q.      Does it include all the previous entries from**

10    **that year?**

11    A.      Yes.

12    **Q.      Do you ever do any kind of annual review or**

13    **anything to track trends?**

14    A.      No.  We don't do anything with trends.  We are

15    always bombarded to give statistics to the media or city

16    hall or whatever.  Usually it's to total numbers at the

17    end of the year.  How many we add, but that's about it.

18    There's no real -- the commander might add those totals

19    in the annual report every year of how many PIS we've

20    had, but I personally do not do an annual.

21    **Q.      Okay.  There are some acronyms in your**

22    **spreadsheet that I'm not familiar with, so I'd like you**

23    **to try to help me understand them, please.  In the**

24    **status column you write GJ/NB?**

25    A.      Grand Jury no bill.

1    **Q.    Okay.  IP?**

2    A.    In-policy.

3    **Q.    CBA?**

4    A.    Cleared by arrest.

5    **Q.    And, again, that has never been -- that's not**

6    **cleared by the officer's arrest, right?**

7    A.    No.  Maybe in Andy Mitchell's case.

8    **Q.    What does it mean?**

9    A.    Cleared by arrest?  It means that the case was

10    -- there was an arrest made out of the case either of

11    the police suspect or the civilian suspect.

12    **Q.    Has it ever been cleared by arrest of the police**

13    **suspect other than potentially Andy Mitchell?**

14    A.    I don't think so, no.

15    **Q.    Why would an arrest of a civilian lead to the**

16    **clearing of the police shooter in a criminal**

17    **investigation?**

18    A.    It wouldn't.  They're pretty much, it's the same

19    with that investigation used for different purposes.

20    **Q.    How so?**

21    A.    Well, it's like the criminal case into the

22    officer, it's all one investigation, but we're looking

23    at the officer, and if the officer did anything

24    criminally wrong, and then we look at the civilian

25    suspect and did they commit any crimes.  And then, you

1  know, there's once -- for instance, let's say that it's

2  a nonfatal police involved shooting and we've determined

3  that the officer didn't commit a crime.  For that

4  officer that part of the investigation is concluded, but

5  that same investigation is still going if we file

6  charges on a criminal suspect until that's adjudicated.

7  **Q.     What does cleared by arrest then mean in this**

8  **column?**

9  A.     That's just an internal terminology we use for

10  reports, like our premier one report you're familiar

11  with, that's a clearance code for that report.

12  **Q.     What does cleared mean?**

13  A.     It basically is saying that that report is

14  closed based on the fact that an arrest was made.

15  **Q.     So it may or may not have anything to do with**

16  **the police officer?**

17  A.     Correct.  Most cases it would not.

18  **Q.     If a civilian is charged with a crime what**

19  **impact, if any, does that have on the criminal**

20  **investigation of the police officer shooter?**

21  A.     Well, if a civilian committed a crime say,

22  robbed the UDF, and then they came out and got into an

23  altercation with a police officer and was shot they

24  would be charged with the robbery of the UDF, so that

25  one doesn't really play a big role in the police

1     involved shooting.  But if the suspect also came out and

2     pointed a gun or fired a shot at the officer, then they

3     would be charged with that too.  And in those cases I

4     would say that criminal charge is more intertwined.

5     It's not going to have a lot to do with the officer.

6     The decision is going to be was the officer acting like

7     a reasonable officer would and acting within the scope

8     of his duties of a law enforcement officer.

9     **Q.**      **Okay.  What does EX-CLR means?**

10     A.      That's exceptionally clear.  Again, that's one

11     of our premier one report classifications.  A report is

12     exceptionally clear, for instance, but the death of an

13     offender, someone not wanting to cooperate, you know, an

14     uncooperative victim.  There's several different reasons

15     why you can ex-clear a case.  That's loosely something

16     we use just to say this is where this is going.  When

17     the Grand Jury no bills a case and says that it's not a

18     crime, traditionally we ex-clear that.  More recently we

19     had a lieutenant that said that that wasn't technically

20     accurate, that it should be closed, not a crime.  That's

21     a different report classification.  Before that

22     lieutenant previously we always used exceptionally

23     cleared because there wasn't going to be a prosecution.

24     **Q.**      **Okay.  There's another column that says FDRB?**

25     A.      Firearms Death Review Board.

1   **Q.     And then in that column is IP, in-policy?**

2   A.     In-policy. And those are technically accurate.

3   Those are my little notations. I know what you're

4   looking at. That's the status of the investigation. We

5   kind of went away from that. Like I described earlier,

6   they do intentional in-policy, intentional

7   out-of-policy, unintentional in-policy and unintentional

8   outside of policy. But it's still pretty much -- for my

9   notation I just put it was ruled in-policy.

10   **Q.     Why are you making any notations at all about**

11   **what the Firearms Review Board does with these?**

12   A.     Just so I know where that case is at. I get

13   called all the time on these police involved shootings

14   and get, "asked is this case closed? Is it over?" Or

15   whatever. Once it's been through the criminal process

16   and once it goes to the Firearms Review Board, once I

17   have a ruling back from them, as far as I'm concerned

18   that's completely over.

19   **Q.     So you're just tracking what's happening there**

20   **even though your role in this is technically over?**

21   A.     Correct. Correct.

22   **Q.     Okay. Fair enough. The next one is AD-INIP.**

23   **What does AD stand for?**

24   A.     AD is accidental discharge. That terminology

25   has also been changed. They want us to refer to it as

1   an unintentional discharge.

2   **Q.     Okay.   And then on here with AD-INIP, I presume**

3   **the rest of is intentional in-policy?**

4   A.     If it's NIP, it's intentional not in-policy.

5   **Q.     AD-INIP.**

6   A.     Intentional not in-policy.

7   **Q.     Oh, I see now.**

8   A.     Yes.

9   **Q.     Thank you.   I was grouping the letters**

10   **differently in my head.   And then PIT-NIP?**

11   A.     That would be a pit maneuver, and then NIP is

12   not in-policy.

13   **Q.     What's pit maneuver?**

14   A.     A pit maneuver is when you're trying to catch a

15   car, they've been involved in something, they bump the

16   back end and it spins out.   It's basically a stopping

17   technique.

18   **Q.     Okay.   I,IP, is that intentional in-policy?**

19   A.     Yes.

20   **Q.     NVP?**

21   A.     NVP, not a violation of policy.

22   **Q.     Okay.   INVP?**

23   A.     Intentional not a violation of policy.   I know

24   it's confusing.

25   **Q.     That's something different though, intentional**

1  **not in violation of policy, right?**

2  A.        Yeah.   Basically for my notation NVP, and NIP

3  are the same thing.

4  **Q.        How is intentional not in violation of the**

5  **policy the same as intentional not within the policy?**

6  A.        They're not different.   They changed terminology

7  and, you know, this is pretty much is for my own

8  records, so I know what I'm talking about.

9  **Q.        Hold on.   I still don't.   I'm sorry.   The way**

10 **I'm reading is intentional not in-policy.   It's not**

11 **in-policy there would be a violation, right?**

12 A.        Yes.   Not in-policy means it was outside of

13 policy.

14 **Q.        Got it.**

15 A.        But then, not a violation of policy.   You're

16 right.   I was the one that was confused.   Not a

17 violation of policy means that it was in-policy.

18 **Q.        Okay.   Got it.   So they are different?**

19 A.        Yes.   Sorry.

20 **Q.        Okay.   FOR?**

21 A.        Foreign.   We did it for a foreign jurisdiction

22 **Q.        Okay.   Thank you for helping me with that.**

23               MS. GELSOMINO:   Michael, all of these

24 CIRT summaries and the spreadsheets that you guys have

25 produced, I would prefer not to go through and take up

```
 1    time to authenticate all of them.  What we were able to

 2    do with Wes previously this week is to just get a

 3    stipulation that you wouldn't challenge the authenticity

 4    of those documents.  Can we do that here?

 5                    MR. HALLORAN:  As long as they're the

 6    same ones that we produced.

 7                    MS. GELSOMINO:  Yes.  They're what you

 8    produced.  I can't even get through the questions about

 9    the acronyms let alone make it up.

10    BY MS. GELSOMINO:

11    Q.     I do have have some questions for you about some

12    specific summaries.  Let me pull this up.  Do you see

13    the 2011 police involved situations?

14    A.     Yes

15    Q.     This is what you created in 2011, right?

16    A.     Yes.

17    Q.     As your CIRT summary?

18    A.     Yes.

19    Q.     I'm going to mark this as Exhibit 3.

20                         - - - -

21        (Thereupon, Plaintiff's Exhibit 3 was marked for

22                     identification.)

23                         - - - -

24    BY MS. GELSOMINO:

25    Q.     Look at the first one, Harry Boney.
```

```
 1    A.        Okay.

 2    Q.        Do you remember this shooting?

 3    A.        Vaguely.

 4    Q.        The status here is cleared by arrest.  What does

 5    that mean in this case?

 6    A.        In this one it was the arrest of the civilian

 7    suspect.

 8    Q.        How did that, if at all, impact the CIRT

 9    conclusions regarding the officer?

10    A.        The only way that I can really think to answer

11    that question is based on what the suspect's actions

12    were determined what the officer's actions were.  I

13    guess that's the way we would look at that.

14    Q.        In this case was there ever any allegation that

15    at the time of the shooting Mr. Boney posed an actual

16    imminent threat of death or great bodily harm to the

17    shooting officer?

18    A.        I don't specifically remember, but where it says

19    charges, it says "aggravated menacing," so in my mind it

20    means that the suspect pointed a weapon at the officer.

21    Q.        But you're not sure?

22    A.        I don't specifically remember.

23    Q.        Okay.  Why don't you have the name of the

24    officer in here?

25    A.        The involved officer is Uniform Patrol Officer
```

1    Steven Foe.  Male, white, 28.

2    **Q.       Oh, sorry.  I looked right past it.  Thank you.**

3    **At the time that you created this summary Regarding**

4    **Harry Boney, did you know what the Firearms Review Board**

5    **determination was?**

6    A.       At the time that I created that, no.

7    **Q.       Did you know what the conclusions of the**

8    **criminal case against Boney were?**

9    A.       No.  And I'll explain my procedure with that, if

10   you'd like.

11   **Q.       Thank you.**

12   A.       On the night of the PIS, I would have filled in

13   pretty much down through charges, and then possibly if

14   we had filed charges on him that night, I may have

15   entered in the status.  Once the case is over, and I

16   even wait until the Firearms Review Board is done, that

17   secretary that I told you about that assigns the

18   Firearms Review Board commanders, when they have come to

19   a final decision, be it the Firearms Review Board, chain

20   of command or the chief, she'll send me the decision.

21   Once I have that decision I'll go in and put under

22   Firearms Death and Review Board, I'll put what they

23   found and what date is on the routing sheet or the

24   decision that she sent me, and then I'll go back into

25   our electronic version of our files and read the final

1    process and see what happened in court and include that

2    information at the time, too.  That's so in the future

3    people can look at this and know what happened in that

4    case.

5    Q.      Okay.  Then after you finished completing that

6    part of it, did you like send this back out again?

7    A.      No.  The investigative package, the secretary

8    that sends me the final review, she's the one

9    responsible for sending it to Internal Affairs.

10   Q.      She sends the package to Internal Affairs?

11   A.      Yeah.  She's the secretary for the deputy chief

12   in charge of the Firearms Review Board, the chairman.

13   When this is all concluded she sends one of the three

14   copies that I made.  She'll sent one to Internal Affairs

15   and destroy the other two.

16   Q.      But this summary report here, after you complete

17   it with the information from the court and Firearms

18   Review Board, do you send it out again to anyone?

19   A.      No, I don't.  And full disclosure, I lack in

20   going back and updating that.

21   Q.      I appreciate that disclosure.  Let's look at

22   2012.  I'll mark this as Exhibit 4.

23                  - - - -

24        (Thereupon, Plaintiff's Exhibit 4 was marked for

25                  identification.)

```
 1                              - - - -

 2    BY MS. GELSOMINO:

 3    Q.      I want to look at the bottom of page three onto

 4    page four regarding Anthony Wadsworth.  Do you recall

 5    this shooting?

 6    A.      Yes.  I vaguely remember this one.  He was

 7    stopped at the gas station.

 8    Q.      And in this case were there any charges brought

 9    against the officers?

10    A.      No.

11    Q.      Why not?

12    A.      This was a murder suspect.  If I recall right,

13    they believed he was reaching for a weapon as they were

14    attempting to arrest him and they fired shots into the

15    vehicle striking him.

16    Q.      Was there any allegation that at the time of

17    this shooting Mr. Wadsworth posed an actual imminent

18    threat of bodily harm to the officers?

19    A.      I don't recall all the specifics of this.  I

20    need to refresh my memory, but I'm sure that was the

21    case.

22    Q.      Why are you so sure of that?

23    A.      Because we didn't file charges on the officers.

24    Q.      Okay.  Was Mr. Wadsworth in possession of a

25    firearm?
```

```
 1   A.       I do not recall.
 2   Q.       Did any of the officers claim that he actually
 3   had a firearm at the time that they shot him?
 4   A.       I do not recall.
 5   Q.       All right.  I'm looking for this one here at the
 6   top of page 12, PIS 12-15.  Do you recall this shooting?
 7   A.       Yes, I do.
 8   Q.       What do you recall about it?
 9   A.       This took place in an apartment complex and the
10   victim was the victim of a home invasion.  They had
11   broken into his apartment and threatened him with a gun.
12   At some point he had taken the gun off of the suspect
13   and ran out of the apartment.  The police had been
14   called and while responding to the run, Officer Kaufman
15   runs pretty much right into the suspect/victim running
16   with a gun in his hand.  I don't recall if he asked him
17   to drop it or what happened with that, but I do recall
18   that he felt threatened by the gun and fired at this
19   individual and killed him.
20   Q.       You said "the suspect/victim?"
21   A.       Well, in the officer's mind he was a suspect
22   because he was coming at him with a gun.  He didn't know
23   at the time that this was actually the victim and he had
24   just taken the weapon off the suspects who were the home
25   invasion people.
```

1  Q.      So the residence called the police for help and

2  ended up being killed y the police that night?

3  A.      Yes.

4  Q.      And what were the results of this investigation

5  from CIRT?

6  A.      Well, we found he didn't do anything criminally

7  wrong and that it went to the -- well, let me -- I

8  misspoke.  We sent that to the prosecutor, who sent it

9  to the Grand Jury, who determined that he didn't do

10  anything criminally wrong, so it was exceptionally

11  cleared.  It went to the Firearms Review Board and was

12  found in-policy.

13  Q.      Do you know why it was found to be within

14  policy?

15  A.      Yes.

16  Q.      Tell me.

17  A.      So most of what the officers rely on for using

18  deadly force is a Supreme Court case called Graham vs.

19  Connor.  And in that Supreme Court case it says that the

20  officer is judged based on what the officer knew at the

21  time they fired their weapon, absent hindsight 20/20.

22  In this particular case this officer had a male, black,

23  I believe he was only in his boxers, he may have had

24  socks on, I'm not sure.  He was running at him with a

25  gun in his hand.  I don't specifically recall whether he

1  made commands that weren't followed or what, but the

2  officer felt that his life was in danger because this

3  individual was approaching him with a firearm.  So the

4  information known to him at the time was that this

5  person was a threat.  Later investigation revealed that

6  this guy was  the victim of a home invasion and was

7  running outside to get away from these guys and had

8  taken the gun away from them and had it in his hand, but

9  that's information that was not known to Officer Kaufman

10  at the time that he fired his weapon.  It was based on

11  the information that the officer had at the time he

12  pulled the trigger.

13  **Q.      Did any of the investigators from the division**

14  **of police consider the fact that the resident of the**

15  **home was wearing boxer shorts and socks at the time that**

16  **he was shot?**

17  A.      I'm sure that's the case, but I don't remember

18  specifically what Officer Kaufman said.  I believe he

19  said that it happened so fast he didn't really realize

20  that until it was all over.

21  **Q.      A person in a home wearing boxers and socks,**

22  **seeing a person like that would indicate that they lived**

23  **in that home, right?**

24                   MR. HALLORAN:  Objection.

25  A.      If they had time to think about it.

```
 1   BY MS. GELSOMINO:
 2   Q.        Have you ever heard of a home invader who
 3   invaded a home in underwear?
 4                       MR. HALLORAN:  Objection.
 5   A.        Actually, I have.
 6   BY MS. GELSOMINO:
 7   Q.        I can't wait for the story.  Go ahead.
 8   A.        Actually there was an individual that was hopped
 9   up on drugs and was actually going around breaking into
10   homes completely naked, and had a knife in his hand, and
11   terrorized this neighborhood until they called the
12   police, and that was another police involved shooting.
13   But this person was breaking into homes and threatening
14   them with a knife and was naked.
15   Q.        Was that person also killed by the police?
16   A.        I don't recall.  I know the person was shot.  I
17   don't remember if that was a fatal or not.
18   Q.        Was that person naked at the time he was shot?
19   A.        Yes, I believe so.
20   Q.        What's his name?
21   A.        I do not recall.  I could probably find it in
22   flipping through all of these, but off the top of my
23   head I don't recall.
24   Q.        Was Officer William Kaufman who shot and killed
25   Dustin Thomas ever investigated for any other policy
```

1    violations?

2    A.      Out of this particular incident I would say no.

3    Q.      Why do you say that?

4    A.      I don't remember any policy violations in this.

5    It wouldn't be up to CIRT to investigate that, but this

6    was a pretty -- responding to a home invasion, get out

7    of your cruiser and meet a suspect with a gun.  I don't

8    think there was a whole lot there to really evaluate.

9    Q.      Other than the fact that the resident of the

10   home who was killed was holding a gun at the time that

11   he was shot, were there any other allegations at the

12   time that he was shot that he posed an actual imminent

13   threat of death or bodily harm to the officer?

14   A.      I don't recall.

15   Q.      Okay.  This next one is David O'Neil.  Do you

16   recall this shooting?

17   A.      The name rings a bell.  Let's see.  Yes.  This

18   is out of the same incident.

19   Q.      What do you mean?

20   A.      David O'Neil was a suspect out of the home

21   invasion.

22   Q.      Did he steel the cruiser?

23   A.      Yes.  He did steel the cruiser.

24   Q.      What was the conclusion at the end of the CIRT

25   investigation?

1  A.      At the end of the CIRT investigation we did not

2  find -- we believed that officer Camp-Donovan was acting

3  within the scope of her duties, although she violated

4  policy.  This guy was a home invasion suspect.  She

5  believed there was a possibility he could have been

6  armed, and she also had weapons in the vehicle that he

7  stole, the cruiser, and believed that he could still be

8  a threat.  So she fired on her vehicle, which the

9  department found she was in violation of and she was

10  issued departmental charges for that.  The suspect was

11  actually found guilty at trial with all of his criminal

12  charges it appears.

13  **Q.      Okay.  But the CIRT team did not recommend**

14  **criminal charges against this officer?**

15  A.      No.  We did not.

16  **Q.      Okay.  And what factors -- was there ever any**

17  **allegation at the time of this shooting of David O'Neil**

18  **that he posed an actual imminent threat or great bodily**

19  **harm to the officer or anyone else?**

20  A.      I don't specifically recall the testimony given

21  by the officer, but I believe she said that based on the

22  totality of the circumstances, him having already

23  committed one home alleged invasion, and being bold

24  enough to steel a police officer's car, that he -- and

25  the possibility that there are weapons in the cruiser

1   that he would be a threat to the public, not to the

2   officer. I believe that's what she said in her

3   statement, but I don't remember specifically.

4   **Q.      How does any of that justify the use of deadly**

5   **force?**

6                  MR. HALLORAN: Objection.

7   A.      Well, first of all, everything that she just

8   said leads to a justification of her actions. She was

9   acting within the scope of her duties. You have to

10   understand, this isn't what I as the investigator

11   believes, it's what the officer believes at the time

12   they pulled the trigger. As I said, I don't recall

13   specifically what she said in her formal statement, but

14   I imagine it was enough for us to believe that she

15   believed this person was a threat to the public.

16   Therefore, that is a justification for using deadly

17   force.

18   BY MS. GELSOMINO:

19   **Q.      In order to use deadly force, there must be an**

20   **imminent and actual threat, correct?**

21                  MR. HALLORAN: Objection.

22   A.      Yes. And the fact that she had weapons inside

23   that cruiser I think led to that belief that she had at

24   the time that she pulled the trigger.

25   BY MS. GELSOMINO:

1  Q.      Okay.  Now, is the determination here to be made

2  what the officer thought at the time or what a

3  reasonable officer would have thought at the time?

4  A.      It is what a reasonable officer thought at the

5  time, and what that specific officer knew at the time

6  they pulled the trigger.  That's what they are to be

7  judged on, what that specific officer knew at the time

8  they pulled the trigger.  That's what they are to be

9  judged on.  Can they articulate their actions and would

10  another reasonable officer do the same.

11  Q.      What you just described to me in terms of the

12  fact that she had weapons in the car and he could

13  potentially have posed a threat to other people and not

14  herself, isn't that a speculative concern about

15  potential danger?

16              MR. HALLORAN:  Objection.

17  A.      Yes.

18  BY MS. GELSOMINO:

19  Q.      Is it the position of the department that

20  speculative concern about potential danger can justify

21  deadly force?

22              MR. HALLORAN:  Objection.

23  A.      If the officer at the time she pulled the

24  trigger believed him to be a threat to the public I

25  would say yes.

1  BY MS. GELSOMINO:

2  **Q.      Even if she considered at the time that he could**

3  **present a future threat to the public --**

4  A.      It was an apartment complex that had a lot of

5  people out that day, so I believe she thought, this guy

6  did a home invasion, now he has access to weapons, he's

7  bold enough to steel a police car, in her mind he posed

8  a threat to the public.

9  **Q.      And that's because of something he might do in**

10 **the future?**

11                 MR. HALLORAN:  Objection.

12 A.      That he had the capability to do based on what

13 she was describing.

14 BY MS. GELSOMINO:

15 **Q.      Okay.  So, is it the department's position that**

16 **if an officer believes that a person has the capability**

17 **of potentially committing harm in the future that that**

18 **can justify the use of deadly force?**

19                 MR. HALLORAN:  Objection.

20 A.      No.  Your use of the terminology in the future

21 is what I take exception with in this particular case.

22 I believe that she felt that he was, you know, pretty

23 much on a crime spree there.  He committed a home

24 invasion, he chases a police officer, he steels her

25 cruiser, the cruiser has weapons in it, it's a densely

1   populated area, and she believed that he was a danger to

2   the public right then and there.  I don't believe

3   necessarily that your use of in the future was what she

4   was thinking at the time she pulled the trigger.

5   BY MS. GELSOMINO:

6   Q.      **Is it the division's position that the use of**

7   **deadly force in that instance was justified and within**

8   **policy?**

9   A.      Yes.  Let me rephrase that.  They felt that the

10  firing at her cruiser was not within policy.  It wasn't

11  the best choice that she made, but it didn't raise to

12  the level of a criminal offense.

13  Q.      **Well, explain that to me.  What was the**

14  **violation of the policy in that case?**

15  A.      I'm not really sure.  It states right there, but

16  I'd have to look it up, and that's all changed.

17  Violation Rule of Conduct 1.20 and Division Directive

18  3.25 2(b) 3(b), I don't really know what those are.  I

19  think if I had to guess I believe that's the part about

20  firing at a moving vehicle, and she did receive

21  departmental charges for that and she did forfeit

22  vacation time.  I don't know.  It was substantial.  I

23  don't remember how much.

24  Q.      **Is it the division's position that she**

25  **reasonable believed -- strike that.  Is it the**

1  department's position that the use of deadly force in

2  this circumstance was justified?

3  A.      Yes.  I believe so.  I believe that the fact

4  that she was not charged with a violation of that, I

5  believe they believed that she was acting within the

6  scope of her duties, therefore, it did not raise to the

7  level of criminal misconduct.

8  Q.      Is it the department's position that that use of

9  deadly force was reasonable?

10 A.      Yes.

11 Q.      Okay.  This one here PIS 12-18.  Take a look and

12 tell me if you remember this incident.

13 A.      I don't recall this one to be honest with you.

14 Q.      Okay.  So do you know whether or not that there

15 was ever an allegation that at the time this person was

16 shot that he posed an imminent threat of death or bodily

17 harm?

18                  MR. HALLORAN:  Objection.

19 A.      As I said, I don't remember this case.  There's

20 a possibility that I wasn't the scene sergeant.  I may

21 have been, but I don't recall this case.  However, based

22 on what it says that he exited the door with a handgun,

23 I don't know what he did with that handgun to justify

24 them firing at him.  If a robbery suspect exits a

25 residence with a handgun in his hand, I think the

```
 1  officers would have a reason to feel an active threat at

 2  that moment.

 3  BY MS. GELSOMINO:

 4  Q.      It's not appropriate for an officer to use

 5  deadly force just because a person is in possession of a

 6  handgun, right?

 7  A.      No.  The officers would have to feel that their

 8  lives were in danger, did they believe that the suspect

 9  was about to fire upon them.  They would have to

10  articulate that in a formal statement.

11  Q.      It's not appropriate for an officer to use

12  deadly force on a suspect who is fleeing?

13  A.      No.  You're allowed to use force on a fleeing

14  felon if we believe them to be a danger.

15  Q.      If you believe them to be a danger?

16  A.      Yes.

17  Q.      But you have to have that last part, right?

18  A.      Correct.

19  Q.      An officer is not permitted to use deadly force

20  against a fleeing felon, even if they're in possession

21  of a handgun without something more, right?

22                  MR. HALLORAN:  Objection.

23  A.      This is speculation on my part, but if the

24  officers said this person had just committed a robbery

25  and is running through a neighborhood with a handgun
```

Deposition of Sergeant Eric Pilya          Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

1    that he would pose a danger to other people in that

2    area, so I believe that's one of the cases, I think

3    articulated that, that would be justification.

4    BY MS. GELSOMINO:

5    Q.      This is another one where the case was cleared

6    by the arrest of the person who was shot, right?

7    A.      It appears so.  I don't know why I didn't go

8    back and update the name of that suspect.  It appears

9    that suspect was arrested and entered a guilty plea for

10   the burglary and sentenced to eight years incarceration.

11   BY MS. GELSOMINO:

12   Q.      Can a Columbus Division of Police Officer shoot

13   a person that commits a robbery with a gun after the

14   completion of the robbery?

15                 MR. HALLORAN:  Objection.

16   A.      If they feel that he's a threat to themselves or

17   others.

18   BY MS. GELSOMINO:

19   Q.      Okay.  There has to be an articulation of some

20   factors to give rise to a threat beyond the fact that he

21   just completed a robbery with a gun, right?

22                 MR. HALLORAN:  Objection.

23   A.      Yes.

24   BY MS. GELSOMINO:

25   Q.      Okay.  This next one, 12-19, which involved the

1  shooting of David Richardson.

2  A.    Okay.  I do recall this one.

3  Q.    **Tell me what you recall about whether or not**

4  **there was any allegation at the time of the shooting**

5  **whether the person posed an actual and imminent threat.**

6  A.    Again, I don't remember the absolute specific

7  wording in the formal statement, but it was officer

8  Richardson's belief that based on his experience in that

9  neighborhood and with armed individuals that this

10 individual had gone for a weapon, he felt that his life

11 was in danger, and he did not want to wait for the

12 suspect to fire upon him, and fired his weapon at the

13 individual.

14      At that time we could not prove nor disprove if

15 this person actually had a weapon because we never

16 recovered one from the scene.  We did look extensively,

17 but there was a foot pursuit, the suspect had time to

18 get rid of a weapon if he had had one, and we never

19 found one at the scene.

20 Q.    **So then, did you include that he did not have**

21 **one?**

22 A.    We did not make a conclusion on that.  We could

23 neither approve nor disapprove if he had a weapon at the

24 time.  He made the gesture as if going for a weapon.

25 Q.    **Okay.  So there was never any evidence or**

1  allegation that he was actually touching a firearm at

2  the time that he was shot, right?

3  A.      We could not prove that, no.

4  Q.      **No officer ever even made that allegation,**

5  **right?**

6  A.      The officer that fired believed he was going for

7  a weapon.

8  Q.      **Was going for a weapon, not that he had a**

9  **weapon, right?**

10  A.      No.

11  Q.      **So there was never any allegation that**

12  **Mr. Richardson was touching a weapon or had a weapon in**

13  **his hand at the time that he was shot by the officer,**

14  **right?**

15  A.      Yes.   There was an allegation by the involved

16  officer.   The officer believed based on his experience

17  that that neighborhood -- if I'm remembering this

18  correctly, I believe he referred to it as chicken

19  winging it.   It's when the person reaches for their

20  waistband and their elbow comes up like a chicken wing.

21  And in his experience he believed he was going for a

22  weapon.

23  Q.      **Okay.  He never saw a weapon?**

24  A.      He never saw a weapon, no.

25  Q.      **Okay.  In this case because it was nonfatal did**

Deposition of Sergeant Eric Pilya          Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

1   **CIRT make the determination about whether or not to**
2   **bring criminal charges against the officer?**
3   A.      Yes.  We decided that he was acting upon the
4   scope of his duties, therefore, it didn't rise to
5   criminal charges.  I believe he was found outside of
6   policy for that one.
7   **Q.      What did you base the determination of CIRT that**
8   **this officer was acting within the scope of his duties?**
9   A.      Well, this suspect had just struck an officer
10  with his vehicle.  There was a long chase, vehicle
11  chase.  The suspect wrecked into another vehicle, bailed
12  out on foot, and then the officer believed that the
13  suspect was going for a weapon and fired.  The officer
14  during the formal statement stated that he was in fear
15  for his life because he believed this suspect was
16  reaching for and going to pull a weapon upon him.
17  **Q.      Even though he never saw a weapon and even**
18  **though no weapon was ever recovered?**
19  A.      That's correct.
20  **Q.      You claimed earlier that there was ample time**
21  **for him to get rid of a gun?**
22  A.      There was.
23  **Q.      Was there ample time for this subject to have**
24  **gotten rid of the gun between the time that he was shot**
25  **and the time that he was taken into custody?**

1  A.      I don't believe he was shot.  He was not struck

2  by a bullet.  He was injured out of the apprehension,

3  but he was not shot.

4  Q.      **He was just shot at?**

5  A.      He was shot at.

6  Q.      **There was a time between the time that he was**

7  **shot and at the time he was taken into custody?**

8  A.      Yes.

9  Q.      **Okay.  Let's look at this one PSI 12-20.**

10  A.      This is going to be a long day.

11  Q.      **Yeah.**

12  A.      Okay.  I don't think I was the scene sergeant at

13  this one.  I do recall it happening, but I don't believe

14  I was the scene sergeant there.

15  Q.      **All right.  This is another one where CIRT would**

16  **have made the findings about criminal allegations,**

17  **right?**

18  A.      Yes.

19  Q.      **What was the basis of -- did CIRT determine not**

20  **to file any criminal charges against the officer?**

21  A.      That's correct.

22  Q.      **Why?**

23  A.      Again, I believe it was because he was found not

24  to be acting within the scope of his duties at the time

25  of the shooting.

Deposition of Sergeant Eric Pilya      Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

1   **Q.**      Based on what?

2   A.      I don't really recall on this one. I don't

3   know. I want to say he was found not within policy. I

4   seem to remember this may have been a startle response,

5   but I'm not positive of that.

6   **Q.**      **When you do these summaries do you include all**

7   **of the facts that are relevant for determining whether**

8   **or not the use of force would have been reasonable?**

9   A.      No. This is just to notify the chain of command

10   just bare bones overview that there was a PIS that

11   night. This is not used for justification of anything.

12   This is pretty much a summary of who, what, where, when,

13   notification of incident. The CIRT package is what

14   determines all of that.

15   **Q.**      **Do you include facts in here to help refresh**

16   **your recollection about why the shooting was --**

17   A.      I'm sorry, you faded out there.

18   **Q.**      **Do you include enough facts in these summaries**

19   **to just refresh your recollection about why the shooting**

20   **was not criminal?**

21   A.      No. I do not do that.

22   **Q.**      **Okay.**

23   A.      That's not the purpose of this document.

24   **Q.**      **The last one for this year, PIS 12-24. Take a**

25   **look at that, please.**

Deposition of Sergeant Eric Pilya      Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

1   A.      Okay.  I did respond to the scene.

2   **Q.      Okay.  And this was another one where CIRT did**

3   **not recommend any criminal charges?**

4   A.      Correct.

5   **Q.      Why?**

6   A.      Because I'm sure that the involved officers were

7   found to be acting within the scope of their duties and

8   the evidence did not raise to criminal intent.

9   **Q.      Based on what?**

10   A.      I don't specifically remember how these officers

11   justified their actions, but this was someone who had

12   just committed an armed robbery.  He had a handgun.  It

13   was later determined to not be a real weapon.  You can't

14   judge the officers on that unless during the course of

15   the formal statement you asked them and they believed it

16   was a fake gun from the very get-go.  Often times they

17   believed this to be a real gun.  The person just robbed

18   the BMV, he ran, I believe he had the gun in his hand.

19   I don't recall why Officer Brenner struck him.  I want

20   to say he was running toward another SWAT officer that

21   had the other side and then he ran back away with the

22   gun in his hand still, and I can't recall why SWAT

23   Officer Sprague said he fired.  I do recall he ran into

24   a dance studio that was filled with toddlers and was

25   apprehended inside there.

1   Q.      Was he shot by the officer before he ran into

2   the studio?

3   A.      If the officer actually hit him.  This small

4   laceration was nothing really.  I don't think we could

5   prove it came from the officer's weapon.  He was struck

6   by a car, he was running, they tussled inside.  I don't

7   think we could prove he was actually struck.

8   Q.      Whether or not an individual was struck by an

9   officer should not impact the determination of whether

10  or not that was justified or criminal or within policy,

11  right?

12                  MR. HALLORAN:  Objection.

13  A.      No.  No.

14  BY MS. GELSOMINO:

15  Q.      Am I correct?  Was my statement correct or

16  incorrect?

17  A.      You're saying whether they actually shoot them

18  or miss it's the same circumstances as to why they

19  fired, that's correct.

20  Q.      Okay.  So in this case, what were the

21  allegations, if any, that at the actual time of the

22  shooting he posed an actual imminent threat?

23  A.      I don't specifically remember what they gave as

24  their justification.  This was eight years ago, and

25  without having the package in front of me, I couldn't

1    really tell you specifically.

2    Q.      Had you reviewed the package you would have been

3    able to tell me, right?

4    A.      Yes.

5    Q.      Okay.  I'm going to turn off this one for 2012.

6    We'll mark this as Exhibit 5.

7                            - - - -

8        (Thereupon, Plaintiff's Exhibit 5 was marked for

9                        identification.)

10                           - - - -

11   BY MS. GELSOMINO:

12   Q.      PIS 13-04, take a look at that, please.

13   A.      Okay.

14   Q.      So in this case what were the conclusions of

15   CIRT?

16   A.      The conclusions of CIRT were that there was not

17   enough evidence to believe that the officer had criminal

18   intent, that he was acting within the scope of his

19   duties as a law enforcement officer, and that the firing

20   of his weapon, he believed he was under threat at the

21   time that he fired the weapon.

22   Q.      What do you mean by "criminal intent" in this

23   context?

24   A.      Criminal intent is, as we discussed before, in

25   order for a police officer to be charged criminally with

1  a crime out of one of these incidents, they have to be

2  acting outside the scope of their duties as a law

3  enforcement officer.  If they're attempting to do their

4  job the way they've been trained to do their job and

5  they're acting in good faith and articulate their

6  actions, then it may be a out-of-policy shoot, but not

7  necessarily enough to raise to the level of charging the

8  officer with felonious assault.  Does that make sense?

9  **Q.      What do you need to prove to charge an officer**

10  **with felonious assault?**

11  A.      That they were not acting within the scope of

12  their duties.  That they had a malicious intent.  That

13  they were not in fear of their life.  They did not feel

14  threatened at the time that they fired.

15  **Q.      Not threatened, not in fear, not acting with**

16  **malicious intent?**

17  A.      Acting with malicious intent, not within the

18  scope of their duties as a police officer.

19  **Q.      Is it possible for an officer to be acting in**

20  **good faith but unreasonably?**

21  A.      Yes.

22  **Q.      Is it possible that an officer was acting in**

23  **good faith but without malicious intent and yet still**

24  **uses deadly force when they're not reasonably in fear of**

25  **their life?**

```
 1              MR. HALLORAN:  Objection.

 2  A.      Are you saying could that happen and it not be a

 3  crime?

 4  BY MS. GELSOMINO:

 5  Q.      Could that happen, period?

 6  A.      Could that happen -- I'm sorry.  Could you just

 7  repeat that question, please.

 8  Q.      If an officer was acting without any malicious

 9  intent, yet uses deadly force when it was not reasonable

10  to believe that the suspect presented a imminent threat

11  of death or great bodily harm?

12              MR. HALLORAN:  Objection.

13  A.      I'm still confused what the question is.  Could

14  they use deadly force without malicious intent, but

15  within the scope of their duties?  Is that what you're

16  trying to get at?

17  BY MS. GELSOMINO:

18  Q.      I still don't understand what you mean when you

19  say within the scope of their duties.

20  A.      So law enforcement officers are allowed to use

21  deadly force to protect themselves and others from an

22  active threat.  If the officers are acting within the

23  scope of their duties, which means the officers are

24  acting the way they're trained to act, they're on a run,

25  they were doing what they're supposed to be doing and
```

1   they fire their weapon, if they can articulate their

2   actions and it's supported by witness testimony and

3   physical evidence that they felt threatened at the time

4   of the shooting, then it would not raise to the level of

5   a crime.  They may be outside of an administrative

6   policy.  It may be a bad police shooting based on their

7   decision-making and the policies of the division, but

8   not necessarily a crime.  Does that make sense?

9   **Q.      Yeah.  An officer can commit felonious assault**

10  **ever without having malicious intent, right?**

11  A.      Yes.

12  **Q.      All right.  So in this case with Mr. Trussle**

13  **that you just reviewed, what was the allegation that at**

14  **the time of the shooting he posed an actual threat of**

15  **death or great bodily harm?**

16  A.      Again, I can't specifically tell you because I

17  don't remember exactly what the officer said, but I

18  think I could get in the ballpark.  I believe the fact

19  that the person was a -- had a felony warrant for a

20  violate crime and was fleeing from the officers being

21  able to arrest them.  This individual was found in a

22  shed.  I seem to believe the officer saying that there

23  were any number of -- they didn't know if this guy was

24  armed.  There were any number of things in a shed that

25  could be used as a weapon, and when the guy burst out

1  the door at him he fired his weapon because he was in

2  fear that this person was attacking him.

3          I believe that did not raise to the level of a

4  crime.  I believe the fact that he could not articulate

5  actually seeing a weapon in the individual's hands was

6  why he was found out-of-policy.  He received discipline

7  for that, and the Fraternal Order of Police grieved it,

8  and for whatever reason the arbitrator sided with the

9  officer, therefore, they were required to reverse their

10  decision on the policy violation.

11  **Q.      Do you think that the arbitrator made the wrong**

12  **decision?**

13  A.      The decision of the arbitrator is binding, so it

14  really doesn't matter what I think.

15  **Q.      I know, but what do you think?**

16  A.      I believe in this case that the officer was

17  afraid.  I do believe he felt that he was being

18  attacked, but I believe that the shot was more of a

19  startle than it was intentional.  Even though I

20  specifically remember asking him during the formal

21  statement if he intentionally fired or if it was a

22  startle response, and he said that he intentionally

23  fired.

24  **Q.      Did you decide not to bring criminal charges in**

25  **this case because you believed it was a startle**

1   **response?**

2   A.     No.   I believed that it was not criminal because

3   he was acting within the scope of his duties as a law

4   enforcement officer and he articulated what he believed

5   at the time he pulled the trigger, an articulable fear

6   of threat.

7   **Q.     He could not articulate that he ever saw a**

8   **weapon on this person, right?**

9   A.     No.   He did not.

10   **Q.     So how could it be noncriminal to use deadly**

11   **force when this officer could not articulate that the**

12   **person was armed at the time that he was shot?**

13                 MR. HALLORAN:   Objection.

14   A.     He could not articulate, and again, I'm trying

15   to recall this from memory.   I don't have it sitting in

16   front of me, but I believe that he was articulating that

17   he wasn't going to wait for this guy to, you know, use

18   the weapon against him.   There was so many potential

19   weapons that could be found inside a shed, he didn't

20   know if this guy actually had a weapon on him, and when

21   he burst through the shed door and came at the officer

22   he believed that his life was in jeopardy.

23   BY MS. GELSOMINO:

24   **Q.     So this officer fired because of things that he**

25   **thought might happen, right?**

Deposition of Sergeant Eric Pilya          Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

```
 1    A.      It is what he knew at the time that he pulled
 2    the trigger, yes.
 3    Q.      Those are all things that he thought might
 4    happen?
 5    A.      Well, being afraid of a potential threat is one
 6    way of articulating your actions.  They don't have to
 7    wait to be shot or stabbed.  That's something that they
 8    don't have to wait to do.
 9    Q.      Do you agree with me that he articulated a
10    potential threat not an imminent threat?
11                      MR. HALLORAN:  Objection.
12    A.      In my mind, yes.  In his mind I believe he felt
13    it was imminent.
14    BY MS. GELSOMINO:
15    Q.      Okay.  But you agree that he articulated a
16    potential threat, right?
17    A.      Yes.
18    Q.      And a potential threat is very different than an
19    imminent threat, right?
20    A.      Yes.
21    Q.      So how -- was the finding then, the conclusion
22    of the division of police, that even though this officer
23    used deadly force in the face of only a potential
24    threat, not an imminent threat, that he did not commit
25    any crime?
```

Deposition of Sergeant Eric Pilya          Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

```
 1    A.      Yes.

 2    Q.      Okay.  Does the division of police policy allow

 3    for a potential threat to serve as justification to use

 4    deadly force?

 5    A.      It depends on the case and how the officer

 6    articulates their actions at the time.

 7    Q.      So if an officer articulates what he believed to

 8    be a potential threat, does the CPD policy permit use of

 9    deadly force in that case, in that circumstance?

10    A.      If that officer was acting within the scope of

11    their duties as a law enforcement officer and they felt

12    a threat at the time they pulled the trigger, then, yes.

13    Q.      Even if the only threat that they could

14    articulate was a potential threat?

15    A.      Yes.

16    Q.      You still believe that would be a use of force

17    within the policy --

18    A.      No.  Not within policy.  There's a difference

19    here.  It wouldn't raise to the level of filing a

20    criminal charge against the officer, but it would be

21    out-of-policy.

22    Q.      Okay.  I still don't understand why that's not

23    criminal in this case.  How is that not felonious

24    assault?

25                      MR. HALLORAN:  Objection.
```

1   A.     So there's a difference between someone getting

2   into a fight and intentionally causing serious physical

3   harm against someone and an officer doing their job, and

4   while they're acting -- they're attempting to act within

5   the scope of their duties.  Officers are given a certain

6   leeway by the courts because of the dangerous jobs that

7   they do and making split second decisions.

8   BY MS. GELSOMINO:

9   **Q.     I understand that.  But if an officer is acting**

10   **outside of policy, then he's not within the scope of his**

11   **duties as a police officer, right?**

12              MR. HALLORAN:  Objection.

13   A.     Not necessarily, no.  They could be acting

14   within the scope of his duties as a police officer,

15   attempting to do everything right, but maybe make a bad

16   decision.  Maybe not be as tactically sound as they

17   could have been and be out-of-policy.  They weren't

18   overtly intending to commit a crime.  They were doing

19   their job and made a bad decision, therefore, instead of

20   filing a criminal charge against them, what they did was

21   they were outside of policy administratively.

22   BY MS. GELSOMINO:

23   **Q.     Is it the position of the division of police,**

24   **then that an officer can use deadly force in the absence**

25   **of an immediate threat of death or great bodily harm and**

```
 1   do so legally?

 2                   MR. HALLORAN:  Objection.

 3   A.      I believe that's on a case-by-case basis, and I

 4   believe it's how the officer articulates their actions.

 5   It's going to be what the officer believed at the time.

 6   BY MS. GELSOMINO:

 7   Q.      Right.

 8   A.      That's what their judged on.

 9                   MS. GELSOMINO:  All right.  I'm going

10   to take a quick bathroom break and we can move on.

11                          - - - -

12      (Thereupon, an off-the-record discussion was held.)

13                          - - - -

14   BY MS. GELSOMINO:

15   Q.      Okay.  So we're looking at this one, PIS 13-19,

16   regarding the shooting of James Robert Barber.  What do

17   you know about that case?

18   A.      I was at that scene, if I recall this correctly.

19   This was -- I believe this was an incident where it was

20   a motel that had rooms on the top and bottom and there's

21   a balcony going around the second floor, and there were

22   a group of construction workers that were in town for

23   the job and were staying at the hotel.  There was a lot

24   of alcohol flowing, and the one individual in question

25   was threatening to stab himself.  One of the other
```

 1    individuals in the room called the police and said,

 2    "hey, this guy is really upset and he's going to try and

 3    stab himself."

 4          The officers responded.  There were two

 5    officers, a female and a male officer.  Schoolcraft was

 6    the male officer.  As they approached they were walking

 7    along the balcony, the door flies open, the female

 8    officer is standing in the doorway, and the individual

 9    that was threatening to stab himself is rushing the

10    officer.  The involved officer said that he believed

11    that he was firing to protect the life of the female

12    officer that was standing in the doorway that was being

13    rushed by the man who said he was going to stab himself.

14    He saw a silver metallic object in the subject's hands

15    and fired one-time and shot him in the shoulder.  That

16    was the case.

17    Q.      What, if any, allegations were there that at the

18    time of the shooting the person actually posed an

19    imminent threat?

20    A.      Well, to the officer that fired the round he was

21    working off the premise that this person was in an

22    agitated mental state, he had threatened to do harm to

23    himself, which all officers are trained that if you're

24    suicidal, you're homicidal.  The guy threatened to stab

25    himself, so he believed him to be armed.  As the door

1    flew open, he believed he saw a shiny silver object in

2    the guy's hand when he was coming at the officer.  You

3    know those balconies are real short.  There's only maybe

4    two-and-a-half, three feet of balcony there outside the

5    doorway.  The officer is up against the balcony railing

6    and the door opens and this guys comes out.

7    Schoolcrafts makes the decision to fire to protect this

8    officer.

9    **Q.      Did he actually have a knife?**

10   A.      He did not have a knife.  He actually had two

11   silver forks that he had.  It was not a knife, but it

12   did corroborate the fact that the officer may have seen

13   a shiny metallic object.

14   **Q.      Were the forks recovered?**

15   A.      Well, that was an error.  The forks were not

16   recovered.  That was a mistake that was made.  We

17   witnessed them at the scene, but crime scene did not

18   collect those at the time.

19   **Q.      Where did you witness them at the scene?**

20   A.      Where the suspect was apprehended.  There were a

21   couple of forks and a couple of other things that had

22   been in his pocket and they were laying there right at

23   the apprehension scene by his clothing that the medics

24   cut off of him.

25   **Q.      Where were the forks at the time that he was**

1    shot?

2    A.    That we don't know.  That was prior to us

3    arriving that the officers had patted him down and taken

4    those off of him.  I don't specifically recall what

5    those officers said, where they took those forks off of

6    the individual.

7    **Q.    That would have been an important fact to know**

8    **in terms of determining whether this officer acted**

9    **appropriately, right?**

10    A.    Yes.

11    **Q.    Do you believe that it's reasonable that the**

12    **officer mistook two forks to be a deadly weapon?**

13    A.    Yes.  I do believe that.

14    **Q.    Why?**

15    A.    I believe those to be -- you know, the forks

16    were shiny metal and silver, which is what he said he

17    saw.  He believed in that split-second to be a knife.

18    Probably based on the fact that this original run was

19    that this guy was going to stab himself, which in his

20    mind said knife, and when he sees the shiny silver thing

21    in the guy's hand, he's thinking knife, and he believes

22    his partner is in danger there, which led him to fire to

23    protect her life.

24    **Q.    Is it possible that an officer might believe**

25    **subjectively that he's facing a threat, but his belief**

```
 1    is not objectively reasonable?

 2                    MR. HALLORAN:  Objection.

 3    A.      So let's go back to what the officer knew at the

 4    time they pulled the trigger.

 5    BY MS. GELSOMINO:

 6    Q.      I'm asking you a general question.

 7    A.      Could you put it in context?

 8    Q.      You want to talk about what the officer had in

 9    his or her head at the time of the shooting.  That's a

10    subjective belief that the officer holds, right?

11    A.      It's what the officer believed at the time they

12    pulled the trigger, which is what we're required to

13    judge them upon.

14    Q.      For what?

15    A.      We're basing this on Graham vs. Connor.  Graham

16    vs. Connor says you judge the officer based on the facts

17    known to them at the time they pulled the trigger,

18    without hindsight 20/20.  A police officer has a very

19    dangerous job and they have to make split-second

20    decisions, and they may be wrong, but they gave them

21    leeway there because of the dangerous nature of the job

22    and the fact that they make split-second decisions.

23            It's what they knew or believed at the time they

24    pulled the trigger, not necessarily what the

25    investigation revealed afterwards.  Is it reasonable for
```

 1   that officer to assume that going to a run where a

 2   person is threatening to stab himself with a knife, and

 3   in that split-second when he opens the door and he sees

 4   a shiny silver object, that he would put two and two

 5   together and believe that to be a knife even tough he

 6   was wrong.  That's the premise that we're looking at.

 7   What did he believe at the time that he pulled the

 8   trigger, and he believed that to be a knife.

 9          The brain is a funny thing.  I don't care how

10   many times he could have showed him those forks, he

11   would still in his mind believe that that guy was

12   holding a knife.  It's just one of those things.  And he

13   believed his partner's life was in danger.  That this

14   guy was going to stab his partner, and he fired his gun.

15   **Q.      Have you ever heard of a use of deadly force**

16   **that you believe to have been unreasonable?**

17   A.      To be unreasonable?

18   **Q.      Yes.**

19   A.      Since I've been the team leader of the CIRT team

20   we have not found any charges on officers out of these

21   police involved shootings.  And I would say that's based

22   on the fact that given what the totality of the

23   circumstances in the investigation and based on what the

24   officer knew at the time they pulled the trigger, it did

25   not raise to the level of a criminal charge.

1    **Q.**      **Are you aware that this case that we're**

2    **discussing right now with James Barber resulted in a**

3    **settlement from the City of Columbus?**

4                MR. HALLORAN:   Objection.

5    A.      I'm sorry.   Which one?

6    BY MS. GELSOMINO:

7    **Q.**      **Barber.**

8    A.      No.   I'm not aware of that.

9    **Q.**      **Do you think there was any wrongdoing by any**

10    **officer in that case?**

11    A.      Do I think there was any wrongdoing?   There were

12    two different perspectives in this case.   One

13    perspective was the female officer believed that

14    Mr. Barber never took his hands out of his pockets.   If

15    you go by what that officer says, then it would make the

16    shooting of Mr. Basher inappropriate.   However, like I

17    said, you have to use the totality of the circumstances

18    in that case.   Just like I said, the brain works in

19    mysterious ways.   Even though we showed him the forks,

20    he would think it was a knife.   There's also the

21    possibility that in that split-second, being approached

22    by that suspect that she couldn't really recall where

23    his hands were.   That was her testimony, so we took it

24    as true to her.

25           Basically the thing that made me question that

1    was the shiny silver forks.  The officer's testimony was

2    that he saw a shiny silver object in the guy's hand, and

3    these shiny silver forks were actually taken off of this

4    guy, which makes me believe that the officer did see

5    something shiny and silver in the guy's hands, but

6    didn't know it wasn't a knife.  But he also believed

7    that this guy was attacking his partner, and that's why

8    we made the decision that we made.

9    **Q.      This woman who gave a statement saying that**

10    **Mr. Barber never took his hands out of his pants, was**

11    **that an officer?**

12    A.      Yes.

13    **Q.      So in this case you had an officer statement**

14    **that directly contradicted the statement of the shooting**

15    **officer, and if believed would have rendered this**

16    **shooting a bad one, right?**

17    A.      Correct.

18    **Q.      And yet the division of police credited the**

19    **shooting officer's statement?**

20    A.      Yes.  Because I believed it was based on the

21    totality of the entire investigation.  Officer witnesses

22    do the best that they can, but they could be mistaken as

23    well.  I think the decision on this particular case was

24    based on the totality of the information we had at hand.

25    **Q.      The shooting officer also could have been**

1   mistaken, right?

2   A.      The shooting officer also could have been

3   mistaken.  That's true.

4   Q.      Okay.  PIS 13-22.  Take a look at that.

5   A.      I don't recall this investigation at all.

6   Q.      Do you know whether there were any allegations

7   at the time of the shooting that this person,

8   Mr. Crocket, presented an actual imminent threat of

9   death or great bodily harm?

10  A.      Again, as I said, I don't recall this particular

11  incident, but in charges, we charged him with aggravated

12  menacing, and we only file that charge when the suspect

13  has pointed a gun at the officer.  I would say if the

14  suspect was pointing the gun at the officer enough that

15  we would file aggravated menacing charges, and he plead

16  guilty to that, that the officer felt that his life was

17  in danger.

18  Q.      But you don't remember?

19  A.      I don't remember the case.  I really don't.

20  Q.      Okay.  Let's look at this one PIS 13-24.  This

21  is the shooting of Dabron White.  Take a look at that

22  one, please.

23  A.      Okay.

24  Q.      In this case were there ever any allegations

25  that at the time of the shooting Mr. White presented an

1   **actual imminent threat of death or great bodily harm?**

2   A.     So I don't recall exactly what the officer

3   articulated. I do recall this incident. I'm trying to

4   remember. I know there was a gun found in the vehicle

5   and the officer saw that gun as they ran by the

6   suspect's vehicle. I seem to remember the officer

7   saying that based on our training if there's one gun,

8   there's more guns. This civilian suspect ran into a

9   ravine and there were two officers involved. I remember

10   that the civilian suspect did follow some commands and

11   got down on the ground and was kneeling and there was a

12   chopper overhead. I do remember that. I don't recall

13   what the officer articulated as to why he fired at the

14   suspect. I believe it was found out-of-policy because

15   the suspect was found to be unarmed.

16   **Q.     If the officer shot an unarmed man who was on**

17   **his knees at the time that he was shot, is that correct?**

18   A.     Yes. I believe so.

19   **Q.     So this officer shot an unarmed man in a**

20   **position of surrender at the time that he was shot?**

21   A.     No. He followed the initial commands to get on

22   his knees, but if I'm remembering this correctly, it's

23   been quite a while, but what they said was that he went

24   from having his hands in the air in a kneeling position

25   to bending over and reaching for his waistband, and they

1    believed that he was going for a weapon and they fired.

2    Q.       Okay.  So they shot an unarmed man while he was

3    on his knees and they never saw a weapon on that man,

4    correct?

5    A.       They saw a weapon in the suspect's vehicle as

6    they ran by, which I believe that led them to believe

7    that he may have another weapon on his person.

8    Q.       Okay.  Would you agree with me that that's again

9    a speculative fear?

10                        MR. HALLORAN:  Objection.

11   A.       So much of a police officer's job is to evaluate

12   their surroundings.  It's to take in everything and try

13   and make sense of it.  All of these things are what lead

14   a police officer to take the actions that they take.  If

15   they said that they saw a gun, which we did find in the

16   suspect vehicle, and that lead them to believe that the

17   suspect had another weapon, and then a suspect actually

18   makes a gesture as if going for a weapon, it would be

19   reasonable for them to believe that the suspect might

20   pull the weapon and fire upon them.

21   BY MS. GELSOMINO

22   Q.       The officers ran by a vehicle and saw a weapon

23   in the vehicle, right?

24   A.       Correct.

25   Q.       That vehicle was far away from the suspect,

Deposition of Sergeant Eric Pilya          Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

```
 1    right?

 2    A.      I don't recall how far.  He bailed out of that

 3    vehicle and ran.  There was a foot chase.  He ran down

 4    into a ravine.  So it wasn't right next to him, no.

 5    Q.      Right.  So he's down a ravine away from the

 6    vehicle?

 7    A.      Correct.

 8    Q.      He never went back to the vehicle at any point?

 9    A.      He did not.

10    Q.      So now he's at the bottom of the ravine, and the

11    car is at the top of the ravine and the officers know

12    that, right?

13    A.      Right.

14    Q.      So then he's on his knees at the bottom of the

15    ravine, and the officers never saw a gun on him, right?

16    A.      No.  They never saw a gun on him.

17    Q.      Is it the division of police's determination

18    that this officer was within policy and did not commit

19    any criminal action when he shot at a person on his

20    knees when the officers did not see a gun on that

21    person?

22                    MR. HALLORAN:  Objection.

23    A.      No.  There's two answers to that.  One, they

24    determined that it did not raise to the level of a

25    criminal offense, however, they did find him in
```

```
 1   violation of policy administratively.

 2   BY MS. GELSOMINO:

 3   Q.      Your CIRT team made the determination that the

 4   officer did not commit a crime when he shot this unarmed

 5   man, right?

 6   A.      Correct.

 7   Q.      Based on that officer's belief that that suspect

 8   may have another gun because he had one up at the top of

 9   the ravine, right?

10                     MR. HALLORAN:  Objection.

11   A.      And the fact that he was reaching for a weapon

12   and felt that his life was in danger.

13   BY MS. GELSOMINO:

14   Q.      It was the CIRT's position that it was

15   reasonable for this officer to think that his life was

16   in danger by a threat presented by an unarmed man in

17   front of him on whom he did not see a gun, correct?

18                     MR. HALLORAN:  Objection.

19   A.      Yes.

20   BY MS. GELSOMINO:

21   Q.      There's no criminal action there according to

22   the division, right?

23   A.      Correct.

24   Q.      What is the violation of the policy then?

25   A.      It doesn't say.  I don't know what they found it
```

1    in violation of.  I'm guessing it was because the guy

2    was unarmed, but I don't know that for sure.

3    Q.       Do you agree with me that this officer's

4    articulation of a fear was based on speculation that

5    this person may be armed?

6                        MR. HALLORAN:  Objection.

7    A.       Yes.  I would agree that that was his belief.

8    BY MS. GELSOMINO:

9    Q.       And it was a speculative belief?

10                       MR. HALLORAN:  Objection.

11   A.       Well, it's what he believed at the time.

12   BY MS. GELSOMINO:

13   Q.       All right.  We're going to skip ahead to 2015.

14   At the top of page five here PIS 2015-0005.  This is the

15   shooting of James England, right?

16                            - - - -

17       (Thereupon, Plaintiff's Exhibit 6 was marked for

18                        identification.)

19                            - - - -

20   A.       I can't see that.

21   BY MS. GELSOMINO:

22   Q.       I should probably share the screen with you.

23   A.       Okay.

24   Q.       First of all, I understand that you were on the

25   scene for the shooting of James England, right?

Deposition of Sergeant Eric Pilya                    Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

1    A.        Yes.

2    Q.        **Tell me everything that did you personally in**

3    **relation to James England.**

4    A.        I was the scene supervisor for that, so I called

5    out a team and responded to the Dolby Drive address.  We

6    were briefed by the supervisor at the scene, and I

7    determined that Detective Martin Kessner was the primary

8    and handed out assignments at that time.  We did the

9    walk-through.  I remember the attorney was Robert Byard

10   at the time.  I did the walk-through with Attorney Byard

11   and Officer Abel.  And then, I'm sure, I just supervised

12   the rest of the scene.  I don't recall specifically

13   taking any actions.

14   Q.        **Okay.  Did you observe or participate in any**

15   **interviews with any officers, suspects or witnesses?**

16   A.        At the scene, I don't believe I interviewed

17   anything at the scene.  That's not my job.

18   Q.        **How about at any time?**

19   A.        I interviewed, I took the formal statement of

20   Officer Abel.

21   Q.        **Since this was a nonfatal shooting CIRT made the**

22   **determination about whether or not to bring changes**

23   **against Abel, right?**

24   A.        Yes.

25   Q.        **What was the determination of CIRT?**

```
 1   A.       That the officer was acting within the scope of
 2   his duties, but there was insufficient evidence to prove
 3   that he committed a crime.
 4   Q.       Did you write that down somewhere?
 5   A.       I was given it by legal.
 6   Q.       Tell me again.
 7   A.       So when we make that ruling on the nonfatal
 8   cases -- I can't remember when we decided to do this.
 9   It actually was at the promoting of the FOP attorneys,
10   they were like, "why don't you put something in the
11   package that states that."  That's what we were
12   instructed by our legal advisors.  When this happens we
13   always put at the conclusion of the CIRT package when
14   we're not charging the officer with a crime that
15   statement.
16   Q.       Who are the legal advisors?
17   A.       Jeff Furbee.
18   Q.       Does he work for the police department?
19   A.       He works for the City Attorneys Office, but he's
20   assigned as the liaison for the Columbus Division of
21   Police.
22   Q.       Did he review all of the findings of CIRT?
23   A.       I don't believe he's in that process, no.
24   Q.       So on what did you base your conclusion that
25   Abel was acting within the scope of his duties, but
```

1    **there was insufficient evidence to charge him with a**

2    **crime?**

3    A.       Again, I don't specifically remember the

4    complete details.  I did review it prior to coming here.

5    The officers were -- I'm sorry.  They were looking up

6    people that have warrants on their precinct and they saw

7    that Mr. England had a felonious assault warrant, and

8    some of the officers on the precinct were aware of

9    Mr. England and his previous arrests.  So they decided

10   to go to Mr. England's residence to serve the warrant.

11   Officers knocked on the front door and contacted someone

12   inside.  Eventually he admitted that it was him,

13   Mr. England, and they told him to come out.  He went out

14   the back door instead.  Officer Abel was at the back

15   door.  He was giving commands to Mr. England to

16   surrender because he had the warrant.  There was a

17   locked -- it was a patio door, like a Florida room that

18   had been destroyed at some point because there was no

19   sides to it.  There was plywood up the door and it was

20   locked.

21          The officers were ordering him back to them over

22   by the door and they attempted to place handcuffs on

23   him.  He, in their words, was resisting arrest, was not

24   complying or partially complying, and there were also

25   two pitbulls that had exited the house.  There was a

1    fairly large dog door on the back of the residence and

2    there were two pitbulls that were acting very aggressive

3    toward the officer.  As they're trying to handcuff the

4    suspect, office Abel is kind of vertically challenged,

5    and he was up on the wood part of the door and the other

6    part of his body was hanging through the window part of

7    this screen door.

8              It was his testimony that he believed that

9    Mr. England was violent, that he was serving a felonious

10   assault warrant on him, that if Mr. England had pulled

11   him through that window that he would have sustained an

12   injury from being pulled through the window.  That he

13   was unsure if Mr. England had any weapons because they

14   had not had a chance to pat him down or anything at that

15   point.  He also feared that he would be in jeopardy from

16   the pitbulls that were acting aggressive, and that he

17   fired because he felt he was being pulled through there

18   and he was in fear of all of those things, and that's

19   why he fired his weapon at Mr. England.  Mr. England

20   then fled through the doggy door back into the house.

21   He was handcuffed at the time --

22   **Q.      I don't need all the details here.  I'm asking**

23   **just for the facts that were pertinent to the conclusion**

24   **of the CIRT team.**

25   A.      That's what I'm trying to give you.

1    Q.      Okay.  This fleeing after the shooting

2    impacted --

3    A.      No.  All of the things that Officer Abel said

4    that he was in fear of happening if he actually got

5    pulled through that window and over was his

6    justification for firing his weapon.

7    Q.      Was England handcuffed at the time that he was

8    shot?

9    A.      Yes.

10   Q.      So you said that Abel was afraid that if he got

11   pulled through the door he could be in danger, right?

12   A.      He was being pulled through there at that time

13   before he fired.  He felt that if he hadn't fired that

14   he would have been pulled through and those things would

15   have happened.  That was his justification for firing

16   his weapon.

17   Q.      There was no evidence at the time that England

18   was shot that he possessed a firearm, right?

19   A.      No.

20   Q.      Am I correct in saying that?

21   A.      Yes.

22   Q.      So this -- there was no evidence that he had any

23   kind of weapon whatsoever, right?

24   A.      They had no idea if he had a weapon on him or

25   not.

1    Q.      Right.  No idea?

2    A.      No.

3    Q.      So this fear, again, that Abel articulated that

4    he felt at the time, would you agree with me that he

5    articulated a fear of things that could possibly come to

6    be?

7                    MR. HALLORAN:  Objection.

8    A.      Yes.

9    BY MS. GELSOMINO:

10   Q.      So Abel was articulating speculative fear,

11   right?

12                   MR. HALLORAN:  Objection.

13   A.      He was articulating what he believed was

14   occurring, and he was being pulled through this window,

15   and he felt that if he didn't take action these things

16   were surely going to happen.

17   BY MS. GELSOMINO:

18   Q.      But they weren't happening at the time that he

19   shot, right?

20   A.      He was being pulled through window.  So yes,

21   they were a threat to him.

22   Q.      How was he being pulled through the window?

23   A.      If I remember correctly, he had his left arm

24   hooked through the right arm of the suspect, and the

25   suspect was bending over and puling him using that

Deposition of Sergeant Eric Pilya          Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

1   inertia to pull the office through the window of the

2   door.

3   Q.      What charges did the CIRT team consider for

4   Abel, if any?

5   A.      For Abel, we did not consider criminal charges

6   against Abel.

7   Q.      Why not?

8   A.      Because he was acting within the scope of his

9   duties as a law enforcement officer and articulated

10  threats that he was in fear for his life at the time he

11  pulled the trigger.

12  Q.      At what point did you come to that conclusion?

13  A.      After we had all the facts of the investigation

14  and pretty much after the formal statement.

15  Q.      When you arrived on scene the day of the

16  shooting and you were briefed about what occurred, did

17  you believe that it was most likely a legal shooting?

18  A.      When we first arrived the facts had changed from

19  the time that we arrived until the formal statement.

20  When we first arrived at scene the supervisor on scene

21  had led us to believe that Officer Abel was shooting at

22  the pitbulls and it must have been a ricochet or

23  something that had hit Mr. England.  That was the

24  premise that we were working from at the time of the

25  investigation at the scene.

1   **Q.**     **At what point did you realize that was an**

2   **incorrect premise that the supervisor told you?**

3   A.     One of the CIRT detectives interviewed one of

4   the officers at the scene, and in interviewing the

5   officers at the scene he had made it sound as if at the

6   time that Officer Abel fired the dogs were not in close

7   proximity to Mr. England. I believe at that time I had

8   that investigator go back to that officer witness and

9   get more information. I believe the CIRT detective was

10   Dana Crone, and the officer was Officer Dungey. I

11   believe Officer Dungey had said that the dogs were

12   running back and forth along the outside of the patio

13   there from north to southeast of the patio. If they

14   were doing that then, in our mind the dogs weren't

15   anywhere close to Mr. England at the time that the shots

16   were fired. At that time we didn't believe he was

17   shooting at the dogs and there had to be a different

18   reason for firing his weapon.

19   **Q.**     **Or could it have been there was no justification**

20   **for firing his weapon?**

21            MR. HALLORAN: Objection.

22   A.     We didn't know at the time. We were still in

23   the beginning stages of the investigation.

24   BY MS. GELSOMINO:

25   **Q.**     **At that point was that even a possibility in**

1   your head?

2   A.      It's always a possibility.  We're always running

3   through everything, but I try not to really jump to a

4   hard conclusion until we have all the facts.

5   **Q.      At that point even though you had been mislead**

6   **by a supervisor you still believed that you would**

7   **develop some justification for that shooting, right?**

8                       MR. HALLORAN:  Objection.

9   A.      No.  First of all, I don't believe that I had

10  any way of knowing that was misled by the supervisor.  I

11  believe that's what the supervisor believed happened at

12  that time.  And also, it's not our responsibility to

13  come up with a justification for the officer.  The

14  officer has to articulate their reason for firing their

15  weapon and it has to match the testimony of the

16  witnesses and the evidence at the scene.  It's not for

17  me to justify the officer's actions.

18  BY MS. GELSOMINO:

19  **Q.      Do you know whether that officer came up with**

20  **that version of events that ended up not being correct?**

21  A.      I do not.

22  **Q.      Did you ever ask?**

23  A.      He was interviewed by detectives, and I believe

24  that's what he told detectives was that he believed he

25  had shot at the dogs.  I'm not positive about that, but

1  I believe that's what he said.  I have no reason to

2  believe that the supervisor not believe that at the time

3  he told me that.

4  Q.      Okay.  But you did not base your conclusion that

5  Abel's actions were legal on the fact that the dogs were

6  there, right?

7  A.      No.  I don't believe the dogs had anything to do

8  with it other than him feeling that if he was pulled

9  over he would be in danger of being attacked by the

10 dogs, but I don't believe he fired at the dogs.

11 Q.      Do you believe it was a reasonable fear for him

12 to think that if he was pulled over he would be in

13 danger from the dogs?

14 A.      Yes, I do.

15 Q.      Do you believe this was an intentional shooting?

16 A.      Yes, I do.

17 Q.      Why?

18 A.      I don't believe it was accidental or

19 unintentional.  I believe he intended to fire his

20 weapon.

21 Q.      Does danger from dogs allow an officer to shoot

22 a person?

23 A.      It can.

24 Q.      When?

25 A.      Well, in this particular instance, Officer Abel

1　articulated that he was in a precarious situation there,

2　that he was being pulled into this area with two

3　pitbulls that he had repeatedly states and other

4　officers had stated were acting very aggressively toward

5　the officers.  So I do believe it was reasonable for him

6　to believe that if he had actually been pulled all the

7　way through that window and landed on the patio that the

8　dogs would attack him and do serious damage to him,

9　which he would be allowed to protect himself by using

10　deadly force.

11　Q.　Because of the threat of the dogs or because of

12　the threat of the person?

13　A.　The threat of the dogs if a person pulled them

14　all the way through.

15　Q.　Did you discuss the possibility of bringing

16　criminal charges against Abel with legal counsel?

17　A.　No.

18　Q.　What was CIRT's conclusion in this case?

19　A.　CIRT's conclusion was that the officer was

20　acting within the scope of his duties and there was

21　insufficient evidence to bring criminal charges.

22　Q.　Was that conclusion ever revisited after FRB

23　issued its findings?

24　A.　No.

25　Q.　Was that conclusion ever revisited after the

1  **chain of command review of this case recommending**

2  **discipline?**

3  A.      No.

4  **Q.      Why not?**

5  A.      Because, again, this was a situation where the

6  officer was acting within the scope of his duties, but

7  had made a poor decision.  It didn't raise to the level

8  of a criminal charge, but it certainly was more looking

9  at from a policy standpoint.

10  **Q.      What made it a poor decision?**

11  A.      I believe it was found out-of-policy because

12  they felt he made an inappropriate decision.  I don't

13  know what that was, but I know it was found

14  out-of-policy.

15  **Q.      Do you believe that he made an inappropriate**

16  **decision?**

17  A.      I'm trying to really think how I'm going to

18  articulate this.  I had a hard time following exactly

19  what Officer Abel was saying he did with the suspect,

20  Mr. England.  It was probably one of the most confusing

21  formal statements that I had taken.  If you've read

22  that, you know it's painful.  I kept going back to him

23  and trying to get him to articulate his actions better.

24  I think that Officer Abel did articulate a reasonable

25  fear of what would happen to him if he was pulled

1    through that window, but as far as the tactics of how

2    they were trying to take control of Mr. England through

3    that locked door and through that tall window, I really

4    felt that those were poor decisions. I did not believe

5    that that was the best way to try and apprehend

6    Mr. England at the time.

7    **Q.     Do you think it was a reasonable way to try to**

8    **apprehend him?**

9                MR. HALLORAN: Objection.

10   A.     I just don't know how they thought it was going

11   to be possible. They were trying to keep control of

12   him. And I think part of it is they didn't want him

13   going back in the house. They knew this guy was

14   dangerous and they wanted to keep control of him, and

15   once somebody had a hand on him they didn't want to give

16   that up. I didn't know how they were going to be

17   successful in actually apprehending him in the manner in

18   which they were going about it.

19   BY MS. GELSOMINO:

20   **Q.     Do you agree that that police officer shouldn't**

21   **create dangerous situations that result in them --**

22   **strike that. Do you agree that police officers should**

23   **not create dangerous situations and then rely upon those**

24   **dangerous situations they created to justify the use of**

25   **deadly force?**

Deposition of Sergeant Eric Pilya · · · · · · Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

| | |
|---|---|
| 1 | · · · · · · · · · MR. HALLORAN:· Objection. |
| 2 | A.· · · · It's not my job to give opinions on that.· My |
| 3 | job is to collect the facts of each individual case.· I |
| 4 | won't speak for the division on that question.· I will |
| 5 | say that the division does everything they can to train |
| 6 | officers to make the right decisions, and sometimes in |
| 7 | the heat of the moment and given the particular |
| 8 | circumstances they're involved with, sometimes they |
| 9 | don't.· That doesn't necessarily mean that the |
| 10 | subsequent officer involved shooting is not legal and/or |
| 11 | in-policy.· It just means that they need some work on |
| 12 | those tactical decisions. |
| 13 | BY MS. GELSOMINO: |
| 14 | Q.· · · · **Making the right tactical decisions is important** |
| 15 | **for a police officer, right?** |
| 16 | A.· · · · Yes. |
| 17 | Q.· · · · **And making incorrect or poor tactical decisions** |
| 18 | **can create dangerous situations, right?** |
| 19 | A.· · · · Yes. |
| 20 | Q.· · · · **And they can be dangerous not just for the** |
| 21 | **people immediately involved in the situation, but also** |
| 22 | **anyone in the immediate vicinity, right?** |
| 23 | A.· · · · Potentially. |
| 24 | Q.· · · · **Officers have a duty to protect the suspects who** |
| 25 | **they're attempting to take into custody, right?** |

Deposition of Sergeant Eric Pilya          Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

```
 1                        MR. HALLORAN:  Objection.
 2   A.      I think they have a duty to use only that force
 3   necessary to effect the arrest.
 4   BY MS. GELSOMINO:
 5   Q.      Police officers have a duty not to use deadly
 6   force unless they're faced with an imminent threat of
 7   death or great bodily harm, right?
 8                        MR. HALLORAN:  Objection.
 9   A.      Based on the facts known to them at the time.
10   BY MS. GELSOMINO:
11   Q.      Would you agree with me that's an important
12   safety rule?
13   A.      Yes.
14   Q.      And, again, not just for the safety of the
15   suspect but also for the police officers and for the
16   community at large, right?
17                        MR. HALLORAN:  Objection.
18   A.      Yes.
19   BY MS. GELSOMINO:
20   Q.      It's dangerous for society to have police
21   officers using deadly force when they're not confronted
22   with an immediate imminent threat of death or great
23   bodily harm, right?
24                        MR. HALLORAN:  Objection.
25   A.      I think that's a generality that can't really
```

Deposition of Sergeant Eric Pilya      Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

1    define every case on its merits.

2    BY MS. GELSOMINO:

3    **Q.    How so?**

4    A.    Well, the officers have policies and guidelines

5    that they are to follow, but each individual case, they

6    have to make split-second decisions based on what

7    they're seeing at that time. The actions that a suspect

8    is taking at that time. And they alone have to make

9    that decision in that split-second to do what they

10    believe is best based on what they know at the time they

11    pull that trigger. So I don't believe -- I know where

12    you're going. I don't believe that officers are

13    intentionally putting themselves in bad tactical

14    decisions. I believe that they're trying to do their

15    job the best they can, and at the time they may have

16    made a decision that wasn't the best decision at the

17    time, but was the best decision that they could come up

18    with at the time.

19    **Q.    The division of police trains officers to make**

20    **split-second decisions, right?**

21    A.    As best they can, yes.

22    **Q.    It's an expectation of police officers that**

23    **they will make split-second decisions every day in their**

24    **job, right?**

25    A.    Yes.

Deposition of Sergeant Eric Pilya          Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

1  Q.      And even the split-second decisions that

2  officers are expected to make every day in their job

3  must be within the law, right?

4  A.      Yes.

5  Q.      Even the split-second decisions that officers

6  make every day in their job still must be in compliance

7  with the policies of the division of police, right?

8  A.      Yes.

9  Q.      When would it be safe for an officer to use

10 deadly force in the absence of an imminent fear of great

11 bodily harm or death?

12                    MR. HALLORAN:  Objection.

13 A.      So the policy says that you can use force in

14 that situation.  I think what you're having a hard or

15 maybe I'm not explaining it right, is the fact that

16 there's a difference between what the officer knew at

17 the time they fired, and later when we find out what

18 actually occurred in the case through the investigation.

19 If they believe it to be an imminent threat even though

20 later we found out that it wasn't, that's what they were

21 thinking, that's what they say their reason for firing

22 was, then, whether it ends up being a threat or not, it

23 was real to them in that moment.

24 BY MS. GELSOMINO:

25 Q.      Regardless of what the subjective intent or

1   belief of the officer at the time is, can you give me

2   any examples of any time where it is safe for a police

3   officer to use deadly force in the absence of an --

4   strike that.

5        Can you think of any time that it would be safe

6   for an officer to use deadly force in the absence of a

7   reasonable fear of imminent death or great bodily harm?

8                 MR. HALLORAN: Objection.

9   A.      No.

10   BY MS. GELSOMINO:

11   Q.      The simple act of resisting arrest does not give

12   rise for the justification of use of deadly force,

13   correct?

14   A.      Usually I would say no.

15   Q.      Are you qualifying that answer somehow?

16   A.      Well, sure. It's impossible for me to answer

17   these with every variable. For instance, you have a

18   female officer that's 5'1 and they're trying to

19   apprehend a violent felon who is 6'4, 300 pounds. They

20   may not have a weapon on them, but if they're violently

21   resisting that officer and that officer feels that

22   they're going to succumb to these injuries, that this

23   person could take their weapon, in that particular case,

24   that officer would be justified in using force. It's an

25   unarmed individual, but they're much bigger.

```
 1            There's different factors to take into account
 2    in all of these.  That officer being smaller in stature
 3    and having the worst end of that fight feels that their
 4    life was in danger, sure.  And that's just resisting
 5    arrest.  The guy doesn't have weapons other than his
 6    hands, fists, feet, but that's resisting.  There are all
 7    kinds of different variables out there that play a role
 8    in these.  You have to take the totality of all the
 9    facts and what the officer knew at the time when you're
10    making these determinations.
11    Q.      In that case though that you just set forth,
12    would it be the resisting, the fact that person was
13    resisting that would lead to the justification for the
14    use of deadly force, or the physical attack on a police
15    officer?
16    A.      It would be the physical attack, but it started
17    out as just resisting.
18    Q.      My question is just the resisting.  In that case
19    if the officer is arresting this giant man and all he's
20    doing is just resisting but he's not physically
21    attacking her, would that give rise --
22    A.      No.  No.  If there's resisting without that
23    element.  If they're just not following commands, that
24    does not justify deadly force, no.
25    Q.      Okay.  Let's move on.  Let's look at this one.
```

1   **The bottom of page ten, PIS 2015-0013.**

2   A.      Okay.

3   **Q.      Are you familiar with this case?**

4   A.      I am.

5   **Q.      And in this case what was the conclusion of**

6   **CIRT?**

7   A.      That the officer was acting within the scope of

8   his duties and there was insufficient evidence that he

9   committed a criminal act.

10   **Q.      Based on what?**

11   A.      The totality of the investigation.

12   **Q.      What specific factors lead to that conclusion by**

13   **CIRT?**

14   A.      So, I'm sure you're aware of the particulars of

15   this case.  While the officer was on another call for

16   service, he was approached by the female saying there

17   was an emergency, please come help.  He went over to the

18   house and the female that approached him, I believe it

19   was her sister had put her hand through the window and

20   was cut very badly.  They called for a squad and the

21   person that approached Officer Thomas was upset that the

22   squad was taking too long to get there.

23         While the officer was speaking to them inside

24   the house there was a dog in the living room that

25   approached the officer.  The officer placed his hand on

```
 1    his weapon and asked the people there to take control of

 2    the dog.  This dog then walked away, did not come at

 3    him.  At the same time another dog came from deeper in

 4    the house, I believe the kitchen area, and charged the

 5    officer.  The officer backed out of the residence,

 6    turned 90 degrees so as not to have the people inside

 7    house in his backdrop, and back pedalled away from the

 8    dog.  The dog kept coming, he pulled his weapon and

 9    fired at the dog, and at the same time a four year old

10    girl from inside the residence had stepped into the line

11    of fire and was shot in the leg.

12    Q.      What was the basis of the officer's fear of

13    immediate physical harm or death?

14                    MR. HALLORAN:  Objection.

15    A.      An aggressive dog attacking him.

16    BY MS. GELSOMINO:

17    Q.      I'm sorry.  Did you say the dog bit him?

18    A.      Was attacking him.

19    Q.      How was he attacking him?

20    A.      Chasing him aggressively coming toward him.  He

21    had even turned and went out onto the front porch and

22    the dog continued to pursue him.

23    Q.      Did the dog come outside of the house?

24    A.      Yes.

25    Q.      Was the dog shot outside of the house?
```

```
 1   A.       Yes.

 2   Q.       Was the girl shot outside of the house?

 3   A.       The girl was shot in the doorway to the

 4   residence.

 5   Q.       How far outside of the house was the dog at the

 6   time that the officer shot?

 7   A.       The dog was outside the house and had made the

 8   same turn as the officer, and was on front of the patio

 9   area of the house.

10   Q.       Did any other officer shoot?

11   A.       He was the only officer there at the time.

12   Q.       Do you know whether there was ever any finding

13   that this was a shooting that was outside of policy?

14   A.       Yes.  I believe there was.

15   Q.       Was that overturned?

16   A.       It was in arbitration.

17   Q.       Do you know why it was originally found to be in

18   violation of policy?

19   A.       No, I don't.

20   Q.       How often do disciplinary determinations get

21   overturned by arbitration?

22                    MR. HALLORAN:  Objection.

23   A.       I wouldn't know.

24   BY MS. GELSOMINO:

25   Q.       Are you aware that the City of Columbus settled
```

1  this case with the four year old who was shot?

2  A.      I believe they paid the family money, yes.

3  Q.      Do you agree with that decision?

4  A.      Personally, or speaking for the division?

5  Q.      Speaking for the division.

6  A.      Yes.

7  Q.      How about personally?

8  A.      Yes.  But I qualify that.  I believe that the

9  Columbus Division of Police -- a personnel from the

10 division of police shot a four year old child.  Should

11 we pay the family money for that, absolutely.  Does that

12 mean that the officer did anything wrong, I do not

13 believe those two equate.  I do not think the officer

14 did anything wrong in this case

15 Q.      All right.  Then PIS 2015-0016 is the shooting

16 of Deaunte Bell-McGrew.  You reviewed the CIRT also so

17 you're familiar with the facts of this case, right?

18 A.      Yes.

19 Q.      This was a deadly shooting, so did CIRT come to

20 any conclusions?

21 A.      CIRT did not.  This case was turned over to the

22 prosecutor's office and a Grand Jury.

23 Q.      What was the position of CIRT at the conclusion

24 of the investigation?

25 A.      We agreed with the Grand Jury's decision.

1   Q.      What factors did you rely upon in your agreement
2   with the Grand Jury's decision?

3   A.      Well, Officer Narewski was in conversation with
4   Mr. Bell. He recognized Mr. Bell from previous contacts
5   in the area. What made them very suspicious that
6   Mr. Bell was armed was he kept reaching down in between
7   his legs in the vehicle. He was told repeatedly to stop
8   doing that, and those are things that the officers pick
9   up on that made them suspicious that he may be armed.
10   When Narewski was approaching him and opened the door --
11   I can't really recall whether at that moment in time he
12   reached towards his waistband or reached back down, but
13   Narewski felt he may been armed and he grabbed ahold of
14   his left arm. At the time the suspect turned to his
15   right, Officer Baase saw the gun, yelled "gun" to his
16   partner, Narewski. Narewski now knew that the suspect
17   was going for the gun, so he tried to get control of the
18   suspect's right arm so he couldn't get the gun. They
19   wrestled inside the vehicle. At no time could Narewski
20   actually get ahold of the right hand.

21      The gun was in the right side pocket of the
22   suspect's hoodie. Officer Baase fired one round through
23   the window of the vehicle, hoping to strike the suspect
24   before the suspect could access the weapon and shoot his
25   partner. At the time Narewski had backed out, the

1  suspect still had the gun in his pocket.  The suspect

2  came out towards the opening of the vehicle and

3  believing that -- I think he turned on Officer Narewski,

4  too.  Believing that he was about to shoot Officer

5  Narewski fired and killed the suspect.

6  Q.     **Was there any difference between the version of**

7  **the events told by the different officers in this case?**

8  A.     I'm trying to recall the specific details of

9  this.  I don't know that there were any glaring

10  differences in this case, especially where the suspect

11  was concerned.  One of the front passengers claimed to

12  be asleep, and both officers said that the individual

13  was awake the whole time.  That I recall.

14  Q.     **Did that have any input in your investigation or**

15  **your conclusions of CIRT?**

16  A.     In regard to the suspect's testimony?

17  Q.     **In regard to anything.**

18  A.     I mean, the front seat passenger's testimony?

19  Q.     **Did the front seat passenger's testimony or the**

20  **fact that you just noted that he claimed to be asleep**

21  **and other people claimed that he was awake, did that**

22  **impact the position of CIRT at all?**

23  A.     No.  He claimed to be asleep and didn't see

24  anything until it was over, so he didn't impact the

25  investigation one way or other.

Deposition of Sergeant Eric Pilya                Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

1    Q.       There's no allegation that Deaunte Bell-McGrew

2    ever had a gun in his hand, right?

3    A.       Is there any allegation that he ever had the gun

4    in his hands?  No.  The officers couldn't say that for

5    sure.

6    Q.       Did you ever have any conversation with anyone

7    in FRB or the chain of command regarding Deaunte

8    Bell-McGrew?

9    A.       Regarding Bell?

10   Q.       Regarding this case.  Yeah.

11   A.       Not that I recall.

12   Q.       Did you ever speak to the prosecutor about it,

13   anyone in the prosecutor's office?

14   A.       I don't believe I had any conversation with the

15   prosecutor's office.

16   Q.       Okay.  So in the case of Deaunte Bell-McGrew the

17   officers could not say that Deaunte was ever holding the

18   gun, right?  You just said that.

19   A.       Correct.

20   Q.       So he was shot by both officers in that case

21   because they believed that he may at some point in the

22   future have a gun in his hand, right?

23                     MR. HALLORAN:  Objection.

24   A.       I think, according to both officers, the fact

25   that he was actively resisting them and had a gun in his

1  pocket made it a very dangerous situation for them and

2  they were in fear for their lives.

3  BY MS. GELSOMINO:

4  **Q.        At the time that Narewski shot Deaunte**

5  **Bell-McGrew, was he actively resisting in any way?**

6  A.        I don't believe technically he was resisting.

7  He had been resisting immediately prior to that.  The

8  fact that Baase had shot out the window, the glass went

9  flying, and Narewski believed that either the suspect or

10  Baase had shot and he backed out of the vehicle.  The

11  suspect came out of the vehicle as well.  It was

12  something that happened really fast.  He wasn't hands-on

13  with the officer at the time, but the officer also

14  didn't have control of his hands so he could easily

15  access the weapon.

16  **Q.        The officer was some distance away from Deaunte**

17  **Bell-McGrew at the time that he shot Deaunte, right?**

18  A.        Yes, he was.

19  **Q.        And at the time that he shot Deaunte, Deaunte**

20  **was not resisting?**

21                    MR. HALLORAN:  Objection.

22  A.        At the precise moment that he pulled the trigger

23  there was no physical contact between Mr. Bell and

24  Officer Narewski.

25  BY MS. GELSOMINO:

Deposition of Sergeant Eric Pilya                    Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

1    Q.        There was no resisting whatsoever happening at

2    the time that Narewski shot Bell-McGrew, right?

3                   MR. HALLORAN:  Objection.

4    A.        I think Bell was resisting pretty much

5    throughout this engagement.  The fact that they'd broken

6    off from each other at that particular point doesn't

7    negate the immediately previous resisting.

8    BY MS. GELSOMINO:

9    Q.        So immediately previously to the time that

10   Narewski shot him, it's your position that Bell was

11   resisting, correct?

12   A.        Correct.

13   Q.        At the time that Narewski shot him, Bell was not

14   resisting, right?

15   A.        Well, it depends on your definition of

16   resisting.  He wasn't giving up.  He didn't have his

17   hands in the air or getting down on the ground.  He was

18   still in effect resisting his own arrest.

19   Q.        Bell-McGrew was shot as he was exiting the

20   vehicle, right?

21   A.        He was where the door meets the frame of the

22   vehicle.  He was halfway in, and halfway out of the car.

23   That's my understanding.

24   Q.        Was he in the process of getting out of the car?

25   A.        My understanding, yes.

1    Q.      Okay.  And do you know whether or not he was in

2    the process of getting out of the car to surrender to

3    the police?

4    A.      I do not know that, but he did not do that, so I

5    don't know.

6    Q.      Well, you don't know whether or not he did that

7    because he was shot by Narewski.

8    A.      Well, he did turn.  I believe the officer said

9    that he did turn to his right and that's when he fired

10   upon him, so he was turning towards the officer and he

11   was armed, so that wasn't really an action of giving up.

12   Q.      Well, so is it your position then, that when an

13   individual turns toward an officer and may potentially

14   be armed that officer would be acting both within policy

15   and not --

16   A.      If the officer believed that the suspect was

17   going to fire upon him, as Narewski said, then yes.

18   Q.      Narewski's basis for stating that he believed

19   that Bell-McGrew could potentially fire on him was based

20   on speculation, correct?

21                    MR. HALLORAN:  Objection.

22   A.      I don't think it was speculation that Mr. Bell

23   had a firearm on his person.  That was fact.

24   BY MS. GELSOMINO:

25   Q.      At the time that Narewski pulled the trigger and

1  **shot Bell-McGrew, he had never seen a gun on Bell-McGrew**

2  **anywhere, right?**

3  A.    I don't recall specifically Narewski.  I know

4  Baase had seen the gun in his pocket and told Narewski

5  that he had a gun, but I don't recall if he ever

6  mentioned seeing him with a weapon, no.

7  **Q.    So Bell-McGrew was shot as he was getting out of**

8  **the vehicle without any weapon in his hands, right?**

9  A.    Correct.

10  **Q.    Any alleged fear of death or great bodily harm**

11  **would have been based on fear of something that**

12  **Bell-McGrew may do, right?**

13  A.    Yes.

14                MR. HALLORAN:  Objection.

15  BY MS. GELSOMINO:

16  **Q.    Is it the position of the division of police**

17  **that possession of a firearm will justify use of deadly**

18  **force, possession on a person's body of a firearm?**

19  A.    Mere possession, no.

20  **Q.    And so, as you've articulated at this point, the**

21  **position of CIRT at the end of the investigation was**

22  **based on Narewski's articulation of fear based on what**

23  **Bell-McGrew may have done, but didn't actually do,**

24  **right?**

25  A.    Well, I didn't say that he didn't actually do.

```
 1   It was based on what both officers were saying that

 2   Bell's actions were.

 3   Q.      Were the conclusions of CIRT at the end of the

 4   investigation based on Narewski's and Baase's

 5   articulation of what Bell-McGrew may have done in the

 6   future?

 7   A.      It was based on what those officers articulated

 8   they believed at the time they pulled the trigger.

 9   Q.      I want to talk specifically about Narewski.

10   What Narewski believed at the time was that Bell-McGrew

11   may take actions in the future which could put him in

12   harm's way?

13                     MR. HALLORAN:  Objection.

14   A.      Yes.

15   BY MS. GELSOMINO:

16   Q.      Okay.  Now we're looking at 2016.  2015 would

17   have been Exhibit 6, and Exhibit 7 is 2016.

18                     - - - -

19       (Thereupon, Plaintiff's Exhibit 7 was marked for

20                     identification.)

21                     - - - -

22   BY MS. GELSOMINO:

23   Q.      See how many I'm not asking you about?

24   A.      Thank you.

25   Q.      You're welcome.  Are these your red lines in
```

1    here?

2    A.        Yes.   I didn't save the changes.

3    Q.        Look at PIS 2016-0014.   Do you recall this case?

4    A.        I do recall being out there that night, but I

5    don't recall the specifics of the investigation.

6    Q.        What were the CIRT findings in this case?

7    A.        It appears that we found the sergeant to be

8    acting within the scope of his duties and insufficient

9    evidence that he committed a crime.   We also found that

10   the suspect, the civilian suspect, once identified, that

11   he committed the aggravated robbery of the gas station.

12   Q.        In this case the sergeant fired his shotgun at

13   the robbery suspect as he was leaving the gas station,

14   right?

15   A.        He did fire a shotgun, but I don't remember the

16   particulars of where the suspect was or what the suspect

17   was doing when he fired the shotgun.

18   Q.        Was there ever any allegation that the suspect

19   was presenting an actual threat of bodily harm or death

20   to the officer at the time that he was shot?

21   A.        I don't recall.   I don't remember what the

22   officer said at the time.   I know that the suspect had

23   been committing these robberies and that he was armed

24   and exiting the store.   He had a duffle bag, I remember

25   that, but I don't recall what the sergeant said the

1  suspect's actions were or what we determined the

2  suspect's actions to have been during the shooting.  I

3  don't recall that.

4  **Q.      Okay.**

5  A.      I do believe we had video in that one to refer

6  to as well, but I don't recall.

7  **Q.      All right.  Let's talk about Tyree King.  You**

8  **reviewed the CIRT package before you came here, right,**

9  **so you're familiar?**

10 A.      I did.

11 **Q.      I understand this was a fatal shooting, so**

12 **again, this was presented to the Grand Jury, right?**

13 A.      It was, yes.

14 **Q.      What was the position of CIRT at the conclusion**

15 **of this investigation?**

16 A.      Well, again, as I said, we don't make

17 conclusions in these situations.  We refer them to the

18 prosecutor, who refers them to the Grand Jury.  The

19 Grand Jury found there not to be a crime committed by

20 the officer, and I would say we agreed with that.

21 **Q.      Did you ever write down the position of the CIRT**

22 **team at any point or your position?**

23 A.      I don't believe so, no.  It being fatal we don't

24 put that determination in the investigation.  I don't

25 believe so.

1  Q.      Okay.  Why do you agree with the Grand Jury's

2  finding in this case?

3  A.      I believe that Tyree King and other individuals

4  had just committed an armed robbery and they were

5  fleeing from the police out of that crime.  At the time

6  that the officer fired his weapon he had seen a gun

7  tucked into the waistband, what he believed to be the

8  handle of a gun, tucked into the waistband of Tyree

9  King, and according to the officer, Tyree King had

10  attempted to pull that out two or three times jerking at

11  it, and when it came out he saw it had a laser sight on

12  it, one of the things he noticed about the gun.  He

13  believed it to be a real gun and that his life was in

14  danger, and he fired upon Tyree King striking him and

15  killing him.  It was later discovered that the gun was

16  actually a pellet gun even though it looked like a real

17  gun.

18  A.      If there were witness statements that said Tyree

19  King never actually pulled the gun out would that have

20  changed the position of CIRT.

21                    MR. HALLORAN:  Objection.

22  A.      If there were witness statements that Tyree King

23  never attempted to pull the gun and following officer

24  commands, then, yes, it would have.

25  BY MS. GELSOMINO:

1  Q.      If Tyree King had not actually pulled the toy

2  gun out of his waistband, but was still not complying

3  with officer's orders to stop running, would that have

4  justified the officer's use of deadly force?

5                    MR. HALLORAN:  Objection.

6  A.      No.

7  BY MS. GELSOMINO:

8  Q.      In your CIRT investigation into the shooting of

9  Tyree King, was the background with previous uses of

10 force by Mason considered?

11 A.      We were aware of the previous incidents of

12 deadly force by Mason, yes.  It did not affect our

13 decision-making in this particular incident, no.

14 Q.      Why not?

15 A.      Because we were acting on the merits of this

16 particular case and what occurred during this incident.

17 We were collecting the facts on this particular case.

18 Q.      Do you think that the fact that an officer has

19 previously used deadly force and, in fact, had been

20 involved in fatal shootings could impact the

21 determination about whether or not it was reasonable for

22 him to believe that he may have faced an imminent fear

23 of death or great bodily harm?

24                    MR. HALLORAN:  Objection.

25 A.      I do believe that could play a role in that, and

 1   that's why during our interviews we ask them that.

 2   That's one of the final questions that I go over with

 3   officers, have you been involved in a police involved

 4   shooting in the past, and did that previous incident

 5   affect you in any way in your decision making in this

 6   PIS?  I don't recall off the top of my head how he

 7   responded to that.

 8   BY MS. GELSOMINO:

 9   Q.      How many times have you interviewed police

10   officers in a police involved shooting who had

11   previously -- who had been involved in other uses of

12   deadly force?

13   A.      Numerous times.  I couldn't tell you

14   specifically the number, but numerous times.

15   Q.      How many times have you interviewed or has CIRT

16   investigated a fatal use of deadly force by an officer

17   who had previous uses of fatal deadly force?

18   A.      Again, I couldn't give you a specific number,

19   but we have had those investigations in the past.

20   Q.      How many officers in the division of police do

21   you think have been involved in more than one fatal use

22   of deadly force?

23   A.      Multiple officers.  I wouldn't want to guess.  I

24   don't know how many, but there's multiple officers that

25   have been involved in those situations.

1    Q.       More than five officers who have killed more

2    than one person in the line of duty?

3    A.       Probably.

4    Q.       More than ten?

5    A.       I don't know specifically.

6    Q.       Can you name any other officer aside from Mason

7    who has killed more than one civilian?

8    A.       I believe there are a few.  I believe Dave

9    Sibner is one.  Possibly Chuck Distlehorst.  Possibly

10   Howard Brenner.  Brian Mason.  I'm sure there are more,

11   but I don't know right off the top of my head.

12   Q.       Are all of those officers that you just named

13   still working as police officers within the Division of

14   Police in Columbus?

15   A.       Yeah.  I believe so.

16   Q.       Have any of them been disciplined for their

17   multiple uses of deadly force?

18   A.       I don't believe so, no.

19   Q.       In the case of the shooting of Tyree King, did

20   CIRT investigate the racial slurs that were alleged in

21   this case?

22   A.       We did.

23   Q.       How?

24   A.       I know that we reinterviewed Demetrius Braxton.

25   We also gave Demetrius a polygraph out of this case.  I

 1    don't remember the specific details.

 2    Q.        Why did you give Demetrius a polygraph?

 3    A.        We didn't find him to be credible.  I can't

 4    think of any other reason we'd give him a polygraph.

 5    Q.        Why did you find him to be less than credible?

 6    A.        I think his stories changed.  As I said, I'm not

 7    really sure specifically what those were.

 8    Q.        Did you give any of the officers polygraphs?

 9    A.        No.

10    Q.        How often has CIRT given polygraphs to civilian

11    witnesses in other cases?

12    A.        CIRT, I don't believe we've ever given a

13    polygraph to any civilian witness.  On homicide we do

14    that all the time, but in CIRT I don't believe we have.

15    Q.        The only person that CIRT has ever given a

16    polygraph to is Demetrius Braxton?

17    A.        I think so, yes.

18    Q.        But you can't articulate why you did that?

19    A.        I don't recall the specifics, no.  I think that

20    it was because he was the only person that was pretty

21    much not saying what everyone else was saying out there,

22    and we wanted to find out whether he was telling us the

23    truth or not.

24    Q.        Did you trust the results of the polygraph?

25    A.        Well, I think the polygraph is a useful tool.  I

1   don't know that I believe in it 100 percent, no.

2   Q.      In this case did you believe it?

3   A.      I believe that in this case he showed signs of

4   deception, and I think we thought that going in.  Often

5   times we use a polygraph to try and see the person's

6   reaction when they agree to take the polygraph, and then

7   we reinterview them after the polygraph has shown signs

8   of deception, or whatever, to see if they will give us

9   more information, but I don't specifically remember what

10  the details were with that.

11  Q.      Did that happen in this case with Demetrius

12  Braxton?

13  A.      I do believe so.  I believe he was interviewed

14  after as well, but I don't recall what he said.

15  Q.      Before you administered the polygraph to

16  Demetrius Braxton, had you already determined that he

17  was being untruthful?

18  A.      I think the detectives were leaning that way,

19  yes.

20  Q.      And is that because he was telling a story that

21  was different than the officers' stories?

22  A.      I believe so, yes.

23  Q.      Okay.  What was done to investigate the racial

24  slur allegations?

25  A.      I don't specifically recall.

1    Q.      Okay.  Has CIRT team ever investigated officers

2    for bias or racial discrimination?

3    A.      No.  That's not really part of our process.

4    That would fall more under the purview of the chain of

5    command or Internal Affairs.

6    Q.      Okay.  You previously discussed in this

7    deposition the importance of considering whether or not

8    the officer had malicious intent at the time of the

9    shooting, right?

10   A.      Yes.

11   Q.      Do you agree that the use of a racial slur at or

12   around the time of the use of deadly force could

13   indicate potential malicious intent?

14   A.      Possibly.

15   Q.      Okay.  Do you believe it would ever be

16   appropriate for an officer to use a racial slur in the

17   scope of his duties?

18   A.      No.

19   Q.      It should be concerning to you if there was an

20   allegation that an officer used a racial slur right at

21   the time that he shot and killed a boy, right?

22   A.      Yes.

23   Q.      So did CIRT do anything to follow-up on that

24   allegation?

25   A.      I don't really recall.  I recall there was an

1  allegation of a racial slur, but I don't recall what we

2  did to investigate that or if we passed that onto

3  Internal Affairs.  I don't recall.

4  **Q.      Who was the lead detective in the investigation?**

5  A.      William Gillet.

6  **Q.      Were all of the interviews on video in the Tyree**

7  **King case?**

8  A.      I'm sure they were not.  They should all be on

9  audio, but not necessarily on video.

10  **Q.      But they were recorded?**

11  A.      Yes.

12  **Q.      Was the interview of Demetrius Braxton after the**

13  **polygraph recorded?**

14  A.      It should have been at least audio recorded.  I

15  don't know if it was additionally video recorded or not.

16  **Q.      And it would not have been appropriate to**

17  **conduct that interview after the polygraph and not**

18  **record it, right?**

19  A.      Right.  All of our interviews are supposed to be

20  recorded.

21  **Q.      And that's pursuant to the policies and**

22  **practices of the division?**

23  A.      Yes.

24  **Q.      It would not be consistent with the policies or**

25  **practices of the division to cutoff a video or otherwise**

1  alter it, right?

2  A.      Correct.

3  Q.      Or a recording?

4  A.      Well, the audio recordings are a little bit

5  different.  We have very old tape recorders and we do

6  often have malfunctions, but if there's a malfunction

7  that should be included in the summary.

8  Q.      It should be indicated in the summary?

9  A.      Yes.

10  Q.      Because to cutoff a recording or somehow alter a

11  recording would not be consistent with the policies or

12  practices within the division of police, right?

13  A.      Correct.

14  Q.      And it would be wrong, right?

15  A.      Correct.

16  Q.      Mason testified that he did not complete his own

17  use of force report after the shooting of Tyree King

18  even though he should have per division policy.  Do you

19  know why not?

20  A.      His own use of force report?

21  Q.      Yes?

22  A.      No officers fill out their own use of force

23  report pursuant to division policy in a fatal shooting.

24  I complete that for the officers.

25  Q.      Okay.  Did CIRT consider any other factors that

1  **you haven't yet told me about which would have led you**

2  **to the conclusion that Mason did not act criminally?**

3  A.      We had a nun as a witness.  I'm sorry.  I just

4  always wanted to say that.  It never happens.  We did

5  have eyewitnesses and they corroborated the officer's

6  statements.

7  **Q.      Anything else?**

8  A.      I'm not sure, but I don't believe so.

9  **Q.      How did the nun corroborate Mason's statements**

10  **about the justification for that shooting?**

11  A.      I'm sorry.

12  **Q.      How did the nun corroborate Mason's statement?**

13  A.      Basically she just said that she saw the

14  officers chasing two individuals, and I'm paraphrasing,

15  but the gist was that she saw two individuals running

16  from police officers and they ran towards an officer and

17  that she saw the officer fire.  The corroboration was

18  more or less the placement of the officer and Tyree

19  King.  She was not in a position -- there was a car

20  between her and Tyree King, so she was not in a position

21  to see him attempting to draw the weapon, but she did

22  place them where the officer said they were located.

23  And she said that the officer fired and that the boy

24  went down, and she was under the impression, I believe,

25  she said she was under the impression that he was being

Deposition of Sergeant Eric Pilya          Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

1    Tased.   She thought he was sleeping.

2    **Q.       She never saw a gun?**

3    A.       She did not see a gun, no.

4    **Q.       At the top of this page here it says that the**

5    **status of the Tyree King case is exceptionally cleared.**

6    A.       Correct.

7    **Q.       Why does it say that?**

8    A.       As I discussed earlier, that's a report

9    classification.  So once the Franklin County Grand Jury

10   issues a no bill in that the premier one report is

11   exceptionally cleared.

12   **Q.       Okay.  Look at this case here, the shooting of**

13   **Jacquerious Robinson.  What was the CIRT finding?**

14   A.       That the officers acted within the scope of

15   their duties and there was insufficient evidence to

16   prove that they committed a crime.

17   **Q.       Was the suspect armed at the time that he was**

18   **shot?**

19   A.       I believe so.  It says, "ran from police and had

20   a handgun on his person."  I believe that means he was

21   armed at the time.

22   **Q.       What were the allegations that the officers**

23   **faced an imminent fear at the time?**

24   A.       I don't recall specifically.  I think the

25   suspect turned toward them with the firearm, but I don't

1   recall specifically. I'd have to review the case.

2   **Q.**      **Okay. I only have your red line version here.**

3   **I'll share this with you. Has this been updated at all?**

4   A.      Probably not.

5   **Q.**      **The red lines are correct, right?**

6   A.      Yeah. That's probably just, it's still on

7   tracking changes from previously.

8   **Q.**      **In this case on page four, which is 2018-003,**

9   **what was the conclusion of CIRT?**

10   A.      That the officers were acting within the scope

11   of their duties, and there was insufficient evidence

12   that they committed a crime.

13   **Q.**      **In this case the individual was shot as he began**

14   **to draw a handgun. Is that true?**

15   A.      I believe that's what the officers said, yes.

16   **Q.**      **Do you know whether he had a handgun in his hand**

17   **at the time that he was shot?**

18   A.      I do not recall. What I remember best about

19   that case is that it was an incredibly bad snow storm

20   that night, and I do remember that his girlfriend was in

21   the car with him at the time of the incident, but I

22   don't remember specifically if he had the gun in his

23   hand after the shooting.

24   **Q.**      **All right. Take a look at this one, 2018-0013.**

25   **In this case what were the conclusions of CIRT?**

1  A.     I don't recall this incident at all.  I may not

2  have been on this one.  I just have no recollection of

3  this case.

4  Q.     Okay.  Take a look at this one 2017-0014?

5  A.     Okay.

6  Q.     What were the conclusions of CIRT in this case?

7  A.     I believe the conclusions were that the officers

8  were acting within the scope of their duties, and there

9  was insufficient evidence to charge them criminally.  I

10 don't believe this has gone through the Firearms Review

11 Board yet.

12 Q.     What is this charge here, RSP auto?  What does

13 that mean?

14 A.     Receiving stolen property.  A car was stolen.

15 Q.     Were there any allegations that this individual

16 was armed at the time that he was shot?

17 A.     I don't recall.  If I remember correctly, the

18 officers -- the one officer believed that the suspect

19 was trying to hit them with his vehicle, and the other

20 officer believed that the suspect had run over the other

21 officer and that was his reason for firing.  If I'm

22 remembering that correctly.

23               MS. GELSOMINO:  I'm going to mark that

24 one as Exhibit 9.  And I have a quick question about

25 2017 so I'm going to mark that as 8, so we're in

Deposition of Sergeant Eric Pilya        Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

```
 1   order.
 2                          - - - -
 3      (Thereupon, Plaintiff's Exhibits 8 & 9 were marked for
 4                       identification.)
 5                          - - - -
 6   BY MS. GELSOMINO:
 7   Q.      So on this one, page four of 2017, it's PIS
 8   2017-0003.  Take a look at that one, please.
 9   A.      Okay.
10   Q.      What's the position of CIRT about this one?
11   A.      That the officer was acting within the scope of
12   her duties as a law enforcement officer, and there's
13   insufficient evidence that she committed a crime.
14   Q.      And in this case the suspect pointed a gun at
15   himself, correct?
16   A.      Yes.
17   Q.      Is that a basis for an officer using deadly
18   force?
19   A.      It can be.
20   Q.      When?
21   A.      Well, I don't specifically remember the formal
22   statement of Officer Wilkenson, but I do know that
23   officers in the training academy and DTU, everyone of
24   them is trained that if a suspect is suicidal they're
25   also homicidal, and there's also a split-second from
```

1   here to here.

2   **Q.      For the record you're indicating --**

3   A.      From the temple to the officer.  I don't

4   remember specifically her formal statement, but that's

5   what I would imagine.

6   **Q.      Is it the position of the department that it**

7   **would be appropriate for an officer to shoot a suicidal**

8   **suspect who was threatening themselves, only themselves?**

9   A.      If they were only threatening themselves and

10  there was zero chance of them turning the gun on the

11  officer, for example, if the officer was behind a

12  significant cover or something of that nature, then no,

13  they would not be justified in shooting them at that

14  point.  Only if they were a danger to the officer or

15  someone else.

16  **Q.      So in this case that we're looking at with Keith**

17  **Marshal who was pointing a gun at only himself, how**

18  **could the officer have been justified in shooting at him**

19  **at that point?**

20  A.      I don't recall what her justification was.  I'd

21  have to read her formal statement to be able to answer

22  your question.

23  **Q.      Do you agree that if she shot him just because**

24  **he was pointing the gun at himself and no one else, and**

25  **there was no other threat that he created at the time,**

1  then that shooting would have been excessive, right?

2                    MR. HALLORAN:  Objection.

3  A.       Probably, yes.  That's why I'm saying, I don't

4  recall what threat she articulated.

5  BY MS. GELSOMINO:

6  Q.       How many uses of deadly force have there been

7  within the division since 2009?

8  A.       Since 2009, I don't know a specific number.  I

9  know we range in anywhere from 13 to 26 a year.  Not all

10  of those are firearms.  Some are death in custodies,

11  some are foreign agencies and things of nature.  As far

12  as the actual shots fired it would be less than the

13  overall total.  We've pulled the numbers before, but I

14  don't know offhand specifically.

15  Q.       Okay.  Within all of those cases within the

16  division since 2009 that an officer has used deadly

17  force, how many of those officers have been disciplined?

18  A.       I have no idea.

19  Q.       Since 2009, how many officers who used deadly

20  force have been charged criminally?

21  A.       One.

22  Q.       Since 2009, how many times has a use of deadly

23  force been determined to be outside of policy?

24  A.       I don't know.

25  Q.       Since 2009, how many officers that have used

1   deadly force have been suspended?

2   A.     I don't know.

3   Q.     Since 2009, how many officers who have used

4   deadly force have been terminated?

5   A.     Terminated, I don't believe any.

6   Q.     Have you ever -- excuse me.

7   A.     I'm not positive of that.

8   Q.     Okay.  You can't think of any officer who was

9   terminated as a result of deadly force?

10   A.     I don't believe so, no.

11   Q.     Have you ever observed an officer use what you

12   believe to be excessive force within the Division of

13   Police in Columbus?

14   A.     Have I ever observed anyone use excessive force?

15   I don't believe so, no.

16   Q.     Have you ever heard of an officer using force

17   that you believed to be excessive?

18   A.     Yes.

19   Q.     Tell me about that.

20   A.     I can't specifically recall which cases, but I

21   know that there have been incidents where officers have

22   been accused of that, and when I heard the particulars I

23   agreed, but I can't tell you specifically what case that

24   would be.

25   Q.     Okay.  Have you ever made any kind of finding at

1   any point in your career as a supervisor that any of

2   your subordinates used force that you deemed to be

3   excessive?

4   A.      I don't recall.  And I don't want to say no,

5   because I may have, but I don't really remember.  It

6   would have been a long long time ago when I was on

7   patrol, not in homicide.

8   Q.      Okay.  Have you ever raised any concerns about

9   any of your subordinates' uses of force within your

10  chain of command?

11  A.      I don't believe so.

12  Q.      Have any of your subordinates or anyone in your

13  department come to you to say they believe another

14  officer used force that was excessive?

15  A.      I was involved in one investigation as a patrol

16  officer where there was a use of force, and one of the

17  officers involved had notified supervision that they

18  believed it to be excessive and there was an

19  investigation, chain of command investigation, that

20  ended up going to a civil service hearing, and that

21  officer was disciplined.

22  Q.      The officer who used the force or the officer

23  who made the complaint?

24  A.      The officer who used the force was disciplined.

25  Q.      What happened to the officer who made the

1 complaint?

2 A.   Nothing.

3 Q.   So, in all of your years as an officer within

4 the Columbus Division of Police, is that the only time

5 that you could think of that an officer raised a concern

6 about the level of force used by another officer?

7 A.   That I was specifically involved in, yes.

8 Q.   What about like just things that you've heard

9 about that you weren't specifically involved?

10 A.   I really don't recall.

11 Q.   Can't think of any other times?

12 A.   I'm sure there have been, but I can't recall

13 them.

14 Q.   Has the department ever found an officer's use

15 of deadly force to be unnecessary?

16 A.   Unnecessary.  I don't know that those are

17 parameters that we use.  I can say that I do not

18 believe, at least since 2009, that any officer has been

19 charged criminally for a use of deadly force other than

20 Detective Mitchell.  As far as being ruled

21 out-of-policy, I'm sure there's plenty of those that

22 shootings have been ruled out-of-policy by the division

23 and discipline issued.  As far as unnecessary, I'm not

24 sure that we use those parameters.

25 Q.   Okay.  Has the Columbus Division of Police ever

Deposition of Sergeant Eric Pilya                    Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

1    **found an officer's use of deadly force to be excessive?**

2    A.        I'm not sure of the answer to that.  I don't

3    know if that's been the case, other than the one I can

4    refer to is Detective Mitchell.  Other than that I'm not

5    sure.

6    **Q.        Has the Columbus Division of Police ever found**

7    **an officer's use of force to be unjustified?**

8    A.        Use of force to be unjustified.

9    **Q.        Deadly force.  Let me ask that question again.**

10   **Has the Columbus Division of Police ever found an**

11   **officer's use of deadly force to be unjustified?**

12   A.        Other than Detective Mitchell, I can't recall

13   any.

14   **Q.        Okay.  Have you ever reviewed a case in which**

15   **you found the officer's use of deadly force to be**

16   **unnecessary?**

17                        MR. HALLORAN:  Objection.

18   A.        I don't make that determination.  As far as CIRT

19   is concerned, we're doing a criminal investigation and

20   we're determining whether we believe the officer

21   committed a crime or not.

22   BY MS. GELSOMINO:

23   **Q.        Have you ever come to your conclusion that any**

24   **officer's use of deadly force that you've reviewed is**

25   **unnecessary?**

```
 1              MR. HALLORAN:  Objection.
 2   A.      Deadly force unnecessary, I would have to say
 3   no.
 4   BY MS. GELSOMINO:
 5   Q.      Okay.  Have you ever reviewed an officer's use
 6   of deadly force with division of police and found that
 7   use of deadly force to be excessive?
 8   A.      No.
 9   Q.      Have you ever reviewed a use of deadly force
10   within the Columbus Division of Police and found that
11   use of force to be unjustified?
12   A.      No.
13   Q.      All of the policies, procedures and practices
14   and customs that we talked about today, they all applied
15   at the time of the shooting death and the investigation
16   into the shooting death of Tyree king, correct?
17   A.      Yes.
18   Q.      All of the policies, procedures, practices and
19   customs that we talked about all applied at the time of
20   the shooting death and the investigation of the shooting
21   death of Deaunte Bell-McGrew, correct?
22   A.      Yes.
23   Q.      And all of the policies, practices and
24   procedures and customs that we talked about today
25   applied at the time of the shooting of James England and
```

 1   the investigation of the shooting of James England,

 2   correct?

 3   A.      Yes.

 4   Q.      And all the policies, practices, procedures and

 5   customs that we talked about today also applied at the

 6   time of the investigations of all of the other shootings

 7   on the spreadsheets that you have created with CIRT,

 8   correct?

 9                   MR. HALLORAN:  Objection.

10   A.      I believe so.  The CIRT manual was revised in

11   December of 2013.  So you showed some from '11 and '12,

12   and some of those may not have applied at the time, but

13   from December 19th of 2013 forward I would say, yes.

14   BY MS. GELSOMINO:

15   Q.      Okay.  What were the changes in 2014?

16   A.      I don't really recall.  I'm sure research and

17   development keeps copies of the previous versions.

18   Q.      Okay.  Was there any real substantive change of

19   the customs and practices of how the investigations were

20   completed?

21   A.      Not really.  I think they more put it in writing

22   where it was not in writing before, if that makes sense.

23   Q.      Okay.  For all intents and purposes, the

24   procedures and policies didn't change, they were just

25   memorialized?

Deposition of Sergeant Eric Pilya                    Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

1    A.        Correct.

2                     MS. GELSOMINO:  All right.  I'm done.

3    Thank you very much.

4    A.        Thank you.

5                     MS. GELSOMINO:  I appreciate it.

6                     MR. HALLORAN:  We'll read.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                 C E R T I F I C A T E

 2   STATE OF OHIO,              )
                                 )
 3   CUYAHOGA COUNTY.            )

 4   I, Megan A. Medved, a Notary Public within and for the

 5   State of Ohio, duly commissioned and qualified, do

 6   hereby certify that the within named witness, SERGEANT

 7   ERIC PILYA, was by me first duly sworn to testify to the

 8   truth, the whole truth and nothing but the truth in the

 9   cause aforesaid; that the testimony then given by the

10   witness was by me reduced to Stenotype in the presence

11   of said witness, afterwards transcribed upon a computer;

12   and that the foregoing is a true and correct

13   transcription of the testimony so given by the witness

14   as aforesaid.

15

16   I do further certify that this deposition was taken at

17   the time and place in the foregoing caption specified,

18   and was completed without adjournment.

19

20   I do further certify that I am not a relative, employee

21   of or attorney for any of the parties in the

22   above-captioned action; I am not a relative or employee

23   of an attorney of any of the parties in the

24   above-captioned action; I am not financially interested

25   in the action; and I am not, nor is the court reporting
```

```
 1   firm with which I am affiliated, under a contract as

 2   defined in Civil Rule 28(D).

 3

 4   IN WITNESS HEREOF, I have hereunto set my hand and

 5   affixed my seal of office at Cleveland, Ohio on December

 6   15th, 2020.

 7

 8

 9

10   _____

11             Megan A. Medved, a Notary Public

12             in and for the State of Ohio.

13             My Commission expires 9/17/23

14

15

16

17

18

19

20

21

22

23

24

25
```

Case: 2:18-cv-01060-EAS-EPD Doc #: 141-1 Filed: 03/24/21 Page: 241 of 265 PAGEID #: 3384

Deposition of Sergeant Eric Pilya      Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

**WORD INDEX**

**< 1 >**
**1** 4:7 117:8, *10* 118:5
**1.** 7:6, 6, 7, 7, 9, 9
**1.20** 149:*17*
**10:00** 2:8
**100** 20:*11* 221:*1*
**1020** 2:9
**11** 237:*11*
**117** 4:8
**12** 40:*15* 84:*16* 140:6
237:*11*
**12-15** 140:6
**12-18** 150:*11*
**12-19** 152:25
**122** 4:9
**12-20** 156:9
**12-24** 157:24
**13** 231:9
**13-04** 160:*12*
**13-19** 169:*15*
**13-22** 177:4
**13-24** 177:20
**135** 4:*10*
**138** 4:*11*
**13th** 13:22
**14** 88:*16, 21, 22*
**15th** 240:6
**160** 4:*12*
**17** 240:*13*
**1801** 2:9
**182** 4:*13*
**1900** 3:6
**1987** 13:22
**1994** 5:*21* 13:25
**19th** 118:*12, 14* 237:*13*

**< 2 >**
**2** 4:9 122:*4, 6* 123:*18*
149:*18*
**2.** 7:6, *8, 9*
**2:18CV1060** 1:2
**2:19CV1049** 1:*20*
**2:19CV3105** 1:*13*
**20** 20:*18* 141:*21, 21*
173:*18, 18*
**200** 20:*13, 18*
**2001** 14:*4*
**2002** 20:*7*
**2005** 6:*17* 8:8 9:*4* 72:*15*
**2009** 21:*4* 77:*20, 23* 78:*9,*
*12* 108:*21* 231:*7, 8, 16, 19,*
*22, 25* 232:*3* 234:*18*
**2010** 7:*17, 24*
**2011** 4:*10, 6* 6:*19* 8:*11, 13,*
*19* 20:*25* 135:*13, 15*
**2012** 4:*11* 138:22 160:5
**2013** 4:*12* 118:*14* 237:*11,*

**13**
**2014** 237:*15*
**2015** 4:*13* 41:8, 9 118:8
182:*13* 213:*16*
**2015-0005** 182:*14*
**2015-0013** 202:*1*
**2015-0016** 205:*15*
**2016** 4:*14* 41:8 118:8
124:9 213:*16, 17*
**2016-0014** 214:*3*
**2017** 4:*15* 228:*25* 229:7
**2017-0003** 229:8
**2017-0014** 228:*4*
**2018** 4:*16*
**2018-0013** 227:*24*
**2018-003** 227:8
**2020** 2:7 240:6
**213** 4:*14*
**216** 3:*10*
**229** 4:*15, 16*
**23** 240:*13*
**239** 4:5
**241-1430** 3:*10*
**24-hours** 94:*16*
**24th** 2:7
**25** 112:*4*
**26** 231:9
**28** 137:*1* 240:2

**< 3 >**
**3** 4:2, *10* 135:*19, 21*
149:*18*
**3.25** 149:*18*
**30** 11:*13* 74:9
**300** 200:*19*
**31** 117:*18*

**< 4 >**
**4** 4:*11* 138:22, *24*
**40** 97:*15*
**43215** 3:*16*
**44113** 3:7

**< 5 >**
**5** 4:*4, 12* 160:6, *8*
**500** 20:*15*
**5'1** 200:*18*
**5115** 5:*17*
**55** 3:6

**< 6 >**
**6** 4:*13* 7:6, *8, 9* 11:*13*
74:9 182:*17* 213:*17*
**614** 3:*18*
**6'4** 200:*19*
**645-6959** 3:*18*

**< 7 >**
**7** 4:*14* 213:*17, 19*

**7.** 7:7, *8, 9*
**77** 3:*15*

**< 8 >**
**8** 4:*15* 228:*25* 229:3

**< 9 >**
**9** 4:*16* 228:*24* 229:3
240:*13*
**90** 203:6
**911** 93:*19*
**99.9** 26:*21*
**9mm** 97:*13*
**9th** 2:9

**< A >**
**a.m** 2:8
**Abel** 183:*11, 20, 23*
184:*25* 185:*14* 186:*4*
187:*3, 10* 188:*3, 10* 189:*4,*
*5, 6, 21* 190:6 192:25
193:*16* 194:*19, 24*
**Abel's** 192:5
**able** 60:*10* 135:*1* 160:3
163:*21* 230:*21*
**above-captioned** 239:*22, 24*
**absence** 168:*24* 199:*10*
200:*3, 6*
**absent** 141:*21*
**absolute** 153:6
**Absolutely** 12:7 87:*14*
205:*11*
**academy** 13:23 78:*21, 24*
229:*23*
**accept** 90:*4*
**access** 8:*17* 148:6 206:*24*
209:*15*
**accidental** 132:*24* 192:*18*
**accidents** 15:*1*
**account** 201:*1*
**accurate** 47:2 131:*20*
132:2
**accurately** 123:*18*
**accused** 25:20, *23* 50:6
232:22
**acronyms** 128:*21* 135:9
**act** 42:8 77:*14, 17, 25*
81:*10* 162:*24* 168:*4*
200:*11* 202:9 225:2
**acted** 35:8 172:8 226:*14*
**acting** 32:*15* 35:5 38:8,
*11, 14* 40:9 72:25 73:*4*
77:9 81:9 131:6, 7 145:2
146:9 150:5 155:*3, 8*
156:24 158:7 160:*18*
161:2, 5, *11, 15, 17, 19, 22*
162:8, *22, 24* 165:*3*
167:*10* 168:*4, 9, 13* 184:*1,*
*25* 186:2, *16* 189:8 193:*4,*
*20* 194:6 202:7 211:*14*

**214:8** 217:*15* 227:*10*
228:8 229:*11*
**action** 22:2 23:23 24:*14,*
*21* 30:*1* 34:*4, 5, 16* 35:*11*
37:7, 9 65:*10, 12, 17, 22*
66:7, *16, 21* 67:2, 9, *10, 18,*
*19* 68:*19* 69:22 70:*3, 4, 4,*
*13* 71:*13* 73:3 108:8, *13,*
*25* 116:*5, 6* 180:*19*
181:*21* 188:*15* 211:*11*
239:22, *24, 25*
**actions** 24:*13* 29:*19*
38:*16* 56:*10* 59:*11, 14*
83:9 109:22 119:*12*
136:*11, 12* 146:8 147:9
158:*11* 161:6 163:2
166:6 167:6 169:*4*
179:*14* 183:*13* 191:*17*
192:5 194:23 198:7
213:2, *11* 215:*1, 2*
**activated** 89:*20*
**active** 151:*1* 162:22
**actively** 21:5 208:25
209:5
**activity** 34:8, *25* 51:*10*
75:4 80:23 81:*3*
**actual** 6:24 17:5 136:*15*
139:*17* 144:*12* 145:*18*
146:20 153:5 159:21, 22
163:*14* 177:8 178:*1*
214:*19* 231:*12*
**AD** 132:23, *24*
**add** 103:*12* 128:*17, 18*
**added** 127:*13*
**adding** 127:*12*
**addition** 42:2 45:*20*
46:*12* 110:7
**additional** 14:6 42:6
43:22 45:*11* 83:*15* 111:6
**Additionally** 107:*19*
223:*15*
**address** 106:22, *23* 107:*25*
108:*11* 183:5
**addresses** 93:*18*
**AD-INIP** 132:22 133:2, *5*
**adjournment** 239:*18*
**adjudicated** 100:*23* 101:9,
*19* 103:*12* 130:6
**adjudication** 103:6
**ad-lib** 120:6
**Adm** 1:2
**Adm.,** 1:*12*
**administered** 221:*15*
**administrative** 22:*14, 16*
37:*17* 73:9, *10, 15* 90:7,
*17* 101:3 105:*12, 21, 23,*
*25* 106:*16* 107:9, *11, 17,*
*19* 163:5
**administratively** 73:*11*

Deposition of Sergeant Eric Pilya     Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

168:21 181:1
admitted 32:2, 5 185:12
adopted 39:21 65:10
advised 46:8 58:15 60:12
advising 29:4
advisors 184:12, 16
Affairs 105:11, 11, 24
106:19 115:3, 7, 16
116:13 138:9, 10, 14
222:5 223:3
affect 217:12 218:5
affiliated 240:1
affixed 240:5
afford 30:21
afforded 32:23
aforesaid 239:9, 14
afraid 164:17 166:5
187:10
age 5:3
agencies 122:16 231:11
agency 101:2, 2 111:16
112:12
agenda 120:11
agendas 123:8
agents 111:24
aggravated 136:19 177:11,
15 214:11
aggressive 186:2, 16
203:15
aggressively 193:4 203:20
agitated 170:22
ago 80:7 121:15 122:15
123:5, 7 124:17, 18, 19
125:4 159:24 233:6
agree 11:2 25:10, 12
31:9, 12 33:1 59:19 92:4
105:9, 13 111:7 166:9, 15
179:8 182:3, 7 188:4
195:20, 22 197:11 205:3
216:1 221:6 222:11
230:23
agreed 31:13 85:11
86:15, 19 87:8 205:25
215:20 232:23
agreeing 28:20
agreement 2:7 86:17, 23
91:14, 15 206:1
ahead 8:25 16:25 45:15
69:15 96:12 143:7
182:13
ahold 206:13, 20
air 41:18, 21 86:6 178:24
210:17
al, 1:2, 17, 23
alcohol 169:24
alerting 44:18
allegation 17:18 136:14
139:16 145:17 150:15
153:4 154:1, 4, 11, 15

163:13 208:1, 3 214:18
222:20, 24 223:1
allegations 144:11 156:16
159:21 170:17 177:6, 24
221:24 226:22 228:15
alleged 145:23 212:10
219:20
alley 54:20 85:15
allow 26:22 30:5 167:2
192:21
allowance 30:9
allowances 29:20 36:24
allowed 23:21 25:14, 24
48:22 50:9 52:12 58:24
60:5 62:22 63:5 118:24
151:13 162:20 193:9
allows 35:25
alter 224:1, 10
altercation 37:22 130:23
amount 50:10 51:25
52:2 56:4, 9, 12 60:7, 9,
16, 25 61:13 62:18
ample 155:20, 23
analysis 128:3
analyzed 18:18
Andrew 71:1, 2, 3 72:10,
22 75:25 78:17, 19, 20
Andy 79:18 129:7, 13
anger 53:7
annual 128:12, 19, 20
answer 10:23 12:15, 23
13:7, 7 23:6 40:7 55:9
60:2 78:8 82:24 83:2, 4
86:20 104:9 136:10
200:15, 16 230:21 235:2
answering 86:11
answers 110:17, 18 180:23
Anthony 139:4
anybody 26:13 79:17
82:16 83:5 96:17 127:18
anymore 93:15
apartment 140:9, 11, 13
148:4
apparent 34:15
APPEARANCES 3:1 4:2
appears 145:12 152:7, 8
214:7
applied 14:5 236:14, 19,
25 237:5, 12
apply 118:8
applying 41:3
appreciate 7:11 138:21
238:5
apprehend 195:5, 8
200:19
apprehended 158:25
171:20
apprehending 195:17
apprehension 156:2
171:23

approached 170:6 175:21
202:16, 18, 21, 25
approaching 142:3 206:10
appropriate 151:4, 11
222:16 223:16 230:7
appropriately 172:9
approve 126:18 153:23
approximately 10:9, 10
20:9, 16, 18 21:18 83:3
arbitration 204:16, 21
arbitrator 164:8, 11, 13
area 15:22 16:5 19:22
45:6 86:8 113:9, 20
149:1 152:2 193:2 203:4
204:9 206:5
areas 11:22 18:22 19:20
arm 188:23, 24 206:14, 18
armed 54:9 145:6 153:9
158:12 163:24 165:12
170:25 182:5 206:6, 9, 13
211:11, 14 214:23 216:4
226:17, 21 228:16
arrest 71:6 73:14 129:4,
6, 9, 10, 12, 15 130:7, 14
136:4, 6 139:14 152:6
163:21 185:23 197:3
200:11 201:5 210:18
arrested 152:9
arresting 201:19
arrests 185:9
arrive 41:19 42:15
arrived 189:15, 18, 19, 20
arrives 28:8
arriving 172:3
articles 125:6
articulable 165:5
articulate 147:9 151:10
161:5 163:1 164:4 165:7,
11, 14 167:14 191:14
194:18, 23, 24 220:18
articulated 152:3 165:4
166:9, 15 178:3, 13 188:3,
5 189:9 193:1 212:20
213:7 231:4
articulates 167:6, 7 169:4
articulating 165:16 166:6
188:10, 13
articulation 152:19 182:4
212:22 213:5
aside 17:2 46:4 66:10
219:6
asked 12:21 13:8 25:7
74:23 77:5 87:17 90:20
99:7 132:14 140:16
158:15 203:1
asking 74:7, 8, 12 112:21
113:1 164:20 173:6
186:22 213:23
asleep 207:12, 20, 23
aspects 30:18

assault 52:10 161:8, 10
163:9 167:24 185:7
186:10
assess 109:7
assign 44:11 47:25, 25
48:2, 3 56:7 58:16 61:9,
11 82:14
assigned 41:1 55:24
60:24 62:8 63:4 64:2
104:3, 20 121:24 184:20
assignment 87:21
assignments 13:17, 24
14:2 36:10 47:22 81:18
104:3 183:8
assigns 137:17
assistant 42:9 93:5
associated 20:22
assume 12:23 174:1
assumption 29:6
attach 94:20
attack 193:8 201:14, 16
attacked 164:18 192:9
attacking 164:17 176:7
201:21 203:15, 18, 19
attempt 26:5, 20 27:8
28:5, 10 30:20 39:22
61:3 110:4
attempted 25:24 26:2
185:22 216:10, 23
attempting 37:16 139:14
161:3 168:4, 15 196:25
225:21
attend 94:12, 15
attorney 23:12 26:22, 22
27:13, 24, 25 28:4, 7 29:4
64:4 86:9 87:15, 15, 18
88:2 89:10 90:1 91:1
118:23 183:9, 10 239:21,
23
attorneys 5:23 85:11
86:12 91:14, 15, 21 92:4,
8 93:2 184:9, 19
audio 223:9, 14 224:4
audited 18:18
authenticate 135:1
authenticity 135:3
authority 107:3
authorized 50:5
auto 228:12
automatically 29:14
115:18
autopsy 84:16 94:13, 15
95:2
available 10:4, 20 11:3,
16 35:24 45:10
await 27:24
awake 207:13, 21
aware 39:16 40:1 49:25
52:20 54:24 59:7, 11
60:21 81:16 99:4 175:1,

Deposition of Sergeant Eric Pilya                    Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

*8* 185:8 202:14 204:25
217:11

**< B >**
**Baase** 206:15, 22 209:8,
10 212:4
**Baase's** 213:4
**back** 20:6 23:10 24:18,
22 25:1, 18 26:8 27:15,
19 28:2, 2 30:24 31:6, 19,
22, 23 34:21 36:12, 14, 20
37:21 38:1 42:19 44:22
47:12 48:5 49:8, 9 51:3
52:21 55:2, 4 56:23
61:16, 22 64:8 73:13
81:11 83:3, 6, 7 85:6, 9,
10 93:12 94:11 96:9
102:15, 17, 17 104:9
106:13 116:8 118:24
119:3 132:17 133:16
137:24 138:6, 20 152:8
158:21 173:3 180:8
185:14, 14, 21 186:1, 20
190:8, 12 194:22 195:13
203:7 206:12
**backdrop** 203:7
**backed** 54:20 94:15
203:5 206:25 209:10
**background** 109:15 217:9
**bad** 163:6 168:15, 19
176:16 198:13 227:19
**badge** 5:16, 17 87:21
**badly** 202:20
**bag** 214:24
**bailed** 155:11 180:2
**balconies** 171:3
**balcony** 169:21 170:7
171:4, 5
**ballpark** 163:18
**Barber** 169:16 175:2, 7,
14 176:10
**bare** 157:10
**base** 155:7 184:24 192:4
**based** 21:14 42:5 57:20
66:8, 21 68:8 72:18, 19
76:18 82:5 90:18, 24
94:7 96:11 130:14
136:11 141:20 142:10
145:21 148:12 150:21
153:8 154:16 157:1
158:9 163:6 172:18
173:16 174:21, 23 176:20,
24 178:7 181:7 182:4
197:9 198:6, 10 202:10
211:19 212:11, 22, 22
213:1, 4, 7
**Basher** 175:16
**basic** 97:4 98:5, 16, 23
**Basically** 15:17 76:17
82:14 87:25 92:3, 19

105:19 106:18 113:16
127:11 130:13 133:16
134:2 175:25 225:13
**basing** 173:15
**basis** 18:20 29:12 84:6
110:3 156:19 169:3
203:12 211:18 229:17
**bathroom** 169:10
**BCI** 111:24
**bear** 12:19
**began** 227:13
**beginning** 32:16 102:1
190:23
**behalf** 3:2, 12 6:2 9:2, 10
22:9, 11 72:21
**behavior** 19:14 59:21
**belief** 146:23 153:8
172:25 173:10 181:7
182:7, 9 200:1
**believe** 14:18 15:1 16:22
19:16, 25 21:10, 14 24:11
27:3, 7, 12 28:15 30:18
36:3 39:20 52:12 53:25
54:5, 6, 10 56:20 59:10
60:8 62:15 64:10 67:2, 9,
17 71:12 73:4, 8, 9 76:22
77:5, 8, 11, 21 78:2, 9, 15
80:13, 18, 20 81:6 82:1
88:16 89:2, 24 91:17
92:3 95:13 99:15 100:2
110:6, 21 112:3 114:18
115:3, 9, 12 117:21 119:4
121:6 123:16, 20, 23
124:1, 5 141:23 142:18
143:19 145:21 146:2, 14
148:5, 22 149:2, 19 150:3,
3, 5 151:8, 14, 15 152:2
154:18 155:5 156:1, 13,
23 158:18 160:17 162:10
163:18, 22 164:3, 4, 16, 17,
18 165:16 166:12 167:16
169:3, 4, 19 172:11, 13, 15,
24 174:5, 7, 11, 16 176:4
178:14, 18 179:6, 6, 16, 19
183:16 184:23 189:17, 21
190:7, 9, 11, 16 191:9, 11,
23 192:1, 2, 2, 7, 10, 11, 15,
18, 19 193:5, 6 194:11, 15
195:4 198:10, 11, 12, 14
199:19 202:18 203:4
204:14 205:2, 8, 13
208:14 209:6 211:8
215:5, 23, 25 216:3
217:22, 25 219:8, 8, 15, 18
220:12, 14 221:1, 2, 3, 13,
13, 22 222:15 225:8, 24
226:19, 20 227:15 228:7,
10 232:5, 10, 12, 15
233:11, 13 234:18 235:20
237:10

**believed** 54:8 71:5 74:12
113:1, 8 139:13 145:2, 5,
7 146:15 147:24 149:1,
25 150:5 154:6, 16, 21
155:12, 15 158:15, 17
160:20 164:25 165:2, 4,
22 167:7 169:5 170:10,
25 171:1 172:17 173:11,
23 174:8, 13 175:13
176:6, 15, 20 179:1
182:11 186:8 188:13
191:6, 11, 24 208:21
209:9 211:16, 18 213:8,
10 216:7, 13 228:18, 20
232:17 233:18
**believes** 146:11, 11
148:16 172:21
**believing** 207:3, 4
**Bell** 9:12 144:17 206:4, 4,
6 208:9 209:23 210:4, 10,
13 211:22
**BELL-McGREW** 1:14
6:6 43:1 53:16 57:16
62:11, 13 80:5 104:12
115:11 118:9 205:16
208:1, 8, 16 209:5, 17
210:2, 19 211:19 212:1, 1,
7, 12, 23 213:5, 10 236:21
**Bell-McGrew's** 55:6
**Bell's** 213:2
**bending** 178:25 188:25
**best** 12:14, 19 38:15
56:15 64:7 93:23 122:10
149:11 176:22 195:5
198:10, 15, 16, 17, 21
227:18
**better** 10:5 15:7, 20 16:1,
10 18:22 19:21 194:23
**beyond** 75:18 152:20
**bias** 222:2
**big** 130:25
**bigger** 200:25
**bill** 66:20 128:25 226:10
**bills** 101:13 131:17
**binding** 6:2, 12 8:5
164:13
**birthday** 125:18
**bit** 22:6 85:4 203:17
224:4
**black** 141:22
**block** 63:4, 11
**BMV** 158:18
**board** 15:20 22:19 46:13
101:1, 6, 17 102:7 103:3,
25 104:2, 4, 21, 23 105:9,
20 115:25 131:25 132:11,
16 137:4, 16, 18, 19, 22
138:12, 18 141:11 228:11
**Board's** 105:13

**bodily** 136:16 139:18
144:13 145:18 150:16
162:11 163:15 168:25
177:9 178:1 197:7, 23
199:11 200:7 212:10
214:19 217:23
**body** 31:11, 13, 16 94:1
97:8 113:13, 14 186:6
212:18
**bold** 145:23 148:7
**bombarded** 128:15
**bones** 157:10
**Boney** 135:25 136:15
137:4, 8
**book** 31:25
**bottom** 118:12 127:10
139:3 169:20 180:10, 14
202:1
**box** 12:9 19:23
**boxer** 142:15
**boxers** 141:23 142:21
**boxes** 19:17, 18
**boy** 222:21 225:23
**brain** 174:9 175:18
**Braxton** 219:24 220:16
221:12, 16 223:12
**break** 38:22 99:17 100:4
169:10
**breakdown** 64:21, 25
**breaker** 116:10
**breaking** 143:9, 13
**Brenner** 158:19 219:10
**Brian** 219:10
**brief** 42:16 45:7 46:11
47:13 78:22
**briefed** 46:10 52:4 61:2
81:16 183:6 189:16
**briefing** 42:19
**bring** 70:21 155:2
164:24 183:22 193:21
**bringing** 193:15
**broken** 140:11 210:5
**brought** 15:11 139:8
**building** 54:22
**bullet** 156:2
**bullets** 27:1, 17
**bump** 133:15
**bunch** 20:10 111:10
**burden** 112:18
**Bureau** 14:1, 3 40:19, 20
44:20 51:24 111:23
118:4
**burglary** 152:10
**burst** 163:25 165:21
**bus** 26:15 42:13 45:2, 4
87:5 92:18
**buss** 45:5
**Byard** 183:9, 10

Deposition of Sergeant Eric Pilya      Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

**< C >**

**caliber** 97:24 99:6
**calibers** 97:8
**call** 13:17 41:22, 24, 25
42:1, 5, 6, 9, 11, 21, 23, 25
43:5, 10, 22 44:3, 16, 17,
21, 21 45:1, 11, 13, 16, 20
62:2 82:3 85:6, 7 91:6
93:19, 24 94:13 104:8
202:15
**called** 2:3 6:5 42:7
48:24 72:13, 14 89:12
93:18 103:12 119:25
132:13 140:14 141:1, 18
143:11 170:1 183:4
202:20
**call-in** 127:11
**call-out** 41:21
**callouts** 127:7
**calls** 42:4 44:20 127:18,
19
**Cameron** 104:1
**Camp-Donovan** 145:2
**canvas** 82:12, 12, 14, 22
**capability** 148:12, 16
**capacity** 16:20 126:16
**caption** 239:17
**car** 31:23 45:2 50:24
51:4 56:23 62:13, 24, 25
133:15 145:24 147:12
148:7 159:6 180:11
210:22, 24 211:2 225:19
227:21 228:14
**care** 38:15 174:9
**career** 233:1
**careful** 96:15
**carried** 97:14
**cars** 62:23 63:17
**CASE** 1:2, 13, 20 6:5, 7
7:5, 7, 8 9:16 10:12
15:10 18:7 29:11 31:16,
18 32:17 34:14, 19, 20
39:9 44:3 54:1, 6 57:16
58:1, 20, 23 62:10 66:9,
20 69:12, 20 70:2, 6, 11,
16 71:21 72:5, 15, 19, 20
73:6 74:2 75:12, 25 76:7,
18 79:1, 11, 12, 13, 14
80:4, 25 82:6 83:14 84:9
86:3 89:22 90:24 91:3
93:7, 8 96:14, 17 98:7, 18,
25 101:17, 19, 22 102:8
103:13 105:1, 10, 22, 22,
23 107:13 109:22 113:5
114:19 127:21 129:7, 9,
10, 21 131:15, 17 132:12,
14 136:5, 14 137:8, 15
138:4 139:8, 21 141:18,
19, 22 142:17 148:21
149:14 150:19, 21 152:5

154:25 159:20 160:14
163:12 164:16, 25 167:5,
9, 23 169:17 170:16
175:1, 10, 12, 18 176:13,
23 177:19, 24 193:18
194:1 196:3 198:1, 5
199:18 200:23 201:11, 18
202:3, 5, 15 205:1, 14, 17,
21 207:7, 10 208:10, 16,
20 214:3, 6, 12 216:2
217:16, 17 219:19, 21, 25
221:2, 3, 11 223:7 226:5,
12 227:1, 8, 13, 19, 25
228:3, 6 229:14 230:16
232:23 235:3, 14
**case-by-case** 18:20 29:12
84:6 110:3 169:3
**cases** 5:23 6:3, 15, 16
8:10, 13 9:11, 15, 20
10:13 22:12, 16, 16, 20
26:20, 21 34:18 40:1
44:14 60:15 63:16 64:1
71:17 72:12 73:25, 25
100:11, 17 109:23 112:5
119:18 124:4, 11 127:19
130:17 131:3 152:2
184:8 220:11 231:15
232:20
**cases,** 22:15
**casings** 26:18 85:22
**Castleberry** 74:16 75:5,
17
**catch** 133:14
**caught** 66:4
**cause** 32:3 50:3 62:12
239:9
**causing** 168:2
**CBA** 129:3
**certain** 19:10 32:10
53:22 58:1 64:23 73:12
168:5
**Certainly** 78:9 194:8
**CERTIFICATE** 4:5
**certified** 5:5
**certify** 239:6, 16, 20
**cetera** 83:16
**chain** 9:5 40:18 42:9
46:7, 16 58:5 59:2, 3
70:19 79:23 101:24
102:9, 22, 25 103:1, 4, 8,
16 105:7, 8, 19 106:8, 11,
15, 25 108:5, 8, 12, 23
115:23, 23 116:4, 7
118:20 128:1 137:19
157:9 194:1 208:7 222:4
233:10, 19
**chairman** 138:12
**challenge** 135:3
**challenged** 186:4

**chance** 29:22 48:23 49:1
186:14 230:10
**change** 91:24 92:5
111:21 114:21 122:25
123:1 237:18, 24
**changed** 5:18 89:1
121:10, 12 123:24 132:25
134:6 149:16 189:18
216:20 220:6
**changes** 122:22 127:8, 11
183:22 214:2 227:7
237:15
**changing** 127:12
**channel** 45:1
**charge** 46:10 48:2, 4
66:12 81:20 101:15
131:4 138:12 161:9
167:20 168:20 174:25
177:12 185:1 194:8
228:9, 12
**charged** 62:18 69:22
71:1 78:13 130:18, 24
131:3 150:4 160:25
177:11 203:4 231:20
234:19
**charges** 69:15, 15 70:10,
19, 22 71:25 78:5 101:7
119:2 130:6 136:19
137:13, 14 139:8, 23
145:10, 12, 14 149:21
155:2, 5 156:20 158:3
164:24 174:20 177:11, 15
189:3, 5 193:16, 21
**charging** 161:7 184:14
**charter** 111:21
**chase** 155:10, 11 180:3
**chases** 148:24
**chasing** 113:12 203:20
225:14
**check** 19:17 124:9
**checked** 19:23
**chicken** 154:18, 20
**CHIEF** 1:2, 16 3:14
21:10 46:20 76:2 79:25
102:4, 5 104:1 105:15, 16
107:1, 5 116:8, 10 128:1
137:20 138:11
**child** 205:10
**choice** 149:11
**choose** 81:5 90:13
**chopper** 178:12
**CHRISTOPHER** 1:12
**Chuck** 219:9
**circumstance** 150:2 167:9
**circumstances** 32:10
145:22 159:18 174:23
175:17 196:8
**CIRT** 8:16 9:17 20:23
21:17, 23 22:16, 24 24:12
28:8 30:2 32:17 33:11

34:16 36:3, 15 39:11, 14,
16 40:14, 15, 17, 22, 24
41:1, 3, 21, 24 42:7, 9, 15
44:4 45:9, 22, 23 46:6
48:24 50:15 55:15 58:17
60:11 68:3 69:25 70:5,
12, 17, 21, 25 71:10, 12, 16
73:18, 19, 22 74:3, 14, 17,
21 75:3, 20 77:3, 13, 16,
23 79:4 80:2, 22, 25 81:1,
13 84:12 86:19 90:8, 10,
20 91:9 94:23 97:3
100:10 102:24, 25 103:1,
4, 16 106:21, 21, 24
109:14, 23 111:7 112:3,
22 114:14 116:8, 16, 23,
23 117:2, 3, 24, 25 118:2
119:1, 15, 18, 22, 24 120:1,
23 121:23 123:10 124:24
126:16, 18, 19, 21, 24
127:5, 6, 15 134:24
135:17 136:8 141:5
144:5, 24 145:1, 13 155:1,
7 156:15, 19 157:13
158:2 160:15, 16 174:19
181:3 183:21, 25 184:13,
22 186:24 189:3 190:3, 9
202:6, 13 205:16, 19, 21,
23 207:15, 22 212:21
213:3 214:6 215:8, 14, 21
216:20 217:8 218:15
219:20 220:10, 12, 14, 15
222:1, 23 224:25 226:13
227:9, 25 228:6 229:10
235:18 237:7, 10
**CIRT's** 22:9 74:10
181:14 193:18, 19
**CITY** 1:2, 17, 23 2:9
3:14 6:1, 2, 12 8:4 9:3,
10 10:20 11:3, 14, 16
72:8, 9, 10, 21 75:12
111:21 112:7 128:15
175:3 184:19 204:25
**civil** 116:17 233:20 240:2
**civilian** 23:14 25:3, 5, 7,
10, 14, 17, 20, 23 27:7
28:24 29:6, 8, 14 30:19
31:1, 5, 8, 18 33:2, 20
35:16 39:18, 23 40:2, 3
47:17, 19 48:4, 14, 16, 19
49:7, 18, 22 50:3, 5, 20, 24
52:24 53:17 54:2 55:22
56:7 58:11, 15 59:24
60:4, 14 61:3, 4, 13 62:5
64:19, 20 65:2 81:14, 19
82:1 86:10 90:14 100:23
101:15, 19 112:23 113:1,
8, 17 114:9, 14, 19 129:11,
15, 24 130:18, 21 136:6

Case: 2:18-cv-01060-EAS-EPD Doc #: 141-1 Filed: 03/24/21 Page: 245 of 265 PAGEID #: 3388

Deposition of Sergeant Eric Pilya     Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

178:8, *10* 214:*10* 219:7
220:*10, 13*
**claim** 140:2
**claimed** 155:*20* 207:*11, 20, 21, 23*
**class** 78:20 119:22, *23, 24* 121:*19, 19* 122:*14, 15* 125:2
**classes** 120:*12*
**classic** 125:*12*
**classification** 131:*21* 226:9
**classifications** 131:*11*
**clean** 12:*14*
**clear** 68:*17* 84:*3* 125:*18* 131:*10, 12*
**clearance** 130:*11*
**cleared** 64:22 82:9, *21* 92:*15* 94:4 129:*4, 6, 9, 12* 130:7, *12* 131:*23* 136:4 141:*11* 152:5 226:5, *11*
**clearing** 129:*16*
**Cleveland** 2:*10* 3:7 240:5
**close** 20:*18* 82:*15* 190:6, *15*
**closed** 130:*14* 131:*20* 132:*14*
**clothing** 171:*23*
**coaching** 121:22
**co-counsel** 5:24
**code** 130:*11*
**cognizant** 90:*11*
**cold** 114:*4*
**collect** 26:*14* 35:24 171:*18* 196:*3*
**collected** 84:*10*
**collecting** 217:*17*
**collection** 126:*19*
**COLUMBUS** 1:2, *17, 23* 3:*14, 16* 5:*12* 6:*1* 9:*3, 10* 10:*20* 11:*4, 14, 16* 72:8, *9, 10, 21* 75:*12* 101:*4* 108:*13* 111:22 152:*12* 175:*3* 184:*20* 204:25 205:9 219:*14* 232:*13* 234:*4, 25* 235:6, *10* 236:*10*
**column** 128:*24* 130:8 131:*24* 132:*1*
**COM** 45:*1*
**come** 17:*20* 23:*10, 12* 27:*15, 19* 28:*1* 35:25 36:*18* 47:*1* 48:5 74:*3* 84:*17* 85:*6, 8* 90:*3* 93:*11, 25* 100:*17* 101:25 118:*24* 137:*18* 185:*13* 188:5 189:*12* 191:*13* 198:*17* 202:*17* 203:*2, 23* 205:*19* 233:*13* 235:*23*
**comes** 26:8 32:7 36:*14* 61:*16* 87:*4* 119:2 154:*20*

171:6
**comfortable** 91:2
**coming** 25:*1* 30:24 36:20 140:*22* 171:*2* 185:*4* 203:*8, 20*
**command** 9:6 26:*15* 40:*18* 42:*10, 13* 45:*2, 4, 5* 46:*7, 16* 58:*2* 59:*2, 3* 60:*18* 70:*20* 79:23 87:5 92:*18* 101:*24* 102:*10, 23, 25* 103:*1, 4, 16* 105:*7, 8* 106:*9, 11, 15* 107:*1* 108:*5, 8, 12, 24* 115:*23, 24* 116:*4, 8* 118:*20* 128:*1* 137:*20* 157:*9* 194:*1* 208:*7* 222:*5* 233:*10, 19*
**commander** 40:*19* 41:*4, 6, 10, 10* 42:*10* 46:*13, 17* 102:*3* 104:*23* 118:*21* 128:*18*
**commanders** 22:*21* 103:*25* 104:*2, 4, 20* 137:*18*
**commands** 142:*1* 178:*10, 21* 185:*15* 201:*23* 216:*24*
**command's** 105:*20*
**Commission** 240:*13*
**commissioned** 239:*5*
**commit** 37:*24* 38:2 40:9 72:*10* 73:*20* 75:*4* 129:*25* 130:*3* 163:*9* 166:*24* 168:*18* 180:*18* 181:*4*
**commits** 152:*13*
**committed** 34:*24* 73:*24* 74:*3* 77:*14, 17, 24* 130:*21* 145:*23* 148:*23* 151:*24* 158:*12* 184:*3* 202:*9* 214:*9, 11* 215:*19* 216:*4* 226:*16* 227:*12* 229:*13* 235:*21*
**committing** 49:*23, 24* 148:*17* 214:*23*
**communicate** 46:*6, 21* 49:*16* 93:22
**communicated** 95:*5, 11*
**communication** 95:22 103:*20*
**Communications** 13:*25*
**community** 96:*18* 197:*16*
**compel** 90:*18*
**competing** 112:*20*
**complaint** 115:7 233:*23* 234:*1*
**complete** 19:*10* 67:22 84:*9* 117:*19* 138:*16* 185:*4* 224:*16, 24*
**completed** 16:*12* 20:2 34:*7* 76:*7* 82:*19* 101:25 117:22 119:*1* 152:*21* 237:*20* 239:*18*

**completely** 48:*9* 101:*12* 132:*18* 143:*10*
**completing** 15:*15* 19:6 138:*5*
**completion** 100:9 152:*14*
**complex** 140:9 148:*4*
**compliance** 199:6
**complicated** 12:*18*
**complying** 185:*24, 24* 217:2
**comprised** 40:*14*
**computer** 239:*11*
**concern** 147:*14, 20* 234:5
**concerned** 39:22 90:9, *9* 132:*17* 207:*11* 235:*19*
**concerning** 7:*17* 8:*1* 9:5 222:*19*
**concerns** 233:8
**concluded** 73:*19* 77:*13, 16* 80:22 82:*18* 130:*4* 138:*13*
**conclusion** 23:*25* 27:*20* 74:*3, 5, 15, 21* 75:*3, 23* 90:*16* 98:*20* 100:*19, 21* 103:5 105:*14* 108:4 116:*15* 144:*24* 153:22 166:*21* 184:*13, 24* 186:*23* 189:*12* 191:*4* 192:*4* 193:*18, 19, 22, 25* 202:*5, 12* 205:*23* 215:*14* 225:2 227:9 235:*23*
**conclusions** 68:*4* 71:*10* 72:5 73:22 136:9 137:7 160:*14, 16* 205:*20* 207:*15* 213:*3* 215:*17* 227:25 228:6, *7*
**concurrent** 105:*12, 17* 106:*20* 107:6
**conduct** 8:*3* 18:*3* 35:9 59:*4* 61:22 67:6 111:*7, 17* 119:*15* 124:22 149:*17* 223:*17*
**conducted** 52:22 111:*23*
**conducting** 36:8
**conducts** 22:*18* 90:*10*
**confer** 94:2
**confidence** 110:*18*
**confidential** 99:8, *10, 14*
**conflict** 79:*19*
**conflicts** 79:*17*
**confronted** 197:*21*
**confused** 134:*16* 162:*13*
**confusing** 133:24 194:20
**Connor** 141:*19* 173:*15, 16*
**consent** 50:*13*
**consequences** 90:*7*
**consider** 26:*24* 28:*16* 64:*18* 65:*2, 5* 109:*14* 142:*14* 189:*3, 5* 224:25

**considered** 17:*8* 39:*12* 82:*9* 148:*2* 217:*10*
**considering** 75:*8* 222:*7*
**consistent** 223:*24* 224:*11*
**constitute** 81:*10*
**construction** 169:22
**consult** 53:*24* 88:*23*
**consulting** 116:*3*
**contact** 46:*9* 50:*18* 53:*11, 12* 78:*23* 79:*20* 104:*5, 6* 115:*3* 209:*23*
**contacted** 54:*16* 185:*11*
**contacts** 206:*4*
**contain** 47:*11*
**content** 61:*16* 62:*1*
**contents** 117:*15*
**context** 106:*7* 109:*16* 160:*23* 173:*7*
**continued** 203:22
**contract** 240:*1*
**contradict** 110:*23*
**contradicted** 114:*10* 176:*14*
**contrary** 17:*14*
**control** 95:*9, 17* 99:*11* 108:*17* 195:*2, 11, 14* 203:*1* 206:*17* 209:*14*
**conversation** 28:*11* 76:*15* 79:*3* 85:*23* 206:*3* 208:*6, 14*
**conversations** 80:*6, 11, 17* 96:*3, 22* 99:*20*
**converse** 27:*25*
**COOPER** 1:*12* 6:5 7:8 124:*10*
**cooperate** 92:8 131:*13*
**cooperating** 30:*25*
**cooperation** 23:9
**cooperative** 24:*25* 28:*17, 22, 23* 29:*1, 2, 10* 30:24 31:*19* 53:7
**copied** 128:*3*
**copies** 103:*23, 25* 138:*14* 237:*17*
**copy** 76:*7, 9* 116:*11, 13* 123:*10, 11*
**coroner** 95:*19, 20, 20*
**coroner's** 93:*24, 25* 94:*13, 24* 95:*6, 12, 22* 96:*19* 97:*2, 19* 99:*2, 7*
**correct** 8:*23* 9:*18* 17:7 23:*25* 24:8 27:*18* 32:*11* 34:8 35:*9, 10, 13* 46:2 48:*15, 18* 55:*16, 17* 56:25 63:*1, 15* 67:22 69:*24* 70:*1* 71:24 73:*21* 80:24 88:5, *7, 8, 12* 102:*12* 108:*13* 111:*14* 119:9, *14* 130:*17* 132:*21, 21* 146:*20* 151:*18* 155:*19* 156:*21*

Case: 2:18-cv-01060-EAS-EPD Doc #: 141-1 Filed: 03/24/21 Page: 246 of 265 PAGEID #: 3389

Deposition of Sergeant Eric Pilya      Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

158:4 159:15, 15, 19
176:17 178:17 179:4, 24
180:7 181:6, 17, 23
187:20 191:20 200:13
208:19 210:11, 12 211:20
212:9 224:2, 13, 15 226:6
227:5 229:15 236:16, 21
237:2, 8 238:1 239:12
**corrections** 108:6
**correctly** 112:25 154:18
169:18 178:22 188:23
228:17, 22
**corroborate** 171:12 225:9,
12
**corroborated** 114:20
225:5
**corroboration** 225:17
**corrupt** 112:14
**council** 111:21
**counsel** 2:7 90:13 193:16
**count** 26:17 92:21
**County** 2:10 69:7, 11, 11,
13, 17 71:18, 19, 22, 22
72:3 226:9 239:3
**couple** 6:25 10:16 94:14
96:7 171:21, 21
**course** 10:17 67:20 90:6
158:14
**COURT** 1:1 2:8 101:11
107:22 138:1, 17 141:18,
19 239:25
**courtroom** 103:13
**courts** 60:8 168:6
**cover** 230:12
**CPD** 100:25 167:8
**create** 121:13 123:3
124:15 126:17 195:21, 23
196:18
**created** 123:25 124:9
135:15 137:3, 6 195:24
230:25 237:7
**creative** 126:2
**credibility** 109:24 113:2,
24 114:22
**credible** 110:21 113:7
220:3, 5
**credit** 114:1
**credited** 112:22 114:14
176:18
**crime** 23:11 26:14, 16, 17
37:3, 24 38:3 40:9 41:17
45:16 50:6 52:7, 8 57:13,
16 65:17 66:23 67:3
68:19 69:23 72:11 73:20,
24 74:4, 13 78:13 81:21
82:3, 18, 19 84:10, 24
85:5, 18, 21 87:8 92:18,
23 93:20, 22, 23 94:2
96:12 117:1 128:3 130:3,
18, 21 131:18, 20 148:23

161:1 162:3 163:5, 8, 20
164:4 166:25 168:18
171:17 181:4 184:3, 14
185:2 214:9 215:19
216:5 226:16 227:12
229:13 235:21
**Crimes** 40:19, 20 49:23,
24 118:4 129:25
**criminal** 22:12 23:24
24:5 30:1, 12, 14, 17 34:8,
18, 24 35:12 39:13, 21
46:1 48:22 51:10, 16
58:19, 23 66:6, 21 67:9,
18 70:4, 14, 19, 22 71:13
73:6 75:4 77:14, 17, 25
78:5 80:23 81:2, 10
87:10 90:6, 11, 16 97:5
98:6 100:21, 23 101:7
103:5, 9, 13, 24 107:9, 12,
13, 19, 21 108:4 111:23
119:2 129:16, 21 130:6,
19 131:4 132:15 137:8
145:11, 14 149:12 150:7
155:2, 5 156:16, 20
157:20 158:3, 8 159:10
160:17, 22, 24 164:24
165:2 167:20, 23 168:20
174:25 180:19, 25 181:21
189:5 193:16, 21 194:8
202:9 235:19
**criminality** 37:18
**criminally** 71:1 101:12
129:24 141:6, 10 160:25
225:2 228:9 231:20
234:19
**Critical** 4:7 5:15 6:13,
18 22:16 27:20 45:24
50:8, 9 51:16 56:20 60:4
64:14 117:15
**critically** 73:1
**Crocket** 177:8
**Crone** 190:10
**crossed** 102:12
**cross-examination** 2:4 4:4
5:7
**cruiser** 24:18, 23 25:18
34:22 49:8, 10 52:18
55:2, 4 63:3 144:7, 22, 23
145:7, 25 146:23 148:25,
25 149:10
**cruisers** 49:12 55:19, 23
63:7
**cues** 110:15
**Currently** 41:7 111:20
**custodies** 231:10
**custody** 31:25 53:20
54:3, 6, 8 55:7, 25 56:4,
22 113:15, 16 155:25
156:7 196:25

**customs** 118:6 123:18
236:14, 19, 24 237:5, 19
**cut** 171:24 202:10
**cutoff** 223:25 224:10
**Cuyahoga** 2:10 239:3

**< D >**
**Dabron** 177:21
**damage** 193:8
**Dana** 190:10
**dance** 158:24
**danger** 142:2 147:15, 20
149:1 151:8, 14, 15 152:1
153:11 172:22 174:13
177:17 181:12, 16 187:11
192:9, 13, 21 201:4
216:14 230:14
**dangerous** 168:6 173:19,
21 195:14, 21, 23, 24
196:18, 20 197:20 209:1
**data** 126:19
**date** 83:1 126:22 127:9
137:23
**dates** 10:3
**daughters** 125:12 126:6
**Dave** 219:8
**David** 144:15, 20 145:17
153:1
**day** 28:17 87:22 94:14
121:22 148:5 156:10
189:15 198:23 199:2, 6
**days** 10:16 25:24 88:9,
17, 21, 22 89:2, 3, 6 94:14
118:20, 21
**deadly** 7:17, 25 8:7, 18
9:5 10:25 29:25 30:11
32:5, 9, 15 34:23 77:15,
25 78:6, 14 89:16 114:11
115:17, 19 116:15 118:17
119:12 123:21 141:18
146:4, 16, 19 147:21
148:18 149:7 150:1, 9
151:5, 12, 19 161:24
162:9, 14, 21 165:10
166:23 167:4, 9 168:24
172:12 174:15 193:10
195:25 197:5, 21 199:10
200:3, 6, 12 201:14, 24
205:19 212:17 217:4, 12,
19 218:12, 16, 17, 22
219:17 222:12 229:17
231:6, 16, 19, 22 232:1, 4,
9 234:15, 19 235:1, 9, 11,
15, 24 236:2, 6, 7, 9
**deal** 94:9
**dealing** 91:21
**DEARREA** 1:2
**Death** 22:19 74:15 80:4,
10 95:4 100:25 101:17
103:3 104:11, 21 113:15,

16 114:6 115:25 131:12,
25 136:16 137:22 144:13
150:16 162:11 163:15
168:25 177:9 178:1
197:7, 22 199:11 200:7
203:13 212:10 214:19
217:23 231:10 236:15, 16,
20, 21
**DEAUNTE** 1:13 6:6
9:12 43:1 53:16 55:6
57:16 62:10, 13 80:4
104:12 115:10 118:9
205:16 208:1, 7, 16, 17
209:4, 16, 17, 19, 19 236:21
**DEAVERS** 1:2, 17
**December** 13:22 118:12,
14 237:11, 13 240:5
**deception** 110:16 221:4, 8
**decide** 24:4 106:12, 15
164:24
**decided** 60:8 66:16, 17, 20
68:19 86:25 155:3 184:8
185:9
**decides** 66:20
**deciding** 88:14
**decision** 24:6 57:18, 21
58:18 62:4, 7 70:5 83:7
105:16 116:11 131:6
137:19, 20, 21, 24 164:10,
12, 13 168:16, 19 171:7
176:8, 23 194:7, 10, 12, 16
198:9, 16, 16, 17 205:3, 25
206:2 218:5
**decision-maker** 70:17
**decision-making** 163:7
217:13
**decisions** 82:5 83:15
168:7 173:20, 22 195:4
196:6, 12, 14, 17 198:6, 14,
20, 23 199:1, 5
**decreases** 15:25
**decree** 111:20
**deem** 70:13
**deemed** 15:14 24:14
33:7, 25 70:3 233:2
**deeper** 111:5 203:3
**Defendant** 1:2, 18, 24
**Defendants** 3:12
**deficiencies** 16:7 18:3, 13
**deficiency** 17:18, 23
**deficient** 15:22 16:4, 7
17:13 18:23
**define** 198:1
**defined** 240:2
**definition** 210:15
**degrees** 203:6
**delve** 111:5 113:20
**Demetrius** 219:24, 25
220:2, 16 221:11, 16

Case: 2:18-cv-01060-EAS-EPD Doc #: 141-1 Filed: 03/24/21 Page: 247 of 265 PAGEID #: 3390

Deposition of Sergeant Eric Pilya    Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

223:12
**densely** 148:25
**department** 13:15, 18
  16:21 65:15 81:1 111:11
  124:23 127:24 145:9
  147:19 184:18 230:6
  233:13 234:14
**departmental** 145:10
  149:21
**department's** 148:15
  150:1, 8
**depends** 81:24 84:13
  86:3 167:5 210:15
**deponent** 6:25 74:9
**deposed** 10:3
**deposes** 5:5
**deposition** 2:2 9:10, 23
  10:8 13:2, 5, 10 118:7
  222:7 239:16
**depositions** 6:25 10:18
  12:11 116:17
**Deputy** 3:14 21:10 46:20
  102:4 104:1 138:11
**descent** 104:22, 24 105:13
**descending** 104:23
**described** 39:9 106:9
  118:7 132:5 147:11
**describing** 148:13
**description** 86:4
**designate** 44:7
**designated** 6:1, 11, 22 8:4
  9:2 10:21 11:4, 13, 17
  43:18 66:12 72:8 79:13
  80:1
**designates** 94:12
**desire** 47:11
**desk** 41:23, 23 42:4 44:20
**destinations** 7:3, 14
**destroy** 138:15
**destroyed** 185:18
**detail** 121:20
**detailed** 90:21
**detailing** 104:24
**details** 86:1 87:13 88:24
  97:6, 9, 16, 25 98:6, 17, 24
  185:4 186:22 207:8
  220:1 221:10
**detain** 48:22 50:5, 9, 24
  51:2, 17 53:1 58:24 60:5,
  7
**detained** 47:18 48:17, 19
  49:7, 18, 19, 22 50:13
  51:10 52:25 54:10 55:19,
  23, 25 58:12, 16 60:12, 15,
  17 62:21 81:14
**detaining** 59:24
**detective** 15:2, 9, 11, 12
  16:8 17:13 42:7 44:8, 19
  47:25, 25 48:23 50:10
  51:17 53:2 58:17 60:6,

13 61:9, 11, 12, 15, 21
  62:2, 8 63:5 72:25 76:21
  77:8 79:13, 20 81:20
  83:18 84:8 93:17, 23
  94:16 102:15 121:14
  183:7 190:9 223:4
  234:20 235:4, 12
**detectives** 15:8 20:16
  40:16, 21 41:1 42:6
  43:23 44:3, 4, 21, 22
  47:22 48:2, 3 52:3 53:12
  55:24 56:7 57:23, 25
  58:17 60:10, 24 81:18
  82:14 84:1 93:11, 18
  111:10 112:2 190:3
  191:23, 24 221:18
**detention** 50:21 58:8
**determination** 24:3 34:7
  35:15 41:5 57:15 65:18
  66:25 67:8, 12, 21, 24
  81:8 92:20 101:7 104:22
  137:5 147:1 155:1, 7
  159:9 180:17 181:3
  183:22, 25 215:24 217:21
  235:18
**determinations** 66:8
  201:10 204:20
**determine** 35:7, 11 46:24
  68:23 69:15 70:12, 13
  84:25 85:1 93:23 96:10
  110:6, 11 156:19
**determined** 23:25 57:12,
  23 65:13 70:3, 21 108:24
  130:2 136:12 141:9
  158:13 180:24 183:7
  215:1 221:16 231:23
**determines** 40:25 61:21
  69:22 82:6 84:6 157:14
**determining** 35:23 157:7
  172:8 235:20
**detrimental** 96:13, 17
**develop** 19:23 36:4, 15
  67:16 68:3 191:7
**developed** 30:5
**Development** 19:18, 20
  20:19 237:17
**difference** 30:23 32:7
  34:3, 5, 6 167:18 168:1
  199:16 207:6
**differences** 21:25 22:1, 7,
  24 23:15 33:4 35:18
  207:10
**different** 6:3 13:23 22:6
  23:3, 8 32:4 33:12 34:17
  35:16 39:10 44:8, 11
  51:6 57:19 81:25 82:5
  89:13 110:13 129:19
  131:14, 21 133:25 134:6,
  18 166:18 175:12 190:17

201:1, 7 207:7 221:21
  224:5
**differently** 24:13 28:24
  29:14 31:1 33:2, 6, 22, 24
  34:3, 14 133:10
**direction** 26:10 35:22
  36:4 85:20
**directive** 116:25 117:1, 2
  123:12 149:17
**directives** 9:13 10:12, 24
**directly** 176:14
**disagree** 74:2 102:23
**disapprove** 153:23
**discharge** 117:1 123:12
  132:24 133:1
**disciplinary** 9:6 16:21
  17:9 204:20
**discipline** 14:21 15:1, 2
  105:14 116:6, 11 164:6
  194:2 234:23
**disciplined** 15:4, 11
  219:16 231:17 233:21, 24
**disclose** 113:19
**disclosure** 138:19, 21
**discovered** 216:15
**discretion** 44:7, 10 107:3
**discrimination** 222:2
**discuss** 17:3 19:9 81:2
  85:2 93:6, 12 99:9
  193:15
**discussed** 44:9 99:13
  160:24 222:6 226:8
**discussing** 175:2
**discussion** 38:5, 25 94:23
  100:6 111:15 169:12
**discussions** 95:14 96:14,
  20
**disposed** 31:10
**disprove** 153:14
**distance** 209:16
**Distlehorst** 219:9
**DISTRICT** 1:1, 1
**disturb** 99:16
**DIVISION** 1:2 5:12 7:16,
  22 8:8, 19 9:13 10:12, 24
  13:17, 19 14:22 16:14, 24
  18:2, 10 19:1, 12 20:2
  24:12 30:4, 13 37:8, 12
  39:4, 21 45:25 50:23
  51:2, 9 63:24 65:10 72:4,
  6, 7 75:2, 8 76:1 77:3
  78:6, 12 86:25 88:19, 20
  90:9 95:5, 10, 21 98:9
  99:1, 7 108:3, 12 111:16,
  17 112:8 115:18 118:19
  119:5, 10, 18 123:19
  142:13 149:17 152:12
  163:7 166:22 167:2
  168:23 176:18 180:17
  181:22 184:20 196:4, 5

198:19 199:7 205:4, 5, 9,
  10 212:16 218:20 219:13
  223:22, 25 224:12, 18, 23
  231:7, 16 232:12 234:4,
  22, 25 235:6, 10 236:6, 10
**division's** 22:10 36:3, 15
  149:6, 24
**divvy** 81:18
**document** 16:12 18:14
  87:9 114:8 117:18
  122:10 126:25 127:5
  157:23
**documentation** 126:17
**documented** 86:22
**documents** 10:19 11:21
  12:8 79:2 127:7 135:4
**dog** 186:1 202:24 203:2,
  2, 3, 8, 8, 9, 15, 17, 22, 23,
  25 204:5, 7
**doggy** 186:20
**dogs** 190:6, 11, 14, 17
  191:25 192:5, 7, 10, 10, 13,
  21 193:8, 11, 13
**doing** 17:3 45:23 48:5,
  10 52:11 83:19 93:10, 10
  105:11 112:8 125:13
  162:25, 25 168:3, 18
  190:14 201:20 206:8
  214:17 235:19
**Dolby** 183:5
**domestic** 34:12 66:10
**Donna** 74:15
**dont** 38:11
**door** 82:24 150:22 164:1
  165:21 170:7, 25 171:6
  174:3 185:11, 14, 15, 17,
  19, 22 186:1, 5, 7, 20
  187:11 189:2 195:3
  206:10 210:21
**doors** 82:15 83:4
**doorway** 170:8, 12 171:5
  204:3
**dotted** 102:12
**downtime** 45:19
**Dr** 95:20
**draw** 225:21 227:14
**Drive** 183:5
**driver's** 49:5
**drop** 76:13 140:17
**dropped** 76:16
**drown** 113:15 114:4
**drugs** 62:16, 18 85:16
  143:9
**DTU** 106:14 229:23
**duffle** 214:24
**duly** 5:4 239:5, 7
**dumpster** 85:16
**Dungey** 190:10, 11
**Dustin** 143:25

Case: 2:18-cv-01060-EAS-EPD Doc #: 141-1 Filed: 03/24/21 Page: 248 of 265 PAGEID #: 3391

Deposition of Sergeant Eric Pilya | Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

**duties** 35:20 38:4, 8, 9, 15, 20 73:1, 5 77:9 81:9 125:7 126:20 131:8 145:3 146:9 150:6 155:4, 8 156:24 158:7 160:19 161:2, 12, 18 162:15, 19, 23 165:3 167:11 168:5, 11, 14 184:2, 25 189:9 193:20 194:6 202:8 214:8 222:17 226:15 227:11 228:8 229:12

**duty** 26:19, 19 34:24 37:2, 6 38:7, 15 40:10 41:23, 23 42:4 59:19 66:2 87:21 196:24 197:2, 5 219:2

**< E >**

**earlier** 5:25 54:9 85:21 90:24 92:9 106:9 115:22 132:5 155:20 226:8

**early** 18:10 66:25

**easier** 6:23

**easily** 209:14

**East** 2:9

**EASTERN** 1:2

**edits** 122:22

**EDMUND** 1:2

**effect** 15:8, 14, 16 20:4 38:7 67:5 73:14 197:3 210:18

**effecting** 71:5

**effort** 8:12, 21 10:19 11:21 46:23 89:22 91:24

**eight** 84:17 152:10 159:24

**either** 12:20 38:19 45:1 77:22 100:22 125:17 129:10 209:9

**elbow** 154:20

**electronic** 137:25

**elects** 90:5

**element** 201:23

**elements** 45:7

**ELIZABETH** 1:2, 16

**e-mail** 83:21

**emergency** 202:17

**employee** 5:16 16:1, 4 17:8 18:13 239:20, 22

**employees** 17:3 20:8

**employment** 13:21 37:10 90:7, 19

**ended** 66:2 113:22 141:2 191:20 233:20

**ends** 199:22

**Enforcement** 14:3 23:21 32:8 37:8 45:24 131:8 160:19 161:3 162:20 165:4 167:11 189:9

229:12

**engagement** 210:5

**engaging** 111:16

**ENGLAND** 1:20 6:8 7:7 9:12 43:11 80:16 104:17 114:25 118:9 182:15, 25 183:3 185:7, 9, 13, 15 186:9, 10, 13, 19, 19 187:7, 17 189:23 190:7, 15 194:20 195:2, 6 236:25 237:1

**England's** 185:10

**ensure** 50:19 56:3, 10 60:23 61:11 93:6

**ensuring** 58:11

**entered** 137:15 152:9

**entire** 11:16 48:7 70:19 108:5 176:21

**entries** 128:9

**Eppert** 123:5

**equate** 205:13

**equipment** 45:13

**ERIC** 2:3 4:3 5:3, 7, 11 239:7

**error** 38:3 106:10 171:15

**errors** 37:16, 17

**escalated** 38:2

**especially** 207:10

**Esq** 3:3, 4, 13

**essential** 87:11

**essentially** 106:19

**ESTATE** 1:2, 13

**et** 1:2, 17, 23 83:15

**evaluate** 16:13 109:19 110:17 144:8 179:11

**evaluated** 119:13

**evaluation** 15:13, 17, 21 16:9, 11, 23 17:14, 16, 22 18:1, 14, 17

**evaluations** 15:5, 15 16:6 17:1, 8, 17 18:8 19:6, 15 20:1, 4

**event** 64:25 65:9 118:18

**events** 9:5 191:20 207:7

**eventually** 113:15 185:12

**evidence** 23:12 25:2 26:11, 14 31:15 84:10 85:13, 18 86:11 87:8 110:8, 22 111:4 112:18, 20 153:25 158:8 160:17 163:3 184:2 185:1 187:17, 22 191:16 193:21 202:8 214:9 226:15 227:11 228:9 229:13

**exact** 111:3 123:1

**exactly** 11:9 126:7 163:17 178:2 194:18

**example** 34:11, 20 66:1 78:4 81:25 85:14 230:11

**examples** 18:5, 24 200:2

**excellent** 15:12

**exception** 148:21

**exceptionally** 131:10, 12, 22 141:10 226:5, 11

**excessive** 231:1 232:12, 14, 17 233:3, 14, 18 235:1 236:7

**ex-clear** 131:15, 18

**EX-CLR** 131:9

**excuse** 232:6

**exercise** 30:21 90:14

**exercising** 27:12 29:3

**Exhibit** 117:8, 10 118:5 122:4, 6 123:18 135:19, 21 138:22, 24 160:6, 8 182:17 213:17, 17, 19 228:24

**Exhibits** 229:3

**exist** 112:17

**exists** 112:2

**exited** 150:22 185:25

**exiting** 210:19 214:24

**exits** 150:24

**expect** 121:21

**expectation** 198:22

**expected** 13:7 64:15 199:2

**experience** 112:15 153:8 154:16, 21

**experienced** 13:4

**expires** 240:13

**explain** 22:23 82:13 91:10 123:18 137:9 149:13

**explained** 85:21

**explaining** 199:15

**extensively** 153:16

**extent** 104:10

**extra** 12:18

**extremely** 14:13

**eyewitnesses** 225:5

**< F >**

**face** 166:23

**Facebook** 125:23, 25 126:3

**faced** 197:6 217:22 226:23

**face-to-face** 83:23

**facets** 84:21

**facilitate** 12:14

**facility** 27:23, 24 32:25 41:21 64:8

**facing** 172:25

**fact** 29:24 30:1, 10 56:6 113:7 130:14 142:14 144:9 146:22 147:12 150:3 152:20 163:18 164:4 171:12 172:7, 18

173:22 174:22 181:11 192:5 199:15 201:12 207:20 208:24 209:8 210:5 211:23 217:18, 19

**factor** 35:23

**factors** 145:16 152:20 201:1 202:12 206:1 224:25

**facts** 34:19 35:24, 24 66:9 72:19, 20 76:18 82:5 83:19 90:24 93:8 114:3, 8 157:7, 15, 18 173:16 186:23 189:13, 18 191:4 196:3 197:9 201:9 205:17 217:17

**faded** 157:17

**failed** 113:19

**fair** 12:24 18:12 29:13 112:22 132:22

**Fairfield** 69:11

**fairly** 186:1

**faith** 161:5, 20, 23

**fake** 158:16

**fall** 222:4

**familiar** 128:22 130:10 202:3 205:17 215:9

**families** 14:19

**family** 96:19 97:14 205:2, 11

**far** 11:6 39:21 132:17 179:25 180:2 195:1 204:5 231:11 234:20, 23 235:18

**fast** 142:19 209:12

**faster** 117:21

**fatal** 26:3 71:17 73:25 74:2 79:1 94:11 101:16 143:17 215:11, 23 217:20 218:16, 17, 21 224:23

**fatality** 69:2 71:14, 21 93:24

**fatally** 75:5

**FDRB** 131:24

**fear** 73:2 98:19 155:14 161:13, 15, 24 164:2 165:5 179:9 182:4 186:18 187:4 188:3, 5, 10 189:10 192:11 194:25 199:10 200:7 203:12 209:2 212:10, 11, 22 217:22 226:23

**feared** 186:15

**February** 6:19 8:11 20:24

**feel** 17:15 111:25 118:21 151:1, 7 152:16 161:13

**feeling** 192:8

**feels** 200:21 201:3

**feet** 171:4 201:6

**felon** 151:14, 20 200:19

Case: 2:18-cv-01060-EAS-EPD Doc #: 141-1 Filed: 03/24/21 Page: 249 of 265 PAGEID #: 3392

Deposition of Sergeant Eric Pilya      Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

**felonious** 52:9 161:8, 10
163:9 167:23 185:7
186:9
**felony** 163:19
**felt** 15:20 16:1, 10
140:18 142:2 148:22
149:9 153:10 163:3
164:17 166:12 167:11
177:16 181:12 186:17
187:13 188:4, 15 194:12
195:4 206:13
**female** 54:17 170:5, 7, 11
175:13 200:18 202:16, 18
**fight** 168:2 201:3
**figure** 54:13
**file** 69:15 70:9, 18 130:5
139:23 156:20 177:12, 15
**filed** 105:10 116:21
137:14
**files** 137:25
**filing** 167:19 168:20
**fill** 19:11 224:22
**filled** 137:12 158:24
**filter** 127:9
**final** 35:23 41:4 70:17
85:19 103:12, 14 105:16
137:19, 25 138:8 218:2
**financially** 239:24
**find** 29:25 30:11 93:16
110:8 115:2 116:5
143:21 145:2 179:15
180:25 199:17 220:3, 5, 22
**finding** 166:21 204:12
216:2 226:13 232:25
**findings** 9:4 156:16
184:22 193:23 214:6
**finished** 22:13 48:9
82:19 103:9 138:5
**fire** 37:23 85:20 151:9
153:12 163:1 171:7
172:22 179:20 192:19
203:11 211:17, 19 214:15
225:17
**firearm** 139:25 140:3
142:3 154:1 187:18
211:23 212:17, 18 226:25
**Firearms** 22:19 46:13
100:25 101:6, 17 102:7
103:3, 24 104:2, 4, 21, 23
105:9, 13, 20 115:24
117:1 123:12 131:25
132:11, 16 137:4, 16, 18,
19, 22 138:12, 17 141:11
228:10 231:10
**fired** 26:10, 10 71:6 73:3
86:10 131:2 139:14
140:18 141:21 142:10
145:8 153:12 154:6
155:13 158:23 159:19
160:21 161:14 164:1, 21,

23 165:24 170:15, 20
174:14 178:13 179:1
186:17, 19 187:13, 13
190:6, 16 192:10 199:17
203:9 206:22 207:5
211:9 214:12, 17 216:6,
14 225:23 231:12
**firing** 149:10, 20 150:24
160:19 170:11 187:6, 15
190:18, 20 191:14 199:21
228:21
**firm** 240:1
**first** 5:4, 14 7:15 10:2
20:4, 22 36:10 37:21
42:5 44:17 50:17 56:8,
16 60:2 61:4 63:9
113:24 121:22 123:3
135:25 146:7 182:24
189:18, 20 191:9 239:7
**fists** 201:6
**five** 123:7 182:14 219:1
**Flanotta** 21:10
**fled** 186:20
**fleeing** 151:12, 13, 20
163:20 187:1 216:5
**flew** 171:1
**flies** 170:7
**flipping** 143:22
**floor** 169:21
**Florida** 185:17
**flowing** 169:24
**flying** 209:9
**focus** 101:4 120:7
**Foe** 137:1
**follow** 32:21 49:6 85:22
125:20, 23 178:10 198:5
**followed** 54:16 142:1
178:21
**following** 21:6 37:11, 12
108:14 194:18 201:23
216:23
**follows** 5:5 117:24
**follow-up** 42:20 53:14
82:22 83:1, 15 84:7
93:15 94:9, 10 222:23
**foot** 153:17 155:12 180:3
**FOP** 26:21, 22 27:24, 25
28:3 85:11 86:17, 20, 23
91:14, 15, 21 92:4, 7
125:23 184:9
**force** 7:17, 25 8:8, 18 9:5,
13 10:25 22:25 24:1
29:25 30:11, 11 32:5, 9,
15 33:7, 25 34:23 77:15,
25 78:6, 14 89:16 106:2,
6 109:15 112:24 114:11,
15 115:17, 19, 20 116:15,
25 118:17 119:12 123:11,
21 125:2 141:18 146:5,
17, 19 147:21 148:18

149:7 150:1, 9 151:5, 12,
13, 19 157:8 161:24
162:9, 14, 21 165:11
166:23 167:4, 9, 16
168:24 174:15 193:10
195:25 197:2, 6, 21
199:10, 13 200:3, 6, 12, 24
201:14, 24 212:18 217:4,
10, 12, 19 218:12, 16, 17,
22 219:17 222:12 224:17,
20, 22 229:18 231:6, 17,
20, 23 232:1, 4, 9, 12, 14,
16 233:2, 9, 14, 16, 22, 24
234:6, 15, 19 235:1, 7, 8, 9,
11, 15, 24 236:2, 6, 7, 9, 11
**foregoing** 239:12, 17
**foreign** 134:21, 21 231:11
**forfeit** 149:21
**forgotten** 102:13
**forks** 171:11, 14, 15, 21, 25
172:5, 12, 15 174:10
175:19 176:1, 3
**form** 19:9, 10, 11
**formal** 22:3, 8 100:13, 14
109:21 113:21 146:13
151:10 153:7 155:14
158:15 164:20 183:19
189:14, 19 194:21 229:21
230:4, 21
**formalized** 86:23
**formally** 77:13, 16
**forth** 37:12 190:12
201:11
**forward** 237:13
**found** 6:23 14:13 23:20
29:18 33:14 34:24 57:20
137:23 141:6, 12, 13
145:9, 11 153:19 155:5
156:23 157:3 158:7
163:21 164:6 165:19
174:20 178:4, 14, 15
181:25 194:11, 13 199:20
204:17 214:7, 9 215:19
234:14 235:1, 6, 10, 15
236:6, 10
**four** 84:16 105:1 123:7
124:19 139:4 203:9
205:1, 10 227:8 229:7
**frame** 210:21
**Franklin** 69:7, 17 71:20,
22, 22 72:3 226:9
**Fraternal** 164:7
**FRB** 101:14 102:6
103:18, 20 104:12 106:25
108:5 193:22 208:7
**free** 52:25 57:2, 4 93:3
**Friedman** 3:5
**Front** 3:15 62:25 159:25
165:16 181:17 185:11

203:21 204:8 207:11, 18,
19
**full** 5:9 44:2 88:22
119:6, 11 138:19
**function** 87:1
**functioning** 119:6, 11
**funny** 174:9
**Furbee** 184:17
**further** 86:1 87:10, 12
91:3 94:10 116:14, 20
239:16, 20
**futile** 92:7
**future** 138:2 148:3, 10, 17,
20 149:3 208:22 213:6, 11

< G >
**Garrity** 90:18
**gas** 139:7 214:11, 13
**gather** 8:12 10:19 11:15,
21
**gathered** 8:21
**gathering** 11:7
**Gelsomino** 3:3 4:4 5:8,
22 6:21 7:4, 10, 12 9:1
11:1, 11, 20 12:1, 5 17:4
18:16 23:16 29:23 33:17
36:2 38:21 39:2, 25 40:8,
13 51:5, 19 52:5 56:17
58:21 59:8, 18 60:22
61:18 65:23 66:24 67:7,
13 68:1, 9, 16 69:3 73:7
75:1, 10, 15, 22 78:3, 11,
25 89:4 91:5 92:6, 12
98:8 100:3, 8 109:10
110:9 114:23 117:13
122:9 124:6, 13, 14
134:23 135:7, 10, 24
139:2 143:1, 6 146:18, 25
147:18 148:1, 14 149:5
151:3 152:4, 11, 18, 24
159:14 160:11 162:4, 17
165:23 166:14 168:8, 22
169:6, 9, 14 173:5 175:6
179:21 181:2, 13, 20
182:8, 12, 21 188:9, 17
190:24 191:18 195:19
196:13 197:4, 10, 19
198:2 199:24 200:10
203:16 204:24 209:3, 25
210:8 211:24 212:15
213:15, 22 216:25 217:7
218:8 228:23 229:6
231:5 235:22 236:4
237:14 238:2, 5
**general** 118:3 173:6
**generality** 197:25
**GEORGE** 1:15
**gesture** 153:24 179:18
**get-go** 158:16

Case: 2:18-cv-01060-EAS-EPD Doc #: 141-1 Filed: 03/24/21 Page: 250 of 265 PAGEID #: 3393

Deposition of Sergeant Eric Pilya

Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

**getting** 15:2 36:*12* 168:*1*
210:*17, 24* 211:2 212:7
**giant** 201:*19*
**Gilbert** 3:*5*
**Gillet** 223:*5*
**girl** 203:*10* 204:2, *3*
**girlfriend** 227:*20*
**gist** 26:*13* 47:*14* 66:22
67:*16, 25* 68:*3* 225:*15*
**give** 6:*1, 12, 14* 8:*4* 10:3
13:*5, 16, 20* 15:20 16:*3*
23:*10* 25:*7, 11* 27:*3, 8, 16*
28:*16, 21* 29:*11* 31:*12*
34:*11* 44:*20* 46:*11* 47:*14*
50:*25* 51:*20* 53:*8, 13, 23*
62:*5* 63:*18* 87:*24* 88:*6,
14, 20, 23* 89:*5, 15, 23*
90:*3, 12* 93:*7* 102:2, *15,
16, 17* 118:*21, 22* 123:*10*
128:*15* 152:*20* 186:*25*
195:*15* 196:2 200:*1, 11*
201:*21* 218:*18* 220:2, *4, 8*
221:*8*
**given** 28:*12* 50:*20* 53:*17*
54:2 63:*8, 10* 74:*18* 76:4
92:*24* 124:4 145:*20*
168:*5* 174:*22* 184:*5*
196:*7* 220:*10, 12, 15*
239:*9, 13*
**gives** 26:*13* 65:*8* 88:*10*
100:*14* 104:*2, 4*
**giving** 25:*1* 27:*14* 30:*25*
53:*18* 91:2 92:*8* 185:*15*
210:*16* 211:*11*
**GJ** 128:*24*
**glaring** 207:*9*
**glaringly** 118:*7*
**glass** 209:*8*
**glitch** 12:22
**Go** 8:*25* 15:*9, 24* 16:2, *9,
15, 25* 19:*9, 19* 22:20
30:*22* 31:*7, 11* 32:*1*
35:*23* 37:*21* 43:*3, 8, 13*
45:*1* 48:*1* 55:*24* 58:*17*
61:*9* 63:*7* 69:*15* 71:*16*
81:*11* 83:*2, 5, 7* 87:*20, 20*
93:*3, 13* 94:22 100:*18, 25*
101:*6, 14* 102:*1* 103:2, *4,
15* 105:2, *14, 15, 24*
106:*13* 110:20 116:*12, 13*
117:*21* 121:*18* 122:2
127:*9, 21, 25* 128:*1*
134:*25* 137:*21, 24* 143:*7*
152:*7* 173:*3* 175:*15*
185:*10* 190:*8* 218:2
**goes** 60:*13* 101:*17* 103:*1,
8, 18* 116:*7, 8, 9, 9* 132:*16*
**going** 7:*13* 10:*3* 14:*10*
21:*8* 35:22 36:*1, 5, 9, 11,
16* 40:*6* 42:*3* 45:*18*

47:*24* 53:*6, 7* 57:20
64:*16* 66:23 83:*14, 18*
84:*25* 85:*2* 90:2, *4, 17*
92:*4* 107:*16* 108:*8* 111:*5*
117:*5, 7, 17* 121:*24* 122:*1,
4* 127:2, *18* 130:*5* 131:*5,
6, 16, 23* 135:*19* 138:*20*
143:*9* 153:24 154:*6, 8, 21*
155:*13, 16* 156:*10* 160:*5*
165:*17* 169:*5, 9, 21* 170:*2,
13* 172:*19* 174:*1, 14*
179:*1, 18* 182:*13* 188:*16*
194:*17, 22* 195:*10, 13, 16,
18* 198:*12* 200:22 206:*17*
211:*17* 221:*4* 228:*23, 25*
233:*20*
**Good** 5:*9* 15:*10* 34:*18*
35:22 49:*4* 53:*11, 12*
65:*5* 96:*17, 18, 18* 109:*8*
161:*5, 20, 23*
**Gorniak** 95:*14, 18* 96:*4*
**gotten** 47:*21* 73:*13*
155:*24*
**govern** 116:22
**governs** 118:2
**grabbed** 206:*13*
**Graham** 141:*18* 173:*15,
15*
**grammar** 102:*12*
**Grand** 24:*4, 6* 32:*18*
39:*5* 65:*18, 25* 66:*19, 19*
68:*11, 24* 69:*8, 14, 19, 21*
71:*8, 23* 74:*19* 80:*8, 14,
19* 101:*13, 16* 128:*25*
131:*17* 141:*9* 205:*22, 25*
206:2 215:*12, 18, 19*
216:*1* 226:*9*
**granted** 30:*9*
**Gray** 41:*10*
**great** 7:*4* 9:*9* 136:*16*
145:*18* 162:*11* 163:*15*
168:*25* 177:*9* 178:*1*
197:*7, 22* 199:*10* 200:*7*
212:*10* 217:*23*
**greatest** 106:*12*
**Greene** 3:*4* 5:*25*
**Greg** 76:*21*
**grievance** 105:*14*
**grieved** 164:*7*
**ground** 178:*11* 210:*17*
**group** 115:*18* 169:22
**grouping** 133:*9*
**guess** 6:*13* 136:*13*
149:*19* 218:*23*
**guessing** 182:*1*
**guidelines** 198:*4*
**guilt** 27:*5, 9*
**guilty** 145:*11* 152:*9*
177:*16*

**gun** 131:2 140:*11, 12, 16,
18, 22* 141:*25* 142:*8*
144:*7, 10* 152:*13, 21*
155:*21, 24* 158:*16, 17, 18,
22* 174:*14* 177:*13, 14*
178:*4, 5, 7* 179:*15* 180:*15,
16, 20* 181:*8, 17* 206:*15,
15, 17, 18, 21* 207:*1* 208:2,
3, 18, 22, 25* 212:*1, 4, 5*
216:*6, 8, 12, 13, 15, 16, 17,
19, 23* 217:2 226:2, *3*
227:22 229:*14* 230:*10, 17,
24*
**guns** 178:*8*
**gunshots** 99:*5*
**guy** 142:*6* 145:*4* 148:*5*
163:*23, 25* 165:*17, 20*
170:2, *24* 172:*19* 174:*11,
14* 176:*4, 7* 182:*1* 195:*13*
201:*5*
**guys** 45:*17* 66:25 68:2
126:*23* 127:*1* 134:24
142:*7* 171:6
**guy's** 171:2 172:*21* 176:2,
5*

**< H >**
**halfway** 210:*22, 22*
**hall** 128:*16*
**Halloran** 3:*13* 7:*1, 5*
8:*25* 10:22 11:*8, 18, 24*
12:*3* 13:*1, 12* 16:25
18:*11* 23:*5, 7* 29:*16*
33:*15* 35:*17* 38:23 39:*19*
40:*5, 11* 51:*1, 14* 52:*1*
56:*13* 58:*13* 59:*6, 16*
60:20 61:*14* 65:*19* 66:*18*
67:*4, 11, 23* 68:*6, 14, 25*
72:24 74:22 75:*6, 13, 18*
78:*1, 7, 18* 88:*25* 90:22
92:*1, 10* 98:*2* 109:2
110:2 114:*17* 124:*8*
135:*5* 142:*24* 143:*4*
146:*6, 21* 147:*16, 22*
148:*11, 19* 150:*18* 151:22
152:*15, 22* 159:*12* 162:*1,
12* 165:*13* 166:*11* 167:25
168:*12* 169:*2* 173:2
175:*4* 179:*10* 180:22
181:*10, 18* 182:*6, 10*
188:*7, 12* 190:*21* 191:*8*
195:*9* 196:*1* 197:*1, 8, 17,
24* 199:*12* 200:*8* 203:*14*
204:22 208:*23* 209:*21*
210:*3* 211:*21* 212:*14*
213:*13* 216:*21* 217:*5, 24*
231:2 235:*17* 236:*1*
237:*9* 238:*6*
**halo** 15:*8, 13, 16*

**hand** 140:*16* 141:*25*
142:*8* 143:*10* 150:*25*
154:*13* 158:*18, 22* 171:2
172:*21* 176:2, *24* 195:*15*
202:*19, 25* 206:*20* 208:*2,
22* 227:*16, 23* 240:*4*
**handcuff** 186:*3*
**handcuffed** 186:*21* 187:*7*
**handcuffs** 25:*21* 31:20
34:*21* 57:*7, 10, 11, 14, 22,
24* 185:22
**hand-deliver** 76:*9* 79:*2*
**handed** 75:*24* 76:*5, 6*
183:*8*
**handgun** 150:*22, 23, 25*
151:*6, 21, 25* 158:*12*
226:20 227:*14, 16*
**handle** 16:*7, 10* 95:*3*
126:*8* 127:*19* 216:*8*
**handled** 16:*23* 34:*17*
64:*1* 94:*25*
**handling** 95:*25*
**handouts** 120:*21*
**hands** 19:*18* 76:*19* 164:*5*
170:*14* 175:*14, 23* 176:*5,
10* 178:*24* 201:*6* 208:*4*
209:*14* 210:*17* 212:*8*
**hands-on** 209:*12*
**hanging** 186:*6*
**happen** 25:*3* 64:*16* 89:*25*
107:*17* 162:*2, 5, 6* 165:*25*
166:*4* 188:*16* 194:*25*
221:*11*
**happened** 36:*19* 46:*15, 24*
49:*17* 68:*8, 11* 86:*2* 88:*3*
93:*1* 103:*13* 126:22
138:*1, 3* 140:*17* 142:*19*
187:*15* 191:*11* 209:*12*
233:*25*
**happening** 18:*24* 108:*18*
132:*19* 156:*13* 187:*4*
188:*18* 210:*1*
**happens** 31:*17* 36:2*1*
41:*13* 47:*8* 69:*10* 81:*14*
84:*4* 92:*14* 100:20
104:*19* 184:*12* 225:*4*
**happy** 53:*5* 125:*17*
**hard** 191:*4* 194:*18*
199:*14*
**harm** 136:*16* 139:*18*
144:*13* 145:*19* 148:*17*
150:*17* 162:*11* 163:*15*
168:*3, 25* 170:22 177:*9*
178:*1* 197:*7, 23* 199:*11*
200:*7* 203:*13* 212:*10*
214:*19* 217:*23*
**harm's** 213:*12*
**Harry** 135:*25* 137:*4*
**head** 38:*13* 52:*23* 70:*16*
82:*4* 126:*16* 133:*10*

Case: 2:18-cv-01060-EAS-EPD Doc #: 141-1 Filed: 03/24/21 Page: 251 of 265 PAGEID #: 3394

Deposition of Sergeant Eric Pilya

Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

143:23 173:9 191:1
218:6 219:11
**headquarters** 27:23 56:21,
24 57:1 61:24 64:11
**heard** 108:18 143:2
174:15 232:16, 22 234:8
**hearing** 233:20
**heat** 196:7
**heavily** 122:24
**He'd** 73:1
**held** 38:25 53:20 56:4
100:6 169:12
**help** 18:22 19:21 44:4
128:23 141:1 157:15
202:17
**helping** 134:22
**hereinafter** 5:4
**HEREOF** 240:4
**hereunto** 240:4
**hey** 170:2
**high** 15:20 16:3
**hindsight** 141:21 173:18
**hired** 13:22
**history** 13:21 17:23
**hit** 125:11 159:3 189:23
228:19
**hold** 48:25 134:9
**holding** 144:10 174:12
208:17
**holds** 173:10
**home** 32:1 66:3, 3 83:5
140:10, 24 142:6, 15, 21,
23 143:2, 3 144:6, 10, 20
145:4, 23 148:6, 23
**homes** 143:10, 13
**homicidal** 170:24 229:25
**Homicide** 5:14 13:24
14:4, 9, 12, 17, 18 21:15,
24 22:5 23:1, 3, 14, 18, 19,
21 24:5, 14 25:21, 24
28:25 29:6 31:10 33:2, 3,
6, 12, 13, 21 40:15, 16, 21,
23, 25 52:9 64:9, 18 65:3,
16 75:17 78:22 79:18
111:10 119:8 220:13
233:7
**homicides** 96:6
**honest** 112:1 150:13
**hoodie** 206:22
**hooked** 188:24
**Hopefully** 42:13
**hoping** 206:23
**hopped** 143:8
**Horton's** 64:11
**hospital** 47:20 48:1 64:22
**hospitalization** 65:1
**hotel** 169:23
**hours** 49:19 59:24 87:21

**house** 185:25 186:20
195:13 202:18, 24 203:4,
7, 23, 25 204:2, 5, 7, 9
**Howard** 219:10
**Huh-uh** 123:14
**human** 116:12
**hundred** 64:3

**< I >**
**I,IP** 133:18
**IA** 105:17 106:17 114:24
115:13 116:3, 6
**Ian** 5:11
**idea** 34:18 35:22, 25
36:4, 16 49:16 68:7, 10
187:24 188:1 231:18
**ideas** 36:18
**identification** 49:4 111:24
117:11 122:7 135:22
138:25 160:9 182:18
213:20 229:4
**identified** 20:19 214:10
**identify** 18:2 110:22
**identity** 53:11
**imagine** 146:14 230:5
**immediate** 27:20 41:15,
16 108:25 115:23 168:25
196:22 197:22 203:13
**immediately** 26:3, 5 58:16
61:19 108:14 196:21
209:7 210:7, 9
**imminent** 136:16 139:17
144:12 145:18 146:20
150:16 153:5 159:22
162:10 166:10, 13, 19, 24
170:19 177:8 178:1
197:6, 22 199:10, 19
200:7 217:22 226:23
**impact** 17:5 97:3, 20
98:12, 16 130:19 136:8
159:9 207:22, 24 217:20
**impacted** 187:2
**impacts** 30:2
**importance** 14:16 222:7
**important** 14:17, 19
31:16 172:7 196:14
197:11
**impossible** 200:16
**impression** 225:24, 25
**improper** 15:15
**improperly** 15:4
**inaccurate** 123:24
**inappropriate** 175:16
194:12, 15
**incarceration** 152:10
**Incident** 4:7 5:15 6:13,
19 25:25 27:21 30:8
36:19 42:5 46:12 48:22
50:1 66:10 70:25 80:21
82:25 83:3 85:17 87:24

91:4 92:20 117:16 144:2,
18 150:12 157:13 169:19
177:11 178:3 217:13, 16
218:4 227:21 228:1
**incidents** 22:16 29:18
45:24 64:14 89:9 109:21
123:21 161:1 217:11
232:21
**include** 9:15 128:9 138:1
153:20 157:6, 15, 18
**included** 224:7
**including** 43:17
**inconvenienced** 61:6
**incorrect** 39:8 159:16
190:2 196:17
**increases** 15:19
**incredibly** 227:19
**independent** 111:8
**INDEX** 4:1 94:17
**indicate** 110:16 142:22
222:13
**indicated** 224:8
**indicating** 230:2
**indicative** 27:4, 9
**indicted** 71:9, 25
**individual** 16:1, 8 18:21
49:11 54:7 60:17 62:3, 8
71:7 82:6 110:4, 17
140:19 142:3 143:8
153:10, 13 159:8 163:21
169:24 170:8 172:6
196:3 198:5 200:25
207:12 211:13 227:13
228:15
**individuals** 50:12 55:18
62:12 153:9 170:1 216:3
225:14, 15
**individual's** 164:5
**inertia** 189:1
**inflame** 98:21
**influence** 49:16 107:13, 18
**influenced** 96:21
**informal** 77:2 86:22
**informally** 77:14, 17 86:15
**information** 6:14 8:12, 17
9:16 10:19 11:3, 6, 15
17:12 23:10 25:1, 8, 11
27:16 30:25 31:6 36:13
42:11 47:6, 7, 18, 21 48:6
50:8 51:16, 18 53:8, 13
54:14, 16 55:22 58:19, 23
60:4 66:5, 22 68:12 86:6
87:9, 11 91:2 92:8 94:8,
9 95:7, 16, 23 96:7, 12
97:1, 19 98:20 99:1
107:22 113:20, 25 138:2,
17 142:4, 9, 11 176:24
190:9 221:9
**informational** 83:25 84:1

94:19, 21
**informed** 61:25 83:14
**initial** 31:8, 12 46:24
66:9 92:25 93:19 102:9
178:21
**initially** 57:11 83:4
**injured** 73:1 85:12 156:2
**injuries** 200:22
**injury** 42:10 47:19
186:12
**In-person** 99:23, 24
**in-policy** 22:22 105:2, 3
129:2 132:1, 2, 6, 7, 9
133:3, 4, 6, 12, 18 134:10,
11, 12, 17 141:12 196:11
**input** 207:14
**inservice** 120:2
**in-service** 19:5, 7
**inside** 62:13 81:25
146:22 158:25 159:6
165:19 185:12 202:23
203:6, 10 206:19
**Instagram** 126:4, 8
**instance** 24:17 28:22
31:9 37:20 43:24 44:1
47:23 97:7, 13 130:1
131:12 149:7 192:25
200:17
**instruct** 50:15
**instructed** 184:12
**instructing** 21:7
**instructs** 13:6
**insufficient** 184:2 185:1
193:21 202:8 214:8
226:15 227:11 228:9
229:13
**intact** 43:24
**integrity** 112:4
**intended** 192:19
**intending** 168:18
**intent** 37:13 158:8
160:18, 22, 24 161:12, 16,
17, 23 162:9, 14 163:10
199:25 222:8, 13
**intention** 105:3
**intentional** 105:3 132:6, 6
133:3, 4, 6, 18, 23, 25
134:4, 5, 10 164:19 192:15
**intentionally** 164:21, 22
168:2 198:13
**intents** 237:23
**interest** 79:19 107:24
**interested** 41:3 239:24
**interesting** 14:13, 14
**Internal** 105:10, 11, 24
106:19 115:3, 6, 16
116:13 130:9 138:9, 10,
14 222:5 223:3
**internally** 127:4

Case: 2:18-cv-01060-EAS-EPD Doc #: 141-1 Filed: 03/24/21 Page: 252 of 265 PAGEID #: 3395

Deposition of Sergeant Eric Pilya        Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

interrogate 25:25 26:2, 5
28:10
interrogated 49:20
interrogation 27:1, 8
interrogations 110:11
intertwined 131:4
interview 30:20 31:8
48:1 53:14 55:24 56:7
57:25 58:17 61:9, 15, 16,
22 62:8 81:19 93:5
110:4, 5 223:12, 17
interviewed 43:25 48:20
52:19 54:19, 21, 23, 25
56:1, 11, 16, 21 57:23
61:4, 7, 24 82:10, 11
94:19 183:16, 19 190:3
191:23 218:9, 15 221:13
interviewing 110:15 190:4
interviews 36:8 44:4, 5
45:6 52:22 56:20 94:22
183:15 218:1 223:6, 19
invaded 143:3
invader 143:2
invasion 140:10, 25 142:6
144:6, 21 145:4, 23 148:6,
24
investigate 106:5 107:4
144:5 219:20 221:23
223:2
investigated 6:17 39:12
100:11 119:17 143:25
218:16 222:1
investigating 46:3 111:13
112:2, 12 113:9 115:19
investigation 6:15 9:14,
17 14:15, 16, 17, 18 22:5,
13, 24 23:1, 18, 20 30:2
31:1, 10 32:17 33:11, 12,
22, 24 34:7 35:9, 21, 22
36:1, 5, 15, 16 39:22
43:20, 21 45:9 46:1
48:12 50:9 51:16 60:5
62:1 64:18 67:6, 22 68:5,
8 69:25 71:11 73:18, 19
74:15, 21 75:3, 17, 21, 23
76:1, 3, 5, 18, 22 79:21
80:2 81:21, 23, 24 82:8
84:4, 5, 12, 19 87:10, 12
90:6, 11, 16, 17 94:6, 7
96:13 99:2, 5, 6, 10, 15, 20
98:3, 6, 12, 16, 21, 23
100:10, 19, 22 102:14, 24
103:24 104:11, 15, 17
105:12, 17, 24 106:17, 20
107:6, 12, 17, 19, 21 108:4
109:14, 16 111:8, 23
113:16 114:24 115:14, 16
116:7, 15, 16, 23 119:1
121:23 129:17, 19, 22
130:4, 5, 20 132:4 141:4

142:5 144:25 145:1
173:25 174:23 176:21
177:5 189:13, 25 190:23
199:18 202:11 205:24
207:14, 25 212:21 213:4
214:5 215:15, 24 217:8
223:4 233:15, 19, 19
235:19 236:15, 20 237:1
investigations 7:18, 18, 25
9:3 10:13 21:5, 23, 24
23:4 29:25 30:10 36:22
45:23 51:7 52:12 60:11
84:22 107:10, 11, 13, 20
109:23 111:17, 22 112:15
126:18 218:19 237:6, 19
investigative 41:23, 23
42:4 66:5 74:6, 25 84:2
98:5 115:8 118:4 138:7
investigator 42:3 43:16,
17, 18 55:15 62:9 68:2
79:5, 9 83:8, 10, 13 94:12
146:10 190:8
investigators 34:16, 17
35:19 36:4 67:2, 14, 16
142:13
investigatory 97:4
Involved 4:10, 11, 12, 13,
14, 15, 16 17:25 34:12
39:4, 12, 15, 17 40:17, 22,
23 41:12, 14, 14, 19 42:21
43:24 44:1, 2 46:8 47:5,
6, 16 51:7 52:10 58:6
63:25 64:17 65:7, 7, 12,
16, 21 66:7, 11 67:18
68:18 69:2 70:12, 20, 23,
24 71:3 72:22 76:22
85:17 89:11 93:7 94:24
95:2, 7 96:1, 23, 25 97:2,
20 98:9 99:3 100:24
105:7 106:7, 19 121:21
122:11, 16 126:22 130:2
131:1 132:13 133:15
135:13 136:25 143:12
152:25 154:15 158:6
170:10 174:21 178:9
196:8, 10, 21 217:20
218:3, 3, 10, 11, 21, 25
233:15, 17 234:7, 9
involvement 75:16 116:6,
14, 20
involves 122:25
involving 22:16, 17 45:24,
24 111:22
INVP 133:22
IP 129:1 132:1
Irrelevant 75:19
I's 102:12
issue 105:23
issued 145:10 193:23
234:23

issues 64:21 105:21, 25
106:16 226:10
its 39:10 193:23 198:1

< J >
Jacqueline 3:4 5:25
Jacquerious 226:13
JAMES 1:20 6:8 9:12
43:11 80:16 104:17
114:25 118:9 169:16
175:2 182:15, 25 183:3
236:25 237:1
Jan 95:14, 18 96:3 99:20
Jeff 184:17
Jeffery 21:1
jeopardy 165:22 186:15
jerking 216:10
Jgreene@f-glaw.com 3:8
Jim 121:14
Jimmy 76:14, 16
job 1:10 37:16 106:5,
12 161:4, 4 168:3, 19
169:23 173:19, 21 179:11
183:17 196:2, 3 198:15,
24 199:2, 3
jobs 168:6
joint 62:7
joke 116:19
JOLSON 1:23
JR 1:2
JUDGE 1:2, 2, 15, 16, 21,
22 158:14 173:13, 16
judged 141:20 147:7, 9
169:8
jump 191:3
jumped 114:5
June 5:21 13:25
jurisdiction 134:21
Jury 24:4, 6 32:18 39:5
65:18, 25 66:19, 20 68:11,
24 69:8, 14, 19, 21 71:8,
23 74:19 80:8, 14, 19
101:13, 16 128:25 131:17
141:9 205:22 215:12, 18,
19 226:9
Jury's 205:25 206:2
216:1
justice 14:19
justifiable 23:20 24:5
72:17
justification 87:2 112:23
114:15 146:8, 16 152:3
157:11 159:24 167:3
187:6, 15 190:19 191:7,
13 200:12 201:13 225:10
230:20
justified 24:2 33:14
72:22 149:7 150:2
158:11 159:10 200:24
217:4 230:13, 18

justify 146:4 147:20
148:18 150:23 191:17
195:24 201:24 212:17

< K >
Kaufman 140:14 142:9,
18 143:24
keep 16:3 53:5 66:15
83:13 93:10 96:9 97:16
98:6 107:9 127:5 195:11,
14
keeping 99:10, 13
keeps 237:17
Keith 230:16
Kelly 41:10
kept 194:22 203:8 206:6
Kessner 183:7
key 60:6
kill 32:15
killed 31:10 32:5 34:13
66:4 140:19 143:15, 24
144:10 207:5 219:1, 7
222:21
killedy 141:2
killing 66:2 71:7 216:15
KIMBERLY 1:22
kind 12:22 17:18, 23
18:9 21:16 46:14 85:19
86:11 88:23 90:1 96:9
101:21, 23 104:25 106:1
120:10 121:20 128:12
132:5 186:4 187:23
232:25
kinds 66:11 201:7
kinetic 110:14
KING 1:2, 2 6:7 7:5
9:12 43:6 54:1, 7 80:10
104:15 109:12 115:13, 15,
16 118:10 215:7 216:3, 9,
9, 14, 19, 22 217:1, 9
219:19 223:7 224:17
225:19, 20 226:5 236:16
kitchen 203:4
kneeling 178:11, 24
knees 178:17, 22 179:3
180:14, 20
knew 11:9 78:19 81:1
141:20 147:5, 7 166:1
173:3, 23 174:24 195:13
199:16 201:9 206:16
knife 143:10, 14 171:9, 10,
11 172:17, 20, 21 174:2, 5,
8, 12 175:20 176:6
knock 82:15 83:4
knocked 185:11
know 8:10 10:4 12:11
16:17, 19 18:5, 24 20:3
23:23 26:14 32:20 39:11
41:25 44:22 47:4, 14, 16,
23 48:13 52:11, 13 53:19

Case: 2:18-cv-01060-EAS-EPD Doc #: 141-1 Filed: 03/24/21 Page: 253 of 265 PAGEID #: 3396

Deposition of Sergeant Eric Pilya     Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

54:12 55:10, 13 56:2, 18
58:1 62:2 73:14 76:2
78:8, 10 82:7, 11, 12 84:7
85:13, 17 91:18 92:22
96:8, 14, 20 98:4, 9, 15
107:16 110:19 112:12
117:19 124:6, 8 125:12
126:9 127:17, 21 128:2
130:1 131:13 132:3, 12
133:23 134:7, 8 137:4, 7
138:3 140:22 141:13
143:16 148:22 149:18, 22
150:14, 23 152:7 157:3
163:23 164:15 165:17, 20
169:17 171:3 172:2, 7, 15
176:6 177:6 178:4
180:11 181:25 182:2
190:22 191:19 194:13, 13,
22 195:10, 16 198:10, 11
204:12, 17, 23 207:9
211:1, 4, 5, 6 212:3
214:22 218:24 219:5, 11,
24 221:1 223:15 224:19
227:16 229:22 231:8, 9,
14, 24 232:2, 21 234:16
235:3
**knowing** 191:10
**knowledge** 45:15 96:11
97:10 98:7
**known** 11:15 142:4, 9
173:17 197:9
**knows** 23:11 26:17 42:4
98:13

**< L >**
**lab** 84:10, 17 94:11
**labs** 84:9
**laceration** 159:4
**lack** 138:19
**lady** 71:4
**landed** 193:7
**large** 29:17 45:5 47:10
86:4 112:11 186:1
197:16
**laser** 216:11
**latest** 127:9
**law** 23:21, 22 32:8, 8
37:8, 11 45:24 50:9
51:17, 20 60:5 131:8
160:19 161:2 162:20
165:3 167:11 189:9
199:3 229:12
**lawful** 5:3
**lawfully** 60:15
**laws** 46:4
**lawsuit** 116:21
**lawyer** 6:20, 24 11:23
13:13 28:13 53:24 85:24
88:11

**lawyers** 88:23 90:15
124:4
**laying** 171:22
**lead** 18:3 20:24 21:7, 8,
13, 17 44:8 55:15 68:2
76:23 94:16 129:15
179:13, 16 201:13 202:12
223:4
**leader** 5:15 6:13, 18 21:1
40:18 41:2 42:8 46:6
70:24 75:20 81:1 174:19
**leadership** 44:6
**leads** 72:20 146:8
**lean** 84:15
**leaning** 221:18
**learning** 55:21
**leave** 48:9 52:25 53:10
57:2, 5 62:22 63:5, 20, 22
82:25 86:11 93:3, 4
**leaves** 127:13
**leaving** 53:17 54:3
214:13
**led** 113:8 146:23 172:22
179:6 189:21 225:1
**leeway** 168:6 173:21
**left** 71:16 76:19 94:3
100:9 106:8 188:23
206:14
**leg** 203:11
**legal** 51:23 184:5, 12, 16
189:17 192:5 193:16
196:10
**legally** 169:1
**legs** 206:7
**Leica** 85:1, 1
**length** 52:3 77:18
**lethal** 22:25
**letter** 104:24
**letters** 133:9
**level** 37:18 149:12 150:7
161:7 163:4 164:3
167:19 174:25 180:24
194:7 234:6
**liaison** 184:20
**license** 49:5
**lieutenant** 40:19 42:10
46:17 102:3, 18, 19
103:15, 16 131:19, 22
**life** 32:9 37:24 73:2
142:2 153:10 155:15
161:13, 25 165:22 170:11
172:23 174:13 177:16
181:12, 15 189:10 201:4
216:13
**limited** 95:6
**line** 34:23 203:10 219:2
227:2
**lines** 96:20 115:7 213:25
227:5
**LinkedIn** 125:6 126:10

**list** 41:25, 25 42:23
44:21 102:15 119:20
**literally** 102:11
**Litigation** 3:14
**little** 12:18 15:22 22:6
24:17 78:23 79:19 85:4
109:7 116:19 117:21
132:3 224:4
**live** 54:19
**lived** 142:22
**lives** 23:22, 22 151:8
209:2
**living** 202:24
**LLC** 2:9
**located** 81:17 225:22
**location** 26:25 27:16, 25
31:11, 13 99:5
**locked** 185:17, 20 195:3
**lodged** 78:5
**long** 14:25 39:14 55:25
60:9 63:24 76:25 80:7
84:12, 13, 14, 15 86:21
88:16 89:21 91:20
121:12 124:17, 18 135:5
155:10 156:10 202:22
233:6, 6
**longer** 89:8, 9, 13 95:19
**longest** 89:14, 19
**long-standing** 65:11
**look** 19:13 25:2 26:11,
11, 18 65:11, 15 68:18
85:21 86:10 87:7 92:23
105:25 116:1 121:24
124:12 127:20, 21 129:24
135:25 136:13 138:3, 21
139:3 149:16 150:11
153:16 156:9 157:25
160:12 177:4, 20, 21
201:25 214:3 226:12
227:24 228:4 229:8
**looked** 137:2 216:16
**looking** 86:7 108:6
110:14, 16 129:22 132:4
140:5 169:15 174:6
185:5 194:8 213:16
230:16
**looks** 102:6, 7
**loosely** 131:15
**lot** 29:9, 9 34:17 36:11,
12 43:25 45:18 47:4
65:14 84:21, 21 121:20
122:15 131:5 144:8
148:4 169:23
**loud** 12:16
**love** 87:14
**Lowe** 76:14, 16, 25 77:2

**< M >**
**MAG** 1:2, 16

**MAGISTRATE** 1:22
**maintain** 99:8
**Major** 40:19, 20 118:4
**majority** 29:18, 24 33:7,
25 48:11 54:5 104:25
**making** 12:14 47:21
120:8, 9 132:10 168:7
196:14, 17 201:10 218:5
**Male** 137:1 141:22 170:5,
6
**malfunction** 224:6
**malfunctions** 224:6
**malicious** 37:13 161:12,
16, 17, 23 162:8, 14
163:10 222:8, 13
**man** 170:13 178:16, 19
179:2, 3 181:5, 16 201:19
**manage** 127:17
**mandatory** 118:20
**maneuver** 133:11, 13, 14
**manner** 108:1 110:1
195:17
**manual** 117:3 123:11
237:10
**mark** 117:7 118:5 122:4
135:19 138:22 160:6
228:23, 25
**marked** 117:10 122:6
123:17 135:21 138:24
160:8 182:17 213:19
229:3
**marks** 15:21 16:4
**Marshal** 230:17
**Martin** 183:7
**Mason** 217:10, 12 219:6,
10 224:16 225:2
**Mason's** 225:9, 12
**match** 110:7 111:4
191:15
**materials** 7:24 120:4, 15,
21 121:4 122:19 124:15
**matter** 13:18 58:22 98:7
108:9 114:3 164:14
**Mayor** 111:20
**McCosky** 121:14
**mean** 6:11 22:15, 24
23:17 34:10 37:5 38:14
45:12 47:3 84:15 90:23
95:13 101:10 106:1
112:10 116:17 129:8
130:7, 12 136:5 144:19
160:22 162:18 196:9
205:12 207:18 228:13
**means** 37:7 41:22 129:9
131:9 134:12, 17 136:20
162:23 196:11 226:20
**mechanism** 68:23 69:1
**media** 95:16 96:8 125:9,
10, 11, 13, 16 126:3, 14

Case: 2:18-cv-01060-EAS-EPD Doc #: 141-1 Filed: 03/24/21 Page: 254 of 265 PAGEID #: 3397

Deposition of Sergeant Eric Pilya | Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

128:15
**medics** 171:23
**Medved** 2:5 239:4 240:11
**meet** 45:6 93:11, 20
118:22, 23 144:7
**meeting** 76:25 101:23
**meets** 210:21
**mega-bus** 44:2
**Megan** 2:5 12:12 239:4
240:11
**member** 21:3 24:21 28:3
32:24 41:18, 19 63:23
64:2 85:9 93:4, 6 121:25
**members** 8:8, 18 24:12
48:24 64:13 81:13 97:14
127:5, 12
**memorialized** 91:16
237:25
**memory** 109:4 139:20
165:15
**memos** 83:20
**menacing** 177:12, 15
**menacing,** 136:19
**mental** 64:12, 18, 21, 25
65:2, 6 170:22
**mention** 117:25
**mentioned** 9:11 48:16
118:1 212:6
**Mere** 212:19
**merits** 39:10 99:10, 13
198:1 217:15
**message** 83:21
**met** 28:3
**metal** 172:16
**metallic** 170:14 171:13
**Michael** 3:13 6:21 13:1
134:23
**mid** 21:4
**mid-2009** 20:25
**Mike** 10:5 13:12 41:10
124:6
**military** 89:12, 20, 23
**mind** 68:7, 10 136:19
140:21 148:7 166:12, 12
172:20 174:11 190:14
**minute** 38:22
**Miranda** 90:12
**misconduct** 17:24 18:9
150:7
**misdemeanors** 52:12
**mislead** 191:5
**misled** 191:10
**missing** 92:22
**misspellings** 102:13
**misspoke** 141:8
**mistake** 171:16
**mistaken** 62:17 176:22
177:1, 3
**mistook** 172:12

**Mitchell** 71:1, 2, 3, 25
72:10, 22, 25 73:19 75:4,
25 77:9 78:5, 17, 19, 20
79:11, 12, 20 129:13
234:20 235:4, 12
**Mitchell's** 129:7
**moment** 33:23 41:12
151:2 196:7 199:23
206:11 209:22
**Monday** 2:7
**money** 205:2, 11
**monitor** 59:20
**month** 10:7, 10, 11, 17
42:2 89:18
**moral** 15:25 16:3
**morgue** 94:1
**morning** 5:9
**MORRIS** 1:21
**motel** 169:20
**motions** 30:22
**move** 22:13 169:10
201:25
**moving** 149:20
**muddies** 97:15
**multifaceted** 100:16
**multiple** 109:5 218:23, 24
219:17
**murder** 23:24 32:2 34:4,
6 35:2 72:1 139:12
**murderer** 96:8
**mysterious** 175:19

**< N >**
**naked** 143:10, 14, 18
**name** 5:10, 22 87:21
125:25 127:20 136:23
143:20 144:17 152:8
219:6
**named** 219:12 239:6
**Nancy** 103:25
**Narewski** 206:3, 10, 13, 16,
16, 19, 25 207:3, 5 209:4,
9, 24 210:2, 10, 13 211:7,
17, 25 212:3, 4 213:9, 10
**Narewski's** 211:18 212:22
213:4
**nature** 15:19 22:4 32:25
37:13 45:8 47:20 48:10
49:3, 5 63:12 64:16, 21
84:11 85:3 93:19 97:9
110:20 116:21 127:14
173:21 230:12 231:11
**NB** 128:24
**nearest** 27:22 30:7 32:24
41:20
**nearly** 108:20
**necessarily** 51:3 70:18
96:5 114:18 124:10
149:3 161:7 163:8

168:13 173:24 196:9
223:9
**necessary** 48:1 85:2 87:7
118:22 197:3
**need** 19:20 38:21 85:17
93:21 139:20 161:9
186:22 196:11
**needed** 19:18, 23 20:19
45:18 108:25
**needs** 84:6
**negate** 210:7
**negative** 15:25
**negatively** 97:3, 20
**neighborhood** 143:11
151:25 153:9 154:17
**neither** 153:23
**nervous** 110:17
**never** 20:19 28:5 77:23
78:21 91:24 103:8, 22
104:7 122:16 126:5
129:5 153:15, 18, 25
154:11, 23, 24 155:17
175:14 176:10 179:3
180:8, 15, 16 212:1
216:19, 23 225:4 226:2
**new** 119:19, 21 120:17
125:2 127:12 128:2
**newest** 43:21
**newly** 120:7
**nice** 12:14
**night** 27:4 31:25 35:21
36:5 56:15 88:1 108:9
137:12, 14 141:2 157:11
214:4 227:20
**NIP** 133:4, 11 134:2
**noncriminal** 29:19 33:8
34:1 39:5 165:10
**nonfatal** 73:25 80:21, 25
101:18 130:2 154:25
183:21 184:7
**non-fatality** 70:2, 11, 22
**non-police** 64:17
**nonverbal** 110:15
**North** 3:15 54:22 190:13
**Notary** 2:5 239:4 240:11
**notation** 132:9 134:2
**notations** 132:3, 10
**note** 18:8, 9
**noted** 207:20
**notes** 120:11 123:8
**notice** 6:23 9:25 10:2, 8
**noticed** 216:12
**notification** 115:6 157:13
**notified** 233:17
**notify** 41:15 157:9
**November** 2:7
**nullified** 113:2
**number** 5:16, 16, 17 7:6,
6, 6, 7, 7, 8, 8, 8 44:5, 6
49:19 53:12 87:21 94:20

112:13 126:23 127:21
163:23, 24 218:14, 18
231:8
**numbering** 94:17
**numbers** 7:6 127:12
128:16 231:13
**Numerous** 218:13, 14
**nun** 225:3, 9, 12
**nuns** 54:21
**NVP** 133:20, 21 134:2

**< O >**
**o0o** 1:11, 19 2:1
**object** 13:4 170:14 171:1,
13 174:4 176:2
**objected** 124:11
**Objection** 8:25 10:22
11:8, 18, 24 12:3 13:6
16:25 18:11 23:5 29:16
33:15 35:17 39:19 40:5,
11 51:1, 14 52:1 56:13
58:13 59:6, 16 60:20
61:14 65:19 66:18 67:4,
11, 23 68:6, 14, 25 72:24
74:22 75:6, 13, 18 78:1, 7,
18 88:25 90:22 92:1, 10
98:2 109:2 110:2 114:17
142:24 143:4 146:6, 21
147:16, 22 148:11, 19
150:18 151:22 152:15, 22
159:12 162:1, 12 165:13
166:11 167:25 168:12
169:2 173:2 175:4
179:10 180:22 181:10, 18
182:6, 10 188:7, 12
190:21 191:8 195:9
196:1 197:1, 8, 17, 24
199:12 200:8 203:14
204:22 208:23 209:21
210:3 211:21 212:14
213:13 216:21 217:5, 24
231:2 235:17 236:1
237:9
**objectively** 173:1
**O'Brien** 69:17 76:14, 16,
25 77:2
**observe** 183:14
**observed** 232:11, 14
**obvious** 108:7
**obviously** 53:6 90:4
126:17
**occasion** 18:6 39:15
89:11 104:7
**Occasionally** 49:2 82:23
**occasions** 31:4, 5 64:23
89:13 96:7 106:9
**occur** 84:7 94:10
**occurred** 34:8 46:12, 25
47:15 69:13 71:18 76:17

Deposition of Sergeant Eric Pilya | Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

77:22  81:25  83:3  189:16
199:18  217:16
**occurring** 73:3  188:14
**occurs** 24:23  60:11  87:6
106:19
**offender** 131:13
**offense** 149:12  180:25
**offhand** 51:22  231:14
**office** 69:16, 21  70:7, 9
71:8  72:5  74:1, 7, 18
75:24  76:6, 8  79:2, 7
83:24  93:24, 25  94:13, 24
95:6, 12, 23  96:19  97:2,
19  99:2, 7  100:1  105:15
184:19  186:4  189:1
205:22  208:13, 15  240:5
**officer** 18:2  23:19  24:7,
12, 18, 20  26:3, 8, 25  27:3,
22, 22  28:3, 6, 11, 16
29:21  30:5, 9, 17, 19, 24
32:4, 8, 16, 23, 23  33:3, 21
34:12, 20, 23  35:5, 6, 7, 8,
15  36:12, 14, 17, 19  37:10,
15, 20  38:7, 8, 14, 16
39:17  40:2, 9  41:14, 18,
19, 20  42:11  48:3  49:3
52:14, 20  55:1  57:10, 21
62:20  63:13, 16, 23, 25
64:1, 2, 3, 13  65:3, 6, 11,
16, 21  66:2, 6  68:18  69:2
70:11, 19, 22, 23, 25  71:3,
4, 9  77:14, 17, 24  78:6, 13
85:4, 6, 7, 9, 15, 17, 23
86:9, 18  87:1, 12  88:2, 10,
14, 20, 22  89:12, 15, 19
90:5, 20  91:10  92:17
93:3, 5, 7  98:14  100:14,
22  105:7  107:25  109:5, 8,
15  110:25  113:3, 6, 6, 8, 9,
12, 18, 19, 21, 24  114:10,
16  118:16  119:2, 23, 24
120:16, 23, 25  121:1, 4, 6,
19, 24  122:11  124:3, 16
129:22, 23, 23  130:3, 4, 16,
20, 23  131:2, 5, 6, 7, 8
136:9, 17, 20, 24, 25, 25
140:14  141:20, 20, 22
142:2, 9, 11, 18  143:24
144:13  145:2, 14, 19, 21
146:2, 11  147:2, 3, 4, 5, 7,
10, 23  148:16, 24  151:4,
11, 19  152:12  153:7
154:4, 6, 13, 16, 16  155:2,
8, 9, 12, 13  156:20  158:19,
20, 23  159:1, 3, 9  160:17,
19, 25  161:3, 8, 9, 18, 19,
22  162:8  163:9, 17, 22
164:9, 16  165:4, 11, 21, 24
166:22  167:5, 7, 10, 11, 20
168:3, 9, 11, 14, 24  169:4,

5  170:5, 6, 8, 10, 10, 12, 20
171:2, 5, 8, 12  172:8, 12,
24  173:3, 8, 10, 11, 16, 18
174:1, 24  175:10, 13, 15
176:4, 11, 13, 15, 21, 25
177:2, 13, 14, 16  178:2, 5,
6, 13, 16, 19  179:14
180:18  181:4, 15  183:11,
20  184:1, 14  185:14
186:3  187:3  189:9, 21
190:6, 8, 10, 10, 11  191:13,
14, 19  192:21, 25  193:19
194:6, 19, 24  195:20
196:10, 15  199:9, 16
200:1, 3, 6, 18, 21, 21, 24
201:2, 9, 15, 19  202:7, 15,
21, 23, 25, 25  203:5, 5
204:6, 8, 10, 11  205:12, 13
206:3, 15, 22  207:3, 4
209:13, 13, 16, 24  211:8,
10, 13, 14, 16  214:20, 22
215:20  216:6, 9, 23
217:18  218:16  219:6
222:8, 16, 20  225:16, 17,
18, 22, 23  228:18, 20, 21
229:11, 12, 17, 22  230:3, 7,
11, 11, 14, 18  231:16
232:8, 11, 16  233:14, 16,
21, 22, 22, 24, 25  234:3, 5,
6, 18  235:20
**officers** 7:23  18:21  22:4,
8, 17  23:21  27:15  32:14
33:13  34:2  36:25  37:14
41:20  45:25  47:5, 5, 16
48:2, 25  50:15  53:11
55:11, 12  59:5, 10  63:10,
20, 22  86:7  100:24
101:22  106:15  111:13, 22
114:6  119:5, 10  126:22
139:9, 18, 23  140:2
141:17  151:1, 7, 24  158:6,
10, 14  162:20, 22, 23
163:20  168:5  170:4, 5, 23
172:3, 5  174:20  178:9
179:22  180:11, 15, 20
183:15  185:5, 8, 11, 21
190:4, 5  193:4, 5  195:22
196:6, 24  197:5, 15, 21
198:4, 12, 19, 22  199:2, 5
206:8  207:7, 12  208:4, 17,
20, 24  213:1, 7  218:3, 10,
20, 23, 24  219:1, 12, 13
220:8  221:21  222:1
224:22, 24  225:14, 16
226:14, 22  227:10, 15
228:7, 18  229:23  231:17,
19, 25  232:3, 21  233:17
**officer's** 27:21  35:20
64:12  106:8, 25  109:15
112:24  114:2, 20, 21

115:23  129:6  136:12
140:21  145:24  159:5
176:1, 19  179:11  181:7
182:3  191:17  203:12
217:3, 4  225:5  234:14
235:1, 7, 11, 15, 24  236:5
**Offices** 2:8
**Officially** 66:19  95:13
**off-the-record** 38:25
100:6  169:12
**oh** 15:3  124:20  133:7
137:2
**OHIO** 1:1  2:6, 9, 10  3:7,
16  239:2, 5  240:5, 12
**Okay** 5:22  6:5  8:6
10:17  11:2  13:8, 13, 15,
20  20:16, 24:19  40:25
41:12  42:17  44:24  45:22
46:19  47:8  50:19  66:13,
14  68:2  69:20  70:6, 11
71:14, 21  75:2, 16, 23
76:5  77:23  78:4, 12  79:1
82:7  84:3  92:13  100:3,
14  101:4, 5, 13  102:22
103:8  104:19  105:5, 17
107:3  114:13, 24  115:17
117:3, 17  118:5, 15, 16
121:1, 13, 16  122:3  123:3,
8, 13, 17, 23  124:2, 13, 21
125:5, 15  126:10, 14
128:4, 21  129:1  131:9, 24
132:22  133:2, 18, 22
134:18, 20, 22  136:1, 23
138:5  139:24  144:15
145:13, 16  147:1  148:15
150:11, 14  152:19, 25
153:2, 25  154:23, 25
156:9, 12  157:22  158:1, 2
159:20  160:5, 13  166:15
167:2, 22  169:15  177:4,
20, 23  179:2, 8  182:23
183:14  187:1  192:4
201:25  202:2  208:16
211:1  213:16  215:4
216:1  221:23  222:1, 6, 15
224:25  226:12  227:2
228:4, 5  229:9  231:15
232:8, 25  233:8  234:25
235:14  236:5  237:15, 18,
23
**old** 203:9  205:1, 10  224:5
**oldest** 43:20
**omission** 113:7
**omitted** 113:25
**once** 14:9  15:5  16:12
57:12, 20  63:8  81:16
82:18  92:17  94:1  103:10,
11, 14  105:6  113:19
119:22  130:1  132:15, 16,

16  137:15, 21  195:15
214:10  226:9
**O'Neil** 144:15, 20  145:17
**one-o-one** 98:23
**ones** 135:6
**one-time** 109:4  170:15
**ongoing** 96:13  97:5  98:5,
24  107:21
**on-the-job** 21:21
**open** 105:24  170:7  171:1
**opened** 206:10
**opening** 207:2
**opens** 106:20  171:6  174:3
**operated** 112:3
**Operating** 4:7
**opinion** 72:16  74:7, 10, 14,
17  77:5  114:21
**opinions** 196:2
**OPOTA** 122:14, 18, 20, 21
123:9  124:23
**opportunity** 28:6, 12
30:21  53:23  88:6
**option** 50:20  53:17  54:2
69:11, 14  70:8, 9  105:11
**options** 57:19
**order** 8:22  11:7  16:3
18:2  87:9  146:19  160:25
164:7  229:1
**ordered** 79:24
**ordering** 185:21
**orders** 217:3
**original** 172:18
**originally** 204:17
**Ortiz** 95:20
**other's** 49:16
**ourself** 70:10
**outcomes** 9:4
**outdoor** 45:16
**outfitted** 45:5
**outline** 120:11
**outlines** 123:9
**out-of-policy** 106:11
132:7  161:6  164:6
167:21  168:17  178:14
194:11, 14  234:21, 22
**outside** 35:5, 8  37:10
38:8, 11, 16, 19  44:8  82:3
105:3, 4, 22  108:16
111:16  132:8  134:12
142:7  155:5  161:2  163:5
168:10, 21  171:4  190:12
203:23, 25  204:2, 5, 7, 13
231:23
**outstanding** 90:25
**overall** 231:13
**overhead** 178:12
**oversee** 83:9
**overtly** 168:18
**overturned** 204:15, 21

Case: 2:18-cv-01060-EAS-EPD Doc #: 141-1 Filed: 03/24/21 Page: 256 of 265 PAGEID #: 3399

Deposition of Sergeant Eric Pilya      Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

overview 13:*16*, *20*
126:*21* 127:*18* 157:*10*

< P >
package 9:*16* 74:*18*, *25*
76:*7* 79:*6* 84:*2* 100:*24*,
*25* 101:*1*, *25* 102:*2*
103:*10* 105:*8* 106:*21*, *21*,
*24* 107:*8* 115:*4*, *5*, *8*, *24*
116:*12*, *13* 138:*7*, *10*
157:*13* 159:*25* 160:*2*
184:*11*, *13* 215:*8*
packet 74:*6* 76:*16*
page 117:*18* 139:*3*, *4*
140:*6* 182:*14* 202:*1*
226:*4* 227:*8* 229:*7*
pages 125:*20*
paid 205:*2*
painful 194:*22*
pants 176:*10*
parameters 91:*13* 234:*17*,
*24*
paraphrasing 225:*14*
Pardon 74:*11*
part 19:*16* 21:*22* 22:*10*
29:*1* 30:*7* 42:*6* 48:*8*, *11*
65:*13* 82:*8* 84:*19* 108:*22*
120:*2* 122:*24* 130:*4*
138:*6* 149:*19* 151:*17*, *23*
186:*5*, *6*, *6* 195:*12* 222:*3*
partially 185:*24*
participate 80:*5*, *11*, *17*
183:*14*
particular 16:*4* 28:*21*
29:*2* 44:*3* 113:*5* 141:*22*
144:*2* 148:*21* 176:*23*
177:*10* 192:*25* 196:*7*
200:*23* 210:*6* 217:*13*, *16*,
*17*
particulars 202:*14* 214:*16*
232:*22*
parties 239:*21*, *23*
partner 87:*23* 172:*22*
174:*14* 176:*7* 206:*16*, *25*
partner's 174:*13*
parts 85:*19* 97:*8* 102:*23*
110:*23*
pass 101:*23* 102:*18*
127:*23*
passed 101:*20* 223:*2*
passengers 44:*2* 207:*11*
passenger's 207:*18*, *19*
pat 186:*14*
path 85:*22*
patio 185:*17* 190:*12*, *13*
193:*7* 204:*8*
patrol 13:*23* 14:*1* 42:*16*,
*19* 47:*12* 48:*25* 49:*3*
50:*17* 53:*10* 57:*20* 58:*15*

85:*7* 136:*25* 233:*7*, *15*
patted 172:*3*
pauses 110:*19*
pay 15:*19* 205:*11*
pedalled 203:*7*
pellet 216:*16*
people 20:*2* 25:*15* 32:*15*
54:*19* 93:*18* 97:*12*
112:*12* 128:*5* 138:*3*
140:*25* 147:*13* 148:*5*
152:*1* 185:*6* 196:*21*
203:*1*, *6* 207:*21*
perceives 112:*16*
percent 26:*21* 64:*3* 221:*1*
perception 112:*1*, *9*
perfect 12:*21* 117:*17*
performance 15:*4*, *12*, *15*,
*17*, *21* 16:*6*, *9*, *11*, *14*, *22*
17:*1*, *14*, *15*, *17*, *22* 18:*1*, *8*,
*14*, *17* 19:*5*, *15* 20:*1*, *3*
performing 15:*4*
period 50:*6* 78:*22* 88:*13*,
*19* 89:*14* 109:*5* 121:*22*
162:*5*
permission 51:*20*
permit 87:*16*, *18* 167:*8*
permitted 51:*17* 63:*20*, *22*
151:*19*
person 10:*5* 15:*21* 44:*11*
45:*20* 58:*19*, *22* 83:*1*
93:*16* 97:*14*, *23* 109:*10*, *13*
110:*15*, *21* 113:*12*, *13*
114:*4* 127:*10* 142:*5*, *21*,
*22* 143:*13*, *15*, *16*, *18*
146:*15* 148:*16* 150:*15*
151:*5*, *24* 152:*6*, *13* 153:*5*,
*15* 154:*19* 158:*17* 163:*19*
164:*2* 165:*8*, *12* 170:*18*,
*21* 174:*2* 177:*7* 179:*7*
180:*19*, *21* 182:*5* 192:*22*
193:*12*, *13* 200:*23* 201:*12*
202:*21* 211:*23* 219:*2*
220:*15*, *20* 226:*20*
personal 72:*16*
personally 18:*25* 50:*14*,
*22* 128:*20* 183:*2* 205:*4*, *7*
personnel 20:*5* 41:*24*
45:*13*, *25* 205:*9*
person's 212:*18* 221:*5*
perspective 175:*13*
perspectives 175:*12*
pertain 105:*21*
pertaining 105:*23*
pertinent 58:*19*, *23* 98:*3*
186:*23*
phone 42:*21*, *25* 43:*5*, *10*
44:*17* 99:*23* 127:*12*
photograph 92:*18*
photographed 26:*16*

physical 76:*9* 163:*3*
168:*2* 201:*14*, *16* 203:*13*
209:*23*
physically 201:*20*
pick 206:*8*
picked 71:*4*
pieces 110:*22* 125:*6*
PILYA 2:*3* 4:*3* 5:*3*, *7*, *11*
126:*1*, *9*, *22* 239:*7*
PIS 96:*6* 126:*23* 128:*6*,
*19* 137:*12* 140:*6* 150:*11*
157:*10*, *24* 160:*12* 169:*15*
177:*4*, *20* 182:*14* 202:*1*
205:*15* 214:*3* 218:*6*
229:*7*
pit 133:*11*, *13*, *14*
pitbulls 185:*25* 186:*2*, *16*
189:*22* 193:*3*
PIT-NIP 133:*10*
place 33:*10* 64:*6*, *7* 65:*14*,
*20* 82:*12* 91:*3*, *20* 107:*11*
140:*9* 185:*22* 225:*22*
239:*17*
placed 24:*22* 34:*21*, *21*
57:*11* 63:*11* 84:*2* 202:*25*
placement 225:*18*
Plaintiff 1:*2*, *15*, *21*
Plaintiffs 2:*4* 3:*2* 117:*10*
PLAINTIFF'S 4:*6* 5:*23*
122:*6* 135:*21* 138:*24*
160:*8* 182:*17* 213:*19*
229:*3*
plan 19:*21*
platforms 126:*3*
play 17:*20* 32:*7* 130:*25*
201:*7* 217:*25*
players 47:*15*
plays 17:*16* 98:*22*
Plaza 2:*9*
plea 152:*9*
plead 103:*14* 177:*15*
please 5:*9* 33:*19* 128:*23*
157:*25* 160:*12* 162:*7*
177:*22* 202:*17* 229:*8*
plenty 234:*21*
plus 43:*16*
plywood 185:*19*
pocket 171:*22* 206:*21*
207:*1* 209:*2* 212:*4*
pockets 175:*14*
Point 4:*9* 16:*11* 21:*3*
25:*14* 30:*16*, *23* 35:*14*
61:*10* 63:*7*, *17* 80:*5*, *11*,
*17* 81:*12*, *15*, *22* 92:*3*, *13*
93:*2*, *17* 94:*3* 96:*22*
99:*16* 100:*14* 106:*23*
107:*5* 118:*7* 120:*19*, *20*,
*24* 121:*7*, *10* 122:*23*, *24*
123:*4*, *17*, *24* 124:*2*, *15*
140:*12* 180:*8* 185:*18*

186:*15* 189:*12* 190:*1*, *25*
191:*5* 208:*21* 210:*6*
212:*20* 215:*22* 230:*14*, *19*
233:*1*
pointed 131:*2* 136:*20*
177:*13* 229:*14*
pointing 177:*14* 230:*17*,
*24*
Points 120:*14*
Police 4:*10*, *11*, *12*, *13*, *14*,
*15*, *16* 5:*13* 7:*16*, *23* 8:*8*,
*19* 16:*24* 18:*2* 19:*1*, *13*
20:*2* 22:*2*, *17*, *20*, *25*
23:*19*, *23* 24:*7*, *14*, *18*, *21*
26:*2* 27:*23*, *23* 29:*13*, *19*
30:*1* 31:*23* 32:*4*, *16*, *24*
33:*3*, *6* 34:*4*, *5*, *11*, *15*
35:*2*, *6*, *8* 36:*24* 38:*8*, *16*
39:*4*, *4*, *12*, *17*, *17*, *23* 40:*2*,
*9* 41:*12*, *14*, *21* 42:*21*
44:*1* 46:*8* 47:*17* 48:*13*
49:*8*, *9*, *11* 50:*23*, *24* 51:*3*,
*6* 52:*10*, *14*, *20* 53:*18*, *20*
54:*3* 55:*2*, *4*, *7*, *25* 56:*4*,
*22*, *23*, *23* 57:*1* 58:*6* 61:*3*
62:*20*, *23*, *24*, *25* 63:*13*, *16*,
*24* 64:*8* 65:*3*, *6*, *7*, *10*, *12*,
*17*, *22* 66:*7*, *11*, *16* 67:*2*,
*10*, *17*, *18* 68:*18* 70:*3*
72:*4*, *17*, *22* 75:*3*, *8* 76:*1*
77:*3* 78:*6*, *12* 79:*5*
81:*12*, *20* 86:*25* 88:*19*
90:*20* 94:*24* 95:*1*, *5*, *7*, *10*,
*25* 96:*23*, *25* 97:*2*, *20*
98:*9*, *14* 99:*2*, *3*, *7* 106:*7*,
*18* 108:*13*, *14*, *21* 111:*16*,
*17*, *22* 112:*14*, *24* 114:*10*,
*16* 116:*10* 118:*24* 119:*6*,
*11*, *11* 121:*21* 122:*16*
123:*19* 125:*7*, *18*, *22*
129:*11*, *12*, *16* 130:*2*, *16*,
*20*, *23*, *25* 132:*13* 135:*13*
140:*13* 141:*1*, *2* 142:*14*
143:*12*, *12*, *15* 145:*24*
148:*7*, *24* 152:*12* 160:*25*
161:*18* 163:*6* 164:*7*
166:*22* 167:*2* 168:*11*, *14*,
*23* 170:*1* 173:*18* 174:*21*
176:*18* 179:*11*, *14* 184:*18*,
*21* 195:*20*, *22* 196:*15*
197:*5*, *15*, *20* 198:*19*, *22*
199:*7* 200:*2* 201:*14*
205:*9*, *10* 211:*3* 212:*16*
216:*5* 218:*3*, *9*, *10*, *20*
219:*13*, *14* 224:*12* 225:*16*
226:*19* 232:*13* 234:*4*, *25*
235:*6*, *10* 236:*6*, *10*
police's 7:*23* 180:*17*
policies 7:*16* 10:*25* 33:*9*
37:*12* 65:*11*, *11*, *14* 73:*8*,

Case: 2:18-cv-01060-EAS-EPD Doc #: 141-1 Filed: 03/24/21 Page: 257 of 265 PAGEID #: 3400

Deposition of Sergeant Eric Pilya     Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

*9, 10, 11, 12* 96:*15* 101:*3* 106:*6* 116:22, *24* 118:*1* 123:*19* 163:*7* 198:*4* 199:*7* 223:*21, 24* 224:*11* 236:*13, 18, 23* 237:*4, 24*

**policing** 125:*1*

**policy** 9:*6* 34:*1* 37:*8* 39:*3* 50:23 51:2 63:24 64:*6, 10* 65:*15* 69:*7, 18* 73:*15* 88:*18* 89:*1, 5* 91:20 95:*15* 105:*3, 4* 106:*2, 3, 6* 107:*4, 25* 108:*6, 14, 25* 115:20 116:*1, 5* 118:*9, 11, 19* 119:*13* 132:*8* 133:*21, 23* 134:*1, 5, 5, 13, 15, 17* 141:*14* 143:*25* 144:*4* 145:*4* 149:*8, 10, 14* 155:*6* 157:*3* 159:*10* 163:*6* 164:*10* 167:*2, 8, 17, 18* 168:*10, 21* 180:*18* 181:*1, 24* 194:*9* 199:*13* 204:*13, 18* 211:*14* 224:*18, 23* 231:*23*

**polygraph** 219:*25* 220:*2, 4, 13, 16, 24, 25* 221:*5, 6, 7, 15* 223:*13, 17*

**polygraphs** 220:*8, 10*

**poor** 194:*7, 10* 195:*4* 196:*17*

**populated** 149:*1*

**porch** 203:*21*

**portray** 112:*13*

**pose** 152:*1*

**posed** 136:*15* 139:*17* 144:*12* 145:*18* 147:*13* 148:*7* 150:*16* 153:*5* 159:22 163:*14* 170:*18*

**position** 5:*12* 6:*14* 11:*13* 72:*9* 74:20, *23, 24* 75:*2, 7, 8* 77:*3, 11, 24* 79:*4* 102:*24* 147:*19* 148:*15* 149:*6, 24* 150:*1, 8* 168:*23* 178:*20, 24* 181:*14* 205:*23* 207:*22* 210:*10* 211:*12* 212:*16, 21* 215:*14, 21, 22* 216:20 225:*19, 20* 229:*10* 230:*6*

**positive** 157:*5* 191:*25* 232:*7*

**possessed** 187:*18*

**possession** 139:*24* 151:*5, 20* 212:*17, 18, 19*

**possibility** 32:20 55:*10* 145:*5, 25* 150:20 175:*21* 190:*25* 191:*2* 193:*15*

**possible** 55:*5* 61:*7* 88:*15* 161:*19, 22* 172:*24* 195:*11*

**Possibly** 20:*14* 137:*13* 188:*5* 219:*9, 9* 222:*14*

**posted** 125:*6, 15*

**potential** 18:*9, 18* 19:*13* 24:*13* 25:*21* 51:*9* 52:*7* 54:*25* 55:*14* 81:*2* 119:*2, 7* 147:*15, 20* 165:*18* 166:*5, 10, 16, 18, 23* 167:*3, 8, 14* 222:*13*

**potentially** 98:*12* 107:*1* 129:*13* 147:*13* 148:*17* 196:*23* 211:*13, 19*

**pounds** 200:*19*

**Power** 4:*9* 120:*14, 19, 20, 24* 121:*7, 10* 122:*23, 24* 123:*3, 17, 24* 124:*2, 15*

**powers** 119:*6, 11*

**practice** 88:*18* 98:*5, 16* 118:*2*

**practices** 7:*16* 97:*4* 116:22, *24* 118:*6* 122:*11* 123:*19* 223:22, *25* 224:*12* 236:*13, 18, 23* 237:*4, 19*

**precarious** 193:*1*

**precinct** 185:*6, 8*

**precise** 209:*22*

**prefer** 97:22 134:*25*

**pregnant** 110:*19*

**preliminary** 35:*21* 66:*5, 21* 68:*8* 94:*8*

**premier** 130:*10* 131:*11* 226:*10*

**premise** 170:*21* 174:*6* 189:*24* 190:*2*

**preparation** 9:*22*

**prepare** 9:*9* 10:*10, 18* 11:*7*

**prepared** 7:*15, 19, 22* 8:*7* 9:*7*

**preponderance** 112:*19*

**presence** 60:*13* 239:*10*

**present** 7:*17, 25* 8:*9* 9:*4* 69:*12, 14* 70:*8* 71:*17* 74:*19* 99:*19* 148:*3*

**presentation** 120:*15, 20* 123:*9*

**presented** 68:*12* 69:*19, 20* 70:*6* 71:*7, 22, 23* 125:*1* 162:*10* 177:*8, 25* 181:*16* 215:*12*

**presenting** 214:*19*

**presume** 124:*9* 133:*2*

**presumption** 32:*14, 19*

**pretty** 21:*21* 34:*18* 35:*21* 45:*19* 51:*15* 73:*15, 16* 95:*3, 15* 100:*17* 102:*11* 103:*11* 104:*10* 109:*6* 113:*2* 120:*3, 6, 8* 121:*18* 125:*13* 126:24 127:*14* 129:*18* 132:*8* 134:*7* 137:*13* 140:*15* 144:*6* 148:22 157:*12* 189:*14* 210:*4* 220:*20*

**previous** 40:*6* 59:*1* 109:*21* 128:*9* 185:*9* 206:*4* 210:*7* 217:*9, 11* 218:*4, 17* 237:*17*

**previously** 131:22 135:*2* 210:*9* 217:*19* 218:*11* 222:*6* 227:*7*

**primary** 23:*15* 42:*3* 43:*16, 17, 18* 47:24 62:*9* 79:*5, 8, 13, 15* 80:*1* 83:*8, 9, 13* 84:*8* 94:*11* 117:*23* 183:*7*

**prior** 8:*13* 36:*11, 19* 172:*2* 185:*4* 209:*7*

**priority** 95:*2*

**privacy** 82:*2*

**probable** 32:*3* 50:*2* 62:*12* 124:*11, 19* 125:*3* 126:*9, 12* 127:*1* 143:*21* 172:*18* 182:22 194:*20* 219:*3* 227:*4, 6* 231:*3*

**problem** 109:*8*

**problematic** 19:*14*

**Procedure** 4:*8* 52:*6* 95:*25* 118:*4* 137:*9*

**procedures** 7:*16* 30:*5* 32:*21, 22* 39:*20* 65:20 118:*6* 120:*1* 122:*1, 2* 236:*13, 18, 24* 237:*4, 24*

**proceed** 82:*6*

**proceeding** 64:*23*

**proceedings** 17:*6* 103:*9*

**P-R-O-C-E-E-D-I-N-G-S** 5:*1*

**process** 14:*15* 17:*16* 19:*19* 64:*15* 84:*18* 102:*21* 132:*15* 138:*1* 184:*23* 210:*24* 211:*2* 222:*3*

**processing** 82:*4, 20* 85:*3* 92:*16*

**produce** 11:*22*

**produced** 124:*7, 11* 134:*25* 135:*6, 8*

**program** 18:*22* 19:*16*

**programmed** 15:*3*

**progress** 103:*12, 15*

**projectile** 26:*12*

**projectiles** 26:*18* 85:*22*

**promoted** 5:*19* 13:*24* 14:*11* 20:*4* 119:*20, 21* 120:*7*

**promoting** 184:*9*

**promotion** 14:*6* 15:*19*

**properly** 59:*20*

**property** 228:*14*

**prosecution** 131:*23*

**prosecutor** 69:*13* 71:*18* 76:*4* 79:*3* 81:*2* 101:*20* 141:*8* 208:*12* 215:*18*

**prosecutors** 80:*6, 12, 17*

**prosecutor's** 69:*16, 21* 70:*7, 9* 71:*8* 72:*5* 74:*1, 6, 18* 75:24 76:*6, 8* 79:*2, 7* 107:*14* 205:22 208:*13, 15*

**prostitute** 71:*5*

**protect** 23:22 32:*9* 37:*23* 162:*21* 170:*11* 171:*7* 172:*23* 193:*9* 196:*24*

**protocol** 87:*20*

**prove** 153:*14* 154:*3* 159:*5, 7* 161:*9* 184:*2* 226:*16*

**proven** 65:22, *24*

**provide** 23:*13*

**proximity** 82:*16* 190:*7*

**PSI** 156:*9*

**psychologist** 118:*24*

**Public** 2:*6* 3:*6* 30:*25* 42:*11* 85:*10* 86:*15, 20* 87:*6* 95:*16* 97:*10, 17* 98:*7, 13, 21* 99:*8* 107:20, *24* 108:*9* 112:*1, 9, 11, 16* 146:*1, 15* 147:24 148:*3, 8* 149:*2* 239:*4* 240:*11*

**published** 125:*5*

**puling** 188:*25*

**pull** 135:*12* 155:*16* 179:20 189:*1* 198:*11* 216:*10, 23*

**pulled** 109:*6* 142:*12* 146:*12, 24* 147:*6, 8, 23* 149:*4* 165:*5* 166:*1* 167:*12* 173:*4, 12, 17, 24* 174:*7, 24* 186:*10, 12, 17* 187:*5, 11, 12, 14* 188:*14, 20, 22* 189:*11* 192:*8, 12* 193:*2, 6, 13* 194:*25* 203:*8* 209:*22* 211:*25* 213:*8* 216:*19* 217:*1* 231:*13*

**pulls** 37:22

**punctuation** 102:*13*

**purpose** 16:*15, 18, 22* 102:*9* 127:*15* 157:*23*

**purposes** 129:*19* 237:*23*

**pursuant** 2:*6* 223:*21* 224:*23*

**pursue** 203:*22*

**pursuit** 153:*17*

**purview** 222:*4*

**push** 47:*12*

**put** 6:*22* 11:*12* 18:*21* 19:*21* 24:*17* 25:*18, 21* 33:*9* 37:*15* 55:*1* 56:22 62:*23* 64:*6* 66:*10* 94:*16* 122:*14, 17* 127:*8* 132:*9* 137:*21, 22* 173:*7* 174:*4*

Case: 2:18-cv-01060-EAS-EPD Doc #: 141-1 Filed: 03/24/21 Page: 258 of 265 PAGEID #: 3401

Deposition of Sergeant Eric Pilya

Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

184:*10, 13* 202:*19* 213:*11*
215:*24* 237:*21*
**puts** 41:*17*
**putting** 198:*13*

**< Q >**
**qualifications** 21:*12*
**qualified** 239:*5*
**qualify** 205:*8*
**qualifying** 200:*15*
**question** 6:*20* 8:*1* 10:*6*
12:*21, 23* 13:*7* 33:*16*
59:*1* 60:*2, 3* 85:*19* 86:*12*
95:*10* 104:*8, 9, 10* 110:*18*
112:*25* 113:*24* 117:*5*
136:*11* 162:*7, 13* 169:*24*
173:*6* 175:*25* 196:*4*
201:*18* 228:*24* 230:*22*
235:*9*

**questions** 26:*24* 85:*10, 12*
86:*14, 16, 18* 87:*2, 12, 17*
88:*4* 104:*13* 111:*6* 127:*2*
135:*8, 11* 218:*2*
**quick** 13:*16, 20* 42:*17*
169:*10* 228:*24*
**quickly** 61:*7* 117:*18*
**Quinlin** 79:*25* 128:*1*
**quite** 178:*23*
**quote** 23:*9, 17* 51:*22*
68:*22*

**< R >**
**racial** 219:*20* 221:*23*
222:*2, 11, 16, 20* 223:*1*
**radio** 41:*22* 45:*2* 86:*7*
**railing** 171:*5*
**raise** 149:*11* 150:*6* 158:*8*
161:*7* 163:*4* 164:*3*
167:*19* 174:*25* 180:*24*
194:*7*
**raised** 105:*20* 233:*8*
234:*5*
**ran** 113:*13* 140:*13*
158:*18, 21, 23* 159:*1*
178:*5, 8* 179:*6, 22* 180:*3,
3* 225:*16* 226:*19*
**range** 231:*9*
**rare** 25:*12* 104:*7*
**ravine** 178:*9* 180:*4, 5, 10,
11, 15* 181:*9*
**reached** 206:*12, 12*
**reaches** 154:*19*
**reaching** 139:*13* 155:*16*
178:*25* 181:*11* 206:*6*
**reaction** 221:*6*
**read** 7:*2, 13* 137:*25*
194:*21* 230:*21* 238:*6*
**Reading** 9:*16* 134:*10*
**ready** 10:*11* 28:*1* 44:*19*
85:*8* 99:*18* 127:*20*

**real** 128:*18* 158:*13, 17*
171:*3* 199:*23* 216:*13, 16*
237:*18*
**realize** 142:*19* 190:*1*
**really** 11:*19* 14:*9* 15:*9,
18* 17:*15* 41:*9, 11* 46:*9*
47:*6* 52:*23* 75:*7* 83:*23*
84:*5* 90:*23* 95:*1* 96:*24*
98:*23* 99:*9* 106:*14*
108:*16, 17, 19* 109:*3, 9*
112:*21* 116:*19* 125:*24*
130:*25* 136:*10* 142:*19*
144:*8* 149:*15, 18* 157:*2*
159:*4* 160:*1* 164:*14*
170:*2* 175:*22* 177:*19*
191:*3* 194:*17* 195:*3*
197:*25* 206:*11* 209:*12*
211:*11* 220:*7* 222:*3, 25*
233:*5* 234:*10* 237:*16, 21*
**reason** 15:*15* 33:*5, 11*
114:*6, 11* 151:*1* 164:*8*
190:*18* 191:*14* 192:*1*
199:*21* 220:*4* 228:*21*
**reasonable** 50:*2, 10* 51:*25*
52:*2* 56:*4, 9, 12* 60:*7, 9,
15, 25* 61:*13* 62:*11* 131:*7*
147:*3, 4, 10* 149:*25* 150:*9*
157:*8* 162:*9* 172:*11*
173:*1, 25* 179:*19* 181:*15*
192:*11* 193:*5* 194:*24*
195:*7* 200:*7* 217:*21*
**reasonably** 10:*20* 11:*3, 16*
161:*24*
**reasons** 57:*10* 73:*4* 91:*10*
131:*14*
**rebut** 17:*18*
**recall** 10:*2* 19:*17* 20:*7*
56:*14* 57:*17* 62:*19* 76:*3*
77:*1* 80:*7, 13* 89:*17*
95:*24* 96:*2, 24* 99:*21*
104:*14, 16, 18* 109:*9*
113:*5* 114:*12, 20* 115:*15*
123:*2* 124:*18* 139:*4, 12,
19* 140:*1, 4, 6, 8, 16, 17*
141:*25* 143:*16, 21, 23*
144:*14, 16* 145:*20* 146:*12*
150:*13, 21* 153:*2, 3*
156:*13* 157:*2* 158:*19, 22,
23* 165:*15* 169:*18* 172:*4*
175:*22* 177:*5, 10* 178:*2, 3,
12* 180:*2* 183:*12* 206:*11*
207:*8, 13* 208:*11* 212:*3, 5*
214:*3, 4, 5, 21, 25* 215:*3, 6*
218:*6* 220:*19* 221:*14, 25*
222:*25, 25* 223:*1, 3*
226:*24* 227:*1, 18* 228:*1,
17* 230:*20* 231:*4* 232:*20*
233:*4* 234:*10, 12* 235:*12*
237:*16*

**recanvas** 83:*2, 6, 7* 84:*8*
**receive** 21:*16* 149:*20*
**received** 10:*7* 14:*21, 25*
15:*1* 19:*2, 12* 51:*23* 94:*8*
164:*6*
**Receiving** 228:*14*
**recognized** 206:*4*
**recollection** 157:*16, 19*
228:*2*
**recommend** 145:*13* 158:*3*
**recommendation** 41:*2*
**recommendations** 22:*21*
73:*23*
**recommended** 116:*11*
**recommending** 194:*1*
**record** 5:*10* 6:*22* 12:*14*
107:*20* 223:*18* 230:*2*
**recorded** 85:*24* 86:*21*
223:*10, 13, 14, 15, 20*
**recorders** 224:*5*
**recording** 224:*3, 10, 11*
**recordings** 224:*4*
**records** 8:*20* 134:*8*
**recover** 31:*15* 85:*18*
**recovered** 153:*16* 155:*18*
171:*14, 16*
**recruits** 120:*18* 121:*2, 16,
18*
**red** 213:*25* 227:*2, 5*
**reduced** 239:*10*
**refer** 132:*25* 215:*5, 17*
235:*4*
**reference** 127:*20*
**referenced** 100:*15*
**referred** 117:*20* 154:*18*
**referring** 66:*15*
**refers** 215:*18*
**refresh** 139:*20* 157:*15, 19*
**refuse** 88:*7*
**refuses** 26:*22*
**refusing** 27:*3, 7* 28:*16*
**refute** 17:*12*
**regard** 10:*25* 87:*24*
207:*16, 17*
**regarding** 7:*25* 8:*5, 13, 18*
9:*3* 11:*7* 24:*1* 25:*25*
26:*25* 27:*16* 68:*4, 12*
72:*9* 79:*3* 83:*21* 87:*2, 13*
88:*3, 24* 94:*24* 95:*7, 23,
25* 112:*23* 114:*11, 15*
136:*9* 137:*3* 139:*4*
169:*16* 208:*7, 9, 10*
**regardless** 52:*7* 199:*25*
**regards** 39:*24*
**regroup** 93:*12*
**reinterview** 221:*7*
**reinterviewed** 219:*24*
**related** 6:*6, 7, 8* 9:*19*
10:*20* 11:*4, 22* 59:*1* 96:*6,

22* 97:*1* 109:*11* 123:*21*
125:*19, 20*
**relating** 125:*7*
**relation** 183:*3*
**relationship** 78:*16, 19*
**relative** 239:*20, 22*
**release** 95:*17, 23* 96:*16*
97:*1, 6, 7, 23* 98:*17, 24*
99:*3, 11*
**released** 56:*8, 11* 57:*13*
61:*5* 96:*7* 97:*16, 19*
**releases** 61:*12*
**releasing** 95:*16* 98:*20*
**relevant** 157:*7*
**rely** 47:*7* 141:*17* 195:*23*
206:*1*
**remain** 27:*13* 48:*7* 50:*20*
**remainder** 94:*6, 7* 114:*1*
**remained** 54:*18, 23* 86:*22*
**remaining** 29:*3* 54:*3*
**remember** 55:*3* 62:*15*
109:*3* 136:*2, 18, 22* 139:*6*
142:*17* 143:*17* 144:*4*
146:*3* 149:*23* 150:*12, 19*
153:*6* 157:*4* 158:*10*
159:*23* 163:*17* 164:*20*
177:*18, 19* 178:*4, 6, 9, 12*
183:*9* 184:*8* 185:*3*
188:*23* 214:*15, 21, 24*
220:*1* 221:*9* 227:*18, 20,
22* 228:*17* 229:*21* 230:*4*
233:*5*
**remembering** 154:*17*
178:*22* 228:*22*
**reminder** 12:*12*
**remove** 30:*6* 57:*22*
**removed** 27:*21* 57:*24*
**removing** 29:*21*
**render** 74:*17*
**rendered** 176:*15*
**repeat** 162:*7*
**repeatedly** 193:*3* 206:*7*
**rephrase** 33:*19* 53:*1*
149:*9*
**replace** 26:*18*
**replacement** 92:*24*
**report** 46:*25* 48:*5* 128:*19*
130:*10, 11, 13* 131:*11, 11,
21* 138:*16* 224:*17, 20, 23*
226:*8, 10*
**reported** 113:*17*
**REPORTER** 4:*5*
**Reporting** 2:*8* 239:*25*
**reports** 47:*1* 84:*16*
126:*19* 130:*10*
**representing** 13:*2*
**reputation** 96:*19*
**request** 47:*16* 48:*13* 91:*4*
**requested** 91:*9* 99:*2, 13*
**require** 88:*20*

Case: 2:18-cv-01060-EAS-EPD Doc #: 141-1 Filed: 03/24/21 Page: 259 of 265 PAGEID #: 3402

Deposition of Sergeant Eric Pilya     Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

**required** 37:7, *9* 47:*23*
49:*4* 71:*17* 164:*9* 173:*12*
**requires** 42:*7* 65:*1*
**research** 237:*16*
**residence** 82:*1* 141:*1*
150:*25* 185:*10* 186:*1*
203:*5, 10* 204:*4*
**residences** 54:*20*
**resident** 142:*14* 144:*9*
**residents** 82:*15*
**resisting** 185:*23* 200:*11,*
*21* 201:*4, 6, 12, 13, 17, 18,*
*20, 22* 208:*25* 209:*5, 6, 7,*
*20* 210:*1, 4, 7, 11, 14, 16, 18*
**resolving** 113:*23*
**resources** 45:*11* 116:*12*
**respond** 42:*11* 44:*19*
46:*14* 60:*10* 81:*19* 158:*1*
**responded** 47:*22* 75:*20*
170:*4* 183:*5* 218:*7*
**responding** 44:*23* 63:*9*
140:*14* 144:*6*
**responds** 41:*16*
**Response** 4:*7* 5:*15* 6:*14,*
*19* 14:*3* 55:*21* 77:*10*
117:*16* 157:*4* 164:*22*
165:*1*
**responsibilities** 35:*6* 59:*2*
**responsibility** 11:*15* 58:*9,*
*12* 59:*25* 60:*19* 69:*12*
79:*6* 191:*12*
**responsible** 45:*23* 59:*4, 9,*
*10, 14* 138:*9*
**responsive** 11:*22*
**rest** 133:*3* 183:*12*
**restroom** 99:*17*
**result** 30:*10* 195:*21* 232:*9*
**resulted** 175:*2*
**results** 84:*17* 94:*11*
141:*4* 220:*24*
**retired** 21:*8* 123:*6*
**retrained** 106:*14*
**retraining** 38:*5*
**return** 31:*14*
**revealed** 142:*5* 173:*25*
**reverse** 164:*9*
**review** 9:*6, 19, 22* 10:*12,*
*15* 22:*14, 18, 19* 46:*13*
76:*1* 101:*1, 2, 6, 17* 102:*2,*
*3, 4, 7, 10, 21* 103:*3, 25*
104:*2, 4, 21, 23* 105:*8, 9,*
*13, 15, 20* 106:*21* 107:*5*
108:*5* 115:*25* 128:*12*
131:*25* 132:*11, 16* 137:*4,*
*16, 18, 19, 22* 138:*8, 12, 18*
141:*11* 184:*22* 185:*4*
194:*1* 227:*1* 228:*10*
**reviewed** 8:*22* 9:*11, 13,*
*14* 10:*24* 76:*2* 101:*24*
103:*11* 115:*4* 160:*2*

163:*13* 205:*16* 215:*8*
235:*14, 24* 236:*5, 9*
**reviews** 9:*4* 16:*21* 17:*9*
**revised** 118:*11* 237:*10*
**revisited** 193:*22, 25*
**Richardson** 153:*1* 154:*12*
**Richardson's** 153:*8*
**ricochet** 189:*22*
**rid** 153:*18* 155:*21, 24*
**right** 6:*17* 8:*19* 11:*4*
13:*2* 14:*5* 19:*18* 22:*23*
23:*1* 24:*2, 7* 30:*2, 12*
31:*3, 6* 32:*8, 10* 33:*3, 8*
34:*1, 25* 35:*16* 40:*4* 45:*4*
46:*1* 48:*14* 50:*3* 51:*22*
52:*23* 54:*20* 56:*12* 58:*9,*
*12* 59:*5, 15, 25* 60:*19*
63:*14, 18* 66:*25* 67:*3*
68:*5, 13* 69:*9, 23* 70:*14*
73:*20* 74:*2* 77:*25* 80:*23*
81:*3, 11* 82:*2* 88:*3, 11*
90:*2, 12, 13* 91:*6* 96:*10*
98:*10* 104:*5* 107:*20*
108:*19, 21* 109:*24* 111:*11,*
*12* 114:*16* 115:*21* 117:*3*
119:*13* 122:*3* 129:*6*
134:*1, 11, 16* 135:*15*
137:*2* 139:*12* 140:*5, 15*
142:*23* 149:*2, 15* 151:*6,*
*17, 21* 152:*6, 21* 154:*2, 5,*
*9, 14* 156:*15, 17* 159:*11*
160:*3* 163:*10, 12* 165:*8,*
*25* 166:*16, 19* 168:*11, 15*
169:*7, 9* 171:*22* 172:*9*
173:*10* 175:*2* 176:*16*
177:*1* 179:*23* 180:*1, 4, 5,*
*12, 13, 15* 181:*5, 9, 22*
182:*13, 15, 25* 183:*23*
187:*11, 18, 23* 188:*1, 11,*
*19, 24* 191:*7* 192:*6* 196:*6,*
*14, 15, 18, 22, 25* 197:*7, 16,*
*23* 198:*20, 24* 199:*3, 7, 15*
205:*15, 17* 206:*15, 18, 20,*
*21* 208:*2, 18, 22* 209:*17*
210:*2, 14, 20* 211:*9* 212:*2,*
*8, 12, 24* 214:*14* 215:*7, 8,*
*12* 219:*11* 222:*9, 20, 21*
223:*18, 19* 224:*1, 12, 14*
227:*5, 24* 231:*1* 238:*2*
**rights** 27:*13* 29:*3* 30:*21*
32:*16*
**rings** 144:*17*
**rise** 37:*17* 152:*20* 155:*4*
200:*12* 201:*21*
**road** 98:*4*
**roadway** 63:*4, 11*
**robbed** 130:*22* 158:*17*
**robberies** 214:*23*
**robbery** 54:*9, 15, 17*
130:*24* 150:*24* 151:*24*

152:*13, 14, 21* 158:*12*
214:*11, 13* 216:*4*
**Robert** 41:*7* 169:*16* 183:*9*
**Robinson** 226:*13*
**rocks** 113:*18*
**role** 17:*16* 45:*22* 98:*22*
130:*25* 132:*20* 201:*7*
217:*25*
**roll** 99:*16*
**rolling** 126:*25*
**Ron** 69:*17* 76:*14, 15*
**room** 12:*9* 41:*22* 57:*25*
170:*1* 185:*17* 202:*24*
**rooms** 169:*20*
**rotate** 42:*2, 2* 43:*15*
**rotation** 44:*8* 127:*8*
**rotations** 43:*21* 47:*24*
**round** 170:*20* 206:*22*
**rounds** 26:*17* 92:*21, 22*
97:*24*
**route** 42:*12, 13* 45:*3*
**routinely** 108:*3*
**routing** 137:*23*
**RSP** 228:*12*
**rule** 105:*1* 149:*17* 197:*12*
240:*2*
**ruled** 105:*6* 132:*9*
234:*20, 22*
**rules** 104:*25*
**ruling** 132:*17* 184:*7*
**run** 121:*22* 140:*14*
162:*24* 172:*18* 174:*1*
228:*20*
**rundown** 46:*11*
**running** 140:*15* 141:*24*
142:*7* 151:*25* 158:*20*
159:*6* 190:*12* 191:*2*
217:*3* 225:*15*
**runs** 140:*15*
**rushed** 170:*13*
**rushing** 170:*9*
**RV** 45:*5*

**< S >**

**safe** 199:*9* 200:*2, 5*
**safety** 30:*25* 57:*10* 85:*10*
86:*15, 20* 87:*7* 107:*24*
108:*9* 197:*12, 14*
**Sagstetter** 21:*1, 6, 18*
91:*20*
**SARAH** 1:*21* 3:*3* 5:*22*
**SARGUS** 1:*2*
**save** 214:*2*
**Savings** 2:*9*
**saw** 5:*25* 53:*9* 93:*14*
154:*23, 24* 155:*17* 165:*7*
170:*14* 171:*1* 172:*17*
176:*2* 178:*5* 179:*3, 5, 15,*
*22* 180:*15, 16* 185:*6*

206:*15* 216:*11* 225:*13, 15,*
*17* 226:*2*
**saying** 12:*13* 17:*13* 25:*13*
38:*10* 39:*5* 97:*22* 98:*15*
113:*3* 130:*13* 159:*17*
162:*2* 163:*22* 176:*9*
178:*7* 187:*20* 194:*19*
202:*16* 213:*1* 220:*21, 21*
231:*3*
**says** 5:*5* 103:*13* 122:*10*
131:*17, 24* 136:*18, 19*
141:*19* 150:*22* 173:*16*
175:*15* 199:*13* 226:*4, 19*
**scanners** 85:*1*
**scans** 48:*10* 85:*2*
**scene** 22:*3, 8* 23:*10, 11*
25:*1, 8, 11* 26:*8, 14, 16, 17,*
*25* 27:*16, 21* 28:*1, 2, 8*
29:*21* 30:*6, 24* 31:*6, 14,*
*19, 22* 34:*15* 36:*12* 37:*21*
41:*17, 17, 20* 42:*12, 12, 14*
43:*3, 8, 13* 44:*25* 45:*16,*
*16, 21* 46:*9, 10, 14, 18, 21,*
*24* 47:*7, 9, 10, 13, 25* 48:*7,*
*9* 53:*13* 54:*18, 22* 58:*2, 3,*
*5, 15* 59:*3, 5, 23* 60:*18*
62:*22* 63:*5, 8, 9, 10, 21, 23*
66:*22* 67:*1, 8, 17* 68:*3*
75:*21* 81:*11, 13, 13, 21*
82:*3, 3, 4, 8, 9, 16, 17, 18,*
*19, 20, 20* 84:*3, 24* 85:*5, 5,*
*7, 10, 18, 21* 86:*18* 87:*3, 8*
90:*21* 91:*6* 92:*14, 18, 23*
93:*4, 20, 22, 23, 23* 94:*2, 3*
96:*12* 108:*20, 24* 110:*8*
120:*8* 150:*20* 153:*16, 19*
156:*12, 14* 158:*1* 169:*18*
171:*17, 17, 19, 23* 182:*25*
183:*4, 6, 12, 16, 17* 189:*15,*
*20, 20, 25* 190:*4, 5* 191:*16*
**scenes** 117:*1*
**school** 125:*3*
**Schoolcraft** 170:*5*
**Schoolcrafts** 171:*7*
**scope** 35:*5, 8, 20* 37:*2, 5,*
*10* 38:*4, 9, 11, 11, 14, 17,*
*19, 19* 40:*10* 73:*1, 5*
75:*19* 77:*9* 81:*9* 108:*16*
131:*7* 145:*3* 146:*9* 150:*6*
155:*4, 8* 156:*24* 158:*7*
160:*18* 161:*2, 11, 18*
162:*15, 19, 23* 165:*3*
167:*10* 168:*5, 10, 14*
184:*1, 25* 189:*8* 193:*20*
194:*6* 202:*7* 214:*8*
222:*17* 226:*14* 227:*10*
228:*8* 229:*11*
**screen** 182:*22* 186:*7*
**scroll** 117:*17*

**seal** 240:5
**Sean** 5:24
**search** 23:11 45:17 82:2, 19
**seat** 24:18 25:18 31:23 207:18, 19
**second** 42:17 168:7 169:21
**secondary** 79:14
**secretaries** 128:2
**secretary** 104:1 137:17 138:7, 11
**section** 40:16 51:22
**secure** 120:9
**secured** 63:8
**securing** 63:10
**see** 45:2 66:9 82:17 83:5 93:20 94:2 107:8 109:19 117:14 122:10 127:4 133:7 135:12 138:1 144:17 176:4 180:20 181:17 182:20 207:23 213:23 221:5, 8 225:21 226:3
**seeing** 142:22 164:5 198:7 212:6
**seek** 14:19
**seen** 171:12 212:1, 4 216:6
**sees** 172:20 174:3
**selected** 21:9
**send** 74:1, 6 84:9 93:16, 17 100:24 101:2 105:6 128:4, 7 137:20 138:6, 18
**sending** 138:9
**sends** 138:8, 10, 13
**senior** 21:15
**seniority** 21:14
**sense** 29:2 34:22 75:9 161:8 163:8 179:13 237:22
**sent** 137:24 138:14 141:8, 8
**sentenced** 103:14 152:10
**sentiment** 98:21
**separate** 49:15 107:10
**separated** 49:11 52:14 120:9
**separates** 41:17
**SERGEANT** 2:2 4:3 5:3, 7, 14 14:1, 2 20:25 21:6, 15, 18 42:9 45:16 91:19 93:5 120:20 150:20 156:12, 14 214:7, 12, 25 239:6
**sergeants** 40:16, 23 42:8 121:1
**serious** 117:1 168:2 193:8
**serve** 167:3 185:10

**service** 89:12 202:16 233:20
**serving** 186:9
**set** 17:2 37:12 53:14 94:13 201:11 240:4
**settled** 204:25
**settlement** 175:3
**seven** 88:16, 21, 22 89:2, 3, 6
**severity** 52:7
Sgelsomino@f-glaw.com 3:9
**shadowing** 20:25 21:18 77:21
**share** 182:22 227:3
**shared** 95:7
**shares** 61:16
**shed** 163:22, 24 165:19, 21
**sheet** 127:11 137:23
**shell** 26:18 85:22
**she'll** 137:20 138:14
**Shepherd** 76:21 79:14
**shift** 5:14 78:22
**shiny** 171:1, 13 172:16, 20 174:4 176:1, 2, 3, 5
**shipped** 89:23
**shoot** 152:12 159:17 161:6 192:21 204:10 206:24 207:4 230:7
**shooter** 129:16 130:20
**shooting** 6:6, 7, 8 7:18 25:15, 17 26:3 28:17 33:23 35:2 36:5 37:2 39:12, 13, 17 41:13, 15 42:22, 25 43:5, 10, 19 44:1 46:8 53:16, 21 54:1 55:7 58:6 62:10 64:18 65:7 67:18 68:4, 12 70:12, 23 71:4 72:17, 23 79:1 80:4, 10, 16 81:12 87:3, 13 88:13, 24 95:2 97:2, 21 98:9 99:3 104:11 106:7 108:15, 21 109:11 114:25 115:10, 13 118:9, 16 121:21 122:17 130:2 131:1 136:2, 15, 17 139:5, 17 140:6 143:12 144:16 145:17 153:1, 4 156:25 157:16, 19 159:22 163:4, 6, 14 169:16 170:18 173:9 175:16 176:14, 16, 19, 25 177:2, 7, 21, 25 182:15, 25 183:21 187:1 189:16, 17, 21 190:17 191:7 192:15 196:10 204:13 205:15, 19 215:2, 11 217:8 218:4, 10 219:19 222:9 224:17, 23 225:10 226:12 227:23

230:13, 18 231:1 236:15, 16, 20, 20, 25 237:1
**shootings** 39:4 51:7 66:12 94:25 95:8 96:1, 23, 25 101:4 109:5, 8, 20 122:11 132:13 174:21 217:20 234:22 237:6
**shore** 113:18
**short** 109:5 171:3
**shorts** 142:15
**shot** 75:5 91:10 97:7, 23, 24 98:10, 13 130:23 131:2 140:3 142:16 143:16, 18, 24 144:11, 12 150:16 152:6 154:2, 13 155:24 156:1, 3, 4, 5, 7 159:1 164:18 165:12 166:7 170:15 172:1 178:16, 17, 19, 20 179:2 180:19 181:4 187:8, 18 188:19 191:25 203:11, 25 204:2, 3, 6 205:1, 10 208:20 209:4, 8, 10, 17, 19 210:2, 10, 13, 19 211:7 212:1, 7 214:20 222:21 226:18 227:13, 17 228:16 230:23
**shotgun** 214:12, 15, 17
**shots** 71:6 139:14 190:15 231:12
**shoulder** 170:15
**show** 17:23 112:5 117:7 127:6
**showed** 174:10 175:19 221:3 237:11
**showing** 122:3 127:5
**shown** 221:7
**shows** 112:13
**Sibner** 219:9
**sick** 42:24
**side** 54:22 158:21 206:21
**sided** 164:8
**sides** 185:19
**sight** 216:11
**sign** 102:19
**significant** 230:12
**signs** 18:9, 19 19:13 102:21 221:3, 7
**silent** 27:13 29:3
**silver** 170:14 171:1, 11 172:16, 20 174:4 176:1, 2, 3, 5
**simple** 200:11
**simultaneous** 36:9
**sister** 202:19
**sit** 17:2
**sitting** 63:17 165:15
**situation** 34:12 38:2 69:2 106:19 113:22 193:1

194:5 196:21 199:14 209:1
**Situations** 4:10, 11, 12, 13, 14, 15, 16 52:10 135:13 195:21, 23, 24 196:18 215:17 218:25
**six** 38:21 42:1, 7 43:15, 15 44:20, 22
**skip** 182:13
**sleeping** 226:1
**slur** 221:24 222:11, 16, 20 223:1
**slurs** 219:20
**small** 159:3
**smaller** 122:16 201:2
**SMITH** 1:15
**Snapchat** 126:4
**snow** 227:19
**social** 125:9, 10, 11, 13, 15 126:2, 14
**society** 197:20
**socks** 141:24 142:15, 21
**somebody** 82:23, 24 93:14 97:7 127:13, 13, 19 195:15
**somebody's** 127:20
**soon** 87:5 88:15 101:16
**SOP** 117:2, 4, 16, 19, 23 118:4, 11 122:25, 25 123:2, 10
**SOPs** 116:22
**sorry** 44:10 72:12 116:19 123:16 134:9, 19 137:2 157:17 162:6 175:5 185:5 203:17 225:3, 11
**sound** 168:16 190:5
**southeast** 190:13
**SOUTHERN** 1:1
**speak** 8:2 27:13 28:4, 5, 7 31:9 39:14 50:11 52:4, 9, 13 58:25 60:10 72:6, 7, 8 75:7 124:10 196:4 208:12
**speaking** 57:25 202:23 205:4, 5
**speaks** 60:6, 13 63:5 123:1
**specific** 44:13 97:6, 9, 16, 25 98:6, 17, 24 135:12 147:5, 7 153:6 202:12 207:8 218:18 220:1 231:8
**specifically** 55:3 56:14 57:17 92:2 96:5, 23, 24 97:18 98:15 113:10, 21 114:12 115:15 123:2 124:18 136:18, 22 141:25 142:18 145:20 146:3, 13 158:10 159:23 160:1 163:16 164:20 172:4

Case: 2:18-cv-01060-EAS-EPD Doc #: 141-1 Filed: 03/24/21 Page: 261 of 265 PAGEID #: 3404

Deposition of Sergeant Eric Pilya

Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

183:12 185:3 212:3
213:9 218:14 219:5
220:7 221:9, 25 226:24
227:1, 22 229:21 230:4
231:14 232:20, 23 234:7, 9

**specifics** 139:19 214:5
220:19

**specified** 239:17

**speculation** 151:23 182:4
211:20, 22

**speculative** 147:14, 20
179:9 182:9 188:10

**spins** 133:16

**split** 168:7

**split-second** 172:17
173:19, 22 174:3 175:21
198:6, 9, 20, 23 199:1, 5
229:25

**spouse** 34:13 66:3, 4

**Sprague** 158:23

**spreadsheet** 126:21 127:4
128:4, 22

**spreadsheets** 127:15, 25
134:24 237:7

**spree** 148:23

**squad** 202:20, 22

**Square** 3:6

**stab** 169:25 170:3, 9, 13,
24 172:19 174:2, 14

**stabbed** 71:6 166:7

**stages** 190:23

**stance** 30:13

**stand** 40:6 52:18 63:11
132:23

**Standard** 4:7

**standardized** 87:19

**standing** 26:9 49:10 63:3,
24 69:18 85:20 170:8, 12

**standpoint** 194:9

**start** 30:2 41:24 42:19
44:19 45:17 47:21 94:20
102:1

**started** 20:25 45:19
201:16

**starting** 73:14

**startle** 157:4 164:19, 22,
25

**State** 2:6, 10 5:9 111:24
170:22 239:2, 5 240:12

**stated** 90:23 155:14
193:4

**statement** 23:13 26:20, 23
27:4, 8, 14 28:6, 21
29:11 31:12 51:11 53:18,
21, 24 54:4 55:8 62:6
63:18 65:8 87:4, 5, 24
88:7, 10, 14, 20, 24 89:6,
15, 23 90:3, 13, 15, 21
91:4 92:25, 25 100:13, 15
109:21 110:23 112:23, 24

113:21 114:2, 10, 11, 14,
16 146:3, 13 151:10
153:7 155:14 158:15
159:15 164:21 176:9, 13,
14, 19 183:19 184:15
189:14, 19 225:12 229:22
230:4, 21

**statements** 22:3, 8 50:25
61:12 86:21 87:7 110:25
194:21 216:18, 22 225:6, 9

**STATES** 1:1 149:15
184:11 193:3

**stating** 211:18

**station** 52:21 56:19
61:22 62:5 139:7 214:11,
13

**statistics** 128:15

**stature** 201:2

**status** 83:22 128:24
132:4 136:4 137:15
226:5

**statute** 2:5

**stay** 25:15

**staying** 169:23

**Ste** 3:6

**steel** 144:22, 23 145:24
148:7

**steels** 148:24

**steer** 125:18

**Stenotype** 239:10

**stepped** 203:10

**steps** 22:3, 7 41:13 50:19
56:3 61:10 64:17 65:1, 4

**Steve** 123:5

**Steven** 137:1

**stipulate** 7:1

**stipulation** 135:3

**stole** 145:7

**stolen** 228:14, 14

**stop** 42:17 73:3 206:7
217:3

**stopped** 139:7

**stopping** 133:16

**store** 214:24

**stories** 220:6 221:21

**storm** 227:19

**story** 143:7 221:20

**Strategic** 14:2

**Strausbaugh** 41:7

**Street** 2:9 3:15 41:15
64:11 109:7 120:18

**streets** 118:17 119:6, 12

**strike** 26:12 33:20
149:25 195:22 200:4
206:23

**striking** 139:15 216:14

**struck** 155:9 156:1
158:19 159:5, 7, 8

**studio** 158:24 159:2

**stuff** 27:1, 17 125:11

**subject** 155:23

**subjective** 173:10 199:25

**subjectively** 172:25

**subject's** 170:14

**subordinates** 16:13 19:14,
24 59:5, 14, 21, 23 233:2,
9, 12

**subsequent** 196:10

**substantial** 149:22

**substantive** 87:2 237:18

**substation** 27:23 28:9
30:7 85:8

**subtle** 35:18

**succeeded** 41:11

**successful** 195:17

**succumb** 200:22

**suicidal** 170:24 229:24
230:7

**summaries** 83:25 94:18,
21 126:19 128:5 134:24
135:12 157:6, 18

**summary** 83:20 84:1
94:17, 20 101:22 126:24
127:25 128:7 135:17
137:3 138:16 157:12
224:7, 8

**supervise** 59:20

**supervised** 183:11

**supervision** 233:17

**supervisor** 16:20 18:13,
21 19:1 37:25 41:16, 16
46:10 47:14 59:20
119:20, 21, 21 120:5
125:3 183:4, 6 189:20
190:2 191:6, 10, 11 192:2
233:1

**supervisors** 59:13 119:19
120:6, 7

**support** 24:20 25:15
27:22 28:3 30:6 32:24
41:18, 19 63:23 64:1, 13
85:9 93:3, 5 119:23, 24
120:16, 25 121:1, 4, 6, 19,
25 124:3, 16

**supported** 163:2

**supposed** 93:8 95:1
106:18 162:25 223:19

**Supreme** 141:18, 19

**sure** 11:9, 12 14:25 18:4
20:12 26:12 33:16 37:25
41:9, 11 42:12, 18 47:10
56:14 57:6, 8 58:10, 14
59:17 76:2 79:16 84:21
90:23 102:11 108:16, 17
112:21, 22 115:1 118:11
120:8, 9 122:24 125:17,
22 127:6 136:21 139:20,
22 141:24 142:17 149:15
158:6 182:2 183:11

200:16 201:4 202:14
208:5 219:10 220:7
223:8 225:8 234:12, 21,
24 235:2, 5 237:16

**surely** 188:16

**surface** 28:20 34:13

**surrender** 178:20 185:16
211:2

**surroundings** 179:12

**suspect** 23:9, 17, 19 24:7,
9, 10, 12, 22 25:3, 7, 10, 15,
18, 20, 23 26:3, 25 27:7
28:6, 11, 25 29:15 30:14,
17, 17 31:2, 5, 8, 19 33:2,
3, 6 35:15, 16 37:22
39:18, 23, 23 40:2, 2, 3
47:18, 19 54:8 57:22
63:20, 22 64:19, 20 65:2,
3, 16 66:6 73:2 82:1
85:15, 15, 23 86:4, 5, 5, 8,
9, 10 90:14, 21, 25, 25
96:10 100:22, 23 101:15
110:25 114:10, 16 129:11,
11, 13, 25 130:6 131:1
136:7, 20 139:12 140:12,
15, 20, 21 144:7, 20 145:4,
10 150:24 151:8, 12
152:8, 9 153:12, 17 155:9,
11, 13, 15 162:10 171:20
175:22 177:12, 14 178:8,
10, 14, 15 179:16, 17, 17,
19, 25 181:7 186:4
188:24, 25 194:19 197:15
198:7 206:14, 16, 23, 24
207:1, 1, 5, 10 209:9, 11
211:16 214:10, 10, 13, 16,
16, 18, 22 226:17, 25
228:18, 20 229:14, 24
230:8

**suspected** 49:23, 24

**suspects** 23:14 25:5 29:7,
8, 13 30:9, 19, 20 33:13,
20, 21 36:25 55:11, 12
57:12, 16 86:18 140:24
183:15 196:24

**suspect's** 101:19 136:11
178:6 179:5 206:18, 22
207:16 215:1, 2

**suspended** 232:1

**suspicion** 62:11

**suspicious** 50:2 206:5, 9

**sustained** 186:11

**swam** 113:14

**SWAT** 43:24 158:20, 22

**sworn** 5:4 20:5 239:7

**system** 18:10 101:11


< T >
**table** 45:6 117:15

**Tackla** 2:8

Case: 2:18-cv-01060-EAS-EPD Doc #: 141-1 Filed: 03/24/21 Page: 262 of 265 PAGEID #: 3405

Deposition of Sergeant Eric Pilya     Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

**tactical** 37:16 38:3
106:10 196:12, 14, 17
198:13
**tactically** 168:16
**tactics** 38:6 106:13
108:10 195:1
**take** 26:16 30:6 31:13,
18, 22 37:9 38:15, 16
41:19 50:19 56:3, 10
64:8, 10, 17, 22 65:1, 4
69:8 76:8 79:20 84:12,
14 85:3 89:8, 9, 13 92:21
99:16 100:3 103:25
108:8 116:4, 5 134:25
148:21 150:11 157:24
160:12 169:10 177:4, 21
179:12, 14, 14 188:15
195:2 196:25 200:23
201:1, 8 203:1 213:11
221:6 227:24 228:4
229:8
**taken** 2:5 22:3, 7 26:15
27:22 29:12, 21 30:13
32:18, 24 51:11 54:7
55:7 56:18, 21, 22, 23
61:10 62:16 71:8 77:24
81:2 82:12 89:15 92:17
108:13, 25 118:16, 17
140:12, 24 142:8 155:25
156:7 172:3 176:3
194:21 239:16
**takes** 48:24 52:3 58:2
60:9 61:12 79:6 84:13
91:3
**talk** 12:15 13:10 28:12
29:22 46:16 48:23 49:1
53:4, 5, 8 60:24 66:11, 13
83:1 88:2 90:2, 5, 18
93:9 97:18 173:8 213:9
215:7
**talked** 99:25 124:22
236:14, 19, 24 237:5
**talking** 36:17 69:1 83:18
134:8
**talks** 53:2
**tall** 195:3
**tape** 41:18 224:5
**Tased** 226:1
**task** 63:9, 10
**tasked** 115:19
**taught** 19:11 120:17
122:18
**teach** 119:18 122:14
**teaching** 122:19
**Team** 4:7 5:15, 15 6:14,
18, 19 8:16 20:23, 24
21:1, 3, 7, 8, 12, 17 24:20
27:22 28:3 32:24 39:11
40:14, 15, 17, 17 41:2, 24
42:7, 8, 15 45:22 63:23

64:1, 13 68:3 70:5, 12, 17,
21, 24, 25 71:12, 16 73:22
74:3, 14, 21 75:20 77:3,
13, 16 79:4 80:22 85:9
91:21 93:4, 6 94:23
102:24 112:3 114:14
116:23 117:16 118:2
119:23, 25 120:16, 23
121:2, 4, 6, 25 124:3
126:16 145:13 174:19, 19
181:3 183:5 186:24
189:3 215:22 222:1
**Teams** 14:3 42:1 43:15
119:15 120:25
**technically** 23:19 24:3
34:9, 10 131:19 132:2, 20
209:6
**technique** 133:17
**techniques** 110:5, 10, 13, 14
**technology** 12:22
**teleconference** 2:2
**television** 112:13
**tell** 7:14 12:22 14:24
26:9 55:17 64:7 69:6
70:2 71:2 72:16 77:2, 7
81:23 85:8 86:17 89:20
92:23 96:3 111:19
113:11 119:17 121:16, 20
141:16 150:12 153:3
160:1, 3 163:16 183:2
184:6 218:13 232:19, 23
**telling** 220:22 221:20
**temple** 230:3
**ten** 20:16 125:3 202:1
219:4
**terminated** 232:4, 5, 9
**terminology** 130:9 132:24
134:6 148:20
**terms** 94:6 108:25
112:19 126:18 147:11
172:8
**terrorized** 143:11
**testified** 224:16
**testify** 6:23 7:15, 19, 22
8:7, 22 9:2 10:1 11:7
16:21 72:13, 14, 21 80:8,
14 239:7
**testifying** 11:10
**testimony** 6:2, 12 8:5
74:8 75:11, 12 114:20
145:20 163:2 175:23
176:1 186:8 191:15
207:16, 18, 19 239:9, 13
**testing** 84:10
**text** 83:21
**Thank** 7:10 38:23
124:13, 21 133:9 134:22
137:2, 11 213:24 238:3, 4

**thing** 31:7 73:16 94:1
107:14 120:10 134:3
172:20 174:9 175:25
**things** 22:4 24:17 25:2
32:25 36:11 37:13 45:7
47:20 48:10 64:6 84:11
85:3 88:3 91:23, 25
93:19 96:9 97:9 100:17,
18 102:16 110:19, 20
127:13 163:24 165:24
166:3 171:21 174:12
179:13 186:18 187:3, 14
188:5, 15 206:8 216:12
231:11 234:8
**think** 17:1, 12, 20 18:12,
20 23:8 25:19 29:8, 20
30:8, 23 32:7 35:18
36:18 37:1, 9 38:18, 19
39:9 40:6 41:9 57:10
64:7, 8, 12 65:5, 13 73:15,
16 76:21 79:16 89:19
92:11 95:3 98:22 100:15,
16 102:16 108:7, 19, 23
109:6 110:3 112:4, 7, 11
114:13 116:25 117:19
118:3 120:16, 22 121:12
125:22, 24 126:15 127:14
129:14 136:10 142:25
144:8 146:23 149:19
150:25 152:2 156:12
159:4, 7 163:18 164:11,
14, 15 175:9, 11, 20
176:23 181:15 192:12
194:17, 24 195:7, 12
197:2, 25 199:14 200:5
205:13 207:3 208:24
210:4 211:22 217:18
218:21 220:4, 6, 17, 19, 25
221:18 226:24 232:8
234:5, 11 237:21
**thinking** 109:4 149:4
172:21 199:21
**third** 6:8 78:22
**Thomas** 79:25 143:25
202:21
**thorough** 35:9
**thought** 15:7 55:11, 12
76:17 125:5 147:2, 3, 4
148:5 165:25 166:3
195:10 221:4 226:1
**threat** 136:16 139:18
142:5 144:13 145:8, 18
146:1, 15, 20 147:13, 24
148:3, 8 150:16 151:1
152:16, 20 153:5 159:22
160:20 162:10, 22 163:14
165:6 166:5, 10, 10, 16, 18,
19, 24, 24 167:3, 8, 12, 13,
14 168:25 170:19 172:25
177:8 178:1 181:16

188:21 193:11, 12, 13
197:6, 22 199:19, 22
214:19 230:25 231:4
**threatened** 140:11, 18
161:14, 15 163:3 170:22,
24
**threatening** 143:13
169:25 170:9 174:2
230:8, 9
**threats** 189:10
**three** 6:2 7:19 9:11, 15
10:13 22:20 44:13 85:12
86:14, 18 88:4 103:23
104:20, 25 118:20 122:18
138:13 139:3 171:4
216:10
**throwing** 55:13 113:18
**throws** 85:15
**tickling** 109:3
**tie** 116:10
**tie-breaker** 105:16
**tied** 95:15
**Tim** 64:11
**time** 8:16 13:5 14:25
15:3, 7, 14, 24 17:1, 2, 15
21:2, 11, 15 26:4, 23 28:8,
21 29:9, 9, 10 32:12, 13
39:5, 11, 13, 16 42:14, 21
44:1, 16 45:15 48:7 49:6
50:7, 10 51:10, 25 52:2, 3,
20, 24 53:20, 21 54:4
55:16, 20 56:4, 9, 12 60:7,
9, 16, 25 61:13 62:14
64:3 65:17 66:15 67:22
68:11 73:2 77:4, 12, 18
78:23 80:7 82:7 83:3, 5,
6, 6 84:13, 15 86:19
87:19 88:9, 13, 16, 16, 19
89:14 92:19, 24 93:24
96:12 98:4 103:21, 22
104:7 108:11, 23 109:6
114:9, 12 118:22 121:12
124:17, 18 128:6 132:13
135:1 136:15 137:3, 6
138:2 139:16 140:3, 23
141:21 142:4, 10, 11, 15,
25 143:18 144:10, 12
147:17 146:11, 24 147:2,
3, 5, 5, 7, 23 148:2 149:4,
22 150:15 153:4, 14, 17,
24 154:2, 13 155:20, 23,
24, 25 156:6, 6, 7, 24
159:21 160:21 161:14
163:3, 14 165:5, 12 166:1
167:6, 12 169:5 170:18
171:18, 25 173:4, 9, 11, 17,
23 174:7, 24 177:7, 25
178:17, 20 182:11 183:8,
10, 18 186:21 187:7, 12,
17 188:4, 18 189:10, 19,

Case: 2:18-cv-01060-EAS-EPD Doc #: 141-1 Filed: 03/24/21 Page: 263 of 265 PAGEID #: 3406

Deposition of Sergeant Eric Pilya     Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

24 190:6, 7, 15, 16, 22
191:12 192:2 194:18
195:6 197:9 198:7, 8, 10,
15, 17, 18 199:17 200:1, 2,
5 201:9 203:3, 9 204:6,
11 206:11, 14, 19, 25
207:13 209:4, 13, 17, 19
210:2, 9, 13 211:25 213:8,
10 214:20, 22 216:5
220:14 222:8, 12, 21
226:17, 21, 23 227:17, 21
228:16 230:25 233:6
234:4 236:15, 19, 25
237:6, 12 239:17
timely 108:1
times 29:11 31:16 36:11
47:4 84:25 97:23 98:10,
13 114:13 118:8 122:18
158:16 174:10 216:10
218:9, 13, 14, 15 221:5
231:22 234:11
today 7:3, 15, 20 8:5, 23
9:7, 10, 23 11:7 12:8
13:11 66:13 72:21 75:11
236:14, 24 237:5
toddlers 158:24
to-do 102:15
told 12:4, 6 36:25 57:4
61:2 76:7 84:20, 23
85:4, 14 92:13 94:5, 18
100:12 137:17 185:13
190:2 191:24 192:3
206:7 207:7 212:4 225:1
tool 220:25
top 52:23 58:5 59:3
63:11 140:6 143:22
169:20 180:11 181:8
182:14 218:6 219:11
226:4
topic 8:23
topics 10:21 11:4, 9, 17
125:19
total 128:16 231:13
totality 145:22 174:22
175:17 176:21, 24 201:8
202:11
totally 101:25
totals 128:18
touching 154:1, 12
tough 174:5
tour 66:3
town 42:24 169:22
toy 217:1
track 18:18 128:13
tracking 132:19 227:7
traditionally 131:18
train 196:5
trained 19:7 34:16 58:18
91:19 93:9 161:4 162:24
170:23 229:24

training 7:23, 24 8:2, 3
19:2, 5, 12, 16 21:16, 21
51:23 119:15, 22 120:2, 5
121:17 124:24 178:7
229:23
trainings 19:8 124:16, 21
trains 198:19
transcribed 239:11
transcribing 12:12
transcription 239:13
transition 103:21, 23
transpired 36:13
transport 62:5 85:9
transported 28:2 61:23
94:1
traumatic 65:9
treat 24:12 30:8, 14, 16
34:14 39:22 65:21
treated 24:9, 10, 22 28:24
29:14 34:2 39:16 40:3, 3
66:6
treating 33:1, 5, 20, 21, 24
trend 18:2
trends 128:13, 14
trial 145:11
tried 206:17
trigger 142:12 146:12, 24
147:6, 8, 24 149:4 165:5
166:2 167:12 173:4, 12,
17, 24 174:8, 24 189:11
198:11 209:22 211:25
213:8
triggered 106:17
troll 125:12
true 175:24 177:3
227:14 239:12
Trussle 163:12
trust 220:24
trustworthy 112:14
truth 220:23 239:8, 8, 8
truthful 110:6, 12
try 12:15 31:7 56:6
87:17 88:15 92:25 93:16
97:16 107:9 110:22
128:23 170:2 179:12
191:3 195:5, 7 221:5
trying 38:7, 13 53:14
60:3 62:15 112:19
133:14 162:16 165:14
178:3 186:3, 25 194:17,
23 195:2, 11 198:14
200:18 207:8 228:19
T's 102:12
tucked 216:7, 8
turn 160:5 204:8 211:8, 9
turned 203:6, 21 205:21
206:14 207:3 226:25
turning 211:10 230:10
turns 211:13

tussled 159:6
twice 120:17
Twitter 126:10, 12
two 5:23 21:19 38:1
42:1, 8 43:15 55:18, 22
57:19 62:12 85:19 99:21
119:18 122:18 124:11
127:3 138:15 170:4
171:10 172:12 174:4, 4
175:12 178:9 180:23
185:25 186:2 193:2
205:13 216:10 225:14, 15
226:5 236:16
two-and-a-half 171:4
type 98:20
typical 33:12
typically 33:14 36:21
typing 94:21
TYREE 1:2 6:7 9:12
43:6 54:1 80:10 104:15
109:11 115:13, 15, 16
118:10 215:7 216:3, 8, 9,
14, 18, 22 217:1, 9 219:19
223:6 224:17 225:18, 20
226:5 236:16

< U >
UDF 130:22, 24
uh-huh 12:17
ultimately 59:4
unarmed 178:15, 16, 19
179:2 181:4, 16 182:2
200:25
unavailable 89:10, 11
un-bias 110:1
unbiased 112:6
uncooperative 29:7
131:14
un-cooperative 25:6
understand 5:25 6:9
11:12, 13 12:20 13:1
29:19 33:16, 18 38:10, 12
59:13 60:3 74:20 75:11,
14 99:12 112:1, 16, 25
128:23 146:10 162:18
167:22 168:9 182:24
215:11
understanding 210:23, 25
understood 12:23
underwear 143:3
Uniform 136:25
unintentional 105:2, 2
132:7, 7 133:1 192:19
unique 100:17
unit 82:19
UNITED 1:1
unjustified 24:2 235:7, 8,
11 236:11
unknown 31:11
unlawful 60:1

unlawfully 58:12 59:24
60:17
unnecessary 234:15, 16, 23
235:16, 25 236:2
unquote 23:9, 17
unreasonable 174:16, 17
unreasonably 161:20
unsure 186:13
untrustful 112:11
untruthful 221:17
update 128:8 152:8
updated 128:7 227:3
updates 83:21, 21
updating 138:20
upset 170:2 202:21
use 7:17, 25 9:13 10:25
17:23 19:15 22:25 24:1
29:25 30:11, 11 32:8, 14
45:2, 9 106:2, 6 110:5, 5,
13 112:23 114:15 115:17,
19 116:24 120:4, 11, 14
121:5 123:8, 11 125:2, 9,
10, 14 126:2, 5 130:9
131:16 146:4, 19 148:18,
20 149:3, 6 150:1, 8
151:4, 11, 13, 19 157:8
162:14, 20 165:10, 17
167:3, 8, 16 168:24
174:15 175:17 195:24
197:2, 5 199:9, 13 200:3,
6, 12 201:14 212:17
217:4 218:16, 21 221:5
222:11, 12, 16 224:17, 20,
22 231:22 232:11, 14
233:16 234:14, 17, 19, 24
235:1, 7, 8, 11, 15, 24
236:5, 7, 9, 11
useful 220:25
uses 8:18 33:7, 25 34:23
109:15 161:24 162:9
217:9 218:11, 17 219:17
231:6 233:9
usually 23:13 28:8 36:9
41:22 45:1 46:17 47:1,
15 48:21, 24 49:8, 25
50:4, 17 52:18 53:3, 10
62:7, 24 63:2, 9 79:5
83:23 85:6, 12 94:3, 14,
17 102:15 103:22 107:7
115:6 128:16 200:14
utilize 15:8 90:18
utilized 15:13 52:6

< V >
vacancy 41:4
vacation 42:24 149:22
Vaguely 136:3 139:6
variable 200:17
variables 201:7

Deposition of Sergeant Eric Pilya  Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

**various** 109:*24* 110:*5*

**vast** 29:*18, 24*

**vehicle** 55:*19* 86:*5, 8* 90:*25* 139:*15* 145:6, *8* 149:20 155:*10, 10, 11* 178:*4, 6* 179:*5, 16, 22, 23, 25* 180:*3, 6, 8* 206:*7, 19, 23* 207:2 209:*10, 11* 210:*20, 22* 212:*8* 228:*19*

**verbally** 46:*22*

**versed** 91:*22*

**version** 117:*22* 137:*25* 191:*20* 207:*6* 227:*2*

**versions** 237:*17*

**vertically** 186:*4*

**vice** 71:*4*

**vicinity** 196:*22*

**victim** 54:*15* 131:*14* 140:*10, 10, 15, 20, 23* 142:*6*

**victims** 7:*19* 14:*20*

**victim's** 96:*19*

**video** 2:2 56:*21* 215:*5* 223:*6, 9, 15, 25*

**view** 39:*4* 82:*17*

**violate** 73:*11* 163:*20*

**violated** 73:*8, 10* 116:*5* 145:*3*

**violating** 106:*2*

**violation** 46:*4* 106:*2* 109:*1* 115:*20* 133:*21, 23* 134:*1, 4, 11, 15, 17* 145:*9* 149:*14, 17* 150:*4* 164:*10* 181:*1, 24* 182:*1* 204:*18*

**violations** 106:*5* 107:*4, 25* 108:*6, 14* 115:*20* 116:*1* 119:*13* 144:*1, 4*

**violence** 66:*10*

**violent** 186:*9* 200:*19*

**violently** 200:*20*

**volition** 114:*5*

**vs** 141:*18* 173:*15, 16*

**< W >**

**Wadsworth** 139:*4, 17, 24*

**waistband** 154:*20* 178:*25* 206:*12* 216:*7, 8* 217:*2*

**wait** 37:*21* 42:*15* 47:*12* 52:*18* 88:*14, 22* 101:*18* 137:*16* 143:*7* 153:*11* 165:*17* 166:*7, 8*

**waited** 38:*1* 73:*13*

**waits** 108:*3*

**walk** 41:*13* 46:*14* 64:*14* 84:*24* 121:*25*

**walked** 203:*2*

**walkie** 15:*2*

**walking** 170:*6*

**walk-through** 87:*6* 91:*6, 7, 9* 92:*2, 17* 183:*9, 10*

**Walton** 5:*24*

**want** 12:*13* 14:*11, 12* 49:*9, 15* 53:*4, 4, 5* 61:*5, 7, 21* 68:*17* 79:*18* 81:*11* 89:*2* 93:*6* 96:*9* 97:*5* 98:*17* 99:*15* 106:*22* 107:*10, 12, 18, 22* 111:*5* 127:*6* 132:*25* 139:*3* 153:*11* 157:*3* 158:*19* 173:*8* 195:*12, 15* 213:*9* 218:*23* 233:*4*

**wanted** 14:*9* 15:*10* 79:*16* 195:*14* 220:*22* 225:*4*

**wanting** 131:*13*

**wants** 102:*4*

**warning** 18:*9, 10, 19* 19:*13*

**warnings** 90:*12*

**warrant** 45:*17* 82:2 163:*19* 185:*7, 10, 16* 186:*10*

**warranted** 30:*15, 16* 69:*16*

**warrants** 113:*13* 185:*6*

**water** 113:*14, 14* 114:*4, 5*

**waters** 97:*15*

**way** 16:*10, 23* 18:*18* 28:*14* 30:*4* 35:*7, 25* 37:*15* 45:*17, 21* 63:*25* 64:*8* 67:*5* 79:*10* 82:*4* 85:*13, 24* 86:*19* 87:*1* 90:*1* 91:*19, 22, 25* 93:*9* 95:*6* 96:*1* 100:*11, 18* 111:*3* 134:*9* 136:*10, 13* 161:*4* 162:*24* 166:*6* 191:*10* 193:*7, 14* 195:*5, 7* 207:*25* 209:*5* 213:*12* 218:*5* 221:*18*

**ways** 24:*23, 24* 105:*1* 175:*19*

**weapon** 26:*17, 19, 19* 37:*23* 63:*12* 73:*3* 92:*21, 24* 99:*6* 136:*20* 139:*13* 140:*24* 141:*21* 142:*10* 153:*10, 12, 15, 18, 23, 24* 154:*7, 8, 9, 12, 12, 22, 23, 24* 155:*13, 16, 17, 18* 158:*13* 159:*5* 160:*20, 21* 163:*1, 25* 164:*1, 5* 165:*8, 18, 20* 172:*12* 179:*1, 3, 5, 7, 17, 18, 20, 22* 181:*11* 186:*19* 187:*6, 16, 23, 24* 190:*18, 20* 191:*15* 192:*20* 200:*20, 23* 203:*1, 8* 206:*24* 209:*15* 212:*6, 8* 216:*6* 225:*21*

**weapons** 97:*8* 145:*6, 25* 146:*22* 147:*12* 148:*6, 25* 165:*19* 186:*13* 201:*5*

**wearing** 92:*19* 142:*15, 21*

**weary** 125:*10*

**weather** 45:*7*

**week** 135:*2*

**weeks** 84:*16, 17*

**weigh** 109:*24* 112:*20*

**welcome** 213:*25*

**Well** 8:*4* 20:*3, 16* 22:*12* 23:*18* 24:*3, 17* 29:*1, 17* 39:*9* 46:*15* 47:*4* 52:2 53:*1* 54:*14, 23* 55:*15* 57:*19* 60:*1* 61:*23* 65:*10* 66:*1* 67:*21* 68:*4, 11* 69:*7* 72:*20* 73:*18* 77:*21* 79:*12* 81:*24* 83:*13* 91:*22* 92:*16* 97:*12, 14* 100:*21* 103:*10, 22* 104:*20* 105:*8* 106:*12* 107:*16* 109:*19, 22* 111:*10* 126:*25* 127:*1* 129:*21* 130:*21* 140:*21* 141:*6, 7* 146:*7* 149:*13* 155:*9* 166:*5* 170:*20* 171:*15* 176:*23* 182:*11* 192:*25* 198:*4* 200:*16* 206:*3* 209:*11* 210:*15* 211:*6, 8, 12* 212:*25* 215:*6, 16* 220:*25* 221:*14* 224:*4* 229:*21*

**wellbeing** 64:*12, 19* 65:*2, 6*

**well-versed** 35:*19*

**went** 10:*2, 21* 13:*23, 24, 25* 14:*1, 2* 20:*4* 47:*20* 54:*25* 66:*3, 3* 132:*5* 141:*7, 11* 178:*23* 180:*8* 185:*13* 202:*17* 203:*21* 209:*8* 225:*24*

**we're** 12:*13* 35:*23* 40:*18* 48:*22* 50:*9* 51:*17* 58:*24* 60:*5, 12* 61:*1, 2* 69:*1* 81:*16* 85:*8* 90:*1, 11* 93:*10* 111:*5* 129:*22* 169:*15* 173:*12, 15* 174:*6* 175:*1* 182:*13* 184:*14* 191:2 213:*16* 228:*25* 230:*16* 235:*19, 20*

**Wes** 135:2

**we've** 29:*22* 47:*21* 49:*1* 81:*16* 86:*15* 87:*8* 89:*9* 94:*8* 128:*19* 130:2 220:*12* 231:*13*

**whatsoever** 107:*18* 187:*23* 210:*1*

**whim** 90:*1*

**Whiner** 41:*10*

**white** 137:*1* 177:*21, 25*

**Wilkenson** 229:*22*

**William** 143:*24* 223:*5*

**window** 186:*6, 11, 12* 187:*5* 188:*14, 20, 22* 189:*1* 193:*7* 195:*1, 3*

**weather** 202:*19* 206:*23* 209:*8*

**wing** 154:*20*

**winging** 154:*19*

**wise** 73:*15*

**wish** 29:*10* 53:*10* 87:*23*

**witness** 2:*3* 5:*3* 11:*14* 36:*8* 44:*4* 48:*21* 49:*2, 6* 50:*6* 53:*8, 15* 57:*21* 59:*24* 60:*4* 61:*23* 62:*5* 85:*16* 93:*13, 15* 110:*23* 113:*1, 3, 8* 114:*10, 15* 163:*2* 171:*19* 190:*8* 216:*18, 22* 220:*13* 225:*3* 239:*6, 10, 11, 13* 240:*4*

**witnessed** 171:*17*

**witnesses** 41:*17* 43:*25* 44:*6* 47:*17, 17* 48:*3, 4, 6, 14, 14, 16, 19* 49:*1, 7, 15, 18, 22, 25* 50:*3, 18, 20, 24* 51:*3, 9* 52:*14, 21, 24* 53:*4, 17* 54:*2, 5, 9, 17, 18, 25* 55:*1, 4, 6, 22* 56:*8, 15* 58:*8, 11, 16* 60:*14, 24* 61:*2, 4* 62:*20* 63:*13, 16* 81:*14, 17, 19, 20* 82:*10, 10, 17* 84:*8* 93:*12* 94:*9, 18* 109:*24* 113:*17* 114:*19* 120:*9* 176:*21* 183:*15* 191:*16* 220:*11*

**Wmphillips@columbus.gov** 3:*17*

**wold** 16:*7*

**woman** 176:*9*

**wood** 186:*5*

**woodworking** 125:*18*

**wording** 153:*7*

**words** 185:*23*

**work** 28:*14* 49:*3* 78:*21* 83:*24* 105:*18* 118:*17, 25* 119:*3* 184:*18* 196:*11*

**worked** 54:*21* 78:*21, 22* 79:*17*

**workers** 169:*22*

**working** 87:*22, 22* 170:*21* 189:*24* 219:*13*

**works** 90:*10* 175:*18* 184:*19*

**worst** 201:*3*

**wrap** 38:*13* 82:*7* 101:*21*

**wrapped** 102:*14*

**wrecked** 155:*11*

**wrestled** 206:*19*

**write** 12:*16, 17* 74:*5* 104:*24* 128:*24* 184:*4* 215:*21*

**writing** 237:*21, 22*

**written** 23:*13* 74:*24* 90:*3* 118:*1*

Deposition of Sergeant Eric Pilya      Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

**wrong**  73:*17*  129:*24*
141:*7, 10*  164:*11*  173:*20*
174:*6*  205:*12, 14*  224:*14*
**wrongdoing**  17:*19*  175:*9,*
*11*
**wrote**  68:*22*

< Y >
**Yeah**  72:*14*  77:*21*  87:*19*
124:*20*  134:*2*  138:*11*
156:*11*  163:*9*  208:*10*
219:*15*  227:*6*
**year**  16:*12*  17:*2*  20:*7, 17*
21:*19*  41:*11*  119:*22*
120:*17*  126:*25*  128:*10, 17,*
*19*  157:*24*  203:*9*  205:*1,*
*10*  231:*9*
**years**  20:*6, 18*  21:*19*
33:*10*  95:*14*  96:*5*  112:*4*
121:*14, 14*  122:*15*  123:*6,*
*7*  124:*19*  125:*4*  152:*10*
159:*24*  234:*3*
**yelled**  206:*15*
**Yep**  58:*7*

< Z >
**zero**  230:*10*
**Zoom**  12:*19*