```
 1              IN THE UNITED STATES DISTRICT COURT
                   SOUTHERN DISTRICT OF OHIO
 2                      EASTERN DIVISION

 3
                            - - - -
 4
    DEARREA KING, Adm., of the  )
 5
    ESTATE OF TYREE KING,        )CASE NO. 2:18CV1060
 6
             Plaintiff,          )JUDGE EDMUND A. SARGUS, JR
 7
    -V-                          )CHIEF MAG. JUDGE ELIZABETH
 8
    THE CITY OF COLUMBUS, et al,)P. DEAVERS
 9
             Defendants.         )
10

11                     - - - oOo - - -

12  CHRISTOPHER M. COOPER, Adm.,)

13  Of the ESTATE OF DEAUNTE     )CASE NO. 2:19CV3105

14  BELL-McGREW,                 )

15           Plaintiff,          )JUDGE GEORGE C. SMITH

16  -V-                          )CHIEF MAG. JUDGE ELIZABETH

17  THE CITY OF COLUMBUS, et al,)P. DEAVERS

18           Defendants.         )

19                     - - - oOo - - -

20  JAMES J. ENGLAND,            )CASE NO. 2:19CV1049

21           Plaintiff,          )JUDGE SARAH D. MORRIS

22  -V-                          )MAGISTRATE JUDGE KIMBERLY

23  THE CITY OF COLUMBUS, et al,)A. JOLSON

24           Defendants.         )

25
```

**EXHIBIT**
**Pl. Ex. 2**

```
 1                    - - - o0o - - -

 2        The video teleconference deposition of OFFICER

 3   TRACI SHAW, a witness herein, being called by the

 4   Plaintiffs as if upon cross-examination under the

 5   statute, and taken before Megan A. Medved, a Notary

 6   Public within and for the State of Ohio, pursuant to the

 7   agreement of counsel, on Wednesday, January 27th, 2021,

 8   at 10:30 a.m., at the Offices of Tackla Court Reporting,

 9   LLC, 1020 Ohio Savings Plaza, 1801 East 9th Street, City

10   of Cleveland, County of Cuyahoga, and the State of Ohio.

11                       - - - -

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Deposition of Officer Traci Shaw     Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

```
 1    APPEARANCES:

 2    On behalf of the Plaintiffs:

 3         By:   Jacqueline Greene, Esq.

 4               Friedman & Gilbert

 5               55 Public Square, Ste. 1900

 6               Cleveland, Ohio 44113

 7               Jgreene@f-glaw.com

 8               (216)241-1430

 9

10    On behalf of the Defendants:

11         By:   William Sperlazza, Esq.

12               Senior Assistant City Attorney

13               77 North Front Street

14               Columbus, Ohio 43215

15               Wsperlazza@columbus.gov

16               (614)645-6959

17

18

19

20

21

22

23

24

25
```

Deposition of Officer Traci Shaw                    Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

```
 1                        INDEX

 2   APPEARANCES ....................................... 3

 3   OFFICER TRACI SHAW

 4   CROSS-EXAMINATION BY MS. GREEN .................... 6

 5   REPORTER CERTIFICATE ............................. 153

 6   PLAINTIFF'S:

 7   1. CDP Division Rules, Policies and Directive Manual

 8      12/30/14 ...................................... 74

 9   2. Keith Abel Training Record .................... 84

10      Narewski Exhibit 4 ........................... 92

11   3. Bryan Mason Training Record .................. 93

12   4. DTU 2008 Proficiency Skills & Taser Phase ..... 102

13   5. DTU 2009 Proficiency Skills & Taser Phase ..... 105

14   6. DTU 2010 Proficiency Skills & Taser Phase ..... 109

15   7. DTU 2011 Proficiency Skills & Taser Phase ..... 109

16   8. DTU 2012 Proficiency Skills & Taser Phase ..... 109

17   9. DTU 2013 Proficiency Skills & Taser Phase ..... 110

18   10. DTU 2014 Proficiency Skills & Taser Phase .... 113

19   11. DTU 2015 Proficiency Skills & Taser Phase .... 119

20   12. Defensive Tactics, 2016 ..................... 123

21   13. DTU 2016 Proficiency Skills & Taser Phase .... 124

22   14. DTU 2007 Proficiency Skills & Taser Phase .... 127

23   15. Use of Deadly Force ......................... 129

24   16. Deadly Force Encounters ..................... 131

25   17. DTU Scenario Training ....................... 140
```

Deposition of Officer Traci Shaw                    Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

1   18. DTU Scenario Training .......................... 143

2   19. DTU Scenario Training .......................... 143

3   20. 2015 - 2018 Scenario Training: Defensive Tactics

4        And Ordnance .................................. 146

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                      P-R-O-C-E-E-D-I-N-G-S

 2                            - - - -

 3              TRACI SHAW, of lawful age, a witness herein,

 4      having been first duly sworn, as hereinafter certified,

 5                 deposes and says as follows:

 6                            - - - -

 7              CROSS-EXAMINATION OF TRACI SHAW

 8      BY MS. GREENE:

 9      Q.      Good morning.  I'm Jacqueline Green.  I'm one of

10      the lawyers representing the Plaintiffs in three

11      separate cases that we're here to talk about.  Those

12      cases include Cooper vs. Columbus, et al., England v.

13      Columbus, et al., and King v. Columbus, et al.  Before

14      we get started, for the record, can you please state and

15      spell your name?

16      A.      Yes.  My name is Traci Shaw.  T-R-A-C-I.  Middle

17      initial M for Michelle, MICHELLE.  Shaw, S-H-A-W.

18      Q.      I think your connection might be a little bit

19      wavering.  You cut out for a  second there.  Before we

20      get going, I'll talk a little bit about our rules of

21      deposition, although, I'm sure that you've spoken about

22      these with Mr. Sperlazza in advance of today's

23      deposition.  We are using Zoom on the Internet, so

24      sometimes there will be technical issues.  At any point

25      if you're experiencing tech issues on your end, please
```

1   let us know right away.  If for some reason your audi

2   isn't working, you could send us a message in the chat.

3   A.      Okay.

4   Q.      And let's see here.  Have you ever testified in

5   a deposition before?

6   A.      I have, ma'am, but I've not done one on Zoom.

7   Q.      Okay.  So, our most important special rule for

8   Zoom depositions is that if you are having any issues

9   that you please let us know right away.

10   A.      Okay.

11   Q.      Before we get going today I want to remind you

12   of some of the other rules of deposition.  The first of

13   them is that we need to make sure that we're speaking

14   one at a time.  Please let me finish my questions before

15   you begin your answers, or if your attorney is making

16   any statements, please let him finish before you start

17   answering, so we can keep a clean record for our court

18   reporter today.  Okay?

19   A.      Yes, ma'am.

20   Q.      And, of course, we need you to answer verbally

21   with yes and no.  Nods of the head or nonverbal answers

22   will not be recorded into the record, so we will need

23   verbal answers throughout.  Okay?

24   A.      Yes.

25   Q.      Okay.  And if at any point I ask a question to

Deposition of Officer Traci Shaw        Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

```
 1   you that you either don't hear because of Zoom problems,

 2   or don't understand, or need clarification on, whatever

 3   the issue may be, please let me know and ask me to

 4   restate the question or rephrase.  Okay?

 5   A.      Yes, ma'am.

 6   Q.      Okay.  And just to be clear though, we are on

 7   Zoom.  Of course, you do understand that you're here

 8   testifying under the plenty of perjury, correct?

 9   A.      Yes, ma'am.

10   Q.      If at any time you need a break, that's fine.

11   Just make sure that you answer any pending questions,

12   and then, let us know you need a break.  Okay?

13   A.      Yes, ma'am.

14   Q.      Okay.  And before we get going, are you sitting

15   here today under the effects of any medical or other

16   issue that may affect your ability to testify truthfully

17   or accurately this morning?

18   A.      No, ma'am.

19   Q.      Okay.  And what is your current rank?

20   A.      I'm an officer.

21   Q.      Okay.  Officer Shaw, you understand that you're

22   here today to testify concerning the police involved

23   shootings of James England on February 6th, 2015,

24   Deaunte Bell-McGrew on October 29th, 2015, and Tyree

25   King on September 14th, 2016, correct?
```

Deposition of Officer Traci Shaw                    Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

1   A.      Yes, ma'am.

2   Q.      And you understand that you're here in your

3   official capacity as a representative of the City of

4   Columbus?

5   A.      Yes, ma'am.

6                   MS. GREENE:  And before we move any

7   further, I'll ask counsel to stipulate on the record to

8   the topics that Officer Shaw is here today to testify

9   concerning.  So, starting with Cooper v. Columbus, et

10  al, Officer Shaw is here to testify about topic 1(A),

11  CDP policies, procedures, and practices from 2010 to

12  present concerning use of deadly force, is that correct?

13                  MR. SPERLAZZA:  That's correct.

14                  MS. GREENE:  As well as topic 2(A),

15  CDP's training of its police officers and materials used

16  for such training from 2010 to present concerning use of

17  force, correct?

18                  MR. SPERLAZZA:  That's correct.

19                  MS. GREENE:  And topic 5(A), CDP's

20  training of Defendants Baase and Narewski and materials

21  used for such training concerning use for deadly force.

22                  MR. SPERLAZZA:  That's correct.

23                  MS. GREENE:  And then, in the England

24  case, England v. Columbus, et al., again, topic 1(A),

25  CDP policies, procedures, practices from 2010 to present

1   concerning use of deadly force.

2             MR. SPERLAZZA:  Correct.

3             MS. GREENE:  Topic 2(A), CDP's

4   training of its police officers and materials used for

5   such training from 2010 to present concerning use of

6   deadly force.

7             MR. SPERLAZZA:  That's correct.

8             MS. GREENE:  And topic 5, CDP's

9   training of Defendant Abel and materials used for such

10   training concerning the use of deadly force.

11             MR. SPERLAZZA:  That's correct.

12             MS. GREENE:  And then, in the matter

13   of King vs. Columbus, et al, again, Officer Shaw is here

14   to testify on topic 1(A), CDP's policies, procedures and

15   practices from 2010 to present concerning use of deadly

16   force.

17             MR. SPERLAZZA:  That's correct.

18             MS. GREENE:  Topic 2(A) CDP's training

19   of its police officers and materials used for such

20   trainings from 2010 to present concerning use of deadly

21   force.

22             MR. SPERLAZZA:  That's correct.

23             MS. GREENE:  And then, topic 5(A),

24   CDP's training of Defendant Mason and materials used for

25   such training concerning use of deadly force.

Deposition of Officer Traci Shaw          Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

```
 1                        MR. SPERLAZZA:  That's correct.

 2                        MS. GREENE:  Are there any other

 3    topics for which Officer Shaw is designated to testify

 4    today?

 5                        MR. SPERLAZZA:  No, ma'am.

 6                        MS. GREENE:  Thank you very much.

 7    BY MS. GREENE:

 8    Q.        Okay.  So, Officer Shaw.

 9    A.        Yes, ma'am.

10    Q.        What did you do to prepare for the deposition

11    today?

12    A.        I looked over my lesson plan that we normally

13    give our training recruits.  So, that's at the basic

14    training level.  I looked over, again, case law of

15    Graham v. Connor.  I looked over Tennessee v. Garner,

16    that's another one.  Reaction times, I looked at that

17    this morning to answer, you know, I'm sure what's going

18    to come up is, I'm guessing the training that we give

19    the recruits as far as reaction times.  That's a big

20    part of training with deadly force.  And I looked up

21    the, I guess, the training records of the officers

22    involved, just scrolled down through those.

23    Q.        Anything else?

24    A.        I looked at our use of force policy.  Of course,

25    I realize that this is over -- I looked over our current
```

1  use of force policy.  So, I realized that's a different

2  time than when these incidents occurred, but just to

3  familiarize myself.

4  **Q.      Any other documents you reviewed for today?**

5  A.      No, ma'am.

6  **Q.      How much time did you spend reviewing documents**

7  **for today's deposition?**

8  A.      I got into work this morning somewhere around 8

9  a.m.  So, from eight to 10 with a lot of interruption.

10  **Q.      As happens any time any of us are in the office,**

11  **right?**

12  A.      Yes.

13  **Q.      Did you meet with any attorneys in advance of**

14  **today's deposition to prepare?**

15  A.      No, ma'am.

16  **Q.      Did you speak with anyone in preparation for**

17  **today's deposition?**

18  A.      Yes.  I spoke with Bill.  He called me on the

19  phone to make sure that I was familiar with Zoom.  Just

20  to make sure that I was familiar enough with Zoom,

21  because that can slow depositions down if I was not.

22  **Q.      Okay.  Did you speak with anyone besides Bill in**

23  **preparation for this deposition today?**

24  A.      No, ma'am.

25  **Q.      Okay.  Officer Shaw, please tell me about your**

1  **educational background.**

2  A.      I graduated from high school, obviously.  Went

3  to Mount Vernon of Nazarene for business.  Then, I

4  became a medical assistant.  I went through a year of

5  medical training in phlebotomy.  I was a radiation tech,

6  so I did X-rays.  I got on the department in 1999, and

7  then I graduated the academy in June of 2000.  So, I

8  guess, from '99 until 2000 it was a basic training

9  curriculum, OPOTA curriculum at that time, and then the

10 policies, of course, of the Columbus Division of Police

11 at the time.

12        Since then I was a field training officer, so I

13 went through the training associated with that.

14 Defensive tactics instructor in '03, became a certified

15 defensive tactics instructor with OPOTA in '05, and I've

16 had numerous -- I'd have to look at my certificates, but

17 numerous trainings that I've went through.  I've also

18 went through force science which was a week long

19 training specifically dealing with use of force

20 incidents.  I've done executive protection training,

21 ground fighting training, officer survival school in the

22 water.  And then, all of the rollcall trainings that

23 have been done for the division and inservice trainings,

24 firearms.

25 Q.      Let me briefly interrupt you.  Before you said

1    all of the rollcall trainings you cut out.  What did you

2    say?

3    A.      All of the rollcall training from 1999 to 2000,

4    so they have varied from, obviously, from sergeants

5    giving those at rollcall to, obviously, computers were

6    introduced in my tenure on the division.  So a lot of

7    those are electronic now.  And I also have the inservice

8    trainings from 1999 to the present.  All the legal

9    updates.  I've, obviously, attended all of those.  The

10   yearly defensive tactics reviews.

11   Q.      What year did you finish high school?

12   A.      1990.

13   Q.      And your Mount Vernon of Nazarene College

14   degree, what year was that?

15   A.      I was one of the ones that started in like 2000

16   and finished in 2005, I believe.

17   Q.      Okay.  And then, a lot of what you described to

18   me just now was like academy and then departmental

19   training, right?

20   A.      Yes, ma'am.

21   Q.      Okay.  You mentioned that you were a defensive

22   tactics instructor in 2003.  Was that starting in 2003

23   and ongoing, or just in the year of 2003?

24   A.      So, that was a two week course, and that was in

25   2003, and that was training specific to the Columbus

1    Division of Police.  So, that's basically dealing with

2    training of officers.  And then, in 2005, that was

3    training dealing with basic training with OPOTA.

4    Q.      Were these both kind of train the trainer

5    trainings?

6    A.      No.  So, the train the trainer level to make

7    other instructors, that's something completely

8    different.  So training to teach is a lower standard,

9    but actually training to train the trainer, I didn't get

10   that certification until 2012.

11   Q.      Okay.  So, trained to teach in 2003 for

12   defensive tactics.  And then, 2005 for the OPOTA course.

13   And then, in 2012 you were trained to be a trainer?

14   A.      Yes, ma'am.  Well, certified to do that.

15   Q.      Okay.  So, in terms of defensive tactics

16   training, you have been an instructor of other officers

17   in the CDP, then over the course of your career, is that

18   right?

19   A.      Yes, ma'am.

20   Q.      When did you start teaching other officers in

21   the CDP about defensive tactics?

22   A.      2003.

23   Q.      Okay.  And have you been providing defensive

24   tactics training to CDP officers from 2003 onward?

25   A.      Yes, ma'am.

1    Q.      And tell me about your role as a defensive

2    tactics trainer in the CDP.

3    A.      Yes, ma'am.  So, from 2003 to 2010 I was

4    involved in inservice training of other officers through

5    defensive tactics training to include use of Taser,

6    being a Taser instructor.  And then -- so, basically

7    that's lecture.  And then, also running the skills.  And

8    then also taking part as a role-player or an evaluator

9    in scenarios.

10   Q.      And did you teach, during this annual inservice

11   training that you just described, were you the sole

12   trainer, or did you teach in a team with others?

13   A.      I taught with others, and that would have been

14   on separate schedules.  So, when we do inservice

15   training you have first shift, second shift, and third

16   shift.  So I was a third shift trainer until 2010.

17   Q.      Okay.  And so, from 2003 to 2010 you were the

18   defensive tactics trainer for third shift officers for

19   the annual inservice training, is that right?

20   A.      Yes, ma'am.

21   Q.      And then, for the people who trained the first

22   and second shift officers, did they give the same

23   training that you provided to third shift officers?  Was

24   it constant throughout?

25   A.      Yes, ma'am.  Same PowerPoint; same training;

Deposition of Officer Traci Shaw             Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

1   same scenarios.

2   Q.      Okay.  So then, every officer in the CDP would

3   have received the same training whether they received it

4   from you or the other officers providing the first or

5   second shift training?

6   A.      Yes, ma'am.  And at the time it wasn't specific

7   to -- obviously, if someone was a detective versus a

8   patrol officer, everyone received the same training.

9   Q.      We'll talk more about that in a bit.  But,

10  beyond the inservice training as a defensive tactics

11  instructor, did you do any other training for CDP

12  officers?

13  A.      Yes, ma'am.  So, in 2005, then, my

14  responsibility then changed to also include recruits.

15  So, that would be new officers that have not yet

16  received their OPOTA certifications.

17  Q.      So, that's the academy then, you would teach

18  defensive tactics to the academy students?

19  A.      Yes, ma'am.  And that would have been on a

20  part-time basis up until 2010.  And then, in 2010, I got

21  a position at the academy.  And then, in 2011, that

22  position become permanent.

23  Q.      Okay.  So, maybe I should ask this question

24  first and we can come back to this topic.  Can you tell

25  me about your current role in the organizational

Deposition of Officer Traci Shaw                    Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

1  structure of the -- you're a division of police, right,

2  not a police department?

3  A.      Yes.  So, my current role is I would be the Lead

4  Defensive Tactics Instructor for the recruit training

5  for the Division of Police.

6  Q.      Okay.  And your current role is officer, but

7  you're the lead instructor for defensive tactics for

8  recruit training, right?

9  A.      Yes, ma'am.

10 Q.      And explain to me in the organizational chart of

11 the CDP where you fit in?

12 A.      Sure.  I'm almost near the bottom.  So, I'm just

13 right above the recruits.

14 Q.      Okay.  But, you do have this leadership role

15 even as an officer?

16 A.      Yes, ma'am.

17 Q.      Okay.  And in terms of the path to lead you to

18 this role of lead defensive tactics instructor for

19 recruit training, did you have to undertake any testing,

20 or other tasks that needed to be completed to be

21 designated in that role, or appointed to that role?

22 A.      We have yearly use of force testing that we have

23 to do, but that's for everyone in the division.  So, I

24 wouldn't say it's exactly a written test, but there is a

25 written test for becoming an instructor of impact

Deposition of Officer Traci Shaw      Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

1   weapons, of subject control.  There is for becoming an

2   instructor period.  There's a test involved in that.

3   Also presentation is involved in that.  In order to have

4   the role specifically, I would say, yes, you would

5   certainly need all of that training and testing before

6   they would put me in the role that I am now.

7   **Q.      Okay.  And do you currently teach defensive**

8   **tactics to certified officers who are members of the**

9   **CDP, or just recruits?**

10   A.      Just to recruits.  We do have -- I mean, we're

11   all in the same building, so certainly if they're short

12   an instructor, we'll come down and help instruct, but

13   that's on a limited basis.

14   **Q.      Okay.  And in what year did you stop teaching**

15   **CDP officers about defensive tactics other than on this**

16   **kind of as-needed, fill-in basis?**

17   A.      So, I became an instructor specifically for

18   recruit training in 2011.  So, however, it depended on

19   our staffing.  So I don't know of an exact date of when,

20   I guess, on what phase training that I did not help out

21   with those scenarios.  I can't say a specific date.

22   **Q.      Okay.  In any case, you've been designated to**

23   **testify about the training that is provided to officers,**

24   **but you primarily being a training for officers and**

25   **instead were training recruits?**

Deposition of Officer Traci Shaw                    Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

```
 1   A.      Yes, ma'am.
 2   Q.      Okay.  So, can you please tell me a little bit,
 3   or give me an overview of your employment path and roles
 4   within the CDP from time of hire to the present?
 5   A.      Yes, ma'am.  So, I was a patrol officer from the
 6   time that I graduated the academy.  And then, obviously,
 7   I developed those certifications, but it didn't change
 8   my title at all.  It just changed some of my roles.  I
 9   became a field training officer in 2004 or 2005, I
10   believe.  And then, that field training officer position
11   allowed me to take a temporary role in 2010 at the
12   academy, and then in 2011 a permanent job came up and
13   became part of staff.
14   Q.      Have you at any time sought promotion within the
15   department in terms of rank?
16   A.      No, ma'am.
17   Q.      Why not?
18   A.      So, if you know anything about the police
19   department, if you get promoted you start at rock bottom
20   again.  So, I am a mother, was a mother of a young
21   child, and when I was finally able to get to first shift
22   that's the time that people start to get promoted, and
23   that's the time that she was involved in a lot of
24   after-school activities.  And, frankly, I didn't want to
25   go back to third shift again.
```

Deposition of Officer Traci Shaw  Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

1 Q.  That's a pretty good reason.

2 A.  Uh-huh.

3 Q.  Who is your direct supervisor?

4 A.  My direct supervisor is Sergeant Laura Subra.

5 Q.  Are you assigned to a particular unit within the

6 CDP?

7 A.  Yes, ma'am.  So, it's under the division of

8 training, but it's basic training.

9 Q.  And can you tell me the organizational structure

10 of that unit, or division rather, of the Division of

11 Police?

12 A.  So, I can't.  It has changed so much that

13 there's been -- since we got a new chief within the last

14 year.  So they have changed and moved things around so

15 much, that without seeing a supplemental chart -- I

16 mean, obviously, I know who was in my rank and file

17 above me in the chain of command, but as far as the

18 title and names, I don't know.  I apologize.

19 Q.  That's okay.  Can you walk me through your chain

20 of command then?

21 A.  Yes, ma'am.  Sergeant Laura Subra.  She's the

22 basic training sergeant.  Sergeant Don Alverio.  I'm

23 sorry.  Lieutenant Don Alverio.  And then, my commander

24 is Commander Mark Lang.  My deputy chief is Deputy Chief

25 Jennifer Knight.  And then, my chief is Chief Thomas

Deposition of Officer Traci Shaw          Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

1   Quinlin.

2   **Q.     Okay.  Thank you.  So before we get too deep**

3   **into a lot of the training stuff, I want to ask you**

4   **generally about some policy questions.  So, in general,**

5   **where are written policies concerning use of deadly**

6   **force contained in the Columbus Division of Police**

7   **regarding the topics that you're here to testify on**

8   **today?**

9   A.     Yes, ma'am.  So they're written in our division

10  directive books.  We've got division directive 201, use

11  of force policy.  Of course, it's referenced throughout

12  other manuals, but most people access it via the

13  electronic system of Power DMS.

14  **Q.     And are there any other sources of written**

15  **policies beyond the division directives to use of force**

16  **in the Division of Police?**

17  A.     It's mentioned in the supervisor's manual.  It's

18  also mentioned in the field report manual, which is

19  basically how we complete reports.  I know it's

20  referenced there.  It's also in the defensive tactics

21  training lesson plans.

22  **Q.     Any other sources of written policies?**

23  A.     That's it, ma'am.

24  **Q.     Any memos, or handouts during rollcall or**

25  **anything like that where they contain written policies**

1 about using deadly force?

2 A.  Possibly, but it's mostly that written policy in

3 the division directive.

4 Q.  Okay.  In terms of the division directives you

5 mentioned Power DMS as a means to review the directives,

6 is that right?

7 A.  Yes, ma'am.

8 Q.  So, what's Power DMS?

9 A.  So, Power DMS, we've had many different ones

10 over the years, but that's the most recent one, which is

11 basically an electronic filing, reporting, I guess, a

12 program.  Like software.  And on there that's where

13 directives are put.  That's where you sign off on your

14 directives that you reviewed and received it.  And then,

15 it also has any type of, I guess, the policies and

16 procedures that you need to know as a sworn employee of

17 the Division of Police.

18 Q.  And how often, if at all, are CDP officers

19 required to review those directives in Power DMS?

20 A.  On a regular basis.

21 Q.  How often is a regular basis?

22 A.  Like yesterday I did I think three or four, just

23 yesterday, because I was behind.  They'll release them,

24 you get an e-mail to let you know you need to get on

25 Power DMS and review those.  So, it's on a regular

1    basis.

2    Q.      So, in terms of what you were just describing,

3    is that for new updates to policies, is that right?

4    A.      Yes, ma'am.

5    Q.      Okay.  And when there are policies, or

6    directives rather, that are not subject to an update,

7    for example, they've been in place for some number of

8    years, is there a regular review of those policies?

9    A.      Well, you're expected, when you sign off on that

10   policy, you're expected to know it and go by it.  So, as

11   far as regular review of that policy, from the time that

12   you sign it you're agreeing that you need to be aware of

13   the policy and follow it.

14   Q.      So after a new policy is promulgated officers

15   are expected to review and sign off on having reviewed

16   that policy, right?

17   A.      Yes, ma'am.

18   Q.      Is there any subsequent requirement to review it

19   after that?

20   A.      Not unless there's an update, but I know in the

21   rules of conduct you're expected to follow policy and

22   procedure.

23   Q.      Okay.  And in terms of the Power DMS system,

24   when did that start being a mechanism used for policy

25   review?  What year?

1   A.      I would say within the last two years.  And

2   before that we used, it was called Connect Rule

3   Training, which was just a different software.  But, I

4   could be wrong, but I think within the last couple of

5   years.

6   **Q.      Okay.  And then, for the Connect Rule Training**

7   **software, do you know when that started to be used?**

8   A.      I don't, ma'am.

9   **Q.      Okay.  Let me ask you this: Was there any point**

10  **in your career where the review of new or updated**

11  **policies occurred through anything other than a software**

12  **program?**

13  A.      Yes, ma'am.  So we only had -- when I started we

14  would have to sign, basically it was all printed, and

15  you had to have all of your manuals.  So there's three

16  manuals that you would have to have.  Your division

17  directive, your aid to enforcement, which is basically

18  traffic laws and general offenses, cruiser district

19  maps.  And then, also your aid to enforcement manual,

20  which had all of your criminal offenses.  And any time

21  there was an update in the law, any time there was an

22  update in the policy with that new law and that update

23  in policy that was sent, so you're talking a stack of

24  papers was sent to you, and on the outside of that pack

25  of new policies and procedures you had to sign it and

1    date it, and then turn that into your sergeant.

2    Q.       Okay.  Do you remember around when you switched

3    from that paper based system to a computer based system?

4    A.       I would say, I mean, I think probably within the

5    last, I don't know, ten, 12 years I think that we

6    switched to electronic.  Somewhere around that time,

7    because then officers were given the option, because you

8    could imagine it was quite costly for 1900 employees to

9    receive, any time there was an update in a policy, all

10   that paperwork that was generated.  I'm thinking -- and

11   then, if you still wanted to continue to get that paper

12   you had to actually request it.  That's when that

13   switched, and obviously, during that time -- so from the

14   time that I got on until, I don't know, whenever that

15   policy was switched, you were subject to being inspected

16   by a lieutenant who would come to the -- he would just

17   show up at rollcall and he would be there and he would

18   say, "Officer Shaw, come with me and let me see your

19   books," and he would make sure that all of those updates

20   were in your books.  So he was a compliance lieutenant,

21   if you will.  Now, it is all done electronically, and

22   then if you do not complete those in a timely manner you

23   get a reminder from your supervisor that that needs to

24   be done.

25   Q.       Okay.  In both of these systems, the paper based

 1  and computer based system, when CDP officers received

 2  new policies or policy updates, they were required to

 3  sign something, whether on paper or electronically,

 4  indicating that they had reviewed the policy, correct?

 5  A.      Yes, ma'am.

 6  Q.      Was there anything that supervisors or others in

 7  the department did to ensure that the person had

 8  actually reviewed the policy?

 9  A.      I don't -- I mean, it's your signature.  It's

10  your word.  I think that they're expecting officers that

11  if they sign that to make sure that they review it.  I

12  will say this:  Come to think of it, if there was a new

13  policy at rollcall your supervisor would go over that

14  new policy.  So it wasn't always just giving you that

15  stack of paper.  Certainly, if it was something that was

16  meaningful to that patrol officer or, I guess, directly

17  affected that patrol officer, he would review that at

18  rollcall as well.

19  Q.      Generally it sounds like an honor code system,

20  if you signed the paper we expect that you're accurately

21  and truthful expecting that you reviewed the policy?

22  A.      Yes.  And it continues to be that even

23  electronically.  I mean, if you're signing off on it,

24  some of them I've even noticed that there's a timer

25  that's associated with reviewing that, so you can't just

Deposition of Officer Traci Shaw          Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

1  click on it and say you reviewed it and move on to

2  something else.  You actually have to spend time on that

3  page reviewing that.

4  Q.      Okay.  So, in theory, that's supposed to try to

5  get people to read it, but you could just sit there with

6  the document open and click through if you wanted, I

7  suppose, right?

8  A.      I suppose, ma'am.

9  Q.      Okay.  So, officers receive a manual of

10  directives when they're first employed with the

11  division, right?

12  A.      Yes, ma'am.

13  Q.      And then, we've talked about update processes.

14  And if there are no updates to a policy, then there is

15  no review of that particular policy with officers unless

16  or until there's an update, right?

17  A.      Yes, ma'am.  That's correct.

18  Q.      Okay.  Is there any periodic testing of policies

19  that occurs within the CDP?

20  A.      Yes, ma'am.  The use of force policy.  Firearms

21  policy.  Mace policy.  If you're a Taser user, you have

22  to take a yearly Taser test.  Those are the written

23  ones.  And then, on some of the rollcall trainings that

24  you have to review, they'll ask you to take a brief test

25  after that.  It could be a very small one, but they want

1    to make sure that you actually reviewed the policy, so

2    they'll ask questions regarding that.  But that's not on

3    all of them, just some of them.

4    Q.      That was a rollcall test, you said?

5    A.      Yes, ma'am.

6    Q.      And for those tests, how are they administered?

7    A.      So the -- well, because of Covid our use of

8    force policy this year has changed.  It's now

9    electronic.  But before you would go to qualify for

10   firearms four times usually, and normally in one of

11   those stages of training we'll have to complete an

12   actual written test.  Now, because of Covid it's

13   electronic this year.

14   Q.      Okay.  You also mentioned during rollcall that

15   sometimes supervisors would go over with a particular

16   officer policies that were especially relevant to that

17   officer.  Can you explain that a little bit more to me,

18   please?

19   A.      Certainly.  Sometimes policies come out and some

20   need help with making sure that, I guess, that everybody

21   understands it correctly.  Recently with the body

22   camera, that policy is being updated, and a lot of those

23   are going to require a supervisor to make sure that you

24   can decipher those.  They changed, I guess, one that was

25   very, very recent was the nonviolent misdemeanors

1    policy.  So, arresting nonviolent misdemeanors.  When

2    that policy came out I think there was three subsequent

3    e-mails from the city attorney's office explaining, I

4    guess, questions and answers, so even with the policy

5    there the officers had questions regarding how that was

6    going to affect how they completed -- I guess not

7    arrests, but how they were going to issue summons.

8    There was a lot of questions out there.  I know there

9    was at least three e-mails, and that was covered with

10   the sergeants at their rollcall as well.

11   Q.      Okay.  And division directives provide general

12   principles and guidance to officers, and rules and

13   boundaries in some cases, regarding how to conduct

14   themselves as officers within their duties, correct?

15   A.      Yes, ma'am.

16   Q.      And then, officers are expected to understand

17   those principles, rules, and that guidance and use those

18   principles, rules and guidance, to make decisions in

19   specific circumstances about how they engage in their

20   duties as a police officer, right?

21   A.      Yes, ma'am.

22   Q.      Now, in the practical kind of being out there in

23   the world situation that officers find themselves in, do

24   CDP officers ever vary or, you know, slightly vary from

25   written policies in the way that they execute their

Deposition of Officer Traci Shaw        Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

1    duties?

2    A.       Yes.  I would say, yes, that they do.  However,

3    for those discipline is then given.  I mean, you run the

4    risk of discipline if you go about it a different way

5    that it is in policy.

6    **Q.      Are officers always disciplined if they go about**

7    **things in a different way than they're written in the**

8    **policy?**

9    A.       No, ma'am.  Sometimes they get away with it.  I

10    mean, unless, if you think of the checks and balances in

11    the division directives, there's a large amount of

12    information.  It's very hard for, I guess, the

13    supervisors certainly to keep track of.  So I would

14    think that it would be possible for an officer to forget

15    to turn on their body camera, and then that not be

16    checked and then disciplined for that.  There's

17    certainly a possibility.

18    **Q.      So, sometimes officers don't comply to every**

19    **piece of a policy when they're out on the streets doing**

20    **their jobs, right?**

21    A.       Yes, ma'am.

22    **Q.      And then, sometimes you said they could get away**

23    **with not following things to a tee because there's a lot**

24    **for supervisors to keep track of, is that right?**

25    A.       Yes, ma'am.

Deposition of Officer Traci Shaw                    Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

1  Q.      Okay.  So, let's talk about training concerning

2  the use of deadly force in the CDP.  Can you please

3  describe for how how the Columbus Division of Police

4  trains its officers on use of deadly force?

5  A.      Yes.  The big picture is definitely lecture in a

6  classroom.  And then, training.  And then, practical

7  application of those tactics.  So, that would be

8  scenario based trainings.

9  Q.      Okay.  And what you've just described, is this

10  like an annual inservice training?

11  A.      So, what I was describing was for basic

12  training.

13  Q.      Okay.  Basic training involves lecture,

14  training, tactical application of tactics through

15  scenario, is that right?

16  A.      Yes, ma'am.

17  Q.      Okay.  And what do your lectures cover?

18  A.      So, civil liability in use of force.  The use of

19  force policy.  Case law, which continually changes, of

20  course.  Action versus reaction.  That's what the

21  lecture will cover.  Definitely the basic training

22  level, the myths that are out there.  Most people come

23  from a video culture of Hollywood, so they have ideas of

24  what officers are, I guess, capable of doing or required

25  to do, and that changes when they have that lecture.

```
 1   We're trying to, obviously, debunk the myths that are

 2   out there.

 3   Q.      Okay.  And so, you mentioned they're trained on

 4   the division policy, on civil liability, and on use of

 5   force, case law, and then action/reaction and myths.  Is

 6   there anything else that you can think of right now that

 7   is included in basic training lectures?

 8   A.      So, obviously, city ordinances, those are

 9   covered.  State law.  Binding law.  Supreme Court cases.

10   Those are covered as well.

11   Q.      Okay.  In terms of binding law that's provided

12   to officers during their basic training, who tells you

13   what the binding law is that they need to know about?

14   A.      That would be our city attorney Jeff Furbee and

15   Deanna Overtte.

16   Q.      Do they give you like a list of cases or

17   training materials to use for what binding case law

18   trainees need to know?

19   A.      Yes, ma'am.

20   Q.      Do you know whether those documents have been

21   produced to the Plaintiffs in these cases?

22   A.      No, ma'am.  I do not.

23   Q.      Okay.  Are those materials included in the

24   presentation on the use of force and civil liability?

25   A.      Yes, ma'am.
```

1    Q.      Okay.  And how often do people from the city

2    attorney's office provide trainers of the basic training

3    program with binding case law that they need to use when

4    they're teaching new recruits?

5    A.      Yearly.  I'm sorry.  Sometimes if there's a new

6    case law that comes out, and, obviously, directly

7    affects how officers' use of force -- there's plenty of

8    them, but if there's a use of force case that comes out

9    and it changes things for us, that decision is made and

10   they, obviously, need to get that training out right

11   away.  So, it's not always just on a yearly basis, but

12   certainly if there's something new and case law comes

13   out, that's given right away.

14   Q.      Okay.  And you immediately incorporate that into

15   your basic training program once you receive that?

16   A.      Yes, ma'am.

17   Q.      How is that information conveyed to officers who

18   are outside of basic training at that point who are

19   already a fully functioning licensed officer?

20   A.      Yes, ma'am.  So that's done in legal updates,

21   which are also required that you sign off that you

22   reviewed those as well.

23   Q.      For legal updates, where are the officers, like

24   sign-offs on having received and reviewed those?  Where

25   are those sign-offs maintains?

1    A.        Now I know they're in the electronic software

2    Power DMS.  It's maintained there.  Obviously, I just

3    told you it's very recent.  And before that those legal

4    updates were recorded in your training record of when

5    you attended the legal updates, that yearly training.

6    **Q.        Okay.  And those legal update reviews and sign**

7    **off processes went through Power DMS or on an old system**

8    **on paper, right?**

9    A.        Yes, ma'am.

10   **Q.        Those are part of officer training in an ongoing**

11   **capacity for the division, right?**

12   A.        Yes, ma'am.

13   **Q.        And once officers sign off on legal updates that**

14   **they received it's understood that they've received,**

15   **reviewed, and understand the legal update that they were**

16   **provided, correct?**

17   A.        Yes, ma'am.

18   **Q.        And there are records kept for all officers**

19   **regarding their receipt and review of legal updates over**

20   **the course of their careers?**

21   A.        Yes, ma'am.  There's a training record for each

22   officer, and those are -- I don't know exactly where

23   they're kept, but I know that everybody has a training

24   record.

25   **Q.        Okay.  So legal updates are reflected in**

1   people's training records is what you're saying, right?

2   A.      Yes, ma'am.

3   Q.      Okay.  Do you know whether those training

4   records reflect the specific updates that people

5   received and reviewed, or weather there's just like a

6   general entry for legal updates without any detail?

7   A.      I wouldn't know without assuming, but I know

8   based on a way that the division handles everything

9   else, it would be very specific of what legal updates it

10  was based on, the month, and the day, and year.

11  Q.      Okay.  So let's turn back to use of deadly force

12  training.  You were talking to me about basic training,

13  the lecture, the training, the tactical application and

14  tactical scenarios.  We've covered the lecture portion

15  of that at this point, correct?

16  A.      Yes, ma'am.

17  Q.      What is the training provided to the recruits?

18  A.      So, certainly the city's attorney's office is

19  the foundation for use of force training.  And then, we

20  have a couple of scenarios pretty early on, and one of

21  those being an immediate response scenario.  And then,

22  another one is focussed mostly on getting them to,

23  putting them in a situation and, obviously, we want to

24  determine on whether or not they know how to respond.

