```
               IN THE UNITED STATES DISTRICT COURT
                   SOUTHERN DISTRICT OF OHIO
                        EASTERN DIVISION


                          - - - -

    DEARREA KING, Adm., of the  )
    ESTATE OF TYREE KING,       )CASE NO. 2:18CV1060
              Plaintiff,        )JUDGE EDMUND A. SARGUS, JR
    -V-                         )CHIEF MAG. JUDGE ELIZABETH
    THE CITY OF COLUMBUS, et al,)P. DEAVERS
              Defendant.        )

                      - - - oOo - - -

    CHRISTOPHER M. COOPER, Adm.,)
    Of the ESTATE OF DEAUNTE    )CASE NO. 2:19CV3105
    BELL-McGREW,                )
              Plaintiff,        )JUDGE GEORGE C. SMITH
    -V-                         )CHIEF MAG. JUDGE ELIZABETH
    THE CITY OF COLUMBUS, et al,)P. DEAVERS
              Defendant.        )
                      - - - oOo - - -
    JAMES J. ENGLAND,           )CASE NO. 2:19CV1049
              Plaintiff,        )JUDGE SARAH D. MORRIS
    -V-                         )MAGISTRATE JUDGE KIMBERLY
    THE CITY OF COLUMBUS, et al,)A. JOLSON
              Defendant.        )
```

**EXHIBIT**
**Pl. Ex. 3**

 1       - - - o0o - - -

 2   The video teleconference deposition of DEPUTY CHIEF

 3 KENNETH KUEBLER, a witness herein, being called by the

 4 Plaintiffs as if upon cross-examination under the

 5 statute, and taken before Megan A. Medved, a Notary

 6 Public within and for the State of Ohio, pursuant to the

 7 agreement of counsel, on Monday, November 23rd, 2020, at

 8 10:00 a.m., at the Offices of Tackla Court Reporting,

 9 LLC, 1020 Ohio Savings Plaza, 1801 East 9th Street, City

10 of Cleveland, County of Cuyahoga, and the State of Ohio.

11        - - - -

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Deposition of Deputy Chief Kenneth Kuebler          Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

```
 1     APPEARANCES:

 2     On behalf of the Plaintiffs:

 3          By:   Sarah Gelsomino, Esq.

 4                Jacqueline Greene, Esq.

 5                Friedman & Gilbert

 6                55 Public Square, Ste. 1900

 7                Cleveland, Ohio 44113

 8                Jgreene@f-glaw.com

 9                Sgelsomino@f-glaw.com

10                (216)241-1430

11

12     On behalf of the Defendants:

13          By:   Westley Phillips, Esq.

14                City of Columbus Deputy Chief of Litigation

15                77 North Front Street

16                Columbus, Ohio 43215

17                Wmphillips@columbus.gov

18                (614)645-6959

19

20

21

22

23

24

25
```

Deposition of Deputy Chief Kenneth Kuebler          Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

```
 1                              INDEX
```

```
 2   APPEARANCES ...................................... 3

 3   DEPUTY CHIEF KENNETH KUEBLER

 4   CROSS-EXAMINATION BY MS. GELSOMINO ................ 6

 5   REPORTER CERTIFICATE ............................ 199

 6   PLAINTIFF'S:

 7   1. 2014 Firearms Review Board Standard Operating

 8   Procedure ....................................... 93

 9   2. 2005 Firearms Review Board Log ............... 105

10   3. 2006 Firearms Review Board Log ............... 110

11   4. 2007 Firearms Review Board Log ............... 113

12   5. 2008 Firearms Review Board Log ............... 116

13   6. 2009 Firearms Review Board Log ............... 118

14   7. 2010 Firearms Review Board Log ............... 120

15   8. 2011 Firearms Review Board Log ............... 121

16   9. 2012 Firearms Review Board Log ............... 122

17   10. 2013 Firearms Review Board Log .............. 130

18   11. 2014 Firearms Review Board Log .............. 133

19   12. 2015 Firearms Review Board Log .............. 135

20   13. 2016 Firearms Review Board Log .............. 139

21   14. 2017 Firearms Review Board Log .............. 141

22   15. Routing Sheet ............................... 144

23   16. Memo ........................................ 148

24   17. Firearms Review Board findings ............. 154

25   18. Routing Sheet ............................... 156
```

Deposition of Deputy Chief Kenneth Kuebler                    Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

1   19. Memo ........................................ 162

2   20. Chief's Hearing Transcript .................... 186

3   21. Correspondence ................................ 190

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Deposition of Deputy Chief Kenneth Kuebler          Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

1          P-R-O-C-E-E-D-I-N-G-S

2                  - - - -

3          DEPUTY CHIEF KENNETH KUEBLER, of lawful age, a

4     witness herein, having been first duly sworn, as

5     hereinafter certified, deposes and says as follows:

6                  - - - -

7     CROSS-EXAMINATION OF DEPUTY CHIEF KENNETH KUEBLER

8     BY MS. GELSOMINO:

9     **Q.      Can you please state your full name for the**

10    **record?**

11    A.      Kenneth Kuebler.  Last name is spelled K-U-E-B,

12    as in boy, L-E-R.

13    **Q.      And what is your title within the police**

14    **department?**

15    A.      I'm a Deputy Chief of Police over The Special

16    Operations Subdivision.

17    **Q.      Kuebler, right?**

18    A.      Like the cookies.  That's correct.

19    **Q.      I'll do my best on that.  My name is Sarah**

20    **Gelsomino.  I'm one of the lawyers that represents the**

21    **Plaintiffs in the three cases that we're here today to**

22    **take your testimony in.  My partner Jacqueline Greene is**

23    **also here with us.  Before we start just some general**

24    **stuff.  Have you done a deposition by Zoom before?**

25    A.      I have.

1   Q.      Okay.  And I know you've sat for many

2   depositions in your life before, right?

3   A.      Yes.

4   Q.      Okay.  So just a reminder, especially on Zoom,

5   sometimes it's hard, we end up talking over each other,

6   so let's just be conscious of that so Megan can do her

7   best to make a clean transcript.  She can't write down

8   nods of the head, et cetera.  If you don't understand

9   something that I say particularly because sometimes the

10  audio can come in and out over Zoom, please ask me to

11  rephrase or tell me that you didn't understand it.  If

12  you answer I'm going to assume that you understood my

13  question.  Is that fair?

14  A.      Sure.

15  Q.      And you understand that you are here today to

16  tell the truth, right?

17  A.      Yes.

18  Q.      You took an oath today to tell the truth?

19  A.      Yes.

20  Q.      And can I rely upon you today to testify

21  accurately and truthfully?

22  A.      Yes.

23  Q.      Is anything going on today, are you on any

24  medications or having any other personal issues that

25  would impact your ability to testify accurately and

1  truthfully today?

2  A.      No.

3  Q.      Okay.  You understand that you have been named

4  as what we call a 30(b)6 representative for the city.

5  Do you understand that?

6  A.      No.

7  Q.      Okay.  Do you understand that you're here in

8  your official capacity to give binding testimony for the

9  City of Columbus?

10  A.      Yes.

11  Q.      So you are what we call -- you have some

12  information, some personal knowledge about some of the

13  cases that you're here to testify about today?

14  A.      I suppose.

15  Q.      But above and beyond, that you're also going to

16  testify as the official designee for the City of

17  Columbus to give that binding testimony for them, right?

18  A.      Yes.

19  Q.      Okay.  So I'm going to show you the Deposition

20  Notice in this case.

21               MS. GELSOMINO:  Let's go off the

22  record.

23                    - - - -

24     (Thereupon, an off-the-record discussion was held.)

25                    - - - -

```
 1                    MS. GELSOMINO:  Let's go back on the

 2    record then.  So, Wes, for the record, he's going to be

 3    testifying today in all three cases about 7.)A, right?

 4                    MR. PHILLIPS:  Correct.

 5    BY MS. GELSOMINO:

 6    Q.      So you're here to testify on all investigations,

 7    reviews, findings and outcomes from 2005 to present for

 8    all deadly force events involving CPD members concerning

 9    the firearms police involved death review board.  Is

10    that your understanding?

11    A.      I was subpoenaed to be here to testify.  I

12    didn't know what it was for, but I could do that.

13    Q.      Okay.  What did you do to prepare for the

14    deposition today?

15    A.      I had a ten minute web conversation with

16    Mr. Phillips on Thursday or Friday last week.

17    Q.      Late last week?

18    A.      Late last week, yeah.

19    Q.      That's close enough.  Did do you anything else

20    to prepare for this deposition?

21    A.      Yes.

22    Q.      What?

23    A.      I reviewed two routing sheets.

24    Q.      Which routing sheets are those?

25    A.      I believe it was Tyree King's routing sheet, and
```

Deposition of Deputy Chief Kenneth Kuebler      Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

1   one other. I believe -- I don't remember the name of

2   which cases they are. It was the one involving the pit

3   bulls and the officer fired at the pit bulls.

4   **Q.**      **England?**

5   A.      Yeah.

6   **Q.**      **Did you look at anything regarding the shooting**

7   **of Deaunte Bell-McGrew?**

8   A.      No.

9   **Q.**      **Did you look at anything else regarding the**

10   **shooting of Tyree King?**

11   A.      No.

12   **Q.**      **Did you look at anything else regarding the**

13   **shooting of Mr. England?**

14   A.      No.

15   **Q.**      **Did you look at any documents at all in**

16   **preparation for today's deposition?**

17   A.      No.

18   **Q.**      **Okay. Do you understand that as a designated**

19   **witness to give binding testimony on behalf of the City**

20   **of Columbus you have a responsibility to identify all**

21   **sources of information and gather all of the necessary**

22   **information to testify?**

23                   MR. PHILLIPS: Objection. You can go

24   ahead and answer.

25   A.      I don't understand that.

1    BY MS. GELSOMINO:

2    **Q.      You have access to all of the information**

3    **regarding the firearms police involved death review**

4    **board since 2005?**

5    A.      Yes, I have access.

6    **Q.      Where is that held?**

7    A.      The majority of it is online.

8    **Q.      Where?**

9    A.      On our division's intranet.  Much of it is on

10   the Internet.

11   **Q.      Much of it is like publicly available on the**

12   **Internet, is that what you mean?**

13   A.      Yes.

14   **Q.      Okay.  What are you thinking about that's**

15   **publicly available on the Internet?**

16   A.      The division's directives.

17   **Q.      Okay.  What else?**

18   A.      That's it, I believe.

19   **Q.      Okay.  What do you have access to on the**

20   **intranet?**

21   A.      Those same files.  The firearm death review

22   board's SOPs.

23   **Q.      Okay.  Anything in addition to the SOPs?**

24   A.      Relating to this case, I don't think.

25   **Q.      What do you mean "relating to this case"?**

 1    A.       There's lots of information on the intranet.

 2    Q.       **Yeah.  I'm asking what information is available**

 3    **to you on the intranet regarding the firearm police**

 4    **involved death review board?**

 5    A.       The SOP, I believe.  That would be it.

 6    Q.       **What about the investigations and reviews and**

 7    **findings of that board?**

 8    A.       No.  They're not online.

 9    Q.       **Where are they?**

10    A.       I don't know.  Probably in Internal Affairs.  I

11    don't know where they eventually reside.

12    Q.       **Do you have access to them in Internal Affairs?**

13    A.       I would have to ask for them.

14    Q.       **But you could gather them though, right?  Like**

15    **had you in preparation for this deposition made an**

16    **attempt to gather the necessary information to testify,**

17    **you could have received those investigations, right?**

18    A.       Yes.

19             MR. PHILLIPS:  I object to the

20    characterization of necessary.  I mean, he's ready to

21    testify about the firearms review board.  He knows the

22    process.

23    BY MS. GELSOMINO:

24    Q.       **Okay.  So, if the investigations reviews**

25    **findings and outcomes, you think they eventually reside**

1  in IA, right?

2  A.       I believe so.

3  Q.       Okay.  So where are they before they come to

4  that final resting place?  Where are they held?

5  A.       I don't understand the question.  They would

6  move about the division until they landed in their final

7  resting place.

8  Q.       How do they move about?  Is there like software

9  or paper copies?

10  A.       Paper copies.  And they're hand delivered.

11  Q.       Is there any database or electronic source where

12  anything related to the investigation review's findings

13  or outcomes of deadly force investigations?

14  A.       Yes.

15  Q.       Where?

16  A.       CIRT I believe would have the criminal

17  investigations.  In addition the board's administrative

18  secretary maintains copies where those are being

19  forwarded to, et cetera, and maintain a spreadsheet.

20  Q.       She maintains a spreadsheet of where the

21  paperwork is?

22  A.       Where the paperwork is and where the cases are.

23  Q.       Okay.  Does that spreadsheet have a name?

24  A.       Probably.

25  Q.       Do you know it?

Deposition of Deputy Chief Kenneth Kuebler      Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

```
 1    A.       I do not.

 2    Q.       Okay.  Again, had you made an effort you could

 3    have seen that spreadsheet, right?

 4                       MR. PHILLIPS:  Objection to the

 5    characterization.  You can go ahead and answer.

 6    A.       Yes, I have access to the spreadsheet.

 7    BY MS. GELSOMINO:

 8    Q.       Okay.  So in addition to this spreadsheet does

 9    the board itself maintain any other electronic documents

10    regarding any of these investigations?

11    A.       Yes.  Not the board itself, but there are other

12    documents created in that review, yes.

13    Q.       What are those documents?

14    A.       Of findings to the board to render a written

15    finding.

16    Q.       Okay.  Anything else?

17    A.       No.  That's it.  There's a calendar of who

18    responds.

19    Q.       A calendar?

20    A.       Yes.

21    Q.       How is that used?

22    A.       There's a list of -- I guess there would be two

23    things, a list of people who are on the board, and then

24    there's a callout list for a year as to who will be the

25    firearm responder on any use of firearm respond.  March
```

Deposition of Deputy Chief Kenneth Kuebler          Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

1    would have Commander A and B responding, and April would

2    have Commander C and D.

3    **Q.      And then by responding --**

4    A.      There would be only one.  I said A and B.

5    **Q.      Sure.  Basically the responding commander**

6    **changes every month?**

7    A.      Correct.

8    **Q.      What does it mean to be the responding**

9    **commander?**

10   A.      Every month one board member is assigned the

11   responsibility to respond to a police involved shooting

12   and if there's a police involved shooting or death where

13   CIRT was called out, or now The Bureau of Criminal

14   Investigations were called out to do an investigation,

15   that commander is to respond to the scene.

16   **Q.      Physically respond to the scene?**

17   A.      Physically respond to the scene.  Yes.

18   **Q.      And then does that commander become responsible**

19   **for ensuring the investigation?**

20   A.      No.

21   **Q.      Strike that.  Does that commander have any**

22   **further responsibilities?**

23   A.      Usually, yes.

24   **Q.      What are they?**

25   A.      His or her responsibility would be to answer

1   questions that other review members who are reviewing

2   that particular case might have about the scene so they

3   could answer what they saw physically with their own

4   eyes the seen, or information they gathered they seen.

5   Traditionally, or generally the preferred course of

6   actions is the responder would be the author of the

7   findings letter, but that's not always possible.

8   **Q.      We're going to talk in detail about that process**

9   **a little later.  I'm sorry I got sidetracked.  I just**

10   **want to go back and identify all of the different**

11   **documents that are available to you.**

12   **So the board secretary has this calendar, this**

13   **spreadsheet.  Anything else held there, electronically**

14   **or otherwise?**

15   A.      Not that I can think of.

16   **Q.      Okay.  And then CIRT has documents regarding**

17   **these investigations?**

18   A.      Correct.

19   **Q.      IA has some.  Does any other division or area**

20   **within the police department hold any documents at any**

21   **point with regard to the Firearms Review Board with**

22   **regard to shooting investigations?**

23   A.      So CIRT has copies of original files that exist

24   elsewhere in an investigation.  For example, body cam or

25   cruiser video, so those originals would be where they

```
 1    normally are kept, and then the investigators would have

 2    copies of the originals.

 3    Q.      Okay.  Anything else?

 4    A.      I don't believe so.

 5    Q.      Okay.  If at any point you think of additional

 6    documentation that's created at any point in any of

 7    these investigations, please tell me.  Okay?

 8    A.      Okay.

 9    Q.      You have been noticed --

10    A.      I don't know what you're asking for.  If an

11    investigation is also disciplined, then there's a

12    discipline case and there's additional files in a

13    discipline case.

14    Q.      And where are those files held in the

15    department?

16    A.      Either with The Professional Standards Bureau or

17    Internal Affairs.

18    Q.      Okay.  We're here today for you to give your

19    testimony in three different cases involving the City of

20    Columbus.  One is related to the shooting of Deaunte

21    Bell-McGrew, that case is called Cooper.  Are you

22    familiar with that?

23    A.      Vaguely.

24    Q.      Okay.  Do you understand that you're here to

25    give testimony in that case?
```

1    A.      Yes.

2    Q.      Okay.  The second case is England, the shooting

3    of James England.  Are you familiar with that case?

4    A.      Vaguely.

5    Q.      Okay.  But you understand you're here to give

6    testimony in that case, right?

7    A.      Yes.

8    Q.      And the third case is the shooting of Tyree

9    King.  You understand you're here to give testimony in

10   that case as well?

11   A.      Yes.

12   Q.      And then, you're also -- I'm going to ask you

13   some general questions about The Firearms Review Board

14   also.  Okay?

15   A.      Yes.

16   Q.      Okay.  I just want to make sure -- this is a

17   different kind of deposition because we're here for

18   several cases.  So I just want to make sure that you're

19   prepared to give testimony on each of those different

20   cases.

21                  MR. PHILLIPS:  Sarah, not to interfere

22   with your deposition, just so I'm clear what the scope

23   is, he's testifying about The Firearms Review Board as

24   it relates to all of the cases.  He's not testifying

25   specifically -- I know it's for all three separate

1    cases, but he's not the investigator in those three

2    cases.  He's here to testify as to how these things are

3    investigated and then goes through The Firearms Review

4    Board.

5              MS. GELSOMINO:  Yeah.  I understand

6    that.  But also Wes, he was personally involved in the

7    investigation of the England case.

8              MR. PHILLIPS:  Okay.  So how are we

9    going to handle that then, because that's separate from

10   a 30(b)6?

11             MS. GELSOMINO:  Off the record.

12                       - - - -

13      (Thereupon, an off-the-record discussion was held.)

14                       - - - -

15   BY MS. GELSOMINO:

16   Q.      When did you first learn of the shooting of

17   Deaunte Bell-McGrew?

18   A.      I don't recall.

19   Q.      Do you recall when you first learned of that

20   lawsuit?

21   A.      I do not recall.

22   Q.      Okay.  Same question for the shooting of James

23   England.  When did you first hear of that incident?

24   A.      I don't recall.

25   Q.      Do you recall when you first learned of that

```
 1   lawsuit?

 2   A.       I do not.

 3   Q.       When did you first learn of the shooting of

 4   Tyree King?

 5   A.       On the night it happened.

 6   Q.       And how did you learn about it on the night that

 7   it happened?

 8   A.       By phone call.

 9   Q.       From whom?

10   A.       I believe it was from The Communications Bureau.

11   Q.       Why did you get that phone call?

12   A.       Because at the time I was the chair person of

13   the board and I received that phone call.

14   Q.       Okay.  I will ask you more about that particular

15   phone call later.  But when did you first learn of the

16   lawsuit in that case?

17   A.       I don't recall.

18   Q.       When did you first learn that you were being

19   designated as the witness for the deposition?

20   A.       I don't recall.

21   Q.       How many -- do you recall approximately how much

22   notice you had before today's deposition?

23   A.       From being notified of the deposition to today?

24   Q.       Correct.

25   A.       I don't recall.  A month or so.
```

1 Q.  Okay.  So you had plenty of time to prepare for

2 today's deposition, right?

3 A.  Yes.

4 Q.  Okay.  Have you told me everything that you did

5 to gather all information known or reasonable available

6 to the City of Columbus in preparation for this

7 deposition?

8 A.  Yes.

9 Q.  Okay.  Can you just give me a quick rundown of

10 your history with the Columbus Police Department?  When

11 did you start?

12 A.  1994.

13 Q.  As a patrolman?

14 A.  As a recruit.

15 Q.  Okay.  Before that did you have any other law

16 enforcement or corrections experience?

17 A.  No.

18 Q.  Have you ever worked for any other police

19 department or law enforcement agency?

20 A.  No.

21 Q.  Okay.  So where did you do your academy

22 training?

23 A.  In Columbus.

24 Q.  Where?

25 A.  At The Columbus Police Academy.

Deposition of Deputy Chief Kenneth Kuebler          Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

1    Q.       After you were a patrolman what was your next

2    job?

3    A.       Sergeant.

4    Q.       Where?

5    A.       Like what precinct?

6    Q.       Uh-huh.

7    A.       The far east side.  Zone two and zone five.  So,

8    central city and near east side.

9    Q.       Do you know what zone the Deaunte Bell-McGrew

10   shooting happened in?

11   A.       I don't.  It was either two or five.

12   Q.       Okay.  How about the England shooting?

13   A.       Zone two.

14   Q.       And Tyree King?

15   A.       Zone five.

16   Q.       Okay.  How long were you a sergeant there in

17   zone five?

18   A.       I don't recall.  I was a sergeant for about

19   seven years.

20   Q.       Were you a sergeant in other areas?

21   A.       Yes.

22   Q.       Which ones?

23   A.       I was a sergeant over our research and

24   development unit, which crafts policies and forms as an

25   administrative job.

Deposition of Deputy Chief Kenneth Kuebler      Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

1    Q.      Anywhere else?

2    A.      As a sergeant, no.

3    Q.      Do you recall approximately how long you were in

4    the research and development?

5    A.      I want to say about two years.

6    Q.      Okay. So approximately five years or so then as

7    a sergeant in zone five?

8    A.      Zone two and zone five combined.

9    Q.      How are they combined?

10    A.      I worked zone two for some years and zone five

11    for other years.

12    Q.      Okay. I see. And those are both on the far

13    east side?

14    A.      Zone five is the central city. Zone two is the

15    southeast quadrate.

16    Q.      When you were a sergeant in zone two and zone

17    five were there any uses of deadly force?

18    A.      Yes.

19    Q.      In those zones while you were a sergeant there?

20    A.      Yes.

21    Q.      Let's start with zone two. First of all, what

22    years are we talking here approximately?

23    A.      Approximately 2000 to 2007.

24    Q.      Okay. So when you were in zone two tell me

25    about the uses of deadly force that happened.

1   A.      I'm sorry.  I don't recall them specifically.

2   **Q.      How many?**

3   A.      I don't know.

4   **Q.      How could you find out?**

5   A.      I could ask to see CIRT records from those dates

6   and times.

7   **Q.      Were you involved in the investigations of any**

8   **of the uses of deadly force in zone two?**

9   A.      No.

10  **Q.      Why not?**

11  A.      Because sergeants don't do those investigations.

12  **Q.      Okay.  Did you review any of the investigations**

13  **at any point?**

14  A.      I don't recall.

15  **Q.      Did you offer any commentary on any of the**

16  **investigations from zone two?**

17  A.      As a sergeant?

18  **Q.      Yes.**

19  A.      I do not recall.

20  **Q.      Okay.  Did you -- were any of the uses of deadly**

21  **force found to be outside of policy while you were a**

22  **sergeant in zone two?**

23  A.      I don't recall.

24  **Q.      Did you ever observe any uses of force that you**

25  **believed as the sergeant were outside of policy while**

1    you were a sergeant in zone two?

2                    MR. PHILLIPS:  Objection.  Outside of

3    the scope of this deposition.  You can go ahead and

4    answer.

5    A.      Physically observe the actual use of force?

6    BY MS. GELSOMINO:

7    Q.      Sure.

8    A.      No.

9    Q.      Do you believe that any of the uses of force

10   that happened, I understand you didn't observe the uses

11   of force, but do you believe that any of the uses of

12   deadly force that occurred while you were a sergeant in

13   zone two were outside of policy?

14                   MR. PHILLIPS:  Objection.  Outside of

15   the scope.  You can go ahead and answer.

16   A.      I don't recall them.

17   BY MS. GELSOMINO:

18   Q.      Okay.  You don't recall any uses of force that

19   happened there at all?

20                   MR. PHILLIPS:  Objection.  Outside of

21   the scope.

22   A.      I do not.

23   BY MS. GELSOMINO:

24   Q.      Okay.  Same questions for zone five, do you

25   recall any of the uses of deadly force that occurred

Deposition of Deputy Chief Kenneth Kuebler        Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

```
 1   while you were a sergeant there?
 2                   MR. PHILLIPS:  Objection.  Outside the
 3   scope.  Go ahead and answer.
 4   A.      Yes.
 5   BY MS. GELSOMINO:
 6   Q.      Can you tell me about those, please?
 7                   MR. PHILLIPS:  Can I get a continuing
 8   objection on this topic because it's outside of the
 9   scope of this deposition?
10                   MS. GELSOMINO:  That would be great.
11   Go ahead.
12   A.      Can you repeat the question?
13   BY MS. GELSOMINO:
14   Q.      I just want you to tell me about the uses of
15   deadly force that occurred in zone five while you were a
16   sergeant there.
17   A.      I only recall one.
18   Q.      Okay.  Tell me about that one, then.
19   A.      I was involved and I used the deadly force.
20   Q.      That would make it memorable.  Tell me about
21   what happened there?
22   A.      An individual shot two people on the west side
23   of Columbus and fled in a vehicle.  Myself and other
24   officers intercepted that vehicle on I71, and he shot at
25   us about 100 times with an AK-47, and we shot him at the
```

Deposition of Deputy Chief Kenneth Kuebler      Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

```
 1   conclusion of that event.
 2   Q.      Did you shoot him while he was driving in the
 3   vehicle?
 4   A.      We shot him while he was driving the vehicle and
 5   after he exited his vehicle.
 6   Q.      Okay.  What was his name?
 7   A.      I don't recall.
 8   Q.      Did he survive?
 9   A.      Yes.
10   Q.      Were any officers injured?
11   A.      Yes.
12   Q.      Which ones and how?
13   A.      An officer suffered a hearing loss injury, and I
14   believe another from cut glass, flying glass.
15   Q.      Was the suspect injured?
16   A.      Yes.
17   Q.      How so?
18   A.      By gunfire.
19   Q.      Where on his body?  Describe the injuries to me.
20   A.      I don't recall.  I know that one or two was in
21   his shoulder.
22   Q.      Okay.  How many times did you fire in that case?
23   A.      I don't recall.
24                   MR. PHILLIPS:  If this is about his
25   personal deposition, then I'll let you ask these
```

 1    questions, but right now you're doing 30(b)6, right?

 2                    MS. GELSOMINO:  I am.

 3                    MR. PHILLIPS:  So then it's outside of

 4    the scope.  I'll move to strike all of this testimony.

 5    If you want to ask him himself, then that's a different

 6    story.

 7                    MS. GELSOMINO:  Okay.  Let's ask about

 8    his own personal uses of force and his own previous

 9    lawsuits for outside of the scope of the 30(b)6 just as

10    his personal deposition.

11                    MR. PHILLIPS:  Okay.  Is there like a

12    way that we can note when you're switching back and

13    forth in this deposition so the record is clear in the

14    future?

15                    MS. GELSOMINO:  I'll do my best.  I

16    didn't anticipate him going down this road.  So now --

17                    MR. PHILLIPS:  Okay.

18    BY MS. GELSOMINO:

19    **Q.      In terms of your personal experience with your**

20    **previous uses of force, this guy that was shot in the**

21    **car, describe his injuries to me, please.**

22    A.       A number of gunshot injuries, I believe, to the

23    shoulder.

24    **Q.      Other than that one-time have you ever**

25    **discharged your firearm in the line of duty?**

Deposition of Deputy Chief Kenneth Kuebler      Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

```
 1    A.       Yes.
 2    Q.       How many times?
 3    A.       One other time.
 4    Q.       Tell me about that time.
 5    A.       My partner and I were patrolling on five
 6    precinct in the area of Joyce and Windsor Avenue where
 7    we observed another individual with an AK-47 point the
 8    firearm at us.
 9    Q.       Okay.  And then what happened?
10    A.       We became in pursuit of that vehicle and I fired
11    one or two shots at him on Sunbury Road.
12    Q.       Was anyone injured at all?
13    A.       No.
14    Q.       Did you strike the suspect?
15    A.       I did not.
16    Q.       Was he arrested?
17    A.       Yes.
18    Q.       Do you recall his name?
19    A.       I do not.
20    Q.       Were either of these use of force investigated?
21    A.       Yes.
22    Q.       Did you give statements in those investigations?
23    A.       Yes.
24    Q.       Do you recall when that second one was?
25    A.       The second one or the first one?
```

Deposition of Deputy Chief Kenneth Kuebler       Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

1   **Q.**      **The one where you observed a person holding an**

2   **AK-47 and pointing it at you.**

3   A.      That was the first one, and that was in the mid

4   1990s.

5   **Q.**      **That's when you were a patrolman?**

6   A.      Correct.

7   **Q.**      **What were the findings in those two**

8   **investigations?**

9   A.      Both uses of deadly force were found to be

10  within policy.

11  **Q.**      **Have you ever received any discipline at all,**

12  **any level of discipline formal, informal, counselling,**

13  **retraining, anything?**

14  A.      Yes.

15  **Q.**      **Tell me about those.**

16  A.      The first one was a case where I left my cruiser

17  running outside of a run that I was on, and a juvenile

18  stole my cruiser and drove it into the side of a garage

19  and I received a DCC for leaving my cruiser on.

20  **Q.**      **What did you receive?**

21  A.      A DCC. A documented constructive counselling.

22  It's the first level of discipline in the FOP contract.

23  **Q.**      **Okay. Is that like a letter in your personnel**

24  **file or something?**

25  A.      Yes.

1    **Q.**     **Okay. No time off or anything like that?**

2    A.     No.

3    **Q.**     **What was the other discipline?**

4    A.     I lost my badge once. I found it three weeks

5    after I got the discipline. But I lost my badge.

6    **Q.**     **Okay. What kind of discipline did you get for**

7    **that?**

8    A.     I got a DCC. I should say I misplaced my badge.

9    I didn't loose it. I found it.

10    **Q.**     **I understand. Any other discipline?**

11    A.     I don't recall. I received a traffic ticket as

12    a result of an accident.

13    **Q.**     **Okay. Anything else?**

14    A.     I don't believe so.

15    **Q.**     **If you get a traffic ticket is that**

16    **considered -- like do you get disciplined for getting a**

17    **traffic ticket?**

18    A.     It's complicated, but that replaces discipline.

19    In our traffic investigation process you could receive

20    discipline or a traffic ticket, but not both. I

21    received a traffic ticket.

22    **Q.**     **Okay. How about civilian complaints against**

23    **you, are you aware of any?**

24    A.     Yes.

25    **Q.**     **Tell me about the ones that you remember.**

Deposition of Deputy Chief Kenneth Kuebler       Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

```
 1   A.      I don't recall them specifically.  There was one
 2   recently, but the majority of them would have occurred
 3   when I was in patrol.
 4   Q.      What's the recent one?
 5   A.      Somebody filed a complaint regarding my personal
 6   off-duty social media usage.
 7   Q.      Tell me about that.
 8   A.      That's it.  Somebody complained about my
 9   off-duty social media usage.  I believe it was the
10   employee of the City Attorney's Office, but I don't know
11   for sure because I haven't been told.
12   Q.      When were you made aware of this complaint?
13   A.      Approximately July 7th of this year.
14   Q.      Okay.  And do you know what the allegations are
15   regarding your off-duty social media usage?
16   A.      I have no idea.
17   Q.      Well, what have you been told about this?
18   A.      I've been told that I will be investigated for
19   it.
20   Q.      Have you given a statement in that investigation
21   yet?
22   A.      I have not.
23   Q.      Why not?
24   A.      I have no idea.  I haven't been asked to.
25   Q.      When you were informed of it in July how were
```

Deposition of Deputy Chief Kenneth Kuebler        Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

1    **you given notice?**

2    A.        One of the deputy directors from Public Safety

3    notified me.

4    **Q.        No written notice?**

5    A.        It was by e-mail.

6    **Q.        Okay.  What did that e-mail say?**

7    A.        Just what I told you, that I was going to be

8    referred for investigation.

9    **Q.        Who does that investigation?**

10   A.        This one is being conducted by the law firm of

11   Baker Hostetler.

12   **Q.        Do you know why?**

13   A.        I have no idea.

14   **Q.        Have you ever heard of any other investigations**

15   **to a civilian complaint that was conducted by an agency**

16   **outside of the police department?**

17   A.        Yes.

18   **Q.        Tell me about that.**

19   A.        Dozens of them were recently referred to Baker

20   Hostetler out of incidents involving riots this summer

21   downtown.

22   **Q.        Why is that?**

23   A.        I have no idea.

24   **Q.        Okay.  As you sit here today, do you have any**

25   **ideas about what social media posts or whatever was on**

1  **your social media that lead to this complaint could be?**

2  A.      I'd been provided with one single Tweet that I

3  sent in my personal capacity off duty that was

4  referenced, but I don't know what about that particular

5  Tweet -- I don't know if that one is being investigated,

6  but that was provided to me as an example.

7  **Q.      Who provided it to you?**

8  A.      Deputy Director George Speaks.

9  **Q.      What's that Tweet?**

10 A.      I don't have it by memory.

11 **Q.      Can you give me an approximation of what that**

12 **Tweet is?**

13 A.      Yes.

14 **Q.      Go ahead.**

15 A.      It is generally that I stated that if you pay

16 someone to do an investigation for you, it's not an

17 independent investigation.  That person is your personal

18 contractor.

19 **Q.      What were you referring to in that Tweet?**

20 A.      It was just the general concept of whether an

21 independent investigation could be done by somebody that

22 you were paying to do the investigation for you.

23 **Q.      Which investigation were you referencing?**

24 A.      Those investigations are being referred to Baker

25 Hostetler for uses of force.

1    Q.      So you don't believe that it would be an

2    independent investigation that Baker Hostetler will

3    conduct?

4    A.       It was something that I suggested in a Tweet,

5    yes.

6    Q.       What is your opinion on that today?

7    A.       Interestingly, it appears that Baker Hostetler

8    actually did pretty good independent investigations,

9    however, the response by the people who paid for that

10   seem to suggest that they excepted a different outcome.

11   Q.       Who paid for that?

12   A.       Columbus City Council by direction of the Mayor.

13   Q.       What do you base your statement on that it seems

14   like they did a pretty good investigation?

15   A.       I've read most of them.

16   Q.       What about them makes you say that they're good?

17   A.       They were thorough.  They were complete.  They

18   got all the available witnesses, et cetera, and they

19   came to conclusions that I believe were fair.

20   Q.       Okay.  What were the conclusions?

21   A.       There's dozens of them, but some of them were

22   sustained, some of them were unfounded, and some of them

23   were not sustained, some of them were exonerated, and

24   some were cancelled for cause, I believe.

25   Q.       Did you read these because you were interested

1  personally, or did you read them within your official

2  capacity somehow as a police officer?

3  A.     Within my official capacity.

4  Q.     Why?

5  A.     We were to review them and render our findings

6  on them.

7  Q.     Interesting.  Who's we?

8  A.     The deputy chiefs.

9  Q.     All of you?

10  A.     Yes.

11  Q.     How does that work?  Baker Hostetler gave you

12  their findings from their investigations, right?

13  A.     Correct.

14  Q.     And then what was the next step?

15  A.     They were assigned a deputy chief to render

16  their findings.

17  Q.     Could you overturn the findings?

18  A.     Yes.

19  Q.     How many deputy chiefs reviewed each conclusion?

20  A.     I don't understand that question.

21  Q.     Sure.  So there's a bunch of different

22  investigations, right?

23  A.     Yes.

24  Q.     So for each investigation, each case, how many

25  deputy chiefs reviewed the findings of each case?

```
 1    A.        It depends, but generally one.

 2    Q.        So one deputy chief could agree or disagree,

 3    right?

 4    A.        Yes.

 5    Q.        And then what happened next?

 6    A.        That would be the final determination.  The

 7    deputy chief is the final decider.

 8    Q.        How many did you review personally?

 9              MR. PHILLIPS:  Hey, Sarah, I'm going

10    to object.  I think this is very irrelevant to our case.

11    I've let you go pretty far with this, but I think this

12    has more to do with the protest issue than police

13    involved shootings.  I can let you go a couple more

14    questions, but it seems like -- I don't know if it's

15    your intention, but it seems from where I'm sitting like

16    this is more discovery for a different lawsuit.

17              MS. GELSOMINO:  Well, I don't have any

18    other lawsuits right now.

19              MR. PHILLIPS:  Right.  I get that, but

20    if you were in my shoes, you may be saying the same.

21    This seems a little different than the police involved

22    shooting situations.

23              MS. GELSOMINO:  I don't want to spend

24    too much more time on it, but it is an investigation in

25    the police department that's done in a different way, so
```

 1    I'm curious about that.  And I think that's relevant

 2    because we're here to talk about investigations in the

 3    department.

 4                    MR. PHILLIPS:  And if you've noticed,

 5    I have let you go.

 6                    MS. GELSOMINO:  I appreciate it, and

 7    I'm really almost done.

 8    BY MS. GELSOMINO:

 9    Q.      In terms of the ones that you, yourself,

10    reviewed, did you change any of the findings or disagree

11    with any of the findings of the law firm?

12    A.      I don't believe so.  Nothing substantively.

13    Q.      Do you know if any of the deputy chiefs

14    disagreed on any of the cases?

15    A.      Yes.

16    Q.      Do you know what those cases were about?

17    A.      I don't.

18    Q.      Do you know weather there were any cases where

19    the law firm found the use of force to be unjustified

20    that the deputy chief changed or disagreed with?

21    A.      I don't believe so, no.

22    Q.      Now, you started this off by saying that you

23    thought the reaction from the people who paid for the

24    investigation leads you to think that they were

25    expecting different conclusions.

1  A.      Yes.

2  **Q.      Why do you say that?**

3  A.      I believe the Mayor's words were that he was

4  angry and surprised at the outcome, and City Council

5  President made similar comments.

6  **Q.      And your Tweet was related specifically to these**

7  **investigations?**

8  A.      A general concept.

9  **Q.      But you were referencing these investigations,**

10  **right?**

11  A.      No.  I did not reference these investigations.

12  It was a general comment.

13  **Q.      What led you to Tweet that?**

14  A.      I was watching a press conference about the

15  announcement of the investigations at the time.

16  **Q.      Okay.  What's your Twitter handle?**

17  A.      @Kenkeebs.

18  **Q.      How do you spell Keebs?**

19  A.      K-E-E-B-S.

20  **Q.      Do you use any other social media?**

21  A.      Yes.

22  **Q.      What?**

23  A.      What?

24  **Q.      What other social media?**

25  A.      Instagram, Facebook, Nextdoor, LinkedIn.  I have

 1   several Twitter accounts.

 2   **Q.     Okay.  Tell me your other Twitter accounts then.**

 3                MR. PHILLIPS:  Sarah, I have defended

 4   a deposition about police social media before, we're

 5   fine talking about anything that relates to police

 6   stuff, but we're always worried about police officers

 7   with strictly personal social media that's just family

 8   stuff.  So if you could, if it's anything that's just

 9   family and not talking about the police --

10                MS. GELSOMINO:  Well, I don't agree.

11   All social media accounts are potentially relevant.

12                MR. PHILLIPS:  They are?

13                MS. GELSOMINO:  Yeah.

14                MR. PHILLIPS:  If they're talking

15   about police issues, sure.  If they're talking about,

16   like, I don't know, somebody's kids, no, they're not.

17                MS. GELSOMINO:  I have no interest in

18   exposing someone's children, Wes, but I don't think you

19   could pick and choose which social media accounts I'm

20   told about in this deposition because of the

21   representation that somebody posts about their family on

22   one of those social media accounts.  I'm still entitled

23   to know which social media account he's using to post

24   across formats.

25                MR. PHILLIPS:  How is it relevant if

1  it's just strictly a family issue?

2                    MS. GELSOMINO:  If it has to do with

3  just strictly family issues, and then it could be sussed

4  out down the line.  I'm not going to take a

5  representation that something has nothing to do with any

6  policing or other types of comments that could indicate

7  something in this case.

8  BY MS. GELSOMINO:

9  Q.      **Ken, do you have any social media accounts where**

10 **you've only posted about your family?**

11 A.      Yes.  No.

12 Q.      **Okay.  So tell me about all of your social media**

13 **accounts.  What are our other two Twitter handles?**

14 A.      I don't know all of my Twitter handles off the

15 top of my head.  They're in the app.  One of them in a

16 version of Popups, P-O-P-U-P-S.  I ran a social media

17 account for a company called Bright Force Software,

18 which is, I believe, now defunct about six or eight

19 years ago, and that would by it.

20 Q.      **Bright Force Software?**

21 A.      Bright Force, yes.

22 Q.      **What kind of software is that?**

23 A.      They wrote software for security guard companies

24 like for security guards to walk around, check in and do

25 reports and things.

1    Q.       Okay.  Did you work for that company in any

2    other capacity other than running their social media?

3    A.       No.

4    Q.       What's the Popups account?

5    A.       It references '80s and '90s cars.  I'm a car

6    geek and it references '80s and '90s models of specific

7    cars.  It hasn't been posted to in years.  We ran a car

8    show a couple of years ago for charity.

9    Q.       That's cool.  That's it for Twitter?

10   A.       That's it for Twitter.

11   Q.       How about Instagram?

12   A.       I have one account that I use to follow my

13   family.

14   Q.       What's that?

15   A.       Phyveau.  P-H-Y-V-E-A-U-X.

16                MR. PHILLIPS:  Hey, Sarah, if you file

17   this deposition will you file that under protection,

18   under seal?

19                MS. GELSOMINO:  His Instagram name?

20                MR. PHILLIPS:  Accounts that are used

21   just to do family issues.

22                MS. GELSOMINO:  Sure.

23   BY MS. GELSOMINO:

24   Q.       Have you ever posted on your Instagram or liked

25   any pages or commented on anything that's not related to

Deposition of Deputy Chief Kenneth Kuebler          Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

```
 1    your family?

 2    A.      On Instagram?

 3    Q.      On Instagram.

 4    A.      Yes.

 5    Q.      Any other Instagram?

 6    A.      Yes.   Concurrent Popups related to the same

 7    Twitter.

 8    Q.      Okay.   How about Facebook?

 9    A.      Yes.

10    Q.      What are your names on Facebook?

11    A.      James Logan.

12    Q.      Just James L-O-G-A-N?

13    A.      Yes.

14    Q.      What else?

15    A.      That's it.

16    Q.      And you said that you used Nextdoor?

17    A.      Yes.

18    Q.      Okay.   What's your name on that?

19                    MR. PHILLIPS:   I'm going to object to

20    that.  That's going to give up where a police officer

21    lives.

22                    MS. GELSOMINO:   I don't even know what

23    Nextdoor is.

24                    MR. PHILLIPS:   It's a neighborhood

25    app.
```

1  BY MS. GELSOMINO:

2  **Q.      Ken, how do you use that?**

3  A.      What do you mean by how do I use that?  I open

4  the application and type things in it.

5  **Q.      What's the purpose of the app?**

6  A.      I have no idea.  It's a social media app for

7  neighborhood.

8                    MR. PHILLIPS:  It's like if there's a

9  lost dog on your street or things of that nature.  A car

10  break in on your street or the next street.  With a

11  police officer, it's dangerous to give up people's home

12  address and where they live.

13                    MS. GELSOMINO:  I have no interest in

14  giving out his personal address for anything.  If you

15  want to keep this particular name under seal for

16  Nextdoor, I'm fine with that for now.  If something

17  comes up then we need to discuss that later, but it's

18  under abundance of caution that's fine.  Can you just

19  give it to me off the record?

20                    MR. PHILLIPS:  Let's go off the

21  record.

22                             - - - -

23     (Thereupon, an off-the-record discussion was held.)

24                             - - - -

25  BY MS. GELSOMINO:

1  Q.      Okay.  What about Snapchat?

2  A.      No.

3  Q.      Do you use any other social media accounts?

4  A.      I mentioned LinkedIn.

5  Q.      Oh, right.  What's your name on LinkedIn?

6  A.      Ken Kuebler.

7  Q.      Okay.  Any other social media?

8  A.      No.

9  Q.      Do you blog?

10  A.      I do not.  I have posted things on LinkedIn.

11  Q.      Okay.  Have you ever?

12  A.      I'd say thought pieces.  I wouldn't call it a

13  blog.

14  Q.      Okay.  Do you post thought pieces anywhere else

15  other than LinkedIn?

16  A.      I do not.

17  Q.      Okay.  Have you ever?

18  A.      No.

19  Q.      Have you ever written anything else for any

20  other publication or website?

21  A.      No.  I was published in a medical journal at one

22  point, co-published a medical piece on Narcan years ago,

23  but I don't know if that counts as a blog or a thought

24  piece necessarily.

25  Q.      That's pretty cool.  Any other times that you

Deposition of Deputy Chief Kenneth Kuebler          Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

```
 1    were published?

 2    A.      I don't believe so.

 3    Q.      Have you ever written for any police magazines?

 4    A.      No.

 5    Q.      Okay.  Nothing for any professional

 6    organizations that you belong to?

 7    A.      No.

 8    Q.      Okay.  It's my understanding that you've been

 9    sued before, is that correct?

10    A.      Yes.

11    Q.      Okay.  How many times have you been named as a

12    defendant in a lawsuit?

13    A.      I don't know.

14    Q.      Okay.  Do you know the names of any of the

15    lawsuits that you've been named in?

16    A.      I do not.

17    Q.      Do you recall the allegations against you raised

18    in any of the lawsuits?

19    A.      I do not.

20    Q.      Have you ever given a deposition in a case where

21    you were a defendant?

22    A.      Yes.

23    Q.      Like where you were accused of having personally

24    been involved in an incident?

25    A.      I get confused with your legal world, but I've
```

1    been deposed and named in a dozen or more lawsuits in my

2    official capacity here in the division, and I don't

3    recall all of them.

4    Q.      Do you know whether any those lawsuits resolved

5    in favor of the plaintiff?

6    A.      Not that I'm aware of.

7    Q.      Did you ever have to testify in court for any of

8    those case?

9    A.      No.

10   Q.      Do you know if any of them went to trial?

11   A.      I don't know.

12   Q.      Do you know if any of them settled?

13   A.      I don't know.

14   Q.      Do you know whether they were in federal court

15   or state court?

16   A.      I don't know.

17   Q.      Okay.

18   A.      I believe both.

19   Q.      Okay.  Have you ever been charged with a crime?

20   A.      I got a traffic ticket once.

21   Q.      Okay.  Have you ever been arrested?

22   A.      No.

23   Q.      Okay.  Let's finish your employment history with

24   the Columbus Division of Police.

25                      MS. GELSOMINO:  And we'll do this back

```
 1   to his capacity as a 30(b)6.

 2                       MR. PHILLIPS:  That works.

 3   BY MS. GELSOMINO:

 4   Q.      Okay.  So we left off with your seven years as a

 5   sergeant, and you told me that for some period of time

 6   that you were in the research and development, right?

 7   A.      Yes.

 8   Q.      Did you work on -- what did you work on while

 9   you were there as a sergeant?

10   A.      As sergeant I oversaw the work of officers, but

11   they worked on policies and directives and forms and

12   research for the chief or other units in the division

13   that asked for research to be done.

14   Q.      Does that department still exist?

15   A.      Yes.

16   Q.      Did you participate in rewriting any policies?

17   A.      Yes.

18   Q.      Which ones?

19   A.      I don't recall.

20   Q.      Did you ever rewrite any research or oversee any

21   of that happening regarding use of force?

22   A.      I don't know.  Probably, but I don't know for

23   sure.

24   Q.      Okay.  How about anything regarding the Firearms

25   Review Board?
```

Deposition of Deputy Chief Kenneth Kuebler      Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

```
1   A.      Not that I recall, but it wouldn't surprise me

2   if I did.

3   Q.      Okay.  What did you do after your seven years as

4   a sergeant?

5   A.      I was promoted to Lieutenant.

6   Q.      Do you recall what year that was?

7   A.      I believe it was 2007.

8   Q.      Okay.  What were your assignments as the

9   lieutenant?

10  A.      I was Patrol Lieutenant only.

11  Q.      How many patrol lieutenants are there in the

12  division?

13  A.      Upper 20s, I believe, mid 20s.

14  Q.      Okay.  So what areas did you oversee?

15  A.      I covered third shift primarily on zone five.

16  Q.      What's third shift?

17  A.      10 p.m. to 6 a.m., or 11 p.m. to 7 a.m.

18  Q.      Okay.  How long were you a Lieutenant there?

19  A.      Three years.

20  Q.      And then what?

21  A.      I was promoted to Commander.

22  Q.      That was in 2010?

23  A.      Yes.  2010.

24  Q.      Okay.  And what was your assignment as a

25  Commander?
```

Deposition of Deputy Chief Kenneth Kuebler  Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

1 A.  I was a Technical Service Bureau Commander.

2 **Q.  What does that mean?**

3 A.  The Technical Services Bureau Commander at the

4 time oversaw fleet, records management, identification,

5 fingerprints, facilities, the computer systems, the

6 network, all the support functions in the background of

7 the division, technical support functions.

8 **Q.  Okay.  How long did you do that?**

9 A.  Two years.

10 **Q.  And then what?**

11 A.  I was promoted to Deputy Chief.

12 **Q.  How many commanders are there within the**

13 **division?**

14 A.  The number has vacillated between 17 and 18, but

15 there are currently 18.

16 **Q.  Okay.  So you became Deputy Chief around like**

17 **2012?**

18 A.  Correct.

19 **Q.  How many deputy chiefs are there?**

20 A.  There are currently six.

21 **Q.  And in 2012 were there six?**

22 A.  Yes.

23 **Q.  Okay.  What was your responsibility when you**

24 **first became deputy chief in 2012?**

25 A.  I was one of two Patrol Deputy Chiefs.

Deposition of Deputy Chief Kenneth Kuebler          Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

1   Q.        For how long did you do that?

2   A.        Five years until October, fall of 2017.

3   Q.        Did you and the other patrol deputy chiefs split

4   the city geographically?

5   A.        Yes.

6   Q.        What were you responsible for?

7   A.        I was responsible for patrol south, which was

8   zones two, three and five.

9   Q.        Okay.  And then after the fall of 2017 where did

10  you go?

11  A.        I'm now where I'm at currently, the Special

12  Operation Subdivision Deputy Chief.

13  Q.        Are you the only deputy chief within that

14  division?

15  A.        Yes.

16  Q.        What are your responsibilities within the

17  subdivision?

18  A.        I oversee the communication bureau, which

19  includes the 911 call takers and dispatchers.  So the

20  personnel there, not the hardware or the computer

21  systems in the background or not the radio.  The Traffic

22  Bureau, which includes motorcycles, freeway patrol,

23  mounted unit and felony traffic investigations.  And

24  then the Special Services Subdivision, which includes

25  SWAT, K9, aviation, executive protection, and large

Deposition of Deputy Chief Kenneth Kuebler      Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

1    event planning, the emergency operation center.  That's

2    it.

3    **Q.     That's a lot.  Do you have any special training**

4    **in any of those areas that qualifies you to be the**

5    **deputy chief overseeing them?**

6    A.     I have extensive training on the event planning

7    and emergency management piece.

8    **Q.     Okay.  When did you receive that?**

9    A.     Throughout my entire career.

10    **Q.     Okay.  What about SWAT or K9?**

11    A.     No.

12    **Q.     Have you ever been in any leadership capacity**

13    **overseeing the Firearms Review Board or any other**

14    **investigative body?**

15    A.     Those are two separate questions.  Firearms

16    Review Board doesn't do investigations.  I've overseen

17    the Firearms Review Board and, as I mentioned, I'm

18    overseeing the accident investigation unit currently,

19    which does felony traffic investigation.

20    **Q.     Okay.  Where in the division of the department**

21    **does the Firearms Review Board sit?**

22    A.     Everywhere.  The Firearms Review chairperson is

23    a deputy chief of police.  The people who sit on the

24    board are commanders throughout the division of police.

25    It isn't a full-time job.

1  Q.       Right.  Okay.  Have you ever been the

2  chairperson?

3  A.       Yes.

4  Q.       When?

5  A.       From approximately 2012 to 2017.

6  Q.       Okay.  So is the chairperson the deputy chief of

7  the patrol division?

8  A.       No.  The chairperson is the deputy chief named

9  by the chief of police.

10  Q.       It could be any of the deputy chiefs?

11  A.       That's correct.

12  Q.       Got it.  Tell me those years again.

13  A.       Roughly from the time that I was promoted in

14  2012 until I changed my assignments to the special

15  operations subdivision.

16  Q.       Okay.

17                MS. GELSOMINO:  I'd like to take a

18  quick break before we move on and talk about the next

19  area.  Give me five minutes or so.

20                      - - - -

21     (Thereupon, an off-the-record discussion was held.)

22                      - - - -

23                MS. GELSOMINO:  Okay.

24  BY MS. GELSOMINO:

25  Q.       We're going to talk now about the FRB.

1   **Something that you're very familiar with and I'm not.  I**

2   **want you to walk me through this whole process.  From**

3   **the time of a police involved shooting on the street**

4   **what happens?**

5   A.      So as I mentioned before, the Firearms Review

6   Board responder will show up.  At the time these

7   lawsuits are referencing the critical response team,

8   which is a group of, a specialized group of homicide

9   detectives will respond to the scene and conduct the

10  criminal investigation into the use of deadly force.

11       So is CIRT team will conduct a criminal

12  investigation.  In the case of a death, they will

13  present that case to the County Prosecutor's office for

14  the Grand Jury.  At the conclusion of the investigation,

15  if it was a death, at the conclusion of the Grand Jury

16  process, the investigation that CIRT conducted would be

17  forwarded to the Firearms Death Review Board, firearms

18  police involved situation Death Review Board.

19       At the conclusion if there was not a death, a

20  determination will be made whether there should be

21  criminal charges filed for felonious assault, for

22  example, or whatever the shooting would acquaint.  If

23  there's no charge for that non-death, again it would

24  also go to the Firearms Review Board for their process.

25  The Firearms Review Board's process is do the

1    administrative review of that shooting to determine if

2    policy violations had occurred.  The legal decisions

3    were made either by the Grand Jury in the case of a

4    death, or by the investigator in the case of not a

5    death.  At the conclusion of that, that investigation is

6    forwarded to the board for review in determination of

7    policy violations occurring.

8    Q.      Okay.  And every single police involved shooting

9    **is referred at some point to the FRB?**

10   A.      Accidental discharges are not referred to the

11   board necessarily.  Accidental discharges are referred

12   to the board, unless it occurred at the range.  So an

13   accidental discharge of a weapon during firearms

14   training is not referred to the board.  And then also,

15   shootings involving animals and such are also reviewed

16   by the board, but not investigated by CIRT.  So CIRT

17   would not do a criminal investigation for the shooting

18   of an animal or a non-intentional discharge.  A

19   lieutenant would do that investigation and forward that

20   investigation to the board for policy review.

21   Q.      Okay.  So the FRB responder, whoever that

22   **commander is on the calendar, right, they're the one who**

23   **gets the call?**

24   A.      Yes.

25   Q.      Who makes that call from the scene?

1    A.       Nobody from the scene calls the board responder.

2    Our communications bureau, the 911 dispatches and such

3    will make that call to the board member.  They have a

4    list of that call out.  They have that call-out calendar

5    and they make that call.

6    Q.       **In addition to the other calls that they have to**

7    **make involving a shooting?**

8    A.       Correct.

9    Q.       **What does that FRB responder do on the scene?**

10   A.       He or she will meet with the lead detective to

11   check in and say I'm here, let the CIRT sergeant know

12   that he or she has arrived at scene.  We'll generally

13   just do observations to see what the scene looks like at

14   the time without necessarily going into the scene, but

15   reviewing the scene from outside, and just being in tune

16   for any issues or concerns or things that they might

17   need to know from an administrative perspective that the

18   criminal investigator might not necessarily be

19   interested in finding out.  I can't come to an example,

20   but there might be an administrative question that's not

21   relevant to the criminal investigation that the board

22   member might want to have tidied up.

23   Q.       **You can't think of any examples of what that**

24   **might be?**

25   A.       Not off the top of my head.  I just wanted to

1   leave that out there. It's one of the responsibilities

2   to look for things that a criminal investigator may not

3   pick up on that would be important in making an

4   administrative decision. Certainly a shooting could be

5   legally justified, but not justified by policy.

6   **Q.        Sure.  Have you ever been involved in any --**

7   **strike that.  I mean, since 2005 have any shootings been**

8   **found to be legally justified but outside of policy?**

9   A.        Well, the England case was originally found

10   outside of policy and, obviously, was not presented for

11   legal prosecution. That's one here. I don't want to

12   say no, but I'm trying to think off the top of my head

13   of one that I can think of. There's one that I actually

14   was the board responder on in 2010 or so, and that was

15   an officer Billy Camp-Donavon, and she fired at a

16   fleeing murder suspect, and that was found to be legally

17   justified, but not within division policy. She shot at

18   him fleeing in a car with a bad backstop and such. It

19   was not presented for prosecution, but she was

20   departmentally charged for policy violation.

21   **Q.        And what was the violation of policy there?**

22   A.        Firing at a moving vehicle when it wasn't a

23   threat to her, and general backstop, putting other

24   people in danger with your use of deadly force.

25   **Q.        Does that mean like --**

Deposition of Deputy Chief Kenneth Kuebler    Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

1   A.     People that would have been down range of her if

2   she missed the person or what she was shooting at.

3   **Q.     In her line of fire.  Okay.  What was the**

4   **discipline that was recommended?**

5   A.     I don't recall.  It was a suspension of some

6   number of hours, but I don't recall what those hours

7   were.

8   **Q.     Do you know whether she was actually suspended?**

9   A.     She was.  As I recall she was, yes.

10   **Q.     Okay.  Other than the England case and her case**

11   **can you think of any other times since 2005 where a**

12   **discharge has been found legally justified but a**

13   **violation of policy?**

14   A.     When I say, "legally justified," the shootings

15   that don't involve a death not necessarily going to a

16   Grand Jury for prosecution.  The decision to prosecute

17   is made without the use of a Grand Jury.  When I say,

18   "legally justified," what I mean is it was not

19   prosecuted, but certainly we have had a number of

20   outside of policy uses of deadly force, so I have to say

21   yes, but I can't think of the nature of those cases.

22   **Q.     We'll go through some later so maybe it will**

23   **refresh your recollection.  In general though, where**

24   **could we look to find the answer to that?**

25   A.     The spreadsheet that I mentioned before managed

1  by the Firearms Review Board administrative secretary.

2  **Q.       Okay.  The FRB responder that goes to the scene,**

3  **does that person have any other responsibilities on the**

4  **scene that you haven't told me about yet?**

5  A.      No.  Let me back up to the previous question

6  also.  Every unintentional discharge or accidental

7  discharge, we use the unintentional instead of

8  accidental, but we commonly use both words.  Every

9  unintentional discharge is a violation of policy, but

10  not prosecuted.  Those investigations are done by a

11  lieutenant, not by the board.  We don't present that as

12  a negligent discharge type of case.

13  **Q.       Wait.  The investigation for an accidental**

14  **discharge are not done at all by the Firearms Review**

15  **Board?**

16  A.      Investigations are not done by the review board,

17  they're done by CIRT or a lieutenant.  The board reviews

18  investigations but does not conduct investigations.  An

19  accidental discharge is investigated by a lieutenant.

20  **Q.       And still reviewed by the FRB?**

21  A.      Correct.  The exception to that is, if it could

22  be reasonably believed that an unintentional discharge

23  was intended for a human, if you're chasing a suspect

24  and your gun goes off, if somebody might think it was

25  intended toward somebody else, CIRT will do that

Deposition of Deputy Chief Kenneth Kuebler          Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

1    investigation.

2    **Q.      Okay.  Who makes that decision?**

3    A.      Generally the consultation between the

4    lieutenant and the CIRT, and the lieutenant's commander

5    or the CIRT commander, and sometimes it gets up to

6    deputy chief, if there's a question we err on the side

7    of having CIRT do an investigation.

8    **Q.      Okay.  Does anyone from the FRB have anything to**

9    **do with that decision?**

10   A.      No.

11   **Q.      Okay.  The FRB responder on the scene, do they**

12   **do anything else that you haven't told me about?**

13   A.      No.

14   **Q.      Okay.  Is that person or any representative of**

15   **the FRB involved in any way in the investigative**

16   **process?**

17   A.      No.

18   **Q.      Do they have access to the investigative process**

19   **during the investigation?**

20   A.      No.

21   **Q.      Never sit in on interviews or anything?**

22   A.      No.

23   **Q.      Okay.  Why not?**

24   A.      Because they're a review board, not an

25   investigative board.  Their job is simple to review the

 1    investigations, not conduct them.

 2    Q.      Okay.  Do they have any investigative powers,

 3    like, at some point if someone on the FRB wants to talk

 4    to the shooting officer or something, or a witness?

 5    A.      No.

 6    Q.      They can't do that?

 7    A.      No.

 8    Q.      Okay.  Can someone on the review board request

 9    further investigation into any specific area?

10    A.      Yes.

11    Q.      How does that work?

12    A.      The board member who is reviewing an

13    investigation, if they have concerns about an

14    investigation could go to a chairperson, who would then

15    reach out to investigative subdivision's deputy chief to

16    recommend a further explanation as to something that

17    occurred.

18    Q.      Okay.  How often does that happen?

19    A.      It's infrequent, but it has occurred on

20    occasion.

21    Q.      Okay.  Can you think of any time that it's

22    occurred since 2005?

23    A.      Yes.

24    Q.      Tell me about those times.

25    A.      I can think of just one off the top of my head.

1    It involved a SWAT shooting that I investigated and I

2    had some questions about the recorded interviews of one

3    of the witnesses.  So I consulted with an investigative

4    deputy chief and I said, "I'm confused as to this line

5    of questioning from the investigator to the" -- I was

6    confused by the summary, I guess I should say, of the

7    discussion that the investigator had with the witness,

8    and they went back and reviewed that audio of that and

9    clarified some questions for me.

10   **Q.      Okay.  When you say that you investigated that,**

11   **what do you mean by that?**

12   A.     I said investigated?  I meant reviewed it as the

13   deputy chief.

14   **Q.      You're going to confuse me.**

15   A.     No.  I reviewed the shooting as the deputy

16   chief, the ultimate decider on that shooting, and I

17   wanted that summary cleared up.

18   **Q.      Okay.  So the FRB responder goes out to the**

19   **scene, but then a long period of time can pass before**

20   **that shooting gets back to the FRB for review, right?**

21   A.     Yes.

22   **Q.      Does the FRB do anything until the conclusion of**

23   **the investigation?**

24   A.     No.

25   **Q.      The criminal investigation?**

Deposition of Deputy Chief Kenneth Kuebler     Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

1   A.     No.

2   Q.     **Okay.  So then how does the investigation get**

3   **sent to the FRB?**

4   A.     When the criminal investigation is concluded,

5   the CIRT sergeant will complete the packaging up of the

6   investigative materials, deliver it to the

7   administrative secretary and the administrative

8   secretary will assign it to three board members for

9   their review.  It's physically hand-delivered.

10   Q.     **Is this still all done with physical copies?**

11   A.     Yes.

12   Q.     **Is there any electronic file whatsoever?**

13   A.     No.  It's printed out, obviously, from an

14   electronic file.  There's a Word document somewhere

15   that's printed and bound, but the electronic package is

16   not forwarded around.  It's printed as a binder of

17   investigation.

18   Q.     **Okay.  And you said that binder is delivered to**

19   **the board secretary?**

20   A.     Correct.  Usually three copies of it.

21   Q.     **Okay.  Who's the board secretary?**

22   A.     Currently it's a woman named Nancy Cameron.

23   C-A-M-E-R-O-N.

24   Q.     **Was Nancy Cameron the board secretary in 2015,**

25   **'16 and '17?**

```
 1   A.      Yes.
 2   Q.      Okay.  And then she assigns it to three board
 3   members?
 4   A.      Correct.  Generally a responder plus two others,
 5   but it's not always possible.
 6   Q.      Why is it not always possible?
 7   A.      People retire or leave and are no longer
 8   available.
 9   Q.      Are there any other reasons?
10   A.      There are a number of commanders.  The
11   professional standard bureau commander who cannot sit on
12   the board because of their roles in processing
13   discipline.  It's possible that in-between the person
14   being the responder and the conclusion of that
15   investigation that commander may have changed
16   assignments.  If a commander moved to an assignment or
17   they time out.  There's time limits of sitting on the
18   board as well.  She tries to manage that so a person
19   doesn't get an investigation if they're coming close to
20   their timing out of the board.
21   Q.      Is that just discretionary?  Like her discretion
22   to determine which board members are on which shootings?
23   A.      Yes.  It's about managing caseload and how many
24   they have.  During busier times or years, somebody might
25   get more than they get otherwise, but she tries to
```

1   balance the load.

2   **Q.      Okay.**

3   A.      You wouldn't assign the person's commander

4   either.  So if the review board -- if a person has

5   changed from one assignment to another during the course

6   of an investigation she would try not to assign the

7   investigation to that employee's current commander to

8   sit on the board.  That person's current commander will

9   review the case later after the board has rendered its

10  findings.

11  **Q.      Okay.  How many members of the Firearms Review**

12  **Board are there at any given time?**

13  A.      Nine.

14  **Q.      How are those nine members chosen?**

15  A.      They are assigned by considering who is

16  currently available; who hasn't timed out; who isn't in

17  the one of those prohibited positions, like Internal

18  Affairs and Professional Standards.  And then they're

19  assigned -- I haven't been the board chair for three

20  years, and if I recall it was a three year term, and so

21  you'll spend some of that time as a responder and some

22  of the time as a reviewer only.  Of those nine, six of

23  any given year are responders, and the other three are

24  just reviewers.

25  **Q.      Okay.  Who assigns them?**

```
 1   A.        To the board?

 2   Q.        Yes.

 3   A.        The chairperson.

 4   Q.        And who selects the chairperson?

 5   A.        The chief of police.

 6   Q.        Is that a three year assignment as well?

 7   A.        There's no term on the chairperson.

 8   Q.        Okay.  And you were the chair person from 2012

 9   to 2017?

10   A.        Approximately, yes.

11   Q.        Okay.  Why did you end up leaving that position?

12   A.        The chief just reassigned me when I left patrol

13   and was taking on a new role.  The chief likes to push

14   all those responsibilities around to make sure everyone

15   has opportunities and cross-training.  And you don't

16   want to leave a board position in one-person's control

17   for too long.  It's just generally not a good practice.

18   Q.        Okay.  So once Nancy assigns a file to three

19   board members, right?

20   A.        Yes.

21   Q.        What's next?

22   A.        The board members will review the investigation

23   and they will generally consult with each other and the

24   assigned writer, which is usually the responder, will

25   render the opinion of the board.  It's a majority
```

1    opinion as to the outcome.  So two of the three, or

2    three of the three must agree to a finding.

3    **Q.        What if one -- can a person descent?**

4    A.        Yes.

5    **Q.        How do they do that?**

6    A.        So sometimes they'll write a descent and that

7    will be included with a board's finding.  Sometimes the

8    writer will record the descenter's descent in the

9    board's rendered finding.  But regardless all three

10   members will sign the board's finding, the majority

11   finding of the board, and if the descenter wants to

12   write a descent, he or she can do that as well.

13   **Q.        Okay.  What materials are included for the board**

14   **members to review?**

15   A.        Sometimes hundreds of sheets of paper, which is

16   the CIRT investigation; that's the documented witness

17   transcripts, and descriptions of the scene.  The

18   coroner's report if it's a fatality.  News articles

19   about the incident.  Charging documents if there were to

20   be a charge out of it.  Videos, audio recording,

21   surveillance videos or body cam videos that are on CD or

22   DVDs.  Our internal report system report.  So at any

23   time an investigation is conducted whether it's a

24   burglary or a shooting, there's an internal report

25   created, victim, suspends, witnesses, et cetera.  That

1    report will be printed out and included in that

2    investigation.  They're called progress summaries.

3    Everything that the detective reduces to writing to

4    discuss what's happened.

5    **Q.      As a reviewer do you have a responsibility to**

6    **read and review every bit of evidence that's presented**

7    **to you?**

8    A.      Yes.

9    **Q.      So do you review the actual transcripts or**

10   **summaries?**

11   A.      Personally I would review the transcripts and

12   the summaries both.

13   **Q.      What about the rest of the FRB?**

14   A.      They were expected to be a thorough review.

15   Whether they do a summary review or a transcript review,

16   I don't know.  I couldn't answer which portion.

17   **Q.      Okay.  Is the thorough review defined anywhere?**

18   A.      I don't believe so.

19   **Q.      So what happens are the writer writes the**

20   **opinion of the board?**

21   A.      It is then forwarded to the employee or

22   employees, plural, chains of command for their final

23   findings.  So the board is a recommendation, and then

24   the deputy chief eventually.  So, if it's an officer, it

25   will be sent to the officer's sergeant, who then sends

1   it to the lieutenant, the commander, then the deputy

2   chief, and the deputy chief will render a final decision

3   unless the deputy chief disagrees with the board.

4   **Q.      Okay.  Let's break that down a little bit.  So**

5   **the board makes a recommendation?**

6   A.      Yes.

7   **Q.      What kind of recommendation?**

8   A.      A finding of -- so beginning in 2013 somewhere

9   in there we reduced it to four possible outcome

10  recommendations from the board.  So was the use of

11  deadly force intentional or unintentional, and was it a

12  violation of policy or not a violation of policy.

13  **Q.      Okay.  So you make those recommendations or**

14  **findings.  Does the board also make a recommendation for**

15  **discipline?**

16  A.      No.

17  **Q.      So they just say in policy, intentional or vise**

18  **versa, it's just those four lines and that's it?**

19  A.      Yes.  That's it.

20  **Q.      So then it's forwarded to the chain of command**

21  **of the individual employee?**

22  A.      Yes.

23  **Q.      Where does it start?**

24  A.      It depends on the rank of the person.  If it was

25  a sergeant who fired, it would start with the sergeant's

Deposition of Deputy Chief Kenneth Kuebler          Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

```
 1   lieutenant.  If it was an officer who fired, it would
 2   start with the officer's sergeant.
 3   Q.      Basically it starts with their immediate
 4   supervisor?
 5   A.      Yes.
 6   Q.      Okay.  And what is forwarded to their immediate
 7   supervisor?
 8   A.      The same investigation that the board reviewed.
 9   Q.      The entire binder?
10   A.      The entire binder and all the disks and
11   photographs.  Yes.
12   Q.      And also with the recommendation of the FRB?
13   A.      Yes.
14   Q.      Why is it forwarded to the their immediate
15   supervisor?
16   A.      The board makes a recommendation and the chain
17   of command makes the final determination.  If there's
18   going to be any discipline, it must come from the
19   person's immediate supervisor per the contract with the
20   Division of Police.  So the board does not have the
21   ability to issue discipline.
22   Q.      Does the board have an ability to recommend
23   discipline?
24   A.      No.  The board has no part whatsoever in the
25   discipline process.
```

1   Q.      Who recommends discipline, if any?

2   A.      The immediate supervisor or any other person

3   higher in the chain of command.

4   Q.      Okay.  So when it's sent to the chain of

5   command, is this what the routing sheet tracks?

6   A.      Yes.  The routing sheet can track -- it's a

7   general document in the division.  But yes, in this case

8   it would track the chain of command.

9   Q.      Is there just one routing sheet for this entire

10  FRB or this entire investigative and review process?

11  A.      No.

12  Q.      Okay.  Describe to me how the routing sheets are

13  used in the course of this.

14  A.      The routing sheet only has lists for five or six

15  people on it, so if the document moves through more than

16  five or six people, you would just have to continue one

17  to another routing sheet and continue as necessary.

18  It's created new, I believe, from the board to the chain

19  of command.  There's no routing sheet when it's in the

20  board, and there's a routing sheet then once the board

21  assigns it back to the chain of command.

22  Q.      Okay.  So even though there might be multiple

23  pages of routing sheets, there's one comprehensive

24  document that follows the investigation throughout the

25  chain of command?

1    A.        Yes.

2    **Q.        Okay.  And --**

3    A.        To point out, if there are officers from

4    multiple chains of command, there'd be two separate

5    routing sheets because you'd send a copy to both chains

6    of command.

7    **Q.        Okay.  That makes sense.  What does the**

8    **immediate supervisor do?**

9    A.        The immediate supervisor would either concur or

10   descent with the board's finding, and then would also

11   chose one of those four outcomes, intentional, not

12   intentional, violation of policy or not violation of

13   policy, reduce that on the routing sheet, or sometimes

14   create a separate letter and say "see comments on my

15   letter," and then forward it to the next person in the

16   chain.

17   **Q.        Okay.  So whatever their findings are they're**

18   **indicated on the routing sheet?**

19   A.        Yes.  Or is a side letter that they would point

20   to from the routing sheet.

21   **Q.        Right.  But the routing sheet will reference**

22   **whatever additional documentation?**

23   A.        Yes.

24   **Q.        Okay.  Other than a side letter and signing the**

25   **routing sheet does the immediate supervisor create any**

1  documentation?

2  A.       No.

3  Q.       Is there any concern that an immediate

4  supervisor is somehow bias toward finding in favor

5  toward a police officer?

6  A.       I don't have that concern.

7  Q.       Does the department have that concern in any

8  way?

9  A.       Not that I'm aware of.

10  Q.       Does the Columbus Division of Police do anything

11  to ensure that bias does not impact the results of the

12  investigation in the chain of command?

13  A.       All new supervisors go through extensive

14  supervisor training, what we call supervisor school or

15  sergeant school, and those issues are certainly

16  discussed in that training.

17  Q.       Okay.  Other than training in the sergeant

18  school about this, does the Division of Police do

19  anything to ensure that bias does not impact the

20  investigation process of a police involved shooting?

21  A.       It's subjected to multiple levels of review, so

22  one person's bias would not have -- would be deluded by

23  other people's review, if you will.  So if it were

24  obvious, I would expect the next level supervisor to

25  pick up on that.

1  Q.      So after the immediate supervisor or sergeant

2  makes their findings, then what happens?

3  A.      Then it moves to the next person in the chain of

4  command all the way to the deputy chief.

5  Q.      Does any of the review at any level differ from

6  what you've already told me about?

7  A.      The process?

8  Q.      Yes?

9  A.      No.

10  Q.      Okay.  So they review the investigation that

11  everyone else reviewed and they make a finding on the

12  routing sheet?

13  A.      Yes.

14  Q.      Okay.  And I assume they can also make some kind

15  of side letter or something, if they want?

16  A.      Yes.

17  Q.      Any other documentation created along with this

18  way at all?

19  A.      No.

20  Q.      Who's the ultimate decision-maker regarding the

21  findings of the FRB?

22  A.      If the deputy chief agrees with -- the deputy

23  chief is the final decision-maker in the chain of

24  command.  If the deputy chief agrees with the board's

25  finding, the deputy chief is the final decision-maker.

Deposition of Deputy Chief Kenneth Kuebler   Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

1 If the deputy chief descents with the board, the chief

2 of police is the final decision-maker.

3 **Q. Okay.  So if the deputy chief agrees with the**

4 **Firearm Review Board recommendation, then there's no**

5 **further review of the deputy chief's findings, correct?**

6 A. That's correct.  Well, if the board finds it's

7 in violation of the policy and the deputy chief finds it

8 in violation of policy, then there will be discipline

9 rendered and generally be departmental charges.  The

10 chief would hear that criminal charges hearing.  The

11 discipline would move to the chief's office.

12 **Q. And at that point the chief could chose to --**

13 **what options are available to the chief?**

14 A. First the chief would have to make a

15 determination whether he or she found the shooting to be

16 one of those four things.  Intentional, unintentional,

17 in policy or a violation of policy.  The chief could

18 overrule the board if the chief found an outside of

19 policy shooting in policy at the charges hearing, and I

20 believe that happened in the England case, or the chief

21 could agree that a shooting is in violation of policy

22 and recommend discipline.

23 **Q. Okay.  So in any case where discipline is**

24 **recommended, the chief is the final policy maker for**

25 **those cases?**

1    A.      No.  Are you referencing firearms cases or any

2    cases?

3    **Q.      Firearms cases.**

4    A.      So it's conceivable that in a firearms case a

5    deputy chief could find somebody to have violated policy

6    and determine that a DCC is the appropriate course of

7    action, the lowest course of discipline, the deputy

8    chief can issue that discipline without the chief's

9    involvement.  If the deputy chief wishes for a written

10   reprimand or a departmental charges hearing to be held,

11   the chief must approve that level of discipline.

12   **Q.      Okay.  Run me through the levels of discipline.**

13   **There's DCC at the bottom?**

14   A.      Yeah.  There's something -- there's counselling,

15   that's the first step in the corrective action process,

16   but it's not formalized discipline per the contract.  I

17   noticed you showed up late to work today, don't do it

18   again tomorrow.  That's not reduced to writing or a

19   formalized piece of discipline.

20           The next step would be DCC, documented

21   constructive counselling, and as you mentioned, that's

22   basically a letter in the file that's maintained for a

23   short period of time and can serve as the basis for

24   progressive discipline in the future, if necessary.  The

25   next level up, if you bypass that DCC, if you wanted to

Deposition of Deputy Chief Kenneth Kuebler     Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

1   go to a written reprimand, the chief of police would

2   have to approve going outside of the progressive process

3   of the DCC and giving a written reprimand.

4       The next step would be departmental charges,

5   which isn't actually discipline. Departmental charges

6   is that the chief is going to hear this case and render

7   a finding on discipline. The next level of discipline

8   would be a suspension or termination.

9       And so, the first step of discipline is a DCC,

10   the second step is a written reprimand, the third step

11   is a suspension or termination, but what we call that is

12   a departmental charges hearing and the chief would then

13   give that discipline. The chief could give a DCC, a

14   written reprimand, throw the case out entirely, or

15   recommend termination or suspension.

16   **Q.**     **Okay. So suspension or termination never can**

17   **happen without a chief's hearing, right?**

18   A.     That's correct.

19   **Q.**     **So in a firearms case if the Firearms Review**

20   **Board recommends a written reprimand or a DCC?**

21   A.     The Firearms Review Board, as I mentioned, does

22   not recommend discipline.

23   **Q.**     **Okay. Let's start from the top. If the**

24   **Firearms Review Board finds something to be intentional**

25   **and out of policy, and the chain of command agrees, and**

1    **then the chain of command recommends a DCC or written**

2    **reprimand, does that go to the chief of police for a**

3    **hearing?**

4    A.      The written reprimand would have to be approved

5    by the chief of police if it wasn't based on progressive

6    discipline, but it would not be done during a hearing.

7    The deputy chief could issue a DCC on his or her own,

8    the deputy chief can write a reprimand pursuant to

9    progressive discipline.  In other words, the person had

10   a DCC prior for the same behavior, you can issue a

11   written reprimand without the chief's approval.  If this

12   is a person's first discipline case on this matter and

13   you want a written reprimand, the chief of police would

14   have to approve that by contract.

15   **Q.      Would the chief of police have to approve it if**

16   **it was a written reprimand, but it was progressive**

17   **discipline?**

18   A.      No.

19   **Q.      Okay.  When you say, "progressive discipline,"**

20   **what do you mean?**

21   A.      So with a public employee discipline, so if I

22   was late to work today and you said, "don't come late to

23   work tomorrow," and I showed up late to work tomorrow,

24   in Columbus you would get a DCC.  If I showed up late to

25   work within the administrative use time period of that

1  DCC again, I could get a written reprimand.  It's more

2  discipline based on the same event that keeps occurring.

3  If I continue to show up late I could be departmentally

4  charged and the chief would hold a hearing for that.

5  **Q.      Okay.  So in a case where the Firearms Review**

6  **Board finds it to be outside of policy and the chain of**

7  **command agrees and recommends suspension or termination**

8  **the chief --**

9  A.      The chain or command does not recommend

10  suspension or termination.

11  **Q.      Okay.  They recommend departmental charges?**

12  A.      Correct.

13  **Q.      Okay.  So if they recommended departmental**

14  **charges then the chief of police is the final**

15  **decision-maker regarding that discipline and review?**

16  A.      No.

17  **Q.      Why?**

18  A.      The public safety director would have to step in

19  if it was suspension or termination.

20  **Q.      There's a lot of steps to this, Ken.  At what**

21  **point does the safety director come in?**

22  A.      If the chief recommends a suspension or

23  termination, it would have to go to the public safety

24  director.  The chief of police has a one option called a

25  leave forfeiture option, so up to 120 hours worth of

1   suspension, essentially you could offer the employee the

2   opportunity to deplete their leave time banks up to that

3   amount instead of serving the unpaid suspension.

4   **Q.      Leave time?**

5   A.      Vacation time, compensatory time off.  So the

6   chief of police can say, "I'll give you an eight hour

7   suspension but offer you the opportunity for leave

8   forfeiture," and the employee could accept to give up

9   eight hours of vacation time to quote, unquote, serve

10  that suspension, if you will, and the case never goes to

11  the safety director in that case.  Any suspension of

12  more than 120 hours has to be served as an suspension

13  and the safety director has to weigh in on it to make

14  the determination.

15  **Q.      Okay.  You said that the chief can give them the**

16  **option of leave?**

17  A.      Leave forfeiture.

18  **Q.      Okay.  So assuming the chief recommends a 120**

19  **hour suspension and it has to go to the safety director,**

20  **how does that process then work?**

21  A.      The safety director holds a hearing similar to

22  the chief of police and would render a final decision.

23  **Q.      So the chief of police is only the final**

24  **decision-maker in the case of a suspension over 120**

25  **hours or determination, correct?**

1  A.       Did you say under 120 hours, or over?

2  **Q.       Let me start that question again.  The safety**

3  **director is the final decision-maker in cases where**

4  **there's recommended suspension of over 120 hours or**

5  **termination?**

6  A.       Or if the chief of police does not offer leave

7  forfeiture for less than 120 hours.  The chief can say

8  this is an eight hour suspension and you have to serve

9  it.  That can go to the director's office.

10  **Q.       Okay.  So anything basically between that level**

11  **of discipline, a suspension where there's no leave**

12  **forfeiture option, a suspension of over 120 hours or**

13  **termination, between that and a DCC, the chief is the**

14  **final decision-maker, right?**

15  A.       Yes.

16  **Q.       And then for any discipline which is just a DCC**

17  **the duty chief in the chain of command would be the**

18  **final decision-maker?**

19  A.       Yes.

20  **Q.       Okay.  I think I understand it now.**

21  A.       The deputy chief would also be the final

22  decision-maker on the written reprimand pursuant to

23  progressive discipline.

24  **Q.       Okay.  Do you know how long a DCC stays active**

25  **in the file to be part of progressive discipline?**

Deposition of Deputy Chief Kenneth Kuebler       Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

1  A.       That has changed over the years.  I believe nine

2  months at the time of these cases, and it is a year now,

3  I believe.

4  Q.       So after nine months at the time of these cases

5  or a year now, the DCC cannot lead to progressive

6  discipline ever again?

7  A.       Correct.

8  Q.       Okay.  Is there any part of the FRB process or

9  any function of the FRB that we haven't talked about?

10 A.       I don't think so.  Well, the Firearms Review

11 Board does an annual use of deadly force analysis.  That

12 might be one of the documents that you asked about

13 earlier today.  So the use of force analysis the

14 chairperson or the vice chairperson is responsible for

15 putting that together.

16 Q.       What is the purpose of that?

17 A.       To identify trends, or training needs, or other

18 things that might influence the decision-makers to

19 change policy or training or make adjustments in the

20 division.

21 Q.       How are trends tracked?

22 A.       Nancy Cameron does that spreadsheet and includes

23 that information for purposes of that report.  She

24 tracks number of officers involved, date and time of the

25 situation, daylight, not daylight, inside of business,

1  outside of business, or at homes, all the demographics

2  of the shooting, if you will.  The chairperson and vice

3  chairperson will review that annually to look for trends

4  and training needs, et cetera.

5  **Q.     Okay.  So it's the responsibility of the**

6  **chairperson or vice chairperson to analyze the data to**

7  **identify the trends and training needs?**

8  A.      Yes.  Policy changes, if necessary.

9  **Q.     Since 2005 what kind of trends have been**

10 **identified through this analysis of the FRB statistics?**

11 A.      Certainly there are trends regarding -- so

12 several years ago we noticed that dog shootings were

13 increasing, so there was an evaluation of those dog

14 shootings.  Why were they occurring?  How were they

15 occurring?  Do we need additional training or tools with

16 aggressively behaving dogs and such?  So we made some

17 adjustments in that regard.  You will notice as you do

18 those reviews that we had a spate unintentional

19 discharges a number of years ago where officers were

20 unintentionally discharging their firearms, and we made

21 some training changes and adjustments to that process.

22      Certainly we looked to see where shootings were

23 occurring, whether they were daylight shootings or

24 nighttime shootings to help, again, influence our

25 training decisions.  So if all of our shootings were

Deposition of Deputy Chief Kenneth Kuebler          Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

1   occurring at night, we would want to maybe make more

2   night scenario trainings and that type of thing.

3   Q.       How is that information like passed on if the

4   chairperson identifies a trend, say with the nighttime

5   shootings?  Is that a true one actually or just an

6   example?

7   A.       That's just an example.

8   Q.       The dogs though were?

9   A.       The dogs and the unintentionals were real.

10  Q.       Okay.  So let's talk about the unintentionals.

11  So when this trend was identified that there was a spate

12  of unidentified shootings, how is that information

13  passed on within the department to actually implement a

14  change?

15  A.       So the report is shared annually with the deputy

16  chiefs and I believe the commanders as well.  So the

17  chief will consider that and develop new training to

18  address that particular situation.

19  Q.       Once the chairperson or vice chairperson puts

20  these recommendation in the report -- it goes in the

21  report, right?

22  A.       Yes.

23  Q.       Are there any other ways that recommendations or

24  trends or policy change recommendations or anything are

25  identified and communicated other than in that report?

1    A.      I know at times.  I don't know that it occurred

2    annually.  At times the board chairperson will ask to

3    meet with the executive staff and have an in-person

4    conversation about that.

5    **Q.      Since 2005 how many times has that happened?**

6    A.      I don't know.

7    **Q.      Do you know of any times that that's happened?**

8    A.      I believe it occurred with the unintentional

9    discharges.  I've not been a member of the executive

10   staff since 2005, so I can't speak to the majority of

11   the time that you're referencing.  I have no idea prior

12   to my time on the executive staff.  I know that it

13   occurred when we had the unintentional discharge

14   situation.

15   **Q.      When you say your time on executive staff, what**

16   **do you mean?**

17   A.      The deputy chiefs and the chief are members of

18   executive staff.  I was not been a member prior to 2012.

19   **Q.      Okay.  So are you saying to me that you don't**

20   **know between 2005 and 2012 whether that ever happened?**

21   A.      Correct.

22   **Q.      Okay.  So do you know after 2012 if that's**

23   **happened?**

24   A.      The unintentional discharges one I believe was

25   after 2012, and I believe we had the vice chairperson

Deposition of Deputy Chief Kenneth Kuebler          Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

1    come in and have a conversation about that.

2    Q.       Okay.  The information about whether or not the

3    chairperson or vice chairperson raised any issues in a

4    meeting to the executive staff between 2005 and 2012 is

5    available to the Division of Police, right?  Like you

6    could have found that out if you wanted to before this

7    deposition?

8    A.       If a meeting occurred between 2005 and today?

9    Q.       Yes.

10   A.       I doubt it.

11   Q.       Why?

12   A.       There would not be records of calendars or

13   meetings going back to 2005.

14   Q.       Okay.  Other than the dogs and the accidental

15   discharges since 2005, has the FRB annual report

16   recommended any other changes with any problematic

17   trends?

18   A.       I don't know.  I don't believe so.

19   Q.       In terms of the dog issue was there any follow

20   through in relation to the recommendations?

21   A.       Yes.

22   Q.       What happened?

23   A.       There was training to the entire division about

24   alterative methods to try to scare or dissuade an

25   attacking dog other than using deadly force.  I believe

Deposition of Deputy Chief Kenneth Kuebler      Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

1   there were some changes made to one the groups that

2   happen to shoot a lot of dogs.  That was our intact

3   unit, and I believe they made changes to their

4   procedures as well.

5   **Q.**       **When did that happened?**

6   A.       I think it was 2015, but I don't know exactly.

7   **Q.**       **And have those changes that you just noted led**

8   **to a decrease in the number of shootings in relation to**

9   **dogs?**

10   A.       I believe so, yes.

11   **Q.**       **And then regarding the accidental discharges, I**

12   **have the same line of questioning.  Has there been any**

13   **follow through relating to the recommendations of the**

14   **FRB?**

15   A.       Yes.

16   **Q.**       **Tell me about them.**

17   A.       Primarily, if I recall, they were related

18   largely to long guns, shotguns and rifles.  So there was

19   enhanced training at first.  And when officers went to

20   firearm qualifications for those weapons there was

21   additional discussion and conversation about why those

22   were happening.

23   **Q.**       **Okay.  Any policy changes there?**

24   A.       There has been a notice of discipline policy, if

25   you will, regarding accidental discharges that occur

Deposition of Deputy Chief Kenneth Kuebler          Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

 1    when long guns, especial shotguns are loaded and

 2    unloaded at the substation.  There's a specific

 3    procedure for loading a shotgun, that if not followed

 4    properly can result in the discharge of a shotgun shell.

 5    So we have special devices in the substations designed

 6    to capture that collection of pellets as it leaves the

 7    firearm so nobody gets hurt.  And so we used various

 8    levels of incentives, if you will, and disincentives to

 9    make sure that officers are using that barrel trap when

10    doing that loading procedure to ensure that the trap is

11    used as intended to keep people safe.

12          For example, and I was part of this on both

13    ends, historically the accidental discharge or

14    unintentional discharge of a firearm would generally

15    result in a written reprimand.  That would be the

16    primary outcome of an unintentional discharge.  And so

17    in the late 2000s when I was a lieutenant, I had a

18    similar case where the officer used the bullet trap

19    properly and had an accidental discharge.  I approached

20    my deputy chief at the time and said if they use the

21    device that we want them to use and still give the same

22    discipline as if they didn't use the device, what

23    incentive is there, other than you don't shoot your

24    partner, to use the device?  We should incentivize the

25    use of the device.  If there's an unintentional

1  discharge using the bullet trap, we should give a DCC

2  for that instead of a written reprimand.

3        Over several years we continued to have some

4  unintentional discharges in substations where instead of

5  using the bullet trap they used the ceiling or the wall

6  to capture those bullets.  So I recommended at the time

7  to Chief Jacobs, it's time that we disincentivize the

8  lack of use of the trap, if you will, and departmentally

9  charge people.  If the trap is available and they fail

10 to use it, that should be departmental charges.  That's

11 currently how it's handled in the division.  So ten

12 years ago, 12 years ago, when all unintentional

13 discharges were written reprimands, now if you make the

14 common sense decision to use the trap, it's DCC, and if

15 you intentionally fail to use the trap it's departmental

16 charges.  We went both directions with that to try to

17 change that behavior.

18 **Q.       Okay.  Do you feel that was effective?**

19 A.       They have slowed.  I would like to see

20 unintentional discharges be a number of zero every year,

21 and that hasn't occurred, and we still have had people

22 not use the bullet trap.  I wish I could say it's

23 completely changed behavior, but I can't -- for every

24 one that didn't occur I can't say that it's because of

25 what we did.

1    Q.      Sure.  Let's go back to this chain of command

2    review.  What if the one member in the chain of command

3    disagrees with the -- say there's sergeant, lieutenant,

4    commander, deputy chief in the chain of command, am I

5    missing anybody?

6    A.      Sergeant, lieutenant, commander, deputy chief.

7    That's correct.

8    Q.      What if a lieutenant disagrees and everybody

9    else is in agreement, what happens?

10   A.      The deputy chief is the decider unless there's a

11   disagreement with the board.  So the deputy chief would

12   consider the disagreement of the lower ranking member of

13   the chain, and might meet with that person to discuss

14   and try to find out.  Available to the deputy chief if

15   the person was just being grossly unreasonable, would be

16   to discipline the supervisor for making an unreasonable

17   recommendation, but if you and I just disagree on

18   whether the Browns are good or not, you know, a

19   reasonable disagreement can be had.  So the deputy chief

20   is the ultimate decider.

21   Q.      That's interesting.  Tell me about the ability

22   to discipline a supervisor for making an unreasonable

23   conclusion.

24   A.      That's really it in a nutshell.  If they make an

25   unreasonable recommendation the person can be

 1   disciplined.

 2   Q.      What if the deputy chiefs finds the lieutenant

 3   to have been unreasonable and recommend a written

 4   reprimand, does that then start off a whole other

 5   disciplinary process?

 6   A.      It could.

 7   Q.      That would be outside of the Firearms Review

 8   Board investigation purview, correct?

 9   A.      Correct.

10   Q.      Has that ever happened?

11   A.      I believe supervisors have been disciplined for

12   unreasonable recommendations in the past, but I can't

13   think of a particular issue.

14   Q.      Okay.  What policies and procedures govern the

15   Firearms Review Board?

16   A.      The directives on the use of force; the

17   directives on the use of firearms, and the Firearm

18   Review Board SOPs.  Additionally, I mean, we could get

19   into policies regarding what type of firearms you're

20   allowed to carry, et cetera.  The board can find a

21   shooting outside of policy or make recommendations that

22   they find other policy violations other than just a

23   shooting.  Like carrying the wrong weapon, which is just

24   an example.  I'm not sure of it actually happening, but

25   they can point out other policy violations for the chain

1    to consider.

2    Q.       So the Firearms Review Board looks at violation

3    of all policies?

4    A.       They render their finding on whether the

5    shooting was in policy or not, but mixed into that are

6    considerations as to whether or not they did a policy

7    violation that contributed to the shooting or the death

8    being outside of policy.

9    Q.       Is there any other agency or board or

10   investigator that looks into violations of any other

11   policy?

12   A.       I don't understand the question.

13   Q.       Sure.  So in an officer involved shooting the

14   Firearms Review Board reviews it to determine whether

15   the shooting itself was in policy, right?

16   A.       Yes.

17   Q.       And ancillary to that they could identify other

18   potential, any other violations of policy, but they

19   don't have to.  They're not necessarily looking for

20   other policy violations, right?

21   A.       Yes.

22   Q.       So is there any other board or investigator or

23   anybody who looks specifically to identify whether there

24   were any other violations of policy?

25   A.       Regarding the use of deadly force, or regarding

1  the incident that gave rise to the use of deadly force?

2  **Q.      Regarding the incident.**

3  A.      Yes.

4  **Q.      Who?**

5  A.      If the incident involved a pursuit, the Pursuit

6  Review Committee would investigate whether the pursuit

7  was in policy or not within policy.

8  **Q.      Okay.  Any other examples?**

9  A.      There are other boards throughout the division

10  that could come into play depending on the scenario,

11  however, I'm not familiar with one that I can think of

12  related to shootings recent or in my memory.

13  **Q.      Can you see that?**

14  A.      Yes.

15  **Q.      For the record this is Columbus 011737 through**

16  **011744.  I'm going to mark this as Exhibit 1.**

17                          - - - -

18      **(Thereupon, Plaintiff's Exhibit 1 was marked for**

19                      **identification.)**

20                          - - - -

21  BY MS. GELSOMINO:

22  **Q.      What is this?**

23  A.      That's the Firearms Police Involved Death Review

24  Board SOP effective as of January 2014.

25  **Q.      Is that still effective or have there been any**

1    revisions to that?

2    A.       I don't know.

3    Q.       Is this the SOP that ruled at the time of the

4    investigations and the review of the shootings in the

5    three cases that we're here to talk about today?

6    A.       Yes.

7    Q.       Okay.  Are there any other written policies or

8    SOPs that specifically relate to the operation of the

9    Firearms Review Board?

10   A.       No.

11   Q.       Since 2005 how many times has the board and the

12   chain of command recommended to bypass progressive

13   discipline and file departmental charges?

14   A.       The board does not recommend discipline, so that

15   answer would be zero.  The board not does issue or

16   recommend discipline.  How many times since what year?

17   Q.       2005.

18   A.       Have shootings been found to be not within

19   violation of policy, is that your question?

20   Q.       Sure.

21   A.       I have no idea.

22   Q.       Since 2005 how many times has the chain of

23   command recommended to bypass progressive discipline?

24   A.       For anything?

25   Q.       Anything in relation to a police involved

Deposition of Deputy Chief Kenneth Kuebler          Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

1    shooting.

2    A.      I have no idea.

3    Q.      Since 2005 how many times has the chain of

4    command recommended to file departmental charges in

5    relation to a police involved shooting?

6    A.      I don't know.

7    Q.      You had access to the information to answer

8    those questions before you came to this deposition,

9    right?

10   A.      No.

11   Q.      Why not?

12   A.      I didn't know what the questions would be.  How

13   would I have answers to questions that I don't know?

14   Q.      But you have access to the sources that could

15   give you the answers to the questions about the

16   discipline and recommendations of the board and the

17   chain of command, right?

18   A.      Yes.

19              MR. PHILLIPS:  Sarah, not to

20   interfere, but the notice wasn't that specific.  He's

21   giving you a pretty comprehensive description of what's

22   in the Notice of Deposition in 7.)A.

23              MS. GELSOMINO:  Part of this though,

24   Wes, is about the investigations, the findings, the

25   reviews and the outcome for all deadly force events from

1   2005 to the present.  So that's exactly what I just

2   asked him and exactly what's in the deposition notice.

3                     MR. PHILLIPS:  Not to be difficult,

4   but he really has given you a great description of the

5   topics that you've asked for in 7.)A today.  I'm not

6   sure -- I mean, short of an incredibly detailed Notice

7   of Deposition, I don't know what else he could do on

8   that.

9                     MS. GELSOMINO:  We're going to go

10  through it all, so that's fine.  Let's go off the record

11  for a second.

12                          - - - -

13     (Thereupon, an off-the-record discussion was held.)

14                          - - - -

15  BY MS. GELSOMINO:

16  **Q.      Okay.  So for the nine members of the FRB does**

17  **that include the chairperson?**

18  A.      No.

19  **Q.      So it's the chairperson plus the nine members or**

20  **so?**

21  A.      Yes.  The chairperson doesn't ever render

22  findings or isn't ever a reviewer.  The chairperson only

23  oversees the nine.

24  **Q.      Okay.  Thank you.  What is the training, if any,**

25  **that the chairperson receives in order to qualify them**

Deposition of Deputy Chief Kenneth Kuebler          Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

1  to be in that position?

2  A.      There is not.

3  Q.      How about anywhere training for the members of

4  the FRB?

5  A.      When I made a change and we updated the SOP in

6  2014 there, the version that you have, we did a -- we

7  had those existing board members sit in on a

8  conversation about what we were changing and how it was

9  being changed.  Other than that there was no addition

10  training.

11  Q.      Okay.  All of the procedures and practices of

12  the FRB as you've described them to be today were the

13  same in 2015, 2016 and 2017, correct?

14  A.      Yes.

15  Q.      Everything that you've described to me was the

16  same as they were when the FRB considered the shootings

17  of England, Bell-McGrew and King, correct?

18  A.      Yes.

19  Q.      Okay.  Thank you.  Is there any like interplay

20  between FRB and flagging information for EARS?

21  A.      Doing what for EARS?

22  Q.      You know what EARS is, right?

23  A.      Yes.

24  Q.      Is there any information that is -- that the FRB

25  puts into EARS or like passes along to anyone to put

1   into the EARS systems, or is there any interplay there

2   whatsoever?

3   A.      The board has nothing at all to do with that.

4   Certainly use of force is considered by EARS, and a use

5   of deadly force is a use of force.  So there's

6   interplay, I guess, to use your words, but the board has

7   no piece in that process.

8   Q.      Does the chairperson of the board or anyone else

9   do anything to ensure that certain uses of force are put

10  into EARS?

11  A.      No.

12  Q.      Does the board track -- when I say, "the board,"

13  does that include the chairperson and the secretary and

14  the vice-chair?

15  A.      No.  The board would not include the secretary,

16  because she's not a part of the board.  But the

17  vice-chair is one of those nine, but generally the

18  vice-chair is the one that crafts the annual report.

19  Q.      With the assistance of the secretary, right?

20  A.      Right.

21  Q.      Does anyone on the board, the chairperson or the

22  secretary, track uses of deadly force by officer over a

23  number of years?

24  A.      No.

25  Q.      Why not?

Deposition of Deputy Chief Kenneth Kuebler        Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

1   A.        Because all of that information is captured by

2   Internal Affairs already.  It would be redundant.

3   **Q.        Okay.  Does anyone from the board, or the board**

4   **itself, the secretary, the chairperson, do anything to**

5   **watch trends in these zones where most of the use of**

6   **force is -- most of the firearms are being discharged?**

7   A.        That would be part of the statistical analysis

8   for the annual report, yes.

9   **Q.        And what's done with that information?**

10  A.        It's generally just recognized in the report of

11  what it is.  It's more of an observation, I suppose.  I

12  haven't seen it used as a specific piece of analysis to

13  make a change in decisions or a change in policy, or

14  influence decision-making.

15  **Q.        Okay.  So those statistics have not been used to**

16  **identify any zones where particularly -- where officers**

17  **may be using more deadly force than in other zones?**

18  A.        It's self-evident, and the numbers are recorded

19  by zone and precinct, and they are kind of just

20  self-evident.

21  **Q.        Has the department ever used any of those**

22  **statistics regarding uses of force in particular zones**

23  **to change policies, or increase training, or change**

24  **training in those zones?**

25  A.        Not that I'm aware of.

Deposition of Deputy Chief Kenneth Kuebler      Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

 1            MS. GELSOMINO:  Wes, in terms of the

 2   reports since 2005, I really don't want to go through

 3   all of the reports right now if we don't have to, but

 4   will you guys be challenging the admissibility of the

 5   authenticity of those reports in any way?

 6            MR. PHILLIPS:  I doubt it.  I would

 7   have to see specifically what it is.  We're pretty easy

 8   to work with, Sarah.  We don't jam up the other side.

 9            MS. GELSOMINO:  They're just the

10   reports that we've been talking about that are generated

11   each year in the FRB.

12            MR. PHILLIPS:  Okay.  And we provided

13   in part of discovery?

14            MS. GELSOMINO:  Yeah.

15            MR. PHILLIPS:  Okay.  Then we're not

16   going to challenge those.

17            MS. GELSOMINO:  Based on that

18   representation, then I'm not going to go through and ask

19   him to authenticate every one.

20            MR. PHILLIPS:  Just so I'm clear,

21   specifically what documents are they?

22            MS. GELSOMINO:  FRB reports.

23            MR. PHILLIPS:  We won't challenge the

24   authenticity of them.  We're not going to jam you up on

25   technicalities.  We want to get to the actual substance

```
 1   of the case.  We may object to the relevance, but when

 2   it comes to the authenticity, if we provided it, then

 3   it's something that we're not going to challenge.

 4                   MS. GELSOMINO:  Okay.  Perfect.  Thank

 5   you.

 6   BY MS. GELSOMINO:

 7   Q.       Okay.  I have reports up until 2017.  Do you

 8   know whether any report has been generated for 2018 or

 9   '19?

10   A.       2018 should be done.  2019 should be done, but I

11   don't know that for sure.

12   Q.       I noticed that they're done like a year -- well,

13   for a while they were done two years after the reports.

14   A.       Uh-huh.

15   Q.       And it seems like that time period has been

16   shortened.  Why is there such a delay?

17   A.       Because for the majority of cases that occur in

18   a given year, the majority of the shootings of 2016

19   would not have been adjudicated either by the Grand Jury

20   or the board until sometimes middle or late 2017 or even

21   beyond.  It's often a point of contention.  Do we go

22   with what we have or do we wait until we have all the

23   information?  Do we want to do a report that only

24   analyzes a portion of the shootings or do we want to

25   wait and do an analysis of all of the shootings?  We've
```

1  generally erred on waiting and doing an analysis of all

2  the shootings, if possible.

3  Q.      Okay.  Sometimes some of the shootings have not

4  been adjudicated at the time of the report, right?

5  A.      Correct.

6  Q.      Is there like an addendum, or are those

7  shootings later included somehow in the statistics?

8  A.      If I recall, the statistics are usually

9  included.  It's just an analysis of what we can learn

10  from the summary or the actual cases itself.  I believe

11  if it's in the Firearms Review Board process, not in the

12  Grand Jury process, that we would include the

13  statistics, date and time, number of shots fired, et

14  cetera.  If it's still in the Grand Jury process that

15  information is not necessarily available to the board,

16  so it wouldn't be included.  Regardless, the

17  investigation of the summary, or the analysis of the

18  summary of what caused the shooting will not occur until

19  it's completed.  I believe the statistics that are known

20  are included.

21  Q.      When is that summary or analysis done?  Is it

22  ever done?

23  A.      The ones that were concluded?

24  Q.      Yeah.  Like when you did the 2012 report, for

25  example, and you did this in 2014 and there were some

1   things that were still outstanding, are the things that

2   are outstanding ever included in any kind of an

3   analysis?

4   A.     I don't believe so.

5   Q.     There's no follow-up done?

6   A.     No.

7   Q.     Why not?

8   A.     I don't know.

9   Q.     Do you agree that that could be potentially

10   important information that the department is missing out

11   on because these cases are not being included in the

12   analysis?

13   A.     To the point that you qualify with potentially,

14   sure.

15   Q.     Okay. How many annual reports have you drafted

16   yourself?

17   A.     I don't know.

18   Q.     You started there in 2012, right, as the

19   chairperson?

20   A.     2012 or early 2013, yes. It might have been

21   '13.

22   Q.     Have you ever sat on the actual board?

23   A.     Yes. As a commander.

24   Q.     And when was that?

25   A.     2010 until 2012.

1  Q.      Okay.  And then after that point you were not a

2  reviewer, you were just the chairperson?

3  A.      Correct.

4  Q.      Okay.

5  A.      That's another example of when somebody who

6  responded won't be the writer.  They get promoted out of

7  the position.  So I was a responder on several cases in

8  2012, but was promoted in 2012, therefore I did not sit

9  on or write that review.

10  Q.      Okay.  That makes sense.  While you were a

11  reviewer or responder did you ever find any of the cases

12  that you looked into to be intentional and out of

13  policy?

14  A.      I don't believe so.

15  Q.      Okay.  I know that you authored the report in

16  2014 regarding 2012.  Do you recall ever authoring any

17  other reports?

18  A.      I don't believe so.  I believe after that report

19  I assigned it to a vice-chairperson to craft going

20  forward.

21  Q.      Lang, right?

22  A.      It's currently Lang.  It was not Lang at the

23  time.

24  Q.      Okay.  I'm going to show you an FRB log for

25  2005.  Can you see that?

1    A.      Yes.

2    Q.      Okay.  I'm going to mark this as Exhibit 2.

3                      - - - -

4        (Thereupon, Plaintiff's Exhibit 2 was marked for

5                      identification.)

6                      - - - -

7    BY MS. GELSOMINO:

8    Q.      Is this the spreadsheet that you were talking

9    about earlier that the board secretary maintains?

10   A.      Yes.

11   Q.      Have you ever seen this document before?

12   A.      I've seen it before.  I've not spent time with

13   it.

14   Q.      Okay.  This is like -- investigation register

15   it's called, is the best places for us to look at for

16   all the reviews done by FRB, correct?

17   A.      Yes.

18   Q.      Along with the findings?

19   A.      Yes.

20   Q.      Okay.  So I understand that you haven't spent a

21   lot of time with this before, but what I want to do is

22   look through this document and a number of others to

23   discuss any that were found outside of policy.  So in

24   2005 on this first page that we're looking at all of the

25   reviews were found to be within policy, correct?

```
 1   A.      Yes.
 2   Q.      Based on this there was no way to tell whether
 3   or not it was a fatal shooting, right?
 4   A.      Based on this, no.
 5   Q.      If I wanted to get more information about any
 6   one of these individual incidents, where would I look?
 7   A.      Internal Affairs.
 8   Q.      Okay.  At what point does it go to Internal
 9   Affairs?
10   A.      Once the chain of command -- after discipline is
11   done or if it's found to be within policy, reasonably
12   soon after they're done with the chain of command.
13   Q.      What does Internal Affairs do with it?
14   A.      Files it.
15   Q.      They just hold it?  They don't take any further
16   action?
17   A.      No.
18   Q.      Okay.  I'm going to go to the second page of
19   this five page document.  I see one that was not within
20   policy here, which is in red.  Do you see that?
21   A.      Yes.
22   Q.      That was for an accidental shooting, right?
23   A.      That's what it reads, yes.
24   Q.      Do you know any of the details of this
25   particular incident?
```

Deposition of Deputy Chief Kenneth Kuebler          Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

1   A.       No.  I was a sergeant at the time.  I don't know

2   anything about that.

3   **Q.       Okay.  A written reprimand in 2005, was that the**

4   **discipline that was automatically given for accidental**

5   **discharges?**

6   A.       That was the normal course of practice.  It

7   wouldn't be automatically given, but that's the standard

8   discipline.

9   **Q.       Okay.  The bottom entry here on the right it**

10  **says "did not involve division issued firearm or**

11  **personal firearm approved for off-duty use.  Not a**

12  **matter for Firearms Review Board."  Why would a**

13  **discharge not be a matter for the Firearms Review Board?**

14  A.       Your question is not reflective of what happened

15  here.  You asked why a discharge would not go to the

16  board.  I don't know if a case that's a discharge would

17  not go to the board.  This doesn't say it was a

18  discharge.

19  **Q.       Well, explain this to me, then.  Do you know**

20  **what happened here?**

21  A.       I have no idea.

22  **Q.       Is there any time that something that's not a**

23  **firearms discharge wouldn't go to the board?**

24  A.       Yes.

25  **Q.       When?**

1   A.      You keep referencing it as the Firearms Review

2   Board.  It's the Firearms Death Review Board.  An

3   in-custody death would go to the board.  We had a case

4   that I reviewed as a commander where an officer tried to

5   run a person over on purpose with their car, and

6   actually did run them over with a car, with the intent

7   of using that as a use of force.  So that would not be a

8   discharge of a firearm.

9   Q.      Okay.  In that case though someone died, right?

10  The car that you just told me about?

11  A.      It's complicated, but yes.

12  Q.      Okay.  Either way, you don't know what this last

13  entry is, right?

14  A.      I do not.

15  Q.      Moving onto the third page then, there's another

16  accidental discharge that's not within policy.  There's

17  actually three not within policies on this page, and all

18  three of these are accidental discharges, correct?

19  A.      That's correct.

20  Q.      On page four there's an additional accidental

21  discharge that was found not within policy?

22  A.      Yes.

23  Q.      And then there's one other incident that was

24  found not within policy, right?

25  A.      That's correct.

1    **Q.**      **Do you understand what this entry means here,**

2    **"not within policy, JGJ"?**

3    A.      James G. Jackson.

4    **Q.**      **Who is that?**

5    A.      The chief of police at the time.

6    **Q.**      **What does this entry mean to you?**

7    A.      I have some vague knowledge of that case.  I

8    believe it was found to be not within policy, and at the

9    director's level there was no suspension, I don't

10   believe, out of that case.  I believe that they were

11   referred for additional training and that was it.

12   **Q.**      **What do you know about the facts of this case?**

13   A.      I know it occurred at the Continent after a bar

14   closing, and I believe a car attempted to run over some

15   of the officers or the patrons, I forget which, and I

16   believe those officers fired at that car, at the driver.

17   I was not involved in that case.  It was just what I

18   heard around the division.

19   **Q.**      **Okay.  Do you know what the basis of the finding**

20   **that the shooting was not within policy was?**

21   A.      I do not.

22   **Q.**      **How can I figure out what the basis of that**

23   **finding was?**

24   A.      You could get the original shooting package

25   probably from Internal Affairs.  I don't know if the

```
 1   discipline is still on file or not.  There are

 2   contractual notations on how long the discipline can be

 3   kept, but I would start with Internal Affairs.  Any

 4   public records request to ask for that information and

 5   we can figure out where it is.

 6   Q.     Okay.  So in 2005, of all of the shootings that

 7   were found to be not within policy, there was only one

 8   that was not an accident, right?

 9   A.     According to this log.  I can't speak to that

10   personally, but according to this log.

11   Q.     And you have no reason to believe that this log

12   would be incorrect, right?

13   A.     I do not.

14   Q.     Or incomplete?

15   A.     I do not.

16   Q.     Okay.  This is going to be a bit tedious, but

17   we're going to do this for the remainder of the years

18   that you're here to testify about today.  Okay?

19   A.     Okay.

20   Q.     In 2006, which I'll mark as Exhibit 3.

21                      - - - -

22        (Thereupon, Plaintiff's Exhibit 3 was marked for

23                    identification.)

24                      - - - -

25   BY MS. GELSOMINO:
```

Deposition of Deputy Chief Kenneth Kuebler          Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

1    Q.      This is the 2006 investigative register.  Here

2    there's one on the first page.  There's one not within

3    policy, and again, that's an accidental shooting,

4    correct?

5    A.      Yes.

6    Q.      Now, there's another down here that says "within

7    policy," again, with the initials of the chief of

8    police.  Why would the initials of the chief of police

9    be on this particular within policy finding and not on

10   others?

11   A.      I don't know.

12   Q.      On this register is there any way to determine

13   whether there was a disagreement between the board and

14   the chain of command and the chief?

15   A.      It does not appear so.

16   Q.      The policy decision, whose decision is that

17   referencing?

18   A.      The final decision-maker, I would assume.

19   Q.      Okay.  So in order to look to determine whether

20   or not there was some disagreement or different finding

21   at some point, how would we do that?

22   A.      We'd have to pull the original findings letter

23   from the board.

24   Q.      Okay.  Since 2005, how many times has the chain

25   of command disagreed with the recommendations of the

1    board?

2    A.      I'm sorry.  I don't know.

3    Q.      Since 2005, how many times has the chief of

4    police disagreed with the findings of the board, the

5    recommendations of the board?

6    A.      I don't know.

7    Q.      Do you know how many times the chief of police

8    has disagreed with the findings of the chain of command?

9    A.      I don't know.

10   Q.      When you were the chairperson, during the years

11   that you were the chairperson, how many times did the

12   chief disagree with the findings of the chain of

13   command?

14   A.      I don't know.

15   Q.      Do you know how many times the chain of command

16   disagreed with the recommendations of the board while

17   you were the chairperson?

18   A.      I don't know.

19   Q.      All right.  Let's look at page two of the 2006

20   register.  There's only one finding here that's not

21   within policy and that's, again, accidental, correct?

22   A.      Yes.

23   Q.      On the third page there's two not within policy

24   findings and both of those are accidental, correct?

25   A.      Yes.

1   Q.      On the fourth page, again, the only not within

2   policy finding is accidental?

3   A.      Yes.

4   Q.      And on the fifth page, the final page, there are

5   four finding not within policy and they're all

6   accidental, correct?

7   A.      Yes.

8   Q.      So the only firearms discharges that were found

9   to be not within policy during 2006 were all accidental

10  discharges, right?

11  A.      Yes.

12  Q.      Everything else was found to be within policy,

13  correct?

14  A.      Yes.

15  Q.      All right.  Here's the 2007 log.  This is that

16  same log from the year of 2007, right?

17  A.      Yes.

18                          - - - -

19      (Thereupon, Plaintiff's Exhibit 4 was marked for

20                      identification.)

21                          - - - -

22  BY MS. GELSOMINO:

23  Q.      And there's no reason to believe that this is

24  missing anything or is incorrect in any way?

25  A.      I don't believe so.

Deposition of Deputy Chief Kenneth Kuebler        Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

1   Q.      So on page one the only not within policy was

2   accidental?

3   A.      Yes.

4   Q.      On page two there's one accidental that's found

5   not within policy, but then there's also another

6   incident here.  Do you see this, involves Randy Valiski?

7   A.      Yes.

8   Q.      Do you understand what this is saying about the

9   final decision?

10  A.      Yes.

11  Q.      Can you explain that to me, please?

12  A.      I can surmise.  I'm not familiar with the case.

13  It appears that -- based on that record it appears there

14  was two shots.  One shot is found within policy, one not

15  within policy, and then eventually found to be within

16  policy by Chief Jackson.

17  Q.      So, this looks like the chief then found that

18  both the shots were within the policy?

19  A.      That's what I would surmise from that entry.

20  Q.      So, this would be an example of a time that the

21  chief disagreed with the conclusions of the review

22  board, correct?

23  A.      Maybe.

24  Q.      Is there another option?

25  A.      The other option is that, again, if there's a

1   agreement between the deputy chief and the chief, it

2   goes to the chief.  I can't from this show where the

3   disagreement was.

4   **Q.      Okay.  Because you don't know who this**

5   **finding -- who made this initial finding?**

6   A.      I don't know if Chief Jackson disagreed with the

7   board or with the chain of command.  I can't tell from

8   that entry, but to get to the chief there was a

9   disagreement.

10  **Q.      And the chief then found it within policy?**

11  A.      Correct.

12  **Q.      Got it.  On the next page everything that was**

13  **found not within policy was an accident, right?**

14  A.      Yes.

15  **Q.      On the fifth page, again, everything that was**

16  **found not to be within policy was an accidental**

17  **shooting, correct?**

18  A.      Yes.

19  **Q.      And the last page, again, just an accidental**

20  **shooting, right?**

21  A.      Yes.

22  **Q.      In 2007 then, the only firearms discharges that**

23  **were found to be not within policy were accidental**

24  **discharges, correct?**

25  A.      Yes.

1  Q.      Okay.  This is the 2008 log, which will be

2  Exhibit 5.

3                           - - - -

4      (Thereupon, Plaintiff's Exhibit 5 was marked for

5                        identification.)

6                           - - - -

7  BY MS. GELSOMINO:

8  Q.      Again, there's no reason to believe that this

9  log would be incorrect or incomplete somehow, right?

10 A.      No.

11 Q.      And all of this not within policy on the first

12 page were accidental?

13 A.      Yes.

14 Q.      Same with the second page, the only not within

15 policy was accidental?

16 A.      Yes.

17 Q.      The next not within policy that's on page four

18 is also accidental, right?

19 A.      Yes.

20 Q.      There is one here that looks like it was an

21 intentional shooting on page five that was not within

22 policy where a reprimand was issued.  Do you know

23 anything about this case?

24 A.      I do not.

25 Q.      Otherwise everything else was accidental,

Deposition of Deputy Chief Kenneth Kuebler          Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

1    correct?

2    A.       Yes.

3    Q.       Do you know anything about this case on page

4    six, which included Christopher Boyle that was found not

5    within policy and there's a note about training, do you

6    know anything about that case?

7    A.       Maybe.

8    Q.       Tell me what you know.

9    A.       I believe that case involved the officer firing

10   at that suspect from what the chain of command

11   determined, or the board determined to be an excessive

12   distance.  That the use of force was objectively

13   reasonable from a force perspective, but outside of

14   policy because it was simply too long of a shot.

15   Q.       Okay.  What does the training here indicate?

16   A.       I think it was just referencing that it went

17   back to discuss considering the length of the shot

18   you're taking before you take the shot basically.

19   Q.       Was there any discipline issued or just some

20   training?

21   A.       I don't know.

22   Q.       Otherwise, here on page seven the only finding

23   of not within policy and discipline are accidental

24   shootings, right?

25   A.       The top one says "departmental charges."  I

```
 1   don't know what that references.

 2   Q.      Okay.  Thank you.  Back to page six, there was

 3   one finding here of not within policy, which includes

 4   Robert Altherr, A-L-T-H-E-R-R.  Do you know anything

 5   about that shooting?

 6   A.      I do not.

 7   Q.      Do you know what happened with those

 8   departmental charges?

 9   A.      I do not.

10   Q.      Do you know whether there was any discipline?

11   A.      I do not.

12   Q.      Page eight, another accidental shooting is the

13   only discipline, right?

14   A.      Yes.

15   Q.      Other than that there was no -- every other

16   shooting or discharge in 2008 was found to be within

17   policy and there was no discipline for it, correct?

18   A.      Correct.

19                              - - - -

20       (Thereupon, Plaintiff's Exhibit 6 was marked for

21                       identification.)

22                              - - - -

23   BY MS. GELSOMINO:

24   Q.      Okay.  Here is the log for 2009.  Raccoons have

25   their own column here.  Are there a lot of raccoons shot
```

1   by officers?

2   A.      We only had it listed by animal generally.  I

3   think it was an attempt to spread it out to add

4   additional animals.  There's only one or two perhaps on

5   that sheet probably.

6   Q.      Okay.  So on page one of the 2009 review there's

7   only one incident where something was found to not be

8   within policy and discipline was issued, and that was

9   for an accidental discharge, right?

10  A.      Yes.

11  Q.      On page two, again, it's just accidental

12  discharges that are disciplined?

13  A.      I can't see the columns again.  I didn't

14  memorize the columns.

15  Q.      The middle column here is accidental.

16  A.      Then, yes.

17  Q.      On the third gauge, again, only the accidental

18  discharge is disciplined?

19  A.      Yes.

20  Q.      On page four, again, the only discipline is

21  accidental?

22  A.      Yes.  That was the case that I had the policy

23  change with the DCC.  That was the case that I

24  referenced.

25  Q.      Okay.  So less discipline at this point?

```
 1   A.      Yes.

 2   Q.      Okay.  Thank you for noting that.  Again, on

 3   page five the only shooting that was found to be not

 4   within policy for which discipline was given were

 5   accidental shootings, right?

 6   A.      Yes.

 7   Q.      Again, on page six?

 8   A.      Yes.

 9   Q.      Okay.  So in 2008 then, the only shootings that

10   were found to be not within policy were accidental

11   discharges?

12   A.      Yes.

13   Q.      Okay.  Remember the accidental one is the third

14   column here.

15   A.      Yep.

16   Q.      This is the 2009 log.

17   A.      We just did the 2009.

18   Q.      Okay.  So that would have been Exhibit 6.  Thank

19   you.  Here's 2010, which will be Exhibit 7.

20                          - - - -

21       (Thereupon, Plaintiff's Exhibit 7 was marked for

22                       identification.)

23                          - - - -

24   BY MS. GELSOMINO:

25   Q.      So here for the log on 2010, there on the first
```

Deposition of Deputy Chief Kenneth Kuebler          Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

1   page there's this finding here that says "within policy

2   per chief," and that relates to a shooting where Officer

3   Ryan Rosser was involved.  Do you know anything about

4   that case or why the chief found it to be within policy?

5   A.      I do not.

6   Q.      Okay.  I'm just going to flip through this and

7   tell me if every time that a person -- strike that.  In

8   2010, was any discharge found to be not within policy

9   other than an accidental shooting?  Just tell me when

10  you want me to flip through the pages.

11  A.      Flip.  Flip.  Flip.  Flip.  Flip.  Flip.  Flip.

12  Flip.

13  Q.      These are different investigations, right?

14  They're not firearms?

15  A.      Correct.

16  Q.      Okay.  So of the firearm discharges in 2010 was

17  anything found to be not within policy that was an

18  intentional discharge?

19  A.      No.

20  Q.      Okay.  We'll do it the same way for this one.

21  We'll flip through this document, which is Exhibit 8,

22  the 2011 log for the FRB.  Was any intentional firearms

23  discharges found to be outside of policy in 2011?

24                            - - - -

25      (Thereupon, Plaintiff's Exhibit 8 was marked for

```
 1                    identification.)

 2                       - - - -

 3   A.      Flip.  Flip.  Flip.  Flip.

 4   BY MS. GELSOMINO:

 5   Q.      That's it.

 6   A.      No.

 7   Q.      All right.  This is the log for 2012, which I'll

 8   mark as Exhibit 9.

 9                       - - - -

10      (Thereupon, Plaintiff's Exhibit 9 was marked for

11                    identification.)

12                       - - - -

13   BY MS. GELSOMINO:

14   Q.      This seems to have more information on it.  Did

15   you have anything to do with changing this log?

16   A.      No.  Not in 2012.

17   Q.      In 2012 you were part of the FRB, right?

18   A.      It would have been the last month or two or

19   early 2013.  I was promoted to Deputy Chief in October

20   of that year.

21   Q.      Remind me though, it was for what years?  When

22   were you on the board itself as a reviewer?

23   A.      2010 to 2012 as a reviewer.

24   Q.      Okay.  Did you ever come to a conclusion or make

25   a recommendation as a reviewer or a responder that was
```

1  later disagreed with by the chain of command or the

2  chief?

3  A.      As a reviewer or responder, I don't believe so.

4  Q.      Okay.

5  A.      As a board reviewer?  As the chain of command,

6  yes, but not as a board reviewer.

7  Q.      Yeah.  As a board reviewer.

8  A.      No.

9  Q.      Tell me about when that happened as a chain of

10  command reviewer.

11  A.      It would be the one that you're deposing me

12  about, England.

13  Q.      Okay.  Any time other than that?

14  A.      I don't believe so.

15  Q.      Okay.  So for 2012, this is the column for

16  accidental shootings here, the third column in.  And

17  this second column from the right is not within policy.

18  Got it?  It's a littler harder for me to read.

19  A.      Yes.

20  Q.      On this page, on page one, the only times that a

21  discharge was found not to be within policy were, again,

22  accidental discharges, correct?

23  A.      Correct.

24  Q.      Let's just flip through the rest of the document

25  and you can let me know if there was ever any time that

1  an intentional discharge was found not to be within

2  policy, okay?

3  A.      2012-21 has one of those comments within policy

4  per Chief Jacobs, so I would assume there was a

5  disagreement at some point.

6  Q.      Okay.  Do you know anything about that case?

7  A.      I do not.

8  Q.      You don't know why Chief Jacobs would have come

9  to that conclusion?

10  A.      I have no idea.

11  Q.      Okay.  Any time here in 2012 --

12  A.      No.

13  Q.      Okay.  Next page?

14  A.      No.  Notice the bottom one says the Firearms

15  Review Board not within policy.  Chain of command not

16  within policy.  Deputy chief though disagreed with the

17  board, and it was found within policy per the chief.

18  Q.      Okay.  So and we're looking at the last entry

19  here, which the officer involved is Ryan Steele, right?

20  A.      Uh-huh.

21  Q.      Is that a yes?

22  A.      Yes.  I'm sorry.

23  Q.      You're fine.  In this case is the deputy chief

24  not considered part of the chain of command?

25  A.      Yes.  The deputy chief is considered part of the

```
 1   chain of command.

 2   Q.      So where it says "COC, chain of command, not

 3   within policy," that's basically everyone up until the

 4   deputy chief found it to be within policy and the deputy

 5   chief disagreed?

 6   A.      Correct.

 7   Q.      And why would that go to the chief again?

 8   A.      Because it's a disagreement between the deputy

 9   chief and the Firearms Review Board.

10   Q.      Okay.  You don't know any facts of this case?

11   A.      I believe I was the deputy chief in that case.

12   Q.      Okay.  Then tell me what you know about this

13   case.

14   A.      I don't recall what the distinction with the

15   board was.  I believe it involved special duty officers

16   working at a bar and I believe that they were shot at

17   perhaps -- were they shot at or did somebody try to

18   drive over then?  I believe in that case the use of

19   deadly force was objectively reasonable towards the

20   suspect, however, I think a ricochet struck a civilian

21   injuring the civilian.  And if I recall correctly, the

22   board found backdrop issue to be a problem because of

23   that injury, but I, if I recall, found the use of force

24   to be objectively reasonable and that the backdrop issue

25   was beyond their -- I didn't find the backdrop to be
```

```
 1    unreasonable as the board did.
 2    Q.       Why not?
 3    A.       It was six years ago.  I don't recall the
 4    specifics.
 5    Q.       Okay.  Did you write anything out describing the
 6    reasoning for your findings here?
 7    A.       Probably not, but I don't recall.
 8    Q.       Would this have gone to hearing with the chief?
 9    A.       Not necessarily, no.
10    Q.       Did you speak to the chief directly about this?
11    A.       Yes.
12    Q.       What was that conversation?
13    A.       I don't recall.
14    Q.       Okay.  So in the end you disagreed with the
15    chain of command and the Firearms Review Board.  The
16    chief agreed with you and there was no discipline,
17    right?
18    A.       Correct.
19    Q.       Okay.  So moving onto page five.
20    A.       Those are all accidentals and that's it.
21    Q.       Okay.  There is one here, Billy Camp-Donavon.
22    A.       Yes.  I spoke about that one to you earlier.
23    Q.       Remind me what it is.
24    A.       She fired at a fleeing murder suspect in his car
25    and it was objectively reasonable criminally, but not
```

Deposition of Deputy Chief Kenneth Kuebler          Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

```
 1   within policy.
 2   Q.      What happened here with the departmental
 3   charges, do you recall?
 4   A.      She served a suspension.  I don't recall for how
 5   many hours.
 6   Q.      Okay.  On page six the only findings that were
 7   not within policy were accidental, right?
 8   A.      Correct.
 9   Q.      Okay.  The next page Anthony Sebastiano.
10   A.      Yes.
11   Q.      It looks like an accidental shooting that was
12   not within policy and departmental charges were issued.
13   Do you know anything about that case?
14   A.      I do not.
15   Q.      Do you know whether there was any kind of
16   disagreement among any of the reviewing parties?
17   A.      I don't know.
18   Q.      Do you know what happened?
19   A.      I don't.
20   Q.      Okay.  There are two other accidental discharges
21   on this that received discipline, right?
22   A.      Yes.
23   Q.      And then there was one other intentional
24   shooting that was not within policy but there was no
25   discipline issued.  The second from the bottom.  Paul
```

1    **Fetter.**

2    A.       Yes.  Probably.  You say "shooting," I don't

3    know if it was a shooting.  It could have been another

4    alterative death review of some sort.  I don't know.

5    **Q.       Okay.  Do you know why there would be no**

6    **discipline even though the finding was that his actions**

7    **were not within policy?**

8    A.       This one -- is 4077 Carl Road a school?  Do we

9    have access to a Google map?  This might be a case that

10   lead to changes in the '14 SOP.  There were changes

11   because -- I think 4077 Carl might be a Columbus City

12   School, and if it is, that was a case that gave rise to

13   a lot of changes to the '14 SOP.

14   **Q.       What's the '14 SOP?**

15   A.       The 2014 SOP revisions that you referenced

16   earlier.  The Firearms Review Board SOP, the 2014

17   revision, that's what I'm referring to.

18                    MR. PHILLIPS:  Not to interrupt the

19   deposition, but I just checked.  It is a school.

20                    MS. GELSOMINO:  Thanks.

21   A.       Okay.  So to that point, that was an accidental

22   discharge because the officer was responding to a

23   burglary alarm.  There were suspects inside the building

24   and he had drawn his firearm at one of the suspects

25   inside the building, the suspect's co-suspect came

1  running out of a room crashing next to the officer

2  causing the firearm to discharge.  And we said, you

3  cannot accidentally discharge a firearm and have it be

4  within policy because our policy is that all discharges

5  will be intentional, so we found it technically to be

6  not within policy, no discipline, because the officer

7  wasn't negligent.  It wasn't the officer's fault.  The

8  officer couldn't have avoided what happened.  It was

9  caused by the actions of the other suspect.  So as a

10  result of that we made changes to the wording in the

11  2014 SOP and the findings.

12  **Q.      Okay.  Moving on to page eight.  Again, the only**

13  **discipline that was issued was for accidental**

14  **discharges, right?**

15  A.      Yes.

16  **Q.      For the top here, Craig Gibson, why would**

17  **departmental charges be lodged for an accidental**

18  **discharge?**

19  A.      Two reasons.  One pursuant to progressive

20  discipline, they had it written before.  Or -- I don't

21  think this is the case in this one, but, or you did not

22  use the bullet trap, if you remember.

23  **Q.      Oh, right.**

24  A.      I suspect based on the address of this one,

25  South 6th Street.  That's a substation there.  So I'd

 1  guess that's pursuant to the progressive discipline.

 2  Q.      Okay.  Page nine everything was found within

 3  policy.  Page ten there's one found outside of policy.

 4  Again, that's an accident, right?

 5  A.      Yes.

 6  Q.      And that's the same for the final page, right?

 7  A.      Yes.

 8  Q.      Every other intentional shooting was found to be

 9  within policy in 2012?

10  A.      Yes.

11  Q.      Okay.  Now, I'm going to show you the FRB log

12  for 2013, and this is Exhibit 10.

13                          - - - -

14      (Thereupon, Plaintiff's Exhibit 10 was marked for

15                     identification.)

16                          - - - -

17  BY MS. GELSOMINO:

18  Q.      This one is nice and color coded now for us.  I

19  believe in 2013 that all but one of the shootings that

20  were found to be not within policy were related to

21  accidental discharges.  So I want you to go through this

22  document and tell me if that's accurate.

23  A.      Okay.  Flip.  The first one looks to be a

24  suspect and not within policy.

25  Q.      That's one, and everything else is accidental,

Deposition of Deputy Chief Kenneth Kuebler   Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

1 **right?**

2 A.  Yes. Same for that page, one accidental. Flip.

3 Wait a minute. Two accidentals.

4 **Q.  Two accidentals, and everything else was within**

5 **policy?**

6 A.  Yes. Flip. One accidental not within policy.

7 Flip. One accidental not within policy. I'm sorry. Go

8 back. There's two actually. The one on the bottom.

9 Same.

10 **Q.  Both accidental. Okay.**

11 A.  Same. Flip. No outside of policy. No outside

12 of policy. No outside of policy. Going forward, as I

13 understand, I'm to answer your questions, so I prefer

14 that you start phasing them as questions as opposed to

15 this general flip and comment.

16 **Q.  So this is my question: In 2013, is it accurate**

17 **to say that all but one of the shootings that were found**

18 **to be not within policy were related to accidental**

19 **shootings?**

20 A.  Yes.

21 **Q.  Okay. And the reason I'm having you do this**

22 **flip thing is so we don't have to go through**

23 **page-by-page. I'm just going to pose the question and**

24 **have you look through the document. Okay?**

25 A.  And I understand, but I'm not making tally marks

1    to remind myself what the numbers are.  We get to the

2    end and you asked me if there's one, two or three, and I

3    may not remember.

4    Q.      Okay.  Well, in this case there was one?

5    A.      Yes.

6    Q.      One intentional shooting in 2013 that was found

7    to be outside of policy that was not an accident, right?

8    A.      Yes.

9    Q.      And do you know -- so we're looking at that

10   right now at the top of the page, and the officer

11   involved is Timothy Maclellan, M-A-C-L-E-L-L-A-N.  Do

12   you know anything about this case?

13   A.      I don't recall anything about that case.

14   Q.      Do you know whether there was any disagreement

15   among any of the reviewers or the chief?

16   A.      I don't know.

17   Q.      Were you involved in this review at all?

18   A.      I don't recall.

19   Q.      In 2013 it's possible that you weren't, right,

20   because you weren't the chairperson at the time?

21   A.      Well, I was the patrol deputy chief, so it's

22   possible that I was.  I don't recall.

23   Q.      Okay.  Do you know what happened to this

24   disciplinary charges?

25   A.      I do not.

1  Q.      Okay.  I'm going to show you now the FRB log for

2  2014.  Again, there was a change here, so this is going

3  to be Exhibit 11.

4                      - - - -

5       (Thereupon, Plaintiff's Exhibit 11 was marked for

6                    identification.)

7                      - - - -

8  BY MS. GELSOMINO:

9  Q.      Can you explain what this means now?  The final

10 policy decision has an option of unintentional and

11 negligent.

12 A.      That appears to be an attempt by the secretary

13 who created this log to reflect those four changes in

14 2014.  It doesn't entirely accurately reflect those.

15 That's what that is.

16 Q.      Okay.  So unintentional and negligent would mean

17 accidental and outside of policy?

18 A.      Unintentional is the correct word.  We stopped

19 using the word accidental and use unintentional.  Not

20 negligent would be not in violation of policy.  Not

21 negligent would be not in violation of policy, negligent

22 would be in violation of policy.

23 Q.      Okay.  So whereas in previous years we were

24 seeing accidental and not within policy, now that type

25 of action would be indicated here where it says,

1   "unintentional and negligent," right?

2   A.      Yes.

3   Q.      Okay.  So then on page one, the only time that

4   anything was found to be not within policy or negligent

5   was related to an unintentional discharge, correct?

6   A.      Correct.

7   Q.      Do you see where those columns are here in the

8   first page?

9   A.      Yes.

10   Q.      We're going to do our best here.  On page two it

11   looks like both of the times that something was found

12   not to be within policy was an unintentional discharge,

13   right?

14   A.      Yes.

15   Q.      Same on page three?

16   A.      Yes.

17   Q.      Now, on page four I see this one here, so I'm

18   just going to go up to the first page and check what

19   that is.  This unintentional -- on page four there's one

20   shooting, Richard Mays was involved, which was

21   unintentional and negligent, but there's no discipline

22   noted.  Do you know why that would be?

23   A.      I don't.

24   Q.      Do you recall this incident at all?

25   A.      I do not.

1   Q.      Okay.  On page five the only time that anything

2   was disciplined was an unintentional and negligent

3   shooting, right?

4   A.      Yes.

5   Q.      Same for page six?

6   A.      Yes.

7   Q.      Okay.  And that's it for this year.  So in 2014

8   then, the only time that any discipline was given or any

9   firearms discharge was found not to be within policy was

10  related to an accidental or unintentional shooting,

11  right?

12  A.      Right.

13  Q.      We're almost done.  So 2015 you were the

14  chairperson, right?

15  A.      Yes.

16  Q.      So on the first page of this all of the

17  discharges were found to be within policy and were not

18  disciplined, right?

19  A.      I can't see anything on the screen.

20  Q.      Oh, I'm sorry.  This is Exhibit 12, the 2015

21  log.

22                      - - - -

23      (Thereupon, Plaintiff's Exhibit 12 was marked for

24                  identification.)

25                      - - - -

Deposition of Deputy Chief Kenneth Kuebler          Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

1  BY MS. GELSOMINO:

2  Q.      On the first page of this 2015 log everything

3  was found to be within policy, correct?

4  A.      Yes.

5  Q.      On page two every shooting was found to be

6  within policy?

7  A.      Yes.

8  Q.      On page three every shooting was found to be

9  within policy?

10 A.      The ones with findings, yes.

11 Q.      Why would there be some without findings on

12 this?

13 A.      I don't know.

14 Q.      Moving on to page five, there's one found to be

15 intentional and not within policy, the second column

16 right here, right?

17 A.      Can you go back to that page?

18 Q.      Yeah.

19 A.      That's correct.

20 Q.      Okay.  So do you know anything about this,

21 involving Officer Jonathan Thomas?

22 A.      I do.

23 Q.      Tell me about it, please.

24 A.      The officer was at a home following up on a

25 hit-skip accident and while speaking to the family

1   members a pitbull came out and tried to bite him, and he

2   fired one round at the pitbull and he unfortunately

3   missed the pitbull and unfortunately struck a small

4   child in the leg.

5   **Q.**     **What happened to the child?**

6   A.     She was injured.

7   **Q.**     **What kind of injuries?**

8   A.     A gunshot wound to the leg.

9   **Q.**     **Did she have any permanent injuries?**

10   A.     I don't know.

11   **Q.**     **What was the discipline in this case?**

12   A.     He was departmentally charged, and I believe he

13   either served a suspension or was given a leave

14   forfeiture option.  I don't remember which.

15   **Q.**     **Do you know whether there was any like**

16   **disagreement among any of the reviewing parties in this**

17   **case?**

18   A.     I believe there was disagreement, yes, but I

19   don't know if it was within the chain or between the

20   chain and the board.  I don't remember which.

21   **Q.**     **Were you involved at all in the review of this?**

22   A.     I was the deputy chief at the time, yes.

23   **Q.**     **What were your conclusions?**

24   A.     That it was outside of policy.

25   **Q.**     **Based on what?**

1    A.      Backdrop.  He shouldn't have taken that shot

2    with the girl in the background.

3    **Q.      Which policy would that be in violation of?**

4    A.      Use of firearms.

5    **Q.      Okay.  Did you believe that he was justified in**

6    **discharging his weapon?**

7    A.      No.

8    **Q.      Even though the dog was there?**

9    A.      I'm sorry.  Is that a question?

10    **Q.      Yeah.  I mean, what did you base your conclusion**

11    **on that he was not justified in actually firing his**

12    **weapon?**

13    A.      That the danger to others was a greater risk

14    than the danger to himself.

15    **Q.      Okay.  On page five here's there's a shooting**

16    **with Matthew Gasaway.  Do you know what that was about?**

17    A.      I believe there was an accidental discharge.

18    **Q.      So this is, again, an accidental discharge and**

19    **that's the only time that a shooting on page five was**

20    **found to be within policy, correct?**

21    A.      Correct.

22    **Q.      On page six every shooting was found to be**

23    **justified and within policy?**

24    A.      Yes.

25    **Q.      And same for on page seven, the remainder of the**

1  discharges were found to be justified and within policy,

2  correct?

3  A.      Yes.

4  Q.      Okay.  Thank you.  Now we're going to look at

5  2016 which is Exhibit 13.

6                       - - - -

7      (Thereupon, Plaintiff's Exhibit 13 was marked for

8                      identification.)

9                       - - - -

10  BY MS. GELSOMINO:

11  Q.      Take a minute to orient yourself with this.  On

12  page one all of the discharges were found to be within

13  policy and justified, correct?

14  A.      Yes.

15  Q.      On page two one shooting was found to be

16  unintentional and not negligent.  What does that mean?

17  A.      Unintentional not in violation of policy.

18  Q.      Do you know what that case was about?

19  A.      I don't.

20  Q.      Okay.  But it was an accidental discharge again,

21  right?

22  A.      Unintentional, yes.

23  Q.      On the top one on page three includes Eric

24  Poehler.  Do you know what happened with that case?

25  A.      That was another unintentional discharge at the

1  substation.  That might be out of the column.

2  **Q.      But that, again, was an unintentional discharge?**

3  A.      Yes.

4  **Q.      So both of the discharges that were found to be**

5  **not within policy for which discipline was given on this**

6  **page were both, again, unintentional or accidental**

7  **discharges, right?**

8  A.      Correct.

9  **Q.      On page four there's a shooting here in blue.**

10  **The officer is Lee Hurst.  Do you know what that was**

11  **about?**

12  A.      I do.

13  **Q.      Tell me about that, please.**

14  A.      The officer was working special duty and he

15  heard shots fired in his direction from a treeline.  I

16  believe the shot or shots he said he could hear them

17  whiz past his head from the treeline if I recall

18  correctly, and he returned fire in the direction of the

19  treeline.

20  **Q.      And that was found not to be within policy?**

21  A.      Correct.

22  **Q.      But there was no discipline noted here.  Do you**

23  **know whether he was disciplined?**

24  A.      I don't know.

25  **Q.      If there's a reason why someone would not be**

1  disciplined if a person discharged a firearm in a way

2  that was found not to be within policy?

3  A.      Mitigating circumstances may present itself to

4  the point where you're not going to issue discipline.

5  Q.      But you don't know what happened here?

6  A.      I don't know this issue, no.

7  Q.      Otherwise on this page, page five, the other

8  times that a shooting was found to be not within policy

9  were related to unintentional discharges, right?

10 A.      Correct.

11 Q.      Same for page six, all of the discharges found

12 to be not within policy are related to unintentional

13 shootings?

14 A.      Correct.

15 Q.      And same for page seven, right?

16 A.      Yes.

17 Q.      Okay.  I'm going to show you 2017, and that's

18 the last one that I'm going to show you.  2017 Firearms

19 Review Board log.

20                       - - - -

21     (Thereupon, Plaintiff's Exhibit 14 was marked for

22                    identification.)

23                       - - - -

24 BY MS. GELSOMINO:

25 Q.      On page one every discharge was found to be

1    intentional and not in violation of any policy, right?

2    A.       Accept for one that has no findings, correct.

3    Q.       Do you know why that has no findings?

4    A.       I have no idea.

5    Q.       So on page two the only time that any discharge

6    was found to be not within policy was an unintentional

7    or accidental shooting, right?

8    A.       Correct.

9    Q.       Same for page three?

10   A.       Correct.

11   Q.       And also same for page four, correct?

12   A.       Correct.

13   Q.       So in 2017 all of the intentional firearm

14   discharges were found to be within policy?

15   A.       A large number of the ones on your sheet are not

16   adjudicated, of the ones that are on this sheet,

17   correct, but I don't know about the ones that aren't on

18   the sheet.

19   Q.       Okay.  Are these spreadsheets ever updated?

20   A.       I suspect that they have.  I don't know for

21   sure.

22   Q.       Okay.  For all of the spreadsheets that we've

23   looked at, you have no reason to believe that any of

24   them are inaccurate or incomplete other than where

25   they're missing an adjudication, right?

```
 1   A.       Right.

 2                    MS. GELSOMINO:  Okay.  Let's take a

 3   quick break.

 4                         - - - -

 5      (Thereupon, an off-the-record discussion was held.)

 6                         - - - -

 7                    MS. GELSOMINO:  So we're back.

 8   BY MS. GELSOMINO:

 9   Q.       I'm going to move to ask you questions about the

10   investigation into the shooting of Tyree King.  Okay?

11   A.       Okay.

12   Q.       So you told me at the beginning of this that you

13   reviewed the routing sheet, right?

14   A.       Yes.

15   Q.       So it's possible -- strike that.  Did you have

16   any involvement in the investigation into the shooting

17   of Tyree King?

18   A.       No.

19   Q.       Or the review of the shooting of Tyree king?

20   A.       No.

21   Q.       At that time you were the chairperson, right?

22   A.       At what time?

23   Q.       The time of his shooting.

24   A.       Yes.

25   Q.       So what does that mean in terms of what you
```

1   would have done in regard to this review?

2   A.     In regard to the review?

3   Q.     Yes.

4   A.     Nothing.

5   Q.     How about in relation to the shooting at all?

6   A.     In relation to the investigation of the

7   shooting?

8   Q.     Yes.

9   A.     Nothing.

10   Q.     Okay.  Did you ever personally review any of the

11   investigation?

12   A.     No.

13   Q.     Did you ever have any conversations with anyone

14   who did a review of the investigation?

15   A.     Yes.  I've had conversation with the people who

16   reviewed the investigation.  Yes.

17   Q.     Who?

18   A.     Deputy Chief Richard Bash.

19   Q.     Okay.  Anyone else?

20   A.     I don't know who all was involved in the review

21   of the investigation, so I don't know.

22   Q.     Did you speak to Bash about this investigation?

23   A.     No.

24   Q.     Okay.  Let me clarify my question.  Have you

25   ever spoken to anyone who did review the investigation

1   of the shooting of Tyree King about that investigation

2   or that shooting?

3   A.      No.

4   Q.      Okay.  I'm going to show you the routing sheet

5   for the shooting of Tyree King, which I will mark as

6   Exhibit 15.

7                        - - - -

8      (Thereupon, Plaintiff's Exhibit 15 was marked for

9                      identification.)

10                       - - - -

11  BY MS. GELSOMINO:

12  Q.      Is this the document that you reviewed before

13  the deposition?

14  A.      Can you scroll to the other pages?

15  Q.      I can.

16  A.      Yes.

17  Q.      Okay.  Did the document that you reviewed in

18  anticipation of this deposition include any information,

19  any other pages or notes or anything like that?

20  A.      No.

21  Q.      So on this routing sheet, your name is at the

22  top.  Why?

23  A.      That would be done by the administrative

24  secretary.  It comes out of my office, so it's being

25  sent from my office to the chain of command.

1  Q.      Okay.  So on this routing sheet does it indicate

2  anywhere what the recommendations of the board, the FRB

3  itself is?

4  A.      No.

5  Q.      Do the routing sheets ever?

6  A.      No.

7  Q.      So what are people reviewing?  What's the chain

8  of command reviewing?

9  A.      The entire package that was discussed earlier

10  and the board finding.

11  Q.      And where is the board's finding described?

12  A.      It's a separate sheet of paper or two that's

13  attached to the investigation.

14  Q.      Okay.  Did you, at any point during the pendency

15  of this investigation, review this routing sheet?

16  A.      No.

17  Q.      So FRB makes a finding while you're the

18  chairperson, right?

19  A.      Yes.

20  Q.      FRB makes a recommendation, and then this

21  routing sheet is sent out from your office to the chain

22  of command, right?

23  A.      Yes.

24  Q.      At the end of the chain of command review where

25  does this routing sheet and investigation itself end up?

1   A.      It goes back to the secretary, Nancy.

2   **Q.      Okay.**

3   A.      Who then sends it to, I believe, Internal

4   Affairs for filing.

5   **Q.      So is Nancy the one who decides where it goes**

6   **next or do you, as the chairperson, make that**

7   **determination?**

8   A.      If it was found within policy by the chain of

9   command I would never personally see it.

10   **Q.      Okay. When was the first time that you looked**

11   **at this routing sheet?**

12   A.      Last Friday. Late last week. I forget. I took

13   a vacation day on Thursday, so I don't remember which

14   day it was.

15   **Q.      That's fine. Now, earlier you stated that you**

16   **actually received a phone call when the shooting of**

17   **Tyree King occurred?**

18   A.      Yes.

19   **Q.      Why?**

20   A.      Because the Firearms Review Board chairperson

21   received a phone call every time there's a firearms

22   discharge.

23   **Q.      Who called you?**

24   A.      The Communications Bureau.

25   **Q.      What did they tell you?**

```
 1   A.       They just give basics.   A shooting occurred,

 2   where it occurred, and whether they had success in

 3   notifying the review responder, the chair responder or

 4   not.

 5   Q.       Do they give you any information about the

 6   actual shooting?

 7   A.       Sometimes they will, but not necessarily.   It

 8   would be very basic because they would have very little

 9   information.

10   Q.       Did they in this case give you any information

11   about the shooting?

12   A.       I don't recall.

13   Q.       Okay.  What did you do after you received that

14   phone call?

15   A.       I may have texted the responder to make sure

16   that he or she was going, but I don't recall.

17   Q.       Okay.  Did you do anything else personally in

18   relation to the shooting of Tyree King at any point?

19   A.       No.

20   Q.       Okay.  I'm going to show you now this document,

21   which we'll mark as Exhibit 16.  Do you recognize this?

22                          - - - -

23      (Thereupon, Plaintiff's Exhibit 16 was marked for

24                      identification.)

25                          - - - -
```

1    A.      Yes.

2    BY MS. GELSOMINO:

3    **Q.      What is it?**

4    A.      That's a memo from myself to the people who were

5    going to review a particular shooting, which shooting it

6    is, and direct them to make a finding and return it back

7    to my office.

8    **Q.      So this is like a form letter essentially that**

9    **goes out every time?**

10   A.      Yes.

11   **Q.      Based on this can you tell me who the responder**

12   **was?**

13   A.      I cannot.  Although the writer would be the

14   responder under general purposes, but I don't know if

15   that's necessarily the case on this one.

16   **Q.      And then looking at page two of this exhibit, do**

17   **you recognize this?**

18   A.      Yes.

19   **Q.      What is this?**

20   A.      This is the response back from the board, the

21   three members of the board to whom it was assigned.

22   **Q.      This is their recommendations, right?**

23   A.      This is their finding, yes.

24   **Q.      So the correct terminology is that the board**

25   **reviews it and then makes findings?**

1    A.       It's the board's finding.

2    Q.       **I just want to make sure that I'm using the**

3    **right word for it.**

4    A.       They both get used.

5    Q.       **Okay.  So in this case the board concluded that**

6    **the use of the firearm was intentional and not in**

7    **violation, right?**

8    A.       Correct.

9    Q.       **Did you ever review this document?**

10   A.       Not that I recall.

11   Q.       **So why is this sent to the chief of police?**

12   A.       It's not.

13   Q.       **Even though it's a memo to the chief of police?**

14   A.       Ninety-five percent of all memos in the division

15   of police are written with his or her name at the top

16   and never actually gets there.

17   Q.       **Did this finding of the FRB in relation to the**

18   **Tyree King shooting ever go to the chief of police?**

19   A.       I have no idea.

20   Q.       **Because the FRB and the board -- excuse me.**

21   **Because the board and chain of command agreed in this**

22   **case, who is the final policy maker, decision-maker in**

23   **relation to this investigation?**

24   A.       Deputy Chief Richard Bash.

25   Q.       **Okay.  When was the first time that you saw**

1   this?

2   A.      Three minutes ago.

3   Q.      Okay.  What factors led to the board's findings

4   in this case in relation to Tyree King?

5   A.      I have no idea.

6   Q.      Do you agree or disagree with the findings?

7   A.      I have no opinion on it.

8   Q.      Is it the position of the Columbus Division of

9   Police that the shooting of Tyree King was justified and

10   within policy?

11   A.      Not entirely.

12   Q.      Explain that to me, please.

13   A.      You used the word justified, and that's not the

14   terminology we used.  The division's finding was that it

15   was intentional and not in violation of policy.  That's

16   the division's position.

17   Q.      All right.  I'm going to move on, then to

18   questions regarding the shooting of Deaunte Bell-McGrew.

19   Did you have any personal involvement in any

20   investigation or review into the shooting of Deaunte

21   Bell-McGrew?

22   A.      Yes.

23   Q.      What was that?

24   A.      I believe I was the Deputy Chief at the time of

25   the review.

1  **Q.      That means you were part of the chain of command**

2  **review, right?**

3  A.      Correct.

4  **Q.      What do you know about the shooting of Deaunte**

5  **Bell-McGrew?**

6  A.      I remember it occurring somewhere on the east

7  side, if I recall correctly.  He was in the back seat of

8  a car that was stopped for a traffic violation, and I

9  believe Officer Narewski perhaps was the shooting

10  officer.  I don't recall exactly if he was by himself or

11  a partner.  And that's really all I remember.

12              MR. PHILLIPS:  Sarah, not to get

13  complicated here, but in what capacity are you asking

14  him questions right now?  Because technically there's

15  four separate depositions occurring simultaneously.

16  This is new for me.  I'm not used to four depositions

17  occurring at once.

18              MS. GELSOMINO:  Why don't I do his

19  personal involvement first, because I have a feel that

20  I'll get tripped up, and keep asking personal questions

21  if I don't get that out of the way first.

22  BY MS. GELSOMINO:

23  **Q.      So, I'm asking you these questions regarding**

24  **your personal involvement and knowledge in relation to**

25  **the shooting of Deaunte Bell-McGrew, as opposed to**

1    asking you to give me binding testimony on behalf of the

2    city.  Okay?

3    A.      Okay.

4    Q.      Then we'll switch.  When did you first learn of

5    the shooting of Deaunte Bell-McGrew?

6    A.      I don't recall.

7    Q.      What is the first thing that you remember about

8    it?

9    A.      I remember that I reviewed it because of this

10   deposition.  I mean, I don't really have a distinct

11   memory of the first time that I learned of it.

12   Q.      Okay.  What was the -- let me just understand

13   this.  Were you the chairperson of the FRB at the time?

14   A.      I don't recall.

15   Q.      So Deaunte Bell-McGrew was killed in October of

16   2015.

17   A.      I believe I was the chairperson.

18   Q.      Okay.  Did you have anything to do with the

19   review done by the FRB into this shooting?

20   A.      Similar to the Tyree King shooting, letters went

21   in and out of my office under my name, but again, the

22   board doesn't do investigations or have anything to do

23   with the investigation.

24   Q.      I understand that.  But the board reviews the

25   investigation, and in your capacity as the chairperson

```
 1   of the board did you have anything to do with the review

 2   of the investigation of Tyree King?

 3   A.       Of Tyree King?

 4   Q.       Excuse me.  Deaunte Bell-McGrew.

 5   A.       Only in keeping it moving.

 6   Q.       Okay.  So I'm going to show you -- do you

 7   recognize this document?

 8   A.       Not by memory, but I know what it is.

 9   Q.       What it is?

10   A.       It is the finding of the three members of the

11   firearms review board that reviewed this investigation.

12   Q.       Okay.  So I'm going to mark this as Exhibit 17.

13                         - - - -

14      (Thereupon, Plaintiff's Exhibit 17 was marked for

15                     identification.)

16                         - - - -

17   BY MS. GELSOMINO:

18   Q.       When was the first time that you saw this

19   document indicating the results or the findings of the

20   Firearms Review Board in this case?

21   A.       Most likely when it reached my office in the

22   chain of command review.

23   Q.       Okay.  Do you know what the board relied upon to

24   come to this conclusion?

25   A.       They rely on the investigation.
```

Deposition of Deputy Chief Kenneth Kuebler          Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

1    Q.      Do you know what factors in the investigation

2    led them to come to this conclusion?

3    A.      I have no idea.

4    Q.      Did you ever have any conversation with any of

5    the officers who reviewed this shooting?

6    A.      No.

7    Q.      And then the second page of this Exhibit, this

8    June 8th, 2016 memo, that's similar to how you just

9    described this.  Is it accurate to say this is the memo

10   that was sent by the secretary to assign the reviewers

11   of the FRB to look into the shooting of Deaunte

12   Bell-McGrew?

13   A.      Yes.

14   Q.      Okay.  Again, I'm asking you this in your

15   personal capacity.  When this investigation ended up on

16   your desk in the chain of command review, what did you

17   do?

18   A.      I read the investigation.  I reviewed all the

19   documentation.  I would always look at photographs if

20   they're included, videos if they're included.  I

21   consider the facts in this case and I make my finding.

22   Q.      In this case what was your finding?

23   A.      I found it intentional and not within violation

24   of policy.

25   Q.      Why did you come to that conclusion?

Deposition of Deputy Chief Kenneth Kuebler          Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

```
 1    A.       Because the facts indicated that it was

 2    intentional and not in violation of policy.

 3    Q.       What facts indicated that to you?

 4    A.       I don't recall specifically.

 5    Q.       As you sit here today, can you tell me any

 6    specific facts that lead you to find the shooting to go

 7    to be intentional and within policy?

 8    A.       As I recall the facts in this case as I remember

 9    them today, I remember those officers were involved, and

10    the gentleman was in the back seat of a car, and that's

11    all I remember.

12    Q.       Okay.  I'm showing you what I'm going to mark as

13    Exhibit 18, which is the routing sheet for the shooting

14    of Deaunte Bell-McGrew, right?

15    A.       Correct.

16                         - - - -

17       (Thereupon, Plaintiff's Exhibit 18 was marked for

18                      identification.)

19                         - - - -

20    BY MS. GELSOMINO:

21    Q.       You would have signed the routing sheet

22    somewhere, signed off on it, right?

23    A.       Yes.

24    Q.       Do you see any notation here that you signed off

25    on this document?
```

1    A.      I notice there's two pages on this document and

2    I can't see the second page.

3    Q.      I'll go to the second page.  That's hard to see.

4    A.      I see it.  I do not see my name on this.

5    Q.      But you recall signing off on it somewhere?

6    A.      No.  I do not recall signing off on it.

7    Q.      Do you recall actually reviewing the

8    investigation into the shooting of Deaunte Bell-McGrew

9    as the deputy chief?

10   A.      I don't recall specifically, no.

11   Q.      What do you base your testimony today then that

12   you did so?

13   A.      Just a general understanding that I would have

14   reviewed that case and had my findings on it.

15   Q.      Okay.  I'm going to ask you then, in your 30(b)6

16   capacity, what is the position of the Division of Police

17   for the City of Columbus as to why this shooting was

18   intentional and not in violation of the policy?

19   A.      I don't know how to answer that.

20   Q.      Why?  Does it confuse you?  What about it can't

21   you answer?

22   A.      It confuses me.

23   Q.      There was a finding that the chain of command

24   and the Firearms Review Board determined that this

25   shooting of Deaunte Bell-McGrew was not in violation of

Deposition of Deputy Chief Kenneth Kuebler      Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

1   policy and was intentional, correct?

2   A.     Yes.

3   Q.     Is that the position of the division of police?

4   A.     Yes.

5   Q.     What is the basis of that position of the

6   division of police?

7   A.     I don't understand the question. Basis, I don't

8   recall that.

9   Q.     What factors does the division of police believe

10   led to the decision that the shooting of Deaunte

11   Bell-McGrew was intentional and not in violation of

12   policy?

13   A.     I don't know.

14   Q.     Was any follow-up investigation requested by any

15   reviewing member?

16   A.     Not that I recall.

17   Q.     In this case in the shooting of Deaunte

18   Bell-McGrew you, as the deputy chief, were the final

19   decision-maker regarding whether or not the shooting was

20   in violation of policy, correct?

21   A.     Yes.

22   Q.     Did you ever bring this shooting up with the

23   chief?

24   A.     Not that I recall.

25   Q.     Would this shooting ever have reached the desk

1  **of the chief of police?**

2  A.    Not under normal circumstances.  The chief of

3  police can ask to see anything he or she wishes to see,

4  but I don't recall that.

5               MR. PHILLIPS:  I'm going to object to

6  all of these specific questions being outside the scope

7  of this deposition, but you can go ahead and keep asking

8  them.

9               MS. GELSOMINO:  You can answer.

10  A.    I did.

11  BY MS. GELSOMINO:

12  **Q.    What was the answer?**

13  A.    That I don't believe it got to her by any normal

14  process, but she's the chief of police and can ask for

15  anything that she wants.

16  **Q.    Oh, sorry.  Did she, in this case, ask for**

17  **anything?**

18  A.    I have no idea.

19               MS. GELSOMINO:  Wes, what's the basis

20  of that objection?

21               MR. PHILLIPS:  Outside the scope.

22               MS. GELSOMINO:  How is it outside the

23  scope to ask about the investigation?

24               MR. PHILLIPS:  If you look at the

25  wording of 7.)A, it's outside the scope of the wording

```
 1    of 7.)A.

 2              MS. GELSOMINO:  I don't understand

 3    that.  I need more than that, because 7.)A is

 4    specifically regarding investigation of the FRB.

 5              MR. PHILLIPS:  And he testified to

 6    that.  I mean, you can disagree, but my objection is

 7    noted on the record.  I object to it being outside the

 8    scope of 7.)A.

 9              MS. GELSOMINO:  If I could somehow ask

10    a cleaner question that makes you comfortable, I will.

11              MR. PHILLIPS:  Those specific

12    questions when you're getting now specific into the

13    FRB's review of this incident, that was not what was in

14    your Notice of Deposition, so it's outside of the scope.

15              MS. GELSOMINO:  But what's in the

16    Notice of Deposition is all of the cases from 2005 to

17    present, which includes these specific cases, right?

18              MR. PHILLIPS:  You can disagree, but

19    I'm just talking about the language of 30(b)6, and you

20    didn't state this with particularity.  Like I said, I'm

21    letting him answer, but I'm objecting.  I say it's

22    outside the scope.  You can disagree, and the court can

23    either agree or disagree.

24              MS. GELSOMINO:  That's fine.

25    BY MS. GELSOMINO:
```

1    Q.      In your personal capacity in relation to the

2    shooting of Deaunte Bell-McGrew, are you aware of

3    whether the chief of police ever reviewed your findings?

4    A.      I have no idea.

5    Q.      Okay.  You understand that in this case you were

6    the final policy maker, the final decision-maker, right?

7    A.      Yes.

8    Q.      All right.  I'm going to move on to the shooting

9    of James England.  Let's ask the questions, again, in

10   your personal capacity before we get to the 30(b)6

11   questions on behalf of the city.

12   A.      Okay.

13   Q.      What was your involvement in the review of the

14   shooting of James England?

15   A.      I was the deputy chief at the time.

16   Q.      So you were, once again, a chain of command

17   review, right?

18   A.      Yes.

19   Q.      And you were also -- he was shot in February of

20   2015, so at that time you were also the chairperson?

21   A.      Yes.

22   Q.      Okay.  Were you involved at all in the FRB

23   review of the shooting of James England?

24   A.      Only in the producing of the two documents that

25   we keep referencing.

1  Q.        Okay.  I'm going to show you this memo.  That

2  was, again, generated from your office, right?

3  A.        Yes.

4  Q.        So we're going to mark this as Exhibit 19.

5                          - - - -

6      (Thereupon, Plaintiff's Exhibit 19 was marked for

7                      identification.)

8                          - - - -

9  BY MS. GELSOMINO:

10  Q.        This is your directive to the members of the FRB

11  to conduct a review, correct?

12  A.        Yes.

13  Q.        And why did you do this?

14  A.        That's the standard practice for every

15  investigation made by the review board.

16  Q.        How were you first notified of this shoot in

17  order to begin this process?

18  A.        I don't recall.

19  Q.        Do you get -- strike that.  I understand that

20  your secretary does this, it's generated from your

21  office, but you don't fill out any of the information

22  yourself?

23  A.        Right.

24  Q.        Do you review this?

25  A.        No.

1   Q.      Do you, as the chairperson, even know that this

2   happened?

3   A.      Sometimes.

4   Q.      In this case did you know that this memo was

5   sent?

6   A.      I don't recall.

7   Q.      Okay.  Did you give any other instructions or

8   orders other than what's in this memo?

9   A.      No.

10  Q.      Okay.  Then you were not involved again at any

11  point in the FRB review, correct?

12  A.      Right.

13  Q.      Now, I'm going to show you this exhibit, which

14  was previously marked.  So this was previously marked as

15  Abel Exhibit 8.  What is this?

16  A.      This was the board's finding.  The reply to the

17  last document that you showed me.

18  Q.      What is the finding of the board in the shooting

19  of James England?

20  A.      The shooting was intentional and in violation of

21  policy.

22  Q.      Do you know why the board found it this way?

23  A.      I do not.

24  Q.      Do you know any of the factors, the evidence

25  that led them to come to this conclusion?

1    A.      I do not.

2    **Q.      Okay. Did you ever have any conversations with**

3    **any of the FRB members in relation to this case and**

4    **their findings?**

5    A.      Not that I recall.

6    **Q.      At some point you saw this document, right?**

7    A.      Yes.

8    **Q.      When was the first time that you saw this**

9    **document that contained the findings of the FRB?**

10   A.      I don't recall.

11   **Q.      Do you recall ever seeing it before the**

12   **investigation landed on your desk for a review in the**

13   **chain of command?**

14   A.      I do not recall specifically, but an in

15   violation of policy finding, it would not necessarily be

16   unusual for me to be notified of it.

17   **Q.      Before the chain of command's?**

18   A.      Correct.

19   **Q.      How would you typically be notified of it?**

20   A.      Usually by one of the board members, or by

21   Nancy, alerting me to an unusual case.

22   **Q.      Would that be in writing?**

23   A.      No.

24   **Q.      Why would they notify you?**

25   A.      Because as you went through the logs earlier,

1    it's out of the norm and usual.  It's just an awareness

2    practice, I guess.

3    Q.      Okay.  Do you recall being notified of that in

4    this case?

5    A.      I do not recall that.

6    Q.      In preparation for this deposition did you make

7    any effort to refresh your recollection about what you

8    did in relation to this investigation?

9    A.      No.

10   Q.      Did you attempt to talk to any of the FRB

11   members who reviewed this case to refresh your

12   recollection?

13   A.      No.

14   Q.      You could have talked to any of these members of

15   the FRB review team to determine what they knew about

16   this investigation or their findings, right?

17   A.      Yes.

18   Q.      Do you recall anything else that you did before

19   this came to your desk in the chain of command review?

20   A.      No.

21   Q.      When you did review -- when this investigation

22   came to you there was that memo with just the findings,

23   correct?

24   A.      Correct.

25   Q.      Was there any other memo or information that you

1  reviewed that was generated by anyone within the chain

2  of command or on the FRB?

3  A.       I believe a chain of command member wrote a

4  letter, one or more chain members wrote a letter to

5  justify their findings.

6  Q.       What was the content of that letter?

7  A.       I don't recall specifically.

8  Q.       Did you review that letter?

9  A.       I believe so.

10  Q.       So when it came to your desk what were you

11  reviewing?  You were the top of the chain of command,

12  right?

13  A.       Uh-huh.  Yes.

14  Q.       What were you reviewing, to agree or disagree

15  with?

16  A.       A completed CIRT investigation, the Firearms

17  Review Board findings, the chain of command

18  recommendations, and/or any documentation that the chain

19  of command produced.

20  Q.       Was your job to agree or disagree with the FRB

21  findings?

22  A.       I don't understand the question.

23  Q.       What I'm trying to figure out is like was your

24  task to either agree or disagree with the FRB or the

25  chain of command findings?

Deposition of Deputy Chief Kenneth Kuebler      Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

1   A.      My job was develop on my own the conclusion as

2 to whether the shooting was in violation of policy or

3 not.

4   **Q.      And does that -- okay. Did you agree or**

5 **disagree with the findings of the FRB?**

6   A.      So I know that this case got to Chief Jacobs,

7 which means either I agreed with the board or disagreed

8 with the board. If I agreed with the board it was

9 within violation of policy, or if I disagreed with the

10 board it would go to the chief. I don't recall my exact

11 finding. I believe I found it to be in violation of

12 policy. That's my recollection.

13   **Q.      Based on what?**

14   A.      I don't recall.

15   **Q.      You don't recall why you found it to be in**

16 **violation of policy?**

17   A.      No. I do not recall.

18   **Q.      You could have reviewed your findings in this**

19 **case before you came here, right?**

20   A.      I'm sorry. Was there a question?

21   **Q.      Yeah. I'm asking you, is that correct?**

22   A.      You're cutting out. I didn't hear the correct

23 part.

24   **Q.      It is true that you could have reviewed your**

25 **findings in this case before you came here to testify**

1    about this case today, right?

2    A.      Yes.

3    Q.      And you could have reviewed the entire CIRT

4    investigation, correct?

5    A.      Yes.

6    Q.      And you could have reviewed the chain of command

7    findings and memos, correct?

8    A.      Yes.

9    Q.      You could have reviewed the transcript of the

10   chief's hearing, correct?

11   A.      If there's a transcript, yes.

12   Q.      You knew that you were going to be deposed today

13   under oath regarding this investigation and your

14   involvement in it, correct?

15   A.      I understood that I was coming to speak to the

16   process of the board and how it operates.

17   Q.      And you understood that you were doing that

18   regarding how the board -- all of the investigations

19   that the board has conducted since 2005, right?

20   A.      I understood that I was to explain how the board

21   processes its investigations, its reviews and how the

22   board operates.

23   Q.      Did you understand that you were also called to

24   testify on the findings and outcomes and reviews of the

25   board since 2005?

```
 1    A.       Yes.

 2    Q.       And this shooting of James England is one of

 3    those cases since 2005, right?

 4    A.       Yes.  So as we've discussed, the findings are

 5    explained.

 6    Q.       How?

 7    A.       You asked me to review documents and confirm

 8    that the documents say what they say, which is that it

 9    was an intentional not in violation of policy.  I can't

10    speak to what those folks considered or what was in

11    their mind, nor do I recall what was in my mind five

12    years ago when I read it.  But I can tell you what the

13    findings are, and that's what I understood I was here to

14    do.

15    Q.       You were also noticed to give deposition

16    testimony specifically regarding your personal knowledge

17    as a fact witness in the shooting of each of these men,

18    right?

19    A.       I don't know.

20             MR. PHILLIPS:  I object.  The notice

21    doesn't say to each of these men.  You noticed him to

22    testify in the case, and he's testifying to the best of

23    his recollection.

24             MS. GELSOMINO:  I believe he was also

25    noticed as a fact witness in each of these cases in
```

Deposition of Deputy Chief Kenneth Kuebler          Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

 1   addition to a 30(b)6 witness.

 2                    MR. PHILLIPS:  Correct.  And he

 3   answered the question and said he doesn't remember.

 4   BY MS. GELSOMINO:

 5   Q.      As you sit here today, you can't tell me any of

 6   the factors that you considered in finding that the

 7   shooting was outside of policy?

 8   A.      No.

 9   Q.      All right.  I'm showing you what was previously

10   marked as Abel Exhibit 9.  Do you recognize this?

11   A.      Yes.  I remember that.  That's what I indicated

12   that I believed someone wrote additional documentation.

13   Q.      Okay.  Has this refreshed your recollection

14   about the factors that you relied upon to find that this

15   shooting of Mr. England was intentional and outside of

16   policy?

17   A.      No.  Just the generalities of it.

18   Q.      Do you agree with the conclusions that Knight

19   sets forth in this memo?

20   A.      I reviewed this memo in conjunction with the

21   entire investigative packet, picture, et cetera.  So I

22   can't make those conclusions or decisions based on

23   individual documents, and that's how I would have made

24   the review five years ago, and I can't render a decision

25   on a shooting based on this letter.

1  **Q.      Do you agree that Abel's use of force of the**

2  **firearm was intentional and in violation of the policy?**

3  A.      The division's position is that it was not in

4  violation of policy ultimately.

5  **Q.      So when you first reviewed this investigation**

6  **including Knight's memo and issued your own conclusions**

7  **into your own conclusion in the course of your chain of**

8  **command review, did you agree with Knight's findings?**

9  A.      So I believe I answered that about 20 minutes

10  ago.  I don't recall what my finding was.  I know it

11  went to the chief of police, which means either I

12  disagreed with the board, or I found it in violation,

13  but I just don't recall which one of two it was.

14  **Q.      Okay.  I'm showing you what was previously**

15  **marked as Knight Exhibit 16.  Does this refresh your**

16  **recollection as to what your conclusions were in the**

17  **chain of command review?**

18  A.      It does not.

19  **Q.      What is this document?**

20  A.      This looks to be a continuation of a routing

21  sheet from before.

22  **Q.      What do you mean "from before"?**

23  A.      You showed me another routing sheet on this case

24  just a few moments ago, I believe.

25  **Q.      Okay.  Is this your handwriting on this page on**

Deposition of Deputy Chief Kenneth Kuebler      Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

1    the top?

2    A.    Yes.

3    **Q.    Where it says your name.  What did you write**

4    **below this?**

5    A.    "Discussed with Chief Jacobs departmental

6    charges rule of conduct 120."

7    **Q.    What's rule of conduct 120?**

8    A.    I believe it's use of firearm.

9    **Q.    What does this mean?**

10    A.    What does what mean?

11    **Q.    What you wrote here?**

12    A.    It means -- it's self-evident.  I had a

13    conversation with Chief Jacobs, and then departmental

14    charges for violation rule of conduct 120 were approved

15    by her.

16    **Q.    So she's the one who had to approve the charges,**

17    **right?**

18    A.    Correct.  We discussed that earlier that only

19    the chief can approve departmental charges.

20    **Q.    So did you present her -- did you request that**

21    **she approve departmental charges?**

22    A.    I don't recall if I did or not.

23    **Q.    Why did she approve the departmental charges?**

24    A.    I don't know.

25    **Q.    Was this an in-person conversation?**

```
 1    A.      Yes.

 2    Q.      Where were you?

 3    A.      I don't recall.

 4    Q.      How long did the conversation last?

 5    A.      I don't know.

 6    Q.      Do you recall anything about it whatsoever?

 7    A.      I'm sorry.  I do not.

 8    Q.      Why would you have had this conversation with

 9    Chief Jacobs?

10    A.      That's what leads me to believe that I likely

11    disagreed with the board, so we had conversation with

12    the chief since she would be the final decision-maker on

13    that, but I don't recall what my finding was.  That

14    seems to be the most plausible explanation.

15    Q.      At any other point have you ever discussed

16    departmental charges with Chief Jacobs for any other

17    case?

18    A.      Yes.

19    Q.      Do you recall which case that is?

20    A.      Every case I've ever had departmental charges

21    filed on somebody would have come after a discussion

22    with Chief Jacobs.  There's no bureaucratic way to get

23    that done without that conversation occurring.

24    Q.      How many times have you been a part of getting

25    departmental charges approved?
```

1   A.      Probably several dozen.

2   **Q.      Now, we just went through all of the discipline**

3   **in all of those logs. Were the several dozen attempts**

4   **to get charges approved included in any of those logs?**

5   A.      No.

6   **Q.      Why not?**

7   A.      Because they weren't departmental charges cases.

8   **Q.      So you didn't get the charges that you**

9   **requested?**

10   A.      That log refers to only firearm discharges. You

11   asked me if I ever had discussions about departmental

12   charges. I said several dozen. There are lots of

13   reasons why somebody may be departmentally charged

14   beyond the use of deadly force.

15   **Q.      So in relation to the use of deadly force how**

16   **many times have you discussed bringing departmental**

17   **charges with the chief?**

18   A.      Maybe two or three, I believe.

19   **Q.      Other than James England, what are those other**

20   **cases?**

21   A.      Billy Camp-Donavon, that was discussed earlier,

22   The Poehler case that was discussed earlier. And just

23   leaving one or two out there, those are the two that

24   come to mind.

25   **Q.      What was the second one? Refresh my**

1  recollection.

2  A.        Eric Poehler, who fired a shotgun in a

3  substation and didn't use the bullet trap.

4  Q.        Okay.  Thank you.  Can you read the second

5  square that's completed here for me?

6  A.        You'll need to below it up.  "Forward to

7  discipline grievance lieutenant."  Looks like it went to

8  Lieutenant Lokai, 5054, assignment, Professional

9  Standards Bureau, acronym, PSB.  "Remarks, case

10  reviewed.  Discussed case with DC Kuebler.  Draft of

11  charges complete for Chief Jacobs for approval.  Forward

12  to IAB for storage."

13  Q.        That is all -- what's the lieutenant's name?

14  A.        Lokai.  L-O-K-A-I.

15  Q.        So all of that in that box is written in Lokai's

16  handwriting, correct?

17  A.        The discipline grievance Lieutenant PSB would

18  have been mine, but the remarks are his handwriting.

19  Q.        Tell me about the discussion that you had with

20  Lokai.

21  A.        I don't recall it.  That would be a perfunctory

22  brief conversation.  I reviewed the case.  Other cases

23  similar to it would have been departmental charges.

24  There's just cause for it, and that's it.  It will be a

25  very routine conversation.

Deposition of Deputy Chief Kenneth Kuebler      Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

1    Q.      Okay.  Did you review the draft charges?

2    A.      Probably, but I don't recall specifically.

3    Q.      Okay.  I'm going to move to page two of this

4    document.  Does this refresh your recollection as to

5    your conclusions regarding your review of this shooting

6    of James England?

7    A.      It does.

8    Q.      Tell me what your findings were.

9    A.      It says "the use of firearm was intentional and

10   in violation of policy.  Return to Sergeant Griffis for

11   discipline recommendation."  This is what I suspect was

12   an additional piece the routing sheet in between the

13   first and third one.

14   Q.      Okay.  So you're the top of the chain of command

15   review here, right?  You find this to be intentional and

16   in violation of policy.  So why would you mark it to go

17   back to sergeant for discipline recommendation?  Why

18   don't you make the disciplinary recommendation?

19   A.      The Fraternal Order Of Police Contract puts the

20   discipline on the immediate supervisor.  It gets

21   returned to the chain of command to the immediate

22   supervisor to prepare a disciplinary recommendation.

23   Q.      Before coming to your conclusion that the use of

24   force in this case was intentional and in violation of

25   policy, did you review Sergeant Griffis' memos

1  disagreeing with the finding of the FRB?

2  A.      I believe so, yes.

3  Q.      But even knowing his position on this you still

4  found it to be in violation of policy?

5  A.      Yes.

6  Q.      Why?

7  A.      I don't remember the specifics as to why I found

8  it in violation of policy.

9  Q.      Did you ever have a conversation with him

10 regarding his position in this case?

11 A.      Not that I recall.

12 Q.      Did you ever have a conversation with Knight

13 regarding his position in this case?

14 A.      Not that I recall.

15 Q.      In the course of your review of the shooting of

16 James England, did you listen to the interview of

17 Officer Abel?

18 A.      I don't believe so.

19 Q.      Did you read the transcript of the interview?

20 A.      That's how I usually would do it.

21 Q.      So you knew what he stated in the interview,

22 right?

23 A.      Correct.

24 Q.      Okay.  Did you review the interview of Fulwider?

25 A.      Yes.

1  Q.      Did you review the interview of Dungey?

2  A.      If it was in the investigation, yes.

3  Q.      Did you review everything that was included in

4  the CIRT investigation?

5  A.      I always made it my practice to review

6  everything.

7  Q.      It seems like it.  Okay.  Before you came to

8  your conclusion did you talk to -- I apologize if I

9  asked you this.  Did you talk to any of the reviewers

10  from the FRB?

11  A.      No, I did not.

12  Q.      And before you came to your own conclusions

13  regarding the shooting of England, did you talk to

14  Gardner?

15  A.      I don't recall.  If I would have had a

16  conversation with the chain it would have been Gardner,

17  but I don't recall.

18  Q.      Okay.  What, if any, discipline did Griffis

19  recommend after you sent it back to him for

20  recommendation?

21  A.      I don't recall.

22  Q.      What happened after he reviewed it for a

23  recommendation?

24  A.      I believe he crafted another letter in response.

25  Q.      Did you review that letter?

Deposition of Deputy Chief Kenneth Kuebler          Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

```
 1    A.      I would have, yes.
 2    Q.      Did it change your conclusions at all regarding
 3    your finding that the shooting was intentional and not
 4    within policy?
 5    A.      No.
 6    Q.      Okay.  So just walk me through the logistics
 7    here.  It went up to you, you sent it back to Griffis,
 8    and he wrote another letter.  Where did it go next?
 9    A.      His lieutenant.
10    Q.      Knight?
11    A.      Correct.
12    Q.      And Knight is the one who then recommended
13    progressive discipline?
14    A.      I don't believe he recommended processive
15    discipline.  I think he recommended bypassing
16    progressive discipline.
17    Q.      That's what I meant.  That's what he did
18    recommend, right?
19    A.      I believe so.
20    Q.      Did you agree with Knight's recommendation to
21    bypass progressive discipline in this case?
22    A.      Apparently, yes.
23    Q.      When you say, "apparently, yes," what do you
24    mean?
25    A.      I don't remember it, but you showed me a
```

1     document a little bit and that said the departmental

2     charges are approved and I had come to that conclusion

3     earlier.

4     **Q.**      **Okay. Was there any backlash in the chain of**

5     **command regarding Knight's findings in the disciplinary**

6     **recommendation?**

7     A.      No.

8     **Q.**      **Was this disciplinary recommendation by Knight**

9     **to bypass progressive discipline a typical**

10    **recommendation?**

11    A.      Yes.

12    **Q.**      **How so?**

13    A.      The vast majority of intentional shootings

14    against suspects, we went through those documents

15    before, result in charges.

16    **Q.**      **If they're found to be outside of policy?**

17    A.      That's what I said, yes. Charges outside of

18    policy shootings would result in departmental charges.

19    **Q.**      **Got it. It's just that most of the intentional**

20    **shootings are not found to be outside of policy, right?**

21    A.      That's correct.

22    **Q.**      **There were additional officers on the scene when**

23    **Abel shot James England, right?**

24    A.      I'm sorry.

25    **Q.**      **There were other officers aside from Abel on the**

 1   scene when Abel shot James England, right?

 2   A.       I believe so.

 3   Q.       And none of those officers sought fit to shoot

 4   him?

 5   A.       None of those officers shot at him.  I don't

 6   know what they sought fit to do.

 7   Q.       Did any of the other officers who were on the

 8   scene ever come forward to say that they thought the

 9   shooting was unjustified?

10   A.       Not that I'm aware of.

11   Q.       Did any of those other officers, Griffis,

12   Fulwider, or Dungey, ever come forward to say that Abel

13   shot his firearm in the absence of the threat of death

14   or serious physical harm?

15   A.       Not that I recall.

16   Q.       They ultimately backed Abel's story, right?

17   A.       I don't understand the question.  Backed his

18   story?

19   Q.       Did they agree with Abel's story about the

20   shooting?

21   A.       I can't characterize it as that.

22   Q.       Why not?

23   A.       They were asked to give a statement and they

24   gave a statement.  They gave their story.  They didn't

25   reference his story.

1   Q.      Was any part of the statement of Griffis,

2   Fulwider, Dungey, in contradiction to Abel's story?

3   A.      I have no idea.

4   Q.      You reviewed all of those though, right?

5   A.      I did.

6   Q.      Did any of their testimony or statements in this

7   case impact the finding that this shoot was intentional

8   and outside of policy?

9   A.      I don't recall.

10  Q.      It's typically in investigations of officer

11  involved shootings within the CPD for other officers on

12  the scene to not contradict the shooter regarding

13  justifications, right?

14                  MR. PHILLIPS:  Objection.  Go ahead.

15  A.      I don't understand typical.

16  BY MS. GELSOMINO:

17  Q.      Have you ever in your experience known of a CPD

18  officer who contradicted a shooting officer's testimony

19  regarding the justification of the gunshots?

20  A.      I have read very few investigations whereby the

21  officers give the same story.

22  Q.      Specifically though I'm talking about whether or

23  not those other officers contradicted the justifications

24  of the shooting.

25                  MR. PHILLIPS:  Objection.  You can go

1  ahead and answer.

2  A.      The officers don't justify or not justify a

3  shooting.  They gave a statement as to what they saw,

4  and the chain of command and the review board make the

5  determination whether it's in policy or not.  It's not

6  an officer's position nor do they do that.  They give a

7  statement as to what happened.

8  BY MS. GELSOMINO:

9  **Q.      Have you ever heard of any officer coming**

10 **forward to say that they were on the scene of a shooting**

11 **that they believed to be unjustified or unnecessary?**

12                  MR. PHILLIPS:  Objection.  You can and

13 answer.

14 A.      Yes.

15 BY MS. GELSOMINO:

16 **Q.      When?**

17 A.      I recently heard Lieutenant McFadden

18 contradicting some information regarding the Tyree King

19 case publicly.

20 **Q.      Explain that to me.**

21 A.      I recently heard Lieutenant McFadden, a division

22 of police lieutenant, who claims to have been at or near

23 the scene of Tyree King, made comments that, I believe,

24 she finds that to be a not justified shooting.  She

25 indicated she didn't think it was a justified shooting

 1   and made public statements to that effect, and I think

 2   there's a contradiction of that.

 3   **Q.      Okay.  When did you hear these statements?**

 4   A.      Within the last several weeks.

 5   **Q.      Have you talked to McFadden about them directly?**

 6   A.      I have not.

 7   **Q.      How did you hear them?**

 8   A.      I watched them on a video, or a podcast type of

 9   video.

10   **Q.      Which video?**

11   A.      I don't recall.  It was either a Facebook one

12   she did recently or some similar type interview that she

13   did.

14   **Q.      Okay.  What was -- why did she say that that**

15   **shooting was unjustified?**

16   A.      I don't recall.

17   **Q.      Do you recall anything else about her**

18   **statements?**

19   A.      No.

20   **Q.      Okay.  Other than those recent statements from**

21   **McFadden, have you ever heard any officer within the CPD**

22   **come forward to say they were on the scene of a firearms**

23   **discharge that they believed to be unnecessary or**

24   **unjustified?**

25   A.      Not that I recall.

1    **Q.        How do you define the code of silence?**

2                        MR. PHILLIPS:  Objection.  You can go

3    ahead and answer.

4    A.      I don't know what you're referring to.

5    BY MS. GELSOMINO:

6    **Q.        Have you ever heard the phrase code of silence?**

7    A.      I've heard the phrase.  I have no idea what it

8    means.

9    **Q.        As you sit here today, with all of your**

10   **experience within the police department, can you tell me**

11   **any idea that you have about what the code of silence**

12   **could mean?**

13                       MR. PHILLIPS:  Objection.  Go ahead

14   and answer.

15   A.      I don't know what the code of silence means.  It

16   means nothing to me.

17   BY MS. GELSOMINO:

18   **Q.        Do you know what other people mean when they say**

19   **it?**

20   A.      I do not know what other people mean, no.

21   **Q.        Have you -- in 2016 Officer Abel faced a**

22   **disciplinary hearing.  Are you aware of that?**

23   A.      Yes.

24   **Q.        What do you know about that?**

25   A.      I sat in on the disciplinary hearing.

 1   Q.       Okay.   Who else was there?

 2   A.       The chief, probably some folks from the

 3   Professional Standards Bureau, Officer Abel, either his

 4   attorneys or his FOP representatives.   I don't recall

 5   who else.

 6   Q.       Who presented at that?

 7   A.       Officer Abel primarily.

 8   Q.       Did Officer Abel speak for himself or through

 9   his lawyer?

10   A.       I believe Officer Abel spoke himself.

11   Q.       Did you say anything in that hearing?

12   A.       Yes.

13   Q.       Have you ever reviewed the transcript of that

14   hearing?

15   A.       No.

16   Q.       Okay.   I'm showing you the transcript of that

17   disciplinary hearing that we'll mark as 20.

18                         - - - -

19      (Thereupon, Plaintiff's Exhibit 20 was marked for

20                      identification.)

21                         - - - -

22   BY MS. GELSOMINO:

23   Q.       Let me scroll ahead.   See here where it says,

24   "DC"?

25   A.       Yes.

1    Q.        Do you know who that is?

2    A.        That's me.

3    Q.        How long did the hearing last?

4    A.        I don't recall.  Maybe 30 minutes, 40 minutes.

5    Q.        Okay.  And after that hearing did you have any

6    discussions with anyone who was present?

7    A.        Yes.

8    Q.        Who?

9    A.        Certainly the chief.  I believe the disciplinary

10   grievance lieutenants.  Everybody from his side, if you

11   will, would have been excused.

12   Q.        Okay.  What was the content of that

13   conversation?

14   A.        I don't recall specifically, but I recall that

15   Chief Jacobs seemed to be inclined to find the shooting

16   not in violation of policy.

17   Q.        Based on what?

18   A.        I don't recall.

19   Q.        Do you recall anything that led her to come to

20   that conclusion?

21   A.        Something that had to do with the handcuffing

22   and the handcuffs and where they were on the suspect or

23   how they were attached, but I don't remember the

24   specifics.

25   Q.        Was there anything that you heard in that

1    hearing that changed your perspective about whether the

2    shooting was intentional and not within policy?

3    A.      Not that I recall.

4    Q.      As you sit here today, is it still your position

5    that the shooting of James England by Officer Abel was

6    intentional and not within policy?

7    A.      No.

8    Q.      Why?

9    A.      Because the chief is the final decider and I

10   work for the chief of police.  The chief made a decision

11   and I carry out those decisions as if they are my own.

12   Q.      I understand that.  But did you ever change your

13   own mind about the conclusions that you made in this

14   investigation that the shooting was intentional and not

15   within policy?

16   A.      Not that I recall.

17   Q.      Okay.  Did you believe that England was

18   handcuffed before the shooting?

19   A.      I don't remember.

20   Q.      Okay.  I'm going to show you what was previously

21   marked as Knight Exhibit 18.  This is an e-mail from

22   Lokai to a number of people including you, right?

23   A.      Yes.

24   Q.      Do you recall receiving this e-mail?

25   A.      I do not.

Deposition of Deputy Chief Kenneth Kuebler          Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

```
 1    Q.      Before you received this e-mail were you aware
 2    that the chief had overturned the findings of the chain
 3    of command and the FRB?
 4    A.      I believe so.
 5    Q.      Do you believe that the chief was correct in
 6    doing so?
 7    A.      Yes.
 8    Q.      Why?
 9    A.      Because the chief is the ultimate decision-maker
10    and this is the decision that people can disagree with,
11    so it's not a right or wrong, it's an executive
12    decision.
13    Q.      Okay.  Did you agree or disagree with the
14    findings of the chief in this case?
15    A.      Again, the chief makes a decision.  I agree with
16    her decisions.
17    Q.      I understand that you'll implement her
18    decisions, but do you agree with this one in particular?
19    A.      I don't remember changing my mind.
20    Q.      Okay.  Now, this e-mail says, "Mike, Bela, Eric,
21    Nancy, Miranda, will you please have someone amend your
22    records to reflect that Officer Abel's shooting was
23    found to be 'intentional and not in violation of
24    policy.'"  Who are those people and what records would
25    they have?
```

 1   A.      Mike and Bela were the Internal Affairs Bureau

 2   lieutenants at the time, so they would have had a record

 3   of the finding of in violation of policy.  Nancy

 4   Cameron, as we discussed before, is the Firearms Review

 5   Board administrative secretary.  Eric Pilya is the head

 6   of the CIRT investigating team, and Miranda Vollmer at

 7   the time was the human resources manager for the

 8   division of police and would have had to update

 9   personnel records.

10   **Q.      Okay.  Why would those records be amended?**

11   A.      The records would have reflected a finding that

12   would have changed.  It was updated to reflect the

13   current finding.

14   **Q.      Okay.  I'm going to show you this document,**

15   **which I'm going to mark as 21.**

16                        - - - -

17      **(Thereupon, Plaintiff's Exhibit 21 was marked for**

18                        **identification.)**

19                        - - - -

20   BY MS. GELSOMINO:

21   **Q.      Have you ever seen this before?**

22   A.      Yes.

23   **Q.      What is this?**

24   A.      This is a letter from Chief Jacobs explaining

25   her ultimate decision.

1    Q.       When did you review this?

2    A.       I don't recall specifically.  I believe she gave

3    me a copy of it, but I don't recall.

4    Q.       Were you surprised that Chief Jacobs disagreed

5    with the chain of command and FRB in this case?

6    A.       Maybe a little.

7    Q.       Why?

8    A.       Chief Jacobs was certainly one that I would

9    characterize as having hesitancy to use force or to

10   support force, so this was a case where she supported an

11   officer's use of force, and contrary to a lot of other

12   people, it seemed to be a little bit out of the norm for

13   her.

14   Q.       Okay.  You don't know why she did that?

15   A.       No.  I mean, other than what's written here I

16   don't know.

17   Q.       Okay.  So, I just want to make sure I understand

18   this.  This case went to Chief Jacobs, even though there

19   was no disagreement between the chain of command and FRB

20   because she had to make -- well, why?  Can you just

21   explain to me why she would have reviewed this case even

22   though there was an agreement between the chain of

23   command and the FRB?

24   A.       Because Officer Abel was departmentally charged

25   so she had to hold a hearing.

```
 1   Q.      Okay.

 2                   MS. GELSOMINO:  I think I want to take

 3   a quick break to review my notes and we can wrap up.

 4                   MR. PHILLIPS:  Sure.

 5                   MS. GELSOMINO:  Thank you.

 6                           -  -  -  -

 7      (Thereupon, an off-the-record discussion was held.)

 8                           -  -  -  -

 9   BY MS. GELSOMINO:

10   Q.      As a police officer, Office Abel had a duty not

11   to use more force than necessary under the

12   circumstances, right?

13                   MR. PHILLIPS:  Objection.  Go ahead.

14   A.      Yes.

15   BY MS. GELSOMINO:

16   Q.      And he had that duty while he was interacting

17   with Mr. England?

18                   MR. PHILLIPS:  Objection.  Go ahead

19   and answer.

20   A.      Yes.

21   BY MS. GELSOMINO:

22   Q.      As a police officer, Abel had a duty not to

23   shoot a person who did not present an imminent threat of

24   death or physical harm to himself or anyone else,

25   correct?
```

1          MR. PHILLIPS:  Objection.  You can

2    answer.

3    A.       As reviewed through the lens of a reasonable

4    officer, that's correct.

5    BY MS. GELSOMINO:

6    Q.       **Okay.  A police officer is not permitted either**

7    **by policy or under the law to shoot a person just**

8    **because they're engaging in passive resistance, right?**

9              MR. PHILLIPS:  Objection.  You can

10   answer.

11   A.       Generally, no.

12   BY MS. GELSOMINO:

13   Q.       **Is there ever a time where a police officer**

14   **would be justified in shooting a person who was engaging**

15   **in passive resistance?**

16              MR. PHILLIPS:  Objection.  You can

17   answer.

18   A.       The terminology is -- what an attorney or third

19   party reviewer considers as passive resistance and what

20   a reasonable police officer considers resistance, that

21   terminology isn't defined, it's not specific, and can be

22   used to argue what level of resistance was being

23   offered, so I can't necessarily answer that question.

24   BY MS. GELSOMINO:

25   Q.       **Pursuant to the policies of division of police**

1    is passive resistance as defined by the policies a basis

2    to use deadly force?

3    A.       No.

4    Q.       Okay.  A police officer is not permitted by

5    policies or under the law to shoot a person because they

6    ran away from that officer, correct?

7                    MR. PHILLIPS:  Objection.  Calls for a

8    legal conclusion.  You can answer.

9    A.       That's not correct.

10   BY MS. GELSOMINO:

11   Q.       How so?

12   A.       If the person presents a deadly risk to others,

13   the fleeing in and of itself can justify the use of

14   deadly force.

15   Q.       That makes sense.  But in that case they would

16   have to be presenting a threat of death or serious

17   physical harm to another person while they were running

18   away to justify use of force, correct?

19   A.       Yes.

20   Q.       A police officer is not permitted to shoot a

21   person because they can't lift them off the ground,

22   right?

23                    MR. PHILLIPS:  Objection.  You can

24   answer.

25   A.       Can you repeat the question?

1  BY MS. GELSOMINO:

2  **Q.      Sure.  A police officer is not permitted to**

3  **shoot a person just because that police officer is**

4  **unable to lift the person off the ground, right?**

5                    MR. PHILLIPS:  Objection.  You can

6  answer.

7  A.      Presuming it's a hypothetical, I can't answer.

8  BY MS. GELSOMINO:

9  **Q.      A police officer is not permitted to shoot**

10 **someone simply because a person has a history of**

11 **criminal convictions, right?**

12                   MR. PHILLIPS:  Objection.  You can

13 answer.

14 A.      I don't understand the phraseology, but just

15 because, no.

16 BY MS. GELSOMINO:

17 **Q.      Have you ever heard any division, Columbus**

18 **Division of Police officer make a joke about the use of**

19 **force?**

20 A.      Generally, yes, but not specifically.

21 **Q.      What do you mean by that?**

22 A.      Every profession people make jokes about their

23 own profession.  Off color jokes are made, but I can't

24 think of one specifically.

25 **Q.      No examples whatsoever?**

Deposition of Deputy Chief Kenneth Kuebler        Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

```
 1    A.      No.

 2    Q.      How often do you hear those jokes?

 3    A.      Infrequently.

 4    Q.      Have you ever made any?

 5    A.      Not that I recall.

 6    Q.      Why not?

 7    A.      I don't know.

 8    Q.      Do you think they're funny?

 9    A.      I can't think of any specific things so I can't

10    determine the level of funny.

11    Q.      Do you think it's appropriate to make jokes

12    about the use of force?

13                  MR. PHILLIPS:  Objection.  You can

14    answer.

15    A.      I have no opinion on it one way or the other.

16    BY MS. GELSOMINO:

17    Q.      Have you ever heard any division of police

18    officers make comments based on race?

19    A.      No.  I take that back.  Yes.

20    Q.      Tell me about it.

21    A.      Lieutenant McFadden keeps indicating that things

22    are occurring based on race, so she makes race based

23    comments frequently.  That's been in the news a lot and

24    I've seen those online, heard them in the news.  So I'm

25    aware of her doing that.
```

1  **Q.      So other than Lieutenant McFadden making race**

2  **based claims about the division of police have you heard**

3  **any other officer make any kind of comment that was race**

4  **based?**

5  A.      Not personally, no.

6  **Q.      Have you ever heard of it?**

7  A.      Yes.

8  **Q.      Tell me about it.**

9  A.      Sergeant Eric Moore is accused to have done

10  that.

11  **Q.      What kind of comments?**

12                  MR. PHILLIPS:  Objection.  Irrelevant,

13  but go ahead and answer.

14  A.      He's alleged to have made some comments about

15  referring to African Americans as monkeys.  I believe.

16  I did not read the case.  I read the news stories about

17  it.

18  BY MS. GELSOMINO:

19  **Q.      Have you talked to him about it?**

20  A.      I wouldn't even recognize him.  I have no idea

21  who is he.

22  **Q.      Okay.  Do you know whether or not he's been**

23  **disciplined?**

24  A.      Has he been disciplined?  Yes.

25  **Q.      How many times have you heard a division of**

1   **police officer report another officer for excessive or**

2   **unnecessary force?**

3   A.     None that I can think of.

4   **Q.     Other than the case of James England, have you**

5   **ever heard of any officer who was not disciplined when**

6   **you believed that they should have been?**

7                MR. PHILLIPS: Objection. You can

8   answer.

9   A.     I can't think of anything specific. I can think

10   of times when I thought people should have been

11   disciplined more harshly than they should have been

12   disciplined.

13   BY MS. GELSOMINO:

14   **Q.     Like when?**

15   A.     There were two sergeants that were accused of

16   stealing time a while back and I was on that case and I

17   recommended that they be demoted or terminated.

18   **Q.     What were they actually disciplined?**

19   A.     They were suspended for six weeks.

20   **Q.     Okay. Any other times?**

21   A.     Not that I can recall.

22                MS. GELSOMINO: Okay. That's all that

23   I have for you today.

24                MR. PHILLIPS: Great. He'll read. If

25   you order, we'll get a copy.

C E R T I F I C A T E

1

2    STATE OF OHIO,                )
                                   )
3    CUYAHOGA COUNTY.              )

4    I, Megan A. Medved, a Notary Public within and for the

5    State of Ohio, duly commissioned and qualified, do

6    hereby certify that the within named witness, DEPUTY

7    CHIEF KENNETH KUEBLER, was by me first duly sworn to

8    testify to the truth, the whole truth and nothing but

9    the truth in the cause aforesaid; that the testimony

10   then given by the witness was by me reduced to Stenotype

11   in the presence of said witness, afterwards transcribed

12   upon a computer; and that the foregoing is a true and

13   correct transcription of the testimony so given by the

14   witness as aforesaid.

15

16   I do further certify that this deposition was taken at

17   the time and place in the foregoing caption specified,

18   and was completed without adjournment.

19

20   I do further certify that I am not a relative, employee

21   of or attorney for any of the parties in the

22   above-captioned action; I am not a relative or employee

23   of an attorney of any of the parties in the

24   above-captioned action; I am not financially interested

25   in the action; and I am not, nor is the court reporting

1  firm with which I am affiliated, under a contract as

2  defined in Civil Rule 28(D).

3

4  IN WITNESS HEREOF, I have hereunto set my hand and

5  affixed my seal of office at Cleveland, Ohio on December

6  11th, 2020.

7

8

9

10  _____

11      Megan A. Medved, a Notary Public

12      in and for the State of Ohio.

13      My Commission expires 9/17/23

14

15

16

17

18

19

20

21

22

23

24

25

Deposition of Deputy Chief Kenneth Kuebler     Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

## WORD INDEX

**< 0 >**
**011737**  93:*15*
**011744**  93:*16*

**< 1 >**
**1**  4:*7*  93:*16, 18*
**10**  4:*17*  49:*17*  130:*12, 14*
**10:00**  2:*8*
**100**  26:*25*
**1020**  2:*9*
**105**  4:*9*
**11**  4:*18*  49:*17*  133:*3, 5*
**110**  4:*10*
**113**  4:*11*
**116**  4:*12*
**118**  4:*13*
**11th**  200:*6*
**12**  4:*19*  89:*12*  135:*20, 23*
**120**  4:*14*  79:*25*  80:*12, 18, 24*  81:*1, 4, 7, 12*  172:*6, 7, 14*
**121**  4:*15*
**122**  4:*16*
**13**  4:*20*  103:*21*  139:*5, 7*
**130**  4:*17*
**133**  4:*18*
**135**  4:*19*
**139**  4:*20*
**14**  4:*21*  128:*10, 13, 14*  141:*21*
**141**  4:*21*
**144**  4:*22*
**148**  4:*23*
**15**  4:*22*  145:*6, 8*
**154**  4:*24*
**156**  4:*25*
**16**  4:*23*  63:*25*  148:*21, 23*  171:*15*
**162**  5:*1*
**17**  4:*24*  50:*14*  63:*25*  154:*12, 14*  200:*13*
**18**  4:*25*  50:*14, 15*  156:*13, 17*  188:*21*
**1801**  2:*9*
**186**  5:*2*
**19**  5:*1*  101:*9*  162:*4, 6*
**190**  5:*3*
**1900**  3:*6*
**199**  4:*5*
**1990s**  30:*4*
**1994**  21:*12*

**< 2 >**
**2**  4:*9*  105:*2, 4*
**2:18CV1060**  1:*2*
**2:19CV1049**  1:*20*
**2:19CV3105**  1:*13*

**20**  5:*2*  171:*9*  186:*17, 19*
**2000**  23:*23*
**2000s**  88:*17*
**2005**  4:*9*  9:*7*  11:*4*  57:*7*  58:*11*  61:*22*  83:*9*  85:*5, 10, 20*  86:*4, 8, 13, 15*  94:*11, 17, 22*  95:*3*  96:*1*  100:*2*  104:*25*  105:*24*  107:*3*  110:*6*  111:*24*  112:*3*  160:*16*  168:*19, 25*  169:*3*
**2006**  4:*10*  110:*20*  111:*1*  112:*19*  113:*9*
**2007**  4:*11*  23:*23*  49:*7*  113:*15, 16*  115:*22*
**2008**  4:*12*  116:*1*  118:*16*  120:*9*
**2009**  4:*13*  118:*24*  119:*6*  120:*16, 17*
**2010**  4:*14*  49:*22, 23*  57:*14*  103:*25*  120:*19, 25*  121:*8, 16*  122:*23*
**2011**  4:*15*  121:*22, 23*
**2012**  4:*16*  50:*17, 21, 24*  53:*5, 14*  66:*8*  85:*18, 20, 22, 25*  86:*4*  102:*24*  103:*18, 20, 25*  104:*8, 8, 16*  122:*7, 16, 17, 23*  123:*15*  124:*11*  130:*9*
**2012-21**  124:*3*
**2013**  4:*17*  69:*8*  103:*20*  122:*19*  130:*12, 19*  131:*16*  132:*6, 19*
**2014**  4:*7, 18*  93:*24*  97:*6*  102:*25*  104:*16*  128:*15, 16*  129:*11*  133:*2, 14*  135:*7*
**2015**  4:*19*  63:*24*  87:*6*  97:*13*  135:*13, 20*  136:*2*  153:*16*  161:*20*
**2016**  4:*20*  97:*13*  101:*18*  139:*5*  155:*8*  185:*21*
**2017**  4:*21*  51:*2, 9*  53:*5*  66:*9*  97:*13*  101:*7, 20*  141:*17, 18*  142:*13*
**2018**  101:*8, 10*
**2019**  101:*10*
**2020**  2:*7*  200:*6*
**20s**  49:*13, 13*
**21**  5:*3*  190:*15, 17*
**216**  3:*10*
**23**  200:*13*
**23rd**  2:*7*
**241-1430**  3:*10*
**28**  200:*2*

**< 3 >**
**3**  4:*2, 10*  110:*20, 22*
**30**  8:*4*  19:*10*  28:*1, 9*  48:*1*  157:*15*  160:*19*

**161:*10*  170:*1*  187:*4*

**< 4 >**
**4**  4:*11*  113:*19*
**40**  187:*4*
**4077**  128:*8, 11*
**43215**  3:*16*
**44113**  3:*7*

**< 5 >**
**5**  4:*12*  116:*2, 4*
**5054**  175:*8*
**55**  3:*6*

**< 6 >**
**6**  4:*4, 13*  8:*4*  19:*10*  28:*1, 9*  48:*1*  49:*17*  118:*20*  120:*18*  157:*15*  160:*19*  161:*10*  170:*1*
**614**  3:*18*
**645-6959**  3:*18*
**6th**  129:*25*

**< 7 >**
**7**  4:*14*  49:*17*  120:*19, 21*
**7.**  9:*3*  95:*22*  96:*5*  159:*25*  160:*1, 3, 8*
**77**  3:*15*
**7th**  32:*13*

**< 8 >**
**8**  4:*15*  121:*21, 25*  163:*15*
**80s**  42:*5, 6*
**8th**  155:*8*

**< 9 >**
**9**  4:*16*  122:*8, 10*  170:*10*  200:*13*
**90s**  42:*5, 6*
**911**  51:*19*  56:*2*
**93**  4:*8*
**9th**  2:*9*

**< A >**
**a.m**  2:*8*  49:*17, 17*
**Abel**  163:*15*  170:*10*  177:*17*  180:*23, 25*  181:*1, 12*  185:*21*  186:*3, 7, 8, 10*  188:*5*  191:*24*  192:*10, 22*
**Abel's**  171:*1*  181:*16, 19*  182:*2*  189:*22*
**ability**  7:*25*  70:*21, 22*  90:*21*
**above-captioned**  199:*22, 24*
**absence**  181:*13*
**abundance**  44:*18*
**academy**  21:*21, 25*
**accept**  80:*8*  142:*2*

**access**  11:*2, 5, 19*  12:*12*  14:*6*  60:*18*  95:*7, 14*  128:*9*
**accident**  31:*12*  52:*18*  110:*8*  115:*13*  130:*4*  132:*7*  136:*25*
**Accidental**  55:*10, 11, 13*  59:*6, 8, 13, 19*  86:*14*  87:*11, 25*  88:*13, 19*  106:*22*  107:*4*  108:*16, 18, 20*  111:*3*  112:*21, 24*  113:*2, 6, 9*  114:*2, 4*  115:*16, 19, 23*  116:*12, 15, 18, 25*  117:*23*  118:*12*  119:*9, 11, 15, 17, 21*  120:*5, 10, 13*  121:*9*  123:*16, 22*  127:*7, 11, 20*  128:*21*  129:*13, 17*  130:*21, 25*  131:*2, 6, 7, 10, 18*  133:*17, 19, 24*  135:*10*  138:*17, 18*  139:*20*  140:*6*  142:*7*
**accidentally**  129:*3*
**accidentals**  126:*20*  131:*3, 4*
**account**  40:*23*  41:*17*  42:*4, 12*
**accounts**  40:*1, 2, 11, 19, 22*  41:*9, 13*  42:*20*  45:*3*
**accurate**  130:*22*  131:*16*  155:*9*
**accurately**  7:*21, 25*  133:*14*
**accused**  46:*23*  197:*9*  198:*15*
**acquaint**  54:*22*
**acronym**  175:*9*
**action**  76:*7, 15*  106:*16*  133:*25*  199:*22, 24, 25*
**actions**  16:*6*  128:*6*  129:*9*
**active**  81:*24*
**actual**  25:*5*  68:*9*  100:*25*  102:*10*  103:*22*  148:*6*
**add**  119:*3*
**addendum**  102:*6*
**addition**  11:*23*  13:*17*  14:*8*  56:*6*  97:*9*  170:*1*
**additional**  17:*5, 12*  72:*22*  83:*15*  87:*21*  108:*20*  109:*11*  119:*4*  170:*12*  176:*12*  180:*22*
**Additionally**  91:*18*
**address**  44:*12, 14*  84:*18*  129:*24*
**adjournment**  199:*18*
**adjudicated**  101:*19*  102:*4*  142:*16*
**adjudication**  142:*25*
**adjustments**  82:*19*  83:*17, 21*
**Adm**  1:*2*
**Adm.,**  1:*12*

**Case: 2:18-cv-01060-EAS-EPD Doc #: 141-3 Filed: 03/24/21 Page: 202 of 219 PAGEID #: 3783**

Deposition of Deputy Chief Kenneth Kuebler · · · · · · · · Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

**administrative** 13:*17*
22:*25* 55:*1* 56:*17, 20*
57:*4* 59:*1* 63:*7, 7* 78:*25*
145:*23* 190:*5*
**admissibility** 100:*4*
**Affairs** 12:*10, 12* 17:*17*
65:*18* 99:*2* 106:*7, 9, 13*
109:*25* 110:*3* 147:*4*
190:*1*
**affiliated** 200:*1*
**affixed** 200:*5*
**aforesaid** 199:*9, 14*
**African** 197:*15*
**age** 6:*3*
**agency** 21:*19* 33:*15* 92:*9*
**aggressively** 83:*16*
**ago** 41:*19* 42:*8* 45:*25*
83:*12, 19* 89:*12, 12* 126:*3*
151:*2* 169:*12* 170:*24*
171:*10, 24*
**agree** 37:*2* 40:*10* 67:*2*
75:*21* 103:*9* 151:*6*
160:*23* 166:*14, 20, 24*
167:*4* 170:*18* 171:*1, 8*
179:*20* 181:*19* 189:*13, 15,
18*
**agreed** 126:*16* 150:*21*
167:*7, 8*
**agreement** 2:*7* 90:*9*
115:*1* 191:*22*
**agrees** 74:*22, 24* 75:*3*
77:*25* 79:*7*
**ahead** 10:*24* 14:*5* 25:*3,
15* 26:*3, 11* 34:*14* 159:*7*
182:*14* 183:*1* 185:*3, 13*
186:*23* 192:*13, 18* 197:*13*
**AK-47** 26:*25* 29:*7* 30:*2*
**al,** 1:*2, 17, 23*
**alarm** 128:*23*
**alerting** 164:*21*
**allegations** 32:*14* 46:*17*
**alleged** 197:*14*
**allowed** 91:*20*
**alterative** 86:*24* 128:*4*
**Altherr** 118:*4*
**A-L-T-H-E-R-R** 118:*4*
**amend** 189:*21*
**amended** 190:*10*
**Americans** 197:*15*
**amount** 80:*3*
**analysis** 82:*11, 13* 83:*10*
99:*7, 12* 101:*25* 102:*1, 9,
17, 21* 103:*3, 12*
**analyze** 83:*6*
**analyzes** 101:*24*
**ancillary** 92:*17*
**angry** 39:*4*
**animal** 55:*18* 119:*2*
**animals** 55:*15* 119:*4*
**announcement** 39:*15*

**annual** 82:*11* 86:*15*
98:*18* 99:*8* 103:*15*
**annually** 83:*3* 84:*15* 85:*2*
**answer** 7:*12* 10:*24* 14:*5*
15:*25* 16:*3* 25:*4, 15* 26:*3*
58:*24* 68:*16* 94:*15* 95:*7*
131:*13* 157:*19, 21* 159:*9,
12* 160:*21* 183:*1, 13*
185:*3, 14* 192:*19* 193:*2,
10, 17, 23* 194:*8, 24* 195:*6,
7, 13* 196:*14* 197:*13* 198:*8*
**answered** 170:*3* 171:*9*
**answers** 95:*13, 15*
**Anthony** 127:*9*
**anticipate** 28:*16*
**anticipation** 145:*18*
**anybody** 90:*5* 92:*23*
**apologize** 178:*8*
**app** 41:*15* 43:*25* 44:*5, 6*
**Apparently** 179:*22, 23*
**appear** 111:*15*
**APPEARANCES** 3:*1* 4:*2*
**appears** 35:*7* 114:*13, 13*
133:*12*
**application** 44:*4*
**appreciate** 38:*6*
**approached** 88:*19*
**appropriate** 76:*6* 196:*11*
**approval** 78:*11* 175:*11*
**approve** 76:*11* 77:*2*
78:*14, 15* 172:*16, 19, 21, 23*
**approved** 78:*4* 107:*11*
172:*14* 173:*25* 174:*4*
180:*2*
**approximately** 20:*21* 23:*3,
6, 22, 23* 32:*13* 53:*5* 66:*10*
**approximation** 34:*11*
**April** 15:*1*
**area** 16:*19* 29:*6* 53:*19*
61:*9*
**areas** 22:*20* 49:*14* 52:*4*
**argue** 193:*22*
**arrested** 29:*16* 47:*21*
**arrived** 56:*12*
**articles** 67:*18*
**aside** 180:*25*
**asked** 32:*24* 48:*13* 82:*12*
96:*2, 5* 107:*15* 132:*2*
169:*7* 174:*11* 178:*9*
181:*23*
**asking** 12:*2* 17:*10*
152:*13, 20, 23* 153:*1*
155:*14* 159:*7* 167:*21*
**assault** 54:*21*
**assign** 63:*8* 65:*3, 6*
155:*10*
**assigned** 15:*10* 36:*15*
65:*15, 19* 66:*24* 104:*19*
149:*21*

**assignment** 49:*24* 64:*16*
65:*5* 66:*6* 175:*8*
**assignments** 49:*8* 53:*14*
64:*16*
**assigns** 64:*2* 65:*25* 66:*18*
71:*21*
**assistance** 98:*19*
**assume** 7:*12* 74:*14*
111:*18* 124:*4*
**assuming** 80:*18*
**attached** 146:*13* 187:*23*
**attacking** 86:*25*
**attempt** 12:*16* 119:*3*
133:*12* 165:*10*
**attempted** 109:*14*
**attempts** 174:*3*
**attorney** 193:*18* 199:*21,
23*
**attorneys** 186:*4*
**Attorney's** 32:*10*
**audio** 7:*10* 62:*8* 67:*20*
**authenticate** 100:*19*
**authenticity** 100:*5, 24*
101:*2*
**author** 16:*6*
**authored** 104:*15*
**authoring** 104:*16*
**automatically** 107:*4, 7*
**available** 11:*11, 15* 12:*2*
16:*11* 21:*5* 35:*18* 64:*8*
65:*16* 75:*13* 86:*5* 89:*9*
90:*14* 102:*15*
**Avenue** 29:*6*
**aviation** 51:*25*
**avoided** 129:*8*
**aware** 31:*23* 32:*12* 47:*6*
73:*9* 99:*25* 161:*2* 181:*10*
185:*22* 189:*1* 196:*25*
**awareness** 165:*1*

**< B >**
**back** 9:*1* 16:*10* 28:*12*
47:*25* 59:*5* 62:*8, 20*
71:*21* 86:*13* 90:*1* 117:*17*
118:*2* 131:*8* 136:*17*
143:*7* 147:*1* 149:*6, 20*
152:*7* 156:*10* 176:*17*
178:*19* 179:*7* 196:*19*
198:*16*
**backdrop** 125:*22, 24, 25*
138:*1*
**backed** 181:*16, 17*
**background** 50:*6* 51:*21*
138:*2*
**backlash** 180:*4*
**backstop** 57:*18, 23*
**bad** 57:*18*
**badge** 31:*4, 5, 8*
**Baker** 33:*11, 19* 34:*24*

35:*2, 7* 36:*11*
**balance** 65:*1*
**banks** 80:*2*
**bar** 109:*13* 125:*16*
**barrel** 88:*9*
**base** 35:*13* 138:*10* 157:*11*
**based** 78:*5* 79:*2* 100:*17*
106:*2, 4* 114:*13* 129:*24*
137:*25* 149:*11* 167:*13*
170:*22, 25* 187:*17* 196:*18,
22, 22* 197:*2, 4*
**Bash** 144:*18, 22* 150:*24*
**basic** 148:*8*
**Basically** 15:*5* 70:*3*
76:*22* 81:*10* 117:*18*
125:*3*
**basics** 148:*1*
**basis** 76:*23* 109:*19, 22*
158:*5, 7* 159:*19* 194:*1*
**beginning** 69:*8* 143:*12*
**behalf** 3:*2, 12* 10:*19*
153:*1* 161:*11*
**behaving** 83:*16*
**behavior** 78:*10* 89:*17, 23*
**Bela** 189:*20* 190:*1*
**believe** 9:*25* 10:*1* 11:*18*
12:*5* 13:*2, 16* 17:*4* 20:*10*
25:*9, 11* 27:*14* 28:*22*
31:*14* 32:*9* 35:*1, 19, 24*
38:*12, 21* 39:*3* 41:*18*
46:*2* 47:*18* 49:*7, 13*
68:*18* 71:*18* 75:*20* 82:*1,
3* 84:*16* 85:*8, 24, 25*
86:*18, 25* 87:*3, 10* 91:*11*
102:*10, 19* 103:*4* 104:*14,
18, 18* 109:*8, 10, 10, 14, 16*
110:*11* 113:*23, 25* 116:*8*
117:*9* 123:*3, 14* 125:*11,
15, 16, 18* 130:*19* 137:*12,
18* 138:*5, 17* 140:*16*
142:*23* 147:*3* 151:*24*
152:*9* 153:*17* 158:*9*
159:*13* 166:*3, 9* 167:*11*
169:*24* 171:*9, 24* 172:*8*
173:*10* 174:*18* 177:*2, 18*
178:*24* 179:*14, 19* 181:*2*
183:*23* 186:*10* 187:*9*
188:*17* 189:*4, 5* 191:*2*
197:*15*
**believed** 24:*25* 59:*22*
170:*12* 183:*11* 184:*23*
198:*6*
**BELL-McGREW** 1:*14*
10:*7* 17:*21* 19:*17* 22:*9*
97:*17* 151:*18, 21* 152:*5,
25* 153:*15* 154:*4*
155:*12* 156:*14* 157:*8, 25*
158:*11, 18* 161:*2*
**belong** 46:*6*

Deposition of Deputy Chief Kenneth Kuebler     Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

**best** 6:*19* 7:*7* 28:*15*
105:*15* 134:*10* 169:*22*
**beyond** 8:*15* 101:*21*
125:*25* 174:*14*
**bias** 73:*4, 11, 19, 22*
**Billy** 57:*15* 126:*21* 174:*21*
**binder** 63:*16, 18* 70:*9, 10*
**binding** 8:*8, 17* 10:*19*
153:*1*
**bit** 68:*6* 69:*4* 110:*16*
180:*1* 191:*12*
**bite** 137:*1*
**blog** 45:*9, 13, 23*
**blue** 140:*9*
**Board** 4:*7, 9, 10, 11, 12, 13,
14, 15, 16, 17, 18, 19, 20, 21,
24* 9:*9* 11:*4* 12:*4, 7, 21*
14:*9, 11, 14, 23* 15:*10*
16:*12, 21* 18:*13, 23* 19:*4*
20:*13* 48:*25* 52:*13, 16, 17,
21, 24* 54:*6, 17, 18, 24*
55:*6, 11, 12, 14, 16, 20*
56:*1, 3, 21* 57:*14* 59:*1, 11,
15, 16, 17* 60:*24, 25* 61:*8,
12* 63:*8, 19, 21, 24* 64:*2,
12, 18, 20, 22* 65:*4, 8, 9, 12,
19* 66:*1, 16, 19, 22, 25*
67:*11, 13* 68:*20, 23* 69:*3,
5, 10, 14* 70:*8, 16, 20, 22,
24* 71:*18, 20, 20* 75:*1, 4, 6,
18* 77:*20, 21, 24* 79:*6*
82:*11* 85:*2* 90:*11* 91:*8,
15, 18, 20* 92:*2, 9, 14, 22*
93:*24* 94:*9, 11, 14, 15*
95:*16* 97:*7* 98:*3, 6, 8, 12,
15, 16, 21* 99:*3, 3* 101:*20*
102:*11, 15* 103:*22* 105:*9*
107:*12, 13, 16, 17, 23*
108:*2, 2, 3* 111:*13, 23*
112:*1, 4, 5, 16* 114:*22*
115:*7* 117:*11* 122:*22*
123:*5, 6, 7* 124:*15, 17*
125:*9, 15, 22* 126:*1, 15*
128:*16* 137:*20* 141:*19*
146:*2, 10* 147:*20* 149:*20,
21, 24* 150:*5, 20, 21*
153:*22, 24* 154:*1, 11, 20,
23* 157:*24* 162:*15* 163:*18,
22* 164:*20* 166:*17* 167:*7,
8, 8, 10* 168:*16, 18, 19, 20,
22, 25* 171:*12* 173:*11*
183:*4* 190:*5*
**board,** 98:*12*
**boards** 93:*9*
**board's** 11:*22* 13:*17*
54:*25* 67:*7, 9, 10* 72:*10*
74:*24* 146:*11* 150:*1*
151:*3* 163:*16*
**body** 16:*24* 27:*19* 52:*14*
67:*1*

**bottom** 76:*13* 107:*9*
124:*14* 127:*25* 131:*8*
**bound** 63:*15*
**box** 175:*15*
**boy** 6:*12*
**Boyle** 117:*4*
**break** 44:*10* 53:*18* 69:*4*
143:*3* 192:*3*
**brief** 175:*22*
**Bright** 41:*17, 20, 21*
**bring** 158:*22*
**bringing** 174:*16*
**Browns** 90:*18*
**building** 128:*23, 25*
**bullet** 88:*18* 89:*1, 5, 22*
129:*22* 175:*3*
**bullets** 89:*2*
**bulls** 10:*3, 3*
**bunch** 36:*21*
**Bureau** 15:*13* 17:*16*
20:*10* 50:*1, 3* 51:*18, 22*
56:*2* 64:*11* 147:*24* 175:*9*
186:*3* 190:*1*
**bureaucratic** 173:*22*
**burglary** 67:*24* 128:*23*
**busier** 64:*24*
**business** 82:*25* 83:*1*
**bypass** 76:*25* 94:*12, 23*
179:*21* 180:*9*
**bypassing** 179:*15*

**< C >**
**calendar** 14:*17, 19* 16:*12*
55:*22* 56:*4*
**calendars** 86:*12*
**call** 8:*4, 11* 20:*8, 11, 13,
15* 45:*12* 51:*19* 55:*23, 25*
56:*3, 4, 5* 73:*14* 77:*11*
147:*16, 21* 148:*14*
**called** 2:*3* 15:*13, 14*
17:*21* 41:*17* 68:*2* 79:*24*
105:*15* 147:*23* 168:*23*
**callout** 14:*24*
**call-out** 56:*4*
**calls** 56:*1, 6* 194:*7*
**cam** 16:*24* 67:*21*
**Cameron** 63:*22, 24* 82:*22*
190:*4*
**C-A-M-E-R-O-N** 63:*23*
**Camp-Donavon** 57:*15*
126:*21* 174:*21*
**cancelled** 35:*24*
**capacity** 8:*8* 34:*3* 36:*2, 3*
42:*2* 47:*2* 48:*1* 52:*12*
152:*13* 153:*25* 155:*15*
157:*16* 161:*1, 10*
**caption** 199:*17*
**capture** 88:*6* 89:*6*
**captured** 99:*1*

**car** 28:*21* 42:*5, 7* 44:*9*
57:*18* 108:*5, 6, 10* 109:*14,
16* 126:*24* 152:*8* 156:*10*
**career** 52:*9*
**Carl** 128:*8, 11*
**carry** 91:*20* 188:*11*
**carrying** 91:*23*
**cars** 42:*5, 7*
**CASE** 1:*2, 13, 20* 8:*20*
11:*24, 25* 16:*2* 17:*12, 13,
21, 25* 18:*2, 3, 6, 8, 10*
19:*7* 20:*16* 27:*22* 30:*16*
36:*24, 25* 37:*10* 41:*7*
46:*20* 47:*8* 54:*12, 13*
55:*3, 4* 57:*9* 58:*10, 10*
59:*12* 65:*9* 71:*7* 75:*20,
23* 76:*4* 77:*6, 14, 19*
78:*12* 79:*5* 80:*10, 11, 24*
88:*18* 101:*1* 107:*16*
108:*3, 9* 109:*7, 10, 12, 17*
114:*12* 116:*23* 117:*3, 6, 9*
119:*22, 23* 121:*4* 124:*6,
23* 125:*10, 11, 13, 18*
127:*13* 128:*9, 12* 129:*21*
132:*4, 12, 13* 137:*11, 17*
139:*18, 24* 148:*10* 149:*15*
150:*5, 22* 151:*4* 154:*20*
155:*21, 22* 156:*8* 157:*14*
158:*17* 159:*16* 161:*5*
163:*4* 164:*3, 21* 165:*4, 11*
167:*6, 19, 25* 168:*1*
169:*22* 171:*23* 173:*17, 19,
20* 174:*22* 175:*9, 10, 22*
176:*24* 177:*10, 13* 179:*21*
182:*7* 183:*19* 189:*14*
191:*5, 10, 18, 21* 194:*15*
197:*16* 198:*4, 16*
**caseload** 64:*23*
**cases** 6:*21* 8:*13* 9:*3* 10:*2*
13:*22* 17:*19* 18:*18, 20, 24*
19:*1, 2* 38:*14, 16, 18*
58:*21* 75:*25* 76:*1, 2, 3*
81:*3* 82:*2, 4* 94:*5* 101:*17*
102:*10* 103:*11* 104:*7, 11*
160:*16, 17* 169:*3, 25*
174:*7, 20* 175:*22*
**cause** 35:*24* 175:*24* 199:*9*
**caused** 102:*18* 129:*9*
**causing** 129:*2*
**caution** 44:*18*
**CD** 67:*21*
**ceiling** 89:*5*
**center** 52:*1*
**central** 22:*8* 23:*14*
**certain** 98:*9*
**Certainly** 57:*4* 58:*19*
73:*15* 83:*11, 22* 98:*4*
187:*9* 191:*8*
**CERTIFICATE** 4:*5*

**certified** 6:*5*
**certify** 199:*6, 16, 20*
**cetera** 7:*8* 13:*19* 35:*18*
67:*25* 83:*4* 91:*20* 102:*14*
170:*21*
**chain** 69:*20* 70:*16* 71:*3,
4, 8, 18, 21, 25* 72:*16*
73:*12* 74:*3, 23* 77:*25*
78:*1* 79:*6, 9* 81:*17* 90:*1,
2, 4, 13* 91:*25* 94:*12, 22*
95:*3, 17* 106:*10, 12*
111:*14, 24* 112:*8, 12, 15*
115:*7* 117:*10* 123:*1, 5, 9*
124:*15, 24* 125:*1, 2*
126:*15* 137:*19, 20* 145:*25*
146:*7, 21, 24* 147:*8*
150:*21* 152:*1* 154:*22*
155:*16* 157:*23* 161:*16*
164:*13, 17* 165:*19* 166:*1,
3, 4, 11, 17, 18, 25* 168:*6*
171:*7, 17* 176:*14, 21*
178:*16* 180:*4* 183:*4*
189:*2* 191:*5, 19, 22*
**chains** 68:*22* 72:*4, 5*
**chair** 20:*12* 65:*19* 66:*8*
148:*3*
**chairperson** 52:*22* 53:*2, 6,
8* 61:*14* 66:*3, 4, 7* 82:*14,
14* 83:*2, 3, 6, 6* 84:*4, 19,
19* 85:*2, 25* 86:*3, 3* 96:*17,
19, 21, 22, 25* 98:*8, 13, 21*
99:*4* 103:*19* 104:*2*
112:*10, 11, 17* 132:*20*
135:*14* 143:*21* 146:*18*
147:*6, 20* 153:*13, 17, 25*
161:*20* 163:*1*
**challenge** 100:*16, 23* 101:*3*
**challenging** 100:*4*
**change** 38:*10* 82:*19*
84:*14, 24* 89:*17* 97:*5*
99:*13, 13, 23, 23* 119:*23*
133:*2* 179:*2* 188:*12*
**changed** 38:*20* 53:*14*
64:*15* 65:*5* 82:*1* 89:*23*
97:*9* 188:*1* 190:*12*
**changes** 15:*6* 83:*8, 21*
86:*16* 87:*1, 3, 7, 23*
128:*10, 10, 13* 129:*10*
133:*13*
**changing** 97:*8* 122:*15*
189:*19*
**characterization** 12:*20*
14:*5*
**characterize** 181:*21* 191:*9*
**charge** 54:*23* 67:*20* 89:*9*
**charged** 47:*19* 57:*20*
79:*4* 137:*12* 174:*13*
191:*24*
**charges** 54:*21* 75:*9, 10, 19*
76:*10* 77:*4, 5, 12* 79:*11,*

**Case: 2:18-cv-01060-EAS-EPD Doc #: 141-3 Filed: 03/24/21 Page: 204 of 219 PAGEID #: 3785**

Deposition of Deputy Chief Kenneth Kuebler

Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

*14* 89:*10*, *16* 94:*13* 95:*4*
117:*25* 118:*8* 127:*3*, *12*
129:*17* 132:*24* 172:*6*, *14*,
*16*, *19*, *21*, *23* 173:*16*, *20*,
*25* 174:*4*, *7*, *8*, *12*, *17*
175:*11*, *23* 176:*1* 180:*2*,
*15*, *17*, *18*
**Charging** 67:*19*
**charity** 42:*8*
**chasing** 59:*23*
**check** 41:*24* 56:*11* 134:*18*
**checked** 128:*19*
**CHIEF** 1:*2*, *16* 2:*2* 3:*14*
*4*:*3* 6:*3*, *7*, *15* 36:*15* 37:*2*,
*7* 38:*20* 48:*12* 50:*11*, *16*,
*24* 51:*12*, *13* 52:*5*, *23*
53:*6*, *8*, *9* 60:*6* 61:*15*
62:*4*, *13*, *16* 66:*5*, *12*, *13*
68:*24* 69:*2*, *2*, *3* 74:*4*, *22*,
*23*, *24*, *25* 75:*1*, *1*, *3*, *7*, *10*,
*12*, *13*, *14*, *17*, *18*, *20*, *24*
76:*5*, *8*, *9*, *11* 77:*1*, *6*, *12*,
*13* 78:*2*, *5*, *7*, *8*, *13*, *15*
79:*4*, *8*, *14*, *22*, *24* 80:*6*, *15*,
*18*, *22*, *23* 81:*6*, *7*, *13*, *17*,
*21* 84:*17* 85:*17* 88:*20*
89:*7* 90:*4*, *6*, *10*, *11*, *14*, *19*
109:*5* 111:*7*, *8*, *14* 112:*3*,
*7*, *12* 114:*16*, *17*, *21* 115:*1*,
*1*, *2*, *6*, *8*, *10* 121:*4* 122:*19*
123:*2* 124:*4*, *8*, *16*, *17*, *23*,
*25* 125:*4*, *5*, *7*, *9*, *11* 126:*8*,
*10*, *16* 132:*15*, *21* 137:*22*
144:*18* 150:*11*, *13*, *18*, *24*
151:*24* 157:*9* 158:*18*, *23*
159:*1*, *2*, *14* 161:*3*, *15*
167:*6*, *10* 171:*11* 172:*5*,
*13*, *19* 173:*9*, *12*, *16*, *22*
174:*17* 175:*11* 186:*2*
187:*9*, *15* 188:*9*, *10*, *10*
189:*2*, *5*, *9*, *14*, *15* 190:*24*
191:*4*, *8*, *18* 199:*7*
**chief,** 121:*2*
**chiefs** 36:*8*, *19*, *25* 38:*13*
50:*19*, *25* 51:*3* 53:*10*
84:*16* 85:*17* 91:*2*
**Chief's** 5:*2* 75:*5*, *11* 76:*8*
77:*17* 78:*11* 168:*10*
**child** 137:*4*, *5*
**children** 40:*18*
**choose** 40:*19*
**chose** 72:*11* 75:*12*
**chosen** 65:*14*
**CHRISTOPHER** 1:*12*
117:*4*
**circumstances** 141:*3*
159:*2* 192:*12*
**CIRT** 13:*16* 15:*13* 16:*16*,
*23* 24:*5* 54:*11*, *16* 55:*16*,
*16* 56:*11* 59:*17*, *25* 60:*4*,

5, *7* 63:*5* 67:*16* 166:*16*
168:*3* 178:*4* 190:*6*
**CITY** 1:*2*, *17*, *23* 2:*9*
3:*14* 8:*4*, *9*, *16* 10:*19*
17:*19* 21:*6* 22:*8* 23:*14*
32:*10* 35:*12* 39:*4* 51:*4*
128:*11* 153:*2* 157:*17*
161:*11*
**Civil** 200:*2*
**civilian** 31:*22* 33:*15*
125:*20*, *21*
**claims** 183:*22* 197:*2*
**clarified** 62:*9*
**clarify** 144:*24*
**clean** 7:*7*
**cleaner** 160:*10*
**clear** 18:*22* 28:*13* 100:*20*
**cleared** 62:*17*
**Cleveland** 2:*10* 3:*7* 200:*5*
**close** 9:*19* 64:*19*
**closing** 109:*14*
**COC** 125:*2*
**code** 185:*1*, *6*, *11*, *15*
**coded** 130:*18*
**collection** 88:*6*
**color** 130:*18* 195:*23*
**COLUMBUS** 1:*2*, *17*, *23*
3:*14*, *16* 8:*9*, *17* 10:*20*
17:*20* 21:*6*, *10*, *23*, *25*
26:*23* 35:*12* 47:*24* 73:*10*
78:*24* 93:*15* 128:*11*
151:*8* 157:*17* 195:*17*
**column** 118:*25* 119:*15*
120:*14* 123:*15*, *16*, *17*
136:*15* 140:*1*
**columns** 119:*13*, *14* 134:*7*
**combined** 23:*8*, *9*
**come** 7:*10* 13:*3* 56:*19*
70:*18* 78:*22* 79:*21* 86:*1*
93:*10* 122:*24* 124:*8*
154:*24* 155:*2*, *25* 163:*25*
173:*21* 174:*24* 180:*2*
181:*8*, *12* 184:*22* 187:*19*
**comes** 44:*17* 101:*2*
145:*24*
**comfortable** 160:*10*
**coming** 64:*19* 168:*15*
176:*23* 183:*9*
**command** 68:*22* 69:*20*
70:*17* 71:*3*, *5*, *8*, *19*, *21*, *25*
72:*4*, *6* 73:*12* 74:*4*, *24*
77:*25* 78:*1* 79:*7*, *9* 81:*17*
90:*1*, *2*, *4* 94:*12*, *23* 95:*4*,
*17* 106:*10*, *12* 111:*14*, *25*
112:*8*, *13*, *15* 115:*7*
117:*10* 123:*1*, *5*, *10*
124:*15*, *24* 125:*1*, *2*
126:*15* 145:*25* 146:*8*, *22*,
*24* 147:*9* 150:*21* 152:*1*
154:*22* 155:*16* 157:*23*

161:*16* 164:*13* 165:*19*
166:*2*, *3*, *11*, *17*, *19*, *25*
168:*6* 171:*8*, *17* 176:*14*,
*21* 180:*5* 183:*4* 189:*3*
191:*5*, *19*, *23*
**Commander** 15:*1*, *2*, *5*, *9*,
*15*, *18*, *21* 49:*21*, *25* 50:*1*,
*3* 55:*22* 60:*4*, *5* 64:*11*, *15*,
*16* 65:*3*, *7*, *8* 69:*1* 90:*4*, *6*
103:*23* 108:*4*
**commanders** 50:*12* 52:*24*
64:*10* 84:*16*
**command's** 164:*17*
**comment** 39:*12* 131:*15*
197:*3*
**commentary** 24:*15*
**commented** 42:*25*
**comments** 39:*5* 41:*6*
72:*14* 124:*3* 183:*23*
196:*18*, *23* 197:*11*, *14*
**Commission** 200:*13*
**commissioned** 199:*5*
**Committee** 93:*6*
**common** 89:*14*
**commonly** 59:*8*
**communicated** 84:*25*
**communication** 51:*18*
**Communications** 20:*10*
56:*2* 147:*24*
**companies** 41:*23*
**company** 41:*17* 42:*1*
**compensatory** 80:*5*
**complained** 32:*8*
**complaint** 32:*5*, *12* 33:*15*
34:*1*
**complaints** 31:*22*
**complete** 35:*17* 63:*5*
175:*11*
**completed** 102:*19* 166:*16*
175:*5* 199:*18*
**completely** 89:*23*
**complicated** 31:*18* 108:*11*
152:*13*
**comprehensive** 71:*23*
95:*21*
**computer** 50:*5* 51:*20*
199:*12*
**conceivable** 76:*4*
**concept** 34:*20* 39:*8*
**concern** 73:*3*, *6*, *7*
**concerning** 9:*8*
**concerns** 56:*16* 61:*13*
**concluded** 63:*4* 102:*23*
150:*5*
**conclusion** 27:*1* 36:*19*
54:*14*, *15*, *19* 55:*5* 62:*22*
64:*14* 90:*23* 122:*24*
124:*9* 138:*10* 154:*24*
155:*2*, *25* 163:*25* 167:*1*

171:*7* 176:*23* 178:*8*
180:*2* 187:*20* 194:*8*
**conclusions** 35:*19*, *20*
38:*25* 114:*21* 137:*23*
170:*18*, *22* 171:*6*, *16*
176:*5* 178:*12* 179:*2*
188:*13*
**concur** 72:*9*
**Concurrent** 43:*6*
**conduct** 35:*3* 54:*9*, *11*
59:*18* 61:*1* 162:*11* 172:*6*,
*7*, *14*
**conducted** 33:*10*, *15*
54:*16* 67:*23* 168:*19*
**conference** 39:*14*
**confirm** 169:*7*
**confuse** 62:*14* 157:*20*
**confused** 46:*25* 62:*4*, *6*
**confuses** 157:*22*
**conjunction** 170:*20*
**conscious** 7:*6*
**consider** 84:*17* 90:*12*
92:*1* 155:*21*
**considerations** 92:*6*
**considered** 31:*16* 97:*16*
98:*4* 124:*24*, *25* 169:*10*
170:*6*
**considering** 65:*15* 117:*15*
**considers** 193:*19*, *20*
**constructive** 30:*21* 76:*21*
**consult** 66:*23*
**consultation** 60:*3*
**consulted** 62:*3*
**contained** 164:*9*
**content** 166:*6* 187:*12*
**contention** 101:*21*
**Continent** 109:*13*
**continuation** 171:*20*
**continue** 71:*16*, *17* 79:*3*
**continued** 89:*3*
**continuing** 26:*7*
**contract** 30:*22* 70:*19*
76:*16* 78:*14* 176:*19*
200:*1*
**contractor** 34:*18*
**contractual** 110:*2*
**contradict** 182:*12*
**contradicted** 182:*18*, *23*
**contradicting** 183:*18*
**contradiction** 182:*2* 184:*2*
**contrary** 191:*11*
**contributed** 92:*7*
**control** 66:*16*
**conversation** 9:*15* 85:*4*
86:*1* 87:*21* 97:*8* 126:*12*
144:*15* 155:*4* 172:*13*, *25*
173:*4*, *8*, *11*, *23* 175:*22*, *25*
177:*9*, *12* 178:*16* 187:*13*
**conversations** 144:*13*

Case: 2:18-cv-01060-EAS-EPD Doc #: 141-3 Filed: 03/24/21 Page: 205 of 219 PAGEID #: 3786

Deposition of Deputy Chief Kenneth Kuebler     Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

164:2
**convictions** 195:11
**cookies** 6:18
**cool** 42:9 45:25
**COOPER** 1:12 17:21
**copies** 13:9, 10, 18 16:23
17:2 63:10, 20
**co-published** 45:22
**copy** 72:5 191:3 198:25
**coroner's** 67:18
**correct** 6:18 9:4 15:7
16:18 20:24 30:6 36:13
46:9 50:18 53:11 56:8
59:21 63:20 64:4 75:5, 6
77:18 79:12 80:25 82:7
85:21 90:7 91:8, 9 97:13,
17 102:5 104:3 105:16,
25 108:18, 19, 25 111:4
112:21, 24 113:6, 13
114:22 115:11, 17, 24
117:1 118:17, 18 121:15
123:22, 23 125:6 126:18
127:8 133:18 134:5, 6
136:3, 19 138:20, 21
139:2, 13 140:8, 21
141:10, 14 142:2, 8, 10, 11,
12, 17 149:24 150:8
152:3 156:15 158:1, 20
162:11 163:11 164:18
165:23, 24 167:21, 22
168:4, 7, 10, 14 170:2
172:18 175:16 177:23
179:11 180:21 189:5
192:25 193:4 194:6, 9, 18
199:13
**corrections** 21:16
**corrective** 76:15
**correctly** 125:21 140:18
152:7
**Correspondence** 5:3
**co-suspect** 128:25
**Council** 35:12 39:4
**counsel** 2:7
**counselling** 30:12, 21
76:14, 21
**counts** 45:23
**County** 2:10 54:13 199:3
**couple** 37:13 42:8
**course** 16:5 65:5 71:13
76:6, 7 107:6 171:7
177:15
**COURT** 1:1 2:8 47:7, 14,
15 160:22 199:25
**covered** 49:15
**CPD** 9:8 182:11, 17
184:21
**craft** 104:19
**crafted** 178:24
**crafts** 22:24 98:18

**Craig** 129:16
**crashing** 129:1
**create** 47:19
**created** 14:12 17:6 67:25
71:18 74:17 133:13
**crime** 47:19
**criminal** 13:16 15:13
54:10, 11, 21 55:17 56:18,
21 57:2 62:25 63:4
75:10 195:11
**criminally** 126:25
**critical** 54:7
**cross-examination** 2:4 4:4
6:7
**cross-training** 66:15
**cruiser** 16:25 30:16, 18, 19
**curious** 38:1
**current** 65:7, 8 190:13
**currently** 50:15, 20 51:11
52:18 63:22 65:16 89:11
104:22
**cut** 27:14
**cutting** 167:22
**Cuyahoga** 2:10 199:3

**< D >**
**danger** 57:24 138:13, 14
**dangerous** 44:11
**data** 83:6
**database** 13:11
**date** 82:24 102:13
**dates** 24:5
**day** 147:13, 14
**daylight** 82:25, 25 83:23
**DC** 175:10 186:24
**DCC** 30:19, 21 31:8 76:6,
13, 20, 25 77:3, 9, 13, 20
78:1, 7, 10, 24 79:1 81:13,
16, 24 82:5 89:1, 14
119:23
**deadly** 9:8 13:13 23:17,
25 24:8, 20 25:2, 5, 20
26:15, 19 30:9 54:10
57:24 58:20 69:11 82:11
86:25 92:25 93:1 95:25
98:5, 22 99:17 125:19
174:14, 15 194:2, 12, 14
**DEARREA** 1:2
**death** 9:9 11:3, 21 12:4
15:12 54:12, 15, 17, 18, 19
55:4, 5 58:15 92:7 93:23
108:2, 3 128:4 181:13
192:24 194:16
**DEAUNTE** 1:13 10:7
17:20 19:17 22:9 151:18,
20 152:4, 25 153:5, 15
154:4 155:11 156:14
157:8, 25 158:10, 17 161:2
**DEAVERS** 1:2, 17
**December** 200:5

**decider** 37:7 62:16 90:10,
20 188:9
**decides** 147:5
**decision** 57:4 58:16 60:2,
9 69:2 80:22 89:14
111:16, 16 114:9 133:10
158:10 170:24 188:10
189:10, 12, 15 190:25
**decision-maker** 74:20, 23,
25 75:2 79:15 80:24
81:3, 14, 18, 22 111:18
150:22 158:19 161:6
173:12 189:9
**decision-makers** 82:18
**decision-making** 99:14
**decisions** 55:2 83:25
99:13 170:22 188:11
189:16, 18
**decrease** 87:8
**Defendant** 1:2, 18, 24
46:12, 21
**Defendants** 3:12
**defended** 40:3
**define** 185:1
**defined** 68:17 193:21
194:1 200:2
**defunct** 41:18
**delay** 101:16
**deliver** 63:6
**delivered** 13:10 63:18
**deluded** 73:22
**demographics** 83:1
**demoted** 198:17
**department** 6:14 16:20
17:15 21:10, 19 33:16
37:25 38:3 48:14 52:20
73:7 84:13 99:21 103:10
185:10
**departmental** 75:9 76:10
77:4, 5, 12 79:11, 13
89:10, 15 94:13 95:4
117:25 118:8 127:2, 12
129:17 172:5, 13, 19, 21,
23 173:16, 20, 25 174:7,
11, 16 175:23 180:1, 18
**departmentally** 57:20
79:3 89:8 137:12 174:13
191:24
**depending** 93:10
**depends** 37:1 69:24
**deplete** 80:2
**deposed** 47:1 168:12
**deposes** 6:5
**deposing** 123:11
**deposition** 2:2 6:24 8:19
9:14, 20 10:16 12:15
18:17, 22 20:19, 22, 23
21:2, 7 25:3 26:9 27:25
28:10, 13 40:4, 20 42:17
46:20 86:7 95:8, 22 96:2,

7 128:19 145:13, 18
153:10 159:7 160:14, 16
165:6 169:15 199:16
**depositions** 7:2 152:15, 16
**DEPUTY** 2:2 3:14 4:3
6:3, 7, 15 33:2 34:8 36:8,
15, 19, 25 37:2, 7 38:13,
20 50:11, 16, 19, 24, 25
51:3, 12, 13 52:5, 23 53:6,
8, 10 60:6 61:15 62:4, 13,
15 68:24 69:1, 2, 3 74:4,
22, 22, 24, 25 75:1, 3, 5, 7
76:5, 7, 9 78:7, 8 81:21
84:15 85:17 88:20 90:4,
6, 10, 11, 14, 19 91:2
115:1 122:19 124:16, 23,
25 125:4, 4, 8, 11 132:21
137:22 144:18 150:24
151:24 157:9 158:18
161:15 199:6
**descent** 67:3, 6, 8, 12
72:10
**descenter** 67:11
**descenter's** 67:8
**descents** 75:1
**Describe** 27:19 28:21
71:12
**described** 97:12, 15
146:11 155:9
**describing** 126:5
**description** 95:21 96:4
**descriptions** 67:17
**designated** 10:18 20:19
**designed** 88:5
**designee** 8:16
**desk** 155:16 158:25
164:12 165:19 166:10
**detail** 16:8
**detailed** 96:6
**details** 106:24
**detective** 56:10 68:3
**detectives** 54:9
**determination** 37:6 54:20
55:6 70:17 75:15 80:14,
25 147:7 183:5
**determine** 55:1 64:22
76:6 92:14 111:12, 19
165:15 196:10
**determined** 117:11, 11
157:24
**develop** 84:17 167:1
**development** 22:24 23:4
48:6
**device** 88:21, 22, 24, 25
**devices** 88:5
**died** 108:9
**differ** 74:5
**different** 16:10 17:19
18:17, 19 28:5 35:10

Deposition of Deputy Chief Kenneth Kuebler | Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

36:21 37:16, 21, 25 38:25 111:20 121:13
**difficult** 96:3
**direct** 149:6
**direction** 35:12 140:15, 18
**directions** 89:16
**directive** 162:10
**directives** 11:16 48:11 91:16, 17
**directly** 126:10 184:5
**Director** 34:8 79:18, 21, 24 80:11, 13, 19, 21 81:3
**directors** 33:2
**director's** 81:9 109:9
**disagree** 37:2 38:10 90:17 112:12 151:6 160:6, 18, 22, 23 166:14, 20, 24 167:5 189:10, 13
**disagreed** 38:14, 20 111:25 112:4, 8, 16 114:21 115:6 123:1 124:16 125:5 126:14 167:7, 9 171:12 173:11 191:4
**disagreeing** 177:1
**disagreement** 90:11, 12, 19 111:13, 20 115:3, 9 124:5 125:8 127:16 132:14 137:16, 18 191:19
**disagrees** 69:3 90:3, 8
**discharge** 55:13, 18 58:12 59:6, 7, 9, 12, 14, 19, 22 85:13 88:4, 13, 14, 16, 19 89:1 107:13, 15, 16, 18, 23 108:8, 16, 21 118:16 119:9, 18 121:8, 18 123:21 124:1 128:22 129:2, 3, 18 134:5, 12 135:9 138:17, 18 139:20, 25 140:2 141:25 142:5 147:22 184:23
**discharged** 28:25 99:6 141:1
**discharges** 55:10, 11 83:19 85:9, 24 86:15 87:11, 25 89:4, 13, 20 107:5 108:18 113:8, 10 115:22, 24 119:12 120:11 121:16, 23 123:22 127:20 129:4, 14 130:21 135:17 139:1, 12 140:4, 7 141:9, 11 142:14 174:10
**discharging** 83:20 138:6
**disciplinary** 91:5 132:24 176:18, 22 180:5, 8 185:22, 25 186:17 187:9
**discipline** 17:12, 13 30:11, 12, 22 31:3, 5, 6, 10, 18, 20 58:4 64:13 69:15 70:18, 21, 23, 25 71:1 75:8, 11,
22, 23 76:7, 8, 11, 12, 16, 19, 24 77:5, 7, 7, 9, 13, 22 78:6, 9, 12, 17, 21 79:2, 15 81:11, 16, 23, 25 82:6 87:24 88:22 90:16, 22 94:13, 14, 16, 23 95:16 106:10 107:4, 8 110:1, 2 117:19, 23 118:10, 13, 17 119:8, 20, 25 120:4 126:16 127:21, 25 128:6 129:6, 13, 20 130:1 134:21 135:8 137:11 140:5, 22 141:4 174:2 175:7, 17 176:11, 17, 20 178:18 179:13, 15, 16, 21 180:9
**discipline,** 78:19
**disciplined** 17:11 31:16 91:1, 11 119:12, 18 135:2, 18 140:23 141:1 197:23, 24 198:5, 11, 12, 18
**discovery** 37:16 100:13
**discretion** 64:21
**discretionary** 64:21
**discuss** 44:17 68:4 90:13 105:23 117:17
**discussed** 73:16 146:9 169:4 172:5, 18 173:15 174:16, 21, 22 175:10 190:4
**discussion** 8:24 19:13 44:23 53:21 62:7 87:21 96:13 143:5 173:21 175:19 192:7
**discussions** 174:11 187:6
**disincentives** 88:8
**disincentivize** 89:7
**disks** 70:10
**dispatchers** 51:19
**dispatches** 56:2
**dissuade** 86:24
**distance** 117:12
**distinct** 153:10
**distinction** 125:14
**DISTRICT** 1:1, 1
**DIVISION** 1:2 13:6 16:19 47:2, 24 48:12 49:12 50:7, 13 51:14 52:20, 24 53:7 57:17 70:20 71:7 73:10, 18 82:20 86:5, 23 89:11 93:9 107:10 109:18 150:14 151:8 157:16 158:3, 6, 9 183:21 190:8 193:25 195:17, 18 196:17 197:2, 25
**division's** 11:9, 16 151:14, 16 171:3
**document** 63:14 71:7, 15, 24 105:11, 22 106:19
121:21 123:24 130:22 131:24 145:12, 17 148:20 150:9 154:7, 19 156:25 157:1 163:17 164:6, 9 171:19 176:4 180:1 190:14
**documentation** 17:6 72:22 73:1 74:17 155:19 166:18 170:12
**documented** 30:21 67:16 76:20
**documents** 10:15 14:9, 12, 13 16:11, 16, 20 67:19 82:12 100:21 161:24 169:7, 8 170:23 180:14
**dog** 44:9 83:12, 13 86:19, 25 138:8
**dogs** 83:16 84:8, 9 86:14 87:2, 9
**doing** 28:1 88:10 97:21 102:1 168:17 189:6 196:25
**doubt** 86:10 100:6
**downtown** 33:21
**dozen** 47:1 174:1, 3, 12
**Dozens** 33:19 35:21
**Draft** 175:10 176:1
**drafted** 103:15
**drawn** 128:24
**drive** 125:18
**driver** 109:16
**driving** 27:2, 4
**drove** 30:18
**duly** 6:4 199:5, 7
**Dungey** 178:1 181:12 182:2
**duty** 28:25 34:3 81:17 125:15 140:14 192:10, 16, 22
**DVDs** 67:22

**< E >**
**earlier** 82:13 105:9 126:22 128:16 146:9 147:15 164:25 172:18 174:21, 22 180:3
**early** 103:20 122:19
**EARS** 97:20, 21, 22, 25 98:1, 4, 10
**East** 2:9 22:7, 8 23:13 152:6
**EASTERN** 1:2
**easy** 100:7
**EDMUND** 1:2
**effect** 184:1
**effective** 89:18 93:24, 25
**effort** 14:2 165:7
**eight** 41:18 80:6, 9 81:8 118:12 129:12
**Either** 17:16 22:11 29:20 55:3 65:4 72:9 101:19 108:12 137:13 160:23 166:24 167:7 171:11 184:11 186:3 193:6
**electronic** 13:11 14:9 63:12, 14, 15
**electronically** 16:13
**ELIZABETH** 1:2, 16
**e-mail** 33:5, 6 188:21, 24 189:1, 20
**emergency** 52:1, 7
**employee** 32:10 68:21 69:21 78:21 80:1, 8 199:20, 22
**employees** 68:22
**employee's** 65:7
**employment** 47:23
**ended** 155:15
**ends** 88:13
**enforcement** 21:16, 19
**engaging** 193:8, 14
**ENGLAND** 1:20 10:4, 13 18:2, 3 19:7, 23 22:12 57:9 58:10 75:20 97:17 123:12 161:9, 14, 23 163:19 169:2 170:15 174:19 176:6 177:16 178:13 180:23 181:1 188:5, 17 192:17 198:4
**enhanced** 87:19
**ensure** 73:11, 19 88:10 98:9
**ensuring** 15:19
**entire** 52:9 70:9, 10 71:9, 10 86:23 146:9 168:3 170:21
**entirely** 77:14 133:14 151:11
**entitled** 40:22
**entry** 107:9 108:13 109:1, 6 114:19 115:8 124:18
**Eric** 139:23 175:2 189:20 190:5 197:9
**err** 60:6
**erred** 102:1
**especial** 88:1
**especially** 7:4
**Esq** 3:3, 4, 13
**essentially** 80:1 149:8
**ESTATE** 1:2, 13
**et** 1:2, 17, 23 7:8 13:19 35:18 67:25 83:4 91:20 102:13 170:21
**evaluation** 83:13
**event** 27:1 52:1, 6 79:2
**events** 9:8 95:25
**eventually** 12:11, 25

**Case: 2:18-cv-01060-EAS-EPD Doc #: 141-3 Filed: 03/24/21 Page: 207 of 219 PAGEID #: 3788**

Deposition of Deputy Chief Kenneth Kuebler     Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

68:24  114:15
**everybody** 90:8 187:10
**evidence** 68:6 163:24
**exact** 167:10
**exactly** 87:6 96:1, 2
152:10
**example** 16:24 34:6
54:22 56:19 84:6, 7
88:12 91:24 102:25
104:5 114:20
**examples** 56:23 93:8
195:25
**excepted** 35:10
**exception** 59:21
**excessive** 117:11 198:1
**excuse** 150:20 154:4
**excused** 187:11
**executive** 51:25 85:3, 9,
12, 15, 18 86:4 189:11
**Exhibit** 93:16, 18 105:2, 4
110:20, 22 113:19 116:2,
4 118:20 120:18, 19, 21
121:21, 25 122:8, 10
130:12, 14 133:3, 5
135:20, 23 139:5, 7
141:21 145:6, 8 148:21,
23 149:16 154:12, 14
155:7 156:13, 17 162:4, 6
163:13, 15 170:10 171:15
186:19 188:21 190:17
**exist** 16:23 48:14
**existing** 97:7
**exited** 27:5
**exonerated** 35:23
**expect** 73:24
**expected** 68:14
**expecting** 38:25
**experience** 21:16 28:19
182:17 185:10
**expires** 200:13
**explain** 107:19 114:11
133:9 151:12 168:20
183:20 191:21
**explained** 169:5
**explaining** 190:24
**explanation** 61:16 173:14
**exposing** 40:18
**extensive** 52:6 73:13
**eyes** 16:4

**< F >**
**Facebook** 39:25 43:8, 10
184:11
**faced** 185:21
**facilities** 50:5
**fact** 169:17, 25
**factors** 151:3 155:1
158:9 163:24 170:6, 14
**facts** 109:12 125:10

155:21 156:1, 3, 6, 8
**fail** 89:9, 15
**fair** 7:13 35:19
**fall** 51:2, 9
**familiar** 17:22 18:3 54:1
93:11 114:12
**family** 40:7, 9, 21 41:1, 3,
10 42:13, 21 43:1 136:25
**far** 22:7 23:12 37:11
**fatal** 106:3
**fatality** 67:18
**fault** 129:7
**favor** 47:5 73:4
**February** 161:19
**federal** 47:14
**feel** 89:18 152:19
**felonious** 54:21
**felony** 51:23 52:19
**Fetter** 128:1
**fifth** 113:4 115:15
**figure** 109:22 110:5
166:23
**file** 30:24 42:16, 17
63:12, 14 66:18 76:22
81:25 94:13 95:4 110:1
**filed** 32:5 54:21 173:21
**files** 11:21 16:23 17:12,
14 106:14
**filing** 147:4
**fill** 162:21
**final** 13:4, 6 37:6, 7
68:22 69:2 70:17 74:23,
25 75:2, 24 79:14 80:22,
23 81:3, 14, 18, 21 111:18
113:4 114:9 130:6 133:9
150:22 158:18 161:6, 6
173:12 188:9
**financially** 199:24
**find** 24:4 58:24 76:5
90:14 91:20, 22 104:11
125:25 156:6 170:14
176:15 187:15
**finding** 14:15 56:19 67:2,
7, 9, 10, 11 69:8 72:10
73:4 74:11, 25 77:7 92:4
109:19, 23 111:9, 20
112:20 113:2, 5 115:5, 5
117:22 118:3 121:1
128:6 146:10, 11, 17
149:6, 23 150:1, 17
151:14 154:10 155:21, 22
157:23 163:16, 18 164:15
167:11 170:6 171:10
173:13 177:1 179:3
182:17 190:3, 11, 13
**findings** 4:24 9:7 12:7,
25 13:12 14:14 16:7
30:7 36:5, 12, 16, 17, 25
38:10, 11 65:10 68:23
69:14 72:17 74:2, 21

75:5 95:24 96:22 105:18
111:22 112:4, 8, 12, 24
126:6 127:6 129:11
136:10, 11 142:2, 3
149:25 151:3, 6 154:19
157:14 161:3 164:4, 9
165:16, 22 166:5, 17, 21,
25 167:5, 18, 25 168:7, 24
169:4, 13 171:8 176:8
180:5 189:2, 14
**finds** 75:6, 7 77:24 79:6
91:2 183:24
**fine** 40:5 44:16, 18 96:10
124:23 147:15 160:24
**fingerprints** 50:5
**finish** 47:23
**fire** 27:22 58:3 140:18
**firearm** 11:21 12:3
14:25, 25 28:25 29:8
75:4 87:20 88:7, 14
91:17 107:10, 11 108:8
121:16 128:24 129:2, 3
141:1 142:13 150:6
171:2 172:8 174:10
176:9 181:13
**Firearms** 4:7, 9, 10, 11, 12,
13, 14, 15, 16, 17, 18, 19, 20,
21, 24 9:9 11:3 12:21
16:21 18:13, 23 19:3
48:24 52:13, 15, 17, 21, 22
54:5, 17, 17, 24, 25 55:13
59:1, 14 65:11 76:1, 3, 4
77:19, 19, 21, 24 79:5
82:10 83:20 91:7, 15, 17,
19 92:2, 14 93:23 94:9
99:6 102:11 107:12, 13,
23 108:1, 2 113:8 115:22
121:14, 22 124:14 125:9
126:15 128:16 135:9
138:4 141:18 147:20, 21
154:11, 20 157:24 166:16
184:22 190:4
**fired** 10:3 29:10 57:15
69:25 70:1 102:13
109:16 126:24 137:2
140:15 175:2
**Firing** 57:22 117:9
138:11
**firm** 33:10 38:11, 19
200:1
**first** 6:4 19:16, 19, 23, 25
20:3, 15, 18 23:21 29:25
30:3, 16, 22 50:24 75:14
76:15 77:9 78:12 87:19
105:24 111:2 116:11
120:25 130:23 134:8, 18
135:16 136:2 147:10
150:25 152:19, 21 153:4,
7, 11 154:18 162:16

164:8 171:5 176:13
199:7
**fit** 181:3, 6
**five** 22:7, 11, 15, 17 23:6,
7, 8, 10, 14, 17 25:24
26:15 29:5 49:15 51:2, 8
53:19 71:14, 16 106:19
116:21 120:3 126:19
135:1 136:14 138:15, 19
141:7 169:11 170:24
**flagging** 97:20
**fled** 26:23
**fleeing** 57:16, 18 126:24
194:13
**fleet** 50:4
**flip** 121:6, 10, 11, 11, 11,
11, 11, 11, 11, 12, 21 122:3,
3, 3, 3 123:24 130:23
131:2, 6, 7, 11, 15, 22
**flying** 27:14
**folks** 169:10 186:2
**follow** 42:12 86:19 87:13
**followed** 88:3
**following** 136:24
**follows** 6:5 71:24
**follow-up** 103:5 158:14
**FOP** 30:22 186:4
**force** 9:8 13:13 23:17, 25
24:8, 21, 24 25:5, 9, 11, 12,
18, 25 26:15, 19 28:8, 20
29:20 30:9 34:25 38:19
41:17, 20, 21 48:21 54:10
57:24 58:20 69:11 82:11,
13 86:25 91:16 92:25
93:1 95:25 98:4, 5, 5, 9,
22 99:6, 17, 22 108:7
117:12, 13 125:19, 23
171:12 174:14, 15 176:24
191:9, 10, 11 192:11
194:2, 14, 18 195:19
196:12 198:2
**foregoing** 199:12, 17
**forfeiture** 79:25 80:17
81:7, 12 137:14
**forfeiture,** 80:8
**forget** 109:15 147:12
**form** 149:8
**formal** 30:12
**formalized** 76:16, 19
**formats** 40:24
**forms** 22:24 48:11
**forth** 28:13 170:19
**forward** 55:19 72:15
104:20 131:12 175:6, 11
181:8, 12 183:10 184:22
**forwarded** 13:19 54:17
55:6 63:16 68:21 69:20
70:6, 14
**found** 24:21 30:9 31:4, 9
38:19 57:8, 9, 16 58:12

Case: 2:18-cv-01060-EAS-EPD Doc #: 141-3 Filed: 03/24/21 Page: 208 of 219 PAGEID #: 3789

Deposition of Deputy Chief Kenneth Kuebler    Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

75:15, 18  86:6  94:18
105:23, 25  106:11  108:21,
24  109:8  110:7  113:8, 12
114:4, 14, 15, 17  115:10,
13, 16, 23  117:4  118:16
119:7  120:3, 10  121:4, 8,
17, 23  123:21  124:1, 17
125:4, 22, 23  129:5  130:2,
3, 8, 20  131:17  132:6
134:4, 11  135:9, 17  136:3,
5, 8, 14  138:20, 22  139:1,
12, 15  140:4, 20  141:2, 8,
11, 25  142:6, 14  147:8
155:23  163:22  167:11, 15
171:12  177:4, 7  180:16,
20  189:23
**four**  69:9, 18  72:11
75:16  108:20  113:5
116:17  119:20  133:13
134:17, 19  140:9  142:11
152:15, 16
**fourth**  113:1
**Fraternal**  176:19
**FRB**  53:25  55:9, 21  56:9
59:2, 20  60:8, 11, 15  61:3
62:18, 20, 22  63:3  68:13
70:12  71:10  74:21  82:8,
9  83:10  86:15  87:14
96:16  97:4, 12, 16, 20, 24
100:11, 22  104:24  105:16
121:22  122:17  130:11
133:1  146:2, 17, 20
150:17, 20  153:13, 19
155:11  160:4  161:22
162:10  163:11  164:3, 9
165:10, 15  166:2, 20, 24
167:5  177:1  178:10
189:3  191:5, 19, 23
**FRB's**  160:13
**freeway**  51:22
**frequently**  196:23
**Friday**  9:16  147:12
**Friedman**  3:5
**Front**  3:15
**full**  6:9
**full-time**  52:25
**Fulwider**  177:24  181:12
182:2
**function**  82:9
**functions**  50:6, 7
**funny**  196:8, 10
**further**  15:22  61:9, 16
75:5  106:15  199:16, 20
**future**  28:14  76:24

**< G >**
**garage**  30:18
**Gardner**  178:14, 16
**Gasaway**  138:16

**gather**  10:21  12:14, 16
21:5
**gathered**  16:4
**gauge**  119:17
**geek**  42:6
**Gelsomino**  3:3  4:4  6:8,
20  8:21  9:1, 5  11:1
12:23  14:7  19:5, 11, 15
25:6, 17, 23  26:5, 10, 13
28:2, 7, 15, 18  37:17, 23
38:6, 8  40:10, 13, 17  41:2,
8  42:19, 22, 23  43:22
44:1, 13, 25  47:25  48:3
53:17, 23, 24  93:21  95:23
96:9, 15  100:1, 9, 14, 17,
22  101:4, 6  105:7  110:25
113:22  116:7  118:23
120:24  122:4, 13  128:20
130:17  133:8  136:1
139:10  141:24  143:2, 7, 8
145:11  149:2  152:18, 22
154:17  156:20  159:9, 11,
19, 22  160:2, 9, 15, 24, 25
162:9  169:24  170:4
182:16  183:8, 15  185:5,
17  186:22  190:20  192:2,
5, 9, 15, 21  193:5, 12, 24
194:10  195:1, 8, 16
196:16  197:18  198:13, 22
**general**  6:23  18:13  34:20
39:8, 12  57:23  58:23
71:7  131:15  149:14
157:13
**generalities**  170:17
**generally**  16:5  34:15
37:1  56:12  60:3  64:4
66:17, 23  75:9  88:14
98:17  99:10  102:1  119:2
193:11  195:20
**generated**  100:10  101:8
162:2, 20  166:1
**gentleman**  156:10
**geographically**  51:4
**GEORGE**  1:15  34:8
**getting**  31:16  160:12
173:24
**Gibson**  129:16
**Gilbert**  3:5
**girl**  138:2
**give**  8:8, 17  10:19  17:18,
25  18:5, 9, 19  21:9  29:22
34:11  43:20  44:11, 19
53:19  77:13, 13  80:6, 8,
15  88:21  89:1  95:15
148:1, 5, 10  153:1  163:7
169:15  181:23  182:21
183:6
**given**  32:20  33:1  46:20
65:12, 23  96:4  101:18

107:4, 7  120:4  135:8
137:13  140:5  199:10, 13
**giving**  44:14  77:3  95:21
**glass**  27:14, 14
**go**  8:21  9:1  10:23  14:5
16:10  25:3, 15  26:3, 11
34:14  37:11, 13  38:5
44:20  51:10  54:24  58:22
61:14  73:13  77:1  78:2
79:23  80:19  81:9  90:1
96:9, 10  100:2, 18  101:21
106:8, 18  107:15, 17, 23
108:3  125:7  130:21
131:7, 22  134:18  136:17
150:18  156:6  157:3
159:7  167:10  176:16
179:8  182:14, 25  185:2,
13  192:13, 18  197:13
**goes**  19:3  59:2, 24  62:18
80:10  84:20  115:2  147:1,
5  149:9
**going**  7:12, 23  8:15, 19
9:2  16:8  18:12  19:9
28:16  33:7  37:9  41:4
43:19, 20  53:25  56:14
58:15  62:14  70:18  77:2,
6  86:13  93:16  96:9
100:16, 18, 24  101:3
104:19, 24  105:2  106:18
110:16, 17  121:6  130:11
131:12, 23  133:1, 2
134:10, 18  139:4  141:4,
17, 18  143:9  145:4
148:16, 20  149:5  151:17
154:6, 12  156:12  157:15
159:5  161:8  162:1, 4
163:13  168:12  176:3
188:20  190:14, 15
**good**  35:8, 14, 16  66:17
90:18
**Google**  128:9
**govern**  91:14
**Grand**  54:14, 15  55:3
58:16, 17  101:19  102:12,
14
**great**  26:10  96:4  198:24
**greater**  138:13
**Greene**  3:4  6:22
**grievance**  175:7, 17
187:10
**Griffis**  176:10, 25  178:18
179:7  181:11  182:1
**grossly**  90:15
**ground**  194:21  195:4
**group**  54:8, 8
**groups**  87:1
**guard**  41:23
**guards**  41:24
**guess**  14:22  62:6  98:6

130:1  165:2
**gun**  59:24
**gunfire**  27:18
**guns**  87:18  88:1
**gunshot**  28:22  137:8
**gunshots**  182:19
**guy**  28:20
**guys**  100:4

**< H >**
**hand**  13:10  200:4
**handcuffed**  188:18
**handcuffing**  187:21
**handcuffs**  187:22
**hand-delivered**  63:9
**handle**  19:9  39:16
**handled**  89:11
**handles**  41:13, 14
**handwriting**  171:25
175:16, 18
**happen**  61:18  77:17  87:2
**happened**  20:5, 7  22:10
23:25  25:10, 19  26:21
29:9  37:5  68:4  75:20
85:5, 7, 20, 23  86:22  87:5
91:10  107:14, 20  118:7
123:9  127:2, 18  129:8
132:23  137:5  139:24
141:5  163:2  178:22
183:7
**happening**  48:21  87:22
91:24
**happens**  54:4  68:19  74:2
90:9
**hard**  7:5  157:3
**harder**  123:18
**hardware**  51:20
**harm**  181:14  192:24
194:17
**harshly**  198:11
**head**  7:8  41:15  56:25
57:12  61:25  140:17
190:5
**hear**  19:23  75:10  77:6
140:16  167:22  184:3, 7
196:2
**heard**  33:14  109:18
140:15  183:9, 17, 21
184:21  185:6, 7  187:25
195:17  196:17, 24  197:2,
6, 25  198:5
**Hearing**  5:2  27:13  75:10,
19  76:10  77:12, 17  78:3,
6  79:4  80:21  126:8
168:10  185:22, 25  186:11,
14, 17  187:3, 5  188:1
191:25
**held**  8:24  11:6  13:4
16:13  17:14  19:13  44:23

Case: 2:18-cv-01060-EAS-EPD  Doc #: 141-3  Filed: 03/24/21  Page: 209 of 219  PAGEID #: 3790

Deposition of Deputy Chief Kenneth Kuebler     Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

*53*:21  *76*:10  *96*:13  *143*:5
*192*:7
**He'll**  *198*:24
**help**  *83*:24
**hereinafter**  *6*:5
**HEREOF**  *200*:4
**hereunto**  *200*:4
**hesitancy**  *191*:9
**Hey**  *37*:9  *42*:16
**higher**  *71*:3
**historically**  *88*:13
**history**  *21*:10  *47*:23
*195*:10
**hit-skip**  *136*:25
**hold**  *16*:20  *79*:4  *106*:15
*191*:25
**holding**  *30*:1
**holds**  *80*:21
**home**  *44*:11  *136*:24
**homes**  *83*:1
**homicide**  *54*:8
**Hostetler**  *33*:11, *20*  *34*:25
*35*:2, *7*  *36*:11
**hour**  *80*:6, *19*  *81*:8
**hours**  *58*:6, *6*  *79*:25  *80*:9,
*12*, *25*  *81*:1, *4*, *7*, *12*  *127*:5
**human**  *59*:23  *190*:7
**hundreds**  *67*:15
**Hurst**  *140*:10
**hurt**  *88*:7
**hypothetical**  *195*:7

**< I >**
**I71**  *26*:24
**IA**  *13*:1  *16*:19
**IAB**  *175*:12
**idea**  *32*:16, *24*  *33*:13, *23*
*44*:6  *85*:11  *94*:21  *95*:2
*107*:21  *124*:10  *142*:4
*150*:19  *151*:5  *155*:3
*159*:18  *161*:4  *182*:3
*185*:7, *11*  *197*:20
**ideas**  *33*:25
**identification**  *50*:4  *93*:19
*105*:5  *110*:23  *113*:20
*116*:5  *118*:21  *120*:22
*122*:1, *11*  *130*:15  *133*:6
*135*:24  *139*:8  *141*:22
*145*:9  *148*:24  *154*:15
*156*:18  *162*:7  *186*:20
*190*:18
**identified**  *83*:10  *84*:11, *25*
**identifies**  *84*:4
**identify**  *10*:20  *16*:10
*82*:17  *83*:7  *92*:17, *23*
*99*:16
**immediate**  *70*:3, *6*, *14*, *19*
*71*:2  *72*:8, *9*, *25*  *73*:3
*74*:1  *176*:20, *21*
**imminent**  *192*:23

**impact**  *7*:25  *73*:11, *19*
*182*:7
**implement**  *84*:13  *189*:17
**important**  *57*:3  *103*:10
**inaccurate**  *142*:24
**in-between**  *64*:13
**incentive**  *88*:23
**incentives**  *88*:8
**incentivize**  *88*:24
**incident**  *19*:23  *46*:24
*67*:19  *93*:1, *2*, *5*  *106*:25
*108*:23  *114*:6  *119*:7
*134*:24  *160*:13
**incidents**  *33*:20  *106*:6
**inclined**  *187*:15
**include**  *96*:17  *98*:13, *15*
*102*:12  *145*:18
**included**  *67*:7, *13*  *68*:1
*102*:7, *9*, *16*, *20*  *103*:2, *11*
*117*:4  *155*:20, *20*  *174*:4
*178*:3
**includes**  *51*:19, *22*, *24*
*82*:22  *118*:3  *139*:23
*160*:17
**including**  *171*:6  *188*:22
**incomplete**  *110*:14  *116*:9
*142*:24
**incorrect**  *110*:12  *113*:24
*116*:9
**increase**  *99*:23
**increasing**  *83*:13
**incredibly**  *96*:6
**in-custody**  *108*:3
**independent**  *34*:17, *21*
*35*:2, *8*
**INDEX**  *4*:1
**indicate**  *41*:6  *117*:15
*146*:1
**indicated**  *72*:18  *133*:25
*156*:1, *3*  *170*:11  *183*:25
**indicating**  *154*:19  *196*:21
**individual**  *26*:22  *29*:7
*69*:21  *106*:6  *170*:23
**influence**  *82*:18  *83*:24
*99*:14
**informal**  *30*:12
**information**  *8*:12  *10*:21,
*22*  *11*:2  *12*:1, *2*, *16*  *16*:4
*21*:5  *82*:23  *84*:3, *12*  *86*:2
*95*:7  *97*:20, *24*  *99*:1, *9*
*101*:23  *102*:15  *103*:10
*106*:5  *110*:4  *122*:14
*145*:18  *148*:5, *9*, *10*
*162*:21  *165*:25  *183*:18
**informed**  *32*:25
**infrequent**  *61*:19
**Infrequently**  *196*:3
**initial**  *115*:5
**initials**  *111*:7, *8*

**injured**  *27*:10, *15*  *29*:12
*137*:6
**injuries**  *27*:19  *28*:21, *22*
*137*:7, *9*
**injuring**  *125*:21
**injury**  *27*:13  *125*:23
**in-person**  *85*:3  *172*:25
**inside**  *82*:25  *128*:23, *25*
**Instagram**  *39*:25  *42*:11,
*19*, *24*  *43*:2, *3*, *5*
**instructions**  *163*:7
**intact**  *87*:2
**intended**  *59*:23, *25*  *88*:11
**intent**  *108*:6
**intention**  *37*:15
**intentional**  *69*:11, *17*
*72*:11, *12*  *75*:16  *77*:24
*104*:12  *116*:21  *121*:18, *22*
*124*:1  *127*:23  *129*:5
*130*:8  *132*:6  *136*:15
*142*:1, *13*  *150*:6  *151*:15
*155*:23  *156*:2, *7*  *157*:18
*158*:1, *11*  *163*:20  *169*:9
*170*:15  *171*:2  *176*:9, *15*,
*24*  *179*:3  *180*:13, *19*
*182*:7  *188*:2, *6*, *14*  *189*:23
**intentionally**  *89*:15
**interacting**  *192*:16
**intercepted**  *26*:24
**interest**  *40*:17  *44*:13
**interested**  *35*:25  *56*:19
*199*:24
**Interesting**  *36*:7  *90*:21
**Interestingly**  *35*:7
**interfere**  *18*:21  *95*:20
**Internal**  *12*:10, *12*  *17*:17
*65*:17  *67*:22, *24*  *99*:2
*106*:7, *8*, *13*  *109*:25  *110*:3
*147*:3  *190*:1
**Internet**  *11*:10, *12*, *15*
**interplay**  *97*:19  *98*:1, *6*
**interrupt**  *128*:18
**interview**  *177*:16, *19*, *21*,
*24*  *178*:1  *184*:12
**interviews**  *60*:21  *62*:2
**intranet**  *11*:9, *20*  *12*:1, *3*
**investigate**  *93*:6
**investigated**  *19*:3  *29*:20
*32*:18  *34*:5  *55*:16  *59*:19
*62*:1, *10*, *12*
**investigating**  *190*:6
**investigation**  *13*:12  *15*:14,
*19*  *16*:24  *17*:11  *19*:7
*31*:19  *32*:20  *33*:8, *9*
*34*:16, *17*, *21*, *22*, *23*  *35*:2,
*14*  *36*:24  *37*:24  *38*:24
*52*:18, *19*  *54*:10, *12*, *14*, *16*
*55*:5, *17*, *19*, *20*  *56*:21
*59*:13  *60*:1, *7*, *19*  *61*:9, *13*,
*14*  *62*:23, *25*  *63*:2, *4*, *17*

*64*:15, *19*  *65*:6, *7*  *66*:22
*67*:16, *23*  *68*:2  *70*:8
*71*:24  *73*:12, *20*  *74*:10
*91*:8  *102*:17  *105*:14
*143*:10, *16*  *144*:6, *11*, *14*,
*16*, *21*, *22*, *25*  *145*:1
*146*:13, *15*, *25*  *150*:23
*151*:20  *153*:23, *25*  *154*:2,
*11*, *25*  *155*:1, *15*, *18*  *157*:8
*158*:14  *159*:23  *160*:4
*162*:15  *164*:12  *165*:8, *16*,
*21*  *166*:16  *168*:4, *13*
*171*:5  *178*:2, *4*  *188*:14
**investigations**  *9*:6  *12*:6,
*17*, *24*  *13*:13, *17*  *14*:10
*15*:14  *16*:17, *22*  *17*:7
*24*:7, *11*, *12*, *16*  *29*:22
*30*:8  *33*:14  *34*:24  *35*:8
*36*:12, *22*  *38*:2  *39*:7, *9*, *11*,
*15*  *51*:23  *52*:16  *59*:10, *16*,
*18*, *18*  *61*:1  *94*:4  *95*:24
*121*:13  *153*:22  *168*:18, *21*
*182*:10, *20*
**investigative**  *52*:14  *60*:15,
*18*, *25*  *61*:2, *15*  *62*:3  *63*:6
*71*:10  *111*:1  *170*:21
**investigator**  *19*:1  *55*:4
*56*:18  *57*:2  *62*:5, *7*  *92*:10,
*22*
**investigators**  *17*:1
**involve**  *58*:15  *107*:10
**involved**  *9*:9  *11*:3  *12*:4
*15*:11, *12*  *19*:6  *24*:7
*26*:19  *37*:13, *21*  *46*:24
*54*:3, *18*  *55*:8  *57*:6  *60*:15
*62*:1  *73*:20  *82*:24  *92*:13
*93*:5, *23*  *94*:25  *95*:5
*109*:17  *117*:9  *121*:3
*124*:19  *125*:15  *132*:11, *17*
*134*:20  *137*:21  *144*:20
*156*:9  *161*:22  *163*:10
*182*:11
**involvement**  *76*:9  *143*:16
*151*:19  *152*:19, *24*  *161*:13
*168*:14
**involves**  *114*:6
**involving**  *9*:8  *10*:2  *17*:19
*33*:20  *55*:15  *56*:7  *136*:21
**irrelevant**  *37*:10  *197*:12
**issue**  *37*:12  *41*:1  *70*:21
*76*:8  *78*:7, *10*  *86*:19
*91*:13  *94*:15  *125*:22, *24*
*141*:4, *6*
**issued**  *107*:10  *116*:22
*117*:19  *119*:8  *127*:12, *25*
*129*:13  *171*:6
**issues**  *7*:24  *40*:15  *41*:3
*42*:21  *56*:16  *73*:15  *86*:3
**its**  *65*:9  *168*:21, *21*

Case: 2:18-cv-01060-EAS-EPD Doc #: 141-3 Filed: 03/24/21 Page: 210 of 219 PAGEID #: 3791

Deposition of Deputy Chief Kenneth Kuebler     Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

**< J >**
**Jackson** 109:*3* 114:*16* 115:6
**Jacobs** 89:7 124:*4, 8* 167:6 172:5, *13* 173:9, *16, 22* 175:*11* 187:15 190:24 191:*4, 8, 18*
**Jacqueline** 3:*4* 6:22
**jam** 100:8, *24*
**JAMES** 1:20 18:*3* 19:22 43:*11, 12* 109:*3* 161:9, *14, 23* 163:*19* 169:2 174:*19* 176:6 177:*16* 180:*23* 181:*1* 188:5 198:*4*
**January** 93:*24*
**JGJ** 109:2
**Jgreene@f-glaw.com** 3:8
**job** 22:2, *25* 52:25 60:25 166:20 167:*1*
**joke** 195:*18*
**jokes** 195:22, *23* 196:2, *11*
**JOLSON** 1:*23*
**Jonathan** 136:*21*
**journal** 45:*21*
**Joyce** 29:6
**JR** 1:2
**JUDGE** 1:2, *15, 16, 21, 22*
**July** 32:*13*, 25
**June** 155:*8*
**Jury** 54:*14, 15* 55:3 58:*16, 17* 101:*19* 102:*12, 14*
**justification** 182:*19*
**justifications** 182:*13, 23*
**justified** 57:5, *5, 8, 17* 58:*12* 138:5, *11, 23* 139:*1, 13* 151:9, *13* 183:24, 25 193:*14*
**justified,** 58:*14, 18*
**justify** 166:5 183:2, *2* 194:*13, 18*
**juvenile** 30:*17*

**< K >**
**K9** 51:25 52:*10*
**Keebs** 39:*18*
**K-E-E-B-S** 39:*19*
**keep** 44:*15* 88:*11* 108:*1* 152:20 159:7 161:*25*
**keeping** 154:5
**keeps** 79:2 196:*21*
**Ken** 41:9 44:2 45:6 79:20
**Kenkeebs** 39:*17*
**KENNETH** 2:*3* 4:*3* 6:*3, 7, 11* 199:7
**kept** 17:*1* 110:*3*

**kids** 40:*16*
**killed** 153:*15*
**KIMBERLY** 1:22
**kind** 18:*17* 31:6 41:22 69:7 74:*14* 83:9 99:*19* 103:2 127:*15* 137:7 197:*3, 11*
**KING** 1:2, 2 10:*10* 18:9 20:*4* 22:*14* 97:*17* 143:*10, 17, 19* 145:1, 5 147:*17* 148:*18* 150:*18* 151:*4, 9* 153:20 154:2, *3* 183:*18, 23*
**King's** 9:*25*
**knew** 165:*15* 168:*12* 177:*21*
**Knight** 170:*18* 171:15 177:*12* 179:*10, 12* 180:8 188:*21*
**Knight's** 171:6, *8* 179:20 180:5
**know** 7:*1* 9:*12* 12:*10, 11* 13:25 17:*10* 18:25 22:9 24:*3* 27:20 32:*10, 14* 33:*12* 34:*4, 5* 37:*14* 38:*13, 16, 18* 40:*16, 23* 41:*14* 43:22 45:23 46:*13, 14* 47:*4, 10, 11, 12, 13, 14, 16* 48:22, 22 56:*11, 17* 58:*8* 68:*16* 81:24 85:*1, 1, 6, 7, 12, 20, 22* 86:*18* 87:6 90:*18* 94:2 95:6, *12, 13* 96:7 97:22 101:*8, 11* 103:*8, 17* 104:*15* 106:24 107:*1, 16, 19* 108:*12* 109:*12, 13, 19, 25* 111:*11* 112:2, *6, 7, 9, 14, 15, 18* 115:*4, 6* 116:22 117:*3, 6, 8, 21* 118:*1, 4, 7, 10* 121:3 123:25 124:*6, 8* 125:*10, 12* 127:*13, 15, 17, 18* 128:*3, 4, 5* 132:9, *12, 14, 16, 23* 134:22 136:*13, 20* 137:*10, 15, 19* 138:*16* 139:*18, 24* 140:*10, 23, 24* 141:5, 6 142:*3, 17, 20* 144:20, *21* 149:*14* 152:*4* 154:8, *23* 155:*1* 157:*19* 158:*13* 163:*1, 4, 22, 24* 167:6 169:*19* 171:*10* 172:24 173:5 181:6 185:*4, 15, 18, 20, 24* 187:*1* 191:*14, 16* 196:7 197:22
**knowing** 177:*3*
**knowledge** 8:*12* 109:7 152:24 169:*16*
**known** 21:5 102:*19* 182:*17*
**knows** 12:*21*
**K-U-E-B** 6:*11*

**KUEBLER** 2:*3* 4:*3* 6:*3, 7, 11, 17* 45:6 175:*10* 199:7

**< L >**
**lack** 89:*8*
**landed** 13:6 164:*12*
**Lang** 104:*21, 22, 22*
**language** 160:*19*
**large** 51:25 142:*15*
**largely** 87:*18*
**Late** 9:*17, 18* 76:*17* 78:22, *22, 23, 24* 79:3 88:*17* 101:20 147:*12* 148:*18, 21*
**law** 21:*15, 19* 33:*10* 38:*11, 19* 193:7 194:5
**lawful** 6:*12*
**lawsuit** 19:20 20:*1, 16* 37:*16* 46:*12*
**lawsuits** 28:9 37:*18* 46:*15, 18* 47:*1, 4* 54:7
**lawyer** 186:9
**lawyers** 6:20
**lead** 34:*1* 56:*10* 82:5 128:*10* 156:6
**leadership** 52:*12*
**leads** 38:24 173:*10*
**learn** 19:*16* 20:*3, 6, 15, 18* 102:9 153:*4*
**learned** 19:*19, 25* 153:*11*
**leave** 57:*1* 64:7 66:*16* 79:25 80:2, *4, 7, 16, 17* 81:6, *11* 137:*13*
**leaves** 88:6
**leaving** 30:*19* 66:*11* 174:*23*
**led** 39:*13* 87:7 151:*3* 155:2 158:*10* 163:25 187:*19*
**Lee** 140:*10*
**left** 30:*16* 48:*4* 66:*12*
**leg** 137:*4, 8*
**legal** 46:25 55:2 57:*11* 194:8
**legally** 57:*5, 8, 16* 58:*12, 14, 18*
**length** 117:*17*
**lens** 193:*3*
**L-E-R** 6:*12*
**letter** 16:7 30:23 72:*14, 19, 24* 74:*15* 76:22 111:22 149:8 166:*4, 4, 6, 8* 170:25 178:24, *25* 179:*8* 190:24
**letter,** 72:*15*
**letters** 153:20
**letting** 160:*21*
**level** 30:*12, 22* 73:24 74:5 76:*11, 25* 77:7

**KUEBLER** 2:*3* 4:*3* 6:*3, 7, 11, 17* 45:6 175:*10* 199:7

**levels** 73:*21* 76:*12* 88:8
**Lieutenant** 49:5, *9, 10, 18* 55:*19* 59:*11, 17, 19* 60:4 69:*1* 70:*1* 88:*17* 90:*3, 6, 8* 91:2 175:7, 8, *17* 179:9 183:*17, 21, 22* 196:21 197:*1*
**lieutenants** 49:*11* 187:*10* 190:2
**lieutenant's** 60:*4* 175:*13*
**life** 7:2
**lift** 194:*21* 195:4
**liked** 42:24
**likes** 66:*13*
**limits** 64:*17*
**line** 28:25 41:*4* 58:3 62:*4* 87:*12*
**lines** 60:8
**LinkedIn** 39:25 45:*4, 5, 10, 15*
**list** 14:22, *23, 24* 56:4
**listed** 119:2
**listen** 177:*16*
**lists** 71:*14*
**Litigation** 3:*14*
**little** 16:9 37:*21* 69:4 148:*8* 180:*1* 191:6, *12*
**littler** 123:*18*
**live** 44:*12*
**lives** 43:*21*
**LLC** 2:9
**load** 65:*1*
**loaded** 88:*1*
**loading** 88:3, *10*
**lodged** 129:*17*
**Log** 4:9, *10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21* 104:24 110:9, *10, 11* 113:*15, 16* 116:*1, 9* 118:24 120:*16, 25* 121:22 122:7, *15* 130:*11* 133:*1, 13* 135:*21* 136:2 141:*19* 174:*10*
**Logan** 43:*11*
**L-O-G-A-N** 43:*12*
**logistics** 179:*6*
**logs** 164:*25* 174:*3, 4*
**Lokai** 175:*8, 14, 20* 188:22
**L-O-K-A-I** 175:*14*
**Lokai's** 175:*15*
**long** 22:*16* 23:*3* 49:*18* 50:*8* 51:*1* 62:*19* 66:*17* 81:*24* 87:*18* 88:*1* 110:2 117:*14* 173:*14* 187:*3*
**longer** 64:7
**look** 10:6, *9, 12, 15* 57:2 58:*24* 83:*3* 105:*15, 22* 106:6 111:*19* 112:*19*

**Case: 2:18-cv-01060-EAS-EPD Doc #: 141-3 Filed: 03/24/21 Page: 211 of 219 PAGEID #: 3792**

Deposition of Deputy Chief Kenneth Kuebler        Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

131:*24* 139:*4* 155:*11, 19*
159:*24*
**looked** 83:*22* 104:*12*
142:*23* 147:*10*
**looking** 92:*19* 105:*24*
124:*18* 132:*9* 149:*16*
**looks** 56:*13* 92:*2, 10, 23*
114:*17* 116:*20* 127:*11*
130:*23* 134:*11* 171:*20*
175:*7*
**loose** 31:*9*
**loss** 27:*13*
**lost** 31:*4, 5* 44:*9*
**lot** 52:*3* 79:*20* 87:*2*
105:*21* 118:*25* 128:*13*
191:*11* 196:*23*
**lots** 12:*1* 174:*12*
**lower** 90:*12*
**lowest** 76:*7*

**< M >**
**Maclellan** 132:*11*
**M-A-C-L-E-L-L-A-N**
132:*11*
**MAG** 1:*2, 16*
**magazines** 46:*3*
**MAGISTRATE** 1:*22*
**maintain** 13:*19* 14:*9*
**maintained** 76:*22*
**maintains** 13:*18, 20* 105:*9*
**majority** 11:*7* 32:*2* 66:*25*
67:*10* 85:*10* 101:*17, 18*
180:*13*
**maker** 75:*24* 150:*22*
161:*6*
**making** 57:*3* 90:*16, 22*
131:*25* 197:*1*
**manage** 64:*18*
**managed** 58:*25*
**management** 50:*4* 52:*7*
**manager** 190:*7*
**managing** 64:*23*
**map** 128:*9*
**March** 14:*25*
**mark** 93:*16* 105:*2*
110:*20* 122:*8* 145:*5*
148:*21* 154:*12* 156:*12*
162:*4* 176:*16* 186:*17*
190:*15*
**marked** 93:*18* 105:*4*
110:*22* 113:*19* 116:*4*
118:*20* 120:*21* 121:*25*
122:*10* 130:*14* 133:*5*
135:*23* 139:*7* 141:*21*
145:*8* 148:*23* 154:*14*
156:*17* 162:*6* 163:*14, 14*
170:*10* 171:*15* 186:*19*
188:*21* 190:*17*
**marks** 131:*25*

**materials** 63:*6* 67:*13*
**matter** 78:*12* 107:*12, 13*
**Matthew** 138:*16*
**Mayor** 35:*12*
**Mayor's** 39:*3*
**Mays** 134:*20*
**McFadden** 183:*17, 21*
184:*5, 21* 196:*21* 197:*1*
**mean** 11:*12, 25* 12:*20*
15:*8* 44:*3* 50:*2* 57:*7, 25*
58:*18* 62:*11* 78:*20* 85:*16*
91:*18* 96:*6* 109:*6* 133:*16*
138:*10* 139:*16* 143:*25*
153:*10* 160:*6* 171:*22*
172:*9, 10* 179:*24* 185:*12,
18, 20* 191:*15* 195:*21*
**means** 109:*1* 133:*9* 152:*1*
167:*7* 171:*11* 172:*12*
185:*8, 15, 16*
**meant** 62:*12* 179:*17*
**media** 32:*6, 9, 15* 33:*25*
34:*1* 39:*20, 24* 40:*4, 7, 11,
19, 22, 23* 41:*9, 12, 16*
42:*2* 44:*6* 45:*3, 7*
**medical** 45:*21, 22*
**medications** 7:*24*
**Medved** 2:*5* 199:*4* 200:*11*
**meet** 56:*10* 85:*3* 90:*13*
**meeting** 86:*4, 8*
**meetings** 86:*13*
**Megan** 2:*5* 7:*6* 199:*4*
200:*11*
**member** 15:*10* 56:*3, 22*
61:*12* 85:*9, 18* 90:*2, 12*
158:*15* 166:*3*
**members** 9:*8* 16:*1* 63:*8*
64:*3, 22* 65:*11, 14* 66:*19,
22* 67:*10, 14* 85:*17* 96:*16,
19* 97:*3, 7* 137:*1* 149:*21*
154:*10* 162:*10* 164:*3, 20*
165:*11, 14* 166:*4*
**Memo** 4:*23* 5:*1* 149:*4*
150:*13* 155:*8, 9* 162:*1*
163:*4, 8* 165:*22, 25*
170:*19, 20* 171:*6*
**memorable** 26:*20*
**memorize** 119:*14*
**memory** 34:*10* 93:*12*
153:*11* 154:*8*
**memos** 150:*14* 168:*7*
176:*25*
**men** 169:*17, 21*
**mentioned** 45:*4* 52:*17*
54:*5* 58:*25* 76:*21* 77:*21*
**methods** 86:*24*
**mid** 30:*3* 49:*13*
**middle** 101:*20* 119:*15*
**Mike** 189:*20* 190:*1*
**mind** 169:*11, 11* 174:*24*

**188:**13 189:*19*
**mine** 175:*18*
**minute** 9:*15* 131:*3* 139:*11*
**minutes** 53:*19* 151:*2*
171:*9* 187:*4, 4*
**Miranda** 189:*21* 190:*6*
**misplaced** 31:*8*
**missed** 58:*2* 137:*3*
**missing** 90:*5* 103:*10*
113:*24* 142:*25*
**Mitigating** 141:*3*
**mixed** 92:*5*
**models** 42:*6*
**moments** 171:*24*
**Monday** 2:*7*
**monkeys** 197:*15*
**month** 15:*6, 10* 20:*25*
122:*18*
**months** 82:*2, 4*
**Moore** 197:*9*
**MORRIS** 1:*21*
**motorcycles** 51:*22*
**mounted** 51:*23*
**move** 13:*6, 8* 28:*4* 53:*18*
75:*11* 143:*9* 151:*17*
161:*8* 176:*3*
**moved** 64:*16*
**moves** 71:*15* 74:*3*
**moving** 57:*22* 108:*15*
126:*19* 129:*12* 136:*14*
154:*5*
**multiple** 71:*22* 72:*4*
73:*21*
**murder** 57:*16* 126:*24*

**< N >**
**name** 6:*9, 11, 19* 10:*1*
13:*23* 27:*6* 29:*18* 42:*19*
43:*18* 44:*15* 45:*5* 145:*21*
150:*15* 153:*21* 157:*4*
172:*3* 175:*13*
**named** 8:*3* 46:*11, 15*
47:*1* 53:*8* 63:*22* 199:*6*
**names** 43:*10* 46:*14*
**Nancy** 63:*22, 24* 66:*18*
82:*22* 147:*1, 5* 164:*21*
189:*21* 190:*3*
**Narcan** 45:*22*
**Narewski** 152:*9*
**nature** 44:*9* 58:*21*
**near** 22:*8* 183:*22*
**necessarily** 45:*24* 55:*11*
56:*14, 18* 58:*15* 92:*19*
102:*15* 126:*9* 148:*7*
149:*15* 164:*15* 193:*23*
**necessary** 10:*21* 12:*16, 20*
71:*17* 76:*24* 83:*8* 192:*11*
**need** 44:*17* 56:*17* 83:*15*
160:*3* 175:*6*
**needs** 82:*17* 83:*4, 7*

**negligent** 59:*12* 129:*7*
133:*11, 16, 20, 21, 21*
134:*4, 21* 135:*2* 139:*16*
**negligent,** 134:*1*
**neighborhood** 43:*24* 44:*7*
**network** 50:*6*
**Never** 60:*21* 77:*16* 80:*10*
147:*9* 150:*16*
**new** 66:*13* 71:*18* 73:*13*
84:*17* 152:*16*
**News** 67:*18* 196:*23, 24*
197:*16*
**Nextdoor** 39:*25* 43:*16, 23*
44:*16*
**nice** 130:*18*
**night** 20:*5, 6* 84:*1, 2*
**nighttime** 83:*24* 84:*4*
**Nine** 65:*13, 14, 22* 82:*1, 4*
96:*16, 19, 23* 98:*17* 130:*2*
**Ninety-five** 150:*14*
**nods** 7:*8*
**non-death** 54:*23*
**non-intentional** 55:*18*
**norm** 165:*1* 191:*12*
**normal** 107:*6* 159:*2, 13*
**normally** 17:*1*
**North** 3:*15*
**Notary** 2:*5* 199:*4* 200:*11*
**notation** 156:*24*
**notations** 110:*2*
**note** 28:*12* 117:*5*
**noted** 87:*7* 134:*22*
140:*22* 160:*7*
**notes** 145:*19* 192:*3*
**Notice** 8:*20* 20:*22* 33:*1, 4*
83:*17* 87:*24* 95:*20, 22*
96:*2, 6* 124:*14* 157:*1*
160:*14, 16* 169:*20*
**noticed** 17:*9* 38:*4* 76:*17*
83:*12* 101:*12* 169:*15, 21,
25*
**notified** 20:*23* 33:*3*
162:*16* 164:*16, 19* 165:*3*
**notify** 164:*24*
**notifying** 148:*3*
**noting** 120:*2*
**November** 2:*7*
**number** 28:*22* 50:*14*
58:*6, 19* 64:*10* 82:*24*
83:*19* 87:*8* 89:*20* 98:*23*
102:*13* 105:*22* 142:*15*
188:*22*
**numbers** 99:*18* 132:*1*
**nutshell** 90:*24*

**< O >**
**o0o** 1:*11, 19* 2:*1*
**oath** 7:*18* 168:*13*

Case: 2:18-cv-01060-EAS-EPD Doc #: 141-3 Filed: 03/24/21 Page: 212 of 219 PAGEID #: 3793

Deposition of Deputy Chief Kenneth Kuebler     Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

**object** 12:*19* 37:*10* 43:*19* 101:*1* 159:*5* 160:*7* 169:*20*
**objecting** 160:*21*
**Objection** 10:*23* 14:*4* 25:*2, 14, 20* 26:*2, 8* 159:*20* 160:*6* 182:*14, 25* 183:*12* 185:*2, 13* 192:*13, 18* 193:*1, 9, 16* 194:*7, 23* 195:*5, 12* 196:*13* 197:*12* 198:*7*
**objectively** 117:*12* 125:*19, 24* 126:*25*
**observation** 99:*11*
**observations** 56:*13*
**observe** 24:*24* 25:*5, 10*
**observed** 29:*7* 30:*1*
**obvious** 73:*24*
**obviously** 57:*10* 63:*13*
**occasion** 61:*20*
**occur** 87:*25* 89:*24* 101:*17* 102:*18*
**occurred** 25:*12, 25* 26:*15* 32:*2* 55:*2, 12* 61:*17, 19, 22* 85:*1, 8, 13* 86:*8* 89:*21* 109:*13* 147:*17* 148:*1, 2*
**occurring** 55:*7* 79:*2* 83:*14, 15, 23* 84:*1* 152:*6, 15, 17* 173:*23* 196:*22*
**October** 51:*2* 122:*19* 153:*15*
**off-duty** 32:*6, 9, 15* 107:*11*
**offer** 24:*15* 80:*1, 7* 81:*6*
**offered** 193:*23*
**Office** 32:*10* 54:*13* 75:*11* 81:*9* 145:*24, 25* 146:*21* 149:*7* 153:*21* 154:*21* 162:*2, 21* 192:*10* 200:*5*
**officer** 10:*3* 27:*13* 36:*2* 43:*20* 44:*11* 57:*15* 61:*4* 68:*24* 70:*1* 73:*5* 88:*18* 92:*13* 98:*22* 108:*4* 117:*9* 121:*2* 124:*19* 128:*22* 129:*1, 6, 8* 132:*10* 136:*21, 24* 140:*10, 14* 152:*9, 10* 177:*17* 182:*10, 18* 183:*9* 184:*21* 185:*21* 186:*3, 7, 8, 10* 188:*5* 189:*22* 191:*24* 192:*10, 22* 193:*4, 6, 13, 20* 194:*4, 6, 20* 195:*2, 3, 9, 18* 197:*3* 198:*1, 1, 5*
**officers** 26:*24* 27:*10* 40:*6* 48:*10* 72:*3* 82:*24* 83:*19* 87:*19* 88:*9* 99:*16* 109:*15, 16* 119:*1* 125:*15* 155:*5* 156:*9* 180:*22, 25* 181:*3, 5, 7, 11* 182:*11, 21, 23* 183:*2* 196:*18*

**officer's** 68:*25* 70:*2* 129:*7* 182:*18* 183:*6* 191:*11*
**Offices** 2:*8*
**official** 8:*8, 16* 36:*1, 3* 47:*2*
**off-the-record** 8:*24* 19:*13* 44:*23* 53:*21* 96:*13* 143:*5* 192:*7*
**Oh** 45:*5* 129:*23* 135:*20* 159:*16*
**OHIO** 1:*1* 2:*6, 9, 10* 3:*7, 16* 199:*2, 5* 200:*5, 12*
**Okay** 7:*1, 4* 8:*3, 7, 19* 9:*13* 10:*18* 11:*14, 17, 19, 23* 12:*24* 13:*3, 23* 14:*2, 8, 16* 16:*16* 17:*3, 5, 7, 8, 18, 24* 18:*2, 5, 14, 16* 19:*8, 22* 20:*14* 21:*1, 4, 9, 15, 21* 22:*12, 16* 23:*6, 12, 24* 24:*12, 20* 25:*18, 24* 26:*18* 27:*6, 22* 28:*7, 11, 17* 29:*9* 30:*23* 31:*1, 6, 13, 22* 32:*14* 33:*6, 24* 35:*20* 39:*16* 40:*2* 41:*12* 42:*1* 43:*8, 18* 45:*1, 7, 11, 14, 17* 46:*5, 8, 11, 14* 47:*17, 19, 21, 23* 48:*4, 24* 49:*3, 8, 14, 18, 24* 50:*8, 16, 23* 51:*9* 52:*8, 10, 20* 53:*1, 6, 16, 23* 55:*8, 21* 58:*3, 10* 59:*2* 60:*2, 8, 11, 14, 23* 61:*2, 8, 18, 21* 62:*10, 18* 63:*2, 18, 21* 64:*2* 65:*2, 11, 25* 66:*8, 11, 18* 67:*13* 68:*17* 69:*4, 13* 70:*6* 71:*4, 12, 22* 72:*2, 7, 17, 24* 73:*17* 74:*10, 14* 75:*3, 23* 76:*12* 77:*16, 23* 78:*19* 79:*5, 11, 13* 80:*15, 18* 81:*10, 20, 24* 82:*8* 83:*5* 84:*10* 85:*19, 22* 86:*2, 14* 87:*23* 89:*18* 91:*14* 93:*8* 94:*7* 96:*16, 24* 97:*11, 19* 99:*3, 15* 100:*12, 15* 101:*4, 7* 102:*3* 103:*15* 104:*1, 4, 10, 15, 24* 105:*2, 14, 20* 106:*8, 18* 107:*3, 9* 108:*9, 12* 109:*19* 110:*6, 16, 18, 19* 111:*19, 24* 115:*4* 116:*1* 117:*15* 118:*2, 24* 119:*6, 25* 120:*2, 9, 13, 18* 121:*6, 16, 20* 122:*24* 123:*4, 13, 15* 124:*2, 6, 11, 13, 18* 125:*10, 12* 126:*5, 14, 19, 21* 127:*6, 9, 20* 128:*5, 21* 129:*12* 130:*2, 11, 23* 131:*10, 21, 24* 132:*4, 23* 133:*1, 16, 23* 134:*3* 135:*1, 7* 136:*20* 138:*5, 15* 139:*4, 20*

141:*17* 142:*19, 22* 143:*2, 10, 11* 144:*10, 19, 24* 145:*4, 17* 146:*1, 14* 147:*2, 10* 148:*13, 17, 20* 150:*5, 25* 151:*3* 153:*2, 3, 12, 18* 154:*6, 12, 23* 155:*14* 156:*12* 157:*15* 161:*5, 12, 22* 162:*1* 163:*7, 10* 164:*2* 165:*3* 167:*4* 170:*13* 171:*14, 25* 175:*4* 176:*1, 3, 14* 177:*24* 178:*7, 18* 179:*6* 180:*4* 184:*3, 14, 20* 186:*1, 16* 187:*5, 12* 188:*17, 20* 189:*13, 20* 190:*10, 14* 191:*14, 17* 192:*1* 193:*6* 194:*4* 197:*22* 198:*20, 22*
**once** 31:*4* 47:*20* 66:*18* 71:*20* 84:*19* 106:*10* 152:*17* 161:*16*
**one-person's** 66:*16*
**ones** 22:*22* 27:*12* 31:*25* 38:*9* 48:*18* 102:*23* 136:*10* 142:*15, 16, 17*
**one-time** 28:*24*
**online** 11:*7* 12:*8* 196:*24*
**open** 44:*3*
**operates** 168:*16, 22*
**Operating** 4:*7*
**Operation** 51:*12* 52:*1* 94:*8*
**Operations** 6:*16* 53:*15*
**opinion** 35:*6* 66:*25* 67:*1* 68:*20* 151:*7* 196:*15*
**opportunities** 66:*15*
**opportunity** 80:*2, 7*
**opposed** 131:*14* 152:*25*
**option** 79:*24, 25* 80:*16* 81:*12* 114:*24, 25* 133:*10* 137:*14*
**options** 75:*13*
**order** 96:*25* 111:*19* 162:*17* 176:*19* 198:*25*
**orders** 163:*8*
**organizations** 46:*6*
**orient** 139:*11*
**original** 16:*23* 109:*24* 111:*22*
**originally** 57:*9*
**originals** 16:*25* 17:*2*
**outcome** 35:*10* 39:*4* 67:*1* 69:*9* 88:*16* 95:*25*
**outcomes** 9:*7* 12:*25* 13:*13* 72:*11* 168:*24*
**outside** 24:*21, 25* 25:*2, 13, 14, 20* 26:*2, 8* 28:*3, 9* 30:*17* 33:*16* 56:*15* 57:*8, 10* 58:*20* 75:*18* 77:*2* 79:*6* 83:*1* 91:*7, 21* 92:*8* 105:*23* 117:*13* 121:*23*

130:*3* 131:*11, 11, 12* 132:*7* 133:*17* 137:*24* 159:*6, 21, 22, 25* 160:*7, 14, 22* 170:*7, 15* 180:*16, 17, 20* 182:*8*
**outstanding** 103:*1, 2*
**overrule** 75:*18*
**oversaw** 48:*10* 50:*4*
**oversee** 48:*20* 49:*14* 51:*18*
**overseeing** 52:*5, 13, 18*
**overseen** 52:*16*
**oversees** 96:*23*
**overturn** 36:*17*
**overturned** 189:*2*

**< P >**
**p.m** 49:*17, 17*
**package** 63:*15* 109:*24* 146:*9*
**packaging** 63:*5*
**packet** 170:*21*
**page** 105:*24* 106:*18, 19* 108:*15, 17, 20* 111:*2* 112:*19, 23* 113:*1, 4, 4* 114:*1, 4* 115:*12, 15, 19* 116:*12, 14, 17, 21* 117:*3, 22* 118:*2, 12* 119:*6, 11, 20* 120:*3, 7* 121:*1* 123:*20, 20* 124:*13* 126:*19* 127:*6, 9* 129:*12* 130:*2, 3, 6* 131:*2* 132:*10* 134:*3, 8, 10, 15, 17, 18, 19* 135:*1, 5, 16* 136:*2, 5, 8, 14, 17* 138:*15, 19, 22, 25* 139:*12, 15, 23* 140:*6, 9* 141:*7, 7, 11, 15, 25* 142:*5, 9, 11* 149:*16* 155:*7* 157:*2, 3* 171:*25* 176:*3*
**page-by-page** 131:*23*
**pages** 42:*25* 71:*23* 121:*10* 145:*14, 19* 157:*1*
**paid** 35:*9, 11* 38:*23*
**paper** 13:*9, 10* 67:*15* 146:*12*
**paperwork** 13:*21, 22*
**part** 70:*24* 81:*25* 82:*8* 88:*12* 95:*23* 98:*16* 99:*7* 100:*13* 122:*17* 124:*24, 25* 152:*1* 167:*23* 173:*24* 182:*1*
**participate** 48:*16*
**particular** 16:*2* 20:*14* 34:*4* 44:*15* 84:*18* 91:*13* 99:*22* 106:*25* 111:*9* 149:*5* 189:*18*
**particularity** 160:*20*
**particularly** 7:*9* 99:*16*
**parties** 127:*16* 137:*16* 199:*21, 23*

Case: 2:18-cv-01060-EAS-EPD Doc #: 141-3 Filed: 03/24/21 Page: 213 of 219 PAGEID #: 3794

Deposition of Deputy Chief Kenneth Kuebler      Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

**partner** 6:22 29:5 88:24 152:11

**party** 193:19

**pass** 62:19

**passed** 84:3, 13

**passes** 97:25

**passive** 193:8, 15, 19 194:1

**patrol** 32:3 49:10, 11 50:25 51:3, 7, 22 53:7 66:12 132:21

**patrolling** 29:5

**patrolman** 21:13 22:1 30:5

**patrons** 109:15

**Paul** 127:25

**pay** 34:15

**paying** 34:22

**pellets** 88:6

**pendency** 146:14

**people** 14:23 26:22 35:9 38:23 52:23 57:24 58:1 64:7 71:15, 16 88:11 89:9, 21 144:15 146:7 149:4 185:18, 20 188:22 189:10, 24 191:12 195:22 198:10

**people's** 44:11 73:23

**percent** 150:14

**Perfect** 101:4

**perfunctory** 175:21

**period** 48:5 62:19 76:23 78:25 101:15

**permanent** 137:9

**permitted** 193:6 194:4, 20 195:2, 9

**person** 20:12 30:1 34:17 58:2 59:3 60:14 64:13, 18 65:4 66:8 67:3 69:24 71:2 72:15 74:3 78:9 90:13, 15, 25 108:5 121:7 141:1 192:23 193:7, 14 194:5, 12, 17, 21 195:3, 4, 10

**personal** 7:24 8:12 27:25 28:8, 10, 19 32:5 34:3, 17 40:7 44:14 107:11 151:19 152:19, 20, 24 155:15 161:1, 10 169:16

**personally** 19:6 36:1 37:8 46:23 68:11 110:10 144:10 147:9 148:17 197:5

**personnel** 30:23 51:20 190:9

**person's** 65:3, 8 70:19 73:22 78:12

**perspective** 56:17 117:13 188:1

**phasing** 131:14

**Phillips** 3:13 9:4, 16 10:23 12:19 14:4 18:21 19:8 25:2, 14, 20 26:2, 7 27:24 28:3, 11, 17 37:9, 19 38:4 40:3, 12, 14, 25 42:16, 20 43:19, 24 44:8, 20 48:2 95:19 96:3 100:6, 12, 15, 20, 23 128:18 152:12 159:5, 21, 24 160:5, 11, 18 169:20 170:2 182:14, 25 183:12 185:2, 13 192:4, 13, 18 193:1, 9, 16 194:7, 23 195:5, 12 196:13 197:12 198:7, 24

**phone** 20:8, 11, 13, 15 147:16, 21 148:14

**photographs** 70:11 155:19

**phrase** 185:6, 7

**phraseology** 195:14

**physical** 63:10 181:14 192:24 194:17

**Physically** 15:16, 17 16:3 25:5 63:9

**Phyveau** 42:15

**P-H-Y-V-E-A-U-X** 42:15

**pick** 40:19 57:3 73:25

**picture** 170:21

**piece** 45:22, 24 52:7 76:19 98:7 99:12 176:12

**pieces** 45:12, 14

**Pilya** 190:5

**pit** 10:2, 3

**pitbull** 137:1, 2, 3

**place** 13:4, 7 199:17

**places** 105:15

**Plaintiff** 1:2, 15, 21 47:5

**Plaintiffs** 2:4 3:2 6:21

**PLAINTIFF'S** 4:6 93:18 105:4 110:22 113:19 116:4 118:20 120:21 121:25 122:10 130:14 133:5 135:23 139:7 141:21 145:8 148:23 154:14 156:17 162:6 186:19 190:17

**planning** 52:1, 6

**plausible** 173:14

**play** 93:10

**Plaza** 2:9

**please** 6:9 7:10 17:7 26:6 28:21 114:11 136:23 140:13 151:12 189:21

**plenty** 21:1

**plural** 68:22

**plus** 64:4 96:19

**podcast** 184:8

**Poehler** 139:24 174:22 175:2

**point** 16:21 17:5, 6 24:13 29:7 45:22 55:9 61:3 72:3, 19 75:12 79:21 91:25 101:21 103:13 104:1 106:8 111:21 119:25 124:5 128:21 141:4 146:14 148:18 163:11 164:6 173:15

**pointing** 30:2

**police** 6:13, 15 9:9 11:3 12:3 15:11, 12 16:20 21:10, 18, 25 33:16 36:2 37:12, 21, 25 40:4, 5, 6, 9, 15 43:20 44:11 46:3 47:24 52:23, 24 53:9 54:3, 18 55:8 66:5 70:20 73:5, 10, 18, 20 75:2 77:1 78:2, 5, 13, 15 79:14, 24 80:6, 22, 23 81:6 86:5 93:23 94:25 95:5 109:5 111:8, 8 112:4, 7 150:11, 13, 15, 18 151:9 157:16 158:3, 6, 9 159:1, 3, 14 161:3 171:11 176:19 183:22 185:10 188:10 190:8 192:10, 22 193:6, 13, 20, 25 194:4, 20 195:2, 3, 9, 18 196:17 197:2 198:1

**policies** 22:24 48:11, 16 91:14, 19 92:3 94:7 99:23 108:17 193:25 194:1, 5

**policing** 41:6

**policy** 24:21, 25 25:13 30:10 55:2, 7, 20 57:5, 8, 10, 17, 20, 21 58:13, 20 59:9 69:12, 12, 17 72:12, 13 75:3, 8, 17, 17, 19, 19, 21, 24 76:5 77:25 79:6 82:19 83:8 84:24 87:23, 24 91:21, 22, 25 92:5, 6, 8, 11, 15, 18, 20, 24 93:7, 7 94:19 99:13 104:13 105:23, 25 106:11, 20 108:16, 21, 24 109:2, 8, 20 110:7 111:3, 9, 16 112:21, 23 113:2, 5, 9, 12 114:1, 5, 14, 15, 16, 18 115:10, 13, 16, 23 116:11, 15, 17, 22 117:5, 14, 23 118:3, 17 119:8, 22 120:4, 10 121:1, 4, 8, 17, 23 123:17, 21 124:2, 3, 15, 16, 17 125:4 127:1, 7, 12, 24 128:7 129:4, 4, 6 130:3, 3, 9, 20, 24 131:5, 6, 7, 11, 12, 12, 18 132:7 133:10, 17, 20, 21, 22, 24 134:4, 12 135:9, 17 136:3, 6, 9, 15 137:24

**138**:3, 20, 23 139:1, 13, 17 140:5, 20 141:2, 8, 12 142:1, 6, 14 147:8 150:22 151:10, 15 155:24 156:2, 7 157:18 158:1, 12, 20 161:6 163:21 164:15 167:2, 9, 12, 16 169:9 170:7, 16 171:2, 4 176:10, 16, 25 177:4, 8, 17 179:4 180:16, 18, 20 182:8 183:5 187:16 188:2, 6, 15 190:3 193:7

**policy,** 111:7 125:3

**policy.'** 189:24

**Popups** 41:16 42:4 43:6

**P-O-P-U-P-S** 41:16

**portion** 68:16 101:24

**pose** 131:23

**position** 66:11, 16 97:1 104:7 151:8, 16 157:16 158:3, 5 171:3 177:3, 10, 13 183:6 188:4

**positions** 65:17

**possible** 16:7 64:5, 6, 13 69:9 102:2 132:19, 22 143:15

**post** 40:23 45:14

**posted** 41:10 42:7, 24 45:10

**posts** 33:25 40:21

**potential** 92:18

**potentially** 40:11 103:9, 13

**powers** 61:2

**practice** 66:17 107:6 162:14 165:2 178:5

**practices** 97:11

**precinct** 22:5 29:6 99:19

**prefer** 131:13

**preferred** 16:5

**preparation** 10:16 12:15 21:6 165:6

**prepare** 9:13, 20 21:1 176:22

**prepared** 18:19

**presence** 199:11

**present** 9:7 54:13 59:11 96:1 141:3 160:17 172:20 187:6 192:23

**presented** 57:10, 19 68:6 186:6

**presenting** 194:16

**presents** 194:12

**President** 39:5

**press** 39:14

**Presuming** 195:7

**pretty** 35:8, 14 37:11 45:25 95:21 100:7

**previous** 28:8, 20 59:5 133:23

Case: 2:18-cv-01060-EAS-EPD Doc #: 141-3 Filed: 03/24/21 Page: 214 of 219  PAGEID #: 3795

Deposition of Deputy Chief Kenneth Kuebler          Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

previously 163:*14*, *14*
170:*9* 171:*14* 188:*20*
primarily 49:*15* 87:*17*
186:*7*
primary 88:*16*
printed 63:*13*, *15*, *16* 68:*1*
prior 78:*10* 85:*11*, *18*
Probably 12:*10* 13:*24*
48:*22* 109:*25* 119:*5*
126:*7* 128:*2* 174:*1* 176:*2*
186:*2*
problem 125:*22*
problematic 86:*16*
Procedure 4:*8* 88:*3*, *10*
procedures 87:*4* 91:*14*
97:*11*
P-R-O-C-E-E-D-I-N-G-S
6:*1*
process 12:*22* 16:*8* 31:*19*
54:*2*, *16*, *24*, *25* 60:*16*, *18*
70:*25* 71:*10* 73:*20* 74:*7*
76:*15* 77:*2* 80:*20* 82:*8*
83:*21* 91:*5* 98:*7* 102:*11*,
*12*, *14* 159:*14* 162:*17*
168:*16*
processes 168:*21*
processing 64:*12*
processive 179:*14*
produced 166:*19*
producing 161:*24*
profession 195:*22*, *23*
Professional 17:*16* 46:*5*
64:*11* 65:*18* 175:*8* 186:*3*
progress 68:*2*
progressive 76:*24* 77:*2*
78:*5*, *9*, *16*, *19* 81:*23*, *25*
82:*5* 94:*12*, *23* 129:*17*
130:*1* 179:*13*, *16*, *21* 180:*9*
prohibited 65:*17*
promoted 49:*5*, *21* 50:*11*
53:*13* 104:*6*, *8* 122:*19*
properly 88:*4*, *19*
prosecute 58:*16*
prosecuted 58:*19* 59:*10*
prosecution 57:*11*, *19*
58:*16*
Prosecutor's 54:*13*
protection 42:*17* 51:*25*
protest 37:*12*
provided 34:*2*, *6*, *7*
100:*12* 101:*2*
PSB 175:*9*, *17*
Public 2:*6* 3:*6* 33:*2*
78:*21* 79:*18*, *23* 110:*4*
184:*1* 199:*4* 200:*11*
publication 45:*20*
publicly 11:*11*, *15* 183:*19*
published 45:*21* 46:*1*
pull 111:*22*

purpose 44:*5* 82:*16* 108:*5*
purposes 82:*23* 149:*14*
pursuant 2:*6* 78:*8* 81:*22*
129:*19* 130:*1* 193:*25*
pursuit 29:*10* 93:*5*, *5*, *6*
purview 91:*8*
push 66:*13*
put 97:*25* 98:*9*
puts 84:*19* 97:*25* 176:*19*
putting 57:*23* 82:*15*

< Q >
quadrate 23:*15*
qualifications 87:*20*
qualified 199:*5*
qualifies 52:*4*
qualify 96:*25* 103:*13*
question 7:*13* 13:*5* 19:*22*
26:*12* 36:*20* 56:*20* 59:*5*
60:*6* 81:*2* 92:*12* 94:*19*
107:*14* 131:*16*, *23* 138:*9*
144:*24* 158:*7* 160:*10*
166:*22* 167:*20* 170:*3*
181:*17* 193:*23* 194:*25*
questioning 62:*5* 87:*12*
questions 16:*1* 18:*13*
25:*24* 28:*1* 37:*14* 52:*15*
62:*2*, *9* 95:*8*, *12*, *13*, *15*
131:*13*, *14* 143:*9* 151:*18*
152:*14*, *20*, *23* 159:*6*
160:*12* 161:*9*, *11*
quick 21:*9* 53:*18* 143:*3*
192:*3*
quote 80:*9*

< R >
Raccoons 118:*24*, *25*
race 196:*18*, *22*, *22* 197:*1*,
*3*
radio 51:*21*
raised 46:*17* 86:*3*
ran 41:*16* 42:*7* 194:*6*
Randy 114:*6*
range 55:*12* 58:*1*
rank 69:*24*
ranking 90:*12*
reach 61:*15*
reached 154:*21* 158:*25*
read 35:*15*, *25* 36:*1* 68:*6*
123:*18* 155:*18* 169:*12*
175:*4* 177:*19* 182:*20*
197:*16*, *16* 198:*24*
reads 106:*23*
ready 12:*20*
real 84:*9*
really 38:*7* 90:*24* 96:*4*
100:*2* 152:*11* 153:*10*

reason 110:*11* 113:*23*
116:*8* 131:*21* 140:*25*
142:*23*
reasonable 21:*5* 90:*19*
117:*13* 125:*19*, *24* 126:*25*
193:*3*, *20*
reasonably 59:*22* 106:*11*
reasoning 126:*6*
reasons 64:*9* 129:*19*
174:*13*
reassigned 66:*12*
recall 19:*18*, *19*, *21*, *24*, *25*
20:*17*, *20*, *21*, *25* 22:*18*
23:*3* 24:*1*, *14*, *19*, *23*
25:*16*, *18*, *25* 26:*17* 27:*7*,
*20*, *23* 29:*18*, *24* 31:*11*
32:*1* 46:*17* 47:*3* 48:*19*
49:*1*, *6* 58:*5*, *6*, *9* 65:*20*
87:*17* 102:*8* 104:*16*
125:*14*, *21*, *23* 126:*3*, *7*, *13*
127:*3*, *4* 132:*13*, *18*, *22*
134:*24* 140:*17* 148:*12*, *16*
150:*10* 152:*7*, *10* 153:*6*,
*14* 156:*4*, *8* 157:*5*, *6*, *7*, *10*
158:*8*, *16*, *24* 159:*4*
162:*18* 163:*6* 164:*5*, *10*,
*11*, *14* 165:*3*, *5*, *18* 166:*7*
167:*10*, *14*, *15*, *17* 169:*11*
171:*10*, *13* 172:*22* 173:*3*,
*6*, *13*, *19* 175:*21* 176:*2*
177:*11*, *14* 178:*15*, *17*, *21*
181:*15* 182:*9* 184:*11*, *16*,
*17*, *25* 186:*4* 187:*4*, *14*, *14*,
*18*, *19* 188:*3*, *16*, *24* 191:*2*,
*3* 196:*5* 198:*21*
receive 30:*20* 31:*19* 52:*8*
received 12:*17* 20:*13*
30:*11*, *19* 31:*11*, *21*
127:*21* 147:*16*, *21* 148:*13*
189:*1*
receives 96:*25*
receiving 188:*24*
recognize 148:*21* 149:*17*
154:*7* 170:*10* 197:*20*
recognized 99:*10*
recollection 58:*23* 165:*7*,
*12* 167:*12* 169:*23* 170:*13*
171:*16* 175:*1* 176:*4*
recommend 61:*16* 70:*22*
75:*22* 77:*15*, *22* 79:*9*, *11*
91:*3* 94:*14*, *16* 178:*19*
179:*18*
recommendation 68:*23*
69:*5*, *7*, *14* 70:*12*, *16* 75:*4*
84:*20* 90:*17*, *25* 122:*25*
146:*20* 176:*11*, *17*, *18*, *22*
178:*20*, *23* 179:*20* 180:*6*,
*8*, *10*
recommendations 69:*10*,
*13* 84:*23*, *24* 86:*20* 87:*13*

91:*12*, *21* 95:*16* 111:*25*
112:*5*, *16* 146:*2* 149:*22*
166:*18*
recommended 58:*4* 75:*24*
79:*13* 81:*4* 86:*16* 89:*6*
94:*12*, *23* 95:*4* 179:*12*, *14*,
*15* 198:*17*
recommends 71:*1* 77:*20*
78:*1* 79:*7*, *22* 80:*18*
record 6:*10* 8:*22* 9:*2*, *2*
19:*11* 28:*13* 44:*19*, *21*
67:*8* 93:*15* 96:*10* 114:*13*
160:*7* 190:*2*
recorded 62:*2* 99:*18*
recording 67:*20*
records 24:*5* 50:*4* 86:*12*
110:*4* 189:*22*, *24* 190:*9*,
*10*, *11*
recruit 21:*14*
red 106:*20*
reduce 72:*13*
reduced 69:*9* 76:*18*
199:*10*
reduces 68:*3*
redundant 99:*2*
reference 39:*11* 72:*21*
181:*25*
referenced 34:*4* 119:*24*
128:*15*
references 42:*5*, *6* 118:*1*
referencing 34:*23* 39:*9*
54:*7* 76:*1* 85:*11* 108:*1*
111:*17* 117:*16* 161:*25*
referred 33:*8*, *19* 34:*24*
55:*9*, *10*, *11*, *14* 109:*11*
referring 34:*19* 128:*17*
185:*4* 197:*15*
refers 174:*10*
reflect 133:*13*, *14* 189:*22*
190:*12*
reflected 190:*11*
reflective 107:*14*
refresh 58:*23* 165:*7*, *11*
171:*15* 174:*25* 176:*4*
refreshed 170:*13*
regard 16:*21*, *22* 83:*17*
144:*1*, *2*
regarding 10:*6*, *9*, *12* 11:*3*
12:*3* 14:*10* 16:*16* 32:*5*,
*15* 48:*21*, *24* 74:*20* 79:*15*
83:*11* 87:*11*, *25* 91:*19*
92:*25*, *25* 93:*2* 99:*22*
104:*16* 151:*18* 152:*23*
158:*19* 160:*4* 168:*13*, *18*
169:*16* 176:*5* 177:*10*, *13*
178:*13* 179:*2* 180:*5*
182:*12*, *19* 183:*18*
regardless 67:*9* 102:*16*
register 105:*14* 111:*1*, *12*

Deposition of Deputy Chief Kenneth Kuebler | Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

112:*20*

**relate** 94:*8*

**related** 13:*12* 17:*20* 39:*6* 42:*25* 43:*6* 87:*17* 93:*12* 130:*20* 131:*18* 134:*5* 135:*10* 141:*9*, *12*

**relates** 18:*24* 40:*5* 121:*2*

**Relating** 11:*24*, *25* 87:*13*

**relation** 86:*20* 87:*8* 94:*25* 95:*5* 144:*5*, *6* 148:*18* 150:*17*, *23* 151:*4* 152:*24* 161:*1* 164:*3* 165:*8* 174:*15*

**relative** 199:*20*, *22*

**relevance** 101:*1*

**relevant** 38:*1* 40:*11*, *25* 56:*21*

**relied** 154:*23* 170:*14*

**rely** 7:*20* 154:*25*

**remainder** 110:*17* 138:*25*

**Remarks** 175:*9*, *18*

**remember** 10:*1* 31:*25* 120:*13* 129:*22* 132:*3* 137:*14*, *20* 147:*13* 152:*6*, *11* 153:*7*, *9* 156:*8*, *9*, *11* 170:*3*, *11* 177:*7* 179:*25* 187:*23* 188:*19* 189:*19*

**Remind** 122:*21* 126:*23* 132:*1*

**reminder** 7:*4*

**render** 14:*14* 36:*5*, *15* 66:*25* 69:*2* 77:*6* 80:*22* 92:*4* 96:*21* 170:*24*

**rendered** 65:*9* 67:*9* 75:*9*

**repeat** 26:*12* 194:*25*

**rephrase** 7:*11*

**replaces** 31:*18*

**reply** 163:*16*

**report** 67:*18*, *22*, *22*, *24* 68:*1* 82:*23* 84:*15*, *20*, *21*, *25* 86:*15* 98:*18* 99:*8*, *10* 101:*8*, *23* 102:*4*, *24* 104:*15*, *18* 198:*1*

**REPORTER** 4:*5*

**Reporting** 2:*8* 199:*25*

**reports** 41:*25* 100:*2*, *3*, *5*, *10*, *22* 101:*7*, *13* 103:*15* 104:*17*

**representation** 40:*21* 41:*5* 100:*18*

**representative** 8:*4* 60:*14*

**representatives** 186:*4*

**represents** 6:*20*

**reprimand** 76:*10* 77:*1*, *3*, *10*, *14*, *20* 78:*2*, *4*, *8*, *11*, *13*, *16* 79:*1* 81:*22* 88:*15* 89:*2* 91:*4* 107:*3* 116:*22*

**reprimands** 89:*13*

**request** 61:*8* 110:*4*

172:*20*

**requested** 158:*14* 174:*9*

**research** 22:*23* 23:*4* 48:*6*, *12*, *13*, *20*

**reside** 12:*11*, *25*

**resistance** 193:*8*, *15*, *19*, *20*, *22* 194:*1*

**resolved** 47:*4*

**resources** 190:*7*

**respond** 14:*25* 15:*11*, *15*, *16*, *17* 54:*9*

**responded** 104:*6*

**responder** 14:*25* 16:*6* 54:*6* 55:*21* 56:*1*, *9* 57:*14* 59:*2* 60:*11* 62:*18* 64:*4*, *14* 65:*21* 66:*24* 104:*7*, *11* 122:*25* 123:*3* 148:*3*, *3*, *15* 149:*11*, *14*

**responders** 65:*23*

**responding** 15:*1*, *3*, *5*, *8* 128:*22*

**responds** 14:*18*

**response** 53:*9* 54:*7* 149:*20* 178:*24*

**responsibilities** 15:*22* 51:*16* 57:*1* 59:*3* 66:*14*

**responsibility** 10:*20* 15:*11*, *25* 50:*23* 68:*5* 83:*5*

**responsible** 15:*18* 51:*6*, *7* 82:*14*

**rest** 68:*13* 123:*24*

**resting** 13:*4*, *7*

**result** 31:*12* 88:*4*, *15* 129:*10* 180:*15*, *18*

**results** 73:*11* 154:*19*

**retire** 64:*7*

**retraining** 30:*13*

**return** 149:*6* 176:*10*

**returned** 140:*18* 176:*21*

**Review** 4:*7*, *9*, *10*, *11*, *12*, *13*, *14*, *15*, *16*, *17*, *18*, *19*, *20*, *21*, *24* 9:*9* 11:*3*, *21* 12:*4*, *21* 14:*12* 16:*1*, *21* 18:*13*, *23* 19:*3* 24:*12* 36:*5* 37:*8* 48:*25* 52:*13*, *16*, *17*, *21*, *22* 54:*5*, *17*, *18*, *24*, *25* 55:*1*, *6*, *20* 59:*1*, *14*, *16* 60:*24*, *25* 61:*8* 62:*20* 63:*9* 65:*4*, *9*, *11* 66:*22* 67:*14* 68:*6*, *9*, *11*, *14*, *15*, *15*, *17* 71:*10* 73:*21*, *23* 74:*5*, *10* 75:*4*, *5* 77:*19*, *21*, *24* 79:*5*, *15* 82:*10* 83:*3* 90:*2* 91:*7*, *15*, *18* 92:*2*, *14* 93:*6*, *23* 94:*4*, *9* 102:*11* 104:*9* 107:*12*, *13* 108:*1*, *2* 114:*21* 119:*6* 124:*15* 125:*9* 126:*15* 128:*4*, *16* 132:*17* 137:*21* 141:*19* 143:*19* 144:*1*, *2*, *10*, *14*, *20*, *25* 146:*15*, *24*

147:*20* 148:*3* 149:*5* 150:*9* 151:*20*, *25* 152:*2* 153:*19* 154:*1*, *11*, *20*, *22* 155:*16* 157:*24* 160:*13* 161:*13*, *17*, *23* 162:*11*, *15*, *24* 163:*11* 164:*12* 165:*15*, *19*, *21* 166:*8*, *17* 169:*7* 170:*24* 171:*8*, *17* 176:*1*, *5*, *15*, *25* 177:*15*, *24* 178:*1*, *3*, *5*, *25* 183:*4* 190:*4* 191:*1* 192:*3*

**reviewed** 9:*23* 36:*19*, *25* 38:*10* 55:*15* 59:*20* 62:*8*, *12*, *15* 70:*8* 74:*11* 108:*4* 143:*13* 144:*16* 145:*12*, *17* 153:*9* 154:*11* 155:*5*, *18* 157:*14* 161:*3* 165:*11* 166:*1* 167:*18*, *24* 168:*3*, *6*, *9* 170:*20* 171:*5* 175:*10*, *22* 178:*22* 182:*4* 186:*13* 191:*21* 193:*3*

**reviewer** 65:*22* 68:*5* 96:*22* 104:*2*, *11* 122:*22*, *23*, *25* 123:*3*, *5*, *6*, *7*, *10* 193:*19*

**reviewers** 65:*24* 132:*15* 155:*10* 178:*9*

**reviewing** 16:*1* 56:*15* 61:*12* 127:*16* 137:*16* 146:*7*, *8* 157:*7* 158:*15* 166:*11*, *14*

**reviews** 9:*7* 12:*6*, *24* 59:*17* 83:*18* 92:*14* 95:*25* 105:*16*, *25* 149:*25* 153:*24* 168:*21*, *24*

**review's** 13:*12*

**revision** 128:*17*

**revisions** 94:*1* 128:*15*

**rewrite** 48:*20*

**rewriting** 48:*16*

**Richard** 134:*20* 144:*18* 150:*24*

**ricochet** 125:*20*

**rifles** 87:*18*

**right** 6:*17* 7:*2*, *16* 8:*17* 9:*3* 12:*14*, *17* 13:*1* 14:*3* 18:*6* 21:*2* 28:*1*, *1* 36:*12*, *22* 37:*3*, *18*, *19* 39:*10* 45:*5* 48:*6* 53:*1* 55:*22* 62:*20* 66:*19* 72:*21* 77:*17* 81:*14* 84:*21* 86:*5* 92:*15*, *20* 95:*9*, *17* 97:*22* 98:*19*, *20* 100:*3* 102:*4* 103:*18* 104:*21* 106:*3*, *22* 107:*9* 108:*9*, *13*, *24* 110:*8*, *12* 112:*19* 113:*10*, *15*, *16* 115:*13*, *20* 116:*9*, *18* 117:*24* 118:*13* 119:*9* 120:*5* 121:*13* 122:*7*, *17* 123:*17* 124:*19* 126:*17*

127:*7*, *21* 129:*14*, *23* 130:*4*, *6* 131:*1* 132:*7*, *10*, *19* 134:*1*, *13* 135:*3*, *11*, *12*, *14*, *18* 136:*16*, *16* 139:*21* 140:*7* 141:*9*, *15* 142:*1*, *7*, *25* 143:*1*, *13*, *21* 146:*18*, *22* 149:*22* 150:*3*, *7* 151:*17* 152:*2*, *14* 156:*14*, *22* 160:*17* 161:*6*, *8*, *17* 162:*2*, *23* 163:*12* 164:*6* 165:*16* 166:*12* 167:*19* 168:*1*, *19* 169:*3*, *18* 170:*9* 172:*17* 176:*15* 177:*22* 179:*18* 180:*20*, *23* 181:*1*, *16* 182:*4*, *13* 188:*22* 189:*11* 192:*12* 193:*8* 194:*22* 195:*4*, *11*

**riots** 33:*20*

**rise** 93:*1* 128:*12*

**risk** 138:*13* 194:*12*

**road** 28:*16* 29:*11* 128:*8*

**Robert** 118:*4*

**role** 66:*13*

**roles** 64:*12*

**room** 129:*1*

**Rosser** 121:*3*

**Roughly** 53:*13*

**round** 137:*2*

**routine** 175:*25*

**Routing** 4:*22*, *25* 9:*23*, *24*, *25* 71:*5*, *6*, *9*, *12*, *14*, *17*, *19*, *20*, *23* 72:*5*, *13*, *18*, *20*, *21*, *25* 74:*12* 143:*13* 145:*4*, *21* 146:*1*, *5*, *15*, *21*, *25* 147:*11* 156:*13*, *21* 171:*20*, *23* 176:*12*

**rule** 172:*6*, *7*, *14* 200:*2*

**ruled** 94:*3*

**run** 30:*17* 76:*12* 108:*5*, *6* 109:*14*

**rundown** 21:*9*

**running** 30:*17* 42:*2* 129:*1* 194:*17*

**Ryan** 121:*3* 124:*19*

**< S >**

**safe** 88:*11*

**Safety** 33:*2* 79:*18*, *21*, *23* 80:*11*, *13*, *19*, *21* 81:*2*

**SARAH** 1:*21* 3:*3* 6:*19* 18:*21* 37:*9* 40:*3* 42:*16* 95:*19* 100:*8* 152:*12*

**SARGUS** 1:*2*

**sat** 7:*1* 103:*22* 185:*25*

**Savings** 2:*9*

**saw** 16:*3* 150:*25* 154:*18* 164:*6*, *8* 183:*3*

**saying** 37:*20* 38:*22* 85:*19* 114:*8*

**Case: 2:18-cv-01060-EAS-EPD Doc #: 141-3 Filed: 03/24/21 Page: 216 of 219 PAGEID #: 3797**

Deposition of Deputy Chief Kenneth Kuebler     Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

**says** 6:5 107:10 111:6
117:25 121:1 124:14
125:2 133:25 172:3
176:9 186:23 189:20
**scare** 86:24
**scenario** 84:2 93:10
**scene** 15:15, 16, 17 16:2
54:9 55:25 56:1, 9, 12, 13,
14, 15 59:2, 4 60:11
62:19 67:17 180:22
181:1, 8 182:12 183:10,
23 184:22
**school** 73:14, 15, 18 128:8,
12, 19
**scope** 18:22 25:3, 15, 21
26:3, 9 28:4, 9 159:6, 21,
23, 25 160:8, 14, 22
**screen** 135:19
**scroll** 145:14 186:23
**seal** 42:18 44:15 200:5
**seat** 152:7 156:10
**Sebastiano** 127:9
**second** 18:2 29:24, 25
77:10 96:11 106:18
116:14 123:17 127:25
136:15 155:7 157:2, 3
174:25 175:4
**secretary** 13:18 16:12
59:1 63:7, 8, 19, 21, 24
98:13, 15, 19, 22 99:4
105:9 133:12 145:24
147:1 155:10 162:20
190:5
**security** 41:23, 24
**see** 23:12 24:5 56:13
72:14 83:22 89:19 93:13
100:7 104:25 106:19, 20
114:6 119:13 134:7, 17
135:19 147:9 156:24
157:2, 3, 4, 4 159:3, 3
186:23
**seeing** 133:24 164:11
**seen** 14:3 16:4, 4 99:12
105:11, 12 190:21 196:24
**selects** 66:4
**self-evident** 99:18, 20
172:12
**send** 72:5
**sends** 68:25 147:3
**sense** 72:7 89:14 104:10
194:15
**sent** 34:3 63:3 68:25
71:4 145:25 146:21
150:11 155:10 163:5
178:19 179:7
**separate** 18:25 19:9
52:15 72:4, 14 146:12
152:15
**Sergeant** 22:3, 16, 18, 20,
23 23:2, 7, 16, 19 24:17,

22, 25 25:1, 12 26:1, 16
48:5, 9, 10 49:4 56:11
63:5 68:25 69:25 70:2
73:15, 17 74:1 90:3, 6
107:1 176:10, 17, 25 197:9
**sergeants** 24:11 198:15
**sergeant's** 69:25
**serious** 181:14 194:16
**serve** 76:23 80:9 81:8
**served** 80:12 127:4
137:13
**Service** 50:1
**Services** 50:3 51:24
**serving** 80:3
**set** 200:4
**sets** 170:19
**settled** 47:12
**seven** 22:19 48:4 49:3
117:22 138:25 141:15
**Sgelsommino@f-glaw.com**
3:9
**shared** 84:15
**Sheet** 4:22, 25 9:25 71:5,
6, 9, 14, 17, 19, 20 72:13,
18, 20, 21, 25 74:12 119:5
142:15, 16, 18 143:13
145:4, 21 146:1, 12, 15, 21,
25 147:11 156:13, 21
171:21, 23 176:12
**sheets** 9:23, 24 67:15
71:12, 23 72:5 146:5
**shell** 88:4
**shift** 49:15, 16
**shoes** 37:20
**shoot** 27:2 87:2 88:23
162:16 181:3 182:7
192:23 193:7 194:5, 20
195:3, 9
**shooter** 182:12
**shooting** 10:6, 10, 13
15:11, 12 16:22 17:20
18:2, 8 19:16, 22 20:3
22:10, 12 37:22 54:3, 22
55:1, 8, 17 56:7 57:4
58:2 61:4 62:1, 15, 16, 20
67:24 73:20 75:15, 19, 21
83:2 91:21, 23 92:5, 7, 13,
15 95:1, 5 102:18 106:3,
22 109:20, 24 111:3
115:17, 20 116:21 118:5,
12, 16 120:3 121:2, 9
127:11, 24 128:3 130:8
132:6 134:20 135:3, 10
136:5, 8 138:15, 19, 22
139:15 140:9 141:8
142:7 143:10, 16, 19, 23
144:5, 7 145:1, 2, 5
147:16 148:1, 6, 11, 18
149:5, 5 150:18 151:9, 18,
20 152:4, 9, 25 153:5, 19,

20 155:5, 11 156:6, 13
157:8, 17, 25 158:10, 17,
19, 22, 25 161:2, 8, 14, 23
163:18, 20 167:2 169:2,
17 170:7, 15, 25 176:5
177:15 178:13 179:3
181:9, 20 182:18, 24
183:3, 10, 24, 25 184:15
187:15 188:2, 5, 14, 18
189:22 193:14
**shooting,** 128:2
**shootings** 37:13 55:15
57:7 58:14 64:22 83:12,
14, 22, 23, 24, 25 84:5, 12
87:8 93:12 94:4, 18
97:16 101:18, 24, 25
102:2, 3, 7 110:6 117:24
120:5, 9 123:16 130:19
131:17, 19 141:13 180:13,
18, 20 182:11
**short** 76:23 96:6
**shortened** 101:16
**shot** 26:22, 24, 25 27:4
28:20 57:17 114:14
117:14, 17, 18 118:25
125:16, 17 138:1 140:16
161:19 180:23 181:1, 5, 13
**shotgun** 88:3, 4 175:2
**shotguns** 87:18 88:1
**shots** 29:11 102:13
114:14, 18 140:15, 16
**shoulder** 27:21 28:23
**show** 8:19 42:8 54:6
79:3 104:24 115:2
130:11 133:1 141:17, 18
145:4 148:20 154:6
162:1 163:13 188:20
190:14
**showed** 76:17 78:23, 24
163:17 171:23 179:25
**showing** 156:12 170:9
171:14 186:16
**side** 22:7, 8 23:13 26:22
30:18 60:6 72:19, 24
74:15 100:8 152:7
187:10
**sidetracked** 16:9
**sign** 67:10
**signed** 156:21, 22, 24
**signing** 72:24 157:5, 6
**silence** 185:1, 6, 11, 15
**similar** 39:5 80:21 88:18
153:20 155:8 175:23
184:12
**simple** 60:25
**simply** 117:14 195:10
**simultaneously** 152:15
**single** 34:2 55:8

**sit** 33:24 52:21, 23 60:21
64:11 65:8 97:7 104:8
156:5 170:5 185:9 188:4
**sitting** 37:15 64:17
**situation** 54:18 82:25
84:18 85:14
**situations** 37:22
**six** 41:18 50:20, 21 65:22
71:14, 16 117:4 118:2
120:7 126:3 127:6 135:5
138:22 141:11 198:19
**slowed** 89:19
**small** 137:3
**SMITH** 1:15
**Snapchat** 45:1
**social** 32:6, 9, 15 33:25
34:1 39:20, 24 40:4, 7, 11,
19, 22, 23 41:9, 12, 16
42:2 44:6 45:3, 7
**software** 13:8 41:17, 20,
22, 23
**Somebody** 32:5, 8 34:21
40:21 59:24, 25 64:24
76:5 104:5 125:17
173:21 174:13
**somebody's** 40:16
**someone's** 40:18
**soon** 106:12
**SOP** 12:5 93:24 94:3
97:5 128:10, 13, 14, 15, 16
129:11
**SOPs** 11:22, 23 91:18
94:8
**sorry** 16:9 24:1 112:2
124:22 131:7 135:20
138:9 159:16 167:20
173:7 180:24
**sort** 128:4
**sought** 181:3, 6
**source** 13:11
**sources** 10:21 95:14
**south** 51:7 129:25
**southeast** 23:15
**SOUTHERN** 1:1
**spate** 83:18 84:11
**speak** 85:10 110:9
126:10 144:22 168:15
169:10 186:8
**speaking** 136:25
**Speaks** 34:8
**Special** 6:15 51:11, 24
52:3 53:14 88:5 125:15
140:14
**specialized** 54:8
**specific** 42:6 61:9 88:2
95:20 99:12 156:6 159:6
160:11, 12, 17 193:21
196:9 198:9
**specifically** 18:25 24:1
32:1 39:6 92:23 94:8

**Case: 2:18-cv-01060-EAS-EPD Doc #: 141-3 Filed: 03/24/21 Page: 217 of 219 PAGEID #: 3798**

Deposition of Deputy Chief Kenneth Kuebler | Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

*100:7, 21* 156:4 157:*10*
160:*4* 164:*14* 166:7
169:*16* 176:2 182:22
187:*14* 191:2 195:20, *24*
**specifics** 126:*4* 177:7
187:*24*
**specified** 199:*17*
**spell** 39:*18*
**spelled** 6:*11*
**spend** 37:*23* 65:*21*
**spent** 105:*12, 20*
**split** 51:*3*
**spoke** 126:22 186:*10*
**spoken** 144:25
**spread** 119:*3*
**spreadsheet** 13:*19, 20, 23*
14:*3, 6, 8* 16:*13* 58:25
82:22 105:*8*
**spreadsheets** 142:*19, 22*
**Square** 3:*6* 175:*5*
**staff** 85:*3, 10, 12, 15, 18*
86:*4*
**Standard** 4:7 64:*11*
107:7 162:*14*
**Standards** 17:*16* 65:*18*
175:*9* 186:*3*
**start** 6:*23* 21:*11* 23:*21*
69:*23, 25* 70:2 77:23
81:2 91:*4* 110:*3* 131:*14*
**started** 38:22 103:*18*
**starts** 70:*3*
**State** 2:*6, 10* 6:*9* 47:*15*
160:*20* 199:*2, 5* 200:*12*
**stated** 34:*15* 147:*15*
177:*21*
**statement** 32:*20* 35:*13*
181:*23, 24* 182:*1* 183:*3, 7*
**statements** 29:22 182:6
184:*1, 3, 18, 20*
**STATES** 1:*1*
**statistical** 99:7
**statistics** 83:*10* 99:*15, 22*
102:7, *8, 13, 19*
**statute** 2:*5*
**stays** 81:*24*
**Ste** 3:*6*
**stealing** 198:*16*
**Steele** 124:*19*
**Stenotype** 199:*10*
**step** 36:*14* 76:*15, 20* 77:*4,
9, 10, 10* 79:*18*
**steps** 79:*20*
**stole** 30:*18*
**stopped** 133:*18* 152:*8*
**storage** 175:*12*
**stories** 197:*10*
**story** 28:6 181:*16, 18, 19,
24, 25* 182:2, *21*
**Street** 2:*9* 3:*15* 44:9, *10,*

*10* 54:*3* 129:25
**strictly** 40:7 41:*1, 3*
**Strike** 15:*21* 28:*4* 29:*14*
57:7 121:7 143:*15*
162:*19*
**struck** 125:*20* 137:*3*
**stuff** 6:*24* 40:*6, 8*
**Subdivision** 6:*16* 51:*12,
17, 24* 53:*15*
**subdivision's** 61:*15*
**subjected** 73:*21*
**subpoenaed** 9:*11*
**substance** 100:25
**substantively** 38:*12*
**substation** 88:2 129:25
140:*1* 175:*3*
**substations** 88:*5* 89:*4*
**success** 148:2
**sued** 46:*9*
**suffered** 27:*13*
**suggest** 35:*10*
**suggested** 35:*4*
**summaries** 68:*2, 10, 12*
**summary** 62:*6, 17* 68:*15*
102:*10, 17, 18, 21*
**summer** 33:*20*
**Sunbury** 29:*11*
**supervisor** 70:*4, 7, 15, 19*
71:2 72:*8, 9, 25* 73:*4, 14,
14, 24* 74:*1* 90:*16, 22*
176:*20, 22*
**supervisors** 73:*13* 91:*11*
**support** 50:6, *7* 191:*10*
**supported** 191:*10*
**suppose** 8:*14* 99:*11*
**Sure** 7:*14* 15:*5* 18:*16, 18*
25:*7* 32:*11* 36:*21* 40:*15*
42:*22* 48:*23* 57:6 66:*14*
88:*9* 90:*1* 91:*24* 92:*13*
94:*20* 96:6 101:*11*
103:*14* 142:*21* 148:*15*
150:2 191:*17* 192:*4*
195:2
**surmise** 114:*12, 19*
**surprise** 49:*1*
**surprised** 39:*4* 191:*4*
**surveillance** 67:*21*
**survive** 27:*8*
**suspect** 27:*15* 29:*14*
57:*16* 59:*23* 117:*10*
125:*20* 126:*24* 129:*9, 24*
130:*24* 142:*20* 176:*11*
187:*22*
**suspects** 128:*23, 24* 180:*14*
**suspect's** 128:25
**suspended** 58:*8* 198:*19*
**suspends** 67:*25*
**suspension** 58:*5* 77:*8, 11,
15, 16* 79:7, *10, 19, 22*
80:*1, 3, 7, 10, 11, 12, 19, 24*

81:*4, 8, 11, 12* 109:9
127:*4* 137:*13*
**sussed** 41:*3*
**sustained** 35:22, *23*
**SWAT** 51:25 52:*10* 62:*1*
**switch** 153:*4*
**switching** 28:*12*
**sworn** 6:*4* 199:7
**system** 67:22
**systems** 50:*5* 51:*21* 98:*1*

**< T >**
**Tackla** 2:*8*
**take** 6:22 41:*4* 53:*17*
106:*15* 117:*18* 139:*11*
143:2 192:2 196:*19*
**taken** 2:*5* 138:*1* 199:*16*
**takers** 51:*19*
**talk** 16:*8* 38:2 53:*18, 25*
61:*3* 84:*10* 94:5 165:*10*
178:*8, 9, 13*
**talked** 82:9 165:*14* 184:5
197:*19*
**talking** 7:*5* 23:22 40:*5, 9,
14, 15* 100:*10* 105:8
160:*19* 182:22
**tally** 131:25
**task** 166:*24*
**team** 54:7, *11* 165:*15*
190:6
**Technical** 50:*1, 3, 7*
**technicalities** 100:25
**technically** 129:*5* 152:*14*
**tedious** 110:*16*
**teleconference** 2:2
**tell** 7:*11, 16, 18* 17:7
23:*24* 26:6, *14, 18, 20*
29:*4* 30:*15* 31:25 32:7
33:*18* 40:*2* 41:*12* 53:*12*
61:*24* 87:*16* 90:*21* 106:2
115:7 117:*8* 121:7, *9*
123:*9* 125:*12* 130:22
136:*23* 140:*13* 147:25
149:*11* 156:5 169:*12*
170:5 175:*19* 176:*8*
185:*10* 196:20 197:*8*
**ten** 9:*15* 89:*11* 130:*3*
**term** 65:*20* 66:7
**terminated** 198:*17*
**termination** 77:*8, 11, 15,
16* 79:7, *10, 19, 23* 81:*5, 13*
**terminology** 149:*24*
151:*14* 193:*18, 21*
**terms** 28:*19* 38:9 86:*19*
100:*1* 143:25
**testified** 160:5
**testify** 7:*20, 25* 8:*13, 16*
9:*6, 11* 10:22 12:*16, 21*
19:*2* 47:7 110:*18* 167:25
168:*24* 169:22 199:*8*

**testifying** 9:*3* 18:*23, 24*
169:22
**testimony** 6:22 8:*8, 17*
10:*19* 17:*19, 25* 18:6, *9,
19* 28:*4* 153:*1* 157:*11*
169:*16* 182:*6, 18* 199:*9, 13*
**texted** 148:*15*
**Thank** 96:*24* 97:*19*
101:*4* 118:2 120:2, *18*
139:*4* 175:*4* 192:5
**Thanks** 128:*20*
**thing** 84:2 131:22 153:7
**things** 14:*23* 19:2 41:25
44:*4, 9* 45:*10* 56:*16* 57:2
75:*16* 82:*18* 103:*1, 1*
196:9, *21*
**think** 11:*24* 12:25 16:*15*
17:*5* 37:*10, 11* 38:*1, 24*
40:*18* 56:*23* 57:*12, 13*
58:*11, 21* 59:*24* 61:*21, 25*
81:*20* 82:*10* 87:6 91:*13*
93:*11* 117:*16* 119:*3*
125:*20* 128:*11* 129:*21*
179:*15* 183:25 184:*1*
192:2 195:*24* 196:8, *9, 11*
198:*3, 9, 9*
**thinking** 11:*14*
**third** 18:*8* 49:*15, 16*
77:*10* 108:*15* 112:23
119:*17* 120:*13* 123:*16*
176:*13* 193:*18*
**Thomas** 136:*21*
**thorough** 35:*17* 68:*14, 17*
**thought** 38:*23* 45:*12, 14,
23* 181:*8* 198:*10*
**threat** 57:*23* 181:*13*
192:*23* 194:*16*
**three** 6:*21* 9:*3* 17:*19*
18:*25* 19:*1* 31:*4* 49:*19*
51:*8* 63:*8, 20* 64:2 65:*19,
20, 23* 66:*6, 18* 67:*1, 2, 2,
9* 94:5 108:*17, 18* 132:2
134:*15* 136:*8* 139:*23*
142:9 149:*21* 151:2
154:*10* 174:*18*
**throw** 77:*14*
**Thursday** 9:*16* 147:*13*
**ticket** 31:*11, 15, 17, 20, 21*
47:*20*
**tidied** 56:22
**time** 20:*12* 21:*1* 29:*3, 4*
31:*1* 37:*24* 39:*15* 48:5
50:*4* 53:*13* 54:*3, 6* 56:*14*
61:*21* 62:*19* 64:*17, 17*
65:*12, 21, 22* 67:*23* 76:*23*
78:*25* 80:*2, 4, 5, 5, 9* 82:2,
*4, 24* 85:*11, 12, 15* 88:*20*
89:*6, 7* 94:*3* 101:*15*
102:*4, 13* 104:*23* 105:*12,
21* 107:*1, 22* 109:*5*

**Case: 2:18-cv-01060-EAS-EPD Doc #: 141-3 Filed: 03/24/21 Page: 218 of 219 PAGEID #: 3799**

Deposition of Deputy Chief Kenneth Kuebler    Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

114:*20*  121:*7*  123:*13, 25*
124:*11*  132:20  134:*3*
135:*1, 8*  137:22  138:*19*
142:5  143:*21, 22, 23*
147:*10, 21*  149:9  150:25
151:*24*  153:*11, 13*  154:*18*
161:*15, 20*  164:8  190:2, 7
193:*13*  198:16  199:*17*
**timed** 65:*16*
**times** 24:6  26:25  27:22
29:2  45:25  46:*11*  58:*11*
61:*24*  64:*24*  85:*1, 2, 5, 7*
94:*11, 16, 22*  95:3  111:*24*
112:*3, 7, 11, 15*  123:20
134:*11*  141:8  173:*24*
174:*16*  197:25  198:*10, 20*
**timing** 64:20
**Timothy** 132:*11*
**title** 6:*13*
**today** 6:*21*  7:*15, 18, 20,
23*  8:*1, 13*  9:*3, 14*  17:*18*
20:*23*  33:*24*  35:6  76:*17*
78:*22*  82:*13*  86:8  94:5
96:5  97:*12*  110:*18*  156:*5,
9*  157:*11*  168:*1, 12*  170:5
185:9  188:4  198:*23*
**today's** 10:*16*  20:*22*  21:2
**told** 21:*4*  32:*11, 17, 18*
33:*7*  40:*20*  48:5  59:*4*
60:*12*  74:6  108:*10*
143:*12*
**tomorrow** 76:*18*  78:*23*
**tomorrow,** 78:*23*
**tools** 83:*15*
**top** 41:*15*  56:*25*  57:*12*
61:*25*  77:*23*  117:*25*
129:*16*  132:*10*  139:*23*
145:22  150:*15*  166:*11*
172:*1*  176:*14*
**topic** 26:8
**topics** 96:5
**track** 71:6, 8  98:*12, 22*
**tracked** 82:*21*
**tracks** 71:5  82:*24*
**Traditionally** 16:5
**traffic** 31:*11, 15, 17, 19, 20,
21*  47:20  51:*21, 23*  52:*19*
152:8
**training** 21:22  52:*3, 6*
55:*14*  73:*14, 16, 17*  82:*17,
19*  83:*4, 7, 15, 21, 25*
84:*17*  86:*23*  87:*19*  96:*24*
97:*3, 10*  99:*23, 24*  109:*11*
117:*5, 15, 20*
**trainings** 84:2
**transcribed** 199:*11*
**Transcript** 5:2  7:7  68:*15*
168:*9, 11*  177:*19*  186:*13,
16*

**transcription** 199:*13*
**transcripts** 67:*17*  68:9, *11*
**trap** 88:9, *10, 18*  89:*1, 5,
8, 9, 14, 15, 22*  129:22
175:*3*
**treeline** 140:*15, 17, 19*
**trend** 84:*4, 11*
**trends** 82:*17, 21*  83:*3, 7, 9,
11*  84:*24*  86:*17*  99:5
**trial** 47:*10*
**tried** 108:*4*  137:*1*
**tries** 61:*18, 25*
**tripped** 152:*20*
**true** 84:5  167:*24*  199:*12*
**truth** 7:*16, 18*  199:8, *8, 9*
**truthfully** 7:*21*  8:*1*
**try** 65:6  86:*24*  89:*16*
90:*14*  125:*17*
**trying** 57:*12*  166:*23*
**tune** 56:*15*
**Tweet** 34:*2, 5, 9, 12, 19*
35:*4*  39:*6, 13*
**Twitter** 39:*16*  40:*1, 2*
41:*13, 14*  42:9, *10*  43:7
**two** 9:*23*  14:22  22:7, *11,
13*  23:5, *8, 10, 14, 16, 21,
24*  24:*8, 16, 22*  25:*1, 13*
26:*22*  27:*20*  29:*11*  30:7
41:*13*  50:9, *25*  51:8
52:*15*  64:*4*  67:*1*  72:*4*
101:*13*  112:*19, 23*  114:*4,
14*  119:*4, 11*  122:*18*
127:*20*  129:*19*  131:*3, 4, 8*
132:*2*  134:*10*  136:5
139:*15*  142:5  146:*12*
149:*16*  157:*1*  161:*24*
171:*13*  174:*18, 23, 23*
176:*3*  198:*15*
**type** 44:*4*  59:*12*  84:2
91:*19*  133:*24*  184:*8, 12*
**types** 41:6
**typical** 180:9  182:*15*
**typically** 164:*19*  182:*10*
**TYREE** 1:2  9:*25*  10:*10*
18:8  20:*4*  22:*14*  143:*10,
17, 19*  145:*1, 5*  147:*17*
148:*18*  150:*18*  151:*4, 9*
153:*20*  154:*2, 3*  183:*18, 23*

< U >

**Uh-huh** 22:6  101:*14*
124:*20*  166:*13*
**ultimate** 62:*16*  74:20
90:*20*  189:9  190:*25*
**ultimately** 171:*4*  181:*16*
**unable** 195:*4*
**understand** 7:*8, 11, 15*
8:*3, 5, 7*  10:*18, 25*  13:5
17:*24*  18:*5, 9*  19:5  25:*10*
31:*10*  36:20  81:20  92:*12*

105:*20*  109:*1*  114:*8*
131:*13, 25*  153:*12, 24*
158:*7*  160:2  161:5
162:*19*  166:22  168:*23*
181:*17*  182:*15*  188:*12*
189:*17*  191:*17*  195:*14*
**understanding** 9:*10*  46:8
157:*13*
**understood** 7:*12*  168:*15,
17, 20*  169:*13*
**unfortunately** 137:*2, 3*
**unfounded** 35:22
**unidentified** 84:*12*
**unintentional** 59:*6, 7, 9, 22*
69:*11*  75:*16*  83:*18*  85:*8,
13, 24*  88:*14, 16, 25*  89:*4,
12, 20*  133:*10, 16, 18, 19*
134:*1, 5, 12, 19, 21*  135:*2,
10*  139:*16, 17, 22, 25*
140:*2, 6*  141:*9, 12*  142:6
**unintentionally** 83:*20*
**unintentionals** 84:*9, 10*
**unit** 22:24  51:*23*  52:*18*
87:*3*
**UNITED** 1:*1*
**units** 48:*12*
**unjustified** 38:*19*  181:9
183:*11*  184:*15, 24*
**unloaded** 88:2
**unnecessary** 183:*11*
184:*23*  198:2
**unpaid** 80:*3*
**unquote** 80:9
**unreasonable** 90:*15, 16, 22,
25*  91:*3, 12*  126:*1*
**unusual** 164:*16, 21*
**update** 190:8
**updated** 97:5  142:*19*
190:*12*
**Upper** 49:*13*
**usage** 32:6, *9, 15*
**use** 14:25  25:5  29:20
38:*19*  39:20  42:*12*  44:*2,
3*  45:*3*  48:*21*  54:*10*
57:*24*  58:*17*  59:*7, 8*
69:*10*  78:*25*  82:*11, 13*
88:20, *21, 22, 24, 25*  89:*8,
10, 14, 15, 22*  91:*16, 17*
92:25  93:*1*  98:*4, 4, 5, 6*
99:5  107:*11*  108:7
117:*12*  125:*18, 23*  129:22
133:*19*  138:*4*  150:6
171:*1*  172:*8*  174:*14, 15*
175:*3*  176:*9, 23*  191:*9, 11*
192:*11*  194:*2, 13, 18*
195:*18*  196:*12*
**uses** 23:*17, 25*  24:*8, 20, 24*
25:*9, 10, 11, 18, 25*  26:*14*
28:*8, 20*  30:9  34:25

58:20  98:*9, 22*  99:22
**usual** 165:*1*
**Usually** 15:*23*  63:20
66:*24*  102:8  164:20
177:20

< V >

**Vacation** 80:5, *9*  147:*13*
**vacillated** 50:*14*
**vague** 109:7
**Vaguely** 17:*23*  18:*4*
**Valiski** 114:6
**various** 88:7
**vast** 180:*13*
**vehicle** 26:*23, 24*  27:*3, 4,
5*  29:*10*  57:22
**versa** 69:*18*
**version** 41:*16*  97:6
**vice** 82:*14*  83:*2, 6*  84:*19*
85:*25*  86:*3*
**vice-chair** 98:*14, 17, 18*
**vice-chairperson** 104:*19*
**victim** 67:25
**video** 2:2  16:25  184:*8, 9,
10*
**Videos** 67:20, *21, 21*
155:*20*
**violated** 76:5
**violation** 57:*20, 21*  58:*13*
59:9  69:*12, 12*  72:*12, 12*
75:*7, 8, 17, 21*  92:2, 7
94:*19*  133:20, *21, 22*
138:*3*  139:*17*  142:*1*
150:7  151:*15*  152:8
155:*23*  156:2  157:*18, 25*
158:*11, 20*  163:20  164:*15*
167:*2, 9, 11, 16*  169:9
171:*2, 4, 12*  172:*14*
176:*10, 16, 24*  177:*4, 8*
187:*16*  189:*23*  190:*3*
**violations** 55:*2, 7*  91:22,
*25*  92:*10, 18, 20, 24*
**vise** 69:*17*
**Vollmer** 190:*6*

< W >

**Wait** 59:*13*  101:22, *25*
131:*3*
**waiting** 102:*1*
**walk** 41:24  54:2  179:6
**wall** 89:5
**want** 16:*10*  18:*16, 18*
23:5  26:*14*  28:5  37:23
44:15  54:2  56:22  57:*11*
66:*16*  74:*15*  78:*13*  84:*1*
88:*21*  100:2, *25*  101:*23,
24*  105:*21*  121:*10*  130:*21*
150:2  191:*17*  192:2
**wanted** 56:*25*  62:*17*

Case: 2:18-cv-01060-EAS-EPD Doc #: 141-3 Filed: 03/24/21 Page: 219 of 219 PAGEID #: 3800

Deposition of Deputy Chief Kenneth Kuebler | Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

76:25  86:6  106:5
**wants**  61:3  67:11  159:15
**watch**  99:5
**watched**  184:8
**watching**  39:14
**way**  28:12  37:25  60:15
73:8  74:4, 18  100:5
106:2  108:12  111:12
113:24  121:20  141:1
152:21  163:22  173:22
196:15
**ways**  84:23
**weapon**  55:13  91:23
138:6, 12
**weapons**  87:20
**weather**  38:18
**web**  9:15
**website**  45:20
**week**  9:16, 17, 18  147:12
**weeks**  31:4  184:4  198:19
**weigh**  80:13
**well**  18:10  32:17  37:17
40:10  57:9  64:18  66:6
67:12  75:6  82:10  84:16
87:4  101:12  107:19
132:4, 21  191:20
**went**  47:10  62:8  87:19
89:16  117:16  153:20
164:25  171:11  174:2
175:7  179:7  180:14
191:18
**we're**  6:21  16:8  17:18
18:17  38:2  40:4, 6  53:25
94:5  96:9  100:7, 15, 24
101:3  105:24  110:17
124:18  132:9  134:10
135:13  139:4  143:7
162:4
**Wes**  9:2  19:6  40:18
95:24  100:1  159:19
**west**  26:22
**Westley**  3:13
**we've**  100:10  101:25
142:22  169:4
**whatsoever**  63:12  70:24
98:2  173:6  195:25
**whiz**  140:17
**Windsor**  29:6
**wish**  89:22
**wishes**  76:9  159:3
**witness**  2:3  6:4  10:19
20:19  61:4  62:7  67:16
169:17, 25  170:1  199:6,
10, 11, 14  200:4
**witnesses**  35:18  62:3
67:25
**Wmphillips@columbus.gov**
3:17
**woman**  63:22

**Word**  63:14  133:18, 19
150:3  151:13
**wording**  129:10  159:25,
25
**words**  39:3  59:8  78:9
98:6
**work**  36:11  42:1  48:8, 8,
10  61:11  76:17  78:22, 23,
23, 25  80:20  100:8  188:10
**worked**  21:18  23:10
48:11
**working**  125:16  140:14
**works**  48:2
**world**  46:25
**worried**  40:6
**worth**  79:25
**wound**  137:8
**wrap**  192:3
**write**  7:7  67:6, 12  78:8
104:9  126:5  172:3
**writer**  66:24  67:8  68:19
104:6  149:13
**writes**  68:19
**writing**  68:3  76:18
164:22
**written**  14:14  33:4  45:19
46:3  76:9  77:1, 3, 10, 14,
20  78:1, 4, 11, 13, 16  79:1
81:22  88:15  89:2, 13
91:3  94:7  107:3  129:20
150:15  175:15  191:15
**wrong**  91:23  189:11
**wrote**  41:23  166:3, 4
170:12  172:11  179:8

**< Y >**
**yeah**  9:18  10:5  12:2
19:5  40:13  76:14  100:14
102:24  123:7  136:18
138:10  167:21
**year**  14:24  32:13  49:6
65:20, 23  66:6  82:2, 5
89:20  94:16  100:11
101:12, 18  113:16  122:20
135:7
**years**  22:19  23:5, 6, 10, 11,
22  41:19  42:7, 8  45:22
48:4  49:3, 19  50:9  51:2
53:12  64:24  65:20  82:1
83:12, 19  89:3, 12, 12
98:23  101:13  110:17
112:10  122:21  126:3
133:23  169:12  170:24
**Yep**  120:15
**yes,**  179:23

**< Z >**
**zero**  89:20  94:15
**zone**  22:7, 7, 9, 13, 15, 17
23:7, 8, 8, 10, 10, 14, 14, 16,

16, 21, 24  24:8, 16, 22
25:1, 13, 24  26:15  49:15
99:19
**zones**  23:19  51:8  99:5,
16, 17, 22, 24
**Zoom**  6:24  7:4, 10