Case: 2:18-cv-01060-EAS-EPD Doc #: 141-5 Filed: 03/24/21 Page: 1 of 166 PAGEID #: 3803

Deposition of Deputy Chief Richard Bash          James J. England, vs. City of Columbus, et al.,

```
1                IN THE UNITED STATES DISTRICT COURT
                    SOUTHERN DISTRICT OF OHIO
2                        EASTERN DIVISION

3
                            - - - -
4
     DEARREA KING, Adm., of the  )
5
     ESTATE OF TYREE KING,       )CASE NO. 2:18CV1060
6
               Plaintiff,        )JUDGE EDMUND A. SARGUS, JR
7
     -V-                         )CHIEF MAG. JUDGE ELIZABETH
8
     THE CITY OF COLUMBUS, et al,)P. DEAVERS
9
               Defendants.       )
10
11                       - - - o0o - - -
12   CHRISTOPHER M. COOPER, Adm.,)
13   Of the ESTATE OF DEAUNTE    )CASE NO. 2:19CV3105
14   BELL-McGREW,                )
15             Plaintiff,        )JUDGE GEORGE C. SMITH
16   -V-                         )CHIEF MAG. JUDGE ELIZABETH
17   THE CITY OF COLUMBUS, et al,)P. DEAVERS
18             Defendants.       )
19                       - - - o0o - - -
20   JAMES J. ENGLAND,           )CASE NO. 2:19CV1049
21             Plaintiff,        )JUDGE SARAH D. MORRIS
22   -V-                         )MAGISTRATE JUDGE KIMBERLY
23   THE CITY OF COLUMBUS, et al,)A. JOLSON
24             Defendants.       )
25
```

EXHIBIT
Pl. Ex. 5

1                        - - - o0o - - -

2          The video teleconference deposition of DEPUTY CHIEF

3     RICHARD BASH, a 30(b)6 witness herein, being called by

4     the Plaintiffs as if upon cross-examination under the

5     statute, and taken before Megan A. Medved, a Notary

6     Public within and for the State of Ohio, pursuant to the

7     agreement of counsel, on Wednesday, December 16th, 2020,

8     at 10:30 a.m., at the Offices of Tackla Court Reporting,

9     LLC, 1020 Ohio Savings Plaza, 1801 East 9th Street, City

10    of Cleveland, County of Cuyahoga, and the State of Ohio.

11                        - - - -

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1    APPEARANCES:

 2    On behalf of the Plaintiff:

 3         By:   Jacqueline Greene, Esq.

 4               Sarah Gelsomino, Esq.

 5               Friedman & Gilbert

 6               55 Public Square, Ste. 1900

 7               Cleveland, Ohio 44113

 8               Jgreene@f-glaw.com

 9               Sgelsomino@f-glaw.com

10               (216)241-1430

11

12    On behalf of the Defendants:

13         By:   Theresa Dean, Esq.

14               City of Columbus, Assistant City Attorney

15               77 North Front Street

16               Columbus, Ohio 43215

17               Wmphillips@columbus.gov

18               (614)645-6959

19

20

21

22

23

24

25
```

```
 1                            INDEX

 2    APPEARANCES ...................................... 2

 3    DEPUTY CHIEF RICHARD BASH

 4    CROSS-EXAMINATION BY MS. GREENE ................... 5

 5    REPORTER CERTIFICATE ..............................

 6    EXHIBITS:

 7    Plaintiff's Exhibits 1 through 16.

 8    PLAINTIFF'S:

 9    1. Mason, 9/19/2016 - Return to Work Recommendation . 57

10    2. Mason 10/11/2006 - Notification of Psych Eval .... 62

11    3. Special Examinations - 2012 ..................... 72

12    4. Special Evaluations - 2013 ..................... 73

13    5. 2016 Tracking .................................. 74

14    6. Abel - Failure to Meet Med Requirements ......... 81

15    7. Narewski Polygraph ............................. 86

16    8. Abel IAB History .............................. 111

17    9. Baase IAB History ............................. 123

18    10. Narewski IAB History ......................... 130

19    11. Mason Hiring Polygraph ....................... 135

20    12. Mason - Background Removal of Applicant ........ 136

21    13. Removal Standards ............................ 138

22    14. CDP Notice of Removal ........................ 140

23    15. Mason - Notice of Decision ................... 141

24    16. Mason IAB History ........................... 145

25
```

```
 1              P-R-O-C-E-E-D-I-N-G-S

 2                      - - - -

 3         DEPUTY CHIEF RICHARD BASH, of lawful age, a

 4      witness herein, having been first duly sworn, as

 5      hereinafter certified, deposes and says as follows:

 6                      - - - -

 7      CROSS-EXAMINATION OF DEPUTY CHIEF RICHARD BASH

 8   BY MS. GREENE:

 9   Q.     Good morning.  I'm Jacqueline Greene.  I'm one

10   of the attorneys representing the Plaintiffs in three

11   cases that you're here today to testify about.  Before

12   we get going, I'll ask you to please state and spell

13   your name for the record.

14   A.     My name is Richard, R-I-C-H-A-R-D.  Last name is

15   Bash, B-A-S-H.

16   Q.     Okay.  Thank you.  Now, I'm sure your attorney

17   has gone over with you the rules of how to handle a

18   deposition, and I assume you've been deposed before, is

19   that right?

20   A.     Sadly, that's correct.

21   Q.     So, this is not your first time at the rodeo,

22   but nonetheless, I'll go through some ground rules

23   before we get started.  First, we are on Zoom.  You

24   understand that you're here to testify today under the

25   penalty of perjury, right?
```

Deposition of Deputy Chief Richard Bash      James J. England, vs. City of Columbus, et al.,

| | |
|---|---|
| 1 | A.  Yes. |
| 2 | Q.  And as we go forward I ask that we speak one at |
| 3 | a time.  Please let me finish my questions before you |
| 4 | start speaking, or if Theresa objects, please let her |
| 5 | finish her objection before you begin your answer. |
| 6 | Okay? |
| 7 | A.  Okay. |
| 8 | Q.  All right.  And I ask that you answer every |
| 9 | question orally.  Please don't nod or shake your head. |
| 10 | We need a clean record for Megan today, so every answer |
| 11 | will have to be verbal.  Okay? |
| 12 | A.  Okay. |
| 13 | Q.  And as we move forward, we are on Zoom, and as |
| 14 | we already know this morning there's always the |
| 15 | possibilities of tech issues.  So, if you have any tech |
| 16 | issues as we go forward, if my voice drops out, or |
| 17 | whatever it may be, please let us know right away. |
| 18 | Okay? |
| 19 | A.  Okay. |
| 20 | Q.  And if you answer a question that I've asked |
| 21 | you, I'm going to assume that you understood the |
| 22 | question.  If at any point you need clarification or if |
| 23 | you need me to restate the question, or rephrase the |
| 24 | question, please let me know.  Okay? |
| 25 | A.  Okay. |

1  Q.      If you need a break, that's fine.  Just go ahead

2  and let us know.  I just ask that if I have a pending

3  question that you answer any question that's pending

4  before we take a break.  Fair enough?

5  A.      Okay.

6  Q.      Before we get started, are you affected today by

7  any medical or other issues that might affect your

8  ability to testify accurately or truthfully?

9  A.      I am not.

10  Q.      Okay.  What's your current rank?

11  A.      Deputy Chief.

12  Q.      And you're a Deputy Chief of the Columbus

13  Division of Police, correct?

14  A.      That is correct.

15  Q.      And you understand that you're here to testify

16  today in the cases of Cooper v. Columbus, et al; England

17  v. Columbus, et al; and King v. Columbus, et al,

18  correct?

19  A.      The only one that I have here is Cooper v.

20  Columbus, et al.  Unless it was sent to me separately, I

21  don't have any other ones.

22  Q.      Do you understand that you're here today to

23  testify in three separate cases, though?

24  A.      I did not know that.  I apologize.  I guess I

25  just printed out the one.  I do understand that now.

```
 1   Q.      Okay.  So the three cases that I just named

 2   you're here today to testify about and they pertain to

 3   the police involved shootings of James England, Deaunte

 4   Bell-McGrew and Tyree King, correct?

 5   A.      Correct.

 6                   MS. GREENE:  Let's go off the record

 7   for a second.

 8                           - - - -

 9      (Thereupon, an off-the-record discussion was held.)

10                           - - - -

11                   MS. GREENE:  Back on the record.

12   BY MS. GREENE:

13   Q.      Okay.  Deputy Chief Bash, you're here in your

14   official capacity as a representative of The City of

15   Columbus to testify today, correct?

16   A.      Correct.

17   Q.      And you understand that you've been designated

18   by the city to provide binding testimony on behalf of

19   the city today, correct?

20   A.      Correct.

21   Q.      Okay.  And you have been designated by the city

22   in each of the three cases to testify in relation to

23   topics named in a Notice Rule of Civil Procedure 30(b)6

24   Depositions.

25                   MS. GREENE:  And I'll ask Theresa if
```

1  we could just stipulate on the record to the topics that

2  Deputy Chief Bash is testifying to, so I don't have to

3  go through the notices.

4                    MS. DEAN:  Yes.  That's fine.

5                    MS. GREENE:  Okay.  So, the defense

6  agrees then, that Deputy Chief Bash is here today in

7  Cooper v. Columbus, et al, England v. Columbus, et al,

8  and King v. Columbus, et al, in topics three and four of

9  the notices of 30(b)6 deposition in each of those cases,

10  correct?

11                    MS. DEAN:  That's correct.

12                    MS. GREENE:  Thank you.

13  BY MS. GREENE:

14  **Q.      And these notices have been previously marked in**

15  **prior depositions in the deposition of Robert Meader, so**

16  **I won't have you look at them today.  But, as we go**

17  **forward, you understand that the topics that you are**

18  **here to testify on are the Columbus Division of Police's**

19  **hiring, discipline, and supervision of Matthew Baase,**

20  **John Narewski, Bryan Mason, and Keith Abel, correct?**

21  A.      Correct.

22  **Q.      And you also understand that you're here to**

23  **testify about the Columbus Division of Police's**

24  **psychological evaluations and fitness for duty**

25  **evaluations of those same police officers, correct?**

1    A.      Correct.

2    Q.      **Deputy Chief Bash, what did you do to prepare**

3    **for this deposition?**

4    A.      I read the attached documents that were sent to

5    me by Michael Halloran in regards to these complaints.

6    Q.      **What documents were those?**

7    A.      So on the first page they are The Notice of

8    Depositions for these three cases.  I have a training

9    report for each of these officers.  We have involved

10   shooting preliminary progresses, but that wouldn't be

11   applicable to three and four.  We have the IAB printout

12   for the officers.  We have hiring packages for the

13   officers, such as letters of conditional offer, board

14   evaluations, background investigations, appeals.  Those

15   are amongst the plethora that I have.  Do you want me to

16   list them all?

17   Q.      **Yes, please.  Thanks.**

18   A.      So, Cooper v. Columbus Notice of Deposition.

19   England v. Columbus Notice of Deposition.  King v.

20   Columbus Notice of Deposition.  Training report for

21   Officer Abel.  Training status for Officer Abel.  IAB

22   history for Officer Abel.  Background investigation for

23   Officer Baase.  Database and work history of Officer

24   Baase.  IAB history of Officer Baase.  Performance

25   evaluations for Officer Baase.  A background file for

1    Officer Narewski.  Database and work history for Officer

2    Narewski.  IAB history for Officer Narewski.

3    Performance evaluation for Officer Narewski.

4         I have a letter from a psychologist in regards

5    to Officer Mason.  I have preliminary progress for

6    Officer Mason, a police involved shooting.  We have the

7    second progress in that police involved shooting, a

8    third progress, a forensic progress and final progress

9    for that police involved shooting.  We have also the

10   routing sheet for that police involved shooting, and the

11   Firearms Review Board disposition for that police

12   involved shooting.

13        We have a hiring -- sorry.  This is the letter

14   from the psychologist in regards to Officer Mason.  IAB

15   printout for Officer Mason.  A copy of the routing sheet

16   for use of firearms for Officer Mason.  A copy of a

17   routing sheet for a use of firearm for Officer Mason.

18   The offer of employment for Officer Mason.  A copy of a

19   routing sheet involving Officers Brumfield and

20   Worthington.  A copy of a routing sheet involving a

21   police involved shooting for Officer Mason.  The

22   Firearms Review Board disposition for that use of

23   firearm from Officer Brumfield, Mason, and Worthington.

24   A police involved shooting progress involving that same

25   incident with Officers Brumfield, Worthington, and

1    Mason.  Preliminary investigation involving those.  A

2    forensic summary involving those.  A copy of a routing

3    sheet also involving a police involved shooting

4    involving Officer Mason.  The disposition from the

5    Firearms Review Board in the police involved shooting

6    involving Officer Mason, and the final summary for the

7    police involved shooting with Officer Mason.

8           I have a routing sheet for a police involved

9    shooting involving Officer Mason.  I have another

10   routing sheet for a police involved shooting with

11   Officer Mason.  The Firearms Review Board disposition of

12   Officer Mason's police involved shooting.  A preliminary

13   summary for a police involved shooting involving Officer

14   Mason.  A forensic summary, the final summary of the

15   police involved shooting of Officer Mason.  A medical

16   document.  I think that's the request for proposal for a

17   preemployment physical.  I believe that's just a blank.

18          A copy of Mason's invitation to take the stress

19   test.  A special exams document, that appears to be some

20   type of medical document that's redacted.  A similar one

21   for Officer Mason.  A copy of interrogatory responses in

22   the court case between King and Columbus, et al.

23   Another copy involving Officer Mason of the

24   interrogatories.  Personal history questionnaire of

25   Officer Mason.  Polygraph summary of Officer Mason.  A

1  copy of the removal standards from civil service in

2  place when Officer Mason was hired.  A memo to Officer

3  Mason of his removal from the hiring list.  A copy of

4  his appeal to be reinstated on the hiring list.  A copy

5  of his appeal granted to the hiring list.  Background

6  information from Officer Mason.  Oral board summary for

7  Officer Mason's hiring.  An evaluation from the oral

8  board for Officer Mason.  This one is from Sergeant

9  Weekly evaluating Bryan Mason to become a police officer

10  and also another evaluation from Officer Wolfenbogger.

11  His letter of conditional offer from then safety

12  director Mitchel Brown, and a letter about his medical

13  exam and stress test, and an invitation to take the

14  stress test.  I believe that's everything that I have.

15  **Q.      Okay.**

16  A.      That's a lot.

17  **Q.      It is a lot.  You reviewed all of this in**

18  **preparation for your deposition today?**

19  A.      I looked over it all, yes.

20  **Q.      And normally we would be sitting in a conference**

21  **room across the table from each other and you would have**

22  **brought this file with you.  In a sense you're bringing**

23  **it with you on your computer today, right?**

24  A.      Sure.

25  **Q.      Let's see here.  I guess, in the deposition**

Deposition of Deputy Chief Richard Bash       James J. England, vs. City of Columbus, et al.,

 1  notices that you just listed as some of the documents

 2  that you reviewed, did you see in the notice where it

 3  states that the person designated should produce at

 4  least two days before the depositions any and all

 5  documents related to the topics for which you're

 6  designated to testify?

 7  A.     Apparently I missed that.  I could e-mail these

 8  to you, if you would like.

 9  Q.     That's exactly what I was going to ask you to

10  do, send all of those in an e-mail if you don't mind?

11  A.     Sure.

12              MS. DEAN:  I've got them.

13              MS. GREENE:  That would be great,

14  Theresa, so he doesn't have to worry about it.

15              MS. DEAN:  They've all been produced.

16              MS. GREENE:  I assumed as much, but

17  it's always best to do a double-check.

18              MS. DEAN:  Sure.

19              MS. GREENE:  Thank you.

20  BY MS. GREENE:

21  Q.     Okay.  So, beyond all the documents that we just

22  went through, which were quite numerous, to your

23  knowledge, have all the documents that are relevant to

24  the topics that you're here today to testify on been

25  previously produced to the Plaintiff through your

1   counsel?

2   A.      To my knowledge, yes.

3   Q.      Okay.  And did you do anything to look for any

4   other responsive documents in relation to the topics

5   that you're here to testify on today before the

6   deposition?

7   A.      No.

8   Q.      Okay.  You understand that 30(b)6 witnesses do

9   have a duty to search for and produce relevant documents

10  for the topics that they're designated to testify on,

11  correct?

12  A.      Yes.

13  Q.      Okay.  How long did you spend reviewing the

14  documents that you just listed for me a moment ago?

15  A.      Maybe an hour.

16  Q.      Okay.  And did you meet with any attorneys to

17  prepare for your deposition today?

18  A.      Not in-person.

19  Q.      Via Zoom?

20  A.      Yes.  Zoom.

21  Q.      How long was that meeting or meetings?

22  A.      Maybe an hour.

23  Q.      And did you speak with anybody else other than

24  your attorney about today's deposition?

25  A.      About the specifics or about it occurring?

1  Q.      Either.

2  A.      Well, my supervisor knows that I'm being deposed

3  today as do the rest of the executive staff, and so, I

4  don't know.  Maybe six or eight people know that I'm

5  being deposed about these cases.

6  Q.      Did you discuss any of the substance of what

7  your testimony would be today with those people or

8  anybody else?

9  A.      No.

10  Q.      Okay.  Can you please give me your educational

11  background?

12  A.      I have a bachelor's degree in political science,

13  and a master's degree in management.

14  Q.      Where is your bachelor's from?

15  A.      That's from Ohio Dominican University.

16  Q.      What year?

17  A.      I graduated in 2002.

18  Q.      And for your master's in management where is

19  that from?

20  A.      Mount Vernon Nazarene in 2012.

21  Q.      Okay.  And what year did you begin working for

22  the Columbus Division of Police?

23  A.      1989.

24  Q.      And you came on as a patrol officer?

25  A.      I came on as a recruit in the academy.

1  **Q.      Can you briefly go over for me your history of**

2  **promotion within the department including the ranks and**

3  **the year that you were promoted?**

4  A.      Sure.  In 1997 I was promoted to the rank of

5  sergeant.  In 2002 I was promoted to the rank of

6  lieutenant.  In 2004, I believe, I was promoted to the

7  rank of commander.  And in 2010 I was promoted to the

8  rank of duty chief.

9  **Q.      And what's your role in the organizational**

10  **structure in the Columbus Division of Police today?**

11  A.      Currently I'm the Deputy Chief in charge of the

12  Public Accountability Subdivision, which includes

13  internal affairs, professional standards, human

14  resources, and fiscal operations.

15  **Q.      And what duties do you have in that role?**

16  A.      I supervise two police commanders and two bureau

17  managers in the operations of Internal Affairs,

18  professional standards, and fiscal operations and also

19  human resources.  The roles are just everything that a

20  supervisor would do, ensuring that all of those have

21  smooth and efficient operations.

22  **Q.      Do you oversee in that capacity -- well, strike**

23  **that.  Can you explain to me more what your specific**

24  **duties are -- I think you named four different areas**

25  **essentially that you're supervising, right?**

