```
 1              IN THE UNITED STATES DISTRICT COURT
                   SOUTHERN DISTRICT OF OHIO
 2                      EASTERN DIVISION

 3
                          - - - -
 4
    DEARREA KING, Adm., of the  )
 5
    ESTATE OF TYREE KING,       )CASE NO. 2:18CV1060
 6
            Plaintiff,          )JUDGE EDMUND A. SARGUS, JR
 7
    -V-                         )CHIEF MAG. JUDGE ELIZABETH
 8
    THE CITY OF COLUMBUS, et al,)P. DEAVERS
 9
            Defendant.          )
10
11                    - - - o0o - - -

12  CHRISTOPHER M. COOPER, Adm.,)

13  Of the ESTATE OF DEAUNTE    )CASE NO. 2:19CV3105

14  BELL-McGREW,                )

15          Plaintiff,          )JUDGE GEORGE C. SMITH

16  -V-                         )CHIEF MAG. JUDGE ELIZABETH

17  THE CITY OF COLUMBUS, et al,)P. DEAVERS

18          Defendant.          )

19                    - - - o0o - - -

20  JAMES J. ENGLAND,           )CASE NO. 2:19CV1049

21          Plaintiff,          )JUDGE SARAH D. MORRIS

22  -V-                         )MAGISTRATE JUDGE KIMBERLY

23  THE CITY OF COLUMBUS, et al,)A. JOLSON

24          Defendant.          )

25
```

EXHIBIT
Pl. Ex. 12

Deposition of Chief Kimberly Jacobs        Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

```
 1                    - - - oOo - - -
 2        The video teleconference deposition of CHIEF
 3    KIMBERLY K. JACOBS, a witness herein, being called by
 4    the Plaintiffs as if upon cross-examination under the
 5    statute, and taken before Megan A. Medved, a Notary
 6    Public within and for the State of Ohio, pursuant to the
 7    agreement of counsel, on Tuesday, December 1st, 2020, at
 8    10:00 a.m., at the Offices of Tackla Court Reporting,
 9    LLC, 1020 Ohio Savings Plaza, 1801 East 9th Street, City
10    of Cleveland, County of Cuyahoga, and the State of Ohio.
11                      - - - -
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
 1   APPEARANCES:

 2   On behalf of the Plaintiffs:

 3        By:  Sarah Gelsomino, Esq.

 4             Jacqueline Greene, Esq.

 5             Friedman & Gilbert

 6             55 Public Square, Ste. 1900

 7             Cleveland, Ohio 44113

 8             Sgelsomino@f-glaw.com

 9             Jgreene@f-glaw.com

10             (216)241-1430

11

12        By:  Sean Walton, Esq.

13             Walton & Brown

14             395 E. Broad Street, Ste. 200

15             Columbus, Ohio 43215

16             Swalton@watonbrownlaw.com

17             (614)636-3476

18

19   On behalf of the Defendants:

20        By:  Andy Miller, Esq.

21             City of Columbus Litigation Attorney

22             77 North Front Street

23             Columbus, Ohio 43215

24             Amiller@columbus.gov

25             (614)645-6959
```

Deposition of Chief Kimberly Jacobs                    Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

```
 1                           INDEX

 2   APPEARANCES ....................................... 3

 3   CHIEF KIMBERLY K. JACOBS

 4   CROSS-EXAMINATION BY MS. GELSOMINO ................ 5

 5   REPORTER CERTIFICATE ............................. 176

 6   PREVIOUSLY MARKED PLAINTIFF'S EXHIBITS:

 7   Abel Exhibit 9 ................................... 97

 8   Knight Exhibit 16 ................................ 99

 9   Kuebler Exhibit 20 .............................. 106

10   Abel Exhibit 14 ................................. 128

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Deposition of Chief Kimberly Jacobs     Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

```
 1                 P-R-O-C-E-E-D-I-N-G-S

 2                      - - - -

 3            CHIEF KIMBERLY K. JACOBS, of lawful age, a

 4       witness herein, having been first duly sworn, as

 5        hereinafter certified, deposes and says as follows:

 6                      - - - -

 7          CROSS-EXAMINATION OF CHIEF KIMBERLY K. JACOBS

 8    BY MS. GELSOMINO:

 9    Q.      Good morning.  Could you please state your full

10    name for the record?

11    A.      Kimberly K. Jacobs.

12    Q.      What's your current relationship to the Columbus

13    Division of Police?

14    A.      I'm retired.

15    Q.      When did you retire?

16    A.      February of 2019.

17    Q.      Okay.  Do you do anything for the division

18    anymore other than show up to depositions like this?

19    A.      I have a tangential relationship in the sense

20    that I'm the executive director of the Columbus Police

21    Foundation, and the foundation supports events and

22    activities that the CPD needs help with some financial

23    funding such as the trips to Washington to visit the

24    Holocaust Museum and the African American Museum.

25    Q.      What else does that foundation do?
```

Deposition of Chief Kimberly Jacobs        Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

1     A.      Provides funds for foods.  We did during Covid

2     early on for some of the dispatchers working very long

3     shifts.  We've supported buying tourniquets for officers

4     to carry, so they could use them on people that they

5     come across that might be bleeding.  Provided little

6     bags of trinkets for the kids that go to summer youth

7     camps.  We're working on a project with COSI to build

8     interactive kiosk displays that would be taken out to

9     like libraries, boys and girls clubs, so that kids can

10     interact with the officers that would be there and learn

11     more about policing and get to know officers more.

12     **Q.      Okay.  So is there anything that this foundation**

13     does other than like raising money, and I don't want to

14     call it charity, but these kind of like community

15     events?

16     A.      Not too much, no.  It's mostly those programs

17     that I just mentioned.

18     **Q.      Okay.  Do you do any kind of advising about any**

19     policies or anything within the division?

20     A.      Does somebody from the division consult with me?

21     **Q.      Yes.**

22     A.      Not in any official or informal sense, no.  I've

23     had conversations with CPD personnel since I've been

24     retired about things going on, but I wouldn't call it

25     consulting in any shape.

Deposition of Chief Kimberly Jacobs        Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

1    **Q.      What kind of issues have they brought to you?**

2    A.      Just what's going on.

3    **Q.      Okay.**

4    A.      Current events basically.

5    **Q.      Have you like reviewed any policies or weighed**

6    in on any disciplinary determinations since you retired?

7    A.      You broke up a little bit.  I think you said

8    have I reviewed any policy recommendations.

9    **Q.      Any policy or policy recommendations or**

10    disciplinary determinations, or anything related to

11    those areas?

12    A.      I wouldn't describe it that way with anybody

13    from CPD, no.

14    **Q.      Okay.  So I kind of jumped into this and I**

15    forgot to remind you of some of the deposition rules.  I

16    know you've done depositions before.  Just as a

17    reminder, let's not talk over each other.  Make sure

18    that you answer everything out loud so that Megan can

19    write it down.  The goal is we need a nice, clean

20    transcript.

21          If you don't understand anything, as you just

22    did, please just tell me.  That goes all the time for

23    depositions.  If you don't understand the questions,

24    just tell me that you didn't understand, but

25    particularly with Zoom depositions sometimes there's

Deposition of Chief Kimberly Jacobs           Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

```
1    like weird noise or that Internet connection may just
2    break in-and-out, so just tell me.  I found that we all
3    have to give each other a little extra grace in a Zoom
4    deposition, but if we do that it's quite nice because
5    you could actually be barefoot in your home instead of
6    all day long in a conference room at the police station.
7          Okay.  So today you've been designated as what
8    we call a 30(b)6 witness.  Basically the city has
9    designated you to give binding testimony on behalf of
10   the municipality on particular issues.  Do you
11   understand that's your role today?
12   A.     Yes.
13                MS. GELSOMINO:  And Andy, I've found
14   with other 30(b)6's that it's best to just do this with
15   you via stipulation, but my understanding is that she's
16   been designated as a 30(b)6 for all of the seven in the
17   notice, is that correct?
18                MR. MILLER:  Yeah.  That's my
19   understanding.
20                MS. GELSOMINO:  Okay.  Only seven,
21   nothing else?
22                MR. MILLER:  Yeah.  That's my
23   understanding.
24                MS. GELSOMINO:  Okay.  Perfect.
25   BY MS. GELSOMINO:
```

1    Q.      Do you still go by chief?  Does it matter?  What

2    would you like me to call you today?

3    A.      You can call me Kim if you want to.

4    Q.      Okay.  You can call me Sarah.  Okay.  Number

5    seven in our Notice of Deposition, which designates the

6    topic that you're here to talk about today, "All

7    investigations, reviews, findings and outcome from 2005

8    to the present for all deadly force events involving CPD

9    members concerning:  A.) The Firearm Police Involved

10   Death Review Board, B.) The chain of command policy and

11   disciplinary review, and C.) The policy and disciplinary

12   determinations made by the chief of police and/or her

13   designee."  Does that sound right to you?

14   A.      I think I'm able to do that.

15   Q.      Okay.  Perfect.  Do you feel prepared to answer

16   my questions regarding those questions today on behalf

17   of the city?

18   A.      I'll do my very best.  I don't know what you're

19   going to ask.

20   Q.      Okay.  What did you do to prepare for the

21   deposition today?

22   A.      I had a discussion with the attorneys, Wes

23   Phillips and Michael Halloran, and I looked at the

24   routing sheets for the Brian Mason case, and the Baase

25   case, I believe, and then I read the chief's hearing

1    transcript for the England Case.

2    Q.      Okay.  The routing sheets for the -- I think it

3    was Basse.  Baase?

4    A.      Yeah.  Whatever.

5    Q.      Okay.  That's the shooting of Deaunte

6    Bell-McGrew, right?

7    A.      I believe that's the name, yeah.

8    Q.      Okay.  And then you reviewed the routing sheet

9    for the Brian Mason case.  Did you review any other

10   documents or videos, recordings, anything related to

11   those two shootings?

12   A.      I don't have access to them, no.

13   Q.      Then you read the transcript regarding the Abel

14   disciplinary hearing?

15   A.      Yes.

16   Q.      Did you review anything else?

17   A.      No.

18   Q.      Okay.  You mentioned that you didn't have access

19   to anything else.  Did you attempt to get access to

20   anything else?

21   A.      No.

22   Q.      Do you feel that you have reviewed and gathered

23   all of the information available or reasonably available

24   to the City of Columbus relating to all of the topics

25   that I read out to you from number seven regarding all

Deposition of Chief Kimberly Jacobs      Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

1  of the deadly force events since 2005?

2  A.     That encompasses an awful lot of information, so

3  based on my experience and my memory, I believe that I'm

4  capable.

5  **Q.     Okay.  Now, this notice also requests that at**

6  least two days prior all documents related to the above

7  referenced topics are produced.  Did you do anything to

8  review documents or ensure that the necessary

9  documentation has been produced?

10  A.     Repeat that.

11  **Q.     Sure.  Did you ever see the Notice of Deposition**

12  related to this deposition today?

13  A.     Not that I recall.

14  **Q.     Okay.  One of the things that's required in that**

15  deposition is that you process all documents relevant to

16  the topics that you're here to testify today.  Did you

17  do anything to review documents or ensure that they've

18  been produced to us?

19  A.     No.

20  **Q.     Were you aware that as the designated 30(b)6**

21  witness you have the responsibility to adequately

22  prepare and to review all of the information that is

23  known or reasonably available to the City of Columbus

24  relating to the topics that you've been required to

25  provide testimony on?

1    A.      I don't believe that I've heard those

2    instructions before.

3    Q.      Okay.  Have you done anything at all to gather

4    all of the information known or reasonably available to

5    the City of Columbus regarding these topics?

6    A.      No.

7    Q.      Okay.  How many days did you have to prepare for

8    this deposition?

9    A.      Whenever the notice was sent out.  I've been in

10   the process of buying a house, selling a house, moving

11   for the last month-and-a-half, and just literally moved

12   into this place on Friday.

13   Q.      Right before the snow.

14   A.      Yeah.  I haven't had time to do anything but

15   that.

16   Q.      Okay.  That's fair.  Do you remember when you

17   received notice of the deposition?

18   A.      No.

19   Q.      Okay.  Was it over a week?

20   A.      Yeah.

21   Q.      Okay.  Do you know if it was like a month?

22   A.      Probably been about a month.

23   Q.      Okay.  When did you first learn of the lawsuits

24   related to this deposition?

25   A.      I don't know.

1    Q.        Okay.  Did you learn about them before the

2    notice for this deposition?

3    A.        If they came in while I was still chief I may

4    have been told about them at that time, but subsequent

5    to that I don't believe that I've gotten an e-mail that

6    says another lawsuit has been filed.

7    Q.        Okay.  You wouldn't receive an e-mail like that

8    or notice of that since you left the division, right?

9    A.        Not that I know of.  Not until it became

10   relevant to a deposition or needed my involvement of

11   some sort.

12   Q.        Okay.  So this deposition is a little different

13   than other ones because it's related to three cases.  So

14   just organizationally I'm going to try and work my way

15   through that in an orderly way.  I have some questions

16   about the division and the topics that you've been

17   designated to talk about, and then I'll ask you

18   questions about the shooting of James England, who was

19   shot by Officer Abel.  The shooting of Tyree King, who

20   was the child who was shot and killed by Brian Mason.

21   And then, also the shooting of Deaunte Bell-McGrew, who

22   was shot by Narewski and Baase while he was sitting in

23   the back seat of a car.  I'll try to direct us the best

24   that I can throughout the deposition.  In general

25   though, as the Chief of Police, how would you be made

1  aware of a lawsuit filed against one of your officers?

2  A.      A copy would be sent to the chief's office in

3  the mail, and if I needed to sign for it or whatever, I

4  would, or it would be done for me by the city attorney's

5  office.  Often times if it was something that, you know,

6  a document production or something like that they would

7  ask me what type of documents that I may have that would

8  be related to that particular lawsuit.

9  Q.      So are you talking about like when the actual

10 service of the complaint is summoned?

11 A.      Yes.

12 Q.      If you were not the one to personally receive

13 service of the summons of the lawsuit is there some

14 system within the division that would bring a lawsuit to

15 your attention?

16 A.      That's handled by the city attorney's office.

17 They would decide what type of notifications they wanted

18 to make.  Sometimes the legal advisor might tell me if

19 there was something brewing or something had been filed,

20 but generally I wasn't told about it unless my input was

21 necessary.

22 Q.      So when you receive notice that a civil rights

23 lawsuit has been filed against an officer within the

24 department itself, was there any kind of internal review

25 that that would trigger?

Deposition of Chief Kimberly Jacobs          Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

1   A.      No.  Not any type of an official policy or

2   anything along those lines.  We were generally told by

3   the city attorney's office to let them handle the

4   lawsuits, and there wasn't a look back, if you will, due

5   to the fact that, you know, we had the documents

6   already.  They didn't want us to do anything other than

7   just be aware of it basically until we were needed.

8   Q.      **Well, was there any kind of effort from the**

9   division to take a look at what led to the lawsuit to

10  determine whether there was any tactical review that

11  could be done, or any way to learn from the actions that

12  gave raise to the lawsuit?

13  A.      I would say that for most of the lawsuits that

14  had already had an investigation done that would be

15  considered the investigation.  We didn't reopen

16  investigations based on the lawsuit.  There have been

17  lawsuits that have been filed by people that never made

18  a complaint or never were in a situation that we

19  investigated beyond say use of force report.  So some of

20  those -- I recall one that it was just a use of force,

21  and then a couple years later they filed a lawsuit, and

22  so by then, you know, people that were involved had

23  pretty much forgotten about it because it was a few

24  years later.

25  Q.      **In that case was there any kind of review that**

1  triggered any investigation?

2  A.      Just the defense of the claim by the city

3  attorney's office and trying to get people to recall.

4  Q.      Sure.  So that was just like the defense of the

5  lawsuit, nothing internal within the division in terms

6  of the lawsuit?

7  A.      Correct.

8  Q.      Okay.  In the case of a lawsuit are officers

9  like flagged in any way?  Is there any kind of

10  employment result or consequences as a result of a

11  lawsuit being filed?

12  A.      Are we looking at lawsuit as a way to determine

13  if there's a pattern of behavior?

14  Q.      That's part of my question, yeah.

15  A.      No.  Lawsuits aren't part of our early warning

16  system.  Use of force are and complaints are, but

17  lawsuits are not.

18  Q.      Why not?

19  A.      The early warning system that's been in place

20  since the 1980s or before focussed on the investigations

21  that we had done ourselves basically.  We reorganized

22  that system back in, I believe, 2002, and changed it up

23  a little bit, but there were many aspects that we

24  discussed as being a part of what we could look at, but

25  lawsuits was not ever incorporated.  It's still pretty

Deposition of Chief Kimberly Jacobs        Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

1   much related to use of force and complaints because we

2   didn't have the software systems to do a much deeper

3   analysis, so no. Lawsuits are infrequent. They're not

4   something that we always have access to, and they take

5   many, many years, these are examples, to resolve. The

6   fact that a lawsuit has been filed against you doesn't

7   mean that you did anything wrong. So, no. It's not

8   been included.

9   **Q.      Was there ever a discussion about whether or not**

10   to include lawsuits in the early warning systems?

11   A.      You're talking about --

12                 MR. MILLER: Objection to the extent

13   it calls for conversations with the city attorney's

14   office.

15   A.      I can't say there has or has not been those kind

16   of discussions. We had a presentation several years ago

17   by a company that was trying to sell a program, and it

18   may or may not have been part of their sales pitch.

19   BY MS. GELSOMINO:

20   **Q.      Did you end up going with that program?**

21   A.      No.

22   **Q.      Okay. You said 2002 was the reorganization into**

23   the current iteration of EARS, right?

24   A.      Yes.

25   **Q.      Were you the chief then?**

Deposition of Chief Kimberly Jacobs                    Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

```
 1   A.      No.  I was appointed in 2012.
 2   Q.      Okay.  Were you part of the reorganization at
 3   all?
 4   A.      Yes.
 5   Q.      Into EARS?
 6   A.      Yes.
 7   Q.      Can you tell me about that?  How did that
 8   happen?
 9   A.      I was the commander of the Internal Affairs
10   Bureau at the time, and there was a committee that was
11   working on trying to make revisions to that particular
12   alert systems, and they told me about it, and based on
13   the information that I had from Internal Affairs, I
14   proposed that we take a percentage of our complaints
15   rather than just a number three and try to make sure
16   that we had a deeper look.  Plus, I thought it was
17   important that we had peer review instead of just a
18   chain of command review.
19          EARS was the alert systems and we implemented a
20   peer review committee personnel that volunteered to be
21   on a committee to read through all of the investigations
22   to make recommendations to the chain of command and the
23   chief, and then also to look for not just patterns in
24   the individual officer, but to look for patterns that
25   may be related to training.
```

Deposition of Chief Kimberly Jacobs          Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

1   Q.       Okay.  Why would that be important?

2   A.       Well, if we're training our officers to do a

3   certain thing then if that certain thing results in a

4   lot of use of force, that would be something that we

5   would want to look at and determine whether or not

6   that's how we continued to train.

7   Q.       Has there ever been any issue in training

8   identified?

9   A.       Yes.  I believe that the common peroneal strike,

10  which is basically a hit to the thigh.

11  Q.       Okay.

12  A.       And generally I think the strikes were happening

13  when the suspect or subject was on the ground and they

14  were being kneed, but I believe that the EARS committee

15  had some concerns about whether or not that was

16  effective enough to continue to train.

17  Q.       What happened with that?

18  A.       It was looked at by the training bureau.  I

19  don't remember the specifics.  I mean, that was a long

20  time ago.  Probably before 2010.

21  Q.       Okay.  So at any time then since this one issue

22  was identified by the EARS committee related to

23  training, has there been any other issues that they've

24  identified as potentially problematic related to

25  training?

Deposition of Chief Kimberly Jacobs                    Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

1    A.       I can't say that I remember too many issues, but

2    I do remember that more than once they have had at least

3    suggested that the training bureau take a look at

4    things.

5    **Q.       Okay.  And have there been any changes to**

6    **training implemented as a result of issues flagged by**

7    **the EARS committee?**

8    A.       I would have to say that's a good possibility.

9    I just can't tell you what that specific training was.

10   I mean, our use of force evolved and changed over the

11   years, every year practically, as we learned things, and

12   in my opinion it has improved every year.  We don't just

13   keep doing things.  We've incorporated scenarios that

14   don't involve use of force and deescalation and

15   decision-making and all of that kind of thing.  I can't

16   tell you if it's as a result of the EARS review

17   specifically, but I do know that we've analyzed what the

18   EARS committee has come up with and talked to the

19   training bureau commander, and all of that.  Those

20   records are public records, and certainly going right

21   back through them there's an annual report going back

22   through the EARS committee that's specific to that.

23   **Q.       That was going to be one of my questions.  I was**

24   going to ask you about how I can learn about this, like

25   whatever issues have been flagged by the EARS committee

Deposition of Chief Kimberly Jacobs          Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

 1   related to patterns, not only with an individual

 2   officer, but training and other things.  Where are the

 3   documents that I should look at to learn about that?

 4   A.       The EARS system reports.  They meet twice a

 5   year, so it would be a biannual report.  And in the

 6   report they identify the officers that are being

 7   flagged; they identify the people that were on the

 8   committee; identify the number of investigations that

 9   they reviewed; what type of investigations they were;

10   the discussions that they had that might be relevant to

11   patterns to either an individual or to particular

12   training.

13   Q.       Okay.  Now, you mentioned that you thought it

14   was important to consider percentages of complaints, not

15   just three in terms of the formation of EARS.  Can you

16   explain that to me, please?

17   A.       Sure.  The number three was just an arbitrary

18   number before.  Generally if you're looking for a

19   pattern you need more than two, right?  We had a huge

20   number of complaints back when Internal Affairs

21   reorganized in 2001.  We had more than a thousand

22   complaints that came in that we advertised and went on

23   the media and that kind of thing, so there was a huge

24   influx of complaints and we wanted to make sure that we

25   were getting a representative sample of all complaints.

1   So not just relying on the number three for individuals,

2   but did we get a big enough sample, so we decided, I

3   believe, on five percent of all the complaints should be

4   looked at.  It's been tweaked, I believe, since then.

5   It was just to make sure that we weren't only looking at

6   a certain number.  It could be that four would be that

7   percentage, but we felt that it was important that we

8   looked at enough of the investigations.

9   **Q.      Okay.  So is that what was implemented?**

10  A.      Back then it was implemented that we would take

11  a certain percentage of complaints, a certain percentage

12  of use of force investigations.  I believe at that time

13  mace was a separate column.

14  **Q.      Okay.  So how does EARS work now?  Is it still a**

15  certain percentage of complaints that come into the

16  Internal Affairs?

17  A.      Being gone for almost two years, I can't tell

18  you.

19  **Q.      How about when you were chief, how did it work?**

20  A.      I know that we operated with a certain

21  percentage for most of my career after the 2002 change,

22  so I don't recall anything different.

23  **Q.      Okay.  So I feel like I'm missing something**

24  obvious here, but I don't totally understand what you

25  mean by looking at a certain percentage.  Can you

```
 1   explain that to me?

 2   A.        So, it's hard to explain.  There's an SOP for

 3   the EARS program that would probably be better at it

 4   than I am at this point, but it was all written down.

 5   We had an SOP that described what we were going to do,

 6   but we wanted to make sure that if we had so many

 7   complaints that we looked at at least five percent of

 8   those complaints.  There might have only been a few

 9   people that had three, but we wanted to look at a good

10   group of those total complaints.  If only three officers

11   had three, then we're only looking at nine complaints.

12   We wanted to look at a representative sample.  So it was

13   about sampling the number of investigations rather than

14   certain officers.

15   Q.        Is that in addition to officers who had three

16   complaints?

17   A.        It wasn't triggered anymore by three.  It was

18   triggered if you fell into that group of five percent.

19   Q.        How was that group of five percent selected?

20   A.        By the number of complaints, take five percent,

21   and then wherever that number fell.  If it's three

22   complaints or four complaints or whatever, that would be

23   where it is, and now that the complaints had been

24   lowered that would have been a smaller group.

25   Q.        Okay.  So say you have 100 complaints that come
```

1    **in during a six month period and they are against a**

2    bunch of different officers, are all of the complaints

3    reviewed?

4    A.        In EARS?

5    **Q.        No.  Like in general by Internal Affairs.**

6    A.        Every citizen complaints get investigated that

7    gets written up, and then it's reviewed by the entire

8    chain of command, and there's a decision made on it at

9    the deputy chief level.  If it was turned into a

10   disciplinary action, that would be a written reprimand

11   or above, then it came to me as well.

12   **Q.        So that review happens, and we'll talk about**

13   that in a little bit.  So how does the EARS review

14   happen?  Is that like a second step?

15   A.        Absolutely.  That's after they've all been

16   investigated, and that's why there's a little bit of a

17   delay in going over these, but you have to have the

18   complete investigation to look at the facts.  So they're

19   looking back after the chain of command has already done

20   their review, they're looking back, reading all of the

21   investigations that are part of that group, and then

22   they're going through there to see if that same officer

23   might have had a number of them.

24            Officers and supervisors move around in the

25   division of police by choice.  They take different

1    assignments.  So if an officer had a use of force on the

2    west side then moved to the east side and had a use of

3    force, and then had a use of force on the north side,

4    all three chain of commands might have said they're

5    fine, but the EARS committee might find that they were

6    all against women, that they were all using the same

7    kind of language.  They might have said, well, there

8    wasn't much proof here and here, but put together we

9    have questions.

10          So then to ensure that people aren't moving to

11   avoid being found out, and it's to avoid the situation

12   where -- I'll give you an example.  If somebody claims

13   that they got kneed in the groin and so they had to hit

14   them, you write that up and it says, he got kneed, blah,

15   blah, blah, but if that happens five times in a use of

16   force, maybe there's something or they found an excuse

17   that worked and continued to say it.  But that's what

18   the EARS committee is about, to find out whether or not

19   there's patterns that chains of command might not have

20   been privy to.

21   Q.      Okay.  And then the EARS committee then is

22   reviewing even complaints that are determined to be

23   unfounded?

24   A.      They're reviewing, I believe, unfounded, not

25   sustained, sustained.  I believe the ones that are

1  exonerated are not part of that because the officers'

2  name is removed from an exonerated complaint per the FOP

3  contract.

4  **Q.      Okay.  Do you know how a complaint would be**

5  determined exonerated as opposed to unsustained or

6  unfounded?

7  A.      So if somebody said they towed my car or they

8  handcuffed me behind my back and made me sit in the car

9  for a long time before they processed me, that's totally

10  within policy.  If there's no rudeness associated with

11  it or nothing else associated with it, that's exonerated

12  because our policy requires the officer to handcuff

13  behind the back, so that would be exonerated.  Unfounded

14  means that we didn't have proof that the allegation

15  occurred.

16  **Q.      Okay.  And then unsustained?**

17  A.      Not sustained means that we can't tell one way

18  or the other.

19  **Q.      Okay.**

20  A.      It's basically a 50/50.

21  **Q.      And if it's a 50/50 toss up you defer to the**

22  officer as opposed to the civilian?

23  A.      I wouldn't say that at all.

24  **Q.      If it's a 50/50 toss up then why is it not**

25  sustained as opposed to sustained?

1    A.       I'm talking 50/50.  If the vote came out 50/50,
2    who wins?  In an election who wins?  Nobody, right?
3    Q.       Okay.  Fair enough.  So unsustained does go into
4    EARS though?
5    A.       Not sustained does, yes.
6    Q.       Okay.  And say an officer has like three
7    complaints from three different zones or districts,
8    right, like you mentioned as an example, but those
9    happened over like a year, how long do they stay in EARS
10   to be considered part of a pattern?
11   A.       It's not a matter of staying in EARS.  EARS
12   looks back for a 12 month period, or an 18 month period,
13   I'm not sure which now, and if the complaint has dropped
14   off the timeline for EARS, then it wouldn't be looked at
15   anymore.  If it's in that same period of time that
16   they're looking at it would still be considered as long
17   as the officer -- the records go off an officer's record
18   after a certain period of time.  I believe it's three
19   years per the contract.
20   Q.       Now, you were in Internal Affairs before you
21   were chief, so you could probably give me a perspective
22   on this whole issue, right?  Were there ever any
23   conversations about changes to EARS other than, you
24   know, you had this one sales pitch that you mentioned
25   already, but any other conversations over that period of

1    time that you were in the command chain to make any kind

2    of changes to EARS to make it more effective?

3    A.        Yes.   Internally we talked about what could be

4    done; what we should be looking at.   Should we include

5    sick mark offs.   Should we include, you know, timeliness

6    issues.   All of those ideas have been brought up and

7    talked about over the years.   Sometimes it comes from a

8    supervisor pushing the idea up.   Sometimes it comes from

9    a discussion that we've had at executive staff or

10   command staff, or whatever it might be.

11          That's always something that we've been

12   considering.   It's just a matter of do we have access to

13   those records and are they relevant.   We've also looked

14   at studies.   Charlotte Mecklenburg did a study about

15   their early warning systems and they found that the best

16   prediction of future behavior is whether or not a person

17   had been disciplined.

18   **Q.        And how did that impact -- what does that mean?**

19   A.        You could look at 20 different things.   You

20   could look at all of those different ideas about that,

21   but their research indicated that the best predictor is

22   past performance related to, you know, being outside of

23   policy basically.

24   **Q.        Did that impact the way that you guys handled**

25   discipline or EARS at all?

1   A.    That and many other things.  First of all, the

2   software systems that the division of police use are at

3   best antiquated, and often times it's a database that

4   may or may not have information that would be relevant

5   to helping out.  Medical records really are off limits.

6   You can't be talking about those kinds of things.  So if

7   you're looking at mark offs, you have to decide whether

8   or not that's medical information that we should be

9   discussing.  The information about officer's reports,

10   various other things, trying to derive that from

11   multiple different databases is extremely high

12   intensive, so we took all of that into consideration.

13   **Q.    Were any changes made?**

14   A.    Well, we were still doing EARS up to when I

15   retired generally the way that we had developed it in

16   2002.

17   **Q.    So you didn't implement any changes as a result**

18   of what you learned from this Charlotte study?

19   A.    Well, not just the Charlotte study, but a lot of

20   other factors came into it.

21   **Q.    What about like the information that you learned**

22   from that Charlotte study, and I'm only mentioning that

23   because that's the specific one that you mentioned in

24   terms of the best predictor being whether or not they

25   had been disciplined.  So, was that incorporated at all

1    into the other disciplinary structures within the

2    division of police?

3    A.      Was what incorporated?

4    **Q.      The information you've learned about how**

5    important a predictor of discipline can be for future

6    misconduct?

7    A.      No.  I wouldn't say so, because all disciplinary

8    decisions have to be based on the information at hand.

9    So somebody's past record of discipline doesn't get

10   used.  Much like in court, you don't use somebody's past

11   criminal history to determine their guilt or innocence

12   in a trial.

13   **Q.      Okay.  I understand that.  But what's your point**

14   about you don't use past disciplinary history for what?

15   A.      Current disciplinary decisions.

16   **Q.      Okay.  So when making disciplinary**

17   determinations within the division you don't look back

18   at prior disciplinary determinations?

19   A.      There's a policy about that, so I believe it's

20   in the supervisor's manual or the rules of conduct, but

21   generally they're not going to be considered unless

22   there's a pattern that is relevant to that particular

23   case.  I don't know where the policy is.  It might be in

24   the directive about Internal Affairs in citizen

25   complaints.

Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

1   Q.      Well, if past discipline is not considered, how

2   would the disciplinary body know whether or not there's

3   a pattern?

4   A.      Well, I'm talking about, you know, is

5   progressive discipline -- has something along this line

6   happened during a period of time where we can progress

7   the discipline?  So, if you have the similar

8   disciplinary situation prior to, depending on what type

9   of discipline, whether you could look back at that prior

10  incident and use that as a way to step-up the

11  discipline.

12  Q.      Okay.  So if there was prior discipline within a

13  year is that considered by the disciplinary body?

14  A.      It depends on the type of discipline it was.

15  We're allowed to use a DCC, a documented constructive

16  counseling level for nine months.  It stays on their

17  record for one year, but we're allowed to consider it

18  for nine months.  This was during my tenure.  I'm not

19  sure if the contract changed or not.  For a written

20  reprimand you're allowed to consider it for three years,

21  and for departmental charges you're allowed to consider

22  it for four years of a similar nature, I believe is the

23  terminology.

24          MR. MILLER:  I'm going to object as to

25  form because I think we're talking about two different

1    things.  When you say "disciplinary determination," are

2    you saying A, something is worth disciplining, or B, the

3    determination of how many to discipline?

4                      MS. GELSOMINO:  I think what I'm

5    asking is whether or not there should be discipline.

6                      MR. MILLER:  Okay.  As long as we know

7    which one we're talking about, if we're talking about

8    disciplinary determination, because I think that's where

9    the confusion is coming from.

10   BY MS. GELSOMINO:

11   **Q.       Okay.  Kim, I guess at this point I'm trying to**

12   determine if whether previous discipline can be used in

13   deciding whether or not to discipline an officer again?

14   A.      So I want to be clear, the decision to

15   discipline is based on the finding of the investigation.

16   If the finding is that they've broken the rules, then

17   there's a question of what level of discipline is

18   appropriate for that particular case.

19   **Q.       At what point do you consider, what were you**

20   just telling me, like a DCC you can consider for nine

21   months and down the line, where does that come into

22   play?

23   A.      That comes into play when the supervisors are

24   making a disciplinary recommendation.

25   **Q.       For whether or not to discipline, or for the**

Deposition of Chief Kimberly Jacobs                     Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

1    **level of discipline?**

2    A.        The level of discipline.

3    **Q.        Okay.  So whether or not somebody has been**

4    previously disciplined is not considered at all when

5    making a discussion as to whether or not to discipline?

6    A.        I think you mean whether or not they're guilty.

7    **Q.        Yeah.  I guess so.**

8    A.        I want to be clear, because we're not looking at

9    investigation whether or not we should discipline

10   somebody or not.  We're looking at the facts to

11   determine whether or not they've committed a violation

12   of the rules.  Generally we're not going to look at

13   other cases that they've been involved in to help us

14   determine guilt in this particular case.

15   **Q.        Okay.  That clarifies things for me.  In terms**

16   of determining guilt, I imagine often times that

17   includes a credibility finding?

18   A.        Absolutely.

19   **Q.        So, in making those credibility determinations**

20   about whether or not that officer is telling the truth,

21   does the division consider previous disciplinary

22   findings against that officer in making that credibility

23   determination?

24   A.        Well, I would say that it's the person making

25   that decision's knowledge of that particular officer and

1    situations that they may have been involved in that

2    gives them their reasoning about their credibility.  Not

3    a particular case necessarily.  They may or may not have

4    knowledge of previous cases.  So there's no digging into

5    people's backgrounds, if you know what I mean, to see if

6    they've ever had anything like this.  If I've worked

7    with somebody for five years and felt that they were

8    skirting the truth, or something like that, then that

9    certainly plays into the credibility.

10   Q.      **Why is there no digging?**

11   A.      First of all, the records are only kept for

12   three years per the contract, and I'm trying to remember

13   if it's the contract or if it's a rule of conduct, but

14   it's a matter of access.  It's a matter of fairness.  I

15   mean, we don't look into the criminal record of our

16   complainants to determine whether or not their

17   allegations of rudeness is correct either.  We don't do

18   a lot of digging back, because I have found that the

19   facts of this particular case are what matters.  And I'm

20   just trying to remember whether or not we have that

21   written down.  I thought maybe there was something

22   written down about that either in the contract or in the

23   directive about internal investigations.

24   Q.      **It seems like a lot of these decisions about how**

25   the division considers complaints, and discipline, and

1  for how long they consider that, and how the division

2  can consider that, is determined not by the division

3  itself, but by the FOP contract.  Is that true?

4  A.      The FOP contract impacts our ability to look

5  back certainly.  It's an agreement between the city and

6  the FOP.  Our policies, rules, and all of that are

7  created based on our knowledge of the contract and what

8  we think is the best practice.  Where they meet or butt

9  up against each other is something that we have to deal

10  with.

11  Q.      Yeah.  I imagine that there can sometimes be

12  tension there.  Did you ever have the experience of

13  identifying some area of tension where it was the

14  division's determination that discipline should be

15  handled a certain way or reviewed for a certain amount

16  of time that was different than what was laid out in the

17  contract?

18  A.      I would say fairly often.

19  Q.      Can you give me some examples of that as it

20  related to discipline in particular?

21  A.      Well, as I said before, the written reprimand

22  can be considered for three years, but the records

23  disappear at three years.  So if you're doing an

24  investigation and it ends three years and a day, then

25  you don't have access to the investigation anymore to

1  consider progressive discipline.  There's little things

2  like that and big things that definitely impact, you

3  know, what we're able to do.  You know, notice of past

4  practice, all of those kinds of things have an impact on

5  how the division is able to move through the

6  disciplinary process.

7  **Q.      Did you ever participate in any contract**

8  negotiations while you were chief?

9  A.      I didn't directly participate.  There were times

10  when I was consulted about them, but I wasn't on the

11  team as chief.  I was on the team when I was a deputy

12  chief.

13  **Q.      Okay.  And were there any renegotiations**

14  regarding any issues or record keeping issues?

15  A.      There's always been.  I mean, I believe it's

16  always something that's brought up at negotiations.  The

17  city always has a proposal and the FOP always has

18  proposals, and often times the disciplinary chapter is

19  at play.

20  **Q.      Do you recall whether there were any changes to**

21  that actually implemented in any of the contact

22  provisions?

23  A.      I believe there's been changes each time.  Those

24  are also public records.

25  **Q.      Do you know any of them off the top of your**

1    head?

2    A.       The last one, I believe, was about the amount of

3    time that a citizen complaint can be received.  I think

4    it was extended from 60 days to 90 days.  A long time

5    before that it was extended from 28 days to 60 days.  In

6    8.4, I believe the more recent change, that was a

7    stipulation that says if an investigation isn't

8    completed in 180 days no discipline shall be leveled,

9    and I believe that's been changed to basically let an

10   arbitrator decide whether an investigation took too

11   long.  Those are examples but, you know, that's a long

12   chapter.  Chapter ten we made a change right around the

13   time that I became chief about whether or not we could

14   continue to hold the records of individuals that had

15   been found untruthful.  Officers are required to let the

16   prosecutor know if they had a sustained charge of

17   untruthfulness, and we weren't able to tell whether or

18   not those officers were complying with that.  We didn't

19   know if the prosecutor's office had a list, so we

20   negotiated for and got permission to keep a list of

21   officers that had been found to be guilty of

22   untruthfulness, and then we also were able to preserve

23   those records, I believe, indefinitely, so they didn't

24   just disappear after six years.  Generally, that's going

25   to be a suspension at least or a termination charge.

1    With a suspension charge you're allowed to keep those

2    records for six years, but you're only allowed to use

3    them for four years.  It also impacted their ability to

4    switch assignments.

5    **Q.       What's that list called?**

6    A.       Informally I think it's called a liar's list,

7    but I don't know.  It's described in chapter 10 of the

8    FOP contract.

9    **Q.       Okay.  How do you resolve these tensions between**

10   what the division determines to be the right policy for

11   the department when there's a conflict between that

12   determination of the division and the FOP contract?

13   A.       It's a matter of you have to understand what the

14   rules are and then work within the rules.  If the

15   contract says that you have to do something a certain

16   way, then you do it that way.  If they give you a

17   deadline, then you try to get the deadline made.  We

18   upped our ability to get investigations done within the

19   90 day period enormously by making sure the

20   investigators were taking overtime when necessary.  If

21   you had to provide all the records like the public

22   records law in Ohio requires, then you just have the

23   records ready to go.  You just know that's part of the

24   investigation.  You just have a deep understanding of

25   what the rules are and the contract and telling the

 1    investigators what those are and giving them the tools

 2    to try to deal with them.  Whatever it is.  If it's how

 3    long you can consider discipline, then that's how long

 4    you have.  At some point in time you have to decide

 5    whether or not somebody's past is, you know, relevant to

 6    that particular thing, or whether something can be

 7    progressed or not be progressed.  You know, the more we

 8    know about officers we can, you know, try to guide them,

 9    steer them, train them, whatever, to make good

10    decisions.

11    **Q.      So that makes sense to me.  The more you know**

12    about the officers, the more you know about their

13    history, their long-standing history of civilian

14    complaints, et cetera.  From a layperson's perspective

15    here I would think that would be helpful in paying

16    attention to your officers and making sure that the

17    decision is on the right track.  So, how do you do that

18    though if you're required by the FOP to destroy records

19    and not to consider records over an officer's entire

20    career for a longer period of time?

21    A.      First of all, you said it's required by the FOP.

22    It's required by the contract between the City and the

23    FOP.  So it's not that their giving us rules, it's

24    contract telling us what we're allowed to consider and

25    not allowed to consider.  I would say in most places

1    that have a Union contract there's going to be some type

2    of a time period that they allow you to consider that,

3    and it just so happens that we have a regimented

4    schedule that's there and you just deal with it.  That's

5    just the way that it is.  It was agreed to and you just

6    have to live with it.

7    Q.        I understand that the division is bound by the

8    rules that it agrees upon, but in your experience or in

9    the experience of the division, have those rules that

10   have been agreed upon in the FOP ever impeded the

11   division's ability to track officers and identify

12   patterns of potential misconduct within the department?

13   A.        I wouldn't say it's impeded our ability to track

14   officers as much as it's just a matter, like, if you

15   know that somebody did something three-and-a-half years

16   ago, and they did the same behavior three-and-a-half

17   years later, it's the discipline that's based on it

18   being brand new instead of a repeat of the previous

19   offense.  But you could still know who those officers

20   are, you just can't necessarily use it for a

21   disciplinary decision.

22   Q.        Do you think that negatively impacts the

23   division in any way?

24   A.        It's hard to tell.  I mean, I don't know.  I've

25   heard that some officers might be rude, they get away

```
 1    with that.  Certainly that can hurt the division's
 2    reputation.  If an officer had a history of using force
 3    or something like that, that was borderline or out of
 4    policy or something along those lines, and we weren't
 5    able to consider it, certainly it could hurt the
 6    division if somebody did something again and we should
 7    have been able to prevent it through a disciplinary
 8    process or whatever.  There's time limits on practically
 9    everything.  People go to prison and they do it again.
10    We don't keep them locked up because it could have
11    happened.
12    Q.       That's true.  But would you agree that a pattern
13    of misconduct can show itself over more than a year?
14    A.       Sure.
15    Q.       If somebody does one thing in February of one
16    year, doesn't do anything until February or March of the
17    next year, and then another thing February or March of
18    the next year, in that circumstance that wouldn't be
19    tracked in EARS, right?  Because it's happening only
20    once a year and it's only tracked in EARS for 12 months,
21    is that accurate?
22    A.       Well, if it's actual discipline, yes, it falls
23    off the record.  EARS might have access to it because
24    they're outside of the disciplinary process.  They're
25    not operating under the disciplinary process.  If
```

Deposition of Chief Kimberly Jacobs            Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

1    somebody didn't wear their hat and they got a DCC in

2    February, and then it fell off, and they did it again in

3    the next March, it would fall off again.  Yeah.  Those

4    are the kinds of patterns that you would hope that you

5    would be able to deal with.  And that's just a minor

6    example.

7    **Q.    Sure.  But let's just say it's a person who's**

8    kneeing someone -- or punching somebody because they

9    were kneed in the groin, again, your example from

10    earlier, if a person does that, it's a civilian

11    complaint about do that once every 13 months for three

12    years, would that kind of behavior be monitored or

13    identified as a pattern anywhere within the existing

14    structures within the subdivision?

15    A.    Depending on it falling into the EARS lookback.

16    If it's not in the EARS lookback period, then no,

17    probably not.  Other than that chain of command, if that

18    particular officer and the chain of command were the

19    same, we would still remember all of those instances and

20    should have already been dealing with that.

21    **Q.    It's just up to the individual supervisor in the**

22    chain of command to remember previous civilian

23    complaints against their officers.  It's not tracked

24    anywhere?

25    A.    Remember or keep notes or something along those

1   lines.  They have certainly informal leadership going on

2   that, you know, might be because of what they know about

3   that particular officer, and they could be riding with

4   them or they could be having discussions with them.

5   They could refer them to somebody.  All of those things

6   do happen.  It's just not a formal process.

7   **Q.      Okay.  Is there any oversight of that informal**

8   process?

9   A.      No.  I wouldn't say that there is.

10   **Q.      And if there's a change in command, like a**

11   sergeant switch or something, is there any mandated pass

12   off of that information about a potentially problematic

13   officer to the next supervisor?

14   A.      Not a mandated one, no.

15   **Q.      Is there any pass off encouraged in that**

16   circumstance?

17   A.      I would say that if a supervisor had a problem

18   officer, yes, it would be encouraged that that kind of

19   information would be shared.  There are a lot of

20   supervisors who understand their personnel very well and

21   want them to have the next leader take care of good hard

22   workers and know about the ones that may not be.

23   **Q.      Okay.  How is that encouraged by the division?**

24   A.      Through leadership training, supervisor's

25   training.  You know, the division's support groups, all

Deposition of Chief Kimberly Jacobs                    Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

 1   of that kind of stuff.

 2   Q.        I'm sorry.  Did you say division support groups?

 3   A.        Informal, peer, just getting together and just

 4   talking.  Those kind of things.  The lieutenant over the

 5   supervisors are aware of -- so a lot of times sergeants

 6   will move within a lieutenant's work group, so the

 7   lieutenant is already aware of most of that.  And one

 8   sergeant might have the officers on 13th precinct, for

 9   instance, and because he wants better days off he might

10   move to 14th precinct, but the lieutenant still oversees

11   both of those precincts, so the lieutenant would be

12   aware of that, and the sergeants would be in meetings

13   with the lieutenants to talk about those kinds of

14   things.  It's not like you often times don't leave and

15   go to another side of the city.  You're still sometimes

16   in that same work group, the sergeants, so they would

17   share information because they see each other in

18   meetings with the lieutenant or going on runs and

19   various other things.

20   Q.        Okay.  But, again, that's all just informally

21   done, it's not tracked and there's no oversight from the

22   division on that, right?

23   A.        I wouldn't say it's oversight from the division.

24   The lieutenant or the commander might be keeping track

25   of that on a different level.

1    Q.      But there's no mandated tracking from the

2    division?  I'm sorry.  Can you say that one more time?

3    A.      The point that you were asking was --

4                  MS. GELSOMINO:  Let's go off the

5    record, Megan.

6                            - - - -

7       (Thereupon, an off-the-record discussion was held.)

8                            - - - -

9    BY MS. GELSOMINO:

10   Q.      Since it wasn't clear before, I just want to

11   make sure that I understand that you have testified that

12   there's no division requirement or oversight by the

13   division of supervisors communicating information about

14   potentially problematic officers to new supervisors who

15   are taking over their leadership position, right?

16   A.      Correct.  There's no official program like that.

17   Q.      And you testified that there's some

18   encouragement regarding this at supervisor training, is

19   that true?

20   A.      Well, you know, what I'm saying is that

21   supervisors are taught how to be good leaders, and to be

22   a good leader you need to understand the people that

23   you're leading, and so you're encouraged to seek out

24   information about that by doing 360 reviews, by talking

25   to previous supervisors, other peers and various other

1    things, so those kind of leadership skills are taught,

2    and that would be in the umbrella of learning about the

3    people that you are now supervising.

4    **Q.**     **Do you feel that the limitations set up**

5    regarding the FOP contract have had any kind of negative

6    impact on the division's ability to supervise and

7    discipline your officers in an appropriate way?

8    A.     I would say that, yes. I've tried to discipline

9    people before. I've tried to, you know, do something,

10    and whether it's a past practice or something along

11    those lines, I tried to discipline somebody who lost his

12    driver's license because he had been stopped for OVI and

13    his driver's license was suspended for a year, and he

14    could not work as a police officer until he had his

15    driver's license back, and I tried to discipline him,

16    and an arbitrator ruled that he hadn't had notice of

17    this. The contract requires that you have to have

18    notice and there was no precedent for that particular

19    discipline. Is the division harmed? Well, not being

20    able to discipline somebody, it's hard to argue whether

21    the division is harmed by that. We had to take back

22    officers that the arbitrators have ruled that they

23    shouldn't have lost their jobs, yes. Have we had some

24    discipline changed because of either past practice or

25    whatever, but generally it's not for a particular

1    section like time or something else, it's because

2    somebody disagreed with our decision-making and that's

3    what happens all the time.

4    **Q.     Would that somebody be the arbitrator or**

5    **somebody who could potentially disagree with you?**

6    A.     Civil service commission also gets to weigh in

7    and sometimes there's disagreement among the chain of

8    command on whether or not there should be discipline.

9    **Q.     Sure.  And we'll talk about that, too.  For now**

10    I'm interested in outside of the division.  So have you

11    -- why do you think that disciplining officers for

12    misconduct is important to the division?

13    A.     All good cops want all cops to be good.  They

14    don't like working around bad cops because it makes

15    their job tougher.  Bad cops impact the way that the

16    division's reputation is viewed.  Bad cops can harm

17    citizens in various different ways.  Whether that's

18    through the use of force or a bad experience that will

19    never be forgotten.  So I think it's extremely important

20    that the division of police holds everyone accountable

21    for the rules that are implemented to protect the public

22    from a bad cop and just to provide excellent service.

23    That's the goal, is to provide excellent service.  And

24    when that fails we need to try to correct that behavior.

25    Sometimes that's through training or sometimes that's

1  through the discipline process.

2  **Q.　　Okay.　Do you think that the limitations that**

3  **the division is confronted with regarding discipline has**

4  **ever prevented the division from being able to protect**

5  **the public from bad cops?**

6  A.　　Generally I would say it's more often the amount

7  of evidence that's available that makes that difficult.

8  Limitations of the contract are potentially a problem,

9  but generally once we know the rules we abide by those

10  rules and we're getting those investigations completed.

11  It just comes down to sometimes, you know, again, going

12  back to an arbitrator who's a civilian, who is not

13  employed by the division of police, making a decision

14  about whether or not termination is a factor or a

15  particular disciplinary action is a factor.　I believe

16  you said "bad cop," right?

17  **Q.　　Yeah.　I was trying to use your language.**

18  A.　　A bad cop goes from somebody what's rude all the

19  time to somebody that hurts people.　There's a big

20  range.　So to be specific, yes, I wish that nobody was

21  rude, and I certainly pray that nobody gets hurt by a

22  cop that was out of policy basically.　But the contract

23  certainly impacts our ability to discipline people, but

24  it doesn't impact our ability to train and counsel

25  people, so there's a lot of factors that influence what

1  we're able to do with officers, including the amount of

2  evidence that might have been available.

3  **Q.       Can you explain that to me?  The amount of**

4  evidence available can make it different to protect the

5  public from bad cops.  What do you mean by that?

6  A.       In cases where there's no body camera video.  In

7  cases where there's no audio recording or video

8  recording.  Often times we've had to rely on statements.

9  Sometimes it's physical evidence, and then sometimes

10  it's just statements.  This happened, and then you talk

11  to three other people and they all describe it

12  differently.  It's a matter of credibility.  It's a

13  matter of did the statement make sense?  Did it even

14  play out that particular way?  And so, there are a

15  significant number of cases where we can't prove one way

16  or the other what happened.  Less now because of the

17  body cameras, but if it's about a conversation, about an

18  action that might have happened, then it's difficult

19  sometimes to make a determination of whether or not that

20  person is in violation of the rules.

21  **Q.       Have you ever attempted to discipline any**

22  officer for use of force and have that determination

23  overturned by some other body outside of the division?

24  A.       Absolutely.

25  **Q.       How many times?  And technically, according to**

Deposition of Chief Kimberly Jacobs          Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

```
 1   the notice, I'm talking since 2005, but you tell me how
 2   many times can you tell me about?
 3   A.       I wasn't chief until 2012, but there was one
 4   particular case, there was a shooting that happened on
 5   the west side where I felt that the officer had been in
 6   a situation as such that he should not have fired his
 7   weapon.  When the investigation was complete we talked
 8   about it.  It was determined that -- I determined that
 9   it was outside of policy after having a chief's hearing,
10   recommended discipline for that particular officer, it
11   went to arbitration, and the arbitrator said that it was
12   a reasonable shooting.
13   Q.       What was the officer's name in that case?
14   A.       McClellan.
15   Q.       Okay.
16   A.       There was an accidental discharge, so that
17   wasn't on purpose, but an officer fired his shotgun
18   accidently inside a substation and we tried to give him
19   a departmental charge, and the Union took it to
20   arbitration, and the arbitrator gave him a strange
21   ruling.  They said he needed 10 hours of training and 10
22   hours of documented counselling.  And we were like,
23   "well, we don't do it in hours."  So it was very
24   convoluted.  There might be other ones, but I'd have to
25   look at records to do it on use of force.  I've found
```

1   officers outside of policy on uses of force, but that's

2   the one that I recall, the McClellan case.

3   Q.      **Now, like what are the documents that we could**

4   look at to figure this out?

5   A.      McClellan.

6   Q.      **All of them.  If I wanted to know when the chief**

7   has recommended discipline and any time that it's gone

8   to an arbitrator, what kind of documents do I need to

9   look at to answer that question?

10  A.      At least during my tenure we kept track of

11  disciplinary cases that came to me.  If it didn't come

12  to me it was a DCC or something like that, but written

13  reprimands and suspensions and recommendations for

14  termination would come to me.  We kept track of the

15  discipline that I decided, and word got pushed to the

16  director's officer in the Professional Standards Bureau

17  discipline tracking thing.  It's on the intranet at the

18  CPD.

19  Q.      **At what?**

20  A.      Columbus Police.  It's on the intranet.  We

21  wanted the division personnel to see what the

22  disciplinary decisions were so that they would learn

23  from these other instances.  We take the officer's name

24  off of that because of the timeline, you know.  If you

25  take the name off of it then you're not in violation of

1    the contract with public information.  It's the

2    discipline tracking database from the Professional

3    Standards Bureau that lists chief's discipline, and it

4    may or may not have been updated based on what happened

5    at the director's office or in arbitration.  Some of

6    them might have been, some of them might not have been,

7    because they're busy and don't always go back to make

8    those updates.  Like I said before, some of the

9    arbitrations take years, and some of the investigations

10   take a long time.  So getting up to date with decisions

11   that happened in my office may or may not be in there,

12   but it could be something that you could then track

13   down.

14   Q.      Okay.  So the best place to look is called the

15   discipline tracking database of the Professional

16   Standards Bureau?

17   A.      There's a separate discipline tracking system

18   that is maintained by human resources, but you want the

19   one from the Professional Standards Bureau that's on the

20   intranet about the chief's discipline.

21   Q.      Okay.  And that would include any time that the

22   chief's office determined -- does that only include when

23   you find that there should be discipline?

24   A.      So if I had a hearing on it generally it's going

25   to be in there.  There had been cases, obviously, that

1  you're aware of probably, that I've had a chief's

2  hearing and decided that there won't be any discipline.

3  **Q.      Right.  Would those instances also be in this**

4  discipline tracking database?

5  A.      I believe so.  If there were any number of

6  disciplinary cases, and I can't ensure that every single

7  one was written up, but that was the practice that if

8  there was a hearing, the Professional Standards Bureau

9  lieutenants, the discipline grievance lieutenants, would

10 prepare this statement that we put out on the intranet.

11 I would edit and approve it, and then it would be

12 published.

13 **Q.      Okay.  Was there any other tracking of cases**

14 that came to the level of the chief's office regarding

15 discipline?

16 A.      Internal Affairs probably has some records there

17 as well, because they send a representative to the

18 chief's hearing.

19 **Q.      Okay.**

20 A.      I don't know what they might call that.

21 **Q.      Okay.  Nothing else -- sorry.**

22 A.      The HR discipline tracking system would have all

23 the discipline that's been issued if it's been up to

24 date, and even though names would drop off as required,

25 they would still maintain access.  We had an old, old

```
 1   system -- I can't remember what it was.  The blue screen

 2   databases from way back when before 2000, we had that

 3   discipline that would stay on the record just without

 4   the officer's name.  The techie people would probably

 5   know better whether we still have access to that, but

 6   we've been through different iterations of software for

 7   all of the discipline tracking.  Most everything should

 8   be in that particular system, but names would have

 9   fallen off as required.

10   Q.      Okay.  Have you ever attempted to discipline an

11   officer and had the arbitrator uphold your

12   determination?

13   A.      Yes.

14   Q.      Has that ever happened in the context of use of

15   force?

16   A.      Yes.

17   Q.      How many times?

18   A.      One of them was a police involved shooting on

19   the east side.  And I remember there was another case

20   being overturned.  The Jonathan Thomas case was

21   overturned.  That was out of a dog shooting, and that

22   was overturned by the arbitrator as well.  But the one

23   that was upheld was Camp-Donovan, and that was -- she

24   fired at a murder suspect that she tried to apprehend,

25   he stole her cruiser, and she shot at it as he was
```

Deposition of Chief Kimberly Jacobs          Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

```
 1  driving away, but that arbitration decision took about
 2  four or five years.  The city kept asking the arbitrator
 3  for a decision, and he just failed to respond for years.
 4  Literally.  I believe it happened in 2012, and I don't
 5  think that we had an answer until '18 maybe.
 6  Q.      Wow.
 7  A.      Yeah.
 8  Q.      Well, certainly that kind of a delay would
 9  prevent the division from being able to do any kind of
10  retraining or anything in a timely manner, right?
11  A.      Exactly.  That's why we don't rely on a lot of
12  stuff is timeliness.
13  Q.      In that period of time when this discipline was
14  pending with the arbitrator what was the officer doing?
15  A.      Her regular assignment.
16  Q.      This whole period of time that she was -- what
17  was she disciplined for actually?
18  A.      Outside of policy use of deadly force.
19  Q.      So that's pretty serious.
20  A.      She did receive the discipline.  The discipline
21  proceeds, and then they go to arbitration, and the
22  arbitrator decides that should have happened.  We don't
23  wait to discipline.  We go ahead and proceed with the
24  discipline.  And say if he found she shouldn't have been
25  disciplined, he would give some type of an order as what
```

Deposition of Chief Kimberly Jacobs          Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

1    should happen with the discipline.

2    **Q.        In that case she was disciplined.  How about in**

3    the McClellan case, you recommended discipline in that

4    case, right?

5    A.        I did.

6    **Q.        Do you recall what it was?**

7    A.        I'm pretty sure it was a one day suspension or

8    something along those lines.

9    **Q.        And then the arbitrator overturned that, right?**

10   A.        Yeah.  Said it was within policy.

11   **Q.        What happens if he serves the one day suspension**

12   and then the arbitrator disagrees with you and finds it

13   within policy?

14   A.        It depends on what the arbitrator says.  As I

15   have mentioned before on that actual discharge one, what

16   he said made no sense.  Sometimes they'll say give him

17   back pay, plus interest.  Sometimes it's just back pay.

18   Sometimes it's strike it from the record.  It just

19   depends on whatever the arbitrator decides to order.

20   Sometimes they'll say give the officer their assignment

21   back.  We had to take a sergeant back.  They said, you

22   know, take him back.  And sometimes other ones have

23   said, put him back into this assignment.  All the

24   arbitrators seem to be doing their own thing.

25   **Q.        Okay.  So McClellan was use of deadly force,**

1    **right?**

2    A.      Firearm.

3    **Q.      And John Thomas was also a firearm?**

4    A.      Yes.

5    **Q.      How about Zachary Rosen, do you recall that**

6    case?

7    A.      Which one, kick to the head?

8    **Q.      Yes.**

9    A.      I recall it.

10    **Q.      What do you recall about that?**

11    A.      It was long involved. Are you talking about

12    just the discipline?

13    **Q.      He was accused of kicking somebody in the head,**

14    right?

15    A.      Yes.

16    **Q.      This was not considered a use of deadly force,**

17    or is it considered a use of deadly force?

18    A.      No.

19    **Q.      Okay. And what was your recommendation in terms**

20    of discipline for him?

21    A.      I sustained the charge that he had violated the

22    rules and I recommended a three day suspension.

23    **Q.      Okay. What happened with that suspension, do**

24    you know?

25    A.      The director of public safety, who makes all

Deposition of Chief Kimberly Jacobs                Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

1    termination decisions, he recommended termination.  It

2    went to arbitration, and the arbitrator gave him the

3    three day suspension that I had recommended.

4    Q.       I see.  So this raises for me another issue.  I

5    guess I want to take a step back and ask you to walk me

6    through the entire disciplinary process, because I don't

7    totally understand how it went to the public safety

8    director.  Let's just start with what are the different

9    channels of discipline within the division?

10   A.       I'm not sure I understand what you mean.

11   Q.       Let's just specifically talk about deadly force.

12   If an officer uses deadly force there is first a

13   criminal investigation, is that accurate?

14   A.       If an officer uses their firearm then -- if they

15   use their firearm toward a suspect -- if they shoot at a

16   dog, that's generally investigated differently.  If they

17   intend to harm a person, then the CIRT team comes out to

18   do a criminal investigation.  The officer has all the

19   rights of a person being investigated for a criminal

20   offense.  They're not required to make a statement, just

21   like criminal defendants are not required to.  They do,

22   but they're not required to because it's a criminal

23   investigation.  They participate in these investigations

24   because they believe they did the right thing and

25   they're going to try to explain why they used their

Deposition of Chief Kimberly Jacobs        Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

```
 1    firearm.
 2            A lot of people don't understand why we don't
 3    order people to give a statement, but you can't in a
 4    criminal investigation.  So that investigation is
 5    completed by the CIRT team.  They don't make an
 6    investigation one way or the other with regard to it
 7    being in-policy or not.  That investigation is up the
 8    chain of command for the CIRT team.  They have a
 9    lieutenant, commander, and the deputy chief, and they
10    review and make sure that the investigation is a good
11    one.  Make edits, if need be, for typing or
12    investigative questions or whatever.  That investigation
13    is then completed and then sent to the officer's chain
14    of command.  That officer's sergeant reviews the
15    investigation, and then by contract and by policy they
16    make a recommendation as to the finding on that
17    particular case.  If they said I think that the officer
18    was within policy and didn't break the rules they're
19    going to say that.  If they think the officer did
20    violate the policy, then they say, I think they violated
21    the policy, and they would be making a recommendation of
22    discipline.
23    Q.      Okay.
24    A.      It goes to that sergeant's lieutenant, same
25    thing, commander, deputy chief.  If the deputy chief
```

Deposition of Chief Kimberly Jacobs          Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

1   feels that the officer should be found guilty of rule

2   violation, then they would bring that to my attention

3   and request either a written reprimand or a departmental

4   charge.  If they did that and I agreed, then I would

5   then hold a chief's hearing so that the officer, their

6   representative, can come in and talk to me about that.

7   If I make a recommendation, and it's in the contract, if

8   I make a recommendation of a suspension it automatically

9   goes to the director of public safety's office.  I could

10  make a recommendation of leave forfeiture up to 120

11  hours, and if the officer accepts that, then there is no

12  sending it off to the director's office.  Anything above

13  120 hours automatically goes to the director's office as

14  well.  That's the way it was when I was there.  I don't

15  know if it's changed.  If the chain of command said that

16  it was within policy and the deputy chief agreed it

17  would never come to me.

18  **Q.      Okay.  Did you as chief have any review of the**

19  CIRT findings or recommendations?

20  A.      CIRT doesn't make recommendations.

21  **Q.      Does the chief's office have any role in the**

22  CIRT investigation whatsoever?

23  A.      There's no protocol for the chief to participate

24  in the investigation, no.  That's done by the CIRT team

25  and their chain of command to make sure that their

1    investigation was done correctly.

2    **Q.        At what point, if any, is the chief informed**

3    about the status or the ending of the CIRT

4    investigation?

5    A.        It would be done by the deputy chief of the

6    officer.   Sometimes if the package was one that was

7    gaining public attention or anybody else's attention,

8    then I would probably get regular updates about what was

9    going on with that investigation, where it stood,

10   whether it's gone to the Grand Jury if it did, and all

11   of those kind of things.   I expected my deputy chiefs to

12   keep me updated on high profile cases or things along

13   those lines.   Whether it's completed.   Whether it's at

14   the Grand Jury.   Whether it's been found by the Grand

15   Jury.   What state it's in.

16   **Q.        But if the chief doesn't weigh in on CIRT, like**

17   the criminal proceedings at all against an officer for

18   the use of deadly force, right?

19   A.        Doesn't weigh in on the investigation, no.

20   **Q.        Okay.   The chief doesn't have a role in that**

21   criminal part of what occurs after an officer uses

22   deadly force?

23   A.        Yes.

24   **Q.        After that it goes to the policy and**

25   disciplinary determination portion of this, right?

Deposition of Chief Kimberly Jacobs        Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

1    A.        After the investigation is completed by CIRT in

2    their chain of command review, yes.  Then it goes to the

3    officer's chain of command, if it's an officer,

4    commander, lieutenant, deputy chief to be reviewed.

5    Q.        **Where does FRB come in?**

6    A.        They come in when the investigation is finished.

7    I forgot about them.

8    Q.        **There's a lot of parts of this.**

9    A.        There's a lot of checks and balances.  I was on

10   the Firearms Review Board for about 14 years or 10 years

11   or so.  The investigation is completed by CIRT and their

12   chain of command, and then it goes to the Firearms

13   Review Board.  There's three commanders that the

14   investigation is sent to, and they individually read

15   that, and then they make a recommendation of policy in

16   or out, and then that goes to the chain of command.

17   Sorry.  I skipped that step.

18   Q.        **Okay.  Now, my understanding then is if the**

19   Firearms Review Board makes a recommendation and the

20   chain of command agrees with the Firearms Review Board

21   it doesn't make it to you, right?

22   A.        That's in the case of it being within policy.

23   All of them might recommend that it's outside of policy

24   and it would come to me.

25   Q.        **If the Firearms Review Board saying it's**

1  **in-policy and the chain of command agree it's in-policy,**

2  it never makes it to the chief, right?

3  A.      It wouldn't come to me for action.  I would

4  probably hear about it, but it wouldn't come to me for

5  action.

6  **Q.      In that case that the Firearms Review Board and**

7  chain of command both agree that a use of deadly force

8  was within policy, who is the final decision-maker

9  regarding that decision that it is in-policy?

10  A.      The deputy chief.

11  **Q.      The deputy chief of the officer's chain of**

12  command?

13  A.      Yes.

14  **Q.      Okay.  And then in the case that the Firearms**

15  Review Board and the chain of command agree that it was

16  out-of-policy, the use of deadly force was

17  out-of-policy, what happens next?

18  A.      The chain of command makes a disciplinary

19  recommendation, and basically if it's an outside of

20  policy use of deadly force, I said it should come to me.

21  You can't just give a DCC for something like that.  They

22  could technically by policy give a DCC and never tell me

23  about it, but I made it a policy of mine and let my

24  deputy chiefs know that I expected to see outside of

25  policy uses for deadly force.

1  Q.        How did you communicate that policy that you

2  made for your deputy chiefs?

3  A.        I'm sure I talked about it, but I might have

4  written it down on the expectations that I had for

5  deputy chiefs.  I just don't remember if it was written

6  down or not.  We discussed it that you don't get a DCC

7  for firing your weapon.  Now, I'll be clear that if it

8  was an accidental discharge that's sometimes going to be

9  decided by the deputy chief as a DCC.  They've taken all

10 the precautions, used the equipment at the substation to

11 try to prevent that.  Then there had been some DCCs that

12 were decided upon by the deputy chief without it

13 necessarily coming to my attention.  I'm talking about

14 shooting at suspects.

15 Q.        Intentional discharges at people?

16 A.        Yes.

17 Q.        Okay.  So as far as you know during the time

18 that you were chief were there any DCCs given for use of

19 deadly force?

20 A.        Towards a suspect?

21 Q.        Yes.

22 A.        Not that I recall, no.

23 Q.        And before you were a chief you don't know,

24 right?

25 A.        Not if they were found outside of policy, not to

Deposition of Chief Kimberly Jacobs          Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

1    my knowledge.

2    Q.      I'm sorry.  Is that that you don't know whether

3    it happened?

4    A.      I don't recall anybody getting a DCC for

5    shooting at someone and being outside of policy.

6    Q.      Okay.  Thank you for the clarification.  So

7    every use of deadly force where the chain of command

8    recommended discipline during the time that you were a

9    chief went to you for a hearing, right?

10   A.      The ones that were intentional and at a suspect,

11   yes.

12   Q.      I'm only going to ask you for intention and at a

13   suspect for now.  Is there ever a time that it went to

14   you and you did not have a hearing?

15   A.      Where they said it was outside of policy and I

16   decided not to have a hearing, not that I recall.  They

17   have had cases where they said it was outside of policy

18   and I had a hearing and made a different decision, but

19   no.  I don't recall any where I didn't have a hearing.

20   There might have been a written reprimand involved, but

21   I can't remember which one that would have been.

22   Generally I wanted to have a face-to-face with the

23   officer.

24   Q.      Why?

25   A.      That's the most critical thing an officer can

1    do, right?  If our chain or command or the Firearms

2    Review Board felt that the officer had violated our

3    policy on that, I believe it's extremely important for

4    me to understand what was going on in the officer's

5    mind.

6    Q.        **Then in the case where you made a determination**

7    after a hearing that an officer's use of deadly force

8    was intentional and at a suspect was outside of policy

9    and your disciplinary finding was less than 120 hours of

10   a suspension there's no oversight of that decision,

11   right?  If that's accepted, then you're the final

12   decision-maker regarding discipline, right?

13   A.        I mean, I don't think that there's any formal

14   oversight other than I worked for the director of public

15   safety, and if he wanted to question me about a

16   particular decision he could, he could do that.  I took

17   plenty of criticism from the public or attorneys or

18   whoever else that the decisions that I made were not

19   acceptable to them.

20   Q.        **Sure.  But they don't have any actual oversight**

21   of you?

22   A.        No.  I worked for the public, so did it impact

23   my work terms?  Probably not, but it certainly impacted.

24   Q.        **The public didn't have the ability to change**

25   your disciplinary recommendation or your disciplinary

    

1   finding?

2   A.      Correct.

3   **Q.      The only person over you would have been the**

4   **public safety director?**

5   A.      I don't know that he would have if it never got

6   to him.  He could do something to me, I suppose, but I

7   don't know that he could overturn the disciplinary

8   decision that I made if it didn't come to him.

9   **Q.      Okay.**

10  A.      I think that would be something that would be

11  subject to interruption by the contract and all of that

12  because the contract is what lays out where these kinds

13  of decisions get made, and the directives also lay out

14  the process.

15  **Q.      Okay.  I just want to make sure that I**

16  understand.  When would your disciplinary finding -- you

17  make a finding, right?

18  A.      I make a finding, and depending on the

19  discipline, I make a decision on the discipline or take

20  it to the director's office.

21  **Q.      And it only goes to the director's office if**

22  your recommendation for a suspension was over 120 hours

23  or termination, right?

24  A.      No.  Any suspension goes to the director of

25  public safety, even if it's just up to one day.  If it's

1    leave forfeiture up to 120 hours then we didn't have to

2    go over there.

3    Q.       If you found that an officer should be suspended

4    because their actions were outside of policy but you

5    offered that officer 120 hours of leave forfeiture and

6    they accepted, then that's it.  There's no -- the

7    director of public safety wouldn't review your

8    disciplinary finding in that case, right?

9    A.       Generally, yes.  Unless they specifically ask

10   for something or something along there.

11   Q.       You're the final policy-maker and decision-maker

12   in that circumstance?

13   A.       I'm the final decision-maker if they accept a

14   leave forfeiture of under 120 hours, yes.  Ultimately

15   though, some of those decisions have been taken to

16   arbitration.

17   Q.       I understand.  That's a whole other part of

18   this.  That's outside of the division, the arbitration

19   process?

20   A.       It's outside of the division, but it's in the

21   contract.

22   Q.       I understand.  So within the division the buck

23   stops with you if leave forfeiture of up to 120 hours is

24   accepted, and then it only goes above you to the

25   director if it's a termination, a suspension over 120

Deposition of Chief Kimberly Jacobs          Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

1    hours or if there's no leave forfeiture, right?

2    A.       Any suspension goes to the director.  It's leave

3    forfeiture over 120 hours.

4    Q.       **You're right.  I have to get that right.  It**

5    only goes above you to the public safety director if

6    it's a termination or a suspension and there's no leave

7    forfeiture accepted?

8    A.       Correct.  Leave forfeiture over 120.

9    Q.       **Can the public safety director give leave**

10   forfeiture over 120 hours?

11   A.       I think the director can do what they want to

12   do.  I don't know what the contract says about that, but

13   the director is not bound by as many of those things as

14   the chief is.

15   Q.       **In the time that you were chief, how many times**

16   was an officer found ultimately to have used deadly

17   force outside of policy?

18   A.       By me or by the director?

19   Q.       **Whoever the final decision-maker was for that**

20   level of discipline.

21   A.       Well, Camp-Donovan.

22   Q.       **I don't want to focus on the arbitration at this**

23   point.  Even if it was later overturned, I want to know

24   how many times the division at whatever level ultimately

25   determined that the officer should be disciplined

1   because of an outside of policy use of deadly force?

2   A.      Those three at least, McClellan, Thomas,

3   Camp-Donovan. I don't recall any others, but my memory

4   is limited to, you know, what I remember right now,

5   because I don't have records in front of me. That's all

6   I recall.

7   **Q.      Okay. And what would be -- just to make sure**

8   that I'm not missing anything, where is the best place

9   for us to look to get the answer to that question?

10   A.      I believe that disciplinary tracking system

11   that's kept by the professional standards discipline

12   grievance review on the intranet.

13   **Q.      Okay. Had you requested access to that before**

14   this deposition would you have been able to get access

15   to those documents and review them?

16   A.      Well, yeah. I don't know if the city attorney's

17   office would have gotten them or if I would have had to

18   go through public records, but yeah. Like I said, my

19   last six weeks has been crazy.

20   **Q.      I get that.**

21   A.      I thought it was about these three cases.

22   **Q.      I understand. Part of this deposition is about**

23   us also trying to figure out how we could get the

24   information. For whatever reason outside of your

25   control, you have not brought all of the information

1  that we've requested to the deposition.  So that's why

2  I'm trying to ask where we could get that and what

3  documents we should be looking for so we could access

4  all of the information?

5  A.      I believe in transparency, so I like that we

6  live in Ohio and records are available.  We keep those

7  kinds of records so people can see that we're not hiding

8  anything.

9  **Q.      So how do you reconcile that belief, which I**

10 agree with, with these limitations put upon the division

11 by the FOP contract that require records to be erased or

12 names to be removed?

13 A.      You know, I mean, there's different things

14 across the country as far as police officers, equal

15 rights, access to records.  I mean, we live in a state

16 where, you know, officers' information is publicly

17 available.  In California they shield all officers'

18 names from any disciplinary record.  We're far further

19 ahead in transparency than California is, which is

20 weird.  There's other states where there's no Union and

21 you could be fired for looking at the chief the wrong

22 way.  It's a matter of fairness.  I don't decide.  I'm

23 not the negotiator or the Mayor I don't sign off on

24 contracts.  I just do what's in them.  I wanted to make

25 sure that we have good officers and all of that, but

1    something that happened, and this is a case not related

2    to use of force, but an officer who I believed committed

3    theft that should have been fired, I recommended

4    termination.  He was terminated.  Got his job back

5    because the arbitrator said, "yes, he did one bad thing

6    in 24 years and so, give him his job back."  He had

7    stolen.

8            So there's a whole bunch of different opinions

9    about how long people are held accountable for past

10   actions, whether or not that actually impacts their

11   ability to do their job well.  We've had officers that

12   have made major mistakes who have gone on to never make

13   another mistake and had great careers saving lives.

14   Putting dangerous people in jail.  I just live within

15   the rules.  You have to accept that this is the way that

16   it is.  Do you like it all the time, no.  But you have

17   to decide how you work within those rules to give the

18   public the very best that you can.  Like I said,

19   discipline isn't always the thing that changes behavior.

20   Sometimes it's counseling.  Sometimes it's

21   encouragement.  Sometimes it's training.  Putting people

22   in jail doesn't also correct their behavior.  It's

23   really about trying to understand how we can produce the

24   best officers the best way that we can, whether that's

25   through discipline training, counseling, however it

1   might be, and living within the constraints of all of

2   that.

3          I could give you two or three different

4   discipline cases, give you the whole investigation and

5   all six of us, or whoever is on this call, could come up

6   with six different answers to that.  You have to have a

7   system in place that you believe is doing the right

8   thing for everyone and being consistent and taking all

9   the facts into consideration, because an incident of

10  misconduct, some people would say they should be fired,

11  and some may say they should be complimented.  It's just

12  doing the very best that you can to make sure that

13  officers are doing the right things, and the public is

14  protected from the mistakes that they might make.

15  **Q.      Is there ever a time where the division has**

16  recommended discipline and that has been overturned by

17  an arbitrator wherein the division has made some changes

18  or some retraining or taken any action whatsoever to

19  correct the misconduct or the impact of that misconduct

20  on other officers and on the public?

21  A.      Yes.  I mean, if an arbitrator gave us somebody

22  back then, depending on what the ruling was and what

23  they ordered to happen, that officer might have been

24  monitored more or might have been sent out to the

25  academy for different classes.  All sorts of different

Deposition of Chief Kimberly Jacobs      Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

1   things have happened, but it's not one set thing. It's

2   based on what the arbitrator ordered us to do and what

3   we're allowed to do.

4   **Q.**     **Okay. So for McClellan, did the division take**

5   any action to address the misconduct?

6   A.     I'm 99 percent sure that we had him go out to

7   the academy to go through shoot, don't shoot situation.

8   **Q.**     **How about for other people who within the**

9   division, like did the situation with McClellan alert

10   the decision to any kind of deficiency in training or

11   supervision or discipline that could be corrected or

12   addressed in any way?

13   A.     No. It was one of those situations where some

14   people say it's good and some people say it's borderline

15   or not. So there was no reason to assume that every

16   single cop needed to be trained on how to deal with that

17   particular situation because chances are that -- you

18   know, when you're using deadly force you're judged by

19   the facts at that moment and it was related to his

20   decision-making at that time. There's not a plethora of

21   other cases where other people were, you know, having

22   people jump out at him out a shed.

23   **Q.**     **Okay. In the time that you were chief, what**

24   percentage of uses of deadly force made it to your level

25   for a disciplinary finding?

1    A.       Well, I gave you those several.  What percentage

2    are you talking about, of what?

3    **Q.       Of all the uses of deadly force.**

4    A.       Well, there was an average of 15 maybe for that

5    period of time a year, so I would say less than 10

6    percent.  It might be less than five percent, I just

7    don't have the numbers.

8    **Q.       And of those how many did you disagree with the**

9    recommendation for discipline?

10   A.       The finding?

11   **Q.       The chain of command makes a finding and then**

12   the recommendation for discipline, right?

13   A.       If they make a finding of outside of policy.

14   Everybody makes a recommendation of finding.  If the

15   findings is sustained, they make the recommendation for

16   discipline.

17   **Q.       Thank you.  The vocabulary around this, I'm**

18   trying to get right.  It's a lot.  I'm going to get it

19   eventually.  Thank you for being patient with me.  In

20   your time as chief, which is all you can testify to, how

21   many times did a case come to you, a use of deadly force

22   intentional at a suspect come to you with a finding from

23   the chain of command that it was outside of policy, and

24   then you disagreed with that and found it to be within

25   policy?

1  A.     I know of at least two case, the England case

2  and then another case that involved an officer.  I don't

3  remember the subject's name, but Chase Rodgers, I

4  believe, was his name.  A fairly new officer, and it

5  happened outside of a big box store.  Maybe a K-Mart.

6  The chain of command, I believe most, if not all, might

7  have been one of those mixed things found that it was

8  outside of policy and after a chief's hearing I found it

9  to be within policy.

10  **Q.     You think that officer's name was Chase Rodgers**

11  you said?

12  A.     Yes.

13  **Q.     Do you know what year that was?**

14  A.     It was pretty early on.  2012, or '13.

15  **Q.     Why did you disagree with the chain of command**

16  finding and decide that Chase Rodgers' actions were

17  actually within policy?

18  A.     Based on the information that he provided in the

19  chief's hearing.  All of us that review these things are

20  sitting at our desks.

21  **Q.     Right.**

22  A.     And hearing from the person that was there that

23  moment face-to-face having them be able to describe it

24  is important to understanding the dynamics of the

25  situation.  So the investigations is extremely important

1    to be able to put things together in time and distances,

2    but hearing the officer explain the circumstances I

3    believe is also important, because sometimes the

4    investigators don't grasp all of that or can't write it

5    all down.

6         The Supreme Court said judge their actions based

7    on what a reasonable officer would do, and understand

8    that the situation they're in is different than the one

9    that I'm in sitting at my desk.  So based on what that

10   officer said, I understood the fear of harm he was

11   experiencing and the situation better.  I wouldn't have

12   had that meeting if I didn't have questions about it and

13   feel that he might have violated the policy, but based

14   on the information either provided by the officer and/or

15   the representative I changed my mind and decided not to

16   discipline him.

17   Q.       Do you recall any specific pieces of information

18   that led you to change your mind?

19   A.       It was about the positioning and where the

20   bullets landed.  He fired at somebody in a car.  The car

21   was moving.  He was concerned about being run over and

22   his foot had already been run over once, so he was

23   concerned about the car turning into him and either

24   knocking him down or whatever.  And if you understand

25   enough about reaction time you know that the decision to

1  shoot sometimes in that split second, things can change.

2  If the car is moving and you're moving and all of that

3  kind of stuff, the circumstances are such that your

4  reaction time is not always caught up with what's going

5  on with your trigger pull or something else.  I've done

6  a lot of studying on reaction time and a lot of

7  information like that.

8  Q.      **Was that information about positioning something**

9  that had not been included in the officer's previous

10  statements that were considered by the chain of command?

11  A.      Whatever was included in that particular

12  investigation that was recorded, yes.  The officer has

13  an opportunity to make a statement.  They almost always

14  do, even though it's a criminal investigation.  It's

15  written down by somebody else, created by somebody else,

16  and sometimes they get it all right and sometimes they

17  don't get it as in-depth perhaps as the officer felt or

18  was able to explain at the time.

19  Q.      **Okay.  So for Chase Rodgers, it was information**

20  that he or his attorney told you regarding positioning

21  that changed your mind?

22  A.      The positioning of himself, the car, the

23  movement, the timing, all that kind of thing.

24  Q.      **Did you consider any other factor in**

25  recommending a within policy, or finding him to be

Deposition of Chief Kimberly Jacobs          Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

```
 1   within policy?
 2   A.      Not that I recall.
 3   Q.      Okay.  And so, in that case because you
 4   determined it was within policy you were the final
 5   decision-maker?
 6   A.      Correct.
 7   Q.      No one above you reviewed your decision?
 8   A.      Correct.
 9   Q.      Okay.  And then the other case that you could
10   think of where you overturned a finding, a disciplinary
11   finding, was in the England case?
12   A.      Yes.
13   Q.      You can't think of any other times where you did
14   that?
15   A.      Not right offhand, no.  Not for the use of
16   firearm.
17   Q.      And that's all I'm asking about.  Again, to find
18   any other times that you overturned a disciplinary
19   finding the best place to look would be in that
20   disciplinary tracking system?
21   A.      That tracking system should have those cases
22   that came to my attention, yes.  Recommendations for
23   departmental charges or written reprimands, it would be
24   in that database.  If the chain a command recommended
25   charges, I may have recommended a written reprimand
```

Deposition of Chief Kimberly Jacobs      Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

1   afterwards, after the hearing.  I'm sure I did that too.

2   **Q.     Wait.  So basically you found discipline, but in**

3   **a lower level than the chain of command?**

4   A.     They just recommend charges.  They don't make a

5   recommendation about how long a suspension or anything

6   like that could be.  They just say, I recommend that

7   they have departmental charges.

8   **Q.     Okay.**

9   A.     I could recommend suspension, leave forfeiture,

10   written reprimand, or throw it out.

11        MS. GELSOMINO:  Let's go off the

12   record for a second.

13        - - - -

14   (Thereupon, an off-the-record discussion was held.)

15        - - - -

16        MS. GELSOMINO:  So back on the record.

17   BY MS. GELSOMINO:

18   **Q.     I'm sharing my screen with you.  Do you see a**

19   document with CPD sworn 10.10 on top of it?

20   A.     Yes.

21   **Q.     This is a 12 page document.  I can scan through**

22   it, if you want.  Do you know what this is?

23   A.     I think it was at least our first attempt at

24   trying to create the list that had been okayed by the

25   negotiation in the new contract terms.

Deposition of Chief Kimberly Jacobs          Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

1    **Q.          Informally referred to as the liars list?**

2    A.          Or the 10.10 list.  Yes.

3    **Q.          Does that relate to the --**

4    A.          The chapter and section in the FOP contract.

5    **Q.          Okay.  You believe this was your first attempt**

6    **at it?**

7    A.          The redaction -- we created a list, my

8    administrative sergeant aid in my office tried to come

9    up with the names that would belong on such a list, and

10   we did basically a whole investigation as to whether or

11   not they could be included or not.  We had asked people

12   for -- again, a lot of those records had already been

13   destroyed or whatever, so we tried to come up with a

14   list of people that would qualify beyond that 10.10

15   list, and if the circumstances were such that the

16   untruthfulness was the sustained charge.  We came up

17   with a lot of names.  And then between our investigation

18   and FOP objections, I think this list got whittled down

19   significantly.

20   **Q.          Does it still look the same?**

21   A.          I don't really know what it looks like right

22   now.

23   **Q.          How about when you left your term as the chief,**

24   did it have the same appearance?

25   A.          It would have been a variation of this probably.

1  This isn't the neatest way to do it.

2  Q.      So on this list, do you know a date on this list

3  approximately?

4  A.      It says, "November 29th, 2012."

5  Q.      Do you think that's when it was created?

6  A.      That's when it was printed.  It wouldn't have

7  been created in one-day, maybe days or weeks to put

8  together.

9  Q.      So approximately November of 2012 this was

10  created?

11  A.      Yeah.

12  Q.      Okay.  And you said this is only sustained

13  findings of untruthfulness?

14  A.      That's what would be allowed to be on the list.

15  Q.      Okay.  How was it then later whittled down?

16  A.      Some of the paperwork that we were able to track

17  down ended up showing that perhaps at the director's

18  office the charge was changed from untruthfulness to

19  unbecoming conduct.  If that's what was ultimately

20  sustained, then that person's name would have been

21  removed from the list.  I think that happened maybe with

22  a few people.  Some people might have appealed.  We let

23  people know that we were planning to put them on this

24  list, and did they have any different information.  You

25  know, it might have come from an arbitration decision

Deposition of Chief Kimberly Jacobs      Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

1    that we weren't able to access or something along those

2    lines.  The list changed based on the information that

3    we continued to gather.  I'm not sure if the FOP filed a

4    grievance about it.  And it seems to me that a decision

5    was made, and I don't know by who, the director of

6    public safety or someone else, that we weren't going to

7    do this retroactively, that we'd do it moving forward,

8    because much like you can't be charged with a crime for

9    something that wasn't a crime when you did it.

10    Q.       Right.  Okay.  Why is this list important?

11    A.       Well, for a number of reasons.  If we have an

12    officer that was found to be untruthful once, there's a

13    possibility they might lie in the future.  Much like I

14    said, the Charlotte Mecklenburg investigation of their

15    early warning system indicated that if you've done it

16    once you might do it again.  Untruthfulness is one of

17    the most egregious violations of our rules.  It's almost

18    an automatic termination recommendation because of the

19    seriousness of that.  We need to be able to trust an

20    officer's testimony.  And if we can't trust that

21    testimony with ourselves, we can't necessarily trust it

22    on the stand.  I believe that's the whole Grady aspect

23    of this.  We want to know who has done this most

24    egregious violation and, you know, if we've got officers

25    that have never done anything wrong, have a great

```
 1    record, all of that, then is there something that counts

 2    towards their good behavior as opposed to somebody with

 3    this type of bad behavior being impacted for assignments

 4    and various other things.  It's one of the more

 5    egregious violations we have.

 6    Q.      How was this list used by the division while you

 7    were chief?

 8    A.      It didn't come up very often at all.  The

 9    contract terminology spells out how it can be used and

10    it can be used for certain assignments.  It can be used

11    for I think -- I don't even know if it could be used for

12    progressive discipline or not.  It's spelled out in the

13    contract.  I would rather refer to the contract than try

14    to recall what it says.

15    Q.      That's fair.  Now, on this list -- I just moved

16    to page two.  The third name down the line is Lieutenant

17    Robert Meader.  He's on this list, I believe, more than

18    once.  Do you know why he was on this list?

19    A.      Well, back in 2005.  I think that's 2005

20    09-0086.  The first four digits are the year of the

21    allegation.  So, back in 2005 there was an investigation

22    of him and another sergeant, I believe at the time, and

23    he had, I believe, a sustained charge of untruthfulness

24    at the time.

25    Q.      Do you know what his actions were that were
```

Deposition of Chief Kimberly Jacobs                    Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

1    **deemed by the division to be untruthful?**

2    A.        Both Meader and the sergeant were, I think they

3    were both attorneys and had prepared information about

4    like a promotional exam, a multiple choice question prep

5    for people, and I don't know if they were giving it away

6    for free or charging people for this prep, but at some

7    point in time somebody complained because of the names

8    being used in the examination were either real names or

9    very close names to actual division personnel.  And I

10   think some people took offense with that, made a

11   complaint, the investigation happened, and based on

12   their responses to the investigation the charge of

13   untruthfulness came out.

14   **Q.        Okay.  And did this charge of untruthfulness**

15   impact any of your disciplinary or supervisory decisions

16   of him in any way or promotion within the division?

17   A.        The chief's role in promotions is extremely

18   minor.  We don't have oral boards anymore, so it's a

19   director decision, and the director may or may not ask

20   me for my recommendation.  I had three different

21   directors while I was there, and I would say there's no

22   consistent involvement of me in the promotional process.

23   I don't recall that charge impacting my ability to

24   supervise now Commander Meader.  It happened.  I can't

25   remember what discipline he got out of it even.  It was

Deposition of Chief Kimberly Jacobs          Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

1    before my time.  I probably was assigned to patrol

2    during that time and wouldn't have had a lot of

3    connection to it.

4    **Q.       Okay.  So the fact that one of your command**

5    staff was charged with and apparently determined to have

6    been untruthful within his job didn't impact your

7    working relationship with him whatsoever?

8    A.       No.  I don't think it impacted my ability to

9    effectively deal with him.  And you said the

10   investigation happened internally, but it was really

11   about more off duty conduct.

12   **Q.       I believe you said that most untruthfulness**

13   findings result in a recommendation of termination.  Is

14   that your testimony?

15   A.       That's what I said.  Yes.

16   **Q.       Why is that?**

17   A.       As I said before, it's one of the most egregious

18   violations of rules.  We need to be able to trust an

19   officer's words.  If a COE -- say the president of Ohio

20   State University runs a red light and an officer that's

21   been an officer for six months writes him a ticket for

22   running a red light, it's the president of Ohio State

23   University saying, no, I didn't, and a six month officer

24   saying, yes, they did.  You have to be able to trust

25   their testimony and know that they're telling the truth.

1    It's extremely important.  If they write a report we

2    need to know that the report is written down accurately.

3    If they say that they saw a weapon on somebody, they

4    need to be believed that they saw a weapon on somebody.

5    That they're not planting evidence.  That if they turned

6    all the property in, that they turned all the property

7    in that they recovered other than some of it.  It's

8    critical.

9    **Q.      Has the division ever found an officer to have**

10   acted outside of policy for planting evidence?

11   A.      My history is only 39 years.

12   **Q.      In 39 has that happened?**

13   A.      Planting evidence, not to my knowledge.  I

14   remember that one, I believe a sergeant, I think he was

15   an officer at the time, may have given a false statement

16   about what had happened, but I don't believe I've ever

17   heard of planting evidence as an allegation against

18   somebody.  I mean, I'm sure that we've had defendants in

19   criminal cases say that wasn't mine or it was planted,

20   but not to my knowledge have we had an investigation

21   sustained for that.

22   **Q.      Okay.  Has the division ever processed or found**

23   untruthfulness in the context of use of force

24   allegations?

25   A.      Yes.

1    **Q.      How many times?**

2    A.     I don't know.  One case is standing out.

3    Officer Baldwin was involved in a pursuit, and the

4    suspect ultimately crashed into Officer Baldwin's car, I

5    believe.  Either crashed into the back of it or at least

6    butted up against that I think it was a pickup truck.

7    Officer Baldwin got out of the driver's side, but

8    because his car was touching the pickup truck he ran up

9    to the driver's door, but the driver had already been

10    pulled out of the other side from an officer on the

11    other side.  So the officers on the other side came

12    around, pulled him out, put him on the ground, Officer

13    Baldwin came up around the front of the pickup truck,

14    came around to the group and at some point in time he

15    kicked this particular suspect, maybe in the head.  I'm

16    not sure where, but the suspect was already on the

17    ground under control and it was outside of policy.  When

18    the sergeant came up to the particular situation he did

19    an investigation, he did not report that use of force.

20    So the sergeant wrote that up, but because it was a

21    pursuit it was individually investigated by a lieutenant

22    who then reviewed the video and somehow heard, saw in a

23    pretty bad video this kick, and then an investigation

24    pursued, and the officer then said that he had filed a

25    report and left it on the sergeant's desk about the kick

1  and didn't believe him.  He was departmentally charged,

2  he was scheduled for a hearing and all of this.  The

3  FOP, his representatives, everybody said he left the

4  report on the desk, and my hearing was delayed by ten

5  minutes when the FOP came in and said we need a few

6  minutes.  They came in, the officer sat down and said I

7  lied.  I recommended termination and he was fired.

8  Another officer used I think either a flashlight or

9  baton on somebody and didn't report it right away.

10  Within an hour or two he came back to the substation and

11  told the supervisor about it.  He was charged with

12  untruthfulness.

13  **Q.      Was there any discipline for him?**

14  A.      I recommended termination, but the director

15  allowed him to keep his job.

16  **Q.      Did he have discipline?**

17  A.      Absolutely.  He got a suspension, but he did not

18  get terminated.

19  **Q.      Was there any kind of retraining or counseling**

20  or anything that went along with that?

21  A.      I'm sure there was.

22  **Q.      Was there any tracking of that officer's future**

23  conduct to ensure that he didn't use unnecessary force

24  again or lie about it?

25  A.      I'm absolutely positive that the chain of

1  command was paying close attention to that particular

2  officer.  He happened to be devastated by what he had

3  done, and actually a very religious person, and he was

4  far more upset with him than anybody could have been and

5  he's gone on to be a very stellar employee.  I know that

6  I was checking up on him, and I know that his chain of

7  command was.

8  **Q.      That first officer, I think you said that it was**

9  Baldwin, who admitted to lying late in the

10 investigation, was he actually terminated?

11 A.      Yes.

12 **Q.      Did the arbitrator uphold that finding?**

13 A.      I can't remember if he went to an arbitrator or

14 civil service commission.  I remember it was appealed, I

15 just can't remember what body.  I'm thinking it was

16 probably an arbitrator, but I do believe that that

17 termination held.

18 **Q.      It held?**

19 A.      Yes.

20 **Q.      I'm going to ask you some questions now about**

21 the shooting of James England.  That's the case that

22 involved Officer Abel.  When were you first alerted to

23 Abel's use of deadly force in this context?

24 A.      I assume the day that it occurred.  I asked to

25 be notified of all police involved shootings, and I

1    tried very hard, I probably got out to about 90 percent

2    of them personally during my tenure as chief.

3    **Q.      Did you actually go to the scene of the shooting**

4    of James England?

5    A.      I don't think I went to that one.

6    **Q.      Okay.  So when you were first notified what were**

7    you told?

8    A.      Actually, I'm pretty sure I didn't go to that

9    one.  I would have been told what the circumstances

10   were.  We talked before about my involvement in

11   investigations and I tried not to be involved because I

12   might have to make a decision later on about that.  I

13   wanted fresh eyes and all of that.  Basically when I

14   went out to the scene I ensured that the CIRT team was

15   there, that they had the resources they need to get the

16   job done, do the investigation, make sure that the

17   officer was being taken care of with regard to support

18   team, any resources that they needed like an attorney or

19   anything like that.  The FOP usually took care of that,

20   but just to make sure that the officer was doing okay.

21   The division has a policy that if you are involved in a

22   situation like that that you have to see a psychologist

23   before you're able to come back to work.

24   **Q.      Okay.  So specifically for the case when Officer**

25   Abel shot James England you were notified, and then what

1    was your first involvement actually in the review of

2    this use of force?

3    A.      I don't remember any involvement until the chain

4    of command had made their recommendation.  Firearms

5    Review Board, I might have gotten a heads-up that they

6    said it was outside of policy, just like maybe in an

7    executive staff meeting or something, but I don't

8    remember any real involvement until it came to me for a

9    decision on whether or not we should file departmental

10   charges.

11   **Q.      Okay.  How did it come to you?**

12   A.      It would have been brought to the executive

13   staff after -- the deputy chiefs I asked them to take --

14   when they thought there was going to be departmental

15   charges or a written reprimand, I asked them to run the

16   investigations by the Professional Standards Bureau

17   discipline grievance lieutenants that I mentioned

18   before, because they're basically the prosecutors in the

19   division for misconduct.

20   **Q.      Okay.**

21   A.      So I asked them to review the case for due

22   process, just cause, all of that.  Fortunately a lot of

23   the people that take that job are attorneys, so they

24   understand that process very well with regard to

25   disciplinary cases.  That's their job is to present

1  discipline cases.  So while we think they're guilty, did

2  we follow all the contractual rules?  Do we have just

3  cause?  Did we do the process?  Is this a thorough

4  investigation?  What's the precedent for the discipline

5  on this?  So they prepped and gave the information to

6  the deputy chief, and then the deputy chief would come

7  in and tell me they're recommending departmental

8  charges, and even though that was the process that I had

9  asked to be implemented.  There might have been a couple

10  of times where things came to be before it went to PSB,

11  but they always got the case sooner or later.

12  **Q.     Like what actual documentation comes to you,**

13  specifically in James England, what documentation did

14  you receive?

15  A.      The deputy chief would have briefed me on the

16  incident and depending on how clear the evidence was

17  they would either give me the entire package or I would

18  just go ahead and follow through with departmental

19  charges being filed based on the information provided by

20  them, lieutenants in the discipline office, and then I

21  would have my chief's hearing.  Often times I wouldn't

22  read the entire investigation before then.  I would have

23  the charges filed and then read it closer to the actual

24  hearing, because often times those were at least 30 days

25  away or more, and depending on the size of the

1   investigation I may not have time to read it that

2   particular day.

3   **Q.    In this case with James England how did that**

4   **happen?**

5   A.    I don't know.

6   **Q.    Okay.**

7   A.    The routing sheet would be indicative of how

8   quickly that turned over, but I don't have that routing

9   sheet for some reason.

10   **Q.    I have it.  I'll show it to you in a little bit.**

11   What did you do between the time that you received

12   notification of the FRB and the chain of command's

13   findings?  Between that point and the point of your

14   hearing, what did you do in relation to this case?

15   A.    I would have read the investigation and the

16   chain of command comments.

17   **Q.    Okay.  What specifically did you read in the**

18   **investigation?**

19   A.    Well, we typically read all of the statements.

20   I didn't necessarily look at the property slip and the

21   diagrams if it wasn't relevant.  In this case it was,

22   but I would look at photos.  Most of the information in

23   the case, unless there was something that isn't relevant

24   at all.  Some cases have lots of paperwork that might be

25   phone records for somebody that is 100 pages of phone

Deposition of Chief Kimberly Jacobs                Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

1    records, I wouldn't have read all of those unless it was

2    relevant to the case.

3    **Q.        Did you review any memos from anyone within the**

4    chain of command relating to their findings before the

5    hearing?

6    A.        That's what I mentioned before.  I would have

7    read their chain of command comments.

8    **Q.        Okay.  Did you review Lieutenant Knight's memo?**

9    A.        I don't have a specific memory of that, but I

10   would assume, yes.

11   **Q.        Would you have reviewed Griffis' memory?**

12   A.        I'm sure I did.

13   **Q.        Why did you have a hearing?**

14   A.        Because having heard about it from the deputy

15   chief and the chain of command comments I had a belief

16   that it might have been outside of policy, so I charged

17   him that way.

18   **Q.        What led you to believe that it might be**

19   out-of-policy?

20   A.        The fact that there was a lot of information

21   that said that this subject was handcuffed.

22   **Q.        Okay.  Anything else aside from the handcuffing?**

23   A.        It was just weird.  It was a very strange

24   circumstance.  It was hard to imagine the officer

25   dangling on the door and the danger that they're in on

1   one side of the door, and the suspect and the dogs on

2   the other side of the door. Was it secure or not? So

3   just based on the information that I had, I felt like

4   this doesn't sound right.

5   **Q.     Okay. Where does the hearing happen?**

6   A.     My office.

7   **Q.     And who's present?**

8   A.     You have the list probably.

9   **Q.     Generally.**

10   A.     Generally it's the officer, a representative

11   from the FOP. At times they bring an attorney, then I

12   asked chain of command to come in as well, at least the

13   deputy chief, the commander, and sometimes the

14   lieutenant into the hearings. That wasn't for all seven

15   years, but as I grew into my job I decided that that was

16   a good way to mentor and training the chain of command,

17   having them actually hear all of this information and

18   see the process so they have a better understanding of

19   it. I would invite them in to hear the case. And then,

20   of course, the PSB, discipline grievance lieutenants

21   would be there. Sometimes one, sometimes two.

22   Sometimes the commander of professional standards, and

23   then somebody from Internal Affairs who is kind of like

24   the person to do the recording, and if they were the

25   investigator answer questions if I have them.

Deposition of Chief Kimberly Jacobs          Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

1   **Q.        How was it recorded?**

2   A.       A little audio recorder.

3   **Q.        Were those audio recordings preserved?**

4   A.       I know they're preserved with the investigative

5   package.  I don't know what the record retention

6   schedule is on those.  If there's a sustained finding it

7   might be different.  That's the chief's hearing.  The

8   criminal investigation would probably be kept on hand

9   all the time.

10  **Q.        I'm going to show you a document here that was**

11  previously marked in another deposition as Abel Exhibit

12  9.

13                          - - - -

14        (Thereupon, Abel Exhibit 9 was shown.)

15                          - - - -

16  BY MS. GELSOMINO:

17  **Q.        This is an intra-divisional memo to you from**

18  Lieutenant Knight related to the FRB regarding his

19  recommendations, I guess.  I made this a little smaller.

20  If you need it bigger, let me know?

21  A.       It's fine.

22  **Q.        What is it?**

23  A.       That would be the chain of command comments.

24  Sometimes if they're very brief they would write it on a

25  form called a routing sheet, and often times when they

Deposition of Chief Kimberly Jacobs      Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

1  have more to say than within policy, or whatever, they

2  are expected to write down their rational or

3  recommendation of finding.

4  **Q.**    **Okay.  And you had this before the hearing,**

5  **right?**

6  A.    Yes.

7  **Q.**    **Did you review it?**

8  A.    I would have to say that most probably, yes.  I

9  wouldn't have read just one and not read all of them.

10  **Q.**    **Okay.  So looking on page two here, Knight**

11  states that it was his belief that Abel's use of force

12  was not objectively reasonable and was intentional and

13  in violation of policy, right?

14  A.    Correct.

15  **Q.**    **And he recommended bypassing progressive**

16  discipline, right?

17  A.    Yes.

18  **Q.**    **What does that mean?**

19  A.    Well, a charge such as using deadly force, much

20  as I described earlier, would not be something that I

21  would want to see result in a counseling session or a

22  documented constructive counseling.  It's serious.  You

23  used your firearm, we think it's a violation, so

24  therefore, I wanted the opportunity to weigh in on that

25  without the chain of command issuing discipline and

Deposition of Chief Kimberly Jacobs          Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

```
 1    being done with that.

 2         I had a situation along those lines with an

 3    officer who had an OVI, and the chain of command ruled

 4    on it and didn't tell me about it.  It was his second

 5    OVI, and when I found out that it was sent to IA without

 6    my knowledge I had it reopened at a hearing and

 7    recommended termination.  In that particular case the

 8    deputy chief didn't tell me about it and made the

 9    decision, so I reprimanded the deputy chief also.  And

10    because no discipline had been issued I was able to have

11    a hearing.  If discipline had been issued, I couldn't

12    redo it.

13    Q.    Okay.  I'm going to show you another document in

14    relation to Abel's shooting of James England, and this

15    is Knight Exhibit 16.

16                   - - - -

17         (Thereupon, Knight Exhibit 16 was shown.)

18                   - - - -

19    BY MS. GELSOMINO:

20    Q.    This is the routing sheet for the investigation

21    into the shooting of James England, right?

22    A.    Yes.

23    Q.    Did you review this before the hearing?

24    A.    I'm sure it was part of the package.  It doesn't

25    tell me much.  I wouldn't have paid much attention to
```

Deposition of Chief Kimberly Jacobs      Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

 1   it.

 2   **Q.**      **It's multiple pages, but what this tells you is**

 3   that the chain of command recommended discipline, right?

 4   A.      I don't believe that Sergeant Griffis made a

 5   disciplinary recommendation.

 6   **Q.**      **Right. Other than Sergeant Griffis, because he**

 7   attached a different letter, everyone else in the chain

 8   of command recommended discipline, right?

 9   A.      Correct.

10   **Q.**      **Here's the third page. Just to make sure we're**

11   accurate, everyone other than Sergeant Griffis, who is

12   the lowest on the chain of command recommended --

13   A.      Can you repeat the question? You're fading.

14   **Q.**      **I'm sorry. I just want to make sure that this**

15   three page routing sheet tells us that everyone in the

16   chain of command other than Sergeant Griffis recommended

17   discipline?

18   A.      Correct.

19   **Q.**      **And Sergeant Griffis is the lowest level on the**

20   chain of command of Officer Abel, right?

21   A.      And I don't know that this page does exactly

22   what you said because some of them say, "see attached

23   letter," so I'd have to look at this closer to see if

24   they actually made that recommendation on this routing

25   sheet. Gardner did. Knight just said, "see attached

Deposition of Chief Kimberly Jacobs        Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

1   response," so his was in the letter.

2   **Q.      The letter we just looked at, right?**

3   A.      Yes.

4   **Q.      Which he did recommend discipline?**

5   A.      Right.

6   **Q.      Gardner says, "reviewed recommendations."  What**

7   does that mean?

8   A.      If you'll scroll up a page.

9   **Q.      There we go.  So Gardner on this routing sheet**

10   indicated that he reviewed Sergeant Griffis'

11   recommendation and disagreed with it, right?

12   A.      Yeah.  So look at the dates on the far right.

13   The bottom page I believe is the earliest page.

14                    MR. MILLER:  I'm going to object as to

15   form a little bit on this.  Can we be clear as to

16   whether we're talking about this as a single routing

17   sheet or are these different routing sheets?

18                    MS. GELSOMINO:  I don't know the

19   answer to that.

20   BY MS. GELSOMINO:

21   **Q.      Is this a single or multiple routing sheets?**

22   A.      There's multiple pages, obviously, but it's part

23   of one package.  But if you look at the dates on the

24   right, I believe the last page was the first page,

25   because that started back in November of '15, I believe.

Deposition of Chief Kimberly Jacobs        Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

1   So it came to Deputy Chief Kuebler and he distributes

2   the investigation to the firearms board members, they

3   make their recommendations, and then it comes back to

4   him to send to the chain of command that it belongs to,

5   and in this case it was his.  So he's sending it down

6   for them to review.  Gardner sends it to Knight, who

7   sends it to Griffis.  Griffis reads it, writes his

8   recommendation, and then after Griffis has made his

9   recommendation it goes to Knight.  And you can see that

10   Griffis got it in November.  He forwarded it a month

11   later or so.  Knight got it in December, and he had it

12   for about a week.  Gardner got it on the 6th of January,

13   and he forward it on the 29th.  So, that kind of tells

14   you how long they had the investigation, reviewed it,

15   and took the time to write their comments.

16   **Q.      That makes sense.  So, Griffis was the first one**

17   to actually review it and make a determination?

18   A.      Correct.

19   **Q.      So Griffis is the lowest on the chain of command**

20   for Abel, right, because he's the sergeant?

21   A.      Immediate supervisor.  And the contract requires

22   that the immediate supervisor's opinion matters greatly.

23   **Q.      Why?**

24   A.      Because they're the closest to the officer,

25   knowing who they are, how they work, what they do, all

1   of that kind of thing.  In article 10, I believe 10.3,

2   it discusses weight of the immediate supervisor's

3   opinion.

4   Q.       Do you agree with that?

5   A.       I believe it's important.  I don't know that I

6   give it the weight that it's been given.  I believe that

7   a supervisor of six months doesn't have nearly the

8   knowledge and experience of a chief for 39 years, or 7

9   years, or whatever.  My experience, my knowledge, my

10  training, my education, all of that, and my opinion

11  mattered greatly with regard to these things compared to

12  somebody who this may be the first police involved

13  shooting investigation that they've seen, when I've seen

14  hundreds of them.

15  Q.       Does the division have any concerns regarding an

16  immediate supervisor's potential bias toward an officer?

17  A.       Yes.

18  Q.       How is that dealt with?

19  A.       Through training.  We talk about bias every

20  year.  There's training about bias-based profiling,

21  implicit bias, and different things.  We're always

22  trying to make sure that people are making decisions

23  based on objectivity rather than subjectively on who

24  they know, how they know them, all that kind of stuff.

25  We have rules in place that says if you were part of --

1  like an IA investigator is not allowed to investigate a

2  family member or a friend.  It's right into the SOP.

3  You can't do that.  You have to recuse yourself.  If you

4  were involved in a particular incident as a sergeant

5  you're not allowed to make a ruling in that particular

6  incident for the officers under your command.

7  **Q.       Can you say that last part again, please?**

8  A.       I meant investigation.  You're not allowed to do

9  the investigation.

10  **Q.       If you're a sergeant?**

11  A.       That was in the incident.  If you were part of

12  an incident, you're not allowed to do the investigation.

13  **Q.       Okay.  Because in this case Sergeant Griffis was**

14  part of the incident?

15  A.       Yes.  Correct.  I misspoke.

16  **Q.       Okay.**

17  A.       You're not allowed to do the investigation, and

18  that's written into the rules as well.

19  **Q.       But you can make a ruling?**

20  A.       Yeah.  The contract basically requires that.

21  **Q.       Right.  In some departments there are like**

22  independent review boards, or civilian police

23  accountably review boards and stuff like that.  Is there

24  any kind of independent review of officer complaints or

25  the disciplinary process within the division of police

1    in Columbus?

2    A.      I would say nothing like we're going to get next

3    year.  There's different things.  First of all, all of

4    the records are available to anybody.  If an

5    investigation of a complaint comes in and the person

6    didn't like it, they can appeal.  There's nothing formal

7    until next year probably.

8    Q.      **Do you think it's important to have some kind of**

9    **independent review of officer conduct outside of chain**

10   **of command?**

11   A.      Well, I think it's important if you have a

12   system in place that doesn't have checks and balances

13   that as a culture of corruption, misbehavior, all of

14   that, a lack of transparency.  Like in California, as I

15   said, somebody should be looking at who that is

16   happening with by whatever.  I think if you're going to

17   have civilian review that it is something that comes

18   with some understanding.  Obviously, in a criminal case,

19   the civilian review is either a Grand Jury or a jury if

20   they're charged criminally.

21   Q.      **Right.  During the time of these shootings in**

22   2015, 2016, there was no independent review of policy

23   violation determination, right?

24   A.      Correct.

25   Q.      **Okay.  Let's look at the hearing transcript.**

Deposition of Chief Kimberly Jacobs                    Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

 1   **You said that you reviewed this in advance of the**

 2   deposition, right?

 3   A.       Yes.

 4   **Q.       So this I don't believe has been previously**

 5   marked, so I'm going to mark this as Exhibit 2.  I'm

 6   going to run through some specific parts of this.  I'm

 7   sorry.  This actually was marked as Kuebler Exhibit 20.

 8   I'm going to keep that as Kuebler Exhibit 20.

 9                        - - - -

10        (Thereupon, Kuebler Exhibit 20 was shown.)

11                        - - - -

12   BY MS. GELSOMINO:

13   **Q.       I'm going to go through certain parts of this**

14   transcript.  If there's ever any point that you want to

15   look at other parts, just tell me.

16   A.       Okay.

17   **Q.       I'm skipping ahead to page seven.  At this point**

18   on page seven the Union attorney is comparing this case

19   of Abel to the McClellan case, and we talked about the

20   McClellan case.  What did you understand the Union

21   attorney to be arguing here?

22   A.       Well, the Union attorney was all about not

23   trying to second guess, you know, when you're seated at

24   your desk as compared to being compared to being in the

25   heat of the moment with bad guys and suspects and other

1  things.  So they were trying to say that here's a case

2  where this officer fired from the shed, and I think they

3  were trying to argue that Officer Abel was in more

4  danger than McClellan to some degree.  I'm speculating

5  here.  I think that's what you asked me to do.

6  Q.      Of how you understood it.

7  A.      Yeah.  I think they were trying to say that the

8  situation involving Officer Abel is maybe even more

9  dangerous than McClellan.

10  Q.      Was this a compelling argument to you?

11  A.      I mean, I took all of it into consideration.

12  You can see my questions at the end were still

13  challenging the circumstances.  All of it is part of my

14  consideration.

15  Q.      Was this part of the defense, the Union

16  attorney's argument, a factor that impacted your

17  decision to overturn discipline in this case?

18  A.      You said "overturn discipline."  No discipline

19  had been leveled at this point in time.  I'm having a

20  hearing to determine discipline.  It's just the

21  departmental charges, whether or not they're sustained

22  or not, just to be clear.

23  Q.      Thank you for that.  So in the end you found

24  that Abel was not guilty of departmental charges, right?

25  A.      I determined that he was not in violation of our

1  rules.

2  Q.      And did this Union attorney's argument regarding

3  McClellan and the fact that McClellan's discipline was

4  overturned in arbitration a factor that impacted your

5  decision to find that Abel was not in violation of

6  departmental policy?

7  A.      I don't break down my decision-making based on

8  whether this was five percent or ten percent or anything

9  like that, but, obviously, I listened to the whole

10 presentation.  I well understood the McClellan case, and

11 what I knew about the McClellan case certainly would

12 have played into my decision-making.

13 Q.      Okay.  So I moved to page 13, and down here

14 there's a question from you that starts, "but you're not

15 on that side of the door, so the danger to you is no

16 longer being pulled in."  Do you see that?

17 A.      I do.

18 Q.      Did you believe that when Abel was not being

19 pulled into the door that he was no longer in danger

20 that would warrant the use of deadly force?

21 A.      He could have been in danger, but he might not

22 have known about it.  The guy might have had a gun.  You

23 don't do might haves, you do what you know.

24 Q.      Right.

25 A.      So, I mean, we had a former chief of police that

1    shot a burglar who was standing outside of his house.

2    He was found to be not in violation of the firearms

3    policy.  The burglar wasn't attacking him or anything

4    like that.  He was standing outside.  So -- what was the

5    question?

6    **Q.      So is it a violation of departmental policy then**

7    **to use deadly force based on a speculation of potential**

8    **danger?**

9    A.      Well, it has to be more than speculation.  You

10   need to believe that you're in danger.

11   **Q.      In order to use deadly force, according to the**

12   **division policy, an officer must be able to articulate**

13   **an actual imminent fear of death or great bodily harm,**

14   **correct?**

15   A.      Correct.

16   **Q.      In this case in the Abel hearing were you**

17   questioning whether or not Abel had an actual fear of

18   imminent death or great bodily harm as opposed to a

19   speculative fear?

20   A.      I was questioning what type of danger he was in.

21   It's a lot harder to prove you're in danger when there's

22   a degree of separation with another person and there's a

23   barrier --

24   **Q.      I'm sorry.  After you said there was a barrier**

25   you broke up.

1    A.      So, having the ability to take cover isn't

2    always total protection, but it's certainly a factor of

3    whether or not there's a true danger to you.  The

4    officer can't just think that he's in trouble, he has to

5    believe that there's a threat that, you know, he could

6    be hurt.

7    Q.      **Did you learn something at some point in this**

8    **hearing** that led you to believe that Abel actually

9    believed that he was in imminent danger of death or

10   great bodily harm?

11   A.      I came to the belief that the danger that I had

12   read about was different than I heard about.  Yes.  I

13   felt that he explained the type of danger that he was in

14   and how he got there, what different aspects of that

15   were to the point where what I had read seemed different

16   than what I had heard.

17   Q.      **What was the danger that he was in that you**

18   **heard** about in this hearing that lead you to find that

19   he did not violate departmental rules?

20   A.      How close he described to being pulled into the

21   porch or whatever, that room.  It sounded to me like he

22   was -- it was very possible that he could have been

23   pulled into the room.  Tactically you wouldn't want to

24   necessarily be in that position, but when the guy

25   grabbed his arm as he described, then he is in danger if

1  he does pull him into this small area with barking

2  dangerous dogs and being on that side he could have been

3  injured, knocked unconscious, you know, lost a weapon,

4  whatever.  I believe that he explained the danger that

5  he was in to a degree that it became objectively

6  reasonable that he felt that way and took the action

7  that he did.

8  **Q.      What was the actual and imminent threat of death**

9  or great bodily harm that Abel was facing at the time

10 that he used deadly force?

11 A.      Being pulled into that room by the suspect, and

12 either being mauled by dogs, or disarmed by the suspect,

13 or being knocked unconscious and potentially being

14 injured.

15 **Q.      Did Abel articulate a fear of the dogs?**

16 A.      Yes.

17 **Q.      Did Abel articulate a fear of being knocked**

18 unconscious?

19 A.      It's in here.  I don't remember if it was the

20 attorney or Abel saying it.

21 **Q.      Was the suspect, England, handcuffed at the time**

22 that he was shot by Abel?

23 A.      I have to believe that he probably was.  There's

24 no other real good explanation for the way that we found

25 him later.  I don't have proof of that, but logic says,

1  yes, he probably was.

2  **Q.      So if Abel -- strike that.  If England was**

3  handcuffed at the time that he was shot by Abel, how

4  could he have potentially disarmed Abel?

5  A.      Well, you read the comments from the attorney

6  who described two officers being shot and killed in

7  another jurisdiction by a handcuffed prisoner.  I,

8  myself, have had problems with handcuffed prisoners.

9  They can be dangerous.  We had one that kicked an

10  officer with his foot while he was handcuffed.

11  Certainly restrains are a good thing, but they're not

12  necessarily something that prevents somebody from

13  seriously injuring or killing an officer.

14  **Q.      There was no indication that England ever**

15  attempted to disarm Abel or any other officer, correct?

16  A.      I don't believe that anybody described that,

17  correct.

18  **Q.      And likewise, there was no allegation that**

19  England ever made any threat to any officer, right?

20               MR. MILLER:  Objection.  Go ahead and

21  answer.

22  A.      I can't be certain of the description of his

23  language.  I remember he was -- the statement said that

24  he was resisting their attempts to get him to leave the

25  house.  He was, obviously, attempting to resist arrest.

1    I don't know if he was described as having threatened

2    the officers.  I think they told him to put the dogs

3    away and he would not do that.

4    BY MS. GELSOMINO:

5    **Q.       There were other officers on the scene who**

6    indicated that they did not know why Abel shot, right?

7    A.       I believe so.

8    **Q.       Who said that?**

9    A.       I don't know.  I don't remember which one said

10   which.

11   **Q.       Do you know when they said that?**

12   A.       Excuse me.

13   **Q.       When did they say that?  Like in what context?**

14   A.       I don't know if they said it to each other then,

15   or if they said it in their interviews with the CIRT

16   team.

17   **Q.       Did you ever make any effort to interview the**

18   witness officer directly?

19   A.       That would have been inappropriate for me to get

20   involved in the investigation.

21   **Q.       Well, I mean, after like the conclusion of the**

22   investigation.  You already testified that you felt it

23   was important for England to have an opportunity to talk

24   to you in person to explain things, right?

25   A.       Right.

1   Q.      Did you ever attempt to talk to anybody else who

2   witnessed this in person so you could get a better

3   understanding of what they observed?

4   A.      No.

5   Q.      Why not?

6   A.      It wasn't something that I felt that I needed to

7   do.  I have an understanding of the investigation.  I

8   understood that that was the case, but I also have

9   enough experience and knowledge to know that just

10  because you didn't see it, hear it or understand what it

11  was, doesn't mean that it wasn't going on.  I've had

12  lots of conflicting statements before from people that

13  didn't see what it was that caused them to fire.  Other

14  people have been involved in the same situations, and

15  some fire, some don't.  I didn't consider that something

16  that was relevant once I made my decision.

17  Q.      Had you decided to give those people an

18  opportunity to explain their version of events in person

19  you could have done that, right?  You could have asked

20  them to talk to you about it?

21  A.      I could have, but, I mean, I don't get involved

22  in the investigation.  So if you're talking about after

23  the chief's hearing, I could have, yes.

24  Q.      Okay.  Do you defer to the account of fear of

25  death or serious bodily harm by an officer who uses

1    deadly force?

2    A.      What was the first part of the question?

3    **Q.      Do you defer to the officer's account?**

4    A.      I don't defer.

5    **Q.      When there are conflicting statements about**

6    justification for a use of force do you accept the

7    shooting officer's account over the other officer's

8    accounts?

9    A.      Not necessarily, no. It's all taken into

10    consideration.

11    **Q.      But you only give the shooting officer the**

12    opportunity to explain themselves in person, right?

13                 MR. MILLER: Objection. Go ahead and

14    answer.

15    A.      Yeah. The other officers are not part of the

16    chief's hearing.

17    BY MS. GELSOMINO:

18    **Q.      Do you accept the shooting officer's account of**

19    their own fear in relation to their justification for

20    the use of force?

21    A.      I don't know what you mean by accept.

22    **Q.      Well, if an officer tells you that they were**

23    afraid and therefore used deadly force, do you

24    interrogate that fear in any way?

25    A.      Well, first of all, I would only have questions

1  if I thought that they were in violation.  In an

2  investigation that didn't result in recommendations for

3  sustained violation of the rules, I wouldn't have any

4  connection to that investigation.  We're only talking

5  about those that somebody has said they're outside of

6  policy.  So I would ask questions of that involved

7  officer, but if you mean accept, like, do I just believe

8  it and leave it, no.

9  Q.      Okay.  So on page 15 of this transcript, your

10 comments on the bottom you state, "it's not your tactics

11 that I'm judging, but I think the tactics do matter in

12 how we resolve some situations."  What did you mean by

13 that?

14 A.      Tactics are extremely important with regard to

15 preventing situations where we might need to use deadly

16 force.  A number of things do go the right way because

17 officers use good tactics.  After the Fegurson situation

18 I prepared a three hour training course that

19 specifically talked about tactics that could be used to

20 prevent deadly force.  I trained personally more than

21 500 CPD personnel on how to use good tactics so that

22 they can avoid using deadly force.  So, yes, they're

23 very important in how to resolve some situations and

24 this happens daily among CPD officers that they're using

25 very good tactics and not shooting the hundreds of

1    thousands of people that they see with guns or in

2    situations that could be potentially dangerous.

3    **Q.        What was that training called?**

4    A.        Pride Saves Lives.  I even appeared on PBS news

5    hour weekend.  It got national attention and they

6    profiled it in their news weekend report.

7    **Q.        Did you say pride, P-R-I-D-E?**

8    A.        That's the acronym for the core values at the

9    time in the division of police.  Professionalism,

10   respect, integrity, discipline and enthusiasm.  Those

11   five things can save lives.

12   **Q.        Did you create a Power Point presentation or any**

13   kind of materials for that?

14   A.        I sure did.

15   **Q.        Do you still have those?**

16   A.        Yes.

17                    MR. MILLER:  Counsel, we produced

18   those.

19                    MS. GELSOMINO:  Thank you.  I was

20   going to ask you.

21   BY MS. GELSOMINO:

22   **Q.        Okay.  So in terms of a tactical review in the**

23   context of this disciplinary hearing, why did you say

24   that you were not judging tactics in a chief's hearing?

25   A.        Because tactics aren't a rule of conduct.  It

```
 1   doesn't say that you can't go over an open door or lean
 2   in.  It doesn't say that you have to -- you know, like
 3   what was mentioned in here is that this sergeant pulled
 4   into the driveway next door and Officer Abel was I
 5   believe disturbed because he thought here's this felony
 6   suspect that they're trying to arrest now just got a
 7   warning, and even an officer on the street you try to
 8   maintain a low profile if you're trying to sneak up on
 9   somebody so they don't run.  Running often results in
10   either a use of force or the suspect getting away or
11   something else.  So good tactics mean trying to be as
12   safe as possible.  It's like why we don't put our
13   beacons on when we're trying to stop a traffic violator
14   from a half mile away, because they have a half mile to
15   turn down streets and that kind of stuff.  You use good
16   tactics for your own safety, to reduce resistance, and
17   that ends up being for the suspect's safety, and you use
18   good tactics to protect innocent people.
19   Q.      Can tactical decisions impact your determination
20   of the reasonableness of use of force?
21   A.      Yes.
22   Q.      In this case, did they?
23   A.      Well, again, I can't discipline him for reaching
24   in the door or anything like that.  But, yeah, if an
25   officer were to walk into the middle of the high speed
```

1  lane on the freeway and a car is coming at that person,

2  the cop, and the cop shoots at the car because he's in

3  imminent danger, his tactical decision to go into that

4  lane of traffic would be, you know, totally

5  unreasonable, but you could argue that the car was

6  causing imminent danger.  It's all about the

7  reasonableness of the entire situation, but there's no

8  rule that I could discipline for with regard to tactics.

9  Q.      **In that case if an officer were to walk into**

10  oncoming traffic and then use that oncoming traffic as a

11  justification of a use of force, would you find that use

12  of force to be unreasonable, or outside of policy I

13  should say?

14  A.      That's the finding, outside of policy.  I had a

15  very similar situation like that when I was on the

16  Firearms Review Board.  An officer was trying to stop a

17  drunk driver and stood in the middle of the only exit

18  for that particular person driving out of an exit, and

19  when this car started approaching him he started

20  shooting at the vehicle.  There were a number of things

21  wrong with that.  But yes, I recommended that that

22  firearm's incident be ruled outside of policy, and

23  practically everybody else disagreed with me because

24  they said he's in imminent danger.  But I wrote a 14

25  page explanation as to why I thought it was outside of

1  policy, and ultimately, I believe it was Chief Jackson,

2  ruled that it was sustained, but he issued no

3  discipline.

4  **Q.        How is that any different than the situation**

5  here where Abel put himself in this position that he

6  then relied upon in attempting to justify his use of

7  force?

8  A.        You go knock on an apartment door because you're

9  serving a warrant and the guy comes rushing out with a

10  deadly weapon or a knife or whatever, you're not going

11  to discipline them for standing in that doorway or

12  hallway or something else.  I mean, it depends on all of

13  the circumstances.  It's not unreasonable to try to

14  reach in and unlock a door.  It's not unreasonable to

15  try to grab somebody.  It could have been bad tactics,

16  it doesn't mean that it was wrong.  It doesn't mean that

17  it was in violation of the rules.  I understand that it

18  may be hard to comprehend, but you can't say use good

19  tactics, and if you don't you're going to get in

20  trouble, because sometimes the circumstances don't allow

21  that.

22        I was driving down Mound Street when I was an

23  officer on the street with my seatbelt on and some guy

24  runs out in front of the cruiser with a handgun in his

25  hand.  We didn't intentionally have bad tactics, but

Deposition of Chief Kimberly Jacobs      Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

1    we're stuck and we have to run out.  Sometimes the

2    circumstances you fall into based on whatever is

3    happening in front out you.

4    **Q.     In this case with Abel, do you believe that he**

5    made bad tactical decisions?

6    A.     Well, I think the fact that he was unable to

7    maintain footing, he was dangling rather than -- I think

8    he was not standing on the ground he testified to,

9    that's not the best tactical position, but that's not

10    why the situation was determined by me to be objectively

11    reasonable.

12    **Q.     In this case Abel made bad tactical decisions**

13    that put him into a situation?

14    A.     What bad tactical situation?

15    **Q.     That's what I'm asking you.  Strike that.  Do**

16    you believe that Abel made a bad tactical decision by

17    putting himself in a position to lose his footing?

18    A.     I wouldn't necessarily describe it as bad

19    tactics.  I've been off the ground before trying to

20    crawl in a window myself.  Sometimes that's the

21    circumstances.  You're trying to go check out an open

22    window, an open door, you're in a bad position.  I'm not

23    going to say it was bad tactics, it's a tactic that put

24    him in a bad position.

25    **Q.     Do you believe that Abel made sound tactical**

1    **decisions in his interaction with James England?**

2    A.       I will have to say that I don't know all of the

3    tactics that he used, so I can't -- as far as what I can

4    tell from reading this, I don't think that he was in

5    violation of this policy because of his tactical

6    decisions.

7    **Q.       Well, you determined that you didn't think he**

8    was in violation of the policy at all, right?

9    A.       Correct.

10   **Q.       But you raised in this hearing tactical**

11   decisions.  So, do you believe that any of the tactical

12   decisions that Abel made were unsound or potentially

13   increased the danger of the situation?

14   A.       I believe I already testified that him reaching

15   through the door and not being able to maintain his

16   footing on the ground was, you know, putting him in a

17   bad position.

18   **Q.       Okay.  And then as a result of him putting**

19   himself into a bad position, he then claimed that that

20   was part of the justification for him using deadly

21   force, right?

22   A.       No.  He testified that he was in fear of being

23   pulled in.  He said he was being pulled into the opening

24   by the suspect.

25   **Q.       And he was in a position to be able to be pulled**

1   **into the door by the suspect because he put himself**

2   through the door and in a position where he lost his

3   footing, right?

4   A.     That's what happened. I don't know if that

5   would have been different if he had been able to

6   maintain his feet on the ground either, but yes, that

7   was the position that he was in.

8   Q.     **By firing his gun did Abel prevent himself from**

9   being pulled into the porch area?

10   A.     I don't know. He fired his weapon because he

11   was in fear for the reasons I said earlier.

12   Q.     **Did you, or did anyone in the division, review**

13   Abel or any other officers' tactical decisions in

14   relation to the arrest and the use of force on James

15   England?

16   A.     I only have knowledge of what I did. I don't

17   know what they did.

18   Q.     **Well, you're the chief of police at the time,**

19   right?

20   A.     Yes.

21   Q.     **And you've been designated here to testify on**

22   behalf of the city?

23   A.     Yes.

24   Q.     **So you're here to testify today on all the**

25   information reasonably known to the municipality

1    regarding this review?

2                    MR. MILLER:  Objection.  Go ahead and

3    answer.

4    A.      What's the question?

5    BY MS. GELSOMINO:

6    Q.      **The question is, regarding a tactical review of**

7    any of the tactical decisions made by officers in

8    relation to the shooting of James England, did it ever

9    happen?

10   A.      Not as directed by me.  It may have happened

11   based on the chain of command passing information down,

12   but I don't have knowledge of that.

13   Q.      **Was there ever any counselling or training done**

14   as a result of the shooting of James England and the

15   tactical decisions made therein?

16   A.      Not -- I don't recall any directions that I may

17   have given to the deputy chief with regard to that.

18   It's possible that I mentioned something in the hearing

19   after the recorded portion.  It's recorded up to the

20   point where the officer leaves, and then I typically ask

21   the deputy chief what their thoughts were.  When I made

22   my decision I might have very well have said something

23   to him to follow-up on that, but I don't recall

24   specifics.  It was a long time ago.

25   Q.      **Did the division ever take any action to ensure**

Deposition of Chief Kimberly Jacobs                    Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

1    **that Abel and the other officers learned from this**

2    situation so as not to repeat it again in the future?

3    A.       As I previously described, the training that I,

4    myself, conducted about tactics I, myself, order the

5    training bureau to put on training about shooting at

6    dogs or shooting at cars.  This would have appeared in

7    the discipline tracking system that I described earlier.

8    I don't recall that this particular situation was ever

9    brought up as an example, but tactics have been trained

10   and discussed and counselled on all of that for many

11   years.

12   Q.       **Did you recommend training regarding dogs as a**

13   result of this incident?

14   A.       I have recommended training about shooting at

15   dogs any number of times since I was a commander.  I

16   made policy decisions as a chief about it.  I made

17   recommendations about policy decisions as a commander,

18   constantly trying to make sure that shooting at dogs is

19   given the seriousness of it.  We've had, even when I was

20   on the Firearms Review Board, we had an officer that

21   shot at a couple of dogs, the bullet ricochetted on the

22   sidewalk and ended up hitting his partner with shrapnel

23   just under the eye.

24   Q.       **My question is specifically just related to this**

25   case.  Did you as a result of this case make any

1    recommendations for retraining or policy changes?

2    A.      Not to my knowledge.

3    Q.      **On the next page you say at the top of page 16,**

4    "the perception could be very real to you, but it could

5    also be unreasonable."  Are you stating here that the

6    officer's perspective of danger could be very real to

7    him, but still could be an unreasonable fear?

8    A.      I think that's exactly what that says.

9    Q.      **Do you still believe that to be true?**

10   A.      That somebody could perceive a danger and it

11   could be unreasonable, yes.

12   Q.      **You testified that after the hearing you turn**

13   off the recording and then have some conversation with

14   the deputy chief, right?

15   A.      Yeah.  Usually with the people that are present.

16   I don't always ask each one of them for their opinion,

17   but I ask for thoughts.  If I have questions I might ask

18   them a particular question or I might give direction.

19   Q.      **Did you do that in this case?**

20   A.      I previously said I don't recall any.

21   Q.      **Okay.  I'm sorry.  Did any of the -- did Deputy**

22   Ken Kuebler ever indicate to you that he changed his

23   opinion regarding the out-of-policy finding?

24   A.      I don't recall.

25   Q.      **What did do you after the hearing in relation to**

1    **making a determination about in or out-of-policy?**

2    A.      Like I said, I would have discussed it with some

3    of those people there, asked for their opinions.  I

4    can't remember this specific hearing itself, but

5    sometimes I make a decision based on that conversation

6    and sometimes I decide to wait until I either do more

7    review, go back over statements or investigations, or

8    just gave myself time to think about it.  Sometimes

9    doing research, looking for parallels.  Was something

10   else a similar situation?  Some of the times I make a

11   decision soon after the hearing, and some of the times I

12   do more after that and then make my decision.

13   **Q.      And in this case what did do you?**

14   A.      I don't recall.

15   **Q.      Do you recall whether you researched any other**

16   cases?

17   A.      No, I don't.  I don't recall.

18   **Q.      Would you have like consulted with anyone else**

19   other than these people who were present for the hearing

20   in you making a determination?

21   A.      I know that I have.  I just don't know if it was

22   on this case.

23   **Q.      Okay.  Did you ever talk to the safety director**

24   about this case?

25   A.      Not that I recall.

1   **Q.**      **And because you found this shooting to be within**

2   **policy it never would have gone onto the safety**

3   **director, correct?**

4   A.      Correct.

5   **Q.**      **Okay. So I'm going to show you now your routing**

6   sheet comments, which has been marked as Abel 14.

7               - - - -

8       (Thereupon, Abel Exhibit 14 was shown.)

9               - - - -

10   BY MS. GELSOMINO:

11   **Q.**      **Is this the only document that you've created**

12   **regarding your findings?**

13   A.      There should have been an entry into the

14   discipline tracking on the intranet that I mentioned

15   before.

16   **Q.**      **Okay. You wrote this yourself, right?**

17   A.      Yeah. It's unusual for me to write out my

18   comments, but because I disagreed with so many I felt

19   that it was important to explain why I came up with a

20   different decision than the people in the chain of

21   command that said otherwise.

22   **Q.**      **Did you create any other documentation yourself**

23   **regarding your findings?**

24   A.      Not to my knowledge. This would have been

25   probably very similar to the information that would have

1    appeared in the disciplinary tracking.

2    Q.        So I know we've kind of already talked about

3    this, but I just want to make sure that I really

4    understand.  Were there any other factors, other than

5    what you specifically stated in this memo, that impacted

6    your decision to disagree with the chain of command and

7    to find the shooting within policy?

8    A.        No.  I mean, I think I said it's a totality of

9    all the circumstances and the information presented in

10   the hearing that led me to my decision.

11   Q.        I understand that, but I need to know the

12   factors that went into your determination of the

13   totality of the circumstances.  Is there any other

14   factors other than what you've written here that you

15   considered when determining the totality of the

16   circumstances?

17   A.        I would just say that I've been involved in

18   many, many, many investigations of use of deadly force,

19   use of force.  I've been to training.  I've been a

20   collector, if you will, of articles on use of force and

21   prepared that training that I did.  So, factors about

22   understanding reaction time.  Factors about

23   understanding, you know, reasonable belief and

24   speculation.  Factors about a lot of different things

25   played into this, so what I know played into it as well

```
 1   as what I heard.
 2   Q.      And you determined -- do you stand by your
 3   decision in this case?
 4   A.      Yes.
 5   Q.      And you do that even knowing that England was
 6   unarmed?
 7   A.      Yes.
 8   Q.      And you stand by your decision that this
 9   shooting was within policy even though that you know
10   England was handcuffed at the time, right?
11   A.      Let me go back because you said that I know he
12   was unarmed.  I don't know that he was unarmed with any
13   certainty.  I just know that we didn't find any weapon
14   that could be found.  So, yes, that's how I would
15   respond to that question.  As far as being handcuffed,
16   he was handcuffed when we got him.  I presume with a
17   pretty good deal of certainty that he was handcuffed.  I
18   don't think that he would have handcuffed himself.
19   Q.      Right.
20   A.      It might have been loose.  It could have been
21   loose and he could have gotten a hand out.  I'm just
22   saying what could have happened.  When he fell, or ran,
23   or crawled through the dog thing it might have been
24   tightened up on him.  All sorts of things could have
25   happened, but we found him with handcuffs on.
```

1    Q.       Did this possibility of him having a loose

2    handcuff that he could have slipped out of that you just

3    articulated impact your determination that this use of

4    deadly force was within policy?

5    A.       No.

6    Q.       Did the possibility that England was armed, even

7    though there was never any evidence that he was armed on

8    the scene, impact your determination that the use of

9    deadly force was within policy?

10   A.       I don't believe so, no.  What impacted it was

11   the fact that he was described as being -- pulling

12   officer Abel into that room with the dogs that were

13   clearly present.  No denying they were there barking and

14   agitated.

15   Q.       Did you consider England's version of events in

16   making your determination?

17   A.       I'd have to say that I do recall what he

18   testified to, if anything.

19   Q.       But did you have his statement available to you

20   at the time of your determination here?

21   A.       If he gave a statement it would have been part

22   of the investigative package.

23   Q.       If the dogs here were the source of the danger

24   does that justify the use of deadly force on a person

25   under the division policy?

1    A.      The dog's presence?  Can you ask the question

2    again?

3    **Q.      If Officer Abel articulated a fear of the dogs**

4    does that give him justification under the division

5    policy to use deadly force against Abel?

6    A.      A fear of dogs is not the justification, a fear

7    of being injured by the dogs is, and whether or not

8    that's a legitimate threat is a big decision.  Were the

9    dogs tied up?  Were they able to reach him?  You know,

10   was it a chihuahua or a pitbull all matters.  It's not a

11   simple answer on that.

12   **Q.      If an officer articulates a fear of a dog, does**

13   that provide him justification for shooting at a person

14   who is in the vicinity of the dog?

15            MR. MILLER:  Objection.  I don't even

16   really understand the question.  Is it literally just a

17   fear of the dogs generally and nothing more?

18            MS. GELSOMINO:  Yeah.

19            MR. MILLER:  Okay.

20   A.      If you're asking does a fear of a dog justify

21   shooting a person, not without more facts in play, no.

22   BY MS. GELSOMINO:

23   **Q.      What facts would impact that situation and**

24   justification for shooting a person?

25   A.      These facts.

```
 1              MR. MILLER:  Objection.  We're going

 2    far off field here of 30(b)6 and now we're starting to

 3    ask hypotheticals as if she's an expert.  You can keep

 4    going down that road, we're coming up on 2:43 and we've

 5    got more cases to go through.

 6              MS. GELSOMINO:  You could answer.

 7    A.    I said, these facts here in this particular case

 8    are an example where it could be a factor.

 9    BY MS. GELSOMINO:

10    Q.    Does a fear of serious physical harm from a dog

11    justify shooting a person in proximity to that dog?

12              MR. MILLER:  Objection.  Can I just

13    have a standing objection to this outside the scope of a

14    30(b)6?

15              MS. GELSOMINO:  Go for it.

16    A.    It's all based on the circumstances.  You're

17    giving me a question without knowing all of the

18    circumstances, and I judge it based on all of the

19    circumstances.

20    BY MS. GELSOMINO:

21    Q.    I understand that.  But under the division

22    policy is what I'm trying to get at.  So if -- I'm just

23    trying to isolate these things.  If an officer

24    articulates a fear of serious physical injury from a

25    dog, no other articulation of fear, does that serious
```

1  threat of physical harm from a dog justify shooting a

2  person who is in proximity of that dog under the

3  division policies?

4  A.      There's just no automatic.  I can't respond the

5  way that you wanted me to.  A fear of a dog is not

6  justification to shot a person, sometimes even a dog.

7  There are many other circumstances that have to be

8  analyzed to make a decision on whether or not it's in

9  violation of the policy.

10               MS. GELSOMINO:  Okay.  Let's take a

11  quick break here.

12                       - - - -

13     (Thereupon, an off-the-record discussion was held.)

14                       - - - -

15  BY MS. GELSOMINO:

16  **Q.      So if Officer Abel had articulated only his fear**

17  of possibly falling over the doorway into the porch

18  without more would that have justified his use of deadly

19  force?

20  A.      I don't believe so.

21  **Q.      If he had articulated a fear of the fact that**

22  England might attempt to disarm him if he had landed on

23  the other side of the porch, would that alone have

24  justified his use of deadly force against England?

25  A.      I don't believe so, no.

Deposition of Chief Kimberly Jacobs      Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

1    Q.      And if Abel had articulated only his fear of

2    serious physical harm from the dog, would that have

3    justified his use of deadly force against England?

4    A.      That would depend on what's going on with

5    England at the time.  Is he trying to control the dogs?

6    Is he ordering the dogs to attack him?  I believe that

7    some owners of dogs have been criminally charged for

8    doing just that.

9    Q.      Sure.  Is there any evidence in this case that

10   England was attempting to the dog or order the dog to

11   attack any of the officers including Abel?

12   A.      I don't know if there was any evidence of him

13   ordering the dogs to attack, but I also wouldn't know if

14   he had -- you know, we train our dogs with German

15   commands.  Sometimes trainers use certain words that

16   aren't recognized by other people for commands for dogs.

17   I didn't hear anyone say that they heard him order the

18   dogs to do anything, but he also was not controlling the

19   dogs from what I understood.

20   Q.      If Abel had articulated only that he had a fear

21   of physical harm from the dogs without any report that

22   England was attempting to use the dogs to harm Abel,

23   would that have been enough to justify the use of deadly

24   force against England?

25   A.      If he was in fear of serious bodily harm --

1   Q.       From the dog.  And he did not claim that England

2   was attempting to use the dogs, order the dogs to harm

3   him in any way, would that have justified Abel's use of

4   deadly force against England?

5   A.       Based on what you're describing, no, I don't

6   believe so.

7   Q.       Okay.  Did you have any role in informing Abel

8   about your findings?

9   A.       I would typically not communicate with the

10  officer.  Generally I would make my decision, let the

11  PSB lieutenants know, let them reach out to the FOP and

12  the FOP would inform the officer.  If I happen to bump

13  into the FOP person, if I made my decision I may have

14  told them, but that happened maybe once or twice in all

15  of the different discipline decisions I've made.

16  Typically I would tell the PSB lieutenant, they would

17  write it up and inform the FOP representative, if they

18  have an FOP rep.  If they didn't, they would tell the

19  officer.

20  Q.       Okay.  Let's talk about the shooting of Tyree

21  King.

22  A.       Okay.

23  Q.       Who was shot by Brian Mason?

24  A.       Yes.

25  Q.       When did you first learn of that shooting?

1   A.     Probably not too long after it happened.

2   **Q.     Did you go to the scene for that shooting?**

3   A.     I'm quite sure that I did because I remember

4   hearing that there were nuns that were witnesses and was

5   trying to find out where they might have been in order

6   to see what happened.  So, yes, I was there.  It was in

7   an alley and I do remember being there.

8   **Q.     Did you speak to any of the witnesses on the**

9   scene?

10   A.     I might have talked to one or more of the

11   officers that were witnesses, but I wouldn't have talked

12   to civilian witnesses, no.

13   **Q.     Did you speak to any of the officer witnesses**

14   about what happened?

15   A.     Absolutely not.

16   **Q.     Okay.  In this shooting the division made a**

17   decision to have a press conference pretty early on,

18   right?

19   A.     It wasn't the division's decision.  It was the

20   Mayor's decision.

21   **Q.     The Mayor's decision?**

22   A.     Yes.

23   **Q.     Did you have any input into any conversation**

24   from anyone at the mayor's office about the decision to

25   have a press conference?

Deposition of Chief Kimberly Jacobs        Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

```
 1   A.        Absolutely.
 2   Q.        Tell me about that.
 3   A.        It was a tragedy, and it was certainly going to
 4   raise questions in the community, and the sooner we
 5   addressed -- we thought the sooner that people would
 6   have an understanding of how a 13 year old would get
 7   shot, and especially with the information that the gun
 8   was a BB gun, knowing how that would sound without
 9   addressing it.  So it was a decision that we all felt
10   was right to do for our community to have a better
11   understanding of some of the circumstances.  Obviously,
12   not all of them had been investigated by then, but we
13   were very concerned about the community having some
14   information about this tragedy.
15   Q.        What was the basis of the information that was
16   shared in this press conference?
17   A.        The basis of the information?
18   Q.        If the case hadn't been investigated, then what
19   were you relying upon in this press conference?
20   A.        Well, the gun was found at the scene, the BB
21   gun, but it looks like a real gun.  And, you know, when
22   I was growing up BB guns were plastic toys that didn't
23   look anything like a gun.  Nowadays they're
24   intentionally made to look like a real gun because
25   that's what people are buying.  So we thought it was
```

1  extremely important that people have a better

2  understanding of how a BB gun can be perceived as a real

3  gun and a threat to an officer.

4  Q.        **Other than the fact that the BB gun was found on**

5  the scene, what information was relied upon to give

6  information to the public at this press conference?

7  A.        The information that we know, what the process

8  is.  People don't pay attention to what the police are

9  doing until something big happens.  It's important that

10  people know what's going to be looked at; how it's going

11  to be looked at; who's doing the investigation to let

12  people know what's going on.

13  Q.        **You broke up a little bit there.**

14  A.        I was saying, people don't pay attention to what

15  the police are doing until something big happens, and

16  when something does come to their awareness, it's

17  important for us to reiterate, especially since it's a

18  growing city and there might be somebody who has never

19  heard what the process is and what will happen next.  We

20  don't share the details of the investigation because we

21  don't have all of them, but it's important to give some

22  information to the public about, yes, it's being

23  investigated.  Yes, all the witnesses will be

24  interviewed.  Yes, it will be reviewed by the Grand

25  Jury.  To share information so that people know that we

Deposition of Chief Kimberly Jacobs                    Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

1    have a process that will be followed.

2    **Q.        At the press conference you stated that**

3    unfortunately it becomes necessary at times that the

4    police have to defend themselves.  Do you remember that?

5    A.      Yes.

6    **Q.        At that point did you believe that Mason had**

7    been defending himself when he shot and killed Tyree?

8    A.      I don't believe that I had made any decision on

9    whether or not he had, because I didn't even know what

10   his statement was, but I was describing in general that

11   officers sometimes have to use deadly force.

12   **Q.        Mason was placed on administrative leave, right?**

13   A.      Yes.

14   **Q.        Has he ever returned back to the street?**

15   A.      He had not gone back to the street when I

16   retired.

17   **Q.        Why not?**

18   A.      We reassigned him with agreement to the FOP and

19   Officer Mason to another assignment.

20   **Q.        Why?**

21   A.      He'd been involved in previous police involved

22   shootings, and it was unusual for someone to have that

23   many police involved shootings in a career.  It's

24   unusual to have one.  So we felt that for everybody's

25   sake it would be a good idea to get him out of that

1   scenario of being on patrol, living with another

2   investigation, and a lot of community concerns about,

3   you know, this particular officer.  If he showed up on a

4   run they might have done something to him just because

5   of recognizing his name, but also because it is unusual

6   and it was time for us to, you know, see if he could be

7   out of that situation for a while and not be involved in

8   anything else of a similar nature.

9   Q.      **Were each of these deadly shootings from Mason**

10  determined by the division to be justified?

11  A.      I believe all of them were.

12  Q.      **So if they were justified shootings and he did**

13  nothing wrong, why did the division think it was

14  important to get him off the streets and away from

15  situations where he could use force again?

16  A.      Well, public sentiment is important.  Officers

17  in Columbus didn't do anything wrong when Gorge Floyd

18  was killed either, but there were still riots in the

19  street.  Part of the determining factor of how we deal

20  with things has to take into consideration what's best

21  for our community, too.  Sometimes we're limited in our

22  ability to do certain things because of our FOP contract

23  with the city.  I don't have the ability to

24  administratively reassign people but for just cause and

25  the needs and interests of the division of police.  So I

Deposition of Chief Kimberly Jacobs          Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

1    have that ability, but often times if I do it

2    unwillingly to someone it's grieved.

3              Sometimes we've lost arbitration cases because

4    the chief at the time that made the decision to move

5    somebody, according to the arbitration, violated the

6    contract.  It's not an easy process to get somebody

7    administratively reassigned.  It has to be for

8    particular reasons, and you need to be able to justify

9    that.  In this particular case I thought it was in the

10   best interest for everyone to give him a break from

11   patrol.

12   Q.      **Is it possible that he returned to patrol at**

13   some point?

14   A.      Unless there's been an agreement between Officer

15   Mason, the FOP and the safety director's officer that I

16   don't know about, it's possible.

17   Q.      **Now, you said that you determined that it was**

18   best that he not be on the street because of public

19   sentiment.

20   A.      That's part of it.

21   Q.      **Okay.  So, what were the other reasons that you**

22   determined that Mason should not go back onto the

23   street?

24   A.      Being involved in a deadly force situation is

25   extremely stressful.  You know, Brian seemed to handle

1  the previous situations okay, but this one, obviously,

2  involved a 13 year old.  Sometimes you just need a break

3  and you don't recognize that you need a break.

4  Sometimes other people have to tell you to step back.

5  There's a gung-ho attitude, if you will, with officers

6  to go out and do their job, and it's hard not to.  They

7  have strong feelings about helping people, serving

8  people.  So if you tell them, no, you can't do that,

9  it's sometimes not well received, but sometimes that's

10  the best thing for them and sometimes they recognize it

11  afterwards.  You don't know what's going to cause stress

12  to a particular officer.  We had one officer that was

13  shot in the face and he was also involved in a head-on

14  car accident, and what traumatized that particular

15  officer more was the head-on crash.  He couldn't drive

16  down that particular area without having flashbacks,

17  even though being shot in the face was more scary, if

18  you will.  Sometimes we have to do what we think is best

19  for the officer even though they might not recognize it

20  that way.

21                      - - - -

22    (Thereupon, a loss of Internet connection occurred.)

23                      - - - -

24              MS. GELSOMINO:  Clearly we just had a

25  disruption in the Zoom.  Some of your answer may not be

1   in the transcript.  I'm okay with it not being there.

2   Andy, are you okay with that part of the answer being

3   unclear in the transcript?

4                    MR. MILLER:  Not really.  I actually

5   really liked it.

6                    MS. GELSOMINO:  Would you like her to

7   explain again?

8                    MR. MILLER:  You know what?  No.  I

9   have an affidavit if I want, so I'm tipping my hat a

10  little bit.  You might want to put it back in if I'm

11  going to use it some other way.  I don't care.  I'm not

12  going to ask any questions of my own witness.

13                    MS. GELSOMINO:  You're going to use

14  her answer about another officer being shot in the face

15  to impact this case somehow?

16                    MR. MILLER:  I don't know.  Like I

17  said, I'm just saying you heard it.  It could be on the

18  record.  You're not used to an attorney trying to not

19  pull a fast one on you.  All I'm saying is that I liked

20  the answer.

21                    MS. GELSOMINO:  How could it possibly

22  be relevant to anything?

23                    MR. MILLER:  I have a hard time coming

24  up with that.  I'm not trying to pull a fast one on you.

25  BY MS. GELSOMINO:

1   Q.      Okay.  Well, you were telling us about this

2   other officer who was injured at some other time, right?

3   A.      Yes.

4   Q.      When was that?

5   A.      I don't know the years that he had the two

6   separate incidents, but I brought it up with regard to

7   not knowing what traumatic situation affects somebody

8   more.  I could guess that being shot in the face is more

9   traumatic than a head-on accident that he didn't get

10  injured in, but that, to him, was not the case.

11  Q.      Whatever happened to that officer in his cases,

12  did it have any impact on your determinations regarding

13  how you treated Mason in this case?

14  A.      Not directly.

15  Q.      No?

16  A.      Not directly.

17  Q.      Okay.  So I appreciate you giving the examples.

18  I'm trying to move this along particularly given the

19  fact that my Internet seems to hate me, so I'm going to

20  try and keep my questions narrow and hopefully you could

21  do the same with your answers.  Regarding Mason, you

22  indicated that he seemed to have dealt with prior

23  shooting incidents fine.  Was there some difference in

24  how he handled the shooting of Tyree?

25  A.      This decision was made soon afterwards, so we

Deposition of Chief Kimberly Jacobs          Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

 1    didn't have an opportunity to compare.

 2    **Q.        Did he ever have a fitness for duty examination**

 3    or anything after his period of administrative leave?

 4    A.        Well, a fitness for duty exam is something that

 5    is described in the contract, so I'm sure that he met

 6    with a psychologist at some point in time and was

 7    interviewed by that psychologist to determine whether or

 8    not he was ready to go back to work.  I wouldn't

 9    describe that as a fitness for duty examination because

10    there's contractual language about those.

11    **Q.        After an officer involved shooting does the**

12    officer need to submit to a fitness for duty evaluation?

13    A.        We don't call it a fitness for duty evaluation.

14    We describe it as a checkup with the psychologist.  A

15    fitness for duty is a very formal process that has to be

16    officially requested and all of that.  Follow the

17    contractual rules.

18    **Q.        Did that ever happen for Mason?**

19    A.        Not to my knowledge.

20    **Q.        Have you ever requested or participated in any**

21    kind of fitness for duty evaluation of any officer while

22    you were chief?

23    A.        Yes.  I think it was while I was chief, but it

24    might not have been.  Most always it involved somebody

25    that is experiencing medical issues, occasionally

1   psychological issues.  If somebody has threatened

2   suicide, then generally there's going to be a

3   determination of whether or not they're capable of

4   coming back to work.  There are so many rules about this

5   and the city itself does not, in my opinion, have a lot

6   of leeway with regard to ordering such exams.  And up

7   until recently I think they didn't have anybody under

8   contract to provide those examinations because that

9   person is then working for the city to conduct the

10  examination.

11  **Q.      Right.  Okay.  So in this case with Mason he did**

12  have an interview with a mental health professional,

13  right?

14  A.      All officers are required to see one before

15  they're allowed to return to work.

16  **Q.      And Mason did that?**

17  A.      I didn't see it happen, but yes.  He wouldn't

18  have been back to work without having done that.

19  **Q.      Did you ever receive any notification that he**

20  had done that and had been cleared to return to work?

21  A.      The deputy chiefs are able to make that

22  decision.  The commanders are able to make that

23  decision.  So I can't tell you with certainty if I was

24  informed of that or when.

25  **Q.      But you assumed that it happened, right?**

1    A.        Right.

2    Q.        **So even though he's been cleared to return to**

3    **work by this mental health professional, you still made**

4    the determination that you felt it was safest that he

5    not return to patrol or the streets, right?

6    A.        It was the best step moving forward, yes.

7    Q.        **Do you think that given his history of uses of**

8    deadly force that it would have been dangerous for the

9    community to put Mason back on the streets?

10   A.        I wouldn't describe it as dangerous.  Some

11   officers are more active than others in going on, you

12   know, more dangerous calls.  Some actually work in

13   different precincts.  I remember the SWAT team goes on

14   far more dangerous situations on a regular basis because

15   they're working on highly dangerous warrant services and

16   things like that.  Some people are involved in more

17   situations like that because of the assignment that they

18   have, or the desire to engage in calls for service.

19   Some officers might drive more slowly when the situation

20   might be over.  I wouldn't describe it as dangerous if

21   he was left on the street.  If it had resulted in

22   another shooting and it was justified, if it was Officer

23   Mason defending his life against somebody with a gun

24   that was shooting at him, and him using deadly force, I

25   wouldn't describe that as dangerous.

1   Q.      Do you think that Officer Mason exhibited a

2   pattern of the use of force that was concerning to you

3   at all?

4   A.      Due to the unusual nature of four shoots by a

5   patrol officer, I would say yes.  I had at least some

6   concerns that he shouldn't be out there on patrol.

7   Q.      After his first shooting did you have any

8   concerns about whether he should be on patrol?

9   A.      I don't even know how much I was aware of his

10  first shooting.  I don't know what year that was, if I

11  was even within the chain of command.

12  Q.      After his second shooting did the division have

13  any concern about his ability to be on patrol?

14  A.      Not to my knowledge.

15  Q.      After his third shooting did the division have

16  any concerns about his ability to be on patrol?

17  A.      The division is an entity, but it's made up of a

18  lot of different people.  So you know the chief

19  represents the division, but I don't know who was chief

20  at the time.  The division having concerns could be 50

21  people that have concerns and 2000 that don't.  It's too

22  much of a generalization.

23  Q.      Well, you're here to testify on behalf of the

24  division.  That's why you've been noticed as this type

25  of witness.  So you're testifying for the division as a

1   whole.

2                   MR. MILLER:  Objection.

3   BY MS. GELSOMINO:

4   **Q.      So did the decision after the third shooting by**

5   Brian Mason have any concerns about the safety of him

6   serving as a patrol officer?

7                   MR. MILLER:  Objection.  Go ahead and

8   answer.

9   A.      I'm not aware of any.

10  BY MS. GELSOMINO:

11  **Q.      Did you have any conversations with Mason**

12  related to the shooting?

13  A.      Not that I know of about the shooting itself.

14  **Q.      Did you have any conversations with Mason**

15  regarding moving him out of patrol?

16  A.      I believe I spoke to him some, but most of the

17  time I was dealing with FOP and the people in his chain

18  of command.

19  **Q.      And what were those conversations?**

20  A.      What can we do?  Where can we put him?  How is

21  he feeling?  Does he have preferences?  You don't want

22  to make it feel like punishment if it's unclear as to

23  the outcome of a particular investigation.  So just

24  getting information about where the situation stood, if

25  we were going to have a grievance filed about that.

1   What did other officers think about him getting special

2   treatment.  All of that.  I believe he ended up going

3   into narcotics, and that's a highly desirable job.  I

4   knew there would be some backlash by other officers who

5   would want that type of an assignment potentially

6   grieving that movement.

7   **Q.       Were there any grievances filed?**

8   A.       I don't recall.  There might have been, but I

9   don't recall, because the FOP was involved in that

10  particular thing.  But if somebody wants to file a

11  grievance they're obligated to file it.  I just don't

12  remember for sure what happened.

13  **Q.       Was there any backlash from other officers**

14  regarding Mason's special treatment?

15  A.       I know that there were people that weren't happy

16  with it, yes.

17  **Q.       How do you know that?**

18  A.       Just in conversations with various people in the

19  chain of command and people in the division that brought

20  it to my attention.

21  **Q.       Who wasn't happy with it?**

22  A.       I have no idea who the names were.

23  **Q.       Were they in the chain of command or lower**

24  level, like officers?

25  A.       I would say it happened at different levels.

1   Certainly, as I said, narcotics is a desirable

2   assignment.  Even commanders and deputy chiefs might

3   have expressed their concerns about that assignment

4   being given to him.

5   **Q.     What was the highest rank of a person who**

6   complained regarding the special treatment?

7   A.     I don't know if I could use the word complained,

8   just discussed concerns.  And I imagine some of the

9   deputy chiefs expressed their thoughts about it because

10  that's who I saw on a more regular basis, commanders and

11  deputy chiefs, but I don't remember who specifically.

12  **Q.     Can you tell me the name of any specific**

13  commander or deputy chief who expressed concerns to you

14  regarding the special treatment of Mason?

15  A.     I can't give you any specific names.

16  **Q.     Did anyone create any documentation, memos or**

17  notes or anything regarding the reassignment of Mason?

18  A.     There was an agreement with the FOP about this

19  reassignment, and I would imagine there might have been

20  some e-mails about it.  There was probably some type of

21  a memorandum of understanding, or letter of agreement

22  with the Union on what was stipulated, and it was going

23  to be one-year with a reevaluation at the end of the

24  year.

25  **Q.     Has there ever been a reevaluation of the**

1   **reassignment?**

2   A.        There was, and it was continued.

3   **Q.        How many times has it been reevaluated?**

4   A.        I recall at least once.  I don't know if other

5   times happened after I retired or not.

6   **Q.        Has Mason received any kind of counselling or**

7   retraining or any other interventions regarding his use

8   of force?

9   A.        Everybody gets training.  I don't know about him

10  specifically about his own use of force.  I'm not aware.

11  **Q.        Has he ever grieved this reassignment?**

12  A.        I don't recall an official grievance, but I know

13  that he wasn't necessarily happy about the reassignment

14  initially, but recognized that this was going to be

15  where it was, or what hours we were offering, and those

16  kinds of things.  I think that he started to like the

17  assignment after some time.

18  **Q.        How was that expressed to you?**

19  A.        I may have ran into him at an event or something

20  like that.  I believe he grew a beard and was enjoying

21  the job having the opportunity to do detective work

22  basically.

23  **Q.        Okay.  So, now there are officers in the**

24  divisions of police that have more shootings than Mason,

25  right?

1    A.      I know there have been in the past, and I

2    believe that there very well could be some SWAT team

3    members that have had more than four.

4    Q.      **So why hasn't the division moved to have these**

5    other officers who have more than four uses of deadly

6    force to another division similar to how you had Mason

7    reassigned?

8    A.      All of their investigations have been

9    investigated.  They weren't found to be outside of

10   policy.  There was no indication that it was unusual in

11   that sense that -- you know, it would be usual in the

12   sense that if you're constantly going on robbery

13   surveillance, stakeouts, arresting high profile,

14   dangerous felons, that you're going to run into

15   situations like that.  It's not unusual for a SWAT

16   officer, but it would be more unusual for a patrol

17   officer.

18   Q.      **I understand that.  But if a SWAT officer has**

19   six or eight uses of deadly force does that become

20   unusual?  There has to be some number where it's unusual

21   even for a SWAT officer, right?

22   A.      Depending, yeah, on their assignment.  If you're

23   the first person in the door you're going to have more

24   than the last person in the door generally, because

25   you're going to have eight guys going in at one time.

1    So, depending on your role in that particular section it

2    may or may not be.  There's no number.  It would be

3    based on the information that we had about those

4    shootings, if there was a pattern.  If they were

5    happening quickly enough EARS would have looked at them

6    too.

7    Q.      **Let me ask you this:  Have you ever moved to**

8    have any other officer other than Mason reassigned as a

9    result of the use of deadly force?

10   A.      Not that I recall.

11   Q.      **Has the division ever evaluated some of the SWAT**

12   officers who have multiple uses of deadly force to

13   determine whether or not there was some circumstances

14   that made it unusual to have that many uses of force?

15   A.      It would be the responsibility of the SWAT chain

16   of command to look out for that, yes.

17   Q.      **Has that ever happened?**

18   A.      I can't talk in specifics, but I believe it

19   would be happening on a regular basis.

20   Q.      **You don't know of any SWAT member who has ever**

21   been raised to your level as having potentially a

22   pattern of unusual uses of force, right?

23   A.      Correct.

24   Q.      **Are you aware that Mason was initially removed**

25   from the hiring process because of concerns about

1  dishonesty?

2  A.      I don't recall that information.

3  **Q.      Knowing that, would that impact your**

4  determinations about whether or not any of the use of

5  force were justified?

6  A.      Not knowing what the circumstances were, I

7  wouldn't have any reason to believe that they would

8  impact the decisions that were made about the

9  investigations.

10  **Q.      You agree that any concern about dishonestly in**

11  an officer is extremely significant, right?

12  A.      I've already testified that it's an egregious

13  violation of our rules if you lie.  Now, if you lie

14  about something that had nothing to do with police work

15  in your background or something like that, that would be

16  different.  But certainly what type of a lie it was;

17  what it was about.  Whether it was off-duty, on-duty.

18  You know, some people lie about whether or not they were

19  home when somebody knocked on the door.

20  **Q.      Well, sure.  But do you agree that the concerns**

21  for honesty begin in the hiring process?

22  A.      Absolutely.  If we feel that you've lied during

23  that process at all, we'll kick you out.

24  **Q.      Because that's an indicator right from the**

25  beginning of the relationship with a police department

1    that there could be some concerns for a future officer's

2    honesty and credibility, right?

3    A.        Correct.

4    Q.        **Are you aware that there's an allegation that**

5    Mason used a racial slur against Tyree King before he

6    was shot and killed by him?

7    A.        I'm aware of that.

8    Q.        **Was that ever investigated?**

9    A.        I don't recall a specific investigation about

10   that aspect of it, no.  And I don't know when the

11   allegation was made.

12   Q.        **When did you become aware of it?**

13   A.        Probably as part of this lawsuit.

14   Q.        **Would you agree that -- would it be concerning**

15   to you to know that an officer within the division of

16   police is using racial slurs against people in their

17   conduct as a police officer?

18                    MR. MILLER:  I'm sorry.  Was the

19   question accused of using or using?

20                    MS. GELSOMINO:  I think I said accused

21   of using.

22                    MR. MILLER:  Fair enough.

23   BY MS. GELSOMINO:

24   Q.        **Even if there was an accusation that there was a**

25   racial slur, that would be concerning to you, right?

Deposition of Chief Kimberly Jacobs          Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

1    A.      Yes.

2    Q.      **Why?**

3    A.      Because we try to make sure that all of our

4    officers are acting in a bias-free manner.  If they

5    exhibit bias, then I want to know what the root of that

6    is.

7    Q.      **And did you do anything ever to investigate the**

8    root of any potential bias from Officer Mason?

9    A.      I know that I did not.  A complaint about, you

10   know, this or anything has to be filed within a certain

11   period of time for us to be able to investigate it.  If

12   it comes in past the deadline we're not allowed to

13   investigate it.

14   Q.      **Is that per the contract rules?**

15   A.      Yes.

16   Q.      **Did you or anyone from the division have any**

17   conversation with the coroner's office regarding not

18   releasing information to the public regarding uses of

19   deadly force by officers?

20   A.      Can you ask the question again?

21   Q.      **I'm wondering about conversations between the**

22   division and the coroner's office, and whether there was

23   ever any conversation with the coroner's office

24   indicating that the division does not want the coroner's

25   office to release a lot of information related to deaths

1    caused by officer involved shootings.

2    A.      In general or this particular case?

3    **Q.      In this particular case first, and then in**

4    general.

5    A.      I don't believe that I would have reached out to

6    anybody in the coroner's office. I don't recall that

7    that was done in this particular case. I don't know why

8    it would have. It might have been more context involved

9    that I'm not aware of and that might bring back a recall

10    of something, but I'm not aware of that for this

11    specific case. And then, for other cases, no. I'm not

12    aware of any general contacting the coroner's office to

13    not release information.

14    **Q.      Okay. Did you ever review the recommendations**

15    or findings related to whether or not Mason's shooting

16    of King was within or not within policy?

17    A.      Did I review the recommendations?

18    **Q.      Did you review this investigation?**

19    A.      I don't recall reading the entire investigation,

20    no.

21    **Q.      The chain of command found that the shooting was**

22    within policy, right?

23    A.      Yes.

24    **Q.      Did you ever review that finding?**

25    A.      I don't recall what I would have read, but I do

1   know that I would have discussed, you know, some of the

2   aspects of it, but I don't remember with who, whether it

3   was CIRT or Firearms Review or the chain of command.

4   But yes, I would have been paying attention as to the

5   outcome of that ruling.

6   **Q.        In terms of a decision maker though, did you**

7   have to approve that decision from the chain of command

8   in any way?

9   A.        I don't have to approve it if they all decide

10   it's within policy.  If I felt that they were missing

11   something I certainly would have weighed in and said, "I

12   think you're missing something, reevaluate it."

13   **Q.        Did you do that here?**

14   A.        Not to my knowledge.

15   **Q.        I believe that you were quoted in a news article**

16   saying, "I will not let an officer out on the street to

17   perform their job if I do not trust them."  Do you

18   recall saying that?

19   A.        I probably have said it publicly, privately and

20   in training.

21   **Q.        And you believe that, right?**

22   A.        I do.

23   **Q.        Was trust a factor in you deciding to reassign**

24   **Mason?**

25   A.        What I can say is that I can't say that if he

1    goes back out there on the street I don't trust that

2    he's going to avoid another situation like that the very

3    next day.  He might be put into that situation and take

4    action.  So it's not a matter of not trusting him, it's

5    a matter of not trusting the circumstances might arise

6    where he could be involved in another situation.

7    Q.      **You don't want him to be put back into another**

8    situation where he may have to use deadly force?

9    A.      At that time, yes.

10   Q.      **How about now?**

11   A.      I mean, all police officers that are active

12   could be at any point in time.  So I don't have any

13   reasons to believe that he is making bad decisions

14   because all of the shootings that he has been involved

15   in have been determined to be within policy, based on

16   those facts as far as analyzing it as a pattern there

17   still doesn't seem to be tactical decisions that he's

18   making that are poor, like walking out into street and

19   firing wildly.  So it could happen because he's still an

20   active officer.  But it's not a matter of thinking that

21   he is going to go out there and do something stupid and

22   harm somebody.

23   Q.      **Okay.  Did you have any other involvement in**

24   anything related to the shooting of Tyree King that we

25   haven't already discussed?

Deposition of Chief Kimberly Jacobs          Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

```
 1   A.        Not that I can recall.
 2   Q.        Okay.  I'm going to move on to the shooting of
 3   Deaunte Bell-McGrew then.  When did you first learn of
 4   that shooting?
 5   A.        I would have been called that night if I was in
 6   town.  I always got called.  Sometimes if I was out of
 7   town, I would get called.  I'm pretty sure that I
 8   responded.  Sometimes when I respond I didn't go to the
 9   scene, I just went to wherever the officers were
10   temporarily.  I do believe that I went to that scene
11   though because I think there's a carry out, and I was
12   just down the street that was the scene of another
13   shooting or something along those lines, but I can't be
14   certain.  It feels like I did go.
15   Q.        What did you do while you were there on the
16   scene?
17   A.        Usually when I go to the scene I get briefed by
18   either the public information officer or the CIRT
19   sergeant on what they had been able to ascertain as far
20   as positioning of the officers, in this case where the
21   vehicle was, the lighting conditions, I would take a
22   look around at that.
23   Q.        Did you do that in this case?
24   A.        I believe I did.  I can't say with certainty,
25   but I believe so.
```

Deposition of Chief Kimberly Jacobs                    Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

1    Q.      Okay.  That's fair.  It's just what you

2    remember, and if you don't remember you could tell me

3    that.  What was your next involvement with the

4    investigation or anything in relation to this shooting?

5    A.      I would have been briefed by somebody about the

6    status of that and told when certain milestones had been

7    passed, and then told probably, or read sometimes that

8    it had been ruled upon.

9    Q.      Did you review the investigation?

10   A.      You broke up.

11   Q.      Did you review the investigation at all?

12   A.      I don't have specific knowledge of reviewing

13   that one.

14   Q.      Did you review the chain of command findings?

15   A.      Not to my knowledge.

16   Q.      Okay.  In this case FRB and the chain of command

17   both agreed that the shooting was within policy.  So did

18   you have any -- did you ever review that or weigh-in on

19   that in any way?

20   A.      Not to my knowledge.  The routing sheet would

21   say if it was ever sent to my office.

22   Q.      So in this case, because FRB and the chain of

23   command agreed, the top of the chain of command would be

24   the final decision-maker in this case?

25   A.      The deputy chief.

1  Q.      The duty chief would have been the final

2  decision-maker?

3  A.      Yes.

4  Q.      Did you remember anyone consulting with you

5  about their findings?

6  A.      I know at some point in time I was aware that it

7  was within policy.  Somebody told me.

8  Q.      You were advised of it?

9  A.      Yes.

10  Q.      Did anyone ever ask for your input?

11  A.      Not to my knowledge.

12  Q.      Okay.  Do you agree that the shooting of Deaunte

13  Bell-McGrew was within policy?

14  A.      Based on the information that I was given, I

15  don't have any reason to believe that it wasn't.

16  Q.      What information did you rely upon to make that

17  determination?

18  A.      I believe the officers gave statements that they

19  were trying to arrest a person, they reached for a gun,

20  and the weapon was found in the vehicle near him.

21  Q.      Did you actually read those statements?

22  A.      I don't recall.

23  Q.      Okay.  Are you aware that this interaction began

24  with a consensual encounter?

25  A.      Yeah.  I don't know for sure how it began, but I

Deposition of Chief Kimberly Jacobs                    Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

1    might have been told that in the past.

2    Q.      Did you have any concerns about the legitimacy

3    of the consensual encounter?

4    A.      No.

5    Q.      Are you aware that Deaunte Bell-McGrew was not

6    alleged to have ever been holding a gun?

7    A.      By the officers you mean?

8    Q.      Yeah.  The officers never said that he was

9    holding the gun.  Did you know that?

10   A.      I don't recall that specific information.

11   Q.      Knowing that, does that impact your opinion

12   about whether or not the shooting was justified?

13                      MR. MILLER:  Standing objection on the

14   30(b)6 moving into hypothetical stuff.

15   A.      I feel like that's not all of the context.

16   BY MS. GELSOMINO:

17   Q.      Would that have been an important factor in

18   determining whether or not the shooting was in or

19   out-of-policy?

20   A.      It could have been a factor absolutely if the

21   officers said that they -- I would want to know more, I

22   guess.  What were the other facts.

23   Q.      Did you have any other involvement into the

24   shooting of Deaunte Bell-McGrew that you haven't told me

25   about?

1    A.      Not that I recall.

2    Q.      **In general in the division, has the division**

3    ever found that a police shooting was unnecessary?

4    A.      That's not a finding that we use.  So I'd have

5    to say no, because we have a finding of whether or not

6    it was within policy or outside of policy, and the

7    policy does not require it being necessary.  It requires

8    it being objectively reasonable.

9    Q.      **Has the division ever reviewed a police shooting**

10   and come to the position that it was excessive?

11   A.      Excessive, you know, implies different things.

12   One bullet unnecessary and unreasonable and all of that

13   could be excessive by some definition.  Or, you know,

14   multiple shots, certainly there's been analysis of some

15   shootings that the first two bullets were reasonable,

16   were all of the other ones; whether it's one, two,

17   three, four all necessary?  That has been analyzed

18   before, yes.

19   Q.      **And then the conclusion has been that at least**

20   some of the shots were excessive?

21   A.      That's a possibility.  I remember one case that

22   I was concerned about where an officer fired, I believe,

23   six shots, and it was into a vehicle that was in a

24   parking spot.  He was afraid of being run over by the

25   vehicle, but as the car pulled out he basically followed

Deposition of Chief Kimberly Jacobs      Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

1   that car with shots like in like an arc, and so, I know

2   that I had concerns about all of those shots. Maybe the

3   first one was okay, but the other ones weren't. I just

4   cannot remember the outcome for that particular one.

5   The officer's name is Altharr, A-L-T-H-A-R-R, I believe.

6   That's a possibility of one of those cases.

7   **Q.**     **Okay. Have you ever reviewed a police involved**

8   shooting and come to your own opinion that the shooting

9   was unnecessary?

10   A.     Again, I don't make the decision based on

11   necessary or not. It's whether it's within policy or

12   not.

13   **Q.**     **Have you ever reviewed a police shooting and**

14   come to the collection in your own opinion that the

15   shooting was excessive?

16   A.     Well, I think I've already testified that

17   Camp-Donovan was outside of policy. One bullet was

18   excessive, but we don't rule it that way. We rule it

19   in-policy or out-of-policy.

20   **Q.**     **Okay. Have you ever reviewed a shooting and**

21   come to the conclusion in your own opinion that the

22   shooting was unjustified?

23   A.     Unjustified would be out-of-policy, so, yes.

24   **Q.**     **Okay. Is it your opinion that all out-of-policy**

25   shootings are unjustified?

Deposition of Chief Kimberly Jacobs        Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

```
 1    A.        I think they're basically one in the same.
 2    Q.        Okay.  I understand that at least some point you
 3    were part of the International Association of Chiefs of
 4    Police.  Is that true?
 5    A.        You're breaking up.  But I think the question,
 6    was I a member of the International Association of
 7    Chiefs of Police, yes.
 8    Q.        Do you believe that the policies promulated by
 9    the IACP are generally accepted standards in law
10    enforcement?
11    A.        There's so many it's hard to generalize.
12    They're accepted by some, but it is international, so
13    we're talking the whole world.  Different countries have
14    different laws and all of that.  Sometimes they're not
15    far enough.  And we have stronger policies then IACPs.
16    Sometimes ours are modified versions of those.
17    Q.        Do you believe that the IACP is an organization
18    that the division should look to for guidance in best
19    practices?
20    A.        Yes.
21    Q.        And you have done that?
22    A.        Absolutely.
23    Q.        Okay.  And do you believe that the division
24    should continue to do that?
25    A.        Absolutely.
```

1   **Q.        Okay.  How about with the Ohio Association of**

2   Chiefs of Police, is that similarly an organization that

3   you believe the division should look to for guidance in

4   best practices in policing?

5   A.      I'm not sure that they provide that kind of

6   guidance.

7   **Q.        Okay.**

8   A.      They don't model policies.  Governor Kasich

9   created a commission that started coming up with

10  policies and requiring basically agencies to try to

11  follow those, but that's not OACP.  I'm not aware of a

12  lot of policies that OACP has put out.

13  **Q.        Okay.  Are there other organizations that you**

14  deem that the division should be looking to for guidance

15  in the best practices?

16                      MR. MILLER:  Objection.  Beyond the

17  scope of the 30(b) destination.

18  A.      The division should look at all the resources

19  that they can.  I was a member of the Major City Chiefs

20  Association.  I was also a board member of the

21  association.  It's 70 largest cities.

22  BY MS. GELSOMINO:

23  **Q.        What was that called?**

24  A.      Major City Chief's Association.  I was a member

25  and became a board member as well.  I was part of that

1   decision-making for that organization.  That's the 70

2   largest cities in the US and Canada, and they meet three

3   or four times a year.  They came up with policies with

4   regard to a lot of different things.  Some of them were

5   guidance for chiefs; guidance for departments.  I paid

6   attention to that.  I participated in testifying at the

7   21st Century Policing Commission that President Obama

8   did.  I flew out to Phoenix and testified in their

9   training.

10   **Q.**    **You testified about what?**

11   A.    Training and supervising.  The Police Executive

12   Research Forum, we've hired them to come in and to take

13   a look at different aspects of division things.  They

14   analyzed Internal Affairs a few years ago and created a

15   report.  We looked at a number of policies and model

16   policies, if you will, when we were implementing

17   policies for body camera use.  The division does already

18   look at a lot of different sources for information about

19   what our policies should be.  And don't forget, that we

20   comply with the standards of Commission for Law

21   Enforcement Agencies.  We've been accredited since 1999

22   and they have 450 plus requirements for policies in all

23   of those different areas, and we've been in compliance

24   with those standards since '99, and every three years

25   we've been reaccredited and have policies on many

Deposition of Chief Kimberly Jacobs                    Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

```
 1   different things.
 2   Q.        With the Police Executive Research Forum has the
 3   division ever had them come in to review anything
 4   related to discipline or the use of force?
 5   A.        You broke up a little bit.  About what?
 6   Q.        Discipline or the use of force.
 7   A.        They looked at Internal Affairs.
 8   Q.        Right.
 9   A.        Internal Affairs isn't exactly about discipline.
10   Use of force, no, I don't believe.
11   Q.        Okay.
12                     MS. GELSOMINO:  I'm going to take a
13   quick break just to look at my notes and figure out how
14   to wrap this up.
15                               - - - -
16      (Thereupon, an off-the-record discussion was held.)
17                               - - - -
18   BY MS. GELSOMINO:
19   Q.        We talked at length about your determination
20   that the England shooting by Abel was within policy,
21   right?
22   A.        Which one?
23   Q.        The shooting of England by Abel.
24   A.        Yes.  Was within policy.
25   Q.        So was that your decision regarding that
```

Deposition of Chief Kimberly Jacobs        Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

1   **shooting consistent with your view of how to interpret**

2   and apply the policies of the division of police

3   regarding the use of force?

4   A.     Yes.

5   Q.     **Was your decision of finding the England**

6   shooting within policy consistent with your view with

7   how to interpret and apply the law regarding the use of

8   force?

9               MR. MILLER: Objection. Go ahead and

10   answer.

11   A.     Well, I would say that I have an understanding

12   of the rulings of the Supreme Court with regard to

13   officers' use of deadly force.

14   BY MS. GELSOMINO:

15   Q.     **And did you make that decision regarding the**

16   England shooting in the manner that was consistent with

17   your understanding of the law and decisions of the

18   Supreme Court regarding the use of force?

19               MR. MILLER: Objection. Go ahead and

20   answer.

21   A.     Yes. I did not find that he had committed a

22   criminal offense.

23   BY MS. GELSOMINO:

24   Q.     **And is this the same understanding regarding the**

25   interpretation and application of the policies of the

1   division of police that you apply when making all

2   disciplinary determinations?

3   A.      I'm not sure I understand.

4   Q.      **So your application and interpretation of the**

5   policies that led you to a conclusion in England, right,

6   have you applied that same understanding of the

7   interpretation and application of the policies of the

8   division of police to all of your other disciplinary

9   determinations that you've made?

10  A.      Yes.

11  Q.      **And have you similarly applied your same**

12  understanding of the laws and the constitutional

13  precedent that impacted your findings in England, have

14  you used that same understanding of the law when making

15  all of your other disciplinary determinations?

16              MR. MILLER:  Objection.  Go ahead and

17  answer.

18  A.      I would say yes.

19  BY MS. GELSOMINO:

20  Q.      **Is this the same -- do you expect your designees**

21  and subordinates to apply the same determination of law

22  and policy when they're making their disciplinary

23  determinations?

24              MR. MILLER:  Objection as to form in

25  combination law and policy.

1          MS. GELSOMINO:  I can break it up.

2    BY MS. GELSOMINO:

3    **Q.      Do you expect your designees and subordinates to**

4    apply this same application of the policies in the

5    division of police when making their disciplinary

6    determinations?

7    A.      I'm not clear on what the same interpretation

8    is, but, yes, they are to use their understanding of our

9    rules and policies when making decisions.

10   **Q.        Thank you.  And what I meant by same was the**

11   consistent of your understanding of the determination of

12   the policies?

13   A.      I don't think that I have any way to tell all of

14   the division members what my interpretation is.  There

15   are too many variables to my interpretation of the rules

16   and policies, so we do training about these policies.

17   We give examples.  The legal advisor from the city

18   attorney's office does inservice training every single

19   year about interpretation.  You have to understand when

20   I became an officer in 1979 Graham v. Connor didn't

21   exist.  That shows how old I am.  But we have to

22   constantly update people on the rules, the law, the

23   interpretations of that law, but I don't think that it's

24   possible to say same interpretation.

25   **Q.        Okay.  That's fair.  But you expect your**

1    **designees and subordinates to apply the policies of the**

2    division of police in a way that's consistent with the

3    training of the division of police making disciplinary

4    determinations, right?

5    A.      Training, the writings, yes.  All of that.

6    Q.      **And you expect your designees and subordinates**

7    to apply the law consistent with their training and the

8    information given to them regarding the law from the

9    division of police when making their disciplinary

10   determinations, right?

11   A.      Yes.  Some of the decisions that they make

12   aren't impacted by the law, but yes.

13   Q.      **When the law is impacted then you expect them to**

14   apply it as they're trained, right?

15   A.      Yes.

16   Q.      **And that expectation would apply all the way**

17   down the chain of command, correct?

18   A.      Yeah.

19              MS. GELSOMINO:  Okay.  I think that's

20   all I have for you today.

21              MR. MILLER:  We'll read.

22

23

24

25

Deposition of Chief Kimberly Jacobs        Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

```
 1              C E R T I F I C A T E

 2    STATE OF OHIO,              )
                                  )
 3    CUYAHOGA COUNTY.            )

 4    I, Megan A. Medved, a Notary Public within and for the

 5    State of Ohio, duly commissioned and qualified, do

 6    hereby certify that the within named witness, CHIEF

 7    KIMBERLY K. JACOBS, was by me first duly sworn to

 8    testify to the truth, the whole truth and nothing but

 9    the truth in the cause aforesaid; that the testimony

10    then given by the witness was by me reduced to Stenotype

11    in the presence of said witness, afterwards transcribed

12    upon a computer; and that the foregoing is a true and

13    correct transcription of the testimony so given by the

14    witness as aforesaid.

15

16    I do further certify that this deposition was taken at

17    the time and place in the foregoing caption specified,

18    and was completed without adjournment.

19

20    I do further certify that I am not a relative, employee

21    of or attorney for any of the parties in the

22    above-captioned action; I am not a relative or employee

23    of an attorney of any of the parties in the

24    above-captioned action; I am not financially interested

25    in the action; and I am not, nor is the court reporting
```

Deposition of Chief Kimberly Jacobs        Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

```
 1   firm with which I am affiliated, under a contract as

 2   defined in Civil Rule 28(D).

 3

 4   IN WITNESS HEREOF, I have hereunto set my hand and

 5   affixed my seal of office at Cleveland, Ohio on December

 6   18th, 2020.

 7

 8

 9
                          Megan Medved
10            _____

11            Megan A. Medved, a Notary Public

12            in and for the State of Ohio.

13            My Commission expires 9/17/23

14

15

16

17

18

19

20

21

22

23

24

25
```

Case: 2:18-cv-01060-EAS-EPD Doc #: 141-12 Filed: 03/24/21 Page: 178 of 197 PAGEID #: 4524

Deposition of Chief Kimberly Jacobs     Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

## WORD INDEX

**< 0 >**
**09-0086** 84:*20*

**< 1 >**
**10** 38:7 50:2*1, 21* 62:*10*
*75:5* 103:*1*
**10.10** 80:*19* 81:2, *14*
**10.3** 103:*1*
**10:00** 2:*8*
**100** 23:*25* 94:*25*
**1020** 2:*9*
**106** 4:*9*
**12** 27:*12* 41:*20* 80:*21*
**120** 60:*10, 13* 66:*9* 67:*22*
68:*1, 5, 14, 23, 25* 69:*3, 8,*
*10*
**128** 4:*10*
**13** 42:*11* 76:*14* 108:*13*
138:*6* 143:*2*
**13th** 44:*8*
**14** 4:*10* 62:*10* 119:*24*
128:*6, 8*
**14th** 44:*10*
**15** 75:*4* 101:*25* 116:*9*
**16** 4:*8* 99:*15, 17* 126:*3*
**17** 177:*13*
**176** 4:*5*
**18** 27:*12* 55:*5*
**180** 37:*8*
**1801** 2:*9*
**18th** 177:*6*
**1900** 3:*6*
**1979** 174:*20*
**1980s** 16:*20*
**1999** 170:*21*
**1st** 2:*7*

**< 2 >**
**2** 106:*5*
**2:18CV1060** 1:*2*
**2:19CV1049** 1:*20*
**2:19CV3105** 1:*13*
**2:43** 133:*4*
**20** 4:*9* 28:*19* 106:*7, 8, 10*
**200** 3:*14*
**2000** 54:*2* 149:*21*
**2001** 21:*21*
**2002** 16:*22* 17:*22* 22:*21*
29:*16*
**2005** 9:*7* 11:*1* 50:*1*
84:*19, 19, 21*
**2010** 19:*20*
**2012** 18:*1* 50:*3* 55:*4*
76:*14* 82:*4, 9*
**2015** 105:*22*
**2016** 105:*22*
**2019** 5:*16*

**2020** 2:*7* 177:*6*
**216** 3:*10*
**21st** 170:*7*
**23** 177:*13*
**24** 72:*6*
**241-1430** 3:*10*
**28** 37:*5* 177:*2*
**29th** 82:*4* 102:*13*

**< 3 >**
**3** 4:*2*
**30** 8:*8, 14, 16* 11:*20*
93:*24* 133:*2, 14* 165:*14*
169:*17*
**360** 45:*24*
**39** 87:*11, 12* 103:*8*
**395** 3:*14*

**< 4 >**
**43215** 3:*15, 23*
**44113** 3:*7*
**450** 170:*22*

**< 5 >**
**5** 4:*4*
**50** 26:*20, 20, 21, 21, 24, 24*
27:*1, 1, 1, 1* 149:*20*
**500** 116:*21*
**55** 3:*6*

**< 6 >**
**6** 8:*8, 16* 11:*20* 133:*2, 14*
165:*14*
**60** 37:*4, 5*
**614** 3:*17, 25*
**636-3476** 3:*17*
**645-6959** 3:*25*
**6's** 8:*14*
**6th** 102:*12*

**< 7 >**
**7** 103:*8*
**70** 169:*21* 170:*1*
**77** 3:*22*

**< 8 >**
**8.4** 37:*6*

**< 9 >**
**9** 4:*7* 97:*12, 14* 177:*13*
**90** 37:*4* 38:*19* 91:*1*
**97** 4:*7*
**99** 4:*8* 74:*6* 170:*24*
**9th** 2:*9*

**< A >**
**a.m** 2:*8*
**Abel** 4:*7, 10* 10:*13* 13:*19*
90:*22* 91:*25* 97:*11, 14*
100:*20* 102:*20* 106:*19*

**107**:*3, 8, 24* 108:*5, 18*
109:*16, 17* 110:*8* 111:*9,*
*15, 17, 20, 22* 112:*2, 3, 4,*
*15* 113:*6* 118:*4* 120:*5*
121:*4, 12, 16, 25* 122:*12*
123:*8, 13* 125:*1* 128:*6, 8*
131:*12* 132:*3, 5* 134:*16*
135:*1, 11, 20, 22* 136:*7*
171:*20, 23*
**Abel's** 90:*23* 98:*11* 99:*14*
136:*3*
**abide** 48:*9*
**ability** 35:*4* 38:*3, 18*
40:*11, 13* 46:*6* 48:*23, 24*
66:*24* 72:*11* 85:*23* 86:*8*
110:*1* 141:*22, 23* 142:*1*
149:*13, 16*
**able** 9:*14* 36:*3, 5* 37:*17,*
*22* 41:*5, 7* 42:*5* 46:*20*
48:*4* 49:*1* 55:*9* 70:*14*
76:*23* 77:*1* 78:*18* 82:*16*
83:*1, 19* 86:*18, 24* 91:*23*
99:*10* 109:*12* 122:*15, 25*
123:*5* 132:*9* 142:*8*
147:*21, 22* 158:*11* 162:*19*
**above-captioned** 176:*22, 24*
**Absolutely** 24:*15* 33:*18*
49:*24* 89:*17, 25* 137:*15*
138:*1* 156:*22* 165:*20*
168:*22, 25*
**academy** 73:*25* 74:*7*
**accept** 68:*13* 72:*15* 115:*6,*
*18, 21* 116:*7*
**acceptable** 66:*19*
**accepted** 66:*11* 68:*6, 24*
69:*7* 168:*9, 12*
**accepts** 60:*11*
**access** 10:*12, 18, 19* 17:*4*
28:*12* 34:*14* 35:*25* 41:*23*
53:*25* 54:*5* 70:*13, 14*
71:*3, 15* 83:*1*
**accident** 143:*14* 145:*9*
**accidental** 50:*16* 64:*8*
**accidently** 50:*18*
**account** 114:*24* 115:*3, 7,*
*18*
**accountable** 47:*20* 72:*9*
**accountably** 104:*23*
**accounts** 115:*8*
**accredited** 170:*21*
**accurate** 41:*21* 58:*13*
100:*11*
**accurately** 87:*2*
**accusation** 157:*24*
**accused** 57:*13* 157:*19, 20*
**acronym** 117:*8*
**acted** 87:*10*
**acting** 158:*4*
**action** 24:*10* 48:*15* 49:*18*
63:*3, 5* 73:*18* 74:*5* 111:*6*

**124**:*25* 161:*4* 176:*22, 24,*
*25*
**actions** 15:*11* 68:*4* 72:*10*
76:*16* 77:*6* 84:*25*
**active** 148:*11* 161:*11, 20*
**activities** 5:*22*
**actual** 14:*9* 41:*22* 56:*15*
66:*20* 85:*9* 93:*12, 23*
109:*13, 17* 111:*8*
**addition** 23:*15*
**address** 74:*5*
**addressed** 74:*12* 138:*5*
**addressing** 138:*9*
**adequately** 11:*21*
**adjournment** 176:*18*
**Adm** 1:*2*
**Adm.,** 1:*12*
**administrative** 81:*8*
140:*12* 146:*3*
**administratively** 141:*24*
142:*7*
**admitted** 90:*9*
**advance** 106:*1*
**advertised** 21:*22*
**advised** 164:*8*
**advising** 6:*18*
**advisor** 14:*18* 174:*17*
**Affairs** 18:*9, 13* 21:*20*
22:*16* 24:*5* 27:*20* 30:*24*
53:*16* 96:*23* 170:*14*
171:*7, 9*
**affidavit** 144:*9*
**affiliated** 177:*1*
**affixed** 177:*5*
**aforesaid** 176:*9, 14*
**afraid** 115:*23* 166:*24*
**African** 5:*24*
**age** 5:*3*
**agencies** 169:*10* 170:*21*
**agitated** 131:*14*
**ago** 17:*16* 19:*20* 40:*16*
124:*24* 170:*14*
**agree** 41:*12* 63:*1, 7, 15*
71:*10* 103:*4* 156:*10, 20*
157:*14* 164:*12*
**agreed** 40:*5, 10* 60:*4, 16*
163:*17, 23*
**agreement** 2:*7* 35:*5*
140:*18* 142:*14* 152:*18, 21*
**agrees** 40:*8* 62:*20*
**ahead** 55:*23* 71:*19* 93:*18*
106:*17* 112:*20* 115:*13*
124:*2* 150:*7* 172:*9, 19*
173:*16*
**aid** 81:*8*
**al,** 1:*2, 17, 23*
**alert** 18:*12, 19* 74:*9*
**alerted** 90:*22*
**allegation** 26:*14* 84:*21*

Deposition of Chief Kimberly Jacobs     Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

87:17 112:18 157:4, 11
allegations 34:17 87:24
alleged 165:6
alley 137:7
allow 40:2 120:20
allowed 31:15, 17, 20, 21
38:1, 2 39:24, 25 74:3
82:14 89:15 104:1, 5, 8,
12, 17 147:15 158:12
Altharr 167:5
A-L-T-H-A-R-R 167:5
American 5:24
Amiller@columbus.gov
3:24
amount 35:15 37:2 48:6
49:1, 3
analysis 17:3 166:14
analyzed 20:17 134:8
166:17 170:14
analyzing 161:16
Andy 3:20 8:13 144:2
annual 20:21
answer 7:18 9:15 51:9
55:5 70:9 96:25 101:19
112:21 115:14 124:3
132:11 133:6 143:25
144:2, 14, 20 150:8
172:10, 20 173:17
answers 73:6 145:21
antiquated 29:3
anybody 7:12 61:7 65:4
90:4 105:4 112:16 114:1
147:7 159:6
anymore 5:18 23:17
27:15 35:25 85:18
apartment 120:8
apparently 86:5
appeal 105:6
appealed 82:22 90:14
appearance 81:24
APPEARANCES 3:1 4:2
appeared 117:4 125:6
129:1
application 172:25 173:4,
7 174:4
applied 173:6, 11
apply 172:2, 7 173:1, 21
174:4 175:1, 7, 14, 16
appointed 18:1
appreciate 145:17
apprehend 54:24
approaching 119:19
appropriate 32:18 46:7
approve 53:11 160:7, 9
approximately 82:3, 9
arbitrary 21:17
arbitration 50:11, 20 52:5
55:1, 21 58:2 68:16, 18
69:22 82:25 108:4 142:3,

5
arbitrations 52:9
arbitrator 37:10 46:16
47:4 48:12 50:11, 20
51:8 54:11, 22 55:2, 14,
22 56:9, 12, 14, 19 58:2
72:5 73:17, 21 74:2
90:12, 13, 16
arbitrators 46:22 56:24
arc 167:1
area 35:13 111:1 123:9
143:16
areas 7:11 170:23
argue 46:20 107:3 119:5
arguing 106:21
argument 107:10, 16
108:2
arm 110:25
armed 131:6, 7
arrest 112:25 118:6
123:14 164:19
arresting 154:13
article 103:1 160:15
articles 129:20
articulate 109:12 111:15,
17
articulated 131:3 132:3
134:16, 21 135:1, 20
articulates 132:12 133:24
articulation 133:25
ascertain 162:19
aside 95:22
asked 81:11 90:24 92:13,
15, 21 93:9 96:12 107:5
114:19 127:3
asking 32:5 45:3 55:2
79:17 121:15 132:20
aspect 83:22 157:10
aspects 16:23 110:14
160:2 170:13
assigned 86:1
assignment 55:15 56:20,
23 140:19 148:17 151:5
152:2, 3 153:17 154:22
assignments 25:1 38:4
84:3, 10
associated 26:10, 11
Association 168:3, 6
169:1, 20, 21, 24
assume 74:15 90:24
95:10
assumed 147:25
attached 100:7, 22, 25
attack 135:6, 11, 13
attacking 109:3
attempt 10:19 80:23
81:5 114:1 134:22
attempted 49:21 54:10
112:15

attempting 112:25 120:6
135:10, 22 136:2
attempts 112:24
attention 14:15 39:16
60:2 61:7, 7 64:13 79:22
90:1 99:25 117:5 139:8,
14 151:20 160:4 170:6
attitude 143:5
Attorney 3:21 78:20
91:18 96:11 106:18, 21,
22 111:20 112:5 144:18
176:21, 23
attorneys 9:22 66:17
85:3 92:23
attorney's 14:4, 16 15:3
16:3 17:13 70:16 107:16
108:2 174:18
audio 49:7 97:2, 3
automatic 83:18 134:4
automatically 60:8, 13
available 10:23, 23 11:23
12:4 48:7 49:2, 4 71:6,
17 105:4 131:19
average 75:4
avoid 25:11, 11 116:22
161:2
aware 11:20 14:1 15:7
44:5, 7, 12 53:1 149:9
150:9 153:10 155:24
157:4, 7, 12 159:9, 10, 12
164:6, 23 165:5 169:11
awareness 139:16
awful 11:2

< B >
Baase 9:24 10:3 13:22
back 13:23 15:4 16:22
20:21, 21 21:20 22:10
24:19, 20 26:8, 13 27:12
30:17 31:9 34:18 35:5
46:15, 21 48:12 52:7
54:2 56:17, 17, 21, 21, 22,
23 58:5 72:4, 6 73:22
80:16 84:19, 21 88:5
89:10 91:23 101:25
102:3 127:7 130:11
140:14, 15 142:22 143:4
144:10 146:8 147:4, 18
148:9 159:9 161:1, 7
background 156:15
backgrounds 34:5
backlash 151:4, 13
bad 47:14, 15, 16, 18, 22
48:5, 16, 18 49:5 72:5
84:3 88:23 106:25
120:15, 25 121:5, 12, 14,
16, 18, 22, 23, 24 122:17,
19 161:13
bags 6:6

balances 62:9 105:12
Baldwin 88:3, 7, 13 90:9
Baldwin's 88:4
barefoot 8:5
barking 111:1 131:13
barrier 109:23, 24
based 11:3 15:16 18:12
30:8 32:15 35:7 40:17
52:4 74:2 76:18 77:6, 9,
13 83:2 85:11 93:19
96:3 103:23 108:7 109:7
121:2 124:11 127:5
133:16, 18 136:5 155:3
161:15 164:14 167:10
basically 7:4 8:8 15:7
16:21 19:10 26:20 28:23
37:9 48:22 63:19 80:2
81:10 91:13 92:18
104:20 153:22 166:25
168:1 169:10
basis 138:15, 17 148:14
152:10 155:19
Basse 10:3
baton 88:9
BB 138:8, 20, 22 139:2, 4
beacons 118:13
beard 153:20
began 164:23, 25
beginning 156:25
behalf 3:2, 19 8:9 9:16
123:22 149:23
behavior 16:13 28:16
40:16 42:12 47:24 72:19,
22 84:2, 3
belief 71:9 95:15 98:11
110:11 129:23
believe 9:25 10:7 11:3
12:1 13:5 16:22 19:9, 14
22:3, 4, 12 25:24, 25
27:18 30:19 31:22 36:15,
23 37:2, 6, 9, 23 48:15
53:5 55:4 58:24 66:3
70:10 71:5 73:7 76:4, 6
77:3 81:5 83:22 84:17,
22, 23 86:12 87:14, 16
88:5 89:1 90:16 95:18
100:4 101:13, 24, 25
103:1, 5, 6 106:4 108:18
109:10 110:5, 8 111:4, 23
112:16 113:7 116:7
118:5 120:1 121:4, 16, 25
122:11, 14 126:9 131:10
134:20, 25 135:6 136:6
140:6, 8 141:11 150:16
151:2 153:20 154:2
155:18 156:7 159:5
160:15, 21 161:13 162:10,
24, 25 164:15, 18 166:22
167:5 168:8, 17, 23 169:3

Case: 2:18-cv-01060-EAS-EPD Doc #: 141-12 Filed: 03/24/21 Page: 180 of 197 PAGEID #: 4526

Deposition of Chief Kimberly Jacobs

Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

171:*10*
**believed** 72:*2* 87:*4* 110:*9*
**BELL-McGREW** 1:*14*
10:*6* 13:*21* 162:*3* 164:*13*
165:*5*, *24*
**belong** 81:*9*
**belongs** 102:*4*
**best** 8:*14* 9:*18* 13:*23*
28:*15*, *21* 29:*3*, *24* 35:*8*
52:*14* 70:*8* 72:*18*, *24*, *24*
73:*12* 79:*19* 121:*9*
141:*20* 142:*10*, *18* 143:*10*,
*18* 148:*6* 168:*18* 169:*4*, *15*
**better** 23:*3* 44:*9* 54:*5*
77:*11* 96:*18* 114:*2*
138:*10* 139:*1*
**beyond** 15:*19* 81:*14*
169:*16*
**biannual** 21:*5*
**bias** 103:*16*, *19*, *21* 158:*5*,
*8*
**bias-based** 103:*20*
**bias-free** 158:*4*
**big** 22:*2* 36:*2* 48:*19*
76:*5* 132:*8* 139:*9*, *15*
**bigger** 97:*20*
**binding** 8:*9*
**bit** 7:*7* 16:*23* 24:*13*, *16*
94:*10* 101:*15* 139:*13*
144:*10* 171:*5*
**blah** 25:*14*, *15*, *15*
**bleeding** 6:*5*
**blue** 54:*1*
**Board** 9:*10* 62:*10*, *13*, *19*,
*20*, *25* 63:*6*, *15* 66:*2* 92:*5*
102:*2* 119:*16* 125:*20*
169:*20*, *25*
**boards** 85:*18* 104:*22*, *23*
**bodily** 109:*13*, *18* 110:*10*
111:*9* 114:*25* 135:*25*
**body** 31:*2*, *13* 49:*6*, *17*, *23*
90:*15* 170:*17*
**borderline** 41:*3* 74:*14*
**bottom** 101:*13* 116:*10*
**bound** 40:*7* 69:*13*
**box** 76:*5*
**boys** 6:*9*
**brand** 40:*18*
**break** 8:*2* 59:*18* 108:*7*
134:*11* 142:*10* 143:*2*, *3*
171:*13* 174:*1*
**breaking** 168:*5*
**brewing** 14:*19*
**Brian** 9:*24* 10:*9* 13:*20*
136:*23* 142:*25* 150:*5*
**brief** 97:*24*
**briefed** 93:*15* 162:*17*
163:*5*
**bring** 14:*14* 60:*2* 96:*11*

159:*9*
**Broad** 3:*14*
**broke** 7:*7* 109:*25* 139:*13*
163:*10* 171:*5*
**broken** 32:*16*
**brought** 7:*1* 28:*6* 36:*16*
70:*25* 92:*12* 125:*9* 145:*6*
151:*19*
**Brown** 3:*13*
**buck** 68:*22*
**build** 6:*7*
**bullet** 125:*21* 166:*12*
167:*17*
**bullets** 77:*20* 166:*15*
**bump** 136:*12*
**bunch** 24:*2* 72:*8*
**Bureau** 18:*10* 19:*18* 20:*3*,
*19* 51:*16* 52:*3*, *16*, *19*
53:*8* 92:*16* 125:*5*
**burglar** 109:*1*, *3*
**busy** 52:*7*
**butt** 35:*8*
**butted** 88:*6*
**buying** 6:*3* 12:*10* 138:*25*
**bypassing** 98:*15*

< C >
**California** 71:*17*, *19*
105:*14*
**call** 6:*14*, *24* 8:*8* 9:*2*, *3*, *4*
53:*20* 73:*5* 146:*13*
**called** 2:*3* 38:*5*, *6* 52:*14*
97:*25* 117:*3* 162:*5*, *6*, *7*
169:*23*
**calls** 17:*13* 148:*12*, *18*
**camera** 49:*6* 170:*17*
**cameras** 49:*17*
**Camp-Donovan** 54:*23*
69:*21* 70:*3* 167:*17*
**camps** 6:*7*
**Canada** 170:*2*
**capable** 11:*4* 147:*3*
**caption** 176:*17*
**car** 13:*23* 26:*7*, *8* 77:*20*,
*20*, *23* 78:*2*, *22* 88:*4*, *8*
119:*1*, *2*, *5*, *19* 143:*14*
166:*25* 167:*1*
**care** 43:*21* 91:*17*, *19*
144:*11*
**career** 22:*21* 39:*20*
140:*23*
**careers** 72:*13*
**carry** 6:*4* 162:*11*
**cars** 125:*6*
**CASE** 1:*2*, *13*, *20* 9:*24*, *25*
10:*1*, *9* 15:*25* 16:*8* 30:*23*
32:*18* 33:*14* 34:*3*, *19*
50:*4*, *13* 51:*2* 54:*19*, *20*
56:*2*, *3*, *4* 57:*6* 59:*17*
62:*22* 63:*6*, *14* 66:*6* 68:*8*

72:*1* 75:*21* 76:*1*, *1*, *2*
79:*3*, *9*, *11* 88:*2* 90:*21*
91:*24* 92:*21* 93:*11* 94:*3*,
*14*, *21*, *23* 95:*2* 96:*19*
99:*7* 102:*5* 104:*13*
105:*18* 106:*18*, *19*, *20*
107:*1*, *17* 108:*10*, *11*
109:*16* 114:*8* 118:*22*
119:*9* 121:*4*, *12* 125:*25*,
*25* 126:*19* 127:*13*, *22*, *24*
130:*3* 133:*7* 135:*9*
138:*18* 142:*9* 144:*15*
145:*10*, *13* 147:*11* 159:*2*,
*3*, *7*, *11* 162:*20*, *23* 163:*16*,
*22*, *24* 166:*21*
**cases** 13:*13* 33:*13* 34:*4*
49:*6*, *7*, *15* 51:*11* 52:*25*
53:*6*, *13* 61:*12* 65:*17*
70:*21* 73:*4* 74:*21* 79:*21*
87:*19* 92:*25* 93:*1* 94:*24*
127:*16* 133:*5* 142:*3*
145:*11* 159:*11* 167:*6*
**caught** 78:*4*
**cause** 92:*22* 93:*3* 141:*24*
143:*11* 176:*9*
**caused** 114:*13* 159:*1*
**causing** 119:*6*
**Century** 170:*7*
**certain** 19:*3*, *22*:*6*, *11*,
*11*, *15*, *20*, *25* 23:*14* 27:*18*
35:*15*, *15* 38:*15* 84:*10*
106:*13* 112:*22* 135:*15*
141:*22* 158:*10* 162:*14*
163:*6*
**certainly** 20:*20* 34:*9*
35:*5* 41:*1*, *5* 43:*1* 48:*21*,
*23* 55:*8* 66:*23* 108:*11*
110:*2* 112:*11* 138:*3*
152:*1* 156:*16* 160:*11*
166:*14*
**certainty** 130:*13*, *17*
147:*23* 162:*24*
**CERTIFICATE** 4:*5*
**certified** 5:*5*
**certify** 176:*6*, *16*, *20*
**cetera** 39:*14*
**chain** 9:*10* 18:*18*, *22*
24:*8*, *19* 25:*4* 28:*1* 42:*17*,
*18*, *22* 47:*7* 59:*8*, *13*
60:*15*, *25* 62:*2*, *3*, *12*, *16*,
*20* 63:*1*, *7*, *11*, *15*, *18* 65:*7*
66:*1* 75:*11*, *23* 76:*6*, *15*
78:*10* 79:*24* 80:*3* 89:*25*
90:*6* 92:*3* 94:*12*, *16* 95:*4*,
*7*, *15* 96:*12*, *16* 97:*23*
98:*25* 99:*3* 100:*3*, *7*, *12*,
*16*, *20* 102:*4*, *19* 105:*9*
124:*11* 128:*20* 129:*6*
149:*11* 150:*17* 151:*19*, *23*

155:*15* 159:*21* 160:*3*, *7*
163:*14*, *16*, *22*, *23* 175:*17*
**chains** 25:*19*
**challenging** 107:*13*
**chances** 74:*17*
**change** 22:*21* 37:*6*, *12*
43:*10* 66:*24* 77:*18* 78:*1*
**changed** 16:*22* 20:*10*
31:*19* 37:*9* 46:*24* 60:*15*
77:*15* 78:*21* 82:*18* 83:*2*
126:*22*
**changes** 20:*5* 27:*23* 28:*2*
29:*13*, *17* 36:*20*, *23* 72:*19*
73:*17* 126:*1*
**channels** 58:*9*
**chapter** 36:*18* 37:*12*, *12*
38:*7* 81:*4*
**charge** 37:*16*, *25* 38:*1*
50:*19* 57:*21* 60:*4* 81:*16*
82:*18* 84:*23* 85:*12*, *14*, *23*
98:*19*
**charged** 83:*8* 86:*5* 89:*1*,
*11* 95:*16* 105:*20* 135:*7*
**charges** 31:*21* 79:*23*, *25*
80:*4*, *7* 92:*10*, *15* 93:*8*, *19*,
*23* 107:*21*, *24*
**charging** 85:*6*
**charity** 6:*14*
**Charlotte** 28:*14* 29:*18*, *19*,
*22* 83:*14*
**Chase** 76:*3*, *10*, *16* 78:*19*
**check** 121:*21*
**checking** 90:*6*
**checks** 62:*9* 105:*12*
**checkup** 146:*14*
**CHIEF** 1:*2*, *16* 2:*2* 4:*3*
5:*3*, *7* 9:*1*, *12* 13:*3*, *25*
17:*25* 18:*23* 22:*19* 24:*9*
27:*21* 36:*8*, *11*, *12* 37:*13*
50:*3* 51:*6* 59:*9*, *25*, *25*
60:*16*, *18*, *23* 61:*2*, *5*, *16*,
*20* 62:*4* 63:*2*, *10*, *11* 64:*9*,
*12*, *18*, *23* 65:*9* 69:*14*, *15*
71:*21* 74:*23* 75:*20* 81:*23*
84:*7* 91:*2* 93:*6*, *6*, *15*
95:*15* 96:*13* 99:*8*, *9*
102:*1* 103:*8* 108:*25*
120:*1* 123:*18* 124:*17*, *21*
125:*16* 126:*14* 142:*4*
146:*22*, *23* 149:*18*, *19*
152:*13* 163:*25* 164:*1*
176:*6*
**chiefs** 61:*11* 63:*24* 64:*2*,
*5* 92:*13* 147:*21* 152:*2*, *9*,
*11* 168:*3*, *7* 169:*2*, *19*
170:*5*
**chief's** 9:*25* 14:*2* 50:*9*
52:*3*, *20*, *22* 53:*1*, *14*, *18*
60:*5*, *21* 76:*8*, *19* 85:*17*

Case: 2:18-cv-01060-EAS-EPD Doc #: 141-12 Filed: 03/24/21 Page: 181 of 197 PAGEID #: 4527

Deposition of Chief Kimberly Jacobs     Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

93:21 97:7 114:23
115:16 117:24 169:24
**chihuahua** 132:10
**child** 13:20
**choice** 24:25 85:4
**CHRISTOPHER** 1:12
**circumstance** 41:18 43:16
68:12 95:24
**circumstances** 77:2 78:3
81:15 91:9 107:13
120:13, 20 121:2, 21
129:9, 13, 16 133:16, 18,
19 134:7 138:11 155:13
156:6 161:5
**CIRT** 58:17 59:5, 8
60:19, 20, 22, 24 61:3, 16
62:1, 11 91:14 113:15
160:3 162:18
**cities** 169:21 170:2
**citizen** 24:6 30:24 37:3
**citizens** 47:17
**CITY** 1:2, 17, 23 2:9
3:21 8:8 9:17 10:24
11:23 12:5 14:4, 16 15:3
16:2 17:13 35:5 36:17
39:22 44:15 55:2 70:16
123:22 139:18 141:23
147:5, 9 169:19, 24 174:17
**civil** 14:22 47:6 90:14
177:2
**civilian** 26:22 39:13
42:10, 22 48:12 104:22
105:17, 19 137:12
**claim** 16:2 136:1
**claimed** 122:19
**claims** 25:12
**clarification** 65:6
**clarifies** 33:15
**classes** 73:25
**clean** 7:19
**clear** 32:14 33:8 45:10
64:7 93:16 101:15
107:22 174:7
**cleared** 147:20 148:2
**clearly** 131:13 143:24
**Cleveland** 2:10 3:7 177:5
**close** 85:9 90:1 110:20
**closer** 93:23 100:23
**closest** 102:24
**clubs** 6:9
**COE** 86:19
**collection** 167:14
**collector** 129:20
**COLUMBUS** 1:2, 17, 23
3:15, 21, 23 5:12, 20
10:24 11:23 12:5 51:20
105:1 141:17
**column** 22:13
**combination** 173:25

**come** 6:5 20:18 22:15
23:25 32:21 51:11, 14
60:6, 17 62:5, 6, 24 63:3,
4, 20 67:8 73:5 75:21, 21
81:8, 13 82:25 84:8
91:23 92:11 93:6 96:12
139:16 166:10 167:8, 14,
21 170:12 171:3
**comes** 28:7, 8 32:23
48:11 58:17 93:12 102:3
105:5, 17 120:9 158:12
**coming** 32:9 64:13 119:1
133:4 144:23 147:4
169:9
**command** 9:10 18:18, 22
24:8, 19 25:19 28:1, 10
42:17, 18, 22 43:10 47:8
59:8, 14 60:15, 25 62:2, 3,
12, 16, 20 63:1, 7, 12, 15,
18 65:7 66:1 75:11, 23
76:6, 15 78:10 79:24
80:3 86:4 90:1, 7 92:4
94:16 95:4, 7, 15 96:12,
16 97:23 98:25 99:3
100:3, 8, 12, 16, 20 102:4,
19 104:6 105:10 124:11
128:21 129:6 149:11
150:18 151:19, 23 155:16
159:21 160:3, 7 163:14,
16, 23, 23 175:17
**commander** 18:9 20:19
44:24 59:9, 25 62:4
85:24 96:13, 22 125:15,
17 152:13
**commanders** 62:13
147:22 152:2, 10
**commands** 24:4 135:15,
16
**command's** 94:12
**comments** 94:16 95:7, 15
97:23 102:15 112:5
116:10 128:6, 18
**commission** 47:6 90:14
169:9 170:7, 20 177:13
**commissioned** 176:5
**committed** 33:11 72:2
172:21
**committee** 18:10, 20, 21
19:14, 22 20:7, 18, 22, 25
21:8 25:5, 18, 21
**common** 19:9
**communicate** 64:1 136:9
**communicating** 45:13
**community** 6:14 138:4,
10, 13 141:2, 21 148:9
**company** 17:17
**compare** 146:1
**compared** 103:11 106:24,
24

**comparing** 106:18
**compelling** 107:10
**complainants** 34:16
**complained** 85:7 152:6, 7
**complaint** 14:10 15:18
26:2, 4 27:13 37:3 42:11
85:11 105:5 158:9
**complaints** 16:16 17:1
18:14 21:14, 20, 22, 24, 25
22:3, 11, 15 23:7, 8, 10, 11,
16, 20, 22, 22, 23, 25 24:2,
6, 25:22 27:7 30:25
34:25 39:14 42:23
104:24
**complete** 24:18 50:7
**completed** 37:8 48:10
59:5, 13 61:13 62:1, 11
176:18
**compliance** 170:23
**complimented** 73:11
**comply** 170:20
**complying** 37:18
**comprehend** 120:18
**computer** 176:12
**concern** 113:4 156:10
**concerned** 77:21, 23
138:13 166:22
**concerning** 9:9 149:2
157:14, 25
**concerns** 19:15 103:15
141:2 149:6, 8, 16, 20, 21
150:5 152:3, 8, 13 155:25
156:20 157:1 165:2
167:2
**conclusion** 113:21 166:19
167:21 173:5
**conditions** 162:21
**conduct** 30:20 34:13
82:19 86:11 89:23 105:9
117:25 147:9 157:17
**conducted** 125:4
**conference** 8:6 137:17, 25
138:16, 19 139:6 140:2
**conflict** 38:11
**conflicting** 114:12 115:5
**confronted** 48:3
**confusion** 32:9
**connection** 8:1 86:3
116:4 143:22
**Connor** 174:20
**consensual** 164:24 165:3
**consequences** 16:10
**consider** 21:14 31:17, 20,
21 32:19, 20 33:21 35:1,
2 36:1 39:3, 19, 24, 25
40:2 41:5 78:24 114:15
131:15
**consideration** 29:12 73:9
107:11, 14 115:10 141:20

**considered** 15:15 27:10,
16 30:21 31:1, 13 33:4
35:22 57:16, 17 78:10
129:15
**considering** 28:12
**considers** 34:25
**consistent** 73:8 85:22
172:1, 6, 16 174:11 175:2,
7
**constantly** 125:18 154:12
174:22
**constitutional** 173:12
**constraints** 73:1
**constructive** 31:15 98:22
**consult** 6:20
**consulted** 36:10 127:18
**consulting** 6:25 164:4
**contact** 36:21
**contacting** 159:12
**context** 54:14 87:23
90:23 113:13 117:23
159:8 165:15
**continue** 19:16 37:14
168:24
**continued** 19:6 25:17
83:3 153:2
**contract** 26:3 27:19
31:19 34:12, 13, 22 35:3,
4, 7, 17 36:7 38:8, 12, 15,
25 39:22, 24 40:1 46:5,
17 48:8, 22 52:1 59:15
60:7 67:11, 12 68:21
69:12 71:11 80:25 81:4
84:9, 13, 13 102:21
104:20 141:22 142:6
146:5 147:8 158:14
177:1
**contracts** 71:24
**contractual** 93:2 146:10,
17
**control** 70:25 88:17
135:5
**controlling** 135:18
**conversation** 49:17
126:13 127:5 137:23
158:17, 23
**conversations** 6:23 17:13
27:23, 25 150:11, 14, 19
151:18 158:21
**convoluted** 50:24
**COOPER** 1:12
**cop** 47:22 48:18, 22
74:16 119:2, 2
**cop,** 48:16
**cops** 47:13, 13, 14, 15, 16
48:5 49:5
**copy** 14:2
**core** 117:8
**coroner's** 158:17, 22, 23,
24 159:6, 12

Deposition of Chief Kimberly Jacobs     Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

correct 8:17 16:7 34:17 45:16 47:24 67:2 69:8 72:22 73:19 79:6, 8 98:14 100:9, 18 102:18 104:15 105:24 109:14, 15 112:15, 17 122:9 128:3, 4 155:23 157:3 175:17 176:13
corrected 74:11
correctly 61:1
corruption 105:13
COSI 6:7
counsel 2:7 48:24 117:17
counseling 31:16 72:20, 25 89:19 98:21, 22
counselled 125:10
counselling 50:22 124:13 153:6
countries 168:13
country 71:14
counts 84:1
County 2:10 176:3
couple 15:21 93:9 125:21
course 96:20 116:18
COURT 1:1 2:8 30:10 77:6 172:12, 18 176:25
cover 110:1
Covid 6:1
CPD 5:22 6:23 7:13 9:8 51:18 80:19 116:21, 24
crash 143:15
crashed 88:4, 5
crawl 121:20
crawled 130:23
crazy 70:19
create 80:24 117:12 128:22 152:16
created 35:7 78:15 81:7 82:5, 7, 10 128:11 169:9 170:14
credibility 33:17, 19, 22 34:2, 9 49:12 157:2
crime 83:8, 9
criminal 30:11 34:15 58:13, 18, 19, 21, 22 59:4 61:17, 21 78:14 87:19 97:8 105:18 172:22
criminally 105:20 135:7
critical 65:25 87:8
criticism 66:17
cross-examination 2:4 4:4 5:7
cruiser 54:25 120:24
culture 105:13
current 5:12 7:4 17:23 30:15
Cuyahoga 2:10 176:3

< D >
daily 116:24

danger 95:25 107:4 108:15, 19, 21 109:8, 10, 20, 21 110:3, 9, 11, 13, 17, 25 111:4 119:3, 6, 24 122:13 126:6, 10 131:23
dangerous 72:14 107:9 111:2 112:9 117:2 148:8, 10, 12, 14, 15, 20, 25 154:14
dangling 95:25 121:7
database 29:3 52:2, 15 53:4 79:24
databases 29:11 54:2
date 52:10 53:24 82:2
dates 101:12, 23
day 8:6 35:24 38:19 56:7, 11 57:22 58:3 67:25 90:24 94:2 161:3
days 11:6 12:7 37:4, 4, 5, 5, 8 44:9 82:7 93:24
DCC 31:15 32:20 42:1 51:12 63:21, 22 64:6, 9 65:4
DCCs 64:11, 18
deadline 38:17, 17 158:12
deadly 9:8 11:1 55:18 56:25 57:16, 17 58:11, 12 61:18, 22 63:7, 16, 20, 25 64:19 65:7 66:7 69:16 70:1 74:18, 24 75:3, 21 90:23 98:19 108:20 109:7, 11 111:10 115:1, 23 116:15, 20, 22 120:10 122:20 129:18 131:4, 9, 24 132:5 134:18, 24 135:3, 23 136:4 140:11 141:9 142:24 148:8, 24 154:5, 19 155:9, 12 158:19 161:8 172:13
deal 35:9 39:2 40:4 42:5 74:16 86:9 130:17 141:19
dealing 42:20 150:17
dealt 103:18 145:22
DEARREA 1:2
Death 9:10 109:13, 18 110:9 111:8 114:25
deaths 158:25
DEAUNTE 1:13 10:5 13:21 162:3 164:12 165:5, 24
DEAVERS 1:2, 17
December 2:7 102:11 177:5
decide 14:17 29:7 37:10 39:4 71:22 72:17 76:16 127:6 160:9
decided 22:2 51:15 53:2 64:9, 12 65:16 77:15 96:15 114:17

decides 55:22 56:19
deciding 32:13 160:23
decision 24:8 32:14 39:17 40:21 48:13 55:1, 3 63:9 65:18 66:10, 16 69:19 74:10 77:25 79:7 82:25 83:4 85:19 91:12 92:9 99:9 107:17 108:5 114:16 119:3 121:16 124:22 127:5, 11, 12 128:20 129:6, 10 130:3, 8 132:8 134:8 136:10, 13 137:17, 19, 20, 21, 24 138:9 140:8 142:4 145:25 147:22, 23 150:4 160:6, 7 167:10 171:25 172:5, 15
decision-maker 63:8 66:12 68:11, 13 69:19 79:5 163:24 164:2
decision-making 20:15 47:2 74:20 108:7, 12 170:1
decisions 30:8, 15 34:24 39:10 51:22 52:10 58:1 66:18 67:13 68:15 85:15 103:22 118:19 121:5, 12 122:1, 6, 11, 12 123:13 124:7, 15 125:16, 17 136:15 156:8 161:13, 17 172:17 174:9 175:11
decision's 33:25
deem 169:14
deemed 85:1
deep 38:24
deeper 17:2 18:16
deescalation 20:14
defend 140:4
Defendant 1:2, 18, 24
Defendants 3:19 58:21 87:18
defending 140:7 148:23
defense 16:2, 4 107:15
defer 26:21 114:24 115:3, 4
deficiency 74:10
defined 177:2
definitely 36:2
definition 166:13
degree 107:4 109:22 111:5
delay 24:17 55:8
delayed 89:4
denying 131:13
department 14:24 38:11 40:12 156:25
departmental 31:21 50:19 60:3 79:23 80:7 92:9, 14 93:7, 18 107:21, 24 108:6

109:6 110:19
departmentally 89:1
departments 104:21 170:5
depend 135:4
depending 31:8 42:15 67:18 73:22 93:16, 25 154:22 155:1
depends 31:14 56:14, 19 120:12
deposes 5:5
deposition 2:2 7:15 8:4 9:5, 21 11:11, 12, 15 12:8, 17, 24 13:2, 10, 12, 24 70:14, 22 71:1 97:11 106:2 176:16
depositions 5:18 7:16, 23, 25
deputy 24:9 36:11 59:9, 25, 25 60:16 61:5, 11 62:4 63:10, 11, 24 64:2, 5, 9, 12 92:13 93:6, 6, 15 95:14 96:13 99:8, 9 102:1 124:17, 21 126:14, 21 147:21 152:2, 9, 11, 13 163:25
derive 29:10
describe 7:12 49:11 76:23 121:18 146:9, 14 148:10, 20, 25
described 23:5 38:7 98:20 110:20, 25 112:6, 16 113:1 125:3, 7 131:11 146:5
describing 136:5 140:10
description 112:22
designated 8:7, 9, 16 11:20 13:17 123:21
designates 9:5
designee 9:13
designees 173:20 174:3 175:1, 6
desirable 151:3 152:1
desire 148:18
desk 77:9 88:25 89:4 106:24
desks 76:20
destination 169:17
destroy 39:18
destroyed 81:13
details 139:20
detective 153:21
determination 32:3, 8 33:23 35:14 38:12 49:19, 22 54:12 61:25 66:6 102:17 105:23 118:19 127:1, 20 129:12 131:3, 8, 16, 20 147:3 148:4 164:17 171:19 173:21 174:11
determination, 32:1

Case: 2:18-cv-01060-EAS-EPD Doc #: 141-12 Filed: 03/24/21 Page: 183 of 197 PAGEID #: 4529

Deposition of Chief Kimberly Jacobs      Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

**determinations** 7:6, *10*
9:12 30:*17*, *18* 33:19
145:*12* 156:*4* 173:2, *9*, *15*,
*23* 174:6 175:*4*, *10*
**determine** 15:*10* 16:*12*
19:5 30:*11* 32:*12* 33:*11*,
*14* 34:*16* 107:20 146:7
155:*13*
**determined** 25:22 26:5
35:2 50:8, *8* 52:22 69:25
79:4 86:5 107:*25* 121:*10*
122:7 130:2 141:*10*
142:*17*, 22 161:*15*
**determines** 38:*10*
**determining** 33:*16* 129:*15*
141:*19* 165:*18*
**devastated** 90:2
**developed** 29:*15*
**diagrams** 94:*21*
**difference** 145:*23*
**different** 13:*12* 22:22
24:2, *25* 27:7 28:*19*, 20
29:*11* 31:25 35:*16* 44:25
47:*17* 49:4 54:6 58:8
65:*18* 71:*13* 72:8 73:3, *6*,
*25*, *25* 77:8 82:*24* 85:20
97:7 100:7 101:*17*
103:*21* 105:3 110:*12*, *14*,
*15* 120:4 123:5 128:20
129:*24* 136:*15* 148:*13*
149:*18* 151:*25* 156:*16*
166:*11* 168:*13*, *14* 170:*4*,
*13*, *18*, *23* 171:*1*
**differently** 49:*12* 58:*16*
**difficult** 48:7 49:*18*
**digging** 34:*4*, *10*, *18*
**digits** 84:*20*
**direct** 13:*23*
**directed** 124:*10*
**direction** 126:*18*
**directions** 124:*16*
**directive** 30:24 34:*23*
**directives** 67:*13*
**directly** 36:9 113:*18*
145:*14*, *16*
**director** 5:20 57:*25* 58:8
60:9 66:*14* 67:4, *24* 68:7,
*25* 69:2, *5*, *9*, *11*, *13*, *18*
83:5 85:*19*, *19* 89:*14*
127:*23* 128:*3*
**directors** 85:*21*
**director's** 51:*16* 52:5
60:*12*, *13* 67:20, *21* 82:*17*
142:*15*
**disagree** 47:5 75:8 76:*15*
129:6
**disagreed** 47:2 75:*24*
101:*11* 119:*23* 128:*18*
**disagreement** 47:7

**disagrees** 56:*12*
**disappear** 35:*23* 37:*24*
**disarm** 112:*15* 134:22
**disarmed** 111:*12* 112:*4*
**discharge** 50:*16* 56:*15*
64:8
**discharges** 64:*15*
**disciplinary** 7:6, *10* 9:*11*,
*11* 10:*14* 24:*10* 30:*1*, 7,
*14*, *15*, *16*, *18* 31:2, 8, *13*
32:*1*, 8, *24* 33:*21* 36:6, *18*
40:*21* 41:7, *24*, *25* 48:*15*
51:*11*, 22 53:6 58:6
61:*25* 63:*18* 66:9, *25*, *25*
67:*7*, *16* 68:8 70:*10*
71:*18* 74:*25* 79:*10*, *18*, 20
85:*15* 92:*25* 100:5
104:*25* 117:*23* 129:*1*
173:2, 8, *15*, 22 174:5
175:*3*, 9
**discipline** 28:*25* 30:5, *9*
31:*1*, 5, 7, 9, *11*, *12*, *14*
32:3, 5, *12*, *13*, *15*, *17*, *25*
33:*1*, 2, 5, 9 34:*25* 35:*14*,
*20* 36:*1* 37:8 39:*3* 40:*17*
41:22 46:7, 8, *11*, *15*, *19*,
*20*, *24* 47:8 48:*1*, *3*, *23*
49:*21* 50:*10* 51:*7*, *15*, *17*
52:2, *3*, *15*, *17*, *20*, *23* 53:2,
*4*, 9, *15*, *22*, *23* 54:*3*, 7, *10*
55:*13*, *20*, *20*, *23*, *24* 56:*1*,
*3* 57:*12*, *20* 58:9 59:22
65:8 66:*12* 67:*19*, *19*
69:*20* 70:*11* 72:*19*, *25*
73:*4*, *16* 74:*11* 75:9, *12*,
*16* 77:*16* 80:2 84:*12*
85:*25* 89:*13*, *16* 92:*17*
93:*1*, *4*, *20* 96:20 98:*16*,
*25* 99:*10*, *11* 100:*3*, 8, *17*
101:*4* 107:*17*, *18*, *18*, *20*
108:*3* 117:*10* 118:*23*
119:*8* 120:*3*, *11* 125:7
128:*14* 136:*15* 171:*4*, 6, 9
**disciplined** 28:*17* 29:*25*
33:*4* 55:*17*, *25* 56:2
69:*25*
**disciplining** 32:2 47:*11*
**discussed** 16:*24* 64:6
125:*10* 127:2 152:8
160:*1* 161:*25*
**discusses** 103:2
**discussing** 29:9
**discussion** 9:22 17:9
28:9 33:5 45:7 80:*14*
134:*13* 171:*16*
**discussions** 17:*16* 21:*10*
43:*4*
**dishonestly** 156:*10*
**dishonesty** 156:*1*

**dispatchers** 6:2
**displays** 6:8
**disruption** 143:*25*
**distances** 77:*1*
**distributes** 102:*1*
**DISTRICT** 1:*1*, *1*
**districts** 27:7
**disturbed** 118:*5*
**DIVISION** 1:2 5:*13*, *17*
6:*19*, 20 13:8, *16* 14:*14*
15:9 16:5 24:*25* 29:2
30:2, *17* 33:*21* 34:25
35:*1*, 2 36:5 38:*10*, *12*
40:7, 9, *23* 41:6 43:*23*
44:2, *22*, *23* 45:2, *12*, *13*
46:*19*, *21* 47:*10*, *12*, 20
48:*3*, *4*, *13* 49:*23* 51:*21*
55:9 58:9 68:*18*, 20, 22
69:24 71:*10* 73:*15*, *17*
74:4, 9 84:6 85:*1*, 9, *16*
87:9, *22* 91:*21* 92:*19*
103:*15* 104:*25* 109:*12*
117:9 123:*12* 124:*25*
131:*25* 132:*4* 133:*21*
134:*3* 137:*16* 141:*10*, *13*,
*25* 149:*12*, *15*, *17*, *19*, *20*,
*24*, *25* 151:*19* 154:*4*, 6
155:*11* 157:*15* 158:*16*, 22,
*24* 166:2, *2*, 9 168:*18*, *23*
169:*3*, *14*, *18* 170:*13*, *17*
171:*3* 172:2 173:*1*, 8
174:*5*, *14* 175:*2*, 3, 9
**divisions** 153:*24*
**division's** 35:*14* 40:*11*
41:*1* 43:*25* 46:6 47:*16*
137:*19*
**document** 14:6 80:*19*, *21*
97:*10* 99:*13* 128:*11*
**documentation** 11:9
93:*12*, *13* 128:22 152:*16*
**documented** 31:*15* 50:22
98:22
**documents** 10:*10* 11:6, 8,
*15*, *17* 14:7 15:5 21:*3*
51:3, 8 70:*15* 71:*3*
**dog** 54:*21* 58:*16* 130:*23*
132:*12*, *14*, *20* 133:*10*, *11*,
*25* 134:*1*, 2, 5, 6 135:2, *10*,
*10* 136:*1*
**dogs** 96:*1* 111:2, *12*, *15*
113:2 125:6, *12*, *15*, *18*, *21*
131:*12*, *23* 132:*3*, *6*, 7, 9,
*17* 135:5, 6, 7, *13*, *14*, *16*,
*18*, *19*, *21*, *22* 136:2, *2*
**dog's** 132:*1*
**doing** 20:*13* 29:*14* 35:*23*
45:*24* 55:*14* 56:24 73:7,
*12*, *13* 91:*20* 127:9 135:8
139:*9*, *11*, *15*

**door** 88:9 95:*25* 96:*1*, 2
108:*15*, *19* 118:*1*, *4*, *24*
120:*8*, *14* 121:22 122:*15*
123:*1*, 2 154:*23*, *24* 156:*19*
**doorway** 120:*11* 134:*17*
**drive** 143:*15* 148:*19*
**driver** 88:9 119:*17*
**driver's** 46:*12*, *13*, *15*
88:7, 9
**driveway** 118:*4*
**driving** 55:*1* 119:*18*
120:22
**drop** 53:*24*
**dropped** 27:*13*
**drunk** 119:*17*
**due** 15:*4* 92:*21* 149:*4*
**duly** 5:*4* 176:5, 7
**duty** 86:*11* 146:2, *4*, 9, *12*,
*13*, *15*, *21* 164:*1*
**dynamics** 76:*24*

**< E >**
**earlier** 42:*10* 98:*20*
123:*11* 125:7
**earliest** 101:*13*
**early** 6:2 16:*15*, *19* 17:*10*
28:*15* 76:*14* 83:*15*
137:*17*
**EARS** 17:*23* 18:5, *19*
19:*14*, 22 20:7, *16*, *18*, 22,
*25* 21:*4*, *15* 22:*14* 23:*3*
24:*4*, *13* 25:5, *18*, *21* 27:*4*,
*9*, *11*, *11*, *14*, *23* 28:2, *25*
29:*14* 41:*19*, *20*, *23* 42:*15*,
*16* 155:5
**East** 2:9 25:2 54:*19*
**EASTERN** 1:2
**easy** 142:*6*
**edit** 53:*11*
**edits** 59:*11*
**EDMUND** 1:2
**education** 103:*10*
**effective** 19:*16* 28:2
**effectively** 86:9
**effort** 15:8 113:*17*
**egregious** 83:*17*, *24* 84:5
86:*17* 156:*12*
**eight** 154:*19*, *25*
**either** 21:*11* 34:*17*, *22*
46:24 60:*3* 77:*14*, *23*
85:8 88:5 89:8 93:*17*
105:*19* 111:*12* 118:*10*
123:6 127:6 141:*18*
162:*18*
**election** 27:2
**ELIZABETH** 1:2, *16*
**else's** 61:7
**e-mail** 13:5, 7
**e-mails** 152:*20*

Deposition of Chief Kimberly Jacobs      Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

**employed** 48:*13*
**employee** 90:*5* 176:*20, 22*
**employment** 16:*10*
**encompasses** 11:*2*
**encounter** 164:*24* 165:*3*
**encouraged** 43:*15, 18, 23*
45:*23*
**encouragement** 45:*18*
72:*21*
**ended** 82:*17* 125:*22*
151:*2*
**ends** 35:*24* 118:*17*
**enforcement** 168:*10*
170:*21*
**engage** 148:*18*
**ENGLAND** 1:*20* 10:*1*
13:*18* 76:*1* 79:*11* 90:*21*
91:*4, 25* 93:*13* 94:*3*
99:*14, 21* 111:*21* 112:*2,*
*14, 19* 113:*23* 122:*1*
123:*15* 124:*8, 14* 130:*5,*
*10* 131:*6* 134:*22, 24*
135:*3, 5, 10, 22, 24* 136:*1,*
*4* 171:*20, 23* 172:*5, 16*
173:*5, 13*
**England's** 131:*15*
**enjoying** 153:*20*
**enormously** 38:*19*
**ensure** 11:*8, 17* 25:*10*
53:*6* 89:*23* 124:*25*
**ensured** 91:*14*
**enthusiasm** 117:*10*
**entire** 24:*7* 39:*19* 58:*6*
93:*17, 22* 119:*7* 159:*19*
**entity** 149:*17*
**entry** 128:*13*
**equal** 71:*14*
**equipment** 64:*10*
**erased** 71:*11*
**especially** 138:*7* 139:*17*
**Esq** 3:*3, 4, 12, 20*
**ESTATE** 1:*2, 13*
**et** 1:*2, 17, 23* 39:*14*
**evaluated** 155:*11*
**evaluation** 146:*12, 13, 21*
**event** 153:*19*
**events** 5:*21* 6:*15* 7:*4* 9:*8*
11:*1* 114:*18* 131:*15*
**eventually** 75:*19*
**Everybody** 75:*14* 89:*3*
119:*23* 153:*9*
**everybody's** 140:*24*
**evidence** 48:*7* 49:*2, 4, 9*
87:*5, 10, 13, 17* 93:*16*
131:*7* 135:*9, 12*
**evolved** 20:*10*
**Exactly** 55:*11* 100:*21*
126:*8* 171:*9*
**exam** 85:*4* 146:*4*

**examination** 85:*8* 146:*2, 9*
147:*10*
**examinations** 147:*8*
**example** 25:*12* 27:*8* 42:*6,*
*9* 125:*9* 133:*8*
**examples** 17:*5* 35:*19*
37:*11* 145:*17* 174:*17*
**exams** 147:*6*
**excellent** 47:*22, 23*
**excessive** 166:*10, 11, 13,*
*20* 167:*15, 18*
**excuse** 5:*16* 113:*12*
**executive** 5:*20* 28:*9* 92:*7,*
*12* 170:*11* 171:*2*
**Exhibit** 4:*7, 8, 9, 10* 97:*11,*
*14* 99:*15, 17* 106:*5, 7, 8,*
*10* 128:*8* 158:*5*
**exhibited** 149:*1*
**EXHIBITS** 4:*6*
**exist** 174:*21*
**existing** 42:*13*
**exit** 119:*17, 18*
**exonerated** 26:*1, 2, 5, 11,*
*13*
**expect** 173:*20* 174:*3, 25*
175:*6, 13*
**expectation** 175:*16*
**expectations** 64:*4*
**expected** 61:*11* 63:*24*
98:*2*
**experience** 11:*3* 35:*12*
40:*8, 9* 47:*18* 103:*8, 9*
114:*9*
**experiencing** 77:*11* 146:*25*
**expert** 133:*3*
**expires** 177:*13*
**explain** 21:*16* 23:*1, 2*
49:*3* 58:*25* 77:*2* 78:*18*
113:*24* 114:*18* 115:*12*
128:*19* 144:*7*
**explained** 110:*13* 111:*4*
**explanation** 111:*24* 119:*25*
**expressed** 152:*3, 9, 13*
153:*18*
**extended** 37:*4, 5*
**extent** 17:*12*
**extra** 8:*3*
**extremely** 29:*11* 47:*19*
66:*3* 76:*25* 85:*17* 87:*1*
116:*14* 139:*1* 142:*25*
156:*11*
**eye** 125:*23*
**eyes** 91:*13*

**< F >**
**face** 143:*13, 17* 144:*14*
145:*8*
**face-to-face** 65:*22* 76:*23*
**facing** 111:*9*

**fact** 15:*5* 17:*6* 86:*4*
95:*20* 108:*3* 121:*6*
131:*11* 134:*21* 139:*4*
145:*19*
**factor** 48:*14, 15* 78:*24*
107:*16* 108:*4* 110:*2*
133:*8* 141:*19* 160:*23*
165:*17, 20*
**factors** 29:*20* 48:*25*
129:*4, 12, 14, 21, 22, 24*
**facts** 24:*18* 33:*10* 34:*19*
73:*9* 74:*19* 132:*21, 23, 25*
133:*7* 161:*16* 165:*22*
**fading** 100:*13*
**failed** 55:*3*
**fails** 47:*24*
**fair** 12:*16* 27:*3* 84:*15*
157:*22* 163:*1* 174:*25*
**fairly** 35:*18* 76:*4*
**fairness** 34:*14* 71:*22*
**fall** 42:*3* 121:*2*
**fallen** 54:*9*
**falling** 42:*15* 134:*17*
**falls** 41:*22*
**false** 87:*15*
**family** 104:*2*
**far** 64:*17* 71:*14, 18* 90:*4*
101:*12* 122:*3* 130:*15*
133:*2* 148:*14* 161:*16*
162:*19* 168:*15*
**fast** 144:*19, 24*
**fear** 77:*10* 109:*13, 17, 19*
111:*15, 17* 114:*24* 115:*19,*
*24* 122:*22* 123:*11* 126:*7*
132:*3, 6, 6, 12, 17, 20*
133:*10, 24, 25* 134:*5, 16,*
*21* 135:*1, 20, 25*
**February** 5:*16* 41:*15, 16,*
*17* 42:*2*
**feel** 9:*15* 10:*22* 22:*23*
46:*4* 77:*13* 150:*22*
156:*22* 165:*15*
**feeling** 150:*21*
**feelings** 143:*7*
**feels** 60:*1* 162:*14*
**feet** 123:*6*
**Fegurson** 116:*17*
**fell** 23:*18, 21* 42:*2* 130:*22*
**felons** 154:*14*
**felony** 118:*5*
**felt** 22:*7* 34:*7* 50:*5* 66:*2*
78:*17* 96:*3* 110:*13* 111:*6*
113:*22* 114:*6* 128:*18*
138:*9* 140:*24* 148:*4*
160:*10*
**field** 133:*2*
**figure** 51:*4* 70:*23* 171:*13*
**file** 92:*9* 151:*10, 11*
**filed** 13:*6* 14:*1, 19, 23*
15:*17, 21* 16:*11* 17:*6*

83:*3* 88:*24* 93:*19, 23*
150:*25* 151:*7* 158:*10*
**final** 63:*8* 66:*11* 68:*11,*
*13* 69:*19* 79:*4* 163:*24*
164:*1*
**financial** 5:*22*
**financially** 176:*24*
**find** 25:*5, 18* 52:*23* 79:*17*
108:*5* 110:*18* 119:*11*
129:*7* 130:*13* 137:*5*
172:*21*
**finding** 32:*15, 16* 33:*17*
59:*16* 66:*9* 67:*1, 16, 17,*
*18* 68:*8* 74:*25* 75:*10, 11,*
*13, 14, 22* 76:*16* 78:*25*
79:*10, 11, 19* 90:*12* 97:*6*
98:*3* 119:*14* 126:*23*
159:*24* 166:*4, 5* 172:*5*
**findings** 9:*7* 33:*22* 60:*19*
75:*15* 82:*13* 86:*13* 94:*13*
95:*4* 128:*12, 23* 136:*8*
159:*15* 163:*14* 164:*5*
173:*13*
**finds** 56:*12*
**fine** 25:*5* 97:*21* 145:*23*
**finished** 62:*6*
**fire** 114:*13, 15*
**Firearm** 9:*9* 57:*2, 3*
58:*14, 15* 59:*1* 79:*16*
98:*23*
**Firearms** 62:*10, 12, 19, 20,*
*25* 63:*6, 14* 66:*1* 92:*4*
102:*2* 109:*2* 119:*16*
125:*20* 160:*3*
**firearm's** 119:*22*
**fired** 50:*6, 17* 54:*24*
71:*21* 72:*3* 73:*10* 77:*20*
89:*7* 107:*2* 123:*10*
166:*22*
**firing** 64:*7* 123:*8* 161:*19*
**firm** 177:*1*
**first** 5:*4* 12:*23* 29:*1*
34:*11* 39:*21* 58:*12* 80:*23*
81:*5* 84:*20* 90:*8, 22* 91:*6*
92:*1* 101:*24* 102:*16*
103:*12* 105:*3* 115:*2, 25*
136:*25* 149:*7, 10* 154:*23*
159:*3* 162:*3* 166:*15*
167:*3* 176:*7*
**fitness** 146:*2, 4, 9, 12, 13,*
*15, 21*
**five** 22:*3* 23:*7, 18, 19, 20*
25:*15* 34:*7* 55:*2* 75:*6*
108:*8* 117:*11*
**flagged** 16:*9* 20:*6, 25*
21:*7*
**flashbacks** 143:*16*
**flashlight** 89:*8*
**flew** 170:*8*

Case: 2:18-cv-01060-EAS-EPD Doc #: 141-12 Filed: 03/24/21 Page: 185 of 197 PAGEID #: 4531

Deposition of Chief Kimberly Jacobs    Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

**Floyd** 141:*17*
**focus** 69:*22*
**focussed** 16:*20*
**follow** 93:*2, 18* 146:*16*
169:*11*
**followed** 140:*1* 166:*25*
**follows** 5:*5*
**follow-up** 124:*23*
**foods** 6:*1*
**foot** 77:*22* 112:*10*
**footing** 121:*7, 17* 122:*16*
123:*3*
**FOP** 26:2 35:*3, 4, 6*
36:*17* 38:*8, 12* 39:*18, 21,*
*23* 40:*10* 46:*5* 71:*11*
81:*4, 18* 83:*3* 89:*3, 5*
91:*19* 96:*11* 136:*11, 12,*
*13, 17, 18* 140:*18* 141:22
142:*15* 150:*17* 151:*9*
152:*18*
**force** 9:*8* 11:*1* 15:*19, 20*
16:*16* 17:*1* 19:*4* 20:*10,*
*14* 22:*12* 25:*1, 3, 3, 16*
41:*2* 47:*18* 49:*22* 50:*25*
51:*1* 54:*15* 55:*18* 56:25
57:*16, 17* 58:*11, 12* 61:*18,*
*22* 63:*7, 16, 20, 25* 64:*19*
65:*7* 66:*7* 69:*17* 70:*1*
72:*7* 74:*18, 24* 75:*3, 21*
87:*23* 88:*19* 89:*23* 90:23
92:*2* 98:*11, 19* 108:20
109:*7, 11* 111:*10* 115:*1, 6,*
*20, 23* 116:*16, 20, 22*
118:*10, 20* 119:*11, 12*
120:*7* 122:*21* 123:*14*
129:*18, 19, 20* 131:*4, 9, 24*
132:*5* 134:*19, 24* 135:*3,*
*24* 136:*4* 140:*11* 141:*15*
142:*24* 148:*8, 24* 149:*2*
153:*8, 10* 154:*6, 19* 155:*9,*
*12, 14, 22* 156:*5* 158:*19*
161:*8* 171:*4, 6, 10* 172:*3,*
*8, 13, 18*
**foregoing** 176:*12, 17*
**forfeiture** 60:*10* 68:*1, 5,*
*14, 23* 69:*1, 3, 7, 8, 10* 80:9
**forget** 170:*19*
**forgot** 7:*15* 62:*7*
**forgotten** 15:*23* 47:*19*
**form** 31:25 97:*25* 101:*15*
173:*24*
**formal** 43:*6* 66:*13* 105:6
146:*15*
**formation** 21:*15*
**former** 108:*25*
**Fortunately** 92:*22*
**Forum** 170:*12* 171:*2*
**forward** 83:*7* 102:*13*
148:*6*
**forwarded** 102:*10*

**found** 8:*2, 13* 25:*11, 16*
28:*15* 34:*18* 37:*15, 21*
50:*25* 55:*24* 60:*1* 61:*14*
64:*25* 68:*3* 69:*16* 75:*24*
76:*7, 8* 80:*2* 83:*12* 87:*9,*
*22* 99:*5* 107:*23* 109:*2*
111:*24* 128:*1* 130:*14, 25*
138:*20* 139:*4* 154:*9*
159:*21* 164:*20* 166:*3*
**Foundation** 5:*21, 21, 25*
6:*12*
**four** 22:*6* 23:*22* 31:22
38:*3* 55:*2* 84:*20* 149:*4*
154:*3, 5* 166:*17* 170:*3*
**FRB** 62:*5* 94:*12* 97:*18*
163:*16, 22*
**free** 85:*6*
**freeway** 119:*1*
**fresh** 91:*13*
**Friday** 12:*12*
**Friedman** 3:*5*
**friend** 104:*2*
**Front** 3:*22* 70:*5* 88:*13*
120:*24* 121:*3*
**full** 5:*9*
**funding** 5:*23*
**funds** 6:*1*
**further** 71:*18* 176:*16, 20*
**future** 28:*16* 30:*5* 83:*13*
89:*22* 125:*2* 157:*1*

**< G >**
**gaining** 61:*7*
**Gardner** 100:*25* 101:*6, 9*
102:*6, 12*
**gather** 12:*3* 83:*3*
**gathered** 10:22
**Gelsomino** 3:*3* 4:*4* 5:8
8:*13, 20, 24, 25* 17:*19*
32:*4, 10* 45:*4, 9* 80:*11, 16,*
*17* 97:*16* 99:*19* 101:*18,*
*20* 106:*12* 113:*4* 115:*17*
117:*19, 21* 124:*5* 128:*10*
132:*18, 22* 133:*6, 9, 15, 20*
134:*10, 15* 143:*24* 144:*6,*
*13, 21, 25* 150:*3, 10*
157:*20, 23* 165:*16* 169:22
171:*12, 18* 172:*14, 23*
173:*19* 174:*1, 2* 175:*19*
**general** 13:*24* 24:*5*
140:*10* 159:*2, 4, 12* 166:*2*
**generalization** 149:22
**generalize** 168:*11*
**generally** 14:*20* 15:*2*
19:*12* 21:*18* 29:*15* 30:*21*
33:*12* 37:*24* 46:*25* 48:*6,*
*9* 52:*24* 58:*16* 65:*22*
68:*9* 96:*9, 10* 132:*17*
136:*10* 147:*2* 154:*24*

**168:9**
**GEORGE** 1:*15*
**German** 135:*14*
**getting** 21:25 44:*3* 48:*10*
52:*10* 65:*4* 118:*10*
150:*24* 151:*1*
**Gilbert** 3:*5*
**girls** 6:*9*
**give** 8:*3, 9* 25:*12* 27:*21*
35:*19* 38:*16* 50:*18* 55:25
56:*16, 20* 59:*3* 63:*21, 22*
69:*9* 72:*6, 17* 73:*3, 4*
93:*17* 103:*6* 114:*17*
115:*11* 126:*18* 132:*4*
139:*5, 21* 142:*10* 152:*15*
174:*17*
**given** 64:*18* 87:*15* 103:6
124:*17* 125:*19* 145:*18*
148:*7* 152:*4* 164:*14*
175:*8* 176:*10, 13*
**gives** 34:2
**giving** 39:*1, 23* 85:*5*
133:*17* 145:*17*
**go** 6:*6* 9:*1* 27:*3, 17*
38:*23* 41:*9* 44:*15* 45:*4*
52:*7* 55:*21, 23* 68:2
70:*18* 74:*6, 7* 80:*11* 91:*3,*
*8, 93:18* 101:*9* 106:*13*
112:*20* 115:*13* 116:*16*
118:*1* 119:*3* 120:*8*
121:*21* 124:*2* 127:*7*
130:*11* 133:*5, 15* 137:2
142:*22* 143:*6* 146:8
150:*7* 161:*21* 162:*8, 14,*
*17* 172:*9, 19* 173:*16*
**goal** 7:*19* 47:23
**goes** 7:*22* 48:*18* 59:24
60:*9, 13* 61:*24* 62:*2, 12,*
*16* 67:*21, 24* 68:*24* 69:*2,*
*5* 102:*9* 148:*13* 161:*1*
**going** 6:*24* 7:*2* 9:*19*
13:*14* 17:*20* 20:*20, 21, 23,*
*24* 23:*5* 24:*17, 22* 30:*21*
31:*24* 33:*12* 37:*24* 40:*1*
43:*1* 44:*18* 48:*11* 52:*24*
58:*25* 59:*19* 61:*9* 64:*8*
65:*12* 66:*4* 75:*18* 78:*4*
83:*6* 90:*20* 92:*14* 97:*10*
99:*13* 101:*14* 105:*2, 16*
106:*5, 6, 8, 13* 114:*11*
117:*20* 120:*10, 19* 121:*23*
128:*5* 133:*1, 4* 135:*4*
138:*3* 139:*10, 10, 12*
143:*11* 144:*11, 12, 13*
145:*19* 147:*2* 148:*11*
150:*25* 151:*2* 152:22
153:*14* 154:*12, 14, 23, 25,*
*25* 161:*2, 21* 162:*2* 171:*12*
**Good** 5:*9* 20:*8* 23:*9*
39:*9* 43:*21* 45:*21, 22*

**47:*13, 13* 59:*10* 71:25**
74:*14* 84:*2* 96:*16* 111:*24*
112:*11* 116:*17, 21, 25*
118:*11, 15, 18* 120:*18*
130:*17* 140:25
**Gorge** 141:*17*
**gotten** 13:*5* 70:*17* 92:*5*
130:*21*
**Governor** 169:*8*
**grab** 120:*15*
**grabbed** 110:*25*
**grace** 8:*3*
**Grady** 83:22
**Graham** 174:*20*
**Grand** 61:*10, 14, 14*
105:*19* 139:*24*
**grasp** 77:*4*
**great** 72:*13* 83:*25* 109:*13,*
*18* 110:*10* 111:*9*
**greatly** 102:*22* 103:*11*
**Greene** 3:*4*
**grew** 96:*15* 153:*20*
**grievance** 53:*9* 70:*12*
83:*4* 92:*17* 96:*20* 150:*25*
151:*11* 153:*12*
**grievances** 151:*7*
**grieved** 142:*2* 153:*11*
**grieving** 151:*6*
**Griffis** 95:*11* 100:*4, 6, 11,*
*16, 19* 101:*10* 102:*7, 7, 8,*
*10, 16, 19* 104:*13*
**groin** 25:*13* 42:*9*
**ground** 19:*13* 88:*12, 17*
121:*8, 19* 122:*16* 153:*9*
**group** 23:*10, 18, 19, 24*
24:*21* 44:*6, 16* 88:*14*
**groups** 43:25 44:*2*
**growing** 138:*22* 139:*18*
**guess** 32:*11* 33:*7* 58:*5*
97:*19* 106:*23* 145:*8*
165:22
**guidance** 168:*18* 169:*3, 6,*
*14* 170:*5, 5*
**guide** 39:*8*
**guilt** 30:*11* 33:*14, 16*
**guilty** 33:*6* 37:*21* 60:*1*
93:*1* 107:*24*
**gun** 108:*22* 123:*8* 138:*7,*
*8, 20, 21, 21, 23, 24* 139:*2,*
*3, 4* 148:*23* 164:*19* 165:*6,*
*9*
**gung-ho** 143:*5*
**guns** 117:*1* 138:22
**guy** 108:*22* 110:*24* 120:*9,*
*23*
**guys** 28:*24* 106:*25* 154:25

**< H >**
**half** 118:*14, 14*

Deposition of Chief Kimberly Jacobs    Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

**Halloran** 9:23
**hallway** 120:12
**hand** 30:8 97:8 120:25 130:21 177:4
**handcuff** 26:12 131:2
**handcuffed** 26:8 95:21 111:21 112:3, 7, 8, 10 130:10, 15, 16, 17, 18
**handcuffing** 95:22
**handcuffs** 130:25
**handgun** 120:24
**handle** 15:3 142:25
**handled** 14:16 28:24 35:15 145:24
**happen** 18:8 24:14 43:6 56:1 73:23 94:4 96:5 124:9 136:12 139:19 146:18 147:17 161:19
**happened** 19:17 27:9 31:6 41:11 49:10, 16, 18 50:4 52:4, 11 54:14 55:4, 22 57:23 65:3 72:1 74:1 76:5 82:21 85:11, 24 86:10 87:12, 16 90:2 123:4 124:10 130:22, 25 136:14 137:1, 6, 14 145:11 147:25 151:12, 25 153:5 155:17
**happening** 19:12 41:19 105:16 121:3 155:5, 19
**happens** 24:12 25:15 40:3 47:3 56:11 63:17 116:24 139:9, 15
**happy** 151:15, 21 153:13
**hard** 23:2 40:24 43:21 46:20 91:1 95:24 120:18 143:6 144:23 168:11
**harder** 109:21
**harm** 47:16 58:17 77:10 109:13, 18 110:10 111:9 114:25 133:10 134:1 135:2, 21, 22, 25 136:2 161:22
**harmed** 46:19, 21
**hat** 42:1 144:9
**hate** 145:19
**haves** 108:23
**head** 37:1 57:7, 13 88:15
**head-on** 143:13, 15 145:9
**heads-up** 92:5
**health** 147:12 148:3
**hear** 63:4 96:17, 19 114:10 135:17
**heard** 12:1 40:25 87:17 88:22 95:14 110:12, 16, 18 130:1 135:17 139:19 144:17
**hearing** 9:25 10:14 50:9 52:24 53:2, 8, 18 60:5 65:9, 14, 16, 18, 19 66:7

76:8, 19, 22 77:2 80:1 89:2, 4 93:21, 24 94:14 95:5, 13 96:5 97:7 98:4 99:6, 11, 23 105:25 107:20 109:16 110:8, 18 114:23 115:16 117:23, 24 122:10 124:18 126:12, 25 127:4, 11, 19 129:10 137:4
**hearings** 96:14
**heat** 106:25
**He'd** 140:21
**held** 45:7 72:9 80:14 90:17, 18 134:13 171:16
**help** 5:22 33:13
**helpful** 39:15
**helping** 29:5 143:7
**hereinafter** 5:5
**HEREOF** 177:4
**hereunto** 177:4
**hiding** 71:7
**high** 29:11 61:12 118:25 154:13
**highest** 152:5
**highly** 148:15 151:3
**hired** 170:12
**hiring** 155:25 156:21
**history** 30:11, 14 39:13, 13 41:2 87:11 148:7
**hit** 19:10 25:13
**hitting** 125:22
**hold** 37:14 60:5
**holding** 165:6, 9
**holds** 47:20
**Holocaust** 5:24
**home** 8:5 156:19
**honesty** 156:21 157:2
**hope** 42:4
**hopefully** 145:20
**hour** 89:10 116:18 117:5
**hours** 50:21, 22, 23 60:11, 13 66:9 67:22 68:1, 5, 14, 23 69:1, 3, 10 153:15
**house** 12:10, 10 109:1 112:25
**HR** 53:22
**huge** 21:19, 23
**human** 52:18
**hundreds** 103:14 116:25
**hurt** 41:1, 5 48:21 110:6
**hurts** 48:19
**hypothetical** 165:14
**hypotheticals** 133:3

**< I >**
**IA** 99:5 104:1
**IACP** 168:9, 17
**IACPs** 168:15
**idea** 28:8 140:25 151:22
**ideas** 28:6, 20

**identified** 19:8, 22, 24 42:13
**identify** 21:6, 7, 8 40:11
**identifying** 35:13
**imagine** 33:16 35:11 95:24 152:8, 19
**Immediate** 102:21, 22 103:2, 16
**imminent** 109:13, 18 110:9 111:8 119:3, 6, 24
**impact** 28:18, 24 36:2, 4 46:6 47:15 48:24 66:22 73:19 85:15 86:6 118:19 131:3, 8 132:23 144:15 145:12 156:3, 8 165:11
**impacted** 38:3 66:23 84:3 86:8 107:16 108:4 129:5 131:10 173:13 175:12, 13
**impacting** 85:23
**impacts** 35:4 40:22 48:23 72:10
**impeded** 40:10, 13
**implement** 29:17
**implemented** 18:19 20:6 22:9, 10 36:21 47:21 93:9
**implementing** 170:16
**implicit** 103:21
**implies** 166:11
**important** 18:17 19:1 21:14 22:7 30:5 47:12, 19 66:3 76:24, 25 77:3 83:10 87:1 103:5 105:8, 11 113:23 116:14, 23 128:19 139:1, 9, 17, 21 141:14, 16 165:17
**improved** 20:12
**in-and-out** 8:2
**inappropriate** 113:19
**incident** 31:10 73:9 93:16 104:4, 6, 11, 12, 14 119:22 125:13
**incidents** 145:6, 23
**include** 17:10 28:4, 5 52:21, 22
**included** 17:8 78:9, 11 81:11
**includes** 33:17
**including** 49:1 135:11
**incorporated** 16:25 20:13 29:25 30:3
**increased** 122:13
**indefinitely** 37:23
**independent** 104:22, 24 105:9, 22
**in-depth** 78:17
**INDEX** 4:1
**indicate** 126:22

**indicated** 28:21 83:15 101:10 113:6 145:22
**indicating** 158:24
**indication** 112:14 154:10
**indicative** 94:7
**indicator** 156:24
**individual** 18:24 21:1, 11 42:21
**individually** 62:14 88:21
**individuals** 22:1 37:14
**influence** 48:25
**influx** 21:24
**inform** 136:12, 17
**informal** 6:22 43:1, 7 44:3
**Informally** 38:6 44:20 81:1
**information** 10:23 11:2, 22 12:4 18:13 29:4, 8, 9, 21 30:4, 8 43:12, 19 44:17 45:13, 24 52:1 70:24, 25 71:4, 16 76:18 77:14, 17 78:7, 8, 19 82:24 83:2 85:3 93:5, 19 94:22 95:20 96:3, 17 123:25 124:11 128:25 129:9 138:7, 14, 15, 17 139:5, 6, 7, 22, 25 150:24 155:3 156:2 158:18, 25 159:13 162:18 164:14, 16 165:10 170:18 175:8
**informed** 61:2 147:24
**informing** 136:7
**infrequent** 17:3
**initially** 153:14 155:24
**injured** 111:3, 14 132:7 145:2, 10
**injuring** 112:13
**injury** 133:24
**innocence** 30:11
**innocent** 118:18
**in-policy** 59:7 63:1, 1, 9 167:19
**input** 14:20 137:23 164:10
**inservice** 174:16
**inside** 50:18
**instance** 44:9
**instances** 42:19 51:23 53:3
**instructions** 12:2
**integrity** 117:10
**intend** 58:17
**intensive** 29:12
**intention** 65:12
**Intentional** 64:15 65:10 66:8 75:22 98:12
**intentionally** 120:25 138:24

Case: 2:18-cv-01060-EAS-EPD Doc #: 141-12 Filed: 03/24/21 Page: 187 of 197 PAGEID #: 4533

Deposition of Chief Kimberly Jacobs     Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

interact 6:*10*
interaction 122:*1* 164:*23*
interactive 6:*8*
interest 56:*17* 142:*10*
interested 47:*10* 176:*24*
interests 141:*25*
internal 14:*24* 16:*5* 18:*9, 13* 21:*20* 22:*16* 24:*5* 27:*20* 30:*24* 34:*23* 53:*16* 96:*23* 170:*14* 171:*7, 9*
Internally 28:*3* 86:*10*
International 168:*3, 6, 12*
Internet 8:*1* 143:*22* 145:*19*
interpret 172:*1, 7*
interpretation 172:*25* 173:*4, 7* 174:*7, 14, 15, 19, 24*
interpretations 174:*23*
interrogate 115:*24*
interruption 67:*11*
interventions 153:*7*
interview 113:*17* 147:*12*
interviewed 139:*24* 146:*7*
interviews 113:*15*
intra-divisional 97:*17*
intranet 51:*17, 20* 52:*20* 53:*10* 70:*12* 128:*14*
investigate 104:*1* 158:*7, 11, 13*
investigated 15:*19* 24:*6, 16* 58:*16, 19* 88:*21* 138:*12, 18* 139:*23* 154:*9* 157:*8*
investigation 15:*14, 15* 16:*1* 24:*18* 32:*15* 33:*9* 35:*24, 25* 37:*7, 10* 38:*24* 50:*7* 58:*13, 18, 23* 59:*4, 4, 6, 7, 10, 12, 15* 60:*22, 24* 61:*1, 4, 9, 19* 62:*1, 6, 11, 14* 73:*4* 78:*12, 14* 81:*10, 17* 83:*14* 84:*21* 85:*11, 12* 86:*10* 87:*20* 88:*19, 23* 90:*10* 91:*16* 93:*4, 22* 94:*1, 15, 18* 97:*8* 99:*20* 102:*2, 14* 103:*13* 104:*8, 9, 12, 17* 105:*5* 113:*20, 22* 114:*7, 22* 116:*2, 4* 139:*11, 20* 141:*2* 150:*23* 157:*9* 159:*18, 19* 163:*4, 9, 11*
investigations 9:*7* 15:*16* 16:*20* 18:*21* 21:*8, 9* 22:*8, 12* 23:*13* 24:*21* 34:*23* 38:*18* 48:*10* 52:*9* 58:*23* 76:*25* 91:*11* 92:*16* 127:*7* 129:*18* 154:*8* 156:*9*
investigative 59:*12* 97:*4* 131:*22*
investigator 96:*25* 104:*1*

investigators 38:*20* 39:*1* 77:*4*
invite 96:*19*
involve 20:*14*
Involved 9:*9* 15:*22* 33:*13* 34:*1* 54:*18* 57:*11* 65:*20* 76:*2* 88:*3* 90:*22, 25* 91:*11, 21* 103:*12* 104:*4* 113:*20* 114:*14, 21* 116:*6* 129:*17* 140:*21, 21, 23* 141:*7* 142:*24* 143:*2, 13* 146:*11, 24* 148:*16* 151:*9* 159:*1, 8* 161:*6, 14* 167:*7*
involvement 13:*10* 85:*22* 91:*10* 92:*1, 3, 8* 161:*23* 163:*3* 165:*23*
involving 9:*8* 107:*8*
isolate 133:*23*
issue 19:*7, 21* 27:*22* 58:*4*
issued 53:*23* 99:*10, 11* 120:*2*
issues 7:*1* 8:*10* 19:*23* 20:*1, 6, 25* 28:*6* 36:*14, 14* 146:*25* 147:*1*
issuing 98:*25*
iteration 17:*23*
iterations 54:*6*

< J >
Jackson 120:*1*
JACOBS 2:*3* 4:*3* 5:*3, 7, 11* 176:*7*
Jacqueline 3:*4*
jail 72:*14, 22*
JAMES 1:*20* 13:*18* 90:*21* 91:*4, 25* 93:*13* 94:*3* 99:*14, 21* 122:*1* 123:*14* 124:*8, 14*
January 102:*12*
Jgreene@f-glaw.com 3:*9*
job 47:*15* 72:*4, 6, 11* 86:*6* 89:*15* 91:*16* 92:*23, 25* 96:*15* 143:*6* 151:*3* 153:*21* 160:*17*
jobs 46:*23*
John 57:*3*
JOLSON 1:*23*
Jonathan 54:*20*
JR 1:*2*
JUDGE 1:*2, 2, 15, 16, 21, 22* 77:*6* 133:*18*
judged 74:*18*
judging 116:*11* 117:*24*
jump 74:*22*
jumped 7:*14*
jurisdiction 112:*7*
Jury 61:*10, 14, 15* 105:*19, 19* 139:*25*

justification 115:*6, 19* 119:*11* 122:*20* 132:*4, 6, 13, 24* 134:*6*
justified 134:*18, 24* 135:*3* 136:*3* 141:*10, 12* 148:*22* 156:*5* 165:*12*
justify 120:*6* 131:*24* 132:*20* 133:*11* 134:*1* 135:*23* 142:*8*

< K >
Kasich 169:*8*
keep 20:*13* 37:*20* 38:*1* 41:*10* 42:*25* 61:*12* 71:*6* 89:*15* 106:*8* 133:*3* 145:*20*
keeping 36:*14* 44:*24*
Ken 126:*22*
kept 34:*11* 51:*10, 14* 55:*2* 70:*11* 97:*8*
kick 57:*7* 88:*23, 25* 156:*23*
kicked 88:*15* 112:*9*
kicking 57:*13*
kids 6:*6, 9*
killed 13:*20* 112:*6* 140:*7* 141:*18* 157:*6*
killing 112:*13*
Kim 9:*3* 32:*11*
KIMBERLY 1:*22* 2:*3* 4:*3* 5:*3, 7, 11* 176:*7*
kind 6:*14, 18* 7:*1, 14* 14:*24* 15:*8, 25* 16:*9* 17:*15* 20:*15* 21:*23* 25:*7* 28:*1* 42:*12* 43:*18* 44:*1, 4* 46:*1, 5* 51:*8* 55:*8, 9* 61:*11* 74:*10* 78:*3, 23* 89:*19* 96:*23* 102:*13* 103:*1, 24* 104:*24* 105:*8* 117:*13* 118:*15* 129:*2* 146:*21* 153:*6* 169:*5*
kinds 29:*6* 36:*4* 42:*4* 44:*13* 67:*12* 71:*7* 153:*16*
KING 1:*2, 2* 13:*19* 136:*21* 157:*5* 159:*16* 161:*24*
kiosk 6:*8*
K-Mart 76:*5*
kneed 19:*14* 25:*13, 14* 42:*9*
kneeing 42:*8*
knew 108:*11* 151:*4*
knife 120:*10*
Knight 4:*8* 97:*18* 98:*10* 99:*15, 17* 100:*25* 102:*6, 9, 11*
Knight's 95:*8*
knock 120:*8*
knocked 111:*3, 13, 17*

156:*19*
knocking 77:*24*
know 6:*11* 7:*16* 9:*18* 12:*21, 25* 13:*9* 14:*5* 15:*5, 22* 20:*17* 22:*20* 26:*4* 27:*24* 28:*5, 22* 30:*23* 31:*2, 4* 32:*6* 34:*5* 36:*3, 3, 25* 37:*11, 16, 19* 38:*7, 23* 39:*5, 7, 8, 8, 11, 12* 40:*15, 19, 24* 43:*2, 2, 22, 25* 45:*20* 46:*9* 48:*9, 11* 51:*6, 24* 53:*20* 54:*5* 56:*22* 57:*24* 60:*15* 63:*24* 64:*17, 23* 65:*2* 67:*5, 7* 69:*12, 23* 70:*4, 16* 71:*13, 16* 74:*18, 21* 76:*1, 13* 77:*25* 80:*22* 81:*21* 82:*2, 23, 25* 83:*5, 23, 24* 84:*11, 18, 25* 85:*5* 86:*25* 87:*2* 88:*2* 90:*5, 6* 94:*5* 97:*4, 5, 20* 100:*21* 101:*18* 103:*5, 24, 24* 106:*23* 108:*23* 110:*5* 111:*3* 113:*1, 6, 9, 11, 14* 114:*9* 115:*21* 118:*2* 119:*4* 122:*2, 16* 123:*4, 10, 17* 127:*21, 21* 129:*2, 11, 23, 25* 130:*9, 11, 12, 13* 132:*9* 135:*12, 13, 14* 136:*11* 138:*21* 139:*7, 10, 12, 25* 140:*9* 141:*3, 6* 142:*16, 25* 143:*11* 144:*8, 16* 145:*5* 148:*12* 149:*9, 10, 18, 19* 150:*13* 151:*15, 17* 152:*7* 153:*4, 9, 12* 154:*1, 11* 155:*20* 156:*18* 157:*10, 15* 158:*5, 9, 10* 159:*7* 160:*1, 1* 164:*6, 25* 165:*9, 21* 166:*11, 13* 167:*1*
knowing 102:*25* 130:*5* 133:*17* 138:*8* 145:*7* 156:*3, 6* 165:*11*
knowledge 33:*25* 34:*4* 35:*7* 65:*1* 87:*13, 20* 99:*6* 103:*8, 9* 114:*9* 123:*16* 124:*12* 126:*2* 128:*24* 146:*19* 149:*14* 160:*14* 163:*12, 15, 20* 164:*11*
known 11:*23* 12:*4* 108:*22* 123:*25*
Kuebler 4:*9* 102:*1* 106:*7, 8, 10* 126:*22*

< L >
lack 105:*14*
laid 35:*16*
landed 77:*20* 134:*22*
lane 119:*1, 4*
language 25:*7* 48:*17* 112:*23* 146:*10*

Case: 2:18-cv-01060-EAS-EPD Doc #: 141-12 Filed: 03/24/21 Page: 188 of 197 PAGEID #: 4534

Deposition of Chief Kimberly Jacobs      Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

largest 169:*21* 170:2
late 90:*9*
law 38:22 168:*9* 170:*20*
172:7, *17* 173:*14*, *21*, *25*
174:22, *23* 175:7, *8*, *12*, *13*
lawful 5:*3*
laws 168:*14* 173:12
lawsuit 13:6 14:*1*, *8*, *13*,
*14*, *23* 15:9, *12*, *16*, *21*
16:5, *6*, *8*, *11*, *12* 17:6
157:13
lawsuits 12:23 15:4, *13*,
*17* 16:*15*, *17*, *25* 17:*3*, *10*
lay 67:13
layperson's 39:*14*
lays 67:12
lead 110:*18*
leader 43:*21* 45:22
leaders 45:*21*
leadership 43:*1*, *24* 45:*15*
46:*1*
leading 45:*23*
lean 118:*1*
learn 6:*10* 12:23 13:*1*
15:*11* 20:24 21:*3* 51:22
110:7 136:*25* 162:*3*
learned 20:*11* 29:*18*, *21*
30:4 125:*1*
learning 46:2
leave 44:*14* 60:*10* 68:*1*, *5*,
*14*, *23* 69:*1*, *2*, *6*, *8*, *9* 80:9
112:24 116:*8* 140:*12*
146:*3*
leaves 124:*20*
led 15:9 77:*18* 95:*18*
110:8 129:*10* 173:5
leeway 147:6
left 13:8 81:*23* 88:25
89:*3* 148:*21*
legal 14:*18* 174:*17*
legitimacy 165:2
legitimate 132:*8*
length 171:*19*
letter 100:7 101:*1*, *2*
152:*21*
letter, 100:*23*
level 24:9 31:*16* 32:*17*
33:*1*, *2* 44:25 53:*14*
69:*20*, *24* 74:*24* 80:*3*
100:*19* 151:24 155:*21*
leveled 37:8 107:*19*
levels 151:25
liars 81:*1*
liar's 38:6
libraries 6:*9*
license 46:*12*, *13*, *15*
lie 83:*13* 89:24 156:*13*,
*13*, *16*, *18*
lied 89:7 156:22

lieutenant 44:*4*, *7*, *10*, *11*,
*18*, *24* 59:*9*, *24* 62:*4*
84:*16* 88:*21* 95:*8* 96:*14*
97:*18* 136:*16*
lieutenants 44:*13* 53:*9*, *9*
92:*17* 93:*20* 96:*20*
136:*11*
lieutenant's 44:*6*
life 148:*23*
light 86:*20*, *22*
lighting 162:*21*
liked 144:*5*, *19*
likewise 112:*18*
limitations 46:*4* 48:*2*, *8*
71:*10*
limited 70:*4* 141:*21*
limits 29:*5* 41:*8*
line 31:*5* 32:*21* 84:*16*
lines 15:2 41:*4* 43:*1*
46:*11* 56:*8* 61:*13* 83:2
99:*2* 162:*13*
list 37:*19*, *20* 38:5, *6*
80:24 81:*1*, *2*, *7*, *9*, *14*, *15*,
*18* 82:*2*, *2*, *14*, *21*, *24* 83:2,
*10* 84:*6*, *15*, *17*, *18* 96:*8*
listened 108:*9*
lists 52:*3*
literally 12:*11* 55:4
132:*16*
Litigation 3:*21*
little 6:5 7:7 8:3 13:*12*
16:23 24:*13*, *16* 36:*1*
94:*10* 97:*2*, *19* 101:*15*
139:*13* 144:*10* 171:*5*
live 40:6 71:6, *15* 72:*14*
lives 72:*13* 117:*4*, *11*
living 73:*1* 141:*1*
LLC 2:*9*
locked 41:*10*
logic 111:*25*
long 6:2 8:6 19:*19* 26:9
27:*9*, *16* 32:6 35:*1* 37:*4*,
*11*, *11* 39:*3*, *3* 52:*10*
57:*11* 72:*9* 80:5 102:*14*
124:*24* 137:*1*
longer 39:*20* 108:*16*, *19*
long-standing 39:*13*
look 15:*4*, *9* 16:24 18:*16*,
*23*, *24* 19:5 20:*3* 21:*3*
23:*9*, *12* 24:*18* 28:*19*, *20*
30:*17* 31:9 33:*12* 34:*15*
35:*4* 50:25 51:*4*, *9* 52:*14*
70:9 79:*19* 81:*20* 94:*20*,
*22* 100:*23* 101:*12*, *23*
105:*25* 106:*15* 138:*23*, *24*
155:*16* 162:*22* 168:*18*
169:*3*, *18* 170:*13*, *18*
171:*13*
lookback 42:*15*, *16*

looked 9:*23* 19:*18* 22:*4*,
*8* 23:7 27:*14* 28:*13*
101:2 139:*10*, *11* 155:5
170:*15* 171:7
looking 16:*12* 21:*18* 22:*5*,
*25* 23:*11* 24:*19*, *20* 27:*16*
28:*4* 29:7 33:*8*, *10* 71:*3*,
*21* 98:*10* 105:*15* 127:*9*
169:*14*
looks 27:*12* 81:*21* 138:*21*
loose 130:*20*, *21* 131:*1*
lose 121:*17*
loss 143:22
lost 46:*11*, *23* 111:*3*
123:*2* 142:*3*
lot 11:2 19:*4* 29:*19*
34:*18*, *24* 43:*19* 44:5
48:25 55:*11* 59:2 62:*8*, *9*
75:*18* 78:6, *6* 81:*12*, *17*
86:2 92:*22* 95:*20* 109:*21*
129:*24* 141:2 147:5
149:*18* 158:25 169:*12*
170:*4*, *18*
lots 94:*24* 114:*12*
loud 7:*18*
low 118:8
lower 80:*3* 151:*23*
lowered 23:*24*
lowest 100:*12*, *19* 102:*19*
lying 90:*9*

< M >
mace 22:*13*
MAG 1:2, *16*
MAGISTRATE 1:22
mail 14:*3*
maintain 53:25 118:*8*
121:7 122:*15* 123:6
maintained 52:*18*
major 72:*12* 169:*19*, *24*
maker 160:6
making 30:*16* 32:24 33:5,
*19*, *22*, *24* 38:*19* 39:*16*
48:*13* 59:*21* 103:22
127:*1*, *20* 131:*16* 161:*13*,
*18* 173:*1*, *14*, *22* 174:5, *9*
175:*3*, *9*
mandated 43:*11*, *14* 45:*1*
manner 55:*10* 158:*4*
172:*16*
manual 30:*20*
March 41:*16*, *17* 42:*3*
mark 28:5 29:7 106:5
MARKED 4:6 97:*11*
106:5, *7* 128:6
Mason 9:*24* 10:9 13:*20*
136:23 140:6, *12*, *19*
141:9 142:*15*, *22* 145:*13*,
*21* 146:*18* 147:*11*, *16*
148:*9*, *23* 149:*1* 150:5, *11*,

*14* 152:*14*, *17* 153:6, *24*
154:6 155:8, *24* 157:5
158:8 160:24
Mason's 151:*14* 159:*15*
materials 117:*13*
matter 9:*1* 27:*11* 28:*12*
34:*14*, *14* 38:*13* 40:*14*
49:*12*, *13* 71:22 116:*11*
161:*4*, *5*, *20*
mattered 103:*11*
matters 34:*19* 102:22
132:*10*
mauled 111:*12*
Mayor 71:23
Mayor's 137:*20*, *21*, *24*
McClellan 50:*14* 51:2, *5*
56:*3*, *25* 70:2 74:*4*, *9*
106:*19*, *20* 107:*4*, *9* 108:*3*,
*10*, *11*
McClellan's 108:*3*
Meader 84:*17* 85:2, *24*
mean 17:7 19:*19* 20:*10*
22:25 28:*18* 33:6 34:5,
*15* 36:*15* 40:24 49:5
58:*10* 66:*13* 71:*13*, *15*
73:*21* 87:*18* 98:*18* 101:7
107:*11* 108:25 113:*21*
114:*11*, *21* 115:*21* 116:7,
*12* 118:*11* 120:*12*, *16*, *16*
129:8 161:*11* 165:7
means 26:*14*, *17*
meant 104:8 174:*10*
Mecklenburg 28:*14* 83:*14*
media 21:*13*
Medical 29:5, *8* 146:25
Medved 2:5 176:*4* 177:*11*
meet 21:*4* 35:*8* 170:2
meeting 77:*12* 92:7
meetings 44:*12*, *18*
Megan 2:5 7:*18* 45:5
176:*4* 177:*11*
member 104:2 155:*20*
168:6 169:*19*, *20*, *24*, *25*
members 9:*9* 102:2
154:*3* 174:*14*
memo 95:8 97:*17* 129:5
memorandum 152:*21*
memory 11:3 70:*3* 95:*9*,
*11*
memos 95:3 152:*16*
mental 147:*12* 148:*3*
mentioned 6:*17* 10:*18*
21:*13* 27:8, *24* 29:23
56:*15* 92:*17* 95:6 118:*3*
124:*18* 128:*14*
mentioning 29:22
mentor 96:*16*
met 146:5
Michael 9:*23*

Deposition of Chief Kimberly Jacobs     Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

**middle** 118:25 119:17
**mile** 118:14, 14
**milestones** 163:6
**Miller** 3:20 8:18, 22
  17:12 31:24 32:6 101:14
  112:20 115:13 117:17
  124:2 132:15, 19 133:1,
  12 144:4, 8, 16, 23 150:2,
  7 157:18, 22 165:13
  169:16 172:9, 19 173:16,
  24 175:21
**mind** 66:5 77:15, 18
  78:21
**mine** 63:23 87:19
**minor** 42:5 85:18
**minutes** 89:5, 6
**misbehavior** 105:13
**misconduct** 30:6 40:12
  41:13 47:12 73:10, 19, 19
  74:5 92:19
**missing** 22:23 70:8
  160:10, 12
**misspoke** 104:15
**mistake** 72:13
**mistakes** 72:12 73:14
**mixed** 76:7
**model** 169:8 170:15
**modified** 168:16
**moment** 74:19 76:23
  106:25
**money** 6:13
**monitored** 42:12 73:24
**month** 12:21, 22 24:1
  27:12, 12 86:23 102:10
**month-and-a-half** 12:11
**months** 31:16, 18 32:21
  41:20 42:11 86:21 103:7
**morning** 5:9
**MORRIS** 1:21
**Mound** 120:22
**move** 24:24 36:5 44:6,
  10 142:4 145:18 162:2
**moved** 12:11 25:2 84:15
  108:13 154:4 155:7
**movement** 78:23 151:6
**moving** 12:10 25:10
  77:21 78:2, 2 83:7 148:6
  150:15 165:14
**multiple** 29:11 85:4
  100:2 101:21, 22 155:12
  166:14
**municipality** 8:10 123:25
**murder** 54:24
**Museum** 5:24, 24

**< N >**
**name** 5:10 10:7 26:2
  50:13 51:23, 25 54:4
  76:3, 4, 10 82:20 84:16

**named** 176:6
**names** 53:24 54:8 71:12,
  18 81:9, 17 85:7, 8, 9
  151:22 152:15
**narcotics** 151:3 152:1
**Narewski** 13:22
**narrow** 145:20
**national** 117:5
**nature** 31:22 141:8 149:4
**near** 164:20
**nearly** 103:7
**neatest** 82:1
**necessarily** 34:3 40:20
  64:13 83:21 94:20
  110:24 112:12 115:9
  121:18 153:13
**necessary** 11:8 14:21
  38:20 140:3 166:7, 17
  167:11
**need** 7:19 21:19 45:22
  47:24 51:8 59:11 83:19
  86:18 87:2, 4 89:5 91:15
  97:20 109:10 116:15
  129:11 142:8 143:2, 3
  146:12
**needed** 13:10 14:3 15:7
  50:21 74:16 91:18 114:6
**needs** 5:22 141:25
**negative** 46:5
**negatively** 40:22
**negotiated** 37:20
**negotiation** 80:25
**negotiations** 36:8, 16
**negotiator** 71:23
**never** 15:17, 18 47:19
  60:17 63:2, 22 67:5
  72:12 83:25 128:2 131:7
  139:18 165:8
**new** 40:18 45:14 76:4
  80:25
**news** 117:4, 6 160:15
**nice** 7:19 8:4
**night** 162:5
**nine** 23:11 31:16, 18
  32:20
**noise** 8:1
**North** 3:22 25:3
**Notary** 2:5 176:4 177:11
**notes** 42:25 152:17
  171:13
**notice** 8:17 9:5 11:5, 11
  12:9, 17 13:2, 8 14:22
  36:3 46:16, 18 50:1
**noticed** 149:24
**notification** 94:12 147:19
**notifications** 14:17
**notified** 90:25 91:6, 25
**November** 82:4, 9 101:25

**102:10
**Nowadays** 138:23
**Number** 9:4 10:25 18:15
  21:8, 17, 18, 20 22:1, 6
  23:13, 20, 21 24:23 49:15
  53:5 83:11 116:16
  119:20 125:15 154:20
  155:2 170:15
**numbers** 75:7
**nuns** 137:4

**< O >**
**o0o** 1:11, 19 2:1
**OACP** 169:11, 12
**Obama** 170:7
**object** 31:24 101:14
**Objection** 17:12 112:20
  115:13 124:2 132:15
  133:1, 12, 13 150:2, 7
  165:13 169:16 172:9, 19
  173:16, 24
**objections** 81:18
**objectively** 98:12 111:5
  121:10 166:8
**objectivity** 103:23
**obligated** 151:11
**observed** 114:3
**obvious** 22:24
**obviously** 52:25 101:22
  105:18 108:9 112:25
  138:11 143:1
**occasionally** 146:25
**occurred** 26:15 90:24
  143:22
**occurs** 61:21
**off-duty** 156:17
**offense** 49:19 58:20
  85:10 172:22
**offered** 68:5
**offering** 153:15
**offhand** 79:15
**office** 14:2, 5, 16 15:3
  16:3 17:14 37:19 52:5,
  11, 22 53:14 60:9, 12, 13,
  21 67:20, 21 70:17 81:8
  82:18 93:20 96:6 137:24
  158:17, 22, 23, 25 159:6,
  12 163:21 174:18 177:5
**Officer** 13:19 14:23
  18:24 21:2 24:22 25:1
  26:12, 22 27:6, 17 32:13
  33:20, 22, 25 41:2 42:18
  43:3, 13, 18 46:14 49:22
  50:5, 10, 17 51:16 54:11
  55:14 56:20 58:12, 14, 18
  59:17, 19 60:1, 5, 11 61:6,
  17, 21 62:3 65:23, 25
  66:2 68:3, 5 69:16, 25
  72:2 73:23 76:2, 4 77:2,
  7, 10, 14 78:12, 17 83:12

**86:20, 21, 23 87:9, 15
  88:3, 4, 7, 10, 12, 24 89:6,
  8 90:2, 8, 22 91:17, 20, 24
  95:24 96:10 99:3 100:20
  102:24 103:16 104:24
  105:9 107:2, 3, 8 109:12
  110:4 112:10, 13, 15, 19
  113:18 114:25 115:11, 22
  116:7 118:4, 7, 25 119:9,
  16 120:23 124:20 125:20
  131:12 132:3, 12 133:23
  134:16 136:10, 12, 19
  137:13 139:3 140:19
  141:3 142:14, 15 143:12,
  12, 15, 19 144:14 145:2,
  11 146:11, 12, 21 148:22
  149:1, 5 150:6 154:16, 17,
  18, 21 155:8 156:11
  157:15, 17 158:8 159:1
  160:16 161:20 162:18
  166:22 174:20
**officers** 6:3, 10, 11 14:1
  16:8 19:2 21:6 23:10, 14,
  15 24:2, 24 26:1 37:15,
  18, 21 39:8, 12, 16 40:11,
  14, 19, 25 42:23 44:8
  45:14 46:7, 22 47:11
  49:1 51:1 71:14, 16, 17,
  25 72:11, 24 73:13, 20
  83:24 88:11 104:6 112:6
  113:2, 5 115:15 116:17,
  24 123:13 124:7 125:1
  135:11 137:11 140:11
  141:16 143:5 147:14
  148:11, 19 151:1, 4, 13, 24
  153:23 154:5 155:12
  158:4, 19 161:11 162:9,
  20 164:18 165:7, 8, 21
  172:13
**officer's** 27:17 29:9
  39:19 50:13 51:23 54:4
  59:13, 14 62:3 63:11
  66:4, 7 76:10 78:9 83:20
  86:19 89:22 115:3, 7, 7,
  18 126:6 157:1 167:5
**Offices** 2:8
**official** 6:22 15:1 45:16
  153:12
**officially** 146:16
**offs** 28:5 29:7
**off-the-record** 45:7 80:14
  134:13 171:16
**OHIO** 1:1 2:6, 9, 10 3:7,
  15, 23 38:22 71:6 86:19,
  22 169:1 176:2, 5 177:5,
  12
**Okay** 5:17 6:12, 18 7:3,
  14 8:7, 20, 24 9:4, 4, 15,
  20 10:2, 5, 8, 18 11:5, 14
  12:3, 7, 16, 19, 21, 23 13:1,

Deposition of Chief Kimberly Jacobs · · · · · · · · · · Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

7, 12  16:8  17:22  18:2
19:1, 11, 21  20:5  21:13
22:9, 14, 23  23:25  25:21
26:4, 16, 19  27:3, 6  30:13,
16  31:12  32:6, 11  33:3,
15  36:13  38:9  43:7, 23
44:20  48:2  50:15  52:14,
21  53:13, 19, 21  54:10
56:25  57:19, 23  59:23
60:18  61:20  62:18  63:14
64:17  65:6  67:9, 15  70:7,
13  74:4, 23  78:19  79:3, 9
80:8  81:5  82:12, 15
83:10  85:14  86:4  87:22
91:6, 20, 24  92:11, 20
94:6, 17  95:8, 22  96:5
98:4, 10  99:13  104:13, 16
105:25  106:16  108:13
114:24  116:9  117:22
122:18  126:21  127:23
128:5, 16  132:19  134:10
136:7, 20, 22  137:16
142:21  143:1  144:1, 2
145:1, 17  147:11  153:23
159:14  161:23  162:2
163:1, 16  164:12, 23
167:3, 7, 20, 24  168:2, 23
169:1, 7, 13  171:11
174:25  175:19
okayed  80:24
old  53:25, 25  138:6
143:2  174:21
once  20:2  41:20  42:11
48:9  77:22  83:12, 16
84:18  114:16  136:14
153:4
oncoming  119:10, 10
on-duty  156:17
one-day  82:7
ones  13:13  25:25  43:22
50:24  56:22  65:10
166:16  167:3
one-year  152:23
open  118:1  121:21, 22
opening  122:23
operated  22:20
operating  41:25
opinion  20:12  102:22
103:3, 10  126:16, 23
147:5  165:11  167:8, 14,
21, 24
opinions  72:8  127:3
opportunity  78:13  98:24
113:23  114:18  115:12
146:1  153:21
opposed  26:5, 22, 25  84:2
109:18
oral  85:18

order  55:25  56:19  59:3
109:11  125:4  135:10, 17
136:2  137:5
ordered  73:23  74:2
ordering  135:6, 13  147:6
orderly  13:15
organization  168:17
169:2  170:1
organizationally  13:14
organizations  169:13
outcome  9:7  150:23
160:5  167:4
out-of-policy  63:16, 17
95:19  126:23  127:1
165:19  167:19, 23, 24
outside  28:22  41:24
47:10  49:23  50:9  51:1
55:18  62:23  63:19, 24
64:25  65:5, 15, 17  66:8
68:4, 18, 20  69:17  70:1,
24  75:13, 23  76:5, 8
87:10  88:17  92:6  95:16
105:9  109:1, 4  116:5
119:12, 14, 22, 25  133:13
154:9  166:6  167:17
oversees  44:10
oversight  43:7  44:21, 23
45:12  66:10, 14, 20
overtime  38:20
overturn  67:7  107:17, 18
overturned  49:23  54:20,
21, 22  56:9  69:23  73:16
79:10, 18  108:4
OVI  46:12  99:3, 5
owners  135:7

< P >
package  61:6  93:17  97:5
99:24  101:23  131:22
page  80:21  84:16  98:10
100:10, 15, 21  101:8, 13,
13, 24, 24  106:17, 18
108:13  116:9  119:25
126:3, 3
pages  94:25  100:2  101:22
paid  99:25  170:5
paperwork  82:16  94:24
parallels  127:9
parking  166:24
part  16:14, 15, 24  17:18
18:2  24:21  26:1  27:10
38:23  61:21  68:17  70:22
99:24  101:22  103:25
104:7, 11, 14  107:13, 15
115:2, 15  122:20  131:21
141:19  142:20  144:2
157:13  168:3  169:25
participate  36:7, 9  58:23
60:23
participated  146:20  170:6

particular  8:10  14:8
18:11  21:11  30:22  32:18
33:14, 25  34:3, 19  35:20
39:6  42:18  43:3  46:18,
25  48:15  49:14  50:4, 10
54:8  59:17  66:16  74:17
78:11  88:15, 18  90:1
94:2  99:7  104:4, 5
119:18  125:8  126:18
133:7  141:3  142:8, 9
143:12, 14, 16  150:23
151:10  155:1  159:2, 3, 7
167:4
particularly  7:25  145:18
parties  176:21, 23
partner  125:22
parts  62:8  106:6, 13, 15
pass  43:11, 15
passed  163:7
passing  124:11
patient  75:19
patrol  86:1  141:1  142:11,
12  148:5  149:5, 6, 8, 13,
16  150:6, 15  154:16
pattern  16:13  21:19
27:10  30:22  31:3  41:12
42:13  149:2  155:4, 22
161:16
patterns  18:23, 24  21:1,
11  25:19  40:12  42:4
pay  56:17, 17  139:8, 14
paying  39:15  90:1  160:4
PBS  117:4
peer  18:17, 20  44:3
peers  45:25
pending  55:14
people  6:4  15:17, 22
16:3  21:7  23:9  25:10
41:9  45:22  46:3, 9  48:19,
23, 25  49:11  54:4  59:2, 3
64:15  71:7  72:9, 14, 21
73:10  74:8, 14, 14, 21, 22
81:11, 14  82:22, 22, 23
85:5, 6, 10  92:23  103:22
112:2, 14, 17  117:1
118:18  126:15  127:3, 19
128:20  135:16  138:5, 25
139:1, 8, 10, 12, 14, 25
141:24  143:4, 7, 8  148:16
149:18, 21  150:17  151:15,
18, 19  156:18  157:16
174:22
people's  34:5
perceive  126:10
perceived  139:2
percent  22:3  23:7, 18, 19,
20  74:6  75:6, 6  91:1
108:8, 8
percentage  18:14  22:7, 11,

11, 15, 21, 25  74:24  75:1
percentages  21:14
perception  126:4
Perfect  8:24  9:15
perform  160:17
performance  28:22
period  24:1  27:12, 12, 15,
18, 25  31:6  38:19  39:20
40:2  42:16  55:13, 16
75:5  146:3  158:11
permission  37:20
peroneal  19:9
person  28:16  33:24  42:7,
10  49:20  58:17, 19  67:3
76:22  90:3  96:24  105:5
109:22  113:24  114:2, 18
115:12  119:1, 18  131:24
132:13, 21, 24  133:11
134:2, 6  136:13  147:9
152:5  154:23, 24  164:19
personally  14:12  91:2
116:20
personnel  6:23  18:20
43:20  51:21  85:9  116:21
person's  82:20
perspective  27:21  39:14
126:6
Phillips  9:23
Phoenix  170:8
phone  94:25, 25
photos  94:22
physical  49:9  133:10, 24
134:1  135:2, 21
pickup  88:6, 8, 13
pieces  77:17
pitbull  132:10
pitch  17:18  27:24
place  12:12  16:19  52:14
70:8  73:7  79:19  103:25
105:12  176:17
placed  140:12
places  39:25
Plaintiff  1:2, 15, 21
Plaintiffs  2:4  3:2
PLAINTIFF'S  4:6
planning  82:3
planted  87:19
planting  87:5, 10, 13, 17
plastic  138:22
play  32:22, 23  36:19
49:14  132:21
played  108:12  129:25, 25
plays  34:9
Plaza  2:9
please  5:9  7:22  21:16
104:7
plenty  66:17
plethora  74:20
Plus  18:16  56:17  170:22

Case: 2:18-cv-01060-EAS-EPD Doc #: 141-12 Filed: 03/24/21 Page: 191 of 197 PAGEID #: 4537

Deposition of Chief Kimberly Jacobs          Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

**point** 23:4 30:13 32:11, 19 39:4 45:3 61:2 69:23 85:7 88:14 94:13, 13 106:14, 17 107:19 110:7, 15 117:12 124:20 140:6 142:13 146:6 161:12 164:6 168:2

**Police** 5:13, 20 8:6 9:9, 12 13:25 24:25 29:2 30:2 46:14 47:20 48:13 51:20 54:18 71:14 90:25 103:12 104:22, 25 108:25 117:9 123:18 139:8, 15 140:4, 21, 23 141:25 153:24 156:14, 25 157:16, 17 161:11 166:3, 9 167:7, 13 168:4, 7 169:2 170:11 171:2 172:2 173:1, 8 174:5 175:2, 3, 9

**policies** 6:19 7:5 35:6 134:3 168:8, 15 169:8, 10, 12 170:3, 15, 16, 17, 19, 22, 25 172:2, 25 173:5, 7 174:4, 9, 12, 16, 16 175:1

**policing** 6:11 169:4 170:7

**policy** 7:8, 9, 9 9:10, 11 15:1 26:10, 12 28:23 30:19, 23 38:10 41:4 48:22 50:9 51:1 55:18 56:10, 13 59:15, 18, 20, 21 60:16 61:24 62:15, 22, 23 63:8, 20, 22, 23, 25 64:1, 25 65:5, 15, 17 66:3, 8 68:4 69:17 70:1 75:13, 23, 25 76:8, 9, 17 77:13 78:25 79:1, 4 87:10 88:17 91:21 92:6 95:16 98:1, 13 105:22 108:6 109:3, 6, 12 116:6 119:12, 14, 22 120:1 122:5, 8 125:16, 17 126:1 128:2 129:7 130:9 131:4, 9, 25 132:5 133:22 134:9 154:10 159:16, 22 160:10 161:15 163:17 164:7, 13 166:6, 6, 7 167:11, 17 171:20, 24 172:6 173:22, 25

**policy-maker** 68:11

**poor** 161:18

**porch** 110:21 123:9 134:17, 23

**portion** 61:25 124:19

**position** 45:15 110:24 120:5 121:9, 17, 22, 24 122:17, 19, 25 123:2, 7 166:10

**positioning** 77:19 78:8, 20, 22 162:20

**positive** 89:25

**possibility** 20:8 83:13 131:1, 6 166:21 167:6

**possible** 110:22 118:12 124:18 142:12, 16 174:24

**possibly** 134:17 144:21

**potential** 40:12 103:16 109:7 158:8

**potentially** 19:24 43:12 45:14 47:5 48:8 111:13 112:4 117:2 122:12 151:5 155:21

**Power** 117:12

**practically** 20:11 41:8 119:23

**practice** 35:8 36:4 46:10, 24 53:7

**practices** 168:19 169:4, 15

**pray** 48:21

**precautions** 64:10

**precedent** 46:18 93:4 173:13

**precinct** 44:8, 10

**precincts** 44:11 148:13

**prediction** 28:16

**predictor** 28:21 29:24 30:5

**preferences** 150:21

**prep** 85:4, 6

**prepare** 9:20 11:22 12:7 53:10

**prepared** 9:15 85:3 116:18 129:21

**prepped** 93:5

**presence** 132:1 176:11

**present** 9:8 92:25 96:7 126:15 127:19 131:13

**presentation** 17:16 108:10 117:12

**presented** 129:9

**preserve** 37:22

**preserved** 97:3, 4

**president** 86:19, 22 170:7

**press** 137:17, 25 138:16, 19 139:6 140:2

**presume** 130:16

**pretty** 15:23 16:25 55:19 56:7 76:14 88:23 91:8 130:17 137:17 162:7

**prevent** 41:7 55:9 64:11 116:20 123:8

**prevented** 48:4

**preventing** 116:15

**prevents** 112:12

**previous** 32:12 33:21 34:4 40:18 42:22 45:25 78:9 140:21 143:1

**PREVIOUSLY** 4:6 33:4 97:11 106:4 125:3 126:20

**Pride** 117:4, 7

**P-R-I-D-E** 117:7

**printed** 82:6

**prior** 11:6 30:18 31:8, 9, 12 145:22

**prison** 41:9

**prisoner** 112:7

**prisoners** 112:8

**privately** 160:19

**privy** 25:20

**Probably** 12:22 19:20 23:3 27:21 42:17 53:1, 16 54:4 61:8 63:4 66:23 81:25 86:1 90:16 91:1 96:8 97:8 98:8 105:7 111:23 112:1 128:25 137:1 152:20 157:13 160:19 163:7

**problem** 43:17 48:8

**problematic** 19:24 43:12 45:14

**problems** 112:8

**proceed** 55:23

**proceedings** 61:17

**P-R-O-C-E-E-D-I-N-G-S** 5:1

**proceeds** 55:21

**process** 11:15 12:10 36:6 41:8, 24, 25 43:6, 8 48:1 58:6 67:14 68:19 85:22 92:22, 24 93:3, 8 96:18 104:25 139:7, 19 140:1 142:6 146:15 155:25 156:21, 23

**processed** 26:9 87:22

**produce** 72:23

**produced** 11:7, 9, 18 117:17

**production** 14:6

**Professional** 51:16 52:2, 15, 19 53:8 70:11 92:16 96:22 147:12 148:3

**Professionalism** 117:9

**profile** 61:12 118:8 154:13

**profiled** 117:6

**profiling** 103:20

**program** 17:17, 20 23:3 45:16

**programs** 6:16

**progress** 31:6

**progressed** 39:7, 7

**progressive** 31:5 36:1 84:12 98:15

**project** 6:7

**promotion** 85:16

**promotional** 85:4, 22

**promotions** 85:17

**promulated** 168:8

**proof** 25:8 26:14 111:25

**property** 87:6, 6 94:20

**proposal** 36:17

**proposals** 36:18

**proposed** 18:14

**prosecutor** 37:16

**prosecutors** 92:18

**prosecutor's** 37:19

**protect** 47:21 48:4 49:4 118:18

**protected** 73:14

**protection** 110:2

**protocol** 60:23

**prove** 49:15 109:21

**provide** 11:25 38:21 47:22, 23 132:13 147:8 169:5

**Provided** 6:5 76:18 77:14 93:19

**Provides** 6:1

**provisions** 36:22

**proximity** 133:11 134:2

**PSB** 93:10 96:20 136:11, 16

**psychological** 147:1

**psychologist** 91:22 146:6, 7, 14

**Public** 2:6 3:6 20:20 36:24 38:21 47:21 48:5 49:5 52:1 57:25 58:7 60:9 61:7 66:14, 17, 22, 24 67:4, 25 68:7 69:5, 9 70:18 72:18 73:13, 20 83:6 139:6, 22 141:16 142:18 158:18 162:18 176:4 177:11

**publicly** 71:16 160:19

**published** 53:12

**pull** 78:5 111:1 144:19, 24

**pulled** 88:10, 12 108:16, 19 110:20, 23 111:11 118:3 122:23, 23, 25 123:9 166:25

**pulling** 131:11

**punching** 42:8

**punishment** 150:22

**purpose** 50:17

**pursuant** 2:6

**pursued** 88:24

**pursuit** 88:3, 21

**pushed** 51:15

**pushing** 28:8

**put** 25:8 53:10 56:23 71:10 77:1 82:7, 23 88:12 113:2 118:12 120:5 121:13, 23 123:1 125:5 144:10 148:9 150:20 161:3, 7 169:12

Deposition of Chief Kimberly Jacobs          Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

**Putting** 72:*14, 21* 121:*17*
122:*16, 18*

**< Q >**
**qualified** 176:*5*
**qualify** 81:*14*
**question** 16:*14* 32:*17*
51:*9* 66:*15* 70:*9* 85:*4*
100:*13* 108:*14* 109:*5*
115:*2* 124:*4, 6* 125:*24*
126:*18* 130:*15* 132:*1, 16*
133:*17* 157:*19* 158:*20*
168:*5*
**questioning** 109:*17, 20*
**questions** 7:*23* 9:*16, 16*
13:*15, 18* 20:*23* 25:*9*
59:*12* 77:*12* 90:*20* 96:*25*
107:*12* 115:*25* 116:*6*
126:*17* 138:*4* 144:*12*
145:*20*
**quick** 134:*11* 171:*13*
**quickly** 94:*8* 155:*5*
**quite** 8:*4* 137:*3*
**quoted** 160:*15*

**< R >**
**racial** 157:*5, 16, 25*
**raise** 15:*12* 138:*4*
**raised** 122:*10* 155:*21*
**raises** 58:*4*
**raising** 6:*13*
**ran** 88:*8* 130:*22* 153:*19*
**range** 48:*20*
**rank** 152:*5*
**rational** 98:*2*
**reaccredited** 170:*25*
**reach** 120:*14* 132:*9*
136:*11*
**reached** 159:*5* 164:*19*
**reaching** 118:*23* 122:*14*
**reaction** 77:*25* 78:*4, 6*
129:*22*
**read** 9:*25* 10:*13, 25*
18:*21* 62:*14* 93:*22, 23*
94:*1, 15, 17, 19* 95:*1, 7*
98:*9, 9* 110:*12, 15* 112:*5*
159:*25* 163:*7* 164:*21*
175:*21*
**reading** 24:*20* 122:*4*
159:*19*
**reads** 102:*7*
**ready** 38:*23* 146:*8*
**real** 85:*8* 92:*8* 111:*24*
126:*4, 6* 138:*21, 24* 139:*2*
**really** 29:*5* 72:*23* 81:*21*
86:*10* 129:*3* 132:*16*
144:*4, 5*
**reason** 70:*24* 74:*15* 94:*9*
156:*7* 164:*15*

**reasonable** 50:*12* 77:*7*
98:*12* 111:*6* 121:*11*
129:*23* 166:*8, 15*
**reasonableness** 118:*20*
119:*7*
**reasonably** 10:*23* 11:*23*
12:*4* 123:*25*
**reasoning** 34:*2*
**reasons** 83:*11* 123:*11*
142:*8, 21* 161:*13*
**reassign** 141:*24* 160:*23*
**reassigned** 140:*18* 142:*7*
154:*7* 155:*8*
**reassignment** 152:*17, 19*
153:*1, 11, 13*
**recall** 11:*13* 15:*20* 16:*3*
22:*22* 36:*20* 51:*2* 56:*6*
57:*5, 9, 10* 64:*22* 65:*4, 16,
19* 70:*3, 6* 77:*17* 79:*2*
84:*14* 85:*23* 124:*16, 23*
125:*8* 126:*20, 24* 127:*14,
15, 17, 25* 131:*17* 151:*8, 9*
153:*4, 12* 155:*10* 156:*2*
157:*9* 159:*6, 9, 19, 25*
160:*18* 162:*1* 164:*22*
165:*10* 166:*1*
**receive** 13:*7* 14:*12, 22*
55:*20* 93:*14* 147:*19*
**received** 12:*17* 37:*3*
94:*11* 143:*9* 153:*6*
**recognize** 143:*3, 10, 19*
**recognized** 135:*16* 153:*14*
**recognizing** 141:*5*
**recommend** 62:*23* 80:*4, 6,
9* 101:*4* 125:*12*
**recommendation** 32:*24*
57:*19* 59:*16, 21* 60:*7, 8,
10* 62:*15, 19* 63:*19* 66:*25*
67:*22* 75:*9, 12, 14, 15*
80:*5* 83:*18* 85:*20* 86:*13*
92:*4* 98:*3* 100:*5, 24*
101:*11* 102:*8, 9*
**recommendations** 7:*8, 9*
18:*22* 51:*13* 60:*19, 20*
79:*22* 97:*19* 101:*6* 102:*3*
116:*2* 125:*17* 126:*1*
159:*14, 17*
**recommended** 50:*10* 51:*7*
56:*3* 57:*22* 58:*1, 3* 65:*8*
72:*3* 73:*16* 79:*24, 25*
89:*7, 14* 98:*15* 99:*7*
100:*3, 8, 12, 16* 119:*21*
125:*14*
**recommending** 78:*25* 93:*7*
**reconcile** 71:*9*
**record** 5:*10* 27:*17* 30:*9*
31:*17* 34:*15* 36:*14* 41:*23*
45:*5* 54:*3* 56:*18* 71:*18*
80:*12, 16* 84:*1* 97:*5*
144:*18*

**recorded** 78:*12* 97:*1*
124:*19, 19*
**recorder** 97:*2*
**recording** 49:*7, 8* 96:*24*
126:*13*
**recordings** 10:*10* 97:*3*
**records** 20:*20, 20* 27:*17*
28:*13* 29:*5* 34:*11* 35:*22*
36:*24* 37:*14, 23* 38:*2, 21,
22, 23* 39:*18, 19* 50:*25*
53:*16* 70:*5, 18* 71:*6, 7, 11,
15* 81:*12* 94:*25* 95:*1*
105:*4*
**recovered** 87:*7*
**recuse** 104:*3*
**red** 86:*20, 21*
**redaction** 81:*7*
**redo** 99:*12*
**reduce** 118:*16*
**reduced** 176:*10*
**reevaluate** 160:*12*
**reevaluated** 153:*3*
**reevaluation** 152:*23, 25*
**refer** 43:*5* 84:*13*
**referenced** 11:*7*
**referred** 81:*1*
**regard** 59:*6* 91:*17* 92:*24*
103:*11* 116:*14* 119:*8*
124:*17* 145:*6* 147:*6*
170:*4* 172:*12*
**regarding** 9:*16* 10:*13, 25*
12:*5* 36:*14* 45:*18* 46:*5*
48:*3* 53:*14* 63:*9* 66:*12*
78:*20* 97:*18* 103:*15*
108:*2* 124:*1, 6* 125:*12*
126:*23* 128:*12, 23* 145:*12,
21* 150:*15* 151:*14* 152:*6,
14, 17* 153:*7* 158:*17, 18*
171:*25* 172:*3, 7, 15, 18, 24*
175:*8*
**regimented** 40:*3*
**regular** 55:*15* 61:*8*
148:*14* 152:*10* 155:*19*
**reiterate** 139:*17*
**relate** 81:*3*
**related** 7:*10* 10:*10* 11:*6,
12* 12:*24* 13:*13* 14:*8*
17:*1* 18:*25* 19:*22, 24*
21:*1* 28:*22* 35:*20* 72:*1*
74:*19* 97:*18* 125:*24*
150:*12* 158:*25* 159:*15*
161:*24* 171:*4*
**relating** 10:*24* 11:*24* 95:*4*
**relation** 94:*14* 99:*14*
115:*19* 123:*14* 124:*8*
126:*25* 163:*4*
**relationship** 5:*12, 19* 86:*7*
156:*25*
**relative** 176:*20, 22*

**release** 158:*25* 159:*13*
**releasing** 158:*18*
**relevant** 11:*15* 13:*10*
21:*10* 28:*13* 29:*4* 30:*22*
39:*5* 94:*21, 23* 95:*2*
114:*16* 144:*22*
**relied** 120:*6* 139:*5*
**religious** 90:*3*
**rely** 49:*8* 55:*11* 164:*16*
**relying** 22:*1* 138:*19*
**remember** 12:*16* 19:*19*
20:*1, 2* 34:*12, 20* 42:*19,
22, 25* 54:*1, 19* 64:*5*
65:*21* 70:*4* 76:*3* 85:*25*
87:*14* 90:*13, 14, 15* 92:*3,
8* 111:*19* 112:*23* 113:*9*
127:*4* 137:*3, 7* 140:*4*
148:*13* 151:*12* 152:*11*
160:*2* 163:*2, 2* 164:*4*
166:*21* 167:*4*
**remind** 7:*15*
**reminder** 7:*17*
**removed** 26:*2* 71:*12*
82:*21* 155:*24*
**renegotiations** 36:*13*
**reopen** 15:*15*
**reopened** 99:*6*
**reorganization** 17:*22* 18:*2*
**reorganized** 16:*21* 21:*21*
**rep** 136:*18*
**Repeat** 11:*10* 40:*18*
100:*13* 125:*2*
**report** 15:*19* 20:*21* 21:*5,
6* 87:*1, 2* 88:*19, 25* 89:*4,
9* 117:*6* 135:*21* 170:*15*
**REPORTER** 4:*5*
**Reporting** 2:*8* 176:*25*
**reports** 21:*4* 29:*9*
**representative** 21:*25*
23:*12* 53:*17* 60:*6* 77:*15*
96:*10* 136:*17*
**representatives** 89:*3*
**represents** 149:*19*
**reprimand** 24:*10* 31:*20*
35:*21* 60:*3* 65:*20* 79:*25*
80:*10* 92:*15*
**reprimanded** 99:*9*
**reprimands** 51:*13* 79:*23*
**reputation** 41:*2* 47:*16*
**request** 60:*3*
**requested** 70:*13* 71:*1*
146:*16, 20*
**requests** 11:*5*
**require** 71:*11* 166:*7*
**required** 11:*14, 24* 37:*15*
39:*18, 21, 22* 53:*24* 54:*9*
58:*20, 21, 22* 147:*14*
**requirement** 45:*12*
**requirements** 170:*22*

Case: 2:18-cv-01060-EAS-EPD Doc #: 141-12 Filed: 03/24/21 Page: 193 of 197 PAGEID #: 4539

Deposition of Chief Kimberly Jacobs      Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

**requires** 26:*12* 38:*22* 46:*17* 102:*21* 104:*20* 166:*7*
**requiring** 169:*10*
**research** 28:*21* 127:*9* 170:*12* 171:*2*
**researched** 127:*15*
**resist** 112:*25*
**resistance** 118:*16*
**resisting** 112:*24*
**resolve** 17:*5* 38:*9* 116:*12, 23*
**resources** 52:*18* 91:*15, 18* 169:*18*
**respect** 117:*10*
**respond** 55:*3* 130:*15* 134:*4* 162:*8*
**responded** 162:*8*
**response,** 101:*1*
**responses** 85:*12*
**responsibility** 11:*21* 155:*15*
**restrains** 112:*11*
**result** 16:*10, 10* 20:*6, 16* 29:*17* 86:*13* 98:*21* 116:*2* 122:*18* 124:*14* 125:*13, 25* 155:*9*
**resulted** 148:*21*
**results** 19:*3* 118:*9*
**retention** 97:*5*
**retire** 5:*15*
**retired** 5:*14* 6:*24* 7:*6* 29:*15* 140:*16* 153:*5*
**retraining** 55:*10* 73:*18* 89:*19* 126:*1* 153:*7*
**retroactively** 83:*7*
**return** 147:*15, 20* 148:*2, 5*
**returned** 140:*14* 142:*12*
**Review** 9:*10, 11* 10:*9, 16* 11:*8, 17, 22* 14:*24* 15:*10, 25* 18:*17, 18, 20* 20:*16* 24:*12, 13, 20* 59:*10* 60:*18* 62:*2, 10, 13, 19, 20, 25* 63:*6, 15* 66:*2* 68:*7* 70:*12, 15* 76:*19* 92:*1, 5, 21* 95:*3, 8* 98:*7* 99:*23* 102:*6, 17* 104:*22, 23, 24* 105:*9, 17, 19, 22* 117:*22* 119:*16* 123:*12* 124:*1, 6* 125:*20* 127:*7* 159:*14, 17, 18, 24* 160:*3* 163:*9, 11, 14, 18* 171:*3*
**reviewed** 7:*5, 8* 10:*8, 22* 21:*9* 24:*3, 7* 35:*15* 62:*4* 79:*7* 88:*22* 95:*11* 101:*6, 10* 102:*14* 106:*1* 139:*24* 166:*9* 167:*7, 13, 20*
**reviewing** 25:*22, 24* 163:*12*

**reviews** 9:*7* 45:*24* 59:*14*
**revisions** 18:*11*
**ricochetted** 125:*21*
**riding** 43:*3*
**right** 9:*13* 10:*6* 12:*13* 13:*8* 17:*23* 20:*20* 21:*19* 27:*2, 8, 22* 37:*12* 38:*10* 39:*17* 41:*19* 44:*22* 45:*15* 48:*16* 53:*3* 55:*10* 56:*4, 9* 57:*1, 14* 58:*24* 61:*18, 25* 62:*21* 63:*2* 64:*24* 65:*9* 66:*1, 11, 12* 67:*17, 23* 68:*8* 69:*1, 4, 4* 70:*4* 73:*7, 13* 75:*12, 18* 76:*21* 78:*16* 79:*15* 81:*21* 83:*10* 89:*9* 96:*4* 98:*5, 13, 16* 99:*21* 100:*3, 6, 8, 20* 101:*2, 5, 11, 12, 24* 102:*20* 104:*2, 21* 105:*21, 23* 106:*2* 107:*24* 108:*24* 112:*19* 113:*6, 24, 25* 114:*19* 115:*12* 116:*16* 122:*8, 21* 123:*3, 19* 126:*14* 128:*16* 130:*10, 19* 137:*18* 138:*10* 140:*12* 145:*2* 147:*11, 13, 25* 148:*1, 5* 153:*25* 154:*21* 155:*22* 156:*11, 24* 157:*2, 25* 159:*22* 160:*21* 171:*8, 21* 173:*5* 175:*4, 10, 14*
**rights** 14:*22* 58:*19* 71:*15*
**riots** 141:*18*
**road** 133:*4*
**robbery** 154:*12*
**Robert** 84:*17*
**Rodgers** 76:*3, 10, 16* 78:*19*
**role** 8:*11* 60:*21* 61:*20* 85:*17* 136:*7* 155:*1*
**room** 8:*6* 110:*21, 23* 111:*11* 131:*12*
**root** 158:*5, 8*
**Rosen** 57:*5*
**routing** 9:*24* 10:*2, 8* 94:*7, 8* 97:*25* 99:*20* 100:*15, 24* 101:*9, 16, 17, 21* 128:*5* 163:*20*
**rude** 40:*25* 48:*18, 21*
**rudeness** 26:*10* 34:*17*
**rule** 34:*13* 60:*1* 117:*25* 119:*8* 167:*18, 18* 177:*2*
**ruled** 46:*16, 22* 99:*3* 119:*22* 120:*2* 163:*8*
**rules** 7:*15* 30:*20* 32:*16* 33:*12* 35:*6* 38:*14, 14, 25* 39:*23* 40:*8, 9* 47:*21* 48:*9, 10* 49:*20* 57:*22* 59:*18* 72:*15, 17* 83:*17* 86:*18* 93:*2* 103:*25* 104:*18* 108:*1* 110:*19* 116:*3* 120:*17* 146:*17* 147:*4*

**156:*13* 158:*14* 174:*9, 15, 22*
**ruling** 50:*21* 73:*22* 104:*5, 19* 160:*5*
**rulings** 172:*12*
**run** 77:*21, 22* 92:*15* 106:*6* 118:*9* 121:*1* 141:*4* 154:*14* 166:*24*
**running** 86:*22* 118:*9*
**runs** 44:*18* 86:*20* 120:*24*
**rushing** 120:*9*

**< S >**
**safe** 118:*12*
**safest** 148:*4*
**safety** 57:*25* 58:*7* 66:*15* 67:*4, 25* 68:*7* 69:*5, 9* 83:*6* 118:*16, 17* 127:*23* 128:*2* 142:*15* 150:*5*
**safety's** 60:*9*
**sake** 140:*25*
**sales** 17:*18* 27:*24*
**sample** 21:*25* 22:*2* 23:*12*
**sampling** 23:*13*
**SARAH** 1:*21* 3:*3* 9:*4*
**SARGUS** 1:*2*
**sat** 89:*6*
**save** 117:*11*
**Saves** 117:*4*
**saving** 72:*13*
**Savings** 2:*9*
**saw** 87:*3, 4* 88:*22* 152:*10*
**saying** 32:*2* 45:*20* 62:*25* 86:*23, 24* 111:*20* 132:*22* 139:*14* 144:*17, 19* 160:*16, 18*
**says** 5:*5* 13:*6* 25:*14* 37:*7* 38:*15* 56:*14* 69:*12* 82:*4* 84:*14* 101:*6* 103:*25* 111:*25* 126:*8*
**scan** 80:*21*
**scary** 143:*17*
**scenario** 141:*1*
**scenarios** 20:*13*
**scene** 91:*3, 14* 113:*5* 131:*8* 137:*2, 9* 138:*20* 139:*5* 162:*9, 10, 12, 16, 17*
**schedule** 40:*4* 97:*6*
**scheduled** 89:*2*
**scope** 133:*13* 169:*17*
**screen** 54:*1* 80:*18*
**scroll** 101:*8*
**seal** 177:*5*
**Sean** 3:*12*
**seat** 13:*23*
**seatbelt** 120:*23*
**seated** 106:*23*
**second** 24:*14* 78:*1* 80:*12* 99:*4* 106:*23* 149:*12*

**section** 47:*1* 81:*4* 155:*1*
**secure** 96:*2*
**see** 11:*11* 24:*22* 34:*5* 44:*17* 51:*21* 58:*4* 63:*24* 71:*7* 80:*18* 91:*22* 96:*18* 98:*21* 100:*22, 23, 25* 102:*9* 107:*12* 108:*16* 114:*10, 13* 117:*1* 137:*6* 141:*6* 147:*14, 17*
**seek** 45:*23*
**seen** 103:*13, 13*
**selected** 23:*19*
**sell** 17:*17*
**selling** 12:*10*
**send** 53:*17* 102:*4*
**sending** 60:*12* 102:*5*
**sends** 102:*6, 7*
**sense** 5:*19* 6:*22* 39:*11* 49:*13* 56:*16* 102:*16* 154:*11, 12*
**sent** 12:*9* 14:*2* 59:*13* 62:*14* 73:*24* 99:*5* 163:*21*
**sentiment** 141:*16* 142:*19*
**separate** 22:*13* 52:*17* 145:*6*
**separation** 109:*22*
**sergeant** 43:*11* 44:*8* 56:*21* 59:*14* 81:*8* 84:*22* 85:*2* 87:*14* 88:*18, 20* 100:*4, 6, 11, 16, 19* 101:*10* 102:*20* 104:*4, 10, 13* 118:*3* 162:*19*
**sergeants** 44:*5, 12, 16*
**sergeant's** 59:*24* 88:*25*
**serious** 55:*19* 98:*22* 114:*25* 133:*10, 24, 25* 135:*2, 25*
**seriously** 112:*13*
**seriousness** 83:*19* 125:*19*
**serves** 56:*11*
**service** 14:*10, 13* 47:*6, 22, 23* 90:*14* 148:*18*
**services** 148:*15*
**serving** 120:*9* 143:*7* 150:*6*
**session** 98:*21*
**set** 46:*4* 74:*1* 177:*4*
**seven** 8:*16, 20* 9:*5* 10:*25* 96:*14* 106:*17, 18*
**Sgelsomino@f-glaw.com** 3:*8*
**shape** 6:*25*
**share** 44:*17* 139:*20, 25*
**shared** 43:*19* 138:*16*
**sharing** 80:*18*
**shed** 74:*22* 107:*2*
**sheet** 10:*8* 94:*7, 9* 97:*25* 99:*20* 100:*15, 25* 101:*9, 17* 128:*6* 163:*20*

Deposition of Chief Kimberly Jacobs | Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

**sheets** 9:24 10:2 101:17, 21

**shield** 71:17

**shifts** 6:3

**shoot** 58:15 74:7, 7 78:1

**shooting** 10:5 13:18, 19, 21 50:4, 12 54:18, 21 64:14 65:5 90:21 91:3 99:14, 21 103:13 115:7, 11, 18 116:25 119:20 124:8, 14 125:5, 6, 14, 18 128:1 129:7 130:9 132:13, 21, 24 133:11 134:1 136:20, 25 137:2, 16 145:23, 24 146:11 148:22, 24 149:7, 10, 12, 15 150:4, 12, 13 159:15, 21 161:24 162:2, 4, 13 163:4, 17 164:12 165:12, 18, 24 166:3, 9 167:8, 8, 13, 15, 20, 22 171:20, 23 172:1, 6, 16

**shootings** 10:11 90:25 105:21 140:22, 23 141:9, 12 153:24 155:4 159:1 161:14 166:15 167:25

**shoots** 119:2 149:4

**shot** 13:19, 20, 22 54:25 91:25 109:1 111:22 112:3, 6 113:6 125:21 134:6 136:23 138:7 140:7 143:13, 17 144:14 145:8 157:6

**shotgun** 50:17

**shots** 166:14, 20, 23 167:1, 2

**show** 5:18 41:13 94:10 97:10 99:13 128:5

**showed** 141:3

**showing** 82:17

**shown** 97:14 99:17 106:10 128:8

**shows** 174:21

**shrapnel** 125:22

**sick** 28:5

**side** 25:2, 2, 3 44:15 50:5 54:19 88:7, 10, 11, 11 96:1, 2 108:15 111:2 134:23

**sidewalk** 125:22

**sign** 14:3 71:23

**significant** 49:15 156:11

**significantly** 81:19

**similar** 31:7, 22 119:15 127:10 128:25 141:8 154:6

**similarly** 169:2 173:11

**simple** 132:11

**single** 53:6 74:16 101:16,

21 174:18

**sit** 26:8

**sitting** 13:22 76:20 77:9

**situation** 15:18 25:11 31:8 50:6 74:7, 9, 17 76:25 77:8, 11 88:18 91:22 99:2 107:8 116:17 119:7, 15 120:4 121:10, 13, 14 122:13 125:2, 8 127:10 132:23 141:7 142:24 145:7 148:19 150:24 161:2, 3, 6, 8

**situations** 34:1 74:13 114:14 116:12, 15, 23 117:2 141:15 143:1 148:14, 17 154:15

**six** 24:1 37:24 38:2 70:19 73:5, 6 86:21, 23 103:7 154:19 166:23

**size** 93:25

**skills** 46:1

**skipped** 62:17

**skipping** 106:17

**skirting** 34:8

**slip** 94:20

**slipped** 131:2

**slowly** 148:19

**slur** 157:5, 25

**slurs** 157:16

**small** 111:1

**smaller** 33:24 97:19

**SMITH** 1:15

**sneak** 118:8

**snow** 12:13

**software** 17:2 29:2 54:6

**somebody** 6:20 25:12 26:7 33:3, 10 34:7 40:15 41:6, 15 42:1, 8 43:5 46:11, 20 47:2, 4, 5 48:18, 19 57:13 73:21 77:20 78:15, 15 84:2 85:7 87:3, 4, 18 89:9 94:25 96:23 103:12 105:15 112:12 116:5 118:9 120:15 126:10 139:18 142:5, 6 145:7 146:24 147:1 148:23 151:10 156:19 161:22 163:5 164:7

**somebody's** 30:9, 10 39:5

**soon** 127:11 145:25

**sooner** 93:11 138:4, 5

**SOP** 23:2, 5 104:2

**sorry** 44:2 45:2 53:21 62:17 65:2 100:14 106:7 109:24 126:21 157:18

**sort** 13:11

**sorts** 73:25 130:24

**sound** 9:13 96:4 121:25 138:8

**sounded** 110:21

**source** 131:23

**sources** 170:18

**SOUTHERN** 1:1

**speak** 137:8, 13

**special** 151:1, 14 152:6, 14

**specific** 20:9, 22 29:23 48:20 77:17 95:9 106:6 127:4 152:12, 15 157:9 159:11 163:12 165:10

**specifically** 20:17 58:11 68:9 91:24 93:13 94:17 116:19 125:24 129:5 152:11 153:10

**specifics** 19:19 124:24 155:18

**specified** 176:17

**speculating** 107:4

**speculation** 109:7, 9 129:24

**speculative** 109:19

**speed** 118:25

**spelled** 84:12

**spells** 84:9

**split** 78:1

**spoke** 150:16

**spot** 166:24

**Square** 3:6

**staff** 28:9, 10 86:5 92:7, 13

**stakeouts** 154:13

**stand** 83:22 130:2, 8

**Standards** 51:16 52:3, 16, 19 53:8 70:11 92:16 96:22 168:9 170:20, 24

**standing** 88:2 109:1, 4 120:11 121:8 133:13 165:13

**start** 58:8

**started** 101:25 119:19, 19 153:16 169:9

**starting** 133:2

**starts** 108:14

**State** 2:6, 10 5:9 61:15 71:15 86:20, 22 116:10 176:2, 5 177:12

**stated** 129:5 140:2

**statement** 49:13 53:10 58:20 59:3 78:13 87:15 112:23 131:19, 21 140:10

**statements** 49:8, 10 78:10 94:19 114:12 115:5 127:7 164:18, 21

**STATES** 1:1 71:20 98:11

**stating** 126:5

**station** 8:3

**status** 61:3 163:6

**statute** 2:5

**stay** 27:9 54:3

**staying** 27:11

**stays** 31:16

**Ste** 3:6, 14

**steer** 39:9

**stellar** 90:5

**Stenotype** 176:10

**step** 24:14 58:5 62:17 143:4 148:6

**step-up** 31:10

**stipulated** 152:22

**stipulation** 8:15 37:7

**stole** 54:25

**stolen** 72:7

**stood** 61:9 119:17 150:24

**stop** 118:13 119:16

**stopped** 46:12

**stops** 68:23

**store** 76:5

**strange** 50:20 95:23

**Street** 2:9 3:14, 22 118:7 120:22, 23 140:14, 15 141:19 142:18, 23 148:21 160:16 161:1, 18 162:12

**streets** 118:15 141:14 148:5, 9

**stress** 143:11

**stressful** 142:25

**strike** 19:9 56:18 112:2 121:15

**strikes** 19:12

**strong** 143:7

**stronger** 168:15

**structures** 30:1 42:14

**stuck** 121:1

**studies** 28:14

**study** 28:14 29:18, 19, 22

**studying** 78:6

**stuff** 44:1 55:12 78:3 103:24 104:23 118:15 165:14

**stupid** 161:21

**subdivision** 42:14

**subject** 19:13 67:11 95:21

**subjectively** 103:23

**subject's** 76:3

**submit** 146:12

**subordinates** 173:21 174:3 175:1, 6

**subsequent** 13:4

**substation** 50:18 64:10 89:10

**suggested** 20:3

**suicide** 147:2

**summer** 6:6

**summoned** 14:10

**summons** 14:13

**supervise** 46:6 85:24

**supervising** 46:3 170:11

**supervision** 74:11

Case: 2:18-cv-01060-EAS-EPD Doc #: 141-12 Filed: 03/24/21 Page: 195 of 197 PAGEID #: 4541

Deposition of Chief Kimberly Jacobs      Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

**supervisor** 28:8 42:21 43:13, 17 45:18 89:11 102:21 103:7
**supervisors** 24:24 32:23 43:20 44:5 45:13, 14, 21, 25
**supervisor's** 30:20 43:24 102:22 103:2, 16
**supervisory** 85:15
**support** 43:25 44:2 91:17
**supported** 6:3
**supports** 5:21
**suppose** 67:6
**Supreme** 7:6 172:12, 18
**sure** 7:17 11:11 16:4 18:15 21:17, 24 22:5 23:6 27:13 31:19 38:19 39:16 41:14 42:7 45:11 47:9 56:7 58:10 59:10 60:25 64:3 66:20 67:15 70:7 71:25 73:12 74:6 80:1 83:3 87:18 88:16 89:21 91:8, 16, 20 95:12 99:24 100:10, 14 103:22 117:14 125:18 129:3 135:9 137:3 146:5 151:12 156:20 158:3 162:7 164:25 169:5 173:3
**surveillance** 154:13
**suspect** 19:13 54:24 58:15 64:20 65:10, 13 66:8 75:22 88:4, 15, 16 96:1 111:11, 12, 21 118:6, 10 122:24 123:1
**suspects** 64:14 106:25
**suspect's** 118:17
**suspended** 46:13 68:3
**suspension** 37:25 38:1 56:7, 11 57:22, 23 58:3 60:8 66:10 67:22, 24 68:25 69:2, 6 80:5, 9 89:17
**suspensions** 51:13
**sustained** 25:25, 25 26:17, 25, 25 27:5 37:16 57:21 75:15 81:16 82:12, 20 84:23 87:21 97:6 107:21 116:3 120:2
**Swalton@watonbrownlaw.com** 3:16
**SWAT** 148:13 154:2, 15, 18, 21 155:11, 15, 20
**switch** 38:4 43:11
**sworn** 5:4 80:19 176:7
**system** 14:14 16:16, 19, 22 21:4 52:17 53:22 54:1, 8 70:10 73:7 79:20, 21 83:15 105:12 125:7

**systems** 17:2, 10 18:12, 19 28:15 29:2

**< T >**
**Tackla** 2:8
**tactic** 121:23
**tactical** 15:10 117:22 118:19 119:3 121:5, 9, 12, 14, 16, 25 122:5, 10, 11 123:13 124:6, 7, 15 161:17
**Tactically** 110:23
**tactics** 116:10, 11, 14, 17, 19, 21, 25 117:24, 25 118:11, 16, 18 119:18 120:15, 19, 25 121:19, 23 122:3 125:4, 9
**take** 15:9 17:4 18:14 20:3 22:10 23:20 24:25 43:21 46:21 51:23, 25 52:9, 10 56:21, 22 58:5 67:19 74:4 92:13, 23 110:1 124:25 134:10 141:20 161:3 162:21 170:12 171:12
**taken** 2:5 6:8 64:9 68:15 73:18 91:17 115:9 176:16
**talk** 7:17 9:6 13:17 24:12 44:13 47:9 49:10 58:11 60:6 103:19 113:23 114:1, 20 127:23 136:20 155:18
**talked** 20:18 28:3, 7 50:7 64:3 91:10 106:19 116:19 129:2 137:10, 11 171:19
**talking** 14:9 17:11 27:1 29:6 31:4, 25 32:7, 7 44:4 45:24 50:1 57:11 64:13 75:2 101:16 114:22 116:4 168:13
**tangential** 5:19
**taught** 45:21 46:1
**team** 36:11, 11 58:17 59:5, 8 60:24 91:14, 18 113:16 148:13 154:2
**techie** 54:4
**technically** 49:25 63:22
**teleconference** 2:2
**tell** 7:22, 24 8:2 14:18 18:7 20:9, 16 22:17 26:17 37:17 40:24 50:1, 2 63:22 93:7 99:4, 8, 25 106:15 122:4 136:16, 18 138:2 143:4, 8 147:23 152:12 163:2 174:13
**telling** 32:20 33:20 38:25 39:24 86:25 145:1
**tells** 100:2, 15 102:13

115:22
**temporarily** 162:10
**ten** 37:12 89:4 108:8
**tension** 35:12, 13
**tensions** 38:9
**tenure** 31:18 51:10 91:2
**term** 81:23
**terminated** 72:4 89:18 90:10
**termination** 37:25 48:14 51:14 58:1, 1 67:23 68:25 69:6 72:4 83:18 86:13 89:7, 14 90:17 99:7
**terminology** 31:23 84:9
**terms** 16:5 21:15 29:24 33:15 57:19 66:23 80:25 117:22 160:6
**testified** 45:11, 17 113:22 121:8 122:14, 22 126:12 131:18 156:12 167:16 170:8, 10
**testify** 11:16 75:20 123:21, 24 149:23 176:8
**testifying** 149:25 170:6
**testimony** 8:9 11:25 83:20, 21 86:14, 25 176:9, 13
**Thank** 65:6 75:17, 19 107:23 117:19 174:10
**theft** 72:3
**thigh** 19:10
**thing** 19:3, 3 20:15 21:23 39:6 41:15, 17 51:17 56:24 58:24 59:25 65:25 72:5, 19 73:8 74:1 78:23 103:1 112:11 130:23 143:10 151:10
**things** 6:24 11:14 20:4, 11, 13 21:2 28:19 29:1, 6, 10 32:1 33:15 36:1, 2, 4 43:5 44:4, 14, 19 46:1 61:11, 12 69:13 71:13 73:13 74:1 76:7, 19 77:1 78:1 84:4 93:10 103:11, 21 105:3 107:1 113:24 116:16 117:11 119:20 129:24 130:24 133:23 141:20, 22 148:16 153:16 166:11 170:4, 13 171:1
**think** 7:7 9:14 10:2 19:12 31:25 32:4, 8 33:6 35:8 37:3 38:6 39:15 40:22 47:11, 19 48:2 55:5 59:17, 19, 20 66:13 67:10 69:11 76:10 79:10, 13 80:23 81:18 82:5, 21 84:11, 19 85:2, 10 86:8 87:14 88:6 89:8 90:8 91:5 93:1 98:23 105:8,

11, 16 107:2, 5, 7 110:4 113:2 116:11 121:6, 7 122:4, 7 126:8 127:8 129:8 130:18 141:13 143:18 146:23 147:7 148:7 149:1 151:1 153:16 157:20 160:12 162:11 167:16 168:1, 5 174:13, 23 175:19
**thinking** 90:15 161:20
**third** 84:16 100:10 149:15 150:4
**Thomas** 54:20 57:3 70:2
**thorough** 93:3
**thought** 18:16 21:13 34:21 70:21 92:14 116:1 118:5 119:25 138:5, 25 142:9
**thoughts** 124:21 126:17 152:9
**thousand** 21:21
**thousands** 117:1
**threat** 110:5 111:8 112:19 132:8 134:1 139:3
**threatened** 113:1 147:1
**three** 13:13 18:15 21:15, 17 22:1 23:9, 10, 11, 15, 17, 21 25:4 27:6, 7, 18 31:20 34:12 35:22, 23, 24 42:11 49:11 57:22 58:3 62:13 70:2, 21 73:3 85:20 100:15 116:18 166:17 170:2, 24
**three-and-a-half** 40:15, 16
**throw** 80:10
**ticket** 86:21
**tied** 132:9
**tightened** 130:24
**time** 7:22 12:14 13:4 18:10 19:20, 21 22:12 26:9 27:15, 18 28:1 31:6 35:16 36:23 37:3, 4, 13 39:4, 20 40:2 41:8 45:2 47:1, 3 48:19 51:7 52:10, 21 55:13, 16 64:17 65:8, 13 69:15 72:16 73:15 74:20, 23 75:5, 20 77:1, 25 78:4, 6, 18 84:22, 24 85:7 86:1, 2 87:15 88:14 94:1, 11 97:9 102:15 105:21 107:19 111:9, 21 112:3 117:9 123:18 124:24 127:8 129:22 130:10 131:20 135:5 141:6 142:4 144:23 145:2 146:6 149:20 150:17 153:17 154:25 158:11 161:9, 12 164:6

Deposition of Chief Kimberly Jacobs      Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

176:*17*
**timeline** 27:*14* 51:*24*
**timeliness** 28:*5* 55:*12*
**timely** 55:*10*
**times** 14:*5* 25:*15* 29:*3*
33:*16* 36:*9, 18* 44:*5, 14*
49:*8, 25* 50:*2* 54:*17*
69:*15, 24* 75:*21* 79:*13, 18*
88:*1* 93:*10, 21, 24* 96:*11*
97:*25* 125:*15* 127:*10, 11*
140:*3* 142:*1* 153:*3, 5*
170:*3*
**timing** 78:*23*
**tipping** 144:*9*
**today** 8:*7, 11* 9:*2, 6, 16,*
*21* 11:*12, 16* 123:*24*
175:*20*
**told** 13:*4* 14:*20* 15:*2*
18:*12* 78:*20* 89:*11* 91:*7,*
*9* 113:*2* 136:*14* 163:*6, 7*
164:*7* 165:*1, 24*
**tools** 39:*1*
**top** 36:*25* 80:*19* 126:*3*
163:*23*
**topic** 9:*6*
**topics** 10:*24* 11:*7, 16, 24*
12:*5* 13:*16*
**toss** 26:*21, 24*
**total** 23:*10* 110:2
**totality** 129:*8, 13, 15*
**totally** 22:*24* 26:*9* 58:*7*
119:*4*
**touching** 88:*8*
**tougher** 47:*15*
**tourniquets** 6:*3*
**towed** 26:*7*
**town** 162:*6, 7*
**toys** 138:*22*
**track** 39:*17* 40:*11, 13*
44:*24* 51:*10, 14* 52:*12*
82:*16*
**tracked** 41:*19, 20* 42:*23*
44:*21*
**tracking** 45:*1* 51:*17* 52:*2,*
*15, 17* 53:*4, 13, 22* 54:*7*
70:*10* 79:*20, 21* 89:*22*
125:*7* 128:*14* 129:*1*
**traffic** 118:*13* 119:*4, 10,*
*10*
**tragedy** 138:*3, 14*
**train** 19:*6, 16* 39:*9* 48:*24*
135:*14*
**trained** 74:*16* 116:*20*
125:*9* 175:*14*
**trainers** 135:*15*
**training** 18:*25* 19:*2, 7, 18,*
*23, 25* 20:*3, 6, 9, 19* 21:*2,*
*12* 43:*24, 25* 45:*18* 47:*25*
50:*21* 72:*21, 25* 74:*10*
96:*16* 103:*10, 19, 20*

116:*18* 117:*3* 124:*13*
125:*3, 5, 5, 12, 14* 129:*19,*
*21* 153:*9* 160:*20* 170:*9,*
*11* 174:*16, 18* 175:*3, 5, 7*
**transcribed** 176:*11*
**transcript** 7:*20* 10:*1, 13*
105:*25* 106:*14* 116:*9*
144:*1, 3*
**transcription** 176:*13*
**transparency** 71:*5, 19*
105:*14*
**traumatic** 145:*7, 9*
**traumatized** 143:*14*
**treated** 145:*13*
**treatment** 151:*2, 14* 152:*6,*
*14*
**trial** 30:*12*
**tried** 46:*8, 9, 11, 15* 50:*18*
54:*24* 81:*8, 13* 91:*1, 11*
**trigger** 14:*25* 78:*5*
**triggered** 16:*1* 23:*17, 18*
**trinkets** 6:*6*
**trips** 5:*23*
**trouble** 110:*4* 120:*20*
**truck** 88:*6, 8, 13*
**true** 35:*3* 41:*12* 45:*19*
110:*3* 126:*9* 168:*4*
176:*12*
**trust** 83:*19, 20, 21* 86:*18,*
*24* 160:*17, 23* 161:*1*
**trusting** 161:*4, 5*
**truth** 33:*20* 34:*8* 86:*25*
176:*8, 8, 9*
**try** 13:*14, 23* 18:*15*
38:*17* 39:*2, 8* 47:*24*
58:*25* 64:*11* 84:*13* 118:*7*
120:*13, 15* 145:*20* 158:*3*
169:*10*
**trying** 16:*3* 17:*17* 18:*11*
29:*10* 32:*11* 34:*12, 20*
48:*17* 70:*23* 71:*2* 72:*23*
75:*18* 80:*24* 103:*22*
106:*23* 107:*1, 3, 7* 118:*6,*
*8, 11, 13* 119:*16* 121:*19,*
*21* 125:*18* 133:*22, 23*
135:*5* 137:*5* 144:*18, 24*
145:*18* 164:*19*
**Tuesday** 2:*7*
**turn** 118:*15* 126:*12*
**turned** 24:*9* 87:*5, 6* 94:*8*
**turning** 77:*23*
**tweaked** 22:*4*
**twice** 21:*4* 136:*14*
**two** 10:*11* 11:*6* 21:*19*
22:*17* 31:*25* 73:*3* 76:*1*
84:*16* 89:*10* 96:*21* 98:*10*
112:*6* 145:*5* 166:*15, 16*
**type** 14:*7, 17* 15:*1* 21:*9*
31:*8, 14* 40:*1* 55:*25* 84:*3*

109:*20* 110:*13* 149:*24*
151:*5* 152:*20* 156:*16*
**typically** 94:*19* 124:*20*
136:*9, 16*
**typing** 59:*11*
**TYREE** 1:*2* 13:*19*
136:*20* 140:*7* 145:*24*
157:*5* 161:*24*

**< U >**
**Ultimately** 68:*14* 69:*16,*
*24* 82:*19* 88:*4* 120:*1*
**umbrella** 46:2
**unable** 121:*6*
**unarmed** 130:*6, 12, 12*
**unbecoming** 82:*19*
**unclear** 144:*3* 150:*22*
**unconscious** 111:*3, 13, 18*
**understand** 7:*21, 23, 24*
8:*11* 22:*24* 30:*13* 38:*13*
40:*7* 43:*20* 45:*11, 22*
58:*7, 10* 59:*2* 66:*4* 67:*16*
68:*17, 22* 70:*22* 72:*23*
77:*7, 24* 92:*24* 106:*20*
114:*10* 120:*17* 129:*4, 11*
132:*16* 133:*21* 154:*18*
168:*2* 173:*3* 174:*19*
**understanding** 8:*15, 19, 23*
38:*24* 62:*18* 76:*24* 96:*18*
105:*18* 114:*3, 7* 129:*22,*
*23* 138:*6, 11* 139:*2*
152:*21* 172:*11, 17, 24*
173:*6, 12, 14* 174:*8, 11*
**understood** 77:*10* 107:*6*
108:*10* 114:*8* 135:*19*
**unfortunately** 140:*3*
**unfounded** 25:*23, 24* 26:*6,*
*13*
**Union** 40:*1* 50:*19* 71:*20*
106:*18, 20, 22* 107:*15*
108:*2* 152:*22*
**UNITED** 1:*1*
**University** 86:*20, 23*
**unjustified** 167:*22, 23, 25*
**unlock** 120:*14*
**unnecessary** 89:*23* 166:*3,*
*12* 167:*9*
**unreasonable** 119:*5, 12*
120:*13, 14* 126:*5, 7, 11*
166:*12*
**unsound** 122:*12*
**unsustained** 26:*5, 16* 27:*3*
**untruthful** 37:*15* 83:*12*
85:*1* 86:6
**untruthfulness** 37:*17, 22*
81:*16* 82:*13, 18* 83:*16*
84:*23* 85:*13, 14* 86:*12*
87:*23* 89:*12*

**unusual** 128:*17* 140:*22,*
*24* 141:*5* 149:*4* 154:*10,*
*15, 16, 20, 20* 155:*14, 22*
**unwillingly** 142:*2*
**update** 174:*22*
**updated** 52:*4* 61:*12*
**updates** 52:*8* 61:*8*
**upheld** 54:*23*
**uphold** 54:*11* 90:*12*
**upped** 38:*18*
**upset** 90:*4*
**use** 6:*4* 15:*19, 20* 16:*16*
17:*1* 19:*4* 20:*10, 14*
22:*12* 25:*1, 2, 3, 9* 29:*2*
30:*10, 14* 31:*10, 15* 38:2
40:*20* 47:*18* 48:*17* 49:*22*
50:*25* 54:*14* 55:*18* 56:*25*
57:*16, 17* 58:*15* 61:*18*
63:*7, 16, 20* 64:*18* 65:*7*
66:*7* 70:*1* 72:*2* 75:*21*
79:*15* 87:*23* 88:*19* 89:*23*
90:*23* 92:*2* 98:*11* 108:*20*
109:*7, 11* 115:*6, 20*
116:*15, 17, 21* 118:*10, 15,*
*17, 20* 119:*10, 11, 11*
120:*6, 18* 123:*14* 129:*18,*
*19, 20* 131:*3, 8, 24* 132:*5*
134:*18, 24* 135:*3, 15, 22,*
*23* 136:*2, 3* 140:*11*
141:*15* 144:*11, 13* 149:*2*
152:*7* 153:*7, 10* 155:*9*
156:*4* 161:*8* 166:*4*
170:*17* 171:*4, 6, 10* 172:*3,*
*7, 13, 18* 174:*8*
**uses** 51:*1* 58:*12, 14*
61:*21* 63:*25* 74:*24* 75:*3*
114:*25* 148:*7* 154:*5, 19*
155:*12, 14, 22* 158:*18*
**usual** 154:*11*
**usually** 91:*19* 126:*15*
162:*17*

**< V >**
**values** 117:*8*
**variables** 174:*15*
**variation** 81:*25*
**various** 29:*10* 44:*19*
45:*25* 47:*17* 84:*4* 151:*18*
**vehicle** 119:*20* 162:*21*
164:*20* 166:*23, 25*
**version** 114:*18* 131:*15*
**versions** 168:*16*
**vicinity** 132:*14*
**video** 2:*2* 49:*6, 7* 88:*22,*
*23*
**videos** 10:*10*
**view** 172:*1, 6*
**viewed** 47:*16*
**violate** 59:*20* 110:*19*

Deposition of Chief Kimberly Jacobs     Dearrea King Adm. of the Estate of Tyree King, vs. City of Columbus,

**violated** 57:*21* 59:*20* 66:*2* 77:*13* 142:*5*

**violation** 33:*11* 49:*20* 51:*25* 60:*2* 83:*24* 98:*13, 23* 105:*23* 107:*25* 108:*5* 109:*2, 6* 116:*1, 3* 120:*17* 122:*5, 8* 134:*9* 156:*13*

**violations** 83:*17* 84:*5* 86:*18*

**violator** 118:*13*

**visit** 5:*23*

**vocabulary** 75:*17*

**volunteered** 18:*20*

**vote** 27:*1*

**< W >**

**wait** 55:*23* 80:*2* 127:*6*

**walk** 58:*5* 118:*25* 119:*9*

**walking** 161:*18*

**Walton** 3:*12, 13*

**want** 6:*13* 9:*3* 15:*6* 19:*5* 32:*14* 33:*8* 43:*21* 45:*10* 47:*13* 52:*18* 58:*5* 67:*15* 69:*11, 22, 23* 80:*22* 83:*23* 98:*21* 100:*14* 106:*14* 110:*23* 129:*3* 144:*9, 10* 150:*21* 151:*5* 158:*5, 24* 161:*7* 165:*21*

**wanted** 14:*17* 21:*24* 23:*6, 9, 12* 51:*6, 21* 65:*22* 66:*15* 71:*24* 91:*13* 98:*24* 134:*5*

**wants** 44:*9* 151:*10*

**warning** 16:*15, 19* 17:*10* 28:*15* 83:*15* 118:*7*

**warrant** 108:*20* 120:*9* 148:*15*

**Washington** 5:*23*

**way** 7:*12* 13:*14, 15* 15:*11* 16:*9, 12* 26:*17* 28:*24* 29:*15* 31:*10* 35:*15* 38:*16, 16* 40:*5, 23* 46:*7* 47:*15* 49:*14, 15* 54:*2* 59:*6* 60:*14* 71:*22* 72:*15, 24* 74:*12* 82:*1* 85:*16* 95:*17* 96:*16* 111:*6, 24* 115:*24* 116:*16* 134:*5* 136:*3* 143:*20* 144:*11* 160:*8* 163:*19* 167:*18* 174:*13* 175:*2, 16*

**ways** 47:*17*

**weapon** 50:*7* 64:*7* 87:*3, 4* 111:*3* 120:*10* 123:*10* 130:*13* 164:*20*

**wear** 42:*1*

**week** 12:*19* 102:*12*

**weekend** 117:*5, 6*

**weeks** 70:*19* 82:*7*

**weigh** 47:*6* 61:*16, 19*

**98**:*24*

**weighed** 7:*5* 160:*11*

**weigh-in** 163:*18*

**weight** 103:*2, 6*

**weird** 8:*1* 71:*20* 95:*23*

**Well** 15:*8* 19:*2* 24:*11* 25:*7* 29:*14, 19* 31:*1, 4* 33:*24* 35:*21* 41:*22* 43:*20* 45:*20* 46:*19* 50:*23* 53:*17* 54:*22* 55:*8* 60:*14* 69:*21* 70:*16* 72:*11* 75:*1, 4* 83:*11* 84:*19* 92:*24* 94:*19* 96:*12* 98:*19* 104:*18* 105:*11* 106:*22* 108:*10* 109:*9* 112:*5* 113:*21* 115:*22, 25* 118:*23* 121:*6* 122:*7* 123:*18* 124:*22* 129:*25* 138:*20* 141:*16* 143:*9* 145:*1* 146:*4* 149:*23* 154:*2* 156:*20* 167:*16* 169:*25* 172:*11*

**went** 21:*22* 50:*11* 58:*2, 7* 65:*9, 13* 89:*20* 90:*13* 91:*5, 14* 93:*10* 129:*12* 162:*9, 10*

**We're** 6:*7* 19:*2* 23:*11* 31:*15, 17, 25* 32:*7, 7* 33:*8, 10, 12* 36:*3* 39:*24* 48:*10* 49:*1* 71:*7, 18* 74:*3* 100:*10* 101:*16* 103:*21* 105:*2* 116:*4* 118:*13* 121:*1* 133:*1, 2, 4* 141:*21* 158:*12* 168:*13*

**Wes** 9:*22*

**west** 25:*2* 50:*5*

**We've** 6:*3* 20:*13, 17* 28:*9, 11, 13* 49:*8* 54:*6* 71:*1* 72:*11* 83:*24* 87:*18* 125:*19* 129:*2* 133:*4* 142:*3* 170:*12, 21, 23, 25*

**whatsoever** 60:*22* 73:*18* 86:*7*

**whittled** 81:*18* 82:*15*

**wildly** 161:*19*

**window** 121:*20, 22*

**wins** 27:*2, 2*

**wish** 48:*20*

**witness** 2:*3* 5:*4* 8:*8* 11:*21* 113:*18* 144:*12* 149:*25* 176:*6, 10, 11, 14* 177:*4*

**witnessed** 114:*2*

**witnesses** 137:*4, 8, 11, 12, 13* 139:*23*

**women** 25:*6*

**wondering** 158:*21*

**word** 51:*15* 152:*7*

**words** 86:*19* 135:*15*

**work** 13:*14* 22:*14, 19* 38:*14* 44:*6, 16* 46:*14*

**66**:*23* 72:*17* 91:*23* 102:*25* 146:*8* 147:*4, 15, 18, 20* 148:*3, 12* 153:*21* 156:*14*

**worked** 25:*17* 34:*6* 66:*14, 22*

**workers** 43:*22*

**working** 6:*2, 7* 18:*11* 47:*14* 86:*7* 147:*9* 148:*15*

**world** 168:*13*

**worth** 32:*2*

**Wow** 55:*6*

**wrap** 171:*14*

**write** 7:*19* 25:*14* 77:*4* 87:*1* 97:*24* 98:*2* 102:*15* 128:*17* 136:*17*

**writes** 86:*21* 102:*7*

**writings** 175:*5*

**written** 23:*4* 24:*7, 10* 31:*19* 34:*21, 22* 35:*21* 51:*12* 53:*7* 60:*3* 64:*4, 5* 65:*20* 78:*15* 79:*23, 25* 80:*10* 87:*2* 92:*15* 104:*18* 129:*14*

**wrong** 17:*7* 71:*21* 83:*25* 119:*21* 120:*16* 141:*13, 17*

**wrote** 88:*20* 119:*24* 128:*16*

**< Y >**

**Yeah** 8:*18, 22* 10:*4, 7* 12:*14, 20* 16:*14* 33:*7* 35:*11* 42:*3* 48:*17* 55:*7* 56:*10* 70:*16, 18* 82:*11* 101:*12* 104:*20* 107:*7* 115:*15* 118:*24* 126:*15* 128:*17* 132:*18* 154:*22* 164:*25* 165:*8* 175:*18*

**year** 20:*11, 12* 21:*5* 27:*9* 31:*13, 17* 41:*13, 16, 17, 18, 20* 46:*13* 75:*5* 76:*13* 84:*20* 103:*20* 105:*3, 7* 138:*6* 143:*2* 149:*10* 152:*24* 170:*3* 174:*19*

**years** 15:*21, 24* 17:*5, 16* 20:*11* 22:*17* 27:*19* 28:*7* 31:*20, 22* 34:*7, 12* 35:*22, 23, 24* 37:*24* 38:*2, 3* 40:*15, 17* 42:*12* 52:*9* 55:*2, 3* 62:*10, 10* 72:*6* 87:*11* 96:*15* 103:*8, 9* 125:*11* 145:*5* 170:*14, 24*

**youth** 6:*6*

**< Z >**

**Zachary** 57:*5*

**zones** 27:*7*

**Zoom** 7:*25* 8:*3* 143:*25*