COPY

## DIVISION OF POLICE

Intra-Divisional

October 11, 2013

TO:      Kim Jacobs, Chief of Police

FROM:    Firearms/Police-Involved Death Review Board

SUBJECT:   DISCHARGE OF FIREARM #2012-123

RE:      Officer Bryan Mason #2467, 2B4

---

On October 3, 2013, the Firearms/Police Involved Death Review Board received the above referenced Use of Firearms report. To summarize:

On December 17, 2012, Officer Bryan Mason #2467 discharged his Division-issued firearm in the performance of his duties. Officer Mason did so in defense of himself and Jason W. Blackburn from an imminent threat of death or serious physical harm posed by another, John Kaufmann Jr., wielding a firearm in a threatening manner.

In review of the facts, the Firearms/Police-Involved Death Review Board has concluded that Officer Mason's use of his firearms was reasonable and **WITHIN DIVISION POLICY**, as set forth in Division Directive 3.25 "Action-Response to Resistance/Aggression".

The investigation is remanded to the involved officers' chain of command for review and any further action as deemed appropriate.

Respectfully Submitted,

Commander Gary Cameron #5030

Commander Gary Dunlap #5013

Commander Michael Woods #5012

EXHIBIT
Pl. Ex. 14

COPY

| Columbus Division of Police | SUMMARY NO. 2 | PAGE 1 |
|---|---|---|
| OFFENSE POLICE INVOLVED SITUATION (FATAL) | REPORT NUMBER 121063057 | CASE FILE NO. 2012-25 (P.I.S.) |
| FIRM OR VICTIM P.O. BRYAN MASON, #2467 | PLACE OF OCCURRENCE 3576 BEULAH ROAD | DATE OF OFFENSE DECEMBER 17, 2012 |
| SERGEANT DANA NORMAN, #5170 | DETECTIVE | SERGEANT |

## INFORMATIONAL SUMMARY #2:

SUBJECT: DETERMINATION OF NUMBER OF ROUNDS FIRED

On December 17, 2012, at approximately 7:01 p.m., there was a Police Involved Shooting at 3576 Beulah Road.

The involved officer was Bryan Mason #2467, 2B4.

As the result of this shooting incident, I, Sergeant Dana M. Norman #5170, third shift Homicide/CIRT, was present when the Crime Scene Search Unit Sergeant processed Officer Mason.

This process occurred inside the Command Bus, which was parked next to 3576 Beulah Road.

Present in the Command Bus were: Sergeant Joan Schlabach #5290, Crime Scene Search Unit, Attorney Russ Carnahan and myself.

Sergeant Schlabach took a series of photographs of Officer Mason and his firearm. Sergeant Schlabach removed Officer Mason's firearm and examined said firearm.

Officer Mason was carrying a Division issued Smith & Wesson, M&P, .40 caliber auto pistol (Serial #CPD-2645) with a fifteen (15) round magazine capacity.

When asked, Officer Mason stated that he always carries a sixteenth (16) live round in the chamber. At the time of the examination, there was one (1) live round in the chamber and twelve (12) live rounds in the firearm's magazine.

Officer Mason had two (2) additional magazines on his gun belt containing fifteen (15) live rounds each for a total of thirty (30) live rounds. Therefore, out of the forty-six (46) possible live rounds, Officer Mason had forty-three (43) rounds accounted for; therefore, it is determined that he fired a total of **three (3) rounds.**

Officer Mason was not carrying a back-up firearm.

The investigation continues.

COPY

| | SUMMARY NO. 2 | PAGE 2 |
|---|---|---|
| **Columbus Division of Police** | | |

| OFFENSE | REPORT NUMBER | CASE FILE NO. |
|---|---|---|
| POLICE INVOLVED SITUATION (FATAL) | 121063057 | 2012-25 (P.I.S.) |

Respectfully submitted,

*Sgt. Dana M. Norman*

SERGEANT DANA M. NORMAN #5170
Third Shift Homicide/CIRT

:DN
12/20/12

:sb
01/02/13

I-20.154 (4/2007)

COPY

# Columbus Division of Police

| | SUMMARY NO. 5 | PAGE 1 |
|---|---|---|

| OFFENSE POLICE INVOLVED SITUATION (FATAL) | REPORT NUMBER 121063057 | CASE FILE NO. 2012-25 (P.I.S.) |
|---|---|---|
| FIRM OR VICTIM P.O. BRYAN MASON, #2467 | PLACE OF OCCURRENCE 3576 BEULAH ROAD | DATE OF OFFENSE DECEMBER 17, 2012 |
| DETECTIVE RON CUSTER #1255 | DETECTIVE | SERGEANT |

## INFORMATIONAL SUMMARY #5:

SUBJECT:   INTERVIEW OF:      **OFFICER LAURA SLIVANYA #2423**
                              **FEMALE / WHITE / 30**
                              **ASSIGNMENT:     2B5**
                              **DAYS OFF:        W/T**
                              **DUTY HOURS:      3P-11P**

On December 17, 2012, at 8:48 p.m., I, first shift Homicide Detective Ron Custer #1255, interviewed Officer Slivanya #2423, to obtain information on her involvement in this incident. This interview was conducted inside my city assigned plain vehicle and was audio recorded. The following is a summation of the information given:

Officer Slivanya indicated that she was working Columbus Police Department PTV #28 with Officer Rick Foster #1198, and at around 7:00 p.m. they were dispatched to 3576 Beulah Road on a gun run. According to the caller at 3576 Beulah Road, whom she believed to be the home owner, he had a friend that refused to leave and that there was a gun involved. Officer Slivanya indicated that at the time of the call, they were not sure who actually had the gun. Upon arriving at the residence, Officers Brian Mason #2467 and Jacob Pawlowski #2715, in Columbus Police Cruiser #23, were seen exiting their vehicle in front of the residence. Officer Foster parked their PTV on Carolyn Avenue, which is on the south side of the residence.

As Officers Foster and Slivanya exited their vehicle, Officers Mason and Pawlowski were on foot approaching the front of the residence. Officer Slivanya heard them say that someone had a gun. She asked who had the gun and she didn't get a response. Officers Slivanya and Foster proceeded to the rear of the PTV so that Officer Foster could retrieve his rifle. Officer Slivanya saw Officer Pawlowski and asked him where Officer Mason was. Officer Pawlowski indicated that he didn't know where Officer Mason was, so Officers Slivanya, Foster and Pawlowski immediately went to the rear of the residence, which was on the east side. As they approached the residence they heard gun shots. The rear of the residence was surrounded by a wooden privacy fence and Officer Foster tore off sections of the wooden slats so that they could enter the yard. Officer Slivanya indicated that she heard at least two (2) shots fired.

As they approached the rear of the residence, she observed Officer Mason in the kitchen, with a subject down and a gun lying nearby. A second subject was lying face down in the living room of the residence. Officer Slivanya entered the residence and observed that the subject that had been shot, was lying on his left side and facing away from her. Officer

COPY



| | **SUMMARY NO.** 5 | **PAGE** 2 |
|---|---|---|

**Columbus Division of Police**

| **OFFENSE** POLICE INVOLVED SITUATION (FATAL) | **REPORT NUMBER** 121063057 | **CASE FILE NO.** 2012-25 (P.I.S.) |
|---|---|---|

Slivanya went to the right to clear the back rooms of any other possible subjects and Officers Foster and Pawlowski covered both subjects with Officer Mason. After clearing the residence, Officer Slivanya proceeded to handcuff the subject lying in the living room, who continued to yell at the subject, who had been shot. Officer Slivanya indicated that the subject, who had been shot, was not replying.

Officer Slivanya transferred the custody of this subject to Officers Marc Rees #761 and Russell Redman III #275, who secured him in their cruiser. Officer Slivanya indicated that keys to the residence had to be used to unlock the front door to allow access to and from the residence, by officers and Columbus Division of Fire personnel. Sergeant James Haley #5126, advised Officers Slivanya and Foster to have a seat in their cruiser and to wait there until needed.

