IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION
Case No. 2:18-cv-1060

Dearrea King,                )
                           )
      Plaintiffs,        )
                           )        **Expert Report**
                           )            **of**
Vs.                     )        **Melvin L. Tucker**
                           )  .
City of Columbus, Ohio    )
et al.,                     )
                           )
      Defendants.     )
_____)

## Retention

I was retained by counsel for the plaintiff in this case to review the September 14, 2016 shooting death of 13-year-old Tyre King by Columbus, Ohio Police Officer Bryan Mason. At the time of the shooting, King was being pursued for his involvement in a robbery where a firearm was displayed and had been confronted by Officer Bryan Mason after a foot pursuit.

According to Officer Bryan Mason and his partner Officer Robert Reffitt, King was in the process of pulling a firearm from his waistband when he was killed by Officer Mason. The firearm turned out to be a toy gun.

I was asked to render my opinion as to whether the threat assessment and use of force by Officer Mason was a greater level of force than other officers would have used under the same or similar circumstances under the totality of the circumstances in 2016.

## General Qualifications

I am the former Chief of Police for the City of Tallahassee, Florida, having retired in 1994.

During a twenty-five-year law enforcement career, I served as a Chief of Police in four cities, in three states and as an Agent with the Federal Bureau of Investigation.

I served as an FBI Agent from 1969 to 1971 and during the time period from 1971 to 1994, I served as the Chief of Police for Morristown, Tennessee; Hickory, North Carolina; Asheville, North Carolina and Tallahassee, Florida.

I taught criminal justice courses at colleges and universities across the United States. I served as an adjunct faculty member in criminal justice at Western Carolina University located in



Cullowhee, NC; Florida State University, Florida A&M University and Tallahassee Community College located in Tallahassee, FL; Walters State Community College located in Morristown, TN; and the University of Maine located in Augusta, ME.

I held several law enforcement certificates, including the Advanced Certificate from the State of North Carolina and Basic Certificates from Tennessee and Florida.

I received a bachelor's degree from the University of South Florida, Tampa, Florida and a master's degree with honors from Appalachian State University, Boone, North Carolina.

I have authored forty-two articles on policing and criminal justice issues that have been published in legal, public administration, police trade magazines, and criminal justice professional journals.

I served as a member and Chairman of the North Carolina Criminal Justice Education and Training Council for three years and as a member and Vice-Chairman of the Florida Criminal Justice Standards and Training Commission for three years. In both capacities, I was part of a commission that was responsible for establishing uniform minimum standards for the employment and training of all full-time, part-time and auxiliary law enforcement officers and correctional officers in the respective states.

### Specific Qualifications to Provide Opinions on the Facts of this Case

I co-authored a book that was published in 2011 titled *Prevention and Investigation of Officer Involved Deaths.*

I am familiar with the training protocols, standards, and model policies published by professional associations on use of force, including deadly force, making threat assessments, and the three C's of all tactical situations (**C**ommunicate, **C**oncealment, and **C**over).

I have trained law enforcement officers on the legal and professional standards regulating the use of force and was certified until September 2009 on most use of force disciplines.

I have qualified as an expert in law enforcement practices and procedures, including police use of force, one-hundred and twenty-seven times.  I have previously qualified as a use of force expert and provided testimony in Ohio courts.

My current and complete curriculum vita is attached as Appendix A to this Report.

### Objectivity

Over the past twenty-six years my trial and deposition testimony has been approximately 70% plaintiff and 30% defendants.  A current list of my trial and deposition testimony for the past four years is attached as Appendix B to this Report.

**Fees**

My fee for analysis in this case was $6,000.00.  The fee was based upon a $150.00 hourly rate and an estimate that it would require approximately forty hours of work to review the materials provided and to prepare an Expert Report.

**Items Reviewed and Relied Upon in Development of Opinions**

Before developing my opinions in this case, I reviewed the materials listed in Appendix C attached to this report. The materials reviewed are of the type typically relied upon by consultants and experts when conducting an analysis of law enforcement issues and provided me with enough relevant data to develop my preliminary opinions to a reasonable degree of professional certainty.

**Methodology**

I understand that a non-scientific expert must be qualified to offer expert testimony by knowledge, skill, experience, training, or education. I have provided in this report both my general and specific qualifications that I believe prove my qualifications to provide expert testimony in this case.

I also understand that an expert's testimony must be relevant to the specific facts of an incident under consideration and be of such a specialized nature that it would be beyond the knowledge of a typical juror.

I did not assign credibility to any witness; reviewed sufficient data to reach conclusions to a reasonable degree of professional certainty; developed a set of material and relevant facts only after a review of all materials provided; and assumed those facts to be true solely for purposes of analysis.

I am familiar with what law enforcement officers are told in use of force training programs on making accurate threat assessments and when deadly force is necessary and justified.

I am familiar with the research and the findings conducted over the past 30 years on what is known in the law enforcement profession as the "reactionary gap."

I am familiar about what officers were taught prior to 2016 in training programs about what force is considered reasonable force in a particular set of circumstances.

I am familiar with a concept called pre-emptive action (acting when a threat is perceived but before it can be carried out), the need for accurate threat assessments, and the training officers receive on removing themselves from jeopardy by taking cover, if enough time allows, before using deadly force.

3

I am familiar with the training law enforcement officers in Ohio receive regarding use of deadly force and what they are taught about the factors that should be considered before using deadly force (ability, opportunity, jeopardy and necessity).

These subjects are all matters beyond the knowledge of a typical juror and sufficiently tied to the facts of this case to be relevant and of assistance to the jury in understanding the evidence and resolving factual disputes.

### Summary of Facts

The facts in this case are disputed but I have accepted the officer's version of the events for purposes of analysis and the development of my opinions. Those facts are summarized in Appendix D attached.

### Preliminary Opinions

I have classified my opinions as preliminary at this time because I have been advised that I will be provided with additional materials to review, including Columbus police officer use of force records and others, before trial in this matter.  For that reason, I reserve the right to supplement my preliminary opinions upon the review of any additional materials.

My preliminary opinions are premised upon my experience as a law enforcement officer; my education and training in law enforcement; my knowledge of law enforcement training and standards for use of force; analysis and study in the field; through consulting professional literature, and the facts of this case as determined by my review of the materials listed in Appendix C.  I incorporate by reference my reports and opinions in *Cooper v. City of Columbus*, et al., 2:19-cv-03105 and *England v. City of Columbus*, et al., 2:17-cv-1104. My preliminary opinions are based upon a synthesis of the above.

I hold the following preliminary opinions to a reasonable degree of professional certainty.

1.      Accepting  Officer Bryan Mason's account as true, his use of deadly force against Tyre King, a 13 year old black male, on September 14, 2016 was unnecessary and a greater level of force than other officers would have used in 2016 because Officer Mason had cover and concealment readily available to him and the opportunity to take that cover and concealment instead of resorting to deadly force. Officer Mason ignored the "option" of cover and concealment available to him and shot Tyre King.

Our courts have begun to recognize that police officers too often resort to deadly force unnecessarily against young black males as the Fourth Circuit Court of Appeals did recently in the case of *Jones v. The City of Martinsburg, West Virginia* when it stated "Although we recognize that our police officers are often asked to make split-second decisions, we expect them to do so with respect for the dignity and worth of black lives."[1]

In this case, Columbus police officers were advised in the initial dispatch that "a robbery had

occurred at 18th avenue and E. Broad Street in Columbus. It was a robbery with a firearm, it was a group of kids—four—I think it said three to four" (Mason deposition page 52, lines 13-15) and "one of the black males was wearing a white t-shirt and another black male was wearing a black t-shirt" (Page 3, Report Number 160822744).

Law enforcement officers have been taught for the past 40 years that when engaging a subject, they should seek a position of concealment and cover, if possible, and communicate with the subject until they can clarify the circumstances confronting them. This concept has been referred to in the law enforcement profession for the past 40 years as the 3 C's of all tactical situations.

Officers are instructed in use of force training programs that the reasonableness of an officer's threat assessment and the reasonableness of his/her response is analyzed by asking the "objective reasonableness" questions set out in *Graham v Connor*: (1) would other reasonable officers on the date of the incident, considering the same facts and circumstances, have perceived the threat the same way; and (2) would other reasonable officers, on the same date of the incident, have responded in the same manner.

An officer's threat assessment must be considered in light of the "totality of the circumstances" known to the officer before the reasonableness of the officer's response (threat mitigation) can be determined.

Since 1989 the standard of care established by the United States Supreme Court in *Graham v. Connor*, has been used in basic law enforcement training programs to instruct law enforcement officers on the use of force. Officers are told that the Court in *Graham v. Connor* stated that "the test of reasonableness requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Further, officers are instructed in use of force training programs that the Court ruled that "the question is…. whether the totality of the circumstances justifies a particular sort of seizure."

Law enforcement officers are also told in basic law enforcement training programs on use of force that the U.S. Supreme Court ruled that "All claims that law enforcement officers have used force – deadly or not – in the course of an arrest, investigatory stop, or other seizure…will be analyzed under the Fourth Amendment reasonableness standard."[2]

In the seven-year period before the shooting death of Tyre King on September 14, 2016 Mason had been involved in 47 reports involving use of force and 25 of the use of force incidents resulted in civilians requiring medical attention (Mason deposition page 27, lines 9-21).

