# Columbus Division of Police

| | | | SUMMARY NO. 17 | PAGE 1 |
|---|---|---|---|---|

| CLASSIFICATION POLICE INVOLVED SITUATION (FATAL) | REPORT NUMBER 160822744 | CASE FILE NO. PIS 2016-0018 |
|---|---|---|
| INVOLVED OFFICER(S) P.O. BRYAN MASON #2467 | PLACE OF OCCURRENCE R/O 27 HOFFMAN AVE. | DATE OF OCCURRENCE SEPTEMBER 14, 2016 |
| DETECTIVE MARTIN KESTNER #1827 | DETECTIVE | SERGEANT |

## INFORMATIONAL SUMMARY #17:

SUBJECT:    INTERVIEW OF: <u>ANNA SICORA</u>
FEMALE / WHITE / 36
DOB:        11/5/1979
ADDRESS:    2770 E. LIVINGSTON AVENUE
COLUMBUS, OHIO 43209
PHONE:      614-560-6233

On September 14, 2016, a Police Involved Situation occurred in the rear of 27 Hoffman Avenue. At approximately 10:57 p.m., I, second shift Homicide/C.I.R.T. Detective Martin Kestner #1827, conducted an interview with Sister Anna Sicora after she had been identified as a potential witness to this incident. This interview took place in the rear of Cruiser #112, parked behind 957 E. Broad Street. The following is a summation of that interview:

Sister Sicora stated she was standing in the rear of 957 E. Broad Street, when she heard a commotion and saw a group of young people running and jumping over the fence, near E. Capital and S. 19th Street. (It should be noted that Sister Sicora is a catholic nun, who has come to the United States from Poland for mission work. Sister Sicora seemed to understand English with little or no trouble, but she struggled with being able to think of English words she wanted to use, so there was some language barrier). Sister Sicora related that the group of young people was African American, but she could not identify any of them. She said she saw at least two (2) Columbus Police officers running after the group westbound. She saw some other Police officers come up from a different angle and everybody stopped running. She heard a Police officer give verbal commands, but could not tell me exactly what was said except for **"Stop, stop, stop!"** Sister Sicora told me she did see an officer fire his weapon and that one (1) of the individuals fell to the ground. She could only tell me it was a male black and that he was skinny. Sister Sicora did not realize that the individual was shot with a gun. She said she thought the suspect was **"sleeping"**. I then realized that Sister Sicora thought the suspect had been struck with a taser, not a handgun. Sister Sicora then saw some other officers come running up and that was the extent of what she witnessed.

When asked, Sister Sicora stated that she did not count how many shots were fired, but she knew it was more than one (1). She did not see either of the individuals holding a gun.

The interview with Anna Sicora was concluded. This interview was audio recorded and a copy of that recording will become a permanent part of this investigative packet.

**EXHIBIT**
**Pl. Ex. 21**

## Columbus Division of Police

| SUMMARY NO. 17 | PAGE 2 |
|---|---|

| CLASSIFICATION POLICE INVOLVED SITUATION (FATAL) | REPORT NUMBER 160822744 | CASE FILE NO. PIS 2016-0018 |
|---|---|---|

The following day, after speaking with other members of C.I.R.T., I was unsure whether Sister Sicora was by herself when she witnessed this incident, or with other women from her group.

On September 15, 2016, at approximately 9:07 p.m., I called Sister Sicora and spoke with one of the other nuns in her group, fully identified as:

> **LEONA ZIELINSKA**
> **FEMALE / WHITE / 40**
> **DOB:** 10/1/1977
> **ADDRESS:** 2770 E. LIVINGSTON AVENUE
>               COLUMBUS, OHIO 43209
> **PHONE:** 614-560-6233

I told Sister Zielinska that I needed to ask her some questions to clarify what occurred last night. I asked her if she was with Sister Sicora at the time of the incident. She told me she was, that she, Sister Sicora, along with a third nun, fully identified as:

> **KINGA PORCZYNSKA**
> **FEMALE / WHITE / 33**
> **DOB:** 7/24/1983
> **ADDRESS:** 2770 E. LIVINGSTON AVENUE
>               COLUMBUS, OHIO 43209
> **PHONE:** 614-560-6233

were all standing in the rear of 957 E. Broad Street. She said she saw a commotion occurring on E. Capital Street, but that it happened very quickly. She then heard gunshots, at which point, she turned her back and ran for cover. Sister Zielinska said she never saw anybody fire a weapon; only heard gunshots.

I then asked her to put Sister Porczynska on the phone, which she did. Sister Porczynska's statement was very similar:

The three of them were standing in the rear of 957 E. Broad Street, when a commotion occurred on E. Capital Street. She said she heard gunshots, but never saw anything, and when she heard the gunshots she turned away and sought cover.

This is the extent of information regarding this phone call.

The investigation continues.

I-20.154 (4/2007)

# Columbus Division of Police

| SUMMARY NO. 17 | PAGE 3 |
| --- | --- |

| CLASSIFICATION POLICE INVOLVED SITUATION (FATAL) | REPORT NUMBER 160822744 | CASE FILE NO. PIS 2016-0018 |
| --- | --- | --- |

Respectfully submitted,

#1827

DETECTIVE MARTIN KESTNER #1827
Homicide Second Shift/C.I.R.T.

:MK
9/28/16

:sg
9/30/16

I-20.154 (4/2007)

| **Columbus Division of Police** | | SUMMARY NO.<br>41 | PAGE<br>1 |
|---|---|---|---|
| CLASSIFICATION<br>POLICE INVOLVED SITUATION<br>(FATAL) | REPORT NUMBER<br>160822744 | CASE FILE NO.<br>PIS 2016-0018 | |
| INVOLVED OFFICER(S)<br>P.O. BRYAN MASON #2467 | PLACE OF OCCURRENCE<br>R/O 27 HOFFMAN AVE. | DATE OF OCCURRENCE<br>SEPTEMBER 14, 2016 | |
| DETECTIVE<br>WILLIAM GILLETTE #1616 | DETECTIVE | SERGEANT | |

## INFORMATIONAL SUMMARY #41:

**SUBJECT:**      **THIRD INTERVIEW OF:**

> **DEMETRIUS EMANUEL BRAXTON**
> **MALE / BLACK /19**
> **DOB:**      **09/04/1997**
> **SSN:**      ███
> **LKA:**      **889 HERITAGE DRIVE E.**
>            **WHITEHALL, OHIO 43213**
> **PHONE:**      **614-400-4095 (CELL)**

***MR. BRAXTON IS CURRENTLY INCARCERATED AT THE FRANKLIN COUNTY JAIL\****

On October, 7, 2016, at approximately 12:48 p.m., a proffer was set up with Demetrius Braxton and his attorneys. This interview was conducted at the Franklin County Sheriff's Office Detective Bureau, located at 373 S. High Street, on the 3rd floor. The following people were present at this interview:

