UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

DEARREA KING,

                **Plaintiff,**

    v.

CITY OF COLUMBUS, *et al*,

        **Defendants.**

**Case No. 2:18-cv-1060**
**JUDGE EDMUND A. SARGUS, JR.**
**Magistrate Elizabeth A. Preston Deavers**

<u>**OPINION AND ORDER**</u>

This matter is before the Court on Defendant Bryan Mason and Defendant City of Columbus' motions for summary judgment. (ECF Nos. 136, 137). Plaintiff Dearrea King responded in opposition to both motions, (ECF No. 141) and the Defendants both replied (ECF Nos. 145, 146). Plaintiff then filed a motion for leave to file a sur-reply to Defendant Mason's motion, (ECF No. 147), to which Mason responded (ECF No. 148). For the reasons that follow, the Court **DENIES** Defendant Mason's motion for summary judgment, (ECF No. 136), **GRANTS** Defendant City of Columbus' motion for summary judgment, (ECF No. 137), and **DENIES** Plaintiff King's motion for leave to file a sur-reply (ECF No. 147).

**I.**

This case involves genuine disputes of material fact, but whatever the facts may be, reasonable minds can only agree that what happened here was tragedy. A Columbus police officer shot and killed a thirteen-year-old named Tyre King. The officer was responding to an armed robbery; Tyre King and another were fleeing the scene. Some witnesses say the officer fired his weapon because Tyre King was pulling a gun. Others say he did no such thing and was only attempting to flee. In this system of justice, the public has faith that the jury will find the truth.

### A.  The Call

September 14, 2016, 7:43pm. "Radio to 9070 and 9111 if I could get your help on 12 Precinct. Are there any cars on 12 that can clear up? S12 if you could copy. I'm getting a [robbery–just occurred] at 18th and East Broad."[1] (Audio 02 2016-09-14_19.43.06_Ch63). Uniformed Officer Bryan Mason and his partner Robert Reffitt heard this radio transmission and responded to the call. (Mason Aff. at ¶¶ 5–6, ECF No. 136-2).

> Radio: "Have [person with gun]. Still waiting on additional. Saying that they are eastbound. Direction of travel is eastbound on foot. Suspect is a male black. Dark hoodie. Baggy Pants." (Audio 03, 2016-09-14_19.43.15_Ch63).
> …………………………………………[2]
>
> Radio: "Cars on the [robbery–just occurred], they are saying the suspect is going to be part of a group of 7 or 8 people." (Audio 04 2016-09-14_19.44.23_Ch63).
> ……………………………………
>
> Radio: "Cars on the [robbery–just occurred], looks like he ran eastbound through the Red Cross lot towards Bryden and Oak." (Audio 05 2016-09-14_19.45.05_Ch63).
> …………..
>
> Nelson special: "Nelson special. They're saying there are four kids all together. They're headed in a southeast direction." (Audio 06 2016-09-14_19.45.19_Ch63).
> ……………
>
> Radio: "Hey Chopper, we have a [robbery–just occurred] at 18th and East Broad Street. [Person with gun]. Suspect is going to be a male black. Dark hoodie. Baggy pants. And went eastbound on foot. And he's in a group of four kids." (Audio 07 2016-09-14_19.45.34_Ch63).
> ………………..
>
> Helicopter: "Understand. 18th and East Broad. We're coming from 8 Precinct. What was the description again?" (Audio 08 2016-09-14_19.45.53_Ch63).
> ………..
>
> Radio: "Male black. Dark hoodie. Baggy pants." (Audio 09 2016-09-14_19.46.03_Ch63).
> …….
>
> Helicopter: "Male black. Dark hoodie. Black pants. And did we get a direction of travel?" (Audio 10 2016-09-14_19.46.10_Ch.63).

---

[1] Where the radio transmission uses code, that code has been given its meaning. (Ex. 1, ECF No. 136-3).
[2] One dot equals one second.

……..

Radio: "Eastbound on foot." (Audio 11 2016-09-14_19.46.18_Ch63).

Officers Mason and Reffitt arrived on the scene. Mason saw a police cruiser approximately one block away, as it came to a sudden stop. (Mason Aff. at ¶ 11, ECF No. 136-2, PageID 2893). Two officers exited the cruiser and began running. (*Id.*). The two other officers were South of Mason and were running West. (*Id.*) Seeing this, Mason exited his cruiser (Reffitt was driving) and ran West along an alley while drawing his firearm. (*Id.* at ¶ 12). Running down the alley Mason approached a second alley leading to his left (South). (*Id.* at ¶ 13). He saw Demetrius Braxton and Tyre King running up that second alley in his direction. (*Id.* at ¶ 14). King was holding his pants as he ran. (Braxton Dep., ECF No. 127-1, PageID 1793). Braxton was 19 years old. (Braxton Dep., ECF No. 127-1, PageID 1556). King was 13 years old, 5'2" and 120 pounds. (Autopsy Report, Pl. Ex. 15 at 7, ECF No. 141-15). One witness said of King, "you could look at him and tell that he was just a little boy." (Scott Dep., ECF No. 130-1, PageID 2243).