25  Most of the time those responses are made based upon

Deposition of Officer Traci Shaw        Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

```
 1   their video culture.  Basically, they have that as
 2   context.  They have Hollywood context of what they think
 3   use of force is and when they can shoot, when they can't
 4   shoot.  You know, shoot him in the leg.  Shoot the gun
 5   out of their hand.  You know, The Lone Ranger type of
 6   stuff.  They have that in their head.  Those are the two
 7   scenarios that we do early on.  And then, the immediate
 8   response scenario that we put them through, it could be
 9   a woman being raped, and we put those role players in a
10   room and put that officer in and explain that's what's
11   going on.  A woman has been screaming.  And then, you'll
12   have recruits sort of saunter and walk towards the door
13   instead of having that sense of urgency.  We want to
14   early on realize they have that duty to protect and they
15   need to have that sense of urgency within that.  You
16   would think that those things come naturally, but a lot
17   of times we have to teach that sense of urgency.
18   Q.      Okay.  And in terms of scenarios that you
19   mentioned, how are those actually carried out as a
20   training mechanism?
21   A.      Okay.  So, our use of force scenarios that we
22   use are specific to a level of control.  There's eight
23   levels of control.  I'm not sure if you've seen that or
24   not.  Level zero through eight, zero being officer
25   presence, and eight is deadly force.
```

1  Q.      Is that basically the use of force continuum

2  that you're referencing?

3  A.      Yes, ma'am.

4  Q.      Okay.

5  A.      Those levels are tested.  We teach them the use

6  of force policy.  We teach them the continuum.  And

7  then, we teach them specific skills to control a

8  subject's movements.  And then, we teach them specific

9  skills on the tools on their toolbelt.  So, baton, mace.

10  We put them in these practical applications and test

11  whether or not their level of force is reasonable based

12  on the scenario.

13  Q.      How is the testing or evaluation of their

14  conduct done?

15  A.      So, we will give them -- obviously, safety is

16  important, and safety for us is important for us as

17  well.  So, obviously, we'll give them, you know, inerts,

18  mace and guns, simunition guns, and provide them a mouth

19  piece, head gear, and all of that.  And we'll put them

20  through a scenario, and we have an evaluator that will

21  walk them through that scenario, and then there's

22  expected recruit actions that we expect specific to that

23  level of control that we are testing, and then they're

24  evaluated after the scenario.  And then, if there's a

25  problem in the scenario or didn't pass the scenarios,

1    then, of course, we have to redo that area in which

2    they, I guess, reacted wrong or had a poor understanding

3    of what level of control was reasonable.

4    Q.       And in those scenarios, then, you mentioned,

5    obviously, the students, the evaluator.  Are there

6    people acting out other roles as part of that scenario

7    in an interactive experience for the student?

8    A.       Yes, ma'am.  We primarily use the defensive

9    tactics instructors as those role-players.  And then, we

10   definitely have, I can say it's a defensive tactics

11   instructor that's also doing the evaluating with them.

12   Q.       Okay.  And if someone in the recruitment class

13   fails a scenario, what is done to address that failure?

14   You mentioned like going through that issue with them

15   again, but how is that done?

16   A.       Sure.  So, we videotape most of the scenarios.

17   Certainly the body cameras, the recruits have body

18   cameras, so that helps as well.  We'll go over the video

19   with them, go over the use of force continuum with them,

20   and then retest them.  Obviously, if they're -- let's

21   say, for instance, that they're not using an impact

22   weapon correctly.  They're not striking at one hundred

23   percent, weak strikes or something along those lines.

24   Then, we would also hit that skill based training and

25   then do another scenario.

Deposition of Officer Traci Shaw          Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

1   Q.     Okay. And if, for example, a person was using

2   force when it was not warranted under the use of force

3   continuum under the policies, under the law, how is that

4   retested?

5   A.     That same course of reviewing the video,

6   reviewing the use of force continuum, policy of force,

7   and then putting them through that scenario again. And

8   then if they don't pass those scenarios -- most of the

9   time if anybody fails out of the academy during use of

10   force training, it's because they used too much force

11   and we weren't able to bring them down. We'll have

12   recruits that come through there and will mace, punch,

13   hit with a baton, every single, you know, role-player no

14   matter the scenario. So, obviously, they have this --

15   sometimes they just don't understand it. Sometimes

16   they're not able to control it, and those are the ones

17   that are terminated.

18   Q.     Those people are failed out of the academy then?

19   A.     Yes.

20   Q.     Are they ever able to reenter the academy and

21   attempt again to go through that process to become an

22   officer?

23   A.     Since I've been here, we haven't had anyone of

24   the over-reactors that have come through again, because

25   if they applied for reinstatement from civil service,

1    that comes to the academy and to the recruit training

2    sergeant, it's then their responsibility to --

3    **Q.        I'm sorry.  You cut out there.**

4    A.        If someone applies for reinstatement for civil

5    service, then that request for reinstatement comes back

6    to the academy chain of command, and they recommend

7    whether or not that person should be reinstated or not.

8    **Q.        Okay.  So, the purpose of these scenarios, and**

9    **then if someone fails a scenario to reteach, provide**

10   **feedback and retest, the purpose of that is to ensure**

11   **that people either understand the law and policies and**

12   **their duties as an officer, or to weed out people who do**

13   **not understand those things, is that right?**

14   A.        Yes, ma'am.  First and foremost, our mission is

15   to train.  So we want them -- the city has invested a

16   lot of money in that candidate so we definitely want to

17   train them.  That's definitely first and foremost.  But

18   certainly if they don't meet those expectations after

19   all that mediation, then they'll be terminated if they

20   don't understand that use of force policy.

21   **Q.        In recruit training and basic training, how many**

22   **hours of training do new recruits receive before they**

23   **can become officers?**

24   A.        Specifically use of force training?

25   **Q.        I guess overall first.**

Deposition of Officer Traci Shaw          Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

1    A.      That number has continuously changed, and

2    honestly, since 2014 after Ferguson, the hours have gone

3    up exponentially.  It's always been right around 28

4    weeks that the Columbus Division of Police has in

5    training, and that's well and beyond what the state

6    requires, but I don't have -- I can get those numbers

7    for you.  I just have to check with our security.

8    Q.      Let me ask a different question, I guess.  How

9    many hours of whatever that total period of time is are

10   spent on use of force training?

11   A.      So, the state requires 78 hours, and just on a

12   guestimation of how many additional hours we spend, at

13   least, 120 hours or more.  So, you figure the state

14   requires 78, we're doubling it and then some.

15   Q.      Okay.  And how many hours specifically are spent

16   on use of deadly force training in recruit training?

17   A.      It's not -- we don't separate it.  It would be

18   nearly impossible for me to separate it by use of force.

19   I guess from level zero to seven, so officer presence

20   to, you know, to boxing, takedowns, all of that.

21   Because deadly force is talked about even in those

22   topics as well, but it would be -- I can't separate the

23   two.  For instance, in baton training that we have, so

24   an impact weapon, baton training, depending on where you

25   strike someone with that baton could be deadly force.

Deposition of Officer Traci Shaw          Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

1  So you can't take a baton and hit someone in the head.

2  That's deadly force.  But that's taught at the same time

3  hitting pain compliance target versus injury targets.

4  It's all encapsulated into one.

5  Q.      Okay.  So, for officers who joined before

6  Ferguson, around 2014 or so, they had a shorter basic

7  training period, right?

8  A.      Yes, ma'am.

9  Q.      Do you know how many hours, or weeks?  And I'm

10  going to ask about specific people right now.

11  A.      Okay.

12  Q.      For Officer Keith Abel, do you know how many

13  hours of basic training he received?

14  A.      No.

15  Q.      Do you know how many hours Officer Narewski

16  received in basic training?

17  A.      No.

18  Q.      How about Officer Baase, do you know how many

19  hours he received in basic training?

20  A.      No, ma'am.

21  Q.      Or Officer Mason, do you know how many hours he

22  received in basic training?

23  A.      No, ma'am.

24  Q.      Okay.  Do you know how many hours any of those

25  officers received in basic training pertaining to use of

 1  force?

 2  A.      No, ma'am.

 3  Q.      And do you know how many hours any of those

 4  officers received in basic training pertaining to use of

 5  deadly force?

 6  A.      No, ma'am.

 7  Q.      Do you know whether all of those officers

 8  received their basic training from the Division of

 9  Police itself?

10  A.      Yes, ma'am.

11  Q.      So, they all did receive their basic training

12  through the CDP?

13  A.      Yes, ma'am.

14  Q.      Okay.  In terms of their training academy

15  histories for Abel, Baase, Narewski, and Mason, did you

16  undertake any search for documentation or information

17  that would allow you to answer questions about their

18  basic training?

19  A.      No, ma'am.

20  Q.      Okay.  Let's turn back now to people who are out

21  of basic training who are now officers in the division.

22  Let's come back to this question about training on

23  deadly force for them.  Can you please outline for me

24  how the CDP trains its officers who are done with basic

25  training and are now on duty?

Deposition of Officer Traci Shaw      Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

1    A.     Yes, ma'am.  It's going to start with lecture.

2    Every phase training starts with lecture, a review of

3    the use of force policy, and then, we hit the skills.

4    So, that could include Taser, baton.  That's hands-on,

5    so that's working on those hands-on skills.  And then,

6    that's followed up with scenarios that are pertinent to

7    any type of policy changes, or anything that the

8    division as a whole has seen that's problematic.  They

9    hit those areas as well.

10   **Q.     Are scenarios always used in that officer**

11   **training, or just when there's some kind of policy**

12   **change or problematic issue in the division?**

13   A.     As long as I've been in the department phase

14   training has always incorporated scenarios.

15   **Q.     Okay.  And the scenarios, are they carried out**

16   **in the same way that you described for recruits?**

17   A.     Yes.  Yes.  I mean, there's certain things that

18   aren't.  If you're at the basic training level, it's

19   going to be those scenarios are a lot more physical.  We

20   put them in -- I mean, they have a mouth piece, they've

21   got head gear, and they'll actually get struck in the

22   face.  The scenarios that the officers go through, that

23   same type of physicality, is more focussed on policies,

24   procedures, and skills.

25   **Q.     Why is there that difference, the more physical**

Deposition of Officer Traci Shaw — Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

1   training involving what sounds like a more realistic

2   role-play in use of force than something that's more

3   academic?  It that a fair characterization?

4   A.      I hope I didn't overstate it, but certainly it

5   comes down to injuries.  And then, also, you have to

6   figure that the recruits that we put through these

7   scenarios get regular PT.  I mean, nearly every day they

8   get the physical fitness training.  And then, they're

9   actually getting weekly boxing training, weekly ground

10  fighting training.  You're talking the difference of --

11  you know, basically we're creating a skill set with the

12  recruits, and once the skill set is there, we're testing

13  them based on a different skill set, if you will.  That

14  foundation has been established.  At the recruit level

15  that skill set has not been established yet.  Those

16  scenarios, I can't imagine if we had officers come in

17  off the street and had them box and take hits to the

18  face, and the concussions on a yearly basis, what that

19  would mean for their health.  That would outweigh the

20  benefits I think at that risk.

21  Q.      Okay.  So, for the officers then, even if

22  they're in scenarios that involve less potential for

23  injury, are they tested to see whether they pass or fail

24  those scenarios in a similar manner to the recruits?

25  A.      Yes, ma'am.  Yes.

1  Q.      And so, is there an evaluator there observing

2  their conduct in making a determination as to whether

3  they pass or fail the scenario training?

4  A.      Yes, ma'am.  Every scenario is going to have

5  what we call control and safety, so that control, and

6  then you're going to have that evaluator as well.

7  Depending on how risky the scenario is, obviously, you

8  might need more safety officers.

9  Q.      What are safety officers in a scenario?

10 A.      So, safety officers are out of play.  They're

11 there to protect the role-players as well as the

12 officer, or recruit going through the scenario.  They

13 also conduct searches to make sure that no live weapons

14 get introduced into scenarios.  And, obviously, we want

15 to make the scenarios as realistic as possible, but we

16 don't want to create injuries to recruits or officers.

17 However, if they don't have that skill set, we have to

18 be a little bit more physical at the recruit level,

19 basic training level than the officer level.

20 Q.      What's a control officer in a scenario?

21 A.      They're in charge.  What they say goes.  For

22 instance, from time to time we have the upper echelon

23 might come in and watch the scenarios, or officers from

24 other agencies possibly.  We've had that before.  And

25 that control officer, it doesn't matter what rank they

```
 1    are, if they say, you've got your gun on your hip, it

 2    needs to be out in that scenario.  They're in charge of

 3    that scenario.

 4    Q.      Is the evaluator for scenarios with officers

 5    going through training, is that evaluator a defensive

 6    tactics instructor?

 7    A.      Yes, ma'am.

 8    Q.      You mentioned a couple of times the risk of

 9    weapons being present or introduced in a scenario

10    training situation.  Has that been a problem in the past

11    in the CDP?

12    A.      No, it has not.  Thank the Lord.  It's happened

13    all over the country where typically, especially during

14    phase training with officers, you know, even your safety

15    officers will leave for lunch and they exchange that

16    safety gun on their hip with a real gun, and then

17    sometimes that's where mistakes happen.  We're very --

18    we strive for everybody to be safe and make sure that

19    that doesn't happen.

20    Q.      And then, if an officer fails their scenario

21    training, what happens?

22    A.      So, if an officer fails that scenario training,

23    then we're always going to have a debrief with that

24    officer.  And then, obviously, talk about things that

25    they could have done better or things that we're looking
```

1    for in the scenario.

2    Q.        Is that debrief documented anywhere?

3    A.        It is at the basic training level.  I don't know

4    if they document that at the officer level.

5    Q.        Is the failure of a scenario training at the

6    officer level documented anywhere?

7    A.        I don't know the answer to that, ma'am.

8    Q.        Have you undertaken any search for documents or

9    information to allow you to answer questions about

10   scenario based training for individuals at the officer

11   level concerning use of force?

12   A.        No, I have not.

13   Q.        Before you came here today, did any attorney

14   advise you that you do have a duty to conduct a good

15   faith search for documents or information for the topics

16   in which you are designated to testify?

17   A.        Yes, ma'am.  I'm sure I was.

18   Q.        And you didn't undertake that search or find out

19   any information on the details of use of force training

20   for the officers before you came here today?

21   A.        Not specifically that.

22   Q.        All right.  In your experience as an officer,

23   have you ever seen or heard of a failure of a scenario

24   training event for an officer level individual

25   documented anywhere?

```
1    A.       Yes, ma'am.

2    Q.       Can you explain that to me?

3    A.       So, I know that there was a training sergeant --

4    I'm sorry.  A sergeant that went through training, and

5    it was so poor that they determined that there was

6    something physically wrong with him.  And so, I know

7    that that was done, and I know that there was a letter

8    written up about that.

9    Q.       Okay.  Have you ever heard of or witnessed any

10   other event where an officer failed a scenario training

11   and that failure was documented?

12   A.       I don't know if when they go through those

13   scenarios, I don't know if they're documenting pass or

14   fail at the officer level.

15   Q.       When you provided defensive tactics training to

16   officer level members of the division, do you recall

17   whether at that time there was any documentation of

18   failing scenario training?

19   A.       I don't believe that there was.

20   Q.       And at that time, do you recall whether there

21   was any written document of the debriefing and what the

22   officer could have done better?

23   A.       I don't believe so, ma'am.

24   Q.       Okay.  And do you have any reason to believe

25   that that practice has changed from the time that you
```

1   were a defensive tactics instructor to now?

2   A.      I do not.

3   Q.      Okay.  Now, what you just described to me, you

4   mentioned lecture, review of the use of force policy,

5   and then, skills and scenario training.  Are you

6   describing to me inservice training, or is it something

7   else?

8   A.      That's inservice training.  Starts off with

9   lecture, skills, and then scenarios.

10  Q.      Okay.  And the lecture is typically provided

11  with the aid of a PowerPoint presentation, right?

12  A.      Yes, ma'am.

13  Q.      And how often is that inservice training

14  provided to CDP officers?

15  A.      Other than this year, yearly.

16  Q.      What do you mean, "other than this year?"

17  A.      Because of Covid they cancelled the training

18  because of risk of exposures.

19  Q.      Do you know whether there's any alterative

20  training that the division is offering in lieu of the

21  in-person training?

22  A.      Yes, ma'am.  There's videos online as well as a

23  use of force policy test.

24  Q.      Okay.  Is there, as part of that inservice

25  training every year, a test on the use of force policy?

 1  A.      Yes, ma'am.

 2  Q.      For that test, is it different every year or is

 3  it the same from year-to-year?

 4  A.      It will be the same from year-to-year, unless

 5  there has been any changes to that policy.

 6  Q.      Okay.  And so, then, I guess, how often is that

 7  test updated in your experience as a trainer?

 8  A.      Certainly before phase training, before that

 9  instruction is to be given, before that lecture is to be

10  given, if there's a change to that policy the test will

11  be changed prior to the beginning of that training.

12  Q.      Okay.  So when the division updates its policies

13  is dictated when the change to the use of force test

14  occurs, is that right?

15  A.      Yes, ma'am.

16  Q.      Do you know from, let's say -- you were an

17  officer in 2000, right?  That's when you started?

18  A.      Yes.

19  Q.      From 2000 to present how many times the use of

20  force policy has been updated?

21  A.      I do not no but I can tell you that it's been

22  updated twice in the last seven, eight months.

23  Q.      Okay.

24  A.      So from -- so it depends.  If there's a change,

25  that's unusual, but this has been an unusual time for

Deposition of Officer Traci Shaw                    Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

1   policing.

2   Q.      What do you mean?

3   A.      As far as the use of force policy from our

4   chemical mace from the riots this summer, the use of

5   force policy changed after that.  Certainly they wanted

6   to be very specific in the use of force policy after

7   what happened with the George Floyd, that no way, no

8   how, that any type of neck restraint, any type of

9   chokehold would be used.  That it wouldn't be considered

10  anything but deadly force.  So that's changed.  They

11  changed in December, there was another change, and that

12  was, I believe because CALEA, so displaying a firearm

13  before, that was not something that was kept track of

14  before, but now from December on that has.  Those have

15  been two changes or updates, I think, from maybe July to

16  December.  So I think there was a change in policy from

17  July, and then a policy change in December.  I don't

18  know how many times it's changed from 2000.  I don't

19  know the answer to that.

20  Q.      Okay.  So, CALEA now requires tracking every

21  time an officer draws their weapon, is that right?

22  A.      That's what was told to us in the training.

23  Q.      And CALEA is C-A-L-E A, right?

24  A.      Yes.

25  Q.      And that's an accreditation organization for

Deposition of Officer Traci Shaw          Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

1   police departments?

2   A.      Yes, ma'am.

3   Q.      Do you know whether that new policy requires

4   tracking if an officer removes the weapon from the

5   holster, or only requires tracking when an officer

6   raises and points that weapon?

7   A.      The latest one is when you're actually pointing

8   it at a suspect.  For instance, if you're going to

9   search a building, your gun is drawn, you point your gun

10  at that high ready while you're searching, and you don't

11  find anyone, it's not reported in that instance because

12  there was a suspect or business owner inside the

13  business.

14  Q.      Does the Columbus Division of Police consider

15  pointing a weapon at a person a use of force?

16  A.      Yes.  As of December.  Yes, ma'am.

17  Q.      Before December it did not?

18  A.      No, ma'am.

19  Q.      Do you know whether that position of the

20  Columbus Division of Police comports with Supreme Court

21  cases on the matter?

22  A.      As far as reporting, I know from agency to

23  agency, and we train a lot of different agencies, and

24  their uses of force policies are quite different than

25  ours as far as their reporting.  But I don't know of any

```
 1   Supreme Court case which requires the pointing of a

 2   firearm to be -- to have to report that.

 3   Q.     I'm not asking about reporting, but just that

 4   pointing a weapon at a person constitutes a use of

 5   force.  You said that was considered a use of force by

 6   the division starting in December of 2020, correct?

 7   A.     Yes, ma'am.

 8   Q.     Was it considered a use of force by the division

 9   prior to 2020?

10   A.     No, ma'am.

11   Q.     Okay.  And do you know whether that position,

12   that pointing of a gun at a person constitutes a use of

13   force, whether that position prior to 2020, which was

14   no, it does not, do you know whether that comports with

15   binding law, whether from the Supreme Court or the Sixth

16   Circuit Court of Appeals?

17   A.     I would say as far as reported use of force that

18   level zero like it is now, so pointing of a firearm at

19   someone, the definition of force is in the violent

20   compulsion restraint physically asserted upon a person.

21   I would say that even before that policy was changed it

22   would fit the definition, the state's definition of a

23   use of force.  In my humble opinion it would fit that.

24   Q.     But, the division did not consider it a use of

25   force is what you're saying?
```

```
 1   A.       Not that it didn't consider it.  I think that it
 2   didn't make it reportable.
 3   Q.       Okay.  We were talking about the annual
 4   inservice.  We talked about the lecture.  We talked
 5   about the policy test.  We talked about some changes in
 6   the use of force policy.  You mentioned two changes in
 7   the past year, and related changes in the test.  So I
 8   assume then, that the use of force test has been updated
 9   in light of these two changes to the use of force
10   policy, is that right?
11   A.       Yes, ma'am.
12   Q.       Do you know whether there were any changes to
13   the use of force policy between 2010 and 2016?
14   A.       To the test, ma'am, or to our policy?
15   Q.       To the policy.
16   A.       Yes, there was.
17   Q.       And when did those occur?
18   A.       I would have to -- I don't know that, ma'am.
19   I'd have to contact research and development.  I know
20   they keep track of the dates of when those policies are
21   changed.
22   Q.       Okay.  If we take a break, would you be able to
23   find out when the updates of the use of force policy
24   occurred between 2010 to present?
25   A.       How many times, ma'am?
```

1    Q.        Yeah.  And the dates that they were updated.

2    A.        Do you want me to also find out about your

3    question as far as the scenarios that they keep track of

4    during inservice training?  I could make a phone call

5    for that question.

6    Q.        Sure.  That would be great.  Thank you.

7    A.        Of course.

8    Q.        Before we take a break, I just want to go

9    through a few more things related to this topic.  You

10   mentioned the inservice training.  This is an annual

11   training offered to Columbus Division of Police

12   officers, correct?

13   A.        Yes, ma'am.

14   Q.        Are officers required to attend the annual

15   inservice training?

16   A.        Yes, ma'am.

17   Q.        What happens if they don't attend?

18   A.        There's a make-up date that they have to go to.

19   Most of the time they miss because of injury or if

20   they're deployed.  And if they're injured or deployed,

21   then they have to come back to that training before they

22   hit the streets, before they go back to patrol.

23   Q.        Okay.  And if they miss a make-up session, what

24   happens, then?

25   A.        So if they miss the make-up session, then a date

Deposition of Officer Traci Shaw                    Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

1    will be afforded during the year.  If you missed it,

2    then you have to attend during these dates.  I mean,

3    it's limited because, obviously, it requires a lot of

4    people to put on that training, so it's not like you can

5    say go whenever you want.  Obviously, that has to be

6    scheduled.

7    **Q.      Has it ever happened that officers missed those**

8    **blocks of dates in a given year and failed to complete**

9    **any annual inservice training?**

10   A.      If they miss it, they have to make those up.

11   **Q.      And what happens if they miss that second set of**

12   **dates though?**

13   A.      They can't.  They're not allowed to miss them.

14   So, those always have to be made up.

15   **Q.      And if, let's say, they were still injured,**

16   **deployed, or otherwise unable to attend a later block of**

17   **dates, are they then prevented from working on duty as**

18   **officers until they take the training?**

19   A.      I know for those that are deployed, when they

20   come back to the division they'll spend sometimes

21   upwards of a couple of weeks making up all of that

22   training that they missed while they've been gone, and

23   they're in plain clothes and not working in the streets.

24   So, that I know for sure for people that are deployed.

25   For people that are injured, if they do miss that

Deposition of Officer Traci Shaw        Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

1   training, then they're expected to come whenever that

2   make-up session is scheduled for.

3   **Q.      Has it ever happened that an officer has not**

4   **completed that make-up session?**

5   A.      Not that I'm aware of.  I wouldn't even believe

6   that would be, even be an option.

7   **Q.      Okay.  Does the annual training involve any**

8   **firearms requalification?**

9   A.      Yes, ma'am.

10  **Q.      And how often do CDP officers do firearms**

11  **requalification?**

12  A.      Normally every quarter.

13  **Q.      Okay.**

14  A.      There's phase one, two, three, and four.

15  **Q.      And are those firearms requalification records**

16  **considered part of an officer's training record related**

17  **to deadly force?**

18  A.      So, if someone requalifies we're testing their

19  accuracy with that firearm and, obviously, if they are

20  not accurate with that firearm, then they're not allowed

21  to carry that firearm per the state.  The accuracy is,

22  obviously -- as far as could that be defined as part of

23  their deadly force training?  I suppose it could.  But

24  there's phase training that we do at firearms, which is

25  division-making courses.  So, basically you have someone

1    that's, obviously, friendly.  So, obviously, not

2    presenting that deadly threat to that officer, and

3    obviously, that's not someone that you would be

4    justified in shooting.  So, that phase of training I

5    would consider more of a deadly force training versus

6    shooting at a paper target to determine accuracy.  But

7    under the definition of you need to be accurate if you

8    use -- I don't know if the division considers that

9    deadly force training.

10   Q.      Okay.  At firearms requalification what goes on

11   as part of that process?

12   A.      So, you come in and you take the use of force

13   policy test.  And then, depending on what phase of

14   training it is, they may, you know, go over anything new

15   with the firearm.  The use of the shotgun.  Obviously,

16   there will be retraining there.  They go over sight

17   fixture.  Go over the phase of firing once you get on

18   the range.  Then, they walk you down and, obviously, get

19   you loaded up on the range.  And depending on what that

20   course of fire is, you'll complete it, and then they'll

21   score it.  If you failed it, then you have to shoot it

22   again.

23   Q.      During firearms requalification is there any

24   review of the CDP use of deadly force policies?

25   A.      Yes.  Because we take that use of force policy

1   test.

2   Q.      And you do that during requalification?

3   A.      Yes, ma'am. That's normally done before we even

4   go into shoot.

5   Q.      So, is the use of force policy test taken then

6   at firearms requalification, which happens quarterly,

7   and also at the annual inservice training?

8   A.      So, I'm sorry. It would be the firearms policy.

9   I'm sorry. The firearms policy test is at firearms, and

10   then the use of force policy would be at phase training

11   with the defensive tactics unit. I apologize.

12   Q.      What's the difference between the firearms

13   policy and the use of force policy? What separate

14   topics do they cover?

15   A.      So, the firearms policy is going to be more

16   specific to deadly force, where the use of force policy

17   is going to cover basically all those levels of control,

18   including Taser, baton, mace, and those things.

19   Q.      Beyond the annual inservice training and

20   firearms requalification, is there any other use of

21   deadly force training provided to CDP officers?

22   A.      It would depend on -- the only other area where

23   I could see that would be covered other than, obviously,

24   if there was some other type of use of force policy

25   change, would be at the legal updates class, and that

```
 1    would be determined on whether or not that was a point

 2    of discussion coming from the city attorney's office.

 3    Q.        Okay.

 4    A.        So, those topics on those legal updates are just

 5    as it sounds.  It's legal updates.  So, things that have

 6    happened in case law that have been updated and,

 7    obviously, if there's a new update in regards to deadly

 8    force, then that would be covered there.

 9    Q.        And those legal updates, when they happen,

10    happen either in the old days through handout that you

11    had to sign-off on, or now through software based

12    systems where you have to review the update and sign-off

13    through the update, is that right?

14    A.        Yes, ma'am.

15    Q.        Okay.  And beyond those things then, inservice,

16    legal updates, and firearms requalification, is there

17    any other deadly force training provided to CDP officers

18    on an ongoing basis?

19    A.        No, ma'am.

20    Q.        Okay.  Turning back to the inservice training

21    and the scenarios that we were talking about earlier, in

22    your experience as a defensive tactics instructor, how

23    many times did you see officers fail the scenario

24    training?  And I'm talking about officers, not recruits

25    at this point.
```

Deposition of Officer Traci Shaw          Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

1    A.       It was very rare.  Very rare when you would see

2    anybody consider failing a scenario.  And I don't even

3    -- yeah.  It was very rare.  There's always going to be

4    talking points with tactics that as far as having some

5    type of excessive use of force, or a tactic that we

6    certainly wouldn't want them to do on the street, that

7    would be very rare.

8    Q.       As a trainer for defensive tactics to officers,

9    did you see in those scenario trainings officers

10   engaging in what would be considered excessive force

11   that required addressing with talking points afterwards?

12   A.       Yes, ma'am.

13   Q.       And how often did that happen in the scenario

14   training?

15   A.       Where the decision afterwards happened?  It

16   happened on every scenario regardless of pass or fail,

17   but obviously if they failed that scenario then, that

18   would be something that they would address in that

19   debrief as well.

20   Q.       Would an officer who used what, under the

21   scenario, would have been excessive force, were they

22   always to have considered to have failed the scenario if

23   that happened, or were there times that they still

24   passed under those circumstances?

25   A.       So, that goes down to whether or not there's a

Deposition of Officer Traci Shaw                    Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

 1   written record of them actually passing or failing that
 2   scenario, and that's what I want to make a phone call
 3   down to that defensive tactics unit to see if there's an
 4   actual, if you will, check-off list, like of expected
 5   officer actions on that scenario.  I don't know if they
 6   are doing those presently or not.  I apologize.  I would
 7   have asked if I knew that was going to be a question for
 8   me to know.
 9   **Q.      Okay.  In terms of what we discussed for officer**
10   **training the inservice training firearms**
11   **requalifications, and legal updates, as avenues for**
12   **deadly force training for officers, was that the case**
13   **from 2010 through 2020, those are the three sources?**
14   A.      Yes, ma'am.
15   **Q.      And was that the case even before 2010?**
16   A.      Yes, ma'am.
17               MS. GREENE:  Okay.  Let's take a break
18   and go off the record.
19                        - - - -
20      (Thereupon, an off-the-record discussion was held.)
21                        - - - -
22               MS. GREENE:  Back on the record.
23   BY MS. GREENE:
24   **Q.      Okay.  So, Officer Shaw, on the break you were**
25   **going to make a phone call to find out about whether or**

1　**not officers who are involved in scenario training**

2　**during the annual service whether passed or failed the**

3　**scenario based trainings were documented in any way?**

4　A.　　　Correct, ma'am.  So I called down to the

5　defensive tactics unit and asked them about the

6　question.  He said that there is on their checklist for

7　the day, it has a pass, fail, on whether or not they

8　pass certain skills.  And on there as part of that

9　training for the day, it lists scenarios, and that's

10　also a pass or fail.  However, he said that when someone

11　goes through the scenario, if they fail the scenario,

12　they debrief it and have them go through it again.

13　There's no record on who failed that specific scenario

14　for that day.

15　　　　　　So they didn't know of any other one other than

16　the one that I had mentioned to you about someone being

17　able to complete the scenario.  Now, they did add

18　that -- his name is Chris Cheatham.  He's is defensive

19　tactics training sergeant.  He's sent people home for

20　basically their attitude as far as not going through the

21　training and not being fully engaged.  But other than

22　that one incident he's never sent someone home and come

23　back on another day and redo the scenario for that

24　scenario based training.  The control officer fixes that

25　problem, debriefs it, and then has them go through that

1   scenario again, but they're not keeping a record at this

2   time when someone fails a scenario.

3   Q.      Okay.  So, as far as you know, during your time

4   in the department, then, it sounds like officers going

5   through training scenarios, if they fail a scenario,

6   other than that one guy, we don't have any documentation

7   of that other than specifically for that officer?

8   A.      Yes, ma'am.

9   Q.      Do you know when people do fail certain

10  scenarios, even if that's not documented, if that

11  results in any kind of specific retraining for that

12  individual officer?

13  A.      That normally happens out of discipline.  So,

14  let's say that a suspect is able to get a gun into a

15  detention center because an officer did an improper

16  search, that specific officer would be sent out to the

17  defensive tactics units and they would be retrained on

18  doing searches.  The ones coming out of discipline are

19  more specific to those officers depending on what they

20  have handled incorrectly.

21  Q.      Retraining is offered in response to actual

22  conduct on the job after a disciplinary finding has been

23  made in the chain of command, but not in response to

24  conduct at a scenario based training, is that right?

25  A.      Well, at the scenario based training they

Deposition of Officer Traci Shaw                    Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

 1   correct it right there, right away.  They debrief it,

 2   and have them redo the scenario right there.  However,

 3   they do not have basically an evaluation sheet for each

 4   officer how they completed it the first time, how they

 5   completed it the second time, notes about those

 6   officers.

 7   Q.      Understood.  Now, you also were going to check

 8   on the dates of updates for the use of force policy on

 9   our break.  Did you get a chance to do that?

10   A.      Yes, ma'am.

11   Q.      Okay.  What can you tell me about the dates that

12   the use of force policy was updated?

13   A.      Okay.  So, from March 15th of 2008, there was an

14   update April 15th of 2010.

15   Q.      I'm sorry.  You cut out for a second on that

16   2010 date.  Can you say the 2010 date again.

17   A.      Yes.  April 15th of 2010.

18   Q.      Okay.  Thanks.

19   A.      You're welcome.  The second change was April

20   15th of 2010, that was in effect until June 30th of

21   2014.  The third change was from June 30th, 2014, that

22   was in effect until June 30th, 2015.  From June 30th,

23   2015, it was in effect until December 30th, 2017.  A

24   fifth change was December 30th, it was in effect until

25   July 12th, 2020.  And then, the sixth change was July

1    12th, 2020, and that was in effect until December 30th

2    of 2020.

3    **Q.      Okay.  Thank you.**

4    A.      You're welcome, ma'am.

5    **Q.      The cases that you're here today to testify**

6    **about involved shootings that occurred in February of**

7    **2015, October of 2015, and September of 2016, correct?**

8    A.      Yes, ma'am.

9    **Q.      So, based on the dates that you just gave me, it**

10   **sounds like two different policies would apply to that**

11   **set of shootings, correct?**

12   A.      Ms. Greene, what were the dates again?

13   **Q.      February 6th, 2015.  October 29th, 2015, and**

14   **September 14th, 2016.  So, it sounds like two different**

15   **use of force policies apply to those three shootings,**

16   **correct?**

17   A.      Yes, ma'am.  The changes -- so the use of force

18   policy, it used to be called action response to

19   resistance, and that was from June 30th -- I'm sorry,

20   from June 30th, 2014.  That was changed to use of force

21   on June 30th, 2015.  And then, in December -- I'm sorry.

22   June 30th, 2015, until December 30th, 2017.  So December

23   30th, 2017 they changed the number of the directives

24   from 3.25 to 2.01.  What I don't know is if it's just

25   the title that was changed in 2015, and then, if it was

Deposition of Officer Traci Shaw      Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

1   just the number that was changed in 2017. I don't know

2   about the content of the actual policy. I don't know

3   that there was a change in the actual content of the

4   policy without seeing it.

5   **Q.**     **So you don't know as you sit here right now**

6   **whether there were any substantive changes in the use of**

7   **force policy for the Columbus Division of Police on that**

8   **June 30th, 2015 update?**

9   A.     Yes, ma'am.

10   **Q.**     **Have you reviewed the policy that was in place**

11   **from June 30th, 2014, to June 30th, 2015?**

12   A.     I've reviewed it in the past. I did not review

13   it this morning.

14   **Q.**     **What about the policy from June 30th, 2015, to**

15   **December 30th, 2017, did you review that one for today?**

16   A.     No, ma'am. I did not.

17   **Q.**     **Do you happen to have access to both of those**

18   **policies?**

19   A.     I could get access. I would have to make a

20   phone call. I apologize.

21            MS. GREENE: Bill, correct me if I'm

22   wrong, but I believe that the only division rules

23   policies directive manual that I have is the one that

24   was revised through December 30th, 2014. I could double

25   check.

Deposition of Officer Traci Shaw      Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

```
1                    MR. SPERLAZZA:  December of what year?

2                    MS. GREENE:  2014.

3                    MR. SPERLAZZA:  Okay.  And Officer

4    Shaw thinks there was a change after that?

5                    MS. GREENE:  Yeah.

6                    MR. SPERLAZZA:  Do you think that one

7    applies to the incidents of these three cases?

8                    MS. GREENE:  Well, I assume that the

9    policies through December 30th, 2014, including the use

10   of force would apply to the England shooting, because

11   that happened in February 2015 before that June 2015

12   update.  But for Bell-McGrew and King, those would fall

13   under the subsequent policy.  I'll double-check my

14   records, but I want to make sure that we have both of

15   those sets of policies.

16                   MR. SPERLAZZA:  Check to see if you

17   have them.  And if there's something that you're missing

18   as simple as that, it should not be a problem to get.

19   The hard part would be --

20                   MS. GREENE:  The hard part would be,

21   what?  I'm sorry.

22                   MR. SPERLAZZA:  The hard part would be

23   me finding it, but once I find it I'll get it to you.

24                   MS. GREENE:  Absolutely.

25   BY MS. GREENE:
```

Deposition of Officer Traci Shaw                    Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

1    Q.      Okay.  I'm going to show you a document, Officer

2    Shaw.  Do you see the document on the screen right now?

3    A.      Yes, ma'am.

4    Q.      Okay.  So, this is the division rules, policies,

5    and directives manual that was in effect through

6    December 30th, 2014, right?

7    A.      Yes, ma'am.

8    Q.      And so, the use of force policy based on what we

9    just discussed that's contained in this document should

10   be the one that applied during the time of the police

11   involved shooting of James England of February 6th,

12   2017, correct?

13   A.      Yes, ma'am.

14   Q.      I'm going to skip to the table of contents, and

15   I would like for you to tell me in this document which

16   policy numbers apply to use of deadly force.  I see

17   under the rules of conduct, rule 1.19.  Do you see this

18   here on the bottom of the page stamped Columbus 003085?

19   A.      Yes, ma'am.

20   Q.      That policy applies to use of deadly force,

21   correct?

22   A.      That was in the rules of conduct.  If you want

23   to know the actual policy, I believe it would have been

24   3.25 at that time.

25   Q.      Okay.  Do the rules of conduct also constitute a

1  written policy of the division?

2  A.      Yes, ma'am.  Specifically deadly force.  I don't

3  know if it's in the rules of conduct, without reviewing

4  it.

5  Q.      Okay.  And you haven't had a chance to review

6  the rules of conduct today before the deposition?

7  A.      No, ma'am.

8  Q.      Okay.  So, rule of conduct 1.19, use of force;

9  1.20, use of firearm; 1.21, display of firearms, those

10  seem to me like the rules of conduct that likely apply

11  to use of deadly force.  Are there any others that

12  you're aware of in this particular set of division

13  directives?

14  A.      It should be 3.25.

15  Q.      Okay.  So, you're talking about policies which

16  are listed a little further down in the table of

17  contents.  And now, here we are on page Columbus 003087,

18  and we see policy 3.25.  Is that what you're referencing

19  here?

20  A.      Yes, ma'am.

21  Q.      Okay.  And are there any other policies listed

22  here that would have applied at the time of the shooting

23  of James England on February 6th of 2015 to the use of

24  deadly force?

25  A.      3.23, the firearms regulations.  3.24,

1    discharged firearms.

2    Q.        Anything else?

3    A.        Not that I can see on that page, ma'am.

4    Q.        Would you like me to scroll to another page for

5    you to look?

6    A.        Yes, ma'am.  Thank you.

7    Q.        Anything on this next page, Columbus 003088?

8    A.        No, ma'am.

9    Q.        Okay.  What about this next page, 003089?

10   A.        No, ma'am.

11   Q.        Okay.  And let's check the first two pages of

12   the policy.  I guess the first page of the policy, we

13   did go through that, Columbus 003086.  Do you see

14   anything there that pertains to use of deadly force?