```
 1   A.      Right.  So let's talk about Internal Affairs
 2   then.  Specifically there's a commander in charge of
 3   Internal Affairs.  I direct his work and help him
 4   prioritize investigations, answer his questions,
 5   although I don't rule on very many Internal Affairs
 6   investigations because that goes to the chain of command
 7   of the involved officer.  Professional standards
 8   involves staff inspections, our accreditation unit,
 9   research and development, and also our grievance liaison
10   lieutenants, who are basically the prosecuting attorneys
11   for disciplinary cases in front of the chief of police.
12   Fiscal operations handles expenditures, every
13   expenditure within the division of police.  Purchasing
14   and rental agreements and distribution of funds.  Human
15   resources involves employee benefits, hiring both
16   civilian, and hiring recommendations for sworn, and
17   assignments, transfers.
18   Q.      You said, "recommendations for sworn," you mean
19   sworn police officers?
20   A.      Sworn hires.  But we don't actually hire.  We
21   have an appointing authority, which is the director of
22   public safety.  We do handle the background
23   investigation and put those together for the director of
24   public safety to evaluated who he would choose to hire.
25   Q.      And ultimately you make a recommendation to hire
```

Deposition of Deputy Chief Richard Bash                    James J. England, vs. City of Columbus, et al.,

1    **individuals and the director of public safety then**

2    **reviews your recommendation?**

3    A.        We don't actually make recommendations.  We

4    grade them to determine whether or not this person is

5    acceptable, unacceptable, or with reservations.

6    **Q.        You mentioned earlier that in relation to your**

7    **role supervising the bureau of professional standards**

8    **that you oversee grievance procedures in relation to the**

9    **officers who you said are like prosecutors for**

10   **proceedings before the chief, is that right?**

11   A.        That's correct.

12   **Q.        And can you explain to me what your role in that**

13   **process is?**

14   A.        Actually, I have very little role in that

15   process.  The lieutenants work very closely to the chief

16   of police.  They're within my chain of command, but

17   they're working directly with the chief on grievances,

18   and drawing up departmental charges, and explaining

19   those charges to the chief, and, again, for lack of a

20   better term, prosecuting them to the chief.  I have very

21   little role in that unless they have a question about

22   what particular rule of conduct would be applicable to

23   something like that, but I very seldom need to do that

24   because they're quite seasoned in those roles.

25   **Q.        Do you provide any feedback or make any**

1    decisions in determining whether or not grievances

2    should be, for lack of a better term, prosecuted before

3    the chief?

4    A.       So, there's two different things that we're

5    talking about.  If you're talking about a grievance,

6    what specifically are you asking about, a grievance with

7    the chief?

8    Q.       Okay.  So, let's walk this back.  So, you

9    mentioned grievances and you mentioned the kind of

10   prosecutorial role, for lack of a better term, before

11   the chief.  In terms of proceedings before the chief,

12   what kind of things are being adjudicated in those

13   proceedings?

14   A.       Okay.  So, a grievance would be a grievance

15   against a decision that the chief made that person feels

16   is a violation of the contract.  The prosecutorial role

17   is more in a discipline hearing where an officer is

18   excused of misconduct, there's been an investigation and

19   it rises to the level of discipline where the chief of

20   police has to make an adjudication, they then present

21   that case to the chief from whatever entity conducted

22   the investigation.

23   Q.       So, there's a special unit of officers who

24   fulfill that role to prosecute cases that have gone

25   through either the chain of command review or some other

1   **process where there needs to be a adjudication about**

2   **whether or not a rule violation occurred before the**

3   **chief, is that right?**

4   A.      There are two lieutenants assigned to that task,

5   and they would present to the chief a finding of

6   misconduct that the chain of command found that would

7   rise to the level of discipline, which would be

8   departmental charges, that would require the chief's

9   adjudication, and they present that case to the chief.

10  **Q.      Okay.  So, how are cases brought to those**

11  **officers to proceed with prosecution, or whatever other**

12  **term you want to use?**

13  A.      That's okay.  That's a very good question.  The

14  chain of command would make a recommendation to the

15  chief of police to either deviate from progressive

16  discipline or follow discipline to the level of

17  departmental charges.  Departmental charges then require

18  a hearing in front of the chief of police.  That

19  investigation is then sent to these two grievance

20  liaison lieutenants.  That's their title.  They then

21  prepare the charges, brief the chief, and enable him to

22  hold a hearing for that officer who was determined by

23  their chain of command to have violated a rule of

24  conduct that was so serious it would result in

25  departmental charges.

1    **Q.    So, those people ultimately, I think you said,**

2    **brief the chief so that the chief can hold a hearing,**

3    **right?**

4    A.    Correct.

5    **Q.    Do they themselves present the case to the chief**

6    **in the hearing, or is their role advisory prior to the**

7    **hearing?**

8    A.    They present the information to the chief prior

9    to the hearing.  In the hearing itself they have very

10    little role.

11    **Q.    Okay.  And then, for grievances, we're talking**

12    **about Union contract violations alleged by the officer**

13    **for disciplinary decisions that have been made by the**

14    **chain of command and/or chief?**

15    A.    That is correct.

16    **Q.    And what's your role in overseeing that process?**

17    A.    Again, very little, unless they have some

18    questions.  There's a commander that is between the

19    grievance liaison lieutenants and myself.  So most of

20    the time that commander is able to answer those

21    questions.

22    **Q.    What kind of questions are we talking about?**

23    A.    Just an interpretation of the contract itself.

24    Is this applicable to this section of the contract or

25    this particular rule of conduct.  A consultation.

1  Q.      Now, with regard to Internal Affairs you help

2  prioritize investigations?

3  A.      Correct.

4  Q.      Can you explain that to me?

5  A.      For example, we may get a citizen complaint

6  involving an officer who is accused of domestic

7  violence.  Needless to say, we're going to move that

8  ahead of other investigations that have contractual time

9  limits.  That's, obviously, very important for us to

10 ensure that's adjudicated and investigated quickly, and

11 sometimes the other investigations have to be put on the

12 back burner that may have less serious ramifications if

13 found to be correct.  We have to prioritize everything.

14 Q.      And what are the criteria used to prioritize one

15 investigation over another?

16 A.      The seriousness of the allegation is important.

17 Timelines are important.  There's some cases that don't

18 have timelines.  Citizen complaints do have contractual

19 timelines.  Those are probably the two that are

20 predominate.  The seriousness of the allegation and the

21 necessity to follow a timeline.

22 Q.      What are the timelines for citizen complaints?

23 A.      I don't have it right off the top of my head,

24 but I'm pretty sure we have to complete those within 90

25 days.  I didn't bring my contract down with me.

Deposition of Deputy Chief Richard Bash                    James J. England, vs. City of Columbus, et al.,

1    Q.      That's okay.  Just curious.  Okay.  I think you
2    also might have said something about a chain of command
3    review in relation to your Internal Affairs capacity.
4    Can you explain that to me?
5    A.      Well, we don't get very many citizen complaints
6    against people in Internal Affairs, so I don't often
7    have to review those any longer in this capacity.
8    Q.      I see.  Okay.  So, your role in relation to
9    Internal Affairs primarily involves helping IA officers
10   prioritize the investigations of other officers, but in
11   that division itself, there's not very many officers, so
12   you don't have to participate in many chain of command
13   reviews, right?
14   A.      Correct.
15   Q.      Okay.  In terms of IA investigation of other
16   officers, do you have any other duties or roles that you
17   play?
18   A.      In the actual investigation?
19   Q.      In the investigation or the supervision of the
20   investigation or the people conducting the
21   investigation?
22   A.      I'll answer questions as they pop up, but I
23   can't think of any specific roles that I would have on a
24   regular basis every single time there's an
25   investigation, no.

1  Q.        What kind of questions pop up as investigations

2  come along?

3  A.        Well, there are times where there's a gray line

4  between whether something is criminal in nature or

5  administrative in nature, and we have to prioritize that

6  because of Garrity laws, and we want to make sure that

7  we're following something through as much criminally as

8  we possibly can.  The unfortunate thing is that criminal

9  cases take a very, very long time, and if it stems out

10 of a citizen complaint, we want to make sure that our

11 timelines are complete even though we can hold those in

12 advance.  But we also want to make sure that complainant

13 and the officer both have closure in a reasonable amount

14 of time, and unfortunately some criminal cases take a

15 very, very long time.  So, we want to make sure that any

16 investigation that we have we address completely and

17 thoroughly both administratively and criminally.

18 Q.        And IA conducts both the criminal and the

19 administrative investigations, right?

20 A.        Sometimes.  So, for example, if we're looking at

21 a theft in office case, we would utilize non-IAB

22 personnel who have more experience in investigations of

23 economic crimes than Internal Affairs investigators

24 would.  So it makes more sense to have someone who is a

25 practitioner who has investigated a number of theft in

```
 1   office type of cases do that criminal investigation, and

 2   then Internal Affairs would be the administrative

 3   portion.

 4   Q.      Okay.  Let me ask one more question about this

 5   background stuff.  You mentioned you also supervise the

 6   human resources department in the division, is that

 7   right?

 8   A.      The Human Resources Bureau, yes.

 9   Q.      Okay.  And part of that includes hiring of

10   civilians and recommendations regarding sworn officer

11   hirings, right?

12   A.      That is correct.

13   Q.      Can you explain to me what role you have in

14   relation to those particular tasks?

15   A.      Okay.  So, ultimately I supervise that entire

16   bureau, which includes the background investigators, the

17   polygraph operators, the manager who supervises the ORE

18   boards.  Ultimately, they will send me a package for the

19   perspective hire for me to review the documents, the

20   polygraph, the background investigations, the ORE board

21   recommendations.  And then, I recommend or put my

22   recommendations on there as to whether or not this

23   person is acceptable, unacceptable, or I have some

24   reservations about them becoming a police officer.

25   That's my role.
```

Deposition of Deputy Chief Richard Bash      James J. England, vs. City of Columbus, et al.,

1   **Q.    Okay.  What types of things will give you**

2   **reservations about a person becoming a police officer?**

3   A.    Honestly.  Criminal history.  Job evaluations.

4   References.  There's a number of things that, obviously,

5   would give me reservations about having someone as a

6   police officer that needs to have a very high standard.

7   **Q.    You mentioned honesty as one of those criteria**

8   **that might give you reservations.  How do you assess**

9   **honesty of a candidate?**

10   A.    The background investigation helps confirm some

11   statements made by the candidates, but we also utilize a

12   polygraph to confirm information that the candidate

13   would provide as well.

14   **Q.    Okay.  And then, through those avenues how do**

15   **you come to determine whether or not an officer**

16   **possesses the requisite level of honesty, or does not**

17   **possess that level of honesty?**

18   A.    My recommendation is based on any amount of

19   purposeful dishonesty or misrepresentation.  So if they

20   misrepresent anything in their background that's not

21   just a mistake, because people can forget what year they

22   had this job or that job, but if based on the

23   investigation and other information this person

24   purposefully was deceptive for any reason, then that's

25   going to be a person that I'm going to determine not to

1    be acceptable. And then, of course, that goes to the

2    director. They make that determination on ultimately

3    whether to hire them. That would just be my

4    recommendation.

5    **Q.      Why would that make them unacceptable as a**

6    **police officer?**

7    A.      Well, in my view, officers need to be trusted to

8    tell the truth even when it's an uncomfortable truth.

9    Officers testify in front of jurors. They testify in

10    front of judges. They have the authority to arrest

11    people and create affidavits. If that person has a

12    history of dishonesty, then it's going to be more

13    difficult for a jury and a judge, or anyone else, to

14    believe they're telling the truth.

15    **Q.      And it would be difficult for the division**

16    **itself to trust that that officer is being honest in the**

17    **execution of his or her duties and in his or her**

18    **reports, right?**

19            MS. DEAN: Jacqueline, I just want to

20    be clear that he's speaking now as obviously the deputy

21    chief, but I don't believe this is part of his 30(b)6 on

22    what he's here to testify about. So I'm not sure that

23    he can testify on behalf of the whole department. He

24    can testify as to what his experience is.

25            MS. GREENE: Sure. You know, I think

```
1    ultimately this does tie directly into one of the topics

2    and we can come more specifically to that in a moment,

3    but this is directly relevant to one of the topics that

4    he's here to testify to today as a 30(b)6 witness.

5                     MS. DEAN:  Our understanding was that

6    it's about like the hiring disposition and the

7    supervision of the specific individuals, and then the

8    psychology evaluations and fitness evaluations for those

9    specific individuals.

10                    MS. GREENE:  Right.  And this is

11   relevant specifically to Defendant Mason.

12                    MS. DEAN:  Okay.  I'm not arguing

13   about relevance.  I just want to make clear that he's

14   speaking specifically for the department at this point,

15   but on his behalf.

16                    MS. GREENE:  Okay.  We'll come back to

17   it when we're talking about Mason and ask these

18   questions specifically in relation to that particular

19   hiring.

20                    MS. DEAN:  Thank you.

21   BY MS. GREENE:

22   Q.      All right.  You also mentioned criminal history

23   as a category that could be considered in the

24   determination that person is not fit to become a police

25   officer.  Can you explain the criteria or the bar in
```

1    which conduct must rise to determine someone is not fit

2    to be an officer?

3    A.      Are you speaking specifically to the civil

4    service rules?

5    Q.      You mentioned criminal history earlier, so I

6    guess I'll ask you first to explain to me more what you

7    mean by that.

8    A.      Right.  So, if the person admitted to a theft

9    and they may never have been caught or charged with that

10   theft, or if a person admits to driving drunk on a

11   regular basis, or any of those things, that's the kind

12   of criminal history I'm talking about.  There's an

13   automatic disqualifier in civil service rules for

14   certain kinds of criminal conduct that the person was

15   charged with.

16   Q.      Okay.  Let's move on and talk about

17   psychological evaluations and fitness for duty

18   evaluations in the Columbus Division of Police.  In that

19   context at the CDP what are psychological evaluations?

20   A.      In what context?

21   Q.      Does the Columbus Division of Police administer

22   psychology evaluations to its officers?

23   A.      No, we do not.

24   Q.      Does the Columbus Division of Police administer

25   fitness for duty evaluations for its officers?

1    A.        We do not, no.

2    Q.        **Are there any kinds of psychological evaluations**

3    **conducted for Columbus Division of Police Officers at**

4    **the order of anyone in the division?**

5    A.        So, after an officer is involved in a critical

6    incident we order them to our psychological provider,

7    and that can vary because of contracts, and they're only

8    allowed to return to duty if that psychological provider

9    indicates that they're safe to do so.

10   Q.        **When you say "critical incident," what do you**

11   **mean?**

12   A.        A critical incident can be anything from being

13   in a serious car accident; to responding to a crime

14   scene involving multiple victims or children; to being

15   in a police involved shooting; to being a victim of

16   another crime themselves.  That's a pretty broad

17   spectrum.  The low hanging fruit is, obviously, a police

18   involved deadly use of force situation.  We make that

19   they go to see, and we order them to see a psychologist.

20   Q.        **And who orders those officers to the**

21   **psychologist?**

22   A.        Their commander.

23   Q.        **And so, that's the commander in their chain of**

24   **command?**

25   A.        Correct.

1  Q.      Okay.  So, how many commanders are there in the

2  Columbus Division of Police?

3  A.      Seventeen or 18.  Sorry.  I don't have that

4  memorized.

5  Q.      That's okay.  What does the order state when

6  it's issued from the command?

7  A.      So, the commander verbally tells them that they

8  will be going to the contracted psychologist and that

9  human resources, and we do have a person in human

10  resources, they will coordinate that appointment for

11  that particular officer.  And then that psychologist

12  will then in turn report to our designee in human

13  resources that this person is okay to return to duty.

14  That's all the information that we get.

15  Q.      Okay.  In terms of this order to the

16  psychologist for this evaluation, what's the term of art

17  that the Columbus Division of Police uses to describe

18  this process?  If it's not psychological evaluation,

19  what it is?

20  A.      We're ordering them to see our psychologist.

21  That's really -- I don't know that there's a technical

22  term or acronym for it.  We're just ordering them to see

23  our psychologist.

24  Q.      Okay.  If I use the term fitness for duty

25  evaluation, that's not a term that the Columbus Division

1    of Police uses?

2    A.       Not in this context.

3    Q.       Is there another context in which the CDP uses

4    that term?

5    A.       We do have fitness for duty evaluations for

6    individuals who are injured or off work due to injuries,

7    and there's minimum qualifications, and -- I forget.  It

8    escapes me, the terminology.  The essential job

9    functions that they have to be able to follow in order

10   to go back to full-duty.  That's the context that we

11   would use that terminology

12   Q.       So, fitness for duty in the Columbus Division of

13   Police really pertains to physical capacity issues, is

14   that right?

15   A.       Well, any number of other issues.  They don't

16   just have to be physical.  Are they capable of doing the

17   job function that we expect them to do.

18   Q.       Is there any psychological component to the

19   fitness for duty evaluation in the Columbus Division of

20   Police?

21   A.       There could be, yes.

22   Q.       Okay.  Fitness for duty evaluations that you

23   said are ordered to be conducted for officers who are

24   injured or off work due to injuries, right?

25   A.       Right.  Fitness for duty.  They're off-duty.

1  We're trying to determine whether they can return to

2  work now or really return to work ever.

3  **Q.       What would be the potential psychological**

4  **component of that assessment?**

5  A.       Well, if psychologically they are having

6  hallucinations, or unable to communicate orally.  Any

7  number of psychological types of things that would

8  inhabit someone from being able to effectively do their

9  job as a police officer.  Hallucinations obviously would

10  be something that would be problematic with that.

11  **Q.       Okay.  If those types of events are happening,**

12  **or have happened for an officer, is that officer then**

13  **also referred to the contracted psychologist that you**

14  **mentioned earlier for evaluation as part of a fitness**

15  **for duty evaluation?**

16  A.       Maybe.  It depends upon whether or not they have

17  their own psychologist that has been providing

18  information to us.

19  **Q.       Okay.  So, for the purposes of capturing what I**

20  **would like to ask you about today, can we agree to use**

21  **the term psychological evaluation to describe any time**

22  **that the division orders an officer to see a**

23  **psychologist for the purposes of evaluating that**

24  **officer's ability to do the job?**

25  A.       Sure.  I don't have a problem with that.

1  Q.      Okay.  Since there's no clear term of art that
2  you guys use?

3  A.      Right.

4  Q.      Okay.  So, can you please explain to me all of
5  the type of circumstances in which an officer would be
6  ordered to have a psychological evaluation by the
7  division?

8  A.      A police use of deadly force, such as a police
9  involved shooting.  If the officer is a victim of a
10 serious crime, such as if they were shot or shot at.  If
11 an officer is involved in a deadly crash with someone
12 else, obviously, if they're not the victim.  And then,
13 others would be at the discretion of the commander.
14 They're not automatic.  I mentioned that before.  If we
15 have an officer or officers who respond to a
16 particularly gruesome crime scene, we have the ability
17 to order them to our psychologist to ensure that their
18 mental health is in such a way that they can safely
19 return to work.

20 Q.      Okay.  Is there any criteria in place dictating
21 when a commander should exercise that discretion to send
22 an officer to a psychologist?

23 A.      We term it as a critical incident, and we depend
24 on commanders who have significant amounts of experience
25 to make that termination, because each and every

```
 1   critical incident is slightly different.  So, if you go
 2   to a crime scene and there's four adults that have been
 3   ejected from a van, or something like that, that may not
 4   necessarily have the same psychological impact on
 5   someone as if it was four children or infants.  It's
 6   really dependent upon the commander and their knowledge
 7   and their supervisor's knowledge of the officers to
 8   determine whether or not this is a situation where we're
 9   going to order them there.  There's some that are
10   automatic, as I mentioned, but there's a great deal of
11   discretion for others.
12   Q.      For the ones that are automatic, is that written
13   into a policy, or a directive somewhere?  Where is it
14   deemed that the particular events are automatically
15   referred to a psychologist?
16   A.      I believe that's in the directive for the police
17   involved shooting, but I don't have that in front of me
18   to confirm that.  But I know that is the practice, each
19   and every police involved shooting.
20   Q.      Okay.  So, for any police involved shooting that
21   a Columbus Division of Police officer is involved in, it
22   is the policy, practice, and rule in the division of
23   police that that officer will be referred for
24   psychological evaluation prior to returning to duty,
25   right?
```

Deposition of Deputy Chief Richard Bash      James J. England, vs. City of Columbus, et al.,

1    A.     No.  If a police officer has to fire his weapon

2    at a vicious animal, they're not going to be ordered

3    there.  If a police officer has to use their firearm

4    against an aggressive person and misses, they may or may

5    not be referred.  I think we're having more of a

6    standard practice where they are, but if their target is

7    struck, then, yes, they're absolutely required to go to

8    that psychologist now.

9    **Q.     Okay.  And when did that practice begin in the**

10   **division?**

11   A.     The requirement or -- I know there's been some

12   instances in the past where not every person has been

13   required to go, but I do know under our current chief

14   over the past two years, each and every one has been

15   required to go.

16   **Q.     Okay.  Well, can you explain to me from your**

17   **knowledge, I guess, and you've been in the department**

18   **for a number of years, the history of that practice?**

19   **Can you explain to me when it first started and at what**

20   **point any portion of it became mandated and how?**

21   A.     That was in effect from the time that I came on

22   in 1989, that officers involved in a deadly use of force

23   would be referring to our psychologists.

24   **Q.     And that's just if you hit a person you're**

25   **talking about right now, correct?**

Deposition of Deputy Chief Richard Bash                    James J. England, vs. City of Columbus, et al.,

```
 1   A.        I've never been involved in a police involved
 2   shooting.  I've never had to do that.  So, I would
 3   assume that when I came on in 1989 that that was the
 4   case.  That's what I was told in the academy, that if
 5   you were involved in a police involved shooting you'd be
 6   going to the psychologist.  But I don't know if that
 7   involved a shoot and miss or whatever.  So, as I became
 8   a supervisor as I went forward, especially as a
 9   commander, I required officers to go in almost every
10   case.  I didn't always require them to go if they
11   missed, if there was not a person that they struck at
12   that time, but now we're doing that for each and every
13   time a police officer pulls his trigger and it's aimed
14   at a human individual.
15   Q.        Okay.  And you said that change has been
16   mandated since the new chief became the chief?
17   A.        Correct.
18   Q.        And that's Chief Quinlin?
19   A.        Correct.
20   Q.        What year did Quinlin become chief?
21   A.        I believe it was February of 2020, but he was
22   the interim before that for about a year.
23   Q.        So you said approximately the past two years
24   that practice has been in place?
25   A.        Right.  There is not option to say, well, this
```

```
 1   person doesn't need to go or something like that.
 2   They're absolutely going.
 3   Q.      And before Quinlin became chief and this new
 4   mandated practice became involved, it was up to the
 5   commander's discretion in any circumstance that did not
 6   involve actually hitting a person as to whether or not
 7   the subordinate officer should have a psychological
 8   evaluation, is that right?
 9   A.      To be referred to the psychologist, that's
10   right.
11   Q.      Let me ask you this:.  You say referred to the
12   psychologist, and you guys don't call it a psychological
13   evaluation, right?
14   A.      I don't know what they do.  I've never been in
15   one, so I don't know what the psychologist is doing
16   there.  All I know is that the psychologist ultimately
17   tells us if this person is safe to return.  So, I guess,
18   it could be an evaluation, but I don't know what steps
19   happen.  We have to depend on them.
20   Q.      You mentioned that the psychologist used for
21   this purpose, there are contracts in place setting up
22   that relationship with the division, right?
23   A.      Right.
24   Q.      Does that contract layout what the psychologist
25   is supposed to be evaluating or assessing when they meet
```

Deposition of Deputy Chief Richard Bash          James J. England, vs. City of Columbus, et al.,

```
 1  with an officer?
 2  A.      I have not seen that contract nor have I been
 3  involved in the negotiation of those contracts.
 4  Q.      Do you have access to those contracts?
 5  A.      I probably could get one.  I would assume that's
 6  going to be a public record.
 7  Q.      And you didn't review those contracts in
 8  preparation for today's deposition?
 9  A.      No.
10  Q.      Okay.  So, how many psychologists does the
11  division work with to provide an assessment as to
12  whether or not an officer is fit to return to work?
13  A.      You mean how many psychologists would be in that
14  practice, or how many different are under contract?
15  Q.      How many are under contract at any given time?
16  A.      I don't know the answer to how many contracts we
17  have.
18  Q.      Is there more than one psychologist that the
19  division uses?
20  A.      Maybe.  I don't know if we have a contract with
21  a practice and they may have more in the practice.  I
22  don't know the answer to that.
23  Q.      Now, we talked about psychological evaluations
24  being conducted after a police involved shooting of the
25  types that we have already discussed.  Are psychological
```

1    evaluations conducted also at the time of hiring

2    officers?

3    A.       Yes.

4    Q.       And is that true for every officer who is hired?

5    A.       Every officer who is hired now?  I don't believe

6    that's been the case forever within the division of

7    police, no.  As a matter of fact, I'm positive that it

8    has not.

9    Q.       Do you know when the practice of conducting

10   psychological evaluations for potential hires began?

11   A.       I do not.

12   Q.       Was it within the last ten years?

13   A.       The only thing that I can answer, ma'am, is that

14   I did not take one when I came on in 1989, but I do know

15   that they're in place today.

16   Q.       And you don't have any knowledge as to when that

17   practice began other than that it was not in place in

18   1989?

19   A.       Correct.

20   Q.       What's the purpose of a psychological evaluation

21   conducted at the time of hire?

22   A.       We don't do those, ma'am.  That's the director

23   of public safety.  They schedule those, and they get

24   those, and they use those.  We don't see them.  We don't

25   schedule them.  We have nothing to do with the hiring of

```
 1    psychological evaluations just like the physicals.