This is the extent of the information provided and the interview was concluded.

The investigation continues.

Respectfully submitted,

DETECTIVE RON CUSTER #1255
Homicide First Shift/C.I.R.T.

:RC
12/22/12

:sb
1/03/13

I-20.154 (4/2007)

COPY



# COLUMBUS DIVISION OF POLICE

## INITIAL STATEMENT OF INVOLVED OFFICER

The following will be a tape-recorded initial statement of **COLUMBUS POLICE OFFICER BRYAN MASON, Badge #2467**, assigned to 2B-4. This statement was made in the presence of:

Sgt. Dana Norman #5170         Homicide Third Shift/C.I.R.T.
Attorney Russ Carnahan         Counsel for Officer Mason

This statement was conducted in the Command Bus, parked just south of 3576 Beulah Road, on December 17, 2012, beginning at approximately 9:45 p.m.

Questions were by Sgt. Norman, transcription was done by Police Secretary Stephanie Brobst.

\*\*\*\*\*\*\*   \*\*\*\*\*\*\*   \*\*\*\*\*\*\*   \*\*\*\*\*\*\*   \*\*\*\*\*\*\*   \*\*\*\*\*\*\*   \*\*\*\*\*\*\*

This is in reference to:

| REPORT | OFFENSE | VICTIM | | CASE FILE | |
|--------|---------|--------|---|-----------|---|
| 121063057 | Police Involved Situation | BRYAN MASON | P.O. | 2012-25 | (PIS) |

This Police Involved Situation, involving the above listed officer, occurred at 3576 Beulah Road on December 17, 2012, at approximately 7:01 p.m.

Sgt. Norman:   What is your full name?

P.O. Mason:   Bryan Mason.

Sgt. Norman:   What is your age?

P.O. Mason:   Twenty-seven (27).

Sgt. Norman:   Your badge number?

P.O. Mason:   Number 2467.

Sgt. Norman:   Your current assignment?

COPY

Tape-Recorded initial statement of – Officer Mason
December 17, 2012
Page #2

P.O. Mason:    Is 2B4.

Sgt. Norman:   And your normal duty hours?

P.O. Mason:    3:00 p.m. till 11:00 p.m.

Sgt. Norman:   And what's your days off on this current assignment?

P.O. Mason:    Tuesday/Wednesday

Sgt. Norman:   And on this date your duty hours were?

P.O. Mason:    3:00 p.m. to 11:00 p.m.

Sgt. Norman:   You were on duty when this incident occurred, correct?

P.O. Mason:    Yes.

Sgt. Norman:   Were you in uniform or plain clothes?

P.O. Mason:    Uniform.

Sgt. Norman:   Were you working with a partner at the time? And if so state the name and badge number.

P.O. Mason:    Yes. Jacob Pawlowski, and I don't know his badge number. I think it's #2715, but I'm not certain.

Sgt. Norman:   Are you aware that you may consult with an attorney prior to making a formal statement about this incident.

P.O. Mason:    Yes.

Sgt. Norman:   Do you wish to make a formal statement at this time without the benefit of counsel.

P.O. Mason:    No.

Sgt. Norman:   This will conclude the initial statement of Officer Bryan Mason. The time is 9:47 p.m.

*** End of Tape-Recorded Statement of Fact ***

:sb/6/6/13

COPY

### STATEMENT OF OFFICER BRYAN MASON, BADGE NO. 2467

This statement is in regard to an incident that occurred on Monday, December 17, 2012, at approximately 7:00 p.m. I am making this statement voluntarily as part of the investigation concerning this matter.

My date of hire as a police officer with the Columbus Division of police is December 16, 2006. My regular assignment is 2-B-4, with Tuesday and Wednesdays off. My regular duty hours are from 3:00 p.m. to 11:00 p.m. On the day of the incident, I was working my regular assignment with a partner, Officer Jacob Pawloski (Badge #2715) in Car 23. During the past six months, I have partnered with Officer Pawloski approximately fifteen times.

At the time that this incident occurred, I was in my uniform. I was carrying my Division issued Smith & Wesson, Model M&P, .40 caliber pistol, loaded with Division issued ammunition. I am current in my range qualification with this weapon. I was not carrying a backup firearm. I was wearing my prescription contact lenses. My corrected vision and hearing are good. I am in good health, and I do not take any medications that would impair my ability to perform my duties. I had not consumed any alcohol in the twenty-four hours prior to my shift, and I was not experiencing any unusual stress at the start of my shift.

I began my shift on December 17, 2012 at 3:00 p.m. Prior to 7:00 p.m., Officer Pawloski and I engaged in routine patrol. Around 7:00 p.m., we were in the vicinity of Oakland Park Ave. and Cleveland Ave., when we were dispatched on a call in the 3500 block of Beulah Road. We were advised that there was a man with a gun outside the home at 3576 Beulah Road, and it was my understanding from the information being aired that the man was banging on the windows of the home and trying to get in. I was driving our cruiser, and I activated the emergency beacons and siren as I drove west on Oakland Park Ave. As we approached the intersection with Maize Road, I shut down the lights and siren because I did not want to alert the suspect of our approach.

COPY

At the end of Oakland Park Ave., I turned right (north) onto Beulah Road. There was a civilian vehicle northbound in front of us as I drove north on Beulah, but I did not notice any other vehicles or pedestrians as we got closer to the 3500 block. I slowed our cruiser when we got to that block, and, just as we passed the intersection of Beulah and Carolyn Ave., Officer Pawloski said, "There it is." I stopped and parked our cruiser at a slight northeast angle in the street in front of 3576 Beulah Road, which is on the northeast corner of Beulah and Carolyn. Officer Pawloski and I quickly scanned the area around the house. We did not see anyone outside at that time, and we exited the cruiser. I had my gun drawn as we approached the front of the house. Officer Pawloski moved to the southwest corner of the house, while I went toward the northwest corner of the house.

The front porch light of the house was on, and there were lights on inside the house. When I got to the north side of the house, I could see that I was blocked by a wooden privacy fence, so I quickly moved around the front of the house toward Officer Pawloski's location. I went past Officer Pawloski, in order to go around the south side of the house to the back. The privacy fence extended around the entire backyard, and I was moving toward the southwest corner of the fence while Officer Pawloski was attempting to look into a window the south side of the house. He said something like, "He's inside! He's got him at gunpoint! The gun's pointed at his head!" Officers Lori Slivanya and Rick Foster had just arrived on Carolyn Ave. (the south side of the house) in the wagon, and I heard Officer Foster say that he was getting his rifle as I ran along the south side and then turned north around the southeast corner of the fence. I was using the light on my gun and I could see that a gate on the east side of the fence was closed.

The gate would not open and I could not reach the latch inside the gate, so I pulled a

2

COPY

board off the top of the gate in order to reach the latch. As soon as I pulled the board off the gate, I could see into the back of the house through a glass storm door. I believe the back porch light was on, and the lights in the house also were on. I could see a heavier set, male white in a grey sweatshirt inside the house. He had his back to the storm door, and another skinnier, shirtless male white was in front of him. The shirtless male had tattoos and was wearing jeans. He was facing the door and he had his hands up. I opened the gate and ran toward the back porch and storm door. As I got closer to the back porch, I could see that the male in the grey sweatshirt was pointing a black handgun at the face of the shirtless man, who still had his arms and hands raised straight up. They were both standing on the east side of an open doorway or entryway between the back and the front of the house.