During the time period 2006-2016 Mason had been involved in four cases involving deadly force (Mason deposition page 39, line 20).

To have not taken advantage of the option of cover and concealment to avoid the use of deadly force when Mason knew that King was a black male "kid" ignored the recommended tactics for this type of situation and suggests that Mason would choose deadly force as a first option and not

a last resort. In fact, when asked if there were any incidents that he could recall in his career where it could have been reasonable to use deadly force, but he chose a lesser force option, Mason answered "No" (Mason deposition page 41, line 21).

2.      Acknowledging that there are disputed accounts about the events leading up to the shooting of Tyre King, Columbus Police department (CPD) Officer Bryan Mason did not have justification to use deadly force against Tyre King and his use of deadly force was a greater level of force than other officers would have used under the same or similar circumstances in 2016 because King did not place Mason or anybody else in immediate jeopardy of serious bodily harm or death.

The use of deadly force, in the absence of an actual and immediate threat of death or serious physical harm to anyone, violated the training officers receive on the use of deadly force and the Columbus Police Department policy guidance on the use of deadly force and suggests that Officer Mason was either plainly incompetent (not aware of the standards and his own department's policy for the use of deadly force) or he was aware of the standards but ignored them.

Officers are instructed in use of force training programs that the reasonableness of an officer's threat assessment and the reasonableness of his/her response is analyzed by asking the "objective reasonableness" questions set out in Graham v. Connor: (1) would other reasonable officers on the date of the incident, considering the same facts and circumstances, have perceived the threat the same way; and (2) would other reasonable officers, on the same date of the incident, have responded in the same manner.

An officer's threat assessment must be considered in light of the "totality of the circumstances" known to the officer before the reasonableness of the officer's response (threat mitigation) can be determined.

3.      The failure of the Columbus Police Department to properly supervise their officers by having an effective system in place to identify officers whose behavior might be problematic and to intervene before they harmed a citizen demonstrated a deliberate indifference to the safety of citizens that their officers would come into contact with in the performance of their police duties and was causally connected to Officer Bryan Mason's unnecessary use of deadly force on September 14, 2016 and the death of Tyre King.

The Columbus Police Department's own records showed that Mason had been involved in four incidents involving the use of deadly force during the years of 2006 to 2016.

In addition, in the seven-year period before the shooting death of Tyre King on September14, 2016, Mason had been involved in 47 incidents involving use of force and 25 of the use of force incidents resulted in civilians requiring medical attention (Mason deposition page 27, lines 9-21).

It has been known to law enforcement administrators for the past thirty (30) years that a small percentage of police officers are responsible for a disproportionate share of citizen complaints.

In fact, because the phenomenon of the "problem officer" was so well known, in 1981 the U.S. Commission on Civil Rights suggested that all police departments develop an early warning system designed to identify "problem officers" – or those "who are frequently the subject of complaints or who demonstrate identifiable patterns of inappropriate behavior."[3]

Law Enforcement Professional Associations published guidelines for agencies on how to set up, and operate an Early Warning System. An Early Warning System is a data-based police management tool designed to identify officers whose behavior is problematic. This behavior is measured by the rates of citizen complaints, any use-of-force incidents, or any other behavior deemed problematic. The system is designed to provide for early intervention to correct a problem and to monitor employee performance (Appendix E-IACP Early Warning System, Concepts and Issues Paper, 2002).

A review of the Index of Columbus Police Department Rules of Conduct, Policy Statements, and Division Directives shows that an Early Warning System did not exist in the Columbus Police Department prior to 2016.

The Index of Directives does show that a program called the Early Action Review System (EARS) existed in the Department (Columbus 003087), however, a review of the EARS records reflects that Mason was involved in 4 incidents during the time period 10-1-2012 to 9-30-2013 but no action was taken (Columbus 011065); he was involved in 7 incidents during the time period 4-1-12 to 3-31-13 but no action was taken (Columbus 011055); Mason used Mace 3 times during the time period 4-1-11 to 3-31-12 but no action was taken (Columbus 011039); and Mason used force at a level 3 or above 7 times during the time period 10-1-11 to 9-30-12 but no action was taken (Columbus 011049). Clearly, the EARS program was ineffective in intervening to correct the problematic behavior of officers in the Columbus Police Department. In fact, when asked if anybody from the Columbus Police Department chain of command had ever discussed with him the number of use-of-force incidents he had been involved in, Mason responded "No" (Mason deposition page 28, line 10).

Had the Columbus Police Department put into place an effective early warning and intervention system, it is likely Mason's propensity to use force would have been identified and intervention methods could have been taken to prevent incidents, such as the shooting death of Tyre King.

4.     The Columbus Police Department Firearms/Police-Involved Death Review Board sent a memorandum to Columbus Chief of Police Kimberly Jacobs concluding that the use of deadly force against Tyre King by Officer Mason was intentional and not a violation of policy. The Columbus Police Department chain of command affirmed that finding. The ratification of the shooting of Tyre King by the Columbus Police Department (CPD) chain of command sent a message to all department officers that officers will not be held accountable when they use more force than is necessary and when they violate Department policy.

Columbus Police Division Directive 3.25 titled *Use of Force* clearly states that the suspect must be posing an immediate threat to the safety of the officers or others (Page 2, Section II A 2 b

identified as Columbus 003252).

As discussed in Opinions No. 1 and 2 above, Mason: (a) had cover and concealment readily available to him and the opportunity to take cover and concealment instead of resorting to deadly force, and instead ignored the "option" of cover and concealment available to him and shot Tyre King; and (b) did not face an immediate threat to the safety of himself or others when he shot King.

The CPD's findings and decision not to impose discipline for the shooting of Tyre King is part of a pattern in the CPD, where officers are not disciplined for improper force incidents, including deadly force events. Additional examples of this pattern can be found in the CPD officer-involved shootings of Deaunte Bell-McGrew and James England.

These events are part of a pattern of ratification that sends a message to all department officers that CPD officers will not be held accountable when they use more force than is necessary or violate department policy and that the custom and practice of the CPD is to ignore the law and law enforcement standards for the use of deadly force. This pattern is evident in the decisions by top management and review mechanisms within the CPD, and shows a failure by the CPD to meaningfully investigate and punish unjustified deadly force events. The CPD's pattern of ratification of unjustified deadly force and excessive force events was causally connected to Mason's unnecessary use of deadly force against and the death of Tyre King.

5. The CPD's pattern of ratification of events involving deadly force or other force that is greater than necessary, discussed in Opinion No. 3, combined with the CPD's failure to properly supervise officers by having an effective system in place to identify officers whose behavior might be problematic and to intervene before they harmed a citizen discussed in Opinion No. 2, constitutes an unwritten, affirmative policy by the CPD. This policy reflects the CPD's formal rule or understanding among members of the department that police-involved shootings will almost always be found "within policy" by the CPD even if those shootings are unjustified or constitute excessive force.

This affirmative policy was causally connected to Mason's unnecessary use of deadly force against and the death of Tyre King.

Respectfully Submitted,

_Mel L. Tuck_

Melvin L. Tucker
September 4, 2020

---

[1] Estate of Wayne Jones v. City of Martinsburg, West Virginia, United States Court of Appeals for the Fourth Circuit, No 18-2142, decoded June 9, 2020
[2] *Graham v. Connor*, 490 U.S. 386 (1989)
[3] U.S. Commission on Civil Rights, *Who is Guarding the Guardians*? Washington, D.C Government Printing Office 1981

Appendix A

**MELVIN L. TUCKER**
**Criminal Justice and Security Consultant/Trainer**
**5929 Fordland Drive**
**Raleigh, North Carolina 27606**

mtucker50@nc.rr.com
919 249-6592

# CURRICULUM VITAE

## EMPLOYMENT

- Litigation Consultant and Law Enforcement/Security Trainer 1994 – Present

## ELECTED OFFICE EXPERIENCE

- Councilmember, City of Morristown, Tennessee 2005 - 2008

## CRIMINAL JUSTICE EXPERIENCE

- Deputy Sheriff, Hamblin County, TN 2004 - 2008
- Project Manager, Maine Community Policing Institute, Augusta, ME, 2000-2004
- Chief of Police, Tallahassee, FL, 1979 - 1994
- Chief of Police, Asheville, NC, 1977 - 1979
- Chief of Police, Hickory, NC, 1974 - 1977
- Chief of Police and Public Safety Director, Morristown, TN, 1971 - 1974
- Special Agent, Federal Bureau of Investigation, 1969 – 1971

## MILITARY EXPERIENCE

- United States Navy Reserve, Active Duty 1965-1969, Ensign to Lieutenant
- United States Navy Reserve, Reserve Duty 1969-1988. Lieutenant to Commander

## EDUCATION

- MPA - Public Administration, Appalachian State University; Boone, NC, 1977
- BA - Business Management, University of South Florida; Tampa, FL, 1965

## ACADEMIC APPOINTMENTS

- The University of Maine at Augusta; Augusta, ME; Adjunct, Criminal Justice, 2000-2004
- Florida A&M University; Tallahassee, FL; Adjunct, Criminal Justice, 1981-1994