> **Detective William Gillette #1616**
> **Prosecuting Attorney Ron O'Brien**
> **Assistant Prosecuting Attorney James Lowe**
> **Attorney Marcus Ross (Representing Mr. Braxton)**
> **Attorney Lodema M'Poko (Representing Mr. Braxton, was listening on Mr.**
>      **Ross' Cell Phone)**

I, Homicide Cold Case/C.I.R.T. Detective William Gillette #1616, asked Mr. Braxton to start from the beginning, on September 14, 2016, with who he met and where they went. He stated, **"Everything I told in the past was a lie, so I am starting off with what really happened."**

Mr. Braxton related, at the beginning of the day he went to the Martin Luther King Library to hang out with his girl, **AKILAH**, and stated he does not remember her last name, but added that he can give me her Facebook page later on. He continued, saying he was hanging out with Akilah, because she was his girlfriend at the moment. (She has been fully identified as **AKILAH BULGER**, female black, 14 years of age.)

| | SUMMARY NO. 41 | PAGE 2 |
|---|---|---|
| **Columbus Division of Police** | | |

| CLASSIFICATION POLICE INVOLVED SITUATION (FATAL) | REPORT NUMBER 160822744 | CASE FILE NO. PIS 2016-0018 |
|---|---|---|

He received a phone call from a female, who he referred to as his sister, **"PREANNA"**, she told him she had just stolen her mother's car and was driving over to the Trevitt area to hang out with them (Trevitt is an apartment complex off of Old Leonard Avenue). After about an hour, Mr. Braxton and Akilah met up with her, got in the car, and they went back to the library. Once they left the library, they drove around and met up with Tyre (**TYRE KING**) and Jaronn (**JARONN COLLINS, CPD ID #118114J**). It should be noted, throughout the interview, Mr. Braxton was pronouncing his name as **"JAVONN"**, instead of Jaronn. They first saw Tyre and Jaronn sitting on the front porch at a residence, somewhere in Trevitt.

Preanna asked Tyre and Jaronn if they wanted to ride with them, which they did. While driving around, the conversation turned to guns, and Jaronn said, **"We ain't never slippin', Tyre has the little pole on him right now."** (Mr. Braxton said "the pole" was referring to a handgun.)

Mr. Braxton asked Tyre to see the gun, and after looking at it, he said, **"This isn't real, it's a BB gun."** Mr. Braxton related, they said, **"Well, nobody else will know,"** and he gave it back to Tyre, who put it back in his pants.

Mr. Braxton related, later in the day, they were running out of gas, so he decided to call his uncle and ask him for some gas money. He told them to drive out to Whitehall and he could get some gas money. Mr. Braxton related Jaronn came up with the idea to rob someone and they all agreed that Jaronn was supposed to do it.

Mr. Braxton related they drove to the gas station close to the crime scene, which turned out to be the BP gas station, located at 825 E. Broad Street, on the south side of Broad Street, just west of S. 18th Street. After they pulled onto the lot, Tyre noticed his father was at this gas station, so they all got back in the car and drove around the corner. The reason they left the gas station was because Tyre didn't want his dad to see him.

Once they parked, they all exited the car and started walking down the street. Mr. Braxton related it was Tyre's gun and Tyre gave it to Jaronn. As they were walking down the street, Jaronn first asked a lady for the time, trying to get someone close to him, so he could rob them. Mr. Braxton related Jaronn asked the victim, (referring to **MICHAEL AMES**) "what time it was", and the victim ignored him and kept on walking. Mr. Braxton said Jaronn couldn't do it, so Mr. Braxton got irritated and told Jaronn to give him the gun, he was going to do it. (Referring to robbing Mr. Ames).

After Mr. Braxton was in control of the gun, he ran up to the victim and told him, **"I need everything, don't move, just empty your pockets."** Mr. Braxton told him, **"Just leave the money and take the rest of your stuff and leave."** As the victim was walking away, Mr. Braxton told him, **"Do not turn around, at all."**

Mr. Braxton related Tyre had the gun up until the time of the robbery and then right after the robbery. After the robbery, Mr. Braxton gave the money to Preanna and some of them went to the

I-20.154 (4/2007)

| 🏛 **Columbus Division of Police** | | SUMMARY NO. 41 | PAGE 3 |
|---|---|---|---|
| **CLASSIFICATION** POLICE INVOLVED SITUATION (FATAL) | **REPORT NUMBER** 160822744 | **CASE FILE NO.** PIS 2016-0018 | |

car, but Mr. Braxton and Akilah stayed by the stop sign. Mr. Braxton stated he took off his sweatshirt and jeans and put them underneath a van. Mr. Braxton related he did this so the description the victim would give the police, would not match what he was wearing.

Mr. Braxton related he and Akilah walked back to the car, where the rest of them were, and that was when the cops started pulling up. Tyre said, **"Run,"** so he and Tyre took off running, and they jumped a gate. They also jumped another gate, while being chased by the officers. As they jumped the last gate, they landed in the alleyway and an officer told them to get down, which Mr. Braxton did. Mr. Braxton said Tyre kept on running and that was when he was shot.

I asked Mr. Braxton if he knew what Preanna's real name is, and he related that is her first name. He continued, saying she is his little brother's best friend and he calls her his little sister. At this time, he was shown two (2) photographs, the first one (1) was from his cell phone, of himself and the female he calls Preanna. The second photograph was a **Juvenile, CPD ID #119088J** photograph of **PREONA R. RUSSELL**, female black, 12 years old. After looking at the photographs, he said, **"That's her."**

Mr. Braxton was then shown Juvenile, CPD ID #118114J, Jaronn Collins, male black, 16 years of age. After looking at the photograph, he said, **"That's him."**

I asked Mr. Braxton to verify that the five (5) people inside the car were:

> **Demetrius Braxton (himself)**
> **Jaronn Collins**
> **Tyre King**
> **Akilah Bulger**
> **Preona Russell (Preanna)**

He responded, **"Yes."**

I asked Mr. Braxton why they choose this location to rob someone, and he said, **"No real reason, it's just where we ended up."** In answer to a question, while Jaronn was asking people, "what time it was," they were still together.

At this time, Mr. Ross gave me a sheet of yellow notebook paper, at which time, I drew E. Broad Street, S. 18th Street and Hoffman Avenue, to use as a diagram. This piece of paper will be made a permanent part of this case package.

I asked Mr. Braxton to use this diagram and explain which direction they went in after the robbery. While he was doing this, he told me where he hid his clothing, under the vehicle. He continued, saying that somebody already found them. I asked him if he went back and looked for them and he said, **"Yes."** I advised him that we found his clothing.

I-20.154 (4/2007)

| **Columbus Division of Police** | **SUMMARY NO.** 41 | **PAGE** 4 |
|---|---|---|
| **CLASSIFICATION** POLICE INVOLVED SITUATION (FATAL) | **REPORT NUMBER** 160822744 | **CASE FILE NO.** PIS 2016-0018 |

Mr. Braxton explained, after the robbery they all talked and decided after what happened, Mr. Braxton was too "hot" so he and Akilah walked away and the other three (3) would go get the car, put gas in it, and they would meet up with them after that. I asked Mr. Braxton if Preona used the money to put gas in the car, and he said, **"I assume so, because they got in a car chase the next day."**

Mr. Braxton related, when the cops arrived and they ran, Akilah got into the car with Preona. He told Tyre to get rid of the gun, but Jaronn told him to keep it, which he did. Mr. Braxton related that Jaronn (Collins) was the mastermind behind the robbery.