What happened next is disputed.

## B.  Plaintiff's Version of Events

Mason was on his own at this point, he drew his gun and ordered Braxton and King to get down. (Braxton Dep., ECF No. 127-1, PageID 1599–1600, 1723–24; Scott Dep., ECF No. 130-1, PageID 2131). Braxton immediately dropped to the ground, King did not. (Braxton Dep. at PageID 1600, 1726; Scott. Dep. at PageID 2131). A witness to the events testified as follows: "[King] turned. He tried to turn, and it's a little cut [in the fence] there, he could have went back to Oak Street.  And as he turned, the police officer fired the first shot." (Scott. Dep. at PageID 2213–14). The witness insisted: "he was not reaching for no weapon. He was turning to run." (*Id.* at PageID 2244).

3

King was facing away from Mason when the first bullet struck him in the head. (Bauer Report at ¶ 18, ECF No. 141-19, PageID 4657; Scott Dep. at PageID 2141). "[A]t the time, he was already coming towards – the kid was already like he was falling." (Scott Dep. at PageID 2141). "[I]t was like a pop and then a pop-pop." (*Id.*) The next two bullets struck King as he was falling, going from front left to back right through his body in a steepening downward angle. (Bauer Report at PageID 4648–49) (Warning Graphic). King fell to the ground. Officer Reffitt was still in the cruiser at this point, (Scott Dep. at PageID 2222–24; Braxton Dep., ECF No. 127-1, PageID 1723–24), but within several seconds he was next to Mason.

Panting, Officer Reffitt Radioed in, "Madison and 18th. We have shots fired. Start a medic. Suspect down." (Audio 12 2016-09-14_19.46.25_Ch63). It was now twenty-five seconds past 7:46pm. (*Id.*) Mason handcuffed King. (Mason Aff. at ¶ 27, ECF No. 136-2).

"Fuck. Fuck. Fuck." shouted Mason. (Mason Dep., ECF No. 132-1, PageID 2676–77). Mason began to ramble, saying that Braxton and King "should have stopped," "should have gotten down." (Braxton Dep. at PageID 1616). He called Braxton and King "stupid," and "dumb,"—he called them "dumb [n****rs]." (*Id.*). Tyre King died shortly thereafter.

### C. Mason's Version of Events

As Mason approached the second alley, he saw Braxton and King running towards him at a full sprint. (Mason Aff. at ¶14, ECF No. 136-2; Mason Dep., ECF No. 132-1, PageID 2646). Raising his gun, Mason shouted, "Get down. Get down. Get down. Get down." (Mason Dep. at PageID 2647). Braxton complied. (*Id.*) At this point Officer Reffitt exited the cruiser and had a visual on the scene. (Reffitt Aff. at ¶ 7, ECF No. 136-19, PageID 2926). King was slightly behind Braxton; Mason could see a handgun grip in King's front waistband. (Mason Aff. at ¶ 16). King continued to run; he was running in the direction of a parked car. (*Id.* at ¶ 17).

Suddenly King stopped, stutter stepped, then looked "directly" at Mason, grabbing the grip of the handgun, and tugged. (*Id.* at ¶ 18). Mason again shouted, "Get down!" pointing his gun at King and moving towards the parked car. (*Id.* at ¶ 19). King tugged at the grip "at least one or two more times as if it were snagged or something." (*Id.* at ¶ 20). Then King pulled out the gun. (Reffitt Aff. at ¶ 8). Mason shouted, "Don't do it!" (*Id.*) King raised the gun in front of his torso and— Mason fired three times. (Mason Aff. at ¶ 21). King fell, dropping the gun; it landed beneath the front tires of the parked car. (Reffitt Aff. at ¶ 8). Officer Reffitt approached—"Madison and 18th. We have shots fired. Start a medic. Suspect down[,]" radioed Reffitt. (Mason Aff. at ¶¶ 24, 26). Mason, believing the gun to be under King, asked Officer Reffitt to cover him and cuffed King. (*Id.* at ¶ 27).

### D. The Aftermath

The police recovered a BB gun. The BB gun was not readily identifiable as a BB gun or a pistol with bullets. (*E.g.*, ECF No. 129-8).