15   A.        Indirectly, 1.48.  Compliance with EEO laws,

16   rules, orders, policies and directives.  Disregard,

17   ma'am.  No.

18   Q.        Okay.  And I don't have up in front of us right

19   now the subsequent directives manual, but would the

20   equivalent policies that were in effect from June 30th,

21   2015 to 2017, those equivalent policies would also

22   pertain to use of deadly force, right?  That updated

23   manual?

24   A.        Yes, ma'am.

25   Q.        Do you know whether any additional policies were

1  added in-between those times concerning use of deadly

2  force?

3  A.  No, ma'am.  I'm sorry.  There have been, ma'am.

4  Q.  All right.

5        MS. GREENE:  I'm going to mark this as

6  Exhibit 1.

7           - - - -

8    (Thereupon, Plaintiff's Exhibit 1 was marked for

9        identification.)

10           - - - -

11  BY MS. GREENE:

12  Q.  Let's go back to the annual inservice training

13  topic for a bit.  And you mentioned there's use of force

14  tests administered during that training, right?

15  A.  Yes, ma'am.

16  Q.  Now, in that structure of that program, you

17  start off with a PowerPoint presentation and lecture?

18  A.  Yes, ma'am.

19  Q.  And immediately following that the use of force

20  test is administered?

21  A.  Yes, ma'am.  It depends on if you're a Taser

22  holder as well, then there's an additional test that you

23  have if you carry a Taser.  Obviously, if you're in the

24  detective bureau and you don't have a Taser, you

25  wouldn't take that additional test as well.

1   Q.      Okay.  But, the use of force test, not the Taser

2   test, is right after that PowerPoint presentation, then?

3   A.      Yes, ma'am.

4   Q.      So, on the information that the officers just

5   were taught or refreshed on?

6   A.      Yes, ma'am.

7   Q.      Does the CDP take any steps to conduct use of

8   force policy tests of its officers at a point in time

9   other than immediately after they've been refreshed on

10  the topic to test their retained knowledge on the

11  boundaries, and rules, and laws, regarding use of force?

12  A.      I would have to say that in the firearms, and

13  that deals with deadly force, obviously the firearms

14  policy, in that one there isn't a PowerPoint right prior

15  to, a PowerPoint regarding that use of firearms policy

16  in that.  There's not a presentation for that one, but

17  there is for the one over defensive tactics.

18  Q.      And the one at defensive tactics is on the use

19  of force policy?

20  A.      Yes, ma'am.

21  Q.      Okay.  Now, I want to ask some questions about

22  the specific officers involved in these shootings in

23  relation to these tests.  So, for Baase, do you know

24  whether he passed all of those use of force tests from

25  the point of his hire as an officer to present?

Deposition of Officer Traci Shaw                    Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

```
 1   A.      I do not, ma'am.
 2   Q.      Okay.  For Narewski, do you know whether or not
 3   whether he passed all of those use of force tests from
 4   the point of hire to present?
 5   A.      I do not, ma'am.
 6   Q.      For Mason, do you know there whether he passed
 7   all the tests from his point of hire on use of force to
 8   present?
 9   A.      I do not.
10   Q.      And for Abel, do you know whether he passed all
11   the tests on use of force from the point of his hire to
12   present?
13   A.      I do not, ma'am.
14   Q.      Did you take any steps to ascertain whether or
15   not these officers passed their use of force tests over
16   the course of their training in the CDP before you came
17   in to testify today?
18   A.      I did not, ma'am.
19   Q.      If officers fail a use of force test do they get
20   a chance to retake it?
21   A.      Yes, ma'am.  Right after it.  You have to pass.
22   But I've not physically seen their test scores, so I'm
23   not going to answer that they have passed.  But, if you
24   fail it, you have to take it right after until you pass.
25   Q.      What steps, if any, are taken with an officer
```

1   when they fail that test before they retake the test?

2   A.      They're provided with the question that they

3   missed, remediated on the policy, and then, you take it

4   again.

5   Q.      Are they told what the right answer would have

6   been?

7   A.      If they're given the policy, then yes, they

8   would.

9   Q.      If an officer fails that test and then retakes

10  it during that annual inservice, is there any record

11  that they failed the test and retook it?

12  A.      I don't know if they keep the old -- I can't

13  imagine them destroying the training records, but I

14  can't say for certain that they -- I can't imagine that

15  they would get rid of a failed test, the training

16  record.

17  Q.      Do you know whether it's documented anywhere

18  that any specific officer has failed that test and had

19  to retake it?

20  A.      I don't know the answer to that.

21  Q.      In your experience as the person providing that

22  training, did you ever observe, witness, experience,

23  take part in any documentation that an officer failed a

24  use of force policy test and had to retake it?

25  A.      At the recruit training level, we have record of

Deposition of Officer Traci Shaw                    Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

1    everything, even the actual test.

2    Q.       What about at the officer level when you did

3    those trainings?

4    A.       At the officer level it was the written bubble

5    tests.  So I would imagine they still have that in that

6    officer's training file.

7    Q.       I'm asking if you remember whether or not

8    there's like a list kept, or somewhere that's written

9    down in someone's file that they failed this test and

10   has to retake it?

11   A.       Ma'am, I'm not privy to that information other

12   than the fact that I know that if you do fail the test

13   that you have to retake it and you retake it right then.

14   Q.       When you were a defensive tactics trainer and

15   you put on that inservice training, did you oversee that

16   test being given?

17   A.       Are we talking about the actual physical test?

18   No, I did not.

19   Q.       Was that part of the annual inservice training?

20   A.       Yes, ma'am.

21   Q.       Explain to me, then, how that works, that you

22   weren't involved in the administration of that test when

23   you put on the training.

24   A.       Primarily it's a defensive tactics sergeant that

25   does the PowerPoint and goes over that policy, and

1    they're the one that administers the test as well.

2    **Q.      Okay.  And as you sit here you don't know**

3    **whether or not it is specifically documented that a**

4    **person fails a test other than your speculation that the**

5    **original failed test document is retained in a file?**

6    A.      Yes, ma'am.

7    **Q.      Okay.  We talked about that test being the same**

8    **from year-to-year unless there's a policy update, right?**

9    A.      Yes, ma'am.

10   **Q.      Do you know whether there's any analysis done by**

11   **the CDP to see if individual officers repeatedly fail**

12   **specific questions, for instance, when they're the same**

13   **from year to year?**

14   A.     I do not know of anyone.  I'm on the EARS

15   Committee, and I know that on the EARS Committee we're

16   not given any test scores per se of when someone has

17   failed a use of force policy or firearm policy exam.

18   I've never received an actual test before.

19   **Q.      So EARS doesn't look at use of force tests as**

20   **part of its analysis, then?**

21   A.      No, ma'am.

22   **Q.      And then, what happened in just the inservice**

23   **training process, is there any analysis done to see**

24   **whether or not officers repeatedly fail the same**

25   **question year-to-year?**

Deposition of Officer Traci Shaw      Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

1   A.     Not that I know of.

2   Q.     Is there any analysis done to see if officers

3   repeatedly fail questions on a specific topic from

4   year-to-year?

5   A.     No, ma'am.

6   Q.     Okay.  You mentioned the defensive tactics unit.

7   What is that?

8   A.     The defensive tactics unit is a unit within the

9   division that trains officers on use of force.  They

10   also train recruits in use of force, and then they also

11   teach community engagement as well, like response to

12   active shooter.  And they also give remedial training if

13   an office is found to be deficient in an area.  They're

14   sent back to the defensive tactics unit to basically

15   remedy whatever the officer was doing incorrectly.

16   Q.     Okay.  Now, let me ask you a question about the

17   deadly force training provided in the annual inservices.

18   How are officers taught to use the tactics of cover and

19   concealment rather than immediately resorting to deadly

20   force?

21   A.     We are trained to always be looking to see where

22   cover is.  And, obviously, it depends on the totality of

23   the circumstances, the immediate threat, where that

24   cover is, depending on if you're going to use deadly

25   force.

1  Q.      Okay.  And explain to me what officers are

2  supposed to do pursuant to CDP training with regard to

3  the use of cover and concealment in potential deadly

4  force scenarios.

5  A.      So, as I'm sure you're aware of, that cover will

6  stop a bullet, and concealment doesn't stop a bullet.

7  So if you're in an immediate threat of a firearm, for

8  instance, you would want cover.  When if you're put in a

9  situation where you're going to deploy Taser, you don't

10 necessarily need cover, but more of a barrier in-between

11 you.  It depends on what tool that that officer is using

12 on their toolbelt to determine if it's going to be cover

13 or concealment.  It depends on the totality of the

14 circumstances of that incident.

15 Q.      Are officers in the CDP taught to use cover and

16 concealment wherever possible rather than deadly force?

17 A.      Could you repeat that again?

18 Q.      Are CDP officers taught to use cover and

19 concealment wherever possible rather than resorting to

20 deadly force?

21 A.      It depends on the totality of the circumstances.

22 It depends on what type of weapon that person has.  I

23 guess, the distance of where your cover is because,

24 obviously, in use of force incidents they're very fast,

25 rapidly evolving.  A gun can fire within, you know,

Deposition of Officer Traci Shaw                    Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

1    split seconds, and that reaction time of getting to

2    cover that officer could take rounds, so it depends upon

3    that situation.  So, as far as are they taught to always

4    get behind cover before using deadly force, it would

5    depend on the totality of the circumstances.

6    Q.      Okay.  All of the things being equal, is there a

7    preference in the Columbus Division of police between

8    the use of deadly force and use of cover and concealment

9    if it's possible to use it under the policies,

10   practices, customs of the department?

11   A.      It depends on the totally of the circumstances.

12   And the division is not going to expect their officers,

13   for instance, if there's a deadly threat within six feet

14   in front of them to go to cover before using deadly

15   force.  If they do use deadly force, obviously, that

16   action has to be reasonable.

17   Q.      During the Columbus Division of Police policies,

18   practices, and customs, if an officer has the option to

19   use concealment and cover, rather than deadly force, is

20   the preference under those policies that they use

21   conceal and cover, or is there no preference, or is

22   there a preference for deadly force?

23   A.      It depends on the totality of the circumstances.

24   You change one little fact pattern, and it's going to

25   change, obviously, the analysis of that use of force

Deposition of Officer Traci Shaw       Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

1   incident.

2   Q.     Right.  So, what I'm asking you is in an event

3   that it's possible to use concealment and cover under

4   whatever the totality of the circumstance may be, is

5   there a preference to use conceal and cover, is there no

6   preference, or is there a preference for deadly force?

7   A.     The division would always consider the totality

8   of the circumstances.

9   Q.     I know, but I'm saying that in --

10   A.     I'm sorry.  It's just like you change one little

11   thing and that could change a yes or no.  I mean, do we

12   train the use of cover for officer safety?  Absolutely.

13   Do we train use of cover to give that officer more time

14   to give verbal commands to have someone drop a knife or

15   weapon?  Absolutely.  But it depends upon the totality

16   of the circumstances in that moment on whether or not

17   that officer uses deadly force.

18   Q.     Okay.  I'd like to talk about the individual

19   officers involved in these shootings and their specific

20   training provided by the Columbus Division of Police

21   concerning deadly force.  So can you please -- well,

22   before I ask the question, you said that you reviewed

23   the training records of Abel, Baase, Narewski and Mason,

24   before we started this morning, correct?

25   A.     Yes.  I literally scrolled down through their

Deposition of Officer Traci Shaw           Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

1   rollcall training.

2   Q.       Okay.   Can you please state for me all of the

3   trainings for Keith Abel that the CDP provided

4   pertaining to use of deadly force and the dates of those

5   trainings?

6   A.       Is it okay if I look it up on my computer?

7   Q.       It is, but I could also show you an Exhibit.

8   I'm showing the training records provided to us by the

9   Columbus Division of Police for Keith Abel, and I'm

10   going to mark this as Exhibit 2.

11                          - - - -

12     (Thereupon, Plaintiff's Exhibit 2 was marked for

13                  identification.)

14                          - - - -

15   BY MS. GREENE:

16   Q.       I will flip through this to show you that we

17   have two things combined here.   We have a Train Track

18   list of trainings, and then we also have his employee

19   training record that makes up the rest of the document.

20   So, starting in Train Track, which trainings here

21   pertain to deadly force?

22   A.       So, in Taser proficiency, any time there's

23   Taser, all of that deadly force is mentioned in that

24   Taser policy.

25   Q.       So, we see here five trainings at the top of

Deposition of Officer Traci Shaw          Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

```
 1   this required training status list called DTU Skills
 2   Development Taser in either recertification or
 3   proficiency, and the year that that training was
 4   provided.  Is that what you're referencing right now?
 5   A.      Yes, ma'am.
 6   Q.      So, is each of those trainings related to deadly
 7   force?
 8   A.      Each of those trainings talk about deadly force
 9   in them when you're talking about Taser.  Absolutely.
10   Q.      Okay.  And it looks like the years that we have
11   here, 2007, 2008, 2009 and 2010, right?
12   A.      Yes, ma'am.
13   Q.      Okay.  What else on this page pertains to deadly
14   force?
15   A.      So, the EBO and legal update, that next one.
16   Emergency vehicle operations.  So in that I know any
17   time that you talk about emergency vehicle operations it
18   is mentioned that a cruiser can be used in deadly force,
19   not just a firearms, for instance.  So, definitely
20   deadly force would have been mentioned there.  Without
21   looking at the -- I would have to know about the next
22   one, the inservice 2009 ethics, legal, searches, and the
23   terrorism, that one there, I don't know if deadly force
24   was went over in the legal part of that or not.
25   Q.      Okay.  Let me just ask you a different question.
```

1   **When we look at any of these training records for any of**

2   **these service officers, if we see something called DTU**

3   **with a year, skills, development, and Taser, either**

4   **proficiency or recertification, we'll know that that**

5   **training pertained to deadly force, right?**

6   A.     Not exclusively, but it's definitely mentioned

7   and talked about in training that if someone has deadly

8   force against you that a Taser is not going to be that

9   appropriate use of force response.

10   **Q.     And those pertain to more than Taser use also,**

11   **correct?**

12   A.     Yes, ma'am.

13   **Q.     And so, if we see any title in these officer**

14   **training documents that has the word deadly force, it's**

15   **safe to assume that that training pertains to deadly**

16   **force, right?**

17   A.     Yes, ma'am.

18   **Q.     If we see something called trigger management,**

19   **what's that about?**

20   A.     Where is that listed, ma'am?

21   **Q.     It's down here at the second to last item in the**

22   **list.**

23   A.     I do not recall without seeing the rollcall.

24   **Q.     Okay. Let me ask you a quick question about the**

25   **format of these records. Here on this first page we see**

1  a column called, "Require Training Status." Do you see

2  that?

3  A.      Yes, ma'am.

4  Q.      What does that mean?

5  A.      Required training status, I would assume that

6  those were required training that you have to do.

7  However, I know that the trainings completed are

8  required as well, so I don't know what that specifically

9  means for that training track.

10  Q.      Okay.  In this document we have a date at the

11  bottom left-hand corner here 4/3/2017.  I'm assuming

12  that's the date that this particular record was printed

13  or generated, is that right?

14  A.      I don't know, ma'am.  I'm not familiar --

15  obviously I know this is what they use to record our

16  training, but I can't answer specific questions about

17  the form.

18  Q.      Okay.  Well, let me ask you this:  In this Train

19  Track document, if we see a training listed here on this

20  document, that means that the officer took it, right?

21  A.      Yes, ma'am.

22  Q.      And if it's not listed here -- strike that.

23  Every training that an officer would have taken would be

24  listed either in the Train Track or in the employee

25  training report, right?

1   A.      I would assume so, ma'am.  I'm not familiar with

2   how training is put into the system here.

3   Q.      **Do you know of any other place that training for**

4   **officers is recorded and maintained in terms of the**

5   **lists of trainings that officers have taken?**

6   A.      Well, I noticed as I was looking through this,

7   like it doesn't list that I saw -- it just says

8   "academy."  So, I mean, you think of all the courses and

9   trainings that a recruit gets while they're in the

10  academy, and there wasn't like, the specific hours.  For

11  instance, how many hours did they spend in crisis

12  intervention training?  You can't tell from looking at

13  this record how many hours were spent in that training.

14  So, I would have to say that they're not all listed

15  here.

16  Q.      **Okay.  So, academy training is not listed in the**

17  **employee training report or Train Track, right?**

18  A.      Not that I saw.

19  Q.      **But, training at the officer level is listed**

20  **here, correct?**

21  A.      Yes, ma'am.

22  Q.      **And every training taken at the officer level**

23  **should be contained in the either train track or the**

24  **employee training report lists, right?**

25  A.      Well, at rollcall with a supervisor, if a

Deposition of Officer Traci Shaw          Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

1   supervisor goes over a policy change, or, you know,

2   let's say, an e-mail came out with how to title a

3   report, that's not going to be listed in this training

4   report.

5   Q.       Well, I do see on the page that we're looking at

6   now, which is Bate stamped 170707, page three of this

7   Exhibit 2 that we're looking at, I see several entires

8   here that are called electronic rollcall.  So, it looks

9   like rollcall is tracked in this report, isn't it?

10  A.       That's electronic rollcall.  That's not the

11  training with an actual supervisor at the rollcall

12  table.  That electronic rollcall is an officer will log

13  into that software, so that would be that Power DMS, and

14  look at the rollcall, and that's an electronic rollcall,

15  but any training that's given at the actual rollcall

16  table is not listed here.

17  Q.       But, what we do see listed here is electronic

18  rollcall and classroom training, for example, on this

19  page the 2011 DTU skills and Taser proficiency training,

20  right?

21  A.       Yes, ma'am.

22  Q.       And so, all classroom training and electronic

23  rollcall are included in the Train Track and employee

24  training report lists, right?

25  A.       Yes, ma'am.

1  Q.      And the only thing that isn't necessarily

2  reflected here is rollcall in-person training with a

3  supervisor?

4  A.      Without knowing -- I mean, I don't know if when

5  officers will go to additional trainings at OPOTA, for

6  instance, or Caliber Press, different trainings, and I

7  don't know if those are listed in their training record

8  or not.

9  Q.      Did anyone prepare you to testify on training

10 records for the individual officers involved in these

11 shootings before you came in here to testify with us?

12 A.      No, ma'am.

13 Q.      Did you undertake any activity yourself to

14 prepare yourself to testify about the training records

15 for these individual officers?

16 A.      No, ma'am.  Other than I know -- I mean, I guess

17 as far as I thought I was going to be testifying today

18 in regards to training for the division of police, not

19 for, specifically for these officers.

20 Q.      Nobody told you that you were talking about

21 training for these specific officers for use of deadly

22 force?

23 A.      I have not looked at any of the shootings, them

24 using deadly force.  I've not looked at any specific

25 cases.

1   Q.      That's not what I'm asking. I'm asking, did

2   anyone tell you that you were going to be testifying

3   about training concerning the use of deadly force for

4   these specific officers, meaning Baase, Narewski, Mason

5   and Abel?

6   A.      Yes, ma'am.

7   Q.      Did you prepare to testify about their

8   individual training before you came in here today?

9   A.      Yes, ma'am.

10   Q.      But, as we sit here, you don't seem familiar at

11   all with their training records?

12   A.      Ma'am, I do the training. I don't do any of the

13   entering into this system. I don't do any of that.

14   Q.      Did you review the Notices of Deposition in any

15   of the three cases you're here to testify about before

16   you came in today?

17   A.      I'm sorry. Can you repeat the question?

18   Q.      Did you review the Notices of Deposition that

19   were issued in each of these three cases before you came

20   in to testify today about the topics that you were here

21   to testify on?

22   A.      Yes, ma'am.

23   Q.      Okay. So, you know that you're here to talk

24   about the training of these individual officers relating

25   to deadly force, right?

Deposition of Officer Traci Shaw                    Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

```
 1   A.      Yes, ma'am.

 2   Q.      All right.  I'm going to close this Exhibit and

 3   we're going to look at another Exhibit.  I'm going to

 4   show you what's been previously marked as Narewski

 5   Exhibit 4.

 6                         - - - -

 7     (Thereupon, Previously Marked Narewski Exhibit 4 was

 8                         shown.)

 9                         - - - -

10   BY MS. GREEN:

11   Q.      Have you seen this before?

12   A.      Yes, ma'am.  I reviewed it this morning.

13   Q.      And so, as with Abel, what we'll see in these

14   lists of documents contained in the Train Track, and

15   here we also have a certificates report and awarded

16   list, and an employee training report.  As with Abel,

17   these lists will contain the classroom training and

18   electronic rollcall that he attended while as an

19   officer, right?

20   A.      Yes, ma'am.

21   Q.      Okay.  And this is a complete record of those

22   trainings, right?

23   A.      Like I said earlier, I don't know if any

24   additional training, if that officer went outside, which

25   sometimes they'll do to enhance.  Like, let's say,
```

Deposition of Officer Traci Shaw                    Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

```
 1   they're a freeway officer and they take the class at
 2   OPOTA on how to detect drugs in semis, or how they
 3   conceal them, I don't know if that's listed in this
 4   training record or not.
 5   Q.      Okay.  So there may not be outside agency
 6   training, but anything provided by the Division of
 7   Police is going to be listed here?
 8   A.      Yes, ma'am.
 9   Q.      As with Abel.  And this is Narewski Exhibit 4.
10   We'll move on from this document.  I'm now going to show
11   you a training document for Officer Mason.  Do you see
12   the document here?
13   A.      Yes, ma'am.
14   Q.      Okay.  We're going to call this one Shaw Exhibit
15   3.
16                         - - - -
17       (Thereupon, Plaintiff's Exhibit 3 was marked for
18                     identification.)
19                         - - - -
20   BY MS. GREENE:
21   Q.      Here we have a Train Track listing of trainings
22   along with an employee training report?
23   A.      Yes, ma'am.
24   Q.      And just like with Narewski and Abel, any CDP
25   provided classroom training or electronic rollcall
```

Deposition of Officer Traci Shaw      Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

1   training is reflected in this list if indeed Officer

2   Mason took it, right?

3   A.     Yes, ma'am.

4   Q.     Okay. I'm going to close that. I'm now going

5   to show you one more document, which is Officer Baase's

6   training record, and this was previously marked as Baase

7   Exhibit 9.

8               - - - -

9    (Thereupon, Previously Marked Baase Exhibit 9 was

10                  shown.)

11               - - - -

12   BY MS. GREEN:

13   Q.     Here we have a Train Track record, certificate

14   reports award, and an employee training report, correct?

15   A.     Yes, ma'am.

16   Q.     And like the other three officers that we just

17   discussed, this document will include all classroom

18   training and electronic rollcall training provided to

19   Baase by the CDP, correct?

20   A.     Yes, ma'am.

21   Q.     Okay. So, for any of these trainings that these

22   officers took pertaining to use of deadly force, do you

23   know whether the city has produced all training

24   materials used for those trainings to the Plaintiff's in

25   these cases?

1    A.       No, ma'am.  I do not.

2    Q.       And did you undertake any search to obtain and

3    produce training materials for use of deadly force

4    related trainings for these officers prior to your

5    deposition today?

6    A.       I believe I might have helped out with some

7    training records needed for one of the cases, which

8    would be the Tyree King one, I believe.

9    Q.       What did you do for that?

10   A.       I believe that I forwarded maybe some types of

11   policies.  I'd have to look back.  It was quite sometime

12   ago, but I believe that I helped get that to our

13   secretary because she was getting some of those records

14   together, along with Sergeant Cheatham as well.

15   Q.       Okay.  I'd like to momentarily go back here.  I

16   have, I believe, the use of force policy from June 30th,

17   2015, which we discussed as the single policy change

18   that occurred between the shooting of James England and

19   Deaunte Bell-McGrew.  I'm going to show that document to

20   you just so we can identify it.

21            Here we have use of force policy 2.01.  Is this

22   -- no.  This says revised in 2014, so strike that.  I'll

23   come back to this later.

24            What I'd like to go through with you now are

25   some materials from the defensive tactics unit

```
 1   proficiency skills and Taser training that was provided

 2   to us by the city in relation to these cases.  So, what

 3   I have in front of the us right now is the defensive

 4   tactics unit 2007 proficiency skills and Taser phase

 5   training, correct?

 6   A.      Yes, ma'am.

 7   Q.      Is this the PowerPoint that would be shown at

 8   the annual inservice that we discussed earlier?

 9   A.      I would assume -- so the proficiency skills and

10   Taser phase.

11   Q.      Would you like me to click through it so you can

12   see?

13   A.      Yes, ma'am.  Thank you.

14   Q.      It's 101 pages long, so tell me when you get to

15   the point that you have a sense of what it is.

16   A.      Sure.  Sure.  Yes, ma'am, that would be it.

17   Q.      I'm going to go back to page one for just a

18   moment, but this is the PowerPoint that was shown in

19   2008 at the annual inservice for officers on use of

20   force, right?

21   A.      Yes, ma'am.

22   Q.      Okay.  So, I'm going to skip forward to page 34

23   of this document.  And I just want you to explain to me

24   here -- I believe what we have on this page is the use

25   of force continuum that we referenced earlier, right?
```

1   A.      Yes, ma'am.

2   Q.      And I see level six, and deadly force and baton

3   techniques highlighted here.  Can you explain to me what

4   this page references here?

5   A.      So, a level six is police K9 bite.  And then,

6   you have the use of force continuum.  So, what this

7   slide is representing is you can see basically like K9

8   bite isn't listed on the actual continuum, but that's

9   letting you know that that's going to be a less lethal

10  amount of force, in the time that a police K9 bite,

11  obviously, depending on the subject factors.  But if you

12  go over, there's two columns on that use of force

13  continuum, if you go over on the left-hand side and see

14  the striking and kicking officer, that's when those

15  techniques would be reasonable considering there's the

16  officer subject factors, there weren't any officer

17  subject factors.

18  Q.      Okay.  And then, level seven involves bean bags,

19  knee knockers, and sting balls I see, is that right?

20  A.      Yes, ma'am.  Those are typically used during

21  riot control.

22  Q.      And then, as we move forward here, we have level

23  eight, which is deadly force, and that's the greatest

24  amount of force that an officer could possibly use,

25  correct?

Deposition of Officer Traci Shaw        Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

```
 1   A.      Yes, ma'am.

 2   Q.      And what are CDP officers taught about when they

 3   can use deadly force?

 4   A.      So, deadly force can only be used to protect

 5   life.

 6   Q.      What do you mean by that?

 7   A.      It can't be used solely for a seizure.

 8   Q.      Are there any other elements that officers are

 9   supposed to use in determining when they can use deadly

10   force pursuant to CDP training policies and practice?

11   A.      Yes, ma'am.  They're allowed to use it in two

12   different contexts.  One being to protect themselves or

13   others from immediate threats of serious bodily injury,

14   and/or to prevent the escape of a fleeing dangerous

15   person.  So, let's say out of a burglary, and they

16   weren't known to have a weapon, an officer wouldn't be

17   permitted to use deadly force merely for that seizure.

18   They would need to be dangerous, that immediate threat

19   to the officer or others.

20   Q.      And what does it mean to be a fleeing dangerous

21   suspect?  How does the CDP define that?

22   A.      So, prior to 1985 officers were allowed to, at

23   the time in some states, allowed to do a seizure solely

24   for the purpose of seizing someone because they were a

25   fleeing felon.  So, prior to that, that, obviously,
```

```
 1    being dangerous, means that it's constitutionally

 2    unreasonable to use deadly force solely for the purpose

 3    of -- an officer has to be in that immediate threat.

 4    Q.        You broke up for a second there.  Can you go

 5    back?  I'm sorry.

 6    A.        No problem at all.  When it comes to a fleeing

 7    dangerous person, as far as being able to use deadly

 8    force in that incident, prior to 1985 officers were

 9    allowed to use deadly force to seize someone who is

10    nothing other than a fleeing felon.  For instance, using

11    bad checks, that's a felony.  Using a stolen credit

12    card, that's a felony.  So, that's been found

13    constitutionally unreasonable by the United States

14    Supreme Court, and that's what our officers are taught.

15    There has to be that immediate threat of serious bodily

16    injury or death.  There has to be that immediate threat

17    in order to use deadly force on a subject.

18    Q.        For a person who is fleeing, you mentioned that

19    officers can use deadly force to prevent the escape of

20    fleeing dangerous suspects.  Who is a fleeing dangerous

21    suspect?  What do you have to have present to have the

22    right to shoot a person who is fleeing?

23    A.        Obviously, it depends on the totality of the

24    circumstances.  However, let's say that someone, for

25    instance, an officer sees a subject murder someone, like
```

1  shoot someone with a gun, and then they take off.  The

2  subject takes off running.  An officer would be allowed

3  to shoot that person because of that immediate threat.

4  They've just shot someone else, and so, the chances of

5  that subject, if they're obviously not contained or

6  running somewhere, they would be a threat to anyone

7  coming around, or a house, somewhere along those lines.

8  And also that subject that just murdered someone would

9  definitely have the means to shoot an officer chasing

10 them as well.

11 **Q.      So, under CDP policies and practices in the**

12 **training that's provided, officers are permitted to**

13 **shoot someone after they see that person shoot another**

14 **person and flee regardless of any other circumstances?**

15 **If those things happen, they're allowed to shoot?**

16 A.      No, ma'am.  It has to be immediate.  It has to

17 be something that that shooting just immediately

18 happened, and you have to have that immediate threat of

19 serious physical harm in order to use lethal force on a

20 subject.

21 **Q.      So, what has to be in place to maintain the**

22 **immediacy of that threat after an officer witnesses that**

23 **person shoot someone else and flee?**

24 A.      Can I give you an example?  Like, if you have

25 that immediate or imminent, it doesn't mean that it has

1  to be happening right now, or have to have happened,

2  it's going to happen.  It's imminent.  So, let's say

3  that you have an active shooter in a school and you have

4  a child under a desk in a classroom, that child is in

5  immediate threat of harm, of serious physical harm, even

6  though that shooter isn't actually pointing a gun at

7  that student under that desk, but it's imminent.  It's

8  going to happen.  That person is in threat of immediate

9  serious physical harm.

10  Q.       **What about a circumstance where a person commits**

11  **an armed robbery and then flees a scene, and then points**

12  **a gun during the process of that armed robbery.  During**

13  **the fleeing process, is a CDP officer permitted to shoot**

14  **that person?**

15  A.       They would have to have probable cause to

16  believe that that person was dangerous.  The fact that

17  they were armed.

18  Q.       **So, if a person is armed and commits an armed**

19  **robbery and then flees, that, under the CDP policies,**

20  **practices, training, is sufficient to allow an officer**

21  **to perceive an imminent threat great enough to justify**

22  **deadly force?**

23  A.       That officer would then have to observe some

24  type of movement toward their waistband, for instance.

25  You would need to have some type of -- someone could be

Deposition of Officer Traci Shaw          Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

1    running and match the description of a robbery suspect

2    and not be the robbery suspect.  So, an officer is going

3    to need more than that in that circumstance.

4    Q.        Having your hands near your waistband would

5    constitute enough to elevate that risk level to imminent

6    threat of serious bodily harm?

7    A.        It would depend on the totality of the

8    circumstances.

9    Q.        Okay.

10   A.        I don't believe that someone just having their

11   hands on their waistband is going to be enough.  You're

12   going to have to have the officer give this person the

13   commands to stop.  Show them their hands.  Do they match

14   the description of the subject.  It depends on the

15   totality of the circumstances.

16   Q.        And just for the record, we were looking at page

17   Columbus 019447 in this ==Exhibit 4==, if I haven't marked

18   it already, in the 2008 training PowerPoint.

19                          - - - -

20       (Thereupon, Plaintiff's ==Exhibit 4== was marked for

21                      identification.)

22                          - - - -

23   BY MS. GREENE:

24   Q.        I just have one other question about this

25   document.  We're now on page Columbus 019450.  I see

1    **there that this slide says "defensive tactics are most**

2    **effective when applied with speed, surprise, distraction**

3    **and/or exhaustion." Do you see that there?**

4    A.      Yes, ma'am.

5    **Q.      What does that mean?**

6    A.      So, defensive tactics are most effective when

7    applied with speed. So, like, let's say that you're

8    applying handcuffs, and you're fumbling around with your

9    handcuffs and not getting that speed of application,

10   it's not going to be the most effective. Surprise,

11   we're using that speed of application. Surprise,

12   meaning, get ahold of them quickly. And that

13   distraction and/or exhaustion -- I don't know what

14   they're meaning by distraction and/or exhaustion. I

15   don't know what that particular slides means.

16   **Q.      In 2008 you were still teaching officers**

17   **defensive tactics, right?**

18   A.      Yes, ma'am.

19   **Q.      Would you have used this PowerPoint in that**

20   **training?**

21   A.      Our defensive tactics sergeant would have given

22   the PowerPoint presentation. Not specifically me.

23   **Q.      Would you have been present for the**

24   **presentation?**

25   A.      Yes, ma'am.

1  Q.      And you, in 2008, took your inservice training,

2  right?

3  A.      Yes, ma'am.

4  Q.      So, as we sit here today, you just don't recall

5  what this slide was about that we're looking at right

6  now?

7  A.      Not with certainty.

8  Q.      Okay.  Do you know who taught this course in

9  2008?

10  A.      It would have to have been either Sergeant Chris

11  Cheatham, or it would had to have been Matthew Weekly.

12  One of those two would have taught that.

13  Q.      Okay.  And this training was consistent with the

14  CDP policies, right?

15  A.      Yes, ma'am.  They wouldn't have taught anything

16  that was against policy.

17  Q.      Do you know whether there were any handouts

18  provided to officers during this training?

19  A.      I don't recall, ma'am.

20  Q.      And did Narewski, Baase, Mason, and Abel, take

21  this training?

22  A.      Yes, ma'am.

23  Q.      Okay.  Okay.  I'm going to stop sharing this one

24  and look at another document.  This, what we see here is

25  the defensive tactics training slideshow from the 2009

1   inservice, is that right?

2   A.      Yes, ma'am.

3   Q.      And I'm going to mark this as Exhibit 5.

4                       - - - -

5      (Thereupon, Plaintiff's Exhibit 5 was marked for

6                   identification.)

7                       - - - -

8   BY MS. GREENE:

9   Q.      Here --

10  A.      Ma'am, so it says "2010," on one side of the

11  slide, and 2009 on the -- is that just --

12  Q.      I don't know.  You tell me.  I have a separate

13  one from 2010 that I'm going to show you next.  It was

14  provided to us by the city, so tell me if it's not.

15  A.      Okay.

16  Q.      I have a question for you about the second page

17  of Exhibit 5, which is Bate stamped Columbus 019512.  We

18  see on this the statement at the bottom here, "Ties are

19  bad in a gunfight."  Do you see that?

20  A.      Yes, ma'am.

21  Q.      Can you explain that to me?

22  A.      Yes, ma'am.  I know earlier we mentioned a

23  couple of scenarios that we do early with the recruits.

24  And one of them is kind of the example that you've given

25  with a bank robbery scenario, and we put the recruit

```
 1    right in front of them.  We tell them you were

 2    dispatched on a robbery in progress.  We put the suspect

 3    at the door, we put a gun in their hands and tell them,

 4    that's the bank robber and we want them to react how a

 5    normal officer would act.  And then, the scenario

 6    begins, and a lot of the recruits during that scenario,

 7    they would point the gun at the suspect and start giving

 8    them verbal commands, and they have no cover.  They'll

 9    wait until after the suspect tries to start to pull

10    their arm up with that firearm to point it at them

11    before they will begin to fire.  And, obviously, it

12    doesn't happen instantaneous, and the best they could

13    hope for in that situation is a tie, because they

14    believe, many of them believe, because of video culture,

15    they believe they're going to be able to, with their

16    guns pointed, pull their trigger quicker than a suspect

17    with a gun at their waistband is going to be able to

18    pull it and fire.

19            That's where that ties are bad in a gunfight

20    because of action versus reaction principles that their

21    shot is always going to come after, or near the same

22    time.  So, that's where the whole ties are bad in a

23    gunfight, because, obviously, all it takes is getting

24    shot once to kill someone.  So, that is where ties are

25    bad in a gunfight.  That's where that comes from is that
```

Deposition of Officer Traci Shaw        Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

1   particular scenario.  Obviously, it relates to action

2   versus reaction.

3   **Q.**      **Okay.  So, recruit training, then, you're saying**

4   **that officers or trainees are taught that they shouldn't**

5   **wait for a suspect to begin to pull a gun out of their**

6   **waistband to shoot because it could result in a tie as**

7   **you described?**

8   A.      Absolutely, ma'am.  We train them to react to

9   the threat, not the action.  If you wait for the actual

10   action of lifting that firearm, for instance, in this

11   scenario, it's going to be too late.

12   **Q.**      **So, like the suspect having the hand on the gun**

13   **is enough under that?**

14   A.      Yes, ma'am.

15   **Q.**      **The suspect reaching toward an area where a gun**

16   **is located, is that enough for that principle?**

17   A.      It depends on the totality of the circumstances.

18   Also, I want you to know, in that scenario we don't give

19   them any cover at all, so they have to make that

20   decision right now.  And, of course, we teach them that

21   if there is cover there, that can possibly, depending on

22   the totality of the circumstances, give you more time to

23   give verbal commands for that suspect to drop the

24   firearm.  But, of course, also in that particular

25   scenario it could also give time for that suspect to

 1    enter the bank where there's innocent people inside.

 2    That's where that comes from.

 3    Q.      What we're looking at now is a training for

 4    officers, not recruits, right?

 5    A.      That's correct.

 6    Q.      This same principle that you just described for

 7    recruits is what is taught to officers in this training

 8    that we're looking at, right?

 9    A.      Yes, ma'am.

10    Q.      Okay.  I'm just going to skip ahead in the

11    document, and we're now at Columbus 019542.  These are

12    the same as the pages that we just saw in the 2008

13    training, correct?

14    A.      Yes, ma'am.

15    Q.      And now, I'm going to show you what I believe is

16    the 2010 presentation.  Now, again, you tell me if I got

17    that right.  Okay.  Here we are.  Is this the 2010

18    defensive tactics training slideshow that was used in

19    the 2010 inservice training for CDP officers?

20    A.      Yes, ma'am.

21    Q.      Okay.  I'm just going to skip ahead here in this

22    document and, again, just like the last one, I'm going

23    to flip through these pages, and tell me, these are the

24    same content that we saw in the '08 and '09 trainings,

25    right?

 1  A.      Yes, ma'am.

 2  Q.      We're going to mark this one Exhibit 6.

 3                      - - - -

 4      (Thereupon, Plaintiff's Exhibit 6 was marked for

 5                  identification.)

 6                      - - - -

 7  BY MS. GREENE:

 8  Q.      I'm going to open another document.  And we have

 9  the 2011 defensive tactics slideshow used for the annual

10  inservice training, correct?

11  A.      Yes, ma'am.

12  Q.      Okay.  And I'm going to mark this as Exhibit 7.

13                      - - - -

14      (Thereupon, Plaintiff's Exhibit 7 was marked for

15                  identification.)

16                      - - - -

17  BY MS. GREENE:

18  Q.      Again, I'm going to flip forward through these

19  series of pages, and tell me, this content is the same

20  that we saw in the priority trainings, right?