 2    Q.      Okay.  And do you know what the purpose of those

 3    evaluations is, even if it's the director of public

 4    safety that's ordering them, do you know what the

 5    purpose of those evaluations is?

 6    A.      I do not.

 7    Q.      Well, do you know beyond the circumstances that

 8    you've already listed for me, and at the time of hiring,

 9    do you know whether there are any other periodic or

10    event triggered psychological evaluations conducted for

11    officers in the Columbus Division of Police?

12    A.      Would you repeat that?

13    Q.      Sure.  I guess beyond what you already told me

14    and beyond at the time of hire, are there any other

15    times that psychological evaluations are conducted with

16    respect to CPD officers?

17    A.      Ordered?

18    Q.      Yes.

19    A.      I do not.

20    Q.      Okay.  And you stated earlier that you believe

21    the officer involved shooting related policies dictate

22    that after that occurs a psychological evaluation will

23    be conducted, right?

24    A.      Correct.

25    Q.      Are there any other policies that you're aware
```

 1  of that dictate when or whether an officer should be

 2  subjected to a psychological evaluation by the division?

 3  A.     I can't think of any.

 4  Q.     Okay.  So, turning back to, I guess, the primary

 5  event that leads to a psychological evaluation, an

 6  officer involved shooting event, you said these are

 7  ordered by the commander in the chain of command, right?

 8  A.     Ordered by the commander, yes.

 9  Q.     Is there anybody else who participates in that

10  decision-making to determine whether or not someone

11  needs to go see a psychologist?

12  A.     Well, there are a number of people that could

13  be involved in that process.  There's a frontline

14  supervisor who makes the recommendation to the commander

15  that this is more than just what appears to be.  It's

16  more critical, or this officer just had a baby and

17  there's a baby in the scene.  So, I mean, there's any

18  number of people who can chime in and make

19  recommendations to that commander and provide some

20  professional guidance.  Does that answer your question?

21  Q.     Yeah.  So, you're basically saying other people

22  in the chain of command may make suggestions to the

23  commander that this would be an appropriate event for a

24  psychological evaluation?

25  A.     Correct.

Deposition of Deputy Chief Richard Bash                    James J. England, vs. City of Columbus, et al.,

1   Q.       Anyone outside of the chain of command ever make

2   those kinds of recommendations?

3   A.       I can't answer that.

4   Q.       Okay.  You mean you just don't know?

5   A.       I'm sure -- I don't know if there's other people

6   that I don't know about who have been outside the chain

7   of command who have made recommendations to other people

8   about that.  That would be speculation on my part, and I

9   really cannot legitimately answer that question.

10  Q.       Okay.  Fair enough.  You said that the commander

11  gives an oral order to the involved officer that they're

12  going to be referred for the examination, that HR will

13  schedule it, and then the psychologist will tell the

14  division that they're fit to come back for duty?

15  A.       That's correct.

16  Q.       And then, HR contacts that person to schedule

17  the evaluation itself, is that right?

18  A.       That is correct.  They schedule it for the

19  officer involved.

20  Q.       Okay.  And this HR -- strike that.  So, the

21  purpose of these evaluations is to assist the division

22  of police in deciding whether an officer is in

23  sufficient mental health to continue his duties,

24  correct?

25  A.       That's part of it, yes.

Deposition of Deputy Chief Richard Bash      James J. England, vs. City of Columbus, et al.,

1   Q.       What's the other part?

2   A.       To ensure that we have healthy police officers

3   returning to duty.  We have a significant problem across

4   the country with police officers committing suicide.

5   Critical incidents and PTSD play a significant role in

6   that, and we want to make sure that we're intervening in

7   a timely manner to ensure that we have healthy police

8   officers returning to duty and healthy officers that

9   even don't return to duty.

10   **Q.       Okay.  So, the evaluations are for the purposes**

11   **of determining the state of an officer's mental health,**

12   **and for the sake of determining whether that officer's**

13   **mental health renders them fit for duty, right?**

14   A.       Absolutely.

15   **Q.       So, ultimately then, these evaluations are**

16   **personnel evaluations, correct?**

17   A.       No.  I don't think that would equate to that.

18   **Q.       Well, in terms of the portion of this that**

19   **determines whether or not an officer is fit for duty,**

20   **that would constitute a personnel evaluation, right?**

21   A.       I don't know that I would use that terminology.

22   **Q.       Can you describe for me then, how the**

23   **subdivision uses the information from a psychological**

24   **evaluation of one of its officers with regard to that**

25   **person's ability to serve as an officer?**

Deposition of Deputy Chief Richard Bash        James J. England, vs. City of Columbus, et al.,

1   A.     I would think that it would be used in the same

2   way that a medical exam is, if an officer doesn't have

3   the ability to perform the essential functions of a

4   police officer, then we would not allow them to go back

5   to full-duty.  The physical portion and the mental

6   portion are exactly the same.  It's not a personnel

7   evaluation, it is a medical evaluation that just happens

8   to be psychological in nature.

9   **Q.     But, the purpose is to determine fitness for**

10  **duty ultimately?**

11  A.     No.  As I mentioned before, there are two prongs

12  to this.

13  **Q.     I'm talking now about the portion that we've**

14  **been talking about, that you were just discussing, this**

15  **is like undergoing a medical exam for the purposes of**

16  **determining whether or not you can do the job.  The**

17  **psychological evaluation is also done for the purposes**

18  **of determining whether or not you could do the job, even**

19  **if there's also a part about making sure that you're**

20  **healthy and well, it's also done for the purpose of**

21  **figuring out whether or not the officer can do the job,**

22  **right?**

23  A.     If the officer should return to duty, correct.

24  **Q.     Okay.  And so, like a medical evaluation**

25  **conducted for an officer, these psychological**

Deposition of Deputy Chief Richard Bash                    James J. England, vs. City of Columbus, et al.,

1   evaluations also are not done for the purpose of

2   providing medical care, they're done for the purpose of

3   instead accessing whether or not the officer can return

4   to duty, right?

5   A.     I don't think I agree with that premise.  Would

6   you try that again?

7   Q.     Sure.  We talked a moment ago about medical

8   evaluations of officers for the purposes of determining

9   if they're fit to return to duty, correct?

10  A.     That's correct.

11  Q.     And in those evaluations there's no medical care

12  or treatment provided, correct?

13  A.     Well, I don't believe that's necessarily true

14  either.  So, if we have an officer who's been unable to

15  perform their functions and they go to the doctor and

16  the doctor determines, hey, you have a heart condition,

17  that's why you can't do it, we certainly have an

18  expectation that the doctor will arrange for that heart

19  condition to be treated.  So I would conclude that we

20  would have the exact same set of circumstances in a

21  psychology evaluation.  If a doctor were to determine

22  that there's a psychological issue here that would keep

23  this person from performing their functions, that they

24  would then plan for and help provide any kind of

25  treatment that would be needed as well.

1    Q.      Does the contract that the division has with

2    these psychologists include treatment of mental health

3    issues of its officers?

4    A.      Like I mentioned before, I haven't seen the

5    contract.  But we do have contracts with mental health

6    providers to ensure that officers have mental health, so

7    we do have those in place.  They may actually be the

8    same contractors.  I don't know the answer to that

9    question.  We could have the same contractor under our

10   insurance as we have performing these evaluations.

11   Q.      You're here to testify about psychological

12   evaluations of these officers, and that includes the

13   conditions and the circumstances surrounding how those

14   evaluations are administered.  And as you sit here you

15   tell me that you don't know what the parameters are with

16   regard to the services that the psychologists are

17   supposed to provide in the evaluations, right?

18   A.      I'm telling you I don't have the contract with

19   me, but if that's something that you think is germane,

20   I'll be more than happy to grab a copy of that contract

21   and we can do this again.

22   Q.      I don't want to come back again.  Let's move on

23   here.  Let me ask you this:  After a psychological

24   evaluation an officer who has been ordered by a

25   commander to attend, are they provided with a treatment

1   **plan by the psychologist who performed the evaluation?**

2   A.      If they were, we wouldn't necessarily know about

3   that.

4                 MS. DEAN:   Jacqueline, we understood

5   that Chief Deputy Bash was coming today to testify about

6   the evaluations conducted on these individuals.  And I

7   think to the extent that none of them were provided with

8   a treatment plan, we don't understand that  he had any

9   reason to look into all of the options available as a

10  result of the psychological evaluations.

11  A.     I don't know that we would be told if they had a

12  treatment plan thereafter, because that would be

13  privilege between their doctor.  So, I don't know that

14  we would even have that information.

15  BY MS. GREENE:

16  **Q.      Let me ask you a different question.  The**

17  **psychologist that the officers are ordered to see for**

18  **psychological evaluations are not those officers**

19  **personal psychologists, correct?  They're not their**

20  **personal care providers?**

21  A.      I don't know the answer to that question, ma'am.

22  I don't know who their personal care providers are, so I

23  can't answer that question.  I can't tell you that

24  they're not their personal care providers after they

25  meet with them.

1    Q.      Well, in any case, after a psychological

2    evaluation is conducted the psychologist does provide a

3    report back to the division of police, correct?

4    A.      They provide an opinion back to the division,

5    yes.

6    Q.      And what's the content of that opinion?

7    A.      Whether or not this officer can safely return to

8    work or not safely return to work.

9    Q.      Okay.  I'm going to come back to that in a

10   second, but let me ask a couple more background

11   questions first.  When an officer is referred by his or

12   her commander to a psychologist for an evaluation,

13   they're ordered to participate and undergo that

14   evaluation, right?

15   A.      That is correct.

16   Q.      And they understand that they must participate

17   in that evaluation as part of their duties as a police

18   officer, correct?

19   A.      Would you repeat that question?

20   Q.      The officer who is ordered to go to the

21   evaluation, they understand that they're required to do

22   so as part of carrying out their duties as an officer,

23   correct?

24   A.      They're required to go and participate as part

25   of their employment, yes.

1  Q.      And they understand that information relating to

2  that evaluation will be provided to and accessible to

3  the police department afterward, right?

4  A.      I don't know what information -- they do know

5  that they'll have a determination as to whether they can

6  or cannot return to duty.  I don't know if they're told

7  by their doctor how much of this information will be

8  shared.  Just like any other doctor/client privilege, or

9  doctor/patient, whatever.

10  Q.      Well, it is understood by the officers that

11  information of some amount will be shared with the

12  division after, correct?

13  A.      Whether or not they can return to work, yes.

14  That's the only information that we get.

15  Q.      Who performs psychological evaluations for the

16  Columbus Division of Police?

17  A.      I don't have a copy of that contract, so I don't

18  know who that company is or the psychologists are.

19  Q.      And you said there's contracts pertaining to

20  those services?

21  A.      That's correct.

22  Q.      Are those service providers on a retainer for

23  the division?

24  A.      Can you explain what that means?

25  Q.      I guess can you explain to me the relationship

1    **between the psychologists and the division of police and**

2    **how or weather that psychologist is excepted to be**

3    **available for work in relation to the division's needs?**

4    A.       So, again, I haven't seen the contract.  The way

5    it works is that we tell them that we are contracting

6    them for these services and this is how much we'll be

7    able to pay for these services, so it's a financial

8    contract.  I don't know that they establish how often

9    they're available, but this is what they'll charge for

10   this consultation, evaluation.  It's a financial

11   contract.

12   **Q.       Okay.  Are the evaluations conducted on CDP**

13   **premises or elsewhere?**

14   A.       No.  They're done at the offices of the

15   psychologists.

16   **Q.       Do you know how long these evaluations typically**

17   **last?**

18   A.       I have no idea.

19   **Q.       I think I've seen in this documentation they've**

20   **lasted in some cases around one hour.  Are you aware of**

21   **that?**

22   A.       I'm not aware of that.

23   **Q.       Do you know whether any diagnostic testing is**

24   **performed during these evaluations?**

25   A.       I don't know.

1   Q.     **Findings from these evaluations are provided to**

2   **whom in the division of police?**

3   A.     The opinion as to whether or not this officer

4   can return to work is provided back to the human

5   resources person who scheduled it. And then, we advise

6   the commander, or that HR representative, advising the

7   commander that this person is approved to return to

8   regular duty or not approved to return to regular duty.

9   Q.     **And is that documentation maintained in the**

10   **officer's personnel file?**

11   A.     I do not know the answer to that question, but I

12   can find that out.

13   Q.     **In your experience in, I guess, any of the**

14   **supervisory positions that you've held, have you ever**

15   **seen an officer deemed not able to return to duty by a**

16   **psychologist for the division?**

17   A.     Yes.

18   Q.     **How many times?**

19   A.     I can think of one specifically right now. It

20   was a police involved shooting, but he didn't shoot. He

21   was shot. So, for sure one.

22   Q.     **And what rendered him unable to return to work?**

23   A.     That's up to the psychologist. We were just

24   told that he's not ready to return to full-duty yet.

25   Q.     **You're not made aware of any of the**

1  circumstances surrounding that determination?

2  A.     I don't believe the psychologist shares that

3  information.  The psychologist shares whether or not

4  that person can or cannot return to full-duty.

5  Q.     Were you in that person's chain of command at

6  the time this determination was made?

7  A.     I was not.

8  Q.     And how were you then aware of the determination

9  when it was made?

10 A.     I was in charge of the investigative subdivision

11 at the time, and I was made aware, I think, by their

12 chain of command.

13 Q.     When you say, "the investigative subdivision,"

14 what do you mean?

15 A.     At the time of my previous assignment the

16 investigative subdivision had crimes against persons,

17 crimes against property, special victims and the crime

18 lab.  So crimes against persons investigated and

19 investigates aggravated assault, and assaults, police

20 involved shootings.  So we were there when the officer

21 was shot in the car conducting that investigation.  Of

22 course, I was just there for support, but they were

23 conducting that investigation.

24 Q.     What do you mean you were there for support?

25 A.     Well, I was at the hospital when the officer was

1   there in the hospital, and making sure that we had all

2   of the resources that we needed to adequately conduct

3   this investigation.

4   **Q.      And how did you end up finding out about the**

5   **outcome of that evaluation?**

6   A.      I didn't find out about the outcome of the

7   evaluation.  I was told that he has not returned to

8   regular duty after the normal three days due to, I

9   guess, the psychologist making that recommendation.

10   **Q.      And who told you that?**

11   A.      I can't tell you that and be one hundred percent

12   accurate.  Someone within his chain of command.

13   Probably another duty chief or commander, but I can't

14   specifically tell you specifically who that was.

15   **Q.      When findings from these psychological**

16   **evaluations are provided to the division, you said they**

17   **go to HR, HR advices the commander.  Is there anyone**

18   **else in the chain of command who is then made aware of**

19   **the findings?**

20   A.      The expectation is that the commander would

21   advise the officer's chain of command, the lieutenant

22   and sergeant where the officer works.  That should be

23   the extent of that.

24   **Q.      So then, it comes down the chain of command to**

25   **the point where there's some communication between the**

1    direct supervisor and the involving officer?

2    A.      That he'd been cleared to return to work.

3    Q.      Okay.  Is a formal letter sent with the

4    findings?

5    A.      I don't know the answer to that question.  I've

6    got that on my list here to check out.

7    Q.      Okay.  So, to the extent that there is a letter

8    that's provided by the psychologist to the division,

9    where is that letter stored?

10   A.      Again, I don't know that there is a letter, but

11   if there was a letter, it would probably be in human

12   resources.

13   Q.      Would that be then, in an officer's personnel

14   file?

15   A.      Potentially.  But, again, I don't know what the

16   -- that would be the potential place for it.  I don't

17   know that for sure.  That's on my list of things to

18   check out for you.

19   Q.      Okay.  Have you seen any findings letters

20   related to psychological evaluations for John Narewski,

21   Matthew Baase, Keith Abel or Bryan Mason?

22   A.      Let me check to make sure that I didn't miss

23   them here in this plethora of things.  But as I

24   mentioned before, I don't necessarily remember seeing

25   one, but that doesn't mean that I haven't.  As a matter

1  of fact, I've got one right here.  So, yes.  They do get

2  letters.

3  Q.      Who is that letter for that you're looking at?

4  A.      I have one right here dated September the 19th,

5  2016, indicating Officer Bryan Mason.  This is a letter

6  addressed to then HR manager, Ms. Vollmer.

7          "Columbus Division of Police Officer Bryan Mason

8  was subject to a Critical Incident Stress Debriefing on

9  September 15, 2016.  The duration of this evaluation was

10  approximately one hour in length and was performed by

11  Stephen A. Douglas, Ph.D."

12          "It is our professional opinion Officer Mason is

13  psychologically suitable to return to work. Please feel

14  free to contact our office if you have any additional

15  questions.  Sincerely, signed Stephen A. Douglas, Ph.D.

16  Police Psychologist."  So, there's one.

17  Q.      Okay.  I'm going to share my screen with you.

18  Is the document that you see on your screen right now

19  the same one that you were just referencing?

20  A.      It appears to be so.

21  Q.      Okay.  I'm going to mark this as ==Exhibit 1==.

22                      - - - -

23      (Thereupon, Plaintiff's ==Exhibit 1== was marked for

24                      identification.)

25                      - - - -

Deposition of Deputy Chief Richard Bash                   James J. England, vs. City of Columbus, et al.,

1   BY MS. GREENE:

2   Q.      And so, we see here for this particular

3   evaluation it lasted for about one hour, right?

4   A.      That's what it says.

5   Q.      And it looks like perhaps the Columbus Division

6   of Police term of art is critical incident stress

7   debriefing, is that right?

8   A.      That's the way that Dr. Douglas defines it, yes.

9   Q.      This letter also says, "Please feel free to

10  contact our office with any additional questions,"

11  correct?

12  A.      Yes, it does.

13  Q.      Do you know whether in relation to this letter

14  concerning Bryan Mason the division contacted

15  Dr. Douglas' office with any additional questions?

16  A.      I do not know that.

17  Q.      Did you take any steps to determine whether or

18  not there were any additional questions of follow-up

19  communication with Dr. Douglas after this evaluation?

20  A.      I did not.

21  Q.      I see here at the bottom that Douglas is a

22  police psychologist.  Do you see that?

23  A.      I see that's what he has on his letter, yes.

24  Q.      Is that just referencing his role as the

25  psychologist for the Columbus Division of Police, or do

 1  you understand what that indicates?

 2  A.      I do not understand what that indicates because

 3  he's not an employee of the Columbus Division of Police.

 4  Q.      Okay.  Beyond that findings letter, have you

 5  seen any other findings letters pertaining to Mason, or

 6  any findings letters pertaining to Baase, Narewski, or

 7  Abel?

 8  A.      Let me take a look here and see what else is in

 9  this big pile.  I do not see any other ones in the

10  documents that I was provided, no.

11  Q.      As you sit here today, do you know whether or

12  not Keith Abel, John Narewski, or Matthew Baase were

13  ever subjected to psychological evaluations after these

14  police involved shooting events?

15  A.      I don't know that for a fact, no.

16  Q.      You don't know that?

17  A.      I don't have any documentation to say that they

18  did, so I do not know, and I can't tell you if they did

19  or did not.

20  Q.      You do understand that you were designated to

21  testify binding testimony on behalf of the city today

22  concerning the psychological evaluations of those

23  officers, correct?

24  A.      Uh-huh.

25  Q.      And you did nothing to find out whether or not

1   they'd been subjected to psychological evaluations?

2   A.      I did not.

3   Q.      And your lawyer didn't instruct you to do

4   anything to find out whether or not they were subjected

5   to psychological investigation?

6               MS. DEAN:  Jacqueline, I'm looking

7   through to see if we sent him the information.  My guess

8   is that we do have evaluations in here, but I don't know

9   where.  And I, obviously, am not as involved in this

10  case as other lawyers are, but I'll look at it.

11              MS. GREENE:  I'm going to keep moving

12  on, and maybe on a break we can talk about this a little

13  more, Theresa.

14  BY MS. GREENE:

15  Q.      How are the findings from these psychological

16  evaluations used in hiring or firing decisions of

17  officers?

18  A.      I'm not sure I understand your question.

19  Q.      Are psychological evaluations obtained at the

20  order of either the division of police or the department

21  of public safety used for hiring or firing

22  determinations with regard to police officers?

23  A.      So, there's a psychological exam that the

24  director of public safety orders before they provide an

25  offer of employment.  I don't have access to that.  I

1    don't have any involvement in that.  That would be a

2    question that you would have to ask the director of

3    public safety office.  I don't believe those are used --

4    I've never seen them used in a termination case.  But,

5    again, we don't have them in the division of police so

6    we wouldn't have access to that information in

7    recommending a termination, but we also don't have the

8    authority to terminate.  Again, that would be the

9    directed appointed authority, which would be the

10   director of public safety's office.  I would not have

11   access to that.

12   Q.      Do you know whether Mason, Baase, Narewski, or

13   Abel were subjected to psychological evaluations at the

14   time of hire?

15   A.      There's a lot of documents in background

16   investigations.  No.  I do not have any documentation or

17   invitation to a psychological exam for any of those

18   listed officers.

19   Q.      Okay.  I'm going to show you another document

20   briefly.  Do you see a document on your screen right

21   now?

22   A.      Okay.  There we go.

23   Q.      What's the document that we're looking at right

24   now?

25   A.      That's a copy of the officer's selection

1    process.  Let me see if I have that, too.

2    Q.      We can look at this document on the screen.  I'm

3    going to mark this as Exhibit 2.

4                          - - - -

5        (Thereupon, Plaintiff's Exhibit 2 was marked for

6                       identification.)

7                          - - - -

8    BY MS. GREENE:

9    Q.      This is a letter to Bryan Mason dated October

10   11th, 2006 concerning psychological evaluation as the

11   last step in the police officer selection process,

12   correct?

13   A.      Yes.

14   Q.      So, by nature of this letter, do you know

15   whether or not Bryan Mason was subjected to a

16   psychological evaluation for the purposes of hiring?

17   A.      It appears that he was.

18   Q.      And as we -- do you know whether the division of

19   police is provided with any findings letters from the

20   psychological evaluation conducted at the point of

21   hiring?

22   A.      I have not seen any of those evaluations

23   letters.  In the year-and-a-half that I've been involved

24   in the hiring process I've not seen any.

25   Q.      Okay.  We do know that based on this letter, as

1   least as far back as 2006, psychological evaluation were

2   part of the hiring process, right?

3   A.      It appears to be so.

4   Q.      Do you know whether or not that was part of the

5   hiring process before 2006?

6   A.      I do not.

7   Q.      And as we sit here today, you don't know whether

8   Matt Baase, John Narewski, or Keith Abel were subjected

9   to psychological evaluations as part of the hiring

10  process, correct?

11  A.      I did not see letters like that in their

12  background, no.

13  Q.      And you don't otherwise know that they were

14  subjected to psychological evaluations?

15  A.      I do not know that, no.

16  Q.      Okay.  And as far as you know, as we sit here

17  today, the only psychological evaluation that -- sorry.

18  The only officer that you're aware of having been

19  subjected to any psychological evaluation out of Baase,

20  Narewski, Abel and Mason, is Mason, right?

21  A.      That's the only one that I see, yes.

22  Q.      Okay.  Do you know whether psychological

23  evaluations conducted after a critical incident are used

24  in the chain of command review for deadly force events?

25  A.      They are not.

1    Q.      And is there a policy or some kind of written

2    directive that states that they're not to be used for

3    that purpose?

4    A.      No.  There is no policy that says that they're

5    not to be used for that purpose.

6    Q.      So, what's the basis of your statement that

7    they're not used for that purpose?

8    A.      My experience in evaluating a number of police

9    involved shooting packages where the evaluation is based

10   on the incident in and of itself, what a reasonable

11   officer would do at that particular time without any

12   hindsight.  That's what we're evaluating in determining

13   whether or not they acted within our policy.

14   Q.      So, you're saying that the psychological

15   evaluations conducted after the fact are not used for

16   those determinations?

17   A.      Correct.

18   Q.      Are psychological evaluations conducted after

19   the fact used for the purpose of ongoing supervision of

20   those involved officers?

21   A.      I don't believe so, because most of the time

22   that supervisor is not going to have any additional

23   information about any kind of diagnosis.  The only thing

24   that the chain of command may know is if this person is

25   not cleared to come back and return to duty.

1   Q.    Do you know whether those psychological

2   evaluations conducted after a critical incident are used

3   in any other way other than determining that a person is

4   able to come back to duty or not?

5   A.    They are not used for anything else other than

6   determining whether or not this person is cleared to

7   return to duty.

8   Q.    Okay.  And so, as we sit here today, with

9   respect to Keith Abel, who shot James England, you do

10   not know how many times or whether the CDP has required

11   Abel to undergo a psychological evaluation, correct?

12   A.    That is correct.

13   Q.    So, you don't know with respect to any

14   evaluation that might have been conducted when it

15   occurred, why it was ordered, the purpose of the

16   evaluation, the findings or conclusions, correct?

17   A.    I do not know that for a fact, no.

18   Q.    And you don't know whether there were any

19   psychological issues identified during any psychological

20   evaluation with respect to Keith Abel at any point in

21   time during his employment with the CDP, right?

22   A.    I'm sorry.  Would you repeat that one?

23   Q.    You don't know whether or not there were any

24   psychological issues that were identified during any

25   psychological evaluation of Keith Abel during his

Deposition of Deputy Chief Richard Bash                    James J. England, vs. City of Columbus, et al.,

1   employment with the division, correct?

2   A.      I don't know if he had any psychological

3   evaluation, so I wouldn't have that information either.

4   Q.      And you don't know as you sit here right now

5   whether Abel was ordered to undergo a psychological

6   evaluation after the shooting of James England?

7   A.      I do not know unequivocally, no.

8   Q.      What do you mean "unequivocally?"

9   A.      I know what the practice has been, but I cannot

10  sit here and tell you that that commander told him to go

11  and he was scheduled.  I don't have any documentation to

12  tell me that.

13  Q.      Okay.  What about Matthew Baase, as we sit here

14  today, with respect to Matthew Baase, you don't know

15  whether or how many times the CDP has ever ordered or

16  required Baase to undergo a psychological evaluation,

17  correct?

18  A.      I do not have that documentation, no.

19  Q.      And to the extent that he ever was evaluated,

20  you don't know any of the details, purpose of the

21  evaluation, when, or why the evaluation was ordered,

22  right?

23  A.      Again, you're going to have to repeat that one.

24  Q.      With respect to Baase then, for any evaluation

25  that he was subjected to, you don't know when that

1   occurred, why that was ordered, what the purpose of that

2   evaluation was, or what any findings or conclusions of

3   that evaluation were, right?

4   A.    I do not have any knowledge that he was in any

5   way there, so I cannot answer those other questions

6   either.

7   Q.    Okay.  And you don't know whether or not Baase

8   was ordered to undergo a psychological evaluation after

9   the shooting of Deaunte Bell-McGrew, correct?

10   A.    I do not know that unequivocally,  no.

11   Q.    And with respect to John Narewski, who also was

12   involved in the shooting of Deaunte Bell-McGrew,

13   likewise, you don't know whether or not Narewski was

14   ever ordered to undergo a psychological evaluation after

15   that shooting, correct?

16   A.    I do not.

17   Q.    And you don't know whether or how many times the

18   CDP has ordered or required him to undergo a

19   psychological evaluation, do you?

20   A.    I do not.

21   Q.    So, you don't know when or why the evaluation

22   was ordered, the purpose of the evaluation, or any

23   findings or conclusions from that evaluation, if there

24   ever was one, correct?

25   A.    I do not have any knowledge of that evaluation.

1  Q.      Okay.  Let's talk about Bryan Mason for a

2  moment.  How many times has the CDP required him to

3  undergo a psychological evaluation?

4  A.      I have a documentation that one-time he was

5  ordered to appear, or that he did appear.

6  Q.      And when you say "one-time," I think that we've

7  looked at documents so far both about a psychological

8  evaluation at the time of hire and in 2016, correct?

9  A.      Okay.  So, those are two different things, but

10 yes.  We had documentation that he had a preemployment

11 screening, and we have documentation that he had one

12 based on a critical incident.  That's correct.

13 Q.      So, when you're saying "one-time," you're

14 talking about one-time with respect to a critical

15 incident, right?

16 A.      One-time that's documented in regard to a

17 critical incident.  That's correct.

18 Q.      I'm going to share Exhibit 1 with you again.  So

19 this is the single evaluation with respect to the

20 critical incident that you're aware of, right?  This

21 document, Exhibit 1?

22 A.      That's the only document that I've seen.

23 Correct.

24 Q.      And this is an evaluation conducted September

25 19th, 2016 after the shooting of Tyree King, correct?

1   A.     It's in 2016, yes. I don't have that other

2 reference as to who the other party was involved in the

3 police involved shooting, but I believe that's the case

4 based on the summary here. That's correct, yes.

5   **Q.     Okay. Do you know who ordered this evaluation?**

6   A.     I do not. Whoever that commander was in 2016.

7   **Q.     Do you know when this evaluation was ordered?**

8   A.     No. I do not specifically know when this was

9 ordered, no.

10   **Q.     Do you know what the purpose of this particular**

11 **evaluation was?**

12   A.     Yes.

13   **Q.     What was that?**

14   A.     To determine whether or not this officer could

15 return to regular duty.

16   **Q.     And the finding was that Officer Mason was**

17 **psychologically suitable to return to work, correct?**

18   A.     That's what it says, yes.

19   **Q.     Do you know whether there are any other**

20 **documents associated with this evaluation with this**

21 **findings letter that have ever been provided to the CDP**

22 **from Stephen Douglas?**

23   A.     I do not have anything else provided by

24 Dr. Douglas, no.

25   **Q.     And when you say that you don't have anything**

Deposition of Deputy Chief Richard Bash                    James J. England, vs. City of Columbus, et al.,

1   else, you mean you don't have anything else in the files

2   that were provided to you by counsel, correct?

3   A.      Correct.

4   Q.      And you don't know whether or not there are

5   other documents in the possession of the CDP pertaining

6   to this evaluation because you haven't looked for them,

7   right?

8   A.      I do not know that, correct.

9   Q.      Do you know whether anyone from the CPD

10  contacted the psychologist with follow-up questions as

11  invited at the close of this letter that we're looking

12  at?

13  A.      I do not know that, no.

14  Q.      Okay.  And just to be clear, with respect to all

15  four of these officers, Baase, Narewski, Abel, and

16  Mason, you have not conducted any search for any

17  documents relating to psychological evaluations of these

18  officers, have you?

19  A.      I have not done any additional search for any of

20  the documents, no.

21  Q.      Do you know whether any such documents would be

22  located if we wanted to request them, or if we wanted

23  you to go find them?

24  A.      I do not know that any of these others exist.

25  They would be in the case files that are here.  That

1  would be my best presumption, but I don't know where

2  they would be besides in these documents that you

3  currently have.

4                    MS. GREENE:  I want to take about a

5  ten minute break and come back.  Okay?

6                    - - - -

7     (Thereupon, an off-the-record discussion was held.)

8                    - - - -

9                    MS. GREENE:  Back on the record.

10 BY MS. GREENE:

11 **Q.      Deputy Chief Bash, I'm going to show you a**

12 **couple of documents.  I'm showing a document right now,**

13 **it's a two page document, and I'll go to the second page**

14 **so you could see it.  Have you ever seen this document**

15 **before?**

16 A.      I believe I have.  I think I have something like

17 that that was redacted.  I really couldn't tell what it

18 was.

19 **Q.      And what do you understand this document to be?**

20 A.      I have no idea.

21 **Q.      Do you see it's titled "Special Examinations -**

22 **2012," correct?**

23 A.      That's what it says, yes.

24 **Q.      Do you know what that means?**

25 A.      I don't.

1  Q.      We see that the columns indicated on this

2  special examinations table include date, name/rank,

3  appointment date/time and doctor?

4  A.      That's what it says, yes.

5  Q.      So, you don't know as we sit here whether this

6  is a document generated by the Columbus Division of

7  Police, do you?

8  A.      If it were a division of police document, it

9  would have a document number at the bottom and it does

10 not.

11 Q.      Okay.  So, I see here on the second page that we

12 have Bryan Mason, rank, police officer, with the date of

13 12-20-2012 at noon with Dr. Marzella.  Do you see that?

14 A.      I do see that.

15 Q.      Do you have any idea what that's about?

16 A.      I do not.

17 Q.      Do you know whether Mason was subject to a

18 psychological exam by Dr. Marzella in 2012?

19 A.      I do not.

20            MS. GREENE:  I'm going to mark this as

21 Exhibit 3.

22                       - - - -

23     (Thereupon, Plaintiff's Exhibit 3 was marked for

24                identification.)

25                       - - - -

Deposition of Deputy Chief Richard Bash        James J. England, vs. City of Columbus, et al.,