The shirtless male had seen me as soon as I went through the back gate, and he was looking at me as I approached. I motioned at him to move to the side so that I could possibly have a clear shot at the male with the gun, but the shirtless man did not move. As I reached for the handle of the storm door, the man in the sweatshirt with the gun looked back over his left shoulder at me, but he immediately turned to back toward the shirtless man while still pointing his gun at the shirtless man's face. As I entered the door into the back of the house (which I could see was the kitchen), I shouted, "Drop the gun!" At almost the same time, the shirtless male lowered his arms and knocked the other man's gun hand toward the right (north). Both men then began grappling over the gun. They were standing just inside the doorway between the kitchen and the front (west) half of the house. The men were wrestling over the gun, and the shirtless male was shouting at the man with the gun. I quickly stepped toward the two men through the doorway from the kitchen, and as I stepped to the right (north) of them, I could see

3

COPY

that the hammer of the handgun was cocked back. The shirtless man was grabbing the barrel of the gun and attempting to point it away from his face, moving it to the left and right. I believe I might have shouted again, "Drop the gun!", just as the shirtless man started to slip and fall backwards. I was afraid that the man with the gun was going to end up on top of the shirtless man and would shoot him before I could take action. I moved slightly forward toward the man with the gun (in the grey sweatshirt) and I fired my gun at him. The man with the gun dropped to the floor and his gun fell out of his hand. I quickly kicked the gun backwards, away from the suspect in the grey sweatshirt. I kept the suspect covered with my gun, and the suspect shouted something like, "I told you motherfucker!" at the shirtless male. At some point he also looked at me and said something like, "I'm the fucking homeowner." Officers Slivanya, Foster, and Pawloski came into the house, and I told Officer Foster where the suspect's gun was on the floor. Officer Foster covered the suspect, and Officer Slivanya placed the shirtless male in handcuffs. I aired that shots had been fired and officers were ok, and I requested a Medic. The front door of the house was locked, and I found some keys on top of the dining table and used them to open the front door for the Medic. Other officers had arrived, and I left with Officer Support as the scene was secured.

At the time I fired my weapon at the suspect, I was in fear for the life of the shirtless male, who was grappling with the suspect and attempting to prevent the suspect from pointing his gun at him. I also was afraid for my own life, because I believed the gun could discharge at any time in any direction. I believed that the armed suspect in the sweatshirt was trying to point and fire his gun at the shirtless male as they struggled over the gun. I believe I fired a total of three shots at the suspect from a distance of approximately two feet or less. We were in close

4

COPY

quarters, and I wanted to fire at an angle that would minimize the risk of anyone other than the suspect being struck by my shots. I have received training on the use of firearms under these conditions. I fired my gun at the right side of the suspect's torso. My shots were fired in rapid succession without pause, and the direction of my shots was south (from the suspect's right side, across his torso toward his left side).

I did not believe I had any time to take any other action when I fired my gun at the suspect. I believed that the shirtless male in particular was in immediate danger of being shot and killed, and I did not believe that I had any other reasonable means to protect his life at the time I fired my weapon at the suspect.

This concludes my statement, and I am prepared to answer your questions.

2467  1-8-13

Officer Bryan Mason, Badge No. 2467

5

COPY

## COLUMBUS DIVISION OF POLICE

### FORMAL STATEMENT OF INVOLVED OFFICER

The following will be the tape-recorded formal statement of **COLUMBUS POLICE OFFICER BRYAN MASON #2467**, assigned to 2B4. This statement is being made in the presence of:

Sergeant Eric I. Pilya #5115        Homicide Cold Case/C.I.R.T. Sgt.
Detective William Gillette #1616      Homicide Cold Case/C.I.R.T./Lead
Attorney Russ Carnahan            Counsel for Officer Mason

This statement was conducted at Columbus Police Headquarters, 6th floor conference room on January 8, 2013, beginning at approximately 1:34 p.m.

Questions were by Sergeant Pilya; transcription was done by Police Secretary Stephanie Brobst.

\*\*\*\*\*\*\*    \*\*\*\*\*\*\*    \*\*\*\*\*\*\*    \*\*\*\*\*\*\*    \*\*\*\*\*\*\*    \*\*\*\*\*\*\*    \*\*\*\*\*\*\*

This is in reference to:

| REPORT | OFFENSE | VICTIM | CASE FILE | |
|--------|---------|--------|-----------|---|
| 121063057 | Police Involved Situation (Fatal) | P.O.Bryan Mason #2467 | 2012-25 | (PIS) |

This Police Involved Situation, involving the above listed officer, occurred at 3576 Beulah Road on December 17, 2012.

Sgt. Pilya:      Officer, on December 17, 2012, third shift Homicide Sergeant Dana Norman #5170, conducted an initial interview with you concerning the incident which occurred at 3576 Beulah Road. At that time, you declined to make a statement concerning the incident under investigation. I understand that you have conferred with an attorney since that time and you are now prepared to give a statement concerning your involvement in and/or knowledge of the incident. Is that correct?

PO Mason:     Correct.

Sgt. Pilya:      On January 7, 2013, I received a written statement from Attorney Carnahan on your behalf. Is the statement that you have before you the one that was sent to me?

COPY

Tape-Recorded formal statement of – Officer Bryan Mason
January 8, 2012
Page #2

PO Mason:       Yes.

Sgt. Pilya:     Have there been any changes, additions, or deletions of that statement since the
                time it was sent to me?

PO Mason:       No.

Sgt. Pilya:     Is this statement a true and accurate description of the facts of the incident of
                which you are personally aware?

PO Mason:       Yes.

Sgt. Pilya:     Is this statement voluntary?

PO Mason:       Yes.

Sgt. Pilya:     Would you please sign this statement in our presence, with today's date which is
                the eighth (8th)?

Sgt. Pilya:     Okay. Let the record reflect that this written statement will become a permanent
                part of this case package. Do you wish to voluntarily answer the follow up
                questions that we have at this time?

PO Mason:       Yes.

Sgt. Pilya:     For the record, your attorney is present with you and you are represented by his
                counsel at this time, is that correct?

PO Mason:       Correct.

Sgt. Pilya:     What is your date of appointment to the Columbus Police Department?

PO Mason:       Ah, December 16, 2006.

Sgt. Pilya:     Do you wear glasses, contact lenses or a hearing aide?

PO Mason:       Contacts.

Sgt. Pilya:     And at the time of the incident were you wearing those contacts?

PO Mason:       Yes.

Sgt. Pilya:     Do you have any physical disabilities?

COPY

Tape-Recorded formal statement of – Officer Bryan Mason
January 8, 2012
Page #3

**PO Mason:** No.

**Sgt. Pilya:** Are you currently on any prescription or over the counter medication that would impair your duties?

**PO Mason:** No.

**Sgt. Pilya:** Have you consumed alcohol in the past twenty-four (24) hours?

**PO Mason:** No.

**Sgt. Pilya:** Do you recall when this run was dispatched, if they gave a description of the homeowner, or who had the gun?

**PO Mason:** I, I don't remember any description, just saying that someone was, to my understanding, was outside with a gun. But I don't remember any description.

**Sgt. Pilya:** Okay. When you entered the back door of the residence, what was your thought process at that time?

**PO Mason:** Uhm, I could see ah, the one gentleman holding the gun on the other man. The shirtless guy had his hands up and it looked like, ah, it looked like he was going to shoot him.

**Sgt. Pilya:** So would it be safe to say that you felt that if you didn't take action at that time, that person would have gotten shot?

**PO Mason:** Correct.

**Sgt. Pilya:** Okay. On page three (3) of your statement you are describing the men wrestling over the gun. Were they still standing at this point?

**PO Mason:** Yes, they were both standing.

**Sgt. Pilya:** Okay. You state that the shirtless male was shouting at the man with the gun. Do you recall what he was shouting?

**PO Mason:** I don't remember what he was saying. Uhm, I just know there was a lot of yelling, back and forth, ah, both men were yelling.

**Sgt. Pilya:** Okay. Are you right or left handed.

**PO Mason:** Right handed.

**Sgt. Pilya:** Right handed, okay. When you fired your weapon, how were you holding it?

COPY

Tape-Recorded formal statement of – Officer Bryan Mason
January 8, 2012
Page #4

PO Mason:    Ah, just single handed, uhm, basically at my side, close to my body, uhm firing it.

Sgt. Pilya:    So you had it tucked?

PO Mason:    Tucked close to me.

Sgt. Pilya:    Close to your side?

PO Mason:    Tucked, because if they tried to grab it from me.