1

- Florida State University; Tallahassee; FL; Adjunct, Criminal Justice, 1984
- Tallahassee Community College; Tallahassee, FL; Adjunct, Criminal Justice, 1983-1984
- Western Carolina University; Cullowhee, NC; Adjunct, Criminal Justice, 1978-1979
- Walters State Community College; Morristown, TN; Adjunct, Criminal Justice, 1972-1974

## **PUBLICATIONS**

Books
- Wecht, Cyril; Lee, Henry; Van Blaricom, D.P.; and Tucker, Melvin; *Investigation and Prevention of Officer-Involved Deaths*, CRC Press, 2011

Articles
- Taylor, Roy & Tucker, Melvin, *Action Always Beats Reaction-Or Does It?* The ILEETA Journal, Winter Edition, Volume 5, Edition 3, 2015
- Tucker, Melvin L., *Defense Against Edged Weapons Training and "Unreasonable Fear,"* The ILEETA Journal, Fall Edition, Volume 4, Edition 3, 2014
- Merritt, J., Adams, R., Tucker, M., & McGuinness, J., *Law Enforcement Officer Association Political Candidate Endorsements*, The National Trooper Magazine, October 2012 Issue
- McGuinness, M., & Tucker, M., *Staying out of Trouble and Defending Yourself*, The Blue Review, Issue 5, 2010
- Tucker, M., *The Value of an Expert Witness in Police Litigation*, The Blue Review, Issue 4, 2009
- Tucker, M. & Wisecarver C., *Legal Authority for Preemptive Action*, The Tactical Edge, Spring 2008 Issue
- Overholt, Roger, Tucker, Melvin & Wisecarver, Chris, *Procedural Due Process and the Determination of Just Cause*, The Police Chief, Vol. LXXV, Number 1, January 2008
- Wisecarver, Chris & Tucker, Melvin, *The Force Science Reactionary Gap,* Law and Order, Vol. 55, No.8, September 2007.
- McGuinness, M & Tucker, M., *Police Use of Force: Federal and Colorado Standards*, The Colorado Lawyer, Vol. 36, No. 5, May 2007.
- Tucker, M., *Officer Involved Shootings–Where and When it Happened Matters*, The Tactical Edge, Winter 2007 Issue.
- Tucker, M., *On Liars, Mistletoe and Lack of Respect for Colleagues*, Guest Editorial, The Police Marksman, November/December 2006 Issue.
- Tucker, M., *Poor Training*: *The Real Story Behind The Headlines*, The Law Enforcement Trainer, Oct/Nov/Dec 2005 Issue.
- Tucker, M., *The Selection Process and the Role of Leadership,* Integrity Talk, International Association of Ethics Instructors, Vol. 5, Issue 2, Summer 2003
- Tucker, M. & Mears, R, *High Risk Police Operations Manual,* Augusta, ME, 10-01
- Tucker, M. & Mears, R, *The Investigation of Police Officers And The Fifth Amendment,* Maine Law Officer's Bulletin No. 21, Augusta, ME, 9-01

2

- Tucker, M., *Warning: Use of Force Standards Have Changed,* The Florida Police Journal, Tallahassee, FL, 1-99
- Tucker, M, *Constitutional Rights of Public Employees in a Para-Military Organization*, Quality Cities, 1-94
- Tucker, M., *Crime Prevention Through Environmental Design (CPTED): The Tallahassee Model*, The Police Chief, Alexandria, VA, 10-93
- Tucker, M., *That Looming Reporter: Coping With a Cantankerous Press*, The Florida Police Chief, Tallahassee, FL, 11-91
- Tucker, M., *Military Joins the Drug Fight*, The Florida Police Chief, Tallahassee, FL, 8-90
- Willingham, Mark & Tucker, M., *Ethics and Values Training: A Multifaceted Approach*, The Police Chief, Alexandria, VA, 11-88
- Tucker, M., *Crack Squad Not Enough*, The Police Chief, Alexandria, VA, 6-88
- Kleman, Daniel A. & Tucker, M., *How to Build an Effective Working Relationship: The Manager/Police Chief Relationship*, Public Management, Tallahassee, FL, 6-88
- Tucker, M., *The Consequences of Liberalizing Gun Laws*, The Police Chief, Alexandria, VA, 3-88
- Tucker, Kimberly J. & Tucker, M., *How to Avoid Becoming a Defendant in a Civil Suit* (Part 2), The Florida Police Chief, Tallahassee, FL, 5-85
- Tucker, Kimberly J. & Tucker, M., *How to Avoid Becoming a Defendant in a Civil Suit* (Part 1), The Florida Police Chief, Tallahassee, FL, 4-85
- Tucker, M., *Law Enforcement Accreditation: It's about Time*, The Florida Police Chief, Tallahassee, FL, 3-85
- Hyder, Alan K. & Tucker, M., *Efficiency in Police Services: Traffic*, Law And Order, Wilmette, IL, 6-79
- Tucker, M & Bumgarner, B.L., *Attaining Public Confidence – The Police Department's Role*, The Administrator, Vol. IV, No. 1, 4-79
- Bumgarner, B.L. & Tucker, M., *Attaining Public Credibility Through Open Access*, The Administrator, North Carolina City and County Management Association, 1-79
- Tucker, M., *The Police Administrator and Affirmative Action*, Southern City, Tallahassee, FL, 1-79
- Tucker, M. & Hyder, Alan K., *Some Practical Considerations in Law Enforcement Education*, North Carolina Police Officer (Reprinted), 5-79
- Tucker, M., *The Problem Solving Task Force: Use of Participatory Management Methodology*, The North Carolina Justice Academy Reporter, 8-79
- Tucker, M. & Hyder, Alan, *Some Practical Considerations in Law Enforcement Education*, The Police Chief, Alexandria, VA, 8-78
- Tucker, M., *Zeroing in on Police Productivity,* North Carolina Police Officer, 7-77
- Tucker, M. & Hyder, Alan, *The Compact Police Car*, Southern City, 10-76
- Tucker, M., *The New Breed Police Chief* (Reprinted), Carolina Law And Order, 9-76
- Tucker, M., *The New Breed Police Chief*, The North Carolina Justice Academy Reporter, 8-76, Alexandria, VA
- Hyder, Alan K. & Tucker, M., *Economic Realities Force Effective Manpower Utilization*, The Police Chief, Alexandria, VA, 4-76

- Tucker, M., *Fostering Inefficiency Through LEAA Grants*, <u>Western Piedmont Government News,</u> 12-75
- Tucker, M., *The New Breed of Police Officer,* <u>The North Carolina Justice Academy Reporter,</u> 12-75

## PROFESSIONAL AFFILIATIONS

- International Law Enforcement Educators and Trainers Association (ILEETA)
- National Tactical Officers Association (NTOA)
- American Society of Law Enforcement Trainers (ASLET)
- American Society for Industrial Security (ASIS)
- Police Executive Research Forum (PERF)
- International Association of Chiefs of Police (IACP)
- Maine Chiefs of Police Association (MCPA)
- Florida Department of Business Regulation, Hotels and Restaurants Security Task Force
- Florida Juvenile Justice Center; Commissioner
- Florida Police Chiefs' Association Ethics Committee
- State of Florida Technical Committee for Public Service Education
- Florida District 2, State Emergency Response Commission
- Advisory Board, Florida Criminal Justice Information System (CJIS)
- Advisory Board, Florida Interagency Narcotics Information Network (FININ)
- Florida Criminal Justice Standards and Training Commission; Vice-Chairman
- Florida Governor's Task Force on Law Enforcement
- Florida Police Chiefs Association (FPCA)
- North Carolina Governor's Crime Prevention Commission
- North Carolina Association of Chiefs of Police; Vice-President
- North Carolina Criminal Justice Education and Training Council; Chairman
- North Carolina Association of Chiefs of Police; Secretary-Treasurer
- North Carolina Governor's Law and Order Commission
- Technical Advisory Committee, University of North Carolina, Charlotte

## CERTIFICATIONS

- S&W 9MM Semi-Automatic
- Monadnock PR-24 Baton Basic
- Monadnock Expandable Baton Advanced
- Advanced M-26 and X-26 Taser
- Oleoresin Capsicum (OC)
- Police Defensive Tactics
- Law Enforcement Trainer (CLET), American Society for Law Enforcement Trainers (ASLET)
- Law Enforcement Ethics Instructor, National Institute of Ethics (NIE)

- Certified Protection Professional (CPP), American Society for Industrial Security 1998-2001
- Law Enforcement Certificate, State of Florida 1979-1994
- Advanced Law Enforcement Certificate, State of North Carolina 1974-1979
- Jail Operations Certificate, State of North Carolina 1974-1977
- Law Enforcement Certificate, State of Tennessee 1971-1974

## AWARDS AND RECOGNITIONS

- *First Place Award*; *Use of Force Academic Test*, 14th Annual Seminar, American Society for Law Enforcement Training (ASLET); Orlando, FL, 2-01
- *Outstanding Public Administrator*, North Florida Chapter of the American Society Of Public Administration (ASPA), 4-93
- *Writing Excellence Award* for article, <u>That Looming Reporter: Coping With a Cantankerous Press</u>, Charles G. Wellborn Foundation, 10-92
- *Service Award*, Glenn Terrell Foundation, Tallahassee, FL, 5-90
- *President's Service Award*, United Way, Tallahassee, FL, 5-83
- *Freedom Award*, NAACP, Tallahassee, FL, 5-81
- *Service Award*, North Carolina Attorney General's Office, 12-79
- *Appreciation Award*, U.S. Secret Service, Tallahassee, FL, 9-79
- *Tennessee Law Enforcement Officer of the Year*, TN 1972

## LAW ENFORCEMENT AND SECURITY TRAINING AND CONSULTING

Since 1994, Chief Tucker has been training law enforcement officers in personnel issues, high-risk operations, conducting security surveys for businesses and government agencies, conducting agency evaluations, providing criminal justice and security consulting services and providing litigation support as an expert in police and security matters for both defense and plaintiffs.