I asked Mr. Braxton, who had the gun when they parked and got out of the car, he said Tyre did and he gave it to Jaronn after he asked the first person "what time it was".

I asked Mr. Braxton if he talked with any of the other individuals involved in this situation, after he left Columbus Police Headquarters. Mr. Braxton replied he had called her dad. Mr. Ross asked, **"Whose dad?"** Mr. Braxton said, **"Preanna's dad."** He continued, saying they were calling him throughout the day, but Mr. Braxton told them he didn't know where Preanna/Preona Russell was. They were telling him to tell Preanna/Preona Russell to bring the car back. Mr. Braxton said he called them and told them he had been with her earlier in the day, but didn't know where she was now. Mr. Braxton did say he spoke with Akilah the next day, but he hasn't talked with her since.

Mr. Braxton related there was another female people were talking about, but she had nothing to do with this. I asked him if that was **CHAUNTELLA SHIRLEY**, and he said, **"Yes."** He continued, saying he met her a couple of days after this incident, through Facebook.

Mr. Braxton related Akilah's Facebook name is **"kekevsakilah"**, and she lives in Trevitt, by the freeway. Mr. Lowe pulled her up on Facebook and showed the picture to Mr. Braxton, who squinted his eyes to see the picture on the cell phone and said, **"That is her."** He also told me her phone number was in his cell phone under **"Wifey"**. He also related her password should be (**614loveakilah**) unless she changed it.

I asked Mr. Braxton if, what he had told me in the first interview was true, that when he and Tyre ran from the officers, they had jumped two (2) fences, he said yes and continued, saying, **"Everything I said about that point, the cop situation, was true, just the part about the robbery, I was lying about."**

In answer to a question, he related hearing four (4) gunshots.

I asked Mr. Braxton if he told me the truth about being able to see, he said **"No."** I asked again if that was true, Mr. Braxton stated, **"He didn't pull the gun out."** He continued, saying, **"I didn't tell you the truth about that, because I was still in shock and a little bit scared about the situation."**

I-20.154 (4/2007)

| **Columbus Division of Police** | | SUMMARY NO. 41 | PAGE 5 |
|---|---|---|---|
| CLASSIFICATION POLICE INVOLVED SITUATION (FATAL) | REPORT NUMBER 160822744 | CASE FILE NO. PIS 2016-0018 | |

I asked Mr. Braxton what the officer said, Mr. Braxton asked if I meant after the shooting and I said no, prior to the shooting. He replied, **"He told us to get down, get down now."** Mr. Braxton said, **"I got down and I was telling Tyre, 'Cuz, get down!'"** Mr. Braxton related, Tyre stopped for a second, then started running, and right after his first two (2) steps, that's when he got shot. Mr. Ross asked him, **"You had a clear view of that?"** Mr. Braxton said, **"Yes. I was like two feet (2') from him."**

I asked him what happened after that, he related the officers called them **"dumb niggers"**, saying they were dumb for trying to run. He said, **"I just kept my head down, hoping he didn't come over and shoot me."**

I asked Mr. Braxton directly, (since he never answered my question about wearing glasses) **"Do you have to wear glasses or not?"** Mr. Braxton related, **"I can see without my glasses, but it helps me more when I have glasses."** I reminded him that when we first talked, he told me he could not see in the distance, and asked him if that was true or not. He replied, **"I can't see distance, but I can see, if it's real far, I cannot see."**

Mr. Ross asked him, **"But you're saying you didn't have any problems seeing what just happened, what you are describing?"** Mr. Braxton related, **"No, I didn't have any problems seeing that, because I was watching them the whole time I was down."** Mr. Ross clarified, **"'Them' being the officers?"** Mr. Braxton replied, **"No, I was watching Tyre, hoping he was going to just get down."**

In answer to a question, Mr. Braxton related there was only one (1) officer at the time of the shooting. After Tyre got shot, two (2) more officers arrived, who had been following them behind the gates. And then another officer came from across the other side of the alley, for a total of four (4) officers. Mr. Braxton continued, saying other cop cars started showing up. Mr. Braxton related he was then handcuffed and placed in the back of a police cruiser (which was Cruiser #74 and the cruiser video and audio was copied onto a CD and will be made a permanent part of this case package).

Mr. Lowe asked him where Tyre had the gun, Mr. Braxton replied, **"Deep in his pants."** Mr. Lowe said, **"And he never made a move for the gun?"** Mr. Braxton said, **"Never."** Mr. Braxton continued, saying, **"It would have been hard for him to show the gun, because he had it deep down in his pants. You would not be able to see the handle out of the top of his pants."** Mr. Braxton didn't think Tyre would have a chance to get the gun, while he was running. Mr. Lowe asked, **"So when he fell, the gun was still in his pants?"** Mr. Braxton said, **"Yes."**

Mr. Ross asked Mr. Braxton if he saw what happened when he was placed in the cruiser, as far as Tyre's body. Mr. Braxton said, **"No, I didn't see what happened after that."** Mr. Ross asked him why that was and Mr. Braxton related the cruiser they put him in was far back, close to the exit. Mr. Ross asked, **"So you couldn't see what was going on with his body or the weapon, correct?"** Mr. Braxton said, **"No."**

I-20.154 (4/2007)

| | SUMMARY NO. 41 | PAGE 6 |
|---|---|---|
| ⬤ **Columbus Division of Police** | | |

| CLASSIFICATION POLICE INVOLVED SITUATION (FATAL) | REPORT NUMBER 160822744 | CASE FILE NO. PIS 2016-0018 |
|---|---|---|

Mr. Lowe asked, **"You said you don't think he could get down to it? Did you see his hands?"** Mr. Braxton said, **"Yes, he was running like this."** Mr. Ross said, **"His hands were above his waist?"** Mr. Braxton said, **"Yeah, his hands were above his waist."**

In answer to a question, Mr. Braxton said Tyre wasn't running towards him, he was running away from him, towards where the car was, but he could see the front of his (Tyre's) body. Mr. Ross asked, **"To his left?"** Mr. Braxton replied, **"Yeah."**

Mr. Lowe asked Mr. Braxton why he lied about what he saw originally, he said, **"I didn't want any of them to get in trouble."** Mr. Lowe stated, **"I am not asking you about the robbery, I am talking about why you lied about the police shooting?"** Mr. Braxton related, **"Because I was scared."** Mr. Ross asked, **"Scared of what?"** Mr. Braxton replied, **"The cops could try and kill me about it."** Mr. Ross said, **"Retribution, is the term."** Mr. Braxton continued, saying, **"I have never seen, I have read stuff like that, but I never thought any of that stuff could happen in my life, and especially in front of me, that was really scary."**

Mr. O'Brien asked him if he talked with some news reporters, Mr. Braxton related, **"I didn't really talk to reporters."** He continued, saying, **"When I went back, I was looking for my clothes, because my identification was in there. I really didn't care about my clothes, but I wanted my ID."** Mr. O'Brien asked him again about talking with a reporter. Mr. Ross asked Mr. Braxton, **"Did you talk to someone, who identified themselves as being from Channel 10?"** Mr. Braxton said, **"No, I didn't know he was a reporter. I thought he was some kind of investigator."**

Mr. Lowe asked Mr. Braxton what he told the reporter. Mr. Braxton said, **"The lie I told him (pointing to me)."** Mr. Lowe asked him, **"You mean about there being another guy?"** Mr. Braxton said, **"Yeah."** He didn't think he said anything to the reporter about the shooting. Mr. Braxton related, **"If I would have said something about the shooting, I would have told the reporter the same thing I told him (pointing to me)."** He wanted to make sure the same story was told, in case it got back to me, so the story would be the same.