### E. Procedural Posture

On September 14, 2018, the administrator to Tyre King's estate, Dearrea King, filed the instant lawsuit. (ECF No. 1). King's claims include a Fourth Amendment excessive force claim and a race-based Equal Protection Clause claim against the City of Columbus and Bryan Mason individually, under 42 U.S.C. § 1983; deliberate indifference to a serious medical need; and wrongful death. Mason and the City of Columbus moved separately for Summary Judgment; both motions are now fully briefed and ripe for review. (ECF Nos. 136, 137, 141, 145, 146).

## II.

Summary judgment is appropriate "if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court may therefore grant a motion for summary judgment if the nonmoving party who has the burden of proof at trial fails to make a showing sufficient to establish the existence of an element that is essential to that party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The "party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion and identifying those portions" of the record which demonstrate "the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323. The burden then shifts to the nonmoving party who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quoting Fed. R. Civ. P. 56(e)). "The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255 (citing *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 158–59 (1970)). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248; *see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (The requirement that a dispute be "genuine" means that there must be more than "some metaphysical doubt as to the material facts."). Consequently, the central issue is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Hamad v. Woodcrest Condo. Ass'n*, 328 F.3d 224, 234–35 (6th Cir. 2003) (quoting *Anderson*, 477 U.S. at 251–52).

At the summary judgment stage, the Court views the evidence in the light most favorable to King, the nonmoving party. *Young v. United Parcel Service, Inc.*, 575 U.S. 206, 135 S.Ct. 1338,

1347 (2015). King's version of events is supported by evidence, albeit disputed. Therefore, for the Defendants to succeed in their motions they must succeed on King's version of events.

## III.

### A. Officer Mason – Qualified Immunity

Mason moves for summary judgment on King's claim that Mason used excessive force in violation of the Fourth Amendment. Mason argues that there is no dispute of material fact and that his actions were reasonable. Relatedly, Mason argues that he is entitled to qualified immunity from suit. The issue of reasonableness under the Fourth Amendment is subsumed within the analysis of qualified immunity, and as such the two arguments will be analyzed as one.

Police officers receive a qualified immunity from suit unless (1) the officer violated the Constitution or laws of the United States, and (2) at the time, the right at issue was clearly established. *Saucier v. Katz*, 533 U.S. 194, 200 (2001); *Pearson v. Callahan*, 555 U.S. 223, 232 (2009). These two issues can be addressed in either order, though it is often easier to determine whether a right was clearly established after determining what exactly that right is and whether the officer violated it. *Lyons v. Xenia*, 417 F.3d 565, 581 (6th Cir. 2005) (Sutton, J., Concurring). The Court will begin by determining whether the facts establish a constitutional violation when viewed in the light most favorable to King.

### 1. Fourth Amendment – Excessive Force

The Fourth Amendment commands that "the right of the people to be secure in their persons . . . against unreasonable searches and seizures, shall not be violated." U.S. Const., Amend. IV. No seizure is of greater consequence than a seizure by means of deadly force. *Tennessee v. Garner*, 471 U.S. 1, 9 (1985) ("The intrusiveness of a seizure by means of deadly force is unmatched."). Not only does deadly force deprive a suspect of their most basic interest in life, it

also deprives the public of a criminal justice system ruled by law. (*See id.* at 10). In one moment, the officer becomes judge, jury, and executioner. There can be no appeal. For that reason, deadly force is reserved for only the most desperate of situations. Only in the case where an officer has probable cause to believe that deadly force is necessary to prevent imminent and serious bodily injury to himself, or serious bodily injury to another, is the officer's use of deadly force reasonable. *Garner*, 471 at 111.

Courts analyze an officer's decision to use deadly force "from the perspective of a reasonable officer on the scene," mindful that the situation is rapidly unfolding and officers, as anyone, are susceptible to misperception and error. *Graham v. Connor*, 490 U.S. 386, 396–97 (1989). Three helpful but non-exclusive factors to consider in gauging the reasonableness of force are "(1) the severity of the crime at issue; (2) whether the suspect poses an immediate threat to the safety of the officers or others; and (3) whether the suspect is actively resisting arrest or attempting to evade arrest by flight." *Mitchell v. Schlabach*, 864 F.3d 416, 421 (6th Cir. 2017). The ultimate determination must be based on the "totality" of the circumstances. *Id.*; *Graham*, 490 U.S. at 396 (quoting *Garner*, 471 U.S. at 8–9).

In this case, officers were responding to a call of an armed robbery. That is not disputed. Therefore, on the issue of reasonableness it is of no moment that King was carrying a BB gun rather than a real one. A reasonable officer responding to a report of an armed robbery could reasonably expect that the suspect would be armed. But just because a suspect is armed, without more, is no reason to shoot him. *See Thomas v. City of Columbus*, 854 F.3d 361, 366 (6th Cir. 2017).