21  A.      Yes, ma'am.

22  Q.      Okay.  I'm going to open another one.

23                      - - - -

24      (Thereupon, Plaintiff's Exhibit 8 was marked for

25                  identification.)

```
 1                              - - - -

 2   BY MS. GREENE:

 3   Q.      And here we have the 2012 defensive tactics

 4   slideshow used at inservice training, right?

 5   A.      Yes, ma'am.

 6   Q.      And we're going to do the same thing.  We'll

 7   flip through to the use of force continuum discussion

 8   section of the presentation, and tell me whether this is

 9   the same content that we saw in the prior presentations?

10   A.      Yes, ma'am.

11   Q.      Okay.  I'm going to open another one, and I'll

12   show this to you.

13                              - - - -

14      (Thereupon, Plaintiff's Exhibit 9 was marked for

15                       identification.)

16                              - - - -

17   BY MS. GREENE:

18   Q.      Here we have the 2013 defensive tactics

19   slideshow from the inservice training, right?

20   A.      Yes, ma'am.

21   Q.      Okay.  Now, I have a couple of questions about

22   this one.  We're here, we are on a page marked Columbus

23   020120.  Here it looks like this is describing division

24   directive 3.91.  It says, "Sworn personnel may use

25   intermediate weapons to protect themselves or another
```

1  person from harm, to effect the arrest or gain control

2  of a physically aggressive or resistant subject, to

3  prevent or holt the commission of an offense, and that

4  intermediate weapon are not a substitute for deadly

5  force," correct?

6  A.      Yes, ma'am.

7  Q.      What are intermediate weapons that a CDP

8  officers can use?

9  A.      It could be a baton, or a flashlight.

10 Q.      Anything else?

11 A.      I mean, you could throw environmental weapons in

12 there as well, depending on the totality of a

13 circumstance.  Let's say an officer is rolling around

14 with a subject in a living room.  They can't get to

15 their baton or something along those lines.  However,

16 there's a lamp and they hit that person.  Does that make

17 sense?  So, environmental weapons, depending on what

18 would be available, obviously, that could be used as

19 well.

20 Q.      Okay.  So, these circumstances described on this

21 slide are the times when officers are supposed to use

22 intermediate weapons pursuant to the policies, right?

23 A.      Yes, ma'am.

24 Q.      Okay.  Now, I'm going to --

25 A.      Ms. Greene, there was things about that slide

Deposition of Officer Traci Shaw                    Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

 1   you showed me earlier from 2008, that distraction and/or

 2   exhaustion, I didn't give the presentation, but now that

 3   I'm thinking about it and going through it, I'm guessing

 4   that this distraction meant if you were going to say

 5   tackle someone to the ground, and let's say they're

 6   wrestling around with you and you give them a strike to

 7   the face before you tackle them to the ground, you don't

 8   just want to tackle them to the ground, you want to

 9   distract them somehow.  And, then, the exhaustion,

10   certainly if a subject is exhausted and tired, that

11   would be the time to get the handcuffs on, rather than

12   allowing them to rest and gain strength.  And then,

13   you're going to end up, chances are, having to escalate

14   that level of force.  I didn't mean to go back like

15   that, but I was thinking about it, and that might have

16   been what they were talking about with distraction or

17   exhaustion.

18   Q.      Okay.  Thanks.

19   A.      You're welcome.

20   Q.      Here we are in this 2013 presentation, I'm just

21   going to flip through these again, and if you could just

22   confirm for me, these are the same materials that we saw

23   in the prior years presentations, correct?

24   A.      Yes, ma'am.

25   Q.      Okay.  And now, I'll show you another one.  What

1    we have here is the 2014 slideshow used for defensive

2    tactics training at the inservice, right?

3    A.        Yes, ma'am.

4    Q.        We'll mark this Exhibit 10.

5                            - - - -

6       (Thereupon, Plaintiff's Exhibit 10 was marked for

7                      identification.)

8                            - - - -

9    BY MS. GREENE:

10   Q.        I have a question for you on this page marked

11   Columbus 020245.  Here it says 2014 scenarios, "Foot

12   chase:  When an officer loses sight of a suspect the

13   officer must transition from chase mode to search mode.

14   It is recommended to have the firearm at the ready in

15   search mode."  Do you see that?

16   A.        Yes, ma'am.

17   Q.        Why is that?

18   A.        Because when you lose sight of someone, it was a

19   foot chase before, but now it's a search.  So, when

20   you're chasing someone, you have them in sight, you have

21   an idea of, obviously, what's in their hands.  But when

22   you go into search mode, you could go around a corner

23   and someone could have a gun in their hand, for

24   instance, and you need to be prepared.  Obviously, we

25   talked about action versus reaction.  Action beats

 1    reaction every time.  We want our officers to be better

 2    prepared to have that gun out while they're searching,

 3    because they lost sight of that person's hands.

 4    Q.      So this training then, for CDP officers requires

 5    officers to draw their firearms if they're on a foot

 6    chase, preemptively, just in case that suspect may be

 7    armed and dangerous?

 8    A.      Yes, ma'am.  Plus they can't see their hands.

 9    When you have someone in sight, you could see what their

10    movements are.  But once you lose sight of them, you

11    don't know if they picked a weapon up along the way or

12    if they had one on their person and now it's in their

13    hand.  That's why.

14    Q.      So, under this training then, officers need to

15    take this kind of preemptive protection activity just in

16    case, even though they haven't seen the suspect with a

17    weapon before, under this training, they're supposed to

18    draw their weapons if they're on a foot chase?

19    A.      Yes, ma'am.  When you transition from a foot

20    chase to a search, so we're going to slow things down

21    here, and, obviously, have that deadly force at the

22    ready.

23    Q.      So, any time an officer is searching for

24    someone, even if they haven't seen that person in

25    possession of a weapon, they're supposed to have their

1  firearms at the ready?

2  A.      Yes, ma'am.  Let's say that you get dispatched

3  to a building where a burglary alarm has gone off and

4  there's no evidence at all of a suspect being inside,

5  you're still going to have your gun out while you're

6  searching.

7  Q.      And firearm at the ready means to have your gun

8  out of your holster in your hand, raised and ready to be

9  used, right?

10  A.      Yes, ma'am.

11  Q.      Okay.  I'm going to go to the next page and just

12  take a look at this.  At the bottom it says, "if you use

13  loud repetitive verbal commands when you saw the suspect

14  around the corner."  Do you see that?

15  A.      Yes, ma'am.  I see that.

16  Q.      Why is that important?

17  A.      Officers do not want to use deadly force, and we

18  don't want them to take any life unless they have to, to

19  protect their life or the lives of others.  So 99

20  percent of the time officers are able to use those

21  verbal skills before they use any force, let alone

22  deadly force.  A lot of times officers are able to

23  deescalate using those loud verbal commands, "drop the

24  firearm.  Let me see your hands."  And are able to take

25  that person into custody without any force at all.

1    Compliance is our goal.

2    Q.       Okay.  Now, on page Columbus 202052, the top

3    bullet point on this page is "lethal action requires

4    lethal response."  Do you see that there?

5    A.       Yes, ma'am.

6    Q.       What does that mean?

7    A.       So, lethal action requires lethal response.  So,

8    the thing about Tasers is that people look at them as

9    like a stun gun, or some type of action that's going to

10   immediately stop someone, and then the officers don't

11   have to use deadly force.  However, in using a Taser

12   against someone that has a gun, for instance, we

13   definitely have to have -- deadly force has got to be

14   out there.  Now, lethal force -- so, someone with a

15   knife versus someone with a gun, a Taser is never going

16   to be the answer there.  You can Tase someone under full

17   power and they're still going to be able to reach into

18   their waistband and fire back.  Also, the thing about

19   Tasers is you can miss with a Taser.  With Tasers you

20   have to have two prongs that hit the subject in order

21   for that to work.  If the Taser hits someone's belt, it

22   won't work.  If it hits a big puffy jacket, it won't

23   work.

24   Q.       So, basically, whenever an officer sees a person

25   with something that the officer determines is a

Deposition of Officer Traci Shaw                    Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

1  **potentially lethal weapon, they should draw their**

2  **firearm and not their Taser.  That's what this principle**

3  **is about?**

4  A.       Yes, ma'am.  However, if someone has a knife,

5  you could have a Taser out, you could see that lethal

6  force backup, so one officer could have their Taser out,

7  but the other officer has to have their gun out, so it's

8  that lethal force backup.

9         And this goes for someone with a knife, in order

10  to make sure if that Taser doesn't work and that person

11  would charge the officer with the knife, that you have

12  lethal force.  Remember, when you use a Taser you're

13  within 20 feet of that subject, which is very close, so

14  we definitely want to make sure that if you're going to

15  use a Taser against someone with a knife, which is

16  lethal force, you want to have that lethal force backup.

17         However, you would not want to use it with

18  someone that had a gun because of the fact that someone

19  can still shoot even though they're going through a full

20  action of being Tased.  They could still be a lethal

21  threat to the officer or others.

22  Q.       **Under CDP policies, training, practices, are**

23  **officers supposed to draw their weapons when they are**

24  **arresting compliant suspects who are being arrested**

25  **subject to a warrant?**

Deposition of Officer Traci Shaw        Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

1    A.      What's the warrant for?

2    **Q.      Let's say a felonious assault.**

3    A.      Yes, ma'am.

4    **Q.      Why is that?**

5    A.      So, felonious assault, obviously means --

6    remember in that four prong test of Graham v. Connor.

7    It depends on the severity of the crime.  So, if someone

8    has a warrant for felonious assault that, obviously

9    means that someone that has attempted to or hurt

10   someone, shot someone with a gun, stabbed someone with a

11   knife, something along those lines.  Because of the fact

12   that they have those officer subject factors, that

13   special knowledge that that person had tried to murder

14   someone in a sense --

15   **Q.      Felonious assault is not attempted murder.**

16   **We're talking about felonious assault.**

17   A.      Well, if you shoot someone, ma'am, and they

18   live, that's felonious assault.

19   **Q.      I understand.  But let me just make this**

20   **question simple.  A CDP officer pursuant to CDP**

21   **policies, training and practices, they're going to**

22   **arrest someone for whom there's a warrant for a**

23   **felonious assault offense, but it's some time after that**

24   **event allegedly occurred, is the officer, under CDP**

25   **policies, practices, and training, required to draw the**

Deposition of Officer Traci Shaw        Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

1  firearm during the arrest?

2  A.      Yes.  Best practices, yes.

3  Q.      Okay.  I'm going to flip forward in this

4  presentation, and these slides look a little bit

5  different, but I think they contain the information that

6  we saw in the prior years of training.  So please

7  confirm for me.  I'm going to flip through the pages

8  here.  Is that the same training that we saw in previous

9  trainings?

10  A.      Yes, ma'am.

11  Q.      Okay.  We're going to close this training and

12  open another one.  I'm going to share my screen with you

13  again, and here we have the 2015 defensive tactics

14  slideshow?

15  A.      Yes, ma'am.

16  Q.      We're going to mark this as ==Exhibit 11==, and I'm

17  going to jump forward to page five.

18                - - - -

19    (Thereupon, Plaintiff's ==Exhibit 11== was marked for

20               identification.)

21                - - - -

22  BY MS. GREENE:

23  Q.      What's the lone wolf ambush?

24  A.      It's a trend, if you will, of officers being

25  ambushed by one person on like a surprise attack.

1   Unfortunately we had, certainly in this year

2   specifically, that's what was going on in the country.

3   So officers sitting in their car doing reports and being

4   ambushed by someone.  Obviously, we want to make sure

5   that officers, you know, maintain environment awareness

6   of their surroundings.  The lone wolf was a trend that

7   we were seeing.

8   **Q.      Okay.  I'm going to take you to another page in**

9   **this training.  And for the record, we're at Columbus**

10  **020447, and at the top of the page it continues to talk**

11  **about the lone wolf ambush.  It says, "When talking to**

12  **anyone, be sure you are in an interview stance."  Do you**

13  **see that there?**

14  A.      Yes, ma'am.

15  **Q.      What is that?**

16  A.      An interview stance is a bladed stance with your

17  gun slid back, so obviously, if someone would try to

18  disarm an officer, the further away that your firearm is

19  from them, the better.  You're going to be able to

20  retain your firearm.  The interview stance is going to

21  be bladed with the gun side back, hands up in a

22  protective -- I guess not down at your thighs, if that

23  makes sense.  So if you could imagine having a notepad

24  and paper interviewing someone.  And then, obviously, an

25  interview stance is always going to take into account

1   the reactionary gap.  So, that plays into the realities

2   of action versus reaction.  The closer that you are to

3   someone, the quicker they're going to be able to, I

4   guess, harm the officer.

5   **Q.      All right.  I'm sorry.  Columbus 020448 is the**

6   **page I'm on now.  It says, "handcuff all attackers, dead**

7   **or live, even if the suspect is wounded."  Do you see**

8   **that?**

9   A.      Yes, ma'am.

10  **Q.      Why?**

11  A.      So, if an officer is involved in a shooting,

12  it's best practice to get that person handcuffed as

13  quickly and safely as possible, so that you can render

14  aid.  So, the thing with someone that has -- if an

15  officer shot someone, that doesn't mean that they're no

16  longer a threat.  And so, officers will have to do that

17  threat assessment in order to get those cuffs on, so we

18  need to make sure that they are secure.  They can't get

19  to that weapon anymore.  They don't have any weapons on

20  their person, and we could get the medics in there to

21  get them transported as quickly as possible.

22  **Q.      Are people supposed to remain handcuffed even**

23  **after they've been disarmed in that type of event?**

24  A.      Yes, ma'am.

25  **Q.      What about when unarmed people are shot by the**

1   **police, are they also, pursuant to this training and**

2   **policy by the CDP, that they're supposed to be**

3   **handcuffed?**

4   A.      So, you would need to search them to make sure

5   that they were, in fact, unarmed, and you wouldn't want

6   to search someone unless they were cuffed up.

7   **Q.      If a person is known to be unarmed at the moment**

8   **that the shooting occurs, are they supposed to be**

9   **handcuffed under CDP policies and practices and**

10   **training?**

11   A.      If the officer is involved in a shooting and

12   shoots someone, yes, ma'am. It doesn't necessarily have

13   to be the officer shooting, but they need to get those

14   cuffs on, obviously, when it's safe to do so, and that

15   suspect is no longer a threat.

16   **Q.      So, it's universally applicable pursuant to the**

17   **CDP policies, practices, and training, that if a police**

18   **officer shoots a person, regardless whether they seem to**

19   **be armed or not, that person who is shot should be**

20   **handcuffed after the shooting?**

21   A.      Yes, ma'am.

22   **Q.      What if the handcuffing will cause greater**

23   **injury to that person, is that still true that that**

24   **person should be handcuffed under the division policy,**

25   **practices, and trainings?**

Deposition of Officer Traci Shaw                    Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

```
 1    A.       Yes, ma'am.

 2    Q.       Okay.  I'm going to close Exhibit 11 and show

 3    you another one.  We're close to being done.  I'm going

 4    to share this screen with you.  So I have two versions

 5    of a training from 2016.  This is version one.  I'm

 6    going to mark this as Exhibit 12.

 7                      - - - -

 8        (Thereupon, Plaintiff's Exhibit 12 was marked for

 9                   identification.)

10                      - - - -

11    BY MS. GREENE:

12    Q.       Have you seen this before?

13    A.       Yes, ma'am.

14    Q.       Were there two different versions of the

15    training given in 2016?

16    A.       I don't know the answer to that, ma'am.

17    Q.       Okay.  Let's take a quick look at a few things

18    on this page.  On page Columbus 020609 it says, "basic

19    function of a police officer is to effect the arrest of

20    a violent subject."  What does that mean?

21    A.       One of the functions of a police officer is to

22    arrest violent people.  That's a very basic function of

23    a police officer.  One of the functions.

24    Q.       Okay.  I'm going to close this exhibit.  I'm

25    going to show you what was marked as the 2016 version
```

1   two training.  Have you seen this one before?

2   A.      Yes, ma'am.  I believe so.

3   Q.      Okay.  And we'll mark this as Exhibit 13.

4                      - - - -

5       (Thereupon, Plaintiff's Exhibit 13 was marked for

6                   identification.)

7                      - - - -

8   BY MS. GREENE:

9   Q.      I'm going to go to Columbus 020749 in this

10  document, and this is talking about vehicle extractions

11  and telling officers to use extreme caution when

12  attempting to extract a resistive subject and maintain

13  proper contact and cover principles, correct?

14  A.      Yes, ma'am.

15  Q.      Are CDP officers supposed to during vehicle

16  extraction maintain contact and cover?

17  A.      So, vehicle extractions, you're absolutely

18  right, that means getting people out of vehicles.  Now,

19  it depends upon the severity of the crime on how we're

20  going to extract them out of that vehicle.  Obviously,

21  if that person is complying, it's just a simple escort

22  out of the vehicle and putting them in handcuffs.

23  However, I would like to say that if it's out of a

24  felony stop, for instance, when you're ordering -- like

25  let's say that you stop the car, that you know there's

Deposition of Officer Traci Shaw      Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

1  someone inside that has some type of a felonious assault

2  warrant inside that car, if you know that they're in

3  there and traveling, we're going to get on the air, ask

4  for another car, then you're going to light up that

5  vehicle once that other car is there with you, and then

6  extract them out of the vehicle behind cover.

7  **Q.      Okay.  So, that would be the appropriate**

8  **approach to a vehicle extraction that you just**

9  **described?**

10 A.      If you're doing a traffic stop with someone who

11 has a felonious assault warrant on site, yes, ma'am.

12 **Q.      Under CDP training and policies, are officers**

13 **supposed to get into cars to try to pull people out for**

14 **an extraction tactic?**

15 A.      I mean, obviously, if you're going to get

16 someone out of a vehicle that has a felonious assault

17 warrant, it's always -- I mean, it depends on the

18 totality of the circumstances.  You're talking about a

19 traffic stop type of event, you wouldn't want to

20 approach the car at all, if at all possible.  You would

21 do that behind cover.

22 **Q.      What about like there's a vehicle parked in a**

23 **parking lot, for example, and officers have decided to**

24 **approach that vehicle for a consensual encounter, and**

25 **eventually they determine they have reasonable suspicion**

Deposition of Officer Traci Shaw                Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

1  for some type of activity, are they supposed to get into

2  the car to pull a person out to extract them?

3  A.      We want to avoid getting into the vehicles,

4  ma'am, unless that vehicle is stabilized, because you

5  could be dragged by that vehicle.  So, even when we

6  teach vehicle extraction, if we're reaching into a car

7  to get someone out of there, we want to try to keep as

8  much of your body outside of the car just in case that

9  vehicle goes in motion.  If the vehicle is stabilized it

10 changes the totality of the circumstances.

11 Q.      Okay.  I'm going to show you one last training

12 like the ones that we've been looking at.  It's a little

13 out of order.  This is the 2007 inservice defensive

14 tactics training PowerPoint slideshow, correct?

15 A.      Yes, ma'am.

16 Q.      Okay.  In this training there's a section on

17 sheep and sheepdogs, and I'm on page DTU, TRN 000032.

18 Do you see this here?

19 A.      Yes, ma'am.

20 Q.      I'm going to go through these pages slowly.

21 Tell me when you're ready for me to go to the next one.

22 I want you to familiarize yourself with these pages, and

23 then, we'll talk about them.  Okay?

24 A.      Okay, ma'am.

25 Q.      Are you ready for the next slide?

Deposition of Officer Traci Shaw        Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

```
1    A.      Yes, ma'am.  Okay.  Okay.

2    Q.      Okay.  I'm going to mark this as Exhibit 14.

3                          - - - -

4       (Thereupon, Plaintiff's Exhibit 14 was marked for

5                      identification.)

6                          - - - -

7    BY MS. GREENE:

8    Q.      For the record, we just looked at pages Bates 32

9    through 40.  What is this sheep and sheepdog training

10   about?

11   A.      So, the sheep, sheepdog and the wolves -- what

12   do I say?  It's analogy, if you will, that the wolves

13   are people that prey upon the weak.  And then, the sheep

14   are the citizens that the wolves prey upon, and the

15   sheepdogs are the police officers that protect the sheep

16   from the wolf.

17   Q.      Okay.  And this presentation was the training

18   that all CDP officers received in 2007 on defensive

19   tactics, right?

20   A.      Yes, ma'am.

21   Q.      Okay.  And on this page, Bates 34, we see that

22   the sheep are liberal, exclamation point.  They live in

23   denial and do not want to believe that evil exists.

24   What is this referring to?  You just said that the sheep

25   are the citizens.  What does that mean?
```

Deposition of Officer Traci Shaw          Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

1    A.       I'm guessing a very unprofessional slide put in

2    a defensive tactics presentation basically saying that

3    the sheep, meaning the citizens are -- I mean, I'm here

4    to give my opinion.  To say that they're liberal minded,

5    live in denial.  They don't want to believe that there's

6    people out there that can hurt them, and generally don't

7    like the police.

8    Q.       And on this next one, I see this bad guys in

9    parenthesis.  Is that referring to all suspects?

10   A.       I would guess that's people that prey upon the

11   weak are known as the wolves.

12   Q.       Okay.  You took this training in 2007, right?

13   A.       Yes, ma'am.

14   Q.       Do you remember this presentation?

15   A.       I don't.  But, I do find it unprofessional in

16   nature.

17   Q.       Have you ever had any conversations with any of

18   your fellow Columbus officers about this presentation?

19   A.       No, ma'am.  Not that I can recall.  I'm sure I

20   sat through the presentation.

21   Q.       As one of the trainers in 2007, did you get any

22   feedback on this presentation at the time that it was

23   provided?

24   A.       No, ma'am.

25   Q.       Who gave this presentation in 2007?

1    A.      It would depend on who the defensive tactics

2    sergeant was in 2007.  I believe it was Sergeant Matt

3    Weekly.

4    Q.      All right.  For each of the trainings that we've

5    looked at, Exhibits 4 through 14, Mason, Baase,

6    Narewski, and Abel, took all of those trainings,

7    correct?

8    A.      Yes.

9    Q.      And all of those trainings that were provided

10   were consistent with department policies, right?

11   A.      Yes, ma'am.

12   Q.      I'm going to close Exhibit 14, and I'm going to

13   show you another training.

14                    - - - -

15       (Thereupon, Plaintiff's Exhibit 15 was marked for

16                    identification.)

17                    - - - -

18   BY MS. GREENE:

19   Q.      I'm going to ask quickly with this one.  Have

20   you ever seen this training before?

21   A.      Yes, ma'am.

22   Q.      To whom was this training provided?

23   A.      Does it say what year, ma'am?

24   Q.      No.

25   A.      Okay.  Can you forward to the next slide, ma'am?

```
 1   And the next one.  I can't say for certain, ma'am.  It
 2   looks familiar, but I can't say for certain on who it
 3   would have been given to.
 4   Q.      You don't know who taught it, do you?
 5   A.      I'm not positive.
 6   Q.      I'm at Bates 19215.  The bottom bullet point
 7   here says, "You must be able to justify your actions in
 8   relation to use of deadly force."  Do you see that?
 9   A.      Yes, ma'am.
10   Q.      What does that mean?
11   A.      So, when using deadly force, obviously, an
12   officer's perception is unique to things.  Maybe an
13   ordinary person's inference of movements of a subject in
14   certain ways, readjusting their hips, things like that,
15   those are preattack indicators that maybe a normal
16   person untrained in law enforcement would not see that
17   as a threat.
18   Q.      I just want to know what it means, "you must be
19   able to justify your actions?"
20   A.      Yes, ma'am.  I'm trying to get to it.  I
21   apologize.  So, with that, in order to use deadly force
22   I know we've already covered that, but that's that
23   immediate threat of serious physical harm or death to
24   someone else, and you have to consider the totality of
25   the circumstances, because each one of those
```

 1   circumstances help build probable cause.  Those are

 2   facts, not guesses.  But, the probable cause, an officer

 3   needs to have that in order to use deadly force.  By

 4   saying that you must be able to justify your actions,

 5   you have to be able to articulate your actions of that

 6   subject and why you utilized deadly force.  It has to be

 7   in developing that probable cause, meaning to justify

 8   your actions.

 9   Q.      Okay.  This is the last slide in that

10   presentation, and it's a sign saying, "Warning, beyond

11   the point, deadly force is authorized."  Is this like a

12   little joke to end the presentation?

13   A.      I don't know, ma'am.

14   Q.      All right.  I'm going to close Exhibit 15, and

15   I'm going to open one more training slide set, and I'm

16   going to share this with you.

17                         - - - -

18      (Thereupon, Plaintiff's Exhibit 16 was marked for

19                    identification.)

20                         - - - -

21   BY MS. GREENE:

22   Q.      This particular document looks like a training

23   written by you, is that right?

24   A.      Yes, ma'am.

25   Q.      And this is a 2016 deadly force presentation?

Deposition of Officer Traci Shaw        Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

1   A.      Yes, ma'am.

2   Q.      And this was provided to the police training

3   academy and not to officers, correct?

4   A.      Yes, ma'am.

5   Q.      Are the principles taught in this training also

6   taught to officers?

7   A.      Yes, ma'am.

8   Q.      Okay.  I would like to ask you about a few

9   specific sections of this training.  Actually, we

10  already talked about this scenario.  You're confronting

11  an armed suspect, no cover available.  He faces you with

12  his gun at his side, pointed at the ground.  Your gun is

13  aimed at him and you're ready to shoot.  He ignores your

14  commands to drop his weapon.  Are you justified in

15  pulling the trigger before he does any more to point his

16  gun at you?  What's the answer to that scenario under

17  the CDP polices, practices and training provided to

18  officers?

19  A.      Yes, ma'am.  He's got his weapon right there at

20  his side, absolutely you're justified in using deadly

21  force.

22  Q.      Okay.  Now, I'm going to go to another page.

23  Here on Bates 019243 this document says that it is a

24  myth that officers can't shoot people in the back,

25  right?

```
 1   A.       Yes, ma'am.

 2   Q.       When is it allowed for CDP officers to shoot

 3   people in the back?

 4   A.       Whenever that person is in immediate threat of

 5   serious physical harm or death to the officer or others.

 6   Q.       Okay.  I'm going to go to another page, Bates

 7   019257.  This says, "Forth Amendment standards require

 8   all use of force to be reasonable."  Objective

 9   reasonable standards, and in the bullet point beneath

10   say, "from the perspective of a reasonable officer, not

11   with 20/20 hindsight, what the officer knew at the time

12   based on an objective standard."  Do you see that?

13   A.       Yes, ma'am.

14   Q.       So, under CDP policies and training what does

15   that mean, based on an objective standard?

16   A.       So, objective standard meaning using those

17   totalities of the circumstances on what is reasonable

18   and what is not.  So, directly relating to the continuum

19   on what is reasonable compared to depending on those

20   suspects actions.  An objective standard is would that

21   reasonable officer use that same level of force with

22   that suspect's actions.

23   Q.       Is that based on what that specific officer who

24   actually did the shooting perceived then?

25   A.       What a reasonable officer would do.
```

1   Q.      Okay.  And is that different than the person who

2   was there and engaged in the shooting, this reasonable

3   officer that you're describing?

4   A.      If someone uses deadly force their actions have

5   to be reasonable no matter what officer is standing,

6   they have to be reasonable for that officer.

7   Q.      Okay.  I'm going to skip forward to Bate 019284.

8   I'm going to click through a series of slides, and let

9   me know when you're ready to go to the next one.  Okay?

10  A.      Yes, ma'am.  Okay.

11  Q.      I'm going to stop here for now, and we ended on

12  Bates 019291.  What's the point of this section with the

13  title, "Police related killings and black males?"

14  A.      This is a study, I believe, out of Toledo, and

15  it highlights the fact that officers don't have a

16  trigger finger for white people, and another trigger

17  finger for blacks.

18  Q.      Is this to address the notion that black people

19  are disproportionately subjected to police violence?

20  A.      It's supposed to mean the opposite, that

21  officers aren't targeting black people.

22  Q.      And this information you've included in your

23  presentation here, would you consider it information

24  addressing a myth that there's disproportional police

25  violence toward black people?

1  A.      Yes, ma'am.

2  Q.      And is this training information that we've just

3  looked at on these slides consistent with CDP policies

4  and trainings on police killings?

5  A.      Yes, ma'am.

6  Q.      And so, it's the position of the Columbus

7  Division of Police that black people are not

8  disproportionately targeted or victims of police

9  violence?

10  A.      Yes, ma'am.

11  Q.      Okay.  We're now looking at Bates 019292, and

12  there's a question here, research question five, "How

13  often should the police legitimately be using lethal

14  force?  In other words, based on the limits of the law,

15  how frequently should we expect police use of legal

16  force to legally occur?"

17  A.      Yes, ma'am.

18  Q.      What's the answer to that question?

19  A.      Can you go to the next slide for me?  I would

20  definitely say that shooting has to be a reasonable one.

21  A lot of times people get caught up in the number of

22  shootings that there are.  It's how many unreasonable

23  shootings were there.

24  Q.      Okay.  I'm going to take you to the last page of

25  this training, Bates 019298.  Here this says, "We have

1   28 weeks to take you from citizen to officer. There are

2   wolves. There are sheep. I am the sheepdog." Do you

3   see that?

4   A.      Yes.

5   Q.      Is this referencing the same set of principles

6   that we discussed in the 2007 inservice defensive

7   tactics training around the sheepdog, and the wolves,

8   and the sheep?

9   A.      Not the unprofessional ones, ma'am. Certainly

10   everybody understands that there are the wolves that are

11   the predators that prey on the weak, and the sheep are

12   the civilians that need us to protect them, and that we

13   are the sheepdogs. So, from taking someone from having

14   that mindset, developing that mindset, it's their place

15   now to protect the sheep. That's what that's

16   referencing.

17   Q.      Okay. And so, this idea of wolves, sheep, and

18   sheepdogs is a philosophy that the CDP subscribes to

19   generally then, is that right?

20   A.      I think it's something that people wanting to be

21   police officers can relate to as far as being guardians

22   of their community.

23   Q.      Okay. And this training that we just looked at

24   is a training that you put on, and you put it on in

25   compliance with the policies, and practices, and customs

1    of the Columbus Division of Police, right?

2    A.       Yes, ma'am.

3    Q.       Now, throughout all of these presentations that

4    we just clicked through, I notice there's a number of

5    videos that I was unable to view because I received PDF

6    versions of these trainings.

7    A.       Uh-huh

8    Q.       So, I just want to ask you one quick question

9    about those videos.  In any of the trainings that we've

10   looked at today or in any training that you've ever

11   received from the Columbus Division of Police or been

12   witness to, was the Chris Rock skit, how not to get your

13   ass kicked by the police, ever shown?

14   A.       In one of my videos, absolutely not.

15   Q.       In any training that you've ever received or

16   witnessed by the CDP?

17   A.       I have seen the video.  I don't know where.

18   Q.       Did you see it through any CDP event?

19   A.       I know that I've seen it, but I don't know

20   specifically where I've seen it at.

21   Q.       Do you know whether you saw it in relation to

22   your duties as a police officer?

23   A.       I don't, ma'am.

24   Q.       Is it something that most of your colleagues in

25   the CDP have seen?

```
 1   A.      I don't know.  I mean, I can't answer to anyone
 2   else.  I remember that video years ago.  I don't
 3   remember it being in a presentation, but I can't say for
 4   sure.
 5   Q.      Okay.  Do you know other colleagues who have
 6   seen that video?
 7   A.      I don't know.  I don't know.
 8   Q.      Has any of your other colleagues ever mentioned
 9   that video to you?
10   A.      Ma'am, it might have been.  I don't even know if
11   it was shown in a video or not.  I assure you, it wasn't
12   shown certainly at the recruit training level.  I don't
13   know if it was in the past -- I have seen the video.  I
14   don't know if it was used in a presentation at all.  I'm
15   not going to say that my colleague have seen it or
16   haven't seen it, because if it was in a presentation I
17   don't want to perjure myself.
18   Q.      Is it responsible that it was in a presentation
19   but you don't know as you sit here right now?
20   A.      It's possible, ma'am.
21   Q.      And I have a video that was produced to me in
22   discovery in one case, but Zoom is very poor at showing
23   videos to people.  I'm going to describe it to you and
24   let me know if you remember seeing it in any trainings.
25   It was a Fox News clip, and it was talking about police
```

Deposition of Officer Traci Shaw      Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

1   being shot by civilians, and the statement in that video

2   that was made, "Every police officer by their training

3   and experience feels like they're a target, because you

4   are." And also that, "Young rookie cops starting out

5   need to know it's a dangerous job." Do you recall

6   seeing that in your training at any point?

7   A.     No, ma'am.

8   Q.     Do those statements though reflect the policies,

9   and training, and practices of the CDP?

10   A.     That the rookie cops -- could you read that to

11   me again, Ms. Greene?

12   Q.     "Young rookie cops starting out need to know

13   that it's a dangerous job."

14   A.     I would have to agree that they have to know

15   that it's a dangerous job.

16   Q.     What about, "Every police officer by their

17   training and experience feels like they're a target,

18   because you are?"

19   A.     We frequently say in training that, you know,

20   they see the uniform, and the uniform represents law and

21   people following the law, and we're the enforcers of

22   that law. So, I can't say that that's the position of

23   the Division of Police that because you wear the uniform

24   that you're a target per se, but that certainly wearing

25   a uniform is certainly an enforcer of the law. There's

1  certain predators in society that see us as a threat.

2  Q.       Okay.  I'm going to show you a couple more

3  documents quickly here.  Have you seen this before?

4  A.       It appears to be a scenario.  I don't remember

5  the scenario, but it appears to be a scenario.

6  Q.       Okay.  It was titled when it was given to us as

7  scenario gun run 2016.  Does that suggest that this is

8  the 2016 inservice scenario training provided to CDP

9  officers?

10 A.       Yes, ma'am.  I think that would be fair to say.

11 Q.       Okay.  So, for the 2016 annual inservice

12 training all CDP would have run through these particular

13 scenarios in this document then?

14 A.       Yes, ma'am.

15 Q.       Okay.  I'm going to mark that as ==Exhibit 17==.

16                      - - - -

17     (Thereupon, Plaintiff's ==Exhibit 17== was marked for

18                   identification.)

19                      - - - -

20 BY MS. GREENE:

21 Q.       This one, the document title is training "Deadly

22 Force Decision Making 2015."

23 A.       Okay.

24 Q.       Have you seen this one before?

25 A.       I mean, if it was in the scenario, then I would

Deposition of Officer Traci Shaw      Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

1   have had to have completed it. I'm just looking through

2   it to see if I remember the scenario. I don't remember

3   the scenario, ma'am.

4   Q.     We see on the bottom this was a 2015 document.

5   Was this a scenario used at inservice training that

6   year?

7   A.     I don't remember the scenario.

8   Q.     This is a deadly force training document from

9   the year of 2015 though, right?

10   A.     I'm not familiar with this, ma'am. I'm sorry.

11   Q.     Okay. Well, you're here to testify on deadly

12   force training to the CDP officers in a range of years

13   including 2015, correct?

14   A.     Yes, ma'am.

15   Q.     So you don't know what this is and you've never

16   seen this before?

17   A.     No, ma'am. I don't recall.

18   Q.     I'm going to ask you about the scenario

19   described here. "Officers are dispatched to a domestic

20   where they need to make an arrest and the possibility of

21   a weapon in the apartment." And here during this

22   scenario the officers hear the sound of a shotgun being

23   racked or cycled in another room. What happens

24   apparently is that they deal with the husband and the

25   victim, and then later in the scenario the brother

1  appears in the doorway and he either has a shotgun or

2  the officer just heard the sound of the shotgun being

3  racked in the other room, right?

4  A.     Yes.

5  Q.     So, if the individual appears in the doorway

6  with the gun, is the officer, under this scenario,

7  supposed to shoot at the brother?

8  A.     Ma'am, I haven't seen this before to know the

9  objective.  If the objective says here, "determine if

10  the officers can tactfully determine the need not to

11  shoot after during an arrest when they hear the sound of

12  a shotgun being racked/cycled in another room."  Do you

13  want me to give an opinion on this scenario?

14  Q.     Let me go to the next page.  Maybe this will

15  help you.  See down at the remediation we have,

16  "officers must be able to analyze a tense, fast evolving

17  deadly force encounter.  Instructor will determine what

18  skill was incorrect; specifically failing to identify

19  the deadly force threat, failing to properly respond to

20  the deadly force threat with deadly force."  Do you see

21  that there?

22  A.     Yes, ma'am.

23  Q.     So, tell me if I'm reading this wrong, it sounds

24  like then to me under this document that in this

25  scenario officers are supposed to shoot, is that

Deposition of Officer Traci Shaw                    Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

```
1    correct?

2    A.       Yes, ma'am.

3                           - - - -

4       (Thereupon, Plaintiff's Exhibit 18 was marked for

5                   identification.)

6                           - - - -

7    BY MS GREENE:

8    Q.       I'm going to close Exhibit 18, and I'm going to

9    open what I'll mark as Exhibit 19 and I'll share this

10   with you.

11                          - - - -

12      (Thereupon, Plaintiff's Exhibit 19 was marked for

13                  identification.)

14                          - - - -

15   BY MS. GREENE:

16   Q.       Have you ever seen this one before?

17   A.       Yes.  I remember this one, ma'am.

18   Q.       Do you know what year this is from?

19   A.       I do not know, but I know it was follow-up to

20   basically when you have an active shooter scenario, and

21   using cover to go across -- I remember this one being

22   outside.  This is to help officers get closer to the

23   subject while using cover.

24   Q.       Okay.  And in this document -- we're looking at

25   Bates 24.  In this paragraph at the top, which I think
```

1   you just read, we have a person who was waving a gun,

2   firing shots, officers arrive.  They see the suspect

3   shooting a victim on the ground.  The suspect engages,

4   meaning with fire at officers in the outdoor area, the

5   suspect flees.  And then, ultimately the officers enter

6   that apartment where the suspect fled to, they locate

7   that suspect and arrest them, right?

8   A.      Yes, ma'am.

9   Q.      And here that person is compliant and giving up

10  at the point that they arrive, right?

11  A.      Yes, ma'am.

12  Q.      Now, here this suspect has been seen shooting

13  someone, waving a gun, firing a shots, and shooting a

14  victim on the ground, and the officers here are expected

15  to engage in deescalation techniques to secure that

16  suspect when they arrive in this scenario training,

17  correct?

18  A.      Yes, ma'am.

19  Q.      Okay.  So, having witnessed a suspect engage in

20  the use of deadly force him or herself, that doesn't

21  necessarily justify officers shooting at that person,

22  does it?

23  A.      If the officer sees a suspect shooting at

24  someone, absolutely it allows you to use deadly force.

25  Q.      But here isn't the objective that they're

1    **supposed to use deescalation techniques to secure the**

2    **person?**

3    A.      No.  Well, I remember this scenario is,

4    obviously, to communicate with those other officers

5    to -- this is out of an active shooter.  So, you have

6    possible victims inside, and so you need to make sure

7    that we deal with that deadly threat.  And in here it

8    says that the suspect would then hide in a bedroom

9    within an apartment, and then became compliant in giving

10   up.  So, if you're behind cover and you could give

11   commands to that person and they are compliant, just

12   because they've shot someone -- I mean, we do that.

13   Columbus Police does that all the time in these hostage

14   negotiations.  If the suspect decides to be compliant

15   and give up, it doesn't mean that the use of deadly

16   force is unreasonable while they're shooting the person,

17   actively shooting someone.  Of course, that's going to

18   be that deadly force is going to be reasonable.

19          But, now they get into this room and they're

20   giving them commands and puts down the gun and comes out

21   with his hands up, remember, just because you have the

22   ability to -- not the ability.  But, because deadly

23   force is reasonable, if they drop the gun with hands up

24   and walk out, you could lose the ability to use deadly

25   force even though seconds before it was okay.