```
 1   BY MS. GREENE:

 2   Q.      I'll move on to another document.  Do you see

 3   the document on your screen now?

 4   A.      Yes.

 5   Q.      Do you know what this document is?

 6   A.      I do not.

 7   Q.      Have you ever seen this document before?

 8   A.      I have not seen that document.

 9   Q.      It's another special examinations list, correct?

10   A.      That's what it says at the top, yes.

11   Q.      And it's dated special examinations 2013?

12   A.      That's what it says, yes.

13   Q.      And here this document lists Bryan C. Mason,

14   rank, police officer, with an appointment date of

15   February 5th, 2013 at 9 a.m. with Dr. Douglas, right?

16   A.      That's exactly what it says, yes.

17   Q.      Do you know anything about whether or not Bryan

18   Mason was subject to a psychological exam with

19   Dr. Douglas on February 5th, 2013 at 9 a.m.?

20   A.      I do not.

21               MS. GREENE:  Okay.  We're going to

22   mark this as Exhibit 4.

23                       -  -  -  -

24       (Thereupon, Plaintiff's Exhibit 4 was marked for

25                   identification.)
```

Deposition of Deputy Chief Richard Bash            James J. England, vs. City of Columbus, et al.,

```
 1                            - - - -
 2    BY MS. GREENE:
 3    Q.      And for the record, the remainder of this
 4    document and the exhibit that I showed you before,
 5    Exhibits 3 and 4 are listed that are entirely redacted
 6    but for Bryan Mason's name and pertinent information,
 7    correct?
 8    A.      That's what it looks like, yes.
 9    Q.      Okay.  I'm now going to show you another
10    document.
11                            - - - -
12        (Thereupon, Plaintiff's Exhibit 5 was marked for
13                    identification.)
14                            - - - -
15    BY MS. GREENE:
16    Q.      Have you seen this document before?
17    A.      No.
18    Q.      Have you seen documents like this before?
19    A.      No.
20    Q.      You don't know whether or not this is a document
21    generated by the Columbus Division of Police, do you?
22    A.      There's no number on the bottom that would
23    indicate that it was a division of police document.
24    Q.      Well, what we have here is -- it looks like a
25    table, right?  It doesn't have a title at the top,
```

Deposition of Deputy Chief Richard Bash          James J. England, vs. City of Columbus, et al.,

1    correct?

2    A.      I don't see one.

3    Q.      In any case, it does have columns, which are

4    dates of PIS/traumatic event, right?

5    A.      That's what it says.

6    Q.      What does PIS stand for?

7    A.      In this, I don't know.  We use it as a police

8    involved shooting, but I have no idea what this document

9    means.

10   Q.      But, your experience in the Columbus Division of

11   Police the acronym PIS stands for police involved

12   shooting?

13   A.      In our's, yes.  It does.

14   Q.      And this also has columns of name/rank,

15   appointment date/time, doctor, invoice, column 1, and

16   date forwarded to BO?

17   A.      That's what it says, yes.

18   Q.      Do you know what BO means in that last column,

19   date forwarded to BO?

20   A.      Not in this context, no.

21   Q.      Do you in the CDP, use the acronym BO for

22   anything?

23   A.      No.

24   Q.      So, you don't have any guesses as to what BO

25   stands for there?

1    A.       I don't want to guess in a deposition, so no.

2    Q.       **And no one provided this document to you for the**

3    **purposes of preparing for your deposition today?**

4    A.       I can't say that, so I'll take a look here and

5    see.  Is that BCM XTR 42?

6    Q.       **While you look, can I ask you another question?**

7    **This Bate stamp at the bottom is titled BCM XTR,**

8    **correct?**

9    A.       I see that, yes.

10   Q.       **Does that acronym BCM XTR mean anything to you?**

11   A.       No, it does not.  But, I mean, I've got a number

12   of them here, BCM XTR.  I'm not seeing that document, so

13   I don't know what that is.

14   Q.       **All right.  On the second page of this document**

15   **that you haven't seen before, we do see here Bryan**

16   **Mason, rank of police officer, listed again, right?**

17   A.       Bryan Mason, PO, yes.

18   Q.       **And we see there's a date of 9-15-2016, so**

19   **September 15th, 2016 at 3 p.m., correct?**

20   A.       Yes.

21   Q.       **And that's Dr. Douglas in the doctor column,**

22   **right?**

23   A.       Could you flip back?  Yes.  It looks like the

24   doctor column.  I think I found it.  I've got it here

25   too, but it's labeled differently.

   

1   Q.     What's it labeled for you?

2   A.     It's labeled XTR 000042 and 00043 King tracking,

3   is what it's labeled in what I was sent.

4   Q.     Okay. And in the last column, which is date

5   forwarded to BO, we have the date of 9-21-2016, right?

6   A.     Correct.

7   Q.     Now, this appointment with Dr. Douglas happened

8   on September 15th, 2016, and that corresponds with the

9   date on the letter that we viewed earlier on Exhibit 1,

10   correct?

11   A.     Okay. I don't have Exhibit 1 open, but I

12   will --

13   Q.     I'm happy to show it to you. Looking at Exhibit

14   1 again, and you see here that the stress debriefing

15   listed in this letter was September 15th, 2016?

16   A.     Yes.

17   Q.     And that's the same date as the appointment date

18   and time listed in Exhibit 5, correct?

19   A.     That's the same number listed on this document,

20   yes.

21   Q.     Okay. And we see here that Douglas is the

22   doctor listed in the letter here in Exhibit 1, right?

23   A.     Correct.

24   Q.     And to go back to the tracking sheet, which is

25   going to be Exhibit 5, we see here that, again, this Dr.

Deposition of Deputy Chief Richard Bash        James J. England, vs. City of Columbus, et al.,

1    Douglas, September 16th, 2015 for the appointment,

2    right?

3    A.      That's what it looks like, yes.

4    Q.      So, it appears that this list in ==Exhibit 5== is

5    referencing the exam that was the subject of a letter

6    contained in ==Exhibit 1==, correct?

7    A.      The dates at least are consistent, yes.

8    Q.      Do you know whether or not Mason was ever

9    subjected to any other psychological evaluations other

10    than the ones that we've discussed here today so far?

11    A.      I do not have any knowledge of those, no.

12    Q.      And with respect to these three exhibits that

13    we've just looked at, Exhibits 3, 4 and 5, the special

14    examinations lists and the table without a title, as you

15    sit here, do you know whether those listed reflect that

16    Officer Mason was subjected to psychological evaluations

17    listed on the dates and times listed on those Exhibits?

18    A.      All I know for sure is the one that we got back

19    from Dr. Douglas.  I believe you called that ==Exhibit 1==,

20    where the doctor indicated he was evaluated and was okay

21    to go back to duty.  That's the only conclusion I have.

22    Q.      Have you ever seen any tracking sheets like the

23    ones that we just looked at, Exhibits 3, 4 and 5, with

24    respect to Officers Abel, Narewski, or Baase?

25    A.      I have a couple of them here, so I'm going to

```
 1    check that right now.  No, I have not.

 2    Q.      Okay.  And you have not seen any other tracking

 3    sheets like the ones that we looked at with respect to

 4    any additional psychological exams conducted for Officer

 5    Mason, correct?

 6    A.      No, I have not.

 7    Q.      Okay.

 8                    MS. GREENE:  I want to go off the

 9    record for just a moment.

10                          - - - -

11      (Thereupon, an off-the-record discussion was held.)

12                          - - - -

13                    MS. GREENE:  Let's go back on the

14    record.  So just to be clear, at this point it's

15    Plaintiff's position that documents demonstrating that

16    Baase, Narewski, Abel, and Mason were subjected to

17    psychological evaluations at any point in time, that

18    those documents were requested for production in the

19    Notice of Deposition that we're here today on.  And

20    also, that they would respond to the prior discovery

21    requests.  And you have represented that the lawyers for

22    the city are attempting to obtain those documents at

23    this time, is that right?