Sgt. Pilya:    At about a little higher than waist height?

PO Mason:    Right.

Sgt. Pilya:    Okay. And can you explain what angle and direction you fired?

PO Mason:    Uhm, I had moved to the right side of the gentleman's body to fire my rounds at an angle where the shirtless male wouldn't be in the way. And I fired from the hip, basically a 90 degree angle straight forward, and ah, just fired three (3) shots. The first shot I remember hitting him in the lower hip, the second one up a little higher and the third one kind of mid back, I think.

Sgt. Pilya:    Okay. Did you, uhm, were you standing in the same room as these two? Or were you in the kitchen area?

PO Mason:    Ahh, I was, I was, right in that doorway, maybe a little bit past that doorway. Uhm, so it was, I don't think I was in the kitchen, I think I was just inside the living room.

Sgt. Pilya:    Just inside the living room. Okay.

PO Mason:    Or dining area, or whatever that little area was.

Sgt. Pilya:    And what would you say your backdrop was for each one of your shots?

PO Mason:    The backdrop would have been the wall and the table on the outside of the house.

Sgt. Pilya:    Okay. Other than those in your statement, do you recall either of the individuals saying anything else?

PO Mason:    No.

Sgt. Pilya:    Were any of the other officers inside the residence at the time you fired your weapon?

COPY

Tape-Recorded formal statement of – Officer Bryan Mason
January 8, 2012
Page #5

PO Mason:      To my knowledge, no.

Sgt. Pilya:    Have you ever had any other runs to this address?

PO Mason:      No.

Sgt. Pilya:    You now know the identity of the individual, ahh, as John Kaufmann. Have you
               ever had any prior contact, personal or professional, with Mr. Kaufmann?

PO Mason:      Not that I can remember.

Sgt. Pilya:    I think that's all I have, Detective Gillette do you have anything else?

Det. Gillette: No Sarge.

Sgt. Pilya:    No? Okay, let's do the sketch.

Det. Gillette: Alright, Officer Mason this is a sketch that was completed by our CSSU
               detectives. If you want to take time to take a look at that.

PO Mason:      Okay.

Det. Gillette: Uhm, I've got a red pen, and also use a blue one and a black one.

PO Mason:      Alright.

Attorney:      I figured it might be easier to separate all of them.

PO Mason:      Okay.

Det. Gillette: Uhm, does this look familiar to you?

PO Mason:      Yes.

Det. Gillette: Okay. Why don't you first show us where you entered the residence at? Just put
               your initials in red where you entered the residence.

Det. Gillette: Okay. You entered through the back door. Uhm, where would you have seen the
               suspect? Let's use blue for the suspect, the gentleman holding the gun. Ahh, put
               ah, just put "S" for suspect wherever you saw him.

Det. Gillette: Okay. And then with the black pen if you would use, put where the victim was at,
               where he had the gun pointed.

COPY

Tape-Recorded formal statement of – Officer Bryan Mason
January 8, 2012
Page #6

Det. Gillette: Okay. Uhm, with your red pen again, if you would just use dots and just track your, as you went inside the residence.

Det. Gillette: Okay. Now is that last dot that you made, when you were telling Sergeant Pilya where you were at when you fired, is that where you fired your weapon?

PO Mason: Correct. Right about that area right there.

Det. Gillette: Okay. And the suspect and the vic...

PO Mason: Or maybe a little bit further forward, I remember this round table being almost right beside me. Right in that area.

Det. Gillette: Okay. Okay. Did the suspect or victim move at all?

PO Mason: Once they had started fighting, basically wrestling over the gun, the victim started to fall over this way, and they ended up actually coming back this way and I think he was still on the ground, uhm, well he wasn't, he hadn't fallen all the way to the ground but, basically they moved back a little bit towards me.

Det. Gillette: Towards you? Okay.

PO Mason: And then I fired.

Det. Gillette: Okay.

Sgt. Pilya: How about ah, putting your initials and a "2" where you believe you were when you fired. And then an "S2" where you believe the suspect was when, when ah, you fired your weapon.

PO Mason: Oops, I used the wrong color here.

Det Gillette: That's all right.

Sgt. Pilya: That's all right.

PO Mason: And then the victim would have ended up being ... like, right here.

Sgt. Pilya: Okay.

PO Mason: . . . This way.

Sgt. Pilya: Okay, and for the recording, then you were firing in a southwest direction?

PO Mason: Yes, yes.

COPY

Tape-Recorded formal statement of – Officer Bryan Mason
January 8, 2012
Page #7

Sgt. Pilya:     Okay.  Okay, if you would just put your name, badge number, and today's date on
                the bottom of that form, anywhere.

Sgt. Pilya:     Okay.  Is this statement true to the best of your knowledge?

PO Mason:       Yes.

Sgt. Pilya:     Do you wish to add or change anything in this statement at this?

PO Mason:       No.

Sgt. Pilya:     This will conclude this interview.  The time is now 1:44 p.m.


***   **End of Tape-Recorded Statement of Fact**   ***

:sb/2/19/13

COPY

DIVISION OF POLICE

Intra-Divisional

November 14, 2013

To:        Kimberley K. Jacobs
           Chief of Police

From:      Commander Michael A. Woods #5012
           Special Services Bureau

Subject:   **Use of Firearms/Police Involved Review Board #2013-10**

RE:        Police Officer Bryan C. Mason #2467, 2B4

_____

On February 2, 2013, Police Officer Bryan C. Mason, #2467, discharged his Division issued pistol after encountering an armed suspect that had fled a vehicle after a traffic stop. The suspect produced a handgun during the foot pursuit, and after falling to the ground attempted to retrieve the firearm after being ordered to stop. Officer Mason discharged his firearm in self-defense. The Firearms/Police-Involved Death Review Board received the Use of Firearms Investigation on November 8, 2014.

The Firearms/Police-Involved Death Review Board met on November 13, 2013 to discuss the facts presented in the investigative packet. After a review of the investigative packet, the Board determined the use of firearm by Officer Mason was **WITHIN POLICY**, as set forth in Division Directive 3.25, "Action-Response to Resistance/Aggression".

The investigative packet is being returned to the involved officer's Chain of Command for whatever action they deem appropriate.

Respectfully submitted,

Commander Michael Woods #5012

Commander Rhonda Grizzell #5014

Commander Michael Gray #5021

MW/mw

COPY



| | **SUMMARY NO.** 14 | **PAGE** 2 |
|---|---|---|

**Columbus Division of Police**

| CLASSIFICATION POLICE INVOLVED SITUATION | REPORT NUMBER 130091988 | CASE FILE NO. 2013-03 (P.I.S.) |
|---|---|---|

Mr. Preston pulled over on northbound Cleveland Avenue, just north of E. Dunedin Road. Mr. Williams explained that he exited the car and took off running northbound on Cleveland Avenue. According to Mr. Williams, before dropping off Mr. Hughes' girlfriend, he had taken Mr. Hughes' gun from him. Mr. Williams said that Mr. Hughes can sometimes act like an idiot and he didn't want to be driving with him in a car, while he was carrying a gun.

Mr. Williams told me that he was carrying the gun, until they got to his house on Medina Avenue. Mr. Williams recalled that there was snow on the ground and he started running westbound on Audrey Road from northbound Cleveland Avenue. Mr. Williams indicated that, as he slipped and started to fall, the police officer chasing him, identified as Officer Bryan Mason, Badge #2467, fired one (1) shot at him. Once on the ground, Mr. Williams believed that he had been shot, but quickly figured out that he hadn't been.

Mr. Williams said that the gun that he was carrying fell onto the ice and slid away from him. According to Mr. Williams, as he was trying to get back up onto his knees; that's when he was shot by Officer Mason. I asked Mr. Williams why he didn't try to pitch the gun, while he was running. Mr. Williams replied that the officer was still behind him.