## LITIGATION SUPPORT SERVICES

Chief Tucker has been retained in approximately 600 law enforcement and security cases. He has testified as an expert over 120 times in the following areas:

- Negligent hiring, retention, assignment, training, and supervision
- Use of less than lethal and lethal force
- Emergency vehicle operations
- Premises liability/Security Guard negligence
- Reasonable accommodation
- Free speech
- Probable cause/ reasonable suspicion
- Police personnel practices, officer conduct
- Race and sex discrimination
- Proper police procedures, criminal investigations

5

He has provided litigation services in:

| | | | |
|---|---|---|---|
| Alabama | Alaska | Arizona | Arkansas |
| California | Canada | Colorado | Connecticut |
| District of Columbia | Florida | Georgia | Illinois |
| Kentucky | Louisiana | Maine | Maryland |
| Massachusetts | Michigan | Mississippi | Missouri |
| Montana | Nebraska | New Hampshire | New Jersey |
| New Mexico | New York | Nevada | North Carolina |
| Oklahoma | Ohio | Pennsylvania | Puerto Rico |
| South Carolina | Tennessee | Texas | Virginia |
| Washington | West Virginia | | |

## **CRIMINAL JUSTICE TRAINING SERVICES**

Chief Tucker conducts training seminars for officers, supervisors and managers of federal, state, county and municipal law enforcement agencies in the following areas:

- High-speed pursuit and emergency response
- Use of force
- Personnel practices
- Writing reports to reduce civil liability risk
- Legal and professional standards regulating police high-risk operations
- Auditing operations to reduce civil liability risk
- Civil liability awareness
- Standards for discipline

He has provided criminal justice training for the following organizations:

- The Henry C. Lee Institute of Forensic Science, University of New Haven, *The Crises Between the Police and People of Color*;
- American Bar Association (ABA) Conference in Tampa, FL on *Resolving The Crises*
- Duke Law Center on Law, Race and Politics, *Police Use of Force*
- North Carolina Conference of District Attorneys, *Conducting Investigations and Evaluations of Law Enforcement Officers Use of Deadly Force*, Raleigh, NC
- North Carolina Chapter of the Southern Police Institute Alumni Association, *Career Survival*, Conover, NC
- North Carolina Criminal Defense Lawyers Association, Continuing Legal Education Seminar, Cary, NC, *The Use of Law Enforcement Expert Testimony in Criminal Cases*
- Performance Institute, Arlington, Virginia, National Summit on Use of Force in Law Enforcement, *The Legal Standards of Use of Force*

6

- Jefferson County, TN Sheriff's Department, *Use of Force: Legal, Professional and Ethical Standards*
- Hancock County, TN Sheriff's Department, *Use of Force: Legal, Professional and Ethical Standards*
- Hamblen County, TN Sheriff's Department, *Use of Force: Legal, Professional and Ethical Standards*
- Utah/Nevada FBI National Academy Graduates Association, *Use of Force, Standards & Threat Assessment*
- Morristown, TN Police Department, *Use of Force: Legal and Professional Standards*
- DOJ/COPS, Lewiston, Maine, *Use of Force and Investigation of Citizen Complaints*
- Houlton, Maine Police Department, *Use of Force: Legal, Professional and Ethical Standards*
- Police Executive Leadership Seminar, Lewiston, Maine, *The Police Departments Role in Homeland Security*
- Director's Conference, Regional Community Policing Institutes, Washington, D.C., *Surviving Federal Audits of Grants*
- The 13th Annual NASRO Conference, Orlando, FL*, Avoiding Liability While Serving As A School Resource Officer*
- The 2nd Annual Community Policing Conference, Washington, D.C.*, Ethics and Integrity: The Selection Process*
- Augusta Police Department, Augusta, ME, *Emergency Vehicle Operations*
- Mid-Coast Police Chiefs Association, Brunswick, ME, *Ethics in Law Enforcement*
- National Troopers Coalition, Portland, ME, *Free Speech, Due Process, and Use of Force Investigations*
- Maine Department of Corrections, Charleston, ME, *Ethics and Integrity in a Corrections Setting*
- Tallahassee Police Department, Tallahassee, FL, *Writing Reports, Auditing, Training, and Understanding Concepts to Avoid Administrative and Civil Culpability*
- Pat Thomas Law Enforcement Academy, Quincy, FL; *Legal and Professional Standards Regulating Police Use of Force, Pursuit and Emergency Response*
- Bangor Theological Seminary, Bangor, ME; *Counseling Victims in Police Use of Force Cases*
- Maine Criminal Justice Academy, Vassalboro, ME; *Domestic Violence and Crimes Against the Elderly*
- Maine Mid-Coast Chief's Association, Wiscasset, ME; *High Risk Police Operations*
- Maine Mid-Coast Chief's Association, Rockland, ME; *High Risk Police Operations*
- Maine Criminal Justice Academy, Waterville, ME; *Civil Liability Awareness*
- Labor Relations Information System Seminar, Kissimmee, FL; *Standards For Discipline*
- National Expert Witness and Litigation Seminar, Hyannis, MA; *Police Use of Force*
- Labor Relations Information System, Orlando, FL; *Procedural Due Process and Just Cause*
- Maine EMS, Islesboro, ME; *Emergency Vehicle Operations*
- Public Employment Labor Relations Forum, Tampa, FL; *Constitutional Rights of Public Employees*

- Florida Department of Law Enforcement, Tallahassee, FL; *Investigating Use of Force*
- Center for Advanced Law Enforcement Studies, Tampa, FL; *Excessive and Deadly Force: Law, Policy and Investigation*
- Florida Criminal Justice Executive Institute, Ft. Lauderdale, FL; *Personnel Issues*
- MCPI Leadership 2000 Seminar, Northport, ME; *Auditing Operations to Reduce Civil Liability Risk*
- Gulf Coast Community College, Panama City, FL; *Personnel Issues in Managing a Florida Law Enforcement Agency*
- Florida Police Chiefs and Florida Criminal Justice Executive Institute Annual Seminar, Tallahassee, FL; *Civil Liability*, *Manpower Allocation* a*nd other Personnel Considerations*
- Florida Criminal Justice Executive Institute*:* Fort Pierce, FL; *Police Personnel Use, Discipline Process, and Public Official Liability*
- New River Criminal Justice Academy, Radford, VA; *Policy Issues Relating to Substance Abuse Within Criminal Justice Agencies*
- Florida Criminal Justice Executive Institute, Tallahassee, FL; *Police Personnel Management*
- Lively Criminal Justice Training Academy, Advanced Instructor Training Series: Quincy, FL; *Police Vehicle Operations*, *Use of Force,* and *Vicarious Liability* Concerns for Instructors
- Annual Florida Police Chiefs' Seminar: Tallahassee, FL; *Police Patrol*, *Use of Force*, *Police Vehicle Operations*, and *Police Tactical Operations*
- Iceland Police Department; Reykjavik, Iceland, *Drug investigations, interdiction, and prevention strategies*
- Florida Criminal Justice Executive Institute, St. Petersburg Junior College, St. Petersburg, FL; Personnel *Issues and High Risk Management*
- Maine Police Chiefs' Association, Houlton, ME; *Police High Risk Operations* and *Vicarious Liability*
- Portland Police Department, Portland, ME; *Police High Risk Operations*
- Florida Marine Patrol, Tallahassee, FL; *Police High Risk Operations*
- Bay County Community College, Panama City, FL; *Police Raids, Stakeouts, Use of Force, Vehicle Operations*
- Escambia County Sheriff's Department, Pensacola, FL; *Police High Risk Operations*
- Broward Community College, Melbourne, FL; *Police Raids*, *Stakeouts*, *Use of Force*, *Vehicle Operations*, *Hostage Situations*
- O'Connell Corporation, Washington, D.C.; *Criminal Interrogation Techniques*
- Office of the State Attorney, 6th Judicial Circuit, Key West Florida, *Consultant on Police Code of Silence*
- Hillsborough County Sheriff's Department; Tampa, FL; *Police Civil Liability Awareness/High Risk Operations*

## CRIMINAL JUSTICE CONSULTING

Chief Tucker has provided criminal justice consultant services for the following organizations:

8

- Associated Press, *Deadly Force by Police Against Breonna Taylor* in Louisville, KY
- CNN Kate and John appearance on *Walter Scott Shooting*, North Charleston, SC
- CNN Wolf Blitzer appearance on *Walter Scott Shooting*, North Charleston, SC
- The Associated Press, *Deadly Force Issues since Michael Brown* incident Ferguson, MO
- CBS (Sixty-Minutes) *Police Shootings of unarmed African American males*
- The Associated Press, News Consultant, *Deadly Force Incidents Memphis Police*
- The Sarasota Herald-Tribune, News Consultant, *Off-Duty Officer Involved Shooting*
- The Palm Beach Post, News Consultant, *Policy Guidance, Training, Use of Less Than Lethal Weapons: Tasers*
- The Boston Globe, The Associated Press, The New York Times, The Washington Post, News Consultant, *Death of College Student by Pepper Ball Weapon following Red Sox Game*
- Camden and Rockport, Maine; *Efficiency/Manpower Utilization Studies of Police Departments*
- Louisville Courier-Journal; News Consultant, *Evaluation of Six Officer-Involved Shootings*
- The Florida Department of Lottery; *Review of Firearms Training and Deadly Force Policy*
- Jackson, MS; *Police Chief Selection Consultant*
- CBS program Eye to Eye With Connie Chung; News consultant, *Violence in America*
- CNN program Across America With Larry Woods; News consultant, *Drug Abuse Resistance Education*
- Cape Coral, FL; *Police Chief Selection Consultant*
- Cairo, GA; *Police Chief Selection Consulta*nt
- Cocoa Beach, FL Police Department; *Management Evaluation*
- Fort Walton Beach, FL; *Police Chief Selection Consultant*
- Orange City Police Department; Orange City, FL; *Management Evaluation*
- Edgewater, FL Police Department; *Management Evaluation*
- Bowling Green, KY; *Police Chief Selection Consultant*
- Hendersonville, NC; *Police Chief Selection Consultant*
- Texas League of Municipalities, Houston, TX; *Police Officer Bill Of Rights Consultant*
- U.S. Department of Justice, Nashua, NH *Race Relations and Racial Profiling*
- The Eighth Annual National Expert Witness and Litigation Seminar, Hyannis, MA *Police Use of Force: Myths and Realities*
- Labor Relations Information Personnel Issues Seminar, Orlando, FL; *Procedural Due Process and the Right to Be Heard*
- Labor Relations Information Systems Personnel Issues Seminar, Orlando, FL*; The Investigation of Police Officers and the Fifth Amendment*
- Labor Relations Information Systems Personnel Issues Seminar, Orlando, FL; *Procedural Due Process and the Determination of Just Cause*
- The American Criminal Justice Association, Pittsburgh, PA*; Police Discipline: An Innovative Process for Intra-Agency Corrective Response*

## SECURITY TRAINING AND CONSULTING

During his law enforcement career Chief Tucker supervised crime prevention units in four police departments that provided security surveys of homes, businesses, and government buildings. He routinely reviewed construction plans for new businesses for compliance with the principles of crime prevention through environmental design (see *Crime Prevention Through Environmental*: *Design (CPTED): The Tallahassee Model,* The Police Chief, 10-93). He trained hotel, motel, and restaurant/lounge managers and apartment complex managers on crime prevention techniques, conducting security surveys, and calculating the risk of crime on their property. He served on the Florida Hotel, Motel, and Restaurants Security Task Force providing crime prevention techniques for the Task Force bulletin. He taught crime prevention strategies, concepts, and techniques at the university level as an adjunct faculty member. He also served on the North Carolina Governor's Crime Prevention Commission. In December 2002 he received training in Tel-Aviv, Israel from the Israeli Security Agency (ISA) on airport/airline security, threat assessment, doctrine development, and training requirements. A member of the American Society for Industrial Security (ASIS) and a former Certified Protection Professional (CPP), he has provided security consulting services and security training for the following organizations:

- Walters State Community College, Morristown, TN, *Campus Security Awareness*
- Consortium of Security Professionals, Chicago O'Hare Airport, *Security in a Mass-Transportation Environment/Role of State and Local Police in Homeland Security*
- Maine Post-Secondary Educational Institutions Security Directors Conference, Augusta, ME, *Campus Security*
- University of Maine Center Directors Conference, Augusta, ME*, Premises Liability Concepts, Risks Identification, Security Protocols*
- State of Maine Campus Security Summit, Colby College, Waterville, ME, *Campus Security Risks Assessments, Programs and Audits*
- Gardiner, ME Boys and Girls Club*, Security Evaluation*
- Seeds of Peace Center, Otisfield, ME, *Security Evaluation in preparation for Israeli/Palestinian youth conference*
- Florida Department of Management Services, Division of Facilities Management, Tallahassee, FL, *Security*, *Safety* & *Premises Liability*
- Latitude 44/Longitude 69 Restaurant*, Islesboro, Maine, Security Survey of Facility*
- The Florida Department of Revenue; Tallahassee, FL, *Security Survey of* F*acilities,* Miami, Tampa, and Clearwater offices
- Academy of Florida Trial Lawyers, Premises Liability Seminar, Tampa, FL; *The Role of Law Enforcement in Crime Prevention on Private Property*
- National Crime Prevention Institute, Reykjavik, Iceland; *Crime Prevention in the Future*
- Brett and DeHaven, Tallahassee, FL; *Security Survey of The Highpoint Center Office Complex*
- Florida Hotel & Motel Association*, Tallahassee, FL; Avoiding Liability in Premises Security*

10

Appendix B

Melvin L. Tucker
Deposition/Trial Testimony

1. <u>Rodney Mitchell v Sarasota County Sheriff's Office et al</u>
   United States District Court
   Middle District of Florida
   Tampa Division
   CA No: 8:14-cv-01376
   Deposition/Plaintiff

2. <u>Tanner Gates vs Officers Leonbruno and Gerardi, Willoughby Hills PD</u>
   Court of Common Pleas
   Cuyahoga County, Ohio
   CV 14 824344
   Deposition/Plaintiff

3. <u>Madel Rivero v Sheriff Steve Loftis, Greenville County SO</u>
   Court of Common Pleas
   County of Greenville
   State of South Carolina
   Case # 2013-CP-23-06522
   Deposition/Plaintiff/Trial

4. <u>Monte Stanford v Union County Sheriff's Department</u>
   Court of Common Pleas
   County of Union
   State of South Carolina
   Case No.:2013-CP-44-00227
   Deposition/Plaintiff

5. <u>Shauna Smith v. Pt. Roger Jones</u>
   United Sates District Court
   Northern District of Ohio
   Case No. 1:13-CV-744
   Trial/Plaintiff

6. <u>Vicki McKenney v. Nicholas Mangino, Cumberland County SO</u>
   United States District Court
   District of Maine
   CA No.: 2:15-cv-00073-JDL
   Deposition/Plaintiff

7. <u>Arlean Brown vs. Brian Elliott, Jim Matthews, & Kershaw County SO</u>

United States District Court
District of South Carolina
Columbia Division
CA.: 3:14-cv-01188-JFA-PJG
Deposition/Plaintiff

8.  <u>Williston Drayton vs. County of Charleston, et al.</u>
United States District Court
District of South Carolina
Charleston Division
CA No.: 2:14-CV-3488-RMG-BM
Deposition/Plaintiff

9.  <u>June Morris v. City of East Orange, et al</u>
Superior Court of New Jersey
Essex County
Docket # ESX-L-3896-13
Deposition/Plaintiff

10. <u>Dontrell Stephens v. Ric Bradshaw and PBCSO</u>
United States District Court
Southern District of Florida
CA No.: 9:14-cv-80425
Trial/Plaintiff

11. <u>William Sadulsky v. Town of</u> Winslow, et al
United States District Court
District of Maine
CA No: 1:14-CV-01-GZS
Trial/Plaintiff

12. <u>Corey Khansari v. City of Houston, et al</u>
United States District Court
Southern District of Texas
Houston Division
CA N0: 4:13-CV-02722
Trial/Plaintiff

13. <u>Kenneth Hunter, Rick Donathan, Jerry Medlin v. Town of Mocksville</u>
United States District Court
Middle District of North Carolina
CA NO: 1:12-cv-333
Deposition/Trial/Plaintiff

14. <u>Willie Grimes vs. City of Hickory, et al</u>
United States District Court

Western District of North Carolina
Statesville Division
CA No 5:14-CV-160
Deposition/Plaintiff

15. <u>Spencer Mims Jr. vs City of Charlotte et al</u>.
General Court of Justice
Superior Court Division State of North Carolina
County of Mecklenburg
2014 –CVS-23815
Deposition/Trial/Plaintiff

16. <u>Veronica Dorato vs. Officer Martin Smith, et al.</u>
United States District Court
District of New Mexico
No: 1:14-CV-00365 JB-GBW
Deposition/Plaintiff

17. <u>Jordan Jefferson v Thaddeus Reddish, City of New Haven et al</u>
United States District Court
District of Connecticut
CA 3:12-cv-01543-VLB
Deposition/Plaintiff

18. <u>Reginald Newberne v. NC Department of Public Safety</u>
General Court of Justice
Superior Court Division
Wake County, NC
Trial/Plaintiff

19. <u>Lissette Hernandez v. Bob Hansell et al</u>
USDC
Middle District of Florida
Orlando Division
CA NO: 6:14-cv-1351-ACC-DAB
Trial/Plaintiff

20. <u>Jeffrey Martin, et al v. Mississippi Dept of Public Safety</u>
Circuit Court of Lee County, Mississippi
CA No: CV 2013-021
Trial/Plaintiff

21. <u>Sara Knowlton vs. Richland County, Ohio, et al</u>
USDC
Northern District of Ohio
Eastern Division