While Mr. Lowe was asking Mr. Braxton some questions, I drew a map of the area where the shooting occurred and went over it with Mr. Braxton. I asked him if he remembered what kind, or color, the car was, which was parked behind 27 Hoffman Drive. Mr. Braxton said he thought it was gray, but related he couldn't remember. I asked him if it was facing south and he said yes. On the diagram, Mr. Braxton drew where he went to the ground, where the officer was standing, where Tyre was shot and fell to the ground. Mr. Braxton marked on the diagram that Tyre was shot and fell to the ground on the passenger's side of the vehicle.

I asked Mr. Braxton to sign the diagram, at which point, Mr. Ross said, **"Hold up."** He continued, saying, **"You had a clear, unobstructed view, and you said you were ahead of Tyre, at some point?"** Mr. Braxton said, **"Yeah, when Tyre ran that way, (meaning in a southeastern direction) I could see he wasn't pulling for nothing, and I could see his arms, and I could see the front of him."**

I-20.154 (4/2007)

| | | SUMMARY NO. | PAGE |
|---|---|---|---|
| **Columbus Division of Police** | | 41 | 7 |

| CLASSIFICATION | REPORT NUMBER | CASE FILE NO. |
|---|---|---|
| POLICE INVOLVED SITUATION (FATAL) | 160822744 | PIS 2016-0018 |

Mr. Ross asked Mr. Braxton, **"Is this diagram a fair representation of where you were, as in position, to where Tyre was, when he was shot?"** Mr. Braxton answered, **"Yeah,"** and signed and dated the diagram.

Mr. Lowe asked him, **"When you committed the robbery, where was everyone else?"** Mr. Braxton replied, **"Less than twenty feet (20') away."** Mr. Braxton related they were all together and said, **"After I took the BB gun, I broke off."** In answer to a question, Mr. Braxton related they never talked about robbing anyone else.

Mr. O'Brien asked Mr. Braxton if he had anything else he would like to add. Mr. Braxton related he was sorry about the whole situation and him being the adult, **"I tried to stop it, but I didn't try my hardest."** Mr. Braxton continued, adding that he asked his attorney, Lodema, if he could write an apology letter to Mr. Ames, but his attorney didn't think that would be in his best interest. Mr. Braxton related, **"I would tell him, I apologize from the bottom of my heart. If time is what I get, then that is what I deserve for the crimes I committed."**

At this time, Mr. Lowe used Mr. Ross' cell phone and took a picture of the diagram, (which will be made a permanent part of the case package) we were using during the interview, so he could send it to his co-counsel, Ms. M'Poko.

The interview was concluded and Mr. Lowe, Mr. O'Brien and I, stepped out of the room to discuss what we had just heard. While I was explaining information I had learned about the case, I put a black dot on the diagram that was used during the interview, by mistake. Instead of trying to remove this dot, I put my initials beside it, along with the date, to document that the picture on Mr. Ross' cell phone was going to look different than the one in the case package.

The investigation will continue.

Respectfully submitted,

DETECTIVE WILLIAM GILLETTE #1616
Homicide Cold Case/C.I.R.T.

:WG
10/12/16

:sg
10/13/16

I-20.154 (4/2007)



## COLUMBUS DIVISION OF POLICE

### INITIAL STATEMENT OF OFFICER

The following will be the audio-recorded *Initial Statement* of **COLUMBUS POLICE OFFICER BRYAN MASON #2467**, assigned to CRT5. This statement was made in the presence of:

Sgt. David Sicilian #5182       Homicide First Shift/C.I.R.T.
Sgt. Stan Latta #5124           Homicide Second Shift/C.I.R.T.
Attorney Russ Carnahan         Counsel for Officer Mason

This statement was conducted in the Command Bus, located at S. 18th Street just south of E. Broad Street, on September 14, 2016, beginning at approximately 10:41 p.m.

Questions were asked by Sgt. Sicilian; transcription was completed by Police Secretary Stephanie Gillette.

\*\*\*\*\*\*   \*\*\*\*\*\*   \*\*\*\*\*\*   \*\*\*\*\*\*   \*\*\*\*\*\*   \*\*\*\*\*\*   \*\*\*\*\*\*

This is in reference to:

| REPORT | CLASSIFICATION | INVOLVED OFFICER(S) | CASE FILE |
|---|---|---|---|
| 160822744 | Police Involved Situation (Fatal) | P.O. Bryan Mason #2467 | PIS 2016-0018 |

This interview is in reference to the Police Involved Situation, which occurred in the rear of 27 Hoffman Avenue, *Incident Number 160822744.*

| | |
|---|---|
| Sgt. Sicilian: | Sir, what is your full name, please? |
| P.O. Mason: | Bryan Mason. |
| Sgt. Sicilian: | And your age? |
| P.O. Mason: | Thirty-one (31). |
| Sgt. Sicilian: | Your badge number? |
| P.O. Mason: | Two-four-six-seven (2467). |
| Sgt. Sicilian: | Your current assignment, please? |
| P.O. Mason: | CRT5. |
| Sgt. Sicilian: | And what are your duty hours? |

Audio-Recorded *Initial Statement* of: Officer Mason
September 14, 2016
Page #2

| | |
|---|---|
| P.O. Mason: | Duty hours today were 2:00 to 10:00. |
| Sgt. Sicilian: | 2:00? |
| P.O. Mason: | 2:00 p.m. to 10:00 p.m. |
| Sgt. Sicilian: | Thank you. And what are your days off? |
| P.O. Mason: | Sunday/Monday. |
| Sgt. Sicilian: | On this date, what were your duty hours? |
| P.O. Mason: | 2:00 to 10:00. |
| Sgt. Sicilian: | Thank you. Were you on duty, working special duty, or off duty at the time of the incident? |
| P.O. Mason: | On duty. |
| Sgt. Sicilian: | Were, I notice you're in uniform. Were you in uniform, when the incident occurred? |
| P.O. Mason: | Yes. |
| Sgt. Sicilian: | Were you working with a partner? |
| P.O. Mason: | Yes. |
| Sgt. Sicilian: | And who was your partner? |
| P.O. Mason: | Uh, Robert Reffitt. |
| Sgt. Sicilian: | Are you injured in any way? |
| P.O. Mason: | No. |
| Sgt. Sicilian: | Are you aware that you may consult with an attorney, prior to making a formal statement about this incident? |
| P.O. Mason: | Yes. |
| Sgt. Sicilian: | Do you wish to make a full statement, at this time, with or without the benefit of counsel? |
| P.O. Mason: | No. |

Audio-Recorded *Initial Statement* of: Officer Mason
September 14, 2016
Page #3

Sgt. Sicilian:          Thank you. This will conclude the interview of Officer Mason. The time is
                        10:43 p.m.