Other circumstances within the totality include the officer's knowledge of the suspect acquired through the radio transmissions and sight, as well as the suspect's movements once

confronted by the officer. Here, the armed robbery sets the backdrop. The offense is plainly a violent one, and the suspect can be expected to remain armed. At the same time, based on the radio transmissions an officer would know he was dealing with a group of minors, and on seeing King that knowledge of his adolescence was confirmed. Moreover, when Mason confronted King, Mason already had his gun drawn, cocked, and pointed at King. And Tyre King, according to King's version of events, did not reach for a gun. Rather, King attempted to evade.

Mason makes much of the fact that a gun "can" be drawn in fractions of a second. (*E.g.*, Mason Reply at 2, ECF No. 145). According to Mason, King went for the gun in his waistband but had trouble pulling it out, tugging on it at least three times. According to Mason, it was only when King raised the gun that Mason fired. If that is indeed what happened, then Mason's decision to use deadly force was not unreasonable. Regrettable, tragic, but not unreasonable. If, however, a jury finds that King did not go for the BB gun, then that is a very different story.

Applying King's version of events, as this Court must do for purposes of summary judgement when there is evidentiary support, Mason fired when neither the he nor others were threatened with serious bodily injury. Mason had King in his sights, and King was not reaching for his BB gun. In that scenario, at the moment Mason fired his weapon and in the seconds before, the person threatened with serious bodily harm was not Mason, but King.

In short, if a jury finds that King did not reach for the BB gun, a disputed material fact, then Mason used excessive deadly force. Such force, if proven, constitutes an unreasonable seizure violating the Fourth Amendment.[3] The focus thus shifts to whether use of deadly force under these circumstances violates clearly established law.

---

[3] The Fourth Amendment being incorporated upon the States by the Fourteenth Amendment.

### 2. Clearly Established Law

Having established that the facts, when viewed in King's favor, establish a constitutional violation, the inquiry turns to whether the right was clearly established. That right: the freedom from the unreasonable use of deadly force. In excessive and deadly force cases, whether the right is clearly established typically requires a "particularized" inquiry and "depends very much on the facts of each case." *Brosseau v. Haugen*, 543 U.S. 194, 199, 201 (2004) (Per Curiam).

There are two presently recognized ways to determine whether a right is clearly established, both of which focus on whether a reasonable official would have had notice that his actions violated a constitutional right. First is the "particularized" inquiry into whether precedent "squarely governs the case here." *Brosseau*, 543 U.S. at 201. For the right to be clearly established, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). Courts "do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011). This Court looks to guiding statements of law from the Supreme Court, then the Sixth Circuit, then the other circuits to determine whether the official was on notice. *Hearring v. Sliwowski*, 712 F.3d 275, 280 (6th Cir. 2013). Second, certain conduct is so blatantly unconstitutional that the right is clearly established by common sense, without the need for precedent to state the obvious. *See Hope v. Pelzer*, 536 U.S. 730, 745 (2002) (Guards were on notice that they were cruelly and unusually punishing a prisoner due to the "obvious cruelty" of hitching him to a post for hours without any relief for water, urination, or bowel movements).

King cites to several Sixth Circuit cases to show that Tyre King's right against the use of deadly force under these circumstances was clearly established. (Pl. Resp., ECF No. 141, PageID

10

3122). Having reviewed these cases, the Court agrees. It is well and clearly established that even where the suspect has a weapon, an officer may not use deadly force unless he has a reasonable belief that the suspect poses a danger of serious physical harm to himself or others. *Bouggess v. Mattingly*, 482 F.3d 886, 896 (6th Cir. 2007).

The Sixth Circuit has denied qualified immunity in cases far closer than this one. There is a common theme among these cases: conflicting stories about what happened in the moments leading up to the shooting. As it typically goes, if the defendant-officer's story is believed then the shooting was not unreasonable, but if the plaintiff's story is believed then the officer's use of force was unreasonable. In those cases, as here, because "'the legal question of immunity is completely dependent upon which view of the facts is accepted by the jury,' the 'jury becomes the final arbiter of [a] claim of immunity.'" *Bouggess v. Mattingly*, 482 F.3d 886, 896 (6th Cir. 2007) (quoting *Brandenburg v. Cureton*, 882 F.2d 211, 215–16 (6th Cir. 1989)).

Beginning with *Brandenburg*, the Sixth Circuit held that where a reasonable juror might conclude that an officer using deadly force did not reasonably believe there was a threat of serious physical force to himself or others, qualified immunity could not be granted on summary judgment. *Brandenburg*, 882 F.2d at 215. In *Brandenburg*, the officers tried to serve a warrant on the Brandenburgs; Mr. Brandenburg fired multiple shots over their heads and threatened them with death. *Id.* at 213. The officers retreated and Brandenburg went to close the gate to his property. *Id.* One of the officers then shot Brandenburg, though they disputed whether or not Brandenburg was pointing his gun at the officers when he was shot. *Id.* at 215. The *Brandenburg* court found that "[i]f the jury determines that [the officer] fired on Brandenburg without a belief that someone was in danger of serious bodily injury then as a legal matter no reasonable officer could believe that such gunfire would not violate another's constitutional rights." *Id.* at 216.