Case: 2:18-cv-01060-EAS-EPD Doc #: 141-2 Filed: 03/24/21 Page: 146 of 173 PAGEID #: 3554

Deposition of Officer Traci Shaw                    Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

1    Q.        Okay.  I'm going to open Exhibit 20.

2                          - - - -

3        (Thereupon, Plaintiff's Exhibit 20 was marked for

4                       identification.)

5                          - - - -

6    BY MS. GREENE:

7    Q.        Okay.  Have you seen this one before?

8    A.        Yes, ma'am.  So ordnance means it was done over

9    at firearms and the people running from the venue --

10   this was done with live fire.  The people running from

11   the venue were actually targets.  So this is the

12   decision-making course that officers do and this is just

13   a particular scenario.  So they had targets with

14   non-deadly threats coming at you, and you had to look at

15   those targets and determine which one wasn't a threat

16   and which one was.

17   Q.        And this document contains, it looks like

18   scenarios from 2015, at the bottom we see 2016.  On the

19   next page at the bottom we see 2017.  And then, the

20   following page 2018.  Have you seen this document

21   before, or you just remember that training?

22   A.        I remember going through the training, ma'am.

23   Q.        Okay.  And when you say "at ordnance," is this

24   part of the annual firearms requalification?

25   A.        Yes, ma'am.  So one phase of training is the

1  decision course, and that's -- I mean, it obviously

2  deals with deadly force.  I remember going through that

3  particular scenario.

4  Q.      Is this a scenario training where people act out

5  for the officers who are there as students on that

6  particular day, or the officers actually participate in

7  the scenarios themselves?

8  A.      They were paper targets, ma'am.  So the officers

9  going through these scenarios had live fire in their

10 gun, and the paper targets -- they were told the

11 scenario, but they weren't really people that were

12 running out.  They were paper targets, but it made you

13 look at each target and determine if they had firearm in

14 their hand.

15 Q.      Okay.  So the way that this works then is

16 officers who were at the range are told the facts of a

17 scenario, and then, they are positioned at the range

18 with moving paper targets that arrive in their field of

19 view and they have to make a determination of shoot,

20 don't shoot, is that right?

21 A.      Yes, ma'am.

22 Q.      Okay.  And can I just flip through these pages,

23 and skim them for me, and just tell me if on all of

24 these pages that's the kind of scenario training that

25 we're talking about?

Deposition of Officer Traci Shaw    Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

```
 1   A.      Yes, ma'am.  Okay.  Next one, ma'am.  Next one,
 2   ma'am.
 3   Q.      Okay.  Is that all the same kind of training
 4   that you were just describing?
 5   A.      It is, but I'm guessing it's a document that
 6   describes the scenarios during phase training.  So DTU,
 7   that would be defensive tactics unit, and the ordnance
 8   would be over at firearms.  So, it's all under the
 9   training bureau since they're all training scenarios.
10   However, the DTU scenarios were given during defensive
11   tactics.  And then, the ordnance training was given at
12   the phase of the training over at ordnance.
13   Q.      Okay.  Understood.  So then for the years listed
14   here for inservice training the DTU sections are were
15   what were used at inservice training and the ordnance
16   was part of firearm requalification training at some
17   time during the year?
18   A.      Yes, ma'am.
19   Q.      Okay.  Can I ask you about this scenario three
20   on Bates 00003.  "Officer is dispatched to take a
21   report."  Do you see that there at the top of the page?
22   A.      Yes, ma'am.  This was done at ordnance.
23   Q.      Do you remember this particular training?
24   A.      Yes, ma'am.  It would have been a target with a
25   dog coming at you over at ordnance on the range.
```

1  Q.      Okay.  So, in this scenario where an officer is

2  faced with a situation of a dog running toward the

3  officer, and the owner of that dog, as it says here,

4  "incident human being down range," or in the direction

5  of the dog at the time that the officer may choose to

6  deploy deadly force, what is the officer supposed to do

7  in pursuant to CDP training and policies in that

8  scenario?

9  A.      So, in this scenario the officer -- so we had a

10 tragic incident happen with one of our officers where

11 they had a dog charge at them, and they shot the dog and

12 missed the dog, I think on one of the shots.  And the

13 shot went through a door and shot -- I believe, it was a

14 child, maybe four years old and shot her in the leg.  So

15 this is in response to that training to make sure that

16 we're aware of our backdrop, especially when you have

17 a -- I mean, dogs are very fast and moving around and

18 being aware of your backdrop, and it's a dangerous

19 situation for anyone in the area if you decide to use

20 that deadly force.

21 Q.      So, like if the dog owner is visibly downrange

22 from the officer and the dog is coming at the officer,

23 under CDP policies are they allowed to shoot at the dog?

24 A.      I mean, if you could be certain of your backdrop

25 that it's going to go into the ground and not hit an

```
 1   incident person, deadly force would be able to be used,
 2   but they've gone as far as telling us to distract, try
 3   to distract the dog with using one of our intermediate
 4   weapons.  To use Taser instead of use deadly force if
 5   you can't be certain that an incident person could get
 6   shot, that would be the wrong decision.
 7   Q.      Okay.  So under CDP policies, and training, if a
 8   person who doesn't present an imminent threat at that
 9   time, might accidently get shot while the officer
10   attempts to shoot at a charging dog, the officer should
11   try to do something else other than shoot because of the
12   the risk of hitting the person, is that right?
13   A.      Yes.  I mean, we definitely want the officers to
14   look at their backdrop and try to avoid using deadly
15   force.
16   Q.      Okay.  I just want to go back to this legal
17   updated and citizen liability training briefly.  Is
18   civil liability training provided through the mechanism
19   of legal updates to officers?
20   A.      It's taught at the academy level.  It's actually
21   a four block of training.  That's their first
22   introduction to Graham v. Connor, Tennessee v. Garner,
23   all of that, but they also talk about qualified
24   immunity.  Obviously, if someone is driving recklessly,
25   then you could be criminally charged for that.  That's
```

1    what that class -- it's one of the things that it

2    pertains to.  Certainly, civil liability is certainly

3    covered in legal updates as well.

4    Q.       And for officers, not in academy, now talking

5    about officers, are they provided with civil liability

6    training related to deadly force through any other ways

7    other than legal updates?

8    A.       I mean, I suppose there could be a rollcall

9    training.  It doesn't necessarily mean legal updates,

10   but I believe at legal updates -- from the city

11   attorney's office, that's where that's taught.

12   Q.       Okay.  And with regard to legal updates provided

13   to officer for the purposes of training from 2010 to

14   present, do you have anywhere a compiled list, or a set

15   of those documents available to you specifically related

16   to deadly force?

17   A.       Yes, ma'am.

18   Q.       Would you be able to produce that to your lawyer

19   so they could give that to us?

20   A.       Yes, ma'am.  Is there a timeframe, ma'am?

21   They're archived for quite sometime.  Is there a

22   timeframe that you'd like?

23   Q.       I guess I would ask for 2010 to present.  I'm

24   going to share with you one last document.  Here we have

25   CDP directive Rule 1-01, and then all of the rules that

```
 1   follow.  This was revised on June 30th, 2015 we see at

 2   the bottom, right?

 3   A.     Yes, ma'am.

 4   Q.     And I'm going to come down to --

 5              MS. GREENE:  Bill, I've hunted high

 6   and low for this policy update that was supposed to have

 7   taken place in 2015.  We can't find it, so I'm going to

 8   ask that you produce that to me.

 9              MR. SPERLAZZA:  2015?

10              MS. GREENE:  Use of force policy that

11   was allegedly updated on June 30th, 2015, because all

12   the versions that we have are identical and have a

13   promulgation date from 2014.

14   BY MS. GREENE:

15   Q.     Just to wrap this up, Officer Shaw, whatever

16   that policy is, when Bill produces it to me, that would

17   be the policy that would have applied at the time of the

18   shooting of Deaunte Bell-McGrew on October 29th, 2015,

19   and Tyree King on September 14th, 2016, correct?

20   A.     Yes, ma'am.

21   Q.     Okay.  And other than that update in policy,

22   between the two policies that we discussed, otherwise

23   the policies, and procedures, and practices, that we

24   discussed today all applied during the officer involved

25   shootings of James England, Deaunte Bell-McGrew, and
```

1   **Tyree King, correct?**

2   A.     Yes, ma'am.

3              MS. GREENE:   Okay.   That will be it.

4              MR. SPERLAZZA:   Okay.   We'll read.

Case: 2:18-cv-01060-EAS-EPD Doc #: 141-2 Filed: 03/24/21 Page: 154 of 173 PAGEID #: 3562

Deposition of Officer Traci Shaw                    Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

1                    C E R T I F I C A T E

2    STATE OF OHIO,                )
                                   )
3    CUYAHOGA COUNTY.              )

4    I, Megan A. Medved, a Notary Public within and for the

5    State of Ohio, duly commissioned and qualified, do

6    hereby certify that the within named witness, OFFICER

7    TRACI SHAW, was by me first duly sworn to testify to the

8    truth, the whole truth and nothing but the truth in the

9    cause aforesaid; that the testimony then given by the

10   witness was by me reduced to Stenotype in the presence

11   of said witness, afterwards transcribed upon a computer;

12   and that the foregoing is a true and correct

13   transcription of the testimony so given by the witness

14   as aforesaid.

15

16   I do further certify that this deposition was taken at

17   the time and place in the foregoing caption specified,

18   and was completed without adjournment.

19

20   I do further certify that I am not a relative, employee

21   of or attorney for any of the parties in the

22   above-captioned action; I am not a relative or employee

23   of an attorney of any of the parties in the

24   above-captioned action; I am not financially interested

25   in the action; and I am not, nor is the court reporting

1  firm with which I am affiliated, under a contract as

2  defined in Civil Rule 28(D).

3

4  IN WITNESS HEREOF, I have hereunto set my hand and

5  affixed my seal of office at Cleveland, Ohio on February

6  15th, 2021.

7

8

9

10  _____

11  Megan A. Medved, a Notary Public

12  in and for the State of Ohio.

13  My Commission expires 9/17/23

14

15

16

17

18

19

20

21

22

23

24

25

Deposition of Officer Traci Shaw

Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

## WORD INDEX

**< 0 >**
**00003**  148:*20*
**000032**  126:*17*
**003085**  71:*18*
**003086**  73:*13*
**003087**  72:*17*
**003088**  73:*7*
**003089**  73:*9*
**019243**  132:*23*
**019257**  133:*7*
**019284**  134:*7*
**019291**  134:*12*
**019292**  135:*11*
**019298**  135:*25*
**019447**  102:*17*
**019450**  102:*25*
**019512**  105:*17*
**019542**  108:*11*
**020120**  110:*23*
**020245**  113:*11*
**020447**  120:*10*
**020448**  121:*5*
**020609**  123:*18*
**020749**  124:*9*
**03**  13:*14*
**05**  13:*15*
**08**  108:*24*
**09**  108:*24*

**< 1 >**
**1**  4:*7*  74:*6, 8*
**1(A**  9:*10, 24*  10:*14*
**1.19**  71:*17*  72:*8*
**1.20**  72:*9*
**1.21**  72:*9*
**1.48**  73:*15*
**10**  4:*18*  12:*9*  113:*4, 6*
**10:30**  2:*8*
**101**  96:*14*
**1-01**  151:*25*
**102**  4:*12*
**1020**  2:*9*
**105**  4:*13*
**109**  4:*14, 15, 16*
**11**  4:*19*  119:*16, 19*  123:*2*
**110**  4:*17*
**113**  4:*18*
**119**  4:*19*
**12**  4:*20*  26:*5*  123:*6, 8*
**12/30/14**  4:*8*
**120**  42:*13*
**123**  4:*20*
**124**  4:*21*
**127**  4:*22*
**129**  4:*23*
**12th**  67:*25*  68:*1*
**13**  4:*21*  124:*3, 5*
**131**  4:*24*

**14**  4:*22*  127:*2, 4*  129:*5,
  12*
**140**  4:*25*
**143**  5:*1, 2*
**146**  5:*4*
**14th**  8:*25*  68:*14*  152:*19*
**15**  4:*23*  129:*15*  131:*14*
**153**  4:*5*
**15th**  67:*13, 14, 17, 20*
  155:*6*
**16**  4:*24*  131:*18*
**17**  4:*25*  140:*15, 17*
**170707**  89:*6*
**18**  5:*1*  143:*4, 8*
**1801**  2:*9*
**19**  5:*2*  143:*9, 12*
**1900**  3:*5*  26:*8*
**19215**  130:*6*
**1985**  98:*22*  99:*8*
**1990**  14:*12*
**1999**  13:*6*  14:*3, 8*

**< 2 >**
**2**  4:*9*  84:*10, 12*  89:*7*
**2(A**  9:*14*  10:*3, 18*
**2.01**  68:*24*  95:*21*
**2:18CV1060**  1:*2*
**2:19CV1049**  1:*20*
**2:19CV3105**  1:*13*
**20**  5:*3*  117:*13*  146:*1, 3*
**20/20**  133:*11*
**2000**  13:*7, 8*  14:*3, 15*
  52:*17, 19*  53:*18*
**2003**  14:*22, 23, 25*  15:*11,
  22, 24*  16:*3, 17*
**2004**  20:*9*
**2005**  14:*16*  15:*2, 12*
  17:*13*  20:*9*
**2007**  4:*22*  85:*11*  96:*4*
  126:*13*  127:*18*  128:*12, 21,
  25*  129:*2*  136:*6*
**2008**  4:*12*  67:*13*  85:*11*
  96:*19*  102:*18*  103:*16*
  104:*1, 9*  108:*12*  112:*1*
**2009**  4:*13*  85:*11, 22*
  104:*25*  105:*11*
**201**  22:*10*
**2010**  4:*14*  9:*11, 16, 25*
  10:*5, 15, 20*  16:*3, 16, 17*
  17:*20*  20:*11*  56:*13, 24*
  64:*13, 15*  67:*14, 16, 17, 20*
  85:*11*  105:*10, 13*  108:*16,
  17, 19*  151:*13, 23*
**2011**  4:*15*  17:*21*  19:*18*
  20:*12*  89:*19*  109:*9*
**2012**  4:*16*  15:*10, 13*
  110:*3*
**2013**  4:*17*  110:*18*  112:*20*
**2014**  4:*18*  42:*2*  43:*6*
  67:*21*  68:*20*  69:*11, 24*

**70**:*2, 9*  71:*6*  95:*22*  113:*1,
  11*  152:*13*
**2015**  4:*19*  5:*3*  8:*23, 24*
  67:*22, 23*  68:*7, 13, 21, 22,
  25*  69:*8, 11, 14*  70:*11*
  72:*23*  73:*21*  95:*17*
  119:*13*  140:*22*  141:*4, 9,
  13*  146:*18*  152:*1, 7, 9, 11,
  18*
**2016**  4:*20, 21*  8:*25*  56:*13*
  68:*7, 14*  123:*5, 15, 25*
  131:*25*  140:*7, 8, 11*
  146:*18*  152:*19*
**2017**  67:*23*  68:*22, 23*
  69:*1, 15*  71:*12*  73:*21*
  146:*19*
**2018**  5:*3*  146:*20*
**2020**  55:*6, 9, 13*  64:*13*
  67:*25*  68:*1, 2*
**202052**  116:*2*
**2021**  2:*7*  155:*6*
**216)241-1430**  3:*8*
**24**  143:*25*
**27th**  2:*7*
**28**  42:*3*  136:*1*
**28(D**  155:*2*
**29th**  8:*24*  68:*13*  152:*18*

**< 3 >**
**3**  4:*2, 11*  93:*15, 17*
**3.23**  72:*25*
**3.24**  72:*25*
**3.25**  68:*24*  71:*24*  72:*14,
  18*
**3.91**  110:*24*
**30th**  67:*20, 21, 22, 23, 24*
  68:*1, 19, 20, 21, 22, 23*
  69:*8, 11, 14, 15, 24*  70:*9*
  71:*6*  73:*20*  95:*16*  152:*1,
  18*
**32**  127:*8*
**34**  96:*22*  127:*21*

**< 4 >**
**4**  4:*10, 12*  92:*5, 7*  93:*9*
  102:*17, 20*  129:*5*
**4/3/2017**  87:*11*
**40**  127:*9*
**43215**  3:*14*
**44113**  3:*6*

**< 5 >**
**5**  4:*13*  10:*8*  105:*3, 5, 17*
**5(A**  9:*19*  10:*23*
**55**  3:*5*

**< 6 >**
**6**  4:*4, 14*  109:*2, 4*
**614)645-6959**  3:*16*

**6th**  8:*23*  68:*13*  71:*11*
  72:*23*

**< 7 >**
**7**  4:*15*  109:*12, 14*
**74**  4:*8*
**77**  3:*13*
**78**  42:*11, 14*

**< 8 >**
**8**  4:*16*  12:*8*  109:*24*
**84**  4:*9*

**< 9 >**
**9**  4:*17*  94:*7, 9*  110:*14*
**9/17/23**  155:*13*
**92**  4:*10*
**93**  4:*11*
**99**  13:*8*  115:*19*
**9th**  2:*9*

**< A >**
**a.m**  2:*8*  12:*9*
**Abel**  4:*9*  10:*9*  43:*12*
  44:*15*  76:*10*  83:*23*  84:*3,
  9*  91:*5*  92:*13, 16*  93:*9, 24*
  104:*20*  129:*6*
**ability**  8:*19*  145:*22, 24*
**able**  20:*21*  40:*11, 16, 20*
  56:*22*  65:*17*  66:*14*  99:*7*
  106:*15, 17*  115:*20, 22, 24*
  116:*17*  120:*19*  121:*3*
  130:*7, 19*  131:*4, 5*  142:*16*
  150:*1*  151:*18*
**above-captioned**  154:*22,
  24*
**Absolutely**  70:*24*  83:*12,
  15*  85:*9*  107:*8*  124:*17*
  132:*20*  137:*14*  144:*24*
**academic**  46:*3*
**academy**  13:*7*  14:*18*
  17:*17, 18, 21*  20:*6, 12*
  40:*9, 18, 20*  41:*1, 6*  44:*14*
  88:*8, 10, 16*  132:*3*  150:*20*
  151:*4*
**access**  22:*12*  69:*17, 19*
**accidently**  150:*9*
**account**  120:*25*
**accreditation**  53:*25*
**accuracy**  59:*19, 21*  60:*6*
**accurate**  59:*20*  60:*7*
**accurately**  8:*17*  27:*20*
**act**  106:*5*  147:*4*
**acting**  39:*6*
**Action**  32:*20*  68:*18*
  82:*16*  106:*20*  107:*1, 9, 10*
  113:*25*  116:*3, 7, 9*  117:*20*
  121:*2*  154:*22, 24, 25*
**action/reaction**  33:*5*

Case: 2:18-cv-01060-EAS-EPD Doc #: 141-2 Filed: 03/24/21 Page: 157 of 173 PAGEID #: 3565
Deposition of Officer Traci Shaw

Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

**actions** 38:22 64:5 130:7, 19 131:4, 5, 8 133:20, 22 134:4
**active** 80:12 101:3 143:20 145:5
**actively** 145:17
**activities** 20:24
**activity** 90:13 114:15 126:1
**actual** 29:12 64:4 66:21 69:2, 3 71:23 78:1, 17 79:18 89:11, 15 97:8 107:9
**add** 65:17
**added** 74:1
**additional** 42:12 73:25 74:22, 25 90:5 92:24
**address** 39:13 63:18 134:18
**addressing** 63:11 134:24
**adjournment** 154:18
**Adm** 1:2, 12
**administered** 29:6 74:14, 20
**administers** 79:1
**administration** 78:22
**advance** 6:22 12:13
**advise** 49:14
**affect** 8:16 30:6
**affiliated** 155:1
**affixed** 155:5
**afforded** 58:1
**aforesaid** 154:9, 14
**after-school** 20:24
**age** 6:3
**agencies** 47:24 54:23
**agency** 54:22, 23 93:5
**aggressive** 111:2
**ago** 95:12 138:2
**agree** 139:14
**agreeing** 24:12
**agreement** 2:7
**ahead** 108:10, 21
**ahold** 103:12
**aid** 25:17, 19 51:11 121:14
**aimed** 132:13
**air** 125:3
**al** 6:12, 13 9:10, 24 10:13
**al,)A** 1:23
**al,)P** 1:2, 17
**alarm** 115:3
**allegedly** 118:24 152:11
**allow** 44:17 49:9 101:20
**allowed** 20:11 58:13 59:20 98:11, 22, 23 99:9 100:2, 15 133:2 149:23
**allowing** 112:12
**allows** 144:24

**alterative** 51:19
**Alverio** 21:22, 23
**ambush** 119:23 120:11
**ambushed** 119:25 120:4
**Amendment** 133:7
**amount** 31:11 97:10, 24
**analogy** 127:12
**analysis** 79:10, 20, 23 80:2 82:25
**analyze** 142:16
**and/or** 98:14 103:3, 13, 14 112:1
**annual** 16:10, 19 32:10 56:3 57:10, 14 58:9 59:7 61:7, 19 65:2 74:12 77:10 78:19 80:17 96:8, 19 109:9 140:11 146:24
**answer** 7:20 8:11 11:17 44:17 49:7, 9 53:19 76:23 77:5, 20 87:16 116:16 123:16 132:16 135:18 138:1
**answering** 7:17
**answers** 7:15, 21, 23 30:4
**anybody** 40:9 63:2
**anymore** 121:19
**apartment** 141:21 144:6 145:9
**apologize** 21:18 61:11 64:6 69:20 130:21
**apparently** 141:24
**Appeals** 55:16
**APPEARANCES** 3:1 4:2
**appears** 140:4, 5 142:1, 5
**applicable** 122:16
**application** 32:7, 14 36:13 103:9, 11
**applications** 38:10
**applied** 40:25 71:10 72:22 103:2, 7 152:17, 24
**applies** 41:4 70:7 71:20
**apply** 68:10, 15 70:10 71:16 72:10
**applying** 103:8
**appointed** 18:21
**approach** 125:8, 20, 24
**appropriate** 86:9 125:7
**April** 67:14, 17, 19
**archived** 151:21
**area** 39:1 61:22 80:13 107:15 144:4 149:19
**areas** 45:9
**arm** 106:10
**armed** 101:11, 12, 17, 18 114:7 122:19 132:11
**arrest** 111:1 118:22 119:1 123:19, 22 141:20 142:11 144:7
**arrested** 117:24

**arresting** 30:1 117:24
**arrests** 30:7
**arrive** 144:2, 10, 16 147:18
**articulate** 131:5
**ascertain** 76:14
**asked** 64:7 65:5
**asking** 55:3 78:7 83:2 91:1
**as-needed** 19:16
**ass** 137:13
**assault** 118:2, 5, 8, 15, 16, 18, 23 125:1, 11, 16
**asserted** 55:20
**assessment** 121:17
**assigned** 21:5
**Assistant** 3:12 13:4
**associated** 13:13 27:25
**assume** 56:8 70:8 86:15 87:5 88:1 96:9
**assuming** 36:7 87:11
**assure** 138:11
**attack** 119:25
**attackers** 121:6
**attempt** 40:21
**attempted** 118:9, 15
**attempting** 124:12
**attempts** 150:10
**attend** 57:14, 17 58:2, 16
**attended** 14:9 35:5 92:18
**attitude** 65:20
**Attorney** 3:12 7:15 33:14 49:13 154:21, 23
**attorneys** 12:13
**attorney's** 30:3 34:2 36:18 62:2 151:11
**audi** 7:1
**authorized** 131:11
**available** 111:18 132:11 151:15
**avenues** 64:11
**avoid** 126:3 150:14
**award** 94:14
**awarded** 92:15
**aware** 24:17, 19 59:5 72:12 81:5 149:16, 18
**awareness** 120:5

**< B >**
**Baase** 9:20 43:18 44:15 75:23 83:23 91:4 94:6, 9, 19 104:20 129:5
**Baase's** 94:5
**back** 17:24 20:25 36:11 41:5 44:20, 22 57:21, 22 58:20 62:20 64:22 65:23 74:12 80:14 95:11, 15, 23 96:17 99:5 112:14 116:18 120:17, 21 132:24 133:3 150:16

**backdrop** 149:16, 18, 24 150:14
**background** 13:1
**backup** 117:6, 8, 16
**bad** 99:11 105:19 106:19, 22, 25 128:8
**bags** 97:18
**balances** 31:10
**balls** 97:19
**bank** 105:25 106:4 108:1
**barrier** 81:10
**based** 26:3, 25 27:1 32:8 36:8, 10, 25 38:11 39:24 46:13 49:10 62:11 65:3, 24 66:24, 25 68:9 71:8 133:12, 15, 23 135:14
**basic** 11:13 13:8 15:3 21:8, 22 32:11, 13, 21 33:7, 12 34:2, 15, 18 36:12 41:21 43:6, 13, 16, 19, 22, 25 44:4, 8, 11, 18, 21, 24 45:18 47:19 49:3 123:18, 22
**basically** 15:1 16:6 22:19 23:11 25:14, 17 37:1 38:1 46:11 59:25 61:17 65:20 67:3 80:14 97:7 116:24 128:2 143:20
**basis** 17:20 19:13, 16 23:20, 21 24:1 34:11 46:18 62:18
**Bate** 89:6 105:17 134:7
**Bates** 127:8, 21 130:6 132:23 133:6 134:12 135:11, 25 143:25 148:20
**baton** 38:9 40:13 42:23, 24, 25 43:1 45:4 61:18 97:2 111:9, 15
**bean** 97:18
**beats** 113:25
**becoming** 18:25 19:1
**bedroom** 145:8
**beginning** 52:11
**begins** 106:6
**behalf** 3:2, 10
**believe** 14:16 20:10 50:19, 23, 24 53:12 59:5 69:22 71:23 95:6, 8, 10, 12, 16 96:24 101:16 102:10 106:14, 15 108:15 124:2 127:23 128:5 129:2 134:14 149:13 151:10
**BELL-McGREW** 1:14 8:24 70:12 95:19 152:18, 25
**belt** 116:21
**beneath** 133:9

Deposition of Officer Traci Shaw      Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

benefits 46:20
best 106:12 119:2 121:12
better 48:25 50:22 114:1 120:19
beyond 17:10 22:15 42:5 61:19 62:15 131:10
big 11:19 32:5 116:22
Bill 12:18, 22 69:21 152:5, 16
Binding 33:9, 11, 13, 17 34:3 55:15
bit 6:18, 20 17:9 20:2 29:17 47:18 74:13 119:4
bite 97:5, 8, 10
black 134:13, 18, 21, 25 135:7
blacks 134:17
bladed 120:16, 21
block 58:16 150:21
blocks 58:8
bodily 98:13 99:15 102:6
body 29:21 31:15 39:17 126:8
books 22:10 26:19, 20
bottom 18:12 20:19 71:18 87:11 105:18 115:12 130:6 141:4 146:18, 19 152:2
boundaries 30:13 75:11
box 46:17
boxing 42:20 46:9
break 8:10, 12 56:22 57:8 64:17, 24 67:9
brief 28:24
briefly 13:25 150:17
bring 40:11
broke 99:4
brother 141:25 142:7
Bryan 4:11
bubble 78:4
build 131:1
building 19:11 54:9 115:3
bullet 81:6 116:3 130:6 133:9
bureau 74:24 148:9
burglary 98:15 115:3
business 13:3 54:12, 13

< C >
C-A-L-E 53:23
CALEA 53:12, 20, 23
Caliber 90:4
call 47:5 57:4 64:2, 25 69:20 93:14
called 2:3 12:18 25:2 65:4 68:18 85:1 86:2, 18 87:1 89:8
camera 29:22 31:15

cameras 39:17, 18
cancelled 51:17
candidate 41:16
capable 32:24
capacity 9:3 35:11
caption 154:17
car 120:3 124:25 125:2, 4, 5, 20 126:2, 6, 8
card 99:12
career 15:17 25:10
careers 35:20
carried 37:19 45:15
carry 59:21 74:23
cars 125:13
CASE 1:2, 13, 20 9:24 11:14 19:22 32:19 33:5, 17 34:3, 6, 8, 12 55:1 62:6 64:12, 15 114:6, 16 126:8 138:22
cases 6:11, 12 30:13 33:9, 16, 21 54:21 68:5 70:7 90:25 91:15, 19 94:25 95:7 96:2
caught 135:21
cause 101:15 122:22 131:1, 2, 7 154:9
caution 124:11
CDP 4:7 9:11, 25 15:17, 21, 24 16:2 17:2, 11 18:11 19:9, 15 20:4 21:6 23:18 27:1 28:19 30:24 32:2 44:12, 24 48:11 51:14 59:10 60:24 61:21 62:17 75:7 76:16 79:11 81:2, 15, 18 84:3 93:24 94:19 98:2, 10, 21 100:11 101:13, 19 104:14 108:19 111:7 114:4 117:22 118:20, 24 122:2, 9, 17 124:15 125:12 127:18 132:17 133:2, 14 135:3 136:18 137:16, 18, 25 139:9 140:8, 12 141:12 149:7, 23 150:7 151:25
CDP's 9:15, 19 10:3, 8, 14, 18, 24
center 66:15
certain 45:17 65:8 66:9 77:14 130:1, 2, 14 140:1 149:24 150:5
certainly 19:5, 11 27:15 29:19 31:13, 17 34:12 36:18 39:17 41:18 46:4 52:8 53:5 63:6 112:10 120:1 136:9 138:12 139:24, 25 151:2
certainty 104:7
CERTIFICATE 4:5 94:13

certificates 13:16 92:15
certification 15:10
certifications 17:16 20:7
certified 6:4 13:14 15:14 19:8
certify 154:6, 16, 20
chain 21:17, 19 41:6 66:23
chance 67:9 72:5 76:20
chances 100:4 112:13
change 20:7 45:12 52:10, 13, 24 53:11, 16, 17 61:25 67:19, 21, 24, 25 69:3 70:4 82:24, 25 83:10, 11 89:1 95:17
changed 17:14 20:8 21:12, 14 29:8, 24 42:1 50:25 52:11 53:5, 10, 11, 18 55:21 56:21 68:20, 23, 25 69:1
changes 32:19, 25 34:9 45:7 52:5 53:15 56:5, 6, 7, 9, 12 68:17 69:6 126:10
characterization 46:3
charge 47:21 48:2 117:11 149:11
charged 150:25
charging 150:10
chart 18:10 21:15
chase 113:12, 13, 19 114:6, 18, 20
chasing 100:9 113:20
chat 7:2
Cheatham 65:18 95:14 104:11
check 42:7 67:7 69:25 70:16 73:11
checked 31:16
checklist 65:6
check-off 64:4
checks 31:10 99:11
chemical 53:4
CHIEF 1:2, 16 21:13, 24, 25
child 20:21 101:4 149:14
chokehold 53:9
choose 149:5
Chris 65:18 104:10 137:12
CHRISTOPHER 1:12
Circuit 55:16
circumstance 83:4 101:10 102:3 111:13
circumstances 30:19 63:24 80:23 81:14, 21 82:5, 11, 23 83:8, 16 99:24 100:14 102:8, 15 107:17, 22 111:20 125:18

126:10 130:25 131:1 133:17
citizen 136:1 150:17
citizens 127:14, 25 128:3
CITY 1:2, 17, 23 2:9 3:12 9:3 30:3 33:8, 14 34:1 41:15 62:2 94:23 96:2 105:14 151:10
city's 36:18
civil 32:18 33:4, 24 40:25 41:4 150:18 151:2, 5 155:2
civilians 136:12 139:1
clarification 8:2
class 39:12 61:25 93:1 151:1
classroom 32:6 89:18, 22 92:17 93:25 94:17 101:4
clean 7:17
clear 8:6
Cleveland 2:10 3:6 155:5
click 28:1, 6 96:11 134:8
clicked 137:4
clip 138:25
close 92:2 94:4 117:13 119:11 123:2, 3, 24 129:12 131:14 143:8
closer 121:2 143:22
clothes 58:23
code 27:19
colleague 138:15
colleagues 137:24 138:5, 8
College 14:13
COLUMBUS 1:2, 17, 23 3:14 6:12, 13 9:4, 9, 24 10:13 13:10 14:25 22:6 32:3 42:4 54:14, 20 57:11 69:7 71:18 72:17 73:7, 13 82:7, 17 83:20 84:9 102:17, 25 105:17 108:11 110:22 113:11 116:2 120:9 121:5 123:18 124:9 128:18 135:6 137:1, 11 145:13
column 87:1
columns 97:12
combined 84:17
come 11:18 17:24 19:12 26:16, 18 27:12 29:19 32:22 37:16 40:12, 24 44:22 46:16 47:23 57:21 58:20 59:1 60:12 65:22 95:23 106:21 152:4
comes 34:6, 8, 12 41:1, 5 46:5 99:6 106:25 108:2 145:20
coming 62:2 66:18 100:7 146:14 148:25 149:22

**command** 21:*17*, 20 41:6
66:23
**commander** 21:*23*, 24
**commands** 83:*14* 102:*13*
106:8 107:*23* 115:*13*, 23
132:*14* 145:*11*, 20
**commission** 111:3 155:*13*
**commissioned** 154:5
**commits** 101:*10*, 18
**Committee** 79:15
**communicate** 145:4
**community** 80:*11* 136:22
**compared** 133:*19*
**compiled** 151:*14*
**complete** 22:*19* 26:22
29:*11* 58:8 60:20 65:*17*
92:21
**completed** 18:20 30:6
59:4 67:4, 5 87:7 141:1
154:*18*
**completely** 15:7
**compliance** 26:20 43:3
73:*15* 116:1 136:25
**compliant** 117:*24* 144:9
145:9, *11*, 14
**comply** 31:*18*
**complying** 124:*21*
**comports** 54:20 55:*14*
**compulsion** 55:20
**computer** 26:*3* 27:1
84:6 154:*11*
**computers** 14:5
**conceal** 82:*21* 83:5 93:3
**concealment** 80:*19* 81:*3*,
6, 13, 16, 19 82:8, 19 83:3
**concerning** 8:22 9:9, 12,
16, 21 10:*1*, 5, 10, 15, 20,
25 22:5 32:*1* 49:*11* 74:*1*
83:*21* 91:3
**concussions** 46:*18*
**conduct** 24:*21* 30:*13*
38:*14* 47:*2*, 13 49:*14*
66:*22*, 24 71:*17*, 22, 25
72:3, 6, 8, 10 75:7
**confirm** 112:22 119:7
**confronting** 132:*10*
**Connect** 25:2, 6
**connection** 6:*18*
**Connor** 11:*15* 118:6
150:22
**consensual** 125:*24*
**consider** 54:*14* 55:24
56:*1* 60:5 63:2 83:7
130:*24* 134:*23*
**considered** 53:9 55:5, 8
59:*16* 63:*10*, 22
**considering** 97:*15*
**considers** 60:8
**consistent** 104:*13* 129:*10*

135:*3*
**constant** 16:*24*
**constitute** 71:*25* 102:5
**constitutes** 55:4, *12*
**constitutionally** 99:*1*, 13
**contact** 56:*19* 124:*13*, 16
**contain** 22:25 92:*17*
119:5
**contained** 22:6 71:9
88:*23* 92:*14* 100:5
**contains** 146:*17*
**content** 69:*2*, 3 108:*24*
109:*19* 110:9
**contents** 71:*14* 72:*17*
**context** 37:2
**contexts** 98:*12*
**continually** 32:*19*
**continue** 26:*11*
**continues** 27:22 120:*10*
**continuously** 41:*2*
**continuum** 38:*1*, 6 39:*19*
40:*3*, 6 96:25 97:6, 8, 13
110:7 133:*18*
**contract** 155:*1*
**control** 19:*1* 37:22, 23
38:*7*, 23 39:3 40:*16* 47:*5*,
20, 25 61:*17* 65:*24* 97:*21*
111:*1*
**conversations** 128:*17*
**conveyed** 34:*7*
**COOPER** 1:*12* 6:*12* 9:9
**cops** 139:*4*, 10, 12
**corner** 87:*11* 113:22
115:*14*
**correct** 8:8, 25 9:12, 13,
17, 18, 22 10:2, 7, 11, 17,
22 11:*1* 27:4 28:*17*
30:*14* 35:*16* 36:*15* 55:6
57:*12* 65:4 67:*1* 68:7, *11*,
16 69:*21* 71:*12*, 21 83:*24*
86:*11* 88:20 94:*14*, 19
96:5 97:25 108:5, 13
109:*10* 111:5 112:23
124:*13* 126:*14* 129:7
132:3 141:*13* 143:*1*
144:*17* 152:*19* 153:*1*
154:*12*
**correctly** 29:*21* 39:22
**costly** 26:8
**counsel** 2:7 9:7
**country** 48:*13* 120:2
**County** 2:*10* 154:*3*
**couple** 4:25 36:20 48:8
58:*21* 105:*23* 110:*21*
140:*2*
**course** 7:20 8:7 11:24
13:*10* 14:24 15:*12*, 17
22:*11* 32:20 35:20 39:*1*
40:5 57:7 60:20 76:16

104:8 107:*20*, 24 145:*17*
146:*12* 147:*1*
**courses** 59:25 88:8
**COURT** 1:*1* 2:8 7:*17*
33:9 54:20 55:*1*, 15, 16
99:*14* 154:25
**cover** 32:*17*, 21 61:*14*, 17
80:*18*, 22, 24 81:3, 5, 8, *10*,
12, 15, 18, 23 82:2, 4, 8, *14*,
19, 21 83:3, 5, 12, 13
106:8 107:*19*, 21 124:*13*,
16 125:6, 21 132:*11*
143:*21*, 23 145:*10*
**covered** 30:9 33:9, *10*
36:*14* 61:23 62:8 130:22
151:3
**Covid** 29:7, 12 51:*17*
**create** 47:*16*
**creating** 46:*11*
**credit** 99:*11*
**crime** 118:7 124:*19*
**criminal** 25:20
**criminally** 150:25
**crisis** 88:*11*
**cross-examination** 2:4
4:4 6:7
**cruiser** 25:*18* 85:*18*
**cuffed** 122:6
**cuffs** 121:*17* 122:*14*
**culture** 32:23 37:*1*
106:*14*
**current** 8:*19* 11:25
17:25 18:3, 6
**currently** 19:7
**curriculum** 13:9
**custody** 115:25
**customs** 82:*10*, 18 136:25
**cut** 6:*19* 14:*1* 41:3
67:*15*
**Cuyahoga** 2:*10* 154:*3*
**cycled** 141:*23*

**< D >**
**dangerous** 98:*14*, 18, 20
99:*1*, 7, 20 101:*16* 114:7
139:*5*, 13, 15 149:*18*
**date** 19:*19*, 21 26:*1*
57:*18*, 25 67:*16* 87:*10*, 12
152:*13*
**dates** 56:20 57:*1* 58:2, 8,
12, 17 67:8, 11 68:9, 12
84:4
**day** 36:*10* 46:7 65:7, 9,
14, 23 147:6
**days** 62:*10*
**dead** 121:6
**Deadly** 4:23, 24 9:12, 21
10:*1*, 6, 10, 15, 20, 25
11:20 22:5 23:*1* 32:2, 4
36:*11* 37:25 42:*16*, 21, 25