24                    MS. DEAN:  That's correct.

25    BY MS. GREENE:
```

1 Q.  All right.  Let's move on.  Deputy Chief Bash,

2 we're going to talk about hiring, discipline, and

3 supervision now.  We're moving on to the next topic in

4 the Notices of Deposition in which you are here today to

5 testify on, and this is now going to be topic three in

6 the notices provided in these cases.

7   So, I would like for you to describe for me the

8 hiring process that applied to Keith Abel when he

9 applied to become a CDP officer, please.

10 A.  I'm looking at the specifics for him.  I

11 apologize.  I don't think that I have Abel's documents

12 right here in front of me.  For some reason he's the

13 only one that's missing.

14 Q.  All right.  I'm going to show you a document.

15 A.  Okay.  Thank you.

16 Q.  Okay.  Do you see the document on your screen

17 now?

18 A.  I do.  Thank you.

19 Q.  Have you ever seen this document before?

20 A.  I don't think so.

21 Q.  Do you know what it is?

22 A.  It looks like it was noticed that he was removed

23 from the list, and this was Officer Keith Abel, removed

24 from the list for some medical issue.

25 Q.  And this is a letter dated August 25th, 1993,

1   **correct?**

2   A.     Correct.

3        MS. GREENE:   I'm going to mark this as

4   Exhibit 6.

5            - - - -

6     (Thereupon, Plaintiff's Exhibit 6 was marked for

7            identification.)

8            - - - -

9   BY MS. GREENE:

10   **Q.     When an officer is removed from the list because**

11   **he doesn't meet the required medical standards as stated**

12   **here, what does that mean?**

13   A.     It means there was something in their medical

14   history that would disqualify them based on civil

15   service rules.   It could be any number of things.   It's

16   not specific there what it is, but it does give you the

17   opportunity to file an appeal if you chose to do that.

18   **Q.     And what is the appeal process?**

19   A.     In my experience, because I filed an appeal

20   myself, I went to my doctor and had that test done

21   again, and then those results were sent to the civil

22   service commission.

23   **Q.     As you sit here today, do you know whether Abel**

24   **appealed this finding?**

25   A.     I do not know that, but if I were to put two and

1  two together, I would say that he did because he was at

2  one-time a police officer.

3  Q.      But, you don't know any specific information

4  about whether he appealed or what the subject of the

5  appeal was and what the outcome was?

6  A.      I do not.  Was that subsequently included, the

7  specific diagnosis?

8  Q.      It's possible.  I have another document that I

9  hope you can tell me whether or not it is.

10  A.      Clearly in 1993 I was not involved in the hiring

11  process, so a lot of that is speculation.

12  Q.      Okay.  I'm going to share with you another

13  document.  Do you see this document?

14  A.      Yes.

15  Q.      What is it?

16  A.      Let me read it first.  This tells him that his

17  vision report did not meet the standards, so his name

18  has been removed from the police officer eligibility

19  list, and he's not eligible for appeal.

20  Q.      It says he failed both vision exams.  It seems

21  as though there were two exams that were administered,

22  right?

23  A.      It says both vision exams, so yes.

24  Q.      Now, if there was no appeal procedure in place

25  or available after this event, do you know how Officer

1  Abel was able to become an officer?

2  A.      I do know that many current officers who failed

3  the vision test got laser surgery to fix their eyesight

4  so they were able to pass subsequent eye exams.

5  Q.      And you don't know whether --

6  A.      I don't know if Officer Abel did that, but I do

7  know that that was a regular occurrence for people who

8  failed because it had to be some kind of correctable

9  with glasses to a certain extent.  If you had worse

10  eyesight you could not get hired, hence the failure of

11  both of those.  But the laser eye surgery could correct

12  that so that you wouldn't have to wear glasses.

13  Q.      But, we don't know what happened?

14  A.      We don't have that specific diagnosis, no.

15  Q.      And we don't know how it was that he overcame

16  this removal from the list to be placed back on the list

17  and eventually hired?

18  A.      Well, we also don't know that he was hired from

19  this list.

20  Q.      Where else would he be hired from?

21  A.      He may have taken a subsequent test.  He may

22  have tested again, because you can take a civil service

23  test -- now you can take it yearly.  I don't know what

24  the standard was then, but he could have taken the civil

25  service test a second time, scored to the point where he

Deposition of Deputy Chief Richard Bash                    James J. England, vs. City of Columbus, et al.,

1    went through this process again, and was able to then

2    pass the test.

3    **Q.        All right.**

4    A.        Civil service may be better able to answer that

5    question, since they're the keeper of the tests.

6    **Q.        Okay.  Do you know anything about the hiring**

7    **process as applied to Bryan Mason, John Narewski or**

8    **Matthew Baase?**

9    A.        I do have some background investigations there,

10    yes.  But, again, they were all hired well before I was

11    in the position to be involved in the hiring process.

12    **Q.        Do you know whether anyone -- strike that.  For**

13    **these officers, did they all undergo polygraph**

14    **examinations as part of their hiring process?**

15    A.        Let me take a look and confirm.  I see Officer

16    Baase is scheduled for his polygraph.  A letter that was

17    sent on October the 4th, 1999.  I'm looking for the

18    results here, but I don't see those specifically.  I

19    found some of Abel's documents.  These old files have

20    information tucked away not quite as orderly as what we

21    do today.  I do not see his polygraph results.  I see he

22    was invited to take his polygraph.

23    **Q.        So, presumably he was subjected to a polygraph,**

24    **but you don't know for sure as you sit here right now?**

25    A.        Right.  I don't have the document that tells me

Deposition of Deputy Chief Richard Bash                    James J. England, vs. City of Columbus, et al.,

1    that he passed, or the summary in there.

2    Q.      Or any indications about whether or not he was

3    truthful?

4    A.      Right.  There's no evaluation in there that I

5    could find.  So I'm looking through the Narewski now.

6    Again, I can't attest to how these files were put

7    together back in 1993, or whatever this was.  Here we

8    go.  We have a polygraph summary for Narewski.

9    Q.      What's the Bate stamp on that polygraph summary?

10   A.      The polygraph summary was created on the 25th of

11   September, 2000.

12   Q.      Is there a stamp at the bottom of the page with

13   a title and a number?  I just want to know if I can find

14   what you're looking at right now.

15   A.      Actually, it's amongst Narewski's background

16   file.

17   Q.      And what's the stamp at the bottom of the page?

18   What's the number down there?

19   A.      There's not.

20   Q.      In this case, are there any indications in the

21   document that you're looking at right now, that Narewski

22   exhibited any signs of dishonesty?

23   A.      The box that said no deception -- let me get the

24   direct quote for you here.  So, the bottom of page two

25   says, "No deception indicated," and that box is marked.

1  Q.    Okay.  What page on the background file are you

2  looking at?  I mean, it's 84 pages long, right?

3  A.    Yeah.  Look at page 35.

4  Q.    All right.  I'm going to extract this and make

5  this a document.  Is this the document that you were

6  looking at?

7  A.    That's the front page of the document, yes.

8  There you go, yes.

9  Q.    So, as far as you're aware, beyond what's in

10  this document here, are there any other indications in

11  the hiring process concerning Narewski's honesty or

12  dishonesty?

13  A.    Well, I have not read this package word for

14  word, so I can't tell you that.  I see that the

15  polygraph says, "no deception indicated," but I've not

16  read nor memorized this entire background package, no.

17       MS. GREENE:  I'm going to mark this as Exhibit

18  7, this Narewski polygraph summary.

19                    - - - -

20     (Thereupon, Plaintiff's Exhibit 7 was marked for

21                 identification.)

22                    - - - -

23  BY MS. GREENE:

24  Q.    Okay.  I want to come back to this in a little

25  bit, but for right now I want to move on to a couple of

1  other questions regarding supervision.  Can you explain

2  to me what supervisory systems are in place?

3  A.      So there are a number of supervisory systems in

4  place.  Are you talking about like in the academy?

5  There's supervisory situations where officers supervise

6  recruits.  Once they graduate from the academy there's a

7  sergeant who is the direct supervisor of a number of

8  officers depending upon their job.  A lieutenant then is

9  in charge of supervising sergeants.  A commander

10  supervises a group of lieutenants.  And a deputy chief

11  supervises a group of commanders and/or a bureau of

12  managers.  And then, ultimately the chief supervisors

13  his direct reports, being deputy chiefs and some others.

14  Q.      It sounds to me like you're describing what

15  other witnesses from the division have called the chain

16  of command, is that right?

17  A.      That's true, yes.

18  Q.      And so, supervision of officers occurs through

19  the chain of command system, right?

20  A.      Correct.

21  Q.      Are there any other systems through which

22  supervision occurs within the division of police?

23  A.      You'll have to define the word supervision and

24  maybe I can better answer that question for you.

25  Because we're evaluated by the people that we deal with

```
 1    every day, whether it be a citizen or peers look at us
 2    and say, "hey."  So, we're evaluated regularly, but we
 3    only have one direct supervisor for a unit of command.
 4    Everybody should only have one person that is their
 5    direct supervisor.
 6    Q.      And what are the purposes of that supervision
 7    through that one direct supervisor?
 8    A.      The role of a supervisor, if that's what you're
 9    getting at, is to enable an officer to perform their
10    function to the best of their ability with the resources
11    that they need to perform their function.
12    Q.      Any other roles of a supervisor?
13    A.      Well, certainly ensuring that they are doing
14    their job and doing their job within the parameters of
15    the law and the policies.
16    Q.      And how does a supervisor ensure that an officer
17    is doing their job and doing it within the parameters of
18    the law and policies?
19    A.      Well, thorough investigations through direct
20    contact, direct observation, follow-up and
21    communication.  There are a number of ways to try to
22    maintain that connection to ensure, to the best of their
23    ability, that an officer is doing exactly what they're
24    supposed to be doing in accordance with the law and
25    policy.
```

1  Q.      Supervisors are not present with their

2  subordinate officers at all times, correct?

3  A.      That's correct.

4  Q.      So, in order to make those determinations about

5  whether or not an officer is doing their job within the

6  law and policy, a supervisor is reliant upon either

7  information that's reported to them or that they

8  directly observed, right?

9  A.      Correct.

10  Q.      And supervisors cannot possibly be aware of

11  everything that an officer does at all times, right?

12  A.      That's correct.

13  Q.      So, it's a necessary feature of the system that

14  supervisors do not have the capacity to ensure that

15  officers are doing their jobs within the law and

16  policies at all times, right?

17  A.      That's certainly not exclusive to police

18  functions.  I don't think any supervisor is constantly

19  watching their subordinates.  So, yes.  That's the

20  nature of supervision.

21  Q.      What types of systems or checks are in place in

22  the CDP to ensure that supervisors receive information

23  about their subordinate officers when they're not

24  performing their jobs within the law and the policies of

25  the department?

```
1   A.      I'm not sure I specifically understand your
2   question.  Supervisors will get information about
3   complaints of misconduct from citizens.  They can get
4   information from the officer's peers.  They can get
5   information from other division employees, and that can
6   be both positive and negative.  This person is doing a
7   good job or a poor job.  So, there's quite a number of
8   different sources of information for a supervisor to
9   have.
10  Q.      These are potential sources of information that
11  we're talking about, right?
12  A.      Correct.
13  Q.      Are there any systems in place to ensure that
14  supervisors are provided or have access to information
15  from all of those sources on a regular and ongoing
16  basis?
17  A.      Can you ask that question again?
18  Q.      Are there any systems in place to ensure that
19  supervisors are provided information from those various
20  sources that you just named in order to conduct their
21  supervisory duties on a regular and ongoing basis?
22  A.      I noted citizens, and no, there's no mechanism
23  for citizens to regularly contact supervisors to give
24  them information about subordinates.  There's no
25  mechanism for peers to regularly contact a supervisor to
```

1   provide information on another person.  So, as far as

2   the sources that I mentioned before, no, there's not a

3   regular mechanism in place for them to have

4   communication about an officer.  Correct.

5   Q.      For the purposes of supervision, how do CDP

6   supervisors consider, if at all, citizen complaints in

7   the process of supervision?  How do they use them?

8   A.      So, right now, frontline supervisors see a

9   completed investigation of these citizen complaints.  So

10  they evaluate the officer's behavior based on that

11  complaint and based on the totality of the

12  investigation.

13  Q.      And when you say, "evaluate their behavior based

14  on the totality of the investigation," what do you mean?

15  A.      I guess I could give you an example.  If a

16  citizen complains that this officer was rude and

17  discourteous to them, and Internal Affairs has an

18  interview with the complainant, an interview with the

19  officer, and then a review of the body camera footage

20  that's in existence most of the time, then that

21  frontline supervisor can evaluate whether that officer

22  truly was rude or discourteous, or if there was anything

23  else that needs to be addressed, either positive or

24  negative with the officer's behavior.

25  Q.      When lawsuits are filed against officers, are

1    those considered in a supervisory process?

2    A.        If the supervisor knows about it, but not

3    necessarily part of their evaluation process, no.

4    Q.        Do all lawsuits related to police duties come to

5    the attention, or are they provided for the

6    consideration of supervisors?

7    A.        So, an officer who is served sends a letter up

8    the chain of command usually requesting representation

9    from the city attorney's office, so they'll have that

10   information that an officer is being sued out of a

11   particular incident.

12   Q.        Do you supervisors take into account any of the

13   allegations contained in those lawsuits in their

14   supervision of that subordinate officer?

15   A.        I can't speak for those other supervisors.  I'm

16   sorry.

17   Q.        Is there not a standard practice or supervisory

18   function within the division to consider allegations

19   contained in lawsuits in the supervision process?

20   A.        That's not specifically enumerated, no.

21   Q.        And we talked briefly about citizen complaints a

22   moment ago.  Are those always considered in the

23   supervision process?

24   A.        I can't answer for everyone in saying always.

25   Frontline supervisors see those and read those and

1   they're required to act upon those.  They make their

2   recommendations to the next step of supervision.  I

3   can't say the word always in every one, but I do know

4   that they have that information.

5   **Q.      All citizen complaints then are conveyed to**

6   **supervisors, is that right?**

7   A.      Well, not all citizen complaints, because if a

8   citizen complains of something that's not misconduct,

9   then, that information would not be investigated.  So,

10   if a citizen complained about my haircut, then that's

11   not going to go to my supervisor because that's not

12   misconduct.  So, it's only complaints of misconduct

13   based on the law or our policies.

14   **Q.      Okay.  What about complaints or allegations**

15   **lodged by one officer against another officer, are those**

16   **provided to direct supervisors to use in the process of**

17   **supervision of a subordinate?**

18   A.      They're made aware of that.  That complaints

19   will be investigated usually by Internal Affairs.

20   Sometimes even by the chain of command depending upon

21   what the allegation is, and they'll be aware of it.  I

22   think a supervisor would pay attention to that

23   allegation and certainly put it into the totality of the

24   situation to determine whether there's consistencies or

25   inconsistencies there.  But, all of those were taken

1    into consideration when evaluating an officer and

2    helping them do their jobs the best they possibly can

3    do.

4    **Q.       Are all complaints or allegations by officers**

5    **against other officers provided to supervisors, or is**

6    **there some benchmark that they have to meet in order to**

7    **be provided to the supervisor?**

8    A.       Again, it's based on misconduct.  So, there has

9    to be some allegation that there is violation of the law

10   or of our rules, and not just that his mustache is too

11   long, or something foolish like that.  We have a

12   parameter or a set of standards that have to be met.

13   So, yes.  If there's a complaint that is a complaint of

14   a violation of one of our policies or directives or a

15   violation of the law, that supervisor would know that.

16   **Q.       In the event that an officer maybe doesn't file**

17   **an actual written or formal complaint against another**

18   **officer, but has otherwise voiced some kind of an**

19   **allegation that would rise to the level of violation of**

20   **policy or law, does that come to the attention or**

21   **brought to the attention of supervisors?**

22   A.       So, our policy indicates that if you have any

23   knowledge of misconduct you're obligated to put pen to

24   paper and advise your supervisor of that misconduct in

25   writing.  That would be a requirement.  If you say that

```
 1   this officer is doing this, and it's misconduct and

 2   violation of our policy, you'll then be directed to put

 3   pen to paper, put that allegation in writing, and

 4   forward that up your chain of command.  So, yes.  That

 5   other supervisor will eventually know that.

 6   Q.      Does it happen in the division of police that

 7   officers know about misconduct by other officers and

 8   don't put pen to paper and file a written complaint?

 9   A.      It better not.

10   Q.      Have you ever known it to happen?

11   A.      Have I known it to happen?  I've never known it

12   to happen that it never made pen to paper, because as

13   soon as I knew about it, I require it is made pen to

14   paper.  I can't tell you there's never been a time where

15   there was misconduct that wasn't reported, because if I

16   knew about it, it gets reported.  Does that make sense?

17   Q.      Yes.  And you're talking about officers in your

18   chain of command ordering them to put it to pen to

19   paper, right?

20   A.      Right.  But if, at any time, if an officer tells

21   me of misconduct and they don't want to put it pen to

22   paper, they don't have a choice.  You're telling me of

23   misconduct, we're putting pen to paper.

24   Q.      But, you could only speak about your own

25   practices?
```

1    A.      I can only speak to the information that I have.

2    I can't answer a question that's hypothetical, has this

3    ever happened.  I can't answer that question.

4    Q.      **As you sit here today, you don't know whether or**

5    **not all other supervisors in the same or similar**

6    **position as you have hear about misconduct and also then**

7    **require that officer --**

8    A.      I can't answer that question.  I do not have

9    that knowledge.

10   Q.      **Okay.  And I know it's getting late in the day**

11   **here, but let me finish my question before you start**

12   **talking.  In terms of these things that we've just**

13   **discussed, the information coming to the attention of**

14   **supervisors, are these things documented or tracked in**

15   **any database or written compilation of information?**

16   A.      Yes.  When there is a complaint it makes pen to

17   paper, that does ultimately end up in our Internal

18   Affairs and it's documented in an Internal Affairs

19   database, yes.

20   Q.      **Okay.  And that includes what kind of**

21   **complaints?**

22   A.      Are you still referring to internal?

23   Q.      **Yeah.**

24   A.      So, that could include a complaint that somebody

25   is rude and discourteous.  It could include a complaint

Deposition of Deputy Chief Richard Bash                    James J. England, vs. City of Columbus, et al.,

1    that -- well, any violation.

2    Q.      Let me clarify.  What I'm asking is, are you

3    talking about citizen complaints only right now, or are

4    you talking about lawsuits filed against an officer, or

5    complaints lodged by one officer against officer, other

6    categories?  What type of complaints are documented in

7    that Internal Affairs database?

8    A.      So, a lawsuit filed against an officer, in my

9    experience, lawsuits filed against officers are often

10   just a follow-up to what's been a complaint or an

11   investigation already completed by the division of

12   police.  I've not seen a lawsuit filed, and there may be

13   some, that did not stem from some other investigation,

14   whether it be use of force investigation, a citizen

15   complaint investigation, or some other misconduct

16   investigation.  So, if there was a lawsuit filed, and we

17   had no other indication that there was an investigation

18   done by the division of police, then that certainly

19   would prompt an investigation.  But I've never seen

20   that.

21   Q.      Okay.  How are performance evaluations conducted

22   within the CDP?

23   A.      Annually there are performance evaluations that

24   the direct supervisor needs to complete with their

25   subordinates.

Deposition of Deputy Chief Richard Bash         James J. England, vs. City of Columbus, et al.,

1   Q.      And what's the process for that?

2   A.     It's a matrix, and 90 days before their birthday

3   the supervisor gets a prompt from human resources to

4   evaluate and take a look at all of the different areas

5   of evaluation to determine if there's any development

6   needed.  If there is development needed in any of these

7   areas, the supervisor is obligated to have a conference

8   with the officer and set up a work plan.  If there are

9   no areas of concerns, the supervisor signs that and

10   sends that off.  And then, 90 days within the employee's

11   birthday they go over their evaluation.  I think it's

12   now ten different categories of what officers are

13   expected to do and how well they do them, and they do

14   that every year.

15   Q.      Are citizen complaints reviewed as part of the

16   performance evaluation process?

17   A.     Not always.  It depends on how often that

18   supervisor changes.  Unfortunately, an officer could

19   have a number of different supervisors throughout a

20   given year.  That new supervisor may not have had the

21   opportunity to review every citizen complaint before

22   they saw its disposition, but it is available for them

23   to do that.

24   Q.      Are they required to look at those as part of

25   the performance evaluation?

1   A.      No.

2   Q.      So, what about lawsuits filed against officers,

3   are those included as part of the performance evaluation

4   process?

5   A.      That's not one of the criteria, no.

6   Q.      So, lawsuits filed against an officer is not

7   considered for the purpose of an annual performance

8   evaluation?

9   A.      That's correct.

10  Q.      What about complaints lodged by one officer

11  against another, are those considered for the purpose of

12  a performance evaluation process?

13  A.      Just as the citizen complaints, they are

14  available to the frontline supervisor to be reviewed in

15  the Internal Affairs file.

16  Q.      But, it's not required?

17  A.      No.  It's not required, but it would be in the

18  same location as a citizen complaint.

19  Q.      Now, are officers who are conducting performance

20  evaluations in their capacity as supervisors, are they

21  trained that they should look for citizen complaints or

22  fellow officer complaints as part of that performance

23  evaluation?

24  A.      So, supervisors who are trained to do that are

25  trained to look for every piece of information they can

```
 1  get to help them properly provide feedback to their

 2  subordinates.  So, that could include citizen

 3  complaints.  That could include traffic accidents.  We

 4  have an early warning system.  There's any number of

 5  things that they could have access to.

 6  Q.      Okay.  But, they're not trained that they're

 7  mandated to --

 8  A.      They're not required to do so, no.

 9  Q.      Let me finish my question first.  So, then you

10  mentioned early warning system.  I assume you're

11  referring to EARS, right?

12  A.      Right.

13  Q.      Does EARS have any affect on performance

14  evaluations?

15  A.      It could, yes.

16  Q.      But not necessarily?

17  A.      Well, if an officer is not referred in EARS and

18  the EARS committee determines there's no pattern of

19  problematic behavior, that would not be a problem in the

20  evaluation.

21  Q.      Are supervisors required to consider information

22  contained in citizen complaints, fellow officer

23  complaints, or the EARS system for the purpose of

24  observing and supervising that officer on an ongoing

25  basis?
```

1    A.       I don't know that we have a document that tells

2    them that that's what they have to do. So, as a

3    supervisor, you take all the information that's

4    available to you, and you use that in enabling officers

5    to do the best job that they can possibly do, but I

6    don't believe that we have a document that tells them

7    these are the 18 things you have to read every day to

8    evaluate.

9    **Q.       How about with regard to supervisors; and as we**

10   **discussed before, they have discretion to look or not**

11   **look for those citizen complaints, fellow officer**

12   **complaints, or EARS system tags or outcomes, right?**

13   A.       Correct. They do have discretion as to how much

14   additional research they're going to do during their

15   evaluation period, yes.

16   **Q.       And if they don't look at those documents, then**

17   **they're limited to their own direct observations for**

18   **what has been directly reported to them for the purpose**

19   **of supervision, right?**

20   A.       Or having read other investigations. So,

21   there's other outside stimuli. But you're right,

22   they're certainly very dependant upon their own direct

23   observations.

24   **Q.       Okay. Does the CDP supervisor structure detect**

25   **officers who are frequently the subject of complaints?**

1   A.     Yes.

2   **Q.     And how does it do that?**

3   A.     That's our EARS systems, the early warning

4   system.  I'm sorry.  I don't remember what the acronym

5   stands for.

6   **Q.     That's fine.  We can just say EARS.  EARS is the**

7   **only structure in place for the CDP to track or detect**

8   **officers who are frequently the subject of complaints,**

9   **right?**

10   A.     It is the formal system in place to do that,

11   yes.

12   **Q.     And detecting officers who are frequently the**

13   **subject of complaints is not a formal part of the chain**

14   **of command supervision process, correct?**

15   A.     It's part of the EARS process, and the EARS

16   process is part supervision.  So, I don't think that you

17   can necessarily separate those two.

18   **Q.     So, do direct supervisors have a duty to detect**

19   **officers under their supervision that are frequently the**

20   **subject of complaints?**

21   A.     Yes.

22   **Q.     And then, are they required to document or**

23   **report in any way the frequent complaints about a**

24   **particular officer?**

25   A.     Would you repeat that question?

1 Q.  Sure.  So, let me just turn another direction

2 here.  EARS documents patterns of misconduct, or

3 potential patterns of misconduct, right?

4 A.  Not necessarily.

5 Q.  Okay.

6 A.  EARS detects patterns of behavior.  It's not

7 necessarily misconduct, but it tracks behavior.

8 Q.  Now, are CDP supervisors specifically

9 tasked with tracking officers who are frequently the

10 subject of complaints?

11 A.  Outside of the EARS process, no.

12 Q.  Okay.  So, you mentioned that the performance

13 evaluation can result, if necessary, in a plan being put

14 together for the officer, right?

15 A.  That's correct.

16 Q.  Are there any other points throughout the year

17 or events that would give rise to a supervisor putting

18 together a plan for a subordinate officer other than the

19 annual performance evaluation?

20 A.  Yes.

21 Q.  What are those?

22 A.  Well, a sergeant can detect in a regular review

23 of reports, because a supervisor is required to review

24 the reports that officers complete.  If that supervisor

25 notices a deficiency in the reports he can put together

1   a work plan for that.  If a particular supervisor sees a

2   pattern of complaints that come across his desk, because

3   he's required, again, to read those from Internal

4   Affairs, he could put together a work plan based on

5   those citizen complaints if he sees a pattern of force,

6   or any pattern at all that he or she finds that could be

7   problematic.  He or she has the ability to put together

8   a work plan based on their personal observations.

9   **Q.      Is it required that those plans are in writing,**

10  **or may they be verbal, or oral?**

11  A.      We encourage them to be in writing, and if

12  they're based on the performance evaluations, they must

13  be in writing.  If it's a work plan that I noticed as a

14  sergeant whose subordinate doesn't do a very good job

15  with house searches, I may not put that writing.  I may

16  just take him to a couple of houses and practice.  There

17  could be any number of ways to be a mentor, or teacher,

18  or supervisor.

19  **Q.      In terms of those kinds of events that might**

20  **give rise to a plan being created outside of the**

21  **performance evaluation, if a plan is indeed created, is**

22  **there any requirement that the supervisor either report**

23  **that plan up the chain of command, or that it is**

24  **documented somewhere that a plan was created?**

25  A.      If there's a documented work plan, then, yes.