Mr. Williams stated he knew that he was being chased by a Columbus Police Officer. Mr. Williams indicated that he looked back, as he was running from Officer Mason. Mr. Williams stated that he never pointed the gun at Officer Mason. Mr. Williams remembered that the gun wasn't loaded, because Mr. Hughes had taken the clip out of the gun, before Mr. Williams took it from him.

Mr. Williams told me that the last time that he saw Mr. Hughes was two (2) months prior to this incident. Mr. Williams stated he knew that he had a warrant for his arrest for a DUI charge.

That was the extent of information provided by Mr. Williams and the interview with him was concluded.

The investigation continues.

*Gregory A Sheppard #1710*

DETECTIVE GREGORY SHEPPARD, #1710
Homicide Second Shift/C.I.R.T.

:GS
4-28-13

:eip
5/3/13

I-20.154 (4/2007)

COPY



## COLUMBUS DIVISION OF POLICE

### INITIAL STATEMENT OF INVOLVED OFFICER

The following will be an initial statement of **COLUMBUS POLICE OFFICER BRYAN C. MASON #2467**, assigned to 2 Precinct, B Company. This statement was made in the presence of:

Sgt. Christ Holzhauser #5195            Homicide Second Shift/C.I.R.T.
Attorney Russell Carnahan               Counsel for Officer Mason

This statement was conducted inside of 2 Precinct Substation, 2077 Parkwood Avenue, on February 2, 2013, beginning at approximately 8:34 p.m.

Questions were by Sgt. Christ Holzhauser; transcription was done by Police Secretary Carolyn Young.

\*\*\*\*\*\*\*    \*\*\*\*\*\*\*    \*\*\*\*\*\*\*    \*\*\*\*\*\*\*    \*\*\*\*\*\*\*    \*\*\*\*\*\*\*    \*\*\*\*\*\*\*

This is in reference to:

| REPORT | OFFENSE | VICTIM | CASE FILE |
|--------|---------|--------|-----------|
| 130091988 | POLICE INVOLVED SITUATION | BRYAN C. MASON          P.O. | 2013-3      PIS |

This Police Involved Situation, involving the above listed officer, occurred in front of 1781 Audrey Road on February 2, 2013.

Sgt. Holzhauser:      What is your full name please?

P.O. Mason:            Bryan Mason.

Sgt. Holzhauser:      And Bryan, can you spell all of that for me please.

P.O. Mason:            B-R-Y-A-N M-A-S-O-N.

Sgt. Holzhauser:      Okay, and Bryan, do you have a middle initial?

P.O. Mason:            C as in Charles.

Sgt. Holzhauser:      Okay and what is your age?

P.O. Mason:            27.

COPY

Tape-Recorded initial statement of – P.O. Bryan C. Mason
February 2, 2013
Page #2

| | |
|---|---|
| Sgt. Holzhauser: | And your badge number again? |
| P.O. Mason: | 2467. |
| Sgt. Holzhauser: | And what is your actual current assignment? |
| P.O. Mason: | 2B4. |
| Sgt. Holzhauser: | 2B4 and what are your normal duty hours? |
| P.O. Mason: | 3:00 p.m. to 11:00 p.m. |
| Sgt. Holzhauser: | And what are your days off on your current assignment? |
| P.O. Mason: | Tuesday/Wednesday. |
| Sgt. Holzhauser: | On this date were you working your normal duty hours? |
| P.O. Mason: | Yes. |
| Sgt. Holzhauser: | And you were in uniform as you are now correct? |
| P.O. Mason: | Correct. |
| Sgt. Holzhauser: | Were you working with a partner? |
| P.O. Mason: | Yes. |
| Sgt. Holzhauser: | And who was that, please? |
| P.O. Mason: | Demsas Reddae. |
| Sgt. Holzhauser: | Can you spell that please? |
| P.O. Mason: | I'll try. D-E-M-S-A-S R-E-D-D-A-E. |
| Sgt. Holzhauser: | And do you happen to know the badge number? |
| P.O. Mason: | 2717. I believe it's 2717. |
| Sgt. Holzhauser: | Okay, believes it's 2717. I will confirm that at a later time. Now you are aware of the fact that you may consult with an attorney prior to making a formal statement in regards to this incident, correct? |

COPY

Tape-Recorded initial statement of – P.O. Bryan C. Mason
February 2, 2013
Page #3

P.O. Mason:            Yes.

Sgt. Holzhauser:    Do you wish to make a statement at this time without the benefit of counsel?

P.O. Mason:            No.

Sgt. Holzhauser:    I am now showing 8:36 p.m. and this will terminate the interview.

***    **End of Recorded Statement of Fact**    ***

:cly/6/17/2013

COPY

## STATEMENT OF OFFICER BRYAN MASON, BADGE NO. 2467

This statement is in regard to an incident that occurred on Saturday, February 2, 2013, at approximately 5:00 p.m. I am making this statement voluntarily as part of the investigation concerning this matter.

My date of hire as a police officer with the Columbus Division of police is December 16, 2006. My regular assignment is 2-B-4, with Tuesday and Wednesdays off. My regular duty hours are from 3:00 p.m. to 11:00 p.m. On the day of the incident, I was working my regular assignment with a partner, Officer Demsas Reddae (Badge #2717) in Car 20.

At the time that this incident occurred, I was in my uniform, and I was wearing my blue winter jacket with Columbus Police patches. I was carrying my Division issued Smith & Wesson, Model M&P, .40 caliber pistol, loaded with Division issued ammunition. I had qualified with this weapon on January 31, 2013. I was not carrying a backup firearm. I was wearing my prescription contact lenses. My corrected vision and hearing are good. I am in good health, and I do not take any medications that would impair my ability to perform my duties. I had not consumed any alcohol in the twenty-four hours prior to my shift, and I was not experiencing any unusual stress at the start of my shift.

I began my shift on February 2, 2013 at 3:00 p.m. Officer Reddae and I engaged in routine patrol, and at approximately 4:45 p.m. we were dispatched to a residence on E. Weber Road near the intersection of E. Weber and Cleveland Ave. After speaking to the resident at that house, Officer Reddae and I returned to our cruiser and drove south in the alley that runs behind the houses and businesses on the ~~east~~ west side of Cleveland Ave. When we got close to Manchester Ave. Officer Reddae stopped our cruiser facing southbound in the alley. At that time, we observed a black car that was stopped facing eastbound on Manchester. There were several occupants in the car, and a male black was standing near the car talking to a female on the

COPY

sidewalk on the south side of the street. The male gave the female a hug and a kiss, and then got into the passenger side of the black car. The car then started to drive east on Manchester Ave.

Officer Reddae drove our cruiser onto Manchester Ave., following eastbound behind the black car. We have been looking for a male suspect with murder warrants who is known to stay in the area of Manchester Ave., and I ran the license plate of the black car when it stopped at the intersection of Manchester Ave. and Cleveland Ave. The car then turned north onto Cleveland Ave. and we followed behind it. When the car was near the intersection of Oakland Park Ave., it veered slightly to its right, out of its lane of travel, and then back to its left. At that point, Officer Reddae and I decided to make a traffic stop for the lane violation. Officer Reddae activated our emergency beacons and chirped the siren. The black car started to pull to the right, into the curb lane, and it almost struck another vehicle that was traveling beside it in that lane. The black car swerved back to the left then, when the other car had gone past it, the driver steered the black car to the curb on the east side of Cleveland Ave. near the intersection with E. Dunedin Rd.

Just as the black car came to a stop, I started to open my door on the passenger side of the cruiser, and I grabbed my winter hat and one of my gloves with my left hand. At the same time, a light skinned male black exited from the passenger side of the black car, and he was facing directly toward me as I quickly stepped out of the cruiser. The male black, who was wearing a maroon jacket with white leather sleeves had a startled or surprised look on his face, and he immediately turned and ran northbound on the sidewalk on the east side of Cleveland Ave. I ran after him and began shouting, "Stop!" and "You'd better stop!" I could see that the suspect's left arm was swinging back and forth as he ran, but his right hand was clutching the outside of his right coat pocket. At that time I believed that the suspect may have been holding onto a weapon

2

COPY

that was in his coat pocket or his waistband, and he was trying to prevent it from falling out as he ran.