CA N0: 1:15-CV-00210
Deposition/Plaintiff

22. <u>Tavares Docher vs Christopher Newman et al</u>
USDC
Southern District of Florida
CA NO: 2:16cv14413
Deposition/Plaintiff

23. <u>Sandon Sierad v. Greg Walker, GCSO</u>
USDC
District of South Carolina
Greenville Division
CA No: 6:16-cv-02840-HMH-KFM
Deposition/Plaintiff

24. <u>Kathy Livingston v. Harnett County SO et al</u>
USDC
Eastern District of North Carolina
Western Division
CA 5:16-cv-00906-BO
Deposition/Plaintiff

25. <u>Sabrina Jackson v. Lexington County SO et al</u>
Court of Common Pleas
State of South Carolina
County of Lexington
CA 16-CP-32-1432
Deposition/Trial/Plaintiff

26. <u>Tressa Sherod, et al v. Officer Sean Williams, et al</u>
United States District Court
Southern District of Ohio
Western Division
CA 3:14-cv-454
Deposition/Plaintiff

27. <u>Mack Wells v Steven Sulser, Columbia PD</u>
USDC
District of South Carolina
Columbia Division
CA #3:17-cv-00086-JFA-SVH
Deposition/Plaintiff

28. <u>Teresa Hensley v. Bobby Suttles and Haywood County Sheriffs Office</u>
United States District Court

Western District
Asheville Division
CA No.: 1:14-cv-00193
Trial/Plaintiff

29.    <u>Andrew Joseph v. Hillsborough County SO</u>
United States District Court
Middle District of Florida
Tampa Division
C.A. NO. 8:16-CV-274T^35-TBM
Deposition/Plaintiff

30.    <u>Jason Turk v Tampa Police Dept, Officer Bergman</u>
United States District Court
Middle District of Florida
Tampa Division
CA No.: 8:14-cv-01940-MSS-AEP
Trial/Plaintiff

31.    <u>Adam Fried vs. City of Strongsville, Ohio</u>
United States District Court
Northern District of Ohio
Eastern Division
CA No: 1:18cv-00139
Deposition/Plaintiff

32.    <u>Ronald Johnson vs Escambia County SO, et al</u>
USDC
Northern District of Florida
Pensacola Division
CA 3:15-CV-005430 rv-cjk
Trial/Plaintiff

33.    <u>Angeletha Aiken vs. Campus Corner Property Management</u>
Court of Common Pleas
First Judicial Circuit
State of South Carolina
CA No. 2019P3800059
Trial/Plaintiff

34.    <u>Rebecca Schaeffer vs. Lana's Red Lion Pub, Inc</u>
Circuit Court of the Sixth Judicial Circuit
In and For Pinellas County, Florida
Case Number 2015-CA-002036
Trial/Defense

35.    <u>McGee vs. City of Whitehall, et al</u>
       United States District Court
       Southewrn District of Ohio
       Eastern Division
       Case No. 2:19-CV-379
       Deposition/Plaintiff

36.    <u>Brown v. Park Recreational Development , Inc and Spectrum Properties, Inc.</u>
       Court of Common Pleas
       Ninth Judicial Circuit
       Case No. 2018-CP-10-4210
       Deposition/Plaintiff

Appendix C

Materials Reviewed

1.      Plaintiff's Complaint;
2.      Columbus PD Shooting Investigation;
3.      Deposition of Officer Bryan Mason;
4.      Deposition of Officer Robert Reffitt;
5.      Critical Incident Response Team (CIRT) SOP;
6.      CIRT Spreadsheets 2010-2016;
7.      Defensive Tactics Unit (DTU) studies, scenarios, training on impact weapons, mask, tasers, excited delirium, use of force, etc;
8.      Columbus Police Department (CPD) Policies;
9.      CPD Training Documents;
10.    2010 through 2015 IAB Reports; and
11.    Employee Action Review System (EARS) Reports through 2015;
12.    Documents related to *Cooper v. City of Columbus*, et al., 2:19-cv-03105 and *England v. City of Columbus*, et al., 2:17-cv-1104.

Appendix D

Summary of Disputed Facts

On September 14, 2016 at approximately 9:28 pm Michael Ames was walking to his car parked on the east side of S. 18th Street near the corner of E. Capital Street after leaving the Yellow Brick Pizza store located at 892 Oak Street, Columbus.

Ames observed four teenagers on the west side of the street, near Agate Alley. One of the teenagers asked him for the time and Ames responded that he didn't know what time it was and kept walking.

Ames stated that he walked past his car and turned around and was confronted by one of the teenagers with a handgun who ordered him to empty his pockets which he did. The robber then told him to turn around and walk away. He immediately reported to two females, Felicia Johnson and Sarah Yantis, what had happened and they called the police on 911 and reported the robbery.

At approximately 9:30 pm, Columbus Officer Ryan McKee, working in a patrol car with Officer Kevin Yankovich, heard the radio dispatcher air a robbery at gunpoint at E. Broad Street and S. 18th Street. Officers McKee and Yankovich immediately responded to that area and observed a group of males in the roadway on Hoffman Avenue just south of Broad Street. Two of the individuals took off running and were pursued on foot by McKee and Yankovich. McGee and Yankovich were unable to get a fence gate open that the two teenagers had jumped over and while attempting to get through the gate heard two or three gunshots to the north of their location.

According to Columbus Officers Robert Reffitt and Bryan Mason, as they were getting closer to the location of the robbery, they received a report from dispatch that the suspects were running southeast through the parking lot of the Red Cross building located near Hoffman Avenue and E. Broad Street.

As Officers Reffitt and Mason turned southbound onto Hoffman they spotted two black males fleeing westbound between some houses. At that point, Officer Mason exited the patrol car, which Reffitt was driving, and began a foot pursuit.

As Mason ran past the first house, he came into a small parking area and spotted a black male (later identified as Tyre King) at the front end of a red Honda automobile. Officer Reffitt, who had exited the patrol car and also was engaged in a foot pursuit of the suspects, heard Officer Mason giving commands to King and the other suspect (later identified as Demetrius Braxton) to get on the ground. Braxton followed his commands but King did not.

Both Officers Reffitt and Mason reported that they then saw King pulling a handgun from around the area of his waistband and Mason fired three shots killing King. Reffitt did not fire his weapon.

1

Appendix E

# IACP National Law Enforcement Policy Center
## EARLY WARNING SYSTEM
**Concepts and Issues Paper**
**October 2002**

## I. INTRODUCTION

### A. Purpose of the Document

This paper is designed to accompany the *Model Policy on Early Warning Systems* published by the IACP National Law Enforcement Policy Center. This paper provides essential background material and supporting documentation to provide greater understanding of the developmental philosophy and implementation requirements for the model policy. This material will be of value to law enforcement executives in their efforts to tailor the model to the requirements and circumstances of their communities and their law enforcement agencies.

### B. Background

The intent of this document and the model policy on which it is based is to closely examine the development, goals, and implementation of the early warning system. This information will (1) describe and analyze the various procedural guidelines in creating an early warning system; (2) expand the knowledge of officers, supervisors, and managers alike regarding the use of an early warning system; (3) examine various early warning system software programs that are available for department use; (4) and examine the problems and concerns that are associated with EWS. It is recognized that individual departments often have widely varying procedures and styles in this area and that some of these are the product of state law, employment contracts, or state or local civil service requirements and agreements. This document attempts to provide some fundamental components of a well-administered, professional program governing the use of an early warning system.

There is substantial evidence indicating that in a majority of police departments a small percentage of police officers are accountable for a disproportionate share of citizen complaints. Investigative journalists have reported departments in which as few as 2 percent of all officers are responsible for nearly 50 percent of all citizen complaints.[1] Herman Goldstein first introduced the notion of the "problem officer" in the 1970s. He noted that problem officers are well known to their supervisors, to the top administrators, to their peers, and to the residents of the areas in which they work, but, very little is done to curb their conduct. In 1981, the U.S. Commission on Civil Rights suggested that all police departments develop an early warning system designed to identify problem officers – or those "who are frequently the subject of complaints or who demonstrate identifiable patterns of inappropriate behavior."[2]

An early warning system (EWS) is a data-based police management tool that is designed to identify officers whose behavior is problematic. This behavior is measured by the rates of citizen complaints, any use-of-force incidents, or any other behavior that is deemed problematic. The system is also used to provide intervention to correct the problem and to assist supervisory personnel in monitoring employee performance. A comprehensive personnel early warning system is an essential component to any well-managed law enforcement agency. Early identification of potential problem employees can increase agency accountability and offer

employees a better opportunity to meet performance requirements and conform with the agency's values and mission statement.