                        ***   **End of Audio-Recorded Statement of Fact**   ***


:sg/9/19/16

**STATEMENT OF OFFICER BRYAN MASON, BADGE NO. 2467**

This statement is in regard to an incident that occurred on Wednesday, September 14, 2016, at approximately 7:45 p.m.  I am making this statement voluntarily as part of the investigation concerning this matter.

My date of hire as a police officer with the Columbus Division of Police is December 16, 2006.  My assignment is CRT-5, with Sunday and Monday off.  My regular duty hours are from 3:00 p.m. to 11:00 p.m., but on September 14, I was working from 2:00 p.m. to 10:00 p.m.  On the day of the incident, I was working with a partner, Officer Robert Reffitt (Badge #222) in Car 7514.  At the time that this incident occurred, I was in my uniform, and I was wearing my white uniform shirt with badge and Columbus Police patches.  I was carrying my Division issued Smith & Wesson, Model M&P, .40 caliber pistol, loaded with Division issued ammunition.  I had qualified with this weapon earlier in 2016.  I was not carrying a backup firearm.  I was wearing my prescription contact lenses.  My corrected vision and hearing are good.  I am in good health, and I do not take any medications that would impair my ability to perform my duties.  I had not consumed any alcohol in the twenty-four hours prior to my shift.

I bid for and received my current CRT-5 assignment after working a 2nd Precinct patrol assignment for approximately nine years.  I was interested in the CRT assignment because I understood that it places emphasis on community interaction, and includes bike patrol and other proactive policing efforts.  When I began my shift on September 14, 2016, it was my second day in the CRT-5 assignment.  Following roll call, I was partnered with Officer Robert Reffitt, who has experience in CRT and is familiar with the areas we would be patrolling.  I knew Officer Reffitt from having worked with him several times in special duty assignments.  Officer Reffitt was driving our cruiser during our shift.

We spent a portion of our shift looking for a car that was stolen from the Franklin Park

area, but we were unable to find it.  (It had been reported that occupants of the stolen car had

been flashing guns from inside the vehicle.)  At some point during the afternoon, Officer Reffitt

and I also made a traffic stop on a vehicle with expired tags.  The female driver of the car was

taking her child to a doctor's visit, and we let her go with a warning.  We also stopped and spoke

with a group of teenagers who were smoking and loitering behind a vacant house near Mt.

Vernon Plaza.  We asked the group to move on from that location, and they complied.

At approximately 7 p.m. we stopped to pick up food for our dinner, which we took to the

8 and 16 Precinct Substation.  When we finished our meal, we returned to our cruiser and were

leaving the Substation parking lot at approximately 7:40 p.m., when dispatch aired a call

involving an armed robbery in the area of 18th Street and E. Broad Street.  Officer Reffitt drove

west from our location to S. High Street, then north to E. Broad Street where he turned east.  As

we drove east, I informed Officer Reffitt of additional information that was being posted on

Patrol View (cruiser computer).  Based on the information being aired and posted, I understood

that an individual had been robbed at gunpoint by a group of at least three or four male black

suspects.  At least one of the suspects was described as wearing a black hoodie.  It was reported

that the suspects had fled southeast on foot.

As we approached the vicinity where the robbery had occurred a few minutes earlier,

Officer Reffitt continued east past a BP gas station on the south side of the street.  He then turned

right (south) on a street that I now know is Hoffman Ave., which is one block east of S. 18th St.

Almost immediately after we made the turn onto Hoffman Ave., I saw that there was a

northbound Columbus Police cruiser approximately one block south of us.  That cruiser quickly

came to a stop, angled northwest toward the sidewalk on the west side of Hoffman Ave.  I could

see at least one person, who appeared to a male black in a white tee shirt, standing on the sidewalk near the cruiser. At the same time, both of the cruiser doors came open, and two officers exited and ran directly west between houses on the west side of the street. Officer Reffitt stopped our car just south of the alley that runs east/west behind the properties on the south side of E. Broad Street. (I now know that the alley is E. Capital Street). I believed that the officers from the other cruiser were pursuing the robbery suspects, and I quickly exited our cruiser, saying to Officer Reffitt that they were running westbound. I ran west in the alley (E. Capital Street) thinking that I might be able to stop the suspects if they ran north from the other officers. Having knowledge that the suspects were wanted for an armed robbery with a gun, I drew my duty weapon as I ran westbound in the alley.

As I approached another alley that runs south from E. Capital Street behind the houses on the west side of Hoffman Ave., I saw a tall chain link fence running along the west side of that alley, which I now know is S. 19th Street. I looked south in the alley (S. 19th St.) and immediately saw two male blacks running northbound, at a full sprint, directly toward me. The males were approximately 15-20 yards south of me. The first male suspect, who I believe was dressed in all dark or black clothes, was running about 5 feet ahead and to the left (northwest) of the second male. At the same time, I saw two Columbus Police officers, who also were running northbound, and they were approximately 15-20 yards behind the two males. I moved a few steps south near the center of the S. 19th St. alley, raised my gun, and began shouting "Get down!" or "Get on the ground!" Almost immediately after I shouted these commands, the first male in dark clothing dropped down onto his chest near the middle of the alley, with his hands open and his arms spread out to the sides of his head. He was approximately 15 to 20 feet

3

south/southwest of me at that time, and I saw that the pursuing officers quickly were approaching him.

The second male suspect was running to the right and slightly behind (southeast of) the first male. The second male was wearing a light color shirt, and when I started to shift my focus to him, I could immediately see what I believed was the grip of a handgun that was tucked into his front waistband. As I repeatedly shouted "Get down!", the second male suspect (who I now know was Tyre King) continued running, veering northeast toward a car that was parked, facing south, in a small parking area located on the southeast corner of two alleys (S. 19th St. and E. Capital St.). I thought he was going to run past the driver's side of the parked car, but he came to a stop with a quick stutter step – facing north – approximately 3 feet in front of the car on the driver's side.