11

Similarly, in *Dickerson v. McClellan*, the Sixth Circuit made clear that the focus is on dangerousness at the moment the suspect was shot. 101 F.3d 1151, 1162 (6th Cir. 1996) ("we limit the scope of our inquiry to the moments preceding the shooting."). There, officers responding to a top priority call of shots-fired entered Dickerson's house, smelled discharged gunpowder, and heard Dickerson threaten them. *Id.* at 1154–55. However, after that, and under Dickerson's version of events, when officers ultimately fired upon him they gave no warning and he had his arms down. *Id.* at 1163. The Sixth Circuit concluded that on Dickerson's version of the facts, the officer was not entitled to qualified immunity as the officer had violated Dickerson's clearly established right "to be free from excessive force." *Id.* at 1162–63.

Though King has brought additional cases to the attention of the Court, the discussion of one more should suffice: *Bouggess v. Mattingly*, 482 F.3d 886 (6th Cir. 2007). There, the officer and a suspect got into a scuffle and they may or may not have struggled over the officer's gun before the suspect fled and the officer shot him in the back. *Id.* at 888–89, 895. The individual was suspected of dealing crack and turned out to be armed. *Id.* at 889, 891. Denying qualified immunity due to disputes of material fact, the *Bouggess* court explained that "mere possession of a weapon is not enough to satisfy [defendant's] burden at this stage." *Id.* at 896.

Here, as in the previous cases, qualified immunity is tied to whose story the jury believes. If the jury finds that Mason shot King while King was attempting to evade arrest, and that King never reached for a gun (real or fake), then the jury could conclude that Mason lacked a reasonable belief that King posed a threat to anyone at the time Mason fired upon him.

Mason submits precedent for the proposition that it is not unreasonable for an officer to fire on a suspect in the process of pulling out and tossing aside what appears to be a gun. (Mason Reply at 4, ECF No. 145, PageID 4793) (citing *Nelson v. City of Battle Creek*, 802 Fed. Appx.

983m 988–89 (6th Cir. 2020). Mason's argument ignores that King's primary theory of the case is that Tyre King did not reach for the gun at all. Under that theory, which has some evidentiary support and which a reasonable jury could believe, Mason's use of deadly force was unreasonable.

If Mason fired upon King while King was attempting to evade arrest and was not going for the BB gun, then (1) Mason did not have probable cause to believe King posed a serious and imminent threat to himself or others, and (2) his use of force violated clearly established law. Because there is a genuine dispute of material fact, King's claim of excessive force cannot be subjected to summary judgment.

### B. Equal Protection

Mason also moves for summary judgment on King's Equal Protection claim. The Equal Protection Clause of the Fourteenth Amendment provides that no state shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const., Amend. XIV, § 1, cl. 4. Chief among the guarantees of the Equal Protection Clause is the equal protection of fundamental rights and the equal treatment of suspect classes. *See, e.g.*, *Romer v. Evans*, 517 U.S. 620, 631 (1996).

To prove that a plaintiff was deprived of the equal protection of the law in this context, a plaintiff must show "intentional discrimination against him because of his membership in a particular class." *Harris v. City of Circleville*, 583 F.3d 356, 369–70 (6th Cir. 2009). Accepting King's evidence as true and making all reasonable inferences thereon, King meets that burden. King presents evidence that Mason shot King then called him a "dumb [N-word]." (Braxton Dep., ECF No. 127-1, PageID 1616). Put another way, under King's version of events, Mason used unconstitutionally excessive force and followed it up with a racial slur. If the jury credits King's evidence, it could reasonably infer (or not infer), that Mason's shooting of King was motivated by

racial animus. If Mason fired upon King based on racial animus and not a threat of serious bodily injury, a jury could find that Mason deprived King of his constitutional right because of his race.

Mason argues that King's Equal Protection claim should fail because it is based on a "false" allegation, and because King has not produced evidence that other persons of another race were treated differently. (Mason Mot., ECF No. 136, PageID 2880–81). Whether or not Mason used a racial slur is a genuine dispute of material fact for the jury to decide. As to Mason's second argument, that argument is flawed in that it relies on cases of selective enforcement, not excessive force. A selective enforcement claim concerns the enforcement of an otherwise valid law in a discriminatory manner. *See* 13 Am. Jur. Proof of Facts 2d 609, Westlaw (database updated April 2021). For example, if an officer only gives speeding tickets to African Americans it could be because he is selectively enforcing the law in a discriminatory manner. Here, in contrast, King is claiming that the conduct was otherwise unlawful. That is, King claims that Mason used excessive force violating the Fourth Amendment and did so because of race in violation of the Equal Protection Clause.