43:*2* 44:5, 23 53:*10*
59:*17*, 23 60:2, 5, 9, 24
61:*16*, 21 62:7, 17 64:*12*
71:*16*, 20 72:2, 11, 24
73:*14*, 22 74:*1* 75:*13*
80:*17*, 19, 24 81:3, 16, 20
82:4, 8, 13, 14, 15, 19, 22
83:6, 17, 21 84:4, 21, 23
85:6, 8, 13, 18, 20, 23 86:5,
7, 14, 15 90:21, 24 91:3,
25 94:22 95:3 97:2, 23
98:3, 4, 9, 17 99:2, 7, 9, 17,
19 101:22 111:4 114:21
115:*17*, 22 116:*11*, 13
130:8, 11, 21 131:3, 6, 11,
25 132:20 134:4 140:21
141:8, 11 142:*17*, 19, 20
144:20, 24 145:7, 15, 18,
22, 24 147:2 149:6, 20
150:*1*, 4, 14 151:6, 16
**deal** 141:*24* 145:7
**dealing** 13:*19* 15:*1*, 3
**deals** 75:*13* 147:2
**Deanna** 33:*15*
**DEARREA** 1:2
**death** 99:*16* 130:*23*
133:5
**DEAUNTE** 1:*13* 8:24
95:*19* 152:*18*, 25
**DEAVERS** 1:2, 17
**debrief** 48:*23* 49:2 63:*19*
65:*12* 67:1
**debriefing** 50:*21*
**debriefs** 65:25
**debunk** 33:*1*
**December** 53:*11*, 14, 16,
17 54:*16*, 17 55:6 67:*23*,
24 68:*1*, 21, 22 69:*15*, 24
70:*1*, 9 71:6
**decide** 149:*19*
**decided** 125:*23*
**decides** 145:*14*
**decipher** 29:24
**decision** 34:9 63:*15*
107:20 140:22 147:*1*
150:6
**decision-making** 146:*12*
**decisions** 30:*18*
**deep** 22:2
**deescalate** 115:*23*
**deescalation** 144:*15* 145:*1*
**Defendant** 10:9, 24
**Defendants** 1:2, 18, 24
3:*10* 9:20
**Defensive** 4:20 5:3
13:*14*, 15 14:*10*, 21 15:*12*,
15, 21, 23 16:*1*, 5, 18
17:*10*, 18 18:4, 7, 18 19:7,
15 22:20 39:8, 10 48:5
50:*15* 51:*1* 61:*11* 62:22

Case: 2:18-cv-01060-EAS-EPD Doc #: 141-2 Filed: 03/24/21 Page: 160 of 173 PAGEID #: 3568

Deposition of Officer Traci Shaw

Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

63:8 64:3 65:5, 18 66:17
75:17, 18 78:14, 24 80:6,
8, 14 95:25 96:3 103:1, 6,
17, 21 104:25 108:18
109:9 110:3, 18 113:1
119:13 126:13 127:18
128:2 129:1 136:6 148:7,
10

deficient 80:13

define 98:21

defined 59:22 155:2

definitely 32:5, 21 39:10
41:16, 17 85:19 86:6
100:9 116:13 117:14
135:20 150:13

definition 55:19, 22 60:7

degree 14:14

denial 127:23 128:5

department 13:6 18:2
20:15, 19 27:7 45:13
66:4 82:10 129:10

departmental 14:18

departments 54:1

depend 61:22 82:5
102:7 129:1

depended 19:18

depending 42:24 47:7
60:13, 19 66:19 80:24
97:11 107:21 111:12, 17
133:19

depends 52:24 74:21
80:22 81:11, 13, 21, 22
82:2, 11, 23 83:15 99:23
102:14 107:17 118:7
124:19 125:17

deploy 81:9 149:6

deployed 57:20 58:16, 19,
24

deposes 6:5

deposition 2:2 6:21, 23
7:5, 12 11:10 12:7, 14, 17,
23 72:6 91:14, 18 95:5
154:16

depositions 7:8 12:21

deputy 21:24

describe 32:3 138:23

described 14:17 16:11
32:9 45:16 51:3 107:7
108:6 111:20 125:9
141:19

describes 148:6

describing 24:2 32:11
51:6 110:23 134:3 148:4

description 102:1, 14

designated 11:3 18:21
19:22 49:16

desk 101:4, 7

destroying 77:13

detail 36:6

details 49:19

detect 93:2

detective 17:7 74:24

detention 66:15

determination 47:2
147:19

determine 36:24 60:6
81:12 125:25 142:9, 10,
17 146:15 147:13

determined 50:5 62:1

determines 116:25

determining 98:9

developed 20:7

developing 131:7 136:14

development 56:19 85:2
86:3

dictated 52:13

difference 45:25 46:10
61:12

different 12:1 15:8 23:9
25:3 31:4, 7 42:8 46:13
52:2 54:23, 24 68:10, 14
85:25 90:6 98:12 119:5
123:14 134:1

direct 21:3, 4

direction 149:4

Directive 4:7 22:10 23:3
25:17 69:23 110:24
151:25

directives 22:15 23:4, 5,
13, 14, 19 24:6 28:10
30:11 31:11 68:23 71:5
72:13 73:16, 19

directly 27:16 34:6
133:18

disarm 120:18

disarmed 121:23

discharged 73:1

disciplinary 66:22

discipline 31:3, 4 66:13,
18

disciplined 31:6, 16

discovery 138:22

discussed 64:9 71:9
94:17 95:17 96:8 136:6
152:22, 24

discussion 62:2 64:20
110:7

dispatched 106:2 115:2
141:19 148:20

display 72:9

displaying 53:12

disproportional 134:24

disproportionately 134:19
135:8

Disregard 73:16

distance 81:23

distract 112:9 150:2, 3

distraction 103:2, 13, 14

112:1, 4, 16

DISTRICT 1:1 25:18

DIVISION 1:2 4:7
13:10, 23 14:6 15:1 18:1,
5, 23 21:7, 10 22:6, 9, 10,
15, 16 23:3, 4, 17 25:16
28:11 30:11 31:11 32:3
33:4 35:11 36:8 42:4
44:8, 21 45:8, 12 50:16
51:20 52:12 54:14, 20
55:6, 8, 24 57:11 58:20
60:8 69:7, 22 71:4 72:1,
12 80:9 82:7, 12, 17 83:7,
20 84:9 90:18 93:6
110:23 122:24 135:7
137:1, 11 139:23

division-making 59:25

DMS 22:13 23:5, 8, 9, 19,
25 24:23 35:2, 7 89:13

document 28:6 49:4
50:21 71:1, 2, 9, 15 79:5
84:19 87:10, 19, 20 93:10,
11, 12 94:5, 17 95:19
96:23 102:25 104:24
108:11, 22 109:8 124:10
131:22 132:23 140:13, 21
141:4, 8 142:24 143:24
146:17, 20 148:5 151:24

documentation 44:16
50:17 66:6 77:23

documented 49:2, 6, 25
50:11 65:3 66:10 77:17
79:3

documenting 50:13

documents 12:4, 6 33:20
49:8, 15 86:14 92:14
140:3 151:5

dog 148:25 149:2, 3, 5, 11,
12, 21, 22, 23 150:3, 10

dogs 149:17

doing 31:19 32:24 39:11
64:6 66:18 80:15 120:3
125:10

domestic 141:19

Don 21:22, 23

door 37:12 106:3 149:13

doorway 142:1, 5

double 69:24

double-check 70:13

doubling 42:14

downrange 149:21

dragged 126:5

draw 114:5, 18 117:1, 23
118:25

drawn 54:9

draws 53:21

driving 150:24

drop 83:14 107:23
115:23 132:14 145:23

drugs 93:2

DTU 4:12, 13, 14, 15, 16,
17, 18, 19, 21, 22, 25 5:1, 2
85:1 86:2 89:19 126:17
148:6, 10, 14

duly 6:4 154:5, 7

duties 30:14, 20 31:1
41:12 137:22

duty 37:14 44:25 49:14
58:17

< E >

earlier 62:21 92:23 96:8,
25 105:22 112:1

early 36:20 37:7, 14
105:23

EARS 79:14, 15, 19

East 2:9

EASTERN 1:2

EBO 85:15

echelon 47:22

EDMUND 1:2

educational 13:1

EEO 73:15

effect 67:20, 22, 23, 24
68:1 71:5 73:20 111:1
123:19

effective 103:2, 6, 10

effects 8:15

eight 12:9 37:22, 24, 25
52:22 97:23

either 8:1 41:11 62:10
85:2 86:3 87:24 88:23
104:10 142:1

electronic 14:7 22:13
23:11 26:6 29:9, 13 35:1
89:8, 10, 12, 14, 17, 22
92:18 93:25 94:18

electronically 26:21 27:3,
23

elements 98:8

elevate 102:5

ELIZABETH 1:2, 16

e-mail 23:24 89:2

e-mails 30:3, 9

Emergency 85:16, 17

employed 28:10

employee 23:16 84:18
87:24 88:17, 24 89:23
92:16 93:22 94:14
154:20, 22

employees 26:8

employment 20:3

encapsulated 43:4

encounter 125:24 142:17

Encounters 4:24

ended 134:11

enforcement 25:17, 19
130:16

enforcer 139:25

Case: 2:18-cv-01060-EAS-EPD Doc #: 141-2 Filed: 03/24/21 Page: 161 of 173 PAGEID #: 3569

Deposition of Officer Traci Shaw | Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

enforcers 139:21
engage 30:19 144:15, 19
engaged 65:21 134:2
engagement 80:11
engages 144:3
engaging 63:10
ENGLAND 1:20 6:12
  8:23 9:23, 24 70:10
  71:11 72:23 95:18
  152:25
enhance 92:25
ensure 27:7 41:10
enter 108:1 144:5
entering 91:13
entires 89:7
entry 36:6
environment 120:5
environmental 111:11, 17
equal 82:6
equivalent 73:20, 21
escalate 112:13
escape 98:14 99:19
escort 124:21
especially 29:16 48:13
  149:16
Esq 3:3, 11
established 46:14, 15
ESTATE 1:2, 13
et 1:2, 17, 23 6:12, 13
  9:9, 24 10:13
ethics 85:22
evaluated 38:24
evaluating 39:11
evaluation 38:13 67:3
evaluator 16:8 38:20
  39:5 47:1, 6 48:4, 5
event 49:24 50:10 83:2
  118:24 121:23 125:19
  137:18
eventually 125:25
everybody 29:20 35:23
  48:18 136:10
evidence 115:4
evil 127:23
evolving 81:25 142:16
exact 19:19
exactly 18:24 35:22
exam 79:17
example 24:7 40:1 89:18
  100:24 105:24 125:23
excessive 63:5, 10, 21
exchange 48:15
exclamation 127:22
exclusively 86:6
execute 30:25
executive 13:20
exhausted 112:10
exhaustion 103:3, 13, 14
  112:2, 9, 17

Exhibit 4:10 74:6, 8
  84:7, 10, 12 89:7 92:2, 3,
  5, 7 93:9, 14, 17 94:7, 9
  102:17, 20 105:3, 5, 17
  109:2, 4, 12, 14, 24 110:14
  113:4, 6 119:16, 19 123:2,
  6, 8, 24 124:3, 5 127:2, 4
  129:12, 15 131:14, 18
  140:15, 17 143:4, 8, 9, 12
  146:1, 3
Exhibits 129:5
exists 127:23
expect 27:20 38:22
  82:12 135:15
expectations 41:18
expected 24:9, 10, 15, 21
  30:16 38:22 59:1 64:4
  144:14
expecting 27:10, 21
experience 39:7 49:22
  52:7 62:22 77:21, 22
  139:3, 17
experiencing 6:25
expires 155:13
explain 18:10 29:17
  37:10 50:2 78:21 81:1
  96:23 97:3 105:21
explaining 30:3
exponentially 42:3
exposures 51:18
extract 124:12, 20 125:6
  126:2
extraction 124:16 125:8,
  14 126:6
extractions 124:10, 17
extreme 124:11

< F >

face 45:22 46:18 112:7
faced 149:2
faces 132:11
fact 78:12 82:24 101:16
  117:18 118:11 122:5
  134:15
factors 97:11, 16, 17
  118:12
facts 131:2 147:16
fail 46:23 47:3 50:14
  62:23 63:16 65:7, 10, 11
  66:5, 9 76:19, 24 77:1
  78:12 79:11, 24 80:3
failed 40:18 50:10 58:8
  60:21 63:17, 22 65:2, 13
  77:11, 15, 18, 23 78:9
  79:5, 17
failing 50:18 63:2 64:1
  142:18, 19
fails 39:13 40:9 41:9
  48:20, 22 66:2 77:9 79:4

failure 39:13 49:5, 23
  50:11
fair 46:3 140:10
faith 49:15
fall 70:12
familiar 12:19, 20 87:14
  88:1 91:10 130:2 141:10
familiarize 12:3 126:22
far 11:19 21:17 24:11
  53:3 54:22, 25 55:17
  57:3 59:22 63:4 65:20
  66:3 82:3 90:17 99:7
  136:21 150:2
fast 81:24 142:16 149:17
February 8:23 68:6, 13
  70:11 71:11 72:23 155:5
feedback 41:10 128:22
feels 139:3, 17
feet 82:13 117:13
fellow 128:18
felon 98:25 99:10
felonious 118:2, 5, 8, 15,
  16, 18, 23 125:1, 11, 16
felony 99:11, 12 124:24
Ferguson 42:2 43:6
field 13:12 20:9, 10
  22:18 147:18
fifth 67:24
fighting 13:21 46:10
figure 42:13 46:6
file 21:16 78:6, 9 79:5
filing 23:11
fill-in 19:16
finally 20:21
financially 154:24
find 30:23 49:18 54:11
  56:23 57:2 64:25 70:23
  128:15 152:7
finding 66:22 70:23
fine 8:10
finger 134:16, 17
finish 7:14, 16 14:11
finished 14:16
fire 60:20 81:25 106:11,
  18 116:18 144:4 146:10
  147:9
firearm 53:12 55:2, 18
  59:19, 20, 21 60:15 72:9
  79:17 81:7 106:10
  107:10, 24 113:14 115:7,
  24 117:12 119:1 120:18,
  20 147:13 148:16
firearms 13:24 28:20
  29:10 59:8, 10, 15, 24
  60:10, 23 61:6, 8, 9, 12, 15,
  20 62:16 64:10 72:9, 25
  73:1 75:12, 13, 15 85:19
  114:5 115:1 146:9, 24
  148:8

firing 60:17 144:2, 13
firm 155:1
first 6:4 7:12 16:15, 21
  17:4, 24 20:21 28:10
  41:14, 17, 25 67:4 73:11,
  12 86:25 150:21 154:7
fit 18:11 55:22, 23
fitness 46:8
five 84:25 119:17 135:12
fixes 65:24
fixture 60:17
flashlight 111:9
fled 144:6
flee 100:14, 23
fleeing 98:14, 20, 25 99:6,
  10, 18, 20, 22 101:13
flees 101:11, 19 144:5
flip 84:16 108:23 109:18
  110:7 112:21 119:3, 7
  147:22
Floyd 53:7
focussed 36:22 45:23
follow 24:13, 21 152:1
followed 45:6
following 31:23 74:19
  139:21 146:20
follows 6:5
follow-up 143:19
Foot 113:11, 19 114:5, 18,
  19
fora 6:19
Force 4:23, 24 9:12, 17,
  21 10:1, 6, 10, 16, 21, 25
  11:20, 24 12:1 13:18, 19
  18:22 22:6, 11, 15 23:1
  28:20 29:8 32:2, 4, 18, 19
  33:5, 24 34:7, 8 36:11, 19
  37:3, 21, 25 38:1, 6, 11
  39:19 40:2, 6, 10 41:20,
  24 42:10, 16, 18, 21, 25
  43:2 44:1, 5, 23 45:3
  46:2 49:11, 19 51:4, 23,
  25 52:13, 20 53:3, 5, 6, 10
  54:15, 24 55:5, 8, 13, 17,
  19, 23, 25 56:6, 8, 9, 13, 23
  59:17, 23 60:5, 9, 12, 24,
  25 61:5, 10, 13, 16, 21, 24
  62:8, 17 63:5, 10, 21
  64:12 67:8, 12 68:15, 17,
  20 69:7 70:10 71:8, 16,
  20 72:2, 8, 11, 24 73:14,
  22 74:2, 13, 19 75:1, 8, 11,
  13, 19, 24 76:3, 7, 11, 15,
  19 77:24 79:17, 19 80:9,
  10, 17, 20, 25 81:4, 16, 20,
  24 82:4, 8, 15, 19, 22, 25
  83:6, 17, 21 84:4, 21, 23
  85:7, 8, 14, 18, 20, 23 86:5,
  8, 9, 14, 16 90:22, 24 91:3,
  25 94:22 95:3, 16, 21

Case: 2:18-cv-01060-EAS-EPD Doc #: 141-2 Filed: 03/24/21 Page: 162 of 173 PAGEID #: 3570

Deposition of Officer Traci Shaw      Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

96:20, 25  97:2, 6, 10, 12, 23, 24  98:3, 4, 10, 17  99:2, 8, 9, 17, 19  100:19  101:22  110:7  111:5  112:14  114:21  115:17, 21, 22, 25  116:11, 13, 14  117:6, 8, 12, 16  130:8, 11, 21  131:3, 6, 11, 25  132:21  133:8, 21  134:4  135:14, 16  140:22  141:8, 12  142:17, 19, 20  144:20, 24  145:16, 18, 23, 25  147:2  149:6, 20  150:1, 4, 15  151:6, 16  152:10
**foregoing** 154:12, 17
**foremost** 41:14, 17
**forget** 31:14
**form** 87:17
**format** 86:25
**Forth** 133:7
**forward** 96:22  97:22  109:18  119:3, 17  129:25  134:7
**forwarded** 95:10
**found** 80:13  99:12
**foundation** 36:19  46:14
**four** 23:22  29:10  59:14  118:6  149:14  150:21
**Fox** 138:25
**frankly** 20:24
**freeway** 93:1
**frequently** 135:15  139:19
**Friedman** 3:4
**friendly** 60:1
**Front** 3:13  73:18  82:14  96:3  106:1
**full** 116:16  117:19
**fully** 34:19  65:21
**fumbling** 103:8
**function** 123:19, 22
**functioning** 34:19
**functions** 123:21, 23
**Furbee** 33:14
**further** 9:7  72:16  120:18  154:16, 20

**< G >**
**gain** 111:1  112:12
**gap** 121:1
**Garner** 11:15  150:22
**gear** 38:19  45:21
**general** 22:4  25:18  30:11  36:6
**generally** 22:4  27:19  128:6  136:19
**generated** 26:10  87:13
**GEORGE** 1:15  53:7
**getting** 36:22  46:9  82:1  95:13  103:9  106:23  124:18  126:3
**Gilbert** 3:4

**give** 11:13, 18  16:22  20:3  33:16  38:15, 17  80:12  83:13, 14  100:24  102:12  107:18, 22, 23, 25  112:2, 6  138:24  142:13  145:10, 15  151:19
**given** 26:7  31:3  34:13  52:9, 10  58:8  77:7  78:16  79:16  89:15  103:21  105:24  123:15  130:3  140:6  148:10, 11  154:9, 13
**giving** 14:5  27:14  106:7  144:9  145:9, 20
**go** 20:25  24:10  27:13  29:9, 15  31:4, 6  39:18, 19  40:21  45:22  50:12  57:8, 18, 22  58:5  60:14, 16, 17  61:4  64:18  65:12, 25  73:13  74:12  82:14  90:5  95:15, 24  96:17  97:12, 13  99:4  112:14  113:22  115:11  124:9  126:20, 21  132:22  133:6  134:9  135:19  142:14  143:21  149:25  150:16
**goal** 116:1
**goes** 47:21  60:10  63:25  65:11  78:25  89:1  117:9  126:9
**going** 6:20  7:11  8:14  11:17  29:23  30:6, 7  37:11  39:14  43:10  45:1, 19  47:4, 6, 12  48:5, 23  54:8  61:15, 17  63:3  64:7, 25  65:20  66:4  67:7  71:1, 14  74:5  76:23  80:24  81:9, 12  82:12, 24  84:10  86:8  89:3  90:17  91:2  92:2, 3  93:7, 10, 14  94:4  95:19  96:17, 22  97:9  101:2, 8  102:2, 11, 12  103:10  104:23  105:3, 13  106:15, 17, 21  107:11  108:10, 15, 21, 22  109:2, 8, 12, 18, 22  110:6, 11  111:24  112:3, 4, 13, 21  114:20  115:5, 11  116:9, 15, 17  117:14, 19  118:21  119:3, 7, 11, 12, 16, 17  120:2, 8, 19, 20, 25  121:3  123:2, 3, 6, 24, 25  124:9, 20  125:3, 4, 15  126:11, 20  127:2  129:12, 19  131:14, 15, 16  132:22  133:6  134:7, 8, 11  135:24  138:15, 23  140:2, 15  141:18  143:8  145:17, 18  146:1, 22  147:2, 9  149:25

151:24  152:4, 7
**Good** 6:9  21:1  49:14
**graduated** 13:2, 7  20:6
**Graham** 11:15  118:6  150:22
**great** 57:6  101:21
**greater** 122:22
**greatest** 97:23
**GREEN** 4:4  6:9  92:10  94:12
**Greene** 3:3  6:8  9:6, 14, 19, 23  10:3, 8, 12, 18, 23  11:2, 6, 7  64:17, 22, 23  68:12  69:21  70:2, 5, 8, 20, 24, 25  74:5, 11  84:15  93:20  102:23  105:8  109:7, 17  110:2, 17  111:25  113:9  119:22  123:11  124:8  127:7  129:18  131:21  139:11  140:20  143:7, 15  146:6  152:5, 10, 14  153:3
**ground** 13:21  46:9  112:5, 7, 8  132:12  144:3, 14  149:25
**guardians** 136:21
**guess** 11:21  13:8  19:20  23:11, 15  27:16  29:20, 24  30:4, 6  31:12  32:24  39:2  41:25  42:8, 19  52:6  73:12  81:23  90:16  120:22  121:4  128:10  151:23
**guesses** 131:2
**guessing** 11:18  112:3  128:1  148:5
**guestimation** 42:12
**guidance** 30:12, 17, 18
**gun** 37:4  48:1, 16  54:9  55:12  66:14  81:25  100:1  101:6, 12  106:3, 7, 17  107:5, 12, 15  113:23  114:2  115:5, 7  116:9, 12, 15  117:7, 18  118:10  120:17, 21  132:12, 16  140:7  142:6  144:1, 13  145:20, 23  147:10
**gunfight** 105:19  106:19, 23, 25
**guns** 38:18  106:16
**guy** 66:6
**guys** 128:8

**< H >**
**hand** 37:5  107:12  113:23  114:13  115:8  147:14  155:4
**handcuff** 121:6
**handcuffed** 121:12, 22

122:3, 9, 20, 24
**handcuffing** 122:22
**handcuffs** 103:8, 9  112:11  124:22
**handled** 66:20
**handles** 36:8
**handout** 62:10
**handouts** 22:24  104:17
**hands** 102:4, 11, 13  106:3  113:21  114:3, 8  115:24  120:21  145:21, 23
**hands-on** 45:4, 5
**happen** 48:17, 19  62:9, 10  63:13  69:17  100:15  101:2, 8  106:12  149:10
**happened** 48:12  53:7  58:7  59:3  62:6  63:15, 16, 23  70:11  79:22  100:18  101:1
**happening** 101:1
**happens** 12:10  48:21  57:17, 24  58:11  61:6  66:13  141:23
**hard** 31:12  70:19, 20, 22
**harm** 100:19  101:5, 9  102:6  111:1  121:4  130:23  133:5
**head** 7:21  37:6  38:19  43:1  45:21
**health** 46:19
**hear** 8:1  141:22  142:11
**heard** 49:23  50:9  142:2
**held** 64:20
**help** 19:12, 20  29:20  131:1  142:15  143:22
**helped** 95:6, 12
**helps** 39:18
**hereinafter** 6:4
**HEREOF** 155:4
**hereunto** 155:4
**hide** 145:8
**high** 13:2  14:11  54:10  152:5
**highlighted** 97:3
**highlights** 134:15
**hindsight** 133:11
**hip** 48:1, 16
**hips** 130:14
**hire** 20:4  75:25  76:4, 7, 11
**histories** 44:15
**hit** 39:24  40:13  43:1  45:3, 9  57:22  111:16  116:20  149:25
**hits** 46:17  116:21, 22
**hitting** 43:3  150:12
**holder** 74:22
**Hollywood** 32:23  37:2
**holster** 54:5  115:8

Case: 2:18-cv-01060-EAS-EPD Doc #: 141-2 Filed: 03/24/21 Page: 163 of 173 PAGEID #: 3571

Deposition of Officer Traci Shaw    Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

holt 111:3
home 65:19, 22
honestly 42:2
honor 27:19
hope 46:4 106:13
hostage 145:13
hours 41:22 42:2, 9, 11, 12, 13, 15 43:9, 13, 15, 19, 21, 24 44:3 88:10, 11, 13
house 100:7
human 149:4
humble 55:23
hundred 39:22
hunted 152:5
hurt 118:9 128:6
husband 141:24

< I >
idea 113:21 136:17
ideas 32:23
identical 152:12
identification 74:9 84:13 93:18 102:21 105:6 109:5, 15, 25 110:15 113:7 119:20 123:9 124:6 127:5 129:16 131:19 140:18 143:5, 13 146:4
identify 95:20 142:18
ignores 132:13
imagine 26:8 46:16 77:13, 14 78:5 120:23
immediacy 100:22
immediate 36:21 37:7 80:23 81:7 98:13, 18 99:3, 15, 16 100:3, 16, 18, 25 101:5, 8 130:23 133:4
immediately 34:14 74:19 75:9 80:19 100:17 116:10
imminent 100:25 101:2, 7, 21 102:5 105:8
immunity 150:24
impact 18:25 39:21 42:24
important 7:7 38:16 115:16
impossible 42:18
improper 66:15
in-between 74:1 81:10
incident 65:22 81:14 83:1 99:8 149:4, 10 150:1, 5
incidents 12:2 13:20 70:7 81:24
include 6:12 16:5 17:14 45:4 94:17
included 33:7, 23 89:23 134:22

including 61:18 70:9 141:13
incorporate 34:14
incorporated 45:14
incorrect 142:18
incorrectly 66:20 80:15
INDEX 4:1
indicating 27:4
indicators 130:15
Indirectly 73:15
individual 49:24 66:12 79:11 83:18 90:10, 15 91:8, 24 142:5
individuals 49:10
inerts 38:17
inference 130:13
information 31:12 34:17 44:16 49:9, 15, 19 75:4 78:11 119:5 134:22, 23 135:2
initial 6:17
injured 57:20 58:15, 25
injuries 46:5 47:16
injury 43:3 46:23 57:19 98:13 99:16 122:23
innocent 108:1
in-person 51:21 90:2
inservice 13:23 14:7 16:4, 10, 14, 19 17:10 32:10 51:6, 8, 13, 24 56:4 57:4, 10, 15 58:9 61:7, 19 62:15, 20 64:10 74:12 77:10 78:15, 19 79:22 85:22 96:8, 19 104:1 105:1 108:19 109:10 110:4, 19 113:2 126:13 136:6 140:8, 11 141:5 148:14, 15
inservices 80:17
inside 54:12 108:1 115:4 125:1, 2 145:6
inspected 26:15
instance 39:21 42:23 47:22 54:8, 11 79:12 81:8 82:13 85:19 88:11 90:6 99:10, 25 101:24 107:10 113:24 116:12 124:24
instantaneous 106:12
instruct 19:12
instruction 52:9
instructor 13:14, 15 14:22 15:16 16:6 17:11 18:4, 7, 18, 25 19:2, 12, 17 39:11 48:6 51:1 62:22 142:17
instructors 15:7 39:9
interactive 39:7
interested 154:24

intermediate 110:25 111:4, 7, 22 150:3
Internet 6:23
interrupt 13:25
interruption 12:9
intervention 88:12
interview 120:12, 16, 20, 25
interviewing 120:24
introduced 14:6 47:14 48:9
introduction 150:22
invested 41:15
involve 46:22 59:7
involved 8:22 11:22 16:4 19:2, 3 20:23 65:1 68:6 71:11 75:22 78:22 83:19 90:10 121:11 122:11 152:24
involves 32:13 97:18
involving 46:1
issue 8:3, 16 30:7 39:14 45:12
issued 91:19
issues 6:24, 25 7:8
item 86:1
its 9:15 10:4, 19 32:4 44:24 52:12 75:8 79:20

< J >
jacket 116:22
Jacqueline 3:3 6:9
JAMES 1:20 8:23 71:11 72:23 95:18 152:25
January 2:7
Jeff 33:14
Jennifer 21:25
Jgreene@f-glaw.com 3:7
job 20:12 66:22 139:5, 13, 15
jobs 31:20
joined 43:5
joke 131:12
JOLSON 1:23
JR 1:2
JUDGE 1:2, 15, 16, 21, 22
July 53:15, 17 67:25
jump 15:12
June 13:7 67:20, 21, 22 68:19, 20, 21, 22 69:8, 11, 14 70:11 73:20 95:16 152:1, 11
justified 60:4 132:14, 20
justify 121:17 130:7, 19 131:4, 7 144:21

< K >
K9 97:5, 7, 10
keep 7:17 31:13, 24

56:20 57:3 77:12 126:7
keeping 66:1
Keith 4:9 43:12 84:3, 9
kept 35:18, 23 53:13 78:8
kicked 137:13
kicking 97:14
kill 106:24
killings 134:13 135:4
KIMBERLY 1:22
kind 15:4 19:16 30:22 45:11 66:11 105:24 114:15 147:24 148:3
KING 1:2 6:13 8:25 10:13 70:12 95:8 152:19 153:1
knee 97:19
knew 64:7 133:11
knife 83:14 116:15 117:4, 9, 11, 15 118:11
Knight 21:25
knockers 97:19
know 7:1, 9 8:3, 12 11:17 19:19 20:18 21:16, 18 22:19 23:16, 24 24:10, 20 25:7 26:5, 14 30:8, 24 33:13, 18, 20 35:1, 22, 23 36:3, 7, 24 37:4, 5 38:17 40:13 42:20 43:9, 12, 15, 18, 21, 24 44:3, 7 46:11 48:14 49:3, 7 50:3, 6, 7, 12, 13 51:19 52:16 53:18, 19 54:3, 19, 22, 25 55:11, 14 56:12, 18, 19 58:19, 24 60:8, 14 64:5, 8 65:15 66:3, 9 68:24 69:1, 2, 5 71:23 72:3 73:25 75:23 76:2, 6, 10 77:12, 17, 20 78:12 79:2, 10, 14, 15 80:1 81:25 83:9 85:16, 21, 23 86:4 87:7, 8, 14, 15 88:3 89:1 90:4, 7, 16 91:23 92:23 93:3 94:23 97:9 103:13, 15 104:8, 17 105:12, 22 107:18 114:11 120:5 123:16 124:25 125:2 130:4, 18, 22 131:13 134:9 137:17, 19, 21 138:1, 5, 7, 10, 13, 14, 19, 24 139:5, 12, 14, 19 141:15 142:8 143:18, 19
knowing 90:4
knowledge 75:10 118:13
known 98:16 122:7 128:11

< L >
lamp 111:16
Lang 21:24

Case: 2:18-cv-01060-EAS-EPD Doc #: 141-2 Filed: 03/24/21 Page: 164 of 173 PAGEID #: 3572
Deposition of Officer Traci Shaw
Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

**large** 31:*11*
**late** 107:*11*
**latest** 54:*7*
**Laura** 21:*4, 21*
**law** 11:*14* 25:*21, 22*
32:*19* 33:*5, 9, 11, 13, 17*
34:*3, 6, 12* 40:*3* 41:*11*
55:*15* 62:*6* 130:*16*
135:*14* 139:*20, 21, 22, 25*
**lawful** 6:*3*
**laws** 25:*18* 73:*15* 75:*11*
**lawyer** 151:*18*
**lawyers** 6:*10*
**Lead** 18:*3, 7, 17, 18*
**leadership** 18:*14*
**leave** 48:*15*
**lecture** 16:*7* 32:*5, 13, 21,
25* 36:*13, 14* 45:*1, 2* 51:*4,
9, 10* 52:*9* 56:*4* 74:*17*
**lectures** 32:*17* 33:*7*
**left-hand** 87:*11* 97:*13*
**leg** 37:*4* 149:*14*
**legal** 14:*8* 34:*20, 23* 35:*3,
5, 6, 13, 15, 19, 25* 36:*6, 9*
61:*25* 62:*4, 5, 9, 16* 64:*11*
85:*15, 22, 24* 135:*15*
150:*16, 19* 151:*3, 7, 9, 10,
12*
**legally** 135:*16*
**legitimately** 135:*13*
**lesson** 11:*12* 22:*21*
**lethal** 97:*9* 100:*19* 116:*3,
4, 7, 14* 117:*1, 5, 8, 12, 16,
20* 135:*13*
**letter** 50:*7*
**letting** 97:*9*
**level** 11:*14* 15:*6* 32:*22*
37:*22, 24* 38:*11, 23* 39:*3*
42:*19* 45:*18* 46:*14* 47:*18,
19* 49:*3, 4, 6, 11, 24* 50:*14,
16* 55:*18* 77:*25* 78:*2, 4*
88:*19, 22* 97:*2, 5, 18, 22*
102:*5* 112:*14* 133:*21*
138:*12* 150:*20*
**levels** 37:*23* 38:*5* 61:*17*
**liability** 32:*18* 33:*4, 24*
150:*17, 18* 151:*2, 5*
**liberal** 127:*22* 128:*4*
**licensed** 34:*19*
**lieu** 51:*20*
**Lieutenant** 21:*23* 26:*16,
20*
**life** 98:*5* 115:*18, 19*
**lifting** 107:*10*
**light** 56:*9* 125:*4*
**limited** 19:*13* 58:*3*
**limits** 135:*14*
**lines** 39:*23* 100:*7* 111:*15*
118:*11*

**list** 33:*16* 64:*4* 78:*8*
84:*18* 85:*1* 86:*22* 88:*7*
92:*16* 94:*1* 151:*14*
**listed** 72:*16, 21* 86:*20*
87:*19, 22, 24* 88:*14, 16, 19*
89:*3, 16, 17* 90:*7* 93:*3, 7*
97:*8* 148:*13*
**listing** 93:*21*
**lists** 65:*9* 88:*5, 24* 89:*24*
92:*14, 17*
**literally** 83:*25*
**little** 6:*18, 20* 20:*2* 29:*17*
47:*18* 72:*16* 82:*24* 83:*10*
119:*4* 126:*12* 131:*12*
**live** 47:*13* 118:*18* 121:*7*
127:*22* 128:*5* 146:*10*
147:*9*
**lives** 115:*19*
**living** 111:*14*
**LLC** 2:*9*
**loaded** 60:*19*
**locate** 144:*6*
**located** 107:*16*
**log** 89:*12*
**Lone** 37:*5* 119:*23* 120:*6,
11*
**long** 13:*18* 45:*13* 96:*14*
**longer** 121:*16* 122:*15*
**look** 13:*16* 73:*5* 79:*19*
84:*6* 86:*1* 89:*14* 92:*3*
95:*11* 104:*24* 115:*12*
116:*8* 119:*4* 123:*17*
146:*14* 147:*13* 150:*14*
**looked** 11:*12, 14, 15, 16,
20, 24, 25* 90:*23, 24* 127:*8*
129:*5* 135:*3* 136:*23*
137:*10*
**looking** 48:*25* 80:*21*
85:*21* 88:*6, 12* 89:*5, 7*
102:*16* 104:*5* 108:*3, 8*
126:*12* 135:*11* 141:*1*
143:*24*
**looks** 85:*10* 89:*8* 110:*23*
130:*2* 131:*22* 146:*17*
**Lord** 48:*12*
**lose** 113:*18* 114:*10*
145:*24*
**loses** 113:*12*
**lost** 114:*3*
**lot** 12:*9* 14:*6, 17* 20:*23*
22:*3* 29:*22* 30:*8* 31:*23*
37:*16* 41:*16* 45:*19* 54:*23*
58:*3* 106:*6* 115:*22*
125:*23* 135:*21*
**loud** 115:*13, 23*
**low** 152:*6*
**lower** 15:*8*
**lunch** 48:*15*

**< M >**

**ma'am** 7:*6, 19* 8:*5, 9, 13,
18* 9:*1, 5* 11:*5, 9* 12:*5, 15,
24* 14:*20* 15:*14, 19, 25*
16:*3, 20, 25* 17:*6, 13, 19*
18:*9, 16* 20:*1, 5, 16* 21:*7,
21* 22:*9, 23* 23:*7* 24:*4, 17*
25:*8, 13* 27:*5* 28:*8, 12, 17,
20* 29:*5* 30:*15, 21* 31:*9,
22* 32:*16* 33:*19, 22, 25*
34:*16, 20* 35:*9, 12, 17, 21*
36:*2, 16* 38:*3* 39:*8* 41:*14*
43:*8, 20, 23* 44:*2, 6, 10, 13,
19* 45:*1* 46:*25* 47:*4* 48:*7*
49:*7, 17* 50:*1, 23* 51:*12,
22* 52:*1, 15* 54:*2, 16, 18*
55:*7, 10* 56:*11, 14, 18, 25*
57:*13, 16* 59:*9* 61:*3*
62:*14, 19* 63:*12* 64:*14, 16*
65:*4* 66:*8* 67:*10* 68:*4, 8,
17* 69:*9, 16* 71:*3, 7, 13, 19*
72:*2, 7, 20* 73:*3, 6, 8, 10,
17, 24* 74:*3, 15, 18, 21*
75:*3, 6, 20* 76:*1, 5, 13, 18,
21* 78:*11, 20* 79:*6, 9, 21*
80:*5* 85:*5, 12* 86:*12, 17,
20* 87:*3, 14, 21* 88:*1, 21*
89:*21, 25* 90:*12, 16* 91:*6,
9, 12, 22* 92:*1, 12, 20* 93:*8,
13, 23* 94:*3, 15, 20* 95:*1*
96:*6, 13, 16, 21* 97:*1, 20*
98:*1, 11* 100:*16* 103:*4, 18,
25* 104:*3, 15, 19, 22* 105:*2,
10, 20, 22* 107:*8, 14* 108:*9,
14, 20* 109:*1, 11, 21* 110:*5,
10, 20* 111:*6, 23* 112:*24*
113:*3, 16* 114:*8, 19* 115:*2,
10, 15* 116:*5* 117:*4* 118:*3,
17* 119:*10, 15* 120:*14*
121:*9, 24* 122:*12, 21*
123:*1, 13, 16* 124:*2, 14*
125:*11* 126:*4, 15, 19, 24*
127:*1, 20* 128:*13, 19, 24*
129:*11, 21, 23, 25* 130:*1, 9,
20* 131:*13, 24* 132:*1, 4, 7,
19* 133:*1, 13* 134:*10*
135:*1, 5, 10, 17* 136:*9*
137:*2, 23* 138:*10, 20*
139:*7* 140:*10, 14* 141:*3,
10, 14, 17* 142:*8, 22* 143:*2,
17* 144:*8, 11, 18* 146:*8, 22,
25* 147:*8, 21* 148:*1, 2, 18,
22, 24* 151:*17, 20* 152:*3,
20* 153:*2*
**Mace** 28:*21* 38:*9, 18*
40:*12* 53:*4* 61:*18*
**MAG** 1:*2, 16*
**MAGISTRATE** 1:*22*
**maintain** 100:*21* 120:*5*
124:*12, 16*