```
 1   If it's a coaching opportunity, then, no.
 2   Q.      Okay.  So, it's possible, for example, that a
 3   supervisor notices -- you brought up the issue of house
 4   searches.  A supervisor notices there's problems with an
 5   officer's house search tactics and that supervisor works
 6   with the officer, there's just no documentation that
 7   that occurs, right?
 8   A.      Yes.  That's very possible.
 9   Q.      And likewise, it's possible that a supervisor
10   could notice some potential problematic behavior around
11   use of force issues and might work with the officer,
12   that also may not be documented, right?
13   A.      That is possible, yes.
14   Q.      Okay.  And so, then there's no like formal
15   monitoring system with respect to these undocumented
16   plans that are generated, right?
17   A.      Right.  No formal documentation plan for
18   informal training.
19   Q.      Okay.  And there's discretion on the part of a
20   supervisor as to what type of plan might be created in
21   response to any of these events that are not part of the
22   annual performance evaluation, right?
23   A.      As long as it's done within policy and law.
24   That's the parameters.
25   Q.      If there are plans written for an officer that
```

```
 1   are not part of an annual performance evaluation, where
 2   are those written plans stored?
 3   A.      They would ordinarily be stored in Internal
 4   Affairs.  That's pretty much the document holding spot
 5   for us.
 6   Q.      Okay.  And that's the same place for storing any
 7   performance evaluation related plans, right?
 8   A.      The performance evaluation plans, I believe, are
 9   housed in personnel, but I'm not one hundred percent
10   positive.
11   Q.      As we sit here today, do you know whether any
12   plans, whether part of the performance evaluation
13   process or otherwise, were ever created for Officer
14   Mason?
15   A.      I do not.
16   Q.      As you sit here today, do you know whether any
17   plans of any type were created for Officer Abel?
18   A.      I do not.
19   Q.      Do you know whether any plans of any type were
20   ever created for Officer Narewski?
21   A.      I do not.
22   Q.      And do you know whether any plans of any type
23   were ever created for Officer Baase?
24   A.      I do not.
25   Q.      Okay.  Can you explain to me what mechanisms, if
```

1  any, are in place to inform supervisors of excessive

2  force events by their subordinate officers?

3  A.      So, supervisors are tasked with investigating

4  uses of force by their subordinates.  If there's an

5  excessive use of force incident, then that supervisor is

6  there investigating it, and they would know because

7  they're investigating it.  If there's a use of force

8  incident that occurs during a day where the direct

9  supervisor is not working, that use of force still has

10  to be routed through their direct supervisor.  So, the

11  direct supervisor always sees a use of force, whether it

12  be within policy, or not within policy, so they always

13  have knowledge of whether it's, what you would call,

14  excessive use of force or not excessive use of force,

15  they have knowledge of all of them.

16  Q.      Okay.  We agreed earlier that supervisors cannot

17  be present with an officer at all times, right?

18  A.      Correct.

19  Q.      And so, in determining whether or not an

20  investigation is even warranted, or whether they are to

21  be informed about an excessive force event, for example,

22  those supervisors are reliant on the reports from an

23  officer, him or herself, or reports of fellow officers

24  or witnesses on the scene, right?

25  A.      So, all uses of force are required to be

1    reported.  So if there's an unreported use of force

2    that's never reported, then, no supervisor is going to

3    know about that.

4    Q.       And likewise, if there was a use of force that

5    was indeed reported, but was not accurately reported,

6    and there's no other information that was provided to

7    the supervisor by the witness, the officer, or fellow

8    officers, then the supervisor still would not know that

9    there was an excessive force event in that kind of

10   situation, right?

11   A.       I'm not sure I understand your premise.  If

12   there's an excessive use of force situation the person

13   upon which the force was used is not sharing that

14   information?  I'm confused.

15   Q.       So, for example, in a situation where, let's

16   say, an officer is on the scene alone, he uses excessive

17   force against a person.  That person does not file a

18   complaint, and the officer's report of that force event

19   was not accurate and did not reflect that it was

20   indicative of excessive force.  In that event, if no one

21   came forward to make a complaint, and the officer never

22   provided any additional information, the supervisor

23   would not ever know that excessive force occurred,

24   right?

25   A.       No.  Because the sergeant responds to the scene

1    to interview any potential witnesses and the arrestee

2    or whoever the force was used upon.  Even if the person

3    doesn't call Internal Affairs later, they're talking to

4    the supervisor now, so --

5    **Q.        Okay.**

6    A.        I'm not sure that your premise makes sense.

7    **Q.        It's true that a lot of people are subjected to**

8    **force in the process of an arrest, right?**

9    A.        Some are, yes.

10   **Q.        And it's true that a lot of people who have been**

11   **arrested refuse, often at the advice of counsel, to**

12   **speak to the police about anything surrounding the**

13   **circumstance related to their arrest, correct?**

14   A.        Some do, yes.

15   **Q.        And so, in an event where a person who was**

16   **subjected to excessive force does not convey any**

17   **information to the police, even if the police attempted**

18   **to interview that person, it's possible that an**

19   **excessive force event may go undetected by a supervisor,**

20   **right?**

21   A.        Again, you're asking a hypothetical question.  I

22   suppose between body cameras, witnesses, and phones,

23   anything in this world is possible, ma'am.  So

24   hypothetically, sure.  But, there's a lot of things that

25   could hypothetically happen.

1    Q.      Okay.  Are lawsuits filed against police

2    officers ever considered for the purpose of discipline?

3    A.      Just a lawsuit that's filed against a police

4    officer without any adjudication?

5    Q.      Sure.

6    A.      Then, no.

7    Q.      If there's a lawsuit filed against an officer

8    and an investigation had not previously been conducted

9    with respect to whatever the subject of the lawsuit was,

10   would that spur the CDP to conduct an investigation at

11   that point?

12   A.      Yes.

13   Q.      And is that true in every situation where a

14   lawsuit is filed?

15   A.      When you say, "every" I can't answer that

16   particular question, but that is a notice of misconduct,

17   that's an allegation of misconduct, and if we get that

18   information that a person is alleging misconduct against

19   an officer, then, yes, we start an investigation.

20   That's the policy, that if we find an allegation of

21   misconduct we complete an investigation into that

22   misconduct to the best of our ability.

23   Q.      Okay.

24                   MS. GREENE:  I want to go off the

25   record for a moment to take a short break.

```
 1                        - - - -

 2       (Thereupon, an off-the-record discussion was held.)

 3                        - - - -

 4    BY MS. GREENE:

 5    Q.      All right.  Deputy Chief Bash, let's talk about

 6    Keith Abel, and the supervision of Keith Abel, and

 7    discipline of Keith Abel.  I'm going to show you a

 8    document.  Have you seen this document before?

 9    A.      Yes.  I'm looking at it right now.

10    Q.      Okay.  What is it?

11    A.      This is the IAB history printout.

12    Q.      And what is an IAB history printout?

13    A.      So it's a record of investigations that have

14    been either conducted by IAB or stored in IAB

15    investigations that may have been done by the chain of

16    command.

17    Q.      Okay.  And I'll mark this as Exhibit 8.

18                        - - - -

19       (Thereupon, Plaintiff's Exhibit 8 was marked for

20                    identification.)

21                        - - - -

22    BY MS. GREENE:

23    Q.      You reviewed this document before you came into

24    this deposition today, right?

25    A.      I looked at it, yes.  I did not memorize it.
```

1    Q.      Fair enough.  We're going to look through it and

2    I'm going to ask you to talk about events listed in this

3    document that appear to have given rise to some kind of

4    a finding that a complaint was sustained, founded, or

5    that Officer Abel's actions were considered outside of

6    policy, okay?

7    A.      Okay.

8    Q.      Okay.  So, here we are on the second page of

9    this 24 page document, and at the top of the page we

10   have an event from August 8th, 2013 and it was

11   determined that Abel's actions were outside of policy,

12   right?

13   A.      That's what it says, yes.

14   Q.      Do you know what this particular IAB history

15   entry is about?

16   A.      I do not.

17   Q.      Do you know whether Abel was disciplined for

18   whatever happened here on August 8th, 2013?

19   A.      I do not.

20   Q.      Okay.  Here we are on the fourth page of this

21   document.  Here we have a series of events and one is

22   listed as February 6th, 2015, the other two are listed

23   as February 16th, 2015.  The first two relate to James

24   Michael England, the bottom one has a complainant of

25   Lieutenant Jeffery Lokai, right?

1   A.      Yes.

2   Q.      And can you tell me looking at this document

3   whether in particular this third entry at the bottom of

4   the page complainant, Lieutenant Lokai, whether that is

5   related to the above two entries?

6   A.      I cannot tell you unequivocally.  But, I would

7   conclude, yes.  But, I can't tell you specifically why.

8   That would probably be in the complete shooting package.

9   Q.      Okay.  And in the third entry the address for

10  the event is 120 Marconi Boulevard.  That's the division

11  of police headquarters, right?

12  A.      That's correct.

13  Q.      Okay.  And as we sit here today, do you know the

14  disciplinary outcome, if any, from the events on this

15  page?

16  A.      Well, there wouldn't be any discipline on the

17  intentional and not in violation of policy, and there

18  wouldn't be any discipline on a within policy use of

19  force.

20  Q.      Are you familiar with any discipline that Keith

21  Abel received in relation to the shooting of James

22  England?

23  A.      I don't see any here on the list.

24  Q.      And as we sit here independently from this list,

25  are you aware of the disciplinary process and outcome

1  with respect to the shooting of James England by Keith

2  Abel?

3  A.      I believe that that police involved shooting was

4  found not in violation of policy, so there would be not

5  any discipline.

6  Q.      Are you aware that the chain of command

7  recommended discipline and that the chief overturned

8  that recommendation?

9  A.      I do remember that, yes.

10 Q.      And what do you remember about that?

11 A.      Boy, it's been so long ago.  But my personal

12 recollection is that the chief disagreed with the chain

13 of command that it was intentional and not in violation

14 of policy, and I believe it was the Firearms Review

15 Board thought it was a violation of policy.

16 Q.      Do you remember how you learned that

17 information?

18 A.      I don't know if it was the Firearms Review Board

19 at the time, or I just relinquished it to a fellow

20 deputy chief that had a question about it.  But I do

21 remember having knowledge of it, but not being directly

22 involved in it.

23 Q.      Do you remember any statements from any of the

24 officers who recommended a finding of outside of policy

25 in relation to the chief's reversal of that

1  recommendation?

2  A.      No, I do not.

3  Q.      Okay.  We're going to continue through this

4  document.  There's a number of events listed here.

5  A.      Okay.  That's a different document than I have

6  here.

7  Q.      Okay.  Well, this portion of the document starts

8  on page six.  Have you ever seen this document before?

9  A.      I just have five pages.  I don't have 19 pages

10  for Officer Abel.

11  Q.      I'm showing this to you now.  Have you ever seen

12  what's on the screen here, which is part of my Exhibit

13  8?  Have you seen this before?

14  A.      No.  I've not seen this one before.

15  Q.      Is this a different type of document than the

16  first five pages that we looked at, or is it the same

17  kind of document, different format?

18  A.      It seems to be a similar document, but, again, I

19  don't have that document in front of me.  It may have

20  been generated by a different database, but I don't

21  currently have that one.

22  Q.      Okay.  In any case, you're here today to testify

23  about discipline of Officer Abel as one of the

24  designated topics, right?

25  A.      Right.

1   Q.      I'm going to ask you some questions about this

2   document.  If you look here on page six, it says right

3   underneath the header "Citizen Complaints and Internal

4   Investigations," do you see that there?

5   A.      I do.

6   Q.      Does that mean that everything following that

7   heading is either a citizen complaint or an internal

8   investigation?

9   A.      Correct.

10  Q.      Okay.  So, I'm going to take us to the tenth

11  page of this document in Exhibit 8, and we'll look at

12  these two, I guess, squares, or fields, on the page that

13  I think are associated with each other.  And I'm talking

14  about the square that has incident number 200304-0122

15  and the square below that says, "Application, Citizen

16  Complaints, Tonya Lynchfield."  Do you see those?

17  A.      Yes.

18  Q.      Are those two squares in association with each

19  other?

20  A.      I don't know the answer to that question.

21  Q.      I ask because if we go back to page six, it

22  appears there's an incident number square first, and

23  then the one that follows is a description of the

24  incident with more pertinent details, is that right?

25  A.      Yes.  That seems consistent with this format,

1    but this is a strange format that I've not seen the

2    boxes of different incidents in different boxes.  It

3    seems consistent with those two boxes, yes.

4    Q.      Okay.  So, returning back to the tenth page of

5    this document, which is Bate stamped GB14, I see here

6    that the disposition of whatever this event was is

7    sustained, correct?

8    A.      Yes.

9    Q.      And the event near the incident --

10   A.      I couldn't hear you.

11   Q.      The incident that was considered sustained took

12   place on April 18th, 2003, correct?

13   A.      Yes.  That's what it says.

14   Q.      Do you know the subject or the issues arising in

15   relation to this April 18th, 2003 event?

16   A.      I do not.

17   Q.      Do you know whether or not Abel was disciplined

18   in relation to this event?

19   A.      I do not.

20   Q.      We'll go to the next page.  Here in

21   approximately the middle of the page we have incident

22   200303-0041, which also resulted in a disposition of

23   sustained, correct?

24   A.      That's what it says, yes.

25   Q.      And that was concerning an incident on February

1   25th, 2003?

2   A.      Yes.

3   Q.      Do you know anything about the subject or events

4   giving rise to this entry here?

5   A.      No, I do not.

6   Q.      Do you know whether Abel was ever disciplined in

7   relation to this?

8   A.      No, I do not.

9   Q.      Okay.  On the page stamped GB18 at the bottom

10  there's another event where it appears as though Abel's

11  conduct was determined to have been outside of policy,

12  correct?

13  A.      That's what it says, yes.

14  Q.      And that's in relation to incident 201406-0012?

15  A.      Yes.

16  Q.      For an incident on August 8th, 2013, right?

17  A.      Yes.  That's what it says there.

18  Q.      Do you know anything about the events giving

19  rise to this entry?

20  A.      I do not.  However, it does say "information

21  only," so what I don't know for sure is whether or not

22  this officer was directly involved in the incident.  So

23  were other officers outside of policy?  I can't tell

24  from this entry what other things were going on during

25  this incident.

1   Q.      And you don't know whether or not Abel was

2   disciplined with regard to this event, do you?

3   A.      I do not know, no.

4   Q.      Okay.  I'm going to take us through to the end

5   of the document.  And so, in total we have 24 pages of

6   Internal Affairs history in Exhibit 8, right?

7   A.      I see 19 pages.

8   Q.      24 pages in total.  We had the first five, and

9   then the next 19.

10  A.      Okay.  Sure.

11  Q.      Okay.  In these pages, and this is a little

12  complicated because apparently you haven't looked at

13  this document before, but you don't know how many of

14  these were for use of force events, do you?

15  A.      I do not.

16  Q.      Do you know how many of these pertain to Abel

17  using deadly force?

18  A.      I do not.

19  Q.      Do you know how many of these entries pertain to

20  Abel engaging in conduct involving deceit or dishonesty?

21  A.      I do not.

22  Q.      Can you please describe to me your knowledge of

23  Keith Abel's disciplinary history in the CDP?

24  A.      Just from what I see in this document.

25  Q.      And you don't know anything other than that?

1  A.      No.

2  Q.      Do you know whether Keith Abel has ever received

3  a negative performance evaluation?

4  A.      I do not know that.

5  Q.      Did you review his performance evaluations in

6  preparation for this deposition?

7  A.      No, I did not.

8  Q.      Okay.  Abel did not receive a negative

9  performance evaluation in association with the shooting

10 of James England, did he?

11 A.      I do not know the answer to that question.

12 Q.      Okay.  We'll move on to Matthew Baase.  Can you

13 please describe to me your knowledge of Baase's

14 disciplinary history?

15 A.      I have Officer Baase's IAB printout right here

16 in front of me.

17 Q.      As we sit here today, do you know independently

18 about Baase's disciplinary history?

19 A.      Not without looking at this document, no.

20 Q.      So, your knowledge of Baase's disciplinary

21 history is limited to what's contained in his IAB

22 history?

23 A.      That is correct.

24 Q.      How long is the IAB history that you have in

25 front of you?  How many pages is it?

Deposition of Deputy Chief Richard Bash        James J. England, vs. City of Columbus, et al.,

```
1   A.      It's 44 pages of PDF.

2   Q.      Okay.  Let me just ask this too with respect to

3   Abel.  You have no independent knowledge of his

4   disciplinary history other than what's contained in his

5   IAB history?

6   A.      That's correct.

7   Q.      Did anyone direct you to prepare to testify

8   about the discipline of either of these two officers?

9   A.      No more than just what's in the IAB, no.

10  Q.      And did anyone direct you to prepare to testify

11  to the discipline of Narewski or Mason prior to the

12  deposition?

13  A.      Just what's --

14          MS. DEAN:  I'm just going to object.

15  The people that would have done that would have been his

16  attorneys, so I think that would be privilege, but I

17  guess he already answered.

18  BY MS. GREENE:

19  Q.      You understand that as a 30(b)6 witness for the

20  City of Columbus you had a duty to be prepared on the

21  topics in which you were designated to testify about,

22  correct?