I was approximately 45 to 60 feet behind the suspect as we continued to run north along the east side of Cleveland Ave. As the suspect crossed Dunbar Dr., he veered to his right running into a parking lot for an auto repair shop on the northeast corner of Cleveland Ave. and Dunbar Dr. The suspect looked back over his shoulder at me at that time, and I again shouted at him to stop. The suspect veered back to his left, running north along the sidewalk on the east side of Cleveland Ave., and I believe I aired that we were running past "Yum-ee Donuts". The suspect then ran northwest onto Cleveland Ave. toward the Chase Bank on the west side of the street. His right hand was still clutched onto something near his waist. I followed behind the suspect as he ran to the southwest corner of Cleveland Ave. and Audrey Road, and then directly west on Audrey Road. The suspect was slipping on ice and snow on Audrey Road, and I continued shouting at him to stop, and I said something like, "You're not getting away! The chopper's on the way!" I was trying to stay near the center of the street, which was clear of ice and snow, but the suspect was running closer to the curb on the south side of the street where there was a covering of snow.

The suspect was slowing down, and I could see that he was winded and getting tired. His right hand was still clutching the right bottom of his coat, where it appeared he was trying to keep from losing something in his right coat pocket or waistband. I also started to slow down and catch my breath, and I was still approximately 45 to 60 feet behind the suspect when he slowed almost to a walk. I moved slightly toward my left (south) so that I would be more directly behind the suspect, and he looked back over his right shoulder directly at me. At the

3

COPY

same time, he raised his right hand out from his body, and I could see that he was holding a handgun which appeared to have a high-capacity magazine. The suspect's right hand and the gun then flared out to his right side, with the gun level and swinging out and back. I was afraid that the suspect was going to shoot me and I quickly drew my gun and fired one shot at the suspect. The suspect immediately dropped to the street, falling to his left toward the curb, and his gun fell onto the street about three feet from the suspect's right side.

I had been moving forward when I fired my first shot, and I had just come to a stop approximately 25 to 40 feet west of the suspect, when he rose up onto his hands and knees and began quickly crawling toward his gun. He was focused directly on his gun, and I believed the suspect was going to pick it up and shoot at me. I fired my gun again at the suspect, and I could see one of my rounds strike him near his right hip or buttock as he again dropped down to the ground on his chest. I shouted at the suspect to not move or he would get shot, and I kept cover on him. Three or four people came out of one of the houses on the south side of Audrey Road, and I did not know if they were the suspect's family members. I was concerned that they might approach us, and I moved closer to the suspect and stood directly over his gun. I told him again to not move. The suspect said something like, "They handed me the gun and told me to run!" and at some point I aired "shots fired" and "10-3". I also believe that I aired the address of 1781 Audrey. I kept the suspect at gunpoint and told him a medic was on the way.

Another cruiser approached from the west on Audrey Rd., and one of the officers from that cruiser came up and placed the suspect in handcuffs. When Sergeant Parini arrived, he told me to wait in his cruiser, which I did. When Officer Support arrived, I went with them to the 2nd Precinct Substation and waited while the scene was secured.

4

COPY

Both times that I fired my weapon at the suspect, I was in fear for my life. When I first fired my gun at the suspect, he had just pulled a handgun out of his coat pocket or waistband, and I believed that he was going to shoot me. He was looking over his shoulder at me when he pulled out the gun, then leveled it and swung it out to the right of his body. The second time I fired my gun at the suspect, he was crawling on his hands and knees directly toward his gun, which was on the street approximately three feet to his right (north). I believed the suspect was trying to regain control of his weapon so he could shoot at me, and I fired my gun at him again.

I fired a total of four shots at the suspect. My first shot was from a distance of approximately 45 to 60 feet, and my next three shots were from a distance of approximately 25 to 40 feet. I was moving forward toward the suspect (west) when I fired my first shot. I was standing and not moving forward when I fired my next three shots at the suspect. My target for all of my shots was the suspect, center mass. There was a pause of only two or three seconds between my first shot and the other three shots. My last three shots were fired in rapid succession without pause. The direction of my shots was west, and the backdrop for my shots was the empty street and a parked blue car west of the suspect. It was late afternoon and overcast at the time of this incident, but there was snow on the ground and there was enough light for me to clearly observe the suspect's actions. I did not see any pedestrians in the area or anyone in the parked car at the time that I fired my gun. I do not believe that the suspect fired any shots at me during this incident.

I did not have any cover at the time that I fired my gun at the suspect. I was in fear for my life and I believed that he was going to fire his gun at me. I did not believe that I had any other reasonable means to protect myself at the time I fired my weapon at the suspect.

5

COPY

This concludes my statement, and I am prepared to answer your questions.

2467  2-11-13

Officer Bryan Mason, Badge No. 2467

6

COPY

# COLUMBUS DIVISION OF POLICE

## FORMAL STATEMENT OF INVOLVED OFFICER

The following will be the tape-recorded formal statement of **COLUMBUS POLICE OFFICER BRYAN MASON #2467**, assigned to 2B4. This statement was made in the presence of:

Sgt. Eric I. Pilya #5115          Homicide Cold Case/C.I.R.T. Sgt.
Det. Gregory Sheppard #1710      Homicide Second Shift/C.I.R.T./Lead
Attorney Russ Carnahan            Counsel for Officer Mason

This statement was conducted at Columbus Police Headquarters, third (3rd) floor conference room, on February 11, 2013, beginning at approximately 11:19 a.m.

Questions were by Sgt. Pilya; transcription was done by Police Secretary Stephanie Brobst.

\*\*\*\*\*\*  \*\*\*\*\*\*  \*\*\*\*\*\*  \*\*\*\*\*\*  \*\*\*\*\*\*  \*\*\*\*\*\*  \*\*\*\*\*\*

This is in reference to:

| REPORT | OFFENSE | VICTIM | | CASE FILE | |
|--------|---------|--------|---|-----------|---|
| 130091988 | Police Involved Situation | Bryan C. Mason | P.O. | 2013-03 | (PIS) |

This Police Involved Situation, involving the above listed officer, occurred in front of 1781 Audrey Road on February 2, 2013.

Sgt. Pilya:       Officer, on February 2, 2013, second shift Homicide Sergeant Chris Holzhauser conducted an initial interview with you concerning the incident which occurred at 1781 Audrey Road. At that time, you declined to make a statement concerning the incident under investigation. I understand that you have conferred with an attorney since that time and are now prepared to give a statement concerning your involvement in and/or knowledge of the incident. Is that correct?

PO Mason:      Correct.

Sgt. Pilya:       On February 8, 2013, I received a written statement from Attorney Carnahan on your behalf. Is the statement that you have before you the same as the one that was sent to me?

PO Mason:      Yes.

COPY

Tape-Recorded formal statement of – Officer Mason
February 11, 2013
Page #2

Sgt. Pilya:     Have there been any changes, additions or deletions to that statement since the time it was sent to me?

PO Mason:     No.

Sgt. Pilya:     Not even that one?

PO Mason:     No. That was corrected.

Sgt. Pilya:     That was corrected, okay. Is this statement a true and accurate description of the facts of the incident of which you are personally aware?

PO Mason:     Yes.

Sgt. Pilya:     Is this statement voluntary?

PO Mason:     Yes.

Sgt. Pilya:     Would you please sign this statement in our presence, with today's date?

PO Mason:     Today's the eleventh (11th)?

Sgt. Pilya:     The eleventh (11th), yeah. Alright, let the record reflect that this written statement will become a permanent part of this case package. Do you wish to voluntarily answer the following questions that we have at this time?

PO Mason:     Yes.

Sgt. Pilya:     For the record your attorney is present with you and you are represented by his counsel at this time. Is that correct?

PO Mason:     Correct.

Sgt. Pilya:     What is your date of employment with the Columbus Police Department?