The availability of the early warning system does not alter the critical role of line supervisors to directly monitor the performance and behavior of personnel under their charge on a daily basis. According to national study of early warning systems, "An EWS is 'early' in the sense that a department acts on the basis of performance indicators that suggest that an officer may be having problems on the job but does not necessarily warrant formal disciplinary action. The system 'warns' by providing officers with counseling or training designed to address the problematic behavior. The intervention is informal in the sense that it is not itself an official disciplinary action."[3]

The CALEA Standard 35.1.15 on personnel early warning systems notes that a written directive should establish a personnel early warning system to identify agency employees who may require agency intervention efforts. The system should include

- Provisions to initiate a review based on current patterns of collected material;
- Agency reporting requirements of conduct and behavior;
- Annual evaluations of the system;
- The role of first-and-second level supervision;
- Remedial action; and
- Some type of employee assistance such as a formal employee assistance program peer counseling.[4]

The EWS is also known as risk management – the identification and prevention of predictable losses to an organization. Risk management is the systematic proactive approach to pre-incident reduction of adverse consequences that is associated with organizational operations and should be acknowledged by every department employee. This system is completed through the continuous identification, analysis, and evaluation of risk exposure and determining and developing the best methods of preventing or limiting loss.[5] The need for an early warning system within law enforcement agencies is at an all-time high. Rarely in our nation's history of policing have the actions of its officers been so highly scrutinized as they are today. In 1992, one major city police department paid approximately 54 million dollars in civil claims, settlements, and judgments. Of that 54 million dollars, nearly 20 million of it was directly attributable to the police department.

According to one authority, there are six benefits to an early warning system:

- To "salvage" an officer's career;
- To force immediate supervisors to become actively involved in employee conduct
- To provide evidence of a department's efforts to help an officer should the officer not respond and ultimately need to be terminated;
- To create criteria that can be used to develop positive changes in training, equipment, tactics, and policy;
- To develop documentation that can help defend the agency against custom and practice litigation; and
- To enhance greater community confidence in the department's ability to control and manage itself.[6]

Before 1990, documentation regarding personnel was limited primarily to evaluations, commendations, and disciplinary actions. Few agencies recorded data pertaining to personnel performance or the level of force used by officers, frequency or categories of complaints received, employees responsible for causing complaints, lawsuits and claims, shooting incidents, or tactics used. In addition to this, many departments were not keeping records in a readily

accessible manner. Records, if kept, did not track or indicate employee tendencies for behavioral problems.

A national survey conducted by the National Institute of Justice found that early warning systems have become a significant tool in American law enforcement. By 1999, 39 percent of all municipal and county law enforcement agencies that serve more than 50,000 persons either had an early warning system in place or were planning to implement one. Larger agencies were more likely to use an early warning system than were smaller agencies. Among agencies with 1,000 or more sworn officers, 79 percent had or planned to have an EWS, while only 56 percent of agencies with between 500 and 999 sworn officers had or planned to have such a program.[7]

The popularity of EWS as part of a solution for police misconduct raises several questions about its effectiveness. Are early warning systems effective in reducing police officer misconduct? Are some types of early warning systems more effective than others? What impact do early warning systems have on the departments in which they operate? Do early warning systems have unintended and undesirable effects? Very little research has been done on the subject, and it is the goal of this discussion paper to address many of these questions.

The IACP report on integrity and corruption control affirms that an early warning system is not a program that focuses exclusively on problem officers but rather a proactive management tool that is useful in identifying a wide range of problems including inappropriate supervisory instructions to officers and other management issues.[8] The IACP *Model Policy* on *Early Warning Systems* is intended to assist police supervisors and managers in identifying officers and other department employees whose performances necessitate review and where appropriate, intervention in circumstances that may have potential negative consequences for the employee, fellow employees, the agency, and/or the general public.[9]

## II. POLICY RECOMMENDATIONS

### A. Procedures for Reporting Incidents

The primary goal of the early warning system is to change the behavior of the individual officers who have been identified as having potentially problematic performance records or whose record of actions suggests the need for intervention at some level. The basic intervention strategy involves a combination of deterrence and education. Early warning systems also operate on the theory that training, as a part of intervention, can help officers improve their performance. In most early warning systems, the first intervention consists of a review by the problem officer's immediate supervisor. Nearly half of agencies also include other command officers in counseling officers.

Early warning systems differ in procedures utilized. Most early warning systems are managed by the agency's internal affairs unit. This unit may also be referred to as the office of professional standards (OPS). It is a unit composed of employees whose primary responsibility is to conduct investigations of employee misconduct allegations, and may also have responsibility for risk management and overall compliance with professional standards. For smaller departments, this function may be administered by an individual officer or another department employee.

The OPS has the ability to initiate internal investigations on its own that are not generated by employee misconduct allegations if given prior approval by the department's CEO. Other duties of the OPS include maintaining a central file of complaints received; conducting regular audits of complaints to ascertain the need for changes in training or policy; compiling statistical and related information to identify trends in complaints involving the use of excessive force or abuse of authority; tracking complaints against individual employees to assist in employee risk

analysis; and providing the department's CEO with an annual summary of complaints against employees and the disposition of those complaints.[10]

It is important for the OPS to determine specific selection criteria for identifying problem employees. Although there are currently no standards for identifying officers for early warning programs, there is a general agreement about certain criteria that should induce the selection. One major police department created four categories of behavior to identify officers meriting intervention. These are (1) citizen complaints (list all officers with 5 of more complaints); (2) control of persons (use of force) incidents; (3) reprimands; and (4) discharge of firearms.[11] The IACP *model policy* recommends the following behavioral indicators:

- Complaints lodged by one employee against the other;
- Summary disciplinary actions taken against an employee by a supervisor with or without a formal complaint;
- Complaints lodged by citizens against agency personnel;
- Incidents of spousal abuse;
- Disciplinary actions taken against employees; and
- Administratively defined examples of improper actions and/or improper conduct

A report conducted by the IACP on police integrity and the control of corruption recommends the following for department collection of performances:

- Firearm discharge;
- Excessive force incidents;
- Motor vehicle damage;
- Loss of departmental equipment;
- Injury on duty;
- Excessive use of sick leave; and
- All complaints, including supervisory disciplinary actions[12]

According to the previously mentioned department, once an officer is identified, the supervisor is notified and is expected to meet with the officer to determine if the charged officer is in need of assistance – such as counseling, training or other intervention. The officer is then monitored closely. The internal affairs department provides the supervisor with a report of each incident under review along with the officer's assignment when the incident occurred. If the incident involved a use of force, it is the duty of the OPS to gather all the following information: name, rank, badge number and assignment of officer; case number; date of the incident and the report; name of the subject(s); location of the incident; nature of force and weapon used by the officer and subject; injuries sustained by the officer and subject, if any; and narrative report of the incident.[13] Also included in the OPS report are any occurrences of traffic accidents; pursuit (both within and out of policy); lawsuits and claims; assaults on the officer; officer reports of resisting arrest, and obstruction; sick leave used; and criminal arrests made.[14]

The model policy recommends that incident reports should collect and report on any of the aforementioned data as well as information that is comparable to any historical norms (such as traffic pursuit or use of force) of all agency personnel functioning in the same or similar assignments. It is the responsibility of the department to update regularly the specific norms for each behavioral or performance indicator. Any reports on individual officers based on deviations from those norms should be distributed to the appropriate supervisor.[15]

Incident reports should be completed on a routine basis for all department employees but generated whenever an officer has exceeded the threshold established by the agency.[16] For example, a police department may establish for citizen complaints a threshold of five complaints over a two-year period, and for the discharge of firearms, the threshold is an officer with three or more discharges of firearms within the past five years may exceed the threshold.[17]

The finished report should provide a brief synopsis of filed complaints, use of force incidents, and/or performance indicators and respective dispositions where available. However, the reports are not to draw any conclusions nor make any determinations concerning employee job performance. The purpose of the document is to help supervisory personnel to evaluate and guide their subordinates. The reports are not to form any basis for disciplinary action against the charged employee. It is intended to help the supervisor devise recommendations for action.

The supervisor should review the report with the subject officer and encourage him or her to provide insight into the itemized incident and problems identified in the report. After evaluating the report provided by the OPS, the supervisor may recommend that the officer be (1) reassigned; (2) retrained; (3) transferred; (4) referred to an employee assistance program; (5) given a fitness-for-duty evaluation; (6) dismissed pursuant to civil rules and regulations; (7) referred to an agency peer counselor; (8) referred to an agency-authorized mental health professional or; (9) allowed to return to work, because the officer's actions do not warrant immediate need for corrective action. The recommendation is then sent to the commander of the internal affairs department where each reviewing supervisor must either agree or disagree with the recommendation.[18]

Once the recommendation is approved by the commander of the internal affairs department, the employee is required to follow the plan to completion. The progress of the employee is to be monitored closely and reported to the agency CEO at intervals prescribed by the department. There are several variations on how employee performance can be monitored. Some systems use formal reviews, evaluations, and reporting of officers' performance by immediate supervisors for a period of several months. Other systems rely merely on informal commitment to reviewing officer's performance following intervention. Any indications of employee compliance or non-compliance are to be documented and kept for future references and/or evaluations.

**B.    Software Programs**

Numerous police departments use early warning software programs designed specifically to keep track of force related complaint data as well as the range of information required for a complete early warning system. The design and complexity of such tracking programs depend on the needs of specific police departments, but the overall design of such systems is relatively simple.

Depending on the specific needs of the agency, the software can either be developed from within the department (generally by a systems administrator) or by an outside contractor. Larger police agencies often seek more sophisticated programs and may use contractors that specialize in creating and developing databases and tracking software. Smaller police agencies that cannot afford the costs of hiring a contractor, can create a database using various database programs such as Microsoft Access or Excel.