This second suspect looked directly at me before he grabbed the grip of the handgun in his waistband and tugged on it. I was intently focused on the suspect's hands and the potential threat of a gun in his waistband. While still shouting "Get down!", I quickly took one or two steps closer to the passenger side of the parked car, hoping it would provide me with some cover. My gun was raised and pointed at the suspect at that time, and he forcefully tugged on the grip of his gun at least one or two more times as if it were snagged on something. In that instant, his refusal to comply with my commands and his continuing attempts to pull the gun out, caused me to believe that he was going to engage me in a gun fight. He then pulled the gun out of his waistband and, as he raised it up in front of his torso, I could see it had a laser sight or light attached to the bottom of the barrel. I believed he was going to shoot me, and I fired my gun at him. Immediately after my first shot, the suspect began to spin clockwise (to his right), and,

4

immediately following my last shot, he dropped to the ground in front of the parked car. I moved a few steps forward so that I could see him, and I saw that Officer Reffitt was approaching from the north, with his gun drawn, along the driver's side of the parked car. At some point, I heard Officer Reffitt airing shots fired.

The suspect was laying on his chest, and I could see his left arm and hand to the left side of his body, but I could not see his right hand. He was not moving, and I positioned myself between the front of the parked car and the suspect. I asked Officer Reffitt to cover me, and I stepped forward to place handcuffs on the suspect, believing that his gun might be under him in his right hand. I was able to secure the handcuffs after pulling the suspect's right hand out. I then quickly scanned the area, and saw the suspect's gun, which appeared to be a dark color semi-automatic pistol with a laser sight attached to the bottom of the barrel. The gun was on the ground slightly in front, or slightly under the front bumper, of the parked car. At some point I believe that Officer Reffitt requested a Medic, and I saw that the first suspect (who had got down on the ground in the alley) had been handcuffed by the other officers. I also saw a group of approximately five nuns, who were standing in a parking lot north/northwest of me at the rear of a building on E. Broad Street.

Other officers began to arrive at the scene. During that time, I pointed out to other officers that two of my shell casings were on the ground. At some point, I also noticed that a panel on the grip of the suspect's gun had flipped open, and I thought that it could be a $CO_2$ powered BB or pellet gun (rather than a semi-automatic pistol). I believe that the Medics were arriving on the scene at the same time that I was leaving the area with Officer Support. I then went to the 11 and 12 Precinct Substation and waited there while the scene was secured.

5

When I fired my gun at the second suspect, he had just drawn a gun from his waistband and I believed he was going to shoot me.  I was in fear for my life at that time.  I was giving repeated, loud commands to the suspect to get down on the ground, and he was looking directly at me as I gave those commands and pointed my gun at him.  As the suspect forcefully tugged on the grip of his handgun to pull it from his front waistband, I was still ordering him to get on the ground.  When he did pull the gun out of his waistband, he raised it up in front of his torso with the barrel angled downward toward the west/northwest.  In that instant, I could clearly see a laser sight or light attached to the bottom of the barrel of the gun, which appeared to be a black semi-automatic pistol.  From the suspect's actions and his failure to comply with my commands, I believed he intended to shoot me and I fired my gun at him.

At the time I fired my gun, the suspect was standing approximately three feet in front of a car parked facing south on the southeast corner of the alleys known as S. 19th St. and E. Capital St.  I was standing approximately three feet west of the passenger side front tire of that parked car.  The suspect was standing approximately 8 to 12 feet southeast of me, and I could clearly see the front and the left side of his body from my position when I fired my gun.  I initially believed I fired two shots, but I now know that I fired three shots, all of which were in rapid succession.  My target was the suspect, center mass, and the backdrop for my shots was a wooden privacy fence that runs north/south along the back of the houses on the west side of Hoffman Ave.  I am not sure, but I believe I was using a strong right hand, two-handed grip, when I fired my gun.

I believe that the total time between first seeing the two suspects running toward me in the alley and firing my gun was approximately 5-8 seconds.  All three of my shots were fired in less than two seconds.  I had very little cover from the parked car (from my thighs down to my

6

feet) when I fired my gun.

It was dusk, at – or just after – sunset, when this incident occurred, and there was enough light for me to see the grip on the suspect's gun that was sticking out above his waistband as he ran toward me. I also was able to see him tug on the gun grip two or three times, before he pulled the gun up from his waistband. Before firing my gun, I did not see anyone in the vicinity other than the first male suspect (who had immediately complied with my commands and dropped onto the ground in the alley), the two Columbus Police officers who were running northbound in the alley, and the second male suspect. It was not until I began placing the second suspect in handcuffs that I noticed he appeared to be a young teenager. I did not hear either of the suspects say anything, at any time, during or after this incident.

When I fired my duty weapon, I did not believe that I had any other reasonable means to protect myself from death or serious injury.

This concludes my statement, and I am prepared to answer your questions.

2467    9-22-16

Officer Bryan Mason, Badge No. 2467

7

# COLUMBUS DIVISION OF POLICE

## FORMAL STATEMENT OF INVOLVED OFFICER

The following will be the audio-recorded *Formal Statement* of **COLUMBUS POLICE OFFICER BRYAN MASON #2467**, assigned to CRT5. This statement was made in the presence of:

| | |
|---|---|
| Sgt. Eric Pilya | Homicide Cold Case/C.I.R.T. Sgt. |
| Sgt. Stan Latta | Second Shift Homicide/C.I.R.T. |
| Det. William Gillette | Homicide Cold Case/C.I.R.T./Lead |
| Attorney Russ Carnahan | Counsel for Officer Mason |

This statement was conducted at Columbus Police Headquarters, 6th floor conference room, on September 22, 2016, beginning at approximately 5:04 p.m.

Questions were by Sgt. Pilya; transcription was completed by Police Secretary Stephanie Gillette.

\*\*\*\*\*\*\* \*\*\*\*\*\*\* \*\*\*\*\*\*\* \*\*\*\*\*\*\* \*\*\*\*\*\*\* \*\*\*\*\*\*\* \*\*\*\*\*\*\*

This is in reference to:

| REPORT | CLASSIFICATION | INVOLVED OFFICER | CASE FILE |
|---|---|---|---|
| 160822744 | Police Involved Situation (Fatal) | P.O. Bryan Mason #2467 | PIS 2016-0018 |

This Police Involved Situation, involving the above listed officer, occurred in the rear of 27 Hoffman Avenue, on September 14, 2016.

| | |
|---|---|
| Sgt. Pilya: | Officer, on September 14, 2016, first shift Homicide Sergeant David Sicilian, conducted an *Initial Interview* with you, concerning the incident which occurred in the rear of 27 Hoffman Avenue. At that time, you declined to make a statement concerning the incident under investigation. I understand that you have conferred with an attorney since that time, and you are now prepared to give a statement concerning your involvement in, and/or knowledge of, the incident. Is that correct? |
| P.O. Mason: | Yes. |
| Sgt. Pilya: | On September 21, 2016, I received a written statement from Attorney Carnahan, on your behalf. Is the statement you have before you, the same as the one that was sent to me? |
| P.O. Mason: | Yes. |

Audio-Recorded *Formal Statement* of:  Officer Mason
September 22, 2016
Page #2

Sgt. Pilya:     Have there been any changes, additions, or deletions to that statement since the time it was sent to me?

P.O. Mason:    The only addition, on the top of page #3, was a, a "be" where it says "who appeared to be. . ."

Sgt. Pilya:     Okay, the word "be" b-e?

P.O. Mason:    The word "be" b-e.