To be clear, the parties dispute whether Mason used a racial slur and both parties present evidence to support their version of events, but it is not this Court's role to gauge credibility. It is for the jury to decide what actually happened. A reasonable jury could go either way. King's Equal Protection claim does not fail when the evidence is viewed in the light most favorable to him, and accordingly this Court cannot grant Mason summary judgment.

## C. Deliberate Indifference

Mason next moves for summary judgment on King's claim of deliberate indifference to a serious medical need. King agrees to voluntarily dismiss this claim, and so it is. (King Resp. at fn. 1, ECF No. 141, PageID 3097).

### D.  Wrongful Death

Next, Mason argues that he is entitled to summary judgment on King's Ohio law wrongful death claim because, according to Mason, the claim is barred by Ohio Rev. Code § 2307.60(B)(2) and he is afforded statutory immunity.

#### 1.  O.R.C. § 2307.60(B)(2)

Ohio Rev. Code § 2307.60(B)(2) bars recovery for a wrongful death where:

> The person engaged in conduct that, if prosecuted, could constitute a felony, a misdemeanor that is an offense of violence, an attempt to commit a felony, or an attempt to commit a misdemeanor that is an offense of violence and that conduct was the proximate cause of the injury or loss for which relief is claimed in the tort action, regardless of whether the person has been convicted of or pleaded guilty to or has been charged with committing the felony, the misdemeanor, or the attempt to commit the felony or misdemeanor.

Ohio Rev. Code § 2307.60(B)(2)(b).

However, as King observes, that division "do[es] not apply to civil claims based upon alleged intentionally tortious conduct, [or] alleged violations of the United States Constitution . . . ." Ohio Rev. Code § 2307.60(B)(4). The latter plainly applies, as King's wrongful death claim is based upon Mason's alleged use of excessive deadly force. Because the latter applies, the Court need not address whether the former also applies.

#### 2.  Statutory Immunity

Mason additionally argues that he is entitled to statutory immunity from liability for King's wrongful death claim. Under Ohio law, Mason is entitled to immunity from liability unless, relevantly, Mason's "acts or omissions" were done "in a wanton or reckless manner[.]" Ohio Rev. Code § 2744.03(A)(6)(b). For the same reasons as detailed above, if a jury finds that when Mason shot King he was not reaching for his BB gun, then the jury may also find that Mason's decision to fire was wanton and reckless.

### E. The City of Columbus – Municipal Liability

King's claims against the City of Columbus are for the alleged Fourth Amendment and Equal Protection violations and are brought under 42 U.S.C. § 1983. Briefly, King's Equal Protection claim against the City is dismissed on summary judgment. King, who bears the burden of proof, presents no argument or evidence that the City itself violated the Equal Protection Clause. The Court thus turns to King's excessive force claim against the City.

Under Federal law:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any state . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured  . . . .

42. U.S.C. § 1983.

It is now well established that a municipality may be held liable under § 1983, but only for its own acts. *Monell v. Dept. of Social Serv.*, 436 U.S. 658, 690–91 (1978). A municipality acts through custom and policy. *Id.* at 694; *City of Canton v. Harris*, 489 U.S. 378, 385 (1989). Custom or policy can take the form of (1) official policy or legislative enactment, (2) decisions or ratifications of final decision makers, (3) inadequate training or supervision, or (4) a custom of acquiescence to or tolerance of rights deprivations. *Jackson v. City of Cleveland*, 925 F.3d 793, 828 (6th Cir. 2019). King must establish the existence of a municipal custom or policy, a constitutional violation (addressed above), and a causal link between the two. *City of Canton*, 489 U.S. at 385.

1. **Official Policy or Legislative Enactment**

First, the City argues that King cannot point to any improper official policy or legislative enactment as the source of Mason's conduct. The Court agrees. King has not presented evidence of any improper legislative enactment or official policy. The City has presented evidence that CPD formal rules include, for example, Directive 2.01(II)(B)(1) that states, "[s]worn personnel may use deadly force when the involved personnel have reason to believe the response is objectively reasonable to protect themselves or others from the imminent threat of death or serious physical harm." (Paige Aff. at ¶ 27, ECF No. 136-23; Paige aff. Ex 4, ECF No. 136-27).