**maintained** 35:*2* 88:*4*
**maintains** 34:*25*
**make-up** 57:*18, 23, 25*
59:*2, 4*
**making** 7:*15* 29:*20* 47:*2*
58:*21* 140:*22*
**males** 134:*13*
**management** 86:*18*
**manner** 26:*22* 46:*24*
**Manual** 4:*7* 22:*17, 18*
25:*19* 28:*9* 69:*23* 71:*5*
73:*19, 23*
**manuals** 22:*12* 25:*15, 16*
**maps** 25:*19*
**March** 67:*13*
**Mark** 21:*24* 74:*5* 84:*10*
105:*3* 109:*2, 12* 113:*4*
119:*16* 123:*6* 124:*3*
127:*2* 140:*15* 143:*9*
**marked** 74:*8* 84:*12* 92:*4,
7* 93:*17* 94:*6, 9* 102:*17,
20* 105:*5* 109:*4, 14, 24*
110:*14, 22* 113:*6, 10*
119:*19* 123:*8, 25* 124:*5*
127:*4* 129:*15* 131:*18*
140:*17* 143:*4, 12* 146:*3*
**Mason** 4:*11* 10:*24* 43:*21*
44:*15* 76:*6* 83:*23* 91:*4*
93:*11* 94:*2* 104:*20* 129:*5*
**match** 102:*1, 13*
**materials** 9:*15, 20* 10:*4, 9,
19, 24* 33:*17, 23* 94:*24*
95:*3, 25* 112:*22*
**Matt** 129:*2*
**matter** 10:*12* 40:*14*
47:*25* 54:*21* 134:*5*
**Matthew** 104:*11*
**mean** 19:*10* 21:*16* 26:*4*
27:*9, 23* 31:*3, 10* 45:*17,
20* 46:*7, 19* 51:*16* 53:*2*
58:*2* 83:*11* 87:*4* 88:*8*
90:*4, 16* 98:*6, 20* 100:*25*
103:*5* 111:*11* 112:*14*
116:*6* 121:*15* 123:*20*
125:*15, 17* 127:*25* 128:*3*
130:*10* 133:*15* 134:*20*
138:*1* 140:*25* 145:*12, 15*
147:*1* 149:*17, 24* 150:*13*
151:*8, 9*
**meaning** 91:*4* 103:*12, 14*
128:*3* 131:*7* 133:*16*
144:*4*
**meaningful** 27:*16*
**means** 23:*5* 87:*9, 20*
99:*1* 100:*9* 103:*15* 115:*7*
118:*5, 9* 124:*18* 130:*18*
146:*8*
**meant** 112:*4*
**mechanism** 24:*24* 37:*20*

**Case: 2:18-cv-01060-EAS-EPD Doc #: 141-2 Filed: 03/24/21 Page: 165 of 173 PAGEID #: 3573**

Deposition of Officer Traci Shaw

Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

150:*18*
**mediation** 41:*19*
**medical** 8:*15* 13:*4, 5*
**medics** 121:*20*
**Medved** 2:*5* 154:*4*
155:*11*
**meet** 12:*13* 41:*18*
**Megan** 2:*5* 154:*4* 155:*11*
**members** 19:*8* 50:*16*
**memos** 22:*24*
**mentioned** 14:*21* 22:*17,
18* 23:*5* 29:*14* 33:*3*
37:*19* 39:*4, 14* 48:*8* 51:*4*
56:*6* 57:*10* 65:*16* 74:*13*
80:*6* 84:*23* 85:*18, 20*
86:*6* 99:*18* 105:*22* 138:*8*
**merely** 98:*17*
**message** 7:*2*
**Michelle** 6:*17*
**Middle** 6:*16*
**minded** 128:*4*
**mindset** 136:*14*
**misdemeanors** 29:*25* 30:*1*
**missed** 58:*1, 7, 22* 77:*3*
149:*12*
**missing** 70:*17*
**mission** 41:*14*
**mistakes** 48:*17*
**mode** 113:*13, 15, 22*
**moment** 83:*16* 96:*18*
122:*7*
**momentarily** 95:*15*
**money** 41:*16*
**month** 36:*10*
**months** 52:*22*
**morning** 6:*9* 8:*17* 11:*17*
12:*8* 69:*13* 83:*24* 92:*12*
**MORRIS** 1:*21*
**mother** 20:*20*
**motion** 126:*9*
**Mount** 13:*3* 14:*13*
**mouth** 38:*18* 45:*20*
**move** 9:*6* 28:*1* 93:*10*
97:*22*
**moved** 21:*14*
**movement** 101:*24*
**movements** 38:*8* 114:*10*
130:*13*
**moving** 147:*18* 149:*17*
**murder** 99:*25* 118:*13, 15*
**murdered** 100:*8*
**myth** 132:*24* 134:*24*
**myths** 32:*22* 33:*1, 5*

**< N >**
**name** 6:*15, 16* 65:*18*
**named** 154:*6*
**names** 21:*18*
**Narewski** 4:*10* 9:*20*
43:*15* 44:*15* 76:*2* 83:*23*

91:*4* 92:*4, 7* 93:*9, 24*
104:*20* 129:*6*
**naturally** 37:*16*
**nature** 128:*16*
**Nazarene** 13:*3* 14:*13*
**near** 18:*12* 102:*4* 106:*21*
**nearly** 42:*18* 46:*7*
**necessarily** 81:*10* 90:*1*
122:*12* 144:*21* 151:*9*
**neck** 53:*8*
**need** 7:*13, 20, 22* 8:*2, 10,
12* 19:*5* 23:*16, 24* 24:*12*
29:*20* 33:*13, 18* 34:*3, 10*
37:*15* 47:*8* 60:*7* 81:*10*
98:*18* 101:*25* 102:*3*
113:*24* 114:*14* 121:*18*
122:*4, 13* 136:*12* 139:*5,
12* 141:*20* 142:*10* 145:*6*
**needed** 18:*20* 95:*7*
**needs** 26:*23* 48:*2* 131:*3*
**negotiations** 145:*14*
**never** 65:*22* 79:*18*
116:*15* 141:*5*
**new** 17:*15* 21:*13* 24:*3,
14* 25:*10, 22, 25* 27:*2, 12,
14* 34:*4, 5, 12* 41:*22* 54:*3*
60:*14* 62:*7*
**News** 138:*25*
**Nods** 7:*21*
**non-deadly** 146:*14*
**nonverbal** 7:*21*
**nonviolent** 29:*25* 30:*1*
**normal** 106:*5* 130:*15*
**normally** 11:*12* 29:*10*
59:*12* 61:*3* 66:*13*
**North** 3:*13*
**Notary** 2:*5* 154:*4* 155:*11*
**notepad** 120:*23*
**notes** 67:*5*
**notice** 137:*4*
**noticed** 27:*24* 88:*6*
**Notices** 91:*14, 18*
**notion** 134:*18*
**number** 24:*7* 42:*1* 68:*23*
69:*1* 135:*21* 137:*4*
**numbers** 42:*6* 71:*16*
**numerous** 13:*16, 17*

**< O >**
**o0o** 1:*11, 19* 2:*1*
**Objective** 133:*8, 12, 15, 16,
20* 142:*9* 144:*25*
**observe** 77:*22* 101:*23*
**observing** 47:*1*
**obtain** 95:*2*
**obviously** 3:*12* 14:*4, 5, 9*
17:*7* 20:*6* 21:*16* 26:*13*
33:*1, 8* 34:*6, 10* 35:*2*
36:*23* 38:*15, 17* 39:*5, 20*
40:*14* 47:*7, 14* 48:*24*

58:*3, 5* 59:*19, 22* 60:*1, 3,
15, 18* 61:*23* 62:*7* 63:*17*
74:*23* 75:*13* 80:*22* 81:*24*
82:*15, 25* 87:*15* 97:*11*
98:*25* 99:*23* 100:*5*
106:*11, 23* 107:*1* 111:*18*
113:*21, 24* 114:*21* 118:*5,
8* 120:*4, 17, 24* 122:*14*
124:*20* 125:*15* 130:*11*
145:*4* 147:*1* 150:*24*
**occur** 56:*17* 135:*16*
**occurred** 12:*2* 25:*11*
56:*24* 68:*6* 95:*18* 118:*24*
**occurs** 28:*19* 52:*14* 122:*8*
**October** 8:*24* 68:*7, 13*
152:*18*
**offense** 111:*3* 118:*23*
**offenses** 25:*18, 20*
**offered** 57:*11* 66:*21*
**offering** 51:*20*
**office** 12:*10* 30:*3* 34:*2*
36:*18* 62:*2* 80:*13* 151:*11*
155:*5*
**OFFICER** 2:*2* 4:*3* 8:*20,
21* 9:*8, 10* 10:*13* 11:*3, 8*
12:*25* 13:*12, 21* 17:*2, 8*
18:*6, 15* 20:*5, 9, 10* 26:*18*
27:*16, 17* 29:*16, 17* 30:*20*
31:*14* 34:*19* 35:*10, 22*
37:*10, 24* 40:*22* 41:*12*
42:*19* 43:*12, 15, 18, 21*
45:*10* 47:*12, 19, 20, 25*
48:*20, 22, 24* 49:*4, 6, 10,
22, 24* 50:*10, 14, 16, 22*
52:*17* 53:*21* 54:*4, 5* 59:*3*
60:*2* 63:*20* 64:*5, 9, 24*
65:*24* 66:*7, 12, 15, 16*
67:*4* 70:*3* 71:*1* 75:*25*
76:*25* 77:*9, 18, 23* 78:*2, 4*
80:*15* 81:*11* 82:*2, 18*
83:*12, 13, 17* 86:*13* 87:*20,
23* 88:*19, 22* 89:*12* 92:*19,
24* 93:*1, 11* 94:*1, 5* 97:*14,
16, 24* 98:*16, 19* 99:*3, 25*
100:*2, 9, 22* 101:*13, 20, 23*
102:*2, 12* 106:*5* 111:*13*
113:*12, 13* 114:*23* 116:*24,
25* 117:*6, 7, 11, 21* 118:*12,
20, 24* 120:*18* 121:*4, 11,
15* 122:*11, 13, 18* 123:*19,
21, 23, 25* 134:*3, 5, 6*
136:*1* 137:*22* 139:*2, 16*
142:*2, 6* 144:*23* 148:*20*
149:*1, 3, 5, 6, 9, 22* 150:*9,
10* 151:*13* 152:*15, 24*
154:*6*
**officers** 9:*15* 10:*4, 19*
11:*21* 15:*2, 16, 20, 24*
16:*4, 18, 22, 23* 17:*4, 12,

15* 19:*8, 15, 23, 24* 23:*18*
24:*14* 26:*7* 27:*1, 10* 28:*9,
15* 30:*5, 12, 14, 16, 23, 24*
31:*6, 18* 32:*4, 24* 33:*12*
34:*7, 17, 23* 35:*13, 18*
41:*23* 43:*5, 25* 44:*4, 7, 21,
24* 45:*22* 46:*16, 21* 47:*8,
9, 10, 16, 23* 48:*4, 14, 15*
49:*20* 51:*14* 57:*12, 14*
58:*7, 18* 59:*10* 61:*21*
62:*17, 23, 24* 63:*8, 9*
64:*12* 65:*1* 66:*4, 19* 67:*6*
75:*4, 8, 22* 76:*15, 19*
79:*11, 24* 80:*2, 9, 18* 81:*1,
15, 18* 82:*12* 83:*19* 86:*2*
88:*4, 5* 90:*5, 10, 15, 19, 21*
91:*4, 24* 94:*16, 22* 95:*4*
96:*19* 98:*2, 8, 22* 99:*8, 14,
19* 100:*12* 103:*16* 104:*18*
107:*4* 108:*4, 7, 19* 111:*8,
21* 114:*1, 4, 5, 14* 115:*17,
20, 22* 116:*10* 117:*23*
119:*24* 120:*3, 5* 121:*16*
124:*11, 15* 125:*12, 23*
127:*15, 18* 128:*18* 132:*3,
6, 18, 24* 133:*2* 134:*15, 21*
136:*21* 140:*9* 141:*12, 19,
22* 142:*10, 16, 25* 143:*22*
144:*2, 4, 5, 14, 21* 145:*4*
146:*12* 147:*5, 6, 8, 16*
149:*10* 150:*13, 19* 151:*4,
5*
**officer's** 59:*16* 78:*6*
130:*12*
**Offices** 2:*8*
**official** 9:*3*
**off-the-record** 64:*20*
**OHIO** 1:*1* 2:*6, 9, 10* 3:*6,
14* 154:*2, 5* 155:*5, 12*
**Okay** 7:*3, 7, 10, 18, 23, 25*
8:*4, 6, 12, 14, 19, 21* 11:*8*
12:*22, 25* 14:*17, 21* 15:*11,
15, 23* 16:*17* 17:*2, 23*
18:*6, 14, 17* 19:*7, 14, 22*
20:*2* 21:*19* 22:*2* 23:*4*
24:*5, 23* 25:*6, 9* 26:*2, 25*
28:*4, 9, 18* 29:*14* 30:*11*
32:*1, 9, 13, 17* 33:*3, 11, 23*
34:*1, 14* 35:*6, 25* 36:*3, 11*
37:*18, 21* 38:*4* 39:*12*
40:*1* 41:*8* 42:*15* 43:*5, 11,
24* 44:*14, 20* 45:*15* 46:*21*
50:*9, 24* 51:*3, 10, 24* 52:*6,
12, 23* 53:*20* 55:*11* 56:*3,
22* 57:*23* 59:*7, 13* 60:*10*
62:*3, 15, 20* 64:*9, 17, 24*
66:*3* 67:*11, 13, 18* 68:*3*
70:*3* 71:*1, 4, 25* 72:*5, 8,
15, 21* 73:*9, 11, 18* 75:*1,
21* 76:*2* 79:*2, 7* 80:*6, 16*

Deposition of Officer Traci Shaw      Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

*81:1 82:6 83:18 84:2, 6*
*85:10, 13, 25 86:24 87:10,*
*18 88:16 91:23 92:21*
*93:5, 14 94:4, 21 95:15*
*96:22 97:18 102:9 104:8,*
*13, 23 105:15 107:3*
*108:10, 17, 21 109:12, 22*
*110:11, 21 111:20, 24*
*112:18, 25 115:11 116:2*
*119:3, 11 120:8 123:2, 17,*
*24 124:3 125:7 126:11,*
*16, 23, 24 127:1, 2, 17, 21*
*128:12 129:25 131:9*
*132:8, 22 133:6 134:1, 7,*
*9, 10 135:11, 24 136:17,*
*23 138:5 140:2, 6, 11, 15,*
*23 141:11 143:24 144:19*
*145:25 146:1, 7, 23*
*147:15, 22 148:1, 3, 13, 19*
*149:1 150:7, 16 151:12*
*152:21 153:3, 4*
**old** *35:7 62:10 77:12*
*149:14*
**once** *34:15 35:13 46:12*
*60:17 70:23 106:24*
*114:10 125:5*
**ones** *14:15 23:9 28:23*
*40:16 66:18 126:12*
*136:9*
**ongoing** *14:23 35:10*
*62:18*
**online** *51:22*
**onward** *15:24*
**open** *28:6 109:8, 22*
*110:11 119:12 131:15*
*143:9 146:1*
**operations** *85:16, 17*
**opinion** *55:23 128:4*
*142:13*
**OPOTA** *13:9, 15 15:3, 12*
*17:16 90:5 93:2*
**opposite** *134:20*
**option** *26:7 59:6 82:18*
**order** *19:3 99:17 100:19*
*116:20 117:9 121:17*
*126:13 130:21 131:3*
**ordering** *124:24*
**orders** *73:16*
**ordinance** *148:15*
**ordinances** *33:8*
**ordinary** *130:13*
**Ordnance** *5:4 146:8, 23*
*148:7, 11, 12, 22, 25*
**organization** *53:25*
**organizational** *17:25*
*18:10 21:9*
**original** *79:5*
**outdoor** *144:4*
**outline** *44:23*

**outside** *25:24 34:18*
*92:24 93:5 126:8 143:22*
**outweigh** *46:19*
**overall** *41:25*
**over-reactors** *40:24*
**oversee** *78:15*
**overstate** *46:4*
**Overtte** *33:15*
**overview** *20:3*
**owner** *54:12 149:3, 21*

**< P >**
**pack** *25:24*
**page** *28:3 71:18 72:17*
*73:3, 4, 7, 9, 12 85:13*
*86:25 89:5, 6, 19 96:17,*
*22, 24 97:4 102:16, 25*
*105:16 110:22 113:10*
*115:11 116:2, 3 119:17*
*120:8, 10 121:6 123:18*
*126:17 127:21 132:22*
*133:6 135:24 142:14*
*146:19, 20 148:21*
**pages** *73:11 96:14*
*108:12, 23 109:19 119:7*
*126:20, 22 127:8 147:22,*
*24*
**pain** *43:3*
**paper** *26:3, 11, 25 27:3,*
*15, 20 35:8 60:6 120:24*
*147:8, 10, 12, 18*
**papers** *25:24*
**paperwork** *26:10*
**paragraph** *143:25*
**parenthesis** *128:9*
**parked** *125:22*
**parking** *125:23*
**part** *11:20 16:8 20:13*
*35:10 39:6 51:24 59:16,*
*22 60:11 65:8 70:19, 20,*
*22 77:23 78:19 79:20*
*85:24 146:24 148:16*
**participate** *147:6*
**particular** *21:5 28:15*
*29:15 72:12 87:12*
*103:15 107:1, 24 131:22*
*140:12 146:13 147:3, 6*
*148:23*
**parties** *154:21, 23*
**part-time** *17:20*
**pass** *38:25 40:8 46:23*
*47:3 50:13 63:16 65:7, 8,*
*10 76:21, 24*
**passed** *63:24 65:2 75:24*
*76:3, 6, 10, 15, 23*
**passing** *64:1*
**path** *18:17 20:3*
**patrol** *17:8 20:5 27:16,*
*17 57:22*

**pattern** *82:24*
**PDF** *137:5*
**pending** *8:11*
**people** *16:21 20:22*
*22:12 28:5 32:22 34:1*
*36:4 39:6 40:18 41:1,*
*12 43:10 44:20 58:4, 24,*
*25 65:19 66:9 108:1*
*116:8 121:22, 25 123:22*
*124:18 125:13 127:13*
*128:6, 10 132:24 133:3*
*134:16, 18, 21, 25 135:7,*
*21 136:20 138:23 139:21*
*146:9, 10 147:4, 11*
**people's** *36:1*
**perceive** *101:21*
**perceived** *133:24*
**percent** *39:23 115:20*
**perception** *130:12*
**period** *19:2 42:9 43:7*
**periodic** *28:18*
**perjure** *138:17*
**perjury** *8:17*
**permanent** *17:22 20:12*
**permitted** *98:17 100:12*
*101:13*
**person** *27:7 40:1 41:7*
*54:15 55:4, 12, 20 77:21*
*79:4 81:22 98:15 99:7,*
*18, 22 100:3, 13, 14, 23*
*101:8, 10, 14, 16, 18*
*102:12 111:1, 16 114:12,*
*24 115:25 116:24 117:10*
*118:13 119:25 121:12, 20*
*122:7, 18, 19, 23, 24*
*124:21 126:2 130:16*
*133:4 134:1 144:1, 9, 21*
*145:2, 11, 16 150:1, 5, 8,*
*12*
**personnel** *110:24*
**person's** *114:3 130:13*
**perspective** *133:10*
**pertain** *73:22 84:21*
*86:10*
**pertained** *86:5*
**pertaining** *43:25 44:4*
*84:4 94:22*
**pertains** *73:14 85:13*
*86:15 151:2*
**pertinent** *45:6*
**Phase** *4:12, 13, 14, 15, 16,*
*17, 18, 19, 21, 22 19:20*
*45:2, 13 48:14 52:8*
*59:14, 24 60:4, 13, 17*
*61:10 96:4, 10 146:25*
*148:6, 12*
**philosophy** *136:18*
**phlebotomy** *13:5*
**phone** *12:19 57:4 64:2,*
*25 69:20*

**physical** *45:19, 25 46:8*
*47:18 78:17 100:19*
*101:5, 9 130:23 133:5*
**physicality** *45:23*
**physically** *50:6 55:20*
*76:22 111:2*
**picked** *114:11*
**picture** *32:5*
**piece** *31:19 38:19 45:20*
**place** *24:7 69:10 88:3*
*100:21 136:14 152:7*
*154:17*
**plain** *58:23*
**Plaintiff** *1:2, 15, 21*
**Plaintiffs** *2:4 3:2 6:10*
*33:21*
**PLAINTIFF'S** *4:6 74:8*
*84:12 93:17 94:24*
*102:20 105:5 109:4, 14,*
*24 110:14 113:6 119:19*
*123:8 124:5 127:4*
*129:15 131:18 140:17*
*143:4, 12 146:3*
**plan** *11:12*
**plans** *22:21*
**play** *47:10*
**players** *37:9*
**plays** *121:1*
**Plaza** *2:9*
**please** *6:14, 25 7:9, 14,*
*16 8:3 12:25 20:2 29:18*
*32:2 44:23 83:21 84:2*
*119:6*
**plenty** *8:8 34:7*
**Plus** *114:8*
**point** *6:24 7:25 25:9*
*34:18 36:15 54:9 62:1,*
*25 75:8, 25 76:4, 7, 11*
*96:15 106:7, 10 116:3*
*127:22 130:6 131:11*
*132:15 133:9 134:12*
*139:6 144:10*
**pointed** *106:16 132:12*
**pointing** *54:7, 15 55:1, 4,*
*12, 18 101:6*
**points** *54:6 63:4, 11*
*101:11*
**police** *8:22 9:15 10:4, 19*
*13:10 15:1 18:1, 2, 5*
*20:18 21:11 22:6, 16*
*23:17 30:20 32:3 42:4*
*44:9 54:1, 14, 20 57:11*
*69:7 71:10 82:7, 17*
*83:20 84:9 90:18 93:7*
*97:5, 10 122:1, 17 123:19,*
*21, 23 127:15 128:7*
*132:2 134:13, 19, 24*
*135:4, 7, 8, 13, 15 136:21*
*137:1, 11, 13, 22 138:25*

Case: 2:18-cv-01060-EAS-EPD Doc #: 141-2 Filed: 03/24/21 Page: 167 of 173 PAGEID #: 3575

Deposition of Officer Traci Shaw      Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

139:2, *16, 23* 145:*13*

**polices** 132:*17*

**Policies** 4:7 9:*11, 25* 10:*14* 13:*10* 22:5, *15, 22, 25* 23:*15* 24:3, 5, 8 25:*11, 25* 27:2 28:*18* 29:*16, 19* 30:*25* 40:3 41:*11* 45:*23* 52:*12* 54:*24* 56:*20* 60:*24* 68:*10, 15* 69:*18, 23* 70:9, *15* 71:4 72:*15, 21* 73:*16, 20, 21, 25* 82:9, *17, 20* 95:*11* 98:*10* 100:*11* 101:*19* 104:*14* 111:*22* 117:*22* 118:*21, 25* 122:9, *17* 125:*12* 129:*10* 133:*14* 135:3 136:*25* 139:*8* 149:7, *23* 150:7 152:*22, 23*

**policing** 53:*1*

**policy** 11:*24* 12:*1* 22:4, *11* 23:2 24:*10, 11, 13, 14, 16, 21, 24* 25:*22, 23* 26:9, *15* 27:2, *4, 8, 13, 14, 21* 28:*14, 15, 20, 21* 29:*1, 8, 22* 30:*1, 2, 4* 31:5, *8, 19* 32:*19* 33:*4* 38:6 40:6 41:*20* 45:3, *7, 11* 51:*4, 23, 25* 52:5, *10, 20* 53:3, *5, 6, 16, 17* 54:3 55:*21* 56:5, *6, 10, 13, 14, 15, 23* 60:*13, 25* 61:5, *8, 9, 10, 13, 15, 16, 24* 67:8, *12* 68:*18* 69:2, *4, 7, 10, 14* 70:*13* 71:*8, 16, 20, 23* 72:*1, 18* 73:*12* 75:*8, 14, 15, 19* 77:3, *7, 24* 78:*25* 79:*8, 17* 84:*24* 89:*1* 95:*16, 17, 21* 104:*16* 122:2, *24* 152:6, *10, 16, 17, 21*

**poor** 39:2 50:5 138:*22*

**portion** 36:*14*

**position** 17:*21, 22* 20:*10* 54:*19* 55:*11, 13* 135:6 139:*22*

**positioned** 147:*17*

**positive** 130:5

**possession** 114:*25*

**possibility** 31:*7* 141:*20*

**possible** 31:*14* 47:*15* 81:*16, 19* 82:9 83:3 121:*13, 21* 125:*20* 138:*20* 145:6

**Possibly** 23:2 47:*24* 97:*24* 107:*21*

**potential** 46:*22* 81:3

**potentially** 117:*1*

**Power** 22:*13* 23:5, *8, 9, 19, 25* 24:*23* 35:2, *7* 89:*13* 116:*17*

**PowerPoint** 16:*25* 51:*11* 74:*17* 75:2, *14, 15* 78:*25* 96:7, *18* 102:*18* 103:*19, 22* 126:*14*

**practical** 30:*22* 32:6 38:*10*

**practice** 50:*25* 98:*10* 121:*12*

**practices** 9:*11, 25* 10:*15* 82:*10, 18* 100:*11* 101:*20* 117:*22* 118:*21, 25* 119:2 122:9, *17, 25* 132:*17* 136:*25* 139:9 152:*23*

**preattack** 130:*15*

**predators** 136:*11* 140:*1*

**preemptive** 114:*15*

**preemptively** 114:6

**preference** 82:7, *20, 21, 22* 83:5, *6*

**preparation** 12:*16, 23*

**prepare** 11:*10* 12:*14* 90:9, *14* 91:7

**prepared** 113:*24* 114:2 154:*10*

**presence** 37:*25* 42:*19* 154:*10*

**present** 9:*12, 16, 25* 10:5, *15, 20* 14:8 20:4 48:9 52:*19* 56:*24* 75:*25* 76:4, *8, 12* 99:*21* 103:*23* 150:8 151:*14, 23*

**presentation** 19:3 33:*24* 51:*11* 74:*17* 75:2, *16* 103:*22, 24* 108:*16* 110:8 112:2, *20* 119:*4* 127:*17* 128:2, *14, 18, 20, 22, 25* 131:*10, 12, 25* 134:*23* 138:3, *14, 16, 18*

**presentations** 110:9 112:*23* 137:3

**presenting** 60:2

**presently** 64:6

**Press** 90:6

**pretty** 21:*1* 36:*20*

**prevent** 98:*14* 99:*19* 111:3

**prevented** 58:*17*

**previous** 119:8

**previously** 92:4, 7 94:6, 9

**prey** 127:*13, 14* 128:*10* 136:*11*

**primarily** 19:*24* 39:8 78:*24*

**principle** 107:*16* 108:6 117:2

**principles** 30:*12, 17, 18* 106:*20* 124:*13* 132:5 136:5

**printed** 25:*14* 87:*12*

**prior** 52:*11* 55:9, *13* 75:*14* 95:4 98:*22, 25* 99:8 110:9 112:*23* 119:6

**priority** 109:*20*

**privy** 78:*11*

**probable** 101:*15* 131:*1, 2, 7*

**probably** 26:4

**problem** 38:*25* 48:*10* 65:*25* 70:*18* 99:6

**problematic** 45:8, *12*

**problems** 8:*1*

**procedure** 24:*22*

**procedures** 9:*11, 25* 10:*14* 23:*16* 25:*25* 45:*24* 152:*23*

**P-R-O-C-E-E-D-I-N-G-S** 6:*1*

**process** 40:*21* 60:*11* 79:*23* 101:*12, 13*

**processes** 28:*13* 35:7

**produce** 95:3 151:*18* 152:8

**produced** 33:*21* 94:*23* 138:*21*

**produces** 152:*16*

**Proficiency** 4:*12, 13, 14, 15, 16, 17, 18, 19, 21, 22* 84:*22* 85:3 86:4 89:*19* 96:*1, 4, 9*

**program** 23:*12* 25:*12* 34:3, *15* 74:*16*

**progress** 106:2

**promoted** 20:*19, 22*

**promotion** 20:*14*

**promulgated** 24:*14*

**promulgation** 152:*13*

**prong** 118:6

**prongs** 116:*20*

**proper** 124:*13*

**properly** 142:*19*

**protect** 37:*14* 47:*11* 98:4, *12* 110:*25* 115:*19* 127:*15* 136:*12, 15*

**protection** 13:*20* 114:*15*

**protective** 120:*22*

**provide** 30:*11* 34:2 38:*18* 41:9

**provided** 16:*23* 19:*23* 33:*11* 35:*16* 36:*17* 50:*15* 51:*10, 14* 61:*21* 62:*17* 77:2 80:*17* 83:*20* 84:3, *8* 85:4 93:6, *25* 94:*18* 96:*1* 100:*12* 104:*18* 105:*14* 128:*23* 129:9, *22* 132:2, *17* 140:8 150:*18* 151:5, *12*

**providing** 15:*23* 17:4 77:*21*

**PT** 46:7

**Public** 2:6 3:5 154:4 155:*11*

**puffy** 116:*22*

**pull** 106:9, *16, 18* 107:5 125:*13* 126:2

**pulling** 132:*15*

**punch** 40:*12*

**purpose** 41:*8, 10* 98:*24* 99:2

**purposes** 151:*13*

**pursuant** 2:6 81:2 98:*10* 111:*22* 118:*20* 122:*1, 16* 149:7

**put** 19:6 23:*13* 37:8, *9, 10* 38:*10, 19* 45:*20* 46:6 58:*4* 78:*15, 23* 81:8 88:2 105:*25* 106:2, *3* 128:*1* 136:*24*

**puts** 145:*20*

**putting** 36:*23* 40:7 124:*22*

**< Q >**

**qualified** 150:*23* 154:5

**qualify** 29:9

**quarter** 59:*12*

**quarterly** 61:6

**question** 7:*25* 8:4 17:*23* 42:8 44:*22* 57:3, *5* 64:7 65:6 77:2 79:*25* 80:*16* 83:*22* 85:*25* 86:*24* 91:*17* 102:*24* 105:*16* 113:*10* 118:*20* 135:*12, 18* 137:8

**questions** 7:*14* 8:*11* 22:4 29:2 30:4, *5, 8* 44:*17* 49:9 75:*21* 79:*12* 80:3 87:*16* 110:*21*

**quick** 86:*24* 123:*17* 137:8

**quicker** 106:*16* 121:3

**quickly** 103:*12* 121:*13, 21* 129:*19* 140:3

**Quinlin** 22:*1*

**quite** 26:8 54:*24* 95:*11* 151:*21*

**< R >**

**racked** 141:*23* 142:3

**racked/cycled** 142:*12*

**radiation** 13:5

**raised** 115:8

**raises** 54:6

**range** 60:*18, 19* 141:*12* 147:*16, 17* 148:*25* 149:4

**Ranger** 37:5

**rank** 8:*19* 20:*15* 21:*16* 47:*25*

**raped** 37:9

**rapidly** 81:*25*

**rare** 63:*1, 3, 7*
**reach** 116:*17*
**reaching** 107:*15* 126:*6*
**react** 106:*4* 107:*8*
**reacted** 39:*2*
**Reaction** 11:*16, 19* 32:*20*
  82:*1* 106:*20* 107:*2*
  113:*25* 114:*1* 121:*2*
**reactionary** 121:*1*
**read** 28:*5* 139:*10* 144:*1*
  153:*4*
**reading** 142:*23*
**readjusting** 130:*14*
**ready** 54:*10* 113:*14*
  114:*22* 115:*1, 7, 8* 126:*21,
  25* 132:*13* 134:*9*
**real** 48:*16*
**realistic** 46:*1* 47:*15*
**realities** 121:*1*
**realize** 11:*25* 37:*14*
**realized** 12:*1*
**really** 147:*11*
**reason** 7:*1* 21:*1* 50:*24*
**reasonable** 38:*11* 39:*3*
  82:*16* 97:*15* 125:*25*
  133:*8, 9, 10, 17, 19, 21, 25*
  134:*2, 5, 6* 135:*20* 145:*18,
  23*
**recall** 50:*16, 20* 86:*23*
  104:*4, 19* 128:*19* 139:*5*
  141:*17*
**receipt** 35:*19*
**receive** 26:*9* 28:*9* 34:*15*
  41:*22* 44:*11*
**received** 17:*3, 8, 16* 23:*14*
  27:*1* 34:*24* 35:*14* 36:*5*
  43:*13, 16, 19, 22, 25* 44:*4,
  8* 79:*18* 127:*18* 137:*5, 11,
  15*
**recertification** 85:*2* 86:*4*
**recklessly** 150:*24*
**recommend** 41:*6*
**recommended** 113:*14*
**Record** 4:*9, 11* 6:*14*
  7:*17, 22* 9:*7* 35:*4, 21, 24*
  59:*16* 64:*1, 18, 22* 65:*13*
  66:*1* 77:*10, 16, 25* 84:*19*
  87:*12, 15* 88:*13* 90:*7*
  92:*21* 93:*4* 94:*6, 13*
  102:*16* 120:*9* 127:*8*
**recorded** 7:*22* 35:*4* 88:*4*
**records** 11:*21* 35:*18*
  36:*1, 4* 59:*15* 70:*14*
  77:*13* 83:*23* 84:*8* 86:*1,
  25* 90:*10, 14* 91:*11* 95:*7,
  13*
**recruit** 18:*4, 8, 19* 19:*18*
  38:*22* 41:*1, 21* 42:*16*
  46:*14* 47:*12, 18* 77:*25*

  88:*9* 105:*25* 107:*3*
  138:*12*
**recruitment** 39:*12*
**recruits** 11:*13, 19* 17:*14*
  18:*13* 19:*9, 10, 25* 34:*4*
  36:*17* 37:*12* 39:*17* 40:*12*
  41:*22* 45:*16* 46:*6, 12, 24*
  47:*16* 62:*24* 80:*10*
  105:*23* 106:*6* 108:*4, 7*
**redo** 39:*1* 65:*23* 67:*2*
**reduced** 154:*10*
**reenter** 40:*20*
**referenced** 22:*11, 20*
  96:*25*
**references** 97:*4*
**referencing** 38:*2* 72:*18*
  85:*4* 136:*5, 16*
**referring** 127:*24* 128:*9*
**reflect** 36:*4* 139:*8*
**reflected** 35:*25* 90:*2* 94:*1*
**refreshed** 75:*5, 9*
**regard** 81:*2* 151:*22*
**regarding** 22:*7* 29:*2*
  30:*5, 13* 35:*19* 75:*11, 15*
**regardless** 63:*16* 100:*14*
  122:*18*
**regards** 62:*7* 90:*18*
**regular** 23:*20, 21, 25*
  24:*8, 11* 46:*7*
**regulations** 72:*25*
**reinstated** 41:*7*
**reinstatement** 40:*25* 41:*4,
  5*
**relate** 136:*21*
**related** 56:*7* 57:*9* 59:*16*
  85:*6* 95:*4* 134:*13* 151:*6,
  15*
**relates** 107:*1*
**relating** 91:*24* 133:*18*
**relation** 75:*23* 96:*2*
  130:*8* 137:*21*
**relative** 154:*20, 22*
**release** 23:*23*
**relevant** 29:*16*
**remain** 121:*22*
**remedial** 80:*12*
**remediated** 77:*3*
**remediation** 142:*15*
**remedy** 80:*15*
**remember** 26:*2* 78:*7*
  117:*12* 118:*6* 128:*14*
  138:*2, 3, 24* 140:*4* 141:*2,
  7* 143:*17, 21* 145:*3, 21*
  146:*21, 22* 147:*2* 148:*23*
**remind** 7:*11*
**reminder** 26:*23*
**removes** 54:*4*
**render** 121:*13*
**repeat** 81:*17* 91:*17*

**repeatedly** 79:*11, 24* 80:*3*
**repetitive** 115:*13*
**rephrase** 8:*4*
**report** 22:*18* 55:*2* 87:*25*
  88:*17, 24* 89:*3, 4, 9, 24*
  92:*15, 16* 93:*22* 94:*14*
  148:*21*
**reportable** 56:*2*
**reported** 54:*11* 55:*17*
**REPORTER** 4:*5* 7:*18*
**Reporting** 2:*8* 23:*11*
  54:*22, 25* 55:*3* 154:*25*
**reports** 22:*19* 94:*14*
  120:*3*
**representative** 9:*3*
**representing** 6:*10* 97:*7*
**represents** 139:*20*
**requalification** 59:*8, 11,
  15* 60:*10, 23* 61:*2, 6, 20*
  62:*16* 146:*24* 148:*9*
**requalifications** 64:*11*
**requalifies** 59:*18*
**request** 26:*12* 41:*5*
**require** 29:*23* 87:*1* 133:*7*
**required** 23:*19* 27:*2*
  32:*24* 34:*21* 57:*14* 63:*11*
  85:*1* 87:*5, 6, 8* 118:*25*
**requirement** 24:*18*
**requires** 42:*6, 11, 14*
  53:*20* 54:*3, 5* 55:*1* 58:*3*
  114:*4* 116:*3, 7*
**research** 56:*19* 135:*12*
**resistance** 68:*19*
**resistant** 111:*2*
**resistive** 124:*12*
**resorting** 80:*19* 81:*19*
**respond** 36:*24* 142:*19*
**response** 36:*21* 37:*8*
  66:*21, 23* 68:*18* 80:*11*
  86:*9* 116:*4, 7* 149:*15*
**responses** 36:*25*
**responsibility** 17:*14* 41:*2*
**responsible** 138:*18*
**rest** 84:*19* 112:*12*
**restate** 8:*4*
**restraint** 53:*8* 55:*20*
**result** 107:*6*
**results** 66:*11*
**retain** 120:*20*
**retained** 75:*10* 79:*5*
**retake** 76:*20* 77:*1, 19, 24*
  78:*10, 13*
**retakes** 77:*9*
**reteach** 41:*9*
**retest** 39:*20* 41:*10*
**retested** 40:*4*
**retook** 77:*11*
**retrained** 66:*17*
**retraining** 60:*16* 66:*11, 21*