23  A.      Could you repeat that again?

24  Q.      You understand that as a Federal Rule of Civil

25  Procedure a 30(b)6 witness offering binding testimony on
```

1   behalf of the City of Columbus, you had a duty to be

2   prepared to testify on the topics for which the city

3   designated you as their witness, correct?

4   A.      Yes.

5   Q.      And one of the topics that you were designated

6   to testify on was the discipline of Baase, Narewski,

7   Mason, and Abel, correct?

8   A.      Yes.

9   Q.      And did you undertake anything other than

10  reviewing these IAB history documents that we've

11  referenced to prepare to testify about that topic?

12  A.      I reviewed the IAB history.  That's correct.

13  Q.      And nothing else, right?

14  A.      That's correct.

15  Q.      And the IAB history does not provide enough

16  information for you to give comprehensive testimony

17  about the disciplinary history of these officers, does

18  it?

19  A.      I'm not sure I understand your question.

20  Q.      The IAB history documents that you're

21  referencing do not provide information enough that would

22  allow you to testify comprehensively about the

23  disciplinary history of these officers, right?

24  A.      The IAB database does not provide enough

25  adequate information to answer your questions.

1  Q.      Okay.  Does the IAB database provide you with

2  information on whether or not the officers received

3  discipline in relation to the events noted in the IAB

4  history documents?

5  A.      It does for some, yes.

6  Q.      But, not for all, right?

7  A.      Just those in accordance with the collective

8  bargaining agreement.

9  Q.      Okay.  So, I'm going to show you another

10 document, which I believe is the same thing that you've

11 pulled up for your own reference.  Please let me know if

12 that's the case.  I have a 44 page document titled at

13 the top, "Division of Police Internal Affairs Bureau

14 Employee Report For Baase, Matthew J."  Is this the same

15 document that you were looking at?

16 A.      It appears to be, yes.

17 Q.      We're going to mark this as Exhibit 9.

18                       - - - -

19      (Thereupon, Plaintiff's Exhibit 9 was marked for

20                    identification.)

21                       - - - -

22 BY MS. GREENE:

23 Q.      And this is a 44 page PDF, just like the one

24 that you were reviewing a moment ago, correct?

25 A.      It appears to be, yes.

1    Q.      Okay.  So, on this very first page, the second

2    entry for IAB number 200202-0026.  Do you see that one?

3    A.      Yes, I do.

4    Q.      For an event occurring on January 20th, 2002.

5    The allegation against Baase with respect to that event

6    was sustained, right?

7    A.      That's what it says, yes.

8    Q.      Do you know anything about the events giving

9    rise to this entry in the IAB history for Baase?

10   A.      No.  That would be beyond the records retention.

11   Q.      Do you know whether or not Baase was disciplined

12   for this event?

13   A.      That would also be beyond the records retention.

14   Q.      I'm asking whether you know, not whether the

15   documents were retained.

16   A.      No, I do not know.

17   Q.      And you don't know the events giving rise to

18   this entry, right?

19   A.      That's correct.  I do not know.

20   Q.      Okay.  We're going to continue through this

21   document.  All right.  We're now at the 11th page of

22   this 44 page document.  I'm looking at the square at the

23   top of the page, IAB number 201107-0065.  Do you see

24   that one?

25   A.      I do.

1    Q.       For an event happening on July 13th, 2011?

2    A.       That's what was written here, yes.

3    Q.       And we see that whatever the allegation was it

4    was deemed sustained, correct?

5    A.       That's what it says, yes.

6    Q.       Do you know about the events giving rise to this

7    entry?

8    A.       No, I do not.

9    Q.       Do you know whether or not Baase was disciplined

10   for the events giving rise to this entry?

11   A.       No, I do not.

12   Q.       I'll just note here, we see this heading in the

13   middle of the page that says, "Use of Force/Chain of

14   Command Investigation?"

15   A.       Yes.

16   Q.       Everything that follows that pertains to a use

17   of force or chain of command investigation, is that

18   right?

19   A.       That should be correct, yes.  Or at least until

20   the next heading occurs.

21   Q.       Understood.  Okay.  Here we are on page 16 of

22   this 44 page document, and at the bottom of the page we

23   have IAB number 200212-0159.  Do you see that there?

24   A.       Yes, I do.

25   Q.       And this pertains to an event occurring on

1  December 16th, 2002, which was deemed outside of policy,

2  correct?

3  A.    That's what's written there, yes.

4  Q.    Do you know about the events giving rise to this

5  entry?

6  A.    No, I do not.

7  Q.    Do you know whether or not Baase was disciplined

8  for the events giving rise to this entry?

9  A.    No, I do not.

10  Q.    Presumably this involved a use of force event

11  because it follows that use of force/chain of command

12  heading, correct?

13  A.    Probably so, yes.

14  Q.    All right.  We'll continue.  Here we are on the

15  19th page, and at the top of the page we have an event

16  IAB number 200308-0201, incident date of July 12th,

17  2003, correct?

18  A.    That's what it says, yes.

19  Q.    And this event was also deemed to be outside of

20  policy, correct?

21  A.    Yes.

22  Q.    And it followed that use of force/chain of

23  command heading, so presumably it falls under those

24  categories, right?

25  A.    Possibly, yes.

Deposition of Deputy Chief Richard Bash          James J. England, vs. City of Columbus, et al.,

1   Q.      Do you know about the events giving rise to this

2   entry?

3   A.      No, I do not.

4   Q.      Do you know about whether Baase was disciplined

5   in relation to this entry?

6   A.      No, I do not.

7   Q.      Okay.   Here we are on the 25th page.   In the

8   middle of the page, IAB number 200412-0170 for an

9   incident dated November 5th, 2004.   Do you see that

10   entry?

11   A.      Yes, I do.

12   Q.      That event was deemed outside of policy?

13   A.      That's what's written, yes.

14   Q.      And, again, it's following the use of

15   force/chain of command heading, so it falls under those

16   categories, is that right?

17   A.      It is under that category, yes.

18   Q.      And as we sit here today, do you know about the

19   events giving rise to this entry?

20   A.      No, I do not.

21   Q.      Do you know about whether or not Baase was

22   disciplined for these events?

23   A.      No, I do not.

24   Q.      Okay.   Here we are on the 35th page, and we have

25   two entries, the middle and bottom of the page.   The

1    first one is IAB number 200809-0280 for an incident on

2    September 16th, 2008.  Do you see that?

3    A.       Yes, I do.

4    Q.       And this is still under the heading of use of

5    force/chain of command, right?

6    A.       Well, the action is different, but, yes.  I

7    believe it's still under that heading.

8    Q.       And there's a finding of outside of policy,

9    correct?

10    A.       What number again was that?

11    Q.       200809-0280?

12    A.       Yes.  That's what it says.

13    Q.       Do you know about the events giving rise to this

14    entry?

15    A.       No, I do not.

16    Q.       Do you know whether or not Baase was disciplined

17    for the events giving rise to this entry?

18    A.       No, I do not.

19    Q.       Let's look at the one underneath it.  We have

20    IAB number 200812-0173 dated December 2nd, 2008.  Do you

21    see that?

22    A.       I do see that.

23    Q.       We have another finding of outside of policy

24    conduct, correct?

25    A.       I do see that, yes.

1  Q.      And as we sit here today, do you know what the

2  events giving rise to this entry were?

3  A.      No.  But I also see that the complaint is a

4  Sergeant Matt Baase, so I'm not sure what this entry

5  would mean.

6  Q.      So, you have no idea whether he was the subject

7  of the finding, or solely the complainant.  It's not

8  clear based on this document what the finding is

9  pertaining to Baase, right?

10 A.      That is correct.

11 Q.      And as you sit here today, you have no knowledge

12 of the events giving rise to this entry, correct?

13 A.      That's correct.

14 Q.      And you don't know whether or not Baase was

15 disciplined in relation to these events, correct?

16 A.      That is also correct.

17 Q.      Okay.  So, we've reached the end of that

18 document.  Beyond what we've looked at in Exhibit 9,

19 what other knowledge do you have about any discipline

20 that Baase has been given over the course of his

21 employment with the CDP?

22 A.      I have no additional.

23 Q.      And Baase has never received a negative

24 performance evaluation, correct?

25 A.      I don't know the answer to that question.

 1    Q.      Okay.  Moving on to Officer Narewski.  I'm

 2    sharing a document with you.  Have you seen this

 3    document before?

 4                            - - - -

 5        (Thereupon, Plaintiff's Exhibit 10 was marked for

 6                       identification.)

 7                            - - - -

 8    A.      Yes, I have.

 9    BY MS. GREENE:

10    Q.      What is it?

11    A.      That looks like the IAB database printout of

12    Officer Narewski.

13    Q.      This is a 41 page document, correct?

14    A.      41 pages of PDF, yes.

15    Q.      Okay.  I'm going to go through this document in

16    the same way that we've been doing.  Here we are on the

17    eighth page of the document, at the bottom of the page

18    we have IAB number 200806-0242, an event from June 27th,

19    2008, correct?

20    A.      Correct.

21    Q.      And the disposition of this event was that the

22    allegation was sustained, correct?

23    A.      That's correct.

24    Q.      Do you know anything about the events giving

25    rise to this entry?

 1   A.      No, I do not.

 2   Q.      Do you know whether or not Narewski was

 3   disciplined for the events giving rise to this entry?

 4   A.      No, I do not.

 5   Q.      Okay.  And we see here at the bottom of this

 6   page this heading, on page 16, use of force/chain of

 7   command investigations, correct?

 8   A.      I believe that's the case, yes.

 9   Q.      So, the entries that follow this heading

10   pertained to use of force or chain of command

11   investigations?

12   A.      Yes.

13   Q.      Okay.  So, continuing through the document.

14   Here we are on page 30, IAB number 200807-0156, an event

15   from July 16th, 2008, correct?

16   A.      Yes.

17   Q.      And whatever the conduct was there is deemed

18   outside of policy, right?

19   A.      The disposition was outside of policy, correct.

20   Q.      And because it falls under the category of use

21   of force/chain of command, presumably the events here

22   are associated with a use of force or chain of command

23   issue, right?

24   A.      That is correct.

25   Q.      And are you aware of the events giving rise to

Deposition of Deputy Chief Richard Bash                    James J. England, vs. City of Columbus, et al.,

1    this entry?

2    A.       No, I'm not.

3    Q.       Are you aware of whether or not Narewski was

4    given discipline in relation to the events giving rise

5    to this entry?

6    A.       No, I'm not.

7    Q.       Okay.  On this very last page we have an entry

8    that's IA160003881 for an incident on January 26th,

9    2015, right?

10   A.       Yes.

11   Q.       And the disposition was that the conduct was

12   deemed outside of policy, right?

13   A.       That's what it says there, yes.

14   Q.       Do you know anything about the events giving

15   rise to this entry?

16   A.       I do not.

17   Q.       Do you know if Narewski was disciplined for this

18   outside of policy finding?

19   A.       I do not.

20   Q.       Okay.  And as we sit here, you don't know how

21   many of these events pertain to use of force events, do

22   you?

23   A.       I do not.

24   Q.       Or deadly force events?

25   A.       I do not.

1   Q.      Or situations involving deceit or dishonesty?

2   A.      I do not.

3   Q.      And that's true as well for the document we

4 looked at for Baase, right? You don't know how many of

5 those are for use of force, deadly force, or deceit or

6 dishonesty, right?

7   A.      Are you talking about sustained or any complaint

8 at all?

9   Q.      Either/or. You don't know either way, do you?

10   A.      Well, I would know if there was a deceit or

11 dishonesty sustained. I would know about that because

12 we would have requested termination for that particular

13 officer, so I would say none of those had sustained,

14 dishonesty, or untruthfulness.

15   Q.      Okay. For Narewski, beyond what we've looked at

16 and discussed, can you please provide me with any

17 information or knowledge that you have about Narewski's

18 disciplinary history with the CDP?

19   A.      All I have is what is right there provided.

20   Q.      And Narewski has never received a negative

21 performance evaluation, correct?

22   A.      I don't know the answer to that question.

23   Q.      Okay. Let's talk about Bryan Mason now. What

24 do you know about the hiring process pertaining to

25 Mason?

Deposition of Deputy Chief Richard Bash                    James J. England, vs. City of Columbus, et al.,

1    A.      We're going to hiring process?

2    Q.      **Yeah.  I'm going to go back to that again for a**

3    **moment.**

4    A.      Okay.  Let me find it.  Okay.  What's your

5    question?

6    Q.      **Explain to me the hiring process as it pertains**

7    **to Bryan Mason, and the events that occurred in his**

8    **hiring process.**

9    A.      So, he was assigned and presumably took the

10   civil service test in 2005, passed everything enough to

11   go on to our background process, and had a background

12   investigation conducted by Detective Randy Stonerock

13   starting on May 12th of 2006.  So, how in depth do you

14   want this?  I'll read everything, or what do you want?

15   Q.      **All right.  At any point during the hiring**

16   **process was Mason deemed to have engaged in deceit or**

17   **dishonest conduct?**

18   A.      Let me take a look at the polygraph here.  Would

19   you repeat that question, again?

20   Q.      **Sure.  At any point in time during the hiring**

21   **process was Mason determined to have engaged in deceit**

22   **or dishonesty?**

23   A.      According to the polygraph there was no

24   deception indicated in his polygraph.

25   Q.      **You're looking at the polygraph summary, is that**

1    right?

2    A.       I am.

3    Q.       I'm going to show you a document.  Is this the

4    document that you're looking at?

5    A.       Yes.

6    Q.       I'm going to mark this as Exhibit 11.

7                              - - - -

8        (Thereupon, Plaintiff's Exhibit 11 was marked for

9                        identification.)

10                             - - - -

11   A.     I will say in reading the summary here, under

12   number 8 where it says, "criminal activity," and the

13   third or fourth paragraph, "While reading the questions

14   to be asked on the polygraph, he admitted he lied to the

15   examiner during the pretest interview."

16   Q.       You're talking about the second page of my

17   Exhibit 11, correct?

18   A.       Yes.  The third paragraph down.

19   Q.       States that he lied during the pretest interview

20   about masturbating in his car, and he also admitted

21   subsequently to masturbating at work apparently?

22   A.       That's not dishonesty, but the admission of

23   lying was dishonest.  The act is not dishonest.

24   Q.       In spite of Mason lying during the pretest

25   interview, this Phil Osborne, who conducted this test,

1   determined that Mason had not engaged in deception?

2   A.      So, the conclusion is that there was no

3   deception indicated in the polygraph.  As you note here,

4   you go over the questions before they're asked on the

5   polygraph.  He admitted that he lied during that

6   particular time before the polygraph was administered,

7   but he subsequently apparently told the truth during the

8   polygraph, so that the conclusion of the polygraph

9   results is that there was no deception indicated in

10  those questions during the actual polygraph.

11  Q.      Okay.  Do you know whether, at any point in

12  time, Mason was removed from the hiring process because

13  of his acts of deception or dishonesty?

14  A.      He was removed, and let me take a look and see

15  why he was removed.  He was removed because of a

16  criminal activity.  Do you see that document?

17  Q.      I'm going to show you a document, and please

18  tell me if it's the same thing that you're referencing.

19  This document titled memorandum dated March 20th, 2006,

20  subject, background Removal of Police Officer Applicant,

21  Bryan Mason.  This is what you're looking at, right?

22  A.      Yeah.  So, he was removed based on that, yeah.

23  Q.      We're going to mark this as Exhibit 12.

24                        - - - -

25      (Thereupon, Plaintiff's Exhibit 12 was marked for

Deposition of Deputy Chief Richard Bash                James J. England, vs. City of Columbus, et al.,

```
 1                          identification.)

 2                          - - - -

 3    BY MS. GREENE:

 4    Q.        So, Mason was removed from the hiring process

 5    according to this document?

 6    A.        Yes.

 7    Q.        So, what does that mean, background removal?

 8    A.        So, he's removed from the list.  The civil

 9    service rules are pretty clear.  You could see the two

10    sections that they reference in the civil service rules.

11    So, he was no longer being processed to be a police

12    officer because he was removed from that list within

13    those time limits.

14    Q.        And ultimately Mason became an officer for the

15    CDP, though, correct?

16    A.        Yes, did he.

17    Q.        So, how did that happen in spite of his criminal

18    history?

19    A.        Well, let's take a look at the removal standards

20    by civil service.  And if you look at G1, and G4, it

21    talks about anything that occurs as an adult within the

22    past five years, or anything that would be defined as a

23    felony where this jurisdiction occurred.

24    Q.        Hang tight for a second.  I want to share with

25    you a document and probably mark it.  Is this the
```

1   document that you're referencing right now?

2   A.      Yes.  The civil service rules.

3   Q.      And so, you're saying that according to this

4   section G, somehow he can be reinstated for eligibility,

5   is that right?

6   A.      Yes.  Everybody can.  It's not just him

7   specifically.  There are time limits.

8   Q.      How does that work?

9   A.      So, for example, if you committed this crime

10  before, five years before in the timeline -- so actually

11  I think there's another letter, notice of removal, that

12  we might want to take a look at that might be

13  informative dated March the 21st.  Anyway, civil service

14  guidelines indicate that certain action will time out.

15  So, if you committed a crime of theft within five years

16  of application period, you're removed from the list.  If

17  it's in excess of five years, then you can be left on

18  the list.

19  Q.      Okay.  Looking at this document on the first

20  page, and I'm going to mark this civil service rules

21  document Exhibit 13.  Okay?

22                   - - - -

23     (Thereupon, Plaintiff's Exhibit 13 was marked for

24                   identification.)

25                   - - - -

 1  A.       Okay.

 2  BY MS. GREENE:

 3  Q.       I see here in section A, that any stage of the

 4  investigation process, if the applicant fails to

 5  disclose or acknowledges any disqualifying behavior

 6  activity as an adult, then that would also be grounds

 7  for removal, right?

 8  A.       Correct.

 9  Q.       So, would Mason's, you know, false answers about

10  the questions in the pretest interview qualify as this

11  particular ground for removal pursuant to section A on

12  honest and fabrication?

13  A.       I don't believe so, because ultimately he did

14  disclose that.  I don't believe that would be

15  applicable in this particular instance.

16  Q.       Okay.  All right.  Do you recognize the document

17  that you see here?

18  A.       Yes.

19  Q.       What is this?

20  A.       This is a notice of removal from the civil

21  service commission in regards to Officer Bryan Mason,

22  looks like civil service rule, is it 4?

23  Q.       It looks like VI(E)I section (p), right?

24  A.       That's what it looks like.  And then, directions

25  on how he can appeal.

1    Q.        Okay.  We're going to mark this as Exhibit 14.

2                         - - - -

3       (Thereupon, Plaintiff's Exhibit 14 was marked for

4                    identification.)

5                         - - - -

6    BY MS. GREENE:

7    Q.        This is the letter sent to Mason indicating that

8    he was being removed from the list, correct?

9    A.        Yes.  One of them, yes.

10   Q.        And this letter states he was removed due to

11   rule VI(E)(1)(p), and it includes a quote from that

12   section of the rule, right?

13   A.        Yes.

14   Q.        And all that this says is that if you do

15   something that violates the provisions of the background

16   removal standards, that's the reason for his removal,

17   right?

18   A.        Right.  It's not a well-written letter.

19   Q.        Does this indicate to you the basis for his

20   removal?

21   A.        It does not.

22   Q.        Okay.  I'm going to close this one, and I'm

23   going to show you another document.  Have you seen this

24   document before?

25   A.        Yes.  I'm looking at it right now.

Deposition of Deputy Chief Richard Bash                                    James J. England, vs. City of Columbus, et al.,

1   Q.        Okay.  And what is this?

2   A.        So, apparently Bryan Mason filed an appeal to

3   that decision, and the civil service commission

4   determined that his appeal should be granted.

5   Q.        Do you know whether any Police Union was

6   involved in this appeal?

7   A.        Police Union?

8   Q.        Yeah.

9   A.        No.  I don't know that.  But they're not part of

10  the bargaining unit, so I don't know how they could be.

11  Q.        If they were involved that would be a strange

12  turn of events in your experience?

13  A.        Yes.  Very.  There's no standing for the Union

14  to represent someone who is not an employee.

15  Q.        Okay.  Now, this is an April 20th, 2006 letter

16  that we're talking about right now, correct?

17  A.        Yes.

18  Q.        I'm going to mark this as Exhibit 15.

19                         - - - -

20      (Thereupon, Plaintiff's Exhibit 15 was marked for

21                      identification.)

22                         - - - -

23  BY MS. GREENE:

24  Q.        This letter doesn't do anything to indicate to

25  us what the issue giving rise to removal in that

1   reinstatement to enlist was, right?

2   A.      Correct.

3   Q.      Okay.  As we sit here today, and in your

4   experience, which we've talked a fair amount about over

5   the course of this deposition, does lying during a

6   pretest interview give rise to any concerns about a

7   future for an aspiring officer's honesty or dishonesty?

8   A.      Ma'am, are you talking about my standards and

9   the way I do my reviews today?  Because I can't speak to

10  how someone did the review back in 2006.

11  Q.      Sure.  Let's talk about your perspective sitting

12  here today with your experience.

13  A.      Okay.  Please ask that question again, then.

14  Q.      Sure.  Lying during a pretest interview during a

15  hiring process, does that give rise to any concerns

16  regarding an aspiring officer's honesty or dishonesty?

17  A.      It does, depending on the context of the

18  dishonesty, yes.

19  Q.      Explain that to me more.  What do you mean

20  "depending on the context?"

21  A.      Well, lying about being arrested.  Lying about

22  applying for other jobs.  Lying about committing a

23  theft, or in this case, lying about masturbating as

24  you're driving down the road.  I see that as a little

25  different.  Lying about cheating on your wife.  There's

1   certain things about when ultimately confronted, they

2   say, well, yeah, I did this.  There's things in life

3   that are embarrassing too, so I will say all lies are

4   not created equal.

5   **Q.      Okay.  So, the subject of the lie is important**

6   **in your perspective for determining whether or not the**

7   **capacity of the lie?**

8   A.      The context of the lie, yes.  Absolutely.

9   **Q.      Do you think that other supervisors share your**

10  **perspective?**

11  A.      I think all humans share that perspective,

12  ma'am.  When someone says, "hey, do these jeans make me

13  look fat?"  Are you going to say the jeans make you look

14  fat, or you make you look fat.  There's context to what

15  a lie is.  In this particular case, lying about

16  masturbating driving down the road, I have more problem

17  with him masturbating driving down the road than about

18  lying about it.  And that would create a problem for me

19  as an evaluator on his viability of being a police

20  officer is that, not lying to cover-up that embarrassing

21  activity.  It's the activity that became problematic to

22  me.

23  **Q.      So, the activity itself is problematic in your**

24  **eyes, right?**

25  A.      Correct.

1  Q.      But, you don't think that directly lying to a

2  person conducting an interview for the purposes of

3  potentially hiring you as an officer is problematic,

4  even if it's a less important lie?

5  A.      Ma'am, I already answered that question once.

6  And I will tell you again, that all lies are not created

7  equal.  That's correct.

8  Q.      All right.  Well, given these issues with Mason,

9  his lies to the interviewer, masturbating out on public

10 roads, and also his criminal history, which were all

11 lying through the hiring process, once he was hired as

12 an officer, was there any plan or supervision mechanism

13 put in place to observe him as an officer to ensure that

14 his past conduct was not also creating problems as a

15 current officer?

16 A.      Are you talking about over and above every other

17 newly hired trained recruit?

18 Q.      Yes.

19 A.      I cannot answer that question having not been

20 there, but I would have a hard time believing that he

21 would be the only recruit that has some minor blemish in

22 their history.  We hire humans.  Humans are not perfect.

23 Humans make mistakes.  So, to answer your question, no,

24 I do not have knowledge that they used this background

25 investigation during the hiring process to create a plan

Deposition of Deputy Chief Richard Bash      James J. England, vs. City of Columbus, et al.,

1  of action once he was hired.

2  **Q.     Okay.  I would like to share another document**

3  **with you at this point in time.  Do you see the document**

4  **on the screen?**

5  A.     Yes.

6  **Q.     We're going to go through this one like the**

7  **rest.  What is this document?**

8  A.     Let me get my copy too, so I can see it better.

9  I think I have it, but it's got a redaction on the wrong

10  side.  I think it's the same document.

11  **Q.     Okay.**

12  A.     Mine is only six pages.

13  **Q.     Okay.  How about I zoom in on this one and we'll**

14  **go through it so you can see it.**

15  A.     Yes.  That will help.

16  **Q.     Okay.  Can you see if I zoom in?**

17  A.     Yes.  That's great.  Thank you.

18  **Q.     Let's mark this one as ==Exhibit 16==.**

19                   - - - -

20    (Thereupon, Plaintiff's ==Exhibit 16== was marked for

21               identification.)

22                   - - - -

23  BY MS. GREENE:

24  **Q.     This is Bryan Mason's IAB history printout,**

25  **right?**

1 A.  Yes.

2 Q.  Okay.  I'm going to scroll through here on this

3 first entry, we have an entry relating to the shooting

4 of Tyree King as September 14th, 2016, right?

5 A.  Yes.

6 Q.  And the point in time that this document was

7 created this disposition was pending?

8 A.  I don't believe that's accurate.  I don't know

9 exactly when this is created, but I think that

10 disposition has been in place for a while now.

11 Q.  What was the disposition, if you know?

12 A.  I'm pretty sure that was not a violation of our

13 policy.

14 Q.  Was Mason disciplined for the shooting of Tyree

15 King?

16 A.  No.  If it was within policy he would not be

17 disciplined.

18 Q.  Okay.  We're going to continue on through the

19 document.  Here on the fourth page of the document we

20 have incident number 201304-0153 with the disposition of

21 sustained, do you see that?

22 A.  I do.

23 Q.  For an event on April 18th, 2013, correct?

24 A.  Yes.

25 Q.  And I'm going to scroll down to include the box

1    beneath it, because like we determined in the last

2    documents it's associated with the box above, right?

3    A.      Right.

4    Q.      Okay. Do you know any of the events giving rise

5    to this entry?

6    A.      I do not.

7    Q.      Do you know whether or not Mason was disciplined

8    for these events?

9    A.      I do not.

10    Q.      Okay. So, here we have an event on the ninth

11    page, incident 200804-0097 from December 11th, 2007,

12    right?

13    A.      Yes.

14    Q.      A disposition of outside of policy, correct?

15    A.      That's what it says, yes.

16    Q.      Do you know what the events giving rise to this

17    entry were?

18    A.      No, I do not.

19    Q.      Do you know whether or not Mason was disciplined

20    for these events?

21    A.      No, I do not.

22    Q.      As we're scrolling through we're looking at a

23    large number of entries in this IAB history, right?

24    A.      There's a lot of entries, yes.

25    Q.      Now I'm on page 39, and we have an event for

Deposition of Deputy Chief Richard Bash                    James J. England, vs. City of Columbus, et al.,

1   December 11th, 2007, right?

2   A.      Is that not the same one that you asked me about

3   earlier?

4   Q.      Well, I was going to ask you about that, if you

5   would be able to tell me.  I happen to have those

6   entries open now.  They're both listed at December

7   11th, 2007 at 4:50 p.m.  And to be clear, we're on page

8   39, but I'm also talking about an event on page nine of

9   this document.  They have the same complainant, Patrick

10  Shaffer, though the allegation seems possibly different.

11  Here on page 39 we have violation of police records,

12  orders, etc., right?

13  A.      Correct.

14  Q.      And in the prior entry we looked at, the action

15  was -- strike that.  It says, "Violation of Police

16  Rules, Orders, and Etc."  So I'm assuming this is the

17  same as the one we already looked at then.  Is that

18  fair?

19  A.      Is the IAB number the same?

20  Q.      Indeed it is.  200804-0097.

21  A.      Then, yes.  They're going to be the same.

22  Q.      Okay.  Let's continue.

23  A.      So, this long list may be long because of

24  redundancy.

25  Q.      Maybe.