PO Mason:     December 16, 2006.

Sgt. Pilya:     Do you wear glasses, contact lenses or a hearing aide?

COPY

Tape-Recorded formal statement of – Officer Mason
February 11, 2013
Page #3

PO Mason:     Glasses and contacts.

Sgt. Pilya:     And were you wearing either of those at the time of the incident?

PO Mason:     I was wearing my contacts.

Sgt. Pilya:     Okay. Do you have any physical disabilities?

PO Mason:     No.

Sgt. Pilya:     Are you currently on any prescription or over the counter medication that would impair your duties?

PO Mason:     No.

Sgt. Pilya:     Have you consumed alcohol in the past twenty-four (24) hours?

PO Mason:     No.

Sgt. Pilya:     Okay. If you have a copy of your statement, on page four (4), you describe when you first saw the suspect's gun. You stated that it appeared to have a high capacity magazine. Could you give any more detail in describing the gun?

PO Mason:     The ah, it was just a black handgun, and the magazine was sticking approximately five inches (5") out of the bottom of the grip, which to my knowledge, the high capacity magazines, the thirty (30) round magazines, will generally stick about five to six inches (5-6") out of the bottom of the pistol.

Sgt. Pilya:     Okay. And about how far away were you when you observed the gun at that time?

PO Mason:     About forty feet (40').

Sgt. Pilya:     Okay. Also on page four (4) you describe when the suspect removed the gun from his jacket. You know, let me pause here. Let me break out this sketch real quick. We usually do this at the end but I'm going to have you take a look at this sketch, or actually this is the Google maps image of that area where this occurred. I'm going to give you a red pen, and if you could would you draw, like a little box car, like we do on an accident report, for where you believe the traffic stop occurred? Okay, and that would represent your cruiser, is that correct?

PO Mason:     Correct.

Sgt. Pilya:     Okay. And then the suspect vehicle would have been directly in front of you?

COPY

Tape-Recorded formal statement of – Officer Mason
February 11, 2013
Page #4

| | |
|---|---|
| PO Mason: | Directly in front of us. |
| Sgt. Pilya: | Okay. Alright, and then, if you could, with a dotted line, just show the path that the suspect took, when he left, going all the way over to Audrey. |
| PO Mason: | Okay. |
| Sgt. Pilya: | Okay. And this would be Audrey, right here. So for the recording, basically he's running northbound on Cleveland Avenue and he ducked through a parking lot and then back northbound on Cleveland Avenue, is that correct? |
| PO Mason: | Correct. |
| Sgt. Pilya: | And then he turned westbound on Audrey? |
| PO Mason: | Correct. |
| Sgt. Pilya: | Okay, and according to your statement, he was more to the south by the curb, is that correct? |
| PO Mason: | Well he was in the middle and then kind of moved to the south of the, right next to the curb. |
| Sgt. Pilya: | Okay. |
| PO Mason: | Um, this is kind of unclear up in here. |
| Sgt. Pilya: | You can just stop there, that's okay. |
| PO Mason: | Okay. |
| Sgt. Pilya: | And would you say that your path of travel followed the same route? |
| PO Mason: | Yes. |
| Sgt. Pilya: | Okay, and would you just sign and date that at the bottom there, anywhere. Okay, so that takes us up to being on Audrey. Does that appear to be an accurate representation of where you were on Audrey? |
| PO Mason: | Yes. |
| Sgt. Pilya: | Okay. This cruiser came after the fact, but this is the blue car that you refer to in your statement. |

COPY

Tape-Recorded formal statement of – Officer Mason
February 11, 2013
Page #5

| | |
|---|---|
| PO Mason: | Okay. |
| Sgt. Pilya: | Okay. So this is the directionality, so you were both running westbound, is that correct? |
| PO Mason: | Correct. |
| Sgt. Pilya: | Okay. Now where would you say that the suspect was when he started to pull the gun from his jacket? |
| PO Mason: | Uhm … |
| Sgt. Pilya: | If you'd just put it, mark it on the sketch with an "S". |
| PO Mason: | I think, right about here. |
| Sgt. Pilya: | Okay. Now, you describe the suspect removing the gun from his jacket. Can you describe in a little more detail what action he took, and remember we kind of have to articulate that, because it's on the recording. |
| PO Mason: | Right. He ah, like in the statement, I'm saying that he was holding the right side of his jacket. I couldn't see his hand in front of him, but when he drew the firearm, he had it arranged like he was going to shoot, right side up, positioned, and then he came directly out to where the side of the gun was, or the bottom of the gun was ninety (90) degrees to where my body was. So I could see the whole side of the gun with the sight rail being on the top, as you would take aim. |
| Sgt. Pilya: | Okay, would you say that his arm was straight out from his body? |
| PO Mason: | Yeah, it was, it was, yeah, it was straight out. |
| Sgt. Pilya: | Straight out from his body, okay. |
| PO Mason: | Yeah. |
| Sgt. Pilya: | And then, did, once the gun came straight out from his body, did he rotate back toward you? |
| PO Mason: | Yeah, he, the whole movement was coming back towards me. When I … |
| Sgt. Pilya: | So it was just one fluid movement? |
| PO Mason: | One fluid movement. |
| Sgt. Pilya: | He brought it out and then he started rotating backward. |

COPY

Tape-Recorded formal statement of -- Officer Mason
February 11, 2013
Page #6

PO Mason:       Correct.

Sgt. Pilya:     And that's when you fired your first shot?

PO Mason:       Correct.

Sgt. Pilya:     Okay, after you fired your first shot, could you explain how the suspect fell to the ground?

PO Mason:       He fell, ah, basically on, did like a belly slide. He didn't move very far, he kind of stuck to the ground. And then the gun hit the ground to his right. He had actually fell about two to three feet (2-3') to the left of where the gun was. And had got back up on his hands and knees and started crawling back to the right to get back to the gun. And he was looking right at the gun, he never looked back at me again.

Sgt. Pilya:     Okay. So he's turning towards you. His back is, you're facing his back?

PO Mason:       Correct.

Sgt. Pilya:     Okay. And he draws his right arm out from him and he starts going in a clockwise motion, basically from west to north and coming back east towards you, is that correct?

PO Mason:       Correct.

Sgt. Pilya:     Okay, and then when you fire, does that motion keep going? Does he fall south?

PO Mason:       No he immediately, yeah, he fell straight, I mean straight down from there, and like I said the gun hit the ground to the right of him.

Sgt. Pilya:     Okay, let's just worry about his body. I'm trying to figure out where his body was at that time. So when he hit the ground, which direction would his head have been facing?

PO Mason:       His head went to the south, south/west.

Sgt. Pilya:     Okay, so he was approximately on the south side of the street, and when, when he went down to the ground, his head was facing south?

PO Mason:       Correct.

Sgt. Pilya:     Okay.

PO Mason:       Not directly south, but like a, an angle, kinda angled.

COPY

Tape-Recorded formal statement of – Officer Mason
February 11, 2013
Page #7

Sgt. Pilya:      Okay, so his head was more southwest?

PO Mason:      Right.

Sgt. Pilya:      Okay. And then, if you could, could you place an "X" on here, where you believe
the gun came out, and was lying in the street?

PO Mason:      Ah, I mean it was like right, it was, it wasn't next to the curb but it was relatively
close to the curb.

Sgt. Pilya:      Okay. But he's lying over more towards the sidewalk.

PO Mason:      Right, he's lying more like, this, and this being his head here.

Sgt. Pilya:      Okay, alright. So then you describe him getting up on all fours and then crawling
towards the gun.

PO Mason:      Correct.

Sgt. Pilya:      So, which way did he turn to crawl towards the gun?

PO Mason:      He turned back north to crawl towards the gun.

Sgt. Pilya:      Okay, so kind of clockwise?

PO Mason:      Right.

Sgt. Pilya:      Okay, and then he's more or less positioned towards the gun?

PO Mason:      Right.

Sgt. Pilya:      So you're looking, when you fired the next volley of rounds, you would have
been looking at his right side?