It is beyond the scope of this discussion paper to examine the full array of software programs available. However, one program that may be mentioned as an example is the Internal Affairs Professional (IA Pro) developed by CI Technologies. IA Pro alerts internal affairs or other authorized personnel whenever an officer exceeds predefined thresholds established by the agency. The thresholds are customizable and can be altered to the agency's exact specifications.

An important function of internal affairs units is the generation of statistical reports. A feature of the IA Pro provides multiple statistical reports that can be designed by the user. IA Pro compiles statistical data automatically as new incidents are entered into the system. From the statistical data, the software is able to generate various charts and graphs. Examples of the report and graph categories include:

- Disciplinary History Reports;

5

- Abuse of authority;
- Conduct unbecoming to an officer;
- Corruption;
- Excessive use of force;
- Improper use of police equipment/vehicle;
- Officer criminal activity;
- Sexual harassment;
- Sex/Race based reports; and
- Monthly, Quarterly, and Annual reports

Another feature of IA Pro is visual case management which allows the investigator to easily view their case load, determine the status of the their cases, assess allegations and findings on the computer monitor. The program is also compatible with most word processors (e.g., Microsoft Word), which allows for simple data entry and report writing. The software allows for digital imaging where scanned images or images acquired through a digital camera can be linked to officers, citizens, and incidents. Employee identification photographs can be linked to employees, as can photographs from incidents.[19]

Other general features found in most early warning system software include the following:

- Playback of audio and video statements, interviews, surveillance, and pursuits;
- Expansion of the program to include EWS components;
- Capture of information on employee training and certification;
- Transfer use-of-force case data between OPS;
- Capture of shooting data such as type and caliber of weapons used, shots fired by officer(s) and suspect(s), distance, lighting, and last qualification date of officer(s).

As discussed earlier, the complexity of early warning system software is dependant upon the specific needs of the agency. A larger police agency with more statistical data to track may be inclined to seek outside assistance in creating and developing a more intricate program. A smaller agency with fewer tracking needs may prefer a simpler program.

## C. Problems and Drawbacks

Early warning systems are not without their drawbacks and potential problems. Drawbacks associated with early warning systems include the fact that an EWS:

- May have an adverse impact on an officer's career;
- May inhibit active and desirable police work;
- May lead some supervisors to "simply go through the motions" without taking the goals of the system seriously;
- May create a legal liability for the department if it fails to use the system; and
- May capture data that could be used in court against the department.[20]

It is important to note that although the goal of an early warning system is ultimately to deter officers from wrongful behavior, it may in fact lead officers away from conducting active police work that is both appropriate and consistent with the department's goals. The tendency for some police departments may be to install an early warning system because it is currently accepted, but make little effort to enforce the requirements that are needed to allow the system to operate efficiently and effectively. One authority argues that: "in such instances, an early warning system becomes little more than a symbolic gesture, designed to create the impression of a commitment to accountability but without the substance of real accountability."[21]

An issue that departments must overcome when installing an early warning system is maintaining the trust of their employees. All early warning systems rely heavily on employee confidence that it is for their benefit. It is difficult to help someone who isn't willing to be

helped. There needs to be cooperation from the subject employee in order to attain sufficient results from the system. A thorough implementation plan is needed that includes training and officer orientation.

Another problem faced by police departments is the potential legal issues that maybe involved. Many law enforcement agencies are reluctant to create an EW system for fear that it would create a database of officer misconduct that plaintiff attorneys may use against the department. However, an early warning system is more likely to protect an agency against liability in today's legal environment. It is clear that an early warning system is evidence that a department is making an effort to identify employees whose performance is deemed unsatisfactory, and that has a program is a conscientious effort to correct that behavior.[22]

A major issue is implementation – whether the content of the intervention specifically meets the needs or requirements of the program. The implementation of an early warning system is comparable to that of correctional treatment in the criminal justice system. Once the recommendations have been made involving the officer, steps must be taken to fulfill those recommendations. EWS programs operate under the assumption that there is some substantive treatment, that it is in fact delivered, that it is relevant to the target problem, that it has a positive impact on its subjects, and finally that it has no unintended negative effects.[23]

The main problem in the intervention process is whether or not some sort of intervention did indeed occur. This proves to be extremely important to both administrative and evaluative research. In some early warning systems, there was no way of knowing if any intervention was given, while some programs showed that the content of the intervention was consistent across all subject officers or consistent with the official goals of the program. Some of the problems involved counseling sessions that were often unrecorded and informal in nature, as such there was no way of documenting the content of the intervention. Under these conditions it is entirely possible that the content of the intervention may bear no relation to the overall goals of the early warning system and, even worse, that the content delivered may undermine the system entirely.[24]

In order for the intervention process of an early warning system to be effective, the department must establish a set of guidelines to ensure the consistent delivery of intended intervention content. Therefore, it is necessary to develop written guidelines and train supervisory personnel on the early warning system prior to program implementation.

**D.    Impact and Implications**

Results from research conducted at various police departments indicate that early warning systems have a dramatic effect in reducing citizen complaints and other indicators of problematic police performance. In a study conducted by Sam Walker, results illustrate that the average number of citizen complaints received by officers subject to early intervention dropped by 67 percent approximately one year after the initial intervention. Data from New Orleans also showed that officers responded positively to the early warning intervention.

Research has found early warning systems to have significant effects on supervisors as well. Existence of an intervention system communicates to supervisors their overall responsibility to monitor their officers and particularly those who have been selected by the EWS program. For example, the system used by the New Orleans Police Department requires that the supervisors monitor all identified officers under their command for six months and complete signed evaluations of the officers' performance every two weeks. Early warning systems encourage supervisors to change their overall behavior in order to affect the standards of supervision of all officers, not merely those officers who are subject to intervention.

**III.    CONCLUSION**

7

The emergence of early warning systems is the result of many different factors, the first being the recognition of the existence of "problem officers" –officers who receive a high rate of citizen complaints or whose records indicate other problematic behavior. The early warning system was created by professional organizations in order to identify and help officers who are in need of improving their overall performance.

It is the job of the office of professional standards to develop and maintain a department's early warning system. All employees of the department must be aware of the policies and procedures that are associated with the early warning system.  Data shows that the early warning system is effective in reducing citizen complaints and other forms of problematic police officer behavior.[25]

Studies have shown that the early warning system is an effective management tool in investigating and responding to problem police officers.  But can only be effective if it has a supportive developmental environment of commitment to accountability.

## Endnotes:

[1] "Kansas City Police Go After Their 'Bad Boys,'" *New York Times,* September 10, 1991; "Waves of Abuse Laid to a Few Officers," *Boston Globe,* October 4, 1992.

[2] U.S. Commission on Civil Rights, *Who Is Guarding the Guardians?* (Washington, D.C.: U.S. Government Printing Office, 1981), 81.

[3] U.S. Department of Justice, National Criminal Justice Reference Service, *Final Report: Responding to the Problem Police Officer: A National Study of Early Warning Systems,* by Samuel Walker, Geoffrey P. Alpert, and Dennis J. Kenney, August 2000.

[4] Commission on Accreditation for Law Enforcement Agencies, press release, March 28, 2001.

[5] Los Angeles Police Department, Legal Affairs Section, Risk Management Unit, "Report on Risk Management," final edition, June 1998.

[6] Lou Reiter, "Law Enforcement Administrative Investigations," second edition (Tallahassee, Fla.: Lou Reiter and Associates, 1998),chapter 8.

[7] U.S. Department of Justice, Office of Justice Programs, National Institute of Justice, *Early Warning System: Responding to the Problem Police Officer,* by Samuel Walker, Geoffrey P. Alpert, and Dennis J. Kenney, from the series National Institute of Justice Research in Brief, July 2001.

[8] U.S. Department of Justice, Bureau of Justice Assistance, *Building Integrity and Reducing Drug Corruption in Police Departments,* by the International Association of Chiefs of Police (Washington, D.C.: U.S. Government Printing Office, 1989), 80. Excerpted as "Police Ethics: Building Integrity and Reducing Drug Corruption," *Police Chief* 58, no. 1 (January 1991): 27-41.

[9] See IACP National Law Enforcement Policy Center, *Model Policy: Early Warning System,* August 2001.

[10] See IACP National Law Enforcement Policy Center, *Concepts and Issues Paper: Investigation of Employee Misconduct,* July 2001, section 3, part B.

[11] U.S. Department of Justice, *Final Report: Responding to the Problem Police Officer*.

[12] U.S. Department of Justice, *Building Integrity and Reducing Drug Corruption in Police Departments*, 80.

[13] See IACP National Law Enforcement Policy Center, *Model Policy: Early Warning System,* section 4, part B, no. 2.

[14] Ibid.*,* section 4, part B, no. 3.

[15] Ibid.*,* section 4, part C, no. 1.

[16] Ibid.*,,* section 4, part C, no. 2.

[17] U.S. Department of Justice, *Final Report: Responding to the Problem Police Officer*.

[18] See *Model Policy: Early Warning System,* section 4, part C, no. 5.

[19] For more information on IA Professional visit www.iaprofessional.com.

[20] Lou Reiter, "Law Enforcement Administrative Investigations," chapter 8.

[21] U.S. Department of Justice, *Final Report: Responding to the Problem Police Officer*.

[22] Ibid.*,* 1.24.

[23] Ibid.*,* 2.31.

[24] Ibid.*,* 2.32.

[25] Ibid.*,* 5.24.