Sgt. Pilya:     Okay.  Is this voluntary statement, a true and accurate description of the facts of the incident, to the best of your recollection?

P.O. Mason:    Yes,

Sgt. Pilya:     Would you please sign this statement, in our presence, with today's date?  . . . (signing)

P.O. Mason:    Uh, what is today's date, again?

Sgt. Pilya:     22nd.

P.O. Mason:    22nd.

Sgt. Pilya:     Let the record reflect that this written statement will become a permanent part of this case package.  Do you wish to voluntarily answer the follow-up questions that we have for you at this time?

P.O. Mason:    Yes.

Sgt. Pilya:     For the record, your attorney is present with you, and you are represented by his counsel, at this time.  Is that correct?

P.O. Mason:    Correct.

Sgt. Pilya:     What is your date of appointment to the Columbus Division of Police?

P.O. Mason:    It would be December of 2006, I believe the 16th.  Somewhere around there.

Sgt. Pilya:     Do you wear glasses, contact lenses, or a hearing aid?

P.O. Mason:    Ah, glass, well, glasses or contact lenses.

Sgt. Pilya:     At the time, uh, the incident occurred, were you wearing either of those?

Audio-Recorded *Formal Statement* of: Officer Mason
September 22, 2016
Page #3

P.O. Mason:      Yes.

Sgt. Pilya:      Which?

P.O. Mason:      Contact lenses.

Sgt. Pilya:      And do you know what they correct your vision for?

P.O. Mason:      Uh, it's near sightedness.

Sgt. Pilya:      Okay. Do you have any physical disabilities?

P.O. Mason:      No.

Sgt. Pilya:      Are you currently on any prescription or over-the-counter medication that would impair your duties?

P.O. Mason:      No.

Sgt. Pilya:      Have you consumed alcohol in the past twenty-four (24) hours?

P.O. Mason:      No.

Sgt. Pilya:      When Officer Reffitt and you pulled southbound on Hoffman Avenue, and you observed the one (1) male black in the white t-shirt? Can you describe him in any greater detail?

P.O. Mason:      I can't. He was, he was too far off. About a block south, just the white t-shirt stuck out.

Sgt. Pilya:      Okay, nothing, uh, like hair, or, any other clothing?

P.O. Mason:      No.

Sgt. Pilya:      Nothing? Okay.

P.O. Mason:      Dark, a dark, it looked like dark colored pants, so.

Sgt. Pilya:      Okay. When you observed the two (2) suspects running north on S. 19th Street, towards you? Can you describe them in any greater detail?

P.O. Mason:      Uh, just one (1) male black. The one on, it would have been to the west, to my right, uh, male black, all dark clothing. Uh, then there was another male black, shortly behind him, to his southeast, that had, male black with a, like a white tank top.

Audio-Recorded *Formal Statement* of: Officer Mason
September 22, 2016
Page #4

Sgt. Pilya:        Okay. Did anything else stand out about those two?

P.O. Mason:     No.

Sgt. Pilya:        Height or?

P.O. Mason:     No, I mean other than that they were running full speed right at me.

Sgt. Pilya:        Okay. The suspect that complied with your command to get down on the ground, could you tell if he was holding a gun in either of his hands?

P.O. Mason:     No. I could see both of his hands and when he went down it was almost like a, head first slide into home, home base. He just kept his hands right out to his side.

Sgt. Pilya:        Okay. At that time did you perceive him to be a threat to you?

P.O. Mason:     No.

Sgt. Pilya:        When you observed the other suspect grab the grip of what you stated you believed was a handgun, in his waistband, do you recall which hand the suspect used to grab it?

P.O. Mason:     I do not.

Sgt. Pilya:        In your statement, you stated that the suspect **"pulled the gun out of his waistband and raised it up in front of his torso."** Could you describe exactly what his movements were at that time?

P.O. Mason:     He, uh, he had tugged on the gun a couple of times, and as soon as the gun had cleared his waist, his wais, his waistline, I could see the laser. The barrel was out past his waistline, but the gun was angled downward towards the ground. As, as he was pulling it out.

Sgt. Pilya:        Okay. And, and he had his elbow canted just at an angle?

P.O. Mason:     Right, almost 90, 90 degrees . . .

Sgt. Pilya:        To his body?

P.O. Mason:     . . . I call it the chicken wing, the arm had came out.

Sgt. Pilya:        Okay. At that time, did it ever cross your mind that this was not a real handgun?

P.O. Mason:     No.

Audio-Recorded *Formal Statement* of: Officer Mason
September 22, 2016
Page #5

| | |
|---|---|
| Sgt. Pilya: | When you fired your gun, what was your view of the suspect's body in relation to your position? |
| P.O. Mason: | My view was the entire front of his body and it would be his left side. |
| Sgt. Pilya: | So he was kind of canted to the left? |
| P.O. Mason: | He was, he was kind of canted, uh, not a lot, uh, and I was off to, obviously his, his west. Uh, off to his, it would have been off to his left side facing me. |
| Sgt. Pilya: | Okay. And in what direction did you fire your weapon? |
| P.O. Mason: | I fired my direction, uh, directly at him, uh, towards his left side, front area. |
| Sgt. Pilya: | Okay. Wha, and, and on a compass, what direction would that be? |
| P.O. Mason: | It would have been, southeast. |
| Sgt. Pilya: | Southeast? Okay. Did you fire all your rounds from the same location or were you moving and firing? |
| P.O. Mason: | I believe, I believe the first shot I might have been moving a little bit. And then the second two (2) I had planted, into shooter platform, basically, just square body. |
| Sgt. Pilya: | Okay. So from the first shot to the second and third shot, which way did you move? |
| P.O. Mason: | Closer to the, uh, closer to the car, and towards him. Closer to him. |
| Sgt. Pilya: | Okay. And when did you stop firing? |
| P.O. Mason: | As soon, as soon as he fell, I, uh, I stopped firing. Uh, he had kind of spun away from me and fell to the ground. And then I just maintained, uh, target awareness and approached. |
| Sgt. Pilya: | Okay. Did you, or did you observe any other officer attempt to render emergency medical aid to the suspect? |
| P.O. Mason: | I did not. |
| Sgt. Pilya: | Did you, or did you observe any other officer touch or move the suspect's weapon? |
| P.O. Mason: | No. |