Using the first method of establishing municipal liability, a plaintiff must show "that there 'were formal rules or understandings—*often but not always committed to writing*—that [were] intended to, and [did], establish fixed plans of action to be followed under similar circumstances consistently and over time.'" *Jackson v. City of Cleveland*, 925 F.3d 793, 829 (6th Cir. 2019) (quoting *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480-81 (1986)) (emphasis and alteration in *Jackson*). King must "identify the policy, connect the policy to the city itself and show that the particular injury was incurred because of the execution of that policy." *Id.* (quotation omitted). King has identified two policies: (1) "that police officers are allowed to use deadly force if they experience subjective fear[,]" and (2) "for police officers to shoot when the suspect has their hand on a weapon or when they merely reach in the direction of a weapon." (King Resp., ECF No. 141, PageID 3130-31).

Regarding the first policy King identifies, King has not presented sufficient evidence to connect this policy to the City of Columbus. King attempts to connect this policy to the City using only the following:

BY MS. GELSOMINO:

Q. Is it the position of the department that speculative concern about potential danger can justify deadly force?

    MR. HALLORAN: Objection.

A. If the officer at the time she pulled the trigger believed him to be a threat to the public I would say yes.

BY MS. GELSOMINO:

Q. Even if she considered at the time that he could present a future threat to the public --

A. It was an apartment complex that had a lot of people out that day, so I believe she thought, this guy did a home invasion, now he has access to weapons, he's bold enough to steel a police car, in her mind he posed a threat to the public.

Q. And that's because of something he might do in the future?

    MR. HALLORAN: Objection.

A. That he had the capability to do based on what she was describing.

BY MS. GELSOMINO:

Q. Okay. So, is it the department's position that if an officer believes that a person has the capability of potentially committing harm in the future that that can justify the use of deadly force?

    MR. HALLORAN: Objection.

A. No. Your use of the terminology in the future is what I take exception with in this particular case. I believe that she felt that he was, you know, pretty much on a crime spree there. He committed a home invasion, he chases a police officer, he steels her cruiser, the cruiser has weapons in it, it's a densely populated area, and she believed that he was a danger to the public right then and there. I don't believe necessarily that your use of in the future was what she was thinking at the time she pulled the trigger.

Pilya Dep., ECF No. 141-1, ECF No. 3290–92). This testimony alone does not connect a policy

of allowing deadly force based on subjective fear to the City of Columbus.

    Regarding the second policy King identifies, King cites only to evidence of police training.

(King Resp., ECF No. 141, PageID 3131) (citing Shaw Dep., ECF No. 141-2, PageID3515, 3522).

This evidence fits more neatly with King's failure to train argument, and the Court will address it in more detail there.

### 2. Policymaker Ratification

Next, the City argues that King's evidence does not establish policy through ratification, the second method of establishing municipal liability. The Supreme Court has recognized that policy can come in the form of a single decision by a person with policymaking authority. *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480-81 (1986). In these cases, the policymaker must be the final decisionmaker. *See id.* at 485. That is, while a subordinate carries out the act itself, that subordinate was following the orders of this person, and this person's orders were final. The basic premise: my hand, your will. Evidence of such a one-shot policy can come in the form of orders preceding the act, as well as ratifications. *Compare id.* at 845 *with City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988) (plurality). In either event, the order must have a constraining effect on the subordinate's options, so that the subordinate's only option—outside disobedience—is to carry out the unlawful act. *Praprotnik*, 485 U.S. at 127.

King has not presented any evidence that Mason was carrying out the orders of anyone else, let alone someone with final decision-making authority. According to King, this case involves policy through ratification because a final decisionmaker ratified King's prior use of allegedly excessive force, and then did so again here, evidencing an existing and continuing policy. However, King's argument does not account for the fact that these ratifications did not involve a constraining of Mason's options. There is no evidence to suggest that the City would have viewed Mason as disobeying orders if he had not fired.

Moreover, a key component of King's theory is not supported by the evidence. King claims that the evidence shows that Mason previously fired on a non-threatening suspect and that the City

ratified this action. King's evidence does establish that in the past the CPD investigated Mason following his non-fatal shooting of a suspect. (Pl. Ex. 14, ECF No. 141-14, PageID 4567). The investigation documented both Mason's and the suspect's version of events. According to Mason the suspect was attempting to use his gun against Mason when Mason fired upon him. (*Id.* at 4575). According to the suspect he never went for the gun. (*Id.* at PageID 4568). The CPD concluded its investigation by finding that Mason's use of force was reasonable and conformed to policy. (*Id.* at 4567). King submits that this is evidence of the CPD ratifying Mason's prior use of excessive force. However, while this Court may make reasonable inferences in Mason's favor, it is not reasonable to infer that when the CPD concluded that Mason's use of force was reasonable, it did so believing the suspect's version of events.

Simply put, King's evidence does not support a finding of municipal liability under the theory of policy-through-ratification.

### 3. Failure to Train or Supervise

The third method of imposing liability upon a municipality is for its failure to train or supervise. To establish municipal liability for the CPD's alleged failure to train or supervise, King must show: "(1) the training or supervision was inadequate for the tasks performed; (2) the inadequacy was the result of deliberate indifference; and (3) the inadequacy was closely related to or actually caused the injury." *Ellis ex. rel. Pendergrass v. Cleveland Mun. School. Dist.*, 455 F.3d 690, 700 (6th Cir. 2006).

Here, whether the CPD's training or supervision shows a "deliberate indifference to the rights of persons with whom the police come into contact" is the determinative inquiry. *City of Canton v. Harris*, 489 U.S. 378, 388-89 (1989), A plaintiff can establish deliberate indifference by showing that either the City "fail[s] to provide adequate training in light of the foreseeable

consequences that could result from a lack of instruction[,]" or "fails to act in response to repeated complaints of constitutional violations by its officers." *Ellis*, 455 U.S. at 700-01 (quoting *Brown v. Shaner*, 172 F.3d 927, 931 (6th Cir. 1999)).

King's evidence includes several distasteful slides from a 2007 training PowerPoint, (Pl. Ex. 8, ECF No. 141–8, PageID 3993–95), testimony that the CPD trains officers to fire before a suspect pulls a gun depending on the totality of the circumstances, (Shaw Dep., Pl. Ex. 2, ECF No. 141-2, PageID 3515), and testimony that between 2009 and King's death a CPD representative could not recall any cases where the CPD fired an officer for excessive force (Pl. Ex. 1, ECF No. 141-1, PageID 3149, 3375). King submits that based on this evidence Mason's use of excessive force was foreseeable. (King Resp., ECF No. 141, PageID 3140). The Court does not agree.

As the City highlights, recruits receive over 1,000 hours of training, as well as continuing training once they become sworn officers. (Mason Ex. G at ¶¶ 12, 18, 20–21, ECF No. 136-23, PageID 2939-40). The PowerPoint slides at issue are from 2007 and are far from the only training CPD officers receive. Moreover, the CPD's training that an officer's decision depends on the totality of the circumstances does not evidence deliberate indifference. As to the seven-year period where the CPD representative could not recall an excessive force termination, that evidence falls short of the showing required to establish that the City was deliberately indifferent. Termination is not a police department's only tool, and King has not shown this Court evidence that the CPD's investigations into excessive force claims were deficient.

King's claim that the City can be held liable based on an alleged failure to train or supervise lacks sufficient evidentiary support to establish that the City was deliberately indifferent to the rights of those persons who came in contact with police.

4.  **Custom of Tolerance and Acquiescence**

The fourth way a plaintiff may establish municipal liability for a custom or policy is to establish that the municipality tolerated or acquiesced in the unconstitutional conduct to such an extent that the conduct can fairly be said to be customary. King must show:

> (1) the existence of a clear and persistent pattern of [illegal activity];
> (2) notice or constructive notice on the part of the [defendant];
> (3) the [defendant's] tacit approval of the unconstitutional conduct, such that their deliberate indifference in their failure to act can be said to amount to an official policy of inaction; and
> (4) that the [defendant's] custom was the "moving force" or direct causal link in the constitutional deprivation.

*Thomas v. City of Chattanooga*, 398 F.3d 426, 429 (6th Cir. 2005) (citation omitted). King contends that the City has a pattern of failing to truly investigate cases of excessive force such that it amounts to a custom of tolerance or acquiescence. However, King has not presented evidence establishing a "clear and persistent" pattern of excessive force by officers of the CPD.

Accordingly, King cannot establish that Mason acted pursuant to municipal custom or policy as is required to impose liability upon a municipality for a constitutional violation. The City is entitled to summary judgment.

## IV.

Lastly, King moved for leave to file a sur-reply to Mason's motion for summary judgment. (ECF No. 147). King argues that Mason raised new arguments in his reply brief, and that King should be allowed to respond. This Court typically does grant motions for leave to file a sur-reply where the opposing party raised new arguments in its reply. However, the Court does not agree that Mason raised new arguments in his reply brief.

## V.

In sum, the Court **DENIES** Bryan Mason's motion for summary judgment, (ECF No. 136), and **GRANTS** the City of Columbus's motion for summary judgement. (ECF Nos. 137). The Court also **DENIES** Dearrea King's motion for leave to file a sur-reply. (ECF No. 147).

**IT IS SO ORDERED.**

**8/3/2021**
**DATED**

**s/Edmund A. Sargus, Jr. 8/3/2021**
**EDMUND A. SARGUS, JR.**
**UNITED STATES DISTRICT JUDGE**