**review** 23:*5, 19, 25* 24:*8,
  11, 15, 18, 25* 25:*10* 27:*11,
  17* 28:*15, 24* 35:*19* 45:*2*
  51:*4* 60:*24* 62:*12* 69:*12,
  15* 72:*5* 91:*14, 18*
**reviewed** 12:*4* 23:*14*
  24:*15* 27:*4, 8, 21* 28:*1*
  29:*1* 34:*22, 24* 35:*15*
  36:*5* 69:*10, 12* 83:*22*
  92:*12*
**reviewing** 12:*6* 27:*25*
  28:*3* 40:*5, 6* 72:*3*
**reviews** 14:*10* 35:*6*
**revised** 69:*24* 95:*22*
  152:*1*
**rid** 77:*15*
**right** 7:*1, 9* 12:*11* 14:*19*
  15:*18* 16:*19* 18:*1, 8, 13*
  23:*6* 24:*3, 16* 28:*7, 11, 16*
  30:*20* 31:*20, 24* 32:*15*
  33:*6* 34:*10, 13* 35:*8, 11*
  36:*1* 41:*13* 42:*3* 43:*7, 10*
  49:*22* 51:*11* 52:*14, 17*
  53:*21, 23* 56:*10* 62:*13*
  66:*24* 67:*1, 2* 69:*5* 71:*2,
  6* 73:*18, 22* 74:*4, 14* 75:*2,
  14* 76:*21, 24* 77:*5* 78:*13*
  79:*8* 83:*2* 85:*4, 11* 86:*5,
  16* 87:*13, 20, 25* 88:*17, 24*
  89:*20, 24* 91:*25* 92:*2, 19,
  22* 94:*2* 96:*3, 20, 25*
  97:*19* 99:*22* 101:*1*
  103:*17* 104:*2, 5, 14* 105:*1*
  106:*1* 107:*20* 108:*4, 8, 17,
  25* 109:*20* 110:*4, 11*
  111:*22* 113:*2* 115:*9*
  121:*5* 124:*18* 127:*19*
  128:*12* 129:*4, 10* 131:*14,
  23* 132:*19, 25* 136:*19*
  137:*1* 138:*19* 141:*9*
  142:*3* 144:*7, 10* 147:*20*
  150:*12* 152:*2*
**riot** 97:*21*
**riots** 53:*4*
**risk** 31:*4* 46:*20* 48:*8*
  51:*18* 102:*5* 150:*12*
**risky** 47:*7*
**robber** 106:*4*
**robbery** 101:*11, 12, 19*
  102:*1, 2* 105:*25* 106:*2*
**rock** 20:*19* 137:*12*
**role** 16:*1* 17:*25* 18:*3, 6,
  14, 18, 21* 19:*4, 6* 20:*11*
  37:*9*
**role-play** 46:*2*
**role-player** 16:*8* 40:*13*
**role-players** 39:*9* 47:*11*
**roles** 20:*3, 8* 39:*6*
**rollcall** 13:*22* 14:*1, 3, 5*
  22:*24* 26:*17* 27:*13, 18*

Case: 2:18-cv-01060-EAS-EPD Doc #: 141-2 Filed: 03/24/21 Page: 169 of 173 PAGEID #: 3577
Deposition of Officer Traci Shaw

Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

28:23  29:4, 14  30:10
84:1  86:23  88:25  89:8, 9,
10, 11, 12, 14, 15, 18, 23
90:2  92:18  93:25  94:18
151:8
**rolling**  111:13
**rookie**  139:4, 10, 12
**room**  37:10  111:14
141:23  142:3, 12  145:19
**rounds**  82:2
**rule**  7:7  25:2, 6  71:17
72:8  151:25  155:2
**Rules**  4:7  6:20  7:12
24:21  30:12, 17, 18  69:22
71:4, 17, 22, 25  72:3, 6, 10
73:16  75:11  151:25
**run**  31:3  140:7, 12
**running**  16:7  100:2, 6
102:1  146:9, 10  147:12
149:2

**< S >**
**safe**  48:18  86:15  122:14
**safely**  121:13
**safety**  38:15, 16  47:5, 8, 9,
10  48:14, 16  83:12
**SARAH**  1:21
**SARGUS**  1:2
**sat**  128:20
**saunter**  37:12
**Savings**  2:9
**saw**  88:7, 18  108:12, 24
109:20  110:9  112:22
115:13  119:6, 8  137:21
**saying**  36:1  55:25  83:9
107:3  128:2  131:4, 10
**says**  6:5  88:7  95:22
103:1  105:10  110:24
113:11  115:12  120:11
121:6  123:18  130:7
132:23  133:7  135:25
142:9  145:8  149:3
**Scenario**  4:25  5:1, 2, 3
32:8, 15  36:21  37:8
38:12, 20, 21, 24, 25  39:6,
13, 25  40:7, 14  41:9  47:3,
4, 7, 9, 12, 20  48:2, 3, 9, 20,
22  49:1, 5, 10, 23  50:10,
18  51:5  62:23  63:2, 9, 13,
16, 17, 21, 22  64:2, 5  65:1,
3, 11, 13, 17, 23, 24  66:1, 2,
5, 24, 25  67:2  105:25
106:5, 6  107:1, 11, 18, 25
132:10, 16  140:4, 5, 7, 8,
25  141:2, 3, 5, 7, 18, 22, 25
142:6, 13, 25  143:20
144:16  145:3  146:13
147:3, 4, 11, 17, 24  148:19
149:1, 8, 9

**scenarios**  16:9  17:1
19:21  36:14, 20  37:7, 18,
21  38:25  39:4, 16  40:8
41:8  45:6, 10, 14, 15, 19,
22  46:7, 16, 22, 24  47:14,
15, 23  48:4  50:13  51:9
57:3  62:21  65:9  66:5, 10
81:4  105:23  113:11
140:13  146:18  147:7, 9
148:6, 9, 10
**scene**  101:11
**scheduled**  58:6  59:2
**schedules**  16:14
**school**  13:2, 21  14:11
101:3
**science**  13:18
**score**  60:21
**scores**  76:22  79:16
**screaming**  37:11
**screen**  71:2  119:12  123:4
**scroll**  73:4
**scrolled**  11:22  83:25
**se**  79:16  139:24
**seal**  155:5
**search**  44:16  49:8, 15, 18
54:9  66:16  95:2  113:13,
15, 19, 22  114:20  122:4, 6
**searches**  47:13  66:18
85:22
**searching**  54:10  114:2,
23  115:6
**second**  6:19  16:15, 22
17:5  58:11  67:5, 15, 19
86:21  99:4  105:16
**seconds**  82:1  145:25
**secretary**  95:13
**section**  110:8  126:16
134:12
**sections**  132:9  148:14
**secure**  121:18  144:15
145:1
**security**  42:7
**see**  7:4  26:18  46:23
61:23  62:23  63:1, 9  64:3
70:16  71:2, 16, 17  72:18
73:3, 13  79:11, 23  80:2,
21  84:25  86:2, 13, 18, 25
87:1, 19  89:5, 7, 17  92:13
93:11  96:12  97:2, 7, 13,
19  100:13  102:25  103:3
104:24  105:18, 19  113:15
114:8, 9  115:14, 15, 24
116:4  117:5  120:13
121:7  126:18  127:21
128:8  130:8, 16  133:12
136:3  137:18  139:20
140:1  141:2, 4  142:15, 20
144:2  146:18, 19  148:21
152:1

**seeing**  21:15  69:4  86:23
120:7  138:24  139:6
**seen**  37:23  45:8  49:23
76:22  92:11  114:16, 24
123:12  124:1  129:20
137:17, 19, 20, 25  138:6,
13, 15, 16  140:3, 24
141:16  142:8  143:16
144:12  146:7, 20
**sees**  99:25  116:24  144:23
**seize**  99:9
**seizing**  98:24
**seizure**  98:7, 17, 23
**semis**  93:2
**send**  7:2
**Senior**  3:12
**sense**  37:13, 15, 17  96:15
111:17  118:14  120:23
**sent**  25:23, 24  65:19, 22
66:16  80:14
**separate**  6:11  16:14
42:17, 18, 22  61:13
105:12
**September**  8:25  68:7, 14
152:19
**Sergeant**  21:4, 21, 22
26:1  41:2  50:3, 4  65:19
78:24  95:14  103:21
104:10  129:2
**sergeants**  14:4  30:10
**series**  109:19  134:8
**serious**  98:13  99:15
100:19  101:5, 9  102:6
130:23  133:5
**service**  40:25  41:5  65:2
86:2
**session**  57:23, 25  59:2, 4
**set**  46:11, 12, 13, 15
47:17  58:11  68:11  72:12
131:15  136:5  151:14
155:4
**sets**  70:15
**seven**  42:19  52:22  97:18
**severity**  118:7  124:19
**share**  119:12  123:4
131:16  143:9  151:24
**sharing**  104:23
**SHAW**  2:3  4:3  6:3, 7, 16,
17  8:21  9:8, 10  10:13
11:3, 8  12:25  26:18
64:24  70:4  71:2  93:14
152:15  154:7
**S-H-A-W**  6:17
**sheep**  126:17  127:9, 11,
13, 15, 22, 24  128:3  136:2,
8, 11, 15, 23
**sheepdog**  127:9, 11  136:2,
7
**sheepdogs**  126:17  127:15

**sheet**  67:3
**shift**  16:15, 16, 18, 22, 23
17:5  20:21, 25
**shoot**  37:3, 4  60:21  61:4
99:22  100:1, 3, 9, 13, 15,
23  101:13  107:6  117:19
118:17  132:13, 24  133:2
142:7, 11, 25  147:19, 20
149:23  150:10, 11
**shooter**  80:12  101:3, 6
143:20  145:5
**shooting**  60:4, 6  70:10
71:11  72:22  95:18
100:17  121:11  122:8, 11,
13, 20  133:24  134:2
135:20  144:3, 12, 13, 21,
23  145:16, 17  152:18
**shootings**  8:23  68:6, 11,
15  75:22  83:19  90:11, 23
135:22, 23  152:25
**shoots**  122:12, 18
**short**  19:12
**shorter**  43:6
**shot**  100:4  106:21, 24
118:10  121:15, 25  122:19
139:1  145:12  149:11, 13,
14  150:6, 9
**shotgun**  60:15  141:22
142:1, 2, 12
**shots**  144:2, 13  149:12
**show**  26:17  71:1  84:7,
16  92:4  93:10  94:5
95:19  102:13  105:13
108:15  110:12  112:25
123:2, 25  126:11  129:13
140:2
**showed**  112:1
**showing**  84:8  138:22
**shown**  92:8  94:10  96:7,
18  137:13  138:11, 12
**side**  97:13  105:10
120:21  132:12, 20
**sight**  60:16  113:12, 18, 20
114:3, 9, 10
**sign**  23:13  24:9, 12, 15
25:14, 25  27:3, 11  34:21
35:6, 13  131:10
**signature**  27:9
**signed**  27:20
**signing**  27:23
**sign-off**  62:11, 12
**sign-offs**  34:24, 25
**similar**  46:24
**simple**  70:18  118:20
124:21
**simunition**  38:18
**single**  40:13  95:17
**sit**  28:5  69:5  79:2  91:10

**136**:13, 18

104:4 138:19
site 125:11
sitting 8:14 120:3
situation 30:23 36:23
  48:10 81:9 82:3 106:13
  149:2, 19
six 82:13 97:2, 5
Sixth 55:15 67:25
skill 39:24 46:11, 12, 13,
  15 47:17 142:18
Skills 4:12, 13, 14, 15, 16,
  17, 18, 19, 21, 22 16:7
  38:7, 9 45:3, 5, 24 51:5, 9
  65:8 85:1 86:3 89:19
  96:1, 4, 9 115:21
skim 147:23
skip 71:14 96:22 108:10,
  21 134:7
skit 137:12
slid 120:17
slide 97:7 103:1 104:5
  105:11 111:21, 25 126:25
  128:1 129:25 131:9, 15
  135:19
slides 103:15 119:4
  134:8 135:3
slideshow 104:25 108:18
  109:9 110:4, 19 113:1
  119:14 126:14
slightly 30:24
slow 12:21 114:20
slowly 126:20
small 28:25
SMITH 1:15
society 140:1
software 23:12 25:3, 7,
  11 35:1 62:11 89:13
sole 16:11
solely 98:7, 23 99:2
someone's 78:9 116:21
sorry 21:23 34:5 41:3
  50:4 61:8, 9 67:15 68:19,
  21 70:21 74:3 83:10
  91:17 99:5 121:5 141:10
sort 37:12
sought 20:14
sound 141:22 142:2, 11
sounds 27:19 46:1 62:5
  66:4 68:10, 14 142:23
sources 22:14, 22 64:13
SOUTHERN 1:1
speak 12:16, 22
speaking 7:13
special 7:7 118:13
specific 14:25 17:6
  19:21 30:19 36:4, 9
  37:22 38:7, 8, 22 43:10
  53:6 61:16 65:13 66:11,
  16, 19 75:22 77:18 79:12
  80:3 83:19 87:16 88:10

90:21, 24 91:4 132:9
  133:23
specifically 13:19 19:4,
  17 41:24 42:15 49:21
  66:7 72:2 79:3 87:8
  90:19 103:22 120:2
  137:20 142:18 151:15
specified 154:17
speculation 79:4
speed 103:2, 7, 9, 11
spell 6:15
spend 12:6 28:2 42:12
  58:20 88:11
spent 42:10, 15 88:13
Sperlazza 3:11 6:22
  9:13, 18, 22 10:2, 7, 11, 17,
  22 11:1, 5 70:1, 3, 6, 16,
  22 152:9 153:4
split 82:1
spoke 12:18
spoken 6:21
Square 3:5
stabbed 118:10
stabilized 126:4, 9
stack 25:23 27:15
staff 20:13
staffing 19:19
stages 29:11
stamped 71:18 89:6
  105:17
stance 120:12, 16, 20, 25
standard 15:8 133:12, 15,
  16, 20
standards 133:7, 9
standing 134:5
start 7:16 15:20 20:19,
  22 24:24 45:1 74:17
  106:7, 9
started 6:14 14:15 25:7,
  13 52:17 83:24
starting 9:9 14:22 55:6
  84:20 139:4, 12
starts 45:2 51:8
State 2:6, 10 6:14 33:9
  42:5, 11, 13 59:21 84:2
  154:2, 5 155:12
statement 105:18 139:1
statements 7:16 139:8
STATES 1:1 98:23
  99:13
state's 55:22
status 85:1 87:1, 5
statute 2:5
Ste 3:5
Stenotype 154:10
steps 75:7 76:14, 25
sting 97:19
stipulate 9:7
stolen 99:11

stop 19:14 81:6 102:13
  104:23 116:10 124:24, 25
  125:10, 19 134:11
Street 2:9 3:13 46:17
  63:6
streets 31:19 57:22 58:23
strength 112:12
strike 42:25 87:22 95:22
  112:6
strikes 39:23
striking 39:22 97:14
strive 48:18
struck 45:21
structure 18:1 21:9
  74:16
student 39:7 101:7
students 17:18 39:5
  147:5
study 134:14
stuff 32:3 37:6
stun 116:9
subject 19:1 24:6 26:15
  97:11, 16, 17 99:17, 25
  100:2, 5, 8, 20 102:14
  111:2, 14 112:10 116:20
  117:13, 25 118:12 123:20
  124:12 130:13 131:6
  143:23
subjected 134:19
subject's 38:8
Subra 21:4, 21
subscribes 136:18
subsequent 24:18 30:2
  70:13 73:19
substantive 69:6
substitute 111:4
sufficient 101:20
suggest 140:7
summer 53:4
summons 30:7
supervisor 21:3, 4 26:23
  27:13 29:23 88:25 89:1,
  11 90:3
supervisors 27:6 29:15
  31:13, 24
supervisor's 22:17
supplemental 21:15
suppose 28:7, 8 59:23
  151:8
supposed 28:4 81:2 98:9
  111:21 114:17, 25 117:23
  121:22 122:2, 8 124:15
  125:13 126:1 134:20
  142:7, 25 145:1 149:6
  152:6
Supreme 33:9 54:20
  55:1, 15 99:14
sure 6:21 7:13 8:11
  11:17 12:19, 20 18:12
  26:19 27:11 29:1, 20, 23

37:23 39:16 47:13 48:18
  49:17 57:6 58:24 70:14
  81:5 96:16 117:10, 14
  120:4, 12 121:18 122:4
  128:19 138:4 145:6
  149:15
surprise 103:2, 10, 11
  119:25
surroundings 120:6
survival 13:21
suspect 54:8, 12 66:14
  98:21 99:21 102:1, 2
  106:2, 7, 9, 16 107:5, 12,
  15, 23, 25 113:12 114:6,
  16 115:4, 13 121:7
  122:15 132:11 144:2, 3, 5,
  6, 7, 12, 16, 19, 23 145:8,
  14
suspects 99:20 117:24
  128:9 133:20
suspect's 133:22
suspicion 125:25
switched 22:6, 13, 15
sworn 6:4 23:16 110:24
  154:7
system 22:13 24:23 26:3
  27:1, 19 35:7 88:2 91:13
systems 26:25 62:12

< T >
table 71:14 72:16 89:12,
  16
Tackla 2:8
tackle 112:5, 7, 8
tactfully 142:10
tactic 63:5 125:14
tactical 32:14 36:13, 14
Tactics 4:20 5:3 13:14,
  15 14:10, 22 15:12, 15, 21,
  24 16:2, 5, 18 17:10, 18
  18:4, 7, 18 19:8, 15 22:20
  32:7, 14 39:9, 10 48:6
  50:15 51:1 61:11 62:22
  63:4, 8 64:3 65:5, 19
  66:17 75:17, 18 78:14, 24
  80:6, 8, 14, 18 95:25 96:4
  103:1, 6, 17, 21 104:25
  108:18 109:9 110:3, 18
  113:2 119:13 126:14
  127:19 128:2 129:1
  136:7 148:7, 11
take 20:11 28:22, 24
  43:1 46:17 56:22 57:8
  58:18 60:12, 25 64:17
  74:25 75:7 76:14, 24
  77:3, 23 82:2 93:1 100:1
  104:20 114:15 115:12, 18,
  24 120:8, 25 123:17
  135:24 136:1 148:20
takedowns 42:20

Case: 2:18-cv-01060-EAS-EPD Doc #: 141-2 Filed: 03/24/21 Page: 171 of 173 PAGEID #: 3579

Deposition of Officer Traci Shaw      Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

**taken** 2:5 61:5 76:25
87:23 88:5, 22 152:7
154:16
**takes** 100:2 106:23
**talk** 6:11, 20 17:9 32:1
48:24 83:18 85:8, 17
91:23 120:10 126:23
150:23
**talked** 28:13 42:21 56:4,
5 79:7 86:7 113:25
132:10
**talking** 25:23 36:12
46:10 56:3 62:21, 24
63:4, 11 72:15 78:17
85:9 90:20 112:16
118:16 120:11 124:10
125:18 138:25 147:25
151:4
**target** 43:3 60:6 139:3,
17, 24 147:13 148:24
**targeted** 135:8
**targeting** 134:21
**targets** 43:3 146:11, 13,
15 147:8, 10, 12, 18
**Tase** 116:16
**Tased** 117:20
**Taser** 4:12, 13, 14, 15, 16,
17, 18, 19, 21, 22 16:5, 6
28:21, 22 45:4 61:18
74:21, 23, 24 75:1 81:9
84:22, 23, 24 85:2, 9 86:3,
8, 10 89:19 96:1, 4, 10
116:11, 15, 19, 21 117:2, 5,
6, 10, 12, 15 150:4
**Tasers** 116:8, 19
**tasks** 18:20
**taught** 16:13 43:2 75:5
80:18 81:15, 18 82:3
98:2 99:14 104:8, 12, 15
107:4 108:7 130:4 132:5,
6 150:20 151:11
**teach** 15:8, 11 16:10, 12
17:17 19:7 37:17 38:5, 6,
7, 8 80:11 107:20 126:6
**teaching** 15:20 19:14
34:4 103:16
**team** 16:12
**tech** 6:25 13:5
**technical** 6:24
**techniques** 97:3, 15
144:15 145:1
**tee** 31:23
**teleconference** 2:2
**tell** 12:25 16:1 17:24
20:2 21:9 52:21 67:11
71:15 88:12 91:2 96:14
105:12, 14 106:1, 3
108:16, 23 109:19 110:8
126:21 142:23 147:23

**telling** 124:11 150:2
**tells** 33:12
**temporary** 20:11
**ten** 26:5
**Tennessee** 11:15 150:22
**tense** 142:16
**tenure** 14:6
**terminated** 40:17 41:19
**terms** 15:15 18:17 20:15
23:4 24:2, 23 33:11
37:18 44:14 64:9 88:4
**terrorism** 85:23
**test** 18:24, 25 19:2 28:22,
24 29:4, 12 38:10 51:23,
25 52:2, 7, 10, 13 56:5, 7,
8, 14 60:13 61:1, 5, 9
74:20, 22, 25 75:1, 2, 10
76:19, 22 77:1, 9, 11, 15,
18, 24 78:1, 9, 12, 16, 17,
22 79:1, 4, 5, 7, 16, 18
118:6
**tested** 38:5 46:23
**testified** 7:4
**testify** 8:16, 22 9:8, 10
10:14 11:3 19:23 22:7
49:16 68:5 76:17 90:9,
11, 14 91:7, 15, 20, 21
141:11 154:7
**testifying** 8:8 90:17 91:2
**testimony** 154:9, 13
**testing** 18:19, 22 19:5
28:18 38:13, 23 46:12
59:18
**tests** 29:6 74:14 75:8, 23,
24 76:3, 7, 11, 15 78:5
79:19
**Thank** 11:6 22:2 48:12
57:6 68:3 73:6 96:13
**Thanks** 67:18 112:18
**theory** 28:4
**thighs** 120:22
**thing** 83:11 90:1 110:6
116:8, 18 121:14
**things** 21:14 31:7, 23
34:9 37:16 41:13 45:17
48:24, 25 57:9 61:18
62:5, 15 82:6 84:17
100:15 111:25 114:20
123:17 130:12, 14 151:1
**think** 6:18 23:22 25:4
26:4, 5 27:10, 12 30:2
31:10, 14 33:6 37:2, 16
46:20 53:15, 16 56:1
70:6 88:8 119:5 136:20
140:10 143:25 149:12
**thinking** 26:10 112:3, 15
**thinks** 70:4
**third** 16:15, 16, 18, 23
20:25 67:21

**Thomas** 21:25
**thought** 90:17
**threat** 60:2 80:23 81:7
82:13 98:18 99:3, 15, 16
100:3, 6, 18, 22 101:5, 8,
21 102:6 107:9 117:21
121:16, 17 122:15 130:17,
23 133:4 140:1 142:19,
20 145:7 146:15 150:8
**threats** 98:13 146:14
**three** 6:10 23:22 25:15
30:2, 9 59:14 64:13
68:15 70:7 89:6 91:15,
19 94:16 148:19
**throw** 111:11
**tie** 106:13 107:6
**Ties** 105:18 106:19, 22, 24
**time** 7:14 8:10 12:2, 6,
10 13:9, 11 17:6 20:4, 6,
14, 22, 23 24:11 25:20, 21
26:6, 9, 13, 14 28:2 36:25
40:9 42:9 43:2 47:22
50:17, 20, 25 52:25 53:21
57:19 66:2, 3 67:4, 5
71:10, 24 72:22 75:8
82:1 83:13 84:22 85:17
97:10 98:23 106:22
107:22, 25 112:11 114:1,
23 115:20 118:23 128:22
133:11 145:13 148:17
149:5 150:9 152:17
154:17
**timeframe** 151:20, 22
**timely** 26:22
**timer** 27:24
**times** 11:16, 19 29:10
37:17 48:8 52:19 53:18
56:25 62:23 63:23 74:1
111:21 115:22 135:21
**tired** 112:10
**title** 20:8 21:18 68:25
86:13 89:2 134:13
140:21
**titled** 140:6
**today** 7:11, 18 8:15, 22
9:8 11:4, 11 12:4, 23
22:8 49:13, 20 68:5
69:15 72:6 76:17 90:17
91:8, 16, 20 95:5 104:4
137:10 152:24
**today's** 6:22 12:7, 14, 17
**told** 35:3 53:22 77:5
90:20 147:10, 16
**Toledo** 134:14
**tool** 81:11
**toolbelt** 38:9 81:12
**tools** 38:9
**top** 84:25 116:2 120:10
143:25 148:21

**topic** 9:10, 14, 19, 24
10:3, 8, 14, 18, 23 17:24
57:9 74:13 75:10 80:3
**topics** 9:8 11:3 22:7
42:22 49:15 61:14 62:4
91:20
**total** 42:9
**totalities** 133:17
**totality** 80:22 81:13, 21
82:5, 23 83:4, 7, 15 99:23
102:7, 15 107:17, 22
111:12 125:18 126:10
130:24
**totally** 82:11
**TRACI** 2:3 4:3 6:3, 7,
16 154:7
**T-R-A-C-I** 6:16
**track** 31:13, 24 53:13
56:20 57:3 84:17, 20
87:9, 19, 24 88:17, 23
89:23 92:14 93:21 94:13
**tracked** 89:9
**tracking** 53:20 54:4, 5
**traffic** 25:18 125:10, 19
**tragic** 149:10
**train** 15:4, 6, 9 41:15, 17
54:23 80:10 83:12, 13
84:17, 20 87:18, 24 88:17,
23 89:23 92:14 93:21
94:13 107:8
**trained** 15:11, 13 16:21
33:3 80:21
**trainees** 33:18 107:4
**trainer** 15:4, 6, 9, 13 16:2,
12, 16, 18 52:7 63:8
78:14
**trainers** 34:2 128:21
**Training** 4:9, 11, 25 5:1,
2, 3 9:15, 16, 20, 21 10:4,
5, 9, 10, 18, 24, 25 11:13,
14, 18, 20, 21 13:5, 8, 12,
13, 19, 20, 21 14:3, 19, 25
15:2, 3, 8, 9, 16, 24 16:4, 5,
11, 15, 19, 23, 25 17:3, 5, 8,
10, 11 18:4, 8, 19 19:5, 18,
20, 23, 24, 25 20:9, 10
21:8, 22 22:3, 21 25:3, 6
29:11 32:1, 6, 10, 12, 13,
14, 21 33:7, 12, 17 34:2,
10, 15, 18 35:4, 5, 10, 21,
23 36:1, 3, 12, 13, 17, 19
37:20 39:24 40:10 41:1,
21, 22, 24 42:13, 16, 23,
24 43:7, 13, 16, 19, 22, 25
44:4, 8, 11, 14, 18, 21, 22,
25 45:2, 11, 14, 18 46:1, 8,
9, 10 47:3, 19 48:5, 10, 14,
21, 22 49:3, 5, 10, 19, 24
50:3, 4, 10, 15, 18 51:5, 6,
8, 13, 17, 20, 21, 25 52:8,

Case: 2:18-cv-01060-EAS-EPD Doc #: 141-2 Filed: 03/24/21 Page: 172 of 173 PAGEID #: 3580

Deposition of Officer Traci Shaw                                    Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

*11* 53:22 57:4, *10, 11, 15, 21* 58:4, *9, 18, 22* 59:1, *7, 16, 23, 24* 60:4, *5, 9, 14* 61:7, *10, 19, 21* 62:17, *20, 24* 63:14 64:10, *12* 65:1, *9, 19, 21, 24* 66:5, *24, 25* 74:12, *14* 76:16 77:13, *15, 22, 25* 78:6, *15, 19, 23* 79:23 80:12, *17* 81:2 83:20, *23* 84:1, *8, 19* 85:1, *3* 86:1, *5, 7, 14, 15* 87:1, *5, 6, 9, 16, 19, 23, 25* 88:2, *3, 12, 13, 16, 17, 19, 22, 24* 89:3, *11, 15, 18, 19, 22, 24* 90:2, *7, 9, 14, 18, 21* 91:3, *8, 11, 12, 24* 92:16, *17, 24* 93:4, *6, 11, 22, 25* 94:1, *6, 14, 18, 23* 95:3, *7* 96:1, *5* 98:10 100:12 101:20 102:18 103:20 104:1, *13, 18, 21, 25* 107:3 108:3, *7, 13, 18, 19* 109:10 110:4, *19* 113:2 114:4, *14, 17* 117:22 118:21, *25* 119:6, *8, 11* 120:9 122:1, *10, 17* 123:5, *15* 124:1 125:12 126:11, *14, 16* 127:9, *17* 128:12 129:13, *20, 22* 131:15, *22* 132:2, *5, 9, 17* 133:14 135:2, *25* 136:7, *23, 24* 137:10, *15* 138:12 139:2, *6, 9, 17, 19* 140:8, *12, 21* 141:5, *8, 12* 144:16 146:21, *22, 25* 147:4, *24* 148:3, *6, 9, 11, 12, 14, 15, 16, 23* 149:7, *15* 150:7, *17, 18, 21* 151:6, *9, 13*

**trainings** 10:20 13:17, *22, 23* 14:1, *8* 15:5 28:23 32:8 63:9 65:3 78:3 84:3, *5, 18, 20, 25* 85:6, *8* 87:7 88:5, *9* 90:5, *6* 92:22 93:21 94:21, *24* 95:4 108:24 109:20 119:9 122:25 129:4, *6, 9* 135:4 137:6, *9* 138:24

**trains** 32:4 44:24 80:9

**transcribed** 154:11

**transcription** 154:13

**transition** 113:13 114:19

**transported** 121:21

**traveling** 125:3

**trend** 119:24 120:6

**tried** 118:13

**tries** 106:9

**trigger** 86:18 106:16 132:15 134:16

**TRN** 126:17

**true** 122:23 154:12

---

**truth** 154:8

**truthful** 27:21

**truthfully** 8:16

**try** 28:4 120:17 125:13 126:7 150:2, *11, 14*

**trying** 33:1 130:20

**turn** 26:1 31:15 36:11 44:20

**Turning** 62:20

**twice** 52:22

**two** 14:24 25:1 37:6 42:23 53:15 56:6, *9* 59:14 68:10, *14* 73:11 84:17 97:12 98:11 104:12 116:20 123:4, *14* 124:1 152:22

**type** 23:15 37:5 45:7, *23* 53:8 61:24 63:5 81:22 101:24, *25* 116:9 121:23 125:1, *19* 126:1

**types** 95:10

**typically** 48:13 51:10 97:20

**TYREE** 1:2 8:24 95:8 152:19 153:1

**< U >**

**Uh-huh** 21:2 137:7

**ultimately** 144:5

**unable** 58:16 137:5

**unarmed** 121:25 122:5, *7*

**understand** 8:2, *7, 21* 9:2 30:16 35:15 40:15 41:11, *13, 20* 118:19

**understanding** 39:2

**understands** 29:21 136:10

**understood** 35:14 67:7 148:13

**undertake** 18:19 44:16 49:18 90:13 95:2

**undertaken** 49:8

**Unfortunately** 120:1

**uniform** 139:20, *23, 25*

**unique** 130:12

**unit** 21:5, *10* 61:11 64:3 65:5 80:6, *8, 14* 95:25 96:4 148:7

**UNITED** 1:1 99:13

**units** 66:17

**universally** 122:16

**unprofessional** 128:1, *15* 136:9

**unreasonable** 99:2, *13* 135:22 145:16

**untrained** 130:16

**unusual** 52:25

**update** 24:6, *20* 25:21, *22* 26:9 28:13, *16* 35:6, *15* 62:7, *12, 13* 67:14 69:8

---

70:12 79:8 85:15 152:6, *21*

**updated** 25:10 29:22 52:7, *20, 22* 56:8 57:1 62:6 67:12 73:22 150:17 152:11

**updates** 14:9 24:3 26:19 27:2 28:14 34:20, *23* 35:4, *5, 13, 19, 25* 36:4, *6, 9* 52:12 53:15 56:23 61:25 62:4, *5, 9, 16* 64:11 67:8 150:19 151:3, *7, 9, 10, 12*

**upper** 47:22

**upwards** 58:21

**urgency** 37:13, *15, 17*

**Use** 4:23 9:12, *16, 21* 10:1, *5, 10, 15, 20, 25* 11:24 12:1 13:19 16:5 18:22 22:5, *10, 15* 28:20 29:7 30:17 32:2, *4, 18* 33:4, *17, 24* 34:3, *7, 8* 36:11, *19* 37:2, *22* 38:1, *5* 39:8, *19* 40:2, *6, 9* 41:20, *24* 42:10, *16, 18* 43:25 44:4 45:3 46:2 49:11, *19* 51:4, *23, 25* 52:13, *19* 53:3, *4, 6* 54:15 55:4, *5, 8, 12, 17, 23, 24* 56:6, *8, 9, 13, 23* 60:8, *12, 15, 24, 25* 61:5, *10, 13, 16, 20, 24* 63:5 67:8, *12* 68:15, *17, 20* 69:6 70:9 71:8, *16, 20* 72:8, *9, 11, 23* 73:14, *22* 74:1, *13, 19* 75:1, *7, 11, 15, 18, 24* 76:3, *7, 11, 15, 19* 77:24 79:17, *19* 80:9, *10, 18, 24* 81:3, *15, 18, 24* 82:8, *9, 15, 19, 20, 25* 83:3, *5, 12, 13* 84:4 86:9, *10* 87:15 90:21 91:3 94:22 95:3, *16, 21* 96:19, *24* 97:6, *12, 24* 98:3, *9, 11, 17* 99:2, *7, 9, 17, 19* 100:19 110:7, *24* 111:8, *21* 115:12, *17, 20, 21* 116:11 117:12, *15, 17* 124:11 130:8, *21* 131:3 133:8, *21* 135:15 144:20, *24* 145:1, *15, 24* 149:19 150:4 152:10

**user** 28:21

**uses** 54:24 83:17 134:4

**usually** 29:10

**utilized** 131:6

**< V >**

**varied** 14:4

**vary** 30:24

---

**vehicle** 85:16, *17* 124:10, *15, 17, 20, 22* 125:5, *6, 8, 16, 22, 24* 126:4, *5, 6, 9*

**vehicles** 124:18 126:3

**venue** 146:9, *11*

**verbal** 7:23 83:14 106:8 107:23 115:13, *21, 23*

**verbally** 7:20

**Vernon** 13:3 14:13

**version** 123:5, *25*

**versions** 123:4, *14* 137:6 152:12

**versus** 17:7 32:20 43:3 60:5 106:20 107:2 113:25 116:15 121:2

**victim** 141:25 144:3, *14*

**victims** 135:8 145:6

**video** 2:2 32:23 37:1 39:18 40:5 106:14 137:17 138:2, *6, 9, 11, 13, 21* 139:1

**videos** 51:22 137:5, *9, 14* 138:23

**videotape** 39:16

**view** 137:5 147:19

**violence** 134:19, *25* 135:9

**violent** 55:19 123:20, *22*

**visibly** 149:21

**vs** 6:12 10:13

**< W >**

**waistband** 101:24 102:4, *11* 106:17 107:6 116:18

**wait** 106:9 107:5, *9*

**walk** 21:19 37:12 38:21 60:18 145:24

**want** 7:11 20:24 22:3 28:25 36:23 37:13 41:15, *16* 47:14, *16* 57:2, *8* 58:5 63:6 64:2 70:14 71:22 75:21 81:8 96:23 106:4 107:18 112:8 114:1 115:17, *18* 117:14, *16, 17* 120:4 122:5 125:19 126:3, *7, 22* 127:23 128:5 130:18 137:8 138:17 142:13 150:13, *16*

**wanted** 26:11 28:6 53:5

**wanting** 136:20

**Warning** 131:10

**warrant** 117:25 118:1, *8, 22* 125:2, *11, 17*

**warranted** 40:2

**watch** 47:23

**water** 13:22

**wavering** 6:19

**waving** 144:1, *13*

**way** 30:25 31:4, *7* 36:8 45:16 53:7 65:3 114:11

147:*15*

**ways** 130:*14* 151:*6*

**weak** 39:*23* 127:*13*
128:*11* 136:*11*

**weapon** 39:*22* 42:*24*
53:*21* 54:*4*, *6*, *15* 55:*4*
81:*22* 83:*15* 98:*16* 111:*4*
114:*11*, *17*, *25* 117:*1*
121:*19* 132:*14*, *19* 141:*21*

**weapons** 19:*1* 47:*13*
48:*9* 110:*25* 111:*7*, *11*, *17*,
*22* 114:*18* 117:*23* 121:*19*
150:*4*

**wear** 139:*23*

**wearing** 139:*24*

**weather** 36:*5*

**Wednesday** 2:*7*

**weed** 41:*12*

**week** 13:*18* 14:*24*

**weekly** 46:*9* 104:*11*
129:*3*

**weeks** 42:*4* 43:*9* 58:*21*
136:*1*

**welcome** 67:*19* 68:*4*
112:*19*

**well** 9:*14* 15:*14* 24:*9*
27:*18* 29:*7* 30:*10* 33:*10*
34:*22* 38:*17* 39:*18* 42:*5*,
*22* 45:*9* 47:*6*, *11* 51:*22*
63:*19* 66:*25* 70:*8* 74:*22*,
*25* 79:*1* 80:*11* 83:*21*
87:*8*, *18* 88:*6*, *25* 89:*5*
95:*14* 100:*10* 111:*12*, *19*
118:*17* 141:*11* 145:*3*
151:*3*

**Went** 13:*2*, *4*, *13*, *17*, *18*
35:*7* 50:*4* 85:*24* 92:*24*
149:*13*

**we're** 6:*11* 7:*13* 19:*10*
33:*1* 42:*14* 46:*11*, *12*
48:*17*, *23*, *25* 59:*18* 79:*15*
89:*5*, *7* 92:*3* 93:*14*
102:*25* 103:*11* 104:*5*
108:*3*, *8*, *11* 109:*2* 110:*6*,
*22* 114:*20* 118:*16* 119:*11*,
*16* 120:*9* 123:*3* 124:*19*
125:*3* 126:*6* 135:*11*
139:*21* 143:*24* 147:*25*
149:*16*

**We've** 22:*10* 23:*9* 28:*13*
36:*14* 47:*24* 126:*12*
129:*4* 130:*22* 135:*2*
137:*9*

**white** 134:*16*

**William** 3:*11*

**witness** 2:*3* 6:*3* 77:*22*
137:*12* 154:*6*, *10*, *11*, *13*
155:*4*

**witnessed** 50:*9* 137:*16*

144:*19*

**witnesses** 100:*22*

**wolf** 119:*23* 120:*6*, *11*
127:*16*

**wolves** 127:*11*, *12*, *14*
128:*11* 136:*2*, *7*, *10*, *17*

**woman** 37:*9*, *11*

**word** 27:*10* 86:*14*

**words** 135:*14*

**work** 12:*8* 116:*21*, *22*, *23*
117:*10*

**working** 7:*2* 45:*5* 58:*17*,
*23*

**works** 78:*21* 147:*15*

**world** 30:*23*

**wounded** 121:*7*

**wrap** 152:*15*

**wrestling** 112:*6*

**written** 18:*24*, *25* 22:*5*, *9*,
*14*, *22*, *25* 23:*2* 28:*22*
*29*:*12* 30:*25* 31:*7* 50:*8*,
*21* 64:*1* 72:*1* 78:*4*, *8*
131:*23*

**wrong** 25:*4* 39:*2* 50:*6*
69:*22* 142:*23* 150:*6*

**Wsperlazza@columbus.gov**
3:*15*

**< X >**

**X-rays** 13:*6*

**< Y >**

**Yeah** 57:*1* 63:*3* 70:*5*

**year** 13:*4* 14:*11*, *14*, *23*
19:*14* 21:*14* 24:*25* 29:*8*,
*13* 36:*10* 51:*15*, *16*, *25*
52:*2* 56:*7* 58:*1*, *8* 70:*1*
79:*13* 85:*3* 86:*3* 120:*1*
129:*23* 141:*6*, *9* 143:*18*
148:*17*

**yearly** 14:*10* 18:*22*
28:*22* 34:*5*, *11* 35:*5*
46:*18* 51:*15*

**years** 23:*10* 24:*8* 25:*1*, *5*
26:*5* 85:*10* 112:*23* 119:*6*
138:*2* 141:*12* 148:*13*
149:*14*

**year-to-year** 52:*3*, *4* 79:*8*,
*25* 80:*4*

**yesterday** 23:*22*, *23*

**young** 20:*20* 139:*4*, *12*

**< Z >**

**zero** 37:*24* 42:*19* 55:*18*

**Zoom** 6:*23* 7:*6*, *8* 8:*1*, *7*
12:*19*, *20* 138:*22*