```
 1    A.       If you notice, there's actually two different

 2    formats there.  It could be from when we switched over

 3    databases.  You may have redundant entries from two

 4    different databases.

 5    Q.       In either case, it's longer than the version

 6    that you have, right?

 7    A.       Yes.  It's definitely longer than the version

 8    that I have.

 9    Q.       Okay.  Here's an event on page 60, February 2nd,

10    2013 IAB 201302-0002.  Do you see this here?

11    A.       I do.

12    Q.       And it says this event involved a firearm use,

13    use of force, and the disposition is pending, correct?

14    A.       Yes, it does.

15    Q.       Do you know anything about the events giving

16    rise to this entry?

17    A.       I do not.

18    Q.       Do you know what the disposition is for this

19    February 2nd 2013 use of force event?

20    A.       I do not.

21    Q.       Do you know whether or not Mason was disciplined

22    for this event?

23    A.       It's pending, so I would not know if discipline

24    was warranted.

25    Q.       And you don't know ultimately, beyond what's in
```

1   this document, whether or not he was disciplined for it?

2   A.      Correct.  I don't know anything beyond what's in

3   that document for that.

4   Q.      Okay.  We're now on page 63 in the middle of the

5   page, IAB 201304-0153.  And I believe this is also the

6   same event that we talked about earlier on page four of

7   this document for an April 17th, 2013, the sustained

8   allegation, correct?

9   A.      It appears to be redundant, yes.

10  Q.      All right.  We've reached the end of that

11  document.  As we sit here, do you know of any other

12  events that gave rise to discipline for Officer Mason?

13  A.      No, I do not.

14  Q.      And as we sit here, you don't know whether any

15  of these entries involved allegations of deceit or

16  dishonesty by Mason, do you?

17  A.      As I noted before, if they were sustained

18  allegations of dishonesty or untruthfulness, it would

19  have resulted in departmental charges, and I don't have

20  any recollection of him having departmental charges on

21  those.

22  Q.      Any use of force incident that resulted in any

23  kind of internal investigation should be listed in a

24  police officer's IAB history, right?

25  A.      Not necessarily, because there are retention

1   schedules for records.  So there may be things that are

2   beyond the records retention schedule that would not

3   necessarily be in a database or anywhere.

4   Q.      Okay.  So, if we wanted to have a comprehensive

5   list of an officer's use of force incidents that

6   resulted in an investigation by the department of any

7   kind, how or where would we find them?

8   A.      The Ohio Historical Society has pretty strict

9   guidelines of the destruction of public records of any

10  kind, so I don't know what that would exhibit.

11  Q.      You're saying that you don't think that would

12  exist based on?

13  A.      From what you're asking, a list of everything

14  from the beginning of history to today, because of a

15  public records retention law and destruction policies

16  and laws that wouldn't exist.

17  Q.      So, for any given officer employed by the

18  Columbus Division of Police?

19  A.      So, if that officer were only employed within

20  the limits of what the public records law indicates,

21  then, yes, you would have that, and that would be

22  Internal Affairs.  But, if it extents past what's a

23  public record and the retention schedule then, you would

24  not have it.

25  Q.      And the division of police doesn't retain that

1   information for its own evaluative or supervision

2   purposes beyond that retention schedule for public

3   records?

4   A.      We don't retain anything that would be a

5   violation of law.  That's correct.

6   Q.      It would be a violation of law to retain

7   documents longer than the required retention schedule?

8   A.      If there's a destruction schedule, then we

9   follow that schedule, and follow the law.  If there's an

10  agreement and a collective bargaining agreement, we also

11  follow that agreement.  We would not violate either of

12  those two for the purpose of retention for knowledge.

13  Q.      Okay.  Bryan Mason has been involved in four use

14  of deadly force events, correct?

15  A.      I don't know the answer to that question.  I

16  don't know exactly how many he's been involved in, no.

17  Q.      Okay.  So, you're not aware of the fact that

18  Mason engaged in the use of deadly force four times in

19  the span of six years?

20  A.      I did not know the exact number.  You may be

21  right.  I'm sorry.  I don't keep track of that, but

22  that's very possible.

23  Q.      What do you know about Mason's history of use of

24  deadly force?

25  A.      I know one in particular where he had an

Deposition of Deputy Chief Richard Bash                    James J. England, vs. City of Columbus, et al.,

1    unfortunate encounter with someone with a pistol who

2    committed a robbery, and it turned out to be a toy

3    pistol.  We also know that Officer Mason was

4    administratively reassigned to a non-patrol assignment

5    for his protection and also the protection of the

6    community.  That's pretty much all I know.

7    **Q.      For his protection, what do you mean?**

8    A.      Certainly he's been involved in many critical

9    incidents, and his name was out there on a regular

10   basis, and what we didn't want was for someone who may

11   have something against Officer Mason to goat him, or

12   confront him into a violent encounter.  We wanted to

13   reduce that as much as possible, to get him out of that

14   possibility of being in another violent encounter.

15   **Q.      Was that because Mason is viewed as an officer**

16   **with a propensity to be goated into a violent encounter**

17   **by people?**

18   A.      No, ma'am.  That's not what I said at all.  We

19   just wanted to make sure that we protect this officer

20   from being involved in another violent encounter.  If

21   the number four that you said is correct, that's an

22   amount that's larger than other officers are involved

23   in.  So why would we put him in a position where he

24   might be forced to be in another one.  So, we did what

25   we thought was correct, and I believe it's still correct

1    to this day is to remove him or reduce the opportunities

2    to him to be in a violent encounter.

3    Q.      If that number of shootings is more than most

4    other officers, did that give rise at any point to any

5    supervisory assessment of Mason in whether he was

6    equipped, or fit for duty, and to carry a weapon?

7    A.      Well, as we talked about before, and we have

8    documentation of, he did have at least one documented

9    conversation with a physiatrist or psychologist who

10   determined that he was able to come back to duty.

11   Q.      Would that be the extent of the division's

12   assessment of the cumulative effect of these shootings

13   in relation to Mason's fitness to be a police officer?

14   A.      So are you asking about his mental health?

15   Because we're not mental health professionals.  That's

16   what we depend on the mental health professionals for.

17   Q.      I was asking about whether these four shootings

18   gave rise to any evaluation about whether or not he

19   should continue to be an officer for the division.  And

20   you responded saying, well, that he had a psych eval

21   after the shooting of Tyree King, the one that we

22   already talked about.  What I'm asking you, is there

23   anything beyond that psych eval in 2016 that the

24   division has engaged in to assess whether or not Mason

25   should continue in his employment as a police officer

1  **given these multiple deadly force events?**

2  A.        Every use of force, whether it be deadly use of

3  force, or any other use of force, is evaluated on their

4  own merit and independently.  If there was an indication

5  on any of those investigations that some further action

6  should have been taken, then it would have been.  I

7  don't remember the other incidents and having read those

8  investigations.  Maybe I did, but I do read a lot.

9  Every incident has to be considered on their own merit.

10  So, if you're asking if we put a hard-line on you can

11  only have X number of uses of force then we're going to

12  terminate you, no, we don't have that.

13  **Q.        When evaluating an officer after a use of deadly**

14  **force is it part of the evaluation concerning his**

15  **ongoing employment to look at prior uses of deadly force**

16  **and to look at the totality or accumulative information**

17  **to be gleamed from that array of deadly force events?**

18  A.        Every use of force is evaluated.  So, we have a

19  historical look through EARS.  I hope that answers your

20  question.  I'm not sure exactly what you're getting at,

21  but we evaluate every single use of force to include

22  deadly force, to ensure that what these officers did was

23  within our policy, within our guidelines.  Any deadly

24  use of force is evaluated by the Grand Jury.  So we,

25  again, do not have a hard and fast number to say if

Deposition of Deputy Chief Richard Bash James J. England, vs. City of Columbus, et al.,

1  you're involved in this number of deadly forces, you can

2  no longer be a police officer.  I'm not sure that would

3  stand up to constitutional muster either.  We don't have

4  that number.

5  **Q.      That's not what I'm asking.  I'm asking, does it**

6  **raise red flags that an officer was involved in four**

7  **deadly force events in six years?**

8  A.      Ma'am, we, again, evaluate every single use of

9  force.

10  **Q.      Yes or no, does it raise red flags?**

11  A.      I'm not answering that question.  I'm sorry.  I

12  don't know what a red flag is for you.

13  **Q.      What do you understand the term red flag to**

14  **mean?**

15  A.      If you would repeat the question I would be

16  happy to answer it.

17  **Q.      Is it a cause for concern in your perspective as**

18  **a Columbus Division of Police Deputy Chief that an**

19  **officer engaged in deadly force four times in six years?**

20  A.      Not necessarily.

21  **Q.      Why not?**

22  A.      Because every situation is different.  So, as we

23  look at the situation, in reading the investigation, in

24  determining whether or not there was a problem with the

25  actions taken by the officer in that particular

1  incident, then that would create a red flag.  A number,

2  just a number, does not create a red flag that you're

3  talking about, cause a concern.  The concern is based on

4  the specific incident at hand.

5  **Q.     The number of deadly force events that Mason has**

6  **been involved in constitute an outlier in the grand**

7  **scheme of officers in the division, is that right?**

8  A.     That number is higher.  If the number four is

9  accurate that you provided earlier, that number is

10  higher than most other officers that I know, yes.

11  **Q.     And as a person here to testify about**

12  **supervision, did that number in that span of time ever**

13  **give rise to any increased scrutiny or supervision about**

14  **Mason and his execution of his duties as a police**

15  **officer?**

16  A.     Ma'am, I can't answer the question about other

17  supervisors.  You would have to ask them.

18  **Q.     You're here to testify about the supervision of**

19  **Mason.  So, I'm asking you.**

20  A.     I'm happy to answer the questions that I can

21  answer.  I wouldn't speculate about what others have

22  done.  But again, I'll answer this question yet again.

23  Each and every incident is its own incident and there's

24  not a magic number that says once you get to that number

25  you can no longer be a police officer.  We read every

 1  investigation, completely and thoroughly, and look for

 2  any indicator there whether there was a problem.  Did

 3  they act outside policy?  Were they acting lawfully?

 4  Did they act reasonable in every single incident?  The

 5  number is not near as important as the incident and the

 6  reasonableness of the actions in the incident in itself.

 7  **Q.      So, the CDP assesses the individual incidents**

 8  **without considering other incidents that may have**

 9  **occurred?**

10  A.      Repeat that.

11  **Q.      The CDP accesses use of deadly force incidents**

12  **without respect to other deadly force incidents that an**

13  **officer has been involved in, correct?**

14  A.      We do not combine investigations of two separate

15  incidents.  If that's your question, that's the answer.

16  We do not combine incidents to evaluate whether this new

17  incident is within the policy, reasonable, or lawful.

18  **Q.      Okay.  Mason was never disciplined for any of**

19  **his use of deadly force events, correct?**

20  A.      I know of one specifically where his actions

21  were within policy, so I don't have any knowledge that

22  he was found outside of policy on any deadly use of

23  force.  And if he was not outside of policy he would not

24  be disciplined.

25  **Q.      Okay.  And he was not disciplined, but instead**

1    he was moved to narcotics after his fourth shooting,

2    correct?

3    A.      I don't know if that's exactly where he went

4    after that.  Maybe he was.  I know he was moved out of

5    patrol, but I don't know specifically where he went from

6    there.  I could probably tell you.

7    Q.      So, narcotic assignments are assignments that a

8    lot of officer aspire to, right?

9    A.      Yes.  Many people would like to have those

10   assignments.

11   Q.      Did you hear about any other officers being

12   upset about Mason being moved to narcotics after this

13   shooting because it was such a popular post?

14   A.      I didn't hear from officers, but there

15   definitely was conversation about him going to that

16   assignment in executive staff, yes.

17   Q.      What was the conversation about him going to

18   that assignment in executive staff?

19   A.      There were some that were, as myself, I wasn't

20   excited about that decision, because it's a position

21   that usually somebody with seniority gets, and I did not

22   want a perception to be that there was an award or a

23   punishment for a certain number of violent encounters.

24   Q.      What would have been a more appropriate move for

25   him in your opinion?

```
 1    A.      Well, I'm not sure exactly the more appropriate
 2    move.  Maybe an investigative position, investigative
 3    property crime or something like that probably would
 4    have been more appropriate in my estimation.  But,
 5    again, I understand the merits of the decisions that
 6    were made, but sometimes we disagree.
 7    Q.      And who ultimately made that decision?
 8    A.      That would have been the chief of police at the
 9    time, Kim Jacobs.
10    Q.      Okay.  And do you know who else in that chain of
11    command advocated for that solution?
12    A.      I do not right offhand.
13    Q.      Do you know whether Mason was ever flagged by
14    the EARS system?
15    A.      I do not.  That's a really good question.  I can
16    do some research on that.  There are two levels of EARS
17    alerts.  One is a review.  If you reach a certain
18    threshold, we're going to review those uses.  And then,
19    if there's any commonalities or problems identified in
20    those uses, then they're referred for an action plan
21    from their chain of command.
22    Q.      And you don't know as you sit here whether or
23    not Mason was ever flagged by that system?
24    A.      No, I don't.  Sorry.  EARS is not considered
25    discipline.
```

1 Q. Okay.  Do you have any other knowledge of any

2 other discipline for Mason for the duration of his time

3 as a CDP officer that we have not discussed so far?

4 A. I do not.

5 Q. And Mason has never received a negative

6 performance evaluation, correct?

7 A. I don't know the answer to that question.

8 Q. Okay.  With regard to the disciplinary history

9 that we've discussed today for Abel, Baase, Narewski,

10 and Mason, you did not bring, other than the IAB

11 histories, any relevant documents with you to the

12 deposition, correct?

13 A. I brought all the available documents that were

14 provided, yes.

15 Q. And those were the documents provided by the

16 city lawyers?

17 A. Correct.

18 Q. And you didn't undertake any additional search

19 for any other relevant documents?

20 A. No, I did not.

21 Q. Why not?

22 A. Because those were the documents that were

23 available.

24 Q. Well, you have access to all the documents in

25 the division of police pertaining to these officers'

1   **supervision and discipline, correct?**

2   A.     So, all of the documents that are available were

3   provided to our attorneys.

4   **Q.     And if you looked at those documents and**

5   **determined there were things that you couldn't answer or**

6   **didn't know enough about based on what the city's**

7   **attorneys provided to you, you did have the ability to**

8   **get more documents that would answer the questions,**

9   **right?**

10  A.     No.  Because most of those that you referenced

11  were beyond the records retention.  Discipline and

12  investigations are destroyed based on records retention.

13  So, what you were asking for from 2003 would not be

14  there anymore because that's been destroyed.

15  **Q.     Documents from 2012, 2013, '14, '15, those would**

16  **have been available, right?**

17  A.     Depending on what the documents were and whether

18  there was disciplines involved or not.

19  **Q.     How far back would the documents that you have**

20  **had access have gone, to what year?**

21  A.     So, if it resulted in departmental charges it

22  would go back as far as six years, and documents that

23  are discipline that result in a DCC, they're only

24  retained for two.

25  **Q.     What's a DCC?**

1   A.      A documented constructive counselling.

2   Q.      And so, for example, if a police involved

3   shooting from 2010 came up in our conversation today,

4   you're telling me that no documents concerning that

5   event would be available?

6   A.      That's a criminal investigation, so that's

7   completely different.  A police involved shooting is a

8   criminal investigation.  So criminal investigations are

9   maintained for a longer period of time.

10  Q.      And so, for any of the events that we discussed

11  that were subject to criminal investigations, you did

12  not attempt to obtain those documents, did you?

13                  MS. DEAN:  Objection.  That would be

14  out of scope, I think, because if it didn't result in

15  discipline, then it wasn't part of what was requested in

16  numbers three and four.

17  BY MS. GREENE:

18  Q.      An allegation that an officer is engaged in a

19  criminal act would constitute information that would and

20  should be used to the supervisory process, correct?

21  A.      It says, "in supervision of."  It doesn't talk

22  about the supervisor process of, so I would disagree.

23  Q.      Okay.  So, the supervision of an officer would

24  and should include the incorporation and consideration

25  of information about criminal acts that the officer has

Deposition of Deputy Chief Richard Bash       James J. England, vs. City of Columbus, et al.,

1   alleged to have committed, correct?

2   A.      Yes.  And those are police involved shootings.

3   Those are investigated as criminal acts.  Yes.

4   Q.      Okay.

5   A.      Did you need more information about the police

6   involved shootings?

7   Q.      I've asked about the discipline and supervision

8   in relation to those shootings, and all I've heard from

9   you all day is that you don't know.  So I'm asking you

10  now, is there anything -- did you attempt to obtain any

11  documents that would have aided you in answering these

12  questions regarding the supervision and discipline of

13  Mason for the duration of his employment as a CDP

14  officer?

15  A.      I did not, nor did I need to get any of the

16  additional documents to answer your additional questions

17  on three and four.

18  Q.      Well, that's incorrect, but neither here nor

19  there.

20  A.      You're allowed to be wrong.

21              MS. GREENE:  Okay.  We're done.  I'm

22  sure you'll advise him to read.

23              MS. DEAN:  We'll review the

24  transcript.

25

C E R T I F I C A T E

STATE OF OHIO,               )
                            )
CUYAHOGA COUNTY.            )

I, Megan A. Medved, a Notary Public within and for the

State of Ohio, duly commissioned and qualified, do

hereby certify that the within named witness, DEPUTY

CHIEF RICHARD BASH, was by me first duly sworn to

testify to the truth, the whole truth and nothing but

the truth in the cause aforesaid; that the testimony

then given by the witness was by me reduced to Stenotype

in the presence of said witness, afterwards transcribed

upon a computer; and that the foregoing is a true and

correct transcription of the testimony so given by the

witness as aforesaid.


I do further certify that this deposition was taken at

the time and place in the foregoing caption specified,

and was completed without adjournment.


I do further certify that I am not a relative, employee

of or attorney for any of the parties in the

above-captioned action; I am not a relative or employee

of an attorney of any of the parties in the

above-captioned action; I am not financially interested

in the action; and I am not, nor is the court reporting

Deposition of Deputy Chief Richard Bash                    James J. England, vs. City of Columbus, et al.,

1  firm with which I am affiliated, under a contract as

2  defined in Civil Rule 28(D).

3

4  IN WITNESS HEREOF, I have hereunto set my hand and

5  affixed my seal of office at Cleveland, Ohio on January

6  29th, 2021.

7

8

9

10  _____

11       Megan A. Medved, a Notary Public

12       in and for the State of Ohio.

13       My Commission expires 9/17/23

14

15

16

17

18

19

20

21

22

23

24

25