PO Mason:      Yeah, his right side and back.

Sgt. Pilya:      Okay. Anything else with that, Greg?

Det. Sheppard: No, that answers the question that I had about that.

Sgt. Pilya:      Okay. Alright, were there any other officers around at the time that you fired
your weapon?

PO Mason:      No.

COPY

Tape-Recorded formal statement of – Officer Mason
February 11, 2013
Page #8

**Sgt. Pilya:** Okay. Did you, at any time during this incident, touch or move the gun?

**PO Mason:** No.

**Sgt. Pilya:** Okay. Did you see any other officer touch or move the gun?

**PO Mason:** I did not.

**Sgt. Pilya:** Alright. Do you recall if the chopper was overhead during this incident?

**PO Mason:** I'll be honest, I don't. I remember telling him that the chopper was coming, I think to get him to stop running, but I don't remember the chopper or anything.

**Sgt. Pilya:** Okay. You now know the identity of the suspect to be Gary Williams. Have you had any previous contact, personal or professional, with Mr. Williams?

**PO Mason:** No.

**Sgt. Pilya:** No? Okay. Going back to the sketch, could you just place a circle where you believe you were standing when you fired your first shot? Okay, will you put a little "1" next to that? And then according to your statement you were moving forward, and so you were further west when you fired your next three (3) shots, is that correct?

**PO Mason:** Correct.

**Sgt. Pilya:** Could you put a circle and a "2" next to where you believe you were standing when you fired those? Okay. And was the suspect in the same position, uhm, basically, ah, the first time you fired he was where you marked him as. And then the second time you fired he had crawled around so basically he was close to the same position, this area right here.

**PO Mason:** Right.

**Sgt. Pilya:** Is that correct?

**PO Mason:** Right.

**Sgt. Pilya:** Okay. Could you just sign and date that sketch as well, please. It's the eleventh (11th) again. Do you have any further questions, Greg?

**Det. Sheppard:** The only thing, when you were chasing him, and he was closer to the curb on the south side, did you position yourself in case you had to shoot, to where the houses wouldn't be the backdrop?

COPY

Tape-Recorded formal statement of – Officer Mason
February 11, 2013
Page #9

PO Mason:     Right, yeah I moved closer so I had that open straight.

Det. Sheppard: Okay.

Sgt. Pilya:     So when you moved southbound to get directly behind him you were doing so, to,
                so that you weren't firing into the houses as a backdrop, is that correct?

PO Mason:     Correct.

Sgt. Pilya:     Okay. Anything else?

Det. Sheppard: No.

Sgt. Pilya:     Is this statement true to the best of your knowledge?

PO Mason:     Yes.

Sgt. Pilya:     Do you wish to add or change anything in this statement at this time?

PO Mason:     No.

Sgt. Pilya:     This will conclude this interview. The time is now 11:32 a.m.


***   **End of Tape-Recorded Statement of Fact**   ***

:sb/2/15/13

COPY

| 🛡 **Columbus Division of Police** | | SUMMARY NO. 14 | PAGE 1 |
|---|---|---|---|
| CLASSIFICATION POLICE INVOLVED SITUATION | REPORT NUMBER 130091988 | CASE FILE NO. 2013-03 (P.I.S.) | |
| FIRM OR VICTIM P.O. BRYAN C. MASON #2467 | PLACE OF OCCURRENCE IFO 1781 AUDREY ROAD | DATE OF OFFENSE FEBRUARY 2, 2013 | |
| DETECTIVE GREGORY SHEPPARD #1710 | DETECTIVE | SERGEANT | |

**INFORMATIONAL SUMMARY #14:**

SUBJECT:  INTERVIEW OF:  **GARY WILLIAMS**
MALE / BLACK / 22
DOB:  6/10/1990
ADDRESS:  3446 MEDINA AVENUE
COLUMBUS, OHIO 43224
PHONE:  614-447-9648
CPD ID:  #40109C

On February 5, 2013, I, second shift Homicide/C.I.R.T. Detective Gregory Sheppard, Badge #1710, conducted an interview with **GARY WILLIAMS**. Mr. Williams is the suspect out of a Police Involved Situation. The interview took place on the sixth floor of Columbus Police Headquarters, in the interview rooms. The following is a summation of that interview:

Prior to the interview, I obtained the following biographical information from Mr. Williams: Mr. Williams stated that he does speak English and he does have his G.E.D. Mr. Williams told me that he can read and write. Mr. Williams does not have a problem hearing, nor does he wear glasses, or contacts. Due to Mr. Williams being in the hospital, he has not had any alcohol, but he has had prescription medication in the last twelve (12) to twenty-four (24) hours. Mr. Williams stated that he has never had his rights read to him in the past. I then read the standard Constitutional Rights form to Mr. Williams. Mr. Williams stated that he did understand his rights. Mr. Williams then read the acknowledgement portion of the form. At this time, Mr. Williams stated that he wished to make a statement.

At the onset of the interview, Mr. Williams said that he had just left his sister's house. Mr. Williams said that they were dropping off his cousin, **CHAD's**, girlfriend on Manchester Avenue. Mr. Williams believed that Chad's last name is **DEXTER**. He was later identified as **CHAD HUGHES**.

After dropping her off, Mr. Williams observed a marked Columbus Police cruiser sitting in an alley. Mr. Williams advised me that he told the driver, identified as **ROBERT PRESTON**, to pull over, so that he could go in the house. Mr. Preston's reply was, "No." Mr. Williams stated that Mr. Preston drove off and the police cruiser followed them. Once, on northbound Cleveland Avenue, Mr. Williams further stated that the police cruiser made a traffic stop on their vehicle.

COPY



| | SUMMARY NO. | PAGE |
|---|---|---|
| **Columbus Division of Police** | 14 | 2 |

| CLASSIFICATION | REPORT NUMBER | CASE FILE NO. |
|---|---|---|
| POLICE INVOLVED SITUATION | 130091988 | 2013-03 (P.I.S.) |

Mr. Preston pulled over on northbound Cleveland Avenue, just north of E. Dunedin Road. Mr. Williams explained that he exited the car and took off running northbound on Cleveland Avenue. According to Mr. Williams, before dropping off Mr. Hughes' girlfriend, he had taken Mr. Hughes' gun from him. Mr. Williams said that Mr. Hughes can sometimes act like an idiot and he didn't want to be driving with him in a car, while he was carrying a gun.

Mr. Williams told me that he was carrying the gun, until they got to his house on Medina Avenue. Mr. Williams recalled that there was snow on the ground and he started running westbound on Audrey Road from northbound Cleveland Avenue. Mr. Williams indicated that, as he slipped and started to fall, the police officer chasing him, identified as Officer Bryan Mason, Badge #2467, fired one (1) shot at him. Once on the ground, Mr. Williams believed that he had been shot, but quickly figured out that he hadn't been.

Mr. Williams said that the gun that he was carrying fell onto the ice and slid away from him. According to Mr. Williams, as he was trying to get back up onto his knees; that's when he was shot by Officer Mason. I asked Mr. Williams why he didn't try to pitch the gun, while he was running. Mr. Williams replied that the officer was still behind him.

Mr. Williams stated he knew that he was being chased by a Columbus Police Officer. Mr. Williams indicated that he looked back, as he was running from Officer Mason. Mr. Williams stated that he never pointed the gun at Officer Mason. Mr. Williams remembered that the gun wasn't loaded, because Mr. Hughes had taken the clip out of the gun, before Mr. Williams took it from him.

Mr. Williams told me that the last time that he saw Mr. Hughes was two (2) months prior to this incident. Mr. Williams stated he knew that he had a warrant for his arrest for a DUI charge.

That was the extent of information provided by Mr. Williams and the interview with him was concluded.

The investigation continues.

*Gregory A Sheppard #1710*

DETECTIVE GREGORY SHEPPARD, #1710
Homicide Second Shift/C.I.R.T.

:GS
4-28-13

:eip
5/3/13

I-20.154 (4/2007)