Audio-Recorded *Formal Statement* of: Officer Mason
September 22, 2016
Page #6

| | |
|---|---|
| Sgt. Pilya: | When you handcuffed the suspect, did you also search him? |
| P.O. Mason: | I did not. I just cuffed him and stood over top of him. |
| Sgt. Pilya: | You now know the identity of one of the suspects as **TYRE KING**. Have you ever had any previous contact, personal or professional with Mr. King? |
| P.O. Mason: | I have not. |
| Sgt. Pilya: | The other suspect, that complied with your order to get down, was identified as **DEMETRIUS BRAXTON**. Have you ev, ever had any previous contact, personal or professional with Mr. Braxton? |
| P.O. Mason: | I have not. |
| Sgt. Pilya: | Have you ever been involved in a Police Involved Shooting before? |
| P.O. Mason: | I have. |
| Sgt. Pilya: | And did that previous incident affect your actions during this incident, in any way? |
| P.O. Mason: | The, the previous shootings, no. They have not. |
| Sgt. Pilya: | Detective Gillette, any further questions? |
| Det. Gillette: | No, sir. |
| Sgt. Pilya: | Sergeant Latta? |
| Sgt. Latta: | No, sir. |
| Sgt. Pilya: | Okay. Officer, I'm going to show you this sketch. It was created by our Crime Scene Search Unit, and if you notice up here in the corner, there's a compass. So if I ask you for a directionality please refer to that. I'm going to give you this red pen, and what I'd like you to do with that, is, I'd like you to show me your, uh, uh, direction of travel from, uh, out on Hoffman here, when you first, uh, became aware of the suspects? |
| P.O. Mason: | Okay. Uh, I had exited the cruiser, uh . . . |
| Sgt. Pilya: | If you want to, you can draw a box like we do on an accident diagram for your cruiser. |

Audio-Recorded *Formal Statement* of:  Officer Mason
September 22, 2016
Page #7

| | |
|---|---|
| P.O. Mason: | Okay.  Alright. . . .  (drawing)  And I had exited, uh, I'll make myself a circle here, uh, and proceeded directly west along the side of 27 Hoffman and ran directly to the alley.  Almost, almost to 19th, not quite to 19th. |
| Sgt. Pilya: | Okay.  And where were you located when you first saw the suspects running northbound in, at S. 19th? |
| P.O. Mason: | Almost right at the intersection of 19th and Capital, when I first saw them. |
| Sgt. Pilya: | Okay.  And then, according to your statement, you stepped out in, pretty much more into the middle of S. 19th?  Is that correct? |
| P.O. Mason: | Yes.  And, that's where Mr. Braxton had laid down, was right in this area here. |
| Sgt. Pilya: | Okay, could you, uh, put a "B" where you believe Mr. Braxton laid down? |
| P.O. Mason: | About right here. |
| Sgt. Pilya: | Okay.  And then where did you go from there? |
| P.O. Mason: | Uh, I pretty much stayed stationary right there, uh, until Mr. King had broke, broke off and Mr. King started running north and east. |
| Sgt. Pilya: | How about with the, uh, blue pen you give me a dotted line where, uh, Mr. King, uh, ran. |
| P.O. Mason: | Mr. King, he ran diagonal northwest. |
| Sgt. Pilya: | Okay.  And. . . |
| P.O. Mason: | Er, I'm sorry!  Northeast! |
| Sgt. Pilya: | . . . okay.  And where were you located when you fired your first round? |
| P.O. Mason: | My first round I believe I was, and I'll just mark an "X", uh, generally, probably in this area right here. |
| Sgt. Pilya: | Okay.  And for the tape recorder's purposes, you indicated that you were, uh, west of the car that was parked in the parking spot, on the passenger side of the vehicle? |
| P.O. Mason: | Correct. |
| Sgt. Pilya: | Okay. |

Audio-Recorded *Formal Statement* of: Officer Mason
September 22, 2016
Page #8

| | |
|---|---|
| P.O. Mason: | Actually, that's probably a little further forward, because I was right at the, I believe right, close to the pillar. |
| Sgt. Pilya: | On the passenger side? |
| P.O. Mason: | The passenger and driver side pillar door, there. |
| Sgt. Pilya: | Okay. And, that's where you fired your first shot? |
| P.O. Mason: | Correct. |
| Sgt. Pilya: | Okay. Could you put a "1" next to that "X"? Okay. And then could you, uh, put an "S" where you believe the suspect was when you fired your first round? |
| P.O. Mason: | Sure, uh, he was, he had stopped running right, basically right at the front driver side corner of the car. |
| Sgt. Pilya: | Okay. And then, could you put an "X2" where you were when you fired your second round? Okay. So you had moved a little bit south, uh, closer to the passenger side tire well? |
| P.O. Mason: | Right, right. |
| Sgt. Pilya: | Okay. When you fired your second round, was the suspect still in the same location? |
| P.O. Mason: | Yes. |
| Sgt. Pilya: | Okay. And then, your third shot that you fired, was it basically from the same location as "X2"? |
| P.O. Mason: | It was the s, it was the same exact location. |
| Sgt. Pilya: | Okay. Alright. And was the suspect in the same location for the third time you fired? |
| P.O. Mason: | Correct. |
| Sgt. Pilya: | Okay. Uh, when you fired your weapon, do you recall where any of the other officers were, at that time? |
| P.O. Mason: | I, I saw the two (2) officers coming north on S. 19th, uh, and I just knew that they were to the, they were to my west. I knew they were out of my line of fire. |
| Sgt. Pilya: | Okay. Uh, did they take care of, uh, Mr. Braxton? |

Audio-Recorded *Formal Statement* of: Officer Mason
September 22, 2016
Page #9

P.O. Mason:     They did.

Sgt. Pilya:     Okay. And, you never saw the suspects jump the fence? The first time you saw them, they were northbound on S. 19th? Is that correct?

P.O. Mason:     Uh, I act, I actually saw them, basically right at the fence. I didn't see them coming *over* the fence.

Sgt. Pilya:     Uh huh.

P.O. Mason:     Uh, I had initially thought that they had probably ran around fences, because I just didn't see them coming over the fences.

Sgt. Pilya:     Okay.

P.O. Mason:     And by the time I got around there, they were full sprint right ahead, so.

Sgt. Pilya:     Okay. And, just double checking, according to your statement, you didn't see any other people back in, uh, south of your location, at the time you fired?

P.O. Mason:     No.

Sgt. Pilya:     Detective Gillette, do you have further questions?

Det. Gillette:  No, sir.

Sgt. Pilya:     Sergeant Latta?

Sgt. Latta:     No, sir.

Sgt. Pilya:     Okay. Would you just sign your name down here, name, badge number, and today's date, please?

P.O. Mason:     You said sign?

Sgt. Pilya:     Yes. . . . (signing)

P.O. Mason:     22nd?

Det. Gillette:  Yep.

Sgt. Pilya:     Is this statement true to the best of your knowledge?

P.O. Mason:     Yes.

Audio-Recorded *Formal Statement* of:  Officer Mason
September 22, 2016
Page #10

Sgt. Pilya:          Do you wish to add or change anything in this statement, at this time?

P.O. Mason:          No.

Sgt. Pilya:          This will conclude this interview.  The time is now 5:18 p.m.


***   **End of Audio-Recorded Statement of Fact**   ***


:sg/9/23/16



NOT TO SCALE

| Offense: | Location: | | Date: |
|---|---|---|---|
| **POLICE INVOLVED SITUATION** | 27 Hoffman Avenue (Rear Of) | | 9/14/2016 |
| Investigator: | Drawn By: | Approximate Scale in Feet: | |
| Detective W. Gillette #1616 | Detective L. Shoaf #1217 | 0 5 10 15 20 25 30 35 40 45 50 55 60 65